# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF
# NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>UNIVERSITY OF NORTH CAROLINA; UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS; JOHN C. FENNEBRESQUE, W. LOUIS BISSETTE, JR., JOAN TEMPLETON PERRY, ROGER AIKEN, HANNAH D. GAGE, ANN B. GOODNIGHT, H. FRANK FRAINGER, PETER D. HANS, THOMAS J. HARRELSON, HENRY W. HINTON, JAMES L. HOLMES, JR. RODNEY E. HOOD, W. MARTY KOTIS III, G. LEROY LAIL, SCOTT LAMPE, STEVEN B. LONG, JOAN G. MACNEILL, MARY ANN MAXWELL, W. EDWIN MCMAHAN, W. G. CHAMPION MITCHELL, HARI H. MATH, ANNA SPANGLER NELSON, ALEX PARKER, R. DOYLE PARRISH, THERENCE O. PICKETT, DAVID M. POWERS, ROBERT S. RIPPY, HARRY LEO SMITH, JR., J. CRAIG SOUZA, GEORGE A. SYWASSINK, RICHARD F. TAYLOR, RAIFORD TRASK III, PHILLIP D. WALKER, LAURA I. WILEY, as members of the Board of Governors in their official capacities; THOMAS W. ROSS, President of the University of North Carolina in his Official Capacity; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; CAROL L. FOLT, Chancellor of the University of North Carolina at Chapel Hill in her Official Capacity; UNIVERSITY OF NORTH CAROLINA BOARD OF TRUSTEES; W. LOWRY CAUDILL, ALSTON GARDNER, SALLIE SHUPING-RUSSELL, JEFFERSON W. BROWN, PHILLIP L. CLAY, HAYWOOD D. COCHRANE, DONALD WILLIAMS CURTIS, CHARLES G. DUCKETT, PETER T. GRAUER, KELLY MATTHEWS HOPKINS, STEVEN LERNER, DWIGHT D. STONE, ANDREW HENRY POWELL, as members of the Board of Trustees in their Official Capacity; JAMES W. DEAN JR., Executive Vice Chancellor and Provost in his Official Capacity; STEPHEN M. FARMER, Vice Provost, Enrollment, and Undergraduate Admissions in his Official Capacity,<br><br>        Defendants. | Case No. _____<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Students for Fair Admissions, Inc. brings this action to obtain, among other relief, a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants have employed and are employing racially and ethnically discriminatory policies and procedures in administering the undergraduate admissions program at the University of North Carolina at Chapel Hill ("UNC-Chapel Hill") in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). UNC-Chapel Hill's undergraduate admissions policies and procedures have injured and continue to injure Plaintiff's members by intentionally and unconstitutionally discriminating against them on the basis of their race and ethnicity.

## I. INTRODUCTION

1. This is an action brought under the Fourteenth Amendment and federal civil rights laws to prohibit UNC-Chapel Hill from engaging in intentional discrimination on the basis of race and ethnicity. "Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted). As a consequence, racial classifications are highly disfavored and have been permitted only when there is a compelling government interest that cannot be met through race-neutral means. In the educational setting, "diversity" is the only interest the Supreme

2

Court has found compelling. Even then, the Supreme Court has mandated strict judicial scrutiny to ensure that an academic institution is actually pursuing that interest and that it is absolutely necessary to employ racial preferences in order to achieve a diverse student body.

2.     Yet the Supreme Court has always had misgivings about its decision to permit *any* use of racial preferences in university admissions. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring in part and concurring in the judgment). The Supreme Court was nevertheless convinced to permit racial preferences in pursuit of diversity for two reasons. First, based mainly on an *amicus* brief that Harvard submitted, the Supreme Court was led to believe that schools only would "take account of race as one, nonpredominant factor in a system designed to consider each applicant as an individual." *Grutter v. Bollinger*, 539 U.S. 306, 387 (2003) (Kennedy, J., dissenting) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-91 (1978)). Second, the Supreme Court believed that the "strict scrutiny standard [would] operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort." *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

3.     The Supreme Court was misled. No college or university, including UNC-Chapel Hill or Harvard itself, merely uses race contextually to fill the last few seats in the entering freshman class. Indeed, UNC-Chapel Hill adamantly denies that it uses race in this manner. UNC-Chapel Hill, like all other colleges and universities,

3

labels every applicant by race on the claim that it is pursuing the so-called "critical mass" diversity objective. That creates two problems for UNC-Chapel Hill. First, by failing to implement the "Harvard Plan" rationale that led to the permissibility of racial admissions preferences, UNC-Chapel Hill has deprived the Court of any continuing "authority to approve the use of race in pursuit of student diversity." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Second, UNC-Chapel Hill's claimed interest—critical mass—never should have been endorsed and should be outlawed once and for all. "[T]he concept of critical mass is a delusion used … to mask [an] attempt to make race an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas." *Id.* at 389.

4. Worse still, UNC-Chapel Hill is not even pursuing its claimed "critical mass" interest. Rather, even under governing precedent, UNC-Chapel Hill is violating the Fourteenth Amendment and federal civil rights laws for at least two reasons. First, UNC-Chapel Hill is not using race merely as a "plus factor" in admissions decisions. Rather, UNC-Chapel Hill's racial preference for each underrepresented minority student (which equates to a penalty imposed upon white and Asian-American applicants) is so large that race becomes the "defining feature of his or her application." *Grutter*, 539 U.S. at 337. Only using race or ethnicity as a dominant factor in admissions decisions could, for example, account for the disparate treatment of high-achieving Asian-American and white applicants and underrepresented minority applicants with inferior academic credentials. UNC-Chapel Hill's admissions decisions simply are not explainable on grounds other than

4

race. High-achieving Asian-American and white applicants are as broadly diverse and eclectic in their abilities and interests as any other group seeking admission to UNC-Chapel Hill. They compete in interscholastic sports, are members of the school band, work part-time jobs after school, travel, and engage in volunteer work just like everyone else. It is not a lack of non-academic achievement that is keeping them from securing admission. It is UNC-Chapel Hill's dominant use of racial preferences to their detriment.

5. Second, UNC-Chapel Hill is using race in admissions decisions when race-neutral alternatives can achieve diversity. As other elite universities have shown, increased utilization of non-race-based criteria, such as socioeconomic preferences, can promote diversity about as well as racial preferences. This approach is particularly effective when combined with increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants and the elimination of admissions policies and practices, such as legacy preferences and early admission, which operate to the disadvantage of minority applicants. Further, eliminating racial preferences at UNC-Chapel Hill will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preferences, the North Carolina community, and society as a whole. Racial preferences are a dangerous tool and may only be used as a last resort. There is now overwhelming evidence that race-neutral alternatives render reliance on racial preferences unnecessary.

6.　　UNC-Chapel Hill's refusal to avail itself of race-neutral alternatives is especially troubling given that it knows at least one form of socioeconomic preference would be workable. UNC-Chapel Hill conducted its own study to determine whether granting automatic admission to North Carolina students in the top ten percent of their high school class would work about as well as racial preferences in achieving diversity.　The study showed that a percentage plan would in fact work *better* than racial preferences in achieving diversity in that such a plan would boost minority enrollment.　The pretextual reasons UNC-Chapel Hill gave for deeming this alternative unworkable, such as a trivial decrease in average SAT scores, will never survive strict judicial scrutiny given how disfavored the use of race is under the Fourteenth Amendment.　The fact that it requires a lawsuit to make UNC-Chapel Hill install a race-neutral alternative that it already knows will increase diversity on its campus is discouraging.　It was UNC-Chapel Hill's responsibility to take full advantage of this alternative on its own accord, not to stubbornly resist abandoning racial preferences until a federal court orders it to do so.

7.　　Accordingly, there is no doubt that UNC-Chapel Hill is in violation of the Fourteenth Amendment and federal civil rights laws.　The only question is the proper judicial response.　Given what is occurring at UNC-Chapel Hill and other schools, the proper response is the outright prohibition of racial preferences in university admissions—period.　Allowing this issue to be litigated in case after case will only "perpetuate the hostilities that proper consideration of race is designed to avoid." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting).　UNC-Chapel Hill and

6

other academic institutions cannot and should not be trusted with the awesome and historically dangerous tool of racial classification. As in the past, they will use any leeway the Supreme Court grants them to use racial preferences in college admissions—under whatever rubric—to engage in racial stereotyping and other forms of discrimination to advance their social-engineering agenda. Strict scrutiny has proven to be no match for concerted discrimination hidden behind the veil of "holistic" admissions. There may be times when social problems can be solved democratically. But massive resistance to racial equality is not one of them. *See Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). "The moral imperative of racial neutrality is the driving force of the Equal Protection Clause …. Structural protections may be necessities if moral imperatives are to be obeyed." *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment).

## II.  JURISDICTION AND VENUE

8.     This action arises under section 1 of the Fourteenth Amendment to the United States Constitution and under federal civil rights statutes 42 U.S.C. §§ 1981, 1983, and 2000d *et seq*. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.     Venue is proper in the Middle District of North Carolina under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the Middle District of North Carolina.

## III.    THE PARTIES

### A.    Plaintiff

10.    Plaintiff, Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3) organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.  More specifically, SFFA seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions.

11.    SFFA is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their parents, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions.  SFFA has members throughout the country.

12.    Edward Blum is the President of SFFA.  *See **Exhibit A***, Declaration of Edward Blum ("Blum Dec.") ¶ 2.

13.    SFFA has at least one member ("Applicant") who applied for and was denied admission to UNC-Chapel Hill's 2014 entering class.  Blum Dec. ¶ 4.

14.    Applicant is white.  Blum Dec. ¶ 5.

15.    Applicant had a weighted GPA of 4.4839 at a public high school that U.S. News and World Report ranks as one of the top five high schools in North Carolina and in the top 1 percent of all high schools nationwide.  Blum Dec. ¶ 6.

16.     Applicant achieved a score of 2180 on the SAT I (800 Reading (Perfect) + 710 Math + 670 Writing).  Applicant achieved a perfect score of 800 for SAT II Physics and a perfect score of 800 for SAT II Math.  Applicant had a composite ACT score of 32.  Blum Dec. ¶ 7.

17.     Applicant completed five Advanced Placement ("AP") courses, scoring a perfect "5" on all but one AP exam and scoring a "4" on the other.  Applicant was named an AP Scholar of Distinction.  Blum Dec. ¶ 8.

18.     While in high school, Applicant participated in numerous extracurricular and volunteer activities.   Among other things, Applicant was a member of the varsity cross country team, a teaching associate for students in Latin II, completed a collegiate computer programming course, and held a part-time job.  Blum Dec. ¶ 9.

19.     Applicant was denied the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of race or ethnicity due to UNC-Chapel Hill's discriminatory admissions policies.  Blum Dec. ¶ 10.

20.     Applicant was accepted to and has enrolled at another university in North Carolina.  Applicant is ready, able, and intends to seek to transfer to the UNC-Chapel Hill when it stops discriminating against applicants on the basis of race and ethnicity in violation of the Fourteenth Amendment and federal civil rights laws.  Blum Dec. ¶ 11.

21.     SFFA has members who are currently in high school and intend to apply for admission to UNC-Chapel Hill ("Future Applicants").  Blum Dec. ¶ 12.

22.     Future Applicants will be denied the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of race or ethnicity due to UNC-Chapel Hill's discriminatory admissions policies.  As a result, Future Applicants may be denied admission to UNC-Chapel Hill because of these discriminatory policies.  Blum Dec. ¶ 13.

23.     SFFA has members whose children intend to apply for admission to UNC-Chapel Hill ("Parents").  Blum Dec. ¶ 14.

24.     Parents' children will be denied the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of race or ethnicity due to UNC-Chapel Hill's discriminatory admissions policies.  As a result, Parents' children may be denied admission to UNC-Chapel Hill because of these discriminatory policies.  Blum Dec. ¶ 15.

B.     **Defendants**

25.     The University of North Carolina is a public, multi-campus university system authorized and governed by Article 9, Section 8 of the North Carolina Constitution and Chapter 116 of the North Carolina Revised Statutes.  It is composed of the following constituent institutions: Appalachian State University, East Carolina University, Elizabeth City State University, Fayetteville State University, North Carolina Agricultural and Technical State University, North Carolina Central University, North Carolina School of Science and Mathematics, North Carolina State

10

University at Raleigh, The University of North Carolina at Asheville, The University of North Carolina at Chapel Hill, The University of North Carolina at Charlotte, The University of North Carolina at Greensboro, The University of North Carolina at Pembroke, The University of North Carolina at Wilmington, University of North Carolina School of the Arts, Western Carolina University, and Winston-Salem State University.

26.     The University of North Carolina is funded by the State of North Carolina and the Federal Government.  As a recipient of direct and indirect financial assistance from the Federal Government, the University of North Carolina, as well as all of its programs and activities, including those of UNC-Chapel Hill, are subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq*.

27.     The University of North Carolina Board of Governors is the policy-making body charged with the general determination, control, supervision, management, and governance of all affairs of the University of North Carolina's constituent institutions, including UNC-Chapel Hill.  The Board of Governors elects the President of the University of North Carolina, who administers the university.

28.     John C. Fennebresque, W. Louis Bissette, Jr., Joan Templeton Perry, M.D., Roger Aiken, Hannah D. Gage, Ann B. Goodnight, H. Frank Grainger, Peter D. Hans, Thomas J. Harrelson, Henry W. Hinton, James L. Holmes, Jr., Rodney E. Hood, W. Marty Kotis III, G. Leroy Lail, Scott Lampe, Steven B. Long, Joan G. MacNeill, Mary Ann Maxwell, W. Edwin McMahan, W. G. Champion Mitchell, Hari H. Nath, Anna Spangler Nelson, Alex Parker, R. Doyle Parrish, Therence O. Pickett,

David M. Powers, Robert S. Rippy, Harry Leo Smith, Jr., J. Craig Souza, George A. Sywassink, Richard F. Taylor, Raiford Trask III, Phillip D. Walker, and Laura I. Wiley are the voting members of the University of North Carolina Board of Governors. Each member is elected by the North Carolina General Assembly for a four-year term. The members of the Board of Governors are sued in their official capacity.

29. Thomas W. Ross is the President of the University of North Carolina. The President is the chief administrative and executive officer of the University of North Carolina. The President has complete authority to manage the affairs and execute the policies of the University of North Carolina and its constituent institutions, subject to the direction and control of the Board of Governors and the provisions of The Code of the Board of Governors of The University of North Carolina. He is sued in his official capacity.

30. UNC-Chapel Hill is a public research university located in Chapel Hill, North Carolina. UNC-Chapel Hill is a constituent institution of the University of North Carolina system.

31. Carol L. Folt is the Chancellor of UNC-Chapel Hill. The Chancellor exercises complete executive authority over UNC-Chapel Hill, subject to the direction of the President. The Chancellor is responsible for carrying out policies of the Board of Governors and of the Board of Trustees of UNC-Chapel Hill. She is sued in her official capacity.

12

32.     The UNC-Chapel Hill Board of Trustees is charged with promoting the sound development of its institution within the functions prescribed for it and serving as advisor to the Board of Governors and to the Chancellor of the University of North Carolina at Chapel Hill.  The Board of Trustees also has other powers and duties that are defined and delegated by the Board of Governors.

33.     W. Lowry Caudill, Alston Gardner, Sallie Shuping-Russell, Jefferson W. Brown, Phillip L. Clay, Haywood D. Cochrane, Donal Williams Curtis, Charles G. Duckett, Peter T. Grauer, Kelly Matthews Hopkins, Steven Lerner, Dwight D. Stone, and Andrew Henry Powell are members of the UNC-Chapel Hill Board of Trustees. They are sued in their official capacity.

34.     James W. Dean Jr. is the Executive Vice Chancellor and Provost at UNC-Chapel Hill.  The Provost leads UNC-Chapel Hill in its academic planning and in the setting of academic values, policies, and practices.  He is responsible for providing guidance to the dean of each school, is the Chair of the Deans' Council, and is accountable for regularly evaluating the deans, vice provosts, and selected vice chancellors, as well as candidates for those positions.  He is sued in his official capacity.

35.     Stephen M. Farmer is the Vice Provost for Enrollment and Undergraduate Admissions at UNC-Chapel Hill.  The Vice Provost directs the selection and recruitment of the undergraduate student body at UNC-Chapel Hill.  He is sued in his official capacity.

13

## IV. UNC-CHAPEL HILL'S UNDERGRADUATE ADMISSIONS POLICIES.

### A. UNC-Chapel Hill's Admissions Process

#### 1. The Application

36. During an admissions cycle, the UNC-Chapel Hill Admissions Committee reviews each applicant's admissions materials. Those materials include: (1) the Common Application; (2) two essays; (3) official high school transcript; (4) official standardized test scores; (5) a counselor statement; and (6) one teacher recommendation.

37. UNC-Chapel Hill gathers information about the race and ethnicity of its applicants through numerous ways.

38. An applicant filling out a Common Application has the option of disclosing his or her racial identity.

39. The Common Application asks two questions to identify an applicant's race and ethnicity: (1) "Are you Hispanic/Latino?" and (2) "Regardless of your answer to the prior question, please indicate how you identify yourself. (Check one or more and describe your background.) American Indian or Alaska Native (including all Original Peoples of the Americas); Asian (including Indian subcontinent and Philippines); Black or African American (including Africa and Caribbean); Native Hawaiian or Other Pacific Islander (Original People); or White (including Middle Eastern)."

40. The Common Application requires applicants to identify their parents' first and last name, the parents' former last names, and their country of birth.

41.     UNC-Chapel Hill accepts transfer students who have been out of high school at least one year and have completed any college coursework.  UNC-Chapel Hill evaluates applicants for transfer in the same purportedly "holistic" manner it evaluates all other applicants.  UNC-Chapel Hill uses race or ethnicity as a factor in evaluating transfer applicants.

2.     The Review Process

42.     UNC-Chapel Hill has two application deadlines for admission to the entering class.  The deadline for early admission is in October.  The deadline for regular admission is in January.  Early admission applicants are notified of UNC-Chapel Hill's decision by the end of January.  Applicants for regular admission are notified of UNC-Chapel Hill's decision by the end of March.  According to UNC-Chapel Hill, the evaluation process for both sets of candidates for admission is the same.

43.     Each application is randomly assigned to an admissions officer who serves as the "first reader."  That officer reads the application and enters a recommended decision, which could be to admit, deny, defer, or waitlist the applicant. That first reader also enters comments in support of his or her recommended decision.

44.      The application is then assigned to a "second reader" who repeats the process.  If the two readers agree and either the applicant is a North Carolina resident or the applicant is from out of state and the recommendation is to deny the admission, the decision is entered as a tentative decision.  If the two readers do not agree or if the applicant is from out of state and the recommendation is to admit, the application is

15

reviewed by the Admissions Director, the Admissions Deputy Director, or a subcommittee of admissions officers, and a tentative decision is then entered.

45.     UNC-Chapel Hill claims to base its admissions decision on a "holistic" review of each application using more than 40 criteria, which are grouped broadly into eight categories: (a) academic performance (such as grade point average, rank in class, and trends in grades); (b) academic program (such as the rigor or courses taken); (c) standardized testing (including SAT scores); (d) extracurricular activity (such as work history and demonstrated leadership); (e) special talent (including talent in athletics and music); (f) essay (including persuasiveness, evidence of self-knowledge, and unique perspective); (g) background (including socio-economic status, legacy status, race, and national origin); and (h) personal (including curiosity, integrity, and history of overcoming obstacles).

46.     UNC-Chapel Hill denies using race as a "tie breaker" to fill the final few places in the entering freshman class. UNC-Chapel Hill instead claims to use race to pursue the "critical mass" diversity interest.

47.     After tentative decisions have been entered for all candidates, UNC-Chapel Hill uses a statistical model to predict the number of entering students based on the applications that have been tentatively marked for admission.

48.     UNC-Chapel Hill then conducts what it terms an "end-of-season" review, which it refers to as the school group review or the SGR process. During the SGR process, a report is run showing every applicant from the same high school, with applicants ordered from highest to lowest grade point average. UNC-Chapel Hill

16

claims to use the SGR process for, among other reasons, "quality control" purposes and in order to align the predicted enrollment to the number of available spaces for the entering class.

49.    The Admissions Director is aware of the projected racial composition of the tentatively admitted students during the SGR process.  The reports used during the SGR process include information regarding each candidate's race/ethnicity.  Those reports, however, do not include information regarding non-race factors such as first generation college status or eligibility for a fee waiver.

50.    After the SGR process is completed, applicants receive notification of acceptance, rejection, or placement on the waiting list.  Those applicants who accept a position on the waiting list will be reconsidered for any spaces that are available after the enrollment deadline for admitted students.

## V.    UNC-CHAPEL HILL IS NOT USING RACE MERELY AS A "PLUS" FACTOR.

51.    Although UNC-Chapel Hill claims to use an applicant's race and ethnicity only as one of many factors within its "holistic" system, statistical and other evidence establishes that race is a dominant factor in admissions decisions to the detriment of white and Asian-American applicants.

52.    During the admissions process, UNC-Chapel Hill admissions officers are aware of the race of every applicant for admissions and that information is included on the first page of each applicant's admissions folder.  Moreover, race is the only non-academic factor that is known about an applicant during the SGR process.

17

53. Table A shows admission rates, by race, for a portion of the overall range of academic indices generated by UNC in 2006.

| Index Range | Admissions Rate for: | | |
|---|---|---|---|
| | Black/African American | White/Caucasians | Asian Americans |
| 2.4-2.499 | 19.3% | 3.8% | 0.9% |
| 2.5-2.599 | 30.5% | 3.2% | 0.9% |
| 2.6-2.699 | 44.6% | 3.7% | 2.5% |
| 2.7-2.799 | 59.2% | 12.8% | 8.5% |
| 2.8-2.899 | 65.0% | 28.1% | 25.6% |
| 2.9-2.999 | 89.9% | 37.2% | 26.4% |
| 3.0-3.099 | 89.3% | 44.3% | 30.7% |
| 3.1-3.199 | 100.0% | 42.2% | 43.1% |
| 3.2-3.299 | 98.0% | 47.5% | 55.4% |

**Table A**
**Academic Index for All Admitted Students (2006)**

54. These statistics show that UNC-Chapel Hill does not use race simply as a "plus" factor. For African-American applicants with an academic index above 3.1, race is a dispositive factor essentially guaranteeing admission. For Asian-American applicants with an academic index below 2.6, on the other hand, race is a dispositive factor virtually guaranteeing rejection.

18

55.    Table B shows the average high-school GPA and SAT scores by racial category for students admitted to UNC-Chapel Hill in 2012.

| Table B<br>Average GPA and SAT for All Admitted Students (2012) | | | |
| --- | --- | --- | --- |
| | **Admitted** | **GPA** | **SAT** |
| **American Indian or Alaska Native** | 103 | 4.38 | 1300 |
| **African American** | 618 | 4.32 | 1229 |
| **Asian/Asian American** | 1018 | 4.63 | 1431 |
| **Hispanic** | 415 | 4.51 | 1319 |
| **Pacific Islander** | 6 | 4.51 | 1393 |
| **White** | 3616 | 4.56 | 1360 |
| **Not Reporting** | 123 | 4.46 | 1344 |

56.    These statistics confirm that UNC-Chapel Hill continues to use race as far more than a "plus" factor in admissions.  In particular, the statistics show a massive academic achievement gap between non-preferred admitted students and underrepresented minorities.  The average high-school GPA and SAT scores for non-preferred students (Asian American + white) are 4.57 and 1375.  The average high school GPA and SAT scores for underrepresented minorities (African American + Hispanic + American Indian/Alaska Native) are 4.40 and 1269.

57.    The academic achievement differences are even greater between specific racial groups.  For example, there is over a 200-point SAT gap and a 0.31

19

high-school GPA gap between Asian Americans and African Americans admitted to UNC-Chapel Hill.

58. UNC-Chapel Hill's admissions decisions cannot be attributed to underrepresented minorities having better non-racial, non-academic qualifications than other students. *See, e.g.*, Esteben Aucejo, Hanming Fang, and Ken Spenner, "Does Affirmative Action Lead to Mismatch? A New Test and Evidence," 2 Quantitative Economics 303 (2011). That study found no racial advantage for underrepresented minority applicants in levels of personal achievement.

59. Studies also have shown that high achieving Asian-American students are equally, if not more, qualified than other racial groups with regard to non-academic criteria. At the University of California, Los Angeles (UCLA), over several years, undergraduate admissions readers assigned each applicant three types of scores: "academic achievement" (principally high school grades, AP courses, and standardized test scores); "life challenges" (mainly socioeconomic background); and "personal achievement" (such as leadership, musical ability, and community service). These three scores jointly determined virtually all admissions decisions. *See* Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins, and Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions*, Pennsylvania Journal of Constitutional Law (Fall 2014).

60. The data cover over 100,000 undergraduate applicants to UCLA over three years and show absolutely no correlation between race and "personal achievement." Rather, the data show that the only strong predictor of personal-

achievement scores is academic achievement; applicants with high test scores and grades tended to have personal achievement scores that were about one standard deviation higher than applicants with low test scores and grades.

61.     There is no evidence that Asian Americans applying to UCLA have personal achievement credentials that Asian Americans applying to UNC-Chapel Hill uniformly lack.  Rather, all available evidence points in the opposite direction.

62.     Moreover, notwithstanding UNC-Chapel Hill's public relations emphasis on non-academic factors in reviewing applications, academic performance (except when it comes to underrepresented minorities) is the principal criteria for admission.

63.     Academic analyses of dozens of application processes at colleges and law schools around the country demonstrate that highly competitive schools, such as UNC-Chapel Hill, give far more weight to academic achievement and preparation than to other types of accomplishment and activity (with the exception of racial preferences).  *See* Richard Sander, *Why Strict Scrutiny Requires Transparency: The Practical Effects of Bakke, Gratz, and Grutter* (2011).  In general, academic factors alone explain about 80 percent of admissions decisions at selective schools.

64.     Accordingly, UNC-Chapel Hill is not using race merely as a "plus" factor in admissions decisions.    UNC-Chapel Hill's admissions decisions are attributable to a sizable racial preference for underrepresented minorities.

## VI. UNC-CHAPEL HILL HAS AVAILABLE RACE-NEUTRAL ALTERNATIVES THAT CAN ACHIEVE STUDENT BODY DIVERSITY.

65.     UNC-Chapel Hill has a host of race-neutral alternatives that can achieve student body diversity without the use of racial classifications, including but not limited to: (a) increased utilization of non-race-based preferences; (b) increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants; and (c) elimination of admissions policies and practices that operate to the disadvantage of minority applicants.  Furthermore, eliminating racial preferences at UNC-Chapel will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preference, the North Carolina community, and society as a whole.

### A.     UNC-Chapel Hill Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Non-Racial Preferences.

66.     Colleges and universities that have eliminated race-based admissions have maintained or increased their student body diversity by placing greater emphasis on socioeconomic factors, which often strongly correlate with an applicant's race but are not exclusively reserved for applicants of a particular race or ethnicity.  Using socioeconomic preferences thus increases racial diversity *and* achieves the broader diversity that UNC-Chapel Hill claims to seek by opening the door of opportunity for poor students of all races.

67.     In a recent study of ten leading public universities that ended race-based preferences, researchers found that seven of these schools maintained or increased

their enrollment of African-American and Hispanic students by adopting strategies that target socioeconomic inequality. *See* Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, The Future of Affirmative Action (2014).

68.     For example, the University of Colorado has devised an admissions formula that gives a significant preference to students from socioeconomically disadvantaged backgrounds.  This refined formula takes into consideration numerous socioeconomic factors, including single-parent status, parents' education level, family income, native language, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch, the school-wide student-to-teacher ratio, and the size of the twelfth-grade class.

69.     Under this admissions program, the University of Colorado found not only that the socioeconomic diversity of its incoming class increased substantially, but that racial and ethnic diversity increased as well.  African-American and Hispanic acceptance rates to the University of Colorado increased from 56 percent under race-based admissions to 65 percent under class-based admissions.  *See* Matthew N. Gaertner, *Advancing College Access with Class-Based Affirmative Action*, The Future of Affirmative Action (2014).

70.     Recently, a national simulation was conducted to determine whether the use of socioeconomic preferences could achieve student body diversity without the use of racial preferences at elite universities.  *See* Anthony P. Carnevale, Stephen J.

23

Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014). The study simulated various admissions models at the top-rated 193 colleges and universities "because the dialogue about affirmative action often implies that it is access to these schools and the opportunities they provide in business, social and career advancement that truly matters." The study examined, among other things, the effect of substituting socioeconomic preference for race-based preferences at America's elite college and universities using test scores and high-school grades as measures of merit.

71.    The national simulation ultimately found that "it is possible to achieve both racial and economic diversity in selective colleges without using race *per se* as an admissions criterion" and, importantly, that it could be achieved consistent with the understanding "that affirmative action models ought to promote racial diversity as an educational benefit instead of promoting racial diversity for its own sake."

72.    Another study found that increased focus on parental education and wealth—as opposed to income—as a measure of socioeconomic status also can help achieve student body diversity without the use of racial preferences. *See* Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, The Future of Affirmative Action (2014). The study found that "the most important factor in predicting individual academic success is the education of a parent" and the "economic factor" that mattered most was "parental net worth (that is, wealth) and not income." Indeed, "wealth conceptually captures the legacy of historical inequalities of opportunity better than aspects of class that cannot be literally transferred directly

24

from one generation to the next by signing a check (or a deed or a will)." While African Americans make on the order of 60 to 70 percent of what whites make in income, the median African American family wealth is just 10 percent of white family wealth.

73.    Affording a community-based preference is another means of achieving student body diversity by admitting more socioeconomically disadvantaged students. *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* (2014). African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites.  *See* John R. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics, and Asians in Metropolitan America* (2011), Table 2.

74.    Universities have used this community-based homogeneity to promote racial and ethnic diversity through race-neutral means.  For example, Texas, California, and Florida have adopted "percent plans" that guarantee admission to state universities for top graduates (based on grades) from each high school in the state. These percentage plans have been successful in promoting community, socioeconomic, and racial diversity.

75.    In addition to statewide percentage plans, a university can achieve student body diversity by granting a preference within their existing admissions framework utilizing other community-based metrics, such as an applicant's zip code. *See* Danielle Allen, *Talent is Everywhere: Using Zip Codes and Merit to Enhance Diversity*, The Future of Affirmative Action (2014).

25

76.     Studies show that students admitted based on socioeconomic as opposed to racial criteria regularly outperform all other admitted students. These students drop out at lower rates, graduate in shorter time periods, and receive better grades.

77.     UNC-Chapel Hill has conducted studies proving that it can use race-neutral alternatives to achieve student body diversity without sacrificing its academic standards.

78.     In 2012, after the U.S. Supreme Court granted certiorari in *Fisher v. University of Texas at Austin*, the UNC-Chapel Hill Admissions Office conducted a study to analyze the projected composition of its incoming class if it adopted an admissions plan similar to the one used by the University of Texas at Austin. Under Texas law, all students in the top ten percent of their class at high schools in Texas that comply with certain standards are granted automatic admission to any public state college, including the University of Texas at Austin.

79.     UNC-Chapel Hill submitted the results of its study to the U.S. Department of Education as part of the agency's investigation into UNC-Chapel Hill's admissions practices and to the U.S. Supreme Court through its *amicus* brief in the *Fisher* case.

80.     According to UNC-Chapel Hill, eliminating racial preferences and replacing them with a top-ten-percent plan similar to the University of Texas at Austin's would *increase* the percentage of nonwhite and underrepresented students enrolling at UNC-Chapel Hill from 15 percent to 16 percent.

26

81.    Adopting this plan also likely would increase the average high-school GPA of UNC-Chapel Hill's admitted students because the proportion of the admitted pool coming from the top ten percent of high school classes would by definition increase.

82.    In other words, UNC-Chapel Hill determined that it could adopt a race-neutral admissions policy that increases both the racial diversity of the student body and the likely average GPA of the entering freshman class.

83.    Nevertheless, UNC-Chapel Hill informed the Department of Education and the Supreme Court that it would not implement this admissions plan because it would yield "a significantly less satisfactory admissions system for UNC in most respects."

84.    UNC-Chapel Hill gave three reasons for why the plan was unacceptable: (a) the average entering SATs of the incoming class would decline by 56 points, from 1317 to 1262; (b) predicted first-year GPA averages would drop by 0.10 points, from 3.26 to 3.16; and (c) applicants whose grades were not in the top ten percent of their class would see their chances of admission reduced from 31 percent (under the present system) to 10 percent (under a top-ten-percent plan).

85.    None of these pretextual reasons UNC-Chapel Hill gave for retaining racial preferences instead of adopting this workable, race-neutral alternative can survive judicial review under strict scrutiny.

27

86.     First, UNC-Chapel Hill is well aware that an average decline of 56 SAT points (from the 91st percentile to the 86th percentile) will have little to no effect on the academic quality of the student body.

87.     In its response to the Department of Education, UNC-Chapel Hill sought to explain why admitted African Americans had a far lower average SAT score than admitted Asian-American students (1229 and 1431, respectively) by arguing that the 202-point gap was minimal and, in any event, irrelevant.

88.     To begin, UNC-Chapel Hill claimed that any SAT gap less than 120 points was meaningless because this gap was within the test's margin of error.  UNC-Chapel Hill claimed that the "standard errors of difference ('SED') for the SAT is roughly 40 points on each section; this means that, for two scores on either section to represent what the College Board describes as 'real' differences in the attributes measure by that section, the two scores must be different by at least 60 points, or 1.5 times the SED."

89.     Thus, UNC-Chapel Hill explained, "a student who scores 620 on Critical Reading and 600 on Math [1220 total] displays no 'real' or measured difference from a student who scores 670 and 650, respectively [1320 total]."

90.     While UNC-Chapel Hill acknowledged that "the differences in mean SAT scores between underrepresented students and Asian or white students are statistically significant" (as the gap was greater than 120 points), UNC-Chapel Hill contended that the SAT was a meaningless predictor of future success.

28

91.     UNC-Chapel Hill argued that "[w]hatever the 'real' difference in SAT scores between underrepresented and other students, the significance of that difference is subject to question. If the SAT is a relatively crude predictor of academic performance in general, it is even less reliable at predicting the performance of underrepresented students in particular, even when the impact of socioeconomic status is controlled for."

92.     As an example, UNC-Chapel Hill argued that its "Covenant Scholars," which are students who may receive significant financial aid if their parents' adjusted gross income does not exceed 200 percent of federal poverty guidelines (e.g., $37,060 for a family of three), fully succeed at UNC despite having SAT scores 81 points lower than average.

93.     According to UNC-Chapel Hill, Covenant Scholars "earned SAT scores that averaged 81 points below the class average of 1293," but that "if past experience holds, more than 97 percent of these students will return for the second year at Carolina—a rate equal to that of their classmates with higher incomes and SAT scores."

94.     A 56-point decline in average SAT scores under a top-ten percent plan is especially modest in light of UNC-Chapel Hill's belief that socioeconomically disadvantaged students may have more potential than economically privileged students with similar test scores. Because American high schools tend to be economically as well as racially stratified, a top-ten-percent plan in North Carolina is

likely to be accompanied by an increase in socioeconomic diversity at UNC-Chapel Hill.

95.    Economic diversity increased, for example, after the adoption of UT Austin's top 10 percent plan. In 2013, 21 percent of incoming students admitted through the Texas top 10 percent plan were from families making less than $40,000 compared with 6 percent of those admitted under discretionary admissions. *See* William Powers, The University of Texas at Austin: *Report to the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives on the Implementation of SB 175,* at 30 (2013).

96.    In discussions with the Department of Education, UNC-Chapel Hill emphasized that "assessment of disadvantage must … inform the University's interpretation of the candidate's SAT scores and other academic indicators." Given "the strong correlation between SAT scores and socioeconomic status," UNC-Chapel Hill contended that, "schools, including [UNC-Chapel Hill], have chosen to view SAT scores in light of the student's socioeconomic circumstances, as a way of tempering the test's tendency to measure privilege rather than preparedness."

97.    More broadly, UNC-Chapel Hill stressed that "average [SAT] scores across groups, as well as the scores of individual students, should be interpreted with great caution, and always in conjunction with other indicators that speak to students' academic preparation." To that end, UNC-Chapel Hill repeatedly emphasized that "in evaluating candidates for admission, we do not seek to maximize the average SAT score."

30

98.     Given UNC-Chapel Hill's position that a 100-point SAT gap was within the test's margin of error and thus statistically insignificant, and that a 200-point gap should be "interpreted with great caution" since the SAT is only a "crude predictor of academic success," it is disingenuous in the extreme for UNC-Chapel Hill to claim that it must use race in its admissions in order to prevent a 56-point decline in its average SAT score that would be caused through race-neutral admissions.

99.     Second, UNC-Chapel Hill's professed fear of a 0.10 drop in predicted first-year GPA is pretext for continued racial discrimination.  Here too, UNC-Chapel Hill's submission to the Department of Education belies its newfound concern on predicted first-year GPA.

100.    Before the Department of Education, UNC-Chapel Hill stressed that "in evaluating candidates for admission, we do not seek to maximize ... the average eventual GPA of the entering class."

101.    In addition, in attempting to explain the difference in average high-school GPAs for admitted students (ranging from 4.31 for American Indians to 4.65 for whites) UNC-Chapel Hill argued that such differences were of "questionable statistical significance."  In particular, UNC-Chapel Hill argued that the 0.11 GPA difference between whites/Asians and African Americans/Hispanics/Native Americans was insignificant because a 0.11 GPA differential "is the equivalent of one letter-grade difference in each of two classes over the course of a four-year high school career."

102.    Moreover, UNC-Chapel Hill is aware that students coming from the top ten percent of their class do better than the rest of the student body.  According to UNC-Chapel Hill, "by far the best predictor of eventual academic performance in college[] is high-school grade-point average (GPA)."

103.    For example, of the 391 first year students who made the Dean's List in the Spring of 2012, 79 percent (309 students) were in the top 10 percent of their high school classes.  In addition, among the graduating seniors inducted into Phi Beta Kappa in the Fall of 2010, more than 85 percent were in the top 10 percent of their high school graduating classes.

104.    Third, UNC-Chapel Hill's concern with the decreased admissions chances of applicants with lower grades is simply the byproduct of an admissions process that places more emphasis on high-school GPA—which UNC claims is "by far the best predictor of eventual academic performance in college"—and less emphasis on SAT scores—which UNC dubs "one factor among many" and a "crude predictor of academic performance."  UNC-Chapel Hill does not have a compelling government interest in preferring applicants who do not finish in the top ten percent of their class for its own sake.

105.    In addition to the top-ten-percent plan, UNC-Chapel Hill has other options available for maintaining or increasing diversity through race-neutral means, including prioritizing additional socioeconomic factors in the admissions process.

106. According to UNC-Chapel Hill's submission to the Department of Education, its "applicant pool shows that a disproportionate share of disadvantaged applicants are also underrepresented applicants."

107. UNC-Chapel Hill further noted: "Within the University's applicant pool, underrepresented students are much more likely than Asian and white students to come from disadvantaged households and schools."

108. For Fall 2006, underrepresented applicants were "2.3 times more likely than Asian and white applicants to live in households where neither parent held a college degree (32.3 percent vs. 13.8 percent); 12.2 times more likely to have been poor enough to qualify for a waiver of their admissions application fee (22.1 percent vs. 1.8 percent); 1.9 times more likely to live in a single-parent household (33.6 percent vs. 17.3 percent); and 5.0 times more likely to attend a high school where at least half of the students qualified for free or reduced-price lunch (18.1 percent vs. 3.6 percent)."

109. UNC-Chapel Hill further noted: "Overall, underrepresented applicants were 2.0 times more likely than their Asian and white counterparts to come from backgrounds with at least one of these characteristics (52.6 percent vs. 26.4 percent). The ratio was even higher for students with any two of these characteristics (4.2 times as likely, or 20.7 percent vs. 4.2 percent); for students with three or more characteristics, the ratio was higher still (12.2 times more likely, or 6.5 percent vs. 0.5 percent)."

110.   In addition, UNC-Chapel Hill stated that its "Covenant Scholars" are "2.5 times more likely to be underrepresented than the class as a whole (47 percent vs. 19 percent) and are the poorest of the University's new students."

111.   Given this strong correlation between socioeconomic status and race in UNC-Chapel Hill's applicant pool, UNC-Chapel Hill could easily maintain or increase its racial diversity by emphasizing socioeconomic indicators instead of race.

112.   Like the percentage plan described above, an admissions plan emphasizing additional socioeconomic factors would have no impact on academic quality of the student body.

113.   For example, UNC-Chapel Hill prides itself on the academic success of its Covenant Scholars, who by definition come from socioeconomically disadvantaged backgrounds: "The fact that Covenant Scholars are from lower-income backgrounds doesn't get in the way of their academic success.  Covenant Scholars do well at Carolina."

114.   According to UNC-Chapel Hill, more than 97 percent of Covenant Scholars "will return for the second year at Carolina—a rate equal to that of their classmates with higher incomes and SAT scores."  In addition, "Covenant Scholars are still enrolled in Year 4 at almost the same rate as all other students at the University," and "the average grade point average for Scholars at graduation is almost the same as for all students."

115.   When UNC-Chapel Hill makes its admissions decisions, as reflected by the lack of socioeconomic diversity in the student body as compared to racial

34

diversity, it gives almost no weight to an applicant's socioeconomic status, whether measured by income or by wealth, and/or community of origin.

116.    Measured in terms of those students receiving federal Pell Grants, which are awarded to students coming from low-income families, UNC-Chapel Hill lags behind other schools. The percentage of students at UNC-Chapel Hill who receive Pell Grants in 2013 was only 20 percent. In comparison, universities that employ race-neutral admissions had far greater numbers of Pell Grant recipients, including the University of California, Los Angeles (UCLA) (35 percent), the University of California, Berkeley (33 percent), and the University of Florida (30 percent). 2014 National Universities Rankings – Social Mobility, Washington Monthly (2014). Nationally, 36 percent of college students receive Pell Grants. *See* College Board, *Trends in Student Aid 2013*. In a 2010 study of flagship universities, the Education Trust placed UNC-Chapel Hill in the bottom quartile for low-income student access. *See Opportunity Adrift: Our Flagship Universities are Straying from Their Public Mission* (2010), Figure 17.

117.    By contrast, UNC-Chapel Hill places far greater weight on an applicant's race—regardless of his or her socioeconomic status or the community of origin.

118.    By increasing the weight given to an applicant's socioeconomic status and/or community of origin, UNC-Chapel Hill can achieve student body diversity without resorting to the disfavored tool of racial preferences.

35

**B.** **UNC-Chapel Hill Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Financial Aid And Scholarships To Attract Minority Candidates.**

119.   Relying on socioeconomic instead of racial preferences at the admissions stage is the first step.  But UNC-Chapel Hill needs to ensure that those underprivileged minorities that benefit from socioeconomic preferences are in a position to accept the offer of admission and enroll at UNC-Chapel Hill.  To that end, UNC-Chapel Hill can achieve student body diversity by increasing its use of financial aid and scholarships.

120.   Colleges and universities that have eliminated racial preferences have maintained or increased student body diversity by offering more financial aid to socioeconomically disadvantaged students.  For example, the University of California system, which does not use race-based preferences, covers tuition for students from families with incomes below $80,000.  The University of California devotes one-third of tuition revenue to financial aid.

121.   Yet in August 2014, the UNC Board of Governors instituted a cap that prevents UNC from devoting more than 15 percent of tuition revenue to financial aid.

122.   Moreover, UNC-Chapel Hill could do much more to support socioeconomically disadvantaged students given its significant economic resources.  UNC's $2.38 billion endowment is the one of the largest in the nation; it exceeds the gross domestic product of Greenland and 36 other countries.

123.   Yet the total cost of full-time attendance for undergraduates is estimated to be $24,120 for North Carolina residents and $50,938 for out-of-state residents.

124.   UNC-Chapel Hill has the economic resources to increase its financial aid far beyond the 15 percent threshold.   Doing so would make it possible for underprivileged minorities, especially those in the lower middle class, and those who may have slightly higher income levels but less wealth, admitted to UNC-Chapel Hill through the increased use of socioeconomic preferences (as opposed to the affluent minorities currently being admitted due to racial preferences) to be in a position to accept an offer of admission and enroll at UNC-Chapel Hill.

## C.   **UNC-Chapel Hill Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through Increased Recruitment And Other Steps Designed To Encourage More Qualified Minority Students To Apply For Admission.**

125.   UNC-Chapel Hill can achieve student body diversity by bringing more highly qualified, socioeconomically disadvantaged minorities into its applicant pool. Across the country, there are tens of thousands of socioeconomically disadvantaged, high-achieving minorities who fail to apply to selective schools, including UNC-Chapel Hill, at which they would likely be admitted and at which they would enroll if offered sufficient financial aid.

126.   One study found that between 25,000 and 35,000 socioeconomically disadvantaged high school seniors obtain an SAT or ACT in the 90th percentile or higher and have a GPA of A- or better.   Nearly 6 percent of this group is African American and nearly 8 percent is Hispanic. A great many of these socioeconomically

disadvantaged students "undermatch" by applying to and enrolling at colleges and universities less selective than the ones to which they could have been admitted. *See* Caroline Hoxby, Christopher Avery, *The Missing "One-Offs": The Hidden Supply of High-Achieving, Low-Income Students*, Brookings Papers on Economic Activity (Spring 2013).

127. Universities with race-neutral admissions have increased their student body diversity by improving recruitment of these socioeconomically disadvantaged, high-achieving minority students. For example, after race-based admissions were eliminated in Texas, the University of Texas at Austin increased its student body diversity by implementing numerous programs designed to recruit students from underrepresented regions and high schools, including "Longhorn Game Weekends," which focus on specific geographic regions, and "Longhorn for a Day," which reaches out to students in underrepresented high schools.

128. Furthermore, a study found that simply mailing a well-designed, targeted brochure to high-achieving, socioeconomically disadvantaged students could be instrumental in causing them to apply to selective colleges and universities. *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* 49 (2014).

129. Universities also have achieved student body diversity by aggressively recruiting high-achieving community college students, who are more likely to be African American or Hispanic. For example, in 1997, after California banned racial preferences, the University of California substantially increased its recruitment and enrollment of community college students. As a result of the University of

38

California's efforts, by 2012, about 29 percent of new students enrolling in the University of California system were transfers from community colleges. *See* Preparing California for Its Future: Enhancing Community College Student Transfer to the University of California (2014).

130.  UNC-Chapel Hill can do far more to recruit high-achieving, socioeconomically disadvantaged minority students or high-achieving community college students. Carolina's Student Transfer Excellence Program (C-STEP) has enrolled a mere 450 students since 2006, which represents fewer than 2 percent of new students enrolled during that time period.

131.  This failure to recruit socioeconomically disadvantaged students is reflected in UNC-Chapel Hill's applicant pool. Although there are more than 10,000 high schools in the country that have students with the credentials to be admitted to UNC-Chapel Hill, only a small fraction of these schools have students who ultimately apply to UNC-Chapel Hill.

132.  UNC-Chapel Hill could achieve its student body diversity without the use of racial preferences by improving its recruitment of socioeconomically disadvantaged, high-achieving minorities and community college students.

**D.**      **UNC-Chapel Hill Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through Elimination Of Admissions Policies And Practices That Harm Minority Applicants.**

133.  UNC-Chapel Hill employs admissions practices and policies that make it more difficult for socioeconomically disadvantaged minorities to gain admission.

39

Eliminating these practices and policies would allow UNC-Chapel Hill to achieve student body diversity without using racial preferences.

134. UNC-Chapel Hill purports to not grant admissions preferences to in-state legacies, yet the Admissions Director acknowledges that he is aware of the legacy status of all applicants (both in-state and out-of-state).

135. In addition, UNC-Chapel Hill conceded to the Department of Education that "for out-of-state students, status as an alumni child can ... be very important" in the admissions process.

136. Eighteen percent of first year students at UNC-Chapel Hill are the children of alumni.

137. At most universities throughout the country, including UNC-Chapel Hill, children of alums are less likely to be socioeconomically disadvantaged or racial minorities than the rest of the student body. Thus, colleges and universities, like UNC-Chapel Hill, that grant admissions preferences to legacies give a competitive advantage to mainly white, wealthy applicants, while undermining the chances for admission of socioeconomically disadvantaged and minority applicants. *See* John Brittain and Eric L. Bloom, *Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions*, Affirmative Action for the Rich (2010).

138. As a consequence, eliminating legacy preferences in conjunction with other race-neutral admissions policies can achieve student body diversity. Several universities, including Texas A&M University, the University of Georgia, and the

University of California, have increased their student body diversity by ending their practice of favoring legacies in the admissions process in conjunction with the elimination of racial preferences.

139.    Furthermore, one study found that eliminating legacy preferences in combination with other race-neutral admissions criteria could more than double African-American and Hispanic enrollment and more than triple the enrollment of socioeconomically disadvantaged students.  *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).

140.    Eliminating legacy preferences is a workable race-neutral strategy. Research finds that the existence of legacy preferences does not increase alumni donations to an institution.  *See* Chad Coffman, Tara O'Neil, and Brian Starr, *An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities*, Affirmative Action for the Rich (2010).

141.    UNC-Chapel Hill can achieve student body diversity without using racial preferences by eliminating legacy admissions preferences in conjunction with other race-neutral measures.

142.    UNC-Chapel Hill also admits applicants through an early admission program.  Early admissions is a practice in which schools allow students to submit their application in the early Fall if they apply to only one school or promise to attend the school if admitted.

41

143.    Early admission programs, like UNC-Chapel Hill's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.  *See* Justin Pope, *Harvard Drops Early Admissions, Saying They Favor Wealthier Students Over Minorities, Poor*, Associated Press (Sept. 12, 2006).

144.    By contrast, socioeconomically disadvantaged students and minorities face a disadvantage under early admission programs because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process.

145.    UNC-Chapel Hill can achieve student body diversity without using racial preferences by eliminating its early admissions program in conjunction with other race-neutral measures.

**E.    Achieving Student Body Diversity Through Race-Neutral Means Eliminates The Heavy Cost Imposed By The Use Of Racial Preferences.**

146.    Any assessment of the feasibility of race-neutral alternatives must also take into account the heavy costs of *not* employing them.  The costs of continuing to use racial preferences when workable race-neutral alternatives exist are high from both a legal and a practical perspective.

147.    As a legal matter, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect."  *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (citations and quotations omitted).  As a

42

result, the Fourteenth Amendment, and therefore Title VI, "forbids the use even of narrowly drawn racial classifications except as a last resort." *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

148.    UNC-Chapel Hill's practice of labeling all applicants according to broad racial categories illustrates why such classifications are pernicious and always create the "danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Croson*, 488 U.S. at 493.

149.    These racial categories lump together students in categories such as "African American" or "Hispanic" or "Asian American," even though they come from vastly different cultures, experiences, and backgrounds.

150.    For example, UNC-Chapel Hill's category of "Asian Americans" comprises roughly 60 percent of the world's population, including individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, and Indian descent.

151.    While many Asian Americans have been in the United States for generations, others are recent immigrants or children of immigrants. Some Asian Americans came to the United States to escape communism, authoritarianism, war, and poverty, while others simply sought out greater opportunities. Some Asian Americans come from highly educated families, but many others do not.

152.    Asian Americans also have a wide range of religious beliefs, including Christianity, Islam, Buddhism, Judaism, Hinduism, and many others. Some come from cultures that aggressively promote education, while many others come from cultures that take a less demanding approach.

43

153.    Thus, for example, Indian-American students are different from Japanese-American students; Vietnamese-American students are different from Chinese-American students; and students from Mainland China, Hong Kong, and Taiwan all have unique perspectives and cultural experiences.

154.    Given this diversity, it is lamentable for UNC-Chapel Hill to lump all Asian Americans together in the admissions process.  Yet this categorization is the inevitable byproduct of using group-based racial classifications instead of employing race-neutral alternatives that are able to account for the vast differences among applicants.

155.    Racial classifications also have a stigmatizing effect on the supposed beneficiaries of these policies. Irrespective of whether an individual African-American or Hispanic applicant is admitted to UNC-Chapel Hill because of a racial preference, so long as racial preferences exist, it will often be assumed that race is the reason for the applicant's admission to the school.  This stigma can have a devastating effect on the psyche of impressionable students.

156.    For example, according to one African American who attended an elite liberal arts college, upon arriving at school, "I was immediately stereotyped and put into a box because I was African-American.  And that made it harder to perform…..  There was a general feeling that all blacks on campus were there either because they were athletes or they came through a minority-recruitment program and might not really belong there."  Shaken by the experience, the student dropped out after his freshman year.

157.    UNC-Chapel Hill can eliminate the harmful effects these unfair stereotypes cause by using race-neutral alternatives.

158.    Finally, the "mismatch effect" of racial preferences far too frequently put the supposed beneficiaries of race-based admissions policies in a position where they cannot succeed academically in order to fulfill the university's social-engineering vision.

159.    This "mismatch" effect happens when a school employs such a large admissions preference that the student is academically damaged in a variety of ways by being placed in an academic environment where most of the student's peers have substantially stronger levels of academic preparation.

160.    For example, a student who would flourish at a less elite school instead finds himself or herself at UNC-Chapel Hill, where the professors are not teaching at a pace designed for him or her. Instead, they are teaching to the "middle" of the class, introducing terms and concepts at a speed that is unnerving even to the best-prepared student.

161.    The student who is underprepared relative to others in that class falls behind from the start and becomes increasingly lost as the professor and classmates race ahead. The student's grades on his or her first exams or papers put him or her at the bottom of the class. Worse, the experience may well induce panic and self-doubt, making learning even more difficult, thus creating a vicious cycle that only exacerbates the problem.

162.    The "mismatch effect" has been documented in dozens of studies.  *See, e.g.*, Peter Arcidiacono, Esteban M. Aucejo, and Ken Spenner, *What Happens After Enrollment? An Analysis of the Time Path of Racial Differences in GPA and Major Choice* (2011); U.S. Commission on Civil Rights, *Encouraging Minority Students to Pursue Science, Technology, Engineering and Math Careers*, Briefing Report (October 2010); Richard Sander and Roger Bolus, *Do Credential Gaps in College Reduce the Number of Minority Science Graduates?* (2009); Richard Sander, *A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004); Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003); Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions*, 37 Research in Higher Education 681 (1996).

163.    As this research demonstrates, African-American college freshmen are more likely to aspire to science or engineering careers than are white freshmen, but mismatch causes African Americans to abandon these fields at twice the rate of whites.

164.    As a consequence, African Americans who start college interested in pursuing a doctorate and an academic career are twice as likely to be derailed from this path if they attend a school where they are mismatched.

165.    Furthermore, about half of African-American college students rank in the bottom 20 percent of their classes.

166.   Mismatch also creates social problems on campus.   The academic research shows that interracial friendships are more likely to form among students with relatively similar levels of academic preparation; thus, African Americans and Hispanics are more socially integrated on campuses where they are less academically mismatched.

167.   UNC-Chapel Hill has experienced and continues to experience the "mismatch effect."   At least two serious forms of mismatch have been specifically documented in studies that included students from UNC-Chapel Hill: "academic mismatch" and "science mismatch."

168.   In 2003, Harvard University Press published *Increasing Faculty Diversity*, a major study by sociologists Stephen Cole and Elinor Barber that sought to understand why there were so few underrepresented minorities—particularly African Americans—in the academic pipeline leading to university faculty positions.   In an effort sponsored by the Council of Ivy League Presidents, Cole and Barber conducted in-depth surveys of thousands of underrepresented minority students at a wide range of institutions, including at UNC-Chapel Hill.

169.   They focused on students who started college with a significant interest in pursuing an academic career.   They found, however, that when students received a large preference to attend a more elite school, they tended to get lower grades than they would have had they attended a school where their credentials were close to (or even above) the median of their classmates.   Students receiving large preferences

47

were more likely to get low grades, and poor performance sharply eroded their interest in pursuing an academic career.

170.     The study's results demonstrate that colleges like UNC-Chapel Hill play a double role: the strongest minority students attending UNC-Chapel Hill (those who received no preference or a minimal preference) outperformed their Ivy League peers and quite often remained on the academic track; those who received large preferences into UNC-Chapel Hill were likely to suffer from academic mismatch.  No subsequent research has rebutted Cole and Barber's findings.

171.     In 2004, two psychologists at the University of Virginia published a peer-reviewed study of minority attrition in the sciences.  *See* Frederick L. Smyth and John J. McArdle, *Ethnic and Gender Differences in Science Graduation at Selective Colleges With Implications For Admission Policy and College Choice*, Research In Higher Education, Vol. 45, No. 4 (June 2003).  These scholars gained permission to use the College and Beyond dataset assembled by the Mellon Foundation.  This data set included comprehensive data from Ivy League colleges, selective liberal arts colleges, historically black colleges, and several flagship state university, including UNC-Chapel Hill.

172.     Smyth and McArdle examined what factors affected the success of students in science, technology, engineering, and math ("STEM") fields of study. They found that a critical factor was a student's academic preparation relative to her peers.  Moreover, they found that this effect was essentially identical for white, African American, and Hispanic students.  In all cases, students who attended a

48

school where their level of academic preparation was substantially lower than those of their peers were far more likely to drop out of STEM fields as compared to identical students who attended schools where their relative peer position was higher. The effect was so large that Smyth and McArdle advised high school counselors to take potential mismatch into account in helping students understand the pros and cons of attending "reach" schools.

173. UNC-Chapel Hill can eliminate this harmful mismatch and allow students to excel at schools for which they are most prepared by eliminating the use of racial preferences and employing race-neutral alternatives that bring high-performing, socioeconomically disadvantaged minorities into the applicant pool.

## VII. GOVERNING LAW

174. The Fourteenth Amendment provides, in relevant part, that no person shall be denied "the equal protection of the laws."

175. Section 1981 of Title 42 of the United States Code provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

176. Section 1983 of Title 42 of the United States Code provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

49

any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."

177.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

178.    Under Title VI, "the term 'program or activity' and the term 'program' mean all of the operations … of a college, university, or other postsecondary institution, or a public system of higher education … any part of which is extended Federal financial assistance."  42 U.S.C. § 2000d-4a.

179.    An institution that accepts federal funds violates Title VI when it engages in racial or ethnic discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  *See Gratz v. Bollinger*, 539 U.S. 244, 257 n.23 (2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.") (citing *Alexander v. Sandoval,* 532 U.S. 275, 281 (2001)).

180.    The "central mandate" of equal protection is "racial neutrality" by the government or institution subject to the Fourteenth Amendment.  *Miller v. Johnson*, 515 U.S. 900, 904 (1995).  "Whenever the government treats any person unequally

50

because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

181.    "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).  Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id*. (citation and quotations omitted).  In other words, "because racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Id*. (citations and quotations omitted).

182.    "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.  "Strict scrutiny is a searching examination, and it is the government that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).  Strict scrutiny thus requires a "detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." *Adarand*, 515 U.S. at 227.

183.    In particular, strict scrutiny requires a "detailed examination, both as to ends and to means." *Adarand*, 515 U.S. at 236.  When governmental institutions implement policies and practices that "touch upon an individual's race or ethnic

51

background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

184.   Racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Grutter*, 539 U.S. at 326.

185.   "Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to accomplish that purpose." *Fisher*, 133 S. Ct. at 2418.

186.   To meet strict scrutiny, the end must be "compelling"—not merely legitimate or important.  To be narrowly tailored, "the means chosen" must "fit" the unmet compelling interest "so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (citations and quotations omitted).   In other words, "racial classifications, however, compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

187.   "To survive strict scrutiny," moreover, the institution "must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).   The government must establish the necessity of using race by a "strong basis in evidence" because "the mere recitation" of a compelling interest is "not an automatic shield

52

which protects against any inquiry" into the justification for race-based action." *Croson*, 488 U.S. at 495, 500. Strict scrutiny "forbids the use even of narrowly drawn racial classifications except as a last resort." *Id*. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

188. Racial quotas violate the Fourteenth Amendment. In the educational setting, then, "universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks. Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 334 (citation omitted).

189. Moreover, the university's policy violates the Fourteenth Amendment if it amounts to "racial balancing, which is patently unconstitutional." *Id*. at 329. Racial balancing is a program designed "to assure within [the school's] student body some specified percentage of a particular group merely because of its race or ethnic origin." *Id*. (citations and quotation omitted). "[P]roportional representation" is never a constitutional "rationale for programs of preferential treatment." *Id*. at 343.

190. The only interest in using racial preferences in higher education that the Supreme Court has accepted as "compelling" is the interest "in obtaining the educational benefits that flow from a diverse student body." *Grutter*, 539 U.S. at 343. Redressing past discrimination does "not serve as a compelling interest, because a university's broad mission of education is incompatible with making the judicial, legislative, or administrative findings of constitutional or statutory violations

53

necessary to justify remedial racial classification." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

191.   The interest in student body diversity the Supreme Court has found compelling "is not an interest in simply ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Fisher*, 133 S. Ct. at 2418 (citation and quotations omitted).  "[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

192.   Even in the pursuit of critical mass, the Supreme Court has permitted race to be used only as a "plus" factor in admissions decisions.  *Id.* at 333.  "[I]t remains at all times the University's obligation to demonstrate, and the Judiciary's obligations to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Fisher*, 133 S. Ct. at 2418 (quoting *Grutter*, 539 U.S. at 337).  Thus, even if "the University has established that its goal of diversity is consistent with strict scrutiny, … there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation. The University must prove that the means chosen by the University to attain diversity are narrowly tailored to that goal." *Id.* at 2419-20.

193.   "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity.

54

This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Id*. at 2420 (internal citation omitted). Accordingly, strict scrutiny uniformly "require[s] a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* (quoting *Grutter*, 539 U.S. at 339- 340).

194. "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Id*. (citations and quotations omitted).

195. As a consequence, "strict scrutiny imposes on the university the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice." *Id*. (emphasis added).

## VIII. CLAIMS FOR RELIEF

196. UNC-Chapel Hill's use of racial preferences in undergraduate admissions violates the Fourteenth Amendment and federal civil rights laws. First, UNC-Chapel Hill's use of racial preferences is not narrowly tailored because UNC-Chapel Hill is not pursuing the critical-mass interest found permissible in *Grutter* by failing to use race merely as "plus" factor. Second, UNC-Chapel Hill is not fully utilizing a number of race-neutral alternatives that can achieve student body diversity. Third, and last, whether or not UNC-Chapel Hill is found to be acting permissibly

55

under Supreme Court precedent, the Supreme Court should overrule any decision holding that the Fourteenth Amendment or federal civil rights law ever permit the use of racial preferences to achieve "diversity."

## COUNT I

**Violation of The Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.* (Failure To Use Race Merely As A "Plus" Factor In Admissions Decisions).**

197.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-196 as if fully set forth herein.

198.    UNC-Chapel Hill has intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq.*, by employing an undergraduate admissions policy that does not merely use race as a "plus" factor in admissions decisions in order to achieve student body diversity.

199.    Statistical and other evidence shows that each applicant is not evaluated as an individual.  Instead, race or ethnicity is the defining feature of the application. Only using race or ethnicity as a dominant factor in admissions decisions could account for the decision to admit certain African-American and Hispanic applicants and deny admission to certain white and Asian-American applicants.

200.    Plaintiff's members have been and will continue to be injured because UNC-Chapel Hill has and will continue to deny them the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of

56

race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

201. Defendants acted under color of law in developing and implementing race-based policies that led UNC-Chapel Hill to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq.*

202. Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent UNC-Chapel Hill from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

203. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

**Violation of The Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and 2000d
*et seq.* (Race-Neutral Alternatives)**

204. Plaintiff incorporates the allegations and averments contained in paragraphs 1-203 as if fully set forth herein.

205. UNC-Chapel Hill has intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq.*, by

57

employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity.

206. UNC-Chapel Hill's use of racial preferences is narrowly tailored only if using them is necessary to achieve student body diversity. If UNC-Chapel Hill can achieve student body diversity without resorting to racial preferences, it is required to do so as a matter of law. Moreover, UNC-Chapel Hill must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach *before* turning to the use of racial preferences.

207. There is no evidence that UNC-Chapel Hill studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well *before* turning to racial preferences.

208. Whether UNC-Chapel Hill considered them all or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences. Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, including a percentage plan, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

209. The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as a factor in admissions decisions imposes on minority applicants who receive such admissions preference, the North Carolina community, and society as a whole.

210. Plaintiff's members have been and will continue to be injured because UNC-Chapel Hill has and will continue to deny them the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

211. Defendants acted under color of law in developing and implementing race-based policies that led UNC-Chapel Hill to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq*.

212. Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent UNC-Chapel Hill from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and federal civil rights laws and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

213. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

**Violation of the Fourteenth Amendment and 42 U.S.C §§ 1981, 1983, and 2000d**
***et seq.* (Any Use of Race As A Factor In Admissions).**

214. Plaintiff incorporates the allegations and averments contained in paragraphs 1-213 as if fully set forth herein.

215.   UNC-Chapel Hill has intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq*., by employing an undergraduate admissions policy that uses race as a factor in admissions.

216.   The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled. Those decisions were wrongly decided at the time they were issued, and they remain wrong today. "Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and federal civil rights laws.

217.   Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

218.   The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law. The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used consistent with the "Harvard Plan," which purported to use race merely as a contextual factor in filling the final few places in the entering class. But the Harvard Plan itself was created in order to hide racial and ethnic discrimination. Thus, it is far from certain that Harvard itself *ever* used race in this fashion. "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of

60

education." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979). It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id*.

219. In any event, neither Harvard nor UNC-Chapel Hill nor any other college or university uses race in this manner now. Indeed, UNC-Chapel Hill strongly denies that it uses race as a "tie breaker" to fill the remaining few seats in the entering class. Instead, college and universities, including UNC-Chapel Hill, claim to use race in order to pursue a "critical mass" of underrepresented minorities in the student body. But UNC-Chapel Hill is not pursuing this interest. Even when this interest is actually being pursued, moreover, it is nothing more than racial balancing in that it necessarily seeks to ensure a proportional number of students of certain races or ethnicities in the entering class. Critical mass is a formula for ensuring "a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Bakke*, 438 U.S. at 315 (Powell, J.).

220. Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways. Colleges and universities, if given the chance, will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body" with the true "goal of simply increasing the number of minority persons in the universities and in the professions

61

that these universities feed." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

221. There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement. The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and federal civil rights laws operate in conformity with racial neutrality except in those rare circumstances that justify the use of this disfavored remedy. Time after time, district courts and courts of appeals have been either unwilling or unable to force these colleges and university to provide a strong evidentiary basis for their conclusion that use of racial preferences is *necessary* to achieve diversity. Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

222. There also have been important factual developments since this question was last considered by the Supreme Court. There is now much evidence that race-neutral alternatives can achieve the benefits of diversity. This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and the very minority students these programs are purported to benefit.

223. In the end, the costs of allowing the use of racial preferences in admissions decisions—even in a limited way—far exceed any rapidly diminishing

benefits. No principle of *stare decisis* counsels in favor of retaining decisions allowing their use. Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable. Any decision allowing the use of racial preferences in the educational setting should be overruled.

224. Plaintiff's members have been and will continue to be injured because UNC-Chapel Hill has and will continue to deny them the opportunity to compete for admission to UNC-Chapel Hill on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

225. Defendants acted under color of law in developing and implementing race-based policies that led UNC-Chapel Hill to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and § 2000d *et seq*.

226. Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent UNC-Chapel Hill from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

227. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff, Students for Fair Admissions, Inc., prays for the following relief as to all counts:

(a)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that Defendants' admissions policies and procedures violate the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

(b)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

(c)     A permanent injunction prohibiting Defendants from using race as a factor in future undergraduate admissions decisions at UNC-Chapel Hill;

(d)     A permanent injunction requiring Defendants to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

(e)     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

(f)     All other relief this Court finds appropriate and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action of all triable issues.

Dated: November 17, 2014          Respectfully submitted,

By: /s/ Thomas R. McCarthy
Thomas R. McCarthy

/s/ William S. Consovoy
William S. Consovoy

/s/ J. Michael Connolly
J. Michael Connolly
*Attorneys for Plaintiff*
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Telephone: (703) 243-4923
E-mail: tom@consovoymccarthy.com
E-mail: will@consovoymccarthy.com
E-mail: mike@consovoymccarthy.com

/s/ W. Ellis Boyle
W. Ellis Boyle Bar Number: 33826
*Attorney for Plaintiff, LR 83.1 counsel*
ELLIS BOYLE LAW PLLC
507 N. Blount St.
Raleigh, NC 27604
Telephone: (919) 747-8386
E-mail: ellis@ellisboylelaw.com