**UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-954-LCB-JLW |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | |
| Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PROPOSED DEFENDANT-INTERVENORS'**</u>
<u>**MOTION TO INTERVENE**</u>

Proposed Intervenors are four minorities who currently attend University of North Carolina at Chapel Hill ("Student Intervenors") and five high-achieving minority high school students who intend to apply to the University of North Carolina at Chapel Hill ("Applicant Intervenors").[1]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Students for Fair Admissions ("SFFA") alleges that one of its white members was denied admission to the University of North Carolina at Chapel Hill ("UNC-Chapel Hill") because he or she was not permitted to compete for admission on equal footing with other applicants and that it has members who "may be denied admission to UNC-Chapel Hill because of these discriminatory policies" in the future. Compl. ¶¶ 13-19, 21-24. Plaintiff asserts that UNC-Chapel Hill's consideration of the race of its applicants violates the Constitution and Title VI. Plaintiff seeks a permanent injunction to prevent UNC-Chapel Hill[2] from using race as a factor in future undergraduate admissions decisions and to prevent admissions officers from knowing the race or ethnicity of any applicants. Compl. at p. 64. Plaintiff seeks a declaratory judgment that UNC-Chapel Hill's admissions policies and any other "use of race or ethnicity in an educational setting" violates the Fourteenth Amendment and Title VI. *Id.*

_____

[1] The Applicant Intervenors are minors. Accordingly, their claims are brought by their parents and each Applicant Intervenor is identified by his or her initials.

[2] Proposed Intervenors will collectively refer to all remaining Defendants as "UNC-Chapel Hill."

1

## II. PROPOSED INTERVENORS

The Applicant Intervenors are: 1) C.J., an African American who will be a senior, has survived cancer, and has a 4.03 GPA with a difficult schedule of Advanced Placement and honors courses, *see* Decl. of C.J. (attached as Ex. 1.1); 2) Q.M., an African American who will be a senior, has a GPA of 4.40, participates in numerous extracurricular activities related to science, biology, and robotics, and intends to major in biology and eventually attend medical school, *see* Decl. of Q.M. (attached as Ex. 1.2); 3) R.J., an African American who will be a senior, is consistently on her school's honor roll, belongs to the National Junior Honors Society, and participates in cheerleading, choir, and a conflict resolution group, all while working part-time as a hostess at a restaurant, *see* Decl. of R.J. (attached as Ex. 1.3); 4) A.J., a rising junior who identifies as African American and American Indian, has a 3.8 GPA, has taken numerous honors courses, and is heavily involved in extracurricular activities related to both art and computer science, *see* Decl. of A.J. (attached as Ex. 1.4); and 5) I.N., a rising sophomore who identifies as African American and Hispanic, has taken a number of honors courses, has been dancing since she was two-years old, works as a baby sitter, and volunteers at an agricultural project and a children's services program, *see* Decl. of I.N. (attached as Ex. 1.5). With the exception of R.J., all Applicant Intervenors are North Carolina residents currently enrolled in North Carolina high schools. R.J. is a resident of the District of Columbia and if admitted to UNC-Chapel Hill, she will apply for a D.C. Tuition Assistance Grant, which will provide up to $10,000 toward the difference between in-state and out-of-state tuition at UNC-Chapel Hill.

2

The Applicant Intervenors will all have competitive applications for admission to UNC-Chapel Hill. They seek to ensure that their applications are judged under an admissions process that considers the whole of their applications, including the racial and ethnic diversity they will bring to UNC-Chapel Hill, and that the admissions process resulting from this litigation complies with the Constitution and Title VI, including not having a disparate impact on minority applicants.

The Student Intervenors are: 1) Cecilia Polanco, a rising senior at UNC-Chapel Hill who identifies as Hispanic, received the Morehead Cain Scholarship, supports the current admissions policy, and although UNC-Chapel Hill was her dream school, often feels invisible as a minority student, *see* Decl. of Cecilia Polanco (attached as Ex. 1.6); 2) Luis Acosta, a rising junior at UNC-Chapel Hill who identifies as Hispanic, is the first member of his family to attend college, learned English as a second language, and although UNC-Chapel Hill is more diverse than his hometown, observes that "sometimes students can be unfair or insensitive to each other when an issue involving race or ethnicity comes up on campus," *see* Decl. of Luis Acosta (attached as Ex. 1.7); 3) Star Wingate-Bey, a rising senior at UNC-Chapel Hill who always imagined herself going to UNC-Chapel Hill, identifies as Black and Moorish American, seeks an educational experience where there is "an increase in the number and diversity of underrepresented racial groups admitted," and notes that the administration sometimes responds to protests, like the protests related to a campus building named after a noted Ku Klux Klan member, in a way that "does not make students of color feel welcome on campus," *see* Decl. of Star Wingate-Bey (attached as Ex. 1.8); and 4) Laura Ornelas, a rising junior at UNC-

3

Chapel Hill who identifies as Hispanic, was one of only a handful of minority students from her high school to attend a top-tier university, and observes that Latinos are underrepresented at UNC-Chapel Hill, *see* Decl. of Laura Ornelas (attached as Ex. 1.9).

The Student Intervenors seek to ensure that the UNC-Chapel Hill educational experience continues to be enhanced by a diverse student body and to present evidence of the historical and current state of race relations and diversity at UNC-Chapel Hill.

## III.    ARGUMENT

### A.    Proposed Intervenors Are Entitled to Intervene as a Matter of Right

To intervene as of right under Federal Rule of Civil Procedure 24(a), a proposed intervenor must establish that: 1) the application to intervene is timely; 2) the proposed intervenor has an interest in the subject matter of the underlying action; 3) the denial of the motion to intervene would "impair or impede the applicant's ability to protect its interest;" and 4) the applicant's interest is "not adequately represented by the existing parties to the litigation." *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999) (citations omitted). "As a general matter, liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *United States v. Exxonmobil Corp.*, 264 F.R.D. 242, 245 (N.D. W. Va. 2010) (internal quotation marks and citations omitted).

### 1.    Proposed Intervenors' Motion Is Timely

Although Rule 24 requires that a motion to intervene be "timely," it does not "define the term or specify rigid time limits." *Scardelletti v. Debarr*, 265 F.3d 195, 202

4

(4th Cir. 2001) (quoting *United States v. South Bend Comm'y Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983)), *rev'd sub nom. Devlin v. Scardelletti*, 536 U.S. 1 (2002). "In order to properly determine whether a motion to intervene in a civil action is sufficiently timely, a trial court in this Circuit is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. Envtl. Prot. Agency*, 758 F.3d 588, 591 (4th Cir. 2014) (citation omitted). Considering all three factors, Proposed Intervenors have sought to intervene in a timely fashion.

First, the underlying suit is in its nascent stages. This motion coincides with the deadline for Plaintiff to join additional parties or amend pleadings and is well in advance of the deadline for Defendants to join additional parties or amend pleadings. *See* Order (ECF No. 34) (adopting Defendants Rule 26(f) Report); Defs.' Rule 26(f) Rep. at 4-5 (ECF No. 33). The discovery period set by the Court has just commenced and has eight months remaining. *See id.* Courts have found motions to intervene timely at much later stages of the litigation process. *See, e.g.*, *Grubbs v. Norris*, 870 F.2d 343, 345-46 (6th Cir. 1989) (allowing intervention nine years after the filing of complaint); *Skinner v. Weslaco Independent Sch. Dist.*, 220 F.3d 584, 584 (5th Cir. 2000) (unpublished) (overturning district court's finding that proposed intervenors' motion was untimely when it was filed over a year after the case was filed).

Second, the current parties are not prejudiced by any delay in the bringing of this Motion. "[P]rejudice must be measured by the delay in seeking intervention, not the

5

inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994).

Here, there is no relevant prejudice to the parties. The Proposed Intervenors will complete the discovery they would seek within the existing discovery deadlines and would not otherwise disrupt any aspect of the litigation schedule. Although Proposed Intervenors intend to submit evidence for the Court's consideration, much of it will be presented through declarations and expert testimony. Accordingly, the number of depositions and the amount of written discovery would not be significantly increased by permitting the participation of Proposed Intervenors.

Third, it did not become clear that the Proposed Intervenors' interests would not be fully represented in this litigation until Defendants submitted, and the Court adopted, Defendants' Rule 26(f) Report. Defendants' list of areas and subjects on which they plan to conduct discovery, *see* Defs.' Rule 26(f) Rep. at 3, fails to include evidence that is necessary to the most comprehensive defense of UNC-Chapel Hill's consideration of race in admissions and to ensure that the admissions process resulting from this litigation complies with Proposed Intervenors' rights under the Constitution and Title VI. *See Sierra Club*, 18 F.3d at 1206 (noting that the appropriate "gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties.") (citation omitted).

For example, UNC-Chapel Hill does not seek to adduce or introduce evidence related to UNC's own past history of discrimination. This topic is critical to

6

understanding how the consideration of race in the admissions process helps remedy the long history of segregation and discrimination in North Carolina, including within the University itself. This history is also important to understanding UNC-Chapel Hill's interest in maintaining a diverse student body. Relatedly, UNC-Chapel Hill does not list as a topic for discovery how a diverse student body enhances the lives and educations of all UNC-Chapel Hill students, which is the compelling interest that, by UNC-Chapel Hill's own account, justifies its use of race in its admissions process.

UNC-Chapel Hill does not list as a discovery topic the issue of how certain racial and ethnic groups are disadvantaged in the admissions process by certain factors such as early admissions, standardized test performance, and alumni status, which currently receive great weight. Such evidence is critical to establishing that UNC-Chapel Hill's use of race in admissions helps ameliorate an unwarranted disparate impact on minority applicants caused by these, and potentially other, aspects of the admissions process. Any court-ordered or voluntary resolution of this matter that eliminated or reduced the consideration of race and ethnicity in the holistic review of applications would increase the disparate impact on minority students.

## 2. Proposed Intervenors Have a Significant Protectable Interest in this Litigation

Proposed Intervenors have a protectable interest in this action. "While Rule 24(a) does not specify the nature of the interest required for a party to intervene as a matter of right, the Supreme Court has recognized that what is obviously meant . . . is a significantly protectable interest." *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991)

7

(quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)) (internal quotation marks omitted).

The Applicant Intervenors have a significantly protectable interest in having their applications considered under a holistic admissions process that includes appropriate consideration of race and thus complies with Title VI and the Constitution. Although Applicant Intervenors have not yet submitted applications, three of them are rising high school seniors who will submit college applications in the next few months. Applicant Intervenors have an interest in preserving the aspects of the admissions process that ensure their fair chance of admission to a school that, for North Carolina residents, stands alone. *See Sweatt v. Painter*, 339 U.S. 629, 633-35 (1950) (observing that flagship state university may offer benefits, including resources, faculty, prestige, and alumni networks, that are superior to those available at other state universities). For North Carolina high school students, there is no comparable school that offers the same quality education for the same low in-state tuition, distinguishing it from a school like Harvard College where applicants throughout the country have a similar level of interest in the school. *See Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*, 14-cv-14176-ADB, 2015 WL 3683230, at *6 (D. Mass. June 15, 2015).

Courts have recognized that individuals whose chances of admission would be tangibly and directly affected if an existing educational policy were ceased have a protectable interest for purposes of intervention to defend that program. *See Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (proposed intervenors had "a substantial

8

legal interest in educational opportunity, which requires preserving access to the University for African-American and Latino/a students and preventing a decline in the enrollment of African-American and Latino/a students"); *cf. Podberesky v. Kirwan*, 38 F.3d 147, 162 n.\* (4th Cir. 1994) (discussing minority students allowed to intervene to defend scholarship program for African Americans at University of Maryland); *Wooden v. Board of Regents*, 247 F.3d 1262, 1268 (11th Cir. 2001) (noting that organizations representing minority applicants and African-American individuals had successfully moved to intervene to defend the consideration of race in remedying Georgia's formerly-segregated system of higher education). Courts have even found that individuals have a protectable interest in educational policies whose benefits they have not yet received. For example, in *Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014), the Fifth Circuit, which applies a more stringent standard for a protectable interest than the Fourth Circuit, concluded that parents who wanted their children to obtain school vouchers under a program that had yet to be implemented had "an interest justifying intervention" into a lawsuit regarding the program. 749 F.3d at 344.

Here, Applicant Intervenors have an interest in defending a program that enhances their fair chance for admission to UNC-Chapel Hill. Plaintiff's arguments for banning the consideration of race in the admissions process and its proposed remedies squarely implicate the Applicant Intervenors' own rights to have their applications considered under a policy that does not have a disparate impact on minorities.

9

Student Intervenors have an interest in ensuring that future applications are considered under a holistic process that includes the lawful consideration of race. Otherwise they cannot obtain the "educational benefits that flow from a diverse student body," including breaking down racial stereotypes, enabling students to better understand persons of different races, preparing students for an increasingly diverse workforce and society, and diminishing stereotypes and beliefs regarding minority students. *Grutter v. Bollinger*, 539 U.S. 336, 330-33, 343 (2003); *see Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 306 (1978) (controlling opinion of Powell, J.) (recognizing interest in "obtaining the educational benefits that flow from an ethnically diverse student body"); *see, e.g.*, Decl. of Luis Acosta (attached as Ex. 1.7) ("I have been able to spend time with some Indian and Asian students at UNC-Chapel Hill from whom I have learned a lot and who broke down a lot of the stereotypes I held about people of their ethnic background."); Decl. of Cecilia Polanco (attached as Ex. 1.6) ("Having a diverse student body exposes us to people who think, solve problems, and communicate differently – an exposure that makes us more culturally competent and capable of interacting well with people from different backgrounds."); Decl. of Laura Ornelas (attached as Ex. 1.9) ("I want to work in an international setting, so it is important for me to be around people who have different backgrounds and world views."); Decl. of Star Wingate-Bey (attached as Ex. 1.8) ("If I am the only Black person or Black woman in a classroom setting it often feels like I have to be the fact checker for a conversation or the spokesperson for my entire race or gender.").

### 3. Proposed Intervenors' Interests May Be Impaired If Intervention Is Denied

Parties seeking intervention need not establish that their interests *will* be impaired – only that they *may* be impaired. *Brumfield*, 749 F.3d at 344-45; *Grutter*, 188 F.3d at 399 ("[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal.") (quoting *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997)). Proposed Intervenors' interests may be impaired if intervention is denied.

First, as potential beneficiaries of the race-conscious admissions system currently in use at UNC-Chapel Hill, Proposed Intervenors will clearly be harmed if the Court finds the system unconstitutional and the replacement system reduces their chances of admission. *Grutter,* 188 F.3d at 400 ("There is little room for doubt that access to the University for African-American and Latino/a students will be impaired to some extent and that a substantial decline in the enrollment of these students may well result if the University is precluded from considering race as a factor in admissions."). It is extremely unlikely that UNC Chapel-Hill could devise an alternative admissions process that would fully recreate its current level of diversity, maintain and encourage diversity within different racial and ethnic groups, and otherwise fully protect Proposed Intervenors' interests. And even if it could, Proposed Intervenors would still meet the impaired interests prong because a finding that UNC Chapel-Hill's current admissions policy is unconstitutional "would make the 'task of reestablishing the status quo . . . [more] difficult and burdensome.'" *Crossroads Grassroots Policy Strategies*, No. 14-5199, 2015

11

WL 3513990, at *7 (D.C. Cir. June 5, 2015) (quoting *Funds for Animals Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)).

<u>Second</u>, Proposed Intervenors' interests would be impaired if the resolution of the case leads to an alternative admissions policy that limits UNC-Chapel Hill's ability to foster diversity or that violates Proposed Intervenors' rights to be considered under a process that does not have a disparate impact on minorities. This outcome could result if the Court does not consider or weigh (or cannot consider or weigh because the record is insufficiently developed) the history of discrimination at UNC-Chapel Hill, the inextricable link between that history and UNC's current compelling interest in student body diversity, and the adverse effect that elements of the current admissions process have on the diversity of the student population.

The failure to allow the intervention of parties with a greater interest in developing the record can limit the arguments available not only to the trial court but also to the appeals courts. For example, in *Bakke*, the Supreme Court rejected the University of California's proffered compelling interest in remediating the effects of past segregation, noting that no evidence had been put on record of any "judicial, legislative, or administrative findings of constitutional or statutory violations." *Bakke*, 438 U.S. at 307 (Powell, J.). Earlier in that case, the trial court had denied the NAACP's motion to intervene to submit evidence on exactly that point. Pet. of NAACP for Leave to File as Amicus Curiae on Pet. for Rehearing at 6, *Bakke v. Regents of the Univ. of Cal.*, 553 P. 2d 1152 (Cal. 1976). By contrast, in *Grutter*, the trial court permitted intervenors to

12

participate fully in discovery and at trial. *Grutter v. Bollinger*, 137 F. Supp. 2d 821, 856 (E.D. Mich. 2001). In fact, the intervenors offered significantly more evidence than any other party. *See* William C. Kidder, *Affirmative Action in Higher Education: Recent Developments in Litigation, Admissions, and Diversity Research*, 12 Berkeley La Raza L.J. 173, 176 & n.14 (2001).

The evidentiary record is critical in cases involving race-conscious admissions programs because courts must conduct a detailed review of the evidentiary record. *Bakke*, 438 U.S. at 307, 310 (rejecting argument as to compelling interest because there was "virtually no evidence in the record" on that point); *see, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2421 (2013) (courts must "giv[e] close analysis to the evidence of how the process works in practice"). A race-conscious admissions program must be justified with tangible evidence as to a number of factors, including the compelling interest that justifies considering race, the success of the program in meeting that interest, the justifications for why alternative race-conscious programs would not sufficiently satisfy that interest, and the experiential effect of the program on all affected participants. Proposed Intervenors' interests will be impaired if they are not allowed to intervene and ensure such a record is built.

### 4. UNC-Chapel Hill Will Not Adequately Represent Proposed Intervenors' Interests

In order to satisfy the last requirement for intervention by right, Proposed Intervenors need only show that UNC-Chapel Hill's representation of the Proposed Intervenors' interests "may be inadequate." *Trbovich v. United Mine Workers of Am.*, 404

13

U.S. 528, 538 n.10 (1972) (citation and internal quotation marks omitted). The intervenor's "burden of showing an inadequacy of representation is minimal." *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976).

There are two circumstances where courts presume that an attempted intervenor is adequately represented, but neither applies here. First, a party's representation is presumptively adequate "where a proposed intervenor's ultimate objective is the same as that of an existing party[.]" *Stuart v. Huff*, 706 F.3d 345, 350 (4th Cir. 2013). This presumption applies only where the interests of the intervenor and the party "align precisely." *Brumfield*, 749 F.3d at 345.

UNC-Chapel Hill's interests diverge from Proposed Intervenors' interests in significant ways. UNC-Chapel Hill may not include certain defenses or develop specific evidence that would not only support a finding that the existing admissions process is permissible under the applicable constitutional and statutory provisions, but also show that the current admissions process is *necessary* to comply with minority students' rights under the Constitution and Title VI. *Cf. Ricci v. DeStefano*, 557 U.S. 557, 563 (2009) ("We conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a *strong basis in evidence* that, had it not taken the action, it would have been liable under the disparate-impact statute.") (emphasis added).

UNC-Chapel Hill will not want to gather and emphasize the evidence of historical, recent, or current race discrimination and segregation on its campus and in its admissions

14

process. Proposed Intervenors, however, will present evidence showing that UNC-Chapel Hill's current admissions policy is necessary in part because it helps remedy the long history of segregation and discrimination in North Carolina, including within the University itself. This history is inextricably linked to UNC-Chapel Hill's compelling interest in student body diversity. Proposed Intervenors will also present evidence related to continuing racial tensions on campus, which reflect the need for even greater emphasis on diverse perspectives and racial backgrounds within the campus community. *See, e.g.*, Decl. of Cecilia Polanco (attached as Ex. 1.6) (stating, "I often feel like the administration contributes to negative experiences among students of color by not affirmatively standing in support of underrepresented students."); Decl. of Star Wingate-Bey (attached as Ex. 1.8) (stating, "when many UNC students of color were attempting to have Saunders Hall, which is named after a UNC alumnus and member of the Ku Klux Klan, renamed, it was very clear from the administration's response to protestors that UNC-Chapel Hill would not entertain that action . . . Such an attitude does not make students of color feel welcome on campus.").

Proposed Intervenors will further develop and present evidence that a critical mass, or meaningful representation, of certain racial and ethnic groups – which is necessary to produce the educational benefits that diversity is designed to produce – has not yet been created on campus. *Grutter*, 539 U.S. at 318, 329-30. Proposed Intervenors will also develop evidence regarding how certain aspects of UNC-Chapel Hill's current admissions process, such as its early action program, legacy and other preferences, and

Case 1:14-cv-00954-LCB-JLW   Document 40   Filed 06/30/15   Page 16 of 23

consideration of SAT scores have a disparate impact on the admission of racial minorities.

All of this evidence is relevant to the question of whether, in the absence of any consideration of race or ethnicity, UNC-Chapel Hill's admissions process violates Title VI. UNC-Chapel Hill has been held liable for such violations in the past. *See Adams v. Bell*, 711 F.2d 161, 163-64 (D.C. Cir. 1983) (discussing Title VI claims against North Carolina that were unresolved until 1981). In sum, Proposed Intervenors will gather and submit evidence that UNC-Chapel Hill is institutionally inclined – and has a strong incentive – to avoid. This is a quintessential divergence of interests and, thus, the interests here do not "align precisely." *Brumfield*, 749 F.3d at 345.

Second, "where the party who shares the intervenor's objective is a government agency, the intervenor has the burden of making a strong showing of inadequacy." *Stuart*, 706 F.3d at 350. In contrast to the circumstances here, this presumption has been applied where government agencies or officials were obligated to defend a particular statute or legislation. *See State Police for Automatic Ret. Ass'n v. Difava*, 164 F. Supp. 2d 141, 152 (D. Mass. 2001) ("[C]ourts have adopted a presumption in favor of adequate government representation when the government sues as a plaintiff in its *parens patriae* capacity or when the government defends a statute against attack."); *see also Stuart*, 706 F.3d at 351 (in adopting the presumption of adequate representation by a government agency, noting that the government is the best party to defend a duly-enacted statute). Here, Plaintiff challenges a college's admissions policy adopted by its governing board rather than a

16

statute adopted through a democratic legislative process. UNC-Chapel Hill is not obligated to defend or maintain its admissions policy in the same way that the North Carolina Attorney General has an "obligation to aggressively defend laws duly enacted by the General Assembly." *United States v. North Carolina*, No 13-cv-861, 2014 WL 494911 at \*3 n.1 (M.D.N.C. Feb. 6, 2014); *see also Marie v Moser*, No. 14-cv-02518, 2014 WL 5800151, at \*3 (D. Kan. Nov. 7, 2014) (whether or not a government entity is obligated to defend a statute or policy is reviewed as part of adequacy determination).

It is quite plausible that UNC-Chapel Hill's position on considering race in its admissions process will change. UNC-Chapel Hill should not be presumed to be an adequate representative because it is subject to shifting political pressures and can change its admissions policy with a simple vote by its Board. *See, e.g.*, *N.M. Off-Highway Vehicle Alliance v. U.S. Forest Serv.*, 540 F. App'x 877, 881 (10th Cir. 2013) (finding that the government agency could not adequately represent the intervenors' interests in part because "there is no guarantee that the Forest Service's policy will not shift during litigation"); *Kleissler v U.S. Forest Serv.*, 157 F.3d 964, 973–74 (3d Cir. 1998) (finding inadequate representation and granting intervention in part because the court did not believe that it was "realistic to assume that the [government agency's] programs [would] remain static or unaffected by unanticipated policy shifts").

The political makeup of the UNC Board of Governors has changed dramatically since the University, faced with the risk of losing federal funding, first began making efforts to integrate and achieve greater diversity on campus. In recent months, the Board

17

of Governors has demonstrated a marked shift in governance by abruptly announcing the resignation of UNC system president Tom Ross; closing three campus academic centers, including UNC-Chapel Hill's Center on Poverty, Work, and Opportunity; and voicing concerns related to the work of UNC-Chapel Hill's Center for Civil Rights, which was founded by civil rights attorney Julius Chambers to advocate on behalf of minority and low-income individuals.

Even if the governmental interest presumption were applied in this context, Intervenors can overcome it. A showing of a likelihood of conflict or a divergence of interests will defeat the presumption that the applicant's interest is adequately represented by existing parties. *Cotter v. Mass. Ass'n of Minority Law Enforcement Officers,* 219 F.3d 31, 35 (1st Cir. 2000) (finding inadequate representation where government was unlikely to defend affirmative action based on deficiencies in current testing, rather than past discrimination). As described above, such a divergence of interests is present here because UNC-Chapel Hill and Proposed Intervenors will adduce and present different evidence to defend the consideration of race and ethnicity in the current admissions process and to describe why eliminating or altering the consideration of race and ethnicity would violate minority applicants' Title VI rights.

Moreover, UNC-Chapel Hill does not solely represent the interests of its students. Rather, the University is accountable to a large consortium of different individuals and entities, including faculty members, administrative officials, employees, parents, alumni, state and federal government agencies, and funders. Courts have found that state actors

18

should not be presumed to represent the interests of individuals who have more targeted, narrow interests than the existing party. *See Brumfield*, 749 F.3d at 346 ("We cannot say for sure that the state's more extensive interests will *in fact* result in inadequate representation, but surely they might, which is all that the rule requires."); *In re Sierra Club*, 945 F.2d 776, 779-80 (4th Cir. 1991) (finding inadequate representation when state agency represented "all of the citizens of the state" and proposed intervenor only represented "a subset of citizens" concerned with a particular outcome); *Kleissler*, 157 F.3d at 972 ("[T]he presumption notwithstanding, when an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light.").

No presumption of adequate representation should be made here, where UNC-Chapel Hill is not defending a duly enacted statute, where UNC-Chapel Hill and Proposed Intervenors have a divergence of interests regarding the evidence that needs to be adduced and presented, and where UNC-Chapel Hill must consider the interests of a wide array of parties.

## B. PROPOSED INTERVENORS ARE ENTITLED TO PERMISSIVE INTERVENTION

Should the Court determine that Proposed Intervenors are not entitled to intervene as of right, Proposed Intervenors urge the Court to allow permissive intervention. Federal Rule of Civil Procedure 24(b) provides, in relevant part, that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the

19

main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

First, as described above, this Motion is timely. Second, it is indisputable that UNC-Chapel Hill and Proposed Intervenors' defenses share common questions of law and fact. Third, permitting intervention will not cause undue delay or prejudice to the parties. Discovery has just begun and nearly eight months remain in the discovery period. As discussed above, Proposed Intervenors intend to submit the majority of their evidence in the form of declarations and expert testimony, ensuring that their intervention will not compound discovery and cause undue delay. Proposed Intervenors will comply with the schedule set by the Court and their participation would not require any party to seek to alter any existing deadlines.

## IV.    CONCLUSION

For the foregoing reasons, Proposed Intervenors request that the Court grant them intervention as a matter of right under Federal Rule of Civil Procedure 24(a), or alternatively, permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).

Dated: June 29, 2015                    Respectfully submitted,

/s/ Reed Colfax
Reed Colfax*
Glenn Schlactus*
Sasha Samberg-Champion*
Laura Gaztambide-Arandes*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
rcolfax@relmanlaw.com
gschlactus@relmanlaw.com
ssamberg-champion@relmanlaw.com
larandes@relmanlaw.com
Tel: (202) 728-1888

/s/ Jack Holtzman
Jack Holtzman, N.C. Bar No. 13548
Christine Bischoff, N.C. Bar No. 41792
NORTH CAROLINA JUSTICE CENTER
224 South Dawson Street
Raleigh, NC 27601
jack@ncjustice.org
christine@ncjustice.org
Tel: (919) 856-2165

/s/ Jon M. Greenbaum
Jon M. Greenbaum*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Avenue NW, Suite 400
Washington, DC 20005
jgreenbaum@lawyerscommittee.org
Tel: (202) 662-8600

ATTORNEYS FOR PROPOSED
DEFENDANT-INTERVENORS

* *Special Appearance*

21

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.3(b)(2), I hereby certify that this document filed through the CM-ECF system on June 29, 2015 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Reed N. Colfax
Reed N. Colfax