EXHIBIT 3

FILED

2008 JUL 23  PM 4: 42

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
　　　　　　　DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL NOEL FISHER and RACHEL MULTER MICHALEWICZ, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| STATE OF TEXAS, | § § | |
| Defendant. | § § | CIVIL ACTION NO.  1:08-CV-0263-SS |
| CHAD STANTON, ANTHONY D. WILLIAMS, ARIEL CECIL BARRETT, C.J. DAVIS, DEVON ROBINSON, TRENTON STANTON, ERIC TRE STANTON, and THE UNIVERSITY OF TEXAS BLACK STUDENT ALLIANCE | § § § § § § § | |
| Proposed Intervenors. | | |

## MOTION TO INTERVENE

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Chad Stanton, Anthony D. Williams, Ariel Cecil Barrett, C.J. Davis, Devon Robertson, Trenton Stanton, Eric Tre Stanton,[1] and the University of Texas Black Student Alliance ("BSA") (collectively, "Proposed Intervenors") file this motion to intervene.  Proposed Intervenors are African-American students who are enrolled or seek to enroll at University of Texas at Austin ("UT" or the "University"), and the BSA is a membership organization for enrolled African-American students.  Proposed Intervenors have direct interests in this challenge to the consideration of race in admissions at UT.  Proposed Intervenors will show that UT's admissions process complies with the Supreme

---

[1] Ariel Cecil Barrett, C.J. Davis, Devon Robinson, Trenton Stanton and Eric Tre Stanton are minors and move to intervene by their parents or Guardians, respectively, Kenneth Royce Barrett, Yolanda Davis, Wendy Richardson, and Lisa Stanton.

Court's directive in *Grutter v. Bollinger*, 539 U.S. 306 (2003), upholding the ability of UT to ensure that minority students are not merely token members of the UT community but instead form part of the critical mass of minority students necessary to achieve the benefits of a truly diverse student body.  Since Proposed Intervenors are themselves part of that critical mass, they have direct and substantial interests in ensuring that the admissions process is upheld. Accordingly, pursuant to Federal Rule of Civil Procedure 24, Proposed Intervenors respectfully seek leave to intervene to defend the constitutionality of UT's admissions process.

Proposed Intervenors have specific interests that are different and separate from the general interests of the State of Texas.  Where the State must focus on the overall diversity of the student body, which necessarily includes many different interests, Proposed Intervenors will focus specifically on the benefits of having a critical mass of African-American students.  Where the State has focused more generally on maintaining its discretion to determine whether overall critical mass has been achieved, Proposed Intervenors will demonstrate, through their own experiences and knowledge, that critical mass has not, and cannot be, achieved for African-Americans under the formulaic methodology advocated by the plaintiffs.  Moreover, where the State is obligated to highlight the many positive aspects of the UT experience and may face external pressures on its ability to defend controversial admissions practices, Proposed Intervenors will point out the negative consequences that have resulted, and that would result, from an admissions process where the consideration of race is prohibited.  Thus, Proposed Intervenors' request to intervene here is different than in *Hopwood v. Texas,* 21 F.3d 603 (5th Cir. 1994), where this Court considered the propriety of intervention to defend the use of race to effectuate remedial goals rather than the broad diversity goals later approved by the Supreme Court in *Grutter*.  While Proposed Intervenors remain conscious of UT's well documented

history of exclusion, they move for intervention in this case to present arguments and provide critical evidence about the present circumstances for African-American students who are enrolled at UT and to protect access and diversity for African-American students in the future.

Accordingly, Proposed Intervenors respectfully request that they be granted leave to intervene as defendants in this action either as of right or on a permissive basis.

## I.       STATEMENT OF RELEVANT FACTS

The achievement of racial diversity in its undergraduate student population has been the subject of a long struggle for the University.  From the early 1980s through 1994, the University employed an admissions process which took account of an applicant's race – among other factors – but it was forced to abandon that plan after the Fifth Circuit's decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996) (*Hopwood* II).

After the ruling in *Hopwood* II, the Texas legislature enacted the "Top 10 Percent Law." Pursuant to the Top 10 Percent Law, still in place, Texas public high school students who graduate in the top ten percent of their class are guaranteed admission to UT.  (Am. Compl. at 9.) Currently, the Top 10 Percent Law accounts for over 80% of admissions to the University.  (*See* Affidavit of Gary M. Lavergne to Defendant's Opposition to Motion for a Preliminary Injunction, dated May 5, 2008.)  The University employs a holistic method of selecting students for the remaining seats.  Still, the number of African-American students on campus remains low as compared with the percentage of African Americans residing in Texas.[2]

---

[2] In 2007, African Americans made up around 11.6% of the Texas population, but 5.8% of first-year enrollments at UT.  S*ee* United States Census Bureau, "Texas: Fact Sheet" (2006), *available at* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=&geo_id=04000US48&_geoContext=01000US%7C04 000US48&_street=&_county=&_cityTown=&_state=04000US48&_zip=&_lang=en&_sse=on&ActiveGeoDiv=& _useEV=&pctxt=fph&pgsl=040&_submenuId=factsheet_1&ds_name=null&_ci_nbr=null&qr_name=null&reg=n ull%3Anull&_keyword=&_industry=; University of Texas at Austin, "Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin (Oct. 2007), Tbl. 1.

Proposed Intervenors intend to show that the relatively low number of African-American students on campus impedes efforts to create a diverse, safe, and comfortable learning environment in which all students can thrive.  UT simply has not reached a level of diversity where racial stereotypes lose their force.  Instead, racial tensions and incidents of racial discrimination continue to be prevalent aspects of life on campus for African Americans and other underrepresented minorities.[3]  Proposed Intervenors intend to show that the continued use of a race-conscious admissions process in order to promote diversity is an important factor in reducing such instances of discrimination, and bringing to all UT students a broader and different prospective from their own.  The current plan seeks to ensure that enrolled African-American students do not represent the lone voice or African-American viewpoint, but are instead a meaningful part of an exchange that includes a range of perspectives and helps all students achieve greater cross-racial understanding. *See Grutter*, 539 U.S. at 330 (underscoring the importance of efforts to enroll a critical mass of students from different racial backgrounds to "break down racial stereotypes" and "enable[] [students] to better understand persons of different races.").

For Proposed Intervenors, the promise of *Grutter* is something UT, in fact, is just beginning to achieve.  Here, where Plaintiffs seek to have this Court, not the University, determine what constitutes "critical mass" at UT, and proclaim that there is already a sufficiently diverse population at UT, the participation and perspectives of African-American students

---

[3]  *See, e.g.*, Michelle West, *Law Students' Party Theme Not So Fabulous*, THE DAILY TEXAN, Oct. 13, 2006 (reporting reaction to a "ghetto fabulous" theme party held by law students); David Kassabian, *Officials Talk Camera Upgrade: New Technology Would Detect Suspicious Acts Around MLK Statue*, THE DAILY TEXAN, Aug. 27, 2004 (discussing the repeated vandalism of a campus statue of Martin Luther King, Jr.); *see also* Caroline Page, *UT Students Outraged*, THE DAILY TEXAN, Oct. 5, 2007 (discussing controversy over a "Ghetto Mexican/Cholo" fraternity party).

currently attending UT and those who seek to attend UT are vitally important to include in the resolution of this lawsuit.

## II.    PROPOSED INTERVENORS

Proposed Intervenors are seven African-American students who are either currently enrolled or seek in the future to enroll at UT, as well as the Black Student Alliance at the University of Texas at Austin.  Each Proposed Intervenor seeks to join this suit because of a strong interest in the continuation of the challenged admissions program, and the preservation of access to and more than token racial diversity at UT.

Proposed Intervenors Chad Stanton and Anthony D. Williams are African-American students currently enrolled at UT.  Among other things, they are concerned that the relief sought by Plaintiffs (Am. Compl. ¶165) would result in even fewer African-American students at UT, which would have a negative effect on the recruitment and retention of African-American students and exacerbate the racial isolation felt by African-American students on campus.  Mr. Stanton is entering his 4th year at the University as a government major. He served as the President of the Black Student Alliance during the 2007-2008 school year and currently serves as an at-large representative for UT's student government.  Mr. Williams is currently a rising 5th year student at UT.  He was the 2006-07 President of the Black Student Alliance, and was BSA's Parliamentarian in 2005-06 and 2007-08.

Proposed Intervenor Ariel Cecil Barrett, C.J. Davis, Devon Robinson, Trenton Stanton, and Eric Tre Stanton are all African-American Texas high school students who are interested in attending UT.  Among other things, they are concerned that the relief sought by Plaintiffs (Am. Compl. ¶165) may limit access for African-American and other minority students, and result in a non-diverse educational environment that would not be welcoming to and comfortable for them. Ariel Cecil Barrett is a rising 10th grader at the Incarnate Word Academy in Houston, Texas; C.J.

Davis is a rising 11th grader at Harker Heights High School in Harker Heights, Texas; Devon Robinson is a rising 11th grade student at Cedar Park High School in Cedar Park, Texas; Trenton Stanton is a rising 12th grade student at Justin F. Kimball High School in Dallas, Texas; and Eric Tre Stanton attends Justin F. Kimball High School in Dallas, Texas where he will be attending 10th grade in the fall.

Proposed Intervenor the Black Student Alliance at the University of Texas at Austin ("BSA") is a membership organization for African-American students currently attending UT.[4] Founded in the 1980-81 academic year, the BSA "serves as the representative voice of the Black student body academically, politically, and socially to promote unity, success and involvement."[5] The BSA has long been concerned with the low representation of African Americans on the UT campus. One of the stated goals of the organization is to increase the number of African-American and other minority students through minority recruitment and retention programs.

## III.   DISCUSSION AND AUTHORITIES

### A.   Proposed Intervenors Are Entitled to Intervene as of Right.

In the Fifth Circuit, intervention under Rule 24(a)(2) is proper when:

> (1) the motion to intervene is timely;
>
> (2) the potential intervener asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene;
>
> (3) the disposition of that case may impair or impede the potential intervener's ability to protect her interest; and

---

[4] The Supreme Court has recognized that an organization such as the BSA has significant protectable interests in their own right and as representative of its members. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (recognizing that a nonprofit corporation whose purpose was "to make equal opportunity in housing a reality in the Metropolitan Richmond Area" had a significant organizational interest for standing purposes); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342-45 (1977) (recognizing organization's standing in a representational capacity to protect interests of its members).

[5] *See, e.g.* Black Student Alliance Organization Website, http://studentorgs.utexas.edu/texasbsa/. Under the terms of the BSA's constitution, anyone who seeks to become a member of BSA is automatically granted membership, as long as they attend meetings. Membership is not restricted to African-American students. Students can choose to pay membership dues, which gives them voting and other additional privileges.

> (4) the existing parties do not adequately represent the potential intervener's interest.

*Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004) (quoting *Doe v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001)).  Intervention rules are construed in favor of the potential intervenor.  *See, e.g.*, 7C Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 1904; *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986).  In general, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained."  *Glickman*, 256 F.3d at 375 (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).

Proposed Intervenors satisfy all elements of the Fifth Circuit standard and accordingly request that this Court grant them intervention as of right.

## B.     This Intervention is Timely.

Proposed Intervenors' motion is timely under Rule 24(a).  As the Supreme Court held, "[t]imeliness is to be determined from all factors."  *NAACP v. New York*, 413 U.S. 345, 366 (1973).  The Fifth Circuit has established four grounds to be considered in timeliness determinations:

> (1) The length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene;
>
> (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case;
>
> (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and
>
> (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Espy*, 18 F.3d at 1205 (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977)).

"The analysis is contextual; absolute measures of timeliness should be ignored." *Id.*

Here, the case is relatively new. Plaintiffs' amended complaint and a motion for a preliminary injunction were filed on April 17, 2008. Defendants' opposition to the preliminary injunction motion was filed on May 5, 2008 and their answer to the amended complaint on May 8, 2008. On May 29, 2008, Plaintiffs' motion for a preliminary injunction was denied. Only recently was it determined that the plaintiffs' would not appeal that order, thereby ensuring that this Court would retain jurisdiction over all issues. A scheduling order was entered on July 10, 2008, which provides that plaintiffs will have until January 2, 2009 to file their motion for summary judgment. Proposed Intervenors aver that if granted intervention, they would adhere to the scheduling order.

The parties would in no way be prejudiced by intervention at this time. Aside from the order related to the injunction, this Court and the parties have not yet taken any significant actions with regard to the complaint. Proposed Intervenors understand that plaintiffs served their initial discovery requests on July 7, 2008. *See Smith Petroleum Service, Inc. v. Monsanto Chemical Co.*, 420 F.2d 1103, 1115 (5th Cir. 1970) ("[C]ourts have allowed intervention months or even years after the original filing of the suit where the substantial litigation of the issues had not been commenced when the motion to intervene was filed.") (citation omitted). As such, the parties will suffer no prejudice whatsoever from the timing of this motion to intervene.

Further, as detailed below, a refusal to allow intervention would prejudice Proposed Intervenors by preventing their interests from being fully represented and deprive this Court of relevant evidence. In short, there is nothing about this case which indicates that intervention is untimely.

C.     **Proposed Intervenors have a Direct and Substantial Interest in the University's Continued Ability to Utilize a Race-Conscious Admissions Process That Will Produce a Diverse Undergraduate Student Population that Includes a Critical Mass of African-American Students.**

Each Proposed Intervenor has direct and substantial interests in race continuing to be considered as a factor in undergraduate student admissions at UT.  As African Americans who are enrolled or seek to enroll at the University of Texas or, in the case of BSA, an organization dedicated to advancing the interests of African-Americans on campus, each has a direct and personal interest in ensuring that the pathways to enrollment and graduation at UT remain open and welcoming to them and that they will not be token members of the UT community.

Indeed, Proposed Intervenors have several direct and substantial interests in the University continuing to take race into account in the admissions process:

> (1) preserving educational access and opportunity for African-American students;
>
> (2) promoting a diverse and inclusive student population with a critical mass of African-American students;
>
> (3) ensuring that the number of African-American students does not decline to a token point where they feel isolated and marginalized; and
>
> (4) considering, in the admissions process, applicants' background and experiences as African Americans as a distinct and valuable factor in evaluating what each candidate for admission will bring to the University.

*See Grutter*, 539 U.S. at 331 (recognizing that "'[e]nsuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective' . . . [a]nd, '[n]owhere is the importance of such openness more acute than in the context of higher education'" (quoting Brief for United States as *Amicus Curiae* 13)).

If race is taken out of the equation, Proposed Intervenors' ability to enroll at and/or graduate from their state's flagship institution may be directly threatened.  More importantly,

Proposed Intervenors will suffer as the Supreme Court's mandate in *Grutter* that "the diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals regardless of race or ethnicity" goes wanting.  539 U.S. at 331.   Thus, in *Grutter*, the Sixth Circuit held that minority students had a sufficient interest in defending race-conscious admissions criteria to intervene, noting that "[t]here is little room for doubt that access to the University for African-American and Latino/a students will be impaired to some extent and that a substantial decline in the enrollment of these students may well result if the University is precluded from considering race as a factor in admissions."  *Grutter v. Bollinger*, 188 F.3d 394, 400 (6th Cir. 2001).   Indeed, that court expressly stated that "recent experiences in California and Texas suggest such an outcome."  *Id.*

For much of its history, UT shut its doors to African-American students.[6]  This history provides important context for the instant case.  Today, African-American students continue to be underrepresented on UT's campus as compared to secondary schools in Texas.[7]  Proposed

---

[6] From the mid-1800s through the Supreme Court's decisions in *Sweatt v. Painter,* 339 U.S. 629 (1950) and *Brown v. Board of Education,* 347 U.S. 483 (1954), UT refused to admit African-American students.  Even after the *Brown* decision, things were slow to change.  In 1970, programs designed to attract and retain African-American students were suspended.  By 1980, the federal Office for Civil Rights found that Texas had still failed to eliminate the vestiges of its former racially dual system.  *See Adams v. Bell,* Civ. No. 70-3095, D.D.C., Order of March 24, 1983 at 5, aff'd, 711 F.2d 161, 165 n.25, 166 n.30 (D.C. Cir. 1983).  In further proceedings following the D.C. Circuit's remand, the court ultimately determined that no private cause of action against the Department of Education or the Office for Civil Rights existed, and the lawsuit was ultimately dismissed.  *Women's Equity Action League v. Cavazos,* 906 F.2d 742 (D.C. Cir. 1990).  The Office for Civil Rights, however, continued to investigate, monitor, and assess compliance by Texas and other states that it had originally determined to have failed to eliminate the vestiges of prior duality and segregation.  *See Hopwood v. Texas,* 861 F. Supp. 551, 556-57 (W.D. Tex. 1994) (detailing the continued oversight and monitoring of Texas's efforts to eliminate the vestiges of segregation). To this day, OCR has never announced a finding that Texas has satisfied its obligations under Title VI of the Civil Rights Act of 1964.  *See id.* at 557 ("To date, OCR has not completed its evaluation to determine if Texas is in compliance with Title VI").
   From 1996 to 2003, UT was prohibited from the consideration of race in admissions, pursuant to the Fifth Circuit's decision in *Hopwood v. Texas,* and the percentage of African-American students enrolled at UT dropped to 2.7%.  *Implementation and Results of the Texas Top Ten Percent Law (HB 588) at the University of Texas at Austin (October 2007)*, Tbl. 1, p. 6.

[7] In 2004-2005, 14% of Texas's public high school graduates were African American; that percentage is expected to grow to 16% by 2014-2015. Western Interstate Commission for Higher Education, *Knocking at the College Door: Projections of High School Graduates by State and Race/Ethnicity, 1992-2022* (March 2008).  By contrast, in 2007

Intervenors intend to show that prohibiting the University from taking affirmative steps to include students of different racial backgrounds would further, and dramatically, reduce the number of African-American students who are admitted and enroll at UT.[8]   Moreover, as a practical matter, to the extent that the Top Ten Percent plan succeeds in advancing a racially diverse group of students to UT, that diversity is a direct consequence of continued and pervasive racial segregation of Texas's secondary schools.[9]   Changes in demographics and student assignment plans as well as decisions about where and when new schools will open could all greatly impact diversity at UT, particularly if the consideration of race in admissions is prohibited.  For these reasons, Proposed Intervenors have an interest in an admissions process that allows the University to consider the race of qualified applicants who otherwise meet or exceed the University's admissions criteria and who are members of racial or ethnic population groups that have long been underrepresented at the University.

By increasing the number of African-American students, an admissions program that considers race in pursuit of a diverse student body also serves to create a more receptive, less hostile and less isolated experience for African-American students.  A significant decline in the African-American student population, as described above, would relegate African-American

---

only 5.8% of the enrolled class at UT was African American.  *See* Defendants' Answer  to Plaintiffs' Amended Complaint ¶¶ 90, 95.

[8] *Cf.* Mark C. Long, *Affirmative Action and Its Alternatives in Public Universities, What Do We Know*? PUB. ADMIN. REV, Mar./Apr. 2007, at 315; Charles Burress, *Cal Chancellor Warns of Diversity Crisis; Birgeneau Blames Prop. 209 for Decline*, SAN FRANCISCO CHRONICLE (Apr. 8, 2005) (noting that the number of African Americans in the University of California at Berkeley's freshman had class declined from 260 in 1996-97, before Prop. 209, which effectively banned the use of race in admissions, took effect, to 108 in 2004-05); UCLA Newsroom, *Background: Decline in African American Admissions at UCLA* (Aug. 11, 2006) *available at* http://www.newsroom.ucla.edu/portal/ucla/Background-Decline-in-African-7237.aspx?RelNum=7237 (noting  that the number of African American admits declined from 693 in 1995, before Prop. 209, to 244 in 2006).

[9] *See* Marta Tienda and Sunny Niu, *Capitalizing on Segregation, Pretending Neutrality: College Admissions and the Texas Top 10% Law*, 8 Am. Law & Econ. Rev. 312, 314 (2006) ("ironically, the success of the Top 10% Law in restoring ethno-racial diversity at the Texas public flagships requires segregation"); John F. Kain, et al., *Hopwood and the Top 10 Percent Law: How They Have Affected the College Enrollment Decisions of Texas High School Graduates*, The Texas Schools Project / The University of Texas at Dallas 35 (June 22, 2005) (finding that "a disturbing feature of the Top 10 Percent Law is its dependence on school and residential segregation to achieve the goal of increasing the representation of disadvantaged minorities at the state's selective public universities.").

students to serving as token minorities on campus and result in many, if not most, of them being the only African-American student in their classrooms, or in activities such as student government and the undergraduate business council. Fully realizing the educational benefits of diversity at UT – including increased cross-racial understanding and the diminution or elimination of racial stereotypes – requires more than a token number of students from underrepresented minority groups. *See Grutter*, 539 U.S. at 333 ("diminishing the force of [racial] stereotypes is both a crucial part of the Law School's mission, and one that it cannot accomplish with only token numbers of minority students."). Proposed Intervenors thus have a direct interest in ensuring an admissions process that considers the impact of a student's racial background on his or her life experiences as a distinct factor in evaluating qualifications for admission, and that values what students of diverse racial backgrounds bring to the University's educational environment.

Lastly, the Proposed Intervenors who seek to enroll in UT have a direct interest in access to their State's flagship institution.[10] For virtually its entire history, the University of Texas has trained leaders and provided its students access to political and economic power. For much of that history, however, African-American and Latino students were excluded from this critical exposure. *See Sweatt v. Painter,* 339 U.S. 629, 631 (1950) (noting that admission to the University of Texas was restricted to white students, in accordance with the Texas State Constitution and state statutory requirements). African-American and Latino students cannot continue to be excluded today:

> In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity. All members of our heterogenous society must have confidence in the

---

[10] *See, e.g. Grutter*, 188 F.3d at 399 ("The proposed intervenors have enunciated an interest in the subject matter of this case, namely their interest in gaining admission to the University . . . .").

openness and integrity of the educational institutions that provide this training.

*Grutter*, 539 U.S. at 332.  Proposed Intervenors who seek to enroll at UT can forcefully articulate and advance this interest in access to the leadership and knowledge they aspire to attain.

**D.     Disposition of this Case would Impede Proposed Intervenors' Ability to Protect Their Interests.**

As the Sixth Circuit held in similar circumstances in *Grutter*, Proposed Intervenors' ability to protect their interests will be severely impaired if they are not allowed to participate in this lawsuit.  Proposed Intervenors are currently, or may in the future be, the direct beneficiaries of an admissions policy that takes account of race in order to broaden access to the University and to produce a diverse and inclusive entering class of students.  That is not to say that they were admitted (or will be admitted) because of the program.  Still, it is Proposed Intervenors – even those admitted under the Top Ten Percent Law – who will bear the greatest costs if racial background cannot be taken into account in evaluating applications for admissions, particularly given the relatively low number of African-American students at UT and the very real danger that only a token number of such students would be enrolled at UT.     In particular, and regardless of the impact on any particular individual, the future membership of the BSA would necessarily and directly suffer if African-American enrollment drops at UT.  While an adverse ruling would necessitate a policy change for UT, it would directly affect the educational experience and opportunities afforded to Proposed Intervenors.  Moreover, it is Proposed Intervenors who necessarily will comprise part of the "critical mass" of African-American students at UT.  Proposed Intervenors therefore have a direct and substantial interest in upholding UT's commitment to real diversity.

Furthermore, a judgment in Plaintiffs' favor would leave Proposed Intervenors without the opportunity to challenge such a ruling on appeal and would, as a practical matter, curtail their

ability to bring a new action to restore *status quo ante*. *See, e.g., Espy*, 18 F.3d at 1207 (an intervenor's interest is impaired by the *stare decisis* effect of the district court's judgment); *see also Heaton v. Monogram Credit Card Bank*, 297 F.3d 416, 424 (5th Cir. 2002) (the "stare decisis effect of an adverse judgment constitutes a sufficient impairment to compel intervention") (quoting *Sierra Club v. Glickman*, 82 F.3d 106, 109-110 (5th Cir. 1996).

Participation as amicus curiae alone would not provide sufficient protection against these injuries because Proposed Intervenors would not be able to conduct and participate fully in discovery, to present evidence, to file motions, or to appeal a final judgment in the litigation. *See, e.g., Edwards v. City of Houston*, 78 F.3d 983, 1002-03 (5th Cir. 1996) (recognizing that if not allowed to intervene "would be intervenors [have] no adequate opportunity to set forth factual basis for their challenges"); *Espy*, 18 F.3d at 1207 (noting the "legal rights associated with formal intervention, namely the briefing of issues, presentation of evidence, and ability to appeal"); *Feller*, 802 F.2d at 730 (impairment requirement was satisfied because "[a]micus participants are not able to make motions or to appeal the final judgment in the case").

**E.    The Existing Parties' Interests are Different from those of Proposed Intervenors, and the State will not Adequately Represent those Interests.**

Generally, it is relatively easy for an intervenor to show inadequacy of representation. *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972) ("The requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal"). When, however, "the party whose representation is said to be inadequate is a governmental agency, a much stronger showing of inadequacy is required." *Hopwood*, 21 F.3d at 605; *but see Grutter*, 188 F.3d at 400 (rejecting *Hopwood* standard). When one of the parties to the suit is a sovereign interest, "the State is presumed to represent the interest of all its citizens." *See Hopwood*, 21 F.3d at 605. In

80254876.1

- 14 -

that circumstance, the party seeking intervention must show that "'its interest is in fact different from that of the state and that the interest will not be represented by the state.'"  *Id.* (quoting *Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979)).  In this case, Proposed Intervenors meet that higher burden.

### 1.     Proposed Intervenors Have Different Interests From the State.

Proposed Intervenors' ultimate goals are not identical to those of Defendants for several reasons.  *First*, Defendants' aim is to preserve UT's current admissions plan and to promote a diverse student body generally rather than to focus on the interests of any specific student, and that diversity interest is but one of numerous educational and other interests the State must weigh.  By contrast, Proposed Intervenors have direct and personal interests in ensuring their own access to higher education at the University, as well as preserving similar access and future leadership opportunities for a critical mass of African-American students of which they will be a part.  The University may have an interest in African American student enrollment that is incidental to the University's broader diversity and educational goals, but ensuring African-American students' access to higher education at UT is neither the University's primary nor its sole interest.  In fact, it is conceivable that the University might have broad diversity interests that nonetheless compromise African-American enrollment by focusing on the contributions of other groups.

For their part, Plaintiffs lump African-American and Latino students together to claim that a critical mass of underrepresented minority students already exists. Specifically, Plaintiffs assert that if 20% of the total student population is *either* of African-American or Latino background, "critical mass" has been achieved. (Transcript of Preliminary Injunction Hearing at 19: 12-14.)  For its part, the University is properly concerned with promoting diversity broadly and seeks a critical mass of students from all racial backgrounds, including the comparatively

larger Latino community.  The very breadth of its interest, however, may make it difficult for the University to focus sufficiently on each underrepresented group of Texans, and specifically on African-American students.  Whether intended or not, the practicalities of the litigation process may result in the University's failing to present sufficient evidence about what constitutes a critical mass of African-American students.

Proposed Intervenors will represent that separate and distinct interest.  Their focus would be more limited but essential, and would ensure an adequate presentation to the Court about what constitutes a critical mass of African-American students at the flagship institution of Texas' higher education system.  For Proposed Intervenors, whether or not it is so for the University, this question is central to the adjudication of the case and requires their participation as parties. Proposed Intervenors will enrich the factual record and amplify the record regarding Plaintiffs' claims by focusing on what constitutes "critical mass" for African-American students specifically and by providing an evidentiary foundation for retaining race as a separate subject of consideration within a holistic admissions process.

As public actors, Defendants' ability to advance a broad range of legal justifications for considering race in admissions is constrained substantially by other legitimate governmental considerations, and by Defendants' own institutional interest in their educational goals along with their  fiscal and administrative concerns. *See Glickman*, 256 F.3d at 381 (granting intervention where the "USDA is a governmental agency that must represent the broad public interest, not just the concerns" of potential intervenors); *Cohn v. EEOC*, 569 F.2d 909, 911 (5th Cir. 1978) (holding that EEOC, though sympathetic, did not adequately represent intervenors' interests); *New York Public Interest Research Group, Inc. v. Regents of Univ. of New York*, 516 F.2d 350, 352 (2nd Cir. 1975)  (putative intervenors, an association of pharmacists, had a

narrower, economic interest in regulatory statute than did the defendant Regents).   Proposed Intervenors' goals of ensuring educational access for African-American students and a critical mass of African-American students enrolled at UT are but two of the many competing interests that the University confronts in carrying out its mission.

*Second*, the University's defense has focused on its interest in preserving its own discretion to determine for itself whether the critical mass necessary for meaningful diversity has been achieved, *see* Defendants' Opposition to the Motion for Preliminary Injunction at 15-16, rather than on demonstrating to the Court that it has not in fact been achieved for African-American students.   By contrast, Proposed Intervenors will present evidence showing that, despite the numerous and overwhelmingly positive attributes of UT, the goal of meaningful diversity has not yet been achieved for African-American students and cannot be achieved under Plaintiffs' formulaic approach.   This will necessarily include negative aspects of the current and historical UT experience and context that Defendants, understandably, may be reluctant to highlight.

A central component of any discussion of what constitutes critical mass at UT is the experience and perspectives of African-American students.   Proposed Intervenors intend to show that having a token number of African-American students who feel isolated and marginalized at the University has an inevitable effect on the education process and the interest, if not the ability, of African-American students to reach across communities to promote the educational and social benefits that come from a diverse student body.   They will show that, under an admissions regime that cannot consider race in any way and that therefore lacks meaningful diversity, African-American students have felt, and will continue to feel, unwelcome and marginalized,

thereby diminishing the University's ability to attract and recruit African-American students by signaling that UT is open and accessible to them.

Specifically, Proposed Intervenors may present evidence regarding the following areas of concern that Defendants may be reluctant, if not unwilling to raise, given concerns about future liability and institutional legitimacy: (1) the disparate impact on African-American applicants of other admissions criteria used by UT, especially in light of the previous exclusion of African-American students and the current educational, extracurricular, and college preparatory opportunities afforded to African-American students at the K-12 level in Texas; and (2) existing and past racial tensions and discrimination experienced by African-American students at UT, especially in years when there was not a critical mass of African-American students at the school and a University environment where African-American students were not subject to treatment that made them feel marginalized.

Without the participation of Proposed Intervenors, the consideration of race in admissions might not be adequately defended in all its complexities and the real world impact that it has on the lives of African American college students in Texas may be unnecessarily absent from this adjudication. If this case were to proceed that far, the trial record might fail to substantiate thoroughly both the vital need for considering race in admissions and the benefits that doing so provides to African American students, the student body generally and future leadership within the state of Texas. Proposed Intervenors will make a significant impact on the development of the underlying factual issues, including what constitutes a critical mass of African-American students; why the percentage of African-American students admitted under a top 10% plan without consideration of race in admissions is insufficient to achieve the educational benefits of diversity; and whether there are a sufficient number of African-American students so that

African-American students are not racially isolated and African-American students seeking to apply to UT feel welcome and that the doors to UT are open to them.

*Third*, the University is also subject to internal and external pressures that temper its ability to protect the often-controversial consideration of race in admissions.  Its vigor in defending race as a factor in its admissions programs might, and indeed has been, affected by real differences among members of the University community, alumni, and faculty regarding the desirability of considering race as a factor in admissions. Certainly, electoral outcomes, legislative mandates and political pressures have already changed the admissions landscape at UT, and there is no doubt UT will continue to be subject to external political pressures.  All these pressures may affect the intensity and manner of Defendants' approach to the critical issues at stake in this litigation, including, but not limited to, the University's assertion of its interest in promoting diversity. *See, e.g., Espy*, 18 F.3d at 1205 ("the government must represent the broad public interest, not just the economic concerns" of putative intervenors); *Kneeland v. National Collegiate Athletic Assn.*, 806 F.2d 1285, 1288 (5th Cir. 1987) (recognizing adversity of interests arising from "conflicts between agency attempts to represent the regulated parties and statutory mandates to serve the public interest") (citations omitted); *Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471, 1478 (11th Cir. 1993) (while voters sought to intervene in voting rights suit solely to defend at large system, county commissioner defendants "had to consider the overall fairness of the election system . . . the expense of litigation . . .and the social and political divisiveness of the election issue").  At the same time, the University may be less responsive to the experiences and perspectives of current and prospective African-American students, who comprise a small percentage of the student body, faculty and alumni of UT, and an even smaller proportion of the leadership and power structure in the state of Texas, particularly since the

University faces less risk of harm than do Proposed Intervenors if the consideration of race is prohibited.

### 2.    *Hopwood* Is Inapposite.

In *Hopwood*, the Fifth Circuit affirmed this Court's denial of intervention to African-American and Latino students who sought to preserve the affirmative action plan challenged in that case. *See Hopwood*, 21 F.3d at 603. The Fifth Circuit did not hold that the proposed intervenors lacked a sufficient interest in the case; rather, that decision was based exclusively on the holding that the proposed intervenors, on the facts of that case, had not articulated interests different from those of the State. In light of the Supreme Court's subsequent decision in *Grutter*, however, *Hopwood* is inapposite here.

*Hopwood* considered only whether the proposed intervenors had different interests in defending the use of race as a remedy for past discrimination. The Fifth Circuit noted that the relevant issue was whether the defenders of the admissions plan could "show that there are 'present effects of past discrimination.'" *Id.* at 605 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986)). The courts found that the proposed intervenors had not shown that their defense of the plan on that factual issue differed from that of the State. *Hopwood*, 21 F.3d at 606.

Since that time, the law governing consideration of race in university admissions has been clarified in a manner that warrants the separate participation of Proposed Intervenors here. *See Grutter*, 539 U.S. at 328. The Supreme Court has held that it is not true that "the only government use of race that can survive strict scrutiny is remedying past discrimination." *Id.* Rather, the use of race in college admissions is now permitted by the compelling interest of the State in obtaining a truly diverse student body. For all the reasons detailed above, the interests of the Proposed Intervenors in defending UT's current admissions program under this "diversity"

rationale, unlike the "remedial" rationale considered in *Hopwood*, are not the same as those of the State of Texas. Whereas a remedial rationale is predicated on inherently factual issues regarding the extent of past discrimination and its present effects, and whether use of race is tailored to meet those effects, the diversity interest approved in *Grutter* must examine more subjective factors going to whether a critical mass of truly diverse students exists. Regardless of whether they would have anything different to add to a remedial defense, for all the reasons detailed above current and prospective African-American students plainly have distinct interests in defending the current UT program under a diversity rationale. When the central issue is whether and how and critical mass of African-American students can be achieved, the specific perspectives of those students are vital to an effective defense.

In sum, it is critically important that any determination of what constitutes critical mass at the University reflects and accounts for the particular experiences of students of different racial groups on campus. To exclude the experiences and perspectives of African-American students in a case where two white students who do not attend UT seek to cap the number of underrepresented minority students would not only leave the record impoverished, it would shut out those at the heart of the matter. For African-American students, the stakes are quite high: while the University's continued existence or prosperity would not be jeopardized by a ruling for plaintiffs in this case, Proposed Intervenors face a serious risk of being excluded from the halls at UT and the circles of leadership and power in Texas. "Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U.S. at 332. That participation should extend to litigation that directly affects African-American students.

**F.      Permissive Intervention is also Proper under FRCP 24(B).**

The considerations outlined above also plainly suffice to grant Proposed Intervenors permissive intervention under Rule 24(b). Rule 24(b) grants a district court the discretion to allow intervention if the application is timely and if the "applicant's claim or defense and the main action have a question of law or fact in common." Fed R. Civ. P. 24(b)(2); *Reid v. GMC*, 240 F.R.D. 257, 259 (E.D. Tex. 2006).  In exercising its discretion, the district court should also consider whether "intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed R. Civ. P. 24(b)(2).

As demonstrated above, Proposed Intervenors seek to interpose defenses that share common factual and legal questions with those raised in the main action. Specifically, Proposed Intervenors seek to ensure educational access for African-American students and to maintain a critical mass of African-American students as part of a diverse student body. Further, as explained above, there is no tenable basis upon which either party could claim that Proposed Intervenors' participation will cause prejudice or delay: Proposed Intervenors have sought intervention promptly after the filing of Defendants' answer, and before any significant development of this suit.

Finally, for those reasons elucidated above, Proposed Intervenors have a critical interest in the outcome of this case, which cannot be adequately protected by existing parties, and would make significant contributions to the record about the African-American experience at UT as it relates to the question of critical mass and the educational benefits of diversity.

Indeed, all of the arguments in support of Proposed Intervenors' motion for intervention as of right apply with equal force with this petition, in the alternative, to be granted a permissive intervention.  Accordingly, this motion should be granted.

## IV.    CONCLUSION

For the foregoing reasons, Proposed Intervenors urge this Court to grant them intervention as a matter of right under Federal Rule of Civil Procedure 24(a), or alternatively, permissive intervention pursuant to Rule 24(b).

Dated: July 23, 2008                                  Respectfully submitted,

                                                      _____
                                                      Terry O. Tottenham
                                                      State Bar No. 20147500
                                                      Federal ID:  6261
                                                      600 Congress Avenue, Suite 2400
                                                      Austin, Texas 78701
                                                         - and -
                                                      Edward B. Adams, Jr.
                                                      State Bar No.  00790200
                                                      Federal ID:  19186
                                                      Fulbright Tower
                                                      1301 McKinney, Suite 5100
                                                      Houston, TX  77010-3095
                                                      Telephone:  (713) 651-5151
                                                      Facsimile:  (713) 651-5246

                                                      **Counsel for Intervenors Chad Stanton,
                                                      Anthony D. Williams, Ariel Cecil Barrett,
                                                      Devon Robinson,** *et al.*

OF COUNSEL:
FULBRIGHT & JAWORSKI L.L.P.

NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.


/s/ John A. Payton
    John A. Payton
       President and Director-Counsel
    Debo P. Adegbile
    Anurima Bhargava
    Holly A. Thomas
99 Hudson Street, Suite 1600
New York, NY 10013
Telephone: (212) 965-2200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL NOEL FISHER and RACHEL MULTER MICHALEWICZ, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| STATE OF TEXAS, | § § | **CIVIL ACTION NO.  1:08-CV-0263-SS** |
| Defendant. | § § | |
| CHAD STANTON, ANTHONY D. WILLIAMS, ARIEL CECIL BARRETT, DEVON ROBERTSON, *et al.* | § § § § | |
| Proposed Intervenors | § | |

### CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2008, I filed a Motion to Intervene and the Answer of Proposed Intervenors to Plaintiffs' Amended Complaint with the Clerk of Court.  In addition, a true and accurate copy of the Motion to Intervene and Answer of Proposed Intervenors to Plaintiffs' Amended Complaint was then served via First Class U.S. Mail, Certified Mail, and/or electronic mail on the  24th  of July, 2008 to the following parties:

| | |
|---|---|
| Paul M. Terrill<br>Joshua D. Katz<br>Thomas R. McCarthy<br>The Terrill Firm, P.C.<br>810 West 10th Street<br>Austin, TX  78701 | Mishell B. Kneeland<br>Mariana Grayson<br>Office of the Attorney General<br>General Litigation Division<br>P.O. Box  12548, Capitol Station<br>Austin, TX  78711-2548 |
| Bert W. Rein<br>Wiley Rein LLP<br>1776 K. Street, NW<br>Washington, DC  20006 | James C. Ho<br>OAG/Office of the Solicitor General<br>P.O.Box 12548<br>Austin, TX  78711-2548 |

*Terry O. Tottenham*

Terry O. Tottenham

ABIGAIL NOEL FISHER and RACHEL          §
MULTER MICHALEWICZ,                      §
                                        §
        *Plaintiffs.*                    §
                                        §
v.                                      §
                                        §
STATE OF TEXAS, et. al.                 §
                                        §
        *Defendants.*                    §       CIVIL ACTION NO.  1:08-CV-0263-SS
                                        §
CHAD STANTON, ANTHONY D.                §
WILLIAMS, ARIEL CECIL BARRETT,          §
C.J. DAVIS, DEVON ROBINSON,             §
TRENTON STANTON, ERIC TRE               §
STANTON, and THE UNIVERSITY OF          §
TEXAS BLACK STUDENT ALLIANCE            §
                                        §
        *Proposed Intervenors.*

## ORDER

The Court  considered the motion to intervene filed by Chad Stanton, Anthony D.

Williams, Ariel Cecil Barrett, C.J. Davis, Devon Robertson, Trenton Stanton, Eric Tre

Stanton, and the University of Texas Black Student Alliance, (collectively, "Applicants"),

Applicants' memorandum in support, and any opposition. The Court finds that

Applicants motion is proper and meets the requirements for intervention under Federal

Rule of Civil Procedure 24.

Accordingly, it is **ORDERED** that Applicants' Motion to Intervene as

Defendants is **GRANTED**, and Applicants are given leave to participate as a party to this

action as Defendant-Intervenors.


SIGNED this ___ day of _____, 2008.


_____
Judge Presiding
United States District Judge


{00006437.DOC}