UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNIVERSITY OF NORTH CAROLINA, et al., | ) |
| | ) |
| Defendants. | ) |

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO STAY

Plaintiff Students for Fair Admissions, Inc. ("SFFA") respectfully requests that the Court deny the Motion for Stay filed by Defendants (collectively, "UNC-Chapel Hill").

**I. Introduction**

UNC-Chapel Hill's request for a stay pending a decision in *Fisher v. University of Texas at Austin*, No. 14-981 ("*Fisher II*"), is baseless. UNC-Chapel Hill grossly exaggerates the overlap between *Fisher II* and this case. But the Court need not resolve that dispute because a stay is not warranted in any event. Where a stay would harm the non-moving party, as here, it must be denied absent a clear case of hardship. UNC-Chapel Hill cannot meet that standard. As UNC-Chapel Hill itself concedes, this case is about "the current operation of [UNC-Chapel Hill]'s admissions program." Mem. in Supp. of Defs.' Mot. to Stay ("Mem.") at 2. Nothing the Supreme Court says in *Fisher II* will change the facts regarding the current operation of UNC Chapel-Hill's admissions

1

program or its use of race as a factor therein. UNC Chapel-Hill may wish to change those facts, but that is no reason to delay discovery. Indeed, courts routinely reject requests to stay litigation where a decision by the Supreme Court would not moot the entire litigation. On top of that, *Fisher II* is unlikely to materially impact even part of this case. UNC-Chapel Hill's motion should be denied.

## II. Legal Standard

Although "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket," *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936), this inherent power is constrained by the federal courts' "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also Meade v. Parsley*, 2011 WL 1464852, at *1 (S.D. W.Va. Apr. 15, 2011) ("A district court has broad discretion to stay an action as part of its inherent authority to manage its docket. Nevertheless, the court's discretion has limits."). Thus, courts within this circuit have recognized that "a stay of a civil case should be undertaken only in extraordinary circumstances." *Harris v. Rainey*, 2014 WL 1292803, at *2 (W.D. Va. Mar. 31, 2014).

More particularly, the existence of parallel litigation is an insufficient justification for a stay. "Only in rare circumstances … will a litigant in one cause be compelled to stand aside" while a parallel proceeds. *Landis*, 299 U.S. at 255. This is true even if the parallel case will "settle[] the rule of law that will define the rights of both." *Id.*; *see, e.g.*, *United States v. Clements*, 655 F.3d 1028, 1029 (9th Cir. 2011); *id.* at 1030 (explaining

that "the Supreme Court will definitively decide th[e] question" at issue) (O'Scannlain, J., dissenting). Naturally, then, a stay "is rarely appropriate" when the parallel litigation "will not dispose of the entire case." *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 3 (D.D.C. 2001) (citations and quotations omitted); *see also Consol. Edison Co. of New York v. United States*, 30 F. Supp. 2d 385, 389 (S.D.N.Y. 1998) ("A stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay, it presumably concludes that the parallel litigation will be an adequate vehicle for the complete resolution of the issues between the parties.") (citation omitted)). It is thus unsurprising that federal courts routinely will reject any request to stay litigation pending a decision of the Supreme Court where that decision "would have the potential to moot only a portion of" the litigation. *United States ex rel. Lindsey v. Trend Cmty. Mental Health Services*, 88 F. Supp. 2d 475, 477 (W.D.N.C. 1999).[1]

---

[1] *See, e.g.*, *Walker v. Medtronic, Inc.*, 2008 WL 346384, at *2 (S.D. W.Va. Feb. 6, 2008) (denying stay pending decision by the Supreme Court and explaining that, "although *Riegel* holds the potential to limit or otherwise affect plaintiff's legal theories, it is unlikely that its outcome will entirely alter the scope of discovery to be conducted in this litigation"); *United States v. Town of Oyster Bay*, 66 F. Supp. 3d 285, 292-93 (E.D.N.Y. 2014) ("find[ing] that a stay of the proceedings would not serve the interests of fairness or efficiency and is not warranted" because a decision by the Supreme Court could at most moot only a portion of the case); *Jones v. Travelers Cas. Ins. Co. of Am.*, 2013 WL 4511648, at *2 (N.D. Cal. Aug. 22, 2013) ("Travelers argues that the Supreme Court's decision in *Mount Holly* directly impacts this case, so a stay is warranted. The Court disagrees. *Mount Holly* speaks only to Plaintiffs' disparate impact claim under the FHA. … Even if the Supreme Court ultimately determines that disparate impact is not a cognizable claim under the FHA, Plaintiffs still have three other theories to pursue in this Court. The Court thus finds that a stay pending the outcome of *Mount Holly* does not aid in streamlining the case or helping the Court manage its docket."); *see also Meade v.*

"The proponent of a stay" therefore "bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). Under *Landis*, three factors guide whether to grant a stay: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *White v. Ally Fin. Inc.*, 969 F. Supp. 2d 451, 462 (S.D. W.Va. 2013). But "the *Landis* factors," *id.* at 462 n.8, are not co-equal factors. The proponent "must make out a clear case of hardship or inequity in being required to go forward, *if there is even a fair possibility that the stay for which he prays will work damage to some one else*." *Landis*, 299 U.S. at 255 (emphasis added); *see also Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) ("The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative."); *Aventis CropScience, N.V. v. Pioneer Hi-Bred Interational, Inc.*, No. 1:00CV00463, 2001 WL 604185, at *5 (M.D.N.C. Apr. 23, 2001) (same). Further, a stay is especially difficult to secure in cases where the plaintiff has "alleged … continuing harm and sought … injunctive or declaratory relief." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005). Such cases are distinguishable from those where only damages are at issue. *Id.*

### III. A Stay Is Unjustified Even Accepting UNC-Chapel Hill's Conception of the Overlap Between This Case and *Fisher II*.

---

*Parsley*, 2011 WL 1464852, at *2 (S.D. W.Va. Apr. 15, 2011); *Laumann v. Nat'l Hockey League,* 2013 WL 837640, at *2 (S.D.N.Y. Mar. 6, 2013); *In re Tremont Sec. Law, State Law, & Ins. Litig.,* 2013 WL 4730263, at *4 (S.D.N.Y. Sept. 3, 2013).

UNC-Chapel Hill argues that a stay is appropriate because "[t]he primary issue before the Supreme Court in *Fisher II*—whether the Fifth Circuit properly concluded that the University of Texas at Austin's ('UT-Austin') use of racial preferences in its undergraduate admissions program complies with the Supreme Court's precedents—is the central issue in this case." Mem. at 1. To state UNC-Chapel Hill's argument is to refute it. Nothing about UT-Austin's admissions program is on trial here. Although UNC-Chapel Hill exaggerates any relationship between the two cases, *see infra* at 15-18, the Court need not resolve the dispute over *Fisher II*'s potential impact on the legal issues raised in this case to deny UNC-Chapel Hill's stay motion. As explained below, the motion is meritless even assuming that *Fisher II* will "clarify further the law governing how public universities may consider race in the admissions process." Mem. at 2.

*First*, there is far more than a "fair chance" that granting UNC-Chapel Hill's motion will harm SFFA—it is a certainty. More than eight months ago, SFFA brought this suit on behalf of its members, challenging UNC-Chapel Hill's use of racial classifications in undergraduate admissions decisions. Delaying adjudication of Plaintiff's claims for approximately a year—or more, *see United States ex rel. Lindsey*, 88 F. Supp. 2d at 477 ("Contrary to [Defendant]'s assurances, there is no guarantee that the Supreme Court will dispose of this case during its next term")—is harm enough to defeat UNC-Chapel Hill's request for a stay, *see id.* (finding that "impair[ed] access to the courts" outweighs "the potential to moot only a portion of this action"); *Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 916 (M.D.N.C. 2005) ("A stay of discovery duplicates costs

5

because counsel must reacquaint themselves with the case once the stay is lifted. Matters of importance may be mislaid or avenues unexplored. … While time may heal some disputes, in others it merely permits more opportunity for festering.").

Weighing even more heavily against a stay is the fact that SFFA members have suffered injuries of constitutional magnitude. *See Grutter v. Bollinger*, 539 U.S. 306, 323 (2003) ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." (quotation omitted)). Those members include applicants UNC-Chapel Hill has rejected, high school students who plan to apply to UNC-Chapel Hill in the coming months and years, and the parents of both rejected and future applicants. *See generally* Complaint. These members will have their equal-protection rights further harmed if resolution of this case is delayed by a year or more. This is especially true for those SFFA members who will be applying for transfer admission in the 2016-2017 cycle—the first admissions cycle in which a judgment in SFFA's favor likely would take effect. For those applicants, a one-year delay means losing forever the "opportunity to compete for admission on an equal basis." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

UNC-Chapel Hill gives short shrift to the harm to SFFA members. UNC-Chapel Hill acts as if the only possible harm here relates to the typical burdens and costs attendant to litigation. It is, however, undeniable that "when governmental decisions 'touch upon an individual's race or ethnic background, he is entitled to a judicial

determination that the burden [they are] asked to bear on that basis is precisely tailored to serve a compelling governmental interest.'" *Grutter*, 539 U.S. at 323 (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 299 (1978)). Yet nowhere does UNC-Chapel Hill acknowledge the constitutional injury suffered by SFFA members who have applied to UNC-Chapel Hill or awaiting SFFA members who will apply to UNC-Chapel Hill in the future. Worse still, such delay would mean that UNC-Chapel Hill would inflict an equal-protection injury upon tens of thousands of more applicants in the interim, a fact that weighs further against the requested stay. *See Landis*, 299 U.S. at 255 ("damage to *some one else*") (emphasis added); *see also Klaver Const. Co. v. Kansas Dep't of Transp.*, 2001 WL 1000679, at *3 (D. Kan. Aug. 23, 2001) ("[T]he public has an interest in prompt resolution of constitutional claims.").

In short, this case is about UNC-Chapel Hill's discriminatory policies and the countless applicants these policies harm. SFFA members are entitled to a judicial determination as to whether the process to which they have been (and soon will be) subjected "is fair and constitutional in every phase of implementation." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). That some SFFA members would be denied that right as a result of a stay is more than sufficient reason to deny UNC-Chapel Hill's motion. *See Hines v. D'Artois,* 531 F.2d 726, 737 (5th Cir. 1976) ("We must always have great respect for a trial court's judicial discretion in the control of its docket, but we cannot abdicate our roles in monitoring that discretion to prevent the ossification of rights which attends inordinate delay.... If plaintiffs were not to be permitted forthwith to tell their

7

story to the court, the tale might be stale indeed by the time it reached judicial ears."). After all, *Landis* makes clear that a stay should not be for an indefinite period of time. *See Landis*, 299 U.S. at 255 ("[A] stay of indefinite duration in the absence of a pressing need" constitutes an abuse of discretion.); *United States ex rel. Lindsey*, 88 F. Supp. 2d at 477 (same). For these applicants, the stay pending the Supreme Court's resolution of *Fisher II* would not only be indefinite, *see id.* (stay pending decision by the Supreme Court is a "stay of indefinite duration"); it would operate as a dismissal.

But even those applicants who will "only" have vindication of their constitutional rights delayed will suffer harm sufficient to defeat UNC-Chapel Hill's motion. Stays are disfavored in civil cases, *see Harris*, 2014 WL 1292803, at *2, and particularly so in civil-rights cases, *see Costantino v. City of Atl. City*, 2015 WL 668161, at *3-8 (D.N.J. Feb. 17, 2015), as such delay materially impairs pursuit of claims Congress and the public consider "profoundly important," *see Kelly v. City of San Jose*, 114 F.R.D. 653, 660 (N.D. Cal. 1987); *see also Klaver Const. Co.*, 2001 WL 1000679, at *3 ("In evaluating the competing interests, the Court concludes that plaintiff's interest in pursuing its constitutional claims outweighs defendants' interest in staying the case."). "While the stay is in effect, through no fault of the parties, relevant evidence could be lost or destroyed, memories could fade, and pertinent witnesses could move out of the jurisdiction." *I.K. ex rel. E.K. v. Sylvan Union Sch. Dist.*, 681 F. Supp. 2d 1179, 1193 (E.D. Cal. 2010) (citation omitted); *see also Suntrust Mortgage, Inc. v. Busby*, 2009 WL 4801347, at *8 (W.D.N.C. Dec. 7, 2009) ("A stay that is unrestricted in scope will

certainly prejudice Plaintiff by risking the loss of documents [and] the fading of witnesses' memories[.]"); *New York v. Hill*, 528 U.S. 110, 117 (2000) ("Delay can lead to a less accurate outcome as witnesses become unavailable and memories fade."). In sum, there is a certainty, not merely a "fair chance," that a stay will damage SFFA.[2]

*Second*, UNC-Chapel Hill cannot make out a clear case of hardship or inequity it will suffer in the absence of a stay. UNC-Chapel Hill argues that "it is difficult to conceive of an outcome in *Fisher II* that will not directly and significantly influence the ways in which the parties approach their respective burdens—both from an evidentiary and strategic perspective—and assemble their respective positions." Mem. 9-10. As an initial matter, the Court should be skeptical of this argument. If the Fifth Circuit decision is affirmed, the law will be the same as it is now; but if the Fifth Circuit decision is reversed, UNC-Chapel Hill will almost certainly argue that *Fisher II* has no effect on this case because of differences between the University of Texas's admissions program and the details of UNC-Chapel Hill's.[3]

---

[2] UNC-Chapel Hill relies entirely on unpublished and/or out-of-circuit cases for the proposition that a stay may be appropriate pending a Supreme Court decision in a related case. Aside from being of minimal precedential value, every one of these cases is easily distinguishable as each involved an agreed-to stay, *see, e.g.*, *Stoddard v. Wyeth*, No. 4:08-cv-00173-H (E.D.N.C. Jan 11, 2011), or a situation in which a decision by the Supreme Court could (or would) control the outcome of the litigation, *see, e.g.*, *Norville v. Anne Arundel Cnty. Bd. of Educ.*, 1999 WL 1267696 (D. Md. Nov. 23, 1999), or both, *Carter v. United States*, 2007 WL 2439500 (D. Vt. Aug. 23, 2007).

[3] If UNC-Chapel Hill believes that a loss for UT-Austin before the Supreme Court necessarily would result in defeat here for UNC-Chapel Hill, then a stay of these proceedings might well be appropriate. But UNC-Chapel Hill should state whether a loss for UT-Austin would bind it here. It should not be permitted to argue both that *Fisher II*

9

Moreover, whatever strategy UNC-Chapel Hill might choose to adopt (if different than its current strategy of delay) or whatever evidence it might choose to highlight in its defense has nothing to do with what is discoverable here. The facts are the facts; "the current operation of [UNC-Chapel Hill]'s admissions program," Mem. at 2, is what it is. Wishing away those facts will not change the scope of discoverable information here.

Of course, UNC-Chapel Hill knows this—which is why it does not even argue that *Fisher II* will make the discovery SFFA currently seeks inappropriate or duplicative. *See, e.g.*, *Wittman v. Aetna Health, Inc.*, 2014 WL 4772666, at *2 (D. Me. Sept. 24, 2014). UNC-Chapel Hill mainly argues that the decision in *Fisher II* might render discovery as to its "current [admissions] policies and practices … incomplete," opening the door to *additional* discovery. Mem. at 9. But this falls far short of the showing necessary to justify a stay. Indeed, even the "possibility of duplicative discovery does not establish a clear case of hardship in the face of Plaintiff's objections to the stay." *Hunt Const. Grp., Inc. v. Brennan Beer Gorman/Architects, LLP*, 2009 WL 2424529, at *1 (D. Vt. Aug. 5, 2009).

The only other argument UNC-Chapel Hill offers as to the possibility of hardship is that *Fisher II* might make discovery relating to its current admissions policies irrelevant if *Fisher II* requires a "modifi[cation]" to those policies. *See* Mem. at 9. Here too, even aside from UNC-Chapel Hill's misunderstanding of *Fisher II*, the argument is

---

has everything to do with this case, *see* Mem. at 1 ("the central issue in this case"), and nothing at all to do with this case.

disingenuous. SFFA has filed suit challenging UNC-Chapel Hill's *existing* admissions policies and practices. Mem. at 2, 9. It is therefore true that this case would be over if UNC-Chapel Hill is unable to defend its existing policies in the wake of *Fisher II*. But that would be because SFFA would be entitled to judgment as a matter of law (along with the accompanying declaratory and injunctive relief)—not because SFFA's claim (or discovery relating thereto) would become "largely irrelevant." *Id*. at 9; *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). The idea that UNC-Chapel Hill is entitled to a stay so it can wait and see if the Supreme Court's decision in *Fisher II* makes any defense of its admissions system impossible is absurd.

At bottom, UNC-Chapel Hill's assertions of harm rest on its speculation that *Fisher II* will "clarify further the law governing how public universities may consider race in the admissions process [and] affect the standards that govern this litigation." Mem. at 2. But a possible clarification in the law does not create any meaningful burden on defendants, and cannot overcome the harm to SFFA. *See Klaver Const. Co.*, 2001 WL 1000679, at *3 ("The mere possibility that the Supreme Court may clarify the legal standards which apply to these separate claims does not justify the potential prejudice of a delay to plaintiff. Compared to the potential prejudice to plaintiff, the burden on defendants is small.") "'[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*.'" *Sunbeam*

11

*Products, Inc. v. Hamilton Beach Brands, Inc.*, 2010 WL 1946262, at *4 (E.D. Va. May 10, 2010) (quoting *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005)).

*Third*, a stay will not advance judicial economy. Just as a possible clarification in the law could create only a minimal burden on UNC-Chapel Hill, there is almost nothing to gain from a stay in terms of judicial economy. *See Klaver Const. Co.*, 2001 WL 1000679, at *3 ("The convenience to the Court of having the benefit of a Supreme Court decision does not outweigh the potential prejudice to plaintiff.").

As noted above, whatever impact UNC-Chapel Hill (incorrectly) believes *Fisher II* will have on the legal standard, it will have no meaningful effect on fact discovery. The point of discovery is to build a comprehensive record. *See United States v. 23.76 Acres of Land*, 32 F.R.D. 593, 596 (D. Md. 1963) ("It is the rare law suit in which there are not at least two versions of a single transaction or occurrence. The purpose of discovery is to permit each party to learn of the other party's version."). *Fisher II* will not alter the facts of this case. It will not alter UNC-Chapel Hill's reasons for having *chosen* to consider race in admissions decisions. It will not alter how UNC-Chapel Hill has *used and currently uses* race in its admissions process. And it will not alter UNC-Chapel Hill's reasons for having *determined* that there are no workable race-neutral alternatives to using race.

Even if *Fisher II* refines the applicable legal standard in some way that impacts the kind of facts that might be admissible at trial, *see* Mem. at 8-11, it still would not impact the scope of fact discovery. The Federal Rules of Civil Procedure contemplate liberal

discovery. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993) ("Discovery under the Federal Rules of Civil Procedure is, of course, broad in scope and freely permitted."); *Ralston Purina Co. v. McFarland*, 550 F.2d 967, 973 (4th Cir. 1977); *see also* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). UNC-Chapel Hill cannot credibly contend that *Fisher II* will so fundamentally alter the legal standard as to make otherwise irrelevant facts relevant or vice versa. Indeed, UNC-Chapel Hill offers *no* argument as to how *Fisher II* will impact any specific discovery it plans to take of SFFA or any of SFFA's discovery requests. Instead, it relies on vague generalities about how *Fisher II*'s clarification of the legal standard will affect its strategy and the evidence it may marshal in the defense of its program. Mem. at 2, 8-10. Such generalities fall far short. *See, e.g.*, *Honeywell Int'l, Inc.*, 20 F. Supp. 3d at 132 (rejecting argument "broadly assert[ing]" a "substantial overlap in legal and factual issues between this case and the related cases" as "speculation … unaccompanied by reasoning, analysis, or supporting authority"). SFFA is not concerned with proceeding at the same time as *Fisher II* nor does it anticipate seeking any additional discovery based on its outcome. And if UNC-Chapel Hill has evidence that it "may wish to present" in defense of its program, it would be well advised to timely produce it in response to SFFA's discovery requests to which such evidence is surely responsive. At base, UNC-Chapel Hill "can give the court no assurances or even convincing arguments that a stay will achieve the ends of judicial economy which would be its justification."

13

*Dow Chem. Co. v. Composite Container Corp.*, 1984 WL 1245, at *1 (D. Mass. Apr. 10, 1984).

*Fisher II* likewise will not affect expert discovery. UNC-Chapel Hill offers nothing specific on this point—not even the vague generalities it makes concerning fact discovery. If UNC-Chapel Hill is suggesting that the same issues that purportedly support staying fact discovery support staying expert discovery, the argument is equally meritless. An expert's job is to provide "opinions on scientific matters, technical matters, or matters involving other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). Expert testimony that consists of legal conclusions therefore will not "assist the jury in its determination." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Here, the parties' experts will testify about how UNC-Chapel Hill's admission system works, to what extent (and in what way) race is a factor in admissions, and the ability (or inability) of race-neutral alternatives to achieve diversity in the student body. Experts will *not* be testifying as to the relevant legal standard, however it may be shaped by *Fisher II* (if at all). Any possible clarification of the law thus will have no meaningful effect on expert discovery.

Finally, even if *Fisher II* were to clarify the law in some respect during or after briefing on summary judgment, *see* Mem. at 11-12, this is no reason to stay the case. Parties to litigation routinely submit their views on clarifications in the law during the course of motions practice. Indeed, the Local Rules of this Court expressly contemplate

14

such submissions. *See* M.D.N.C. Rule 7.3(i) ("Suggestion of Subsequently Decided Authority. As an addendum to a brief, response brief, or reply brief—or after oral argument but before decision—a suggestion of subsequent pertinent and significant authorities may be filed at any time prior to the Court's ruling and shall contain only the citation to the case relied upon, if published, or a copy of the opinion if the case is unpublished."). Perhaps more importantly, granting a stay out of concern for deadlines over eight months away would be wildly premature. If the Court is concerned about the timing of briefing on dispositive motions, the appropriate solution would be to order a modest extension of the discovery calendar that would result in briefing on dispositive motions (and the close of discovery) being delayed until after *Fisher II* is likely to be decided. This extension is likely necessary anyway, given that UNC-Chapel Hill has yet to produce a single document in this case despite having received requests for production more than two months ago and that it forecasts discovery disputes "that will consume considerable time and expense by the parties (and almost certainly the Court) to address and properly manage." Mem. at 10. For all of these reasons, UNC-Chapel Hill's stay motion should be denied.

**IV.     UNC-Chapel Hill Misapprehends the Legal Question at Issue in *Fisher II* and The Possible Extent of Its Impact on This Litigation.**

The above argument firmly establishes that the Court should deny the stay request even accepting UNC-Chapel Hill's argument regarding the overlap between *Fisher II* and this case. But UNC-Chapel Hill's argument is, in truth, built on sand. UNC-Chapel Hill's motion is premised on the proposition that a stay is justified until *Fisher II* "clarif[ies]

15

further the law governing how public universities may consider race in the admissions process [and] affect[s] the standards that govern this litigation." Mem. at 2. Even a cursory review of the Supreme Court's decision in *Fisher I* and the certiorari pleadings in *Fisher II* flatly disproves this assertion.

*Fisher I* clarified the applicable law. In that decision, the Supreme Court held that the Fifth Circuit "did not apply the correct standard of strict scrutiny" and set forth the proper legal framework. *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2415 (2013). In particular, the Court walked through the strict-scrutiny requirements established in the "decisions that directly address the question of considering racial minority status as a positive or favorable factor in a university's admissions process" and explained that "additional guidance may be found in the Court's broader equal protection jurisprudence which applies in this context." *Id*. at 2417-18. The Court held that the Fifth Circuit's deferential review of UT-Austin's reasons for reinstating racial classifications was in conflict with this "controlling standard" and remanded the matter "so that the admissions process [could] be considered and judged under a correct analysis." *Id*. at 2421.

On remand, the Fifth Circuit purported to apply "the ordered exacting scrutiny" and again upheld UT-Austin's use of race in its admissions system. *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 637 (5th Cir. 2014). Ms. Fisher, in turn, sought certiorari on the ground that the Fifth Circuit erred in concluding that UT-Austin's use of racial preferences could withstand "the demanding scrutiny that *Fisher I* mandates." Petition for Certiorari, *Fisher v. Univ. of Texas at Austin* (U.S. Feb. 10, 2015) (No. 14-981) ("*Fisher

16

*II* Pet.") at 2. Her position is that the "Court's decision in *Fisher I* could not have been more clear. On remand, the Fifth Circuit was to review the record under the traditional and demanding constraints of strict scrutiny." *Fisher II* Pet. at 14. Ms. Fisher thus argued that the Court should grant certiorari a second time not because of doubt as to the applicable legal standard, but because the Fifth Circuit "contravened" that clear standard "in multiple ways." *Id*. at 15. Indeed, UNC-Chapel Hill concedes that Ms. Fisher asked the Supreme Court to review UT-Austin's use of race under the strict-scrutiny standard the Court clarified in *Fisher I* and the Supreme Court granted review on that precise question. Mem. at 5.

In reality, then, UNC-Chapel Hill's stay request is not premised on the need for guidance as to the governing legal framework. *Fisher I* settled that issue, and it is not up for review in *Fisher II*. UNC-Chapel Hill seeks a stay on the theory that the *application* of strict scrutiny in *Fisher II* to UT-Austin's use of race in admissions will somehow be "central" to this case. Mem. at 1. Of course, UNC-Chapel Hill never explains how this is so. And this is because it is demonstrably incorrect.

The most that UNC-Chapel Hill can muster is to suggest that the Supreme Court may provide further guidance on the various elements of the strict-scrutiny analysis. *See* Mem. at 8. But UNC-Chapel Hill identifies these elements at such a level of abstraction as to completely undermine its argument. For example, UNC-Chapel-Hill suggests that the Supreme Court might provide direction on "[t]he legal and evidentiary requirements of the narrow tailoring test announced in *Grutter* and reinforced in *Fisher*." *Id.* But if this

17

level of generality were to suffice, then any case in which strict scrutiny were the governing standard would be subject to a stay pending the Supreme Court's decision in *Fisher II*. That, of course, is an absurd proposition.

## V. Conclusion.

For the foregoing reasons, Plaintiff SFFA respectfully requests that the Court deny the Motion for Stay.

Respectfully submitted,<br>
STUDENTS FOR FAIR ADMISSIONS, INC.

By its attorneys,

Date: July 27, 2015

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard
Suite 700
Arlington, Virginia 22201
(703) 243-9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
(admitted *pro hac vice*)

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
Bell, Davis & Pitt, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

18

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2015, I filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system.

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
Bell, Davis & Pitt, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com