# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSITY OF NORTH CAROLINA et al., <br><br> Defendants. | **DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF APPLICANT DATA** |

Pursuant to Federal Rules of Civil Procedure 26, 34, and 37, and L.R. 7.2, Plaintiff Students for Fair Admissions, Inc. ("SFFA") respectfully files this Brief in Support of its Motion to Compel Defendants ("Defendants" or "UNC") to produce two years of applicant data from UNC's admissions database from the 2011-12 and 2012-13 admission cycles and aggregate applicant data for the 2009-10 and 2010-11 admissions cycles.

## I. NATURE OF THE MATTER BEFORE THE COURT

At the outset of this case, SFFA requested that UNC produce (among other things) data from its electronic databases (the "Electronic Databases")

1

that contain extensive information about all applicants from each admissions cycle. UNC initially agreed to produce such data for two admissions cycles, one before the date SFFA filed its Complaint and one the following year (for the 2013-14 and 2014-15 admissions cycles). UNC has since elected to rely on two additional years of applicant data in defense of its use of race in admissions and, accordingly, has agreed to produce those to SFFA (for the 2015-16 and 2016-17 admissions cycles). Through this motion, SFFA seeks two more years of applicant data, (for the 2011-12 and 2012-13 admissions cycles), which would result in a total production of six years of applicant data from UNC's Electronic Databases, along with two years of available aggregate applicant data (for the 2009-10 and 2010-11 admissions cycles).

While some discovery disputes may be difficult to resolve, this one is not. The applicant data contained in UNC's Electronic Databases are indisputably relevant, especially given that UNC itself is relying on that very data. Aggregate applicant data (reflecting admissions qualifications that are tracked by the office, broken down by in-state vs. out-of-state, gender, ethnicity, athlete vs. non-athlete, and alumni vs. non-alumni) is equally relevant and even less burdensome to produce.[1] And SFFA's request for two

---

[1] Discovery in this case (and discussions with opposing counsel) establish that UNC is capable of generating these reports, and often does so when assessing the demographic and other features of its class.

years of applicant data (bringing the total to six years' worth) plus two additional years of aggregate applicant data is eminently reasonable in light of the Supreme Court's instruction that eight years of admissions-related data "may be of significant value in determining the constitutionality of the University's current admissions system," *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2209 (2016) ("*Fisher II*"), and the District of Massachusetts' order compelling Harvard to produce six years of similar applicant data and two years of aggregate data in the parallel SFFA action against Harvard, *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No: 1:14-cv-14176-ADB (D. Mass. Sept. 7, 2016).

UNC can have no serious objection to producing two more years of applicant data, given the ease with which it already produced the same volume of data and its recent decision to rely on (and thus produce) an additional two years of data. Any objection UNC might assert with respect to aggregate data is equally misplaced, particularly given that "[d]iscovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted," *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 402 (4th Cir. 2003), the motion should be granted.

## II. STATEMENT OF FACTS

On May 21, 2015, SFFA requested that UNC produce "[a]ll Electronic Databases from any time that include information concerning UNC-CH early action applications, early action admissions, other freshman applications, other freshman admissions, transfer applications, transfer admissions, freshman enrollment, and total undergraduate enrollment." Pl.'s First Request for Production of Documents ("SFFA's First RFPs") No. 1 (May 21, 2015).[2] In addition to this request ("RFP1"), SFFA requested, among other things, "[a]ll documents from any time that UNC contends support any denial or defense in the Answer to the Complaint." SFFA's First RFPs No. 40 (May 21, 2015) ("RFP40").

UNC responded to SFFA First RFPs on July 29, 2015, objecting to RFP1 as "overbroad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence," but otherwise agreeing to produce from its electronic databases "responsive documents kept in the ordinary course of business (redacted to protect applicant privacy) reflecting data of freshman applicants to UNC-CH during the 2013-2014 and 2014-2015 admissions cycles." Defs.' Resps. & Objections to Pl.'s First Set Of Document

---

[2] Relatedly, SFFA sought production of documents sufficient to show the fields and variable used in the Databases, as well as all codebooks, guides, keys, manuals, and the like containing explanations or other information on the content or makeup of the data, variables, and observations. SFFA's First RFPs Nos. 2 & 3.

4

Requests at p.6 (July 29, 2015). In response to RFP40, Defendants agreed to "produce all documents that they plan to use in their defense as required by the Federal Rules of Civil Procedure and the Local Rules of the Middle District of North Carolina." *Id.* at p.25.

Notwithstanding its agreement to produce two cycles of applicant data from its Databases, UNC withheld production of these materials at the time because, in the interim, it had sought a stay of this litigation in light of the Supreme Court's grant of certiorari in *Fisher II*. *See Fisher v. University of Texas at Austin*, No. 14-981 (U.S. June 29, 2015). Although SFFA initially opposed UNC's motion for a stay, the parties eventually "agreed to a partial stay of the proceedings pending the resolution of *Fisher II* on the condition that Defendants make production of certain agreed-upon materials"— including redacted data of freshman applicants to UNC during the 2013-2014 and 2014-2015 admissions cycles. Joint Mot. for Partial Stay of Proceedings at 1 (Sept. 30, 2015) (Doc. 64); Joint Stipulation & Mot. to Amend Protective Order at 2 (Aug. 28, 2015) (Doc. 59).

On October 1, 2015, the Court issued an order granting the partial stay and agreed-upon discovery. The partial stay continued until August 1, 2016, when the Court adopted the parties' jointly proposed discovery schedule following the Supreme Court's decision in *Fisher II*. *See* Order (August 1,

5

2016) (Doc. 71). UNC produced the agreed-upon two years of applicant data from its Electronic Databases during the stay.

After the stay was dissolved and discovery resumed, SFFA renewed its request for applicant data from UNC's Electronic Databases. SFFA narrowed its request, specifically requesting a total of six years of such data, the bulk of which would come from admissions cycles prior to the date of the Complaint (and would thus be more probative of UNC's use of race when litigation was not pending), and two additional years of aggregate applicant data.

After the parties met and conferred multiple times regarding this issue, UNC indicated that it would produce a third year of applicant data, from the (post-Complaint) 2015-16 admission cycle, but no aggregate applicant data. Notably, as UNC made clear for the first time in late March, UNC decided to produce this third year of applicant data from its Electronic Databases, not in response to RFP1 but in response to RFP40. In other words, UNC had decided to rely on these data in defense of its use of race.

In April, UNC notified SFFA that it intended to produce a fourth year of applicant data, from the 2016-17 admissions cycle. Again, UNC informed SFFA that it decided to rely on this additional year of applicant data in defense of its use of race. UNC recently reiterated the point in a filing with the Court: "Defendants are obligated to produce the 2016 and 2017 Application ... Data

6

because Plaintiff, in its Requests for Production, sought documents on which Defendants intend to rely to support the defense of their undergraduate admissions practices." Joint Motion to Produce Documents Pursuant to the Amended Protective Order at 5 (April 14, 2017) (Doc. 81). The Court granted that motion on April 17, 2017.

At this point, UNC has produced two years of applicant data from its Electronic Databases (data from the 2013-14 and 2014-15 admissions cycles); and has elected to rely on and agreed to produce (but has not actually produced) two more years of applicant data (data from the 2015-16 and 2016-17 admissions cycles). SFFA seeks two additional years of applicant data (data from the 2011-12 and 2012-13 admissions cycles, before the Complaint was filed), along with two years of available aggregate applicant data (from the 2009-2010 and 2010-2011 admissions cycles).

Given UNC's election to rely on applicant data in defense of its use of race, SFFA attempted to resume negotiations with UNC. UNC refused to produce additional applicant data, forcing SFFA to file the present motion.

### III. QUESTION PRESENTED

This motion presents the question of whether this Court should grant SFFA's motion to compel UNC to produce two additional years of applicant data, plus two years of aggregate data, to allow for the close review of admissions practices required by Supreme Court precedent.

### IV. ARGUMENT

**1. The Federal Rules Favor Broad Discovery, Particularly in a Civil Right Action Like This One, Where the Defendant Bears the Burden of Proving That It Can Satisfy Strict Scrutiny.**

Several principles govern the scope of permissible discovery in this case. To begin, "[t]he purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. The Federal Rules thus provide that, "[u]nless otherwise limited by court order … [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense …." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*; *see also Flora v. Hamilton,* 81 F.R.D. 576, 578 (M.D.N.C. 1978) ("It is clear that what is relevant in discovery is different from what is relevant at trial, in that the concept at the discovery stage is much broader."). "Over the course of

8

more than four decades, district judges and magistrate judges in the Fourth Circuit (including members of this Court) have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *E.E.O.C. v. Dolgencorp, LLC*, No. 1:09CV700, 2011 WL 1260241, at *11 (M.D.N.C. Mar. 31, 2011). "This includes, of course, where the resisting party asserts that the discovery is irrelevant." *United Oil Co., Inc. v. Parts Assocs., Inc.,* 227 F.R.D. 404, 411 (D.Md. 2005).

Consistent with the foregoing principles, the Fourth Circuit has emphasized that "[d]iscovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted." *Carefirst,* 334 F.3d at 402; *see also Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, No. 1:13CV651, 2016 WL 430494, at *2 (M.D.N.C. Feb. 3, 2016) ("Discovery rules are to be accorded broad and liberal construction.") (citing *Herbert v. Lando,* 441 U.S. 153, 177 (1979); *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)).

Moreover, because this is a civil rights action, SFFA is entitled to "broad discovery." *Wolfe v. Green*, 257 F.R.D. 109, 112 (S.D.W.Va. 2009). "The presumption favoring a broad construction of the concept of relevancy under the Federal Rules is significant in the present context of federal civil rights claims asserted pursuant to 42 U.S.C. § 1983." *Scott v. Clarke*, No. 3:12-CV-

00036, 2013 WL 6158458, at *5 (W.D.Va. Nov. 25, 2013) (collecting cases). "[I]t is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." *Wolfe*, 257 F.R.D. at 112 (quotation omitted).

Finally, UNC retains the burden of proving that its use of race can withstand strict scrutiny. Because this Court must give "close analysis to the evidence of how the process works in practice," there must be a complete record with evidence sufficient to understand UNC's admissions decisions. *See Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2421 (2013). It "remains at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Id.* at 2420. Given the "searching review" strict scrutiny requires, the Court should be especially skeptical of UNC's attempts to thwart discovery into core aspects of its admissions process. *Id.* at 2419; *see also Fisher II*, 136 S. Ct. at 2209 (highlighting the "stringency of the strict-scrutiny burden for a school that employs race [in admissions]").

## 2. The Supreme Court Has Emphasized that Several Years of Admissions Data Are Necessary to Evaluate the Constitutionality of the Use of Race in University Admissions.

In *Fisher II*, the Supreme Court made exceedingly clear that discovery in cases like this must be robust. The Court lamented the "evidentiary gap" that existed in that case and emphasized that data and studies from the previous "*eight years*" "may be of significant value in determining the constitutionality of the University's current admissions system." *Id*. at 2210 (emphasis added); *see also id.* at 2209 (explaining that a "narrow 3-year sample" of information "might yield little insight").

The Court focused particularly on the important role that data must play in evaluating the legality of racial preferences. As the Court explained, "assessment" of the admissions system's legality "must be undertaken in light of the experience the school has accumulated and the data it has gathered since the adoption of its admissions plan." *Id.* at 2210. Review of these "valuable data" will shed light on "which different approaches to admissions may foster diversity or instead dilute it." *Id.* at 2214. Put simply, "data" must be used "to scrutinize the fairness of [the university's] admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative,

11

of the affirmative-action measures [the university] deems necessary." *Id.* at 2214-15.

It is against this backdrop that the Court must decide whether SFFA's request for two additional years of applicant data and two years of aggregate applicant data seeks information "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). As explained more fully below, the requested data easily clears this low bar.

**3. SFFA's Request for Two Additional Years of Applicant Data and Two Years of Aggregate Applicant Data Should Be Granted Because Such Data is Highly Relevant And Production Thereof Would Impose Minimal Burden on UNC.**

The applicant data contained in UNC's Electronic Databases are indisputably "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Having elected to rely on such data itself in defense of its use of race, UNC can hardly argue otherwise. To date, UNC has agreed to produce four years of applicant data to SFFA. The only issue here is whether SFFA is entitled to two additional years, for a total of six years' worth of applicant data, along with two years of aggregate applicant data.

As noted above, the Supreme Court recently instructed lower courts that the legality of an admissions program must be assessed "in light of ... the data [the school] has gathered since the adoption of its admissions plan" and specifically noted the centrality of data, studies, and other material generated

over the course of *eight* years. *Fisher II*, 136 S. Ct. at 2210. Moreover, this data is integral to determine whether UNC has operated a quota or otherwise engaged in unconstitutional racial balancing across admissions classes during a multi-year period. The data UNC has agreed to produce thus far is inadequate for the task, particularly because three of those admissions cycles were after the Complaint was filed, a time when UNC's admissions office may have changed how it evaluates and scores applicants in response to the Complaint. Nor can UNC object on the grounds of burden, as it was able to produce two years of data with relative ease and has elected to rely on (and thus produce) an additional two years' worth.

It is undoubtedly for these very reasons that the federal district court in Massachusetts ordered the production of six total years of applicant data and two years of aggregate applicant data in the parallel litigation over the lawfulness of Harvard's use of race in admissions decisions. In that case, Harvard objected to a similar request by SFFA and the dispute proceeded to motions practice. After a hearing on the motion, the District Court ordered that "Harvard shall produce comprehensive data from its admissions database for six full admissions cycles. Further, Harvard shall produce more limited admissions data for the 2008-2009 and 2009-2010 admissions cycle[s], as discussed at today's conference." Order at 1, *Students for Fair*

13

*Admissions, Inc. v. President & Fellows of Harvard College*, No: 1:14-cv-14176-ADB (D. Mass. Sept. 7, 2016) (attached as Exhibit A); *see also* Tr. of Status Conference, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No: 1:14-cv-14176-ADB (D. Mass. Sept. 6, 2016) at 8:14-15 (explaining that "*Fisher* says three [years] isn't enough" and ordering the production of "six years [of] complete data and then two years of aggregate data") (Exhibit B). This Court should do the same.

## CONCLUSION

For the foregoing reasons, the Court should grant SFFA's motion to compel and order UNC to produce applicant data from UNC's Electronic databases for the 2011-12 and 2012-13 admissions cycles.

Respectfully submitted,

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: tom@consovoymccarthy.com

/s/ *William S. Consovoy*
William S. Consovoy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: will@consovoymccarthy.com

/s/ *Alan M. Ruley*
Alan M. Ruley
N.C. State Bar No. 16407
Bell, Davis & Pitt, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
E: aruley@belldavispitt.com

14

*/s/ J. Michael Connolly*
J. Michael Connolly
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: mike@consovoymccarthy.com

*Attorneys for Plaintiffs*

Dated: May 16, 2017

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed 9,000 words.

This the 16th day of May, 2017.

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing pleading via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 16th day of May, 2017.

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy
