**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:14-CV-954**

| | |
|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND DATA REGARDING STUDENT PREPAREDNESS AND PERFORMANCE** |
| **UNIVERSITY OF NORTH CAROLINA et al.,** | |
| **Defendants.** | |

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Students for Fair Admissions, Inc. ("SFFA") respectfully files this Brief in Support of its Motion to Compel Defendants ("Defendants" or "UNC") to produce anonymized data and documents regarding the academic preparedness and performance of students at UNC for the period of 2011-2017—specifically, (1) documents or data showing GPAs and graduation and retention rates across racial and ethnic groups; (2) any analysis of the academic preparedness of UNC students by race/ethnicity (including any documents that analyze the possible correlation between high school GPA/test scores and academic performance at UNC); and (3) documents or

1

data showing the race and ethnicity of students who took so-called "paper classes" and of the students who maintained their academic standing because of those classes.

## I.    NATURE OF THE MATTER BEFORE THE COURT

SFFA seeks the requested documents and data from UNC in order to explore an issue of direct relevance to this case: whether UNC's use of race in the admissions process results in the admission of underrepresented minority ("URM") students[1] who struggle academically because they are unprepared or underprepared for the academic rigors of UNC. The Supreme Court requires that courts hold universities to the burdens of strict scrutiny in judging the constitutionality of race-conscious admissions. The Supreme Court recently emphasized that universities must provide data sufficient to "identify the effects, both positive and negative, of the affirmative-action measures [the university] deems necessary." *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2214-15 (2016) ("*Fisher II*"). To the extent that UNC's use of racial preferences is causing or contributing to UNC's self-described crisis of URM underperformance, such a negative effect would tend to

---

[1]    UNC uses the term "underrepresented minority" or "URM" to refer to students who identify as African-American, Hispanic or Latino, or Native American—but not Asian-Americans, who nevertheless constitute a minority on campus.

undermine any proffered justification for UNC's consideration of race in admissions decisions. *Id.*

There is no dispute that UNC's use of racial preferences results in the admission and enrollment of URMs with weaker academic qualifications than their Asian and white counterparts. *See, e.g.*, Answer ¶ 55 (Doc. 30). There is also no dispute that URMs tend to have substantially lower academic performance, retention rates, and graduation rates while at UNC. Indeed, numerous documents produced in this litigation highlight UNC's longstanding problem of URM students' academic underperformance and underscore the fact that this problem is particularly acute with respect to URM males.

SFFA seeks the requested data to tie these two points together, that is, to demonstrate that UNC's admission of URM students with lower academic qualifications causes or otherwise contributes to the lower academic performance, and retention rates, and graduation rates for those very students. There is a substantial body of scholarship and academic research supporting this phenomenon—sometimes called the "mismatch" effect. *See generally* Complaint ¶¶ 158-173 (Doc. 1); *see id.* at ¶ 162 (citing numerous sources). This scholarship teaches that the use of racial preferences to boost the chances of URM students' admission actually harms those very students, as their lack of academic preparation compared to their peer matriculants

3

makes them more likely to have poor academic outcomes. UNC may dispute the validity of this theory, but that makes no difference at this juncture. Resolving such a dispute would be unnecessary (and inappropriate) at this stage because the requested materials and data regarding academic preparedness and performance unquestionably meet Rule 26's permissive threshold for relevance. That is enough to justify granting the present motion.

Moreover, UNC has produced materials in this litigation that go most of the way in proving the ultimate point. Some of UNC's own studies and reports demonstrate that lower high school grades and test scores correlate with poorer outcomes in terms of lower GPAs, lower graduation rates, and higher incidences of academic probation at UNC. *See* Exhibit A, at 39, 43, 46.

On top of that, UNC has publicly endorsed the theory of academic mismatch in statements made to the Supreme Court. In the *Fisher* litigation, UNC candidly admitted to the Supreme Court that using a percentage plan instead of racial preferences would actually increase racial diversity at UNC. UNC nonetheless argued that it was justified in rejecting this race-neutral alternative because of its claims that a percentage plan would result in the admission of less qualified students who would "quickly find themselves educationally lost amid the faster pace of Chapel Hill—flocking to remedial courses to overcome their relatively weak secondary school education and

4

facing increasingly difficult challenges to reach graduation." Brief of *Amicus Curiae* of the University of North Carolina at Chapel Hill Supporting Respondent, *Fisher v. University of Texas,* No. 11-345, at 35-36 (filed August 9, 2012), *available at* goo.gl/T1DczZ. UNC's more recent internal efforts to analyze race-neutral alternatives make the same argument. *See* Exhibit B, at 70 (UNC097437). UNC's reliance on the mismatch theory to defend its rejection of an available race-neutral alternative thus constitutes an independent reason to grant the present motion because the Federal Rules authorize parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense … ." Fed. R. Civ. P. 26(b)(1).

And yet UNC has refused to produce any of this information in response to SFFA's requests. To be clear, this is not a student privacy issue: SFFA seeks anonymized or redacted reports or data to ensure that UNC need not disclose any student names or other personally identifying information. But withholding such information denies SFFA discovery into a critically relevant piece of its case. It also runs directly contrary to the Supreme Court's recent instructions in *Fisher II* about the need to analyze available data when judging the lawfulness of the use racial preferences in admissions decisions.

## II. __STATEMENT OF FACTS__

This action challenges the constitutionality of UNC's use of race in the admissions process, on a number of grounds. *See* Compl. ¶¶ 1-7 (Doc. 1). Among other things, the Complaint alleged a substantial gap by ethnicity in the academic qualifications of admitted students—a gap that UNC admitted to in its Answer. *See* Answer ¶ 55. SFFA further alleged that UNC's use of race harmed even its intended beneficiaries, by increasing the stereotypes and fostering doubt about the merits of individual students' admissions. Compl. ¶¶ 155-56. And SFFA highlighted the substantial literature concerning the harm that students suffer when the use of race leads to the admission of students who are unprepared or underprepared for the academic rigor of UNC and thus struggle academically. *Id.* ¶¶ 160-166. Indeed, SFFA noted that UNC itself was included in two specific studies that found evidence of harm resulting from colleges' prioritization of race over academic preparedness. *Id.* ¶¶ 168-172.

On May 21, 2015, SFFA requested that UNC produce "[a]ll documents . . . that seek to measure, estimate, or predict, using race or other demographic variables, . . . the academic performance at UNC-CH of enrolled students, the major selection at UNC-CH of enrolled students, the dropout rate at UNC-CH of enrolled students, the graduation rate at UNC-CH of enrolled students, the

academic performance at UNC-CH of enrolled students, or the debt levels accrued by enrolled students while at UNC-CH[.]" Exhibit C, at 10-11. It separately sought "documents that either mention academic 'mismatch' . . . as it relates to admissions or admissions policy at UNC-CH or that otherwise concern the academic performance of enrolled students who are or were academically underprepared for UNC-CH." *Id.* at 13.

In its written responses and in subsequent meet-and-confer sessions, UNC resisted producing data or documents responsive to these requests, primarily on the ground that producing the requested discovery would be both burdensome and not relevant to the admissions process. *See* Exhibit D, at 20, 24. SFFA disputed those bases for objection, but elected to review the material that UNC agreed to produce to see if it would resolve or narrow the dispute. SFFA also used the deposition process to explore the frequency and extent of UNC's use and analysis of student performance data.

SFFA recently renewed its prior RFPs and propounded a new one on March 20, 2017, seeking "documents showing the academic performance of students while at UNC and their majors broken down by race." Exhibit E, at 8. UNC again opposed producing any documents in response to this request, and the parties' subsequent discussions failed to narrow the differences on these issues.

Yet, UNC's Answer, discovery responses, and production have established the basic elements of the theory UNC advances here. At this point, it is undisputed that UNC admits URM applicants with inferior academic credential as compared with their Asian and White counterparts. *See, e.g.*, Answer ¶ 55 (showing among other things that the average test scores and high school GPAs of African-American applicants admitted in 2012 lagged behind admitted Asian-American applicants by 202 SAT points and .31 GPA points).

In addition, UNC has produced documents demonstrating that admitted URM applicants who enroll at UNC substantially underperform White enrollees.[2] For example, UNC's Diversity Plan Reports highlight the wide achievement gap that exists between these groups. *See, e.g.*, Exhibit F, at 12 (four-year graduation rates for Black and American Indian male students lagged behind white male students by an average of more than 20% over the five year period from 2009 to 2013); *id.* at 13 (illustrating that Black students had cumulative GPAs that on average were a third of a point than White students). UNC produced a recently completed Recommendation Report of the Provost's Minority Male Workgroup. Among other things, that report

_____

[2]     Curiously, UNC's published analyses of academic performance and graduation and retention rates across racial and ethnic groups tend not to include information about Asian-American students at UNC. *See, e.g.*, Exhibit F, at 11-13.

highlighted the fact that nearly 40% of black males fail to graduate within four years. Exhibit G, at 11 (using data from the classes entering UNC between 2001 and 2009). And those who do graduate "have lower GPAs" than "their White peers" and "those low GPAs affect post-graduate study potential, lessening UNC's effectiveness in supplying the diverse talent pipeline for graduate study and completion." *Id.* at 12. UNC officials repeatedly have lamented this achievement gap and, in particular, have underscored the "crisis" with respect to URM males. Exhibit H, at 1; Exhibit G, at 4 (highlighting "the achievement gap between URM male students and other students").

Recently produced documents show that UNC understands and has recognized the link connecting low academic qualifications and poor academic outcomes at UNC. UNC's Retention Task Force, for example, has concluded that "[g]raduation outcomes differed significantly by level of academic preparation at the time of entry to Carolina." Exhibit A, at 39. And the Provost's Minority Male Workgroup recently recommended that UNC conduct a "review of existing institutional policies"—including "admissions criteria"—"to identify any that may adversely impact or inhibit the success of URM males." Exhibit G, at 15.

Though discovery into these issues remains ongoing, SFFA recently met and conferred with UNC to inquire whether UNC would be willing to

9

narrow the issues in dispute here. On June 8, 2017, UNC expressed its unwillingness to do so, necessitating this motion.

## III.    QUESTION PRESENTED

This motion presents the question whether this Court should grant SFFA's motion to compel UNC to produce documents and data in its possession reflecting the academic performance of its students by ethnicity for the period of 2011-17. Specifically, SFFA requests: (1) documents or data showing GPAs, graduation rates, and retention rates across racial and ethnic groups; (2) any analysis of the academic preparedness of UNC students by race/ethnicity (including any documents that analyze the possible correlation between high school GPA/test scores and academic performance at UNC); and (3) documents or data showing the race and ethnicity of students who took so-called "paper classes" offered for years by UNC's Department of African and Afro-American Studies and of those who benefitted academically from taking one or more of these "paper classes."

## IV.    ARGUMENT

### A.    The Federal Rules Favor Broad Discovery, Particularly in a Civil Rights Action Like This One, Where the Defendant Bears the Burden of Proving That It Can Satisfy Strict Scrutiny.

Several principles govern the scope of permissible discovery in this case. To begin, "[t]he purpose of discovery is to provide a mechanism for

10

making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. The Federal Rules thus provide that, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ...." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*; *see also Flora v. Hamilton,* 81 F.R.D. 576, 578 (M.D.N.C. 1978) ("It is clear that what is relevant in discovery is different from what is relevant at trial, in that the concept at the discovery stage is much broader."). "Over the course of more than four decades, district judges and magistrate judges in the Fourth Circuit (including members of this Court) have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *E.E.O.C. v. Dolgencorp, LLC*, No. 09-cv-700, 2011 WL 1260241, at *11 (M.D.N.C. Mar. 31, 2011); *see also Carter Hughes v. Research Triangle Institute*, No. 11-cv-546, 2014 WL 4384078, at *2 (M.D.N.C. 2014). "This includes, of course, where the resisting party asserts that the discovery is irrelevant." *United Oil Co., Inc. v. Parts Assocs., Inc.,* 227 F.R.D. 404, 411 (D. Md. 2005).

Consistent with the foregoing principles, the Fourth Circuit has emphasized that "[d]iscovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted." *Carefirst of Maryland, Inc. v. Carefirst*

*Pregnancy Ctrs., Inc.,* 334 F.3d 390, 402 (4th Cir. 2003); *see also Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, No. 13-cv-651, 2016 WL 430494, at *2 (M.D.N.C. Feb. 3, 2016) ("Discovery rules are to be accorded broad and liberal construction.") (citing *Herbert v. Lando,* 441 U.S. 153, 177 (1979); *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)). For example, discovery that would enable a plaintiff to rebut a defense advanced by the defendant would of course be relevant to the subject matter of the action. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ....")*.*

UNC's burden takes on added significance here because this is a civil rights action in which Plaintiffs are entitled to "broad discovery." *Wolfe v. Green*, 257 F.R.D. 109, 112 (S.D. W. Va. 2009). "The presumption favoring a broad construction of the concept of relevancy under the Federal Rules is significant in the present context of federal civil rights claims asserted pursuant to 42 U.S.C. § 1983." *Scott v. Clarke*, No. 12-cv-36, 2013 WL 6158458, at *5 n.4 (W.D.Va. Nov. 25, 2013) (collecting cases). "[I]t is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." *Wolfe*, 257 F.R.D. at 112 (citation omitted).

To that end, UNC faces the ultimate burden of demonstrating that its use of race can withstand strict scrutiny. In making that judgment, courts must give "close analysis to the evidence of how the process works in practice." *See Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2421 (2013) ("*Fisher I*"). Given the "searching examination" that strict scrutiny requires, the Court should be especially skeptical of UNC's attempts to thwart discovery into the negative impact that UNC's use of race has on the performance of underrepresented minority students. *Id.* at 2419; *see also Fisher II*, 136 S. Ct. at 2209 (highlighting the "stringency of the strict-scrutiny burden for a school that employs race [in admissions]"). Indeed, the Supreme Court has emphasized that "assessment" of the admissions system's legality "must be undertaken in light of the experience the school has accumulated and the data it has gathered since the adoption of its admissions plan." *Id.* at 2010. Review of these "valuable data" will shed light on "which different approaches to admissions may foster diversity or instead dilute it" and "*to identify the effects, both positive and negative, of the affirmative-action measures [the university] deems necessary.*" *Id.* at 2214-15 (emphasis added).

## B. The Requested Student Preparedness and Performance Data and Documents Are Highly Relevant.

SFFA's request for documents and data regarding student preparedness and performance broken down by race and ethnicity is plainly

relevant to the issues raised in its Complaint, for two independent reasons: (1) it is important to assessing the negative effects of UNC's use of racial preferences; and (2) it is important to rebut UNC's likely defense of its rejection of a race-neutral alternative that UNC concedes would make its campus more racially diverse.

1. **The requested student performance data is needed to assess the negative effects of UNC's use of racial preferences.**

The Supreme Court emphasized in *Fisher II* that "data" must be used "to scrutinize the fairness of [the university's] admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; *and to identify the effects, both positive and negative, of the affirmative-action measures [the university] deems necessary*." *Id.* at 2214-15 (emphasis added). That is precisely the point here, as SFFA seeks to determine whether UNC's use of racial preferences has had the negative effect of causing or otherwise contributing to UNC's "crisis" of minority underperformance.

As set out above, UNC's Answer, discovery responses, and production demonstrate both that UNC uses racial preferences to admit URMs with significantly lower academic qualifications than their White counterparts and

that UNC has a longstanding problem with URM academic underperformance. *See supra* 8-9.

What SFFA seeks to prove is the connection between these two undisputed points. Much scholarship and academic writing supports this theory. For example, the Complaint identified a number of peer-reviewed academic studies have found that the use of race can directly harm even its intended beneficiaries by placing them in an academic environment that is more likely to overwhelm them, or at least intimidate them. *Id.* ¶ 162, 168-72. Being surrounded by peers who are more prepared leaves these students struggling to catch up, damages their self-confidence, and drives them out of fields and areas of concentration that they are afraid will be too challenging. *Id.* ¶¶ 159-61. Those studies suggest that students would flourish in an environment where their preparation was closer to that of their peers. *Id.* ¶¶ 163-64, 166, 169-70, 172.

As noted in the Complaint, UNC was included in the studies described above. *Id.* ¶¶ 167-172. As the case progresses, of course, UNC is free to dispute whether students admitted in part due to racial preference are underperforming. But our judicial system is an adversarial one; the only way for the Court to properly resolve such a disputed issue is to allow both parties to analyze the relevant data and present argument based thereon. All SFFA

15

seeks are reports that contain the relevant data (and related analysis) that are maintained in the university's files. In other words, SFFA's request seeks precisely the type of "valuable data" that the Supreme Court deemed essential to these types of cases in *Fisher II.*

Moreover, SFFA's allegations that the use of race is having a negative effect on student performance is not mere conjecture. Evidence UNC has produced so far establishes that UNC has been struggling with an achievement gap on campus among URM students, in particular URM males. For example: UNC's 2012-2014 Diversity Plan Report analyzes data over a five-year period highlights that American Indian and Black students' cumulative GPAs are on average .33 points or more lower than the cumulative GPAs of their White counterparts. *See* Exhibit F, at 13.[3] The Diversity Plan Reports also highlight a significant gap in graduation rates. *Id.* at 11-12 (noting that 80.5% male white students admitted in 2009 graduated in four years, compared to 60% of American Indian students, 60.8% of Black students, and 68.4% of Hispanic Students.). To the same point, UNC's Retention Task Force concluded in 2011 that "four-year graduation rates

---

[3]     The Diversity Plan Report emphasizes that "cumulative GPAs serve as a key indicator of academic performance." Exhibit F, at 36. Further, "academic performance, as measured by cumulative GPA, has a strong relationship to retention and graduation outcomes." Exhibit A, at 43.

were lower for males and underrepresented minorities," and even for six-year graduation rates "African American students are still twelve percentage points lower than White students." Exhibit A, at 35. A UNC official and member of the Minority Male Task Force characterized these achievement gaps as amounting to a "crisis" in "the current state of male students of color." Exhibit H, at 1.

On top of that, UNC itself has recognized the link between low academic qualifications and poor academic outcomes at UNC. The chair of UNC's Committee on Race-Neutral Strategies has sought and received extensive data on admitted students' academic preparation, their graduation and retention rates, major selection, and other admissions criteria. *See generally* Exhibit I. And UNC tracks the retention rate of URM students in UNC's Summer Bridge program—a high school-to-college transition program that disproportionately serves URMs from "schools that lack a strong college prep curriculum." Exhibit J, at 3; Summer Bridge Program, Who Can Attend, *available at* http://summerbridge.unc.edu/who-can-attend/.

More to the point, the Retention Task Force study highlighted above explicitly relied upon "admission application information," including SAT scores, High School GPA, rank, and AP credits awarded in concluding that "[g]raduation outcomes differed significantly by level of academic

preparation at the time of entry to Carolina." Exhibit A, at 11, 39. Further, the Provost's Minority Male Workgroup recently recommended that UNC review its admissions criteria "to identify any that may adversely impact or inhibit the success of URM males." Exhibit G, at 15. This parallels the kind of analysis SFFA seeks to conduct with the students preparedness and performance data and documents requested here.

The link connecting low academic qualifications and poor academic outcomes also was spotlighted in connection with the recent independent investigation into UNC's so-called "paper classes"—a shadow curriculum operating within the Department of African and Afro-American Studies for over two decades. *See* Exhibit K. These fake classes "entailed no class attendance and required only the submission of a single research paper" and were administrated by a Department official for the purpose of helping "under-prepared students who struggled with the demanding Chapel Hill curriculum" by offering them "watered-down academic requirements." *Id.* at 1, 3. The more than 3,100 students in these classes—more than half of whom were not athletes—"never had a single interaction with a faculty member." *Id.* at 1. Nonetheless, the staff member in charge of these classes graded the students "generously—typically with As or High Bs—and largely without regard to the quality of the papers." *Id.* at 2. Many advisors in the Office of

18

Academic Advising would specifically refer "academically-challenged students and students with other hardships to [the] paper classes." *Id.* at 5. "The result was thousands of Chapel Hill students received high grades, a large number of whom did not earn those high grades with high quality work." *Id.* at 2. Those grades often were the difference for many students in maintaining a GPA that kept them in good standing and enabled them graduate. *Id.* at 3. Indeed, for "329 students, the grade they received in a paper class provided the 'GPA boost' that either kept or pushed their GPA above the 2.0 level for a semester." *Id.* The purpose and existence (and apparent need) for these classes demonstrate both that UNC admits students who are not academically prepared to attend UNC and the resulting problems that may arise therefrom. SFFA's request for the racial and ethnic breakdown of students who took these classes and relied on them to maintain their academic standing is unquestionably relevant to determine the negative effects of UNC's use of racial preferences.

> **2. The requested student performance data is important to rebut UNC's likely defense to SFFA's claim that UNC could employ a percentage plan as a workable alternative to racial preferences.**

Moreover, the evidence SFFA seeks is relevant to address a "claim or defense" asserted by UNC. *See* Fed. R. Civ. P. 28(b)(1). One of SFFA's claims relates to UNC's continued "employ[ment of] racial preferences in

19

undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity." Complaint ¶ 205; *see also id.* at ¶¶ 5-6, 205-213. In briefing in *Fisher I*, UNC actually highlighted one available alternative: a top ten percentage plan. UNC admitted to the Supreme Court that such a percentage plan would actually work *better* than racial preferences in achieving diversity in that it would boost minority enrollment to levels higher than UNC achieves through racial preferences. In defending its refusal to actually employ a percentage plan, UNC claimed that such a plan would negatively affect a number of the students admitted: "Under such a system, UNC anticipates that many of the new 'automatic admits' would quickly find themselves educationally lost amid the faster pace of Chapel Hill—flocking to remedial courses to overcome their relatively weak secondary school education and facing increasingly difficult challenges to reach graduation." Brief of *Amicus Curiae* of the University of North Carolina at Chapel Hill Supporting Respondent, *Fisher v. University of Texas,* No. 11-345, at 35-36 (filed August 9, 2012), *available at* goo.gl/T1DczZ.

This claim has been repeated in documents produced to SFFA in this case. For example, a report by UNC's Working Group on Race Neutral Alternatives favorably cited one study finding that "a class-rank [admissions] model without a minimum SAT score would increase racial and economic

20

diversity, but puts some students at risk academically," and claimed that another study found that "students admitted under race-neutral policies in Texas had lower first and sixth-semester GPAs, and lower probability of graduation." *See* Exhibit B, at 6, 9 (UNC0097423, UNC0097426). The same report claimed that none of the several race-neutral alternatives that UNC considered employing "would produce an admitted class that is equal to or stronger than our actual admitted class in terms of both diversity and *academic quality*. Some of the alternatives mirror or exceed the actual admitted class in terms of diversity, but not academics, or vice versa, but no alternative allows us to achieve the same level of excellence and diversity as our current practice of holistic review." *Id.* at 20 (emphasis added and some emphasis removed) (UNC0097437).

Make no mistake: SFFA will contest all aspects of this analysis by UNC as the case moves forward, in particular on the ground that high school GPA is a relatively strong predictor of college academic performance (as the primary author of the report by the Working Group on Race-Neutral Alternatives conceded at her deposition, *see* Exhibit L, at 270:21-271:25. But to assess the possible negative effects of UNC's use of racial preferences and to model the likely academic effects of race-neutral alternatives, SFFA needs the student preparedness and performance data requested here.

In sum, the data and reports that SFFA seeks are essential to testing UNC's assertions about the academic implications of its admissions policies—assertions that go to the heart of the issues in this case. Denying SFFA this opportunity would substantially prejudice its ability to litigate this case, and leave UNC free to make unchallenged assertions about its own experiences and observations about the academic quality of its admitted students. That kind of one-sided approach to a key issue in this case flies in the face of the burden satisfying strict scrutiny, which falls on UNC. It also flies in the face of the Supreme Court's instructions in *Fisher II* regarding the need for analysis of "valuable data" about the effects of university admissions policies.

## C.     There Is No Undue Burden Or Other Obstacle To Production That Would Justify Withholding This Discovery From SFFA.

Finally, the production of the materials requested by SFFA is proportional to the needs of the case. The scope and depth of information that SFFA seeks are relatively easy to identify. In large part, the requested information appears to be centrally located within the Office of the Provost and/or UNC's Office of Institutional Research and Assessment. Indeed, the reports and other documents described above establish that UNC has access to and makes frequent use of this data. *See supra* 8-9. And to the extent SFFA is seeking reports that UNC already prepares with breakdowns of performance and major by ethnicity, identification, and production thereof

22

should be straightforward. Even if it did impose some burden, the importance of the data to the claims and defenses at issue here could never render the burden "undue." And of course, UNC possesses the racial and ethnic breakdown of the students who took "paper classes" and relied on them to maintain their academic standing.

As a general matter, there is nothing remarkable—especially in the civil-rights context—with ordering the production of this kind of information about third parties; indeed, such productions are routine in the Title VII context. *See, e.g., Miranda v. Deloitte LLP*, 962 F. Supp. 2d 379, 384 (D.P.R. 2013) (granting motion to compel production of other employees' semi-annual performance reports); *Nathan v. Ohio State University*, No. 10–cv–872, 2012 WL 5342711, at *11 (S.D. Ohio Oct. 29, 2012) (granting motion to compel performance reports and other information in Title VII case).

To be clear, SFFA's requests do not implicate any student privacy issues. SFFA does not challenge UNC's ability to redact individual student names—as UNC has done throughout this case with other data and documents. Although SFFA seeks performance data that can be correlated with the admissions data about individual applicants that UNC already has produced, this can be done with an anonymized ID number. UNC also has the benefit of the Protective Order (Doc. 49), which provides several levels of

Case 1:14-cv-00954-LCB-JLW   Document 87   Filed 06/09/17   Page 23 of 27

confidentiality designation, to further ensure the privacy of student information produced in this case.

## CONCLUSION

For the foregoing reasons, the Court should grant SFFA's motion to compel and order UNC to produce, for the period of 2011-2017: (1) documents or data showing GPAs and graduation and retention rates across racial and ethnic groups; (2) any analysis of the academic preparedness of UNC students by race/ethnicity (including any documents that analyze the possible correlation between high school GPA/test scores and academic performance at UNC); and (3) documents or data showing the race and ethnicity of students who took "paper classes" and of the students who maintained their academic standing because of those classes.

Respectfully submitted,

/s/ Thomas R. McCarthy
Thomas R. McCarthy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: tom@consovoymccarthy.com

/s/ William S. Consovoy
William S. Consovoy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
Bell, Davis & Pitt, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
E: aruley@belldavispitt.com

Arlington, Virginia 22201
(703) 243-9423
E: will@consovoymccarthy.com

*/s/ J. Michael Connolly*
J. Michael Connolly
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: mike@consovoymccarthy.com

*Attorneys for Plaintiffs*

Dated: June 9, 2017

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.3

Pursuant to L.R. 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, contains 5,106 words, which is less than the limit for this filing.

This the 9th day of June, 2017.

/s/ *Alan M. Ruley*
Alan M. Ruley

Case 1:14-cv-00954-LCB-JLW   Document 87   Filed 06/09/17   Page 26 of 27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I served the foregoing pleading via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 9th day of June, 2017.

<u>/s/ *Alan M. Ruley*</u>
Alan M. Ruley