CADWALADER

# Investigation of Irregular Classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill

**Kenneth L. Wainstein**
A. Joseph Jay III
Colleen Depman Kukowski

October 16, 2014

EXHIBIT K

I. **EXECUTIVE SUMMARY** ..... 1

II. **INTRODUCTION** ..... 7

III. **INVESTIGATIVE PLAN AND METHODOLOGY** ..... 9

A. The Scope of the Investigation ..... 9
B. Preliminary Steps of the Investigation ..... 10
1. Review Prior Reports ..... 10
2. Consult with District Attorney Woodall and the SBI ..... 10
3. Request Input from the Public ..... 11
4. Secure Access to FERPA Information ..... 11
5. Distribute Broad Document Preservation Directive ..... 11
C. Collection and Review of Electronic Documents ..... 11
D. Personal Interviews ..... 12
E. Review of Student Transcripts and Academic Records ..... 13
F. Review of Student Papers ..... 13

IV. **FACTUAL NARRATIVE OF AFAM IRREGULARITIES** ..... 14

A. Debby Crowder's Focus on Helping Challenged Students ..... 14
B. Strong Leadership in AFAM's Early Years ..... 14
C. Nyang'oro's Hands-off Approach to Management ..... 15
D. Crowder's Use of Independent Studies for Paper Classes ..... 16
E. Crowder's Use of Lecture Classes for Paper Classes ..... 17
F. The Popularity of Crowder's Paper Classes ..... 19
G. The Steering of Student-Athletes to These Classes ..... 19
H. Submission of Papers with Text that was Copied or Written by Others ..... 20
I. Isolated Questions About the Paper Classes ..... 20
J. Crowder's Retirement and its Effect on the Paper Classes ..... 21
K. The Paper Classes After Crowder's Retirement ..... 23
L. The Administration's Discovery of the Paper Class Scheme in August 2011 ..... 24
1. Earlier Reviews Related to Irregular Courses ..... 24
a. NCAA Investigation ..... 24
b. Hartlyn-Andrews Review of Courses ..... 25
c. Independent Study Task Force ..... 26
d. The State Bureau of Investigation ..... 26
e. Special Subcommittee of the Faculty Executive Committee ..... 27
f. The Governor Martin Review ..... 27
g. The Baker Tilly Review ..... 28
h. The UNC Board of Governors Academic Review Panel ..... 29
i. The SACS Review ..... 29
j. The Resumption of the NCAA Inquiry ..... 30

V. **FINDINGS** ..... 31

A. Examination of the Paper Class Scheme ..... 31
1. The Identification of Paper Classes ..... 32
a. Independent Study Paper Classes ..... 33
b. Lecture Paper Classes ..... 34
c. Post-Crowder Paper Classes ..... 35
d. Bifurcated Classes ..... 36
e. Student Add-ons ..... 37
f. The Total Numbers of Paper Classes and Paper Class Students ..... 37
2. Grade Manipulation in the AFAM Paper Classes ..... 38
3. The Motivation Behind Offering the AFAM Paper Classes ..... 42
4. Use of the Paper Classes by the Student Body ..... 46
a. Student-Athletes ..... 46
i. Distribution of Paper Class Enrollees per Sports Program ..... 47
ii. Reasons for the Distribution of Paper Class Enrollees by Sports Program ..... 49
iii. Reasons for Fluctuations in Student-Athlete Enrollment in the Paper Classes ..... 50
b. Non-Athlete Students ..... 51
5. The Analysis of Student Papers in the Paper Classes ..... 53
a. The Submission of Papers with Text Written by Others ..... 54
b. The Submission of Papers with Copied Text ..... 57
c. Originality Review ..... 58
6. The Analysis of the Impact of Paper Classes on Student GPAs ..... 61
a. Impact Analysis Methodology ..... 61
b. Impact Analysis Findings ..... 62
B. Assessment of University Employee Knowledge or Involvement in the Paper Classes ..... 63
1. The ASPSA Academic Counselors and Steele Building Academic Advisors 63
a. The ASPSA Academic Counselors ..... 63
i. Knowledge of ASPSA Counselors ..... 64
ii. Active Involvement in the AFAM Paper Classes by ASPSA Counselors ..... 66
2. Advisors in Academic Advising ..... 68
3. Athletics Department Personnel ..... 69
a. Athletics Department Management ..... 69
b. Football Personnel ..... 70
i. Coach John Bunting ..... 70
ii. Coach Butch Davis ..... 70
iii. Associate Athletics Director Corey Holliday ..... 71
c. Men's Basketball Personnel ..... 72
i. Coach Matt Doherty ..... 72
ii. Coach Roy Williams ..... 72
d. Women's Basketball Personnel ..... 74
e. Baseball Personnel ..... 75
f. Women's Soccer Personnel ..... 75

4. The AFAM Faculty ....75
   a. Tim McMillan ....76
   b. Alphonse Mutima ....77
   c. Eunice Sahle ....80
   d. Other AFAM Faculty Members ....81
5. University Faculty Outside of AFAM ....81
   a. The Faculty Athletics Committee ....82
   b. The Faculty Athletics Representative ....89
6. Chapel Hill Administration ....90
   a. The Senior Associate Dean for Social Sciences and Global Programs ....90
   b. The Senior Associate Dean for Finance and Planning ....90
   c. The Senior Associate Dean for Undergraduate Education ....91
   d. Dean of the College of Arts and Sciences ....91
   e. Chancellor ....91

C. Assessment of the University's Oversight of the AFAM Department and ASPSA ....92
1. Oversight of AFAM ....92
2. Oversight of ASPSA ....94

D. Assessment of the University's Response to the Paper Class Revelations ....95

E. Comparison with the Findings in the Martin Report ....97
1. Number of Irregular Classes and Enrollees ....98
2. Duration of Irregular Classes ....98
3. Student-Athlete Composition of Irregular Classes ....98
4. Knowledge of AFAM Faculty ....99
5. Knowledge of ASPSA ....99

VI. **WITNESS ACCOUNT SUMMARIES** ....100

A. UNC and Chapel Hill Leadership ....100
B. Chapel Hill Faculty ....106
C. AFAM Faculty and Staff Members ....108
D. Current and Former Members of the Faculty Athletics Committee ....113
E. Chapel Hill Staff and Advisors ....116
F. Academic Support Program for Student-Athletes Staff ....117
G. Chapel Hill Athletics Department ....123
H. Others ....129
I. Witnesses who Refused to Cooperate ....130

## I. EXECUTIVE SUMMARY

Deborah ("Debby") Crowder was hired in 1979 as the Student Services Manager in the African and Afro-American Studies Curriculum at the University of North Carolina at Chapel Hill ("Chapel Hill"). As a non-faculty member, her official responsibilities were limited to serving as office secretary and administrator for the Curriculum (later to become the Department of African and Afro-American Studies ("AFAM")). By the time she retired in 2009, however, Crowder had not only handled those responsibilities for 30 years; she had also started and managed a line of academically unsound classes that provided deficient educational instruction to thousands of Chapel Hill students.

Debby Crowder's whole life has revolved around Chapel Hill. She grew up dreaming of attending Chapel Hill; she was an undergraduate student at Chapel Hill from 1971 to 1975; and she spent all but four years of her career working there. Despite her love for the University, she often told people that she had a difficult experience during her student years at Chapel Hill, feeling that she was left adrift by a faculty and staff that focused on "the best and the brightest" and failed to pay attention to students like herself who needed direction and support. Because of that experience, Crowder felt a strong affinity for students with academic or other challenges in their lives. She believed it was her duty to lend a helping hand to struggling students, and in particular to that subset of student-athletes who came to campus without adequate academic preparation for Chapel Hill's demanding curriculum.

From the beginning of her AFAM tenure, Crowder thought about ways to help challenged students with watered-down academic requirements. Though tempted to bend the rules for the first 13 years of her AFAM service, that impulse was kept in check by strong leadership that was focused on the rigor of the curriculum.

That changed, however, when Dr. Julius Nyang'oro became chair of the curriculum in 1992. Nyang'oro brought a hands-off approach to management, and was willing to delegate substantial authority to Crowder. He also shared some of Crowder's sympathy for struggling students – and in particular for student-athletes. Crowder took advantage of the more permissive environment under Nyang'oro and started to implement a plan to offer classes that awarded high grades with little regard for the quality of a student's work.

Specifically, she designed and offered what are called "paper classes." These were classes that were taught on an independent study basis for students and student-athletes whom Crowder selected. Like traditional independent studies at Chapel Hill or any other campus, these classes entailed no class attendance and required only the submission of a single research paper. Unlike traditional independent studies, however, there was no faculty member involved in managing the course and overseeing the student's research and writing process. In fact, the students never had a single interaction with a faculty member; their only interaction was with Crowder, the Student Services Manager who was not a member of the University faculty.

Crowder provided the students with no actual instruction, but she managed the whole course from beginning to end. She registered the selected students for the classes; she assigned them their paper topics; she received their completed papers at the end of the semester; she graded the papers; and she recorded the students' final class grades on the grade rolls. When Crowder

graded the papers, she did so generously – typically with As or high Bs – and largely without regard to the quality of the papers. The result was that thousands of Chapel Hill students received high grades, a large number of whom did not earn those high grades with high quality work.

These paper classes were taken by students of all types, but were especially popular among student-athletes, particularly those who played the "revenue" sports of football and men's basketball. Many of these student-athletes were referred to these classes by academic counselors in the Academic Support Program for Student-Athletes ("ASPSA") who were always under pressure to maintain student-athlete eligibility and saw these classes – and their artificially high grades – as key to helping academically-challenged student-athletes remain eligible and on the playing field.

Due to curricular changes and limits on the number of independent studies per student, Crowder modified her approach in the late 1990s and started offering these paper classes under the guise of traditional lecture classes. Despite their lecture designation on the schedule, these classes continued to operate in the same fashion. There was no class attendance or student interaction with anyone other than Crowder, and Crowder continued to grade the papers.

Although Nyang'oro acquiesced in Crowder's paper class scheme and facilitated it in a number of ways, Crowder was the one who coordinated it. When Crowder retired from the University in 2009 and she was no longer in position to arrange these classes, under-prepared students and student-athletes began to struggle to maintain academic eligibility. At the request of ASPSA football counselors, Nyang'oro offered several classes after Crowder's retirement that followed a similar format and were equally lacking in academic rigor.

Despite the fact that these classes involved thousands of students and coordination between Crowder and numerous University employees, the Chapel Hill administration never scrutinized AFAM's operations or the academic integrity of their course offerings. It was only when media reports raised questions about AFAM classes in 2011 that administration officials took a hard look at the AFAM Department. They were shocked with what they found.

The University took a number of actions in reaction to the paper class revelations. They immediately self-reported the misconduct to the NCAA. They then commissioned a series of inquiries to investigate and learn how these classes had developed. However, with both Nyang'oro and Crowder unwilling to be interviewed for these reviews because of a pending criminal investigation, none of these inquiries were able to truly get to the bottom of what happened with the paper classes.

That changed at the end of 2013, once the criminal investigation came to an end and the University learned that it would have access to Debby Crowder and to the information from the State Bureau of Investigation's criminal investigation. Soon thereafter, the University retained us to take advantage of this opportunity and conduct a thorough, probing investigation to answer the lingering open questions about the paper class scheme.

We have done just that over the past eight months, interviewing 120 witnesses, collecting and searching 1.6 million emails and other electronic documents and analyzing student transcripts and Chapel Hill course records dating back to the 1980s. Over the course of that investigation, we have arrived at a number of findings, including the following:

- Between 1993 and 2011, Crowder and Nyang'oro developed and ran a "shadow curriculum" within the AFAM Department that provided students with academically flawed instruction through the offering of "paper classes." These were classes that involved no interaction with a faculty member, required no class attendance or course work other than a single paper, and resulted in consistently high grades that Crowder awarded without reading the papers or otherwise evaluating their true quality.

- Crowder and Nyang'oro were primarily motivated to offer these classes by a desire to help struggling students and student-athletes. Both felt sympathy for under-prepared students who struggled with the demanding Chapel Hill curriculum. Crowder felt a strong affinity for student-athletes in particular, and she gave them ready access to these watered-down classes to help them manage their competing athletic and academic time demands.

- Over the 18 years these classes existed, Crowder and Nyang'oro were responsible for offering 188 different lecture classes as well as hundreds of individual independent studies in the "paper class" format – with no class attendance or faculty involvement, and with Crowder managing the class and liberally grading the papers. Through this scheme, over 3,100 students received one or more semesters of deficient instruction and were awarded high grades that often had little relationship to the quality of their work.

- The grades earned in these AFAM paper classes were significantly higher than grades awarded in the regular AFAM classes. The average grade issued to all identified students in the paper classes was 3.62, as compared to an average grade of 3.28 for the regular AFAM classes. That difference was even greater for student-athletes. The average grade given to all student-athletes for the paper classes was 3.55, as compared to an average student-athlete grade of 2.84 for the regular AFAM classes.

- The inflated grades from the paper classes had a significant impact on student and student-athlete GPAs and academic standing. Each paper class grade increased a student's GPA, on average, by approximately .03 grade points. The significance of this effect could be seen in the number of students for whom the paper class grade made the difference in reaching or not reaching the 2.0 grade threshold. In the case of 329 students, the grade they received in a paper class provided the "GPA boost" that either kept or pushed their GPA above the 2.0 level for a semester. For 81 of those students, that GPA boost was the margin that gave them the 2.0 GPA that allowed them to graduate.

- Student-athletes accounted for a disproportionately high percentage of enrollments in the AFAM paper classes. Of the identifiable enrollments in the lecture paper classes, 47.4% were student-athletes, even though student-athletes make up just over 4% of the Chapel Hill undergraduate student body. Of those student-athlete enrollments, 50.9% were football players,

12.2% were men's basketball players, 6.1% were women's basketball players, and 30.6% were Olympic and other sport athletes.

- A good number of these student-athletes were "steered" to the AFAM paper classes by certain academic counselors in ASPSA. This steering was most prevalent among the counselors for the revenue sports of football and men's basketball. While some of these counselors knew only that these were easy classes, others were fully aware that there was no faculty involvement and that Crowder was managing the whole course and grading the papers. Those counselors saw these paper classes as "GPA boosters" and steered players into them largely in order to help them maintain their GPAs and their eligibility under the NCAA and Chapel Hill eligibility rules. At least two of those counselors went so far as to suggest what grades Crowder should award to their players who were taking her paper classes.

- Several of the ASPSA football counselors grew dependent on the paper classes and were very concerned when Crowder announced her upcoming retirement. They immediately took steps to prepare for the end of the paper classes. They instructed players to submit their papers before Crowder's departure to receive the benefit of her liberal grading; they warned the football coaches that with Crowder's retirement they no longer had access to classes "that met degree requirements in which [the football players] didn't go to class…didn't take notes [or] have to stay awake…didn't have to meet with professors [and] didn't have to pay attention or necessarily engage with the material;" and they undertook an effort to persuade Nyang'oro to continue the paper classes. They succeeded in getting Nyang'oro to offer a few classes, but not before the football team's GPA fell to its lowest point in ten years.

- It became common knowledge among certain quarters of the student and student-athlete body that Crowder did not grade paper-class papers with a discriminating eye and that a student could receive a high grade for turning in a paper of any quality. As a result, a significant proportion of the papers submitted in these classes included large amounts of unoriginal text. In a number of cases, students submitted papers with original introductions and conclusions, but with copied "fluff" text in between, because they knew that Crowder typically just skimmed the beginning and the end of a paper before awarding a high grade.

- ASPSA made tutors available to all student-athletes, and those tutors often helped the student-athletes with their paper-class papers. While most conducted themselves appropriately, several of the tutors crossed the line between permissible and impermissible assistance and drafted parts of the papers that the student-athletes submitted for credit in these classes.

- Although Crowder took steps to mask the true nature of the paper classes, there were University employees who had varying degrees of knowledge about the paper classes:

    - Besides those ASPSA counselors mentioned above who were actively colluding with Crowder and Nyang'oro, there were a number of ASPSA counselors and Athletics Department staff who knew that these were easy courses that required no class attendance and that they resulted in consistently high grades for the student-athletes. Several also recognized the anomaly that these classes were taught in an independent study format even though they were often designated on the course schedule as lecture classes.

    - A number of the Academic Advisors in the Office of Academic Advising occasionally referred academically-challenged students and students with other hardships to Crowder's paper classes, although they apparently did not know that Crowder managed the classes and graded the papers without the involvement of a faculty member.

    - At least three members of the AFAM faculty – besides Nyang'oro – had some knowledge of the paper class scheme and took actions that assisted or facilitated the paper class scheme.

    - Several administrators were aware of red flags about potential irregularities in AFAM but took little or no action to inquire about them. For example, one administrator became aware in 2005 or 2006 that Nyang'oro was routinely listed as the instructor-of-record for a number of independent studies – approximately 300 per year – that was clearly well beyond what any professor could physically handle. That administrator's response was just to ask Nyang'oro to reduce his independent studies numbers and then to let the matter drop. She never asked how he or his small department could possibly teach 300 different independent studies in a single year and never challenged him on the quality of instruction these students were or were not receiving in these independent studies. If she had, she would have learned that the students were effectively getting no instruction and that these were largely paper class students who were writing papers for Debby Crowder. The administrator's inexplicable decision not to press this obvious issue allowed the paper class scheme to continue for another five years.

    - Beyond those University personnel who were aware of red flags about the AFAM classes, there were a larger number among the Chapel Hill faculty, administration and Athletics and ASPSA staff who knew that these were easy-grading classes with little rigor and knew that there was a process – like similar processes that exist in many colleges around the country – where some number of student-

athletes were deliberately steered toward these classes. Several of those same people also made a conscious decision not to ask questions even though they had suspicions about the educational content of those classes.

- Like many universities, the Chapel Hill administration took a loose, decentralized approach to management of its departments and department chairpersons, on the theory that strong management in the college environment unduly constrains the academic independence that fosters creative instruction and research. As a result of this approach, the University failed to conduct any meaningful oversight of the AFAM Department and ASPSA, and Crowder's paper class scheme was allowed to operate within one of the nation's premier academic institutions for almost two decades.

- We found no evidence that the higher levels of the University tried in any way to obscure the facts or the magnitude of this situation. To the extent there were times of delay or equivocation in their response to this controversy, we largely attribute that to insufficient appreciation of the scale of the problem, an understandable lack of experience with this sort of institutional crisis and some lingering disbelief that such misconduct could have occurred at Chapel Hill.