IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **DEFENDANTS' OPPOSITION TO** ) **PLAINTIFF'S MOTION TO** ) **COMPEL PRODUCTION OF** |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | ) **DOCUMENTS AND DATA** ) **REGARDING STUDENT** ) **PREPAREDNESS AND** |
| Defendants. | ) **PERFORMANCE** ) ) |

Plaintiff Students for Fair Admissions has waited until the final days of discovery to seek to compel the University of North Carolina at Chapel Hill to produce vast swaths of information about the academic performance of enrolled students. One dimension of SFFA's request demands information on particular independent study courses (dubbed "paper classes") that ended in 2011; another request levels a plea for academic performance data for every enrolled student from 2011 to 2017; and yet another demand, while purporting to seek academic performance information at the aggregate level, altogether ignores reams of this information already made available by the University.

All of this comes not in a policy debate about the University's graduation rates— which are among the highest in the United States—but rather in a lawsuit with legal claims challenging whether the University's undergraduate admissions processes satisfy established strict scrutiny standards. SFFA's requests are as belated as they are

irrelevant, would impose meaningful burdens on the University, and should be denied in their entirety.

## BACKGROUND

For the second time in a month, SFFA claims that the University is "attempt[ing] to thwart discovery." (ECF 87 at 13.) By the time fact discovery concludes in a week, the University will have produced sixteen witnesses for deposition (exceeding by mutual agreement the limit set by the Court in its scheduling order), extensive data about applicants (on both an aggregate and individual level), over 1,200 randomly selected individual applicant files, and nearly 50,000 emails and other documents totaling over 370,000 pages on various aspects of its admissions practices and diversity efforts. This extensive production information, which as discussed below also includes information directly responsive to SFFA's requests here, belies any assertion that the University has failed in any way to comply with its discovery obligations.

With respect to the specific information sought through this motion, SFFA's contention that "[t]he scope and depth of information SFFA seeks are relatively easy to identify" (ECF 87 at 22) overstates the clarity of its requests. As best the University can tell, SFFA currently seeks three broad categories of documents and information:

1. Academic performance data including (i) aggregate performance data relating to GPA and retention rate broken down by race and ethnicity and major (ECF 87 at 22) and (ii) individualized student performance data that can be "correlated with the admissions data about individual applicants" (*Id.* at 23);

2. "[A]ny analysis of the academic preparedness of UNC students by race/ethnicity" (*Id.* at 1), and

2

3. Documents or data showing the "race and ethnicity of students who took so-called 'paper classes' and of the students who maintained their academic standing because of those classes." (*Id* at 2.)

Each request, as shown below, should be denied.

## ARGUMENT

I. **Discovery Must Be Tied To The Specific Claims and Defenses At Issue.**

   A. **SFFA's Claims Do Not Relate To The Academic Performance of Enrolled Students at UNC-Chapel Hill.**

There is no question that in considering a motion to compel a court must consider whether the discovery sought is relevant, proportional to the needs of the case, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Fed. R. Civ. P. 26(b)(1); *see also Nicholas v. Wyndham Int'l Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (articulating same standard); *Moore v. DAN Holdings, Inc.*, No. 1:12-CV-503, 2013 WL 1833557, at *11 (M.D.N.C. Apr. 30, 2013) (denying a motion to compel production of additional documents based on the principles of Rule 26(b)(2)(C)). In considering the permissible scope of discovery under Rule 26, material that is irrelevant to the elements of the claims or defenses at issue is not subject to discovery. *See Webb v. Green Tree Servicing LLC*, No. ELH-11-2105, 2012 WL 3139551, at *3–*5 (D. Md. July 27, 2012) (denying motion to compel where material sought was not relevant to elements of causes of action asserted in complaint).

Here, SFFA makes broad statements grounded in what it calls "the 'mismatch' effect" and the apparent view that a university is somehow constitutionally obligated—in devising an admissions process—to ensure that all students who are admitted and choose to enroll then go on to achieve some unspecified but equal level of academic success over

3

the course of their undergraduate education. (ECF 87 at 3-5, 15.) But determinations of the proper scope of discovery must be made against the backdrop of Plaintiff's specific claims and requests for relief.

SFFA brought suit against the University on behalf of an Applicant who is not an underrepresented minority and who was denied admission during the 2013-2014 admissions cycle, challenging the University's admissions process as of 2013 as unconstitutional. (ECF 1 (Complaint) ¶¶ 1, 13-14.) SFFA also brought suit on behalf of similarly situated non-underrepresented minority applicants on a going forward basis, challenging the University's continued consideration of race from 2013 until the present. (*Id.* ¶¶ 21-22.) SFFA's complaint seeks an order declaring that the University's admissions practices do not comply with strict scrutiny and seeking to enjoin their continued operation. (*See*, *e.g., id.* ¶¶ 1-7.)

More specifically, SFFA alleges that the University's current admissions practices should be enjoined because: (1) the University's use of race in undergraduate admissions is not narrowly tailored because race is being used neither to achieve "critical mass" nor as a mere "plus factor;" (2) the University is not utilizing race-neutral alternatives that could achieve diversity; and (3) the Supreme Court should overrule *Grutter* and its progeny and invalidate any consideration of race in higher education admissions. (*Id.* ¶ 196.) The resolution of these claims neither requires nor warrants broad discovery into the academic performance data sought by SFFA.

4

### B. The Supreme Court's Decision in *Fisher II* Does Not Require Consideration of Academic Performance.

In *Fisher v. University of Texas at Austin*, 136 S.Ct. 2198 (2016) ("*Fisher II*"), the Supreme Court rejected a challenge to UT-Austin's race-conscious admissions practices and reaffirmed its prior holdings that "'a university may institute a race-conscious admissions program as a means of obtaining the educational benefits that flow from student body diversity.'" 136 S. Ct. 2198, 2210 (2016) (quoting *Fisher v. University of Texas at Austin* ("*Fisher I*"), 133 S.Ct. 2411, 2419 (2013), and citing *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)). The controlling inquiry, the Court emphasized, is whether a university is able to satisfy strict scrutiny by showing not only a compelling interest in diversity and its educational benefits, but also that its admissions objectives cannot be achieved through more narrowly tailored race-neutral alternative practices. *Fisher II*, 136 S. Ct. at 2208. Nowhere in the framework set forth by the Court is there a mandate that the university's admissions practices be measured in terms of the academic performance of applicants who are admitted and ultimately choose to enroll.

SFFA hangs its discovery requests and contrary reading of *Fisher II* on the statement that "universities must provide data sufficient to 'identify the effects, both positive and negative, of the affirmative-action measures [the university] deems necessary.'" (ECF 87 at 2 (quoting *Fisher II,* 136 S.Ct. at 2214).) But the Court did not discuss data relating to how applicants who chose to attend UT-Austin performed academically, but instead "data about the manner in which different approaches to admissions may foster diversity or instead dilute it." *Fisher II*, 136 S.Ct. at 2214.

5

Similarly, in *Fisher I*, the Court discussed a "close analysis to the evidence of how the process works in practice" in the context of remanding to the Fifth Circuit with instructions to determine whether UT-Austin had offered sufficient evidence to show its admissions program was narrowly tailored to obtain the educational benefits of diversity. *Fisher I*, 133 S.Ct. at 2421. In neither opinion is there any indication that, in discussing the operation of an admissions practice, the Court was intending to compel analysis of how individuals who applied and were admitted performed academically after they matriculated—if they matriculated—at UT-Austin.

There is no doubt that the Court has emphasized the importance of data-driven evidence in assessing whether a university's admissions practices satisfy strict scrutiny. But evidence of how an admissions process works in practice is miles removed from requiring that a university produce data showing the grade that a student ultimately received in his or her freshman biology class or senior seminar at the University—what SFFA apparently seeks to compel here. (*See*, *e.g.*, ECF 87 at 23 seeking "performance data that can be correlated with the admissions data about individual applicants".) Notably, *future* performance data is not available to the admissions office at the time admissions decisions are made, and admissions decisions are necessarily based on information known at the time of application review.

Finally, SFFA badly misses the mark in suggesting that the University's *amicus* brief in *Fisher I* conveys agreement with SFFA's theory of "mismatch" or that the University in any way relies on "mismatch" to defend its admissions policies. The *amicus* brief, submitted in August 2012, conveyed the University's belief that adopting a

6

race-neutral percentage plan would result in an admitted cohort with lesser academic qualifications, based on measures such as average SAT score and high school GPA. But nowhere did the University endorse SFFA's theory of so-called "mismatch" or somehow concede its relevance. Nothing the University said in its *Fisher I amicus* brief should open the gates of discovery to a theory that is never mentioned in the brief itself and not part of the University's defense to the claims asserted by SFFA in the current litigation. Indeed, SFFA is far afield in in suggesting that the University, as part of striving to admit diverse classes, admits students that it knows will fail academically upon enrollment in Chapel Hill.

## II. SFFA Is Not Entitled To Additional Discovery Beyond What The University Already Has Produced.

### A. The University Should Not Be Compelled To Produce Additional Aggregate Academic Performance Data Or Any Individual Performance Data.

#### 1. The University Has Made Sufficient Aggregate Academic Performance Data Available.

SFFA's request to compel additional "documents or data showing GPAs and graduation and retention rates across racial and ethnic groups" (ECF 86 at 1; ECF 87 at 1) should be denied. To start, it is important to untangle the record and correct any mischaracterization of the University's position. Recognizing that its efforts to achieve and *maintain* a critical mass of diversity on campus through sustained enrollment is relevant to its interest in realizing the educational benefits of diversity, the University has produced substantial information relating to its efforts to retain all students, including underrepresented minorities. This discovery has included information on graduation

7

rates, and as discussed below, frequently also includes information relating to GPA on an aggregate level.

SFFA does not—and cannot—explain why the aggregate performance data broken out by race and/or ethnicity that has been either produced by the University in discovery or that is publicly available is insufficient. In fact, SFFA admits that the University has produced substantial evidence relating to its retention efforts and graduation rates. (*Id.* at 16-18.) As just discussed, this information frequently also includes GPA information on an aggregated level. Beyond the documents mentioned by SFFA, other materials that the University has produced include:

- 2014-2015 Diversity Plan Report (including information relating to GPA and graduation/retention rates for the 2008-2010 cohorts) (UNC0283397)

- 2011-2012 Diversity Plan Report (including information relating to GPA and graduation/retention rates for the 2004-2007 cohorts) (UNC0283341)

- 4-Year Graduation Rates - 2007-2011 Cohorts (including information relating to graduation/retention rates) (UNC0326638)

- 6-Year Graduation Rates - 2007-2009 Cohorts (including information relating to graduation/retention rates) (UNC0326639)

- Copy of 6-yr graduation rates (including information relating to graduation/retention rates for 2008-2010 cohorts, including projected graduation rates for future years) (UNC0326682)

- Disaggregated Graduation Rates – Projections (including information relating to graduation/retention rates for 2001-2011 cohorts, including projected graduation rates for future years) (UNC0326693)

- Graduation Rates - Leading Publics (including information relating to graduation/retention rates for 2007-2011 cohorts, including data from other institutions) (UNC0326732)

- Most Recent Graduation Rates 2016-05-11(including information relating to graduation/retention rates for 2001-2011 cohort) (UNC0326777)

8

Against this production of materials relating to a lengthy period of time, SFFA's demand for "more" is unduly burdensome and not proportional to the needs of the case.

SFFA's demand for unspecified additional aggregate data is also perplexing considering the vast amount of data that the University makes publicly available. Despite identifying the University's Office of Institutional Research and Assessment in its motion, SFFA ignores the wealth of information that Office makes publicly available with respect to graduation and retention rates—indeed in some cases the very reports that SFFA apparently seeks to compel.

To illustrate, under the Customizable Retention and Graduation Rates Report section of the Office's website (http://oira.unc.edu/), anyone can generate an Excel spreadsheet displaying retention and graduation rates for UNC entering classes since 2001. Moreover, the website is interactive and this information can be filtered by gender, race/ethnicity, citizenship, residency, first generation status, financial need status, and Pell Grant recipient status as desired. There is even a filter for "Under-Represented Minority." (See Exhibit 1 (screenshot of filters available on http://oira.unc.edu).)

The Office of Institutional Research also provides information on undergraduate GPA broken down by race and ethnicity. For example, the Institutional Research website provides the following reports (in both PDF and Excel spreadsheet):

- "Undergraduate Students Term GPA by Gender and Race/Ethnicity Fall 2010-2014"

- "First-Time Undergraduates Cumulative GPA at Graduation by Race/Ethnicity, Gender and First-Generation 2015" (as well as 2014, 2007-2011)

9

- "New First Year Average Term GPA by First Generation, Gender, and Race/Ethnicity Fall 2013 – Fall 2014"

- "New First Year Students Term GPA by First Generation, Gender, and Race/Ethnicity 2010 – 2014"

- "New Transfer Students Term GPA by First Generation, Gender, and Race/Ethnicity Fall 2010 – Fall 2014"

- "New Transfer Undergraduates First Fall Term GPA of 2014 by Race/Ethnicity, Gender and First-Generation"

- "New Transfer Undergraduates First Fall Term GPA of 2014 by Race/Ethnicity, Gender and Needy Status"

- "New Transfer Undergraduates Cumulative GPA at Graduation by Race/Ethnicity, Gender and First-Generation Cohort 2007-2011"

(See Exhibit 2 (screenshot of reports available at http://oira.unc.edu).) Put most simply, the aggregate breakdowns that SFFA seeks to compel are already available to it.

The only remaining category of aggregate academic performance data that the University believes SFFA seeks to compel relates to major. With respect to academic major, with very few exceptions, the University does not require students to declare a major until their junior year—making any argument as to its relevance to the University's admissions process even more strained. Nonetheless, the University does not create documents or reports that break down overall student enrollment by race and/or ethnicity *and* by major and thus has no documents to produce. *See Chambers v. North Carolina Dep't of Juvenile Justice and Delinquency Prevention*, No. 1:10CV315, 2013 WL 3776498, at *2 (M.D.N.C. July 17, 2013) ("'Rule 34 requires a party to produce documents that already exist and a party does not have to create a document in response to a request for production.'") (internal citations omitted); *Nix v. Holbrook*, No. 5:13–

10

02173–JMC, 2015 WL 733778, at *9 (D.S.C. Feb. 20, 2015) ("The court cannot compel Defendants to produce documents they do not possess.") (internal citation omitted).

In conclusion, SFFA fails to show why the extensive amount of aggregate academic performance data made available by the University does not more than satisfy SFFA's discovery requests. Nor does SFFA articulate with any degree of specificity what else it is entitled to under the principles of Rule 26. Denying SFFA's motion would also be consistent with how the district court handling the Harvard litigation has considered and ruled upon the issue. See Exhibit 3 (Sept. 7, 2016 Order at 2 (denying SFFA's motion to compel "data relating to academic performance of matriculated students" but ordering production of *aggregate* data on graduation rates).)

### 2. Individual Student Performance Data is Not Relevant, Unduly Burdensome, and Not Proportional to the Needs of the Case.

In addition to aggregate academic performance data, SFFA seeks to compel individual student performance data that it can "correlate" with the applicant information it has already received in discovery. (ECF 87 at 23.) Even setting aside the fact that none of SFFA's document requests can be reasonably read to request individual student grades, such individualized data is not relevant to SFFA's claims about the University's admission practices. Moreover, ordering its production this late in the discovery period would be unduly burdensome and not proportional to the needs of this case, particularly given the University's prior production of aggregate data. *See Moses H. Cone Mem'l Hosp. Operating Corp. v. Confider Physician Servs., Inc.*, No. 1:13-CV-651, 2016 WL 430494, at *5 (M.D.N.C. Feb, 3, 2016) (denying motion to compel because plaintiff's

11

request at late stage was unduly burdensome under Rule 26(b)(2)(C)'s proportionality limits in light of the production plaintiff had already received).

As discussed above, no aspect of student academic performance is relevant to this lawsuit. Additionally, even more so with respect to individual academic performance data, the basic math shows that the burden to the University would be real and substantial. In 2015 and 2016, the University enrolled over 18,000 undergraduates each semester. Ostensibly, SFFA seeks individual data for roughly this same population of approximately 16,000-18,000 students for fourteen semesters (the 2011 through 2017 school years). Even if SFFA limited this request to a single cumulative GPA, the volume of data remains staggering.

What is more, when discussing individual student performance, the corresponding invasion of privacy is nothing to minimize. By SFFA's own account, it intends to link—on a *personal level*—the academic qualifications of individual applicants with their subsequent grades during their entire academic career at the University. (ECF 87 at 23.) SFFA is then sure to argue—again at an individual level—that particular students, and undoubtedly under-represented minority students, were "mismatched" and thus academically unfit for UNC-Chapel Hill. (*See id.* at 14-15 ("UNC uses racial preferences to admit URMs with significantly lower academic qualifications than their White counterparts and that UNC has a longstanding problem with URM academic underperformance. What SFFA seeks to prove is the connection. . . ." (internal citations omitted)) In addition to being legally irrelevant, the production of such individualized academic performance information would reflect an unwarranted intrusion of student

privacy that would trigger mandatory individual notices under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. pt. 99.

SFFA's description of "the kind of analysis SFFA seeks to conduct with the students preparedness and performance data and documents requested" (ECF 87 at 18) likewise does not explain why it is entitled to individual student data. Indeed, the documents that SFFA expressly identifies both refer to "admissions criteria" and "'admissions application information'" (*id.* at 17-18)—not individual undergraduate performance data. Nor can SFFA claim that such data is proportional to the needs of the case in light of the substantial aggregate data that is available. Any marginal benefit to the sought discovery is outweighed by the significant burden that production would impose, the substantial privacy interests of students, and the likelihood of substantial delay in this case as fact discovery closes on June 30, 2017.

### B. The University Has Produced Discovery In Its Possession Relating To Its Analysis Of Academic Preparedness.

Next, SFFA seeks "any analysis of academic preparedness of UNC students by race/ethnicity." (*Id.* at 1.) Once more, however, SFFA admits that the University *has* produced studies and reports relating to academic preparedness generally. (*Id.* at 4.) Beyond the documents SFFA references, including the 2010 Retention Report, the University has also produced:

- "Grit Manuscript": A study regarding investigating "grit" as a non-cognitive predictor of first year GPA (UNC0108880)

13

- "How Much is Enough? Rethinking the Role of High School Courses in College Admission": A study regarding correlation between number of college-level courses taken during high school and first year GPA (UNC0083052)

- "Analysis of SAT scores and FYGPA": A study regarding the relationship between SAT score and first year GPA (UNC0103256)

The University does not believe that it possesses any documents beyond those that it has already produced that discuss academic preparedness generally and has not analyzed academic preparedness by race and/or ethnicity. Consequently, there is nothing to compel. *See Susko v. City of Weirton*, No. 5:09-cv-1, 2011 WL 98557 (N.D.W.V. Jan. 12, 2011) (denying motion to compel production of documents where plaintiffs lacked a colorable basis for believing relevant, responsive documents existed and were being withheld by defendants).

### C. The So-Called "Paper Classes" Are Entirely Irrelevant.

The last category of information that SFFA seeks is comprised of "documents or data showing the race and ethnicity of students who took so-called 'paper classes' and of the students who maintained their academic standing because of those classes." (ECF 86 at 1-2; ECF 87 at 1-2.) SFFA's attempt to lump this information with general academic performance is a transparent attempt to manufacture relevance that falls flat. As has been widely reported, the University discovered certain academic irregularities in one academic department. Multiple inquiries, including the one SFFA cites (*Id.*, Ex. K), found no indication of wrongdoing in any other academic departments *and* furthermore that the irregularities ended in 2011. By all measures, the irregular courses comprised a miniscule portion of all undergraduate course offerings.

14

To put this in perspective for this litigation, the Applicant applied for admission in Fall 2013, more than two years after the irregularities ended. Yet, SFFA would have the University produce data showing the racial and ethnic breakdown of the students who "maintained their academic standing because of those [paper] classes." (*Id.* at 1-2.) The suggestion that the racial and ethnic breakdown of students who took these courses before 2011 has any relevance to the University's admissions practices in 2013, much less 2017, is absurd and comes nowhere close to meeting the standards set forth by Rule 26. *See Preferred Carolinas Realty, Inc. v. American Home Realty Network*, No. 1:13-CV-181, 2014 WL 1320133, at *6 (M.D.N.C. Mar. 28, 2015) (denying motion to compel where party did not limit requests to timeframe for which it sought relevant documents and noting party's "failure to limit his production request to relevant time period made his request overbroad and unduly burdensome").

Additionally, SFFA's own description of its requests for the production of documents (ECF 87 at 6-7) illustrates the tenuous nature of any purported relevance argument. Neither SFFA's first nor second requests for the production of documents mentions "paper classes."[1] The only remaining inference is that SFFA has made this belated request to muddy the waters by straining to interject questions about courses that ended six years ago. SFFA's "paper class" discovery requests reflect a clear effort to distract the Court. Such tactics should have no place in a case of this significance and the

---

[1] Plaintiff's March 2017 requests propounded sixty-three separate requests so SFFA cannot claim this lack of specificity was due to a lack of effort. (ECF 87, Ex. E.)

15

motion should be denied as irrelevant, unduly burdensome, and not proportional to the needs of this litigation.

For these reasons, the University respectfully submits that SFFA's motion to compel should be denied in its entirety.

**Respectfully submitted this 23rd day of June, 2017.**

> JOSH STEIN
> Attorney General
>
> /s/ Stephanie Brennan
> Stephanie Brennan
> Special Deputy Attorney General
> NC State Bar No. 35955
> E: sbrennan@ncdoj.gov
>
> /s/ Matthew Tulchin
> Matthew Tulchin
> Special Deputy Attorney General
> NC State Bar No. 43921
> E: mtulchin@ncdoj.gov
> NC Department of Justice
> Post Office Box 629
> Raleigh, NC 27602-0629
> (919) 716-6920
>
> /s/ Michael Scudder
> Michael Scudder
> Lara Flath
> Marianne Combs
> Skadden, Arps, Slate, Meagher & Flom LLP
> 155 North Wacker Drive
> Chicago, IL 60606-1720
> (312) 407-0700
> E: michael.scudder@skadden.com
> E: lara.flath@skadden.com
> E: marianne.combs@skadden.com
>
> /s/ Lisa Gilford
> Lisa Gilford
> Skadden, Arps, Slate, Meagher & Flom LLP
> 300 South Grand Ave.
> Los Angeles, CA 90071
> (213) 687-5130
> E: lisa.gilford@skadden.com
> *Attorneys for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed 9,000 words.

This 23rd day of June, 2017.

/s/ Michael Scudder
Michael Scudder

18

Case 1:14-cv-00954-LCB-JLW   Document 92   Filed 06/23/17   Page 18 of 19

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing Defendants' Opposition to Plaintiff's Motion to Compel Production of Documents and Data Regarding Student Preparedness and Performance via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 23rd day of June, 2017.

/s/ Michael Scudder
Michael Scudder
