IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF NORTH CAROLINA et al.,<br><br>Defendants. | PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND DATA REGARDING STUDENT PREPAREDNESS AND PERFORMANCE |

**PRELIMINARY STATEMENT**

As set out in SFFA's opening brief, SFFA seeks certain documents and data from UNC in order to explore an issue of direct relevance to this case—whether UNC's use of race in the admissions process results in the admission of underrepresented minority ("URM") students who struggle academically because they are un- or under-prepared for the academic rigors of UNC. SFFA seeks certain individual-level, anonymized performance data for applicants who matriculated to UNC in the years 2011-2017; and the racial and ethnic breakdown of students who took "paper classes" and relied on them to maintain their academic standing. As explained below, UNC has offered no

1

legitimate basis for withholding production thereof. Accordingly, the Court should grant this motion.[1]

**ARGUMENT**

**I. INDIVIDUAL-LEVEL PERFORMANCE DATA IS HIGHLY RELEVANT AND UNC FAILS TO DEMONSTRATE ANY REASON FOR WITHHOLDING ITS PRODUCTION.**

SFFA requests through this motion individual-level, anonymized performance data for applicants who matriculated to UNC in the 2011-2017 admissions cycles. UNC has already produced substantial amounts of admissions data relating to applicants for the incoming freshman classes in the 2013-2017 admissions cycles and SFFA has filed a motion to compel the production of similar data for the 2011-2013 admissions cycles; what SFFA seeks now are individual-level, anonymized performance data (GPAs and graduation/retention outcomes in annual or semester-by-semester format, whichever is easier) for applicants who matriculated to UNC in the 2011-2017 admissions cycles that can be correlated with the admissions data about individual applicants that UNC already has produced.

---

[1] UNC represents in its opposition that it has produced all documents analyzing academic preparedness. Had UNC made this clear in the meet-and-confer process, SFFA would not have included a request for such documents in its motion. Based on UNC's belated representation, SFFA drops its request for such documents.

2

As SFFA explained in its opening brief, this individualized performance data is highly relevant because it will allow SFFA to explore the extent to which UNC's use of racial preferences is contributing to UNC's longstanding and documented problem of academic underperformance by URM students. To put it simply, students with high academic qualifications tend to perform well academically; conversely, students with lower academic qualifications tend to perform poorly academically. It is undisputed that UNC uses racial preferences to admit URM students that, on average, have lower academic qualifications than their Asian and White counterparts and that URM students at UNC, on average, have worse academic outcomes than their Asian and White counterparts. This performance data is thus key to the Supreme Court's required analysis of "the effects, *both positive and negative*, of the affirmative-action measures [UNC] deems necessary." *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2214-15 (2016) ("*Fisher II*") (emphasis added).

In its opening brief, SFFA walked through at length how UNC has produced extensive evidence in this case that demonstrates the relevance of individualized performance data. This includes aggregate-level data showing that admitted students with lower academic qualifications tend to have worse academic outcomes; that URMs are admitted with lower qualifications than non-URMs; and that URMs have worse academic outcomes at UNC than non-

3

URMs. All of this tends to show that UNC's use of racial preferences is contributing to its problem of URM academic underperformance. Expert analysis of individual-level performance data will allow SFFA to further explore this correlation.

In its opposition, UNC refuses to grapple with any of this evidence—in likely recognition that the evidence strongly supports SFFA's request. So instead, UNC resorts to distractions, advancing a series of spurious claims that serve only to expose its lack of serious argument in opposition. UNC should be ordered to produce the requested performance data.

### A. UNC Refuses to Address the Fact that the Evidence it Has Produced in this Case Demonstrates the Relevance of the Requested Performance Data.

In its opening brief, SFFA explained that the individualized student performance data it seeks is needed both to assess the negative effects of UNC's use of racial preferences and to rebut UNC's likely defense to SFFA's claim that UNC could employ a percentage plan as a workable alternative to racial preferences. *See* Doc. 87, at 13-22. There is no dispute that UNC uses racial preferences to admit URMs with significantly lower academic qualifications than their Asian and White counterparts; or that UNC has a longstanding problem with URM academic underperformance. Indeed, UNC itself has analyzed and found a link between low academic qualifications and poor

4

academic outcomes of its students, concluding that "[g]raduation outcomes differed significantly by level of academic preparation at the time of entry to Carolina." Exhibit A, at 39. Moreover, UNC has on multiple occasions sought and obtained extensive data to analyze admitted students' academic preparation and their performance, and it has gone so far as to recommend an internal review of its admissions criteria (which, of course, include race) "to identify any that may adversely impact or inhibit the success of URM males." Exhibit G, at 15. In short, UNC's own production and statements underscore the relevance of the requested individualized performance data.

In its opposition brief, *UNC does not address any of this*. Instead, UNC simply states that the academic performance of enrolled students has no bearing on SFFA's claims. But this is demonstrably wrong. SFFA's Complaint outlines the connection at length. *See* Compl. ¶¶ 158-173. And as SFFA emphasized in its opening brief, SFFA seeks this information to explore whether UNC's use of racial preferences is causing or contributing to UNC's self-described "crisis" of URM underperformance. Exhibit H, at 1. If it is (as UNC's production thus far suggests), this would tend to undermine any proffered justification for UNC's consideration of race in admissions decisions. *See Fisher II*, 136 S. Ct. at 2214-15. UNC understands this, as it acknowledges (as it must) that the academic performance of its students "is relevant to its

5

interest in realizing the educational benefits of diversity"—after all, UNC needs *retain* URM students in order to "*maintain* a critical mass of diversity." Doc. 92, at 7 (emphasis in original).[2] In short, individualized performance data is plainly relevant.

Moreover, production of individualized performance data is necessary here. It is worth emphasizing that the aggregate performance data produced by UNC shows the following:

- UNC has concluded that lower academic qualifications—including SAT scores, high school GPA, class rank, and college-level instruction—tend to result in lower academic performance at UNC. *See, e.g.*, Exhibit A, at 39 ("Graduation outcomes differed significantly by level of academic preparation at the time of entry to Carolina.").

- URMs admitted to UNC have lower academic qualifications than non-URMs admitted to UNC. *See, e.g*, Doc. 30, ¶ 55.

- URMs who enroll at UNC have worse academic outcomes (in terms of GPA and graduation/retention) than their non-URM counterparts. *See,*

---

[2] UNC cannot possibly draw a line between retention and graduation data on the one hand and GPAs on the other in terms of relevance, for the plainly obvious reason that graduation and retention outcomes are tied to GPA. *See, e.g.*, Exhibit A, at 40 ("Academic performance, as measured by cumulative grade point average, has a strong relationship to retention and graduation outcomes.").

6

*e.g.,* Exhibit A, at 35 ("Significant differences were observed by race ... in the proportions of students who graduated and those who did not. In particular, four-year graduation rates were lower for ... underrepresented minorities.").

This aggregate performance data thus tends to show precisely what SFFA seeks to demonstrate—that UNC's use of racial preferences to admit lower qualified URMs is contributing to UNC's longstanding problem of URM underperformance.

UNC suggests that aggregate performance data is sufficient for SFFA's purposes. If UNC were willing to concede that its use of racial preferences is contributing to its longstanding problem of URM underperformance, then UNC might be correct—and SFFA would be content to proceed simply on the basis of aggregate performance data. But UNC does not appear willing to concede the point. SFFA thus needs individualized performance data to confirm what the UNC's aggregate data already tends to show.[3]

---

[3] Although aggregate data are useful in proving the link between lower academic qualifications of certain groups of admitted students and their relatively lower academic performance at UNC, there might be plausible alternative explanations for these differences other than UNC's use of race or ethnicity in the admissions process. It might be, for example, that URMs include more first-generation students, and these students took longer to acclimate to college than other students. It thus is necessary to have individual-level data control (through regression analysis or other tools) for an individual's race,

7

## B. UNC's Distractions Do Nothing to Undermine the Obvious Relevance of Individual-Level Performance Data or Provide a Basis for Withholding the Production Thereof.

Rather than mount any serious argument in opposition to SFFA's request for individualized performance data, UNC offers a series of distractions. First, UNC attacks the "mismatch" theory, the viability of which is neither relevant at this juncture nor necessary to SFFA's request. *See* Doc. 92, at 3-7. Second, UNC mischaracterizes the individualized data SFFA seeks as "personal" in an attempt to artificially manufacture a privacy issue where there is none. *Id.* at 11-13. Consistent with its requests throughout this case, SFFA seeks anonymized data and the production thereof is covered by protective order. Third, UNC claims that SFFA's request seeks letter grades for every class taken by every student covered by the request. *See id.* a 6; 11-12. This is untrue, there is no basis for the claim, and the Court should not credit this desperate attempt to create the appearance of a burden associated with SFFA's request.[4]

All of this hand-waving makes clear that UNC hopes not to have to produce the requested performance data. But hopes are not arguments. And

---

status as a first-generation student, and other possible factors that could independently influence academic performance.

[4] UNC also repeatedly implies—without any explanation—that SFFA's request is untimely. *See* Doc. 92, at 1, 11, 15. This is nonsense. This motion was filed weeks before the end of the discovery period, after SFFA had built a record supporting this request. And beyond production of these documents, SFFA is not seeking to otherwise extend or delay the closing of fact discovery.

8

they cannot help UNC meet its burden. *See E.E.O.C. v. Dolgencorp, LLC*, No. 09-cv-700, 2011 WL 1260241, at *11 (M.D.N.C. Mar. 31, 2011) ("Over the course of more than four decades, district judges and magistrate judges in the Fourth Circuit (including members of this Court) have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion.").

II. **UNC Has Offered No Legitimate Reason to Deny SFFA's Targeted Request for the Race and Ethnicity of Students Who Took "Paper Classes".**

As SFFA explained above and in its opening brief, performance data is highly relevant. And UNC has, at least implicitly, conceded that preparedness data likewise is relevant through its production of some of that data already. Doc. 92, 13-14. The Wainstein Report makes clear that UNC's "paper classes" relate directly to both; the entire point of these classes was to raise the grades under-prepared students who were performing poorly academically. SFFA seeks limited information in UNC's possession about the race and ethnicity of the approximately 3,100 students who took these classes—and often relied on them to maintain their academic standing—in order to help determine the extent to which UNC's consideration of race has contributed to the academic underperformance of URM students.

Recent deposition testimony has confirmed that UNC has this information, and it is readily available, as it was compiled in connection with UNC's analysis of the Wainstein Report. UNC thus does not dispute the fact that it would be easy to produce this information to SFFA.

Instead, UNC advances a weak relevance objection. It complains that the race and ethnicity of students who took paper classes and relied on them to maintain their academic standing is irrelevant. But UNC never actually explains why (nor could it, given that UNC's "paper classes" underscore the connection between academic preparedness and performance).

UNC's entire argument for withholding this information is that it predates the complaint. But this is a non-starter. This information was compiled in connection with the Wainstein Report, which was published on October 22, 2014—less than a month before the Complaint was filed in this case. UNC has produced several reports and studies that are much older than the Wainstein Report. *See* Doc. 92, at 8-9 (listing numerous reports already produced that pre-date the Wainstein Report). Moreover, these reports analyze data that goes back more than a decade before the Complaint. For example, UNC's 2010 Retention Report analyzes information about UNC students that dates back to the 1990s. *See, e.g.*, Exhibit A, at 11, 40, 43. UNC's claim that the racial and ethnic breakdown of students who took "paper

classes" is irrelevant because these courses were taken "before 2011" thus cannot be taken seriously.[5]

Underscoring the weakness of its position, UNC complains that SFFA's requests for production do not explicitly mention "paper classes." Doc. 92, at 15 & n.1. The Court should not credit this frivolous argument. To begin, SFFA's requests are sufficiently broad to encompass the information it seeks. Moreover, SFFA made clear that it was seeking information about "paper classes" in numerous meet-and-confer sessions prior to filing this motion. UNC never objected on the basis of non-responsiveness then, and it should not be permitted to advance that argument now. The Court should order production

---

[5] Even if there were merit to UNC's objection about this information predating the complaint, it would be an insufficient basis for withholding production. In light of Rule 26's broad concept of relevance and burden on the party opposing discovery, courts regularly hold that issues regarding relevance or admissibility should await dispositive or trial motions where—as here—there are no objections relating to feasibility or burden. *See, e.g.*, *Nationstar Mortg., LLC v. Decker*, No. 13-cv-1793, 2015 WL 519884, at *2 (D. Or. Feb. 9, 2015) ("In the absence of objections relating to feasibility, burden, or proportionality, specific issues relating to the relevance or admissibility of particular evidence should await dispositive or trial motions, when all the parties and the Court can examine the proffered evidence."). "More precise evidentiary rulings should await trial, when the issues are more clearly defined, and be made then or *in limine.*" *Geophysical Sys. Corp. v. Raytheon Co.,* 117 F.R.D. 646, 647 (C.D. Cal. 1987). This is certainly the case with respect to UNC's claim that evidence regarding the race and ethnicity of students who took "paper classes" would be "distracting." Doc. 92, at 15.

11

of the racial and ethnic breakdown of students who took "paper classes" and relied on them to maintain their academic standing.

## CONCLUSION

For the foregoing reasons, as well as those set out in SFFA's opening brief, the Court should grant SFFA's motion to compel and order UNC to produce, for the period of 2011-2017: (1) individual-level, anonymized performance data (GPAs and graduation/retention outcomes in annual or semester-by-semester format, whichever is easier) for applicants who matriculated to UNC in the 2011-2017 admissions cycles that can be correlated with the admissions data about individual applicants that UNC already has produced and SFFA has requested; and (2) documents or data showing the racial and ethnic breakdown of the approximately 3,100 students who took "paper classes" and the 329 students who relied on "paper classes" to maintain their academic standing.

Respectfully submitted,

/s/ Thomas R. McCarthy
Thomas R. McCarthy
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
Bell, Davis & Pitt, P.A.
P.O. Box 21029

(703) 243-9423
E: tom@consovoymccarthy.com

*/s/ William S. Consovoy*
William S. Consovoy
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: will@consovoymccarthy.com

*/s/ J. Michael Connolly*
J. Michael Connolly
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
E: mike@consovoymccarthy.com

Winston Salem, NC 27120-1029
(336) 714-4147
E: aruley@belldavispitt.com

*Attorneys for Plaintiffs*

Dated: July 3, 2017

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.3**

Pursuant to L.R. 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed 4,500 words.

This the 3rd day of July, 2017.

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy

14

## **CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing pleading via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 3rd day of July, 2017.

*/s/ Alan M. Ruley*
Alan M. Ruley