# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, INC.,

        Plaintiff,

v.

UNIVERSITY OF NORTH CAROLINA et al.,

        Defendants.

CASE NO. 1:14-CV-954

## ORDER

Before the court are Plaintiff's Motions to Compel Production of Applicant Data (Docket Entry 83) and to Compel Documents and Data Regarding Student Preparedness and Performance (Docket Entry 86). For the reasons stated herein, the Court will grant Plaintiff's Motion to Compel Production of Applicant Data (Docket Entry 83), and will deny Plaintiff's Motion to Compel Production of Documents and Data Regarding Student Preparedness and Performance (Docket Entry 86.)

## BACKGROUND

This case involves a Fourteenth Amendment dispute. (Docket Entry 1 at 2.) Plaintiff, Students for Fair Admissions, Inc. ("SFFA"), is an organization representing prospective and current applicants to higher education institutions who believe they were unfairly denied admission to these institutions. (Docket Entry 1 at 8.) One such applicant, a white male ("Applicant"), was denied admissions to the University of North Carolina-Chapel Hill ("UNC") in the 2014 entering class. (*Id.*) SFFA alleges that UNC unconstitutionally used race in its evaluation of Applicant's application in denying him admission. (Docket Entry 1 at 9.) More specifically, SFFA claims that

1

UNC's admissions policy and procedures violates the Equal Protection Clause of the Fourteenth Amendment because: (1) its use of race, color, and ethnicity is not narrowly tailored since applied as more than just a "plus factor"; (2) UNC failed to study and apply available race-neutral alternatives to achieve its desired diversity; and (3) even if diversity is a compelling interest, the Supreme Court should overrule *Fisher v. University of Texas at Austin*, 136 S.Ct. 2198 (2016) to invalidate the use of race in admissions. (Docket Entry 1 at 1-4, 56-60.)

SFFA has filed two motions to compel discovery of data to evaluate the UNC admissions policy and procedure. The first motion to compel solicits applicant-level data[1] for the 2011-13 admissions cycles, and aggregate applicant data[2] for the 2009-11 admissions cycles. (Docket Entry 84 at 1.) UNC has already agreed to produce applicant-level data for the 2013-17 admissions cycles, and has already provided SFFA with aggregate applicant data from 2011-17. (*Id.* at 2.)

The second motion to compel solicits student preparedness and performance data for the 2011-17 admissions cycles. (Docket Entry 87 at 1.) More specifically, SFFA solicits for production: (1) data showing GPA's, graduation, and retention rates across racial and ethnic groups; (2) any analysis of academic preparedness of UNC students by race or ethnicity (including those exploring correlation between high school GPA and test scores—SAT or ACT—and academic performance once at UNC); and (3) any documents showing race and ethnicity of those students who participated in the "paper classes." (*Id.* at 1-2.)

---

[1] Applicant-level data, as defined during the motion hearing, is anonymized "information about every applicant [approximately thirty-thousand] in a given admissions cycle data", including over 100 fields from each applicant's full applicant file (e.g. race, academic qualifications, high school, etc.).
[2] Aggregate applicant data is accumulated applicant data "reflecting admissions qualifications . . . broken down by in-state vs. out-of-state, gender, ethnicity, athlete vs. non-athlete, and alumni vs. non-alumni[.]" (Docket Entry 84 at 2.)

2

# DISCUSSION

## I. Standard of Review

As a general rule, Federal Rule 26(b) provides general provisions regarding the scope of discovery:

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1). Discovery rules are to be accorded broad and liberal construction. *See Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Civil rights cases particularly entitle Plaintiffs to broad discovery so that suits may be resolved by truth. *See Wolfe v. Green*, 257 F.R.D. 109, 112 (S.D.W.Va. Apr. 2, 2009) ("The great weight of the policy in favor of discovery in civil rights actions supplements the normal presumption in favor of broad discovery[.]"); *Floren v. Whittington*, 217 F.R.D. 389, 391 (S.D.W.Va. Oct. 2, 2003) (recognizing "the important federal interests in broad discovery and truth seeking as well as the interest in vindicating important federal substantive policy . . . .").

Nevertheless, district courts have broad discretion in managing discovery, including whether to grant or deny a motion to compel. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) (asserting district court's "substantial discretion in managing discovery" by denying Defendant's motion to compel where Defendant "had adequate opportunity to complete discovery" yet unjustifiably failed to do so); *Erdmann v. Preferred Research, Inc. of Georgia*, 852 F.2d 788, 792 (4th Cir. 1988). Rule 26(b)(1) further directs that discretion by requiring the

3

Court to limit discovery to information that is relevant and proportional to the underlying claim. FED.R.CIV.P. 26(b)(1); *see Durand v. Charles*, 2017 WL 2838286, at *1 (M.D.N.C. June 30, 2017) (clarifying that relevancy "involves a determination of how substantively the information requested bears on the issues to be tried." (quoting *Mills v. East Gulf Coal Preparation Co., LLC*, 259 F.R.D. 118, 131 (S.D.W.Va. 2009)); *Webb v. Green Tree Servicing LLC*, 2012 WL 3139551, at *3-*5 (D.Md. July 27, 2012) (finding information sought as minimally relevant since "focus[ed] on transactions other than those at issue", leading to denial of the motion to compel); *Rayfield Aviation, LLC v. Lyon Aviation, Inc.*, No. 1:11CV274, 2012 WL 3095332, at *3 (M.D.N.C. July 30, 2012) (compelling defendant to provide documentation "which relates to the parties' dispute under the [a]greement").

Additionally, the party resisting discovery "bears the burden of persuasion." *E.E.O.C. v. Dolgencorp*, 2011 WL 1260241, at *11 (M.D.N.C. Mar. 31, 2011). That includes "where the resisting party asserts that the discovery is irrelevant." *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 411 (D.Md. 2005); *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 232 (4th Cir.2011) ("[T]he party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine").

Finally, discovery of information predating the cause of action may be admissible since it "may be relevant to establish a pattern or practice of discrimination." *Lyoch v. Anheuser-Busch Companies, Inc.*, 164 F.R.D. 62, 67 (E.D.Mo. 1995) (citing *Phillip v. ANR Freight Sts., Inc.*, 954 F.2d 1054, 1056 (8th Cir. 1991)); *EEOC v. Whitin Mach. Works, Inc.*, 635 F.2d 1095, 1096 n.3 (4th Cir. 1980) (allowing discovery of ten years of employment history to "determine whether any discernible pattern existed."); *United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 441 (5th Cir. 1971) (allowing

4

discovery into "proof of relevant antecedents influencing or explaining best practices", asserting that "Justice would surely be blind" if "[d]eprived of an historical overview").

For a Plaintiff's motions to compel to succeed, the data sought must be both relevant to the Plaintiff's claims and also "proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). The needs of the case are illustrated through the standard of review used to evaluate the constitutionality of undergraduate admissions policies that utilize race as a factor. *See Webb*, 2012 WL 3139551, at *3-*5; *Floren*, 217 F.R.D. at 391-92 (clarifying the standard of review—local government liability for damages—against which the merits of the motion to compel were to be measured).

In finding constitutional the admissions process at the University of Texas at Austin ("UTA"), *Fisher v. University of Texas at Austin*, 136 S.Ct. 511 (2016) ("*Fisher II*") not only upheld as constitutional race-conscious admissions procedures, but also reaffirmed the policy's limitations as defined by *Regents of Univ. of Cal. V. Bakke*, 438 U.S. 265 (1978), *Gratz v. Bollinger*, 539 U.S. 244 (2003), *Grutter v. Bollinger*, 539 U.S. 306 (2003), and others. We adopt the controlling principals affirmed in *Fisher II* as the standard of review against which the relevancy and proportionality of the data solicited is to be measured in the instant action.

*Fisher II* provides the most recent relevant example of the data used to evaluate a university's admissions process. In *Fisher II*, the Supreme Court ultimately held UTA's admissions process as constitutional because (1) UTA had a compelling interest in using race as a factor, and (2) its use of race was narrowly tailored to UTA's admissions goals. *Fisher II*, 136 S.Ct. at 2214. The Court referred to UTA's procedures, several studies, and other admissions data in evaluating the constitutionality of UTA's admissions process. First, the Court reviewed UTA's admissions process to evaluate whether its use of race was appropriately narrowly tailored. *Id.* at 2207. Second, the

5

Court acknowledged the studies UTA completed in evaluation of its admissions policy. *Id.* at 2205-06, 2211, 2213. Third, the Court referenced demographic and anecdotal data provided by UTA. *Id.* at 2212 (noting that "only 21 percent of undergraduate classes with five or more students in them had more than one African-American student enrolled.").

The data referenced by the *Fisher II* Court is additionally relevant for our purposes for two reasons. First, the Court did not mention enrolled student performance. Instead, the Court focused generally on UTA's evidence of the enrolled student demographics, which was sufficient to determine whether UTA's admissions procedures satisfied its admissions goals. Second, enrolled student demographics are an aggregate-level statistic, thus suggesting—albeit not conclusively declaring—that applicant-level data was not required for the Court to make its determination (e.g. consistent stagnation in percentage of enrolled URM's is obtainable from aggregate data).

## II. Analysis

With the example of UTA's admissions procedure in mind, we now proceed to evaluate whether the discovery SFFA seeks to compel is sufficiently relevant and proportional to the needs of resolving SFFA's claims against UNC. FED. R. CIV. P. 26(b)(1). More specifically, the evidence sought must relate to evaluating one of the following: (1) whether UNC's admissions policy and goals provide a compelling interest justifying the use of race in their admissions procedure; or (2) whether UNC's procedure is narrowly tailored to their admissions policy and goals, as demonstrated by evaluating (i) whether the procedure quantifies race, (ii) whether UNC made "good faith" in exploring race-neutral alternatives, and (iii) whether their current race-conscious procedure is justified in light of their "good faith" efforts. *Fisher II*, 136 S.Ct. at 2208.

6

## A. Individual Applicant Level Data and Aggregate Data

Here, SFFA seeks an order to compel UNC to produce applicant-level data for the 2011-12 and 2012-13 admissions cycles along with aggregate data for the 2009-11 admissions cycles. SFFA does not contend that diversity in a student body is a compelling state interest. Indeed, SFFA consents that "[i]n the educational setting, 'diversity' is the only interest the Supreme Court has found compelling." (Docket Entry 1 at 2.)

Instead, SFFA first seeks to compel the discovery of UNC applicant-level and aggregate admissions data to demonstrate that: (a) from 2013 to present, the UNC admissions procedure gives a "racial preference for each underrepresented minority student . . . [that] is so large that race becomes the 'defining feature of his or her application'", thereby failing the narrowly tailored standard, (*id.* at 4) (quoting *Grutter*, 539 U.S. at 337); and (b) such practice unconstitutionally prevented Applicant from gaining admissions to UNC, (Docket Entry 1 at 8.) UNC primarily contends that the information provided thus far is sufficient for analysis purposes, and that the efforts required to produce the solicited data would be unduly burdensome. (Docket Entry 85 at 1.)

This Court finds that both sets of data requested are relevant to the inquiry, would assist in establishing UNC's pattern of admissions practice, and would not cause a significant undue burden on UNC to produce. First, aggregate data is relevant as exemplified by *Fisher II*, rendering the aggregate data SFFA seeks as relevant. *Id.* at 2212. The applicant-level data is the base data from which the aggregate data is constructed, enabling a more detailed analysis of the aggregate data. Therefore, while *Fisher II* does not explicitly acknowledge any results or the utility of applicant-level type data, it is sufficiently related to aggregate data to render it relevant to SFFA's analysis.

7

Second, both data sets dating four years prior to Applicant's denied admission in the 2013-14 admissions cycle would establish a pattern of how UNC treated students from those admissions cycles. Any potential violations prior to the 2013-14 admissions cycle are relevant in determining how UNC handled Applicant's application. *See Moreno Rivera v. DHL Global Forwarding*, 272 F.R.D. 50, 59 (D.P.R. Jan. 14, 2011) ("[Supervisor's] personnel file, performance evaluations and instances of discipline may be relevant in establishing a pattern of behavior . . . As such, his personnel file is relevant and must be turned over."); *see also Morris v. Lowe's Home Centers, Inc.*, 2012 WL 5347826, at *6 (M.D.N.C. Oct. 26, 2012 ) ("Evidence of other lawsuits is typically only relevant if those lawsuits involve similar claims and can be used to establish a pattern or habit or routine practice.").[3]

Third, UNC's claim that producing such information would cause an undue burden is unpersuasive. The format of the data SFFA solicits is not readily discernable from the data produced by UNC thus far, nor is it available in the online sources UNC sites. (Docket Entry 89 at 10-11); (Docket Entry 92 at 9-10.) Additionally, the data is relevant and necessary as previously stated. Furthermore, at the hearing of this motion, UNC was unable to quantify or clarify the actual resources, time, money, or labor required to produce such information. Given the broad scope of discovery for civil action suits, UNC's inability to clarify the supposed burden fails to outweigh the established relevance and necessity of the data. *See Capital One Bank (USA) N.A. v. Hess Kennedy Chartered, LLC*, 2008 WL 4467160, at *4 (E.D.Va. Sept. 30, 2008) (denying defendant's burden argument where defendant failed to provide "any specific information on the amount of projected

---

[3] Here, UNC would not be required to provide eight years of data under the SFFA's interpretation of the *Fisher II* ruling. (Docket Entry 84 at 11, 13.) Instead, UNC is required to provide enough data to "scrutinize the fairness of [UNC's] admissions program", *Fisher II*, 136 S.Ct. at 2214. For the reasons herein, this Court has determined that the solicited data is sufficient to achieve that purpose.

8

hours or effort it would require to obtain the information, nor any specific details on the costs involved.").

## B. Student Preparedness and Performance Data

SFFA also seeks an order to compel UNC to produce the following: (1) data showing GPA's, graduation, and retention rates across racial and ethnic groups; (2) any analysis of academic preparedness of UNC students by race or ethnicity (including those exploring the correlation between high school GPA and test scores—SAT or ACT—and academic performance once at UNC); and (3) any documents showing race and ethnicity of those students who participated in the "paper classes." (Docket Entry 87 at 1-2.) For the following reasons, this Court orders denial of this motion to compel in its entirety.

SFFA seeks this data "to explore . . . whether UNC's use of race in the admissions process results in the admission of underrepresented minority ("URM") students[4] who struggle academically because they are unprepared or underprepared for the academic rigors of UNC." (*Id.* at 2.) More specifically, SFFA seeks "to demonstrate that UNC's admission of URM students with lower academic qualifications causes or otherwise contributes to the lower academic performance, and retention rates, and graduation rates for those very students." (*Id.* at 3.) Additionally, SFFA asserts that the "paper classes" are further evidence of UNC's on-campus efforts to accommodate the "under-prepared students who were performing poorly academically." (Docket Entry 98 at 9.)

This solicited data is outside the scope of discovery because (i) it is not relevant or proportional to the needs of SFFA's claim, (ii) none of the cases referenced by the parties require such data, and (iii) it is inapposite to the core responsibilities of UNC's admissions department.

---

[4] UNC uses URM to refer to students who identify as African-American, Hispanic or Latino, or Native American. Asian Americans are not included in this group. *See* Docket Entry 87 at 2, n.1.

9

First, SFFA's claim challenges UNC's admissions process and its unequal treatment of the Applicant. The discovery must therefore be targeted to determine if the Applicant was treated unequally in the admissions process. *Fisher II*, 136 S.Ct. at 2210. Here, that necessarily means reviewing Applicant's application against other admitted students at the time of the decision—not enrolled student performance. Moreover, neither UTA's nor UNC's admissions procedure calls for such a consideration.

Second, *Fisher II* and its progeny do not support SFFA's contention that post-admissions student performance data is relevant. None of the cases cited by either party reference, cite, or even acknowledge student performance, retention rates, or graduation rates. Instead, these cases reference data regarding admitted student demographics. *See Fisher II*, 136 S.Ct. at 2212.

Lastly, UNC's core responsibilities, as detailed in its Policy on Undergraduate Admissions, acknowledges "satisfactory evidence of scholastic promise" as one of several evaluation criteria that is to be "gleaned from the applicant's academic record, recommendations, test scores, application, and *predicted first-year performance*." (Docket Entry 88, Exh. B at UNC0097428) (emphasis added). UNC's Undergraduate Retention Study addresses how to improve first-year performance predictions. (*Id.* at UNC0097428-41); (Docket Entry 88, Exh. A.) *Fisher II* recognizes such studies as evidence of the "good faith effort" made in the constitutionally-required "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies." *See Fisher II*, 136 S.Ct. at 2215. But nowhere in UNC's admissions policy do they reference post-admissions student performance as a metric in evaluating their admissions policy, and as we have seen, *Fisher II* does not require such data. Thus, the Court finds this information not relevant to the SFFA's claims. FED. R. CIV. P. 26(b)(1).

10

Case 1:14-cv-00954-LCB-JLW Document 101 Filed 08/09/17 Page 10 of 11

SFFA also seeks documents showing race and ethnicity of the "paper class" students. (Docket Entry 87 at 1.) For many of the same reasons that the post-admissions performance data is denied, so too is data pertaining to the "paper class" students. The "paper classes" was a post-admissions performance issue, which previous analysis illustrates is not relevant. Additionally, it is outside the scope of the responsibilities and guidelines of UNC admissions. Therefore, this information is also outside the scope of discoverable data and is denied.

## CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel Production of Applicant Data (Docket Entry 83) is **GRANTED**, whereas Plaintiff's Motion to Compel Production of Documents and Data Regarding Student Preparedness and Performance (Docket Entry 86) is **DENIED**.

Joe L. Webster
United States Magistrate Judge

August 09, 2017
Durham, North Carolina