```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2                  CASE NO.: 1:14-CV-954

 3
        -----------------------------X
 4    STUDENTS FOR FAIR ADMISSIONS, :
      INC.,                          :
 5                                   :
                  Plaintiff,         :
 6                                   :
      v.                             :
 7                                   :
      THE UNIVERSITY OF NORTH        :
 8    CAROLINA AT CHAPEL HILL,       :
      et al.,                        :
 9                                   :
                  Defendants.        :
10      -----------------------------X

11

12

13      SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

14

15

16         DEPOSITION OF EDWARD BLUM, INDIVIDUALLY
           AND AS THE RULE 30(B)(6) DESIGNEE OF
17           STUDENTS FOR FAIR ADMISSIONS, INC.
                  (Taken by Defendants)
18              Charlotte, North Carolina
                      May 12, 2017
19

20

21

22

23

24    Reported by:  Dayna H. Lowe
                    Court Reporter
25                  Notary Public
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
        Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

                                                    EXHIBIT A

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 1 of 21

```
1              BY MR. SCUDDER:

2         Q.   Okay.  So POFR, as I understand it from your

3    testimony, is a litigation facilitator or advocacy firm

4    or advocacy organization that funds litigation and

5    litigation advocacy related activities, and the one

6    organization, at least at the time that the tax document

7    was current, that you can recall the organization

8    funding was Students for Fair Admissions?

9              MR. STRAWBRIDGE:  Object to the form of the

10   question.

11             BY MR. SCUDDER:

12        Q.   Is that --

13        A.   That's correct.

14        Q.   That's correct?  Okay.  Who formed -- let's

15   move away from Project on Fair Representation and talk

16   about Students for Fair Admissions.  When was it formed?

17        A.   There was an informal group of individuals who

18   collaborated I would say in perhaps late 2013, and the

19   formal organization itself began in early 2014.

20        Q.   When you say "formal," by incorporating and

21   becoming a formal organization in that way, or in some

22   other way?

23        A.   No.  I can't recall the exact dates of our

24   incorporation, but we started adding members to Students

25   for Fair Admissions in early 2014.
```

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 2 of 21

1      Q.   Okay.  Let's go to the very beginning of the

2   origination, that late 2013 time and that informal

3   collaboration of individuals as you described.  Can you

4   tell me how that came to be that individuals came

5   together and were collaborating about formation of a new

6   organization?

7            MR. STRAWBRIDGE:  And I just caution the

8   witness, in answering this question please do not

9   disclose the identities of anybody involved in the

10  creation of SFFA, except to the extent that they are

11  publicly known or have been disclosed in this

12  litigation.

13     A.   When the Supreme Court granted cert in Fisher

14  One, a number of us started having conversations about

15  the benefit of a membership organization that -- whose

16  mission would be to oppose the use of race and ethnicity

17  in the admissions process.

18            BY MR. SCUDDER:

19     Q.   And you put that in the summer of 2013?

20     A.   Yeah, kind of summer-fall of 2013, somewhere

21  in through there.

22     Q.   Okay.  And can you describe the -- at that

23  point it sounded like a concept.  Is that --

24     A.   It was a concept.

25     Q.   Okay.  And the concept again was?

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 3 of 21

1        A.    Was advocacy organizations have power when

2    they have members.  The efforts to end race-based

3    classifications and preferences in public policy had no

4    membership organization.  There were legal defense

5    foundations that litigated those issues, there were one

6    or two small think tanks that concentrated on those

7    issues, but no membership organization where people

8    could say I am a member of this group, much like I would

9    be a member of the Sierra Club or the ACLU, and I

10   joined, and that was not -- there was no organization

11   dedicated to that purpose.

12        Q.    So the organization -- so Students for Fair

13   Admissions came together in that spirit of being a new

14   membership organization as you describe it?

15        A.    Correct.

16        Q.    And did you feel that was important?

17        A.    Yes.

18        Q.    And why?

19        A.    Membership organizations have a source of

20   energy that think tanks and legal advocacy groups just

21   simply don't have.  To grow a membership organization

22   dedicated to a purpose, whether it's the environment or,

23   I don't know, economic issues, civil rights issues, that

24   membership organization has, I believe, a more effective

25   role in advocating legal and public policy outcomes.

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 4 of 21

1          MR. STRAWBRIDGE:  Object to the form of the

2    question.  You're not calling for any specific action?

3          MR. SCUDDER:  No.  I can make clear, I'm not

4    intending with any question to breach the agreement that

5    we reached coming into today.

6          MR. STRAWBRIDGE:  And I'm not suggesting that

7    you are, Counsel.  I just want to make sure the witness

8    understands.

9          MR. SCUDDER:  I understand.

10       A.    We primarily rely on litigation to achieve our

11   mission.

12             BY MR. SCUDDER:

13       Q.    Okay.  And do you rely upon anything

14   secondarily to achieve your mission?

15       A.    Advocacy.  Yes, advocacy and -- yes.  Just

16   call it advocacy.

17       Q.    And when you say "advocacy," what do you mean

18   by advocacy?

19       A.    Educate the American public about the unfair

20   and unconstitutional uses of race by educational

21   institutions in their admissions policies.

22       Q.    And with respect to the advocacy prong of the

23   mission or that aspect of the mission, how do you go

24   about pursuing those educational efforts?

25       A.    Speeches, debates, forums, one-on-one

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 5 of 21

1    outreach, media communications.  I guess that's about

2    it.

3         Q.    And who on behalf of the organization engages

4    in that set of activities that you just described?

5         A.    I do, counsel, and occasionally a friend and

6    ally and a member.

7         Q.    Okay.  When you say "friend and ally,"

8    meaning -- I'm not asking you to identify the person --

9         A.    Right.

10        Q.    -- but a non-director?

11        A.    Correct.

12        Q.    And a non-member?

13        A.    I think everyone we have asked to advocate on

14   behalf of Students for Fair Admissions in a public

15   setting has been a member, but I can't swear to that.

16        Q.    Okay.  Understood.  The debates, speeches, and

17   the like that you have participated in, can you give me

18   a ballpark of how many times you've done that since the

19   formation of the organization?

20        A.    So would you clarify your question?  Does that

21   include media contact as well?

22        Q.    Let's leave media contact out.

23        A.    Okay.

24        Q.    Okay?  So speeches and the participation in

25   forum discussions.  I don't know how else you'd

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 6 of 21

1    clause down says that the corporation's members
2    presently number more than 20,000. Members have
3    expressed the desire to participate directly in the
4    leadership of the organization. Do you see that there?
5        A.    I do.
6              MR. STRAWBRIDGE:  Object to the form.
7              BY MR. SCUDDER:
8        Q.    I believe -- do I recall correctly that when
9    the membership was formed a year earlier, in the summer
10   of 2014, members were approximately -- I think you put
11   it in the ballpark of 20-ish?
12       A.    Correct.
13       Q.    Is that correct?  What activity led to the
14   membership growing to 20,000 over that period of time?
15       A.    So the filing of the lawsuits against UNC and
16   Harvard generated a great deal of media and ongoing
17   interest.  I was invited to give talks to Asian American
18   groups throughout the country, and at one of the talks
19   to a large group of Asians in northern California, the
20   response was so overwhelming to our mission that the
21   participants at that meeting and a subsequent one in
22   southern California led to the explosive growth of our
23   membership.
24       Q.    And you attribute that to the lawsuits and
25   then the talks that you gave to Asian affinity groups in

Case 1:14-cv-00954-LCB-JLW  Document 113-1  Filed 11/15/17  Page 7 of 21

1    northern and southern California?

2        A.    Yes.

3        Q.    Can you describe those talks that you gave?

4              MR. STRAWBRIDGE:  Again I caution the witness,

5    do not disclose the particular content, but you may

6    generally describe the topics of your discussions.

7        A.    The one in northern California was a meeting

8    of the Silicon Valley Chinese Association.  It was

9    attended by, I guess, about 300 people.  The panel

10   included myself, one of SFFA's attorneys, and a

11   professor at Berkeley and two other individuals, and

12   part of my discussion was a request for new members and

13   within a -- at the close of that meeting, shortly

14   thereafter, the membership grew substantially over a

15   four-, five-, ten-day period.  It skyrocketed.

16             BY MR. SCUDDER:

17       Q.    As a result of the talk to the Silicon

18   Valley --

19       A.    Chinese Association.  Right.  Yeah.

20       Q.    Okay.  And how did it come to be that you

21   spoke to that organization?

22       A.    I was invited there by the president.

23       Q.    Okay.  Do you know why?

24       A.    I'm the individual most publicly associated

25   with the lawsuits against UNC and Harvard.

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 8 of 21

1        Q.    And then why don't you walk me through, again
2    respecting the instruction Mr. Strawbridge gave, the
3    southern California meeting.

4        A.    That was a meeting of Chinese American
5    business and academic leaders, much smaller -- much
6    smaller group, primarily a dinner and a talk by myself
7    and one of my lawyers.

8        Q.    Okay.  And implicit in what you're -- both of
9    these talks, meetings, occurred after the litigation in
10   Boston against Harvard and against UNC was filed?

11       A.    Correct.

12       Q.    Would those two talks in northern and southern
13   California have been talks that you would have prepared
14   remarks in advance of or jotted some notes down?

15       A.    Typically no.  It was described that there
16   will be five people on a panel discussion, they would
17   like the panel to last about an hour with plenty of time
18   for questions and answers, so my remarks are often
19   brief.  My notes are not -- I rarely provide, you know,
20   a text for a talk like that.

21       Q.    Okay.  And it's the filing of the litigation,
22   that activity, that you attribute the growth, 20 members
23   at incorporation, approximately 20, to 20,000 by the
24   middle of June of 2015?

25       A.    It was not that leap from 20 up to 20,000.  We

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 9 of 21

1    grew steadily from 20 up to, I think at the time of the

2    filing, about 45 or 50 members.

3         Q.   At the time of the filing of --

4         A.   Of both lawsuits.

5         Q.   Yeah.  They were filed on the same day, right?

6         A.   Correct.

7         Q.   Okay.  45 or 50 members?

8         A.   Correct.

9         Q.   Okay.  Go ahead.

10        A.   And then from the date of the filing, we grew

11   steadily to approximately, I think, 1200 or so.  I think

12   that's right.  And then after the -- after the

13   presentations in southern and northern California, we

14   grew from, I guess, around 12 to 1500 up to 20,000.

15        Q.   Okay.  Do you know as you sit here today the

16   approximate number of members of the organization?

17        A.   Today?

18        Q.   Yes.

19        A.   21,500 plus or minus.

20        Q.   Okay.  Let's take a look at page 2 of that

21   particular document, so going to Bates stamp 53, and I'm

22   looking at the resolution in the top half of the page

23   about the decision that the board made to require a

24   one-time assessment of $10 as membership dues.  Why did

25   the organization make that decision at that time?

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 10 of 21

1        A.    We thought that initially we didn't want to

2    have any barriers for an individual to join our

3    organization, and once we had achieved this sort of

4    critical mass of 20,000 individuals, we felt a modest

5    lifetime $10 membership fee was in order.

6        Q.    Okay.  So the $10 is, just as it says,

7    literally a one-time assessment?

8        A.    Correct.

9        Q.    Can, pursuant to that resolution, an

10   individual join without paying the membership fee?

11       A.    Yes.

12       Q.    And how does that happen?

13       A.    Joining Students for Fair Admissions typically

14   took place on our website.

15       Q.    For example -- let me make it more concrete.

16   Could an individual this afternoon join the

17   organization, say I'd love to be a member, I'm without

18   the means of paying the $10 one-time assessment, but I'd

19   like to join?

20       A.    We would take that under consideration.

21       Q.    And are there to your knowledge today -- I'm

22   not asking you to identify people -- are there members

23   that make up part of the approximate 21,500 that have

24   not paid the one-time assessment?

25       A.    Of the 21,000?

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 11 of 21

1       Q.   Yes.

2       A.   Yes.

3       Q.   Okay.  Can you approximate the percentage?

4       A.   Well, let me see if I can quantify it for you.

5    We did not assess a membership fee from inception

6    through the date or shortly after the date of these

7    amended bylaws.

8       Q.   Right.

9       A.   At that point we had over 20,000 members.

10   When we assessed the membership fee, then our membership

11   has continued to grow, but not anything like the numbers

12   prior to that.

13      Q.   Right.  So what I am taking away is that at

14   the time that the board made that decision in June of

15   2015, you had a membership in the area of

16   20,000 members.  Today you have a membership in the

17   ballpark of 21,500 members, so approximately

18   1500 members have been asked to pay a one-time

19   assessment?

20      A.   No.  My numbers -- I think by the time we

21   instituted and were able to actually have the mechanism

22   to collect the $10, which took some time, ████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25      Q.   I see.  You're just talking about the

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 12 of 21

1    mechanics of getting young college kids -- creating a

2    means for college kids to be able to pay or remit a $10

3    fee when they're joining over the Internet?

4              MR. STRAWBRIDGE:  Object to the form of the

5    question.

6              BY MR. SCUDDER:

7         Q.   You understand what I mean?

8         A.   Would you state it again?

9         Q.   The members, when they pay the one-time

10   assessment, are they typically paying that by credit

11   card over the Internet?

12        A.   They are.  They are.

13        Q.   As opposed to sending you a $10 bill?

14        A.   Yeah.

15        Q.   And you have to work those mechanics out.

16        A.   Correct.

17        Q.   That's what you're referring to?

18        A.   It took some time for us to establish, you

19   know, the mechanics of integrating into the website a

20   mechanism for taking credit cards and then having those

21   funds sent to our bank.

22        Q.   Understood.  Okay.  So the one-time assessment

23   approved by the board in June of 2015 was then subject

24   to implementation mechanically, as you just described,

25   and it has affected ███████████ who have joined

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 13 of 21

1    since all those mechanics have been sorted out?

2        A.   Correct.

3        Q.   The bottom half of that same page, Mr. Blum,

4    talks about the adoption of a resolution that would

5    authorize the election of what's referred to as a

6    member-elected director.  Do you see that?

7        A.   I do.

8        Q.   Okay.  And for what reason were the bylaws of

9    the organization so amended?

10       A.   Our growing membership had -- many individuals

11   had asked to play a greater role in the organization,

12   and the current board felt that we ought to allow, much

13   like other advocacy groups allow, a board member to be

14   selected from the membership, so that's really the

15   predicate behind introducing that.

16       Q.   Okay.  And has that, in fact, occurred?

17       A.   Yes.

18       Q.   And so as we sit here today, is there a

19   member-elected director?

20       A.   Yes.

21       Q.   And who is that individual?

22       A.   Joe Zhou.

23       Q.   Do you know when that election occurred?

24       A.   Yeah.  It was subsequent to -- just a few

25   months after the implementation of the revised bylaws.

Case 1:14-cv-00954-LCB-JLW   Document 113-1   Filed 11/15/17   Page 14 of 21

1      Q.   Okay.  Which of these individuals have you
2  met?
3            MR. STRAWBRIDGE:  Can I just clarify, Counsel?
4  Are you asking him whether you, as in him personally, or
5  in his representative capacity as SFFA?
6            BY MR. SCUDDER:
7      Q.   Let's start with personally.  Let me ask in
8  what capacity did you meet them?
9      A.   As president of SFFA.
10     Q.   Okay.  So answering the questions from the
11 perspective of meeting them as --
12     A.   Yes.
13     Q.   -- SFFA's president.
14     A.   Yes.
15     Q.   Okay.  Which of them did you meet?
16     A. ████████████████████████████████
17     Q.   Okay.  Do you recall approximately when?  I'm
18 not going to ask you about a specific communication.
19     A.   ████████  would have been the late spring of
20 2014, and ██████ would have been, I guess, maybe spring
21 of 2016, spring-summer of 2016.
22     Q.   Okay.  And what was the context generally in
23 which you met ████████
24     A.   I was there to explain to the ████████the
25 nature of the lawsuit that I wanted to bring against

```
1    UNC, to answer their questions, and to learn a little

2    bit more about ███████████████████

3         Q.   When you say "there," in the state of North

4    Carolina meeting with the family?

5         A.   Yes.

6         Q.   This, of course, preceded the lawsuit being

7    filed?

8         A.   Yes.

9         Q.   And presumably some of that information -- let

10   me back up a second.  When the complaint was filed in

11   November of 2014, do you recall preparing a declaration

12   or an affidavit in connection with the filing of the

13   complaint against UNC-Chapel Hill?

14        A.   I didn't prepare that.

15        Q.   Do you recall signing a declaration or

16   affidavit in connection with the complaint being filed?

17        A.   Me?

18        Q.   Yes, you.  Yeah.  Let me show you.

19        A.   I -- if you have the document, I'd be happy

20   to --

21             MR. SCUDDER:  We do.  Let's mark -- are we up

22   to 16?

23             THE COURT REPORTER:  16.

24             (Exhibit 16 was marked for identification.)

25             BY MR. SCUDDER:
```

1      Q.   What Defendant's Exhibit 16 is, Mr. Blum, is a

2   copy of the complaint in the lawsuit.  You're welcome to

3   leaf through it.  It's a copy of the filed complaint in

4   the litigation, and at the very back of that, I think

5   where we're looking here, is a declaration that you

6   submitted in connection with the filing of the lawsuit,

7   or at least I think you did.  Does this refresh your

8   memory?

9      A.   It does.

10     Q.   And am I right that -- now, the complaint

11  refers not to a particular individual by first and last

12  name but, rather, by the more general anonymous term

13  "applicant."  You're familiar with that?

14     A.   Yes.

15     Q.   Okay.  We know from disclosures in the case

16  that have been marked highly confidential that the

17  applicant is ███████████   Is that your understanding as

18  well?

19     A.   Yes.

20     Q.   Okay.  And so the information that's contained

21  in the body of the declaration is information you

22  presumably would have obtained from███████████████or

23  ███████████

24     A.   Yes.

25     Q.   And we got to that because you mentioned your

```
 1    meeting with them before the lawsuit was filed.

 2         A.   Yes.

 3         Q.   Okay.  Have you met with ████████████████ at

 4    any other time?

 5         A.   Yes.

 6         Q.   Do you remember when?

 7         A.   That would have been either September or

 8    October of 2014.  No, let me withdraw that answer.  It

 9    may have been the latter part of August 2014.

10         Q.   And so, again, before the lawsuit was filed?

11         A.   Yes.

12         Q.   Okay.  And generally what was the context in

13    which that meeting came to occur?

14         A.   That meeting occurred in the offices of Wiley

15    Rein.

16         Q.   Understood.  And without revealing the content

17    of the communication, is that in connection with

18    preparing to file the litigation?

19         A.   Yes.

20         Q.   ██████████████

21         A.   Yes.

22         Q.   The last name listed down there.  Male or

23    female?

24         A.   ██████████

25         Q.   And you said ████████████ is another individual
```

1    that you had met with?

2         A.   Yes.

3         Q.   And what was the context of that meeting?

4         A.   To discuss her participation in this lawsuit.

5         Q.   And approximately when was that?

6         A.   I think that was spring of 2016.  I think

7    that's the approximate date.

8         Q.   Okay.  And is there any other occasion on

9    which you've met with█████████████

10        A.   Yes, but prior to that, but not subsequent to

11   that.

12        Q.   Okay.  And "prior to that," prior to the

13   spring of 2016 meeting that you just described?

14        A.   Yes.

15        Q.   And what was the occasion on which you came

16   together with██████████before the spring of 2016?

17        A.   There was a gathering at a Washington, DC

18   organization in which███was in attendance.

19        Q.   And what gathering was that?

20        A.   You know, I think it was a get-together for

21   the outcome of a Supreme Court decision.

22        Q.   Okay.  Any other occasions you've met with

23   ████████████

24        A.   I don't think so.

25        Q.   And then there's three other individuals,

1 ████████████████████████████████████████

2      A.   Yes.

3      Q.   Have you ever met with those individuals?

4      A.   Not face-to-face.

5      Q.   Have you met with them another way?

6      A.   Yes.

7      Q.   And how is that?

8      A.   Phone call and email.

9      Q.   And generally how was it that this

10 constellation or group of five individuals came to be

11 standing members in the litigation?

12      A.   They agreed to submit a declaration stating

13 that they were denied admission to UNC and wanted to

14 participate in this lawsuit.

15      Q.   Okay.  And before that occurred, did you

16 extend an invitation to them to join a lawsuit?

17           MR. STRAWBRIDGE:  That seems to require the

18 content of particular communications.  If you want to

19 ask about the nature of the contact that was initiated

20 that's been disclosed, I think that's appropriate, but I

21 think talking about who sent what to whom, I feel like

22 that's getting into our agreement and privilege.

23           BY MR. SCUDDER:

24      Q.   Each of those individuals have agreed to be

25 standing members in communications that you've had with

1    them?

2        A.    Yes.

3        Q.    And each of those individuals have prepared

4    either affidavits or declarations with the kind of

5    information that you described a minute ago in them,

6    correct?

7        A.    Yes.

8        Q.    At one point in time in this litigation, and

9    we can -- there were some disclosures that preceded this

10   one in the case, as you'd expect.  There was a ▮▮▮▮▮

11   named ▮▮▮▮▮▮▮▮▮▮ who was designated as a standing

12   member.  Do you recognize that name?

13       A.    Yes.

14       Q.    And is ▮▮▮▮▮▮▮▮▮ an individual that you've

15   met with?

16       A.    Not face-to-face.

17       Q.    By either telephone or email?

18       A.    Yes.

19       Q.    And ▮s no longer a standing member, correct?

20       A.    Correct.

21       Q.    Do you know why that is?

22             MR. STRAWBRIDGE:  I think I'm going to

23   interpose an objection and an instruction here.  I

24   don't -- I think our agreement permits inquiry, and I

25   think the only relevant inquiry in this case is to