## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **CASE NO. 1:14-CV-954** |
| **THE UNIVERSITY OF NORTH CAROLINA et al.,** | |
| **Defendants.** | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

NATURE OF THE CASE ........................................................................................4

STATEMENT OF FACTS .......................................................................................5

I.   The University Has a Longstanding Commitment to Diversity ................................5

   A.   The Educational Benefits of Diversity are Critical to Achieving
        the University's Mission ........................................................................5

   B.   The University Has Made Deliberate and Sustained Efforts to
        Pursue the Educational Benefits of Diversity ...........................................7

   C.   The University Continuously Assesses Its Efforts to Realize the
        Educational Benefits of Diversity ..........................................................9

II.  The University's Use of Race in Admissions is Narrowly Tailored ......................10

   A.   The University's Admissions Process is Holistic ......................................10

        1.   Race is not a dominant factor in admissions decisions .......................10

        2.   Quality-control processes safeguard against deviations from
             admissions policy .....................................................................12

        3.   Statistical analysis confirms that race is not a dominant factor in the
             University's admissions process ...................................................14

   B.   The University Employs Robust Race-Neutral Admissions Strategies to
        Complement Holistic Review ................................................................15

        1.   The University's recruitment efforts are an important, race-neutral
             means to encourage diverse enrollment ...........................................15

        2.   The University has a generous financial aid program that
             facilitates diverse enrollment .......................................................16

        3.   The University attracts transfer students through the Carolina Student
             Transfer Excellence Program ........................................................18

i

C.   The University Has Given Serious, Good-Faith Consideration of
Race-Neutral Substitutes for Its Current Admissions Practices ..................... 18

D.   Expert Evidence Confirms that Elimination of Race-Conscious Practices
Would Result in a Decline in Racial Diversity, Academic Preparedness,
or Both ................................................................................................................ 21

QUESTIONS PRESENTED ......................................................................................... 24

STANDARD OF REVIEW ............................................................................................ 24

ARGUMENT ................................................................................................................... 25

I.   The Supreme Court Has Endorsed Race-Conscious Admissions Practices ............ 25

II.   The University's Admissions Approach Comports With Federal Law .................. 27

A.   The University Has Established a Compelling Interest in Student Body
Diversity ............................................................................................................. 27

B.   The University's Consideration of Race in Admissions is Narrowly
Tailored to Achieve Its Compelling Interest in Diversity ............................... 29

1.   Race is a flexible factor among many in the University's admissions
process .......................................................................................................... 29

2.   Race does not dominate admissions decisions ......................................... 30

3.   The University has explored, but has been unable to find, a workable
race-neutral replacement for race-conscious, holistic review .................. 34

4.   Socioeconomic diversity is not an adequate substitute for
racial diversity ............................................................................................ 37

CONCLUSION ............................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................24, 33, 34

*Fisher v. University of Texas at Austin*,
    570 U.S. 297 (2013) ....................................................................................passim

*Fisher v University of Texas at Austin*,
    136 S. Ct. 2198 (2016)................................................................................passim

*Francis v. Booz, Allen & Hamilton, Inc.*,
    452 F.3d 299 (4th Cir. 2006) ...............................................................................24

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .............................................................................................26

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ....................................................................................passim

*Hayes v. Douglas Dynamics, Inc.*,
    8 F.3d 88 (1st Cir. 1993)......................................................................................39

*Peters v. Jenney*,
    327 F.3d 307 (4th Cir. 2003) ...............................................................................24

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) .............................................................................................26

*Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) .............................................................................................26

*United States v. Fordice*,
    505 U.S. 717 (2002) .............................................................................................25

*Zoroastrian Center & Darb-E-Mehr of Metropolitan Washington, D.C.*
    *v. Rustam Guiv Foundation of New York*,
    822 F.3d 739 (4th Cir. 2016) ...............................................................................34

**Statutes**

North Carolina General Statutes § 116-11(9)...................................................................... 17

**Rules**

Federal Rules of Civil Procedure Rule 56(a) ...................................................................... 24

iv

# INTRODUCTION

The University of North Carolina at Chapel Hill educates students to lead and serve, improving the quality of life for the people of North Carolina and beyond. To further this mission, the University invests in an educational environment led by an excellent faculty and fueled by high-performing students from varied backgrounds and with different perspectives on the world. In the University's educational judgment, admitting and enrolling these students is essential to building a community that fosters the well-established educational benefits associated with diversity, such as improved problem-solving, enhanced leadership skills, and better understanding of people from all backgrounds.

The University's approach to admissions is critical to this environment. The University considers every applicant for admission holistically, as an individual, taking into account academic achievement and other characteristics that suggest an applicant could meaningfully contribute to the campus community. If voluntarily disclosed by the applicant, the University may consider race and ethnicity as one factor among many in its holistic review. It does not consider candidates of different racial backgrounds in separate groups; assign points or automatic plus factors to candidates because they are of a particular race; or use racial targets or quotas of any kind. Likewise, the University never discriminates against applicants on the basis of self-disclosed race or ethnicity, or because they choose not to disclose this information.

The United States Supreme Court has expressly endorsed this kind of flexible, individualized, and non-discriminatory consideration of race as consistent with the Equal Protection Clause of the Fourteenth Amendment. Under controlling Supreme Court precedent, a university's pursuit of the educational benefits of diversity is a compelling interest that can justify the narrowly tailored consideration of race in admissions decisions. If the university engages in a holistic, individualized review of each applicant, and a race-neutral alternative approach to admissions would not allow the university to achieve its diversity goals without sacrificing academic quality or incurring great expense, then, consistent with the Constitution, the university may employ an admissions process that allows for the careful consideration of race. *See Fisher v Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) ("*Fisher II*").

Plaintiff Students For Fair Admissions ("SFFA") is an organization that seeks to eliminate any consideration of race in higher education admissions. SFFA challenges the University's admissions practices as a means to a hoped-for end: overturning longstanding Supreme Court precedent. SFFA criticizes the University's holistic review process, wrongly claiming race is a dominant factor in admissions decisions. SFFA also contends that the University should be required to rely solely on race-neutral "alternative" admissions strategies. However, the majority of the strategies SFFA proposes—such as enhanced recruiting or financial aid—are not *substitutes* for the University's current race-conscious, holistic approach; they merely seek to do more of what the University already does well.

2

SFFA's most drastic tactic is to effectively ask this Court to impose a new constitutional standard. SFFA would have the Court compel universities to abandon effective race-conscious admissions if they can achieve increased *socioeconomic* diversity, even to the detriment of racial diversity. This argument ignores that socioeconomic diversity—although separately important—is not the same as racial diversity. Indeed, the Supreme Court has recognized the distinct benefits of racial diversity. *Fisher II*, 136 S. Ct. at 2210. By requesting a permanent injunction that would prevent the University from exercising its judgment to pursue these unique benefits, SFFA seeks to usurp the University's discretion to set its educational policy consistent with the law and its mission, and to determine how it should best deploy its resources.

The Court should reject SFFA's attempts to rewrite the law and dictate University policy for several reasons. First, the record establishes that the University has a compelling interest in the educational benefits of racial diversity. SFFA has no credible contrary evidence. It cannot seriously contend that racial diversity yields no benefits, when the opposite is well-established in academic literature, empirical studies, expert analysis, legal precedent, and overwhelming record evidence. The University has consistently and deliberately pursued the educational benefits of a diverse student body, and its decision to do so in pursuit of its mission is entitled to deference under the law. *Fisher II*, 136 S. Ct. at 2208.

Second, the University has closely adhered to Supreme Court directives and constitutional requirements. The University engages in careful, holistic review of

applications for admission and devotes substantial resources toward attaining the educational benefits of diversity and analyzing race-neutral alternatives to its current admissions practices, just as the Supreme Court requires.

Finally, the record demonstrates that the University's use of race in admissions is narrowly tailored. No reasonable fact-finder could conclude that race plays a dominant role in the University's admissions process. Although SFFA alleged in its Complaint that it would uncover evidence of prohibited quotas or even intentional discrimination, extensive discovery revealed nothing of the sort. Likewise, the record shows that no race-neutral alternatives could advance the University's mission about as well, at tolerable costs. SFFA offers only flawed expert testimony that fails to create a genuine issue that can defeat summary judgment.

For these reasons, Defendants request that the Court award summary judgment finding that the University has established (1) its compelling interest in the educational benefits of diversity; and (2) its consideration of race in admissions is necessary, narrowly tailored, and constitutionally permissible.

## NATURE OF THE CASE

This case is one of several initiated by SFFA and its founder, Edward Blum. SFFA sued the University and others, alleging that the University's admissions practices violated the constitutional and statutory rights of SFFA's members.

SFFA's Complaint does not seriously challenge the University's interest in the educational benefits of diversity. In Count I, SFFA claims the University uses race as a

4

"dominant factor in admissions decisions" and thereby fails to evaluate candidates as individuals. (Compl. ¶¶197-203.) In Count II, SFFA alleges that the University failed to consider "all of the available race-neutral alternatives" to its current admissions process; SFFA claims that these alternatives "can achieve student body diversity without resorting to racial preferences." (*Id.* ¶¶204-13.) In Count III, SFFA contends that any use of race in admissions is unconstitutional and argues that controlling Supreme Court precedent was wrongly decided. (*Id.* ¶¶214-27.) SFFA requests a declaration that the University's admissions practices violate federal law and a permanent injunction prohibiting the University from using race as a factor in undergraduate admissions decisions. (*Id.* ¶64.)

Now, the University moves for summary judgment on each of SFFA's claims because the undisputed material facts demonstrate that the University's admissions approach is constitutionally sound: its practices are narrowly tailored to achieve the educational benefits of diversity recognized by the Supreme Court.

## STATEMENT OF FACTS

### I.    The University Has a Longstanding Commitment to Diversity.

#### A.    The Educational Benefits of Diversity are Critical to Achieving the University's Mission.

The University's mission is to "teach a diverse community of . . . students to become the next generation of leaders" and to "enhance the quality of life for all people" in North Carolina. (Ex. 4 ¶9.) The University has long recognized that it must admit and enroll a diverse student body to realize this goal. (Ex. 1 ¶20; Ex. 34 at UNC0349696;

Ex. 94 ¶¶56-57; Ex. 100 ¶16; *see also, e.g.*, Ex. 35 at UNC0379170; Ex. 33 at UNC0283261.)

The University defines diversity to include "all of the ways in which people differ" (Ex. 47 at UNC0377854) and fosters a campus community that differs in a wide variety of ways, including social backgrounds, economic circumstances, philosophical outlooks, life experiences, perspectives, beliefs, expectations, and aspirations. (Ex. 13 at 29:14-22.) Diversity includes racial and ethnic differences, which combine with multiple other individual characteristics to create an "exciting environment for learning." (*See id.* at 32:7-14.) As Chancellor Folt testified, because "questions of race and difference . . . are some of the most important questions facing . . . students" today, it is "critical" to expose them to a "broad range of diversity" in college that mirrors what they will face as the next generation of leaders. (*Id.* at 31:5-20.) Thus, the University has expressly established as an institutional goal the admission of underrepresented populations to enhance the educational process. (Ex. 47 at UNC0377854; *see also, e.g.*, Ex. 34 at UNC0349700-702; Ex. 33 at UNC0283261.)

The benefits of diversity are well-documented in academic research (*see* Ex. 20 at 9-12, 14-21; Ex. 21 at 4-6) and are routinely observed by University faculty, staff, students, and alumni across disciplines and professions. (*See* Ex. 88 ¶16; Ex. 68 ¶8; Ex. 72 ¶¶20, 29; Ex. 97 ¶8; Ex. 99 ¶9; Ex. 109 ¶10; Ex. 70 ¶¶16-18; Ex. 73 ¶¶16-18; Ex. 71 ¶6; Ex. 89 ¶15; Ex. 105 ¶10; Ex. 113 ¶¶14, 17; Ex. 76 ¶10; Ex. 79 ¶12; Ex. 95 ¶15-16; Ex. 108 ¶¶11-12; Ex. 98 ¶¶15.)

University professors report that diversity promotes discovery and innovation and expands fields of inquiry. (*See* Ex. 111 ¶¶11-12; Ex. 99 ¶9; Ex. 72 ¶35; Ex. 82 ¶¶18, 24, 27-29.) A diverse student body also improves students' capacity to work effectively with others: exposure to diversity breaks down stereotypes, creates common understandings, and encourages empathy. (Ex. 72 ¶¶20, 30; Ex. 73 ¶18; Ex. 81 ¶13; Ex. 88 ¶19; Ex. 94 ¶12; Ex. 78 ¶19; Ex. 84 ¶13; Ex. 85 ¶11; Ex. 71 ¶9; Ex. 76 ¶11; Ex. 83 ¶¶8-9; Ex. 90 ¶33; Ex. 117 ¶10; Ex. 79 ¶24; Ex. 87 ¶28; Ex. 91 ¶¶19, 22; Ex. 80 ¶16; Ex. 108 ¶12; Ex. 106 ¶13.)

Successful University alumni agree that exposure to diversity in college is necessary to prepare future leaders in a global society. (*See* Ex. 88 ¶11-12; Ex. 103 ¶¶11, 15; Ex. 68 ¶18; Ex. 110 ¶15; Ex. 73 ¶16; Ex. 86 ¶17; Ex. 107 ¶¶13-16; Ex. 70 ¶¶16-18; Ex. 101 ¶¶12-14; Ex. 114 ¶¶12-13; Ex. 115 ¶17.)

Students, too, appreciate the importance of learning from classmates of different backgrounds and recognize that exposure to difference is critical to their future success. (Ex. 67 ¶17; Ex. 112 ¶¶11, 15-17; Ex. 91 ¶24; *see also* Ex. 78 ¶¶4, 13, 20-21; Ex. 109 ¶¶16-19; Ex. 116 ¶4.) Students overwhelmingly want to engage with a broad range of perspectives to improve their leadership skills and deepen their appreciation for others. (Ex. 64 at UNC0380282.)

### B.    The University Has Made Deliberate and Sustained Efforts to Pursue the Educational Benefits of Diversity.

The University strives to foster a campus environment where the educational benefits associated with a diverse student body can be realized. (*See*, *e.g.*, Ex. 13 at 31:5-

35:19, 75:11-18, 173:9-22; Ex. 1 ¶42; Ex. 15 at 106:11-107:22; Ex. 4 ¶¶10, 13-14; Ex. 2 ¶12; Ex. 8 at 89:12-96:17; Ex. 11 at 26:6-29:5, 291:7-292:3; *see also* Ex. 33 at UNC0283261.) In the classroom, the University intentionally creates opportunities for students to learn from their peers and actively encourages participation from all students. (Ex. 72 ¶¶20-28; Ex. 75 ¶¶6-17; Ex. 89 ¶15; Ex. 91 ¶¶16-22; Ex. 93 ¶¶14-16; Ex. 100 ¶¶9-13; Ex. 113 ¶19; Ex. 77 ¶26; Ex. 111 ¶¶8-10; Ex. 90 ¶¶18-22, 26, 28-29; Ex. 79 ¶¶15-26.) Outside the classroom, the University likewise encourages students to interact and engage with other students from a wide variety of backgrounds. (Ex. 2 ¶18; Ex. 94 ¶¶5, 19-24; Ex. 74 ¶¶13-16; Ex. 34 at UNC0349707-708.) Additionally, University programs promote the advancement and connectivity of diverse students. (*See, e.g.*, Ex. 69 ¶16; Ex. 77 ¶¶27-33; Ex. 79 ¶¶27-30; Ex. 81 ¶5; Ex. 86 ¶8.)

Defendants' expert, Professor Mitchell Chang of UCLA, assessed the University's programming, including affinity groups, student housing initiatives, campus discussion forums, academic preparedness and mentoring programs, discipline-specific initiatives, course offerings, classroom assignments, and dialogue. (Ex. 20 at 25-41.) Chang observed that the University has implemented a variety of programs and policies, which demonstrate that it systematically and effectively "engages diversity" to intentionally create the conditions necessary for achievement of educational benefits. (*Id.* at 5-6, 26; *see also* Ex. 21 at 38, 44, 47.)

The University's efforts to achieve the educational benefits of diversity are significant and ongoing, but they are unfinished. The University continues to face

challenges admitting and enrolling underrepresented minorities, particularly African-American males, Hispanics, and Native Americans. (Ex. 12 at 177:11-178:2; Ex. 4 ¶50.) These challenges hinder the University's efforts to provide students with the educational benefits of diversity. (*See* Ex. 20 at 70-73.) University professors observe a lack of minorities in certain classes, fields, or areas of campus; this underrepresentation limits opportunities for exposure and learning. (*E.g.*, Ex. 80 ¶¶18-21; Ex. 66 ¶¶8-10; Ex. 111 ¶15.) In turn, underrepresented minority students report feelings of isolation and unfair pressure to represent their race or ethnicity—effects that further impede education. (*See, e.g.*, Ex. 73 ¶5; Ex. 81 ¶14; Ex. 84 ¶¶9-11; Ex. 92 ¶¶14-16; Ex. 96 ¶9; Ex. 97 ¶¶9, 14; Ex. 102 ¶9; Ex. 104 ¶¶14-23; Ex. 105 ¶¶3-6; *see also* Ex. 21 at 65.)

### C. The University Continuously Assesses Its Efforts to Realize the Educational Benefits of Diversity.

The University regularly evaluates its progress toward achieving the educational benefits of diversity. It engages in ongoing campus climate assessments, including the collection of survey data at numerous intervals over nearly twenty years. (*See* Ex. 20 at 41-43, 49, 53, 58.) Additionally, the University assesses its progress by, for example: (1) measuring its performance (Ex. 1 ¶47; Ex. 15 at 106:11-109:24; Ex. 10 at 64:11-65:23, 118:21-119:5; Ex. 12 at 384:4-385:17); (2) collecting feedback on diversity issues from students and faculty (Ex. 1 ¶48; Ex. 2 ¶61; Ex. 6 ¶¶63; Ex. 8 at 27:2-28:24; Ex. 34 at UNC0349710); (3) completing department-specific self-assessments (Ex. 2 ¶¶62-76; Ex. 74 ¶¶79-95; Ex. 94 ¶¶45-54); and (4) participating in third-party studies and surveys (Ex. 94 ¶¶47-48; Ex. 74 ¶¶87-88, 90-94 & Exs. 3-8).

In December 2017, Provost Robert Blouin established the Educational Benefits of Diversity & Inclusion Working Group ("EBD Working Group"). (Ex. 1 ¶49.) The EBD Working Group is charged with coordinating and enhancing the assessment of the University's ongoing efforts to realize the educational benefits of diversity. (*Id.* ¶49; Ex. 64 at UNC0380279.) During its first year of existence, the EBD Working Group reviewed significant existing data regarding the University's delivery of the educational benefits of diversity and developed a plan for assessing the University's efforts going forward. (Ex. 1 ¶¶51, 53-54.) Its work continues. (*Id.* ¶55.)

## II. The University's Use of Race in Admissions is Narrowly Tailored.

### A. The University's Admissions Process is Holistic.

#### 1. Race is not a dominant factor in admissions decisions.

The University annually enrolls a first-year class of approximately 4,000 students, of which 82% must be North Carolinians. (Ex. 4 ¶¶17-18.) The admissions process is highly selective: for the class of 2022, the University received approximately 43,500 applications and made offers of admission to approximately 9,500 applicants, or less than 22%. (*Id.* ¶17.)

The University's application for admission consists of the Common Application (a standardized application used by hundreds of universities), two essays, a letter of recommendation, a high school transcript and test scores, and any supplemental information the applicant wishes to provide. (Ex. 7 ¶¶10-13.) The Common Application

10

allows the applicant the option to provide demographic information, such as gender, race, and ethnicity. (*Id.* ¶10.)

Application readers are responsible for evaluating all applications and making admissions decisions. (*Id.* ¶¶17, 30; Ex. 4 ¶20.) At least one reader reviews every application in its entirety and assesses the applicant using more than 40 criteria, grouped into the areas of academic performance, academic program, standardized testing, extracurricular activity, special talent, essay, background, and personal criteria. (Ex. 7 ¶31.) Readers seek to understand each candidate individually and holistically, based on everything their applications reveal about them. (*Id.* ¶28; Ex. 39 at UNC0323608.) At any stage of the review process, readers may consider an applicant's race, ethnicity, or national origin, if provided, but only in the context of everything else known about the applicant. (Ex. 4 ¶24; Ex. 14 at 132:7-17.)

The evaluation process does not use formulas, fixed weights, or points to reflect a reader's overall assessment of a candidate relative to the applicant pool. (Ex. 4 ¶23; Ex. 17 at 108:3-108:8, 109:6-109:8; Ex. 39 at UNC0323607.) Instead, the reader will apply a score across five categories: academic program; academic performance; extracurricular activities; essays; and personal qualities, such as curiosity, integrity, and history of overcoming obstacles. (Ex. 7 ¶¶32, 37.) Readers do not tally or total these ratings; there is no minimum score required for admission, nor is there a score that guarantees admission. (*Id.*)

11

A candidate's race is not given a numerical weight at any point in the review. (Ex. 4 ¶25.) The University does not have quotas for any particular racial or ethnic group, or for underrepresented minority students as whole, and readers are *never* given targets or numerical goals regarding the shape of the incoming class. (*Id.* ¶29; Ex. 7 ¶25; Ex. 17 at 108:3-108:8, 109:6-109:8.) During the review, readers do not receive any information regarding the racial or ethnic composition of the class that has been provisionally identified for admission; therefore, readers have no ability to adjust decisions in order to achieve any particular class makeup. (Ex. 4 ¶29.)

After assigning ratings, the reader recommends whether the student should be admitted, denied, or wait-listed based on the totality of information in the applicant's file. (Ex. 7 ¶44.) Admissions decisions at this stage are provisional pending a separate quality-control review. (Ex. 4 ¶27.)

### 2. Quality-control processes safeguard against deviations from admissions policy.

The University employs a number of quality-control measures to assure that admissions decisions are consistent with University policy. First, more experienced "Tier 2 Readers" may conduct "second reads" of applications. (Ex. 7 ¶46.) Second reads occur when the first reader believes an application warrants additional review. (*Id.* ¶45.) Additionally, Tier 2 Readers review applications evaluated by first-time readers to provide feedback. (*Id.* ¶¶26, 46.) The Admissions Office also holds weekly all-staff meetings to evaluate applications in a group setting. (*Id.* ¶27.)

12

Next, all admission decisions go through "School Group Review" ("SGR"). (Ex. 4 ¶31.) This process involves evaluating the provisional admission decisions grouped by high school. (Ex. 7 ¶52; Ex. 60 at UNC0079438.) SGR facilitates a review of readers' admissions recommendations to assure conformity with the University's standards and to assure that decisions on applicants from the same high school are justified in context. (*Id.*; Ex. 16 at 179:17-181:1.) It also allows the Admissions Office to consider expected enrollment and, if necessary, make adjustments to avoid over- or under-enrollment. (Ex. 7 ¶50.) Admissions staff do not use the SGR process to shape class composition toward a particular goal, other than admitting the correct proportion of North Carolina versus out-of-state residents. (*Id.* ¶55; Ex. 12 at 173:4-174:4.) Otherwise, the SGR committee receives no goals, targets, or quotas. (Ex. 7 ¶55.) Nor do they have access to the racial or ethnic composition of the admitted class. (Ex. 4 ¶33.) Readers who revisit an application during SGR reread it in its entirety, holistically. (Ex. 7 ¶54; Ex. 12 at 168:23-169:5, 173:22-174:4.)

Finally, the University allows admissions decisions to be appealed to an admissions officer or the Provost on the basis of an alleged policy violation or material procedural error. (Ex. 4 ¶37.)

After finalizing admissions decisions, the Admissions Office reviews the demographics of the incoming class in order to understand the admitted class profile. (Ex. 16 at 187:123-188:21.) The Admissions Office never uses racial or ethnic data to make adjustments to the admitted class. (*Id.*)

13

### 3. Statistical analysis confirms that race is not a dominant factor in the University's admissions process.

To assess the statistical relationship between certain applicant characteristics—for example, race, test scores, grades, class rank, in-state residency, and gender—and the applicant's admission decision, the University engaged Caroline Hoxby, the Scott and Donya Bommer Professor in Economics at Stanford University. Using actual University applicant data, Hoxby employed regression analysis to construct various models of the University's admissions process, each comparing the relationship of different variables or combinations of variables to admissions outcomes.[1] (Ex. 22 ¶¶41-44.) One model tested the relationship between an applicant's race and combined test score and admissions outcome. (*Id.* ¶57, Ex. 1, Table 2, row 1.) Other models added variables such as class rank, GPA, gender, and in-state residency. (*Id.* row 5.)

Hoxby also performed a statistical analysis to determine whether race is the dominant factor in admission decisions. This analysis (known as a "Shapley decomposition") measures how a particular factor (here, race) contributes to a particular model's success in explaining the outcome (here, the admissions decision). (*Id.* ¶¶44-46; Ex. 23 ¶17.) SFFA's expert, Peter Arcidiacono, agreed that this type of analysis would be "useful in determining the impact of particular factors across the entire applicant pool." (Ex. 18 at 109.) Performing this analysis on her own models, Hoxby concluded that race

---

[1]  A regression analysis is a well-accepted, commonly used statistical tool that is capable of measuring the relationship between multiple factors. (Ex. 22 ¶41.)

explained, at most, only a small share of the University's admissions decisions: approximately 0.8–5.6%, depending on the model. (Ex. 22 ¶¶53-58, Ex. 1; Ex. 23 ¶17.) When Hoxby performed the same analysis on competing regression models submitted by Arcidiacono, the results were similar: race explained only 2.0–6.7% of admissions decisions, depending on the model. (Ex. 23 ¶18.)

**B.  The University Employs Robust Race-Neutral Admissions Strategies to Complement Holistic Review.[2]**

**1.  The University's recruitment efforts are an important, race-neutral means to encourage diverse enrollment.**

The University engages in considerable recruitment efforts to encourage talented and diverse students, including underrepresented minority students, low-income students, first generation college students, and geographically diverse students, to apply for admission. (Ex. 3 ¶11; Ex. 9 at 103:11-104:18, 106:21-107:5; Ex. 17 at 40:19-41:6.) These activities can be divided into two broad categories: recruitment of students to apply and recruitment of admitted students to enroll. (Ex. 3 ¶7.)

---

[2]  As used within this brief, "race-neutral alternatives" refer to admissions processes that would entirely replace race-conscious holistic admissions and require admissions officers to ignore a candidate's self-disclosed race or ethnicity. "Race-neutral strategies" are means by which a university may seek to bolster diversity within its applicant pool separate and apart from the process by which candidates are evaluated for admission. To illustrate, a "percentage plan" that admits the top x% of candidates from any high school is a race-neutral alternative that could replace holistic review. Enhanced recruiting, including of underrepresented minority or socioeconomically disadvantaged applicants, is a race-neutral strategy that could supplement holistic review by impacting the applicant pool.

The University's recruitment efforts are extensive. Through the purchase of data from the College Board, the University identifies approximately 70,000 high school sophomores or juniors each year who are potentially admissible to UNC. (Ex. 9 at 225:24-226:4.) The University encourages these students to apply, using mailings, emails, and other communications. (Ex. 3 ¶¶ 15, 19.) In-person outreach, including high school visits, college fairs, and admitted-student events, is another major component of recruitment efforts. (*Id.* ¶18.) The University also extends its outreach to underserved, low-income, first generation college student, and minority populations through the Carolina College Advising Corps program, which places recent UNC graduates to serve as advisors in selected partner high schools throughout the state. (Ex. 4 ¶60.)

### 2. The University has a generous financial aid program that facilitates diverse enrollment.

The University's admissions approach is need-blind; it evaluates applicants based on their merits, not their financial means. (*Id.* ¶66.) Nevertheless, the University works to increase access to higher education for low income students, both by seeking to understand their achievements in the context of socioeconomic challenges and by making it financially possible to attend UNC. (*Id.*) The University's generous financial aid program is a critical, race-neutral way that it attracts and enrolls a diverse undergraduate student body, regardless of ability to pay. (*Id.* ¶¶66-67.) Indeed, the University awards 93% of its available scholarship and grant funds based solely on financial need. (*Id.* ¶71.) Moreover, the University is one of only two public universities in the country that meets

100% of students' demonstrated financial need, without resorting to high-interest private loans. (*Id.* ¶67.)

Through its Carolina Covenant program, the University offers students whose family income is 200% or less of federal poverty guidelines a financial aid package that allows them to graduate debt-free. (*Id.* ¶¶74-75.) Approximately 12 to 14% of each first-year class qualifies. (*Id.* ¶76.)

The University's financial aid program awarded $159 million in scholarships and grants to undergraduate students in the 2016-2017 school year. (*Id.* ¶70.) During the same year, the Jack Kent Cooke Foundation awarded the University its prestigious Cooke Prize for Equity in Educational Excellence, a $1 million award given to a "selective college or university with an excellent record of admitting, supporting and graduating outstanding low-income students." (*Id.* ¶73.) To date, UNC is the only public school to receive this award. (*Id.*)

Although the University strives to support socioeconomically disadvantaged students in every way possible, its financial aid program is not limitless. As a state-supported entity, the University receives monies from direct state appropriations that are designated by the General Assembly for purposes other than student aid. N.C. Gen. Stat. § 116-11(9). (Ex. 1 ¶37.) The amount of tuition revenue that can be allocated to need-based financial aid is budgeted by the Board of Governors, which set the amount available in 2014. (Ex. 4 ¶82.) The University's endowment funds are subject to

restrictions that donors typically place on such funds, which cannot be removed without express consent. (Ex. 1 ¶¶ 38-39.)

### 3. The University attracts transfer students through the Carolina Student Transfer Excellence Program.

To enable students to transfer to UNC, the University established the Carolina Student Transfer Excellence Program ("C-STEP"). (Ex. 4 ¶64.) C-STEP focuses on students whose household incomes fall at or below 300% of federal poverty guidelines. (*Id.*) The program offers guaranteed UNC admission to these students if they complete required coursework at a partner community college in North Carolina and earn an Associate degree. (*Id.* ¶65.) The University meets 100% of the financial need of enrolling C-STEP students. (*Id.*) C-STEP is another way the University attracts diverse talent.[3]

### C. The University Has Given Serious, Good-Faith Consideration of Race-Neutral Substitutes for Its Current Admissions Practices.

In addition to employing the race-neutral strategies discussed above, the University has rigorously assessed potential race-neutral alternatives that might replace its current admissions process, and continues to do so. (*Id.* ¶¶86, 107.) In 2007, the Admissions Office evaluated whether it could use indicators of socioeconomic disadvantage in the admissions process to yield a class with academic credentials and

---

[3] SFFA's expert, Richard Kahlenberg, suggests the University could expand its recruiting and community college transfer programs, but does not attempt to quantify the impact of his vague assertions. Hoxby, however, did just that. She found that expanding recruiting or the transfer program could not achieve—or would reduce—the University's current levels of racial diversity or academic standards. (Ex. 22 ¶¶281, 284-285; Ex. 24 ¶¶85-97.)

18

racial diversity levels similar to those of the actual admitted class. (*Id.* ¶92.) This study demonstrated that giving increased weight to socioeconomic status would not permit the University to achieve levels of diversity and academic excellence comparable to those attained through the current practice of holistic review. (*Id.* ¶93.)

In 2009, the Admissions Office conducted an extensive review of published studies and academic commentary concerning the leading race-neutral alternatives. (*Id.* ¶94.) This research concluded that available race-neutral alternatives were not as effective as holistic admissions practices at producing comparable levels of diversity and academic quality. (*Id.*; Ex. 41 at UNC0079527-28.)

In 2012, the Admissions Office considered historical applicant data to model a top 10% plan—*i.e.*, guaranteeing admission to every in-state applicant who graduated in the top 10% of his or her high school class. (Ex. 4 ¶95; Ex. 40 at UNC0079622.) The analysis showed a marginal increase in racial diversity, but a decrease in other indicators of academic quality. (*Id.*)

In 2013 (before this litigation), the University convened faculty members and administrators to serve on the Working Group on Race-Neutral Alternatives. (Ex. 4 ¶97; Ex. 5 ¶¶18-19.) The Working Group held regular meetings in 2013-2014 to identify race-neutral alternatives, review literature and commentary, and understand other institutions' experiences. (Ex. 4 ¶97; Ex. 42 at UNC0079624; Ex. 43 at UNC079613; Ex. 44 at UNC0079724-25; Ex. 45 at UNC0079650; Ex. 46 at UNC0079822; Ex. 49 at UNC0283540.) The Working Group modeled the impact of five race-neutral alternatives

19

on the in-state portion of the entering class: (1) an approach that used strength of a student's high school curriculum and a standardized testing threshold as criteria for admission; (2) a top 10% plan; (3) a top 4.5% plan; (4) a percentage plan that guaranteed admission to top-ranked students while also admitting more students from low-income high schools; and (5) an approach that would guarantee admission to students with a standardized test score above a certain threshold. (Ex. 4 ¶¶98-101; Ex. 49 at UNC0283556-58.)

The analysis of each alternative resulted in either a decline in racial diversity, a decline in academic quality, or both. (Ex. 49 at UNC0283556-59.) The Working Group reported that no race-neutral alternative would allow the University to achieve a level of academic excellence *and* diversity comparable to that achieved by the current admissions practices. (Ex. 4 ¶102; Ex. 49 at UNC0283559.)

In 2016, the University formed the Committee on Race-Neutral Strategies to build upon this prior work. (Ex. 4 ¶104; Ex. 6 ¶46.) The Committee's work is active and ongoing; while it will continue to consider options, to date, it has not identified any workable race-neutral alternative to race-conscious, holistic review that it believes will be likely to enable the University to achieve the educational benefits of diversity without sacrificing its educational goals. (Ex. 6 ¶68.)

### D. Expert Evidence Confirms that Elimination of Race-Conscious Practices Would Result in a Decline in Racial Diversity, Academic Preparedness, or Both.

Independently, the University's expert, Hoxby, assessed whether various race-neutral alternatives potentially available to the University could replicate the outcomes from its current race-conscious holistic review. She did so by running more than 100 simulations of various admissions plans and analyzing the resulting racial composition and academic preparedness of a hypothetical enrolling class.[4] The alternatives she assessed include: (1) socioeconomic status-based plans in which greater emphasis is given to applicants from disadvantaged backgrounds; (2) percentage plans in which a certain percentage of students—typically those at the top of their high school class—are automatically admitted; and (3) geography-based plans in which greater emphasis is given to applicants from particular geographic areas. (Ex. 22 ¶¶93-96.)

In each instance, whether a race-neutral alternative could achieve the same amount of racial diversity as a race-conscious approach depends on how strongly the indicator used (*e.g.*, socioeconomic status or attending a particular high school) correlates with underrepresented minority status within the applicant pool. (*Id.* ¶¶109-116, 125, 147,

---

[4] Hoxby assessed academic preparedness by comparing change in standardized scores, which is not a perfect measure, but is more standardized than GPA. (Ex. 24 ¶¶115-116.)

248; *see also* Ex. 30 ¶¶21, 45.)[5] Hoxby used regression analysis to assess whether race-neutral indicators could reliably substitute for an applicant's race. (Ex. 22 ¶¶210-217; Ex. 24 ¶¶71-72.)

Then, relying on multiple data sources—including actual applicant data, North Carolina public high school student data,[6] and Census data—Hoxby analyzed potential race-neutral alternatives suggested in the Complaint and academic literature (including any reasonable modifications that could improve the alternatives) against a hypothetical pool of students who would be incentivized to apply under the particular alternative. (Ex. 22 ¶¶135-222 (socioeconomic plans), 224-237 (percentage plans), 238-257 (geographic plans).) She sought to maximize the chances that race-neutral plans could replicate the University's current admissions results by making assumptions likely to

---

[5] Defendants retained Bridget Terry Long, Dean of Harvard University's Graduate School of Education, to opine on academic research regarding race-neutral alternatives and the experience of other highly-selective undergraduate institutions with these alternatives. (Exs. 30, 31, 125.)

[6] The North Carolina Department of Education maintains a rich reserve of data on North Carolina public high school students, including test scores. Utilizing this data is important for admissions simulations because changes in admissions policies would likely result in corresponding changes to the applicant pool. (Ex. 22 ¶101; Ex. 24 ¶¶71-72.)

22

favor each plan's chances of success. (*Id.* ¶¶176-77, 184, 218, 252; Ex. 24 ¶¶75-76; *see also* Ex. 19 at 95:11-16.)[7]

Hoxby conducted additional simulations in response to the reports submitted by SFFA's expert, Kahlenberg. (Ex. 23 ¶¶9, 119-168; Ex. 24 ¶¶10-19, 61-114.) Hoxby found that "there is no race-blind alternative available to UNC that could be used, even in some practical combination with another alternative, that would allow UNC to maintain its current level of academic preparedness and racial diversity." (*Id.* ¶61.) Specifically, she concluded:

- Using a socioeconomic-status based index, UNC would consistently fail to attain its current levels of academic preparedness and racial diversity. (Ex. 22 ¶¶133-223; Ex. 23 ¶¶130-133; Ex. 24 ¶¶74-79.)

- Using any plausible percentage-based plan, overall academic preparedness (as indicated by average test scores) would likely decrease, and this decrease would be especially pronounced among underrepresented minority students. (Ex. 22 ¶¶224-237; Ex. 23 ¶¶149-150; Ex. 24 ¶¶80-81.)

- Using a geography-based plan—which has never been implemented in practice by any undergraduate institution—UNC would fail to attain its current levels of academic preparedness or racial diversity. (Ex. 22 ¶¶238-257.)

---

[7] For example, if a university like Carolina implemented an alternative admissions process (such as a percentage plan), its applicant pool would change—some new candidates would decide to apply and some candidates who would have applied under the old process would not apply. (Ex. 22 ¶101; Ex. 30 ¶¶73-84.) To maximize the alternative's chances of achieving the same level of racial diversity and academic preparedness, Hoxby assumed that highly qualified students would continue to apply even if their chances of admission would fall substantially under the alternative. (Ex. 24 ¶75.)

## QUESTIONS PRESENTED

(1)     Does the record establish as a matter of law that the University has a compelling interest in the educational benefits of diversity such that the University is entitled to summary judgment finding that it has established a constitutionally permissible goal of attaining a diverse undergraduate student body?

(2)     Does the record establish as a matter of law that the University's consideration of race in undergraduate admissions decisions is narrowly tailored such that the University is entitled to summary judgment on SFFA's claims?

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might "affect the outcome of the suit," and a dispute over a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Even where, as here, the defendant carries the burden of proof at trial, "the non-moving party must still provide evidence sufficient to create an issue for trial." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 251).

**ARGUMENT**

**I.    The Supreme Court Has Endorsed Race-Conscious Admissions Practices.**

In *Grutter v. Bollinger*, the Supreme Court held that diversity and the educational benefits derived from diversity are compelling interests that can justify the narrowly tailored consideration of race in higher education admissions decisions. 539 U.S. 306 (2003). The Court has *twice* reaffirmed the holding of *Grutter. See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013) ("*Fisher I*"); *Fisher II*, 136 S. Ct. 2198. The resulting legal framework gives the University certain burdens of proof, but respects the University's determination that admitting a diverse class of students is essential to the University's educational mission.

A race-conscious admissions approach is constitutionally permissible if it can withstand "strict scrutiny." *Fisher I*, 570 U.S. at 308, 309-310; *see also Grutter*, 538 U.S. at 343 (finding the protections of Title VI to be no greater than those afforded by the Constitution); *United States v. Fordice*, 505 U.S. 717, 732, n.7 (2002) (same). In practice, this rule means that a university must demonstrate that (1) it has compelling, constitutionally permissible goals that require it to consider race in admissions, and (2) the use of race in admissions is "narrowly tailored to achieve the university's permissible goals." *Fisher II*, 136 S. Ct. at 2208; *Fisher I*, 570 U.S. at 308, 309-310.

Attaining the educational benefits that flow from a diverse student body is a compelling, constitutionally permissible goal. *Grutter*, 539 U.S. at 325. As the Supreme Court has recognized, racial diversity has substantial, distinct educational benefits: it

25

"promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Fisher II*, 136 S. Ct. at 2210 (quoting *Grutter*, 539 U.S. at 330). "Equally important, 'student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.'" *Id.* (quoting *Grutter*, 539 U.S. at 330).

The decision to pursue these educational benefits "is, in substantial measure, an academic judgment." *Fisher II*, 136 S. Ct. at 2208; *see also Grutter*, 539 U.S. at 329 (recognizing that the autonomy to select a student body is an academic freedom rooted in the First Amendment); *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 312 (1978) (same). Thus, a university's "reasoned, principled explanation for its decision" to pursue the educational benefits of diversity deserves considerable judicial deference. *Fisher II*, 136 S. Ct. at 2208 (internal quotations omitted).

To be narrowly tailored the admissions approach implemented must closely "'fit' the compelling goal" so there is "little or no possibility [for] illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 334 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). Thus, admissions policies cannot use a quota system or automatically assign numerical values to race. *Id.*; *Gratz v. Bollinger*, 539 U.S. 244, 273-74 (2003). Instead, the Supreme Court has recognized race-conscious policies as narrowly tailored when race is considered flexibly as part of an individualized review of each applicant and an assessment of all the qualities the applicant possesses. *Grutter*, 538 U.S. at 334; *Gratz*, 539 U.S. at 271.

26

Narrow tailoring also requires a showing that race-neutral alternatives do not promote the university's goals "about as well [as race-conscious practices] and at tolerable administrative expense." *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312). However, "exhaustion of every conceivable race-neutral alternative" is not required, and universities need not implement either overly expensive alternatives or those that would result in a decrease in diversity, the academic quality of admitted students, or both. *Grutter*, 539 U.S. at 339-40. "[T]he Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence." *Fisher II*, 136 S. Ct. at 2213.

## II. The University's Admissions Approach Comports With Federal Law.

### A. The University Has Established a Compelling Interest in Student Body Diversity.

In its academic judgment, the University has determined that pursuing the educational benefits of diversity is integral to fulfilling its mission to prepare the next generation of leaders. This decision is wholly consistent with the Supreme Court's recognition that "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332. Thus, the University has long emphasized the fundamental educational value of diversity, and it deliberately seeks to attain a diverse and talented student body. Academic plans, diversity plans, surveys, a Faculty Council resolution, and a recent provost report all reiterate the

27

University's commitment to diversity and document the educational benefits diversity produces. (*Supra* at 5-7.)

Voluminous testimony from expert and lay witnesses, as well as academic studies, confirm that the benefits of diversity are real, not theoretical. UNC has submitted more than 50 declarations of administrators, faculty, staff, students, and alumni, all of whom attest to the advantages that flow from learning in a campus environment that is diverse on many levels. (*Supra* at 5-7.) Relying on record evidence and academic studies (including his own), Chang opined on the multiple benefits of diverse learning environments, including enhanced learning outcomes; preparation for participation in a pluralistic, democratic society; reduction in prejudice; satisfaction with the college experience; improved persistence to graduation; and combatting tokenism. (Ex. 20 at 14-22.) SFFA offers no expert to rebut these conclusions. Indeed, Kahlenberg agrees that universities have a compelling interest in racial diversity and that such diversity yields educational benefits. (Ex. 123 at 76:1-78:4.)

Proof of the University's compelling interest in pursuing the well-established educational benefits of diversity is uncontradicted and overwhelming. The University's considered judgment to pursue these benefits is well-documented and entitled to "judicial deference." *Fisher II*, 136 S.Ct. at 2208. SFFA cannot seriously contest that the University has a compelling interest in fostering diversity. The law calls for summary judgment on this issue.

28

**B.** **The University's Consideration of Race in Admissions is Narrowly Tailored to Achieve Its Compelling Interest in Diversity.**

**1.** **Race is a flexible factor among many in the University's admissions process.**

Consistent with Supreme Court precedent, the University engages in a "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 337; *see Fisher II*, 136 S. Ct. at 2205-06. Readers evaluate each application in its entirety and attempt to understand each student on an individual basis, assessing all the ways he or she might contribute to the student body. (Ex. 39 at UNC0323610 (calling for a search for students "who would offer their classmates and professors an unusual or unique perspective, aptitude, achievement, or experience").) Even SFFA's experts concede that the University's admissions process is individualized and holistic. (Ex. 19 at 78:17-21, 91:13-19; Ex. 18 at 77:1-5.)

If willingly disclosed, race is only one factor among many that Admissions staff members may consider when individually assessing applicants. (Ex. 39 at UNC0323609-10; Ex. 4 ¶24; Ex. 7 ¶25.) The University does not employ quotas or separate processes for considering applicants of different races or ethnicities; readers are not privy to how many applicants of any racial or ethnic group have been offered admission; and decisions are not revisited to admit additional students from any racial or ethnic group. (Ex. 4 ¶¶25, 29, 33; Ex. 7 ¶¶25, 55.) These practices align with Supreme Court guidance. *See Grutter*,

29

539 U.S. at 334 (finding universities may consider race "flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant").

SFFA has uncovered no contrary evidence. No reasonable trier of fact could conclude on this record that the University uses quotas, engages in racial set asides or point allocations, or intentionally discriminates against applicants based on race. Indeed, SFFA's experts confirmed that they will *not* offer expert opinions contending otherwise. (Ex. 18 at 27:3-28:2; Ex. 19 at 42:21-44:15.)

## 2. Race does not dominate admissions decisions.

SFFA nevertheless would have the Court believe that race dominates the University's admissions decisions. In other words, SFFA contends that race is more than a "plus" factor. (Compl. Count I.) This is wrong. The Admissions Office does not automatically give a plus for an applicant's race, nor does consideration that is given guarantee admission. (Ex. 39 at UNC0323609-10.) Instead, this factor, like all others, is always considered in the context of everything else known about a candidate and in light of the range of contributions the candidate might make to the University. (*Id.*)

Of course, it is necessarily true that where, as here, a university considers a highly competitive applicant pool—more than 40,000 applicants for a class of roughly 4,000—any plus factor (race or other) may be significant enough in an *individual* case to tip the scales toward admission. But this case is not about whether race could have tipped the

30

scales toward an individual applicant's admission.[8] Instead, SFFA's claim is that the University uses race in an outsized way that negates the individualized nature of its holistic admissions process. (*See* Compl. ¶199.) In a lawsuit based on that assertion, the germane question is not whether an applicant's race might have an effect on some portion of decisions. It is whether *the entire admissions program* is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337; *see also Fisher I*, 570 U.S. at 309.

Viewing this case through the lens of Supreme Court precedent, rather than SFFA's reimagined interpretation of it, shows that there are no disputes of *material* fact. Unquestionably, the competing experts in this case disagree on many issues, including the construction of an appropriate statistical model of the admissions process and the resulting conclusions. But the material point in this case—the empirical invalidity of SFFA's claim of systemic race-based admissions—stands undisputed. In analyzing the University's entire applicant pool, Hoxby found that race explains, at most, a very small share of applicants' admissions outcomes. (Ex. 22 ¶¶53-55, Ex. 1, Table 1.) Indeed, she reached the same conclusion after applying accepted statistical methodologies to the competing models submitted by SFFA's expert. (Ex. 23 ¶¶12-18, Ex. 1, Table 1.)

---

[8]   Indeed, SFFA could not pursue such a case because a sparing and individualized use of race is considered a "hallmark of narrow tailoring." *Fisher II*, 136 S.Ct. at 2212; *Grutter*, 539 U.S. at 339.

Arcidiacono does not refute this analysis. Thus, unrebutted statistical analysis of the University's entire applicant pool demonstrates that race is *not* a dominant factor in admissions; it is one factor among many in a complex admissions process.

The only contradictory expert "evidence" SFFA can muster is based on a non-representative *subset* of applicants. Like Hoxby, Arcidiacono constructed a statistical model that attempts to replicate the admissions outcome for past University applicants. (Ex. 25 at 17-18.) Even if this model were reliable—and Hoxby shows it is not (Ex. 23 ¶¶7-8, 75-78)—Arcidiacono's ensuing analysis and conclusions are irrelevant and immaterial for two reasons.

First, as Arcidiacono acknowledges, he intentionally *excluded* from his statistical analysis applicants for whom race did not play any role. (Ex. 26 at 29 n.20.) That exclusion ignores the Supreme Court's guidance that analysis in cases like this one must go beyond individual data points and must address the applicant pool in its entirety. As the Court explained in *Fisher II*: "The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality." 136 S. Ct. at 2212; *see also Grutter*, 539 U.S. at 339 (recognizing that under constitutionally permissible admissions plans race could be "likely outcome determinative" for certain members of minority groups). By excluding these applicants from his analysis, Arcidiacono rendered his opinions immaterial. He has chosen to ignore the central question here: whether race was a predominant factor in the *overall* admissions process. (Ex. 23 ¶43.)

32

Second, along these same lines, Arcidiacono improperly relies on anecdotal analysis of a handful of *hypothetical* Asian and White applicants. He concludes that if these applicants were "transformed" into underrepresented minorities, and "all other characteristics stayed the same," these hypothetical applicants "would be transformed into highly likely admits." (Ex. 25 at 43.) Based on these limited, extreme examples, he posits that race plays an outsized role across the board. But as Hoxby explains, these selective, hypothetical examples are not representative of outcomes across the entire admissions process.[9] (Ex. 23 ¶¶58-60.) Moreover, even using Arcidiacono's own calculations, the median change in admissions probability for an Asian in-state applicant who is hypothetically "transformed" into an African-American applicant is an increase of only 2.6%. (*Id.* ¶61.) Arcidiacono does not rebut this conclusion. Thus, even Arcidiacono's flawed and misleading transformation exercise shows that race plays a small role in the overall admissions process.

Because Arcidiacono's analysis does not address SFFA's claim of system-wide discrimination, it does not create any dispute of *material* fact. *See Anderson*, 477 U.S. at 247-48 ("Only disputes over facts that might affect the outcome of the suit under the

---

[9] Additionally, Arcidiacono artificially divides the applicant pool into deciles based on GPA and SAT score (even though there is no record evidence that UNC does any such thing and Arcidiacono admitted he imported this concept from his work in the Harvard litigation). (Ex. 18 at 63:23-64:13.) After re-sorting applicants into a ranking of his own making, Arcidiacono draws 75% of his "transformation examples" from a decile that accounts for only 6% of University admits. (Ex. 23 ¶53.)

33

governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."); *see also Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 751 (4th Cir. 2016) (citing *Anderson*, 477 U.S. at 247-48 ("While conflicting testimony can indeed preclude summary judgment, any inconsistency must concern a material fact.")). Because there is no genuine issue of material fact on SFFA's claim that the University improperly uses race as more than a plus factor, the University is entitled to summary judgment on Count I.

### 3. The University has explored, but has been unable to find, a workable race-neutral replacement for race-conscious, holistic review.

The University's admissions process is narrowly tailored because no race-neutral alternative would promote its interest in diversity "'about as well and at tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312). "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Fisher I*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339-40). Nor does it "force universities to choose between a diverse student body and a reputation for academic excellence." *Fisher II*, 136 S. Ct. at 2213 (citing *Grutter*, 539 U.S. at 339). Rather, the University must show that it engaged in "serious, good faith consideration of workable race-neutral alternatives," *Grutter*, 539 U.S. at 339, and that these alternatives do not provide an "'available' and 'workable' means through which the University could

[meet] its educational goals, as it under[stands] and define[s] them." *Fisher II*, 136 S. Ct. at 2214 (quoting *Fisher I*, 570 U.S. at 312).

The University has devoted substantial resources to considering whether race-neutral alternatives could allow it to meet its educational goals. Over the course of more than ten years, the Admissions Office and two University-wide committees have analyzed numerous alternatives, including many that SFFA suggests. (*Compare supra* at 18-20 *with* Compl. ¶¶66, 74.) In each instance, this work has yet to reveal any race-neutral alternative that would allow the University to achieve racial diversity about as well, without sacrificing academic quality. *See Fisher II*, 136 S. Ct. at 2208 (establishing that standard).

The University's expert independently reached the same conclusion. Hoxby performed exhaustive econometric analysis, testing more than 100 permutations of race-neutral admissions simulations. (*Supra* at 21-23.) In each scenario, she drew assumptions in *favor* of the success of the alternative, attempting to maximize the chances that it would attain the University's current level of racial diversity and academic preparedness. (*Supra* at 22-23.) Despite searching for the alternative most likely to succeed, none of the simulations resulted in an admitted—much less matriculating—class with the same level of racial diversity and academic preparedness as the University currently achieves. (Ex. 24 ¶61.)

Tellingly, Kahlenberg failed to respond to Hoxby's analysis on the merits.[10] (*Id.* ¶¶71-72.) Instead, Kahlenberg asserted that the University should broaden its definition of socioeconomic disadvantage to account for an applicant's "wealth" rather than income. (Ex. 28 at 5-6.) But this disregards that the University engages in need-blind admissions—meaning it does not consider applicant income information—and that the University does not possess applicant wealth information. (Ex. 125 ¶¶6, 9-16.) Moreover, no undergraduate institution has ever employed such a measure. (*Id.* ¶¶8, 32; Ex. 24 ¶¶64-66; Ex. 19 at 129:18-130:1.)

Likewise, Kahlenberg failed to simulate any geography-based race-neutral alternatives of his own, claiming instead that certain simulations considered by Hoxby showed "promise" and that it was "disappointing that Hoxby [gave] up so easily." (Ex. 29 at 48.) But the Supreme Court's mandate that the University engage in a serious, good-faith effort to consider race-neutral alternatives does not mean that SFFA can force the University to play an endless game of whack-a-mole in which it must systematically test every concept that SFFA can imagine. *See Fisher I*, 570 U.S. at 312. The University has continuously and reasonably assessed race-neutral alternatives, and no evidence reveals a

---

[10] Rather than constructing a model and running admissions simulations himself, Kahlenberg (who is not an economist) devised "high level" instructions for Arcidiacono, who implemented them. (Ex. 19 at 57:13-58:12, 69:21-70:7.) Even though the simulations and opinions appear exclusively in his reports, Kahlenberg had never seen the underlying work papers and could not answer questions about the methodology as he abdicated significant responsibility to Arcidiacono. (*Id.* at 69:1-20, 73:4-13, 81:3-18, 83:20-22, 145:15-22.)

36

workable alternative that could enable it to achieve its educational mission. It has met its constitutional obligation.

Nor would enhancing the race-neutral strategies already employed by the University create a workable race-neutral *alternative* to its current admissions approach. Without any detailed analysis or evidence, Kahlenberg asserts that the University could do "more" to recruit minority students, partner with disadvantaged high schools, and increase transfers from community colleges. He admits that none of these alternatives could, on their own, replace the University's current admissions approach; however, he insists that increased efforts would enable the University to move away from the consideration of race as part of a holistic review. (Ex. 19 at 167:11-15, 180:6-9; Ex. 27 at 57-62, 64.) This unsupported assertion cannot create a material issue of fact. Moreover, Kahlenberg's assertions constitute an attempt to substitute his judgment for the University's and ignore record evidence showing that the University *already* takes advantage of these strategies. (*Supra* at 15-18.)

### 4. Socioeconomic diversity is not an adequate substitute for racial diversity.

Kahlenberg, a self-described proponent of socioeconomic affirmative action, attempts to change the legal standards by urging that a race-neutral alternative must be employed if it results in *socioeconomic* diversity. (*See* Ex. 29 at 56; *see also* Ex. 19 at 20:11-14; Ex. 27 at 1, 44.) Kahlenberg believes that a drop—even a significant drop—in racial diversity is acceptable if an admissions practice can achieve socioeconomic

37

diversity. (Ex. 27 at 44; Ex. 19 at 121:7-122:1.) He implies that this continues to hold true even if the University would fall in the national rankings. (Ex. 27 at 52.)

Any debate as to whether Kahlenberg's opinions can create a genuine issue of material fact should end here because the law does not require what Kahlenberg advocates. The Supreme Court has recognized the distinct educational benefits of racial diversity. *Fisher II*, 136 S. Ct. at 2210; *Grutter*, 539 U.S. at 330. So too has Kahlenberg. (Ex. 19 at 187:5-14; Ex. 123 at 76:1-78:4). Attaining these distinct benefits is a compelling interest that the University may pursue through race-conscious admissions practices, so long as no workable race-neutral alternative exists. *See Fisher II*, 136 S. Ct. at 2208; *Fisher I*, 570 U.S. at 312.

Kahlenberg's personal advocacy for socioeconomic-based admissions and interpretation of Supreme Court precedent has no bearing on whether the University can implement a race-neutral alternative that allows it to achieve racial diversity.[11] In the University's judgment—which is entitled to deference—socioeconomic diversity, while separately important to the University, is not a substitute for racial diversity. In order to defeat a motion for summary judgment by creating a genuine issue of material fact, an expert opinion must be more than a conclusory assertion about ultimate legal issues.

--------

[11] In many instances, Kahlenberg's "opinions" read more like a summary judgment brief than an expert report; he makes legal arguments and attempts to apply the facts to the law. This is improper. To the extent SFFA attempts to introduce this testimony at either summary judgment or trial, the University reserves its right to move to strike.

*Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993). Kahlenberg's opinions address the wrong question and are therefore immaterial.

The record establishes that the University has carried its burden and undertaken a good faith consideration of race-neutral alternatives. Having found none that could feasibly achieve the diversity or academic standards it seeks, the University has established that its current use of race is permissible. The Court should grant summary judgment to the University on Count II.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss SFFA's Complaint in its entirety with prejudice.

Respectfully submitted this 18th day of January, 2019.

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

/s/ Patrick Fitzgerald
Patrick Fitzgerald
Amy L. Van Gelder
Lara Flath
Marianne Combs
Skadden, Arps, Slate, Meagher & Flom,
LLP
155 North Wacker Drive
Chicago, IL 60606-1720
(312) 407-0700
E: patrick.fitzgerald@skadden.com
E: amy.vangelder@skadden.com
E: lara.flath@skadden.com
E: marianne.combs@skadden.com

Joshua H. Stein
  Attorney General

/s/ Stephanie Brennan
Stephanie Brennan
Special Deputy Attorney General
NC State Bar No. 35955
E: sbrennan@ncdoj.gov

/s/ Nora Sullivan
Nora Sullivan
Assistant Attorney General
NC State Bar No. 43284
E: nsullivan@ncdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed 9,500 words.

This 18th day of January, 2019.

/s/ Patrick Fitzgerald
Patrick Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment and all related exhibits via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 18th day of January, 2019.

/s/ Patrick Fitzgerald
Patrick Fitzgerald
