# EXHIBIT 5

# Declaration of Jennifer Kretchmar

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNIVERSITY OF NORTH CAROLINA et al., <br><br> Defendants. | CASE NO. 1:14-CV-954 |

## DECLARATION OF JENNIFER KRETCHMAR

I, Jennifer Kretchmar, hereby make this declaration from my personal knowledge and, if called to testify to these facts, could and would do so competently:

## I. Background and Role in Admissions Office

1. I am the Associate Director for Research and Analytics in the Office of Undergraduate Admissions at The University of North Carolina at Chapel Hill (the "University"). In this role, I am involved in all aspects of application evaluation. Additionally, I lead efforts related to research used to inform our messaging to current and prospective students, surveys that provide insights about applicants and our competition, and data reporting on applications and admissions statistics.

2. I attended Pennsylvania State University on an athletic and academic scholarship. I earned a degree in Psychology and graduated Phi Beta Kappa in 1993. I then entered a doctoral program in educational psychology at The University of North Carolina at Chapel Hill and graduated with a Ph.D. in 2001. Throughout my graduate studies and early work experience, I regularly utilized quantitative and qualitative research methods to help develop performance-based examinations for North Carolina medical schools, and to conduct program evaluations of state-level federally-funded special education programs.

3. In July of 2002, I was hired as a Senior Assistant Director of Research in the Office of Undergraduate Admissions at the University. I was promoted to Associate Director for Research and Analytics in 2017 and report to Stephen Farmer, the Director of Undergraduate Admissions.

2

4. As Associate Director for Research and Analytics, I conduct research and analysis to assist other Undergraduate Admission Office leaders in determining whether various admissions approaches are helping to achieve our admissions goals.

5. I also helped to create and run the Undergraduate Admissions Office yield model, which is a statistical tool we use to predict enrollment based on historic enrollment trends and the applicants' residency status.

6. I also serve on University committees. I was a member of the Working Group on Race-Neutral Alternatives, which was convened in 2013, and presently serve as a consultant to the Faculty Advisory Committee on Race-Neutral Strategies.

## II. The University has Diligently Considered Race-Neutral Alternative Admission Approaches

7. During my time in the Undergraduate Admissions Office, I have been involved in the University's efforts to assess race-neutral alternatives to our current admissions approach.

### A. The 2009 Race-Neutral Alternatives Literature Review.

8. In 2009, I conducted an extensive review of published studies regarding race-neutral admissions practices at the direction of Mr. Farmer. Because most of the intentional implementations of race-neutral admission policies were adopted in the late 1990's and early 2000's, my 2009 review benefited from the passage of time and extensively researched literature, which provided more fully informed guidance regarding the impacts of race-neutral policies on diverse student bodies.

9. As a first step, I searched for, located, and reviewed descriptions and commentary in order to identify the race-neutral alternatives considered promising by experts at the time. I also researched which states had banned the use of race or ethnicity in college admissions and determined which schools had adopted race-neutral approaches to admissions as a result. I then found available literature analyzing the prevailing race-neutral alternatives and their impact on representation within the enrolling class, applicant behavior, and student quality and academic performance. Ultimately, I reviewed twenty-five leading studies, papers, and articles related to race-neutral alternatives, including reports issued by the Department of Education.

10. The literature I reviewed on race-neutral admissions plans focused on two broad categories—plans based on socioeconomic factors and plans based primarily on class rank. My research included both theoretical discussion pieces and reports based on statistical modeling of the outcomes of these plans.

11. Based on my in-depth review of the selected literature, I concluded that the race-neutral alternatives proposed and implemented up to that time failed to achieve the levels of diversity sought and attained through a holistic approach to admissions, which gives consideration to an applicant's race and ethnicity, among all other characteristics. Furthermore, race-neutral alternatives that managed to establish the desired levels of diversity did so by compromising the academic quality of the enrolling class.

12. Following my review and analysis of the selected literature, I drafted a summary of my work and findings, titled "Literature Review of Race-Neutral Research,"

4

which I sent to senior Admissions Office leadership in June 2010. (*See* Ex. 41 (J. Kretchmar Research Compendium (2009 Literature Review)), UNC0079519-31.)

### B. The University has conducted statistical analyses of race-neutral alternatives.

13. In the Spring of 2012, Mr. Farmer asked me to analyze the hypothetical impact of adopting a Top Ten Percent Plan for admitting in-state applicants to the University. This type of plan would automatically admit students in the top 10% of their graduating high school classes.

14. To conduct this analysis, I used data about North Carolina students who applied for admission to the University for the first-year class enrolling in 2012. (*See* Ex. 40 (Top 10 Percent Plan (2012 Analysis)), UNC0079622.) First, I identified those students from North Carolina high schools who reported a class rank in the top 10% of their graduating classes. (*Id.*) Next, I used the Undergraduate Admissions Office's yield model to project how many of those students would have enrolled at the University had all of them been offered admission. (*Id.*) I also calculated how many spots would have remained for North Carolina students who were outside the top 10% of their graduating classes. (*Id.*) I then used these projections to develop a profile of the hypothetical class admitted and enrolled under a Top Ten Percent Plan. (*Id.*)

15. I then compared the class profiles of the hypothetically admitted and enrolled students with those students actually admitted and enrolled by the University using its holistic approach to admissions. (Ex. 40.) My analysis determined that a Top Ten Percent Plan would yield a marginal increase in the percent of underrepresented

5

minority students in the class but, with one obvious exception—the share of the class ranking in the top 10% of their high school classes—would cause a decline along every single academic indicator, including GPA and standardized test scores. (*Id.*)

16. Additionally, under this hypothetical Top Ten Percent plan, the admission rate for North Carolina students not in the top 10% percent of their graduating class would decline from 31% to 10%, excluding many candidates offered admission under a comprehensive, holistic, and individualized review. (*Id.*)

17. I shared the results of my work with Mr. Farmer, and we subsequently shared these findings with the Advisory Committee on Undergraduate Admissions.

### C. The Admissions Office gave serious consideration to race-neutral alternatives through the work of the Working Group on Race-Neutral Alternatives.

18. I served as a member of the Working Group on Race-Neutral Alternatives ("Working Group"), which was convened by the Undergraduate Admissions Office in November 2013. (*See generally* Exs. 42-46 (Working Group to Consider Race-Neutral Alternatives to Admissions Agendas), UNC0079624, UNC0079613, UNC0079724-25, UNC0079650, UNC0079822.) The Working Group's charge was to identify potential alternatives to race-conscious practices in admissions; to evaluate each alternative and determine whether it would yield an entering class with equal or greater diversity and academic quality; and to present its findings to the Advisory Committee on Undergraduate Admissions.

19. The Working Group was chaired by Barbara Polk, Deputy Director of Undergraduate Admissions. The other Working Group members were academic

6

administrators and faculty members encompassing a broad range of backgrounds and expertise, including professors from a variety of departments, the University's Chief Diversity Officer, a member of the Office of University Counsel, and administrators from the business school and other strategic departments, among others. (*See* Ex. 49 (Exploring Race-Neutral Alternatives in Undergraduate Admissions ("White Paper")), UNC0283540-68, at UNC0283561.)

20. Building from my 2009 literature review, the Working Group assessed the legal history and framework of race-conscious admissions, as well as the leading literature identifying race-neutral alternatives. Based on this review and our professional experience and judgment, and remaining mindful of the University's mission and goals, the Working Group identified five alternatives to test. (*See* Ex. 42 (Working Group to Consider Race-Neutral Alternatives to Admissions Agenda - December 19, 2013), UNC0079624; Ex. 43 (Working Group to Consider Race-Neutral Alternatives to Admissions Agenda - January 15, 2014), UNC0079613.)

21. The alternatives that the Working Group identified were:

(a) A percentage plan guaranteeing admission to students in the top 10% of their high school class;

(b) A percentage plan that accounted for the University's enrollment constraints by guaranteeing admission to students in the top 4.5% of their high school class;

(c) A percentage plan that guaranteed admission to top-ranked students while also considering socioeconomic diversity by admitting more students from low-income high schools;

(d) An approach that used strength of a student's high school curriculum and standardized testing threshold as criteria for admission; and

7

(e) An approach that would guarantee admission to students with a standardized test score above a certain threshold.

(*See* Ex. 49 at UNC0283556-57; Ex. 44 (Working Group to Consider Race-Neutral Alternatives to Admissions Meeting Minutes - February 26, 2014), UNC0079724-25.)

22. The Working Group had two primary criteria for assessing the admitted classes that resulted from these race-neutral alternatives as compared to the class admitted under the University's holistic review: (a) the extent to which alternatives resulted in an admitted class of equal or greater academic quality, and (b) the extent to which alternatives resulted in an admitted class of equal or greater diversity. (*See* Ex. 49 at UNC0283540; Ex. 44 at UNC0079725.)

23. Based on insights from my earlier Literature Review and review of subsequent scholarship on the subject, we recognized that a change in the University's admissions approach would likely result in a change in the University's applicant pool. To account for those changes in the applicant pool, the Working Group therefore decided to expand the data used to analyze potential alternatives beyond the data pertaining to those candidates historically in the University's applicant pool. (*See* Ex. 49 at UNC0283553.)

24. To do so, we requested and obtained data from the North Carolina Education Research Data Center ("NCERDC"). The NCERDC maintains a robust set of data for North Carolina public high school students that contains academic metrics like class rank, test scores, and number of Advanced Placement courses taken; demographic metrics, including gender and ethnicity; and metrics that describe the socio-economic

8

environment in which schools reside such as the percent of students receiving free and reduced price lunch, expenditures per student and teacher turnover. (*See id.* at UNC0283554.)

25. The Working Group also obtained data for North Carolina private school students. Although data for high school graduates of North Carolina private and parochial schools is not housed in a single repository, we obtained aggregate data from the College Board Enrollment Planning Service ("EPS") for the University's top twenty private feeder high schools in North Carolina. (*See id.* at UNC0283559; Ex. 45 (Working Group to Consider Race-Neutral Alternatives to Admissions Agenda - October 23, 2014), UNC0079650.)

26. Unfortunately, comparable data about a similarly hypothetically expanded out-of-state applicant pool was unavailable due to the potential size of the pool and the lack of a central repository for such data with respect to a nationwide pool. (*See* Ex. 49 at UNC0283554.) For this reason, we modeled the impact of race-neutral alternatives using data from out-of-state students who actually applied to the University in the 2011-2012 admissions cycle. (*Id.*)

27. I first analyzed the impact of the alternatives identified by the Working Group on the in-state, public high school portion of the incoming class and determined they could not achieve the University's diversity goals, while maintaining the high academic quality of the actual admitted class.

28. A plan that would guarantee admission to North Carolina residents in the top 10% of their high school class was not a viable alternative because it yielded an

9

admitted class nearly double the size of the actual admitted class. While the racial and ethnic diversity remained largely identical to that of the actual admitted class, and socio-economic diversity increased, the academic quality dropped along all metrics other than the number of students in the top 10% of their class. (*See* Ex. 49 at UNC0283556.)

29. A plan offering automatic admission to students graduating in the top 4.5% of their high school class would admit a class size that the University could accommodate. (*See id.* at UNC0283556-57.) However, under this plan, the admitted class would be both less diverse and less academically qualified than the actual admitted class. Specifically, use of the top 4.5% plan caused a 2% drop in under-represented minorities in the admitted class, and a decrease in students identifying as non-white, from 30.6% of the admitted class to 24% of the admitted class. (*Id.* at UNC0283557.) Additionally, the average SAT score would drop, and less than half of the admitted class would have taken five or more Advanced Placement courses (compared with 92% of the class admitted under holistic review). (*Id.*)

30. The final top percentage plan we analyzed would grant automatic admission to the top 7.5% attending high poverty schools, and the top 3% attending low poverty schools, in an attempt to increase socioeconomic diversity. (*See* Ex. 49 at UNC0283557.) This plan yielded mixed results. While the resulting admitted class reflected an increase of 1.4 percentage points in underrepresented minority students, as well as an increase in socioeconomic diversity, the academic quality of the group again suffered. (*Id.*) Indeed, the average SAT score of a class admitted under this plan would

10

fall over 100 points and only 40% of students in the admitted class would have taken five or more Advanced Placement courses. (*Id.*)

31. The Working Group also considered an admission plan based on strength of high school curriculum, hypothetically granting automatic admission to North Carolina public high school graduates who pursued five or more Advanced Placement courses. (*Id.*) To admit a class the same size as the actual admitted class, we added a testing threshold as well: 1150 or higher on the SAT. (*Id.*) Though this plan produced an admitted class with SAT scores and strength of curriculum roughly equal to the class admitted under holistic review, racial, ethnic, socioeconomic, and geographic diversity declined significantly. (*Id.*) Of the class that would be admitted under this plan, only 6.4% of the class would identify as underrepresented minorities, compared to 16.4% admitted under the University's holistic review. (*Id.*)

32. The approach granting automatic admission based on SAT scores also resulted in a significant drop in the diversity of the enrolling class. (*See* Ex. 49 at UNC0283557-58.) This alternative approach contemplated automatically admitting high school students who earned a combined score of 1280 or higher on the Critical Reading and Math portions of the SAT. (*Id.* at UNC0283557.) Though this plan would increase the average test score compared to the class admitted under holistic review, the class would be weaker in terms of class rank, strength of curriculum, and racial and ethnic diversity—only 4.8% of this group would identify as underrepresented minorities. (*Id.* at UNC0283558.)

11

33. Based on the analysis outlined above, the Working Group concluded that none of the race-neutral alternatives modeled on the in-state portion of the entering first year class were effective at producing comparable levels of diversity and academic quality as the University's holistic admissions practices.

34. The Working Group also modeled a hypothetical admitted class of North Carolina private high school graduates. (*See* Ex. 49 at UNC0283559.) However, we could not test each of the five proposed race-neutral alternatives on this population due to limitations in our data. (*Id.*)

35. Because so few students attending North Carolina private and parochial high schools report official class ranks, modeling a top percentage plan with this population of students was not feasible. (*Id.*) Instead, we used the College Board ESB aggregate academic and demographic data for each of our top twenty North Carolina private feeder high schools. (*Id.*) Together, these twenty high schools accounted for 60% of all admitted students from North Carolina private schools. (*Id.*) For each school we then calculated the percentage of non-whites and underrepresented minorities, the average SAT score, percentage first-generation college students, percentage of students taking at least one AP course, and average number of AP courses taken for the graduating class. (*Id.*) These indicators were then weighted by the number of students graduating from each private high school who typically apply to the University, thus rendering an approximated profile of all North Carolina private high school graduates applying to the University. (*Id.*) From that applicant pool, I created a hypothetical admitted class of North Carolina private school students. (*Id.*)

36. In terms of diversity, this hypothetical class largely mirrored the actual class of admitted North Carolina private school students with small drops in the percentage of underrepresented minority and non-white students. (*See* Ex. 49 at UNC0283559.) However, academic quality again declined with an estimated 200 point drop in SAT scores and a 25% drop in the number of students who had taken at least one AP course. (*Id.*)

37. We also modeled several race-neutral approaches on our out-of-state applicant pool. We analyzed the impact of a Top Ten percent plan, a Top 5 percent plan with a testing threshold, and an approach that guaranteed admissions based on a combination of grades and testing threshold. (*Id.* at UNC0283558-59.)

38. A Top Ten Percent Plan would exclude over half of our out-of-state applicant pool (because those students do not have an official class rank), but still yield an admitted class two thousand students larger than the actual out-of-state admitted class. (*Id.* at UNC0283558.) Therefore, the Working Group concluded that this plan was not feasible.

39. A Top 5 Percent Plan plus a testing threshold (SAT of 1230 or higher) was similar in size and academic quality to the class admitted under holistic review, but significantly less diverse. (*Id.*) Only 5.4% of this group identified as underrepresented minorities, compared to 27.1% of the class admitted under holistic review. (*Id.*) Moreover, similar to the Top Ten Percent Plan, this plan would also exclude over half of our out-of-state applicant pool. (*Id.*) As a result, the Working Group determined that this plan would not achieve the University's objectives for admitting a diverse class.

13

Case 1:14-cv-00954-LCB-JLW   Document 154-5   Filed 01/18/19   Page 14 of 18

40. In order to include applicants not reporting official class ranks, we tested a plan that granted automatic admission to all applicants with straight As during their four years of high school and an SAT score of 1220 or higher. (*See* Ex. 48 at UNC0283558.) While this approach produced a class with similar academic quality, it compromised racial and ethnic diversity. Only 7.2% identified as underrepresented minority, compared to 27.1% in the class admitted under holistic review. (*Id.* at UNC0283558-59.)

41. The Working Group discussed the results of the statistical analyses described above. We determined that none of the race-neutral alternative admission approaches, applied to any of the three segments of the University's applicant pool, would produce an admitted class equal to or stronger than the University's actual admitted class, chosen by holistic review, in terms of both diversity and academic quality.

42. In addition to our statistical analysis of potential race-neutral alternatives, the Working Group also considered a software program called Application Quest, which is a self-described holistic review software program that claims to maximize diversity without giving preferential treatment to applicants on the basis of race. (*See* Ex. 49 at UNC0283559-60; Ex. 45.)

43. On behalf of the Working Group, Barbara Polk and I attended a webinar hosted by the developer of Applications Quest and learned how the software operates. We shared this information with the Working Group. (Ex. 49 at UNC0283559.)

44. The Working Group identified several problems with the use of Application Quest. First, the software requires using predefined, minimum standards applied in a rigid and mechanistic way. (*Id.* at UNC0283560.) Such predefined cut-offs are antithetical to

the University's guiding principles and mission for the admission of its first-year class. (*Id.*; Ex. 45) They would also impede the University's goal of admitting, through individualized, comprehensive, and holistic review, an academically strong class with broad diversity across various categories, including diversity of background and experience, which would contribute most meaningfully to the UNC experience. (Ex. 49 at UNC0283560.)

45. Second, the software would result in a three-track application review—one for students falling below the predefined minimum standards, another for those evaluated using the software, and, finally, one for those deemed as exceptions to this process and these standards—that subjects different applicants to different processes or standards. This too contradicts the University's guiding principles and mission. (*Id.*)

46. For these reasons, the Working Group determined that Application Quest was not a viable alternative to the current practice of holistic evaluation.

47. With input from the other members of the Working Group, I drafted a report summarizing the group's activities and analysis, titled "Exploring Race-Neutral Alternatives in Undergraduate Admissions," which we refer to as the "White Paper." (Ex. 49.)

48. The White Paper was shared with the Undergraduate Admissions Office and later presented to the Faculty Advisory Committee on Undergraduate Admissions on January 19, 2016. (*See* Ex. 50 (Exploring Race-Neutral Alternatives in Undergraduate Admissions), UNC0374120-48; Ex. 51 (Exploring Race-Neutral Alternatives in

15

Undergraduate Admissions, January 19, 2016 PowerPoint presentation to Committee), UNC0323680-90.)

### D. The University continues to examine race-neutral alternatives.

49. I am a consultant to the University's Committee on Race-Neutral Strategies (the "Committee"), which was convened by the Faculty Advisory Committee in 2016 to build upon the efforts of the Working Group. The Committee is charged with identifying possible race-neutral admissions practices and assessing whether those practices would yield the undergraduate student body that the University requires in order to achieve its mission and provide the educational benefits of diversity.

50. Members of the Admissions Office provide support to the Committee. I am one of the support staff, along with Stephen Farmer. My role is primarily advisory; I answer questions regarding admissions posed to me by members of the Committee, respond to admissions data requests from the Committee, and provide other assistance as needed.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on January 14, 2019.

*Jennifer Kretchmar*
Jennifer Kretchmar
Associate Director for Research and Analytics

17