# EXHIBIT 31

**Expert Rebuttal Report of Bridget Terry Long, Ph.D., dated April 6, 2018**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:14-CV-954

STUDENTS FOR FAIR ADMISSIONS, INC.,    )
)
)
        Plaintiff,   )
)
v.   )
)
THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al.,   )
)
)
        Defendants.   )
)
)


**Expert Rebuttal Report of**
**Bridget Terry Long, Ph.D.**
**Saris Professor of Education and Economics**
**Harvard Graduate School of Education**


**April 6, 2018**

## TABLE OF CONTENTS

Page

I. SUMMARY AND INTRODUCTION ................................................................. 1

II. MR. KAHLENBERG IMPROPERLY ASSUMES SOCIOECONOMIC DIVERSITY
EQUATES TO AND ACHIEVES RACIAL AND ETHNIC DIVERSITY ........................... 3

    A. Research Shows that Socioeconomic Status-Based Admissions Policies Have
Not Worked as Substitutes for Race-Conscious Admissions Plans in Terms of
Replicating Racial and Ethnic Diversity.................................................................4

    B. Mr. Kahlenberg Fails to Consider the Quality of Research regarding SES-
Based Plans ...................................................................................................5

III. CONTRARY TO MR. KAHLENBERG'S ASSERTIONS, RACE-NEUTRAL
APPROACHES HAVE HAD ONLY LIMITED SUCCESS AND IN CONTEXTS
DISSIMILAR TO UNC-CHAPEL HILL...............................................................10

    A. Fewer Institutions Were Able to Implement Effective Race-Neutral
Approaches than Mr. Kahlenberg Suggests..............................................................10

    B. Research Demonstrates that the Texas Top 10% Plan Has Not Been Effective
in Maintaining Levels of Diversity ..............................................................10

    C. Mr. Kahlenberg Fails to Consider How a Change in Admissions Policy Would
Alter who Applies .........................................................................................11

    D. Mr. Kahlenberg Fails to Consider the Importance of Context and Tries to
Apply the Results from Institutions Dissimilar to UNC-CH .......................................12

    E. UNC-Chapel Hill Already Utilizes Some of the Admissions Practices Mr.
Kahlenberg Describes as Successful Race-Neutral Approaches ................................14

    F. Mr. Kahlenberg Overstates the Applicability of Non-Undergraduate
Institutions.................................................................................................15

IV. WHEN DISCUSSING OTHER RACE-NEUTRAL APPROACHES, SUCH AS
GEOGRAPHY-BASED PLANS OR ELIMINATING LEGACY PREFERENCES,
MR. KAHLENBERG CITES THEORETICAL SUGGESTIONS RATHER THAN
WORKABLE ALTERNATIVES. ..............................................................................15

V. RACE-NEUTRAL APPROACHES MAY HAVE A NEGATIVE EFFECT ON THE
ACADEMIC QUALITY OF AN INSTITUTION ..................................................18

VI. CONCLUSION..................................................................................................19

# I.      SUMMARY AND INTRODUCTION

1.      In this rebuttal report, I respond to the opinions put forth by Plaintiff's expert Richard Kahlenberg in his January 12, 2018 report relating to his literature review and opinions on workable race-neutral alternatives generally available to UNC-Chapel Hill.[1]  Although Mr. Kahlenberg and I generally discuss the same categories of potential race-neutral alternatives (including place-based race-neutral alternatives, such as percentage plans or geography-based plans, and socioeconomic-based alternatives), in my opinion, Mr. Kahlenberg overstates the availability and workability of race-neutral alternatives both generally *and* as those alternatives may apply to the circumstances of UNC-Chapel Hill.

2.      From the outset, it is clear that Mr. Kahlenberg's opinions and his proposed race-neutral alternatives are slanted in favor of his self-acknowledged advocacy for socioeconomic-based admissions practices with the goal of increasing the representation of low-income students at selective institutions.  Many of the flaws in his approach and opinions flow from the overweighted preference he places on socioeconomic-based admissions practices.

3.      In the context of this litigation, I understand that the relevant question is whether a socioeconomic status-based plan could serve as a workable substitute for a race-conscious admissions plan in terms of achieving racial and ethnic diversity without compromising UNC-Chapel Hill's high standards for academic achievement.  This is the central question I consider in my review of the research literature.  As shown by numerous studies, admissions policies focused on economic diversity (e.g., socioeconomic-based preferences) are not a substitute for policies that allow for the consideration of race and ethnicity because these socioeconomic-based policies do not result in maintaining levels of racial and ethnic diversity.  Yet Mr. Kahlenberg insists on evaluating a different question by asking whether a race-neutral alternative will increase diversity from both a racial *and* socioeconomic perspective. This reveals a misplaced focus in his opinions—both with respect to the academic research he cites and his purported simulations of potential race-neutral alternatives at UNC-Chapel Hill.  In many ways, Mr. Kahlenberg's focus on the desirability of increasing socio-economic diversity limits the contributions of his report.

4.      I also disagree with Mr. Kahlenberg's broad conclusion that "[e]xperience and academic research show that colleges and universities can maintain or increase diversity through race-neutral alternatives without sacrificing academic quality" (Kahlenberg Report p. 5).  In opining that these alternatives are available and effective, including that they are available to UNC-Chapel Hill, Mr. Kahlenberg does not adequately consider the *quality* and *quantity* of the evidence available on undergraduate admissions policies.  More specifically, in my opinion:

> a.      Mr. Kahlenberg's report glosses over the details of the studies he cites, and he does not demonstrate careful consideration of the data and research

---

[1] In his first "main opinion," Mr. Kahlenberg opines that "there is extensive empirical and academic research documenting the myriad (and innovative) ways in which colleges and universities such as UNC can use race-neutral alternatives to produce the educational benefits of diversity" (Kahlenberg Report p. 5).  Mr. Kahlenberg also discusses some of the research on race-neutral alternatives in the context of his third opinion that "there are race-neutral alternatives available that could provide UNC with the educational benefits of diversity without the use of racial preferences" (Id.).

1

methodologies used.  As a result, he fails to consider the degree to which each study presents *convincing* evidence, and he makes broad statements that are incorrect based on the details of the findings.  In fact, many of Mr. Kahlenberg's assertions are based on studies with limited data, unrealistic assumptions, and/or theoretical models that do not represent how applicants and institutions actually behave in the real world.

b.  In addition, Mr. Kahlenberg fails to consider the importance of institutional and state context in the determination of whether a race-neutral approach is successful.  Many of Mr. Kahlenberg's assertions are based on studies of institutions and contexts that are far different than UNC-Chapel Hill, which limits the reliability of his conclusions to this case.  Moreover, he fails to consider what conditions are necessary for a race-neutral approach to be effective. This is a serious flaw because, when it comes to race-neutral alternatives, there is no one-size-fits-all solution available to universities—especially to highly-selective universities like UNC-Chapel Hill, which place substantial priority on achieving both meaningful diversity *and* academic preparedness objectives.

c.  Mr. Kahlenberg also fails to consider factors related to the feasibility and implementation challenges of various alternatives.   He relies upon studies that use complex data and estimation techniques not ordinarily available to admissions committees rather than providing concrete examples of admissions policies that have been successfully implemented by institutions.

d.  Several of the alternatives presented by Mr. Kahlenberg, which he opines as being strategies that UNC-Chapel Hill could employ, are only theoretical suggestions that have been raised in the academic literature rather than workable alternative that have been implemented.  For example, Mr. Kahlenberg suggests a "version of the percentage plan could also be applied to out-of-state applicants by admitting top students from a variety of geographic locations, such as zip codes or College Board clusters" (Kahlenberg Report p. 76, fn. 291).  Mr. Kahlenberg provides no explanation or detail as to how UNC-Chapel Hill might implement such as plan, and I am aware of no institution that has studied, much less implemented, an out-of-state geography-based race-neutral alternative. The consideration of giving admissions preference according to geographic zip code has only been discussed in a theoretical way without any kind of real simulation or pilot test.

5.  I note that, in contrast to Mr. Kahlenberg's approach, in the expert report I submitted on January 12, 2018 (which I refer to as my affirmative report), I carefully considered the quality of each research study and the details of the evidence to form my conclusions about the various race-neutral alternatives that UNC-Chapel Hill might consider (or continue to consider).  Indeed, as I mentioned in my affirmative report and based on my review of Mr. Kahlenberg's report, not all research studies are equally convincing due to the data used, the

2

methods of analysis, and the context studied. Some studies are better able to identify the effects of an admissions policy change separate from other factors and trends happening at the same time, and my conclusions rely on this kind of research. Moreover, the studies I consider to be the most persuasive tend to have detailed information on large groups of applicants over time to give a comprehensive sense of the effects of a policy not only on the racial composition of accepted applicants but also other factors such as academic preparation levels. The most convincing studies test the veracity of their results by also considering counterfactual arguments and exploring other possible interpretations of the findings. Once taking into account these research details, my conclusions deviate strongly from Mr. Kahlenberg's.

6.      In addition to the qualifications set forth in my affirmative report, I note that I am qualified to offer these opinions, due to my educational and professional background, including a Ph.D. in Economics and years of experience doing original research using a variety of quantitative data sets and analytical approaches. This has well prepared me to evaluate the quality of research, especially complex empirical studies and simulations. In contrast, Mr. Kahlenberg lacks the training of a quantitative researcher, and he is not an economist or statistician.

7.      None of the academic literature or research cited by Mr. Kahlenberg change any of the opinions offered in my original report with respect to the race-neutral alternatives that I concluded UNC-Chapel Hill should consider evaluating. As in my affirmative report, I do not opine on the evaluation of or actual implementation of any of these alternatives at UNC-Chapel Hill. I understand that Professor Caroline Hoxby has done so for the University and will respond to the simulations included in Mr. Kahlenberg's report.

## II.    MR. KAHLENBERG IMPROPERLY ASSUMES SOCIOECONOMIC DIVERSITY EQUATES TO AND ACHIEVES RACIAL AND ETHNIC DIVERSITY

8.      A major theme and benchmark that runs throughout the Kahlenberg report is his clear desire to increase socioeconomic diversity at selective institutions (Kahlenberg Report p. 9 ("The enhancement of socioeconomic diversity that flows from these plans is critical from an educational and legal perspective, because the educational benefits of diversity arise from the interchange of ideas and experiences with those from different financial circumstances just as surely as those from different racial backgrounds.")). Indeed, in each of the results of the race-neutral alternative simulations purportedly performed by Professor Arcidiacono and discussed by Mr. Kahlenberg in Section VI, the results are reported in terms of racial and socioeconomic status (Kahlenberg Report p. 73 ("the critical measure is the net impact on socioeconomic and racial diversity taken together")).

9.      The question of whether and how institutions could increase socioeconomic diversity is an important topic in higher education, but the relevant issue for this case is not whether a socioeconomic based alternative is preferred as a policy matter, but rather whether a socioeconomic status-based policy is a workable alternative to race-conscious admissions. In other words, the key question is whether an admissions policy that focuses on socioeconomic status but does not consider race in any way would replicate the levels of racial and ethnic diversity achieved through race-conscious policies without sacrificing other important goals such

as academic excellence.  Thus, Mr. Kahlenberg's strong preference for socioeconomic diversity limits the value and utility of his opinions in light of the question presented in the litigation.

### A. Research Shows that Socioeconomic Status-Based Admissions Policies Have Not Worked as Substitutes for Race-Conscious Admissions Plans in Terms of Replicating Racial and Ethnic Diversity

10.     As I observed in my affirmative report (e.g., Long Report ¶ 125), the rationale for considering a socioeconomic status ("SES")-based preference as a possible race-neutral alternative is that race and income are correlated, i.e., many underrepresented applicants are also from low-income families.[2]  However, as I explained in my affirmative report, research has documented that race and income are not perfectly correlated.  As I describe below, the research literature documents that most applicants from low-income families are White, and so SES-based admissions policies typically would result in giving preference to many more White applicants than African-American or Hispanic applicants.  Thus, I disagree with Mr. Kahlenberg's broad assertions that "[s]ocioeconomic factors such as income and wealth are *highly* correlated with race" (Kahlenberg Report p. 22 (emphasis added)).

11.     An important study on this topic was completed by William Bowen and co-authors.  Mr. Kahlenberg recognizes Bowen as a major authority on issues in higher education, citing the praise Bowen has given Kahlenberg on his contributions towards arguing for "stronger efforts to address disparities by socioeconomic status" (Kahlenberg Report p. 2).  Bowen's own extensive analysis, however, underscores that SES-based plans are not substitutes for admissions policies that allow the consideration of race.  Bowen, Kurzweil, and Tobin (2005) use data from 18 selective institutions, including 3 public flagship universities, to simulate the effects of giving preference to applicants from low-income families while also removing race-based consideration, and they conclude that doing so would reduce minority enrollment by nearly half.[3]

12.     Other studies also conclude that SES-based policies do not produce the same levels of diversity as race-conscious policies.  For example, Cancian (1998) uses a nationally-representative data set of students to simulate the effects of different admission scenarios and concludes that admissions policies based on class or economic status do not produce the same results as programs that consider race.  Cancian's simulations suggest that "many minority youths would not be eligible [under class-based admissions] and many eligible youths would not be members of racial or ethnic minority groups" (p. 104).  Stated another way, when focusing on the low-income population in the country, one will find that most poor families are White.[4]

13.     Mr. Kahlenberg also cites Alon (2015) to support his opinion that "broad reform"—such as eliminating legacy, athletic, and racial preferences—along with a "socioeconomic boost" can replicate and even increase levels of racial and ethnic diversity

---

[2] Indeed, I opined in my affirmative report that UNC-Chapel Hill should carefully consider a SES-based plan in the context of evaluating race-neutral alternatives.
[3] Bowen, William G., Martin A. Kurzweil, and Eugene M. Tobin. (2005). *Equity and Excellence in American Higher Education.* University of Virginia Press.
[4] Cancian, Maria. "Race-Based versus Class-Based Affirmative Action in College Admissions." *Journal of Policy Analysis and Management* 17, no. 1 (1998): 94-105.

4

(Kahlenberg Report at 13).[5]  Although there are some questions about the robustness of this specific analysis that I discuss below, Alon's ultimate takeaway is the *opposite* of what Mr. Kahlenberg describes.  She highlights that there are tradeoffs between class- and race-based admissions policies.  As Alon summarizes in the introduction, "the student bodies of elite colleges would be substantially less diverse racially and ethnically under all types of class-based affirmative action relative to current race-based policy" (p. 40).  Although Alon makes a compelling argument for the special consideration of socioeconomic status in admissions, she concludes that it may not be possible to also have racial and ethnic diversity without also taking race into account.  She writes, "perhaps the best route for generating broad diversity would be a race-within-class model" in which socioeconomic status would be considered, and within group, race would be an admissions factor.  Such a model would replicate current levels of racial and ethnic diversity, but this kind of policy would require, as she acknowledges, "the abandonment of race-neutrality" (p. 41).

**B.    Mr. Kahlenberg Fails to Consider the Quality of Research regarding SES-Based Plans**

14.    Mr. Kahlenberg cites several other studies as support for his advocacy for the effectiveness of SES-based admissions policies.  In each instance, however, Mr. Kahlenberg overstates the persuasive nature of these research studies in supporting his assertion that "[a]cademic research shows selective universities can employ effective race-neutral strategies" and "valuable research has emerged identifying concrete ways in which universities increase racial diversity through race-neutral means" (Kahlenberg Report p. 11).

15.    In support of his sweeping assertions regarding the ability of SES-based plans to achieve racial diversity, Mr. Kahlenberg cites a 2014 study by Anthony Carnevale, Stephen Rose, and Jeff Strohl (Kahlenberg Report p. 11-12).  He emphasizes their conclusion that if class-based affirmative action replaced the use of racial preference, the percentage of African-American and Hispanic students would rise (*Id*. p. 12).  However, Mr. Kahlenberg does not provide detail on how the research was conducted other than to mention briefly the sample used.  But the details of the research are incredibly relevant when considering the implications for UNC-Chapel Hill.

16.    With this in mind, my affirmative report discussed Carnevale, Rose, and Strohl (2014) but noted the study has several weaknesses that should call into question the conclusion that implementing an SES-based admissions process would necessarily cause African-American and Hispanic diversity to rise at UNC-Chapel Hill (Long Report ¶¶ 136-138).  First, the model they use is not tethered to reality.  Carnevale, Rose, and Strohl assume students apply to *all* of the 193 most selective colleges in the United States.  This characterization does not fit actual applicant behavior (i.e., students do not each apply to 193 colleges).  Thus, the study misstates the likely applicant pool and overestimates the number of underrepresented minority applicants to a particular college.  The model is also unrealistic in that, after assuming students apply to all 193 colleges, it assumes the enlarged applicant pool and then fill their slots by starting at the top of the list.  This is not how admissions committees work, especially those using holistic review.  Other weaknesses of this study include that the authors fail to consider the

---

[5] Alon, Sigal. (2015) *Race, Class, and Affirmative Action*. New York: Russell Sage Foundation.

dynamic effects of an admissions policy change or acknowledge concerns about whether admissions committees have access to the data used in the study. Yet another weakness of the study is that the researchers do not use actual institutional data on applicants and enrollees. Instead, they use an external dataset that may not be representative of the population of applicants and hypothetical admitted students that they are trying to measure. Taken together, these concerns suggest that the simulations by Carnevale, Rose, and Strohl (2014) are much more theoretical exercises than an attempt to test whether a specific SES-based admissions policy would work at a specific institution.[6]

17. Mr. Kahlenberg also discusses research by Matthew Gaertner as support for his advocacy of SES-based policies (Kahlenberg Report p. 12 ("a sophisticated socioeconomic affirmative action plan that gave considerable weight to economic disadvantage could achieve even *more* racial diversity than using racial preferences")). As I observed in my affirmative report, several key considerations should be kept in mind when considering the potential applicability of this study to UNC-Chapel Hill (e.g., Long Report ¶¶ 139-146).

18. Gaertner (2014) and Gaertner and Hart (2013) describe a simulation done with data from the University of Colorado at Boulder in which race-based considerations were replaced with preferences based on disadvantage and overachievement as measured by indices that take into account an applicant's family background and high school characteristics. Based on a sample of 487 applications from a single application cycle (2009), they conclude that a class-based approach of this type could both increase economic diversity as well as maintain high levels of racial and ethnic diversity.[7] However, careful consideration of the details of the study prompts many questions and unresolved issues.

19. As I commented in my affirmative report, it is important to recognize that this study is limited to only one institution (i.e., CU Boulder), and even Gaertner (2014) admits that the results are limited to the Colorado context (p. 181). In other words, it is difficult to say that one institution's experience represents what the experiences of other universities would be. Moreover, CU Boulder is a moderately-selective institution, whereas UNC-Chapel Hill is much more selective in comparison. In fall 2016, CU Boulder had an admissions rate of 77 percent while UNC-Chapel Hill only accepted 27 percent of applicants that year.[8] If UNC-Chapel Hill's much lower acceptance rate had been applied in the CU Boulder simulation, the results would likely change greatly. With a lower admissions rate, many of the accepted applicants in the CU Boulder case would now be rejected, and this could have implications for the racial and ethnic makeup of the group of remaining accepted applicants. In essence, using a different acceptance rate changes one of the fundamental assumptions of the simulation, and so the CU Boulder

---

[6] This is in contrast to the use of actual applicant data and ability to observe past institutional admissions decisions, which is how the study by Bowen, Kurzweil, and Tobin (2005) was conducted. For these reasons, my affirmative report has much more confidence in the conclusions of Bowen, Kurzweil, and Tobin (2005) than those of Carnevale, Rose, and Strohl (2014) (Long Report ¶ 150).

[7] Gaertner, Matthew. (2014). "Advancing College Access with Class-Based Affirmative Action: The Colorado Case." In R. D. Kahlenberg (Ed.), *The future of affirmative action: New paths to higher education diversity after Fisher v. University of Texas.* New York, NY: Century Foundation Press. (pp. 175-186). Gaertner, Matthew N. and Melissa Hart. (2013). "Considering Class: College Access and Diversity." *Harvard Law & Policy Review* 7, no. 2: 367-403.

[8] Source: College Navigator, National Center for Education Statistics, U.S. Department of Education.

simulation in isolation can tell us little about whether this type of approach would work at UNC-Chapel Hill.

20.    I also noted in my affirmative report that the CU Boulder simulation was run using only one cohort of applicants.  It is unknown if the particular year studied is representative for all years or if the findings would change due to natural fluctuations in the size and composition of an applicant pool from year to year.  It is also notable that 2009 was during a major economic recession, which may have influenced the family income levels and/or socioeconomic status of applicants.  During recessions, families are more likely to struggle financially, and so more applicants could have been categorized as facing "moderate" or "severe" disadvantage than would be the case during a non-recession year.  It is unclear if that particular cohort or year was unique in some way and whether the effects would be the same for different time frames.

21.    Yet another potential limitation of the CU Boulder simulation is the data sample used.  The analysis was only performed on a subset of the total applications received by CU that year, and the study does not present summary statistics for the reader to be able to judge whether the research sample is representative for all applicants to the institution or selective institutions in general (or UNC-Chapel Hill specifically).  This is yet another reason why one should question the applicability and persuasive value of this research for UNC-Chapel Hill's circumstances.

22.    Another concern about the race-neutral admissions approach used by Gaertner and Hart is whether it is feasible for other institutions to implement due to issues like data availability.  As I noted in my affirmative report, when reviewing a potential race-neutral approach, one must consider the types of information available to admissions committees and what would be possible for them to execute during their review and selection process.  For the CU Boulder simulations, Gaertner and Hart constructed a "Disadvantage Index" using many high school-level characteristics that are not typically available to admissions committees.  In fact, Gaertner and Hart had to rely on a unique, extant data source: the Education Longitudinal Study of 2002 (ELS2002), which was also used by Carnevale, Rose, and Strohl (2014).  This is a nationally representative, longitudinal dataset that has information from administrative data and assessments as well as extensive student, parent, and teacher surveys.  Even Gaertner and Hart (2013) and Gaertner (2014) acknowledge this data, which was necessary for their CU Boulder simulations, is not what admissions committees ordinarily have.  This suggests that such an approach would require a substantial overhaul of the information that UNC-Chapel Hill must seek from its applicants, including many measures of wealth and economic status that are not customary on college applications.  Moreover, some of the information may not even be available to applicants themselves, such as indicators about their high school and neighborhood. It is an overstatement to suggest that it would be immediately feasible for other institutions, including UNC-Chapel Hill, to be able to use this type of data in admissions. The fact that the authors of the simulation studies had to rely on extensive outside data helps to demonstrate this point. Mr. Kahlenberg's concept and definition of socioeconomic status differ significantly from what admissions committees are able to measure.  Typically, admissions committees only know one year of an applicant's family income, and that is only if the applicant applies for financial aid *and* the university makes such information available to the admissions committee.

Case 1:14-cv-00954-LCB-JLW   Document 154-31   Filed 01/18/19   Page 10 of 23

23.     Finally, a change in an admissions policy could also cause potential applicants to change how they invest their time preparing for college, where they choose to attend school, and whether they decide to apply at all.  Other research has documented these types of responses to other admissions policy changes (e.g., Black, Cortes, and Lincove, 2015; M. Long, Saenz, and Tienda, 2010; Niu and Tienda, 2010).  However, the Gaertner and Hart study does not consider this possibility of how the change in admissions policy could spur changes in applicants' behavior or what the results might be beyond one year.  It is also worth noting that CU Boulder never adopted the alternative admissions policy, and I am aware of no university that has implemented a SES-based admissions plan based on the Gaertner study.

24.     To summarize, the Gaertner (2014) and Gaertner and Hart (2013) studies give limited insight into the potential effects of a socioeconomic-based approach by focusing on only one institution for a subset of one cohort of applicants.  Although I opine that UNC-Chapel Hill should evaluate whether an SES-based plan could work as a race-neutral alternative, Mr. Kahlenberg goes too far to the extent he concludes that Gaertner's work *proves* that selective universities can employ socioeconomic-based strategies to increase racial diversity.

25.     As discussed above, Mr. Kahlenberg also cites Alon (2015) and summarizes that she finds eliminating legacy, athletic, and racial preferences and replacing them with class-based affirmative action "could not only replicate the current level of racial and ethnic diversity at elite institutions but even increase it" (Kahlenberg Report p. 13).  Mr. Kahlenberg overstates this finding and its direct applicability to the circumstances here.  For example, even though her work was published in 2015, Alon uses data from the cohort that first enrolled in college in 1995 to simulate the effects of different admissions policies.  It is unclear if her findings would still hold over two decades later, especially given demographic changes in the country.  According to data from the U.S. Department of Education, in 1990, 79% of students at four-year institutions were White in comparison to 8% and 4% for Black and Hispanic students, respectively.  However, by 2016, that had changed dramatically.  That year only 56% of students at four-year institutions identified as White while the percentages had grown to 13% and 14% for Black and Hispanic students, respectively.[9]

26.     Another weakness of the Alon study, which even Mr. Kahlenberg acknowledges, is that this specific analysis, with the elimination of legacy and athletic preferences in addition to the end of racial preferences, requires Alon to make a large number of assumptions.  For example, one would need to replace students in the bottom 25% academically with the most academically-prepared students from low socioeconomic groups to get this specific result (Kahlenberg Report p. 13, fn. 36).  As other research suggests, even if an institution were to implement an SES-based admissions process, it is unlikely that institutions would do so in practice using the assumptions Alon makes (Bowen, Kurzweil, and Tobin, 2005).

27.     As I reviewed in my affirmative report, there is additional research available that examines how SES-based policies might affect a broad set of institutions.  For instance, Reardon, et al. (2015) that incorporates a large sample of institutions and builds from the previous research

---

[9] Source: Digest of Education Statistics (2017), Table 306.20. U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), "Fall Enrollment Survey."

8

by modeling a "dynamic system of colleges, rather than a single, static college" (p. 7).[10]  This study incorporates multiple years of data rather than being a simulation of one point in time, and unlike the research relied upon by Mr. Kahlenberg, the study recognizes that applicant behavior might change over time.  Also, the authors do not assume that students would apply to all colleges, which is unrealistic.  All of these factors suggest this study is designed to give a much more realistic understanding of the broader effects of introducing an SES-based admissions policy.

28.　　　Using this more comprehensive data and model, Reardon, et al. (2015) conclude that a socioeconomic-based policy would make colleges less racially and ethnically diverse than when race-based preferences are used.  They find that the correlation between socioeconomic status and race is not high enough to produce racial diversity when preferences are only given for economic diversity.  This is another way of stating the point made by Cancian: among low-income students, there are many White applicants, and so the connection between income and race was not strong enough for a socioeconomic-approach to be effective in creating racial and economic diversity.

29.　　　To summarize, the research studies cited by Mr. Kahlenberg do not change any of the opinions offered in my affirmative report.  In fact, my affirmative report includes many of the studies Mr. Kahlenberg cites, but it is worth emphasizing that Mr. Kahlenberg overstates the persuasiveness or findings of these studies, particularly given certain limitations of that research.  As I emphasized throughout my affirmative report, the details are important when considering how to interpret research and how to weigh the conclusions of various studies, and once taking the quality of the research evidence into account, the studies by Reardon et al. (2015), Bowen, Kurzweil, and Tobin (2005), and Cancian (1998) are more convincing than other research in this area.  Using a range of data sets that encompass large number of institutions, they repeatedly find that SES-based policies are not a substitute for considering race in admissions.  Although overlapping to a small degree, socioeconomic and racial diversity are not the same goals, and research has suggested that SES-based admissions preferences do not produce the same outcomes as race-conscious admissions approaches.  Consequently, although I believe UNC-Chapel Hill should consider whether a SES-based alternative is workable for its specific context, it would be improper to assume that it will automatically work based upon the research cited by Mr. Kahlenberg.

---

[10] Reardon, Sean F, Rachel Baker, Matt Kasman, Daniel Klasik, and Joseph B Townsend. (2015). *Can Socioeconomic Status Substitute for Race in Affirmative Action College Admissions Policies? Evidence from a Simulation Model.* Princeton, NJ: Educational Testing Service. Note: Although this was published by ETS, the research was also funded by the National Institutes of Health (NIH) Office of Behavioral and Social Sciences Research (OBSSR; Award HHSN276200800013C). The authors report that the views expressed are their own and do not necessarily reflect the views of either NIH or ETS.

Case 1:14-cv-00954-LCB-JLW   Document 154-31   Filed 01/18/19   Page 12 of 23

**III. CONTRARY TO MR. KAHLENBERG'S ASSERTIONS, RACE-NEUTRAL APPROACHES HAVE HAD ONLY LIMITED SUCCESS AND IN CONTEXTS DISSIMILAR TO UNC-CHAPEL HILL**

**A. Fewer Institutions Were Able to Implement Effective Race-Neutral Approaches than Mr. Kahlenberg Suggests**

30. A repeated theme in the Kahlenberg report is that other institutions have successfully implemented race-neutral approaches and consequently the report implies (and at times directly asserts) that these approaches would be successful at UNC-Chapel Hill (Kahlenberg Report pp. 5-15, 53). But again Mr. Kahlenberg does not discuss important details, does not take into account the quality of the evidence, and fails to consider the important role of context when suggesting that these results apply broadly to postsecondary institutions. Once considering the breadth of research on race-neutral alternatives and taking into account research quality, it is clear that far fewer institutions have found success with a race-neutral approach.

31. Mr. Kahlenberg relies heavily on his work with Halley Potter, in which they reviewed ten universities that were prohibited from considering race in admissions. Mr. Kahlenberg opines that they "found that seven of the ten… had used race-neutral alternatives to meet or exceed the racial diversity levels they had obtained in the past using racial preferences."[11] But, in my opinion, Mr. Kahlenberg is incorrect to suggest that his and Potter's conclusions show other institutions have implemented race-neutral alternatives and maintained racial diversity. To the contrary, however, only five of the ten institutions examined by Kahlenberg and Potter experienced any level of success in maintaining levels of diversity. And as described below, there are additional reasons to question how effective the policies were as standalone race-neutral approaches and whether those approaches have applicability to institutions like UNC-Chapel Hill.

**B. Research Demonstrates that the Texas Top 10% Plan Has Not Been Effective in Maintaining Levels of Diversity**

32. Two of the seven purportedly successful institutions discussed by both Kahlenberg and Potter (2012) and Potter (2014) are UT-Austin and Texas A&M. It is unsurprising that, as one of the oldest and highly publicized race-neutral admissions policies, the Texas Top 10% Plan has been the focus of much research in this area. Numerous studies using a range of data sets have come to the conclusion that the Texas Top 10% Plan has not helped these two institutions meet (let alone exceed) previous racial and ethnic diversity levels. In fact, when the underlying demographic changes of the state are taken into account, the percentage plans have been less effective than apparent relative to the benchmark of previous levels of racial and ethnic diversity.

33. Most research evaluates the "effectiveness" of percentage plans by comparing levels of diversity before and after the change in admissions policy (Long Report ¶¶ 47-50). For example, M. Long and Tienda (2008) analyze the effects of the Texas Top 10% Plan at UT-

---

[11] Kahlenberg Report at p. 6, citing Richard D. Kahlenberg & Halley Potter. (2012) *A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences.* New York: Century Foundation, pp. 26-61.

Austin, Texas A&M University, and Texas Tech University.[12] They find that the Texas Top 10% Plan was not an "effective" race-neutral approach as levels of racial and ethnic diversity did not return to previous levels. Interestingly, they note that UT-Austin and Texas A&M put special effort into boosting the admissions probabilities of African-American and Latino applicants in race-neutral ways *beyond* the implementation of a race-neutral percentage plan, including introducing targeted student fellowships to high schools with low college-going rates (minority students were a high proportion of the beneficiaries of the aid). Still, even with this extra effort, this was not enough to counteract the negative effects of the Top 10% Plan on racial and ethnic diversity.[13] It is also worth noting that UT-Austin supplemented the percentage plan with holistic review for a portion of the class because of shortcomings with the outcomes of the percentage plan alone.

34.     Others have advocated that interpretation of the evidence on the effects of the Texas Top 10% Plan should also take into account the context of the state and community of the university, particularly when considering public institutions. For example, Flores and Horn (2015) note that the Texas Top 10% Plan was implemented during a time of substantial growth in the population of Latino students in Texas. Therefore, maintaining levels of racial and ethnic diversity would actually be movement backwards—in order to truly maintain diversity levels, the proportion of minority students should have increased to mirror the population increase experienced in the state at the same time (Flores and Horn, 2015). When considering this larger context, which, as discussed below, Mr. Kahlenberg fails to do, the effectiveness of a percentage plan as a workable race-neutral admissions policy is called into question even more.[14]

## C.     Mr. Kahlenberg Fails to Consider How a Change in Admissions Policy Would Alter who Applies

35.     Another weakness of Mr. Kahlenberg's report is that he fails to consider the possibility of these behavioral responses by potential applicants. In doing so, his review and opinions overlook an important factor to consider when evaluating the effectiveness of a race-neutral approach. Failing to do so could lead one to make incorrect conclusions about what is possible with a specific admissions approach. For instance, if students of color are less likely to apply after the introduction of a race-neutral approach, then the institutions may be less likely to have as racially and ethnically diverse a pool of accepted applicants.

36.     In fact, the past research has documented the fact that application patterns can change in important ways in response to an admissions policy change. For example, after the introduction of the Texas Top 10% Plan, Black, Cortes, and Lincove (2015) find that minority students were less likely to apply to selective public colleges. In other work, M. Long (2004)

---

[12] While all three institutions are selective institutions, the Barron's *Profiles of American Colleges* (1996) classifies UT-Austin as Very Competitive (similar to UNC-Chapel Hill), but Texas A&M University is rated as "Highly Competitive" and Texas Tech University is rated only as "Competitive."

[13] Long, Mark and Marta Tienda. (2008). "Winners and losers: Changes in Texas University admissions post-Hopwood." *Educational Evaluation and Policy Analysis* 30: 255–280.

[14] There is additional research that documents how the Texas Top 10% Plan also negatively affected application rates among students of color (e.g., M. Long, 2004; Black, Cortes, and Lincove, 2015); Long, M. C. (2004). "College applications and the effect of affirmative action." *Journal of Econometrics 121(1)*: 319-342. Black, Sandra, Kalena Cortes, and Jane Lincove. (2015). "Apply Yourself: Racial and Ethnic Differences in College Application." NBER Working Paper No. 21368.

finds that the end of affirmative action in Texas and California reduced the likelihood students of color sent their SAT scores to in-state, public colleges, thus suggesting they were less likely to apply for admission. College preparation activities can also be affected by an admissions policy change. For instance, Dickson (2006) examines data from the Texas Education Agency from 1994 to 2001, and finds that after the introduction of the Texas Top 10% Plan, Hispanic high school graduates were 1.6 percentage points less likely to take the SAT or ACT, and Black high school graduates were 2.1 percentage points less likely. This translates into losing approximately 1,350 students from underrepresented minority groups each year from even taking the first step in the process of being admitted to a selective public institution.

37.     Such responses in applicant and college preparatory behavior highlight that the effectiveness of a race-neutral approach could change over time if the applicant pool also changes. However, Mr. Kahlenberg does not consider this, and most of his report is based on research that simulates possible effects for only one cohort of students without a change to applicant pool composition.

**D.      Mr. Kahlenberg Fails to Consider the Importance of Context and Tries to Apply the Results from Institutions Dissimilar to UNC-CH**

38.     Not only has the Texas Top 10% Plan arguably not successfully maintained racial and ethnic diversity, but Mr. Kahlenberg also overstates the conclusions that can be drawn from the experience of other institutions that have attempted to implement race-neutral alternatives.

39.     As I emphasized in my affirmative report, context is an important determinant of the effects of an admissions policy (e.g., Long Report ¶¶ 42-46). By context, I mean that the outcomes observed and estimated for each race-neutral approach are heavily influenced by the composition of the applicant pool and their background characteristics, the institution's existing admissions practices, and local structural factors such as the distribution of potential applicants by race into nearby K-12 systems of varying quality. Even when reviewing Mr. Kahlenberg's own research, it is clear that there is variation in the outcomes of the ten institutions he studies. This variation underscores the fact that context matters in terms of whether a race-neutral approach will be effective in replicating the levels of diversity achieved through a race-conscious admissions practice.

40.     In my opinion, a major shortcoming of Mr. Kahlenberg's report is that it treats all admissions approaches, institutions, and states as "one size fits all." He seems to assume that what might work in one state or at one institution will work elsewhere. In addition, his summary of the research glosses over important details relevant for considering whether a race-neutral strategy is appropriate for a different institution in a different context (i.e., would the proposed policy have the same effect at UNC-Chapel Hill). In fact, the most prominent attempts at implementing (or potentially implementing) race-neutral admissions policies have occurred in Texas, California, Florida, and Colorado. All differ substantially from North Carolina in terms of state demographics, income distributions, school systems, and policy environments. As such, when reviewing the research on these institutions' experiences, it is important to consider the underlying factors (i.e., context) that may have enabled or limited the impact of a particular policy. Mr. Kahlenberg does not do so.

Case 1:14-cv-00954-LCB-JLW   Document 154-31   Filed 01/18/19   Page 15 of 23

41.     I note that the institutions Kahlenberg and Potter highlight as employing successful race-neutral alternatives are very different than UNC-Chapel Hill, especially in terms of selectivity. Not including the Texas institutions discussed above, below I list the remaining five institutions Kahlenberg describes as successfully using a race-neutral admissions policy and the corresponding percentage of undergraduate applicants who were accepted for admission in fall 2016:[15]

| Institution | Acceptance Rate |
|---|---|
| University of Washington | 45% |
| University of Florida | 46% |
| University of Georgia | 54% |
| University of Nebraska-Lincoln | 75% |
| University of Arizona | 79% |

Note that each of these institutions accepted at least 45% of their applicants. In contrast, UNC-Chapel Hill only accepted 27% of applicants that year.

42.     It is important to note that acceptance rates at public institutions can differ for in-state (i.e., resident) versus out-of-state (i.e., nonresident) applicants. At UNC-Chapel Hill, while the overall admittance rate was 24% in fall 2017, it was 46% for in-state students and 14% for nonresidents.[16] While this may give the impression that UNC-Chapel Hill is less selective from an in-state perspective (as another of Plaintiff's experts, Peter Arcidiacono, suggests), other public institutions also tend to accept higher percentages of applicants who are in-state residents. For instance, the University of Washington, which is one of the institutions Mr. Kahlenberg cites as successfully using a race-neutral approach, accepted 59% of in-state applicants in comparison to 42% of out-of-state applicants in 2017.[17] Hence, when an apples-to-apples comparison is made (i.e., focusing on the admission rate for in-state applicants only), it becomes clear, yet again, that UNC-Chapel Hill is still a more selective institution.

43.     It is also worth noting the corresponding acceptance rate for the three institutions Mr. Kahlenberg recognizes as not having successfully implemented race-neutral alternatives:

| Institution | Acceptance Rate |
|---|---|
| University of Michigan | 29% |
| UCLA | 18% |
| University of California-Berkeley | 17% |

It is immediately apparent that these "unsuccessful" institutions are much more selective—and much more similar to UNC-Chapel Hill in terms of acceptance rate, which makes them a more relevant comparison for this case. When the acceptance rate is broken down by resident status, in 2017, the University of Michigan accepted 42% of in-state applicants and 25% of out-of-state

---

[15] College Navigator, National Center for Education Statistics, U.S. Department of Education. Accessed Feb 9, 2018 at https://nces.ed.gov/collegenavigator/.

[16] Accessed April 4, 2018, from: https://admissions.unc.edu/apply/class-profile-2/

[17] Accessed April 4, 2018, from: http://admit.washington.edu/why-uw/about-uw-university-of-washington/

13

applicants, which confirms it accepts a similar percentage of in-state applicants as UNC-Chapel Hill.[18]

44.     Research confirms the importance of institutional selectivity as a factor in determining the effects of a change in admissions policy. Multiple studies find that schools that admit a smaller proportion of applicants are likely to experience different outcomes from a given admissions policy than schools that accept closer to 50% or more of applicants (Bowen, Kurzweil, and Tobin, 2005; Horn and Flores, 2003). Thus, it is an overstatement to suggest that because other flagship universities have implemented race-neutral strategies, UNC-Chapel Hill must be able to do so successfully as well. UNC-Chapel Hill is in fact much more similar to Mr. Kahlenberg's list of unsuccessful schools than the ones he deems as being successful.

45.     Mr. Kahlenberg suggests that the reasons the University of Michigan, UCLA, and the University of California-Berkeley were not successful with their race-neutral approaches is because they failed "to utilize them fully" (Kahlenberg Report p. 8) by still allowing preferences for legacy applicants and only giving preference to economic disadvantage as defined by family income. However, as I discussed in my affirmative report (Long Report ¶¶ 172-177), the larger literature on legacy preferences and income-based preferences suggests that altering those policies would make not much difference in the overall diversity of an admitted class (Espenshade and Chung, 2005).[19] Moreover, although Mr. Kahlenberg is critical of the fact that the institutions measured economic disadvantage only using income, he does not consider what is feasible for admissions committees. As discussed above, admissions committees only tend to have information on family income (if anything), and they cannot replicate the kinds of simulations he discusses, which are reliant on external data sources that have many measures of wealth and socioeconomic status for an external sample (i.e., not students who applied to the institutions).

E.      **UNC-Chapel Hill Already Utilizes Some of the Admissions Practices Mr. Kahlenberg Describes as Successful Race-Neutral Approaches**

46.     I also believe that is an overstatement to suggest that even the "successful" institutions that were able to maintain diversity through race-neutral admissions were able to do so entirely as the result of a single policy. Moreover, several of the approaches highlighted as successful at other institutions are ones that are already in place at UNC-Chapel Hill. For example, Mr. Kahlenberg mentions that the University of Washington expanded its admissions criteria to consider factors such as "personal adversity" and "economic disadvantage" (Kahlenberg Report p. 7). Likewise, Mr. Kahlenberg describes the University of Georgia as starting to consider socioeconomic factors, such as parental education and high school environment, after the end of race-conscious admissions in 2000 (Id).[20] These "race-neutral

---

[18] Accessed April 4, 2018, from: http://www.mlive.com/news/ann-arbor/index.ssf/2017/04/university_of_michigan_sets_re_1.html

[19] Espenshade, Thomas J, and Chang Y. Chung. (2005). "The opportunity cost of admission preferences at elite universities." *Social Science Quarterly* 86 (2):293-305.

[20] I similarly noted this in my affirmative report: "Potter (2014) documents that the University of Georgia ended using legacy preferences after a court order banned the consideration of race in admissions, but the university also broadened their admissions criteria and starting to take into account more socioeconomic factors, so it is unclear whether their experience is driven by changing the way they handle legacy applicants." (Long Report ¶ 176.)

alternatives" are essential parts of holistic review and factors that UNC-Chapel Hill already considers (Long Report ¶ 31).

###    F.    Mr. Kahlenberg Overstates the Applicability of Non-Undergraduate Institutions

47.     In addition, I question Mr. Kahlenberg's broad statements relating to the use of race-neutral alternatives in contexts beyond undergraduate admissions.  For example, studies about law schools (i.e. graduate school) or elementary and secondary charter schools (i.e., K-12) are not relevant given the many differences in applicant pools and educational context.  For example, Kahlenberg cites evidence about UCLA Law School several times (Kahlenberg Report p. 10, 14, 23).  However, students who apply to graduate school are a non-random subset of the population who seek admittance for undergraduate study.  In other words, comparing the applicant pools of undergraduate institutions and law schools is like comparing apples to oranges.  Moreover, graduate study is specialized by nature and so institutions use different, and often narrower, criteria in determining admissions, such as a different set of tests (i.e., the LSAT) to measure achievement.  For these reasons, it is difficult to consider the results of a law school admissions policy as being directly applicable to an undergraduate institution.

48.     Likewise, the impact of an admission policy at a public charter school is governed by a different set of applicants and admissions criteria.[21]  In some school systems, applicant pools to charter schools can be more expansive than what is observed in higher education because primary and secondary education is required of all residents up until a certain age.  But without standardized exams and the prevalence of lotteries, admission to a charter school tends to be characterized as being more about luck (i.e., a lottery) than past or predicted achievement.  This makes it difficult to extrapolate from the research on different admissions policies at the K-12 level to higher education.  Stated simply, it is hard to compare San Diego-resident elementary school students to applicants to a nationally-known, highly selective undergraduate university.

### IV.    WHEN DISCUSSING OTHER RACE-NEUTRAL APPROACHES, SUCH AS GEOGRAPHY-BASED PLANS OR ELIMINATING LEGACY PREFERENCES, MR. KAHLENBERG CITES THEORETICAL SUGGESTIONS RATHER THAN WORKABLE ALTERNATIVES.

49.     Outside of his literature review-related opinion, Mr. Kahlenberg discusses geography-based plans as a race-neutral alternative that UNC-Chapel Hill could implement in part.  (Kahlenberg Report p. 52 ("Although a percentage is plan is typically applied to in-state students only, a version of such a plan (taking top students within zip codes rather than high schools) could provide a powerful race-neutral alternative for promoting racial, ethnic, and socioeconomic diversity").)  Mr. Kahlenberg relies upon Danielle Allen, whom I cited in my

---

[21] Although I cite the work of Ellison and Pathak (2016) relating to magnet schools within the Chicago Public Schools system in my affirmative report, I do so to highlight options and considerations available to UNC-Chapel Hill when evaluating potential race-neutral alternatives that rely on proxies for race or ethnicity.  Unlike Mr. Kahlenberg, I do not suggest this experience is directly applicable to UNC-Chapel Hill.  Instead, I conclude that "[a]s it continues to evaluate potential race-neutral alternatives, UNC-Chapel Hill should keep in mind what tradeoffs would be necessary if a proxy-type admissions policy was implemented in their context and with their applicant pool." (Long Report ¶ 171.)

affirmative report, as the only proponent of this concept. As explained by Allen (2014), such a plan could give admissions preference based on zip code rather than high school class rank (i.e., the percentage plans). It is worth noting that, even for Allen, using preferences for students within zip code is only a theoretical exercise. To my knowledge, no college or university has used an admissions approach that gives preferences based on an applicant's zip code, and so there is no research on the workability or effects of such a plan (Long Report ¶¶ 114-122).

50.     Despite this lack of evidence, Mr. Kahlenberg claims that "such methods have already been put into action" (Kahlenberg Report p. 53). The only research that Mr. Kahlenberg cites is his own research about the use of zip codes in admissions in San Diego public charter schools. First, it is an overstatement and simply not true that a zip code (or Census Tract)-based plan has been put into action at the postsecondary education level.

51.     Second, Mr. Kahlenberg claims that the use of zip codes within San Diego can succeed in creating socioeconomic and racial diversity because "concentrated poverty is often highly correlated with race" (Kahlenberg Report p. 53). For all the reasons discussed above and in my affirmative report, Mr. Kahlenberg overstates the correlation between socioeconomic status and race. Moreover, the overall composition and distribution of students by racial and ethnic background is different in San Diego than North Carolina, which suggests the results of a policy focused on zip codes in North Carolina (much less the *entire country* as Mr. Kahlenberg suggests should be used) would be different.

52.     Third, the UNC-Chapel Hill context is completely different, which limits the applicability and reliability of the results of the San Diego public charter schools particularly given that Mr. Kahlenberg suggests that UNC-Chapel Hill implement a zip code plan for *out-of-state* applicants. The San Diego public school system has the advantage of a clearly-defined geographical area that it serves: a city. In contrast, UNC-Chapel Hill receives applicants from across the country and world. This presents a series of unique challenges, including some that I discuss in my affirmative report but that Mr. Kahlenberg glosses over entirely.

53.     With respect to some of these challenges, theoretically, a zip-code-based policy could mirror some of what is observed with the high-school-based preferences used in percentage plans, but this depends largely on the degree of segregation by zip code and how much the zip code boundaries overlap with high school boundaries. In other ways, a residence-based policy might produce very different outcomes than a percentage plan or even exacerbate inequality across applicants. This is because while there are state policies that attempt to equalize funding across high schools with the goal of closing gaps in educational quality, there are no such policies at the *national* zip code level. Therefore, there may be large differences in academic preparation levels between the applicants from one zip code to another—differences that are greater than what is observed from one high school to another. Additionally, there may be large variation in application rates to an institution by zip code that is attributable to variation in how many graduating high school seniors are in each area. The result would be that applicants could experience a large advantage or disadvantage due to the luck of which birth cohort an application is part of. Using a minimum entrance threshold might mean that some zip codes would be shut out altogether (thus not achieving the residential diversity Allen proposes).

16

54.     Although I suggested that UNC-Chapel Hill explore whether an *in-state* zip-code-based plan could be created, I also observed that any concerns with a percentage-plan race-neutral alternative were likely to be exacerbated with a zip-code-based plan (Long Report ¶ 122). Suggesting that an *out-of-state* zip-code-based plan is a workable race-neutral alternative for UNC-Chapel Hill (Kahlenberg Report p. 76, fn. 291; p. 53-54) is not supported by any reliable academic research or evidence.

55.     Mr. Kahlenberg also makes suggestions related to other non-standalone race-neutral measures, such as increasing financial aid, but these measures are also similarly theoretical and fail to consider the nuance of whether such measures would be feasible or effective at UNC-Chapel Hill.  For example, Mr. Kahlenberg suggests that UNC-Chapel Hill could increase financial aid and creating programs and partnerships to attract "underrepresented demographics with the promise of financial support" (Kahlenberg Report p. 6, 36-38).  As discussed above, this was not an effective policy for UT Austin and Texas A&M.  It is also unclear what level of additional resources would be necessary to have a meaningful change on the composition of the admitted applicant pool.

56.     It is first questionable whether increasing financial aid is feasible.  Mr. Kahlenberg acknowledges the substantial resources UNC-Chapel Hill already devotes to low-income students who make up to 200% of the poverty line (Kahlenberg Report p. 36).  In fact, the Carolina Covenant has been recognized as a national model in supporting college access for low-income students.[22]  However, Mr. Kahlenberg pushes that UNC-Chapel Hill should cover tuition and fees for the students of families who make up to $80,000 a year, which would be an extremely generous program and perhaps outside the North Carolina budget.  He notes that only one other state has been able to make such a commitment (i.e., California with Berkeley and UCLA).  Yet Kahlenberg also recognizes that UNC-Chapel Hill's financial aid policy is partly governed by action taken by the Board of Regents (and thus out of the hands of the Office of Undergraduate Admissions).  Although I do not consider or opine upon the steps that UNC-Chapel Hill has taken, I highlight this opinion of Mr. Kahlenberg as an example of how his sweeping assertions are frequently theoretical in nature and do not fully consider what is feasible for the university.

57.     Other approaches Mr. Kahlenberg suggests, including additional recruitment and eliminating legacy preferences, have only been used to complement larger admissions practices and are insufficient as standalone race-neutral alternative admissions practices (Kahlenberg Report p. 54-59). For example, Mr. Kahlenberg suggests that increased outreach to minority applicants could be an effective race-neutral approach.  He suggests creating programs and partnerships to attract "underrepresented demographics with the promise of financial support" (p. 6).  As noted above, the evidence suggests this has not had a large enough impact to help Texas institutions maintain levels of racial and ethnic diversity.  Therefore, while outreach may be an important part of a broader set of admissions activities, it is questionable whether outreach (or increased outreach alone) could have a large impact alone.  As discussed in my affirmative report, the same is true for eliminating legacy preferences (Long Report ¶¶172-177).  There is

---

[22] Mr. Kahlenberg himself has praised the Carolina Covenant in his writings.  For example, see "Graduating Low-Income Students," *Chronicle of Higher Education*, August 11, 2010.

not a research basis to judge the impact of eliminating Early Action, which Mr. Kahlenberg
mentions briefly as an option.

## V. RACE-NEUTRAL APPROACHES MAY HAVE A NEGATIVE EFFECT ON THE ACADEMIC QUALITY OF AN INSTITUTION

58.     Mr. Kahlenberg also makes general assertions about race-neutral approaches
having a minimal impact on the academic quality of institutions.  This is relevant because a key
question when considering race-neutral approaches is whether they would have an impact on the
other goals of an institution, including academic excellence.  I offer no opinion as to what degree
of impact is significant in assessing academic standards and excellence but note that once again
Mr. Kahlenberg overstates in making the blanket assertion that "well-crafted race-neutral
strategies do not compromise academic quality" (Kahlenberg Report p. 14).

59.     For example, in his opinion relying upon his literature review, Mr. Kahlenberg
cites "careful research" by Niu and Tienda (2010) to show that "between 1993 and 2003, black
and Hispanic students admitted through the percentage plan 'consistently perform as well or
better' than white students ranked at or below the third decile" (Kahlenberg Report p. 14).  Mr.
Kahlenberg does not discuss the research details in his report, but it is important to note that the
Niu and Tienda paper utilizes a regression discontinuity research methodology, which *by design*
focuses only on people just above and below the cutoff of being accepted.  It therefore says
nothing about the overall effect of an admissions policy on a student body.[23]  Notably, in
response to continual concerns about the Texas Top 10% Plan's effects on its academic mission,
UT-Austin successfully petitioned the state legislature in 2009 to cap the number of applicants
admitted automatically according to the policy.[24]

60.     In considering the research on the effect of race-neutral policies on academic
quality, I instead cite other research:  Koretz, et al. (2002) uses California data and finds that
race-neutral policies negatively affect academic quality indicators.  Overall, the research—based
on both performing simulations using student data and examining data after the introduction of
percentage plans—finds that admissions policies based on high school class rank, such as
percentage plans, result in colleges admitting students with lower levels of academic excellence
measured in multiple ways (e.g., Koretz, et al., 2002).[25]  Consequently, I disagree with Mr.
Kahlenberg's broad assertion that "well-crafted race-neutral strategies do not compromise
academic quality" and reiterate the need for a nuanced approach that considers the specific
context of UNC-Chapel Hill when determining whether a race-neutral alternative is workable.

---

[23] My affirmative report also cites Niu and Tienda, but I focus on the main topic of the paper: the enrollment effects
of the Texas Top 10% Plan.  The authors find that there was an increase in the number of applications from students
ranked in the top ten-percent at high schools with a high proportion of minority students or the state average share of
low-income students.
[24] Watkins, Matthew. (April 5, 2017). "Texas senators mull eliminating Top 10 Percent Rule." *The Texas Tribune*.
Available here: https://www.texastribune.org/2017/04/05/texas-senators-mull-eliminating-top-10-percent-rule/
[25] Koretz, Daniel, Michael Russell, Chingwei David Shin, Cathy Horn, and Kelly Shasby. (2002) "Testing and
diversity in postsecondary education: The case of California." *Education Policy Analysis Archives* 10(1): 1-39.

18

## VI. CONCLUSION

61.     In conclusion, it is my opinion that Mr. Kahlenberg fails to present convincing evidence that workable, race-neutral alternatives exist that would apply to the circumstances of UNC-Chapel Hill due to the fact that his survey of research literature and adopted alternative admissions policies does not adequately consider the quality and quantity of the evidence available on admissions policies.  In fact, many of Mr. Kahlenberg's assertions are based on studies with limited data and unrealistic assumptions and theoretical models about how applicants and institutions behave.  In addition, Mr. Kahlenberg fails to consider the importance of institutional and state context, and he omits the consideration of factors related to the feasibility and implementation challenges of various alternatives.  Much of the Kahlenberg report focuses on an entirely different admissions goal: increasing the representation of low-income students at selective institutions.  As shown in numerous research studies, admissions policies focused on economic diversity (e.g., socioeconomic-based preferences) are not a substitute for policies that allow for the consideration of race and ethnicity. Mr. Kahlenberg's focus on the desirability of increasing socioeconomic diversity, therefore, limits the reliability of his report.

62.     As such, the Kahlenberg report does not change any of the opinions offered in my affirmative report with respect to the race-neutral alternatives that I concluded UNC-Chapel Hill should consider evaluating.

Dated:  April 6, 2018

Respectfully submitted,

Bridget Terry Long

Case 1:14-cv-00954-LCB-JLW   Document 154-31   Filed 01/18/19   Page 22 of 23

**Exhibit A: Materials Relied Upon**

**Case Materials**

- Expert Report of Bridget Long, filed January 12, 2018, including materials relied upon
- Expert Report of Richard D. Kahlenberg, filed January 12, 2018, including materials relied upon

**Other Materials Relied Upon But Not Previously Cited**

College Navigator, National Center for Education Statistics, U.S. Department of Education. Accessed Feb. 9, 2018 at https://nces.ed.gov/collegenavigator/

Digest of Education Statistics (2017), Table 306.20. U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data Systems (IPEDS), "Fall Enrollment Survey."

https://admissions.unc.edu/apply/class-profile-2/ (Accessed April 4, 2018)

http://admit.washington.edu/why-uw/about-uw-university-of-washington/ (Accessed April 4, 2018)

http://www.mlive.com/news/ann-arbor/index.ssf/2017/04/university_of_michigan_sets_re_1.html (Accessed April 4, 2018)

Watkins, Matthew. (April 5, 2017). "Texas senators mull eliminating Top 10 Percent Rule." *The Texas Tribune*. Available here: https://www.texastribune.org/2017/04/05/texas-senators-mull-eliminating-top-10-percent-rule/

Case 1:14-cv-00954-LCB-JLW   Document 154-31   Filed 01/18/19   Page 23 of 23