# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-954-LCB-JLW |
| UNIVERSITY OF NORTH CAROLINA, et al., | |
| Defendants. | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(212) 247-8006
park@consovoymccarthy.com

Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
Bryan K. Weir
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

# TABLE OF CONTENTS

NATURE OF THE MATTER BEFORE THIS COURT ...................................................1

STATEMENT OF FACTS ...........................................................................................2

I.    Students for Fair Admissions ...........................................................................2

II.   The University of North Carolina at Chapel Hill ...........................................2

III.  UNC's Policies Regarding the Use of Race in Admissions.............................3

      A.    UNC's Use of Race in Admissions ......................................................3

      B.    UNC's Heavy Preference for "Underrepresented Minorities" ............3

      C.    UNC's Failure to Define, Understand, and Pursue Critical Mass .......4

IV.   UNC's Admissions Process ..............................................................................6

      A.    Pre-Application Recruiting...................................................................6

      B.    The Application ....................................................................................6

      C.    Reader Review ......................................................................................7

            1.    Scoring Applications..................................................................7

            2.    Evaluating Standardized Test Scores ........................................8

            3.    Evaluating an Applicant's Race .................................................8

            4.    Making Tentative Admissions Decisions ...................................9

      D.    Monitoring the Racial Makeup of the Class.........................................9

      E.    School Group Review...........................................................................9

      F.    Post-Admission Evaluation ...............................................................11

V.    Statistical Evidence of Racial Preferences ....................................................12

      A.    UNC's Admissions Process Operates Differently for In-State and Out-of-State Applicants. ...............................................................................12

      B.    Non-URM Applicants Have Significantly Stronger Qualifications Than URM Applicants. ...............................................................................13

      C.    UNC's Gives Significant Racial Preferences to URM Applicants. ....................17

      D.    UNC Uses Race in a Mechanical, Formulaic Way Instead of an Individualized Fashion.......................................................................20

      E.    UNC's Expert Confirms that UNC's Racial Preferences are Enormous. ........21

VI.   The Availability of Race-Neutral Alternatives ..............................................22

      A.    Examination of Race-Neutral Alternatives.........................................22

B.   UNC Failed to Fully Consider or Implement Numerous Available
     Race-Neutral Alternatives that Could Achieve the Educational Benefits
     of Diversity..............................................................................................24

C.   Kahlenberg Demonstrated Through Various Simulations that UNC
     Has Available and Workable Race-Neutral Alternatives. ..................................25

D.   UNC's Experts Do Not Contest Kahlenberg's Conclusion that
     Workable Race-Neutral Alternatives are Available to UNC. ............................26

STANDARD OF REVIEW....................................................................................................27

ARGUMENT ..........................................................................................................................27

I.    SFFA HAS STANDING. ..............................................................................................27

II.   SFFA IS ENTITLED TO SUMMARY JUDGMENT. .................................................28

A.   UNC Does Not Use Race Merely as a "Plus" Factor to Achieve the
     "Educational Benefits of Diversity." ................................................................28

     1.   UNC's Use of Race Is Not Narrowly Tailored to Enroll a
          "Critical Mass" of Underrepresented Minorities in Order to
          Secure the "Educational Benefits of Diversity." ...................................28

     2.   UNC Mechanically Uses Race As Far More Than a "Plus"
          Factor.....................................................................................................31

B.   It is Unnecessary for UNC to Use Race to Achieve Student Body
     Diversity..........................................................................................................34

CONCLUSION ......................................................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) .......................................................................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ..............................................................................1

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519 (1989) .....................................................................34

*Eisenberg ex rel. Eisenberg v. Montgomery Cty. Public Schools*, 197 F.3d 123, 128-29 (4th Cir. 1999) ...........28

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2208 (2016) .............................................................1

*Fisher v. University of Texas at Austin*, 570 U.S. 297, 310 (2013).....................................................................28

*Gratz v. Bollinger*, 539 U.S. 244, 270, 272 (2003) .........................................................................................32

*Grutter v. Bollinger*, 539 U.S. 306, 334-340 (2003) ........................................................................................1

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) .....................................................27

*Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015)...................................27

*Tuttle v. Arlington Cty. School Bd.*, 195 F.3d 698, 706 (4th Cir. 1999 .............................................................30

## NATURE OF THE MATTER BEFORE THIS COURT

Students for Fair Admissions ("SFFA") is entitled to summary judgment. The parties have engaged in extensive discovery and, in cases of this type, summary judgment is often inappropriate. But sometimes, as here, the record is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). No rational factfinder could conclude that the admissions system of the University of North Carolina at Chapel Hill ("UNC") complies with the Fourteenth Amendment and Title VI.

UNC must pass strict scrutiny to withstand this legal challenge. That means UNC must prove that its use of race in admissions "is narrowly tailored to achieve the educational benefits that flow from diversity." *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2208 (2016) ("*Fisher II*") (citation and quotation omitted). UNC must make three showings in order to prove that its use of race is narrowly tailored. UNC must prove (1) that it uses race to enroll a "critical mass" of underrepresented minorities; (2) that its use of race is individualized; and (3) that it cannot achieve student body diversity through the implementation of race-neutral alternatives. *Grutter v. Bollinger*, 539 U.S. 306, 334-340 (2003).

UNC cannot make *any* of these showings. UNC officials could not even agree on what critical mass means—let alone show that they have pursued it. UNC's use of race is the opposite of individualized; UNC uses race mechanically to ensure the admission of the vast majority of underrepresented minorities. And, had UNC properly studied the issue, it would have learned that (as SFFA's uncontradicted evidence shows) socioeconomic preferences, among other race-neutral alternatives, can achieve student body diversity.

1

## STATEMENT OF FACTS

### I.    SFFA

Students for Fair Admissions, Inc. ("SFFA") is a non-profit organization whose mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." EX1, SFFA-UNC 0000059.[1] SFFA is a voluntary membership association with more than 20,000 members—including applicants and prospective applicants to institutions of higher education. *Id.* at SFFA-UNC 0000052; Doc. 114, Exs. G, I, J-N. SFFA has members who have applied to UNC, who were denied admission through a system that considers race and ethnicity, and who are ready and able to apply to transfer to UNC if it ceases its discriminatory practices. Doc. 114, Exs. G, I, J-N.

### II.    UNC

UNC is a flagship public research university located in Chapel Hill, North Carolina. EX2. UNC's Chancellor is Carol Folt, and its Provost is Robert Blouin, who replaced James Dean in 2017. EX69 7:19-20; EX61 16:16-22; EX66 7:18-23. Together they oversee UNC's academic activities, including admissions. EX69 12:10-15:14; EX66 30:20-38:8. The Office of Undergraduate Admissions ("Admissions Office") makes UNC's admissions decisions. The Vice Provost for Enrollment and Undergraduate Admissions is Stephen Farmer, and the Senior Associate Director of Admissions is Barbara Polk. EX3; EX76 29:19-31:12; EX68 7:24-8:4; EX75 18:2-19:9. Together they oversee all aspects of the Admissions Office. EX68 26:4-27:1; EX75 18:2-19:9; EX3.

---

[1] All exhibits are attached to the Declaration of Thomas McCarthy unless otherwise noted.

## III. UNC's Policies Regarding the Use of Race in Admissions

### A. UNC's Use of Race in Admissions

UNC makes admissions decisions based, in part, on the applicant's race. EX4, Interrogatory 27. According to UNC, an applicant's race can be a "'plus' that is awarded" and "may be significant in an individual case and tip the balance towards the admission of the student." EX5, UNC0323610; EX75 42:7-15; EX68 109:18-22; EX6, UNC0209654. UNC considers the applicant's race at every stage of the process, EX5, UNC0323609, and does not use race as a factor only when filling the last few seats in the class, EX7, Admission 5. UNC considers race even when the application gives no indication that race affected the student's life in any way. EX68 317:23-318:3.

### B. UNC's Heavy Preference for "Underrepresented Minorities"

UNC uses race in admissions to increase admission of "underrepresented minorities" or "URMs." EX68 96:13-21. URMs are African Americans, Hispanics, and Native Americans. EX68 40:21-25. They are "underrepresented," according to UNC, because the "percentage [of their race] enroll[ed] within the undergraduate student body is lower than their percentage within the general population in North Carolina." EX5, UNC0323609. UNC considers URMs to be "priority groups," EX8, UNC0103716; EX9, UNC0079824; EX73 31:22-24, and gives preferences to these "key priority demographics" because they "enhance diversity," EX76 294:17-295:17. UNC closely monitors its admission of URMs along a variety of metrics, including year-to-year, EX10, by comparison to UNC's peer universities, EX11; EX12, and in relation to the North Carolina and U.S. populations as a whole, EX13, UNC0079512.[2]

---

[2] UNC does not consider Asian Americans to be "underrepresented minorities." EX68 40:21-25; EX76 95:5-15. Although Asian Americans comprise numerous ethnicities, UNC views them as an

## C.  UNC's Failure to Define, Understand, and Pursue Critical Mass

UNC claims that it admits students based, in part, on their racial background because it wants to obtain the "educational benefits of diversity." EX4, Interrogatory 27. UNC states it can secure these benefits by enrolling a "critical mass" of URMs. EX14; EX60 55:20-56:19; EX68 63:19-64:10, 79:2-8; EX15, at 16-17.

Yet, admissions officers and senior UNC officials never discuss the concept of "critical mass." EX66 144:22-145:5 ("In all my conversations with Steve Farmer, that phrase [critical mass] has never come up. ... [N]o one has directed anybody to achieve a critical mass, and I'm not even sure we would know what it is."); EX66 167:24-168:4 (critical mass does not "driv[e] the conversation about when race is used and why it is used"); EX72 167:13-169:12 ("never" discussed critical mass in her more than a decade in the Admissions Office or in numerous race-neutral-alternatives committee meetings); EX76 223:4-11 (critical mass is "not a term we really use much in our office"); EX63 175:9-20; EX74 247:22-248:24. UNC has never determined whether it has achieved critical mass, EX76 271:22-272:2; EX69 122:2-9; EX60 93:9-18; EX62 42:23-43:7; EX77 105:2-19, 193:16-25, and has no idea whether its current level of racial diversity achieves its diversity goals, EX66 126:10-19, 131:1-12; EX68 90:8-25.

Unsurprisingly, then, UNC has no definition or coherent understanding of "critical mass." EX68 65:11-15, 69:13-22; EX75 260:5-261:6; EX76 223:4-16. Some officials say that the number of URMs in the admitted class is important. EX72 169:8-24. Others believe that numbers are irrelevant and what matters is how individual students feel. EX68 63:24-65:15 ("I

---

undifferentiated mass of "majority" students. EX73 240:11-241:8. UNC holds Asian-American applicants to a higher academic standard than URMs. EX73 207:4-24; EX16, UNC0224142-43; Arcidiacono Rep. 42-48.

don't think [critical mass] can be defined necessarily in terms of the number."); EX60 80:10-13 (critical mass "is about how individuals in the unit feel, their sense of welcoming of presence, of ability to flourish, to see people like them succeed"); EX62 36:20-24 (critical mass is "very amorphous…. [T]hat really is the point at which individuals who are a part of any underrepresented population begin to … feel like an individual."). Others point to more esoteric considerations. EX67 297:24-307:21 (critical mass is a consideration of the "representation [of the race] among administrators, faculty, and staff," "visibility of issues or individuals," the level of "racial identity development," such as whether a Latino student is actually "go[ing] out and protest[ing] for Latino issues," whether there are "allies and champions" for the racial group, and whether there is "intersectional identity" within the racial group). Others believe critical mass cannot be measured. EX62 52:11-53:2 ("Because critical mass is amorphous, you know, there – there is really not a way to make the determination."). And others lack any conception of the term at all. EX75 256:1-12 ("I don't think that we actually know…. [T]here's no concrete definition. There's nothing that says when you get to X you will have reached critical mass."); EX76 223:12-16 (acknowledging he lacks "any understanding how the critical mass goal would actually be measured or determined"); EX69 129:18-24 ("I don't find that term [critical mass] very useful because I don't know what that means."); EX73 21:22-25 ("I don't really understand what [critical mass] is."); EX65 253:10-254:3; EX63 175:9-202.

5

## IV. UNC's Admissions Process

### A. Pre-Application Recruiting

Each year, the Admissions Office purchases the contact information of more than 75,000 high school students who have taken standardized tests. EX17, UNC0087530. The goal is to "identif[y] admissible prospects and encourage[] them to apply" and allow UNC "to segment [its] prospect pool so that [it] can focus additional effort on students who advance [its] priorities." EX18, UNC0171437. These students are sent promotional materials encouraging them to visit and to apply to UNC. EX17, UNC0087530. This "strategy" is part of UNC's "priority of recruiting top North Carolinians and students who strengthen diversity." *Id.*

In identifying these students, the Admissions Office requires some racial groups to perform better on standardized tests than others. In 2014, for example, URMs in North Carolina could score as low as a 26 on the ACT and be recruited, whereas white and Asian-American students needed at least a 29. EX17, UNC0087530. UNC imposes similar racial thresholds when it holds recruiting events. EX65 228:10-14; EX19, UNC0186917; EX73 118:1-121:3; EX20, UNC0186754. UNC imposes these racial cutoffs because it does not want to "purchas[e] names that we know for a fact would not be admissible." EX65 52:22-54:8, 132:19-133:22.

### B. The Application

To apply, a student must submit an application, academic transcript, standardized test scores, personal essays, and letters of recommendation. EX21, Interrogatory 4. Students can apply through "early action" (applications due in October; decisions in January) or "regular

6

action" (applications due in January; decisions in March). EX76 175:25-176:20. UNC's application (the Common Application) contains a "Demographics" section that requests the applicant's citizenship status, birthplace, and race, and a "Family" section that requests the applicant's parents' country of birth. EX22, UNC0098996-97. UNC faces financial penalties unless it limits the proportion of out-of-state students in the entering first-year class to no more than 18%. EX76 45:12-25; UNC Board of Governors Policy 700.1.3. Thus, in-state students must comprise at least 82% of the class.

### C. Reader Review

#### 1. Scoring Applications

Applications are randomly assigned to and read by at least one admissions official. EX5, UNC0323607. Each application has a "summary sheet", which contains basic information about the applicant (*e.g.*, name, address, and deadline applied). EX76 167:9-169:6. The sheet prominently identifies the applicant's race. EX72 132:5-17.

The reader scores the applicant (on a scale of 1 to 10) in five categories: (1) "program," which assesses the difficulty of the student's curriculum; (2) "performance," which assesses the student's grades; (3) "extracurricular," which assesses the student's extracurricular record; (4) "essay," which assesses the writing quality of the student's essays; and (5) "personal qualities," which assesses both the student's personal qualities (*e.g.*, curiosity, kindness, integrity) and the applicant's race/ethnicity. EX5, UN0323608-09; EX76 143:3-144:12, 169:7-170:15, 250:13-251:15; EX72 82:14-92:3; EX74 40:3-43:10; EX4, Interrogatory 26. The readers record those ratings on the summary sheet. EX74 37:19-38:19, 44:25-45:8; EX76 167:9-169:13.

7

## 2. Evaluating Standardized Test Scores

Readers evaluate test scores differently depending on the applicant's race. EX73 207:4-19 (admissions officers "treat all Asian American students the same" when considering their standardized test scores because they "test higher than African American, Hispanic/Latino, and … American Indian[s]"); *id.* 215:17-25 ("because African American students, on national average, have lower test scores, you look at their test scores through that lens"); *id.* 201:17-202:2, 204:9-12; 205:11-20, 206:5-13. When readers' admissions decisions reflect that they do not "grasp[] the testing context of URM," senior admissions officials intervene to make clear that URM test results must be treated differently. EX23; EX24, UNC0128124; EX25 ¶ 55 (Asian-American admits have SAT scores 200 points higher than African-American admits).

## 3. Evaluating an Applicant's Race

Readers are keenly focused on the applicant's race, especially for URMs. Admissions officers frequently highlight the applicant's race as a key feature. EX26 ("She is an AA [African-American] female, with solid everything that adds up to an admit for me."); EX27 ("I'm going through this trouble because this is a bi-racial (black/white) male."); EX16, UNC0224139 ("I just opened a brown girl who's an 810 [SAT]."); *id.* (noting she was just "think[ing] of a wonderful brown girl a bit ago"); *id.* UNC0224140 ("If its brown and above a 1300 [SAT] put them in for [the] merit/Excel [scholarship]."); *id.* UNC0224141 (even with a 26 ACT, the applicant is "[s]till yes, give these brown babies a shot at these merit $$"); *id.* UNC0224142-43 (expressing disappointment that an applicant with perfect test scores was Asian and not "Brown"); EX49 ("Stellar academics for a Native Amer/African Amer kid[.]"); EX28, UNC0231016; EX29, UNC0194840; EX30; EX31, UNC0194845.

### 4. Making Tentative Admissions Decisions

The reader makes a tentative decision to either admit, deny, defer (during early action), or waitlist (during regular action), EX72 96:14-18; EX76 176:21-177:1, by considering the five ratings and all other information contained in the application, including standardized test scores, recommendation letters, legacy status, and race. EX68 60:15-61:6; EX5, UNC0323608-10. Readers take race into account when deciding whether to tentatively admit or deny an applicant; race can be the "tipping point." EX75 42:7-15; EX68 109:7-22; EX5, UNC0323609-10; EX6; EX16, UNC0224140.

### D. Monitoring the Racial Makeup of the Class

Before this suit was filed (November 2014), UNC monitored the racial makeup of its incoming class as reader decisions were made. First, UNC regularly sent senior admissions officers daily "core reports" that identified the racial/ethnic composition of the admitted class as of that date, with comparisons to the prior year. EX75 42:16-44:1, 64:1-21; EX72 133:18-135:8; EX68 138:9-23, 144:3-7; EX10, UNC0081617-18. Second, admissions officers discussed the ethnic makeup of the admitted class at Admissions Office meetings. EX75 44:15-45:16. Third, senior admissions officers received updates on the projected "yield" of various minorities throughout the admissions cycle. EX32, UNC0083090-91; EX72 72:4-73:3. As of fall 2015, UNC claims that it no longer engages in these race-monitoring practices. EX68 149:17-150:9; EX75 44:15-45:16; EX4, Interrogatories 8-9.

### E. School Group Review

The Admissions Office finalizes admissions decisions through "school group review" or "SGR". EX76 177:22-179:3. During SGR, senior admissions officers receive reports that

9

display all applicants from the same high school, key information about each applicant (*e.g.*, ratings, test scores, legacy status), and the tentative admissions decision for each applicant. EX76 182:1-183:23. Before this lawsuit, SGR reports prominently identified the race of each applicant listed. EX75 136:11-137:2. UNC removed race from SGR reports at the advice of counsel, *id.*, yet race is still easily available by clicking on the applicant's name on the SGR report. EX76 186:1-187:22; EX33 (handwritten notations on SGR report highlighting URM status). And UNC officials have asked that race be put back on SGR reports. EX34, UNC179481.

The admissions officer then reviews the SGR report and, if he or she chooses, the applications identified on the report; if the admissions officer determines that any admission decision should be changed, the officer will change the decision (*e.g.*, from deny to admit). EX76 180:1-181:1; EX72 24:9-25:20; EX35. SGR "shapes and fine-tunes" the class from a racial/ethnic standpoint; officers take race into account when deciding whether to change an applicant's tentative admissions decision, EX34, UNC0179481; EX76 186:16-187:22; EX36, and often cite URM status as a basis for admitting applicants via SGR. *See, e.g.*, EX37, UNC0194911 ("Defer to admit. UR."); EX38, UNC0194935 ("Defer to admit. UR."); *id.* ("Possible deny to defer. UR."). After SGR, UNC releases its admissions decisions to the applicants. EX75 31:11-16. If there are spaces available, UNC will admit applicants through the waitlist, EX73 86:6-88:12, using the same evaluation criteria, including race. EX75 218:21-220:25.

### F.    Post-Admission Evaluation

Despite claiming that "the students we admit are students we're confident have the capacity to succeed at UNC," EX68 236:19-24; EX66 177:11-178:24, URMs underperform academically relative to non-URMs. EX39, UNC0236941 (Native American and African-American students' GPA on average 0.33 points or more lower than white students'); *id.* at UNC0236940 (four-year graduation rates for Black and Native American male students lagged behind white male students by an average of more than 20% from 2009 through 2013); EX40, UNC0124112-13. UNC officials repeatedly have lamented this achievement gap and described it as a "crisis" with respect to URM males. EX41, UNC0109850.

UNC has recognized that low academic qualifications are linked to poor academic outcomes. Its Retention Task Force, for example, concluded that "[g]raduation outcomes differed significantly by level of academic preparation at the time of entry to Carolina." EX40, UNC0124116. The Provost's Minority Male Workgroup recommended that UNC conduct a "review of existing institutional policies"—including "admission criteria"—"to identify any that may adversely impact or inhibit the success of URM males." EX42, UNC0326485. Yet there is no indication that UNC has analyzed whether its use of race is doing just that.

The link between low qualifications and poor outcomes was illustrated by UNC's so-called "paper classes"—a shadow curriculum operating within the Department of African and Afro-American Studies for over two decades. EX43. These fake classes "entailed no class attendance and required only the submission of a single research paper" and were administered so that "under-prepared students who struggled with the demanding Chapel Hill curriculum" could have "watered-down academic requirements." *Id.* at 1, 3. The students in these classes—

more than 3,100 over 18 years—"never had a single interaction with a faculty member." *Id.* Nonetheless, they were graded "generously—typically with As or High Bs—and largely without regard to the quality of the papers." *Id.* at 2, 3.

## V.     Statistical Evidence of Racial Preferences

SFFA retained Peter Arcidiacono—a professor in the Department of Economics at Duke University—to analyze the data produced by UNC and to answer several questions about UNC's admissions process, using accepted econometric and statistical methods and techniques. Arcidiacono Decl., Ex. A ("Arcidiacono Rep."), at 1. Using this data, Professor Arcidiacono constructed a dataset that permitted him to use logistic regression analysis to determine how various factors—including race/ethnicity—affect the scoring of applications and admissions decisions. His analysis reveals, among other things, that UNC's admissions process operates differently for in-state and out-of-state applicants; that non-URMs have far stronger academic qualifications than their URM counterparts; that UNC gives substantial preferences to URMs; and that UNC uses race in a mechanical, formulaic way.

### A.     UNC's Admissions Process Operates Differently for In-State and Out-of-State Applicants.

UNC's admitted class is limited to 18% out-of-state students. Yet, UNC receives applications from approximately twice as many out-of-state applicants as in-state applicants. Arcidiacono Rep. 10. The combination of these two factors makes out-of-state admission to UNC much more competitive than in-state admission. *Id.* Comparative admit rates reveal a striking difference between admission rates between the in-state pool (47.9%) and the out-of-

12

state pool (13.5%).[3] Arcidiacono Rep. 19. Moreover, there are substantial differences in how race impacts in-state and out-of-state applicants. In-state non-URM applicants are admitted at a significantly higher rate than their African-American and Hispanic counterparts; for out-of-state applicants, the reverse is true: URM applicants are admitted at a significantly higher rate than out-of-state non-URM applicants. Arcidiacono Rep. 19-20 & Table 2.2.

### B. Non-URM Applicants Have Significantly Stronger Qualifications Than URM Applicants.

Non-URM applicants have substantially stronger qualifications than URM applicants—whether measured by standardized test scores, high school GPA, or UNC's own ratings (except for the personal quality rating). Arcidiacono Rep. 24-26 & Tables 2.3, 2.4. Professor Arcidiacono conducted a simple analysis to examine racial/ethnic differences in admission rates for students with similar academic qualifications. To do so, he constructed an academic index, which is a weighted average of an applicant's SAT score and high school GPA. He then "partition[ed] the academic index into deciles to show how the patterns of admissions differ by race/ethnicity for students who fall within the same academic index decile." Arcidiacono Rep. 26-27.

Tables 3.1 & 3.2 (reprinted from Arcidiacono Rep. 28) show the number and share of each race/ethnicity in each academic index decile for the in-state and out-of-state applicant pools, respectively. They confirm that non-URM applicants are far more academically qualified than URM applicants.

---

[3] A UNC study produced after the close of fact discovery revealed that, when the entire applicant pool is taken as a whole, residency is the variable with the largest impact on admission. EX71 173:7-174:7; EX64 25:4-18.

**Table 3.1**: In-State Number and Share in Each Academic Index Decile by Race/Ethnicity

| | Number of applicants in each decile | | | | Share of applicants in each decile | | | |
|---|---|---|---|---|---|---|---|---|
| Decile | White | African American | Hispanic | Asian American | White | African American | Hispanic | Asian American |
| 1 | 1,848 | 2,462 | 582 | 376 | 5.18 | 32.74 | 16.85 | 6.54 |
| 2 | 2,762 | 1,553 | 518 | 420 | 7.74 | 20.65 | 14.99 | 7.31 |
| 3 | 3,310 | 1,053 | 476 | 433 | 9.27 | 14.00 | 13.78 | 7.53 |
| 4 | 3,663 | 723 | 406 | 473 | 10.26 | 9.61 | 11.75 | 8.23 |
| 5 | 3,880 | 563 | 363 | 457 | 10.87 | 7.49 | 10.51 | 7.95 |
| 6 | 3,972 | 452 | 325 | 498 | 11.13 | 6.01 | 9.41 | 8.66 |
| 7 | 4,101 | 304 | 238 | 588 | 11.49 | 4.04 | 6.89 | 10.23 |
| 8 | 4,153 | 205 | 248 | 625 | 11.64 | 2.73 | 7.18 | 10.87 |
| 9 | 4,180 | 138 | 171 | 739 | 11.71 | 1.84 | 4.95 | 12.86 |
| 10 | 3,820 | 67 | 128 | 1,139 | 10.70 | 0.89 | 3.70 | 19.82 |
| Total | 35,689 | 7,520 | 3,455 | 5,748 | 100.00 | 100.00 | 100.00 | 100.00 |

**Table 3.2**: Out-of-State Number and Share in Each Academic Index Decile by Race/Ethnicity

| | Number of applicants in each decile | | | | Share of applicants in each decile | | | |
|---|---|---|---|---|---|---|---|---|
| Decile | White | African American | Hispanic | Asian American | White | African American | Hispanic | Asian American |
| 1 | 3,033 | 2,674 | 840 | 493 | 6.77 | 39.21 | 13.10 | 4.41 |
| 2 | 4,195 | 1,296 | 787 | 721 | 9.36 | 19.01 | 12.28 | 6.45 |
| 3 | 4,618 | 808 | 693 | 816 | 10.31 | 11.85 | 10.81 | 7.30 |
| 4 | 4,737 | 603 | 657 | 964 | 10.57 | 8.84 | 10.25 | 8.62 |
| 5 | 4,860 | 409 | 645 | 1012 | 10.85 | 6.00 | 10.06 | 9.05 |
| 6 | 4,926 | 308 | 581 | 1140 | 10.99 | 4.52 | 9.06 | 10.19 |
| 7 | 4,883 | 265 | 537 | 1199 | 10.90 | 3.89 | 8.38 | 10.72 |
| 8 | 4,727 | 197 | 562 | 1386 | 10.55 | 2.89 | 8.77 | 12.39 |
| 9 | 4,610 | 136 | 540 | 1551 | 10.29 | 1.99 | 8.42 | 13.87 |
| 10 | 4,216 | 123 | 568 | 1,900 | 9.41 | 1.80 | 8.86 | 16.99 |
| Total | 44,805 | 6,819 | 6,410 | 11,182 | 100.00 | 100.00 | 100.00 | 100.00 |

The first row of each table shows the number and share of applicants from each racial group in the bottom decile of the academic index. There are far more URMs than non-URMs

14

(by share) in that decile; for the in-state pool, more than 31% of Hispanic and 53% of African-American applicants are in the bottom two deciles. And in both tables, the URM share drops and the non-URM share increases as the analysis moves to the higher deciles. For the in-state pool, 19.8% of Asian Americans and 10.7% of whites are in the top decile as compared to only 3.7% of Hispanics and less than 1% of African Americans. Professor Arcidiacono's analysis also demonstrates that higher academic indexes are strongly correlated with admission to UNC (as well as higher scores by UNC's admissions staff). Arcidiacono Rep. Tables 3.3, 3.4, 3.5.

Thus, there are "substantial differences … between the admissions rates of different racial/ethnic groups within the same academic index decile." *Id.* at 30. As Table 3.3 (reprinted below) shows, with the exception of the top decile (where admission rates are above 97% for every race/ethnicity), in-state URM applicants "have higher admit rates than non-URMs in every decile." Arcidiacono Rep. 30. What is particularly noteworthy is "how much higher the admission rates are for [URMs]." *Id.* In the fifth decile, for example, "[n]on-URMs have admission rates below 30% …. But the corresponding admission rates for URMs are much higher—Hispanic admit rates are over 53% (23 percentage points higher) and African-American admit rates are over 71% (41 percentage points higher)." *Id.*

**Table 3.3**: In-State Admission Rates by Academic Index Decile and Race/Ethnicity

| Decile | White | African American | Hispanic | Asian American | Total |
|---|---|---|---|---|---|
| 1 | 0.70% | 1.02% | 1.37% | 0.27% | 0.89% |
| 2 | 3.08% | 10.69% | 5.21% | 1.90% | 5.44% |
| 3 | 7.76% | 28.77% | 22.48% | 6.24% | 13.16% |
| 4 | 17.83% | 49.24% | 38.42% | 16.91% | 23.65% |
| 5 | 29.56% | 71.23% | 53.72% | 28.67% | 35.61% |
| 6 | 47.31% | 80.09% | 67.69% | 44.38% | 51.11% |
| 7 | 69.40% | 88.49% | 81.09% | 56.97% | 69.64% |
| 8 | 84.08% | 94.63% | 87.50% | 74.40% | 83.50% |
| 9 | 94.07% | 97.10% | 96.49% | 88.36% | 93.42% |
| 10 | 98.85% | 97.01% | 98.44% | 98.16% | 98.66% |
| Total | 50.66% | 30.25% | 40.93% | 52.87% | 47.33% |

Table 3.4 (reprinted below) shows "even more striking" "racial/ethnic discrepancies" for out-of-state applicants. *Id.* at 31. In the sixth decile, for example, out-of-state African-American applicants "had over a 46% chance of being admitted. But the corresponding rates for non-URMs was around 5%." *Id.* Moreover, African-American applicants in that decile "have admit rates that are over four and a half percentage points higher than whites in the top decile." *Id.*

**Table 3.4**: Out-of-State Admission Rates by Academic Index Decile and Race/Ethnicity

| Decile | White | African American | Hispanic | Asian American | Total |
|---|---|---|---|---|---|
| 1 | 0.49% | 0.45% | 0.12% | 0.00% | 0.40% |
| 2 | 0.52% | 5.71% | 1.27% | 0.28% | 1.54% |
| 3 | 0.89% | 14.36% | 3.61% | 0.25% | 2.65% |
| 4 | 1.52% | 29.85% | 9.28% | 1.04% | 4.64% |
| 5 | 2.90% | 39.61% | 15.97% | 1.38% | 6.06% |
| 6 | 5.34% | 46.10% | 22.20% | 4.56% | 8.43% |
| 7 | 9.24% | 57.74% | 30.35% | 6.51% | 12.27% |
| 8 | 15.87% | 57.87% | 33.63% | 15.51% | 18.45% |
| 9 | 26.51% | 69.12% | 42.41% | 27.66% | 28.87% |
| 10 | 41.58% | 73.17% | 61.44% | 52.89% | 46.97% |
| Total | 10.56% | 16.67% | 19.64% | 16.16% | 12.91% |

This analysis demonstrates that, if admission to UNC were based only on the academic index, the admitted classes would shift to a substantially larger population of non-URM students. For the in-state class, over the six-year period from 2012 to 2017, "[t]he number of

admitted white and Asian-American applicants would increase by 1175 and 428 respectively;" correspondingly, the number of African-American and Hispanic admits would fall by 1,220 and 383, respectively. Arcidiacono Rep. 35 & Table 3.6. For the out-of-state class, over that same six-year period, the number of admitted white and Asian-American applicants would increase by 920 and 575, respectively, and "[t]he number of Hispanic and African American admits would fall by 523 and 972 respectively." Arcidiacono Rep. 37 & Table 3.7.

### C.     UNC's Gives Significant Racial Preferences to URM Applicants.

Professor Arcidiacono estimated a series of logistic regression models of admission in order to estimate the magnitude of UNC's racial preferences. He did this separately for the in-state and out-of-state applicant pools because it is readily apparent that many of the variables UNC considers in evaluating candidates—and UNC's ultimate admissions decisions—operate differently for these two applicant groups. Arcidiacono Decl., Ex. C ("Arcidiacono Reply Rep."), at 44-45. Professor Arcidiacono's models demonstrate that UNC gives very large racial preferences to URM applicants. As these figures show, the racial preferences UNC gives to URM applicants are substantial.[4]

In particular, Professor Arcidiacono's analysis shows that, for both in-state and out-of-state applicants, race is a determinative factor for many URMs. For example, "[i]n-state Hispanic applicants are admitted at a rate of 41% and would experience a 9.7% drop in their admission rate if they were treated as white applicants." Arcidiacono Reply Rep. 46. In other words, racial preferences "account for nearly a fourth of admissions for in-state Hispanic

---

[4] UNC gives preferences to legacy applicants, but they have relatively little effect on the racial composition of UNC's admitted classes. Arcidiacono Rep. 5.

17

applicants." *Id.* UNC's preferences for African-American applicants are even larger. "In-state African-American applicants are admitted at a rate of 30.5% with racial preferences," but removing those preferences "would result in a drop in [their] admissions rate of 12.7%. In other words, racial preferences account for nearly 42% of African-American in-state admissions." *Id.*

UNC's racial preferences for URMs are even larger for out-of-state applicants. Out-of-state Hispanic applicants have admit rates of 20.3%. But "without racial preferences, their admit rates would fall to 6.0%." *Id.* UNC's racial preferences thus "account for 70% of out-of-state Hispanic admissions." *Id.* Out-of-state admission rates for African-American applicants are 17%; their rates would plummet to 1.5% without racial preferences. In other words, "racial preferences account for 91% of out-of-state African-American admissions." *Id.*[5]

Professor Arcidiacono illustrates the effect of UNC's racial preferences on admission rates another way: by showing the effect of removing racial preferences on the admission rates of URM applicants who were actually admitted to UNC (that is, URMs whose admit rate is known to be 100%). *Id.* at 48-49 (Table 3.1). "For in-state applicants, if racial preferences were removed, Hispanic admits would see an average probability of admission of 75.8%—a 24.2 percentage point decrease." Arcidiacono Reply Rep. 49. For in-state African-American admits, removing racial preferences would drop their "average probability of admission [to] 57.8%, a 42.2 percentage point decrease." *Id.* The effect on out-of-state URM admits is even more

---

[5] Compared to UNC's racial preferences, its preferences for First Generation College ("FGC") applicants are quite small. UNC gives first-generation URM applicants a much smaller preference for their FGC status than it gives first-generation non-URM applicants. "Relative to the non-URM applicant, the overall preference the [URM] applicant receives would be larger if the two applicants were non-FGC than if they were FGC." Arcidiacono Rep. 42.

striking. "For out-of-state Hispanic admits, removing racial preferences would result in an average probability of admission of 29.2%, a 70.8 percentage point decrease." *Id.* at 50. And for out-of-state African-American admits, their average probability of admission would drop to "8.7%, a 91.3 percentage point decrease." *Id.*

Professor Arcidiacono further illustrates the magnitude of UNC's racial preferences by showing how a hypothetical non-URM applicant's likelihood of admission would rise by changing his/her race to URM (while keeping all other characteristics the same). Arcidiacono Decl, Ex. B ("Arcidiacono Rebuttal Rep.") Table 4.1R. Consider a male, non-FGC Asian-American applicant with a 25% chance of admission: "If he were an in-state applicant, his probability of admission would increase to over 67% (i.e., more than double) had he been treated like a Hispanic applicant, and to over 90% (i.e., more than triple) had he been treated like an African-American applicant." Arcidiacono Reply Rep. 46. Again, UNC's racial preferences are even larger for out-of-state URM applicants. If that same applicant with a 25% chance of admission were an out-of-state applicant, "his probability of admission would increase to over 86% had he been treated like a Hispanic applicant and over 99% had he been treated like an African-American applicant." *Id.* at 46-47. "Simply changing this hypothetical Asian-American applicant's race to either Hispanic or African American thus would transform him from an unlikely admit to an almost certain admit." *Id.* at 47.

Professor Arcidiacono also illustrates the effect of UNC's racial preferences on the incoming admitted classes as a whole. Arcidiacono Rebuttal Rep. Tables 4.4R & 4.5R. He does this by removing the effect of UNC's racial preferences from his model while holding fixed the number of admits UNC made each year for the six-year period from 2012 through 2017.

19

This demonstrates the striking effect of UNC's racial preferences in boosting URM admissions. For the in-state applicant pool, "removing racial preferences would result in 1,171 additional non-URM admits over the six-year period"—nearly two hundred per year. Arcidiacono Reply Rep. 47. And for the out-of-state pool, "removing racial preferences would result in 2,486 more non-URM admits" over the same period, or more than 400 per year. *Id.* On average, then, UNC denies admission to more than 600 non-URM applicants each year on account of race.[6]

### D. UNC Uses Race in a Mechanical, Formulaic Way Instead of an Individualized Fashion.

Professor Arcidiacono's modeling is highly accurate at predicting UNC's actual admissions decisions. His models are well over 90% accurate in predicting admissions decisions for both the in-state (92.1%) and the out-of-state (93.3%) applicant pools. Arcidiacono Rebuttal Rep. 24, 28. It is particularly striking how accurately his model predicts actual admits in the in-state pool (91.8%)—these levels of accuracy "are virtually never reported in economics papers." *Id.* at 23. As Professor Arcidiacono explains, his models generate a prediction of each applicant's likelihood of admission. Those predictions are "heavily clustered" near "'0' (certain to be rejected) [and] '1' (certain to be admitted)." *Id.* at 24-25. That is, his model "has an easy time sorting applicants into those very likely to be rejected and very likely to be admitted." *Id.* And as noted, those predictions match up very

---

[6] Professor Arcidiacono's analysis actually underestimates the magnitude of UNC's racial preferences. First, "[n]on-URM applicants are strong on the measures that are observed in the data, suggesting that they would likely be strong on unobserved variables not in the data (e.g., number and scores on AP exams)." Second, "[t]here is evidence of bias in the personal quality measure that UNC assigns to applicants in favor of African Americans and Hispanics"—accounting for this would show preferences of even larger magnitude. Arcidiacono Rep. 4.

closely to UNC's actual admissions decisions. Arcidiacono Rebuttal Rep. Figures 1-3 and accompanying text. The accuracy with which Professor Arcidiacono's models predict admission "shows a heavily formulaic approach in which the key factors driving admission are combined in a largely mechanical way." *Id.* at 25.

### E. UNC's Expert Confirms that UNC's Racial Preferences are Enormous.

UNC produced reports from Professor Caroline Hoxby, a Stanford University economics professor. Her work does nothing to rebut Professor Arcidiacono's statistical analysis.[7] It actually confirms "that UNC's racial preferences for URM applicants are enormous." Arcidiacono Reply Rep. 7. First, she purports to show that racial preferences have little effect on admissions by observing the effect on non-URM applicants of equalizing admission rates for URM and non-URM applicants within deciles of the "admissions index" (an index derived from her estimated admissions model). This is a sleight of hand designed to make UNC's racial preferences appear smaller than they are by spreading the effect of UNC's racial preferences over the pool of non-URM applicants. Although Hoxby does not report the data underlying this analysis, they reveal that UNC's "racial preferences account for 70% of out-of-state URM admits" or "2,399 URM admits over the six-year period." Arcidiacono Reply Rep. 7-8.

Second, in criticizing the simulations of SFFA's expert on race-neutral alternatives (Richard Kahlenberg), Hoxby claims that the socioeconomic preferences Kahlenberg utilizes are unreasonably large. She claims that Kahlenberg's SES preference "can equate to an SAT

---

[7] Notably, Professor Arcidiacono's admissions models "have much greater predictive power than [Hoxby's] preferred model." Arcidiacono Reply Rep. 9, 10.

bump of 278 points." *Id.* at 8. But using her "methods reveals that out-of-state African-American applicants receive a racial preference that equates to nearly 400 SAT points." *Id.* Her own analysis, then, indicates that UNC's racial preferences are massive.

## VI. The Availability of Race-Neutral Alternatives

### A. Examination of Race-Neutral Alternatives

In 2003, the Supreme Court held that universities may not employ racial preferences unless they have first engaged in "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. Despite this obligation, by November 2014 (when this suit was filed), the sum total of UNC's efforts—in the 11 years since *Grutter*—were (1) a 2007 excel "spreadsheet" in which Farmer calculated UNC's class if the admissions process operated "mechanically" based on certain factors, EX68 208:6-211:22; (2) a 2010 "literature review," in which Jennifer Kretchmar reviewed academic papers on race-neutral alternatives but performed no analysis of whether such alternatives were feasible at UNC, EX44 (explaining the research was "dated" in 2014); (3) a 2012 top-ten-percent analysis Kretchmar conducted for UNC's amicus brief in *Fisher I*, EX45, UNC0080085-86 (4) an ad hoc "working group" on race-neutral alternatives that met for the first time in December 2013 (and met only four additional times between then and February 2016 when it was disbanded), EX46, UNC0079625; EX47 UNC0326127-32; EX75 272:24-275:4, and (5) an October 2014 rough "draft" of a report from Jennifer Kretchmar that contained "preliminary results" of her findings on race-neutral alternatives for the working group, EX48, UNC0097417, UNC0097434-37. UNC formed a new race-neutral-alternatives committee in 2016; as of June

30, 2017 (the close of fact discovery), however, that committee had yet to produce any final conclusions. EX7, Admission 14; EX75 300:5-20.

A year after the close of fact discovery, UNC produced an interim report from the committee; in that report, the committee noted that some academic literature "cast[s] doubt on the utility of race-neutral strategies as complete substitutes for overt considerations of race" but recommended that it should conduct its own simulations of race-neutral strategies because "the outcomes of race-neutral admission strategies vary depending on the circumstances surrounding the particular universit[y]." EX78, UNC0380387-88. The committee, however, has never actually conducted any simulations of race-neutral alternatives. EX71 42:6-8; 43:20-44:1; 44:15-20; EX64 20:6-13; 44:4-8.

SFFA retained Richard Kahlenberg—a senior fellow at The Century Foundation—to do what UNC was supposed to do: examine whether UNC could implement race-neutral strategies that could achieve the educational benefits of diversity. Kahlenberg Decl., Ex. A ("Kahlenberg Rep.") at 3. Drawing on his extensive knowledge of the history and study of race-neutral alternatives (*id.* at 5-16), Kahlenberg reviewed UNC's efforts and concluded that "UNC failed to accurately consider or fully implement any of the numerous available race-neutral alternatives that could achieve the educational benefits of diversity." *Id.* at 5. Kahlenberg also evaluated simulations of several race-neutral options using the admissions data provided by UNC. He concluded that these simulations demonstrate that workable race-neutral alternatives exist.

**B. UNC Failed to Fully Consider or Implement Numerous Available Race-Neutral Alternatives that Could Achieve the Educational Benefits of Diversity.**

Kahlenberg outlined the "extensive empirical evidence and academic research documenting the myriad (and innovative) ways in which colleges and universities such as UNC can use race-neutral alternatives to produce the educational benefits of diversity." Kahlenberg Rep. 5; *id.* at 5-16. He found that UNC failed to fully consider or implement numerous workable race-neutral alternatives, including:

- Increasing socioeconomic preferences;

- Increasing financial aid;

- Adopting policies using geographic diversity, including percentage plans and the use of zip codes and Census tract data;

- Reducing or eliminating preferences for legacies;

- Increasing recruitment efforts;

- Increasing admission of community college transfers;

- Eliminating Early Action; and

- Developing partnerships with disadvantaged high schools.

Kahlenberg Rep. 22-65; Kahlenberg Decl., Ex. B ("Kahlenberg Rebuttal Rep.") 20-36; Kahlenberg Decl., Ex. C ("Kahlenberg Reply Rep.") 30-43.

Kahlenberg also found that UNC failed to conduct a basic regression analysis "to determine what weight its admissions committee currently provides to race" and failed to define critical mass to establish an appropriate benchmark against which to evaluate UNC's

use of race and consideration of race-neutral alternatives.[8] Kahlenberg Rep. 18-20. He explained that UNC improperly utilized an overly strict standard by rejecting race-neutral alternatives that do not precisely meet or exceed "current levels of racial diversity and academic preparedness." *Id.* at 17-20.

### C. Kahlenberg Demonstrated Through Various Simulations that UNC Has Available and Workable Race-Neutral Alternatives.

Kahlenberg evaluated numerous simulations of race-neutral strategies to determine whether UNC has workable race-neutral alternatives available to it. The simulations he considered included the use of various socioeconomic preferences and percentage plans. Some simulations focused only on applicants to UNC (based on admissions data UNC produced in this case) because doing so allows consideration of UNC's ratings. Others also considered a broader possible applicant pool (*i.e.*, students who did not apply to UNC or "non-applicants") because these students might be motivated to apply under a new admissions policy.

Several of these simulations demonstrate that UNC has available and workable alternatives (including Simulations 3, 7, 8, 9, 10, 11, 12, and 13 identified in Kahlenberg's report). Kahlenberg Reply Rep. 64. Likewise, Professor Hoxby's 750/20% socioeconomic preference and top 5% admissions models provide viable alternatives. *Id.*

---

[8] Although the Admissions Office has examined the effect of numerous factors on admissions decisions, including gender, legacy, admissions cycle (early vs. regular), and standardized test scores, it has never analyzed the extent to which race is affecting its decision-making—despite having a model that would permit it to do so. EX68 121:16-126:4; EX72 194:20-195:6. A year after the close of fact discovery, UNC produced documents showing that its Data Analytics Subcommittee conducted a regression analysis showing that URM status is "uniquely predictive of admission," EX59, UNC0380807—*i.e.*, that the coefficient for URM status is statistically significant, EX71 118:21-119:7.

**D. UNC's Experts Do Not Contest Kahlenberg's Conclusion that Workable Race-Neutral Alternatives are Available to UNC.**

UNC's experts do not ever opine on whether any particular race-neutral strategy is workable and available. Professors Mitchell Chang and Bridget Long offered no opinions regarding the workability of any particular race-neutral strategies—in their reports or at deposition. Professor Hoxby discussed SFFA's various race-neutral alternatives and created her own simulations of race-neutral strategies. She rejects them all—but only for failing to meet or exceed both UNC's actual levels of URM enrollment and standardized test scores. She takes no position on whether any particular race-neutral alternative is workable and available to UNC.

To be sure, Hoxby's reports sometimes read as if she were rejecting particular strategies as not workable. *E.g.*, EX58 ("Hoxby Reply Rep.") at 27 ("Mr. Kahlenberg's New SES Plans Are Not Workable Alternatives for UNC"). Yet, upon questioning, she backtracked, clarifying that she meant only that "there is no race-blind alternative in which I predicted that UNC could achieve its actuals," that is, its actual level of URM representation and standardized test scores. EX70 63:18-65:9. As Hoxby explained, whether any race-neutral alternative was "workable" was outside the scope of her "assignment." *Id.* at 59:9-13.

Her "assignment" was limited to "evaluat[ing] each alternative relative to what UNC attains actually now under its current plan" to determine whether any particular "race-neutral alternative [is or] is not predicted to achieve UNC's current actuals" in terms of URM representation and standardized test scores. *Id.* at 59:1-2, 60:23-25. Hoxby never considered, much less reported, how any race-neutral alternative might affect socioeconomic diversity. *Id.* at 32:21-22. She even declined to opine on whether socioeconomic diversity is "an appropriate

goal for a university" or even "whether increasing SES diversity would help a university attain the educational benefits of diversity." *Id.* at 33:2-17; 35:7-14.

## STANDARD OF REVIEW

"A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a [factfinder] could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (citations and quotations omitted). Even where there are disputed facts, summary judgment is warranted if the record "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## ARGUMENT

## I. SFFA HAS STANDING.

This Court has already held that SFFA has standing under *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). Doc. 150 at 2-16. First, "at least one of [SFFA's] Standing Members would have standing to sue on their own." *Id.* at 11. Second, "the instant lawsuit which seeks to end [UNC's] alleged racial discrimination in its admission process is aligned with, and furthers, SFFA's stated purpose." *Id.* at 12. Third, because SFFA only "seeks declaratory and injunctive relief, obtaining such relief ... would not require individual participation by its members." *Id.* (citations and quotations omitted). Accordingly, "SFFA satisfies the requirements necessary to establish associational standing to sue on behalf of its members." *Id.* at 16.

## II.  SFFA IS ENTITLED TO SUMMARY JUDGMENT.

Strict scrutiny applies "to any admissions program using racial categories or classifications." *Fisher v. University of Texas at Austin*, 570 U.S. 297, 310 (2013) ("*Fisher I*"); *Eisenberg ex rel. Eisenberg v. Montgomery Cty. Public Schools*, 197 F.3d 123, 128-29 (4th Cir. 1999). Under strict scrutiny, "racial 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.'" *Fisher I*, 570 U.S. at 310 (quoting *Grutter*, 539 U.S. at 326). UNC cannot shoulder that heavy burden. First, UNC does not use race merely as an individualized "plus" factor to achieve the educational benefits of diversity. Second, it is unnecessary for UNC to use race to enroll a diverse student body.

### A.  UNC Does Not Use Race Merely as an Individualized "Plus" Factor to Achieve the "Educational Benefits of Diversity."

UNC must show "that its plan is narrowly tailored to achieve the only interest [the Supreme] Court has approved in this context: the benefits of a student body diversity that 'encompasses a ... broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher I*, 570 U.S. at 314-15. Accordingly, UNC may use race only to enroll a "critical mass of underrepresented minority students ... so as to realize the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 318. Even then, race may only be a "plus" factor in a system "that consider[s] the overall individual contribution of each candidate." *Fisher I*, 570 U.S. at 305. UNC is violating both preconditions.

#### 1.  UNC's Use of Race Is Not Narrowly Tailored to Enroll a "Critical Mass" of Underrepresented Minorities in order to Secure the "Educational Benefits of Diversity."

UNC claims to use race in admissions in order to enroll a "critical mass" of URMs so it may secure the "educational benefits of diversity." Ordinarily, a university's explanation for

*why* it uses race—*i.e.*, that it truly believes in the "goal of diversity"—is considered an "academic judgment" to which courts give some measure of deference. *Fisher II*, 136 S. Ct. at 2208. Here, though, there is reason not to. UNC has shown no interest in creating an environment where URMs will thrive academically. There is powerful evidence that URM students (and URM males in particular) struggle academically compared to their peers. EX39, UNC0236941; EX40, UNC0124112-13. The record evidence also reveals a significant gap in graduation rates. EX39, UNC0236940; EX40, UNC0124112-13; EX42, UNC0326479. A UNC official characterized these achievement gaps as a "crisis" in "the current state of male students of color." EX41, UNC0109850. But instead of focusing on admitting URM applicants who are equipped to succeed academically, UNC cynically focuses on diversity at the most superficial level. *Fisher I*, 570 U.S. at 331-334 (Thomas, J., concurring).

The "paper classes" scandal underscores UNC's indifference to these students' plight. Instead of facing the underlying issues of insufficient academic preparedness, UNC swept the problem under the rug by running a shadow curriculum in the Department of African and Afro-American Studies that allowed students to take fake classes which "entailed no class attendance and required only the submission of a single research paper." EX43, at 1. These classes were supposed to help "under-prepared students who struggled with the demanding [UNC] curriculum" by offering them "watered-down academic requirements." *Id.* at 1, 3. But the academic requirements were not watered-down—they were nonexistent. The more than 3,100 students in these classes—most of whom were non-athletes—"never had a single interaction with a faculty member." *Id.* at 1. Yet they were graded "generously—typically with As or high Bs—and largely without regard to the quality of the papers." *Id.* at 2. Those grades

often were the difference for many students in maintaining a GPA that kept them in good standing and "allowed them graduate." *Id.* at 3. The existence (and apparent need) for these fake classes confirms that whatever reasoning underlies UNC's decision to use race in admissions, it was not an academic judgment.

Regardless, UNC is owed no deference regarding *how* it pursues critical mass. *Fisher I*, 570 U.S. at 311. "The University"—not SFFA—"must prove that the means chosen ... to attain diversity are narrowly tailored to that goal." *Id.* An assertion "writ large" that UNC is pursuing critical mass thus "is insufficient" to meet narrowly tailoring. *Fisher II*, 136 S. Ct. at 2211. UNC must articulate a definition of "critical mass"—*i.e.*, it must identify the conditions under which it will have achieved the educational benefits of student body diversity—with some precision. UNC's "goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Id.* Otherwise, its use of race has no "logical end point." *Grutter*, 539 U.S. at 342; *Tuttle v. Arlington Cty. School Bd.*, 195 F.3d 698, 706 (4th Cir. 1999) (requiring a "logical stopping point").

UNC has no "measurable" definition of critical mass. Indeed, it has no definition at all. *Supra* at 4-5. UNC officials cannot agree on what critical mass means. Some officials believe that it is, at least in part, a numerical goal. Yet UNC does not know if its current level of URM enrollment achieves critical mass or, if not, what level would. *Id.* Other officials (including Steve Farmer, the Dean of Admissions) disagree, taking the view that critical mass cannot be defined "in terms of the number" of URMs enrolled. *Id.* Instead, they claim, critical mass must be about achieving a certain campus environment. *Id.* But UNC has identified no way to measure when that amorphous goal will be met. *Id.* Some officials even claim that critical mass

can never be measured. *Id.* None of this is surprising, though, given that UNC has not studied the issue. As one official explained: "In all my conversations with Steve Farmer, [critical mass] has never come up. No one has directed anybody to achieve a critical mass, and I'm not even sure we would know what it is." EX66 144:22-145:5. UNC's definition of critical mass could not be more elusory or amorphous. For this reason alone, UNC fails strict scrutiny.

>    2.    **UNC Mechanically Uses Race as Far More Than a "Plus" Factor.**

For race to be a "plus" factor, it may not be a "predominant factor" in the decision to admit URMs. *Grutter*, 539 U.S. at 320. UNC instead must use race in a manner that is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 337. UNC violates this narrow-tailoring requirement.

There are a number of ways to look at the admissions data, all leading to the same conclusion: race is anything but "a 'factor of a factor of a factor'" in UNC's admissions system. *Fisher II*, 136 S. Ct. at 2207. UNC's racial preferences account for "a fourth of admissions for in-state Hispanic applicants" and "nearly 42% of African-American in-state admissions." *Supra* at 17. That is a massive racial preference for in-state URM applicants. To illustrate the magnitude of UNC's racial preferences another way, consider a male, in-state, non-FGC Asian-American applicant with a 25% chance of admission. His chances, remarkably, "would increase to 63.8% if treated as a Hispanic applicant. If he were instead treated as an African-American applicant, his admission chances would increase to 88.9%." Arcidiacono Rep. 43. "In other words, these hypothetical non-URM applicants who are highly likely to be rejected

*would be transformed into highly likely admits if they were URMs, and all other characteristics stayed the same." Id.*

The preference is even greater when it comes to out-of-state applicants. UNC's racial preferences "account for 70% of out-of-state Hispanic admissions" and "91% of out-of-state African-American admissions." *Supra* at 18. Consider again, the male, non-FGC Asian-American applicant with a 25% chance of admission, but this time in the out-of-state pool. He would see his "probability of admission ... increase to over 86% had he been treated like an out-of-state Hispanic applicant and over 99% had he been treated like an out-of-state African-American applicant." *Supra* at 19 "Simply changing this hypothetical Asian-American applicant's race to either Hispanic or African-American," in other words, "would transform him from an unlikely admit to an almost certain admit." *Id.*

This is the definition of an admissions system that makes race the predominant consideration for URM applicants. Race is not a "plus" factor that has a marginal effect on their admission chances. The data conclusively demonstrates that race plays a "dominant role in individual admissions decisions (especially for out-of-state applicants)." Arcidiacono Reply Rep. 1. Indeed, race so completely overwhelms other considerations that it even predominates under UNC's own analysis. Using Professor Hoxby's flawed models, over 40% of Hispanic admissions and over 50% of African-American admissions still are attributable to racial preferences. Arcidiacono Rebuttal Rep. 3, 16. The Supreme Court has held that a racial preference accounting for "one-fifth of the points needed to guarantee admission," was not narrowly tailored because it effectively made race "decisive for virtually every minimally qualified underrepresented minority applicant." *Gratz v. Bollinger*, 539 U.S. 244, 270, 272 (2003)

(citation omitted). If anything, the racial preference UNC grants to URM applicants is even larger.

But race does not just predominate over other factors in UNC's admissions system—it does so in a mechanical and inflexible way. In fact, UNC's use of race is functionally no different than the "mechanized" system that the Supreme Court condemned in *Gratz. Id.* at 276 (O'Connor, J., concurring). There, the University of Michigan gave "every underrepresented minority applicant the same, automatic 20-point bonus without consideration of the particular background, experiences, or qualities of each individual applicant." *Id.* at 276-77. As the Supreme Court explained, that Michigan's racial bonus was automatic meant that each applicant did not receive "individualized consideration." *Id.* at 271 (majority opinion).

Try as it might, UNC cannot hide that its admissions process operates as an implicit formula that does not give individualized attention to race. Professor Arcidiacono's model predicts over 90% of both in-state and out-of-state admission decisions. Arcidiacono Rebuttal 23-28. What is particularly striking is Professor Arcidiacono's accuracy with regard to in-state admits (over 91% predictive accuracy). *Id.* at 23. Professor Arcidiacono was able to make such accurate predictions here because "UNC's undergraduate admissions process is very formulaic: the various characteristics of applicants can be assigned numerical scores and added up; those who are above some threshold are admitted, and the rest are rejected." *Id.* at 24. Integral to that formula, of course, is the predictable application of racial preferences across the applicant pool. Absent that, "the predictions of the model" would not "line up with real outcomes" to such an "extraordinary degree." *Id.* at 25. UNC, in short, is not "considering

each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education." *Gratz*, 539 U.S. at 271. UNC instead assumes that all the URM applicants will "automatically" make "a specific and identifiable contribution to ... diversity" simply because of their race. *Id.* That is flagrantly unconstitutional.

### B. It is Unnecessary for UNC to Use Race to Achieve Student Body Diversity.

The Fourteenth Amendment "forbids the use even of narrowly drawn racial classifications except as a last resort." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519 (1989) (Kennedy, J., concurring in part and concurring in the judgment). To be narrowly tailored, UNC's use of race must be "necessary ... to the accomplishment of [the university's] purpose." *Fisher I*, 570 U.S. at 309. Thus, "strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Id.* at 312. Universities are not required to adopt an alternative that "would require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both." *Grutter*, 539 U.S. at 340. But "[i]f a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Fisher I*, 570 U.S. at 312 (quotations omitted).

UNC has workable racial neutral-alternatives available to it. It is thus both unnecessary and unlawful for UNC to use race in admissions decisions.

To begin, UNC has failed to fully consider or implement numerous workable race-neutral alternatives. *Supra* at 23-25. More importantly, SFFA's expert Richard Kahlenberg has demonstrated through simulations of race-neutral strategies that UNC has several race-neutral

34

alternatives available to it that would do at least "about as well" as race in promoting student body diversity; *he* identified 10 different simulations that would work "about as well" (two created by UNC's expert). *Supra* at 25. They demonstrate that UNC's use of race is unnecessary and, accordingly, unlawful. Some actually do a *better job than race in promoting UNC's diversity interests, while maintaining academic quality.*

Take Kahlenberg's Simulation 11. It involves a multi-faceted socioeconomic preference, includes non-applicants, and takes into account socioeconomic disadvantage at the family, neighborhood, and high school levels. Kahlenberg Reply Rep. 49 n.193 & Appendix.

| UNC – Admitted Class in 2014-15 | | | |
|---|---|---|---|
| Status Quo Race-Based Admissions | | Simulation 11: 1.5 SES Boost Race-Neutral Admissions | |
| White | 68.4% | White | 72.7% |
| African American | 8.5% | African American | 10.4% |
| Hispanic | 5.9% | Hispanic | 6.3% |
| Asian American | 11.6% | Asian American | 9.4% |
| Native American | 1.9% | Native American | 1.0% |
| Missing | 3.6% | Missing | 0% |
| Socioeconomically Disadvantaged Family | 28.5% | Socioeconomically Disadvantaged Family | 44.1% |
| Socioeconomically Disadvantaged Neighborhood | 21.7% | Socioeconomically Disadvantaged Neighborhood | 40.7% |
| Socioeconomically Disadvantaged School | 10.3% | Socioeconomically Disadvantaged School | 21.6% |
| SAT score (percentile) | 1305 (90th) | SAT score (percentile) | 1279 (87th/88th) |
| HS GPA weighted | 4.73 | HS GPA weighted | 4.82 |

This plan would increase URM representation (African American share rising from 8.5% to 10.4% and Hispanic share rising from 5.9% to 6.3%), while increasing socioeconomic diversity substantially (on all three socioeconomic diversity metrics).[9]

---

[9] Additional steps would increase both racial and socioeconomic diversity even more. Among other things, UNC could make better use of socioeconomic data, increase financial aid, use geographic data to admit out-of-state applicants, eliminate legacy preferences, admit more community college transfers, end early admissions, and/or develop partnerships with disadvantaged North Carolina high schools. Kahlenberg Rep. 30-31, 36-64.

And it would do so without a "dramatic sacrifice" in academic quality. *Grutter*, 539 U.S. at 340. In fact, the academic qualifications of the admitted class would remain essentially the same (if not improve); the weighted high-school GPA of the class would rise slightly (from 4.73 to 4.82), and the average SAT score would drop slightly (from 1305 to 1279). Moreover, this "modest decline in SAT scores should be considered in light of the greater level of socioeconomic disadvantage present in the class." Kahlenberg Reply Rep. 51. As UNC's own expert has acknowledged, whether a particular applicant "had more challenging childhood circumstances" is a relevant consideration in admissions. EX57 ("Hoxby Rebuttal Rep."), at 13 n.24. Considered in context, Simulation 11 produces an admitted class with academic qualifications that are equal to or better than the status quo at UNC, with better racial and socioeconomic diversity. This confirms that UNC has a workable race-neutral alternative. Kahlenberg Reply Rep. 64.[10]

UNC's experts do not challenge this conclusion. As explained above, *UNC's experts offer no opinion on the workability of any particular race-neutral alternative. Supra* at 25-26. That Kahlenberg's expert opinion stands unrebutted warrants summary judgment for SFFA on Count II. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 308-9 n.17 (4th Cir. 2004). Of course, it does not take an expert to conclude that a race-neutral alternative that performs better than UNC's use of race

---

[10] Several other race-neutral simulations work about as well as UNC's use of race, whether one decides to use a percentage plan or socioeconomic preferences, and whether one decides to use UNC's subjective ratings in the current applicant pool or to include non-applicants who may apply in the future. For example, Simulation 8 (a percentage plan that uses current applicants) increases both racial and socioeconomic diversity, with only a slight decrease in academic qualifications; Simulation 9 (a percentage plan that includes nonapplicants) does about as well on racial diversity, increases socioeconomic diversity and yields similar or better academic qualifications; Simulation 13 (SES preference that uses current applicants) does about as well on racial diversity and academic qualifications, while increasing socioeconomic diversity. Kahlenberg Reply Rep. 58-64 & Appendix.

on the relevant metrics is workable. Summary judgment thus would be warranted on this Count in any event.

## CONCLUSION

For the foregoing reasons, SFFA respectfully requests that the Court grant it summary judgment on all counts.

Dated: January 18, 2019

Respectfully submitted,

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

Michael H. Park
CONSOVOY McCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(212) 247-8006
park@consovoymccarthy.com

/s/ Thomas R. McCarthy
Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
Bryan K. Weir
CONSOVOY McCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY McCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

38

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the word limit contained in the Court's Order filed August 28, 2018 (Docket No. 145) using the word count feature of the word processing software in making this certification.

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

*Attorneys for Plaintiff*
*Students for Fair Admissions*

39

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 18th day of January, 2019.

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy