# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, INC.,

        Plaintiff,

   v.

UNIVERSITY OF NORTH CAROLINA, ET
AL

        Defendant.

Civil Action No. 1:14-cv-00954

EXPERT REPORT OF RICHARD D. KAHLENBERG

i

# TABLE OF CONTENTS

I.  Professional Qualifications ............................................................................................................. 1

II. Purpose ............................................................................................................................................ 3

III. Summary of My Opinions ............................................................................................................ 4

IV. Experience and academic research show that colleges and universities can maintain or increase diversity through race-neutral alternatives without sacrificing academic quality. ....... 5

    A.  Experience at selective public universities shows that race-neutral strategies can produce racial, ethnic, and socioeconomic diversity. .................................................................. 5

    B.  Academic research shows that selective universities can employ effective race-neutral strategies. .................................................................................................................................. 11

    C.  Well-crafted race-neutral strategies do not compromise academic quality. ............................. 14

V.  UNC failed to fully consider any of the numerous race-neutral alternatives that could achieve the educational benefits of diversity. ............................................................................ 16

    A.  UNC could increase socioeconomic preferences. ................................................................. 22

        1.  Socioeconomic factors such as income and wealth are highly correlated with race. .......... 22

        2.  UNC's socioeconomic diversity is deeply lacking. ..................................................... 26

        3.  UNC could make critical socioeconomic data available to admissions officers. ................. 30

        4.  UNC could increase the weight it gives to socioeconomic factors. ................................... 31

    B.  UNC could increase financial aid. ........................................................................................ 36

    C.  UNC could adopt admissions policies utilizing geographic diversity, including percentage plans (for in-state admissions) and the use of zip codes or Census tract data (for out-of-state admissions). .................................................................................................. 38

        1.  2012 UNC Study ............................................................................................................. 40

        2.  2014 UNC Study ............................................................................................................. 42

        3.  A Percentage Plan for Out-of-State Applicants ............................................................... 52

    D.  UNC could reduce or eliminate legacy preferences that favor non-minorities. ....................... 54

    E.  UNC could increase its recruitment efforts. ......................................................................... 57

    F.  UNC could increase its admission of community college transfers. ......................................... 60

    G.  UNC could end early admissions. ......................................................................................... 62

    H.  UNC could develop partnerships with disadvantaged North Carolina high schools. ............. 64

VI. Simulations of UNC's data show that workable race-neutral alternatives exist. ..................... 65

    A.  A careful simulation indicates that UNC could achieve the educational benefits of racial, ethnic, and socioeconomic diversity without sacrificing academic quality. ............................... 65

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 3 of 119

B.  Through inclusion of additional data and better recruiting of low-income students, the simulation could predict even greater racial and ethnic diversity. ............................... 74

C.  A careful simulation of a holistic percentage plan shows UNC could achieve the educational benefits of racial, ethnic, and socioeconomic diversity without sacrificing academic quality. 76

VII.  Conclusion ........................................................................................................... 79

VII.  Appendices ........................................................................................................... 1

A.  Appendix A – Curriculum Vitae ............................................................................. 1

B.  Appendix B – Documents Relied Upon or Considered in Forming Opinion ...................... 19

C.  Appendix C – Simulations ..................................................................................... 22

iii

# I.       Professional Qualifications

My name is Richard D. Kahlenberg.  I am a senior fellow at The Century Foundation, a non-profit, non-partisan research organization founded in 1919. The views expressed in this report are solely my own, and this report is submitted on my own behalf and not on behalf of any organization.

I am the author or co-author of six books and the editor of ten books. (For the full list, see my Curriculum Vitae in Appendix A.) Most relevant here, I am the author of *The Remedy: Class, Race, and Affirmative Action* (Basic Books, 1996), which was described by Harvard University's William Julius Wilson in the New York Times as "by far the most comprehensive and thoughtful argument thus far for . . . affirmative action based on class."[1] The book was named one of the best books of the year by the Washington Post.[2]

In 2003, Diverse Issues in Higher Education, a widely read industry magazine on diversity issues, called me "arguably the nation's chief proponent of class-based affirmative action in higher education admissions."[3] In 2013, The New York Times identified me as "perhaps the most prominent self-described progressive with doubts about the current version of affirmative action."[4] And in 2016, reflecting on my time researching and writing about higher education, William G. Bowen, the former president of Princeton University, and Michael S. McPherson, the former president of Macalester

---

[1] William Julius Wilson, "Class Consciousness," New York Times Book Review, July 14, 1996.

[2] Norman Ornstein, "Social Issues," Washington Post Book World, December 8, 1996.

[3] Ronald Roach, "Class-Based Affirmative Action," Diverse Issues in Higher Education, June 19, 2003.

[4] David Leonhardt, "The Leading Liberal Against Affirmative Action," New York Times, March 9, 2013.

1

College, wrote that I deserve "more credit than anyone else for arguing vigorously and relentlessly for stronger efforts to address disparities by socioeconomic status."[5]

I am also the editor of four books that address, in part or in whole, race-neutral affirmative action strategies:

- *America's Untapped Resource: Low-Income Students in Higher Education* (Century Foundation, 2004);
- *Rewarding Strivers: Helping Low-Income Students Succeed in College* (Century Foundation, 2010);
- *Affirmative Action for the Rich: Legacy Preferences in College Admissions* (Century Foundation, 2010); and
- *The Future of Affirmative Action: New Paths to Higher Education Diversity after Fisher v. University of Texas* (Century Foundation/Lumina Foundation, 2014).

My law review articles on race-neutral alternatives to racial preferences include:

- "Getting Beyond Racial Preferences: The Class-Based Compromise," 45 *American University Law Review* 721 (February 1996);
- "Class-Based Affirmative Action," 84 *California Law Review* 1037 (July 1996); and
- "Reflections on Richard Sander's Class in American Legal Education," 88 *Denver University Law Review* 719 (September 2011).

I also have researched and published numerous articles on race-neutral alternatives to racial preferences in prominent publications, including The New York Times, The Wall Street Journal, The Washington Post, and The New Republic. (See all publications in Appendix A). Over the years, I have served on numerous conference panels giving me an opportunity to interact with college admissions officers at a number of selective colleges.

Before coming to The Century Foundation, I was a Fellow at the Center for National Policy, a visiting associate professor of constitutional law at George Washington University, and a legislative

---

[5] William G. Bowen & Michael S. McPherson, Lesson Plan: An Agenda for Change in American Higher Education (Princeton University Press, 2016), p. 35.

2

assistant to Senator Charles S. Robb (D-VA). I graduated from Harvard College and Harvard Law School.

I also serve on the advisory boards of the Pell Institute and the Albert Shanker Institute, as well as the Research Advisory Panel of the National Coalition for School Diversity. In 2013, I was the winner of the William A. Kaplin Award for Excellence in Higher Education Law and Policy Scholarship.

## II.     Purpose

In 2014, I was retained in this matter by Students for Fair Admissions, Inc. (SFFA) to provide an opinion regarding the availability and feasibility of race-neutral alternatives to the use of race by University of North Carolina at Chapel Hill's (UNC) as a factor in undergraduate admissions. In particular, I was asked to examine whether UNC could implement workable race-neutral alternatives that would produce the educational benefits of diversity. The rate for my services in this matter is $295 an hour.

In making my opinions, I draw first upon my extensive knowledge of the history and study of race-neutral alternatives. *See* Section I, *supra*, and Appendix A. I have authored, co-authored, edited, or reviewed virtually every major study or analysis on race-neutral alternatives from the past 20 years. I have also reviewed substantial portions of the voluminous evidence that has been produced by UNC in this case, including numerous deposition transcripts and several internal reports from UNC. A full list of the documents and transcripts I reviewed is provided at Appendix B. Finally, I have reviewed and had access to the admissions data, analysis, and conclusions from SFFA's other expert witness, Duke Professor Peter Arcidiacono.

It is also important to understand what I have not reviewed. I did not have access to some of the data that I would have liked to review from UNC, including precise data about student income

3

and wealth. These data would have been helpful to me, as they would have allowed me to consider additional race-neutral strategies and evaluate whether they would be workable as possible replacements for UNC's use of race in admissions decisions. Nevertheless, I am confident about the opinions I am able to state below.

I have not testified as an expert at trial or deposition in the past four years.

## III.  Summary of My Opinions

The U.S. Supreme Court has long stated that student body diversity—by race and also by socioeconomic status—offers important educational benefits.[6] But because of the heavy costs associated with using race in governmental decision making, the Fourteenth Amendment "forbids the use even of narrowly drawn racial classifications except as a last resort."[7] In *Fisher v. University of Texas*, therefore, the Supreme Court held that colleges cannot employ racial preferences unless "no workable race-neutral alternatives would produce the educational benefits of diversity."[8] Indeed, in pursuing the compelling goal of diversity, universities bear "the ultimate burden of demonstrating, before turning to racial classifications, that available workable race-neutral alternatives do not suffice."[9]

With these guideposts in mind, I am prepared to give testimony on three main opinions to a reasonable degree of professional certainty.

---

[6] *Grutter v. Bollinger,* 539 U.S. 306, 330 (2003).

[7] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519 (1989) (Kennedy, J., concurring in part and concurring in the judgment).

[8] 133 S. Ct. 2411, 2420 (2013).

[9] Id.

4

First, there is extensive empirical evidence and academic research documenting the myriad (and innovative) ways in which colleges and universities such as UNC can use race-neutral alternatives to produce the educational benefits of diversity.

Second, it is apparent from my review of the deposition testimony and relevant evidence produced that, in the years between *Fisher I* and the filing of this lawsuit, UNC failed to accurately consider or fully implement any of the numerous available race-neutral alternatives that could achieve the educational benefits of diversity. These include:

- Increasing socioeconomic preferences;
- Increasing financial aid;
- Adopting policies using geographic diversity, including percentage plans and the use of zip codes and Census tract data;
- Reducing or eliminating preferences for legacies;
- Increasing recruitment efforts;
- Increasing the admission of community college transfers;
- Eliminating the Early Action admissions option; and
- Developing partnerships with disadvantaged high schools.

Finally, after reviewing UNC's admissions data and other relevant socioeconomic data, I have concluded that there are race-neutral alternatives available that could provide UNC with the educational benefits of diversity without the use of racial preferences.

## IV. Experience and academic research show that colleges and universities can maintain or increase diversity through race-neutral alternatives without sacrificing academic quality.

### A. Experience at selective public universities shows that race-neutral strategies can produce racial, ethnic, and socioeconomic diversity.

For years, supporters of racial preferences argued that no workable alternatives existed for creating racial diversity. In the words of Justice Blackmun in his 1978 *Bakke* opinion, "I suspect that it would be impossible to arrange an affirmative action program in a racially neutral way and have it

5

successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way."[10]

Since then, however, numerous universities have proven him wrong. In 2012, my colleague Halley Potter and I examined ten leading universities where racial preferences had been banned and found that seven of the ten—the University of Texas at Austin, Texas A&M, the University of Washington, the University of Florida, the University of Georgia, the University of Nebraska, and the University of Arizona—had used race-neutral alternatives to meet or exceed the racial diversity levels they had obtained in the past using racial preferences.[11] These schools obtained such results through a variety of approaches, including creating plans to encourage geographic and socioeconomic diversity, bolstering financial aid policies, adopting programs that could attract disadvantaged students from underrepresented demographics with the promise of financial support, and building partnerships with K-12 schools to increase the pool of college-ready applicants.[12]

Many of these colleges had been adamant that race-neutral alternatives could never succeed. For example, in 1998, the University of Washington was forced to abandon racial preferences after a ballot initiative was passed banning the practice. At the time, Richard McCormick, the president of the University of Washington, spoke out strongly against the referendum and made dire predictions about its effect on racial diversity. But the University ultimately crafted new approaches to achieve diversity, including recruiting at predominantly minority high schools, expanding financial aid, and

---

[10] *Regents of University of California v. Bakke*, 438 U.S. 265, 407 (1978) (Blackmun, J., concurring).

[11] Richard D. Kahlenberg & Halley Potter, A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences (Century Foundation), pp. 26-61.

[12] Id. at 76.

6

considering such factors as "personal adversity" and "economic disadvantage" in its admissions decisions. By 2004, McCormick wrote, "the racial and ethnic diversity of the UW's first-year class had returned to its pre-1999 levels," when race was still considered in admissions, and the new admissions policy also increased economic diversity among the student body.[13]

Similarly, in 2000, the University of Georgia adopted a number of race-neutral strategies after a federal court struck down the university's use of race in admissions.[14] In particular, the university began using a number of socioeconomic factors in its admissions process, including parental education and high school environment, began admitting the valedictorian and salutatorian from every high school class, and stopped giving preference to children of alumni. Although alumni opposed the end of legacy admissions, the university "has not encountered noticeable fundraising challenges as a result of the change."[15] Although minority enrollment initially dropped after the ban on using race in admission, it has since moved upward and "the years since 2000 have shown the university moving in the right direction, toward increased racial, ethnic, socioeconomic, linguistic, and geographic diversity on campus."[16]

The other three universities we examined—the University of Michigan, UCLA, and the University of California Berkeley—had not reached their prior levels of racial diversity. As an initial

---

[13] Richard L. McCormick, "Converging Perils to College Access for Racial Minorities: Examples of Responses that Work from Washington State and New Jersey," in The Future of Affirmative Action: New Paths to Higher Education Diversity after *Fisher v. University of Texas*, ed. Richard D. Kahlenberg (New York: Century Foundation/Lumina Foundation, 2014), *supra*, p. 118.

[14] *See Johnson v. Board of Regents*, 106 F. Supp. 2d 1362 (S.D. Ga. 2000).

[15] Nancy G. McDuff & Halley Potter, "Ensuring Diversity Under Race-Neutral Admissions at the University of Georgia," in The Future of Affirmative Action, *supra*, p. 126.

[16] Id. at 123.

7

matter, the data on African-American enrollment at Michigan are problematic. In 2010, the Department of Education changed its methodology for categorizing students by race and ethnicity, requiring colleges to report separately students who are members of two or more races. "So a drop in the number of black students reported at a university from 2009 to 2010," a Chronicle of Higher Education article noted, "doesn't *necessarily* mean that there were actually fewer black students."[17] In fact, when the new "mark one or more" races methodology was proposed, civil rights groups raised concerns that it would result in an artificial decline in African-American and Hispanic representation in government statistics.[18]

　　　　To the extent that race-neutral alternatives have not been fully effective at these universities, however, it is mostly because of their failure to utilize them fully.[19] Michigan still gives preferences in admission to the children of alumni (who, at selective colleges, tend to be disproportionately non-

---

[17] Jonah Newman, "What Does the Education Dept. Know About Race?" Chronicle of Higher Education, April 28, 2014. Consider, also, the case of the University of Virginia (UVA), which is not subject to a voter-imposed ban on racial preferences and continues to use race as a factor in admissions. In 2008, before students could use the multi-race category, UVA enrolled 1,199 African-American students. By 2012, after the change in categories was put in place, the number of African Americans was 946, suggesting a dramatic 21.1 percent drop. But when the 2012 data include the 206 students who identified as African American and some other ethnicity (for a grand total of 1,152 African Americans under the old methodology), the drop was 3.9 percent. In other words, about 80 percent of the apparent decline in black enrollment at UVA was due to reporting changes. McGregor McCance, "Analysis of U.Va.'s Incoming Class Shows Consistent Quality with Dynamic Change," UVA Today, May 16, 2013. In 2010, UNC began reporting IPEDS data using the new multiracial category, which results in an artificial decline in the reporting of African American students and some other categories. Williford deposition, pp. 67-69. See also UNC0193172.

[18] See Kim M. Williams, Mark One or More: Civil Rights in Multicultural America (University of Michigan Press, 2008).

[19] U.C. Berkeley, UCLA, and the University of Michigan have also faced a special disadvantage in recruiting minority students because they have a national pool of applicants and restrictions on using race that were imposed by a state referendum rather than a federal court. As a result, out-of-state competitors could continue to use racial preferences.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 12 of 119

minority)[20] and still provides substantial "merit" aid to wealthy students, thereby diverting funds from need-based aid.[21] U.C. Berkeley and UCLA currently employ only family income as the primary determinant of economic disadvantage and thus are not using more accurate measures of socioeconomic disadvantage.[22] As discussed further below, using wealth alongside income would better capture economic disadvantage than does income alone and could lead to greater racial diversity.

It is significant to note that these types of race-neutral approaches also produce much higher levels of socioeconomic diversity than do race-based admissions.[23] The enhancement of socioeconomic diversity that flows from these plans is critical from an educational and legal perspective, because the educational benefits of diversity arise from the interchange of ideas and experiences with those from different financial circumstances just as surely as those from different racial backgrounds—a point affirmed both by legal precedent and the testimony of UNC officials.[24]

---

[20] John Brittain & Eric L. Bloom, "Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions," in Affirmative Action for the Rich: Legacy Preferences in College Admissions, ed. Richard D. Kahlenberg (Century Foundation Press, 2010), pp. 127-32.

[21] Richard D. Kahlenberg, "A Fresh Chance to Rein in Racial Preferences," Wall Street Journal, October 13, 2013.

[22] Richard Sander, "The Use of Socioeconomic Affirmative Action at the University of California," in The Future of Affirmative Action, *supra*, p. 101 (that U.C. campuses look at parental education and income).

[23] See Matthew N. Gaertner, "Advancing College Access with Class-Based Affirmative Action: The Colorado Case," in The Future of Affirmative Action, *supra*, p. 181, Table 14.3; Anthony P. Carnevale, Stephen J. Rose, & Jeff Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action*, supra,* p. 192, Table 15.2.

[24] See *Grutter*, 539 U.S. 306, 324 (2003); *Bakke*, 438 U.S. 265, 316 (1978). See also Farmer deposition, p. 132 (that underrepresented students who are a priority include "transfer students, first-generation college students…low-income students.") See further discussion below.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 13 of 119

In California, for example, students from economically disadvantaged backgrounds were significantly more likely to be admitted to universities in California after the State banned racial preferences.[25] Likewise, when UCLA Law School adopted a socioeconomic affirmative action program, the proportion of students who were the first in their families to attend college roughly tripled.[26]

It seems hardly an accident, therefore, that the University of California dominates the list of schools "doing the most for low-income students" in the *New York Times'* "College Access Index" in 2015.[27] Similarly, of the top seven institutions for social mobility, six were from the UC system, and the seventh, the University of Florida, has also implemented race-neutral strategies in the face of a racial preference ban.[28] In general, according to a 2017 report from New America, public flagship universities have a wealthier student population today than in the late 1990s. At only three flagship universities did the representation of low-income students increase, two of which (the University of Texas at Austin, and the University of Michigan) were implementing policies to achieve racial diversity without employing race.[29]

---

[25] See Kate Antonovics & Ben Backes, "The Effect of Banning Affirmative Action on College Admissions Policies and Student Quality," The Journal of Human Resources 49, no. 2 (Spring 2014): p. 306.

[26] Sander, "The Use of Socioeconomic Affirmative Action," *supra*, p. 105.

[27] David Leonhardt, "California's Upward-Mobility Machine," New York Times, September 16, 2015.

[28] Id.; Kahlenberg & Potter, A Better Affirmative Action, *supra*.

[29] Stephen Burd (ed), Moving on Up? What a Groundbreaking Study Tells Us about Access, Success, and Mobility in Higher Ed (New America, October 2017), pp. 33-34. The third was the University of Nevada.

10

### B. Academic research shows that selective universities can employ effective race-neutral strategies.

In the wake of Supreme Court rulings on affirmative action, think tanks and the academic community have been examining in earnest the use of race-neutral strategies to promote racial, ethnic, and socioeconomic diversity on campuses. For example, the Lumina Foundation teamed up with The Century Foundation to produce a 299-page volume (which I edited) that brought together both supporters and skeptics of racial preferences to consider the meaning of the Supreme Court's rulings and to examine the efficacy of race-neutral strategies.[30] The College Board's Access and Diversity Collaborative produced papers on race-neutral policies, including "The Playbook: A Guide to Assist Institutions of Higher Education in Evaluating Race-and Ethnicity-Neutral Policies in Support of the Mission-Related Diversity Goals."[31] And the American Council on Education surveyed 338 colleges on their use of race-neutral strategies.[32]

As a result, valuable research has emerged identifying concrete ways in which universities can increase racial diversity through race-neutral means. For example, in 2014, Professors Anthony Carnevale, Stephen Rose, and Jeff Strohl of Georgetown University examined how socioeconomic

---

[30] Kahlenberg (ed), The Future of Affirmative Action, *supra.*

[31] See, e.g., Arthur L. Coleman, Teresa E. Taylor, & Katherine E. Lipper, "The Playbook: A Guide to Assist Institutions of Higher Education in Evaluating Race- and Ethnicity-Neutral Policies in Support of the Mission-Related Diversity Goals," College Board and Education Counsel, October 2014, http://educationcounsel.com/wp-content/uploads/2015/06/ADC%20Playbook%20October%202014%20(for%20posting%20to%20website).pdf. UNC officials were aware of this report. See UNC0325560.

[32] Lorelle L. Espinosa, Matthew N. Gaertner, & Gary Orfield, "Race, Class, and College Access: Achieving Diversity in a Shifting Legal Landscape" American Council on Education, 2015, http://www.acenet.edu/news-room/Documents/Race-Class-and-College-Access-Achieving-Diversity-in-a-Shifting-Legal-Landscape.pdf.

11

affirmative action programs, percentage plans, or a combination of the two, could work at the nation's most selective 193 institutions.[33] The authors found that if these schools used class-based affirmative action—which would include a mix of socioeconomic considerations (such as parental education, income, savings, and school poverty concentrations)—the combined African-American and Hispanic representation would *rise* from 11% to 13%—all without the use of racial preferences. Under a different simulation (in which the top 10% of test takers in every high school was among the pool admitted to this collection of schools) the authors found that African-American and Hispanic representation would rise from 11% to 17%. Under each of these scenarios, socioeconomic diversity and mean SAT scores would also rise.[34]

Similarly, in 2014, Matthew Gaertner examined admissions at the University of Colorado at Boulder and found that a sophisticated socioeconomic affirmative action plan that gave considerable weight to economic disadvantage could achieve even *more* racial diversity than using racial preferences. Based on national research, the University of Colorado devised an index of socioeconomic disadvantage that looked at a number of factors, including "the applicant's native language, single-parent status, parents' education level, family income, the number of dependents in the family, whether

---

[33] Carnevale, Rose, & Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action, *supra*; see also David Leonhardt, "If Affirmative Action Is Doomed, What's Next?" New York Times, June 17, 2014.

[34] Carnevale, Rose, & Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action, *supra*, p. 192, Tables 15.1, 15.2. The study's breakdown is as follows: Status quo (4% African American, 7% Hispanic; 14% from the bottom socioeconomic half; 1230 mean SAT); Admissions by test score (1% African American, 4% Hispanic; 15% bottom socioeconomic half; 1362 mean SAT); Socioeconomic affirmative action (3% African American, 10% Hispanic; 46% from bottom socioeconomic half; 1322 mean SAT); Top 10% of test takers from every high school (6% African American, 11% Hispanic; 31% from bottom socioeconomic half; 1254 mean SAT). Id.

12

the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch (FRL), the school-wide student-to-teacher ratio, and the size of the twelfth-grade class." Under the hypothetical program, the university gave socioeconomically disadvantaged students a preference in admissions that was larger than what African-American and Hispanic students had been provided in the past. When simulations were run, Gaertner found that not only would socioeconomic diversity increase, but the acceptance rates of underrepresented minority applicants would also increase—from 56% under race-based admissions to 65% under class-based admissions.[35]

In addition, in a 2015 study, Professor Sigal Alon found that if the most selective 115 American universities instituted broad reform—including effectively eliminating[36] legacy, athletic, and racial preferences—a socioeconomic boost "could not only replicate the current level of racial and ethnic diversity at elite institutions but even increase it."[37] Professor Alon's model looked at three variations: (1) a "socioeconomic status" model, which looks at family-based economic disadvantages; (2) a "structural" model, which looks at neighborhood-based economic disadvantages; and (3) a "multidimensional" model, which looks at both. Professor Alon found that racial diversity would meet or exceed current admissions and socioeconomic diversity would increase under all three models.

---

[35] Gaertner, "Advancing College Access with Class-Based Affirmative Action," *supra*, p. 181, Table 14.3. UNC was aware of the Boulder experiment. UNC0079652.

[36] Alon effectively eliminates athletic, legacy, and racial preferences by replacing those students in the weakest academic quartile—whom she presumes includes those for whom preferences were decisive—with the most academically competitive economically disadvantaged students of all races.

[37] Sigal Alon, Race, Class, and Affirmative Action (Russell Sage Foundation, 2015), pp. 254-56.

13

Meanwhile, because mean SAT scores would remain steady, "all this could be done without jeopardizing academic selectivity."[38]

### C. Well-crafted race-neutral strategies do not compromise academic quality.

Critics may argue that race-neutral alternatives will reduce academic standards. But experience and research refute that claim.

Consider, for example, the academic results of students admitted through the University of Texas at Austin's "top 10% plan," adopted by the legislature in 1997, which admitted students in the top of their high school classes, irrespective of SAT or ACT scores. In 2000, UT's president noted that "minority students earned higher grade point averages last year than in 1996 and have higher retention rates."[39] Moreover, careful research by Sunny Niu and Marta Tienda of Princeton University found that between 1993 and 2003, black and Hispanic students admitted through the percentage plan "consistently perform as well or better" than white students ranked at or below the third decile.[40] In recent years, with three quarters of the class still admitted through the percentage plan, graduation rates have increased to record levels.[41] To take another example, after UCLA Law School adopted a

---

[38] Id. at 256.

[39] See Larry Faulkner, The "Top Ten Percent Law" Is Working for Texas (Oct. 19, 2000)

[40] Sunny X. Niu & Marta Tienda, Minority Student Academic Performance under the Uniform Admission Law: Evidence from the University of Texas at Austin, 44 EDUC. EVALUATION & POL'Y ANALYSIS 32 (2010).

[41] Four-year graduation rates have risen 15 percentage points in the past five years. The 65.7% on time graduation rate set "a university record." The six-year graduation rate was 82.9%. See "Four-Year Graduation Rate Rises from 51 to 66 Percent in Five Years," UT News, September 20, 2017. https://news.utexas.edu/2017/09/20/four-year-graduation-rate-rises-from-51-to-66-percent

14

socioeconomic preferences program, the school's California bar exam passage rate rose to an all-time high.[42]

Likewise, in a national simulation, Professors Carnevale and Rose found that top universities could nearly quadruple the proportion of students from the bottom socioeconomic half (from 10% of all students, the level they found in their research, to 38%) without any change in graduation rates.[43]

These studies are buttressed by a growing body of research on "undermatching," in which highly qualified students do not apply to selective colleges. Professor Caroline Hoxby of Stanford and Professor Christopher Avery of Harvard have found that 35,000 low-income students are high achieving, but that only one-third apply to one of the country's 238 most selective colleges. Of those low-income, high-achieving students, roughly 2,000 are African American and 2,700 are Hispanic.[44] Additional research has found that 43% of students who are academically qualified to gain admission to selective colleges undermatch, and that many are Hispanic and African American.[45] In raw numbers, that translates into 4,000 Hispanic and 2,000 African-American SAT takers who have the strongest academic credentials yet do not attend a highly selective school.[46] Most recently, research by Anthony Carnevale and Martin Van Der Werf identified 86,000 Pell Grant recipients who have test scores

---

[42] Sander, "The Use of Socioeconomic Affirmative Action at the University of California," *supra*, p. 107.

[43] Anthony P. Carnevale & Stephen J. Rose, "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," in America's Untapped Resource: Low-Income Students in Higher Education, ed. Richard D. Kahlenberg (The Century Foundation Press, 2004), pp. 148-49.

[44] Caroline M. Hoxby & Christopher Avery, "The Missing 'One-Offs': The Hidden Supply of High-Achieving, Low Income Students," NBER Working Paper no. 18586, December 2012, p. 34.

[45] Alexandria Radford & Jessica Howell, "Addressing Undermatch: Creating Opportunity and Social Mobility," in The Future of Affirmative Action, *supra*, p. 134.

[46] Id.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 19 of 119

comparable to those of students at selective colleges but do not now attend such institutions. These high-achieving low-income students include 5,260 who are Hispanic and 2,580 who are black.[47] This body of research indicates that there is enormous potential to increase socioeconomic and racial diversity without in any way sacrificing academic quality if colleges were aggressively to recruit high-achieving, low-income students.

## V.  UNC failed to fully consider any of the numerous race-neutral alternatives that could achieve the educational benefits of diversity.

The Supreme Court's instructions regarding race-neutral alternatives are clear. Colleges must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity."[48] This requirement has been widely discussed in the academic community.[49] Indeed, in a 2013 article in the Chronicle of Higher Education, Thomas Kane and James Ryan of Harvard University noted that the *Fisher* decision means that "[t]o consider race in admissions . . . institutions must prove to courts that race-neutral alternatives—such as relying on socioeconomic status or where students live—will not work."[50] They warned that "few universities and colleges are prepared to answer the questions that courts will soon be asking. If they fail to prepare convincing answers, they

---

[47] Anthony Carnevale & Martin Van Der Werf, "The 20% Solution: Selective Colleges Can Afford to Admit More Pell Grant Recipients (Georgetown University Center on Education and the Workforce, 2017), pp. 9 and 12.

[48] Fisher, 133 S. Ct. 2411, 2420 (2013).

[49] See, e.g., Arthur L. Coleman & Teresa E. Taylor, "Emphasis Added: Fisher v. University of Texas and Its Practical Implications for Institutions of Higher Education," in The Future of Affirmative Action, *supra*, 50-51.

[50] Thomas J. Kane & James E. Ryan, "Why 'Fisher' Means More Work for Colleges," Chronicle of Higher Education, July 29, 2013.

16

will lose. And, having been put on notice, responsibility for that loss will be with our college and university leaders, not our courts."[51]

Despite all this, it appears that UNC—one of the nation's great research universities—conducted only a limited and flawed investigation to see whether race-neutral strategies could yield the educational benefits of diversity, as required by law. In an agreement with the U.S. Department of Education's Office of Civil Rights, UNC committed to completing an analysis of race-neutral alternatives by September 30, 2013.[52] In fact, UNC's Working Group on Race-Neutral Alternatives (chaired by Barbara Polk) did not even convene until December 2013; and the group's report was not presented until January 2016, and not approved until February 25, 2016—about two and half years late.[53]

The Working Group's analysis was flawed from the outset because it chose a different standard for judging race-neutral strategies than the Supreme Court employed. The *Fisher* case held that "If a nonracial approach…could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race."[54] The "about as well" language has been read to suggest some degree of flexibility. Legal scholars such as James Ryan and his colleague Tom Kane, for example, wrote that it is unclear whether a plan "that produced, for example, 60

---

[51] Id.

[52] UNC0325546, UNC0325551; Kretchmar deposition, 196.

[53] UNC0079625, UNC0079680, UNC0079684, UNC0100625, UNC0283495, UNC0283499, UNC0323680; Kretchmar deposition, 31, 36-39, 336-337. See also Panter deposition, 30; Polk deposition, 240-42; and Williford deposition, 187.

[54] This language was quoted when UNC established the Committee on Race-Neutral Strategies. UNC0283498.

17

percent as many minority students would be sufficient."[55]  By contrast, the Working Group instead

chose a higher standard which assumed, without evidence, that current levels of racial diversity and

academic preparedness, are an absolute floor.[56]  According to the Group's chair, Barbara Polk,  an

alternative would not be viable unless it would "maintain" or "increase" racial diversity—meaning it

would produce a "greater or equal percentage" of underrepresented minorities—and "maintain or

increase" academic quality.[57]

Moreover, the Working Group provided no guidelines for what levels of diversity are required

to achieve the educational benefits of diversity.  The Working Group's report noted that UNC's 2005

diversity policy called for the "'achievement of critical masses of underrepresented populations' since

the absence of such critical masses 'impedes the educational process' and 'can place undue pressure

on underrepresented students and interfere with all students' experiencing the educational benefits of

a diverse learning environment.'"[58] The goal of achieving "critical masses" of underrepresented

students was reaffirmed in a 2014 UNC diversity plan.[59]  The Working Group's internal documents

raised the question: "What is 'critical mass' and how will we know when we reach it."[60]  Yet nowhere

---

[55] Kane & Ryan, "Why 'Fisher' Means More Work for Colleges," supra.

[56] In a February 25, 2016 meeting of the Advisory Committee on Undergraduate Admissions to review the Working Group's report, a faculty member homed in on this issue.  According to minutes from the meeting, Professor Jon Engel said "he believed the study demonstrated that the working group did not find a race-neutral means that would yield results exactly the same as the results we are currently achieving.  He asked whether the courts have provided any guidance as to how close such results would need to be before they could be deemed equivalent and workable.  Barbara Polk responded that there was no clear guidance to date."  UNC0283495.

[57] Polk deposition, pp. 296-97.  See also UNC0079684 (looking at whether the alternative "yields an entering class with equal or greater diversity and academic quality"); see also UNC0096472.

[58] UNC0079695.

[59] UNC0283511.

[60] UNC0079651, UNC0079624; see also UNC0324038, UNC0378075, UNC0376477.

18

did the Working Group establish benchmarks for success—defining when critical mass has been achieved—either for underrepresented racial/ethnic or socioeconomic status groups.[61]

The Working Group's literature review of the results from state experiments also had substantial gaps and tended to rely on a skewed subset of studies that suggested race-neutral alternatives were lacking, a deficiency that Working Group Chair Barbara Polk was specifically made aware of but failed to correct. In November 2014, Polk sought input from Howie Kallem, a former official with the U.S. Department of Education's Office for Civil Rights, on the Working Group's draft report.[62] Kallem warned Polk that the draft's literature review was out of date and noted, in particular, that it failed to include an extensive analysis by The Century Foundation of race-neutral strategies which found that "a majority" of flagship universities using race-neutral strategies were successful in maintaining diversity.[63] Nevertheless, the October 2015 draft of the Working Group made no mention of any of the 18 analyses conducted by some of the nation's leading researchers on race-neutral strategies, contained in The Century Foundations/Lumina Foundation study.[64]

Most troubling of all, the Working Group's simulation of race-neutral options at UNC was highly truncated. To begin with, the Office of Institutional Research did not conduct a basic

---

[61] When pressed, UNC officials refused or were otherwise unable to define "critical mass" in terms of a particular level or range of racial and ethnic representation/enrollment. See Dean deposition, pp. 87, 126, and 133, and Polk deposition, p. 197-98. In *Fisher II*, the Supreme Court made clear that "critical mass" is not merely a number but also that it "must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." Slip opinion, p. 12. The Court also noted that demographics "do have some value as a gauge of the University's ability to enroll students who can offer underrepresented perspectives." Slip opinion, p. 14.

[62] UNC0097612 (soliciting input); UNC0325588 (noting that Kallem was with Office for Civil Rights)

[63] UNC0326346.

[64] UNC0079684-712. Although this version of the report is marked "draft," it appears to be the latest available.

19

regression analysis to determine what weight its admissions committee currently provides to race.[65] This failure is particularly glaring because the Office of Admissions conducted similar studies to look at the effect of such factors as legacy, early admission and gender on admissions.[66] Without this baseline analysis of how heavily race counts in admissions, it is very difficult to know whether the use of race is narrowly tailored and to begin the work of devising race-neutral strategies. Likewise, Vice Provost Farmer testified that UNC has never conducted an analysis to determine the impact on racial and ethnic diversity of continuing holistic admission but applying a race-blind reading.[67]

The Working Group did model what would happen if UNC adopted five different versions of a geographic or "percentage plan" approaches to admissions.[68] But it failed to conduct analysis of a variety of other widely-used race-neutral alternatives, including: (1) providing a preference to socioeconomically disadvantaged students, (2) increasing financial aid, (3) eliminating legacy preferences, (4) increasing recruitment efforts, (5) increasing admission to community college transfers, (6) ending early admission, or (7) creating partnerships with disadvantaged high schools. The decision not to analyze and report back on these options is curious. Several of the options were informally raised; indeed, UNC initially planned to simulate "preferencing students on the basis of

---

[65] Williford deposition, p. 155.

[66] Farmer deposition, pp. 119-123, and Kretchmar deposition, p. 194. In addition, UNC conducted an exercise in 2015 seeking to streamline the admissions process and discard the requirement for a second reader in instances when admissions probabilities were very low. The model for this analysis looked at the probability of admissions factoring in "residency, FGC, Alum, URM, highest test score, program, performance, activities, EC's, and deadline applied." UNC0090652. See also Farmer deposition, pp. 115-118.

[67] Farmer deposition, p. 259.

[68] See discussion of the five plans below.

20

socioeconomic status"—but chose not to follow through.[69]  Given its failure to even explore these options, its claim that no workable race-neutral strategies are available lacks credibility.[70]

Following the filing of the SFFA lawsuit,  a successor group, the Committee on Race-Neutral Strategies, chaired by Abigail Panter, was created to examine race-neutral alternatives.[71]  This group, officials said, is beginning to do the elementary work of conducting logistic regressions to determine which factors matter most in admissions, and is beginning to examine race-neutral strategies such as socioeconomic preferences.[72]  But the newly created group has not yet issued any reports on its findings.[73]

Throughout this period of time, there were numerous race-neutral alternatives available that have the potential to obtain the educational benefits of diversity, and which UNC certainly could have considered and potentially adopted. I discuss these options below.

---

[69] See UNC0104931; UNC0104933 (outlining two major simulations – to automatically admit students based on class rank and to provide socioeconomic preferences).  UNC planned an analysis by looking at such factors as the socioeconomic status of schools (including percent of students eligible for free and reduced price lunch), the socioeconomic status of families (including parental education levels) and the socioeconomic status of communities (using Census data). See UNC0104934.  More generally, UNC was aware of additional race-neutral strategies, including community college transfers, high school partnerships, and better recruitment. UNC0079951-54.  It specifically discussed zip code approaches in meetings.  UNC0079613

[70] Farmer acknowledged, for example, that the Working Group's final report did not include any discussion of expanding community college transfers through the C-STEP program, giving greater weight to first generation college status in admissions, or providing a preference by zip code.  Farmer deposition, pp. 273-77.  See also Kretchmar deposition, 317, 338-9.

[71] UNC0079680; UNC0283495; UNC0283498; Polk deposition, pp. 261 and 297.

[72] Panter deposition, 149-150, 156-158.

[73] Polk deposition, p. 308.

21

### A. UNC could increase socioeconomic preferences.

#### 1. Socioeconomic factors such as income and wealth are highly correlated with race.

Well-crafted race-neutral alternatives, while not providing a racial preference, are nevertheless cognizant of the ways in which past and present racial discrimination shapes opportunities in America. Race-neutral alternatives based on socioeconomic factors work to produce racial diversity because economic disadvantage is often influenced by the legacy of racial discrimination. This helps explain why African Americans and Hispanics on average have lower incomes and smaller savings than whites do, and why even middle-class blacks live in neighborhoods with higher poverty rates than low-income whites.[74]

Research finds that when socioeconomic affirmative action programs are constructed using a wide variety of variables—not just parental income, but factors such as wealth/net worth, and neighborhood and school levels of poverty that are correlated with race—they can produce substantial racial and ethnic diversity, because this wider array of socioeconomic factors better captures the economic impact of ongoing and past racial discrimination than does income (or race) alone.

For example, Professor Dalton Conley of New York University finds that a family's wealth (rather than income) better reflects the nation's legacy of slavery and segregation because wealth is handed down from generation to generation.[75] African Americans typically have incomes that are 70%

---

[74] John R. Logan, "Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America," US2010 Project, July 2011, p. 5.

[75] Dalton Conley, "The Why, What, and How of Class-Based Admissions Policy," in The Future of Affirmative Action, *supra*, p. 209. See also Lisa J. Dettling, Joanne W. Hsu, Lindsay Jacobs, Kevin B. Moore, & Jeffrey P. Thompson, "Recent Trends in Wealth-Holding by Race and Ethnicity: Evidence from the Survey of Consumer Finances," Federal Reserve FEDS Notes, September 27, 2017 (Black median family wealth was 10.3% of white median family wealth in 2016, and Hispanic wealth was

22

of white incomes, but African-American wealth is just 10% of white wealth.[76] Moreover, parental wealth and education are far more powerful predictors of college completion than race or income, Conley finds.[77] Wealth matters more than income because "educational advantages are acquired through major capital investments and decisions," such as purchasing a home in a neighborhood with good public schools.[78]

Concentrated poverty is also highly correlated with race and imposes an independent disadvantage on students above and beyond family poverty.[79] For example, while 6% of young whites live in neighborhoods with more than 20% poverty rates, 66% of African Americans live in such neighborhoods.[80] Colleges that give a preference to students growing up in concentrated poverty and having access to little wealth will acknowledge the challenges that, in the aggregate, poor minority children face much more often than poor white children.

UCLA Law School is an exemplar of an institution that examined factors such as wealth and concentrated poverty to obtain racial diversity. In the fall 2011 entering class, African Americans were 11.3 times as likely to be admitted under the socioeconomic status (SES) program as other programs,

---

12.1% of white wealth. Meanwhile, black median family income was 57.8% of white median family income and Hispanic income was 62.9% of white income.); and Ta Nehisi Coates, "The Case for Reparations," The Atlantic, June 2014 (discussing the link between racial discrimination and the black/white wealth gap.)

[76] Conley, "The Why, What, and How of Class-Based Admissions Policy," *supra*, p. 209.

[77] Id. at 206.

[78] Id. at 207.

[79] See e.g. Richard D. Kahlenberg, All Together Now: Creating Middle-Class Schools through Public School Choice (Brookings Press, 2001), pp. 25-37.

[80] See Patrick Sharkey, Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality, Figure 2.1 (University of Chicago Press, 2013), p. 27. See also Logan, "Separate and Unequal," *supra*, pp. 4-6.

23

and Latinos were 2.3 times as likely to be admitted. African Americans constituted 20.4% of those admitted under the SES program (22 of 108) compared with 0.8% of admissions for non-SES programs (12 of 1,363). Likewise, Hispanics constituted 35.2% of SES admits (38 of 108) compared with 5.5% for non-SES admits (75 of 1,363). Even though the SES program admitted 108 students, compared with 1,363 under non-SES, the absolute number of African Americans admitted under the SES program (22) exceeded the number admitted under other programs (12).[81] Similarly, Professor Richard Sander and Aaron Danielson of UCLA found in a 2014 analysis that richer measures of socioeconomic status, above and beyond income to include factors such as wealth and neighborhood poverty levels, significantly increased the correlation between race and socioeconomic status and the racial dividend of class-based affirmative action.[82]

The powerful connection between race and socioeconomic status that is found nationally is also manifest among UNC students. Among admitted in-state students for the classes of 2016-2021, Arcidiacono's analysis of UNC data shows that minority students are much more likely to be economically disadvantaged than white students: 53.5% of admitted black students were economically disadvantaged, as were 47.2% of Hispanic students, and 27% of Asian students, but only 16.5% of white students. As discussed in further detail below, there is also a strong correlation between race and socioeconomic status within UNC's applicant pool. See Appendix C.4.

Some criticize race-neutral alternatives as subterfuges seeking a desired racial result covertly. But this thinking has it exactly backwards because the beneficiaries are a very different subset of African-American and Hispanic students than those who usually benefit from racial preferences. The

---

[81] Kahlenberg & Potter, "A Better Affirmative Action," p. 14, *supra*.

[82] Richard Sander & Aaron Danielson, "Thinking Hard About 'Race-Neutral' Admissions," 47 University of Michigan Journal of Law Reform 967, 990-991 (2014).

24

new beneficiaries are more likely to be working-class and actually to live in segregated neighborhoods. As Georgetown University Law Professor Sheryll Cashin notes, place-based approaches help "those who are actually disadvantaged by structural barriers" rather than enabling "high-income, advantaged blacks to claim the legacy of American apartheid."[83]

Class-based preferences also avoid two important costs associated with racial preferences: a reinforcement of negative stereotypes and an increase in racial and ethnic antagonism.[84] Polls find that most Americans (including a majority of black respondents) oppose the use of race or ethnicity as a factor in college admissions, but large majorities favor the consideration of economic disadvantage.[85] Because students of all races who have overcome economic disadvantage are seen as deserving of special consideration, such students are unlikely to face the stigma or resentment that has been directed toward recipients of racial preferences.[86]  (At UNC, under the existing system of racial preferences, only 73.8% of African American students reported that "students are respected here regardless of their race or ethnicity," compared with 90.4% of students at the university as a whole).[87]

---

[83] Sheryll Cashin, Place Not Race: A New Vision of Opportunity in American (Boston: Beacon Press, 2014), p. 78.

[84] Bakke, 438 U.S. 265, 298-99.

[85] Scott Jaschik, "Poll: Public Opposes Affirmative Action," Inside Higher Ed, July 8, 2016 (citing Gallup poll finding 63%-36% opposition to race as a factor in college admissions, but 61%-39% support for considering family economic circumstances in admissions).

[86] Paul M. Sniderman & Thomas Leonard Piazza, The Scar of Race (Harvard University Press, 1993), pp. 102-04. See also Robert P. Jones, Daniel Cox, Betsy Cooper, & Rachel Lienesch, "Anxiety, Nostalgia and Mistrust: Findings from the 2015 American Values Survey," Public Religion Research Institute, November 17, 2015, p. 5 (finding resentment associated with racial preferences).

[87] UNC0130768.  See also Williford deposition, pp. 220-221.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 29 of 119

## 2.     UNC's socioeconomic diversity is deeply lacking.

Both external studies and internal data from UNC suggest that UNC's student body is deeply lacking in socioeconomic diversity. In the context of racial diversity, UNC officials repeatedly testified that when certain racial and ethnic groups were "underrepresented," the benchmark was "the population in the State of North Carolina."[88]  By this measure, socioeconomic underrepresentation at UNC is far greater than racial underrepresentation.

Most notable is a 2017 study by Professor Raj Chetty of Stanford University) and colleagues which examined a unique data set of 30 million college students and financial data from the IRS. According to analysis of the Chetty data by the New York Times, 60% of UNC students from those born in 1991 (the class of 2013) came from the top 20% of the income distribution compared with 3.8% from the bottom 20% of the income distribution.[89]  In other words, a visitor of UNC was *16 times* as likely to bump into a high-income student as a low-income student on campus.  The median family income of a student from U.N.C. was $135,100.[90]    This is more than twice the median household income for North Carolina residents in 2016 ($53,764).[91]    Indeed, the figure is close to double the median family income ($73,857) for Americans ages 45-54 (a typical age for the parents of

---

[88] See Farmer deposition, p. 44.  See also Andrew Parrish deposition, p. 30; and UNC0378123 ("Foundations and Practices Regarding the Evaluation of Candidates," which defined underrepresented as "groups whose percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.")

[89] "Economic Diversity and Student Outcomes at U.N.C.- Chapel Hill," New York Times, January 18, 2017.

[90] "Economic Diversity and Student Outcomes at U.N.C.- Chapel Hill," New York Times, January 18, 2017.

[91] U.S. Census Bureau, "Median Household Income by State," Table H-8. https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-income-households.html

college students.).[92]  Almost half (43%) of UNC students came from the top 10% of the income distribution.  More students at UNC came from the top 5% than the bottom 60% by income.[93]  By comparison, at top flagship public universities such as U.C. Berkeley and UCLA, Chetty's data show about twice the proportion of students come from the bottom 20% by income as at UNC.[94]

UNC testimony and evidence in this case reinforces these findings up to the present day. For the Fall of 2017 incoming first year class, UNC reported that only 12% of its students qualified for the Carolina Covenant program, which covers disadvantaged families earning up to 200% of the poverty line—about $48,500 for a family of four.[95]  By comparison, 31% North Carolina residents are in households making less than 200% of the poverty line.[96]

---

[92] See Proctor, Semega, and Kollar, "Income and Poverty in the United States: 2015," *supra*, pp. 5-6, Table 1.

[93] "Economic Diversity and Student Outcomes at U.N.C.- Chapel Hill," New York Times, January 18, 2017.

[94] See "Economic Diversity and Student Outcomes at the University of California, Berkeley," New York Times, January 18, 2017 http://www.nytimes.com/interactive/projects/college-mobility/university-of-california-berkeley (summary of Chetty data); and "Economic Diversity and Student Outcomes at the University of California, Los Angeles," New York Times, January 18, 2017 http://www.nytimes.com/interactive/projects/college-mobility/university-of-california-los-angeles (summary of Chetty data).  While 3.8% of UNC Chapel Hill students came from the bottom 20% by income, 7.3% of U.C. Berkeley students and 8.3% of UCLA students did.

[95] UNC, "Class Profile First-Year Students, Fall of 2017," https://admissions.unc.edu/apply/class-profile-2/;  UNC, "Carolina Covenant," https://www.unc.edu/studentaid/pdf/misc/CovOnePage.pdf

[96] Kaiser Family Foundation, "Distribution of the Total Population by Federal Poverty Level (above and below 200% FPL, 2016) https://www.kff.org/other/state-indicator/population-up-to-200-fpl/?currentTimeframe=0&selectedDistributions=under-200percent&sortModel= %7B%22colId%22: %22Location%22,%22sort%22:%22asc%22%7D

In the entering first-year class in 2014, only 10.7% of students qualified for a fee waiver.[97] UNC's fee waiver is determined by income criteria developed by the College Board.[98] The College Board provides that all students eligible for free and reduced price lunch—more than half of the North Carolina public school student population—is eligible for fee waivers on college applications.[99]

In addition, UNC's documents show that only 43% of students receive need-based financial aid to support them in meeting the hefty burden of the annual total cost of full time attendance—$25,876 for North Carolina residents and $53,100 for out-of-state residents in the 2017-18 academic year.[100] In other words, fully 57% of UNC students come from families that are wealthy enough to handle these costs without university grants.

UNC's data also show that the proportion of students who are first generation college students is just 17% for the first year students admitted for the fall of 2017.[101] By comparison, 72.2% of

---

[97] UNC0193169.  In the Fall of 2016, among first year students, 11.4% received fee waivers. UNC0283534.

[98] See UNC079708; UNC0193172.  See also Farmer deposition, p. 278.

[99] At the K-12 level, 59.82% of North Carolina public school students were eligible for free or reduced price lunch in the 2016-17 school year.  Public schools of North Carolina, "Free and Reduced Meal Application Data," http://www.ncpublicschools.org/fbs/resources/data/.  All students receiving free and reduced price meals are eligible for both a College Board SAT waiver and a Common Application fee waiver.  See "SAT Fee Waivers," https://collegereadiness.collegeboard.org/sat/register/fees/fee-waivers; and "Common App Fee Waiver," https://appsupport.commonapp.org/link/portal/33011/33013/Article/758/Common-App-fee-waiver

[100] UNC "Facts and Figures," June 2016; and UNC, "Cost of Attendance," http://admissions.unc.edu/afford/cost-of-attendance/

[101] University of North Carolina at Chapel Hill, "Class Profile," Fall 2017 First Year Students. https://admissions.unc.edu/apply/class-profile-2/.  First Generation College is defined by UNC as "Student for whom neither parent and/or legal guardian has attained a four-year degree." UNC0079708; UNC0193172; see also UNC0193169 (17.9% of fall 2014 first year class was first generation college.)

28

Carolina adults over the age of 25 lack a bachelor's degree, as do 72.5% of those ages 45-64.[102]

Stunningly,  the percentage of students who were sons or daughters of UNC alumni was even greater,

(19%) than first generation college students (17%).[103]  This is remarkable in a nation where there are

*451 times* as many American adults age 25 and older without a college degree (143 million) as adults in

the world with a UNC degree (317,000).[104] The level of socioeconomic underrepresentation at UNC

is substantially greater it is for underrepresented minorities.[105]

Another way to consider socioeconomic diversity is eligibility for the federal Pell grant for

students needing financial aid to pay for college. Using federal data, U.S. News & World Report found

that the proportion of UNC undergraduates receiving Pell grants in the 2015-2016 school year was

22%. By comparison, at U.C. Berkeley, 33% of students received Pell grants, and at UCLA the figure

---

[102] Rebecca Tippett, "NC in Focus: Increasing Educational Attainment," UNC Carolina Population Center, December 10, 2015 (citing 2010-2014 American Community Survey estimates) http://demography.cpc.unc.edu/2015/12/10/nc-in-focus-increasing-educational-attainment/  For national figures, see Ryan & Bauman, "Educational Attainment in the United States: 2015" (68% of adults age 45-64 lack a bachelor's degree).

[103] University of North Carolina at Chapel Hill, "Class Profile," Fall 2017 First Year Students. https://admissions.unc.edu/apply/class-profile-2/.  This pattern is consistent over time.  For example, in the fall of 2014 entering class, the number of alumni children (718) outnumbered those who were first generation college (710). UNC0193169. In the fall of 2016 entering first year class, 18.7% were children of alumni, and just 16.7% first generation college.  UNC0283534.

[104] Camille L. Ryan & Kurt Bauman, "Educational Attainment in the United States: 2015," U.S. Census Bureau, March 2016, p. 2, Table 1; UNC "Facts and Figures," May 2017.

[105] Just 17% of UNC undergraduates are first generation college students, while 72.2% of North Carolina adults lack a bachelor's degree for a representation rate of 0.235.  By contrast African American high school students constitute 27.6% of North Carolina public high school graduates. See Public Schools of North Carolina, "Statistical Profile," http://apps.schools.nc.gov/ords/f?p=1:161:1474975992537601::NO::  African Americans represent 15% of college-age population in the U.S. https://www.nytimes.com/interactive/2017/08/24/us/affirmative-action.html?_r=0 At UNC, 10% of students are African American, as reported in the entering class of 2017.  UNC "Class Profile." This amounts to a representation rate of 0.362 (in-state) and 0.667 (out of state).

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 33 of 119

was 37%.[106] (These universities are considered peers by UNC and rank higher on U.S. News & World Report's college rankings, an evaluation system that UNC recognizes as an important measure in its own literature.[107]) Even some highly-ranked private colleges had a higher percentage of Pell recipients. At Columbia University, for example, 32% of students received Pell grants.[108]

### 3. UNC could make critical socioeconomic data available to admissions officers.

UNC has adopted "need-blind" admissions, meaning it has placed a firewall between the admissions and financial aid offices that prevents admissions officers from knowing the family income or wealth of applicants.[109] This policy creates an enormous barrier to implementing a central race-neutral strategy used at numerous other colleges: one that provides a preference in admissions to low-income and low-wealth applicants.

---

[106] "Economic Diversity: National Universities," US News & World Report, http://www.usnews.com/ best-colleges/rankings/national-universities/economic-diversity. Increases in Pell percentages at UNC over time may not represent actual changes in socioeconomic diversity. See e.g. Jason Delisle, "The Pell Grant proxy: A ubiquitous but flawed measure of low-income student enrollment" Brookings Institution, October 12, 2017 (noting that increases in Pell representation may reflect changes that made the program more generous over time, not increases in actual socioeconomic diversity).

[107] See e.g. Farmer deposition, pp. 98 and 204 (peers). UNC boasts in its literature that in is the 5th best public university in U.S. News & World Report. UNC "Facts and Figures," May 2017. In that evaluation system, UC Berkeley ranked #1 and UCLA #2.

[108] "Economic Diversity: National Universities," US News & World Report, http://www.usnews.com/ best-colleges/rankings/national-universities/economic-diversity.

[109] See Farmer deposition, p. 280 ("We don't share information with financial aid about the financial circumstances of families."); Polk deposition, p. 221 ("we do not have family income information"); and Kretchmar deposition, 127, 234-5.

30

When asked about the possibility of implementing "race-blind" admissions, Provost Jim Dean dismissed the idea because "it would not be holistic if it didn't include everything that we know about the student."[110] Yet in the case of socioeconomic status, admissions officers lack a full picture of the students and so must piece together clues about whether a student is economically disadvantaged. Accordingly, admissions officers try to make educated guesses by examining whether a student requested an application fee waiver, the parents' education level and occupation, the socioeconomic characteristics of an applicant's high school, and the student's essays for clues as to his or her socioeconomic status.

Withholding critical information about a student's specific family income makes it impossible for UNC to implement a sophisticated socioeconomic affirmative action program as a race-neutral alternative for attaining the educational benefits of racial, ethnic, and socioeconomic diversity. Moreover, admissions officers have no solid information about a family's assets. As discussed above, that is a critical omission because wealth is an important determinant of opportunity. Indeed, for the purposes of race-neutral analysis, wealth has a much higher correlation with race than does income, which means the potential racial dividend of using wealth is substantially greater than it is for using income.[111]

### 4. UNC could increase the weight it gives to socioeconomic factors.

For many years, UNC prided itself for failing to provide any admissions break to economically disadvantaged students through its Carolina Covenant program. In creating the 2004 Carolina

---

[110] Dean deposition, p. 194. See also Polk deposition, p. 316 (not possible to do holistic admissions without race).

[111] Conley, "The Why, What, and How of Class-Based Admissions Policy," *supra*, p. 209.

31

Covenant program, UNC associate dean Harold Woodard told former *New York Times* reporter Edward B. Fiske, "there is no doubt that these students are Carolina material…There has been no lowering of standards.  They have not been given a break because of their circumstances."[112]

Over time, UNC began considering socioeconomic status in admissions, but statistical analyses from SFFA's expert shows that the preference provided to economically disadvantaged students is much smaller than those provided to other groups.

SFFA's expert witness, Peter Arcidiacono of Duke University, reviewed data from 200,412 in-state and out-of-state applicants primarily from the class of 2016 to the class of 2021 admissions cycles, of which 162,857 were identified as an appropriate dataset.[113] He provides logit estimates of admission (with the largest numbers suggesting the largest boost). The data are presented for in-state and out-of-state applicants separately.  (UNC faces a financial penalty if out-of-state enrollment exceeds 18% under state policy; as a result, admissions is far more competitive for the smaller number out of state slots.[114]  This competition is compounded by the fact that UNC receives more out-of-state than in-state applications).  In rank order of importance, Arcidiacono's results show the relative weight of various preferences in UNC's admissions for in-state and out-of-state applicants, respectively.[115]

---

[112] Edward B. Fiske, "The Carolina Covenant," in Richard D. Kahlenberg (ed), Rewarding Strivers: Helping Low-Income Students Succeed in College (Century Foundation Press, 2010), 67 (also citing Steve Farmer on the same point).

[113] Arcidiacono Report, § 2.2.1. Some aggregated admissions data were also available for admissions cycles for the classes of 2014 and 2015.

[114] See Bailey Pennington, "The Admissions Radio: the UNC System's 82-18 split," UC Media Hub, May 18, 2016 (describing March 1986 UNC Board of Governors policy 700.1.3.)

[115] Recruited athletes are omitted from this analysis.  Because athletic coaches can discuss admission eligibility with the UNC admissions office before making offers, recruited athletes are essentially guaranteed admission (at a 97% rate).  They constitute just 1.7% of domestic UNC admits. Arcidiacono Report, § 1.

**In State Applicants (2016-2021)**[116]

| Preference | Logit Estimate of Admission |
|---|---|
| African American | 4.687 |
| Hispanic | 2.623 |
| First Generation College | 1.251 |
| Legacy | 0.435 |
| Early Applicant | 0.355 |
| Fee Waiver | 0.205 |
| Female | 0.177 |
| Asian | 0.163 |

As Arcidiacono notes, among in-state applicants, the magnitude of the first generation preference is less than 30% that of the racial preference African-American male applicants receive. Moreover, the preference for first generation college students is smaller for Hispanics, and practically non-existent for African Americans.[117]

A perverse effect of giving such a big preference for race is that it negates the incentive to give minorities a socioeconomic preference. While admitted in-state minority students are more likely to be economically disadvantaged than admitted white students, admitted underrepresented minorities are about twice as likely to be socioeconomically advantaged as the general North Carolina public high school population. For example, according to data produced by the North Carolina Education Research Data Center (NCERDC), for the class of 2019, 55.4% of black students admitted to UNC were from advantaged families, compared with 29.4% of North Carolina black public high school students; and 59.7% of admitted North Carolina Hispanic students were advantaged compared with

---

[116] Arcidiacono Report, Table A.4.1 (spec 7).

[117] Arcidiacono Report, § 4.1

33

25.3% of North Carolina Hispanic public high school students. Likewise, according to UNC's data, in the Fall of 2014, 791 underrepresented minority students 543 (68.6%) had a parent with a bachelor's degree, while 248 (31.4%) were first-generation college.[118]

The same general pattern of preference holds for out-of-state applicants:

**Out-of-State Applicants (2016-2021)**[119]

| Preference | Logit Estimate of Admission |
| --- | --- |
| African American | 7.090 |
| Legacy | 5.637 |
| Hispanic | 3.483 |
| First Generation | 2.428 |
| Early Applicant | 0.967 |
| Asian | 0.218 |
| Fee Waiver | 0.165 |
| Female | -0.08 |

Finally, it is worth noting that these findings are in line with prior studies examining similar schools. Empirical research—from four sets of *supporters* of racial preferences—suggest that universities do not in fact provide much of a leg up to economically disadvantaged students, at least so long as direct racial preferences are available to them.

- In a 2004 study of the nation's most selective 146 institutions, Georgetown professors Anthony Carnevale and Stephen Rose found that race-based preferences on average triple the representation of blacks and Hispanics students compared to admission based on grades and test scores, but that universities do nothing to boost socioeconomic representation.[120] In fact, the representation of poor and working class students is slightly

---

[118] UNC0145991

[119] Arcidiacono Report, Table A.4.2 (spec 6).

[120] Carnevale & Rose, "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," *supra*, p. 135.

34

lower than if grades and test scores were the sole basis for admissions, the researchers found.[121] UNC was among the institutions studied.[122]

- In a 2005 study of highly selective institutions, the Mellon Foundation's William Bowen and colleagues found that being an underrepresented minority increases one's chance of admissions by 27.7 percentage points; that is, an applicant with a 40% chance of admissions has a 68% chance if she is African American, Hispanic, or Native American. By contrast, being in the bottom income quartile (relative to the middle quartiles) has no positive effect.[123]

- A 2009 analysis by Thomas Espenshade of Princeton and Alexandria Radford finds that, at highly selective private institutions, the boost provided to African-American applicants is worth 310 SAT points (on a 1600 scale), compared with 130 points for poor students, 70 points for working-class applicants, and (distressingly) 50 points for upper-middle class students, relative to middle-class pupils.[124]

- A 2015 study of 40 selective colleges by Sean Reardon of Stanford and colleagues using 2004 data concludes that "racial affirmative action plays (or played, in 2004) some role in admissions to highly selective colleges but SES-based affirmative action did not."[125]

In the end, these analyses indicate that UNC is dramatically undervaluing socioeconomic status compared with race.

Consistent with this finding, other behaviors of the UNC admissions office underline the relatively greater importance accorded to racial diversity than to socioeconomic diversity. For many years, for example, the Core reports used to summarize ongoing admissions information as decisions were still being made provided data on racial breakdown, but no data on Covenant Scholars, first

---

[121] Id. at 142.

[122] See America's Untapped Resource, supra, p. 165, Table A2.

[123] William G. Bowen, Martin A. Kurzweil, & Eugene M. Tobin, Equity and Excellence in American Higher Education (University of Virginia Press, 2005), p. 105, Table 5.1.

[124] Thomas J. Espenshade & Alexandria Walton Radford, No Longer Separate, Not Yet Equal (Princeton University Press, 2009), p. 92, Table 3.5.

[125] Sean F. Reardon, Rachel Baker, Matt Kasman, Daniel Klasik, & Joseph B. Townsend, "Can Socioeconomic Status Substitute for Race in Affirmative Action College Admissions Policies? Evidence From a Simulation Model," Educational Testing Service, 2015, p. 6.

35

generation college students, or applicants with fee waivers.[126] Whereas racial status is systematically noted by admissions officers, there is no box for admissions officers of applicants to check to designate "economically disadvantaged."[127]

The behavior of athletic coaches also suggests that race matters more than economic status in admissions. Because coaches are given only a limited number of slots for recruitment, they are careful not to waste special requests on students who would otherwise be admitted. Accordingly, coaches often conduct informal check-ins with admissions officers to gauge the likelihood of an athlete's admissibility. In email correspondence in the record of this case, athletic recruiters would often mention the race of applicants, but not the socioeconomic status.[128]

## B. UNC could increase financial aid.

UNC has gained considerable favorable attention for its "Carolina Covenant" program which provides grants for dependent students coming from families making up to 200% of the poverty line, or about $48,500 for a family of four.[129] But the program does not recognize that typically-sized families making somewhat more than $48,500 may struggle to meet UNC's total cost of full time attendance ($25,876 for North Carolina residents and $53,100 for out-of-state residents in the 2017-18 academic year.)[130] By contrast, UNC's peers, U.C. Berkeley and UCLA, provide the "Blue and Gold Opportunity Plan," which covers tuition and fees for families making up to $80,000 a year.[131]

---

[126] Kretchmar deposition, 170-171. See also Polk deposition, pp. 97-98.

[127] Polk deposition, p. 224.

[128] See, e.g., Polk deposition, pp. 113-133 (citing several examples).

[129] UNC "Facts and Figures," June 2016; UNC, "Carolina Covenant," https://www.unc.edu/studentaid/pdf/misc/CovOnePage.pdf

[130] UNC, "Cost of Attendance," http://admissions.unc.edu/afford/cost-of-attendance/

[131] http://financialaid.berkeley.edu/blue-and-gold-opportunity-plan

36

Moreover, unlike many selective colleges, UNC diverts precious scholarship funds to non-need "merit aid" for 140 students each year. These scholarships can cover up to the full cost of attendance per year for students who do not demonstrate any financial need whatsoever.[132]

Part of UNC's failure to provide financial aid is the direct result of an explicit policy of the board of regents, adopted in 2014, to limit the degree to which Chapel Hill can use tuition money to aid needy students. Under the policy, the amount of tuition revenue that can be used for financial aid is capped at 15%.[133] By contrast, the University of California system devotes one-third of tuition revenues to financial aid.[134]

This lack of commitment to financial aid obviously matters for socioeconomic diversity but it also matters for racial diversity. Unaided students come from the wealthiest families in the country, so it is relevant to note that whites constitute 96.2% of the nation's top 1% of earners and African Americans just 1.4%.[135]

UNC may claim that increasing financial aid would be too expensive to be part of a workable race-neutral strategy. But UNC officials testified that UNC would remain committed to achieving

---

[132] See UNC Student Aid, "Frequently Asked Questions," 8 and 9. http://studentaid.unc.edu/faqs/scholarships-faqs/#Q8. In the First year fall 2014 class, 3.5% (139 students) received merit-based rather than need-based aid. UNC0193169. Merit aid excludes athletic scholarships. UNC0193173.

[133] "Full UNC board limits use of tuition for financial aid," Raleigh News-Observer, August 1, 2014.

[134] Goldie Blumenstyk, "New 11-University Alliance Plans Efforts to Help Graduate More Needy Students," Chronicle of Higher Education, September 16, 2014. https://www.chronicle.com/article/New-11-University-Alliance/148819

[135] Shartia Brantley, "Who Are the Black '1 Percent'?" The Grio, November 21, 2011 (based on calculations from Federal Reserve data).

37

racial diversity in new ways if the courts were to rule against the use of race in admission.[136]

Presumably, this commitment would entail expanding financial aid if it were necessary to achieve the

goal of racial diversity. Although UNC alleged in an amicus brief before the U.S. Supreme Court that

a key race-neutral strategy (a percentage plan) would be unworkable because it would water down

academic quality at UNC with an influx of students from poorly resourced high schools (a contention

we will address below), the university made no claim that the presence of such student would put too

much pressure on financial aid budgets to be workable.[137]

Indeed, UNC's endowment is a staggering $3 billion, making it the 35th richest university in

the entire world.[138] Despite being among the planet's wealthiest colleges, and therefore best positioned

to support low-income students, UNC enrolls far fewer needy students than do colleges with much

smaller endowments.

**C.** **UNC could adopt admissions policies utilizing geographic diversity, including percentage plans (for in-state admissions) and the use of zip codes or Census tract data (for out-of-state admissions).**

UNC says it seeks geographic diversity in its student body, but the commitment appears to be

weak, which in turn undercuts its efforts to promote student body diversity. In Arcidiacono's dataset,

slightly more than half (50.3%) of in-state UNC admitted students come from just 7.8% (59) of North

---

[136] See, e.g., Dean deposition, p. 141 (agreeing with the statement that "regardless of what happens legally, the university will always be concerned about increasing diversity, including racial diversity, on campus.")

[137] University of North Carolina, Amicus brief in *Fisher v. University of Texas*, pp. 33-36.

[138] Hazel Bradford, "UNC Investment Fund returns 12.1% for fiscal year," Pension & Investments, September 12, 2017. http://www.pionline.com/article/20170912/ONLINE/170919957/unc-investment-fund-returns-121-for-fiscal-year ; and The Best Schools, "The 100 Richest Universities: Their Generosity and Commitment to Research 2017," August 17, 2017. https://thebestschools.org/features/richest-universities-endowments-generosity-research/

Carolina high schools. Among just private high schools, which provide 20% of in-state students, a similar pattern prevails. Just 6.5% of North Carolina's private high schools (20) account for nearly 60% of all admitted private high school students at UNC.[139]

Unlike the use of socioeconomic preference options outlined above, UNC did attempt to model the effects of geographic approaches like those used at the University of Texas, the University of California, and the University of Florida that admit a certain percentage of high-achieving students from state high schools.[140] UNC conducted two sets of simulations—one in 2012, and a series of five in 2014. I begin by setting out their respective findings, then explain why UNC was wrong to reject these alternatives as unworkable.

In 2012, UNC filed an amicus brief in the *Fisher v. University of Texas* litigation in which Chapel Hill disclosed that it had conducted its own simulation of how a plan to automatically admit the top 10% of North Carolina public high school students (by class rank) from the existing pool of applicants would have worked for the class entering the fall of 2012.[141] In 2014, the Working Group on Race-

---

[139] UNC079698; UNC079703. North Carolina has 307 private high schools according to Niche, a website that analyzes schools and neighborhoods in the United States. https://www.niche.com/k12/search/best-private-high-schools/s/north-carolina/

[140] See Potter, "Transitioning to Race-Neutral Admissions," supra, pp. 82-83 (referencing details about the Texas top 10% plan, the California top 9% plan, and the Florida top 20% plan. Only the Texas plan guarantees admission to the flagship institution.) See also Stella Flores and Catherine Horn, "Texas Top Ten Percent Plan: How It Works, What Are Its Limits, and Recommendations to Consider" (Educational Testing Service, 2015), p. 6, Table 1 (that Texas's plan applies to public and private high schools; California's to comprehensive public and private school schools; and Florida's to public high schools.) About 80% of North Carolina high schools report class rank. Kretchmar deposition, 213. It may well be that percentage would increase if student admission to UNC depended upon it.

[141] The analysis involved only North Carolina public school students, who constitute about 66% of UNC's total class. 82% of students are in-state, and 80% of in-state students attend public high schools. UNC079697.

39

Neutral Alternatives conducted additional analyses which built upon and expanded the 2012 analysis by going beyond the impact on North Carolina public high school students to look at private school students in North Carolina as well as out-of-state applicants. The new analyses also looked beyond the existing applicant pool.[142] The Working Group analyzed five possibilities: (1) Admitting the Top 10%; (2) Admitting the Top 4.5%; (3) Admitting those with 5 AP classes or more and 1150 SAT or more; (4) Admitting those with 1280 SAT or more; and (5) Admitting the Top 7.5% of High Poverty Schools and the Top 3% of Low Poverty Schools.[143]

### 1. 2012 UNC Study.

UNC's 2012 analysis showed that the percentage plan would, in fact, *increase* the proportion of underrepresented students—from 15% to 16%—enrolled in the first-year class at UNC compared with the use of racial preferences. Oddly, UNC did not say what the socioeconomic impact would be, even though it repeatedly claimed that socioeconomic diversity is also important.[144] Nevertheless, UNC claimed that plan was unworkable because it would result in a 55-point decline in the class's average SAT scores from 1317 to 1262. The university also claimed that first year GPA averages among freshmen students would decline one-tenth of a point from 3.26 to 3.16.[145] Issuing a dire warning, UNC claimed that the plan would have a "devastating educational effect" as "many" of those in the top 10% of their high school class "would quickly find themselves educationally lost amid

---

[142] UNC079697; UNC0323664. Because non-applicants were included, the analysis modeled the likely admitted class rather than the enrolled class. UNC0323665; see also UNC0080085-86.

[143] UNC0087666.

[144] UNC0079622. Texas's percentage plan did increase socioeconomic diversity. See discussion below.

[145] Brief of Amicus Curiae The University of North Carolina at Chapel Hill Supporting Respondents, *Fisher v. University of Texas* (August 9, 2012), pp. 33-35. See also UNC0079622.

the faster pace of Chapel Hill—flocking to remedial courses to overcome their relatively weak secondary school education and facing increasingly difficult challenges to reach graduation."[146]

UNC's analysis of the academic impact of the simulation was flawed on several fronts. An SAT drop from 1317 to 1262 in 2012 represented a modest decline from the 91st percentile to the 86th.[147] In testimony, Vice Provost Farmer, head of admissions, flatly rejected the amicus brief's characterization that students would flock "to remedial courses." Farmer testified: "I don't agree with that statement."[148] He noted that while a gap exists between graduation rates of first generation college students and others, the differential has "narrowed really dramatically over the last ten years."[149]

Strikingly, the analysis focused on SAT scores and did not outline what the effect of the top 10% plan would have on the average high school GPA of incoming UNC students.[150] (A plan focused solely on admitting students with the highest grades in every high school might well be expected to result in a rise in average high school GPA.) UNC officials testified that the University has conducted no analysis of the correlation between high school class rank and college GPA.[151]

---

[146] UNC Amicus Brief, pp. 35-36. The brief also noted that 21% of those making the Dean's list in 2012, and nearly 15% of those inducted into Phi Beta Kappa were outside the top 10% Id. at 36. Left unsaid was that the vast majority—79% of the Dean's list and 85% of Phi Beta Kappa inductees—were in fact in the top 10%.

[147] "SAT Percentile Ranks for Males, Females and Total Group: 2012 College Board Seniors – Critical Reading and Mathematics," (2012) http://media.collegeboard.com/digitalServices/pdf/research/SAT-Percentile-Ranks-Composite-CR-M-2012.pdf

[148] Farmer deposition, p. 333.

[149] Farmer deposition, pp. 346.

[150] UNC0079622. Kretchmar deposition, p. 112.

[151] See e.g. Polk deposition, pp. 78-79. Although class rank is not included in the model, predicted college GPA does include a high school performance variable. UNC0080085.

41

Even the questionable decline in projected college GPA was misreported in the amicus brief. UNC documents show that Dr. Kretchmar, who conducted the study, estimated the drop in first year GPA was not a full tenth of a point but rather between seven and eight one-hundredths of a point.[152] This new projected GPA of 3.19 for the class would have been substantially higher than the projected GPA on which UNC insists for recruited athletes (2.3) or the GPA that was achieved by underrepresented minority males in 2001-2009 at the end of their first year (ranging from 2.54-2.79).[153]

## 2.  2014 UNC Study

UNC's 2014 study of five options found results suggesting that four of the five may have been problematic, but UNC also rejected a fifth option—the top 4.5% plan—despite its strong promise.[154] The Working Group claimed the 4.5% plan resulted in an incoming class that "is both less diverse and less academically qualified than the actual admitted class."[155] But the evidence suggests that when one considers economic as well as racial diversity, and high school grades as well as standardized test

---

[152] UNC0080085-86.  The amicus brief, and a UNC's own write up of the results, employed the wrong comparison, between top 10% NC actually admitted (3.2621) and the top 10% North Carolina simulation (3.1609), yielding the tenth of a point estimate (0.1012).  The correct comparison is between the top 10% North Carolina simulation (3.1609) and Actual North Carolina admits (3.2363), which yields a smaller differential, of 0.0755.  When presenting the SAT decline, UNC did report the proper comparison between the top 10% simulation (1262) actual North Carolina admits (1317).

[153] UNC0193175 and Panter deposition, 44 (recruited athletes must have a predicted college GPA of at least 2.3 though that threshold is sometimes waived.)  The minimum 2.3 projected GPA was waived 23 times in 2012, 14 times in 2013 and 9 times in 2014.  UNC0193178.  For GPA of underrepresented minority males, see UNC0093898.

[154] UNC0087666.  The Working Group found the four other models lacking: (1) the top 10% plan presented a challenge because it admitted too many students (9,592 vs. 4,097) and produced a 130-point drop in SAT scores.  UNC0323685; (2) the 5 AP classes option led to a large reduction in the proportion of underrepresented minorities (from 16.4% in the fall of 2012 to 6.4%); (3) the 1280 SAT option led to an even more dramatic decline of underrepresented minorities (to 4.8%); and (4) the Top 7.5%/Top 3% option led to more diversity (17.8% underrepresented minorities), but a 113-point decline in average critical reading plus math SAT scores (from 1303 to 1190).

[155] UNC0079701.

42

scores, the diversity and academic quality under the top 4.5% plan is at least as strong as the class admitted with the use of racial preferences.

The Working Group noted that under the simulation, underrepresented minorities saw a modest 2.5 percentage point decline among in-state public school students (from 16.4% to 13.9%) and rejected the option for that reason.[156] But the report also noted that economic diversity increased substantially as the proportion who attended schools with more than 50% of students eligible for free and reduced-price lunch increased by 18 percentage points (from 20.2% to 38.0%).[157] The report did not directly track the socioeconomic status of the families of students (as measured by eligibility for free and reduced price lunch, first generation college, or fee waiver.)[158] But we know that in other

---

[156] The data presented in the text reference North Carolina public high school students, who represent two-thirds of the UNC class. This is consistent with UNC's own emphasis on such students. See UNC0104933 ("Because this population of students—North Carolina residents attending North Carolina public schools—comprises the bulk of our first-year enrolling class, we can reasonably assess the impact of alternative admissions practices on the composition of the first-year class by studying the impact of this population alone.")

The Working Group also modeled a variation on the 4.5% plan for out of state students and projected a 21 percentage point decline in under-represented minority students. See UNC0323687; UNC0323669. But the model used for out-of-state students was not parallel to the spirit of the in-state top 4.5% plan in two respects. First, the model imposed an arbitrary SAT minimum of 1230, while the in-state model eliminates consideration of SAT scores. Second, the out-of-state model makes no attempt to prioritize students from different geographic backgrounds by, for example, taking students who ranked high in their high school class from a variety of zip codes. It simply takes those with the highest grades and test scores irrespective of geographic considerations. By avoiding the two central features of the in-state percentage plan—the emphasis on high school grades over test scores and geographic diversity—the out-of-state model is completely inapposite.

[157] UNC0079701. UNC officials were aware from their research on race-neutral strategies that UT Austin's percentage plan had yielded an increase in students from high poverty and medium-poverty schools. UNC0096551.

[158] See UNC0323476 (on data limitations suggesting fee waiver and first generation college status were only available for applicants and student-level free and reduced price lunch eligibility was only available at the student level for the North Carolina public high school dataset.) Indirect evidence, however, suggests an increase in socioeconomic diversity at the family level. As noted above, the income eligibility requirements for college application fee waivers is similar to the high school eligibility for

43

cases, such as the UT's top 10% plan, socioeconomic diversity at the individual family level spiked dramatically under the plan.[159] The lopsided attention to racial/ethnic diversity (to the exclusion of socioeconomic and other types of diversity) was highlighted in the Working Group's conclusion: "No identifiable race-neutral approach was found that would result in admitted class that is academically as qualified while also maintaining or enhancing *racial/ethnic diversity*."(emphasis supplied)[160]

A small decline in racial and ethnic diversity accompanied by a substantial increase in socioeconomic diversity constitutes a net increase the educational benefits of diversity – even by UNC's own standards. UNC says that in evaluating the benefits of diversity, race should be "a single element" within a "larger definition of diversity" which is defined "broadly" to include "differences in social background [and] economic circumstances" among other factors.[161] The University's Academic Plan from 2003 emphasizes "diversity, broadly construed, is fundamental to students

---

free and reduced price lunch**.** See "SAT Fee Waivers," https://collegereadiness.collegeboard.org/sat/register/fees/fee-waivers; and "Common App Fee Waiver," https://appsupport.commonapp.org/link/portal/33011/33013/Article/758/Common-App-fee-waiver. The simulation suggested that for North Carolina in-state public high school students, the existing class had 8.8% of students eligible for fee waivers, and under the 4.5% plan, the proportion eligible for free and reduced price lunch would be 13.9%. UNC0087666.

[159] Roughly three-quarters of students are admitted to UT through the percentage plan, and one-quarter through discretionary admissions (which, after 2004, began to include race again). In 2013, 21% of incoming students admitted through the percent plan were from families making less than $40,000, compared with 6% of those admitted under discretionary admissions. See William Powers, The University of Texas at Austin: Report to the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives on the Implementation of SB 175, at 30 (Dec. 20, 2013).

[160] UNC0323690.

[161] UNC0171640; UNC0079695 (citing 2005 UNC diversity plan). UNC's Working Group also recognized this point, citing Bakke's requirement that "the diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which race or ethnic origin is but a single through important element." UNC0079684.

44

success."[162]  UNC officials outlined several distinct reasons that Chapel Hill should be inclusive of disadvantaged students:  "When we limit educational opportunities (and ultimately leadership) to only those students who have had advantages not open to others, we deprive ourselves of a significant share of the total intellect, talents, and viewpoints available to us."[163]  In an October 2015 statement, UNC declared that it "works strongly to attract and retain disadvantaged students regardless of race. This is a critical component of the institution's obligation to the State of North Carolina and indeed to the nation."[164]  On the broader measure of racial and socioeconomic diversity, the 4.5% plan would result in greater, not fewer, educational benefits.

Likewise, when academic preparation is measured broadly, by high school grades as well as standardized test scores, the 4.5% plan represents a net improvement, not a decline, as the Working Group suggested.  UNC faulted the 4.5% plan because it projected a 76-point decline in average critical reading and math scores (from 1303 to 1227).[165]  (The average score would drop from the 91st to the

---

[162] UNC0079694.  See also 1998 Faculty Statement of Principles of Service, Diversity and Freedom of Inquiry that values diversity "in its many manifestations."

including "economic circumstances" and "family educational attainment" as well as race and ethnicity. UNC0079695-96.

[163] UNC0171641

[164] UNC0283515; UNC0378123.

[165] The Working Group also faulted the 4.5% plan for causing a decline in the proportion of students taking 5 or more AP classes (from 92% to 47.9%).  UNC0079701.  But focusing on AP classes taken is problematic on a number of levels.  First, UNC's own analysis has found taking more than 5 AP classes has no predictive value in college grades.   See Williford deposition, p. 179.

Second, it is relevant to note that among the predictors of Freshman GPA at UNC, the correlation with program/AP classes taken (0.24) was weaker than several other categories, including high school performance (0.42), SAT Critical reading (0.36) and SAT Math (0.35).  UNC0101919.  For the ACT, the correlation for program (0.19) and Freshman GPA was also much weaker than performance (0.42), ACT English (0.34) or ACT math (0.33).  UNC0101924.

Third, focusing on the number of AP classes taken by students leads to inequities.  Many schools do not offer a full complement of AP classes.  According to an analysis by the Education

45

83rd percentile).[166]  But at the same time, the simulation projected that the proportion of students in top 5% of their high school class by grade point average would spike a staggering 41.5 percentage points, from 58.5% to 100%.[167]  (Unlike the 2012 simulation, the 2014 exercise did not project college GPA on the basis of these results.)[168]

If standardized test scores were far more important a measure than high school class rank and grade point average in UNC's estimation, one might understand the Working Group's rejection of the 4.5% plan.  But UNC frequently cites its student body's high school class rank data alongside SAT scores.  Moreover, in practice and testimony, UNC officials repeatedly emphasized the *relative importance* of high school grades over standardized test scores, making the Working Group's dismissal of the 4.5% plan all the more puzzling.

---

Trust, 15.6% of high schools do not offer any AP classes in English; 18.4% in the Social Sciences; 21.9% in math, 28.4% in science, 55.6% in world languages and culture, and 63.2% in art.  See Christina Theokas & Reid Saaris, "Finding America's Missing AP and IB Students," (Education Trust, June 2013), p. 3, Figure 2.  Moreover, low income and minority students were least likely to attend high schools with the full array of AP classes.  Low-income students (15%) were almost twice as likely as other students (8%) to attend a school without "the full complement" of courses; and black students (15%) were more likely than white students (9%) to have limited AP options.  Id, p. 4.  Even in schools where AP is offered, many academically prepared low-income and minority students face barriers that prevent them from enrolling in AP classes.  Id. p. 6.  UNC itself has recognized these inequities, acknowledging that students can hardly be faulted for failing to take large numbers of AP classes where such classes are not offered.  The model did not account for this fact.  See Kretchmar deposition, p. 308.  Indeed, Vice Provost Farmer has said that as part of its effort to create socioeconomic diversity, UNC has decreased the emphasis on the number of Advanced Placement courses taken in high school.  See T. Rees Shapiro, "Cooke Foundation gives UNC $1 million," Washington Post, June 19, 2017.

[166] College Board, "SAT: Understanding Scores, 2017" https://collegereadiness.collegeboard.org/pdf/understanding-sat-scores.pdf.

[167] UNC0087666.

[168] See UNC0323667-69.

In public documents, UNC boasts that 78% of first year students admitted into the class entering in the fall of 2017 were from the top 10% of their high school class – presumably because the university thinks such data are relevant.[169] When asked whether high school grades or standardized test scores were more important, UNC officials repeatedly prioritized grades. Dr. Kretchmar, for example, testified that high school GPA is generally acknowledged to be a better predictor of college performance than test scores.[170] UNC's own internal research on the entering classes beginning in 2006-2010 found high school grades were the most important predictor of college grades. "Our performance rating, a 0-9 measure of the grades earned by an applicant, is the strongest *single* predictor of FGPA (r=.42)," the study concluded.[171] (This reality may help explain why UT students admitted through the percentage plan have been academically successful in college despite the omission of standardized test scores from admission decisions.)[172]

In testimony, UNC officials also prioritized high school grades over test scores. When asked what academic qualifications are "more important than somebody's standardized test score," senior associate director of admissions Barbara Polk listed "grades" and "rigor of high school curriculum."[173] The relative ranking of grades and test scores is also reflected in UNC evaluation of groups of students. After making preliminary decisions about which students to admit, UNC undergoes a process known

---

[169] UNC, "Class Profile," First Year Students enrolling Fall of 2017. https://admissions.unc.edu/apply/class-profile-2/

[170] Kretchmar deposition, 271. See also John Brittain and Benjamin Landy, "Reducing Reliance on Testing to Promote Diversity," in The Future of Affirmative Action, supra, pp. 170-171.

[171] UNC0101918. The study went on to say that other factors, including standardized testing, increases the predictability. Id.

[172] See discussion above.

[173] Polk deposition, pp. 71-72.

47

as "school group review" which compares all applicants from a given high school as a check to make sure decisions were "appropriate."[174]  In presenting students by high school, applicants are listed not by rank order of SAT/ACT scores but by high school grade point average.[175]

Indeed, in other contexts, UNC has repeatedly downplayed the importance of SAT and ACT scores in admissions.[176] Provost Jim Dean testified that SAT and ACT scores "even collectively don't really determine the outcome with a high degree of predictability, which is disappointing for someone like me.  You wish it were better."[177]  Senior associate director of admissions Barbara Polk, when asked if, "all things being equal," UNC valued students with higher standardized test scores, responded "not necessarily….[A] high test score does not necessarily make a better candidate."[178]  A 2007 Faculty Advisory Committee on Undergraduate Admissions suggested that UNC does "not aim to maximize any single, narrow outcome—for example, the average SAT score or the average eventual GPA of the entering class."[179]

In fact, UNC could boost average SAT scores of in-state public students by almost 60 points by using a minimum SAT threshold, the Working Group found, but it chooses not to because doing

---

[174] Polk deposition, p. 149.

[175] Polk deposition, pp. 82-83.

[176] See e.g. Panter deposition, p. 231 (cutoffs are "not always reliable.")  For example, UNC has rejected a flat SAT cutoff in admissions and rejected one race-neutral strategy—known as Application Quest —because it requires hard cutoffs. Farmer deposition, pp. 246-247; https://motherboard.vice.com/en_us/article/nzee5d/behind-the-color-blind-college-admissions-diversity-algorithm; Polk deposition, p. 280; UNC0079703-04; UNC0323671.

[177] Dean deposition, p. 302.

[178] Polk deposition, pp. 70-71

[179] UNC0079697 (referencing April 2007 Faculty Advisory Committee on Undergraduate Admissions.)  See also UNC0283512.

48

so would reduce racial diversity.[180]  Likewise, UNC could boost mean SAT scores by shifting the mix of in-state and out-of-state students.  The mean SAT score for admitted out-of-state students in the entering class of 2021 was 1421, 105 points higher than the mean score of 1316 for in-state students.[181] See App.C.1a &C.1b. But the state has made a policy decision that some things are more important than having a student body with the highest test scores.

Currently, UNC officials testified, all UNC students are academically qualified and can succeed despite large SAT and ACT test score and high school GPA gaps among individual students and groups of students. In Arcidiacono's analysis, for the admitted classes of 2016-2021, UNC admits only 2.79% of whites in the 5th academic decile of out-of-state applicants, and 1.19% of Asians, but 15.60% of Hispanics and 39.17% of African Americans.[182] The pattern has persisted for many years.  The average SAT gap between African American and Asian American students admitted in 2012, for example, was 202 points (1431 vs. 1229).[183]  (This gap actually underestimates first year performance

---

[180] UNC0323686; UNC0087666.

[181] Likewise, the mean SAT score for out of state enrolled students in the entering class in the fall of 2016 was 1353 compared to 1290 for instate students – a difference of 63 points.  UNC0283535. See also Kretchmar deposition, 70 (UNC has twice as many out-of-state applicants for one-fifth the number of slots).  Other universities have a very different mix of in-state and out-of-state students. At the University of Michigan, for example, in the new freshman class entering in the fall of 2017, 51.9% of students were from in-state and 48.1% from out of state.  See University of Michigan "Enrollment Summary, Residence" Fall 2013-Fall 2017 http://www.ro.umich.edu/report/17enrollmentsummary.pdf .  According to the data produced by UNC, if it were to shift from its current 82% in-state/18% out-of-state population an equal mix (similar to that found at the University of Michigan) mean SAT scores of admitted students would rise 33 SAT points from 1348 to 1381.

[182] Arcidiacono Report, Table 3.4.

[183] UNC Answer, pp. 33-34.  See also Parish deposition, p. 212.  UNC contemplated—but did not pursue—a plan to conduct a pre-admit yield campaign for "likely admits."  The proposed parameters for eligibility included (along with performance and program requirements) white and Asian students scoring above 1400 on the SATs and underrepresented minority students scoring above 1100—a

49

gaps because the SAT, as UNC officials know, has been found to over-predict performance for African American students.)[184] Among student athletes who enrolled in the fall of 2014, the SAT scores at the 25th and 75th percentiles were both 180 points below the entering class as a whole.[185] More generally, Dr. Kretchmar testified that the current SAT point range among students is "several hundred points."[186] The range for just the middle 50% of SAT scores in the entering class in the fall of 2016 was 1190-1410, a 220-point spread, suggesting the absolute gap among all students may be considerably larger.[187]

All of these students—even the lowest scoring—are academically qualified, several officials testified. Vice Provost Farmer, for example, after noting that roughly 40 students in a recently admitted class scored less than 1000 on the SAT, testified, "I think the students we admit are students

staggering 300-point difference in thresholds. See UNC0212598 and Parrish deposition, pp. 236-249, and 223.

[184] In email correspondence, Provost Jim Dean hypothesized that SATs might underpredict college performance for under-represented minority students, but he was given information that in fact the opposite was true: on average, African Americans and Hispanics perform worse in college than their SAT scores would predict. UNC0091915-16. This is true in national research. UNC0091922; UNC091928; UNC0091931. UNC's analysis of its own student body for the entering first year classes between 2006 and 2010 also found that SATs overpredict for underrepresented minority students. UNC0101915. The study also found overprediction for First Generation students, though the coefficient (-0.14 for reading and -0.11 for Math) was quite a bit smaller than for African American students (-0.23 for reading and -0.20 for math.) UNC0101921. National research finds that there is no over-prediction for low-income students. Bowen, Kurzweil, & Tobin, Equity and Excellence in Higher Education, *supra*, p. 118.

[185] UNC0193176 (for student athletes who enrolled in 2014, the 25th percentile score was 1030 and the 75th percentile was 1220. By contrast, for the entering class as a whole, the SATs were 1210 at the 25th percentile and 1400 at the 75th percentile). UNC0193169. Student athletes who enrolled in 2014 had test scores in middle 50% (1030-1220) that were 100 points below the projected average for the class in the 4.5% plan (1130-1330). See UNC0323484.

[186] Kretchmar deposition, p. 218. In the fall of 2014 entering class, the SAT range of those in the 25th and 75th percentile alone was 190 points (1210-1400). UNC0193169.

[187] UNC0283535.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 54 of 119

we're confident and have the capacity to succeed at UNC."[188]    Provost Jim Dean testified that regardless of any particular applicant's SAT scores, "I don't believe that we admit students into the university who are unqualified to be here."  He further testified that "we have clearly more qualified students than we're able to take."[189]  Dean specifically rejected the idea that underrepresented minority students were mismatched.  "I believe all the students who we accept are capable of being successful, and in fact the vast majority of them do succeed."[190]  Senior Associate Director of Admissions Barbara Polk agreed that "every student the University admits" is "academically prepared to succeed at UNC" and denied that the use of race in the admissions process is leading to the admission of students who are less than academically prepared to succeed."[191]  To the extent that any admitted students struggles, UNC has decided to devote more than $3 million on a program designed to support them called Thrive.[192]

UNC's rejection of a plan that substantially boosts the proportion of high school students who do very well in high school but would depress SAT scores is so at odds with its stated positions on the importance of test scores that it raises questions about what alternative concerns might be coming into play.  Critical reading and math SAT scores, after all, are a much bigger component in U.S. News & World Report rankings than high school class rank.[193]  UNC itself cites its rankings in

---

[188] Farmer deposition, p. 236.

[189] Dean deposition, pp. 177-178.

[190] Dean deposition, p. 288.

[191] Polk deposition, pp. 335, 336-37. See also Kretchmar deposition, p. 346 (Chapel Hill "turns away plenty of applicants who could probably do well and succeed at UNC.")

[192] Dean deposition, pp. 291-292.

[193] Under U.S. News's methodology, 12.5% of the ranking is due to "Student selectivity."  In that equation, SAT and ACT scores account for 65% of the rating; percentage in the top 10% of the high school class accounts for 25%; and acceptance rate counts for 10%.  See Robert Morse and Eric

51

U.S. News on its website, and, like other schools, cares about its position in the magazine's ratings.[194]

Concern about rankings in a popular magazine, however, has never been found by a court of law to justify using race in admission.

### 3. A Percentage Plan for Out-of-State Applicants

Although a percentage plan is typically applied to in-state students only, a version of such a plan (taking top students within zip codes rather than high schools) could provide a powerful race-neutral alternative for promoting racial, ethnic, and socioeconomic diversity among out-of-state students. According to Harvard University Professor Danielle Allen, programs that enhance geographic diversity (and thus leverage the unfortunate reality of residential and high school segregation by race and class for a positive purpose) can promote integration in higher education. Professor Allen has noted that zip codes provide an important way for national universities to provide geographic diversity and also contribute to racial, ethnic, and socioeconomic diversity.[195] Allen has described how "[g]eographically based structures for seeking talent are tried and true" and "the pursuit of geographic diversity in admissions is our best hope of merging the goals of diversity and

---

Brooks, "Best Colleges Ranking Criteria and Weights," US News and World report, September 11, 2017 https://www.usnews.com/education/best-colleges/articles/ranking-criteria-and-weights.

[194] See e.g. UNC, "Recent Rankings and Ratings," (referencing 5th best public university in US News) http://uncnews.unc.edu/rankings/ Other university officials have expressed concerns about U.S. News rankings specifically related to percentage plan admissions. University of Texas Chancellor William McRaven, for example, has decried the Texas 10% plan, despite the academic success of its students, for its alleged role in depressing US News rankings. See Amy Scott, "'Top 10%' rule for college admissions faces a new challenge," Marketplace, National Public Radio, May 23, 2016. https://www.marketplace.org/2016/05/18/wealth-poverty/top-10-rule-faces-new-challenge-texas See also "University of Texas Chancellor Opposes Top 10 Percent Admission Rule," January 25, 2106 http://publicuniversityhonors.com/2016/01/25/university-of-texas-chancellor-opposes-top-10-percent-admission-rule/.

[195] See Danielle Allen, "Talent is Everywhere: Using ZIP Codes and Merit to Enhance Diversity," in The Future of Affirmative Action, *supra*.

52

excellence."[196] Such geographic diversity could "be taken to the level of ZIP codes and, in particular, to the level of the ZIP+4 system, which divides the United States into geographic units as small as a city block or group of apartments."[197] Professor Allen suggests that a university might sort students through a "geographic diversity algorithm" and then "review the identified admits, case-by-case, confirming or disconfirming [each] selection."[198] A university might also "determine the combination of SAT score and GPA that would constitute its entrance threshold" and then choose the highest performing applicants within specific ZIP codes.[199] Given the increasing number of "ethnic census tracts," in which certain minority groups constitute more than 25% of the tract population, Professor Allen expects that "at selective colleges and universities a stronger orientation toward geographic diversity could well support diversification of student populations by ethnicity, thereby permitting us to slip free of the contested terrain of affirmative action."[200]

Such methods have already been put into action. For example, Halley Potter and I have written about public charter schools in San Diego, California, which have used zip codes to ensure socioeconomic and racial diversity.[201] Such geographic and socioeconomic diversity can succeed because, unfortunately, concentrated poverty is often highly correlated with race. African Americans

---

[196] Id. at 147.

[197] Id.

[198] Id. at 148.

[199] Id. at 147.

[200] Id. at 155-56.

[201] See Richard D. Kahlenberg & Halley Potter, A Smarter Charter: Finding What Works for Charter Schools and Public Education (Teachers College Press, 2014), p. 186.

53

and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites.[202] Indeed, Carnevale's simulation, noted above, finds that a comparable approach—admitting high test scorers within schools—promotes socioeconomic and racial diversity.[203]

UNC officials testified that they rejected this approach because there is too much demographic variation within zip codes. [204] But zip code information is widely used to assess the socioeconomic status of geographic regions. Moreover, UNC's rationale does not explain why it would reject more specific analyses, such as those that employ Census Tract data.[205]

UNC's failure to implement a 4.5 percent plan for in-state students and a zip code plan for out of state students, represents a major missed opportunity. Given UNC's testimony that socioeconomic diversity matters alongside racial diversity, and that high school grades matter more to academic quality than standardized test scores, its insistence on using race in the face of a viable alternative is unreasonable.

**D.      UNC could reduce or eliminate legacy preferences that favor non-minorities.**

UNC also insists on retaining a legacy preference program that disproportionately benefits wealthy and white students—policies whose elimination would increase socioeconomic and racial diversity.

---

[202] See Sharkey, Stuck in Place, supra, p. 27; and Logan, "Separate and Unequal," *supra*, pp. 4-6.

[203] Carnevale, Rose, & Strohl, in "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," *supra*.

[204] Polk deposition, p. 279; Williford deposition, p. 145.

[205] Census tract data have been used to promote socioeconomic diversity in K-12 integration plans. See e.g. Richard D. Kahlenberg, "School Integration in Practice: Lessons from Nine Districts," (Century Foundation, October 14, 2016). https://tcf.org/content/report/school-integration-practice-lessons-nine-districts/ (citing programs in Chicago, Louisville and Dallas).

54

UNC has for decades employed legacy preferences for the offspring of alumni. Legacy policies began at private universities as a strategy for reducing the admissions of Jewish students.[206]  To this day, legacy preferences disproportionately benefit white students to the detriment of Asian-American, African-American, and Hispanic students. [207]

UNC provides a substantial boost to the children of alumni in the case of out-of-state applicants.  Arcidiacono found that for such applicants, the boost is second only to that given to African Americans and is bigger than those provided for Hispanics and First Generation students.[208]  An out-of-state student whose record provides a 25% chance of admission sees her odds skyrocket to 97% if she is a legacy.[209]

UNC persists in promoting legacy preferences despite ample evidence that doing so undermines its efforts to promote racial and socioeconomic diversity. As the former chief counsel for the Lawyers Committee for Civil and Human Rights, John Brittain, and his coauthor Eric Bloom have noted, "For the most part, legacy preferences are 'proxies for privilege' as they favor children of white, well educated, presumably affluent families."[210]  The authors note that "affirmative action does not

---

[206] See Peter Schmidt, "A History of Legacy Preferences and Privileges," in Affirmative Action for the Rich: Legacy Preferences in College Admissions, ed. Richard D. Kahlenberg (New York: Century Foundation press, 2010), p. 42.

[207] See generally Brittain & Bloom, "Admitting the Truth," *supra.*

[208] Arcidiacono Report, Table A.4.2 (spec6).  For in-state applicants, the boost to legacies is much more modest, but is still larger than for early applicants and students receiving fee waivers. Arcidiacono Report ,Table A.4.1 (spec7).

[209] Arcidiacono Report, § 4.3.

[210] Brittain & Bloom, "Admitting the Truth," *supra*, p. 127.

55

offset legacy preference: the use of legacy preference, in fact, requires college admission officers to rely more heavily on affirmative action."[211]

At UNC, Arcidiacono's data show that white applicants are more than twice as likely as non-white applicants to be legacies. In the six cycles he examines, 19.67% of white in-state applicants were the children of alumni, compared with 7.24% of black applicants, 5.24% of Asian applicants, and 4.68% of Hispanic applicants.[212] For out-of-state applicants, the same pattern holds: 4.29% of white applicants are the children of alumni, compared with just 2.12% of black applicants, 1.87% of Hispanic applicants, and 1.16% of Asian applicants. Fully 17.82% of out of state admitted white students are children of alumni, more than four times the rate of admitted out of state Hispanic students (4.34%), Black students (3.80%), and Asian students (3.00%).[213] Arcidiacono's modeling suggests eliminating legacy would have a positive effect on African-American representation and on Hispanic representation for out-of-state applicants.[214] Nevertheless, UNC discussed eliminating legacy preference and decided to maintain the practice.[215]

Although UNC elected to maintain legacy preferences, it should be noted that eliminating legacy preferences is a workable race-neutral strategy. Among the top 10 universities in the widely-cited Shanghai rankings, four (Caltech, U.C. Berkeley, Oxford, and Cambridge) do not employ legacy preferences.[216] Research also finds that the existence of legacy preferences does not increase alumni

---

[211] Brittain & Bloom, "Admitting the Truth," *supra*, p. 132.

[212] Arcidiacono Report, Table 2.3.

[213] Arcidiacono Report, Table 2.4.

[214] Arcidiacono Report, Table 4.5.

[215] Farmer deposition, p. 276.

[216] Richard D. Kahlenberg, "Introduction," in Affirmative Action for the Rich, *supra*, p. 8.

56

donations to an institution. In an examination of the top 100 universities in U.S. News & World Report, Chad Coffman of Winnemac Consulting and colleagues found "no evidence that legacy preference policies themselves exert an influence on giving behavior."[217]  When UNC was sued for the use of legacy preferences in a 1976 case, the judge pointed to the existence of alumni donations, but provided no evidence that legacy preferences were a direct cause of such contributions.[218]  Provost Jim Dean, when asked why UNC provides a legacy preferences, appeared to discount the importance in fundraising.[219]

### E.  UNC could increase its recruitment efforts.

UNC's own Working Group on Race-Neutral Alternatives noted in its report that Florida was successful in promoting racial diversity in large measure because it was able to increase applications from underrepresented minorities.[220]  UNC officials testified also that they were aware of successful efforts by the University of Florida to recruit more disadvantaged students, including underrepresented minorities, to apply.[221]  More generally, UNC officials argued that recruitment was the key to putting UNC on "solid footing for our diversity efforts" in the event the use of race were banned in admissions.[222]

---

[217] Chad Coffman, Tara O'Neil, & Brian Starr, "An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities," in Affirmative Action for the Rich, *supra*, p. 113.

[218] See *Rosenstock v. Bd. of Governors of Univ. of N.C.*, 423 F.Supp. 1321 (1976); and Peter Schmidt, "A History of Legacy Preferences and Privilege," in Affirmative Action for the Rich, supra, p. 61.

[219] Dean deposition, p. 305 ("There may be on the margin some sense about alumni giving to the university.  But the effect is—is relatively small, so it's—I'm not sure how material it actually is.")

[220] UNC0079686.

[221] Kretchmar deposition, p. 325.

[222] UNC0080178 (email from Andrea Felder to Stephen Farmer).

57

UNC's own actions highlight the importance of recruitment in achieving a diverse student body. Vice Provost Farmer pointed to UNC's Carolina College Advising Corps, which was started in 2007 to send recent UNC graduates to disadvantaged high schools, as an important effort to support guidance counseling.[223]  According to UNC, the Corps currently sends 57 advisors to 77 schools.[224] UNC also purchases information about applicants from the College Board based on SAT scores.[225] And UNC employs a program known as Excel to increase yield of admitted students by exposing them to a variety of on-campus opportunities while they are weighing college options.[226]

Nevertheless, the bottom line results suggest UNC does a poor job of recruiting economically disadvantaged applicants, many of whom are underrepresented minorities.   For example, UNC does an especially poor job of recruiting into its applicant pool students whose parents do not have a college degree. For the classes of 2016-2021, Arcidiacono finds that such students comprised just 21.85% of all in-state applicants and 12.28% of out of state applicants.[227] By comparison, the proportion of North Carolina adults ages 45-64 years who lack a bachelor's degree is 72.5%, and 68% of American adults age 45-54 lack a bachelor's degree.[228]

---

[223] Farmer deposition, p. 219.

[224] https://carolinacollegeadvisingcorps.unc.edu/

[225] Parrish deposition, p. 104.

[226] Parrish deposition, p. 169.

[227] Arcidiacono Report, Tables 2.3 & 2.4.

[228] See Rebecca Tippett, "NC in Focus: Increasing Educational Attainment," UNC Carolina Population Center, December 10, 2015 (citing 2010-2014 American Community Survey estimates) http://demography.cpc.unc.edu/2015/12/10/nc-in-focus-increasing-educational-attainment/.   For all North Carolina adults above age 25, the figure lacking a bachelor's degree was 72.2%.; and Ryan & Bauman, "Educational Attainment in the United States: 2015," *supra*, p. 2, Table 1.

58

Likewise, only 11% of UNC applicants request fee waivers because of economic hardship.[229] (As noted early, more than half the children in North Carolina would qualify.)[230]

The poor performance in recruiting first-generation college students and fee-waiver applicants impacts UNC's racial and ethnic diversity as well as its socioeconomic variety. NCERDC data produced in this case indicate that nearly three quarters of Hispanic high school students in North Carolina (74.7%), and 70.6% of black students are economically disadvantaged compared with about one-quarter of white students (28.3%). The same pattern holds among UNC applicants. While 15.69% of North Carolina in-state white applicants are first generation college, 46.73% of Hispanic applicants, 39.20% of black applicants, and 24.68% of Asian applicants are first generation college.[231] Likewise, UNC data indicate that under-represented minority students are *five times* as likely to receive fee waivers as those students who are not under-represented minorities.[232] Among in-state applicants to the 2016-2021 UNC classes, the NCERDC data indicate that African Americans were also five times as likely to be designated as economically disadvantaged (51.5% vs. 9.9%)

Once students are accepted, UNC does a poor job of targeting disadvantaged students to come to campus. In 2013, for example, about one in five students (1817 of 8243) were invited to the special Excel program to encourage acceptance. Of those students deemed highly desirable by UNC, just 17.2% were first generation college students and just 19.5% were underrepresented minorities.[233]

---

[229] Panter deposition, p. 245.

[230] See discussion, *supra*, Section V.A.2.

[231] Arcidiacono Report, Table 2.3 A similar pattern holds for out-of-state applicants: 8.78% of white applicants are first generation, compared with 27.95% of black applicants, 22.14% of Hispanic applicants, and 12.63% of Asian applicants. Id., Table 2.4.

[232] Panter deposition, pp. 242-243.

[233] Parrish deposition, pp. 187-188.

59

This failure to recruit high-achieving, low-income students, including thousands who are African American and Hispanic, is an enormous missed opportunity. As discussed above, there is a very large reservoir of such students whom UNC, the nation's oldest public university, is not recruiting.

### F. UNC could increase its admission of community college transfers.

UNC also fails to provide the opportunity for significant numbers of high-achieving community college students to transfer to UNC—a strategy used by many selective public and private colleges to promote socioeconomic and racial diversity in their student bodies. Community colleges have many more African-American, Hispanic, and low-income students than selective four-year colleges.[234] According to the American Association of Community Colleges, "the majority of Black and Hispanic undergraduate students in this country study at [community] colleges."[235] UNC itself reports that of its incoming class in 2017, its transfer students (38% of whom come from North Carolina community colleges), are much more likely to be first generation college than first year students (34% vs. 17%), more likely to be Carolina Covenant scholars (31% vs. 12%) and less likely

---

[234] See Bridging the Higher Education Divide: Strengthening Community Colleges and Restoring the American Dream – Report of The Century Foundation Task Force on Preventing Community Colleges from Becoming Separate and Unequal (Century Foundation Press, 2013), pp. 18-21.

[235] American Association of Community Colleges, "Students at Community Colleges," http://www.aacc.nche. edu/AboutCC/Trends/Pages/studentsatcommunitycolleges.aspx.

60

to be sons and daughters of UNC alumni (9% vs. 19%).[236]  (If the data isolated community college

transfers, not all transfers, the demographic differences would likely be even larger.)[237]

While other colleges began ramping up community college transfers as a way to promote

student diversity, UNC has for years lagged in this arena.  UNC boasts of the Carolina Student

Transfer Excellence Program, or C-STEP, started in 2006, to provide guaranteed admission, and

transition and support services to disadvantaged students (below 300% of the poverty line)

transferring from selected community colleges.[238] But the program only involves 10 of North

Carolina's 58 community colleges, according to Vice Provost Farmer.[239]  The program has not

expanded beyond these 10 despite an impressive 85% graduation rate of C-STEP students.[240]  In the

incoming class of 2014, C-STEP students accounted for just 6.1% of transfer students and just 1.0%

of all entering UNC students.[241]

Likewise, the total number of community college transfers to UNC (whether part of the

means-tested C-STEP program or not) are paltry in comparison to other top public colleges.  For the

incoming class in the fall of 2017, for example, UNC reported that 38% (or about 270) of its 709

---

[236] UNC, "Class Profile," 2017 incoming class, https://admissions.unc.edu/apply/class-profile-2/. See also UNC0193169-71 (In the entering class in the fall of 2014, transfers were more likely than first years to be eligible for a fee waiver (15.6% vs. 10.7%), be first generation college (31.5% vs. 17.9%), be Carolina Covenant scholars (18.4% vs. 12.5%); and less likely to be alumni children (11.6% vs. 18.1%).  In terms of race, transfers were more likely to be Hispanic (13.0% vs. 7.8%) but less likely to be African American (7.0% vs. 10.6%).

[237] UNC did not provide SFFA data on transfer applications and admitted students.

[238] UNC0193174.  See also http://admissions.unc.edu/apply/transfer-students/carolina-student-transfer-excellence-program-c-step/.

[239] Farmer deposition, p. 273.  See also UNC0193174.

[240] Dean deposition, p. 175 (referencing report).

[241] UNC0193169-71.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 65 of 119

transfer students were from North Carolina community colleges.[242]  Those 270 community college

students represented just 5.3% of the incoming class of 5064 (4355 first year students and 709

transfers).  By contrast, at some top selective public colleges, a much greater proportion of the

undergraduate population consists of community college transfers.  Take, for example, U.C. Berkeley,

which UNC officials consider a peer institution.[243] In 2014, almost 20% of Berkeley's undergraduate

student body consisted of students who had transferred from community colleges—roughly

quadruple UNC's proportion.[244]

The failure represents another missed opportunity to add racial and socioeconomic diversity

to UNC.

### G.    UNC could end early admissions.

In addition, UNC could increase racial, ethnic, and socioeconomic diversity if it were to drop

its "early admissions" program,[245] that disproportionately benefits wealthy and white students. Early

admission is a practice in which schools allow students to submit their application in the early Fall if

they apply to only one school. For the admitted classes of 2016-2021, 82% of in-state admits and 61%

of out-of-state admits applied through the early rather than regular admissions process.  According to

Arcidiacono's model, applying early admission provides important advantages.  For both in-state and

out-of-state applicants, the preference for applying early is larger than that provided to fee waiver

---

[242] UNC "Class Profile," Fall 2017 incoming class, https://admissions.unc.edu/apply/class-profile-2/.

[243] See e.g. Farmer deposition, pp. 100 and 205.

[244] "Campus releases admissions data for 2014-15 transfer students," U.C. Berkeley Public Affairs, May 15, 2014.  http://news.berkeley.edu/2014/05/15/admissions-data-2014-15-transfer-students/

[245] Kretchmar deposition, p. 27.

62

students.[246]  A number of top universities—such as several top University of California programs— have eliminated early admissions. [247]

Early admission programs, like UNC's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.[248] By contrast, low-income students and minorities face a disadvantage under early admissions because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process. According to a 2011 study by Julie J. Park of Miami University and M. Kevin Eagan of the UCLA Higher Education Research Institute, students who applied early-action to 290 colleges and universities across the country are more economically advantaged and more likely to be white than those who did not apply early.[249]

The same pattern holds at UNC. The data produced by UNC indicate that for the admissions cycles for the classes of 2016-2021, of white in-state applicants, 75.8% applied early, compared with 71.2% of Asian applicants, 62.1% of Hispanic applicants, and 54.9% of black applicants.  Among out-of-state students, 54.4% of white UNC applicants applied early, compared with 44.9% of Hispanic applicants, 32.5% of Asian applicants and 32.0% of black applicants.  Economically advantaged students were also more likely to apply early than disadvantaged students.

---

[246] Arcidiacono Report, Tables A.4.1(spec7) and A.4.2 (spec6).

[247] Christopher Avery & Jonathan Levin, "Early Admission at Selective Colleges," Stanford Institute for Economic Policy Research, March 2009, p. 4 (noting that the four top University of California colleges did not employ early admissions).

[248] See Alan Finder & Karen W. Arenson, Harvard Ends Early Admission, New York Times, September 12, 2006, http://www.nytimes.com/2006/09/12/education/12harvard.html.

[249] Julie J. Park & M. Kevin Eagan, "Who Goes Early? A Multi-Level Analysis of Enrolling via Early Action and Early Decision Admissions," Teachers College Record, 2011.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 67 of 119

UNC could increase student body diversity by eliminating early admissions, as other selective colleges have.

### H.  UNC could develop partnerships with disadvantaged North Carolina high schools.

Finally, some Universities, such as the University of Nebraska at Lincoln (UNL), have created special partnerships with disadvantaged high schools to build the pipeline for diverse students.  UNL works with two high schools in particular to provide academic support, counseling and summer classes.[250]  Internal documents show that UNC was aware that colleges in California, Pennsylvania, Vermont and Florida have created partnerships with low-performing high schools to mentor students and improve the diversity of the future applicant pool.[251]

But UNC initially took a more hard-hearted view.  In its 2012 amicus brief in *Fisher*, UNC coldly noted that many North Carolina public schools are "under-financed and low-performing" and that for that reason, top students in those schools were not academically qualified to attend UNC.[252]

UNC's Working Group began by taking a more charitable view.  Rather than writing off every single student in under-resourced high schools as beneath UNC's consideration, the Working Group asked "What if colleges put honor academies in these schools?"[253]  Vice Provost Farmer testified that UNC "had conversations within the office about such partnerships," but ultimately decided not to pursue them.[254]  That failure represents yet another missed opportunity.

---

[250] Potter, "Transitioning to Race-Neutral Strategies," *supra*, p. 87.

[251] UNC0096545.

[252] UNC Amicus Brief, *Fisher v. University of Texas*, p. 35.

[253] UNC0079613.  See also Williford deposition, p. 146.

[254] Farmer deposition, p. 270-72.  See also Polk deposition, pp. 292-93.

64

**VI.** **Simulations of UNC's data show that workable race-neutral alternatives exist.**

**A.** **A careful simulation indicates that UNC could achieve the educational benefits of racial, ethnic, and socioeconomic diversity without sacrificing academic quality.**

To simulate the likely results of adopting race-neutral strategies at UNC, Professor Arcidiacono tested the results of several race-neutral options using the admissions data provided by UNC. At my request, he conducted simulations of multiple race-neutral alternatives to forecast the likely outcomes thereof.[255] These simulations, and the underlying assumptions, are set forth in the charts set forth in detail in Appendix C. For discussion purposes in this report, I will focus primarily on two simulations: a version of the socioeconomic preference which examined family and neighborhood factors (Simulation 3) and a percentage-plan approach (Simulation 5).

By law, UNC enrolls the vast majority of its class (82%) from within North Carolina, and just 18% from out-of-state.[256] The out-of-state admissions process is much more competitive. For the class of 2021, 14% of out-of-state students were admitted compared with 46% of in-state students.[257] Accordingly, Arcidiacono simulated the two processes separately, then combined the results, using the 82/18 ratio of in-state and out-of-state students to approximate the likely results for UNC's student body as a whole.

---

[255] I have worked in the past with researchers such as Anthony Carnevale at Georgetown University to measure the effectiveness of race-neutral alternatives through similar simulations. See *supra* Section IV.B.

[256] http://mediahub.unc.edu/university-ratio-unc-systems-82-18-split/.

[257] See https://admissions.unc.edu/apply/class-profile-2/ The yield rates also differ significantly between in-state applicants (61%) and out of state applicants (20%). Id. In addition, 14% of students in the most recent class were admitted through the transfer process. See https://admissions.unc.edu/apply/class-profile-2/. (In the fall of 2017, UNC enrolled 4,355 first year students and 709 transfer students.) Because UNC did not provide data on transfer applicants, we were unable to include this population in the simulation.

65

To replicate as closely as possible UNC's existing system of holistic admissions, Arcidiacono began by using the model he developed that accounts for numerous criteria for admission, including test scores, high school grades, and UNC's rating system, which rates applicants in five areas: (1) program rating (rigor of classes taken),[258] (2) performance rating (GPA plus whether a student is improving or declining over time),[259] (3) extracurricular rating, (4) essay rating, and (5) personal quality ratings (including curiosity and integrity and contributions to diversity).[260]

UNC's simulations were described by the college itself as inferior to holistic review because they relied on "quantifiable measures like standardized test scores, GPA and class rank" but were unable to account for "application essays, letters of recommendation, and extracurricular activities…all of which give a more nuanced understanding of the academic achievement and potential

---

[258] UNC0079709 (defines program rating as "an indicator of the strength of a student's high school curriculum" including AP classes).

[259] UNC0079708-09 (defines performance rating as "a measure of high school grades/performance"). Complaint, p. 13, has 8 criteria.

[260] See UNC0283514 (outlining eight major categories UNC employs in holistic admissions: (1) Academic program criteria (rigor of courses); (2) Academic performance criteria (grade point average, rank in class, and trends in grades); (3) Standardized testing criteria; (4) Extracurricular activity criteria; (5) Special talent criteria (in music, drama, athletics and writing); (6) Essay criteria; (7) Background criteria (including economic disadvantage and legacy status);  and (8) Personal criteria (including curiosity, creativity, history of overcoming obstacles, and talent for building bridges across divisions.) In addition to these criteria, UNC also singles out the need to achieve critical masses of underrepresented minority students (African American, Hispanic, and American Indian) as well as economically disadvantaged students regardless of race.  UNC0283515. This is based upon Tables A.4.1 and A.4.2 (spec4) in the Arcidiacono report, with an adjustment. Athletes were put back into the dataset. In addition to race interacted with year, the model also contains an interaction between disadvantaged and year.

66

of each student."[261]  By contrast, Arcidiacono's simulations take account of each of these factors by incorporating UNC admissions' officers ratings.[262]

The advantage associated with other preferences were "turned off"—specifically, the preferences for recruited athletes, race, legacy, early decision, first generation status, fee waiver applicants, and female applicants.  With those preferences off, admissions probabilities could be generated, and the applicants could be ranked in order of strength under the remaining aspects of UNC's admissions process. This approach allows for simulating the effects of a variety of race-neutral options on racial diversity, socioeconomic diversity, and academic readiness.

Before beginning the simulations, Arcidiacono turned UNC's existing preferences for recruited athletes back "on." He did this at my direction, because I have found that removing athletic preferences in connection with race-neutral alternatives is sometimes perceived as radical. This particular simulation thus avoids any concern that eliminating recruited athletes is unworkable or otherwise inappropriate when seeking a race-neutral alternative.[263]

Arcidiacono's Simulation 1 shows the effects of turning off preferences for race and socioeconomic status but providing no race-neutral alternatives.  For the class of 2021 (the most recent class for which data are available), removing preferences would cause black admission shares to decline from 8.8% to 5.1%, Hispanic shares to decline from 7.3% to 5.1%, and economic disadvantaged

---

[261] UNC0079699.

[262] For this reason, the Arcidiacono analysis avoids the *Fisher II* court's concern that relying solely on class rank "would sacrifice all other aspects of diversity" and might "exclude the start athlete or musician whose grades suffered because of daily practices and training." *Fisher II,* slip op., p. 17.

[263] For the fall of 2014, 138 athletes were admitted through the special talent policy.  UNC0193173. Of UNC's first year class of 3974, these students constituted 3.5% of the class, or 2.9% of all new first year and transfer students (4758).  There were 175 student athletes in the entering first year class in 2014 as a whole.  UNC0193179.

families to decline from 19.6% to 15.9%, while mean SAT scores rise from 1335 to 1344. Test scores would improve, but racial and socioeconomic diversity would decline, a tradeoff UNC has suggested would be unacceptable. See Appendix C.2.

But what would happen if UNC instead ended racial preferences and substituted them with practicable race-neutral strategies? The first step in the race-neutral socioeconomic model (Simulation 2) provided a preference to students that come from families that are socioeconomically disadvantaged. For in-state applicants, these include students that fall into any of three categories: (1) first generation college (neither parent has a bachelor's degree); (2) applied for a fee-waiver; and (3) eligible for subsidized meals under a federal program providing free and reduced-price lunches.[264]

The magnitude of the preference for disadvantaged students of families (5.0) in the simulation is roughly equivalent to the out-of-state preference currently provided to legacy students (4.741), which is smaller than the preference currently bestowed upon out-of-state African American students (6.059), but is about twice as large as that given to economically disadvantaged students (first generation 1.814 and fee waiver 0.315).[265]

Simulation 2 by itself, however, underestimates the potential of UNC to create race-neutral strategies to promote diversity because it does not directly consider the socioeconomic status of neighborhoods that students grow up in. As noted above, if coming from a family that is socioeconomically disadvantaged imposes a disadvantage, growing up in a low-income neighborhood

---

[264] For out of state-applicants, data for subsidized lunch eligibility were not available, so the first two factors were employed. We did not have access to the family net worth/wealth of either in-state or out-of-state applicants, a factor that is more highly correlated with race than is parental education and income. As a result, the simulations likely form a lower bound estimate of the racial dividends of these strategies. Better data could produce higher levels of racial diversity.

[265] Arcidiacono Report, Table A.4.2 (spec4); see also note 260.

imposes a distinct disadvantage.[266]  Students who overcome such obstacles (and are still academically qualified) deserve special consideration.  Accordingly, Simulation 3 provides an additional legacy-equivalent bump to students who reside in zip codes with median income in the lowest one third of all zip codes nationally. This preference comes on top of a legacy-equivalent bump to students from the most socioeconomically disadvantaged families.

This double-sized legacy-sized preference for students facing both the disadvantages associated with growing up in a socioeconomically disadvantaged family and growing up in a disadvantaged neighborhood amounts to a preference that is larger than that currently provided to underrepresented minority students, but this methodology is appropriate because evidence suggests that socioeconomic obstacles to academic achievement are greater in magnitude than racial obstacles. An economically disadvantaged student who managed to overcome hurdles may have a more promising future than her academic profile on paper.[267]  Moreover, as William Bowen, the former President of Princeton University, has noted, SAT scores do not over-predict the college grades of low-income students as they do those of African-American students.[268]

---

[266] See discussion V.A.1.

[267] See, e.g., Anthony P. Carnevale & Jeff Strohl, "How Increasing College Access Is Increasing Inequality, and What To Do About It," in Rewarding Strivers 170, Table 3.7 (Century Foundation, 2010), p. 170, Table 3.7 (estimating the SAT scores socioeconomically disadvantaged students on average are 399 points below socioeconomically advantaged students, while for African American students, controlling for economic status, the expected score is 56 points lower).

[268] Bowen, Kurzweil, & Tobin, Equity and Excellence in Higher Education, *supra*, p. 118 (SAT's do not over-predict college grade point average for low-income students); and William Bowen and Derek Bok, The Shape of the River, p. 77 (SAT's over-predict college grade point average for African American students).

69

The results of Simulation 3 for the class the admitted class of 2021 (in-state and out-of-state combined) are presented below.[269]

| UNC – Admitted Class of 2021 | | | |
|---|---|---|---|
| Status Quo Race-Based Admissions | | Simulation 3 Race-Neutral Admissions | |
| White | 63.0% | White | 63.6% |
| African American | 8.8% | African American | 7.9% |
| Hispanic | 7.3% | Hispanic | 7.2% |
| Asian American | 14.6% | Asian American | 15.5% |
| Other Minority and Unreported Race | 6.3% | Other Minority and Unreported Race | 5.8% |
| SES Disadvantage | 19.6% | SES Disadvantage | 32.3% |
| SES Advantaged | 80.4% | SES Advantaged | 67.8% |
| SAT/HS GPA | 1335/4.71 | SAT/HS GPA | 1320/4.69 |

Overall, Simulation 3 maintains racial diversity and provides a sizable increase in socioeconomic diversity, while maintaining academic excellence. See Appendix C.2 for the full results (Simulation 3). Several observations are worth highlighting.

---

[269] Simulation 4 takes this socioeconomic preference analysis preference in Simulation 3 one step further and provides an additional legacy-equivalent bump to students who attend schools which are in the most socioeconomically disadvantaged third (as measured by the proportion of students eligible for subsidized lunch) in the state. A long line of research suggests that attending a high-poverty school imposes an additional obstacle to academic achievement, so a student who manages to do well academically despite this hurdle deserves special consideration. See e.g. Richard D. Kahlenberg, All Together Now: Creating Middle Class Schools through Public School Choice (Brookings Press, 2001), pp. 25-39. This approach increases racial diversity among in-state applicants above that achieved using racial preferences. Because school data were readily available for in-state applicants, but not out-of-state applicants, simulation 4 was limited to in-state students.

70

First, under Simulation 3, socioeconomic diversity would increase considerably, with the proportion of socioeconomically disadvantaged students increasing from 19.6% under the status quo to 32.3%, a 65% increase. The disadvantaged share would move UNC much closer to the state average for these categories (which exceed 72%) but is still well below proportional representation.[270]

Second, under simulation 3, overall racial and ethnic diversity would hold steady for underrepresented minorities even through racial preferences are not employed. Hispanic representation would remain virtually the same, declining from 7.3% to 7.2%. African American representation would decline less than a percentage point, from 8.8% to 7.9%. Using racial preferences, UNC has seen much wider swings in black and Latino representation between years.[271] Indeed, in another context, Vice Provost Farmer suggested that a difference of one full percentage point change in the underrepresented minority student population was negligible, characterizing the levels of diversity as "about the same."[272] In fact, several UNC officials testified that they were not looking for a certain percentage of underrepresented minorities on campus. Provost Jim Dean testified that UNC could still achieve the educational benefits of diversity with "some level of variation" in the proportion of underrepresented minority students and that he could not specify a proportion or range

---

[270] Nationally, more than two-thirds of American families headed by individuals between the ages of 45 and 54 lack a bachelor's degree, which lands students in the disadvantaged category. In North Carolina, 72.5% of adults ages 45-64 lack a four-year college degree. This is a floor for the number of students from disadvantaged families to which one would need to add any students from families that are low-income despite having parents with a bachelor's degree. See *supra* section V.A.2.

[271] In the classes of 2016-2021, the proportion of admitted students who were black varied from a low of 8.82% to a high of 10.38%. The proportion of admitted students who are Hispanic ranged from 7.19% to 8.47%. Arcidiacono Report, Table 2.2.

[272] Farmer deposition, p. 223.

71

in minority representation that was necessary.[273] Senior Associate Director of Admissions Barbara Polk said there is no minimum percentage of underrepresented minorities necessary to achieve the educational benefits of diversity.[274] Dean also testified that he was not aware of any analysis conducted by the college to determine what level of racial representation is necessary to achieve the benefits of diversity.[275]

Even with a small decline in black representation, UNC would likely remain among the most racially diverse of its peers.[276] Moreover, this simulation would increase the share of *disadvantaged* African-American and Hispanic students. Admitted UNC underrepresented minority students are currently substantially more advantaged than their peers in the state. State-wide, only 19% of native black adults 25 years and older and 26% of native Hispanics have a bachelor's degree, and yet 45.1% of black in-state UNC admits and 49.0% of Hispanic in-state UNC admits were advantaged in the class of 2021.[277] By contrast, under Simulation 3, the share of disadvantaged black admitted students

---

[273] Dean deposition, pp. 87, 133.

[274] Polk deposition, p. 198.

[275] Dean deposition, p. 126.

[276] According to UNC's own "enrollment diversity benchmarks," its existing levels of racial diversity are high. Among 16 universities that UNC considers its peer group, UNC ranks 3rd in enrollment of African American students and 7th in Hispanic students. In the top 30 national universities, UNC ranked 3rd in enrollment of African Americans and 17th among Hispanic students. Among 60 universities in the Association of American Universities, UNC ranked 5th in African American representation, and in the top half for Hispanic representation. UNC0082907. See also Kretchmar deposition, pp. 245-46; Dean deposition, pp. 207-208; and Williford deposition, pp. 196-198.

[277] Appendix C.4. See also Rebecca Tippett, "NC in Focus: Educational attainment by race/ethnicity and nativity," UNC Carolina Population Center, July 14, 2016 http://demography.cpc.unc.edu/2016/07/14/nc-in-focus-educational-attainment-by-raceethnicity-and-nativity/

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 76 of 119

in-state rises to 77.8% and Hispanics to 81.3%—close to the state averages.[278] Finally, any modest decline in black representation could be addressed if UNC were to employ a wealth variable as discussed below.

Third, in looking at the educational benefits of diversity, the Supreme Court—and UNC officials—have repeatedly suggested that both racial and socioeconomic diversity are important.[279] While media reports often focus solely on the racial impact of alternatives, the critical measure is the net impact on socioeconomic and racial diversity taken together. Given the large increase in socioeconomic diversity and the rough maintenance on racial diversity, the simulation suggests a substantial *net increase* in the educational benefits of diversity.

Fourth, it is important to note that the UNC class remains very academically competitive under Simulation 3. Average SAT scores for the class move from 1335 to 1320—remaining essentially even. The score change represents less than a one percentile point drop (from the 93rd/94th percentile to the 93rd percentile) of all students nationally in 2017.[280] High school GPA also remain essentially unchanged, going from 4.71 to 4.68. As noted above, UNC official Stephen Farmer observed that UNC currently admits students scoring below 1000 on the SAT (the 48th percentile nationally) and yet

---

[278] The same pattern holds for out of state admits. In the class of 2021, 65.8% of black admits were advantaged, along with 80.4% of Hispanic admits. Under Simulation 3, the proportion of advantaged admits declines to 63.6% among black students and 59.4% among Hispanic students. Appendix C.4

[279] See *Grutter*, 539 U.S. 306, 324 (2003); *Bakke*, 438 U.S. 265, 316 (1978). See also UNC, "Our Broad Commitment to Diversity and Inclusion," (referencing importance of socioeconomic diversity), cited in Dean deposition, p. 104; Parrish deposition, p. 34; Polk deposition, p. 88 (socioeconomic diversity a part of diversity) and p. 332 ("All types of diversity are critical to the mission."); and Williford deposition, pp. 99 (noting climate survey looked at diversity in its many forms, including "economic circumstances"); UNC0136870.

[280] See College Board, "SAT: Understanding Scores 2017," https://collegereadiness.collegeboard.org/pdf/understanding-sat-scores.pdf.

Farmer testified that "the students we admit are student we're confident have the capacity to succeed at UNC."[281] And UNC tolerates far larger differences in SAT and GPA between racial and ethnic groups.[282]

## B. Through inclusion of additional data and better recruiting of low-income students, the simulation could predict even greater racial and ethnic diversity.

As noted above, this simulation could have achieved a more robust racial dividend if I had access to additional information about critical factors that UNC did not make available—regarding applicants' income, wealth, and student transfers—or if UNC had recruited disadvantaged students more aggressively.

More accurate income data. UNC's data on socioeconomic disadvantage referenced first generation college status and fee waiver requests, but UNC did not reveal the full range of income of students, which would have allowed SFFA to model socioeconomic preferences more precisely. For instance, I could not model providing a bigger boost in the analysis to a remarkable student who performed well academically despite coming from a very low-income household compared to a student near the 185% of the poverty line which makes one eligible for a fee waiver and covers roughly half of the K-12 student population.[283] This limitation has important implications for the racial dividend of class-based affirmative action because the racial differential grows as one moves further down the income scale. For instance, in 2015, black children were 2.1 times as likely as non-Hispanic

---

[281] Farmer deposition, pp. 235-36.

[282] See discussion in Section V.C.2 *supra*.

[283] See discussion Section V.A.2 *supra*.

74

white children to live at 200% of the poverty line, but were 3.0 times as likely to live at 50% of the poverty line. [284]

Wealth data. Second, I did not have access to data on the wealth of applicants. As discussed earlier, these data have enormous implications for the racial dividend of class-based affirmative action.[285] While African Americans make roughly 60% of what whites make in annual income, the median wealth of African Americans is just 10% the median wealth of whites.[286]

Community college transfer data. Third, UNC did not provide data on transfer applicants, so these students were excluded from the simulation. As noted above, boosting community college transfers to levels employed by the University of California at Berkeley or UCLA could substantially increase racial, ethnic, and socioeconomic diversity, but without the necessary data, transfer students could not be modeled in the simulation.[287]

Better recruitment. Fourth, the simulation necessarily understates the racial and socioeconomic dividend of the alternatives studied because it was limited to the *existing pool* of applicants even though evidence outlined above suggests that UNC does a poor job of recruiting disadvantaged students to apply.[288] There are more than 20,000 very high achieving low-income applicants who do not attend any of the most selective 238 colleges, much less a top-ranked public

---

[284] Annie E. Casey Foundation, Kids Count Data Center, "Children below 200% poverty by race," and "Children in extreme poverty (50 percent poverty) by race and ethnicity" http://datacenter.kidscount.org/data/tables/6726-children-below-200-percent-poverty-by-race#detailed/1/any/false/573,869,36,868,867/10,11,9,12,1,13,185/13819,13820 and

[285] See *supra* Section V.A.1.

[286] Id.

[287] See discussion Section V.F *supra*.

[288] See *supra* Section V.E.

75

college such as UNC.[289]  According to the NCERCD data, in 2014, there were 16,354 economically disadvantaged high school students (of all grades)  who were identified as academically gifted, of which nearly half were underrepresented minorities, (4,277 Black students and 2,795 Hispanic students). If UNC had done a better job of recruiting such students, the more robust applicant pool that would have resulted would likely have increased the racial divided in our simulations.

C.    **A careful simulation of a holistic percentage plan shows UNC could achieve the educational benefits of racial, ethnic, and socioeconomic diversity without sacrificing academic quality.**

In addition to the socioeconomic preference, I asked Professor Arcidiacono to simulate the application of a percentage plan approach.  As noted above, a number of leading state universities have created racial diversity by employing "percentage plans" that enroll top students in a variety of high schools.[290] We focused on the 82% of students enrolled through the in-state process.[291]

UNC determined in its own simulations that a "top 4.5%" model would yield a class similar in size to the current student body, so we follow that approach.  Unlike UNC's simulation, however, the model I asked to Arcidiacono to employ does not rank and admit students solely by a single factor —high school grades—but rather identifies the top 4.5% of students in every North Carolina high school who rank highest using UNC's current holistic model that includes test scores, high school

---

[289] Hoxby & Avery, "The Missing 'One-Offs,'" *supra*, p. 35 (finding that two-thirds of 35,000 high achieving low income students do not attend a selective colleges); see David Leonhardt, Better Colleges Failing to Lure Talented Poor, New York Times, March 16, 2013, http://www.nytimes.com/2013/03/17/education/scholarly-poor-often-overlook-better-colleges.html?pagewanted=all.

[290] See *supra* Section V.C.

[291] A version of the percentage plan could also be applied to out-of-state applicants by admitting top students from a variety of geographic locations, such as zip codes or College Board clusters.  See discussion in Section V.C.3 *supra*.

76

grades, program rating, performance rating, extracurricular rating, essay rating and personal quality.[292] This is Simulation 5.

As with the socioeconomic preference model, Simulation 5 next turns off the preferences for race, legacy, early decision, first generation status, fee waiver applicants, and female applicants. (As with the socioeconomic model, Arcidiacono turned UNC's existing preferences for recruited athletes back "on.")

The results of the simulation for the Class of 2019 (the most recent for which data were available) are reported below.

---

[292] This simulation follows the logic of UNC's 2012 study by examining the pool of UNC applicants, as opposed to the thinking behind UNC's 2014 study, which examined both applicants and hypothetical non-applicants from "the entire population of North Carolina public high school graduates" as well as 20 private feeder high schools. See UNC0079697-98. The disadvantage of the 2012 approach is that a percentage plan could change the applicant pool by encouraging more eligible students to apply. But the disadvantages of the 2014 approach are far greater. The 2014 methodology assumes that all students who are eligible would apply, an audacious assumption. See UNC079698 (outlining study's assumption "that the students we identify would, in fact, apply.") Moreover, as noted above, by focusing on actual applications, Simulation 5 allows us to employ precisely the type of holistic approach that the Supreme Court endorsed in *Fisher II*, by going beyond just high school grades to include test scores, program ratings, performance ratings, extracurricular ratings, essay ratings, and personal quality ratings. See *Fisher II*, slip opinion, p. 17. Such a holistic simulation is impossible when non-applicants are included in the analysis.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 81 of 119

| UNC – Admitted Classes of 2019 (In-State Admissions) | | | |
|---|---|---|---|
| Status Quo Race-Based Admissions | | Simulation 5 Race-Neutral Admissions | |
| White | 69.2% | White | 64.7% |
| African American | 8.7% | African American | 13.1% |
| Hispanic | 5.4% | Hispanic | 6.3% |
| Asian American | 11.0% | Asian American | 11.3% |
| Other Minority or Unreported | 5.7% | Other Minority or Unreported | 4.6% |
| SES Disadvantage | 24.8% | SES Disadvantage | 25.4% |
| SES Advantaged | 75.2% | SES Advantaged | 74.6% |
| SAT/HS GPA | 1309/4.67 | SAT/HS GPA | 1320/4.77 |

Simulation 5 is superior to the status quo in virtually every respect. African-American representation increases by 51%, Hispanic shares increase by more than 16%, and disadvantaged shares also increase. Geographic diversity is enhanced as top students in all high schools can attend UNC. Meanwhile, traditional academic criteria are honored; indeed, academic qualifications improve under this model, as both mean SAT scores and high school GPA rise. Holistic admissions is employed within each high school—with consideration of everything from academic records to extracurricular activities and essays—and the costs associated with explicit racial preferences are avoided.

These simulations are not the only way that UNC could achieve its goals without the use of race. But the analysis confirms—using information about UNC's current process, and data already

78

available to UNC—that such alternatives are both available and workable. UNC no doubt could identify alternative methods, if it were committed to doing so.

## VII. Conclusion

Under the Fourteenth Amendment, UNC bears "the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."[293] UNC officials have claimed the college has fairly examined all workable race-neutral strategies and found them all wanting.

The record refutes that assertion. Experience and research demonstrates that there are numerous ways that universities can achieve the educational benefits of racial and socioeconomic diversity without using race. Despite all of its financial and academic resources, UNC, the oldest public college in the country, has failed to take the necessary steps to determine whether there are workable race-neutral strategies available. Moreover, a careful investigation of UNC's admissions data and practices confirms that UNC has at its disposal viable race-neutral alternatives that would provide a net increase in racial and socioeconomic diversity without requiring the use of race.

Dated: January 12, 2018                                        s/ Richard D. Kahlenberg

                                                             Richard D. Kahlenberg

---

[293] *Fisher*, 133 S. Ct. 2411, 2420.

79

VII.   Appendices

    A.   Appendix A – Curriculum Vitae

1

# RICHARD D. KAHLENBERG

Senior Fellow
The Century Foundation
2040 S Street, N.W.
Washington, D.C. 20009
202-683-4883
kahlenberg@tcf.org

## EDUCATION

1986-1989     Harvard Law School, Cambridge, Massachusetts.
              J.D., *cum laude*, June 1989.

1985-1986     University of Nairobi School of Journalism, Nairobi, Kenya.
              Certificate, Mass Communications, June 1986.
              Rotary International Fellowship.

1981-1985     Harvard College, Cambridge, Massachusetts.
              A.B. in Government, *magna cum laude*, June 1985.
              Senior Honors Thesis "Coalition Building and Robert Kennedy's 1968
              Presidential Campaign"

## EMPLOYMENT HISTORY

1998-         The Century Foundation (formerly Twentieth Century Fund), Washington, D.C.
              Senior Fellow.  Coordinating programs involving elementary, secondary and
              higher education and organized labor.

1996-1998     Center for National Policy, Washington, D.C.
              Fellow. Coordinated project on New Strategies to Promote Equal Opportunity.

1994-1995     Professorial Lecturer and Independent Writer, Washington, D.C.
              Taught Cases in Public Policy, George Washington University Department
              of Public Administration and completed book on affirmative action.

1993-1994     George Washington University National Law Center, Washington, D.C.
              Visiting Associate Professor of Law.  Taught Constitutional Law.

1989-1993     Senator Charles S. Robb, Washington, D.C.
              Legislative Assistant.  Advised Senator on issues relating to Crime, Energy,
              Environment, Judicial Appointments, Campaign Finance, and Civil Rights.

2

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 85 of 119

<u>PUBLICATIONS</u>

I. BOOKS

*A Smarter Charter: Finding What Works for Charter Schools and Public Education* (coauthored with Halley Potter) (Teachers College Columbia University Press, 2014). *The Washington Post* called *A Smarter Charter,* "A remarkable new book...Wise and energetic advocates such as Kahlenberg and Potter can take the charter movement in new and useful directions."

*Why Labor Organizing Should Be a Civil Right: Rebuilding a Middle-Class Democracy by Enhancing Worker Voice* (coauthored with Moshe Z. Marvit) (Century Foundation Press, 2012). The book was called "a must read" by NAACP President and CEO Benjamin Todd Jealous and "a persuasive roadmap for extending the protections of the Civil Rights Act to workers who want to organize a union" by American Federation of Teachers President Randi Weingarten.

*Tough Liberal: Albert Shanker and the Battles Over Schools, Unions, Race and Democracy* (Columbia University Press, 2007). The Wall Street Journal called the book "a well researched and engaging biography," and Slate labeled it a "stirring account." The book has also been reviewed in The Nation, The American Prospect, The Weekly Standard, Newsday, New York Sun, City Journal, Publishers Weekly, and The Washington Monthly. The book was written with the support of the Hewlett, Broad and Fordham foundations. It was named one of the Five Best Books on Labor in the Wall Street Journal

*All Together Now: Creating Middle Class Schools through Public School Choice* (Brookings Institution Press, 2001). The book, labeled "a clarion call for the socioeconomic desegregation of U.S. public schools" by Harvard Educational Review, was said by the Washington Post to make "a substantial contribution to a national conversation" on education. The book was also reviewed in Teachers College Record, Education Next, and National Journal. One author called Kahlenberg "the intellectual father of the economic integration movement."

*The Remedy: Class, Race, and Affirmative Action* (Basic Books, 1996). The book was named one of the best of the year by the Washington Post and William Julius Wilson's review in the New York Times called it "by far the most comprehensive and thoughtful argument thus far for...affirmative action based on class." The book was also reviewed in The American Lawyer, The New Yorker, The Progressive, The Washington Monthly, The Detroit News, National Review, Legal Times, The Atlanta Journal-Constitution, and Publishers Weekly

*Broken Contract: A Memoir of Harvard Law School* (Hill & Wang/Farrar, Straus & Giroux, 1992). The book, which details the way in which idealistic liberal law students are turned to corporate law, was called "a forceful cri de coeur" by the L.A. Times. The book was reviewed in The New York Times, The Washington Post Book World, The Harvard Law Review, The Washington Monthly, Legal Times, The Boston Globe, The Hartford Courant, The Baltimore Evening Sun, The St. Petersburg Times, The Detroit News, The Cleveland Plain Dealer, The Dallas Morning News, and Publishers Weekly. In 1999, the book was reissued by University of Massachusetts Press with a new afterword. The book has also been translated into Japanese and Chinese.

3

Editor, *The Future of Affirmative Action: New Paths to Higher Education Diversity after Fisher v. University of Texas* (Century Foundation Press, 2014). Chapters include, "Defining the Stakes," by Nancy Cantor and Peter Englot; "Promoting Economic Diversity for College Affordability," by Sara Goldrick-Rab; "Fisher v. University of Texas and Its Practical Implications for Institutions of Higher Education," by Arthur L. Coleman and Teresa E. Taylor; "New Rules for Affirmative Action in Higher Education," by Scott Greytak; "Transitioning to Race-Neutral Admissions," by Halley Potter; "Striving for Neutrality," by Marta Tienda; "The Use of Socioeconomic Affirmative Action at the University of California," by Richard Sander; "Converging Perils to College Access for Racial Minorities," by Richard L. McCormick; "Ensuring Diversity Under Race-Neutral Admissions at the University of Georgia," by Nancy G. McDuff and Halley Potter; "Addressing Undermatch," by Alexandria Walton Radford and Jessica Howell; "Talent is Everywhere," by Danielle Allen; "Reducing Reliance on Testing to Promote Diversity," by John Brittain and Benjamin Landy; 'Advancing College Access with Class-Based Affirmative Action," by Matthew N. Gaertner; "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," by Anthony P. Carnevale, Stephen J. Rose, and Jeff Strohl; "The Why, What, and How of Class-Based Admissions Policy," by Dalton Conley; "A Collective Path Upward," by Richard Sander; and "Increasing Socioeconomic Diversity in American Higher Education," by Catharine Hill.

Executive Director (and primary author and editor), *Bridging the Higher Education Divide: Strengthening Community Colleges and Restoring the American Dream* (Century Foundation Press, 2013.) The task force on community colleges, cochaired by Anthony Marx and Eduardo Padron, included John Brittain, Walter Bumphus, Michele Cahill, Louis Caldera, Patrick Callan, Nancy Cantor, Samuel Cargile, Anthony Carnevale, Michelle Asha Cooper, Sara Goldrick-Rab, Jerome Karabel, Catherine Koshland, Felix Matos Rodriguez, Gail Mellow, Arthur Rothkopf, Sandra Schroeder, Louis Soares, Suzanne Walsh, Ronald Williams, and Joshua Wyner. In addition, the volume included background papers by Sandy Baum and Charles Kurose; Sara Goldrick-Rab and Peter Kinsley; and Tatiana Melguizo and Holly Kosiewicz.

Editor, *The Future of School Integration: Socioeconomic Diversity as an Education Reform Strategy* (Century Foundation Press, 2012). Chapters include, "Housing Policy is School Policy: Economically Integrative Housing Promotes Academic Success in Montgomery County, Maryland," by Heather Schwartz; "Socioeconomic Diversity and Early Learning: The Missing Link in Policy for High-Quality Preschools," by Jeanne L. Reid; "The Cost-Effectiveness of Socioeconomic School Integration," by Marco Basile; "The Challenge of High-Poverty Schools: How Feasible is Socioeconomic School Integration?" by An Mantil, Anne G. Perkins, and Stephanie Aberger; "Can NCLB Choice Work? Modeling the Effects of Interdistrict Choice on Student Access to Higher-Performing Schools," by Meredith P. Richards, Kori J. Stroub, and Jennifer Jellison Holme; "The Politics of Maintaining Balanced Schools: An Examination of Three Districts," by Sheneka M. Williams; and "Turnaround and Charter Schools that Work: Moving Beyond Separate but Equal," by Richard Kahlenberg.

Editor, *Affirmative Action for the Rich: Legacy Preferences in College Admissions* (Century Foundation Press, 2010). Chapters include "Legacy Preferences in a Democratic Republic,"

by Michael Lind; "A History of Legacy Preferences," by Peter Schmidt; "An Analytical Survey of Legacy Preferences," by Daniel Golden; "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," by Chad Coffman, Tara O'Neil and Brian Starr; "Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions," by John Brittain and Eric Bloom; "Legacy Preferences and the Constitutional Prohibition of Titles of Nobility," by Carlton Larson; "Heirs of the American Experiment: A Legal Challenge to Preferences as a Violation of the Equal Protection Clause of the Constitution and the Civil Rights Act of 1866," by Steve Shadowen and Sozi Tulante; "Privilege Paving the Way for Privilege: How Judges Will Confront the Legal Ramifications of Legacy Admissions to Public and Private Universities," by Boyce F. Martin Jr. with Donya Khalili; and "The Political Economy of Legacy Admissions, Taxpayer Subsidies, and Excess 'Profits' in American Higher Education: Strategies for Reform," by Peter Sacks.

Editor, *Rewarding Strivers: Helping Low-Income Students Succeed in College* (Century Foundation Press, 2010). Chapters include: "The Carolina Covenant," by Edward B. Fiske, and "How Increasing College Access is Increasing Inequality and What to do About It," by Anthony P. Carnevale and Jeff Strohl. William Fitzsimmons called the book part of Century's "trailblazing mission to prevent the tragic waste of human talent that threatens America's future," while Anthony Marx declared, "Kahlenberg again gathers the best thinkers on how to challenge this status quo; what to do, what works, and what does not."

Editor, *Improving on No Child Left Behind: Getting Education Reform Back on Track* (Century Foundation Press, 2008). Chapters include: an analysis of the under-funding of the No Child Left Behind Act, by William Duncombe, John Yinger and Anna Lukemeyer; a discussion of the rights of students in low performing schools to transfer to better performing public schools across district lines, by Amy Stuart Wells and Jennifer Holme; and an exploration of how to improve the accountability provisions of the act, by Lauren Resnick, Mary Kay Stein, and Sarah Coon. Diane Ravitch called *Improving on No Child Left Behind* "the best of the books on this topic."

Editor, *America's Untapped Resource: Low-Income Students in Higher Education* (Century Foundation Press, 2004). The chapters include: "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," Anthony P. Carnevale and Stephen J. Rose; "Improving the Academic Preparation and Performance of Low-Income Students in American Higher Education," by P. Michael Timpane and Arthur M. Hauptman; and "Low-Income Students and the Affordability of Higher Education," by Lawrence E. Gladieux. Carnevale and Rose's finding, that 74% of students at selective colleges come from the top socioeconomic quartile and 3% from the bottom quartile is widely cited.

Editor, *Public School Choice vs. Private School Vouchers* (Century Foundation Press, 2003). The volume consists of a compilation of new and previously published materials, including articles by Edward B. Fiske, Helen F. Ladd, Sean F. Reardon, John T. Yun, Amy Stuart Wells, Richard Just, Ruy Teixeira, Thad Hall, Gordon MacInnes, Richard C. Leone, and Bernard Wasow.

5

Executive Director (and primary author and editor), *Divided We Fail: Coming Together Through Public School Choice. The Report of The Century Foundation Task Force on the Common School*, (Century Foundation Press, 2002). The task force on school integration, chaired by Lowell Weicker, included Joseph Aguerrebere, Ramon Cortines, Robert Crain, John Degnan, Peter Edelman, Christopher Edley, Kim Elliott, Jennifer Hochschild, Helen Ladd, Marianne Engelman Lado, Leonard Lieberman, Ann Majestic, Dennis Parker, Felipe Reinoso, Charles S. Robb, David Rusk, James Ryan, Judi Sikes, John Brooks Slaughter, Dick Swantz, William Trent, Adam Urbanski, Amy Stuart Wells, and Charles V. Willie. In addition, the volume included background papers by Duncan Chaplin, David Rusk, Edward B. Fiske, William H. Freivogel, Richard Mial, and Todd Silberman.

Editor, *A Notion at Risk: Preserving Public Education as an Engine for Social Mobility* (Century Foundation Press, 2000). The book identifies individual sources of inequality and proposes concrete public policy remedies. The chapters include: "Summer Learning and Home Environment" by Doris Entwisle, Karl Alexander and Linda Olson of Johns Hopkins; "Equalizing Education Resources for Advantaged and Disadvantaged Children" by Richard Rothstein of the Economic Policy Institute; "High Standards: A Strategy for Equalizing Opportunities to Learn?" by Adam Gamoran of the University of Wisconsin; "Inequality in Teaching and Schooling: Supporting High-Quality Teaching and Leadership in Low Income Schools" by Linda Darling-Hammond and Laura Post of Stanford; "Charter Schools and Racial and Social Class Segregation: Yet Another Sorting Machine?" by Amy Stuart Wells, Jennifer Jellison Holme, Alejandra Lopez, and Camille Wilson Cooper of UCLA; "Student Discipline and Academic Achievement" by Paul Barton of the Educational Testing Service; and "Critical Support: The Public View of Public Education," by Ruy Teixeira of the Century Foundation


## II. BOOK CHAPTERS

"The Bipartisan, and Unfounded, Assault on Teachers' Unions," in Michael B. Katz and Mike Rose (eds.), *Public Education Under Siege* (Philadelphia: University of Pennsylvania Press, 2013.)

"Socioeconomic Integration and Segregation," in James A. Banks (ed.), *Encyclopedia of Diversity in Education* (Thousand Oaks, CA: Sage Publications, 2012).

"Socioeconomic School Integration: Preliminary Lessons from More than 80 Districts," in Erica Frankenberg and Elizabeth DeBray-Pelot (eds.), *Integrating Schools in a Challenging Society: New Policy and Legal Options for a Multiracial Generation*, (Chapel Hill, N.C.: University of North Carolina Press, 2011)

"Combating School Segregation in the United States," in Guido Walraven, Dorothee Peters, Eddie Denessen and Joep Bakker (eds.), *International Perspectives on Countering School Segregation* (Dutch National Knowledge Centre for Mixed Schools, 2010).

6

"Levelling the School Playing Field: A Critical Aim for New York's Future," in Jonathan P. Hicks and Dan Morris (eds.), *From Disaster to Diversity: What's Next for New York City's Economy?* (New York: Drum Major Institute, 2009).

"Higher Education Access," in Robert McKinnon (ed), *Actions Speak Loudest* (Guilford, CT: Globe Pequot Press, 2009)

"Socioeconomic School Integration," in Marybeth Shinn and Hirokazu Yoshikawa (eds), *Toward Positive Youth Development: Transforming Schools and Community Programs* (New York: Oxford University Press, 2008).

"The History of Collective Bargaining Among Teachers," in Jane Hannaway and Andrew J. Rotherham (eds) *Collective Bargaining in Education: Negotiating Change in Today's Schools* (Cambridge, MA: Harvard Education Press, 2006).

"Socioeconomic School Integration: A Symposium," in Chester Hartman (ed), *Poverty and Race in America: The Emerging Agendas* (New York: Rowman and Littlefield, Publishers, 2006).

"The Return of 'Separate but Equal,'" in James Lardner and David Smith (eds), *Inequality Maters: The Growing Divide in America and Its Poisonous Consequences* (New York: New Press, 2005).

"Economic School Integration," in Stephen J. Caldas and Carl L. Bankston III (eds), *The End of Desegregation?* (New York: Nova Science Publishers Inc., 2003).

"President Clinton's Race Initiative: Promise and Disappointment," and "How to Achieve One America: Class, Race, and the Future of Politics," in Stanley A. Renshon (ed), *One America? Political Leadership, National Identity and the Dilemmas of Diversity* (Washington DC: Georgetown University Press, 2001).


## III. LAW REVIEW ARTICLES

"'Architects of Democracy': Labor Organizing as a Civil Right," (with Moshe Marvit) 9 *Stanford Journal of Civil Rights & Civil Liberties* 213 (June 2013).

"Reflections on Richard Sander's Class in American Legal Education," 88 *Denver University Law Review* 719 (September 2011).

"Socioeconomic School Integration," 85 *North Carolina Law Review* 1545 (June 2007).

"Remarks: Symposium – Brown v. Board of Education at Fifty: Have We Achieved Its Goals?" 78 *St. John's Law Review* 295 (Spring 2004).

"Socioeconomic School Integration Through Public School Choice: A Progressive Alternative to Vouchers," *45 Howard Law Journal* 247 (Winter 2002).

"Class-Based Affirmative Action," 84 *California Law Review* 1037 (July 1996).

"Getting Beyond Racial Preferences: The Class-Based Compromise," 45 *American University Law Review* 721 (February 1996).


## IV. PERIODICAL ARTICLES

Have written articles in the popular press for the American Educator, American Prospect, American School Board Journal, Atlantic Monthly, Baltimore Sun, Boston Globe, Boston Review, Chicago Sun Times, Christian Science Monitor, Chronicle of Higher Education, Civil Rights Journal, Education Next, Education Week, Educational Leadership, Forward, Inside Higher Education, Jurist, Journal of Blacks in Higher Education, Journal of Commerce, Legal Affairs, Legal Times, New Labor Forum, Nation, New Republic, New York Daily News, New York Times, Orlando Sentinel, Philadelphia Inquirer, Political Science Quarterly, Poverty and Race, Principal Magazine, Slate, Wall Street Journal, Washington Monthly, Washington Post and Wilson Quarterly.

Articles on Affirmative Action:

4/3/95        Author, "Class, Not Race: A Liberal Case for Junking Old-Style Affirmative Action in Favor of Something that Works," The New Republic (cover story).

7/17/95        Author, "Affirmative Action by Class," Washington Post, A19

7/17/95        Author, "Equal Opportunity Critics: Class vs. race, round 2," New Republic.

2/96        Author, "Getting Beyond Racial Preferences: The Class-Based Compromise," American University Law Review.

6/2/96        Author, "Bob Dole's Colorblind Injustice: On Affirmative Action, He Caves to Big Business," Outlook Section, *Washington Post*.

7/96        Author, "Class-Based Affirmative Action," *California Law Review*.

8/23/96        Author, "The Sound of Affirmative Action," The Forward.

9/13/96        Author, "Dishonest Defenders of Racial Preferences," *Wall Street Journal*.

10/7/96        Author, "Goal Line," (re Jack Kemp and affirmative action), *The New Republic*.

11/4/96        Author, "Need-based affirmative action," *Christian Science Monitor*.

12/96        Author, "Defend It, Don't Mend It: Clinton's affirmative action man has little bad to say about racial preferences," *The Washington Monthly*.

12/2/96        Author, "A Sensible Approach to Affirmative Action," *The Washington Post*. [

8

4/20/97        Author, "Need-based affirmative action in the spotlight," Orlando Sentinel.

1/19/98        Author, "Affirmative Action? Yes: But let's base it on need rather than on race," Philadelphia Inquirer.

Spring '98        Author, "Class-Based Affirmative Action: A Natural for Labor," New Labor Forum.

6/98        Author, "In Search of Fairness: A Better Way," *The Washington Monthly*.

11/98        Author, "Style, not Substance," *The Washington Monthly,* pp. 45-48.

1/19/99        Author, "Class-based affirmative action," *The Boston Globe*.

9/21/99        Author, "The Colleges, the Poor, And the SATs" *Washington Post*, A19.

7-8/00        Author, "Class Action: The good and the bad alternatives to affirmative action," *The Washington Monthly*, 39-43.

9/15/01        Author, "President Clinton's Racial Initiative: Promise and Disappointment," (Chapter 4); and "How to Achieve One America: Class, Race, and the Future of Politics," (Chapter 11), in Stanley A. Renshon (ed) *One America? Political Leadership, National Identity, and the Dilemmas of Diversity* (Georgetown University Press)

Spring/02        Author, Review of John David Skrentny "Color Lines," *Political Science Quarterly*, pp. 144-145.

9/9/03        Author, "The Conservative victory in Grutter and Gratz," *Jurist* (symposium with Derick Bell, Peter Schuck, Susan Low Bloch and others).

1/14/04        Author, "Q&A: Low-income college students are increasingly left behind," *USA Today*, p.7D.

3/19/04        Author, "Toward Affirmative Action for Economic Diversity," *Chronicle of Higher Education*.

5/05        Author, "Class Action: Why education needs quotas for poor kids," *Washington Monthly*

11/10/06        Author, "Time for a New Strategy," [re the Michigan affirmative action vote] *Inside Higher Education*.

3/07        Author, "Invisible Men: Race is no longer the unacknowledged dividing line in America. Class Is," *The Washington Monthly*.

9

2/4/08    Author, "Obama's RFK Moment: How he could win over working class whites," *Slate.*

5/12/08    Author, "Barack Obama and Affirmative Action," *Inside Higher Education.*

5/23/08    Author, "A touch of class" (Obama and affirmative action), *Guardian America.*

11/6/08    Author, "What's Next for Affirmative Action?" *The Atlantic.*

9/30/09    Author, "The Next Step in Affirmative Action: Class-based systems can skirt court and ballot defeats – and do a better job of addressing socioeconomic diversity" *Washington Monthly Online.*

12/16/09    Author (along with Julian Bond, Lee Bollinger, Jamie Merisotis and others), "Reactions: Is It Time for Class-Based Affirmative Action?" *The Chronicle of Higher Education.*

3/3/10    Author, "Disadvantages," [review of Thomas Espenshade and Alexandria Walton Radford, No Longer Separate, Not Yet Equal], *New Republic.*

4/2/10    Author, "The Affirmative Action Trap," *The American Prospect*

5/23/10    Author, "Five myths about college admissions," Outlook Section, The *Washington Post*, p. B3 [

5/30/10    Author, "Toward a New Affirmative action," *Chronicle of Higher Education Review.*

6/10/10    Author, "A Response to the Critics of Class-Based Affirmative Action," Innovations Blog, *Chronicle of Higher Education*

6/18/10    Author, "Rewarding Strivers," Innovations Blog, *Chronicle of Higher Education.*

7/7/10    Author, "The French Twist on Affirmative Action," Innovations Blog, *Chronicle of Higher Education.*

7/20/10    Author, "Ross Douthat, White Anxiety and Diversity," Innovations Blog, *Chronicle of Higher Education.*

7/28/10    Author, "Next Week's Court Hearing on Affirmative Action," Innovations Blog, *The Chronicle of Higher Education.*

9/17/10    Author, "Colorado's Affirmative Action Experiment," Innovations Blog, *Chronicle of Higher Education.*

9/22/10    Author, "10 Myths about Legacy Preferences in College Admissions," *Chronicle of Higher Education.*

10

9/24/10    Author, "A Response to Supporters of Legacy Preferences," Innovations Blog, *Chronicle of Higher Education*.

11/3/10    Author, "Arizona's Affirmative Action Ban," Innovations Blog, *Chronicle of Higher Education*.

11/22/10    Author, "New Ways to Achieve Diversity in California," Innovations Blog, *Chronicle of Higher Education*.

11/24/10    Author, "South Africa's Affirmative Action Debate," Innovations Blog, *Chronicle of Higher Education*.

11/29/10    Author, "Does it Matter Where You Go to College?  Numbers Favor Top Schools," Room for Debate, *The New York Times*.

12/10/10    Author, "Oxford's Research-Based Affirmative Action," Innovations Blog, *Chronicle of Higher Education*.

1/6/11    Author, "Do Legacy Preferences Count More than Race?" Innovations Blog, *Chronicle of Higher Education*.

1/27/11    Author, "The Next Big Affirmative-Action Case," Innovations Blog, *Chronicle of Higher Education*.

2/11/11    Author, "Nick Clegg's Attack on Social Segregation in Higher Education," Innovations Blog, *Chronicle of Higher Education*.

3/3/11    Author, "Are Legacy Preferences 'Defensible Corruption?'" Innovations Blog, *Chronicle of Higher Education*.

3/10/11    Author, "Who Benefits Most from Attending Top Colleges?" Innovations Blog, *Chronicle of Higher Education*.

4/5/11    Author, "The 'Reverse Discrimination Sentiment,'" Innovations Blog, *Chronicle of Higher Education*. [cited in "Attitudes Toward Access to Higher Education Affected by Race, Study Shows," *Huffington Post*, 4/6/11]

4/29/11    Author, "The Decline of Legacy Admissions at Yale," Innovations Blog, *Chronicle of Higher Education*.

5/11/11    Author, "Purchasing Seats at Top British Universities," Innovations Blog, *The Chronicle of Higher Education*.

5/26/11    Author, "Restoring LBJ's Original Vision of Affirmative Action," Innovations Blog, *The Chronicle of Higher Education*.

11

6/21/11    Author, "Is Affirmative Action Headed Back to the Supreme Court?" Innovations Blog, *Chronicle of Higher Education.*

7/5/11    Author, "Steps Forward and Back on Affirmative Action, Innovations Blog, *Chronicle of Higher Education.*

8/4/11    Author, "Achieving Racial Diversity Without Using Race," Innovations Blog, *Chronicle of Higher Education.*

8/17/11    Author, "Race, Class and the New ACT Results," Innovations Blog, *Chronicle of Higher Education.*

9/13/11    Author, "An Affirmative Action Success," Innovations Blog, *Chronicle of Higher Education.*

9/27/11    Author, "Reflections on Richard Sander's Class in American Legal Education," *Denver University Law Review.*

9/28/11    Author, "Economic Segregation in American Law Schools," Innovations Blog, *Chronicle of Higher Education.*

10/3/11    Author, "The First Monday in October," [re Fisher v. Texas], Innovations Blog, *Chronicle of Higher Education.*

10/17/11    Author, "A Third Path on Affirmative Action?" Innovations Blog, *Chronicle of Higher Education.*

11/2/11    Author, "The Amicus Briefs on Affirmative Action," Innovations Blog. Chronicle of Higher Education [re Sander and Taylor brief]

11/13/11    Author, "Affirmative Action for the Rich," (with Stephen Joel Trachtenberg, John Brittain, Peter Sacks, Michele Hernandez, Terry Shepard and Debra Thomas), "Why Do Top Schools Still Take Legacy Applicants?" Room for Debate Blog, *New York Times.*

11/17/11    Author, "Legacy Preferences at Private Universities," Innovations Blog, *Chronicle of Higher Education.*

11/21/11    Author, "What Should Obama Do on Affirmative Action?" Innovations Blog, *Chronicle of Higher Education.*
11/29/11    Author, "The Days of Legacy Admissions May Be Numbered," *Minding the Campus* Blog.

12/5/11    Author, "Obama's New Guidance on Diversity," Innovations Blog, *Chronicle of Higher Education*

1/8/12    Author, "The Broader Significance of Fisher v. Texas," Innovations Blog, *Chronicle of Higher Education.*

12

2/9/12       Author, "Waiting on Fisher v. Texas," Innovations Blog, *Chronicle of Higher Education.*

2/21/12      Author, "Fisher v. Texas: How Obama Should Talk About Affirmative Action," *Slate.*

2/22/12      Author, "Will the Supreme Court Kill Diversity?" Innovations Blog, *Chronicle of Higher Education.*

3/29/12      Author, "Three Myths about Affirmative Action," Innovations Blog, *Chronicle of Higher Education.*

4/20/12      Author, "Does the Texas Top-10%-Plan Work?" Innovations Blog, *Chronicle of Higher Education.*

5/10/12      Author, "A Bad Week for Elizabeth Warren - and Affirmative Action," *Chronicle of Higher Education.*

5/29/12      Author, "Overturning or Modifying 'Grutter v. Bollinger'?" Innovations Blog, *Chronicle of Higher Education.*

6/1/12       Author, "Asian Americans and Affirmative Action," Innovations Blog, *Chronicle of Higher Education.* [cited in Asian American Educational Foundation, 6/4/12

6/25/12      Author, "Should Colleges Consider Legacies in the Admissions Process? No: It Hurts the Deserving," (debate with Stephen Joel Trachtenberg), *Wall Street Journal.*

7/11/12      Author, "Transparency About Legacy Preferences," (re MIT), Innovations Blog, *Chronicle of Higher Education.*

8/8/12       Author, "The University of Texas's Weak Affirmative-Action Defense," Innovations Blog, *Chronicle of Higher Education.*

8/10/12      Author, "President Obama's Affirmative Action Problem and What He Should Do About It," *The New Republic.*

8/16/12      Author, "Obama's Affirmative-Action Brief," Innovations Blog, *Chronicle of Higher Education*

9/4/12       Author, "Fisher Symposium: Race-neutral alternatives work," *SCOTUSblog.*

9/11/12      Author, "In defense of race-neutral alternative jurisprudence," Fisher Symposium, *SCOTUSblog,*
9/17/12      Author, "3 views on whether US still needs affirmative action: A middle way - Use affirmative action to help economically disadvantaged students of all races," *Christian Science Monitor.*

13

10/3/12      Author (with Halley Potter), "A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences," The Century Foundation.

10/3/12      Author, "A New Kind of Affirmative Action Can Ensure Diversity," *Chronicle of Higher Education.*

10/10/12      Author, "A Liberal Critique of Racial Preferences," *Wall Street Journal*, A17.

10/10/12      Author, "The Race to the Flop – The Problem with Affirmative Action," *The New Republic.*

10/11/12      Author, "The Achilles Heel of Affirmative Action," Conversation Blog, *Chronicle of Higher Education.*

10/22/12      Author, "Diversity or Discretion?  Essay questions motives of U. Of Texas in affirmative action case," *Inside Higher Education.*

11/7/12      Author, "Another Nail in Affirmative Action's Coffin," The Conversation Blog, *Chronicle of Higher Education.*

11/9/12      Author, "Economic Affirmative Action," *The Washington Post*, A27. [
12/13/12      Author, "Supreme Court Double Header: The Arguments for Gay Marriage Undermine Affirmative Action," *Slate.*

12/19/12      Author (with John Brittain), "When Wealth Trumps Merit," in Room for Debate (along with Ron Unz, S.B. Woo and others), "Fears of an Asian Quota in the Ivy League," *New York Times.*

1/17/13      Author, "Where Sotomayor and Thomas Agree on Affirmative Action," Conversation Blog, *Chronicle of Higher Education.*

3/12/13      Author, "Presidents in denial on use of race-based admissions preferences," *Inside Higher Ed.*

3/19/13      Author, "The Untapped Pool of Low-Income Strivers," The Conversation Blog, *Chronicle of Higher Education.*

5/13/13      Author, "Addressing the Economic Divide," in "Diversity Without Affirmative Action?" Room for Debate (with Patricia Williams, Richard Vedder, Marta Tienda, and John Brittain), *New York Times.*

6/2/13      Author, "End race-based affirmative action? Yes: Class matters much more," *New York Daily News.*

6/24/13     Author, "The Next Affirmative Action?  Universities Should Respond to the Supreme Court Ruling by Giving a Bigger Admissions Boost to Low-Income Students," *Slate.*

6/24/13     Author, "A new affirmative action based on class," *USA Today.*

6/25/13     Author, "The Class-Based Future of Affirmative Action," *The American Prospect.*

6/26/13     Author, "Why Everyone Is Wrong about *Fisher vs. University of Texas*," *Washington Monthly*9/2/13          Author, "A Refreshingly Honest Book About Affirmative Action," *The New Republic.*

9/27/13     Author, "The Misleading Administrative Guidance on Affirmative Action," *Chronicle of Higher Education.* [

10/14/13    Author, "A Fresh Chance to Rein in Racial Preferences: The Supreme Court's Fisher decision last spring has been largely ignored.  Now the justices can strengthen it." *Wall Street Journal*, A15.

11/21/13    Author, "In defense of proxies," (symposium with Sigal Alon, John Skrentny and others), *Contexts: American Sociological Association*, Fall 2013.

3/11/14     Author, "No Longer Black and White: Why Liberals Should Let California's Affirmative Action Ban Stand," *Slate.*

4/10/14     Author, "Good News for Low-Income Students: A campaign to challenge racial-preference policies at three universities should move higher education toward affirmative action based on class," Conversation Blog, *Chronicle of Higher Education.*

4/22/14     Author, "Did the Supreme Court Just Kill Affirmative Action?  No.  But it's clearly on its deathbed.  That might not be such a bad thing," *Politico.*

4/27/14     Author, "Affirmative Action Fail: The Achievement Gap By Income is Twice the Gap by Race," *The New Republic.*

4/27/14     Coauthor (with Halley Potter), "Focus on Class Instead," in Room for Debate, "Should Affirmative Action Be Based on Income?" *New York Times.*

6/17/14     Author, "What Sotomayor Gets Wrong About Affirmative Action," *Chronicle of Higher Education.*
7/17/14     Author, "Affirmative-Action Ruling Could Be Pyrrhic Victory for UT-Austin," *Chronicle of Higher Education.*

9/12/14     Author (with Peter Dreier), "Making Top Colleges Less Aristocratic and More Meritocratic," The Upshot Section, *The New York Times.*

15

11/20/14     Author, "Achieving College Diversity Without Discriminating by Race," *Wall Street Journal*, p. A17.

12/2/14      Author, "Why Labor Should Support Class-Based Affirmative Action," New Labor Forum; and "Richard D. Kahlenberg Responds" (to Julie Park), New Labor Forum.

2/13/15      Author, "Affirmative Action for the Advantaged at UT-Austin," The Conversation Blog, *Chronicle of Higher Education*.

5/18/15      Author, "For the Sake of Working-Class Students, Give 'Fisher' Another Chance," *Chronicle of Higher Education*.

6/4/15       Author, "Race-Based Admissions:  The Right Goal, but the Wrong Policy" (re LBJ 50th anniversary of affirmative action), *The Atlantic*.

7/23/15      Author, "How a New Report May Hasten the End of Racial Preferences in Admissions," *Chronicle of Higher Education*.

12/8/15      Author, "Texas' college admissions policies give the well-to-do a leg up," *Los Angeles Times*.

12/8/15      Author, "The Future of Affirmative Action: How a conservative decision at the Supreme Court could lead to a liberal outcome," *The Atlantic*.

12/11/15     Author, "Right-wing judge for working-class kids:  In praise of Samuel Alito's stand on affirmative action in higher education," *New York Daily News*.

12/14/15     Author, "Scalia's Rant and Alito's Reasoning: What will influence Anthony Kennedy and determine the fate of affirmative action in Fisher?" *Slate*.

12/24/15     Author (with Anthony Carnevale and Jeff Strohl) "Should Race Be a Factor in College Admissions?" Letter to Editor (re Sigal Alon op-ed), *New York Times*, A18.

1/11/16      Coauthor (with Jennifer Giancola), "True Merit: Ensuring Our Brightest Students Have Access to Our Best Colleges and Universities, Jack Kent Cooke Foundation.

3/14/16      Author, "Racial Diversity Without Racial Preferences: The growing case for class-based affirmative action in college admissions,", *Washington Monthly*.

6/23/16      Author, "A win for wealthy students," Fisher II Symposium, *Scotusblog*.

7/1/16       Author, "How the Legal Victory on Affirmative Action Undermines the Progressive Coalition: The University of Texas' policies make it harder to build an enduring cross-racial class-based coalition in American politics," *The Washington Monthly*.

1/4/17       Author, "How to Protect Diversity During Trump's Presidency: Liberals should expand the concept to include socioeconomic status," *The New Republic*.

16

4/14/17          Author, "Harvard's Class Gap: Can the academy understand Donald Trump's 'forgotten' Americans?" Harvard Magazine, May-June 2017, 35-39. [

8/3/17          Author, "The right fix to affirmative action: Progressives should answer the President's apparent plans with their own reforms" *New York Daily News.*


V. ACADEMIC/PUBLIC POLICY APPEARENCES

Have spoken before audiences in numerous settings:  government (U.S. Commission on Civil Rights; U.S. Department of Education); academic associations (American Educational Research Association; Association for Public Policy Analysis and Management); colleges and universities (American, Amherst, Centre, Columbia, Flagler, George Washington, Georgetown, Harvard, Howard, Marymount, Middlebury, Missouri Western, National Defense University, New York University, Oberlin, Pitzer, Rutgers, St. Johns, St. Louis, Stanford, Stetson, Suffolk, University of Chicago, University of Maine, University of Maryland, University of North Carolina, University of Pennsylvania, University of Richmond, University of Southern California, University of Virginia, West Chester, William and Mary, Yale); and public policy forums (American Association of Community Colleges, American Enterprise Institute, Brookings Institution, Cato Institute, Center for American Progress, Chautauqua Institution, College Board, Committee for Economic Development, Council for Opportunity in Education, Economic Policy Institute, Demos, Education Law Association, Education Sector, Ethics and Public Policy Center, Fordham Institute, Hechinger Institute, KnowledgeWorks Foundation, National Academy of Sciences Board on Testing and Assessment, National Alliance for Public Charter Schools, National Council of Educational Opportunity, New America Foundation, New York Historical Society, New York Public Library, Pioneer Institute, Progressive Policy Institute, William T. Grant Foundation, and Woodrow Wilson Center).

VI. AWARDS

William A. Kaplin Award for Excellence in Higher Education Law and Policy Scholarship, Stetson Law School National Conference on Law & Higher Education (2013).

VII. EXPERIENCE CONSULTING WITH SCHOOL DISTRICTS

Chicago Public Schools (Illinois) (2008-2010).   Helped school district create a socioeconomic school integration plan for magnet and selective enrollment schools.

Charlotte-Mecklenburg Schools (North Carolina) (2016).  Helped school district create a socioeconomic school diversity plan.

New Haven Public Schools (2017).  Helping school district implement a socioeconomic diversity plan for magnet schools.

Case 1:14-cv-00954-LCB-JLW   Document 161-1   Filed 01/18/19   Page 100 of 119

Pasadena Educational Foundation (California). (2006 and 2016). Prepared reports for educational foundation associated with Pasadena Unified School District recommending adoption of socioeconomic diversity policies.

**B.**     **Appendix B – Documents Relied Upon or Considered in Forming Opinion**

|  |  |  |
|---|---|---|
|  | UNC0080087 | UNC0104929 |
| Deposition transcripts (with exhibits) of: | UNC0080178 | UNC0104931 |
|  | UNC0080179 | UNC0104939 |
| Jennifer Kretchmar | UNC0080316 | UNC0106298 |
| Abigail Panter | UNC0080443 | UNC0108534 |
| Barbara Polk | UNC0080715 | UNC0115489 |
| Jim Dean | UNC0081010 | UNC0115492 |
| Andrew Parrish | UNC0081017 | UNC0116078 |
| Lynn Williford | UNC0082906 | UNC0116812 |
| Stephen Farmer | UNC0082907 | UNC0117476 |
| A list of fields in UNC's admissions database | UNC0086357 | UNC0118426 |
|  | UNC0086734 | UNC0120997 |
|  | UNC0087025 | UNC0145990 |
| SFFA's Complaint | UNC0087661 | UNC0145991 |
|  | UNC0087662 | UNC0171639 |
| UNC Answer to SFFA Complaint | UNC0087666 | UNC0185910 |
|  | UNC0090683 | UNC0192504 |
| 8/16/13 Letter to Edward Blum from Zach Orth NC Public Records Act & 10% simulation. | UNC0091915 | UNC0193166 |
|  | UNC0091917 | UNC0193169 |
|  | UNC0092133 | UNC0193175 |
|  | UNC0092134 | UNC0283495 |
|  | UNC0096472 | UNC0283498 |
| SFFA and UNC requests to DOE | UNC0096542 | UNC0283499 |
|  | UNC0096543 | UNC0283502 |
| SFFA and UNC requests to NCERDC | UNC0097262 | UNC0283507 |
|  | UNC0097612 | UNC0283517 |
|  | UNC0097721 | UNC0283520 |
| Other documents cited in this report | UNC0099539 | UNC0283523 |
|  | UNC0099540 | UNC0283525 |
|  | UNC0099569 | UNC0283527 |
| UNC0079604 | UNC0100111 | UNC0283529 |
| UNC0079613 | UNC0100130 | UNC0283530 |
| UNC0079622 | UNC0100622 | UNC0283531 |
| UNC0079624 | UNC0101914 | UNC0323474 |
| UNC0079625 | UNC0101915 | UNC0323483 |
| UNC0079650 | UNC0103667 | UNC0323484 |
| UNC0079651 | UNC0103669 | UNC0323487 |
| UNC0079680 | UNC0104748 | UNC0323543 |
| UNC0079684 | UNC0104749 | UNC0323544 |
| UNC0079713 | UNC0104850 | UNC0323611 |
| UNC0079724 | UNC0104851 | UNC0323622 |
| UNC0079951 | UNC0104912 | UNC0323651 |
| UNC0080085 | UNC0104913 | UNC0323680 |

| | | |
|---|---|---|
| UNC0323900 | UNC0376504 | UNC0380166 |
| UNC0324038 | UNC0377992 | UNC0380208 |
| UNC0324078 | UNC0378072 | UNC0380210 |
| UNC0324080 | UNC0378075 | UNC0380212 |
| UNC0324931 | UNC0378117 | UNC0380215 |
| UNC0325546 | UNC0379565 | UNC0380217 |
| UNC0325551 | UNC0379839 | UNC0380222 |
| UNC0325560 | UNC0379840 | UNC0380241 |
| UNC0325570 | UNC0379973 | UNC0380243 |
| UNC0325572 | UNC0380001 | |
| UNC0326127 | UNC0380039 | |
| UNC0326346 | UNC0380071 | |
| UNC0376477 | UNC0380131 | |

**C.**      **Appendix C – Simulations**

Table C.1a: UNC Race-Neutral Modeling Results for In-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Status Quo | | | | | | | | | | | | | | |
| White | 3,043 | 3,022 | 3,160 | 3,064 | 3,323 | 3,381 | 18,993 | 71.8% | 68.6% | 69.3% | 69.2% | 67.4% | 66.8% | 68.8% |
| Black | 389 | 383 | 414 | 383 | 433 | 419 | 2,421 | 9.2% | 8.7% | 9.1% | 8.7% | 8.8% | 8.3% | 8.8% |
| Hispanic | 196 | 229 | 251 | 241 | 261 | 300 | 1,478 | 4.6% | 5.2% | 5.5% | 5.4% | 5.3% | 5.9% | 5.4% |
| Asian | 464 | 470 | 545 | 488 | 604 | 658 | 3,229 | 11.0% | 10.7% | 11.9% | 11.0% | 12.3% | 13.0% | 11.7% |
| Other/Not available | 144 | 299 | 191 | 251 | 309 | 305 | 1,499 | 3.4% | 6.8% | 4.2% | 5.7% | 6.3% | 6.0% | 5.4% |
| Total | 4,236 | 4,403 | 4,561 | 4,427 | 4,930 | 5,063 | 27,620 | | | | | | | |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.57 | 4.61 | 4.64 | 4.67 | 4.70 | 4.76 | | | | | | | | |
| SAT (mean) | 1,302 | 1,308 | 1,321 | 1,309 | 1,317 | 1,316 | | | | | | | | |
| Top decile (%) | 13.4% | 16.2% | 20.7% | 19.1% | 24.4% | 28.5% | | | | | | | | |
| Top two deciles (%) | 30.9% | 35.3% | 40.3% | 39.4% | 43.8% | 50.0% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 76.2% | 76.5% | 76.7% | 75.2% | 79.0% | 79.4% | | | | | | | | |
| Disadvantaged | 23.8% | 23.6% | 23.3% | 24.8% | 21.0% | 20.6% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 81.2% | 79.9% | 82.1% | 80.3% | 82.2% | 83.2% | | | | | | | | |
| Disadvantaged | 18.8% | 20.1% | 17.9% | 19.7% | 17.8% | 16.8% | | | | | | | | |
| School level (%) | | | | | | | | | | | | | | |
| Advantaged | 84.1% | 85.5% | 85.3% | 78.8% | ------ | ------ | | | | | | | | |
| Disadvantaged | 15.9% | 14.5% | 14.7% | 21.2% | ------ | ------ | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1a (continued): UNC Race-Neutral Modeling Results for In-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 1: No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 3,286 | 3,212 | 3,392 | 3,247 | 3,515 | 3,555 | 20,207 | 77.6% | 73.0% | 74.4% | 73.3% | 71.3% | 70.2% | 73.2% |
| Black | 213 | 238 | 244 | 242 | 259 | 291 | 1,487 | 5.0% | 5.4% | 5.3% | 5.5% | 5.3% | 5.7% | 5.4% |
| Hispanic | 152 | 167 | 185 | 193 | 220 | 242 | 1,159 | 3.6% | 3.8% | 4.1% | 4.4% | 4.5% | 4.8% | 4.2% |
| Asian | 470 | 481 | 574 | 503 | 641 | 675 | 3,344 | 11.1% | 10.9% | 12.6% | 11.4% | 13.0% | 13.3% | 12.1% |
| Other/Not available | 115 | 305 | 166 | 242 | 295 | 300 | 1,423 | 2.7% | 6.9% | 3.6% | 5.5% | 6.0% | 5.9% | 5.2% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.58 | 4.62 | 4.65 | 4.68 | 4.70 | 4.76 | | | | | | | | |
| SAT (mean) | 1,309 | 1,314 | 1,328 | 1,315 | 1,323 | 1,321 | | | | | | | | |
| Top decile (%) | 13.4% | 16.3% | 20.8% | 19.3% | 24.5% | 28.7% | | | | | | | | |
| Top two deciles (%) | 31.2% | 35.6% | 40.7% | 39.7% | 44.1% | 50.6% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 79.6% | 80.1% | 80.0% | 78.4% | 81.8% | 82.3% | | | | | | | | |
| Disadvantaged | 20.4% | 19.9% | 20.0% | 21.6% | 18.2% | 17.7% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 82.8% | 81.9% | 83.5% | 81.7% | 83.4% | 84.5% | | | | | | | | |
| Disadvantaged | 17.2% | 18.1% | 16.5% | 18.3% | 16.6% | 15.5% | | | | | | | | |
| School level (%) | | | | | | | | | | | | | | |
| Advantaged | 90.2% | 91.7% | 91.8% | 88.0% | ------ | ------ | | | | | | | | |
| Disadvantaged | 9.8% | 8.3% | 8.2% | 12.0% | ------ | ------ | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1a (continued): UNC Race-Neutral Modeling Results for In-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 2: No racial preferences, family SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 3,150 | 3,088 | 3,249 | 3,129 | 3,343 | 3,392 | 19,351 | 74.4% | 70.1% | 71.2% | 70.7% | 67.8% | 67.0% | 70.1% |
| Black | 301 | 327 | 325 | 308 | 364 | 393 | 2,018 | 7.1% | 7.4% | 7.1% | 7.0% | 7.4% | 7.8% | 7.3% |
| Hispanic | 180 | 201 | 225 | 225 | 280 | 319 | 1,430 | 4.2% | 4.6% | 4.9% | 5.1% | 5.7% | 6.3% | 5.2% |
| Asian | 486 | 496 | 594 | 521 | 655 | 676 | 3,428 | 11.5% | 11.3% | 13.0% | 11.8% | 13.3% | 13.4% | 12.4% |
| Other/Not available | 119 | 291 | 168 | 244 | 288 | 283 | 1,393 | 2.8% | 6.6% | 3.7% | 5.5% | 5.8% | 5.6% | 5.0% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.57 | 4.61 | 4.64 | 4.67 | 4.69 | 4.75 | | | | | | | | |
| SAT (mean) | 1,297 | 1,303 | 1,318 | 1,305 | 1,311 | 1,309 | | | | | | | | |
| Top decile (%) | 13.3% | 16.2% | 20.6% | 19.1% | 24.2% | 28.1% | | | | | | | | |
| Top two deciles (%) | 30.6% | 35.0% | 40.0% | 38.9% | 42.7% | 48.4% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 68.0% | 69.2% | 69.7% | 68.1% | 70.2% | 70.5% | | | | | | | | |
| Disadvantaged | 32.0% | 30.8% | 30.3% | 31.9% | 29.8% | 29.5% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 80.4% | 80.0% | 81.1% | 79.3% | 81.1% | 81.8% | | | | | | | | |
| Disadvantaged | 19.6% | 20.0% | 18.9% | 20.7% | 18.9% | 18.2% | | | | | | | | |
| School level (%) | | | | | | | | | | | | | | |
| Advantaged | 89.2% | 90.5% | 90.6% | 86.8% | ------ | ------ | | | | | | | | |
| Disadvantaged | 10.8% | 9.5% | 9.4% | 13.2% | ------ | ------ | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1a (continued): UNC Race-Neutral Modeling Results for In-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |

Simulation 3: No racial preferences, family and neighborhood SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| White | 3,110 | 3,066 | 3,211 | 3,093 | 3,304 | 3,360 | 19,144 | 73.4% | 69.6% | 70.4% | 69.9% | 67.0% | 66.4% | 69.3% |
| Black | 348 | 376 | 377 | 355 | 415 | 431 | 2,302 | 8.2% | 8.5% | 8.3% | 8.0% | 8.4% | 8.5% | 8.3% |
| Hispanic | 186 | 195 | 226 | 231 | 289 | 342 | 1,469 | 4.4% | 4.4% | 5.0% | 5.2% | 5.9% | 6.8% | 5.3% |
| Asian | 468 | 478 | 576 | 507 | 631 | 654 | 3,314 | 11.0% | 10.9% | 12.6% | 11.5% | 12.8% | 12.9% | 12.0% |
| Other/Not available | 124 | 288 | 171 | 241 | 291 | 276 | 1,391 | 2.9% | 6.5% | 3.7% | 5.4% | 5.9% | 5.5% | 5.0% |
| | | | | | | | | | | | | | | |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.55 | 4.60 | 4.63 | 4.66 | 4.68 | 4.73 | | | | | | | | |
| SAT (mean) | 1,286 | 1,294 | 1,310 | 1,297 | 1,301 | 1,299 | | | | | | | | |
| Top decile (%) | 13.2% | 16.1% | 20.5% | 19.0% | 23.8% | 27.5% | | | | | | | | |
| Top two deciles (%) | 30.0% | 34.3% | 39.4% | 38.1% | 41.4% | 46.6% | | | | | | | | |
| | | | | | | | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 65.8% | 67.6% | 67.7% | 66.1% | 67.9% | 68.2% | | | | | | | | |
| Disadvantaged | 34.2% | 32.4% | 32.3% | 33.9% | 32.1% | 31.8% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 71.7% | 72.3% | 73.9% | 72.2% | 72.1% | 73.1% | | | | | | | | |
| Disadvantaged | 28.3% | 27.7% | 26.1% | 27.8% | 27.9% | 26.9% | | | | | | | | |
| School level (%) | | | | | | | | | | | | | | |
| Advantaged | 88.3% | 89.8% | 89.7% | 85.8% | ------ | ------ | | | | | | | | |
| Disadvantaged | 11.7% | 10.2% | 10.3% | 14.2% | ------ | ------ | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1a (continued): UNC Race-Neutral Modeling Results for In-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 4: No racial preferences, family, neighborhood, and school SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 3,088 | 3,039 | 3,189 | 3,063 | -------- | -------- | 12,379 | 72.9% | 69.0% | 69.9% | 69.2% | -------- | -------- | 70.2% |
| Black | 380 | 413 | 400 | 385 | -------- | -------- | 1,578 | 9.0% | 9.4% | 8.8% | 8.7% | -------- | -------- | 9.0% |
| Hispanic | 189 | 194 | 231 | 233 | -------- | -------- | 847 | 4.5% | 4.4% | 5.1% | 5.3% | -------- | -------- | 4.8% |
| Asian | 458 | 473 | 573 | 506 | -------- | -------- | 2,010 | 10.8% | 10.7% | 12.6% | 11.4% | -------- | -------- | 11.4% |
| Other/Not available | 121 | 284 | 168 | 240 | -------- | -------- | 813 | 2.9% | 6.5% | 3.7% | 5.4% | -------- | -------- | 4.6% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.55 | 4.59 | 4.63 | 4.66 | | | | | | | | | | |
| SAT (mean) | 1,282 | 1,289 | 1,306 | 1,293 | | | | | | | | | | |
| Top decile (%) | 13.1% | 16.0% | 20.4% | 18.8% | | | | | | | | | | |
| Top two deciles (%) | 29.6% | 33.9% | 38.9% | 37.5% | | | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 64.9% | 66.8% | 66.8% | 65.1% | | | | | | | | | | |
| Disadvantaged | 35.1% | 33.2% | 33.2% | 34.9% | | | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 71.2% | 71.8% | 73.4% | 71.8% | | | | | | | | | | |
| Disadvantaged | 28.8% | 28.2% | 26.6% | 28.2% | | | | | | | | | | |
| School level (%) | | | | | | | | | | | | | | |
| Advantaged | 83.4% | 85.9% | 86.0% | 81.2% | | | | | | | | | | |
| Disadvantaged | 16.6% | 14.1% | 14.0% | 18.8% | | | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1b: UNC Race-Neutral Modeling Results for Out-of-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Status Quo | | | | | | | | | | | | | | |
| White | 1,081 | 1,087 | 1,326 | 1,461 | 1,291 | 1,138 | 7,384 | 53.9% | 51.5% | 49.7% | 48.4% | 48.8% | 45.7% | 49.4% |
| Black | 277 | 242 | 342 | 324 | 257 | 284 | 1,726 | 13.8% | 11.5% | 12.8% | 10.7% | 9.7% | 11.4% | 11.6% |
| Hispanic | 246 | 247 | 321 | 368 | 345 | 336 | 1,863 | 12.3% | 11.7% | 12.0% | 12.2% | 13.0% | 13.5% | 12.5% |
| Asian | 294 | 326 | 484 | 585 | 487 | 544 | 2,720 | 14.7% | 15.5% | 18.1% | 19.4% | 18.4% | 21.9% | 18.2% |
| Other/Not available | 107 | 207 | 195 | 281 | 264 | 186 | 1,240 | 5.3% | 9.8% | 7.3% | 9.3% | 10.0% | 7.5% | 8.3% |
| Total | 2,005 | 2,109 | 2,668 | 3,019 | 2,644 | 2,488 | 14,933 | | | | | | | |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.29 | 4.35 | 4.38 | 4.41 | 4.43 | 4.47 | | | | | | | | |
| SAT (mean) | 1,409 | 1,417 | 1,419 | 1,419 | 1,427 | 1,421 | | | | | | | | |
| Top decile (%) | 26.0% | 31.2% | 32.9% | 33.8% | 39.3% | 38.4% | | | | | | | | |
| Top two deciles (%) | 46.7% | 51.0% | 0.541 | 57.0% | 59.5% | 59.7% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 86.5% | 87.0% | 85.3% | 85.0% | 88.4% | 85.1% | | | | | | | | |
| Disadvantaged | 13.5% | 13.0% | 14.7% | 15.0% | 11.6% | 15.0% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 94.4% | 94.1% | 93.1% | 94.3% | 95.3% | 94.3% | | | | | | | | |
| Disadvantaged | 5.6% | 5.9% | 6.9% | 5.7% | 4.7% | 5.7% | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1b (continued): UNC Race-Neutral Modeling Results for Out-of-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 1: No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 1,399 | 1,329 | 1,683 | 1,802 | 1,495 | 1,356 | 9,064 | 69.8% | 63.0% | 63.1% | 59.7% | 56.5% | 54.5% | 60.7% |
| Black | 47 | 37 | 63 | 62 | 50 | 48 | 307 | 2.3% | 1.8% | 2.4% | 2.1% | 1.9% | 1.9% | 2.1% |
| Hispanic | 65 | 110 | 135 | 144 | 141 | 163 | 758 | 3.2% | 5.2% | 5.1% | 4.8% | 5.3% | 6.6% | 5.1% |
| Asian | 423 | 380 | 607 | 724 | 674 | 721 | 3,529 | 21.1% | 18.0% | 22.8% | 24.0% | 25.5% | 29.0% | 23.6% |
| Other/Not available | 71 | 253 | 180 | 287 | 284 | 200 | 1,275 | 3.5% | 12.0% | 6.7% | 9.5% | 10.7% | 8.0% | 8.5% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.31 | 4.38 | 4.40 | 4.43 | 4.45 | 4.49 | | | | | | | | |
| SAT (mean) | 1,438 | 1,440 | 1,442 | 1,440 | 1,452 | 1,446 | | | | | | | | |
| Top decile (%) | 28.5% | 34.5% | 35.4% | 35.9% | 43.1% | 43.0% | | | | | | | | |
| Top two deciles (%) | 51.3% | 57.0% | 59.0% | 61.7% | 66.7% | 67.8% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 91.9% | 93.7% | 91.6% | 91.9% | 91.5% | 92.3% | | | | | | | | |
| Disadvantaged | 8.1% | 6.3% | 8.4% | 8.1% | 8.5% | 7.7% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 95.9% | 95.6% | 95.4% | 96.2% | 96.1% | 95.7% | | | | | | | | |
| Disadvantaged | 4.1% | 4.4% | 4.6% | 3.8% | 3.9% | 4.3% | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1b (continued): UNC Race-Neutral Modeling Results for Out-of-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 2: No racial preferences, family SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 1,321 | 1,247 | 1,561 | 1,695 | 1,394 | 1,268 | 8,486 | 65.9% | 59.1% | 58.5% | 56.1% | 52.7% | 51.0% | 56.8% |
| Black | 68 | 83 | 109 | 101 | 89 | 101 | 551 | 3.4% | 3.9% | 4.1% | 3.3% | 3.4% | 4.1% | 3.7% |
| Hispanic | 94 | 139 | 184 | 198 | 183 | 213 | 1,011 | 4.7% | 6.6% | 6.9% | 6.6% | 6.9% | 8.6% | 6.8% |
| Asian | 446 | 396 | 640 | 754 | 714 | 721 | 3,671 | 22.2% | 18.8% | 24.0% | 25.0% | 27.0% | 29.0% | 24.6% |
| Other/Not available | 76 | 244 | 174 | 271 | 264 | 185 | 1,214 | 3.8% | 11.6% | 6.5% | 9.0% | 10.0% | 7.4% | 8.1% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.30 | 4.36 | 4.39 | 4.42 | 4.43 | 4.48 | | | | | | | | |
| SAT (mean) | 1,421 | 1,422 | 1,425 | 1,425 | 1,434 | 1,429 | | | | | | | | |
| Top decile (%) | 26.4% | 30.7% | 32.7% | 34.2% | 39.0% | 39.3% | | | | | | | | |
| Top two deciles (%) | 47.3% | 51.9% | 53.9% | 57.9% | 61.1% | 62.1% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 70.3% | 71.3% | 69.4% | 74.0% | 70.1% | 68.1% | | | | | | | | |
| Disadvantaged | 29.7% | 28.7% | 30.6% | 26.0% | 29.9% | 31.9% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 94.7% | 94.0% | 93.4% | 94.8% | 94.9% | 93.7% | | | | | | | | |
| Disadvantaged | 5.3% | 6.0% | 6.6% | 5.2% | 5.1% | 6.3% | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.1b (continued): UNC Race-Neutral Modeling Results for Out-of-State Admissions

| | Number of admits | | | | | | | Share of admits | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Simulation 3: No racial preferences, family and neighborhood SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | | | | | | | | |
| White | 1,299 | 1,229 | 1,531 | 1,659 | 1,379 | 1,269 | 8,366 | 64.8% | 58.3% | 57.4% | 55.0% | 52.2% | 51.0% | 56.0% |
| Black | 94 | 121 | 152 | 137 | 126 | 129 | 759 | 4.7% | 5.7% | 5.7% | 4.5% | 4.8% | 5.2% | 5.1% |
| Hispanic | 109 | 149 | 205 | 225 | 206 | 235 | 1,129 | 5.4% | 7.1% | 7.7% | 7.5% | 7.8% | 9.4% | 7.6% |
| Asian | 424 | 379 | 613 | 733 | 682 | 677 | 3,508 | 21.1% | 18.0% | 23.0% | 24.3% | 25.8% | 27.2% | 23.5% |
| Other/Not available | 79 | 231 | 167 | 265 | 251 | 178 | 1,171 | 3.9% | 11.0% | 6.3% | 8.8% | 9.5% | 7.2% | 7.8% |
| Academic variables | | | | | | | | | | | | | | |
| GPA (mean) | 4.28 | 4.34 | 4.38 | 4.41 | 4.42 | 4.48 | | | | | | | | |
| SAT (mean) | 1,408 | 1,409 | 1,413 | 1,415 | 1,421 | 1,418 | | | | | | | | |
| Top decile (%) | 24.5% | 28.8% | 30.6% | 32.5% | 36.7% | 37.3% | | | | | | | | |
| Top two deciles (%) | 43.6% | 48.5% | 50.6% | 55.2% | 56.9% | 58.8% | | | | | | | | |
| SES variables | | | | | | | | | | | | | | |
| Family level (%) | | | | | | | | | | | | | | |
| Advantaged | 68.1% | 69.0% | 67.3% | 72.0% | 67.6% | 65.7% | | | | | | | | |
| Disadvantaged | 31.9% | 31.0% | 32.7% | 28.0% | 32.4% | 34.3% | | | | | | | | |
| Neighborhood level (%) | | | | | | | | | | | | | | |
| Advantaged | 82.2% | 81.4% | 81.6% | 86.0% | 82.8% | 80.1% | | | | | | | | |
| Disadvantaged | 17.8% | 18.6% | 18.4% | 14.0% | 17.2% | 19.9% | | | | | | | | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.2: UNC Race-Neutral Modeling Results for In-State and Out-of-State Admissions Combined (82% and 18%, respectively)

| | | | | Share of admits | | | |
|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| **Status Quo** | | | | | | | |
| White | 68.6% | 65.6% | 65.8% | 65.5% | 64.1% | 63.0% | 65.3% |
| Black | 10.0% | 9.2% | 9.8% | 9.0% | 9.0% | 8.8% | 9.3% |
| Hispanic | 6.0% | 6.4% | 6.7% | 6.7% | 6.7% | 7.3% | 6.6% |
| Asian | 11.6% | 11.5% | 13.1% | 12.5% | 13.4% | 14.6% | 12.9% |
| Other/Not available | 3.7% | 7.3% | 4.7% | 6.3% | 6.9% | 6.3% | 5.9% |
| Academic variables | | | | | | | |
| GPA (mean) | 4.52 | 4.56 | 4.60 | 4.63 | 4.65 | 4.71 | |
| SAT (mean) | 1,321 | 1,328 | 1,339 | 1,329 | 1,337 | 1,335 | |
| Top decile (%) | 15.6% | 18.9% | 22.9% | 21.8% | 27.1% | 30.3% | |
| Top two deciles (%) | 33.8% | 38.1% | 42.8% | 42.6% | 46.6% | 51.8% | |
| SES variables | | | | | | | |
| Family level (%) | | | | | | | |
| Advantaged | 78.0% | 78.4% | 78.2% | 77.0% | 80.7% | 80.4% | |
| Disadvantaged | 22.0% | 21.6% | 21.8% | 23.0% | 19.3% | 19.6% | |
| Neighborhood level (%) | | | | | | | |
| Advantaged | 83.6% | 82.5% | 84.1% | 82.8% | 84.5% | 85.2% | |
| Disadvantaged | 16.4% | 17.5% | 15.9% | 17.2% | 15.5% | 14.8% | |
| **Simulation 1: No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference** | | | | | | | |
| White | 76.2% | 71.2% | 72.3% | 70.9% | 68.6% | 67.4% | 70.9% |
| Black | 4.5% | 4.7% | 4.8% | 4.9% | 4.6% | 5.1% | 4.8% |
| Hispanic | 3.5% | 4.0% | 4.2% | 4.4% | 4.6% | 5.1% | 4.4% |
| Asian | 12.9% | 12.2% | 14.4% | 13.6% | 15.3% | 16.1% | 14.2% |
| Other/Not available | 2.9% | 7.8% | 4.2% | 6.2% | 6.8% | 6.3% | 5.8% |
| Academic variables | | | | | | | |
| GPA (mean) | 4.53 | 4.58 | 4.61 | 4.63 | 4.66 | 4.71 | |
| SAT (mean) | 1,332 | 1,337 | 1,349 | 1,338 | 1,346 | 1,344 | |
| Top decile (%) | 16.1% | 19.6% | 23.4% | 22.3% | 27.8% | 31.3% | |
| Top two deciles (%) | 34.8% | 39.5% | 44.0% | 43.7% | 48.2% | 53.7% | |
| SES variables | | | | | | | |
| Family level (%) | | | | | | | |
| Advantaged | 81.8% | 82.5% | 82.1% | 80.8% | 83.6% | 84.1% | |
| Disadvantaged | 18.2% | 17.5% | 17.9% | 19.2% | 16.4% | 15.9% | |
| Neighborhood level (%) | | | | | | | |
| Advantaged | 85.2% | 84.4% | 85.6% | 84.3% | 85.7% | 86.5% | |
| Disadvantaged | 14.8% | 15.6% | 14.4% | 15.7% | 14.3% | 13.5% | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.2 (continued): UNC Race-Neutral Modeling Results for In-State and Out-of-State Admissions Combined (82% and 18%, respectively)

| | Share of admits | | | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Simulation 2: No racial preferences, family SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | |
| White | 72.8% | 68.2% | 68.9% | 68.1% | 65.1% | 64.1% | 67.7% |
| Black | 6.4% | 6.8% | 6.6% | 6.3% | 6.7% | 7.1% | 6.7% |
| Hispanic | 4.3% | 4.9% | 5.3% | 5.3% | 5.9% | 6.7% | 5.5% |
| Asian | 13.4% | 12.6% | 15.0% | 14.1% | 15.8% | 16.2% | 14.6% |
| Other/Not available | 3.0% | 7.5% | 4.2% | 6.1% | 6.6% | 5.9% | 5.6% |
| Academic variables | | | | | | | |
| GPA (mean) | 4.52 | 4.57 | 4.60 | 4.63 | 4.64 | 4.70 | |
| SAT (mean) | 1,319 | 1,324 | 1,337 | 1,327 | 1,333 | 1,331 | |
| Top decile (%) | 15.7% | 18.8% | 22.8% | 21.8% | 26.9% | 30.1% | |
| Top two deciles (%) | 33.6% | 38.0% | 42.5% | 42.3% | 46.0% | 50.9% | |
| SES variables | | | | | | | |
| Family level (%) | | | | | | | |
| Advantaged | 68.4% | 69.6% | 69.6% | 69.2% | 70.2% | 70.1% | |
| Disadvantaged | 31.6% | 30.4% | 30.4% | 30.8% | 29.8% | 29.9% | |
| Neighborhood level (%) | | | | | | | |
| Advantaged | 83.0% | 82.5% | 83.3% | 82.1% | 83.6% | 83.9% | |
| Disadvantaged | 17.0% | 17.5% | 16.7% | 17.9% | 16.4% | 16.1% | |
| Simulation 3: No racial preferences, family and neighborhood SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | |
| White | 71.9% | 67.6% | 68.1% | 67.2% | 64.3% | 63.6% | 66.9% |
| Black | 7.6% | 8.0% | 7.8% | 7.4% | 7.8% | 7.9% | 7.7% |
| Hispanic | 4.6% | 4.9% | 5.4% | 5.6% | 6.2% | 7.2% | 5.7% |
| Asian | 12.9% | 12.1% | 14.5% | 13.8% | 15.1% | 15.5% | 14.1% |
| Other/Not available | 3.1% | 7.3% | 4.2% | 6.0% | 6.5% | 5.8% | 5.5% |
| Academic variables | | | | | | | |
| GPA (mean) | 4.50 | 4.55 | 4.59 | 4.62 | 4.63 | 4.69 | |
| SAT (mean) | 1,308 | 1,315 | 1,329 | 1,318 | 1,323 | 1,320 | |
| Top decile (%) | 15.2% | 18.4% | 22.3% | 21.4% | 26.1% | 29.3% | |
| Top two deciles (%) | 32.4% | 36.9% | 41.4% | 41.2% | 44.2% | 48.8% | |
| SES variables | | | | | | | |
| Family level (%) | | | | | | | |
| Advantaged | 66.2% | 67.9% | 67.6% | 67.2% | 67.8% | 67.8% | |
| Disadvantaged | 33.8% | 32.1% | 32.4% | 32.8% | 32.2% | 32.3% | |
| Neighborhood level (%) | | | | | | | |
| Advantaged | 73.6% | 73.9% | 75.3% | 74.7% | 74.0% | 74.4% | |
| Disadvantaged | 26.4% | 26.1% | 24.7% | 25.3% | 26.0% | 25.6% | |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx.

Table C.3: UNC Race-Neutral Modeling Results for In-State Admissions (Status Quo and Simulation 5 (4.5% Model))

| | Number of admits | | | | | Share of admits | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | Total | 2016 | 2017 | 2018 | 2019 | Total |
| **Status Quo** | | | | | | | | | | |
| White | 3,043 | 3,022 | 3,160 | 3,064 | 12,289 | 71.8% | 68.6% | 69.3% | 69.2% | 69.7% |
| Black | 389 | 383 | 414 | 383 | 1,569 | 9.2% | 8.7% | 9.1% | 8.7% | 8.9% |
| Hispanic | 196 | 229 | 251 | 241 | 917 | 4.6% | 5.2% | 5.5% | 5.4% | 5.2% |
| Asian | 464 | 470 | 545 | 488 | 1,967 | 11.0% | 10.7% | 11.9% | 11.0% | 11.2% |
| Other/Not available | 144 | 299 | 191 | 251 | 885 | 3.4% | 6.8% | 4.2% | 5.7% | 5.0% |
| Total | 4,236 | 4,403 | 4,561 | 4,427 | 17,627 | | | | | |
| | | | | | | | | | | |
| Academic variables | | | | | | | | | | |
| GPA (mean) | 4.57 | 4.61 | 4.64 | 4.67 | | | | | | |
| SAT (mean) | 1,302 | 1,308 | 1,321 | 1,309 | | | | | | |
| Top decile (%) | 13.4% | 16.2% | 20.7% | 19.1% | | | | | | |
| Top two deciles (%) | 30.9% | 35.3% | 40.3% | 39.4% | | | | | | |
| | | | | | | | | | | |
| SES variables | | | | | | | | | | |
| Family level (%) | | | | | | | | | | |
| Advantaged | 76.2% | 76.5% | 76.7% | 75.2% | | | | | | |
| Disadvantaged | 23.8% | 23.6% | 23.3% | 24.8% | | | | | | |
| Neighborhood level (%) | | | | | | | | | | |
| Advantaged | 81.2% | 79.9% | 82.1% | 80.3% | | | | | | |
| Disadvantaged | 18.8% | 20.1% | 17.9% | 19.7% | | | | | | |
| School level (%) | | | | | | | | | | |
| Advantaged | 84.1% | 85.5% | 85.3% | 78.8% | | | | | | |
| Disadvantaged | 15.9% | 14.5% | 14.7% | 21.2% | | | | | | |

Simulation 5 (4.5% Model)
No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference

| | Number of admits | | | | | Share of admits | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| White | 2,462 | 2,475 | 2,383 | 2,419 | 9,739 | 71.2% | 67.0% | 65.1% | 64.7% | 66.9% |
| Black | 411 | 468 | 479 | 491 | 1,849 | 11.9% | 12.7% | 13.1% | 13.1% | 12.7% |
| Hispanic | 172 | 199 | 220 | 237 | 828 | 5.0% | 5.4% | 6.0% | 6.3% | 5.7% |
| Asian | 324 | 352 | 449 | 423 | 1,548 | 9.4% | 9.5% | 12.3% | 11.3% | 10.6% |
| Other/Not available | 91 | 199 | 127 | 171 | 588 | 2.6% | 5.4% | 3.5% | 4.6% | 4.0% |
| Total | 3,460 | 3,693 | 3,658 | 3,741 | 14,552 | | | | | |
| | | | | | | | | | | |
| Academic variables | | | | | | | | | | |
| GPA (mean) | 4.68 | 4.70 | 4.74 | 4.77 | | | | | | |
| SAT (mean) | 1,315 | 1,318 | 1,334 | 1,320 | | | | | | |
| Top decile (%) | 18.1% | 21.0% | 27.1% | 25.4% | | | | | | |
| Top two deciles (%) | 40.1% | 43.9% | 50.8% | 49.3% | | | | | | |
| SES variables | | | | | | | | | | |
| Family level (%) | | | | | | | | | | |
| Advantaged | 76.7% | 77.6% | 76.8% | 74.6% | | | | | | |
| Disadvantaged | 23.3% | 22.4% | 23.2% | 25.4% | | | | | | |
| Neighborhood level (%) | | | | | | | | | | |
| Advantaged | 80.2% | 79.9% | 82.4% | 77.8% | | | | | | |
| Disadvantaged | 19.8% | 20.1% | 17.6% | 22.2% | | | | | | |
| School level (%) | | | | | | | | | | |
| Advantaged | 83.9% | 86.5% | 85.7% | 79.0% | | | | | | |
| Disadvantaged | 16.1% | 13.5% | 14.3% | 21.0% | | | | | | |

Note:
[1] The counts for Simulation 5 (4.5% Model) are based on applicants for whom NCERDC data is available.

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx, UNC0379834.xlsx, UNC0379835.xlsx, UNC0379836.xlsx, UNC0379837.xlsx, ACS_16_5YR_B19013_with_ann.xlsx, mb_2008_pub.sas7bdat, mb_2009_pub.sas7bdat, mb_2010_pub.sas7bdat, mb_2011_pub.sas7bdat, mb_2012_pub.sas7bdat, pcaudit_pub2013.sas7bdat, pcaudit_pub2014.sas7bdat, pcaudit_pub2015.sas7bdat.

Table C.4: Percentage of Admits Economically Disadvantaged, by Race, Year, and Race-Neutral Simulation Model (In-State Applicants)

| | | | Percentage Economically Disadvantaged | | | | |
|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| **Status Quo** | | | | | | | |
| White | 17.2% | 17.8% | 17.1% | 18.4% | 14.4% | 14.3% | 16.5% |
| Black | 51.7% | 53.3% | 52.7% | 54.8% | 53.8% | 54.9% | 53.5% |
| Hispanic | 45.9% | 44.1% | 41.0% | 51.9% | 47.9% | 51.0% | 47.2% |
| Asian | 32.1% | 30.0% | 29.9% | 29.1% | 23.8% | 20.4% | 27.0% |
| Other/Not available | 31.3% | 17.7% | 21.5% | 22.3% | 18.1% | 13.8% | 19.5% |
| **Simulation 1: No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference** | | | | | | | |
| White | 17.3% | 17.0% | 17.0% | 18.0% | 14.5% | 13.8% | 16.2% |
| Black | 26.7% | 30.7% | 29.9% | 33.9% | 30.6% | 35.5% | 31.2% |
| Hispanic | 31.8% | 29.2% | 25.6% | 36.6% | 35.3% | 37.9% | 33.0% |
| Asian | 31.0% | 28.6% | 29.8% | 28.7% | 23.6% | 19.7% | 26.4% |
| Other/Not available | 19.8% | 14.8% | 12.9% | 18.6% | 15.4% | 12.3% | 15.3% |
| **Simulation 2: No racial preferences, family SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference** | | | | | | | |
| White | 25.6% | 25.0% | 24.0% | 25.5% | 22.4% | 22.0% | 24.0% |
| Black | 56.6% | 61.2% | 56.6% | 58.5% | 62.1% | 68.2% | 60.6% |
| Hispanic | 56.5% | 52.4% | 48.6% | 58.1% | 67.4% | 71.5% | 59.7% |
| Asian | 43.0% | 40.0% | 41.0% | 40.5% | 34.9% | 28.8% | 37.4% |
| Other/Not available | 31.6% | 20.5% | 23.2% | 28.5% | 22.9% | 19.5% | 23.5% |
| **Simulation 3: No racial preferences, family and neighborhood SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference** | | | | | | | |
| White | 26.5% | 25.7% | 24.8% | 26.2% | 23.5% | 23.1% | 24.9% |
| Black | 68.5% | 71.9% | 68.4% | 70.7% | 73.8% | 77.8% | 71.9% |
| Hispanic | 61.8% | 52.4% | 52.3% | 62.9% | 73.1% | 81.3% | 64.9% |
| Asian | 43.0% | 39.8% | 41.1% | 41.1% | 35.3% | 29.4% | 37.7% |
| Other/Not available | 34.1% | 22.5% | 25.7% | 29.9% | 25.6% | 21.2% | 25.6% |
| **Simulation 4: No racial preferences, family, neighborhood, and school SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference** | | | | | | | |
| White | 26.9% | 25.7% | 25.2% | 26.4% | -------- | -------- | 26.0% |
| Black | 75.3% | 80.4% | 73.1% | 76.8% | -------- | -------- | 76.3% |
| Hispanic | 64.4% | 53.2% | 55.7% | 65.2% | -------- | -------- | 59.4% |
| Asian | 42.9% | 40.2% | 42.2% | 42.5% | -------- | -------- | 42.0% |
| Other/Not available | 34.6% | 22.5% | 25.5% | 30.6% | -------- | -------- | 27.4% |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx, UNC0379834.xlsx, UNC0379835.xlsx, UNC0379836.xlsx, UNC0379837.xlsx, ACS_16_5YR_B19013_with_ann.xlsx, mb_2008_pub.sas7bdat, mb_2009_pub.sas7bdat, mb_2010_pub.sas7bdat, mb_2011_pub.sas7bdat, mb_2012_pub.sas7bdat, pcaudit_pub2013.sas7bdat, pcaudit_pub2014.sas7bdat, pcaudit_pub2015.sas7bdat.

Table C.4 (continued): Percentage of Admits Economically Disadvantaged, by Race, Year, and Race-Neutral Simulation Model (Out-of-State Applicants)

| | Percentage Economically Disadvantaged | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Status Quo | | | | | | | |
| White | 8.4% | 8.2% | 8.4% | 9.3% | 7.1% | 10.6% | 8.7% |
| Black | 28.5% | 35.1% | 37.1% | 34.9% | 35.0% | 34.2% | 34.2% |
| Hispanic | 19.1% | 18.2% | 24.0% | 27.5% | 13.9% | 19.6% | 20.6% |
| Asian | 14.3% | 11.0% | 12.4% | 14.0% | 11.1% | 11.6% | 12.4% |
| Other/Not available | 11.2% | 9.2% | 9.2% | 7.8% | 9.5% | 13.4% | 9.8% |
| Simulation 1: No racial preferences, no SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | |
| White | 7.4% | 6.2% | 8.4% | 7.1% | 7.1% | 7.0% | 7.2% |
| Black | 5.6% | 3.9% | 5.1% | 5.9% | 9.4% | 4.4% | 5.7% |
| Hispanic | 4.1% | 5.7% | 7.7% | 8.9% | 5.9% | 7.6% | 6.8% |
| Asian | 16.9% | 8.5% | 12.5% | 12.6% | 13.6% | 10.6% | 12.3% |
| Other/Not available | 6.4% | 7.0% | 5.4% | 5.7% | 8.6% | 8.9% | 7.0% |
| Simulation 2: No racial preferences, family SES preference, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | |
| White | 29.5% | 27.1% | 29.5% | 23.9% | 26.3% | 30.7% | 27.7% |
| Black | 15.1% | 25.1% | 21.7% | 20.4% | 26.4% | 27.1% | 22.5% |
| Hispanic | 22.5% | 28.1% | 32.3% | 31.1% | 27.6% | 34.6% | 29.8% |
| Asian | 52.4% | 37.7% | 42.7% | 35.6% | 46.3% | 37.4% | 41.2% |
| Other/Not available | 23.6% | 27.5% | 20.9% | 16.2% | 23.6% | 25.6% | 22.4% |
| Simulation 3: No racial preferences, family and neighborhood SES preferences, no legacy preference, no early decision preference, no female preference; includes athletic preference | | | | | | | |
| White | 30.4% | 27.1% | 29.6% | 24.3% | 27.3% | 31.1% | 28.1% |
| Black | 22.8% | 40.3% | 33.5% | 30.1% | 39.7% | 36.4% | 33.5% |
| Hispanic | 27.0% | 32.7% | 37.5% | 35.7% | 32.7% | 40.6% | 34.8% |
| Asian | 53.2% | 37.5% | 42.9% | 36.4% | 47.0% | 39.0% | 41.9% |
| Other/Not available | 24.3% | 28.3% | 19.8% | 17.0% | 23.1% | 24.7% | 22.4% |

Sources: MainDataA.csv, MainDataB.csv, MainDataC.csv, MainDataD.csv, UNC0379828.xlsx, UNC0379829.xlsx, UNC0379834.xlsx, UNC0379835.xlsx, UNC0379836.xlsx, UNC0379837.xlsx, ACS_16_5YR_B19013_with_ann.xlsx, mb_2008_pub.sas7bdat, mb_2009_pub.sas7bdat, mb_2010_pub.sas7bdat, mb_2011_pub.sas7bdat, mb_2012_pub.sas7bdat, pcaudit_pub2013.sas7bdat, pcaudit_pub2014.sas7bdat, pcaudit_pub2015.sas7bdat.