# EXHIBIT 124

**Excerpts from Deposition Transcript Vol. II of Abigail Panter**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-00954

STUDENTS FOR FAIR
ADMISSIONS, INC.,

                    Plaintiffs,

     vs.

UNIVERSITY OF NORTH
CAROLINA, et al.,

                    Defendants.

_____

DEPOSITION
OF
ABIGAIL PANTER - VOLUME II

THIS DEPOSITION CONTAINS HIGHLY CONFIDENTIAL AND
PROPRIETARY INFORMATION AND IS SUBJECT TO A PROTECTIVE
ORDER RESTRICTING PUBLIC DISCLOSURE OF ITS CONTENTS

_____

TAKEN AT THE OFFICES OF:
THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
222 East Cameron Avenue
110 Bynum Hall
Chapel Hill, NC  27514

12-04-18
8:28 A.M.

_____

Joanne Floch
Court Reporter

Civil Court Reporting, LLC
P.O. Box 1146
Clemmons, NC  27012
(336) 406-7684

1          Did I read that correctly?

2     A.    Yes.

3     Q.    I believe this is what you made

4     reference to before in part, right, the previous

5     work of the Race-Neutral Alternatives Group that

6     -- that your Committee picked up on that work?

7     A.    Yes.

8     Q.    Okay.  And if you go to the next

9     paragraph it states that "The Subcommittee

10    reviewed literature about the three race-neutral

11    admission strategies: 1) percent plans, 2)

12    socioeconomic affirmative action programs, and 3)

13    race-neutral diversity essays."

14          Did I read that correctly?

15    A.    Yes.

16    Q.    Okay.  So the Subcommittee reviewed

17    literature about those different strategies,

18    right?

19    A.    Yes.

20    Q.    Okay.  If you go to the next paragraph,

21    at the start -- the first sentence in the next

22    paragraph says, "Research generally suggests that

23    percent plans are unlikely to be effective and

24    efficient substitutes for admission strategies

25    that overtly consider race."

1     2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 3 of 22

```
1                    Did I read that correctly?

2        A.    Yes.

3        Q.    So am I correct to understand that that

4   was a conclusion of the Literature Review

5   Subcommittee?

6        A.    It was a conclusion based on what the

7   data looked like -- the research looks like in the

8   update of the work that was done from the prior

9   Committee.  And based on the individual

10  institutions where top X percent plans were

11  implemented.

12       Q.    Understood.  So based on those things it

13  was a conclusion drawn by the Literature Review

14  Subcommittee?

15       A.    Yes.

16       Q.    Great.  If you could go to the next

17  paragraph, which is at the bottom of that page and

18  then goes over onto the next page, page 6.  I'm

19  going to read part of that.  It says, "This

20  literature review has cast doubt on the utility of

21  race-neutral strategies as complete substitutes

22  for overt considerations of race.  Still, the

23  literature suggests that the outcomes of race-

24  neutral admission strategies vary depending on the

25  circumstances surrounding the particular
```

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 4 of 22

 1    simulations.

 2         A.   Correct.

 3         Q.   Correct?  Thanks.  Okay.  I want to look

 4    at the number 2 on that same page.  Do you see

 5    where it says the Data Analytic Subcommittee?

 6         A.   Yes.

 7         Q.   Okay.  I'm going to read the first

 8    sentence of that paragraph.  It says "This

 9    subcommittee conducted an analysis designed to

10    empirically examine the role of various

11    undergraduate applicant factors including race

12    ethnicity that were considered as a part of the

13    holistic admissions process during the 2016 to

14    2017 application cycle and presented its findings

15    to the larger Committee."

16              Did I read that correctly?

17         A.   Yes.

18         Q.   So this describes the various models

19    that the Data Analytic Subcommittee created that

20    showed the effect of different variables in the

21    admissions process, correct?

22         A.   Yes.

23         Q.   Okay.  All right.  I'm going to go on

24    from there where I left off.  The passage reads,

25    "The subcommittee also developed infrastructure

 1    2-04-18       SFFA v UNC, et al./1:14CV00954              COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 5 of 22

 1          for statistical and data analyses that ultimately

 2          can be used to evaluate potential race-neutral

 3          alternatives strategies."

 4                    Did I read that correctly?

 5          A.    Yes.

 6          Q.    Okay.  And is this meant to refer to

 7     what you and I were just talking about that this

 8     Committee -- or I'm sorry, that the Data Analytics

 9     Subcommittee has engaged in substantial

10     preparations towards doing race-neutral

11     simulations?

12                    MS. COMBS:  Objection.

13          A.    This sentence is talking about the

14     preparations for this particular set of models

15     that were being evaluated.

16          Q.    (Mr. McCarthy)  Okay.  So when we were

17     talking before about the preparations that the

18     Data Analytic Subcommittee has engaged in that

19     will eventually lead to the conducting of race-

20     neutral simulations, does that include that the

21     Data Analytic Subcommittee has at least begun

22     building the infrastructure in order to do that?

23          A.    Yes.  All of this is relevant.

24          Q.    Okay.  The last sentence on this page,

25     I'm going to read that real quick.  It says the

 1     2-04-18       SFFA v UNC, et al./1:14CV00954              COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 6 of 22

1    socioeconomic status?  Is that correct?

2                    MS. COMBS:  Objection.

3         A.    What do you mean by this?

4         Q.    (Mr. McCarthy)  I'm sorry.  The -- this

5    spreadsheet with the data on parent and student

6    income.

7         A.    Well, this tells us nothing because it's

8    not linked to -- it just tells us descriptive

9    information about each variable and how they

10   relate, but it does -- tells us nothing about the

11   student level information tied to an applicant.

12        Q.    Understood.  Understood.  I know it's

13   de-identified.  So is this spreadsheet meant to be

14   illustrative of the kind of data that is available

15   on applicant socioeconomic status?

16        A.    It is -- it presents some data that are

17   available.  I don't know if it's intent was to be

18   illustrative.  We intended to have identified

19   data.

20        Q.    Okay.  And what -- if you intended to

21   have identified data, what would that identified

22   data be used for?

23        A.    To understand how variables that are

24   currently being used in the admissions process

25   relate to highly relevant variables of interest

1    2-04-18        SFFA v UNC, et al./1:14CV00954            COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 7 of 22

1    that have been identified for potential race-

2    neutral options later.

3         Q.   Understood.  So I want to see if I

4    understand this correctly.  The Committee on Race-

5    Neutral Strategies was at this time evaluating

6    some income and asset data that is available about

7    students in order to help determine its potential

8    in a possible race-neutral alternative.

9              MS. COMBS:  Objection.

10        Q.   (Mr. McCarthy)  Is that correct?

11        A.   To adequately assess alternatives that

12   have been raised by our working group and in the

13   -- in the literature at large, so the social

14   science and the legal literature at large.  We

15   want to ensure that we can look at financial data

16   that are available and we are exploring ways to

17   evaluate the financial data.

18        Q.   Great.  So there is income and asset

19   data available to the University, correct?

20              MS. COMBS:  Objection.

21        A.   I can only tell you what's available to

22   us.

23        Q.   (Mr. McCarthy)  Right.  And so that's --

24   that's what I'm saying so the University has some

25   income and asset data on admitted students

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 8 of 22

1    example, that measuring them on one single

2    variable can lead to issues that, in fact, they

3    could be more potentially better specified if they

4    were individually examined.

5         Q.   Okay.  If we look at the top of the next

6    page, it says, "Income, what do we have and what

7    do we want."  Does this relate to the Committee's

8    search for available data on income and assets and

9    the like?

10        A.   Yes.

11        Q.   Has the Committee figured out the extent

12   of data that's actually available to it on income

13   and assets?

14        A.   We're working on it.  It's a difficult

15   question because of the federal mandates around

16   the -- how income data are kept.  But we're

17   working on trying to get proxies for SES in any

18   way we can and trying to understand to what extent

19   those proxies are good representations of the kind

20   of income data that we ideally would have.

21        Q.   And ideally would have, do you mean that

22   there's income and/or asset data that if the

23   Committee had, it would think that those would be

24   very useful in making a proxy for SES status?

25                  MS. COMBS:  Objection.

1    2-04-18      SFFA v UNC, et al./1:14CV00954         COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 9 of 22

 1          A.   We are responding from what we read in

 2     the literature and what other institutions have

 3     done, have completed.  And when we're thinking

 4     about race-neutral alternatives that are on --

 5     based on SES or class based or financial or

 6     economic based, that class of -- of race-neutral

 7     options.  For us to consider those options in a

 8     responsible way, we need to make sure that we have

 9     the best quality data that we can get about

10     applicants and students who are here at UNC.

11          Q.   (Mr. McCarthy)  Okay.  And when you say

12     the best quality data in this back and forth we're

13     having, you mean with regard to income and assets?

14          A.   Yes.

15          Q.   Okay.  Thanks.  Okay.  If you turn to

16     page number 3, and I should say this is listed

17     under a header of "Action Steps" ---

18          A.   Uh-huh (yes).

19          Q.   --- from the previous page.

20          A.   Yes.

21          Q.   Okay, 3 reads, "Is there an experiment

22     that we could run in the office, controlled

23     experiment, random subsample of applications this

24     admission cycle?"  What does that mean?

25          A.   It means that at any point if we were to

 1     2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 10 of 22

1    identify a potential race-neutral option, we could

2    design a controlled experiment with a random

3    subset of the applicants that have been -- that

4    have come forth within an application cycle and

5    maybe even this application cycle, to have readers

6    look at those -- the applications with or without

7    certain information.

8         Q.   Okay.  So in other words -- I just want

9    to make sure I understand.  So the normal

10   admissions process is going as usual and a set of

11   application files are sort of duplicated and given

12   to other readers, but without certain information

13   that had been evaluated to see what results

14   would ---

15        A.   That's a -- a potential.  The -- the

16   readers would be trained readers that would be

17   interchangeable with the kinds of readers that are

18   typically looked at.  They wouldn't be real

19   decisions at this time.

20        Q.   Right.

21        A.   They would be decisions of what would

22   the readers have -- what decisions would the

23   readers have made based on of admissions based on

24   the information that's present.

25        Q.   Understood.  So there'd be comparable

1    2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

1    readers who are trained comparably but evaluating

2    just for the purposes of this research, not making

3    actual admissions decisions, but evaluating the

4    same application files with some slight change to

5    the available data to see how that would come out?

6        A.    Yes.  And this is consistent with the

7    kinds of controlled experiments that are conducted

8    in some admissions offices as part of research in

9    this area.

10        Q.    Understood.  Makes sense.  Has

11    thesSubcommittee or the larger Committee made any

12    decisions to do this kind of experiment?

13        A.    Not yet, but we're very close because we

14    have certain variables that we think are really

15    primed for looking at, at least in a preliminary

16    way.  An example is that the College Board has an

17    environmental dashboard that is available to us

18    that includes information about neighborhood,

19    family, academic, school, variables that are

20    aggregate variables that could be presented for

21    each application with the application review.  And

22    that is something that could be evaluated with and

23    without the presence of the dashboard information.

24        Q.    Understood.  So if I understand that

25    example.  Just want to see.  That would be an idea

1    2-04-18        SFFA v UNC, et al./1:14CV00954            COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 12 of 22

 1      to run this type of experiment we've been

 2      discussing on a subset of applications augmented

 3      by some College Board data that gives information

 4      about neighborhood, family, school and see what

 5      the results of that experiment might be.

 6           A.   Without race and ethnicity included.

 7           Q.   Right, I'm sorry.  Without race and

 8      ethnicity included to see if -- if those variables

 9      from the College Board would work as a useful

10      alternative to using race and ethnicity, correct?

11           A.   Those are -- those are potential areas

12      of -- of studies.

13           Q.   Understood.  Okay.  And do I have it

14      correct that the subcommittee and Committee are

15      close to making a decision on whether to do that

16      kind of experiment?

17           A.   We have to receive the data from College

18      Board first and look at the -- them in relation to

19      the models that we've been looking at.  And at

20      that point we will be able to look -- the

21      University, itself does not use the dashboard yet

22      overall, so there's some logistics that are --

23      about the transfer of data, the ensuring that we

24      would have access to the dashboard, but we have

25      been -- that is the direction that we're moving.


 1     2-04-18        SFFA v UNC, et al./1:14CV00954              COPY

1      Q.    Understood.  So it's a direction you're

2   moving but it sounds like there's multiple steps

3   in the process until such time as this kind of

4   experiment might ever be done.

5      A.    Yes.  We have to transfer admissions

6   data to the College Board.  They have to provide

7   the 30-plus metrics around, that are based on

8   national data sets, back to us and then we have to

9   incorporate them, augment our data sets and then

10   examine the quality of those data.

11      Q.    Okay.  And I don't know if you have an

12   answer to this but my guess is that that kind of

13   process -- if that kind of experiment is

14   ultimately done, it would not be done this

15   admission cycle.

16      A.    Well, actually ---

17      Q.    Correct?

18      A.    --- it's not -- it's not the case that

19   we know that yet.   The admission cycle exists and

20   it's going to happen.  In fact, we -- we probably

21   shouldn't interfere with what is going on with the

22   admission cycle at this moment since they're in

23   the midst of it.  So really what we need to know

24   is the set of decisions made by this admission

25   cycle and then -- or any prior admission cycles

1   2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 14 of 22

1    and the setup of the -- the sub -- the experiment

2    that we would run where we -- we'd look, again, at

3    a subset of the applications without race and

4    ethnicity and with the presence of the

5    dashboard ---

6         Q.   Understood.

7         A.   --- formation.

8         Q.   Understood.

9         A.   And then decisions are made and

10   compared.

11        Q.   Sorry, jumping ahead of you.  So I think

12   I understand.  I -- I had a misunderstanding in my

13   head before.  So if this kind of experiment were

14   done, it sounds like it would not be done in

15   parallel with the actual admissions process.  It

16   would be done with a set of application files from

17   which admissions decisions had already been made

18   so that you could then evaluate, okay, how does

19   the experiment compare with what actually happened

20   with those files as they existed when they were

21   considered by the admissions office.

22        A.   Yes.

23        Q.   Okay.  That makes sense.  Okay.

24             MS. COMBS:  Reach a good point for

25   a break soon?

1    2-04-18      SFFA v UNC, et al./1:14CV00954           COPY

```
 1                         MR. MCCARTHY:  Yeah, I think I've
 2      got a couple more questions on this and then we
 3      can take a break and then we'll go for about an
 4      hour, leaving you a couple minutes to get to your
 5      1:00 meeting?
 6                         THE WITNESS:  Okay.
 7                         MR. MCCARTHY:  Make sense?
 8                         THE WITNESS:  Sounds good.
 9                         MS. COMBS:  Yep.
10                         MR. MCCARTHY:  That work?  Okay.
11                         MS. COMBS:  Works for us.
12          Q.   (Mr. McCarthy)  Can we turn to the next
13      page?  Do you see next to the number 4?
14          A.   Yes.
15          Q.   The note reads, "Understanding the
16      processes of admitted versus enrolled."  Can you
17      tell me what that means?
18          A.   Yes.  The -- there's quite a bit of
19      literature around the differences between the
20      decision of being admitted versus not versus
21      enrolled versus not and what happens between the
22      admit time and the matriculation time.
23          Q.   Okay.  So this is yield analysis,
24      essentially?
25          A.   Yes.  Some -- with additional variables
```

```
 1      2-04-18      SFFA v UNC, et al./1:14CV00954         COPY
```

1    of understanding what other factors are coming

2    into play.

3         Q.   Okay.  What other factors are coming

4    into play in the decision by an applicant who's

5    been admitted to enroll or not enroll?

6         A.   Correct.

7         Q.   Got it.  Okay.  Below that, there's a

8    header that says "Lab meetings."

9         A.   Yes.

10        Q.   Within that about the fifth or sixth

11   model down, it says "MK will do boots on the

12   ground causal models."  Do you recall what that

13   means?

14        A.   Yes.

15        Q.   What does that mean?

16        A.   Well, he's the -- he's a national expert

17   on causal modeling and so he will be supervising

18   the causal modeling piece of it especially.

19        Q.   Understood, so -- and by causal

20   modeling, do you mean ---

21        A.   The random forest modeling.

22        Q.   Understood.

23        A.   And other models that are related to

24   adjusting weights, the different weights of

25   variables and predicting what the outcomes would


1    2-04-18      SFFA v UNC, et al./1:14CV00954            COPY

 1          be.

 2               Q.   Like the ones that we looked at a little

 3          bit ago.

 4               A.   Yes.  It's -- there's another series of

 5          models that involve the -- the intentional

 6          reweighting of variables in particular ways to

 7          produce outcomes and whether or not they can

 8          produce similar kinds of outcomes as what we get

 9          now.

10               Q.   Okay.  So in other words the -- like the

11          simulations of race-neutral alternatives?

12               A.   They are ---

13               Q.   Like is that an example of what you

14          mean?

15               A.   It's the change in the weights if we

16          apply different weights for -- for example fee

17          waiver.  Much -- many more higher weight or higher

18          weight for any other first generation college

19          student.  What happens to the outcome.  Those

20          kinds of discussions.

21               Q.   The point is he will do those when the

22          time comes to do those.

23               A.   Yes.  Yes, overall.  He's doing them

24          now.

25                         MR. MCCARTHY:  Okay.  And that's it

 1     2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

Case 1:14-cv-00954-LCB-JLW   Document 162-31   Filed 01/18/19   Page 18 of 22

```
 1        for now.  Why don't we take a short break and then
 2        we'll go for about an hour and then that'll be it.
 3        Okay?
 4                    MS. COMBS:   All right.
 5        (Brief recess: 11:53 a.m. to 12:00 p.m.)
 6                    (EXHIBIT NUMBER 7 WAS MARKED)
 7             Q.   (Mr. McCarthy)  Dr. Panter, I'm going to
 8        hand you what's marked as Exhibit 7.  That's an
 9        email with an attachment to it.  I think the
10        attachment with it is there for completeness.  I
11        don't think we'll talk about it all.  So let's
12        just look at the email that's at the front of this
13        Exhibit Number 7 here.  Do you see that?
14             A.   Yes.
15             Q.   Do you recognize this email?
16             A.   Yes.
17             Q.   Okay.  Can you tell me what it is?
18             A.    It's an email from me to the Race-
19        Neutral Committee -- Strategies Committee.
20             Q.   And what is -- what are you doing in
21        this email?
22             A.   This email, I'm providing the interim
23        report so that they can provide comment.
24             Q.   Understood.  So you were soliciting
25        comment on the Draft Interim Report, correct?
```

```
 1    2-04-18      SFFA v UNC, et al./1:14CV00954          COPY
```

1    Committee on Race-Neutral Strategies has been

2    following?

3         A.    Yes.

4         Q.    Okay.  And other than following it, has

5    the Committee on Race-Neutral Strategies engaged

6    in discussions of whether or not this might be a

7    recommendation to make it to the University of

8    North Carolina?

9         A.    We're not at that point.

10        Q.    Okay.  If you flip a couple pages,

11   you'll see that another document that was attached

12   to his email at the front of this exhibit,

13   "Inventory of assessments related to the delivery

14   of educational benefits of diversity and

15   inclusion."

16             I don't want to go through this document

17   at length but can you tell me where it is

18   generally?

19        A.    Yes.  We administered a survey to

20   diversity liaisons all around the University and

21   we collected different assessments that are -- are

22   ongoing in many of these locations and we

23   collected them and put them in a common format so

24   that we could access them and understand what the

25   University is collecting regularly on the

1    2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

1    educational benefits of diversity and inclusion

2         Q.   Okay.  And what is the -- what is the

3    purpose of this analysis, this creation of this

4    inventory?

5         A.   It's to coordinate the assessment around

6    -- around educational benefit and -- benefits of

7    diversity and inclusion like the charge of our --

8    our Working Group is to have an understanding of

9    what we are -- what we are assessing regularly on

10   this topic.

11        Q.   Okay.  So is -- is the idea here that

12   the Working Group wanted to get a full

13   understanding of all of the information across the

14   entire campus that might be available and worth

15   considering in this discussion of the educational

16   benefits of diversity?

17        A.   As much as we can because it's a moving

18   target.

19        Q.   Understood.  And it's a pretty big

20   university.

21        A.   Yes.

22        Q.   Okay.  Who is responsible for the

23   compiling and the authoring of this document?

24        A.   The Office of Institutional Research and

25   Assessment, especially Lynn Williford.

1    2-04-18      SFFA v UNC, et al./1:14CV00954          COPY

```
 1              Q.    Okay.  And she is a member of the EBD
 2       Working Group, correct?
 3              A.    Yes, she is.
 4              Q.    Okay.  And on the Assessment Subgroup?
 5              A.    Yes.
 6              Q.    Okay.  To help me -- I want to see if
 7       maybe this helps me understand what's in here.  Is
 8       your post as a professor within the Psychology
 9       Department?
10              A.    Psychology and Neuroscience.
11              Q.    Okay.  So ---
12              A.    And -- yes.
13              Q.    So I'm looking here at page 2 of this
14       document under Academic Departments, down the left
15       side it says Psychology Department.  Do you see
16       that?
17              A.    Okay.  Yes.
18              Q.    And so first I just want to ask, this is
19       the department of which you're a member and in
20       your capacity as a professor?
21              A.    Yes.
22              Q.    Okay.  And did -- are you, by chance,
23       the diversity liaison ---
24              A.    No.
25              Q.    --- for that school?
```

```
 1       2-04-18       SFFA v UNC, et al./1:14CV00954          COPY
```