**EXHIBIT 125**

**Expert Reply Report of Bridget Terry Long, Ph.D.,
dated June 8, 2018**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**Expert Reply Report of**
**Bridget Terry Long, Ph.D.**
**Saris Professor of Education and Economics**
**Harvard Graduate School of Education**

**June 8, 2018**

# I.  SUMMARY AND INTRODUCTION

1.      In this reply report, I respond to the opinions put forth by Richard Kahlenberg in his rebuttal report for the Plaintiff, which responded to my opening expert report.  Nothing within Mr. Kahlenberg's rebuttal report changes any of the opinions I previously expressed in either my opening report or my rebuttal report.

2.      To the contrary, Mr. Kahlenberg's rebuttal report and opinions reinforce the numerous shortcomings that were present in his opening report—many of which I have already responded to in my rebuttal report.  Mr. Kahlenberg continues to make incorrect, overreaching statements in his review of the literature, including research on the implementation of race-neutral alternative admissions plans. For example:

   a.   Mr. Kahlenberg continues to ignore the quality of research studies in drawing his conclusions, and there are stark differences between the studies he relies upon versus the ones I do in terms of quality and how convincing the studies are.  Mr. Kahlenberg's observations are not supported by rigorous evidence, and he overstates the conclusions on the effectiveness of race-neutral approaches that have been tried.

   b.   Mr. Kahlenberg's broad, cursory survey of race-neutral alternatives relies on institutions that are not analogous to UNC-Chapel Hill.

   c.   Mr. Kahlenberg continues to present theoretical suggestions that are untested, infeasible, or unlikely to work for other reasons.

3.      Beyond the weaknesses of his review of the research literature, Mr. Kahlenberg mischaracterizes the conclusions from my report by suggesting that my report focuses on race-neutral alternatives being used in isolation.  To the contrary, my review acknowledges many of the admissions practices that Mr. Kahlenberg advocates for, and in most cases, the research I discuss examines the impact of a race-neutral approach being used *in conjunction with* other admissions practices.  Even when race-neutral approaches are implemented as part of a larger collection of admissions practices, they have still been found to be ineffective.  Indeed, I also note that UNC-Chapel Hill already uses many of the admissions practices that Mr. Kahlenberg advocates for, such as targeted financial aid for low-income students.

4.      Finally, Mr. Kahlenberg's opinions in his rebuttal report continue to display his disclosed bias in favor of socioeconomic diversity, which is a distinctly different goal than racial and ethnic diversity.  Moreover, as documented in multiple studies by multiple teams of researchers, admissions policies that are meant to increase socioeconomic diversity have not also been able to maintain levels of racial and ethnic diversity.  The implication is that one likely cannot use admissions policies focused on socioeconomic diversity as a replacement for policies that take into account race and ethnicity in a holistic admissions process.

## II. MR. KAHLENBERG CONTINUES TO ASSUME A SOCIOECONOMIC STATUS-BASED PLAN COULD BE AN EFFECTIVE RACE-NEUTRAL ALTERNATIVE, BUT THE EVIDENCE STATES THIS IS NOT CORRECT.

5.      As I discussed in both my opening and rebuttal reports, for any socioeconomic admissions plan to produce high levels of racial and ethnic diversity, there must be a strong connection between socioeconomic status ("SES") and race (Long Report ¶¶ 125, 131-131; Long Rebuttal Report ¶ 10). My review of the research evidence concludes that the correlation between these two factors is in fact not strong enough to make SES-based plans a workable race-neutral alternative. However, instead of discussing this overwhelming evidence that is counter to his conclusion, Mr. Kahlenberg incorrectly makes the assertion that I ignore the connection between race and wealth (Kahlenberg Rebuttal Report, p. 5).

6.      In reality, my opening report does not ignore the importance of wealth or the benefits of socioeconomic diversity. But, as I discuss in greater detail below, reliable wealth information is not available to institutions nor has it been used regularly within higher education admissions. Moreover, contrary to Mr. Kahlenberg's assertions, I recognize that socioeconomic status is correlated with race and ethnicity and discuss the rationale behind the advocacy for socioeconomic-based admissions policies (Long Report ¶¶ 123, 125, and 126). However, I also underscore that for a SES-based plan to produce sufficiently high levels of racial diversity (or to maintain previous levels of racial and ethnic diversity), the correlation between race and socioeconomic status must be quite strong. This is a necessary condition for Mr. Kahlenberg's assertions to be correct, but the research evidence demonstrates that SES and race are not interchangeable thus the link between race and socioeconomic status is not strong enough for an SES-based admissions approach to serve as a successful race-neutral alternative.

7.      As I explained in my opening and rebuttal reports, there have been many studies that have investigated the possible effects of using socioeconomic-based admissions preferences, but the studies that are the most convincing (due to the high quality of the data used and utilizing research approaches that best approximate reality) suggest that such an admissions policy would not replicate levels of racial and ethnic diversity (Reardon, et al., 2015; Bowen, Kurzweil, and Tobin, 2005; Cancian, 1998).[1] The reason the theory does not work in practice is because, while many applicants of color are low-income, there are many more White students who are poor in absolute numbers. Therefore, an admissions process that gives preference to socioeconomic status will result in many White but few Black and Latino admits. In contrast, as I also explained, it is only simulations that are limited in scope and reflect only the short-term effects of socioeconomic-based admissions preferences that are more optimistic about the possible role of a class-based admissions plan, but these studies do not give reliable and complete answers on the effects of this approach (Long Report ¶¶ 137, 142-146).

---

[1] Reardon, Sean F, Rachel Baker, Matt Kasman, Daniel Klasik, and Joseph B Townsend. (2015). *Can Socioeconomic Status Substitute for Race in Affirmative Action College Admissions Policies? Evidence from a Simulation Model.* Princeton, NJ: Educational Testing Service. Bowen, William G., Martin A. Kurzweil, and Eugene M. Tobin. (2005). *Equity and Excellence in American Higher Education.* University of Virginia Press. Cancian, Maria. "Race-Based versus Class-Based Affirmative Action in College Admissions." *Journal of Policy Analysis and Management* 17, no. 1 (1998): 94-105. See also Long Report ¶¶ 147-150; Long Rebuttal Report ¶¶ 14-29.

Case 1:14-cv-00954-LCB-JLW   Document 162-32   Filed 01/18/19   Page 4 of 13

### III.     MR. KAHLENBERG FAILS TO CONSIDER THE FEASIBILITY AND LIMITATIONS OF THE APPROACHES HE PROPOSES.

8.     Mr. Kahlenberg attempts to avoid the evidence that SES-based policies are not successful race-neutral alternatives by advocating for a broader definition of socioeconomic status (Kahlenberg Rebuttal Report, p. 5-6). For instance, he asserts that institutions should consider both concentrated neighborhood poverty and wealth. It is critical to underscore that this would be a dramatic change to admissions practices. To my knowledge (and Mr. Kahlenberg provides no evidence to the contrary), this definition of socioeconomic status has never been implemented by any university, and so there is no evidence to suggest such an approach would be a workable race-neutral approach.

9.     Moreover, Mr. Kahlenberg's desire to define socioeconomic status using information on family wealth is infeasible and could not be implemented by institutions. First, many highly-selective universities, including UNC-Chapel Hill, are "need-blind." This means that admissions committees do not know a family's financial need when deciding who to admit, and this practice is thought to help protect low-income students from being disadvantaged in an admissions process (i.e., since admitting them would mean that the institution would need to give the applicant financial aid). However, to implement Mr. Kahlenberg's proposed strategy, UNC-Chapel Hill would have to change this fundamental aspect of its admissions practice. Doing so would have much broader implications than Mr. Kahlenberg acknowledges.

10.     But even if UNC-CH *did* decide to consider an applicant's financial circumstances as part of its admissions process, Mr. Kahlenberg grossly overstates the information admissions offices would have access to in their deliberations. For example, in his most recent report, Mr. Kahlenberg suggests that considering wealth is feasible by using the FAFSA (the federal financial aid application). He writes that, "through the FAFSA process, universities have extensive information about the family wealth and income of applicants" (Kahlenberg Rebuttal Report, p. 6).

11.     I have immense expertise on the FAFSA and have done extensive research on who completes the FAFSA and how the data elements collected by the FAFSA influence the awarding of financial aid.[2] Mr. Kahlenberg is wrong with his statements about the kinds of information the FAFSA would provide to admissions offices, and he suggests that the admissions offices have access to far more information than is actually true.

---

[2] For example, see: Bettinger, E., B. T. Long, P. Oreopoulos, and L. Sanbonmatsu. (2012) "The Role of Application Assistance and Information in College Decisions: Results from the H&R Block FAFSA Experiment." *Quarterly Journal of Economics 127(3)*: 1-38; Long, B. T. (2010) "Making College Affordable by Improving Aid Policy." *Issues in Science and Technology.* Washington, D.C.: National Academy of Sciences, Division of Behavioral and Social Sciences and Education, Summer. In addition, I have testified before Congressional committees about the FAFSA: U.S. Senate, Committee on Health, Education, Labor and Pensions. Full Committee Hearing: *Ensuring Access to Higher Education: Simplifying Federal Student Aid for Today's College Student* (2013). I have also co-author policy memos to help inform policy discussions. For example: Policy Briefing to Chairman Harkin and Senator Alexander, U.S. Senate, Committee on Health, Education, Labor and Pensions. "Consensus Recommendations for your Consideration" (coauthored in 2013 with Kristin D. Conklin, Kimberly Cook, and Judith Scott-Clayton). Finally, I served as a Panel Member of the Government Accountability Office (GAO) Review of Simplifying the Federal Student Aid Application Process in 2009.

3

12.     The major issue with Mr. Kahlenberg's assertion is that the FAFSA gives limited and incomplete information on family wealth.[3] The FAFSA focuses most of its financial questions on income: adjusted gross income and earnings from working (not investments) for the student and their parents.  It also asks for the amount in bank accounts,[4] overall net worth,[5] and untaxed income, such as child support received, payments to tax-deferred pension and retirement savings plans, and workers' compensation, and disability benefits.  If all applicants answered these questions, then this would give a sense of assets, but it is still far from an accurate measure of wealth because the FAFSA tells applicants to exclude the value of their home in their answers. Home value is the greatest source of assets for most Americans and central to understanding family wealth (Haskins, 2008) and so leaving it out of the calculation makes the FAFSA data an incomplete measure of wealth.[6] A more accurate definition of wealth would also give a sense of the mix of resources and expenditure patterns. Without such detail, the partial information on wealth collected by the FAFSA would tell institutions little about an applicant's advantage or disadvantage.

13.     It is important to emphasize that even *if* the FAFSA provided good information on wealth, many applicants never complete those questions.  The first reason is that applicants from families who make less than $50,000 are not asked any of the wealth questions when completing the FAFSA.[7]  In 2016, 43.1 percent of households earned less than $50,000,[8] thus suggesting a large number of applicants are never asked questions about wealth on the FAFSA.  Families with college-age children have higher incomes than the average for American families overall, but many college applicants are older, independent students who cannot rely on the resources of their parents to pay for college.[9]

14.     It is also the case that many students never complete the FAFSA at all. In 2016, the FAFSA completion rate among graduating high school seniors was only 40.9 percent.  As noted by Alderman (2016), this suggests there is a sizeable gap between the FAFSA completion rate and the 66 percent of high school graduates who go directly into some form of higher education, meaning that many college students never complete the FAFSA.[10]  Some of the applicants who do not complete the FAFSA are from families with higher incomes that suggest they are less likely to be eligible for federal financial aid like grants.  However, many low-income students, who would have been eligible for federal grants, also do not complete the form.

---

[3] The Free Application for Federal Student Aid (FAFSA) is made available by the U.S. Department of Education and is available at https://fafsa.ed.gov/.
[4] For the 2018-19 FAFSA, the specific question is: "As of today, what is your (and spouse's) total current balance of cash, savings, and checking accounts?"
[5] For the 2018-19 FAFSA, the specific questions are: "As of today, what is the net worth of your (and spouse's) investments, including real estate?" and "As of today, what is the net worth of your (and spouse's) current businesses and/or investment farms?"
[6] Haskins, Ron. (2008) "Wealth and Economic Mobility." In *Getting Ahead or Losing Ground: Economic Mobility in America*. Ron Haskins, Julia B. Isaacs, and Isabel V. Sawhill, Eds.  Washington, DC: The Brookings Institution.
[7] They also must not have been required to complete IRS Form 1040 and so filed 1040A or 1040EZ.
[8] Source: U.S. Census Bureau, Current Population Survey, 2017 Annual Social and Economic Supplements.
[9] Page, Lindsay C. and Judith Scott-Clayton, J. (2016) Improving college access in the United States: Barriers and policy responses. *Economics of Education Review, 51*, 4–22
[10] Alderman, Chad. (2016) "2016 FAFSA Completion Rates by State." Bellwether Education Partners blog, Ahead of the Heard. Available here: https://aheadoftheheard.org/2016-fafsa-completion-rates-by-state/

Case 1:14-cv-00954-LCB-JLW   Document 162-32   Filed 01/18/19   Page 6 of 13

15.     Yet another limitation of the FAFSA is that it asks for prior-prior year income information (i.e., 2016 income if applying for aid to start in fall 2018).  This delay in the income information, by focusing on income earned two years prior to college entry, means that the FAFSA does not necessarily give an accurate view of a student's *current* financial circumstance. Additionally, the FAFSA only gives income information for one year so it does not tell institutions anything about the income and wealth level of the applicant's family over the longer period of time the student was preparing for college. Looking at the applicant's circumstance for multiple years would be necessary to accurately measure the degree to which that applicant faced disadvantage.  In fact, recent research suggests many low-income students experience year-to-year fluctuations in family income that can mean certain years they appear poor but other years they may not, even though the transitory experience of being low-income is correlated with disadvantage (Michelmore and Dynarski, 2017).[11]  The one snapshot of family income given by the FAFSA is therefore incomplete.

16.     To summarize, the issues with non-completion of the FAFSA, coupled with the non-completion of the wealth questions for an additional set of students, results in the FAFSA not providing wealth information for many applicants.   Thus, even if a university did decide to attempt to consider wealth data as part of implementing a race-neutral alternative, it would be impossible for admissions offices to sort through wealth indicators for all students in their pools and apply weights according to socioeconomic advantage or disadvantage.  Even for students who complete all the questions on the FAFSA, the information on income and wealth is limited, excludes a major source of wealth (i.e., home value), and only provides a snapshot for one point in time two years prior to college entry.  For all these reasons, Mr. Kahlenberg's characterization of how the FAFSA could be used is incorrect.

17.     Mr. Kahlenberg also suggests that the College Board could provide admissions officers with detailed neighborhood and high school information (Kahlenberg Rebuttal Report, p. 6).  But even if so, that information would not be sufficient for judging an *individual* applicant's circumstance.  Any neighborhood or high school will have students who range in family income and wealth, and the College Board's measures will be imperfect proxies for any specific applicant.

## IV.     MR. KAHLENBERG OVERSTATES THE CURRENT AND PAST SUCCESS OF RACE-NEUTRAL ALTERNATIVES AND IGNORES IMPORTANT DETAILS RELATED TO THE QUALITY OF THE STUDIES THAT HE CITES AND HOW CONVINCING THE EVIDENCE IS

18.     As I set forth in my rebuttal report, Mr. Kahlenberg, in his opening report, fails to consider the quality of the evidence and relies on studies that are weak and unconvincing  (Long Rebuttal Report, ¶¶ 14-29). This flaw continues in his rebuttal report.  Generally speaking, it is

---

[11] They find that although half of eighth graders in Michigan are eligible for a subsidized school meal, only 14 percent have been eligible during every grade since kindergarten.  There are also differences in academic performance depending on whether the student was constantly disadvantaged or only eligible for a subsidized school meal during selected years, with long-term disadvantage (i.e., being eligible for subsidized school meal every year) being correlated with much lower achievement levels.  Susan M. Dynarski and Katherine Michelmore. (2017). "The Gap within the Gap: Using Longitudinal Data to Understand Income Differences in Student Achievement." *AERA Open* (February).

not sufficient to treat all research studies the same. The details of each study matter, and it is important to consider the quality of the evidence in determining how much confidence we should have in the results and how applicable they are to UNC-Chapel Hill. My opinions take into account the data used, methodological approach, and consideration of alternative interpretations and counterfactual arguments. I also put special emphasis on research results that prove a causal relationship between the admissions policy change and the outcomes of interest. These studies use more sophisticated research strategies than purely descriptive work (Long Report ¶¶ 54-58).

19.    In contrast, the studies Mr. Kahlenberg continues to rely upon have many shortcomings. These weaknesses include limited data samples, unrealistic assumptions that are theoretical in nature and not feasible, and focus on dissimilar contexts with limited applicability to UNC-Chapel Hill. For example, as noted by Mr. Kahlenberg, he "outlined evidence from a study finding that 7 of 10 selective colleges employing race-neutral alternatives – including socioeconomic preferences, place-based or geographic approaches, and other strategies—were able to match or exceed levels of black and Hispanic enrollment obtained in the past using racial preferences" (Kahlenberg Rebuttal Report, p. 3).

20.    I discussed this study in my rebuttal report and explained that it has many shortcomings and limited applicability to UNC-CH (Long Rebuttal Report ¶¶ 30-31). First, two of the seven purportedly successful institutions discussed by both Kahlenberg and Potter (2012) and Potter (2014) are UT-Austin and Texas A&M. Numerous studies using a range of data sets have come to the conclusion that the Texas Top 10% Plan has not helped these two institutions meet (let alone exceed) previous racial and ethnic diversity levels. (M. Long and Tienda, 2008; Harris and Tienda, 2012)) [12] In fact, when the underlying demographic changes of the state are taken into account, the Texas percentage plans have been less effective than apparent relative to the benchmark of previous levels of racial and ethnic diversity (Flores and Horn, 2015). [13]

21.    The five other institutions of the seven highlighted by Mr. Kahlenberg differ from UNC-Chapel Hill in significant ways that calls into question whether the research done on them is applicable to this case. As I noted in my rebuttal report, each of the five institutions cited by Kahlenberg accepted at least 45% of their applicants. In contrast, UNC-Chapel Hill only accepted 27% of applicants that year. [14] Even when focusing on the acceptance rates for in-state applicants, UNC-Chapel Hill accepted 46% of residents for fall 2017 in comparison to 59% for the University of Washington (Long Rebuttal Report ¶¶ 40-43).

22.    Multiple studies find that schools that admit a smaller proportion of applicants are likely to experience different outcomes from a given admissions policy than schools that accept closer to 50% or more of applicants (Bowen, Kurzweil, and Tobin, 2005; Horn and Flores, 2003) (Long Rebuttal Report ¶ 44). Thus, it is an overstatement by Mr. Kahlenberg to suggest that because other flagship universities have implemented race-neutral strategies, UNC-Chapel Hill

---

[12] Long, Mark and Marta Tienda. (2008). "Winners and losers: Changes in Texas University admissions post-Hopwood." *Educational Evaluation and Policy Analysis* 30: 255–280. Harris, Angel L, and Marta Tienda. (2012). "Hispanics in higher education and the Texas top 10% law." *Race and social problems* 4 (1): 57-67.

[13] Flores, Stella M. and Catherine L. Horn. (2015). *Texas Top Ten Percent Plan: How It Works, What Are Its Limits, and Recommendations to Consider*. Educational Testing Service.

[14] College Navigator, National Center for Education Statistics, U.S. Department of Education. Accessed Feb 9, 2018 at https://nces.ed.gov/collegenavigator/.

Case 1:14-cv-00954-LCB-JLW   Document 162-32   Filed 01/18/19   Page 8 of 13

must be able to do so successfully as well. UNC-Chapel Hill is in fact much more similar in selectivity to Mr. Kahlenberg's list of unsuccessful schools (i.e., the University of Michigan, UCLA, and UC Berkeley) than the ones he deems as being successful.

23. Mr. Kahlenberg also claims that percentage plans would not have a negative impact on the academic preparation levels of students. He references a study by Sunny Niu and Marta Tienda (Kahlenberg Rebuttal Report, p. 7), which I also discuss in my opening report (Long Report ¶ 80). However, Mr. Kahlenberg leaves out important conclusions from Niu and Tienda (2010), including that they found reductions in the application rates of minority students from certain kinds of high schools, and Black and Hispanic students from suburban high school enrolled in smaller numbers (Long Rebuttal Report ¶ 60). This underscores the concerns about how a percentage plan could influence application patterns in ways that would reduce racial and ethnic diversity at an institution—a critique Mr. Kahlenberg does not address at all.

24. Mr. Kahlenberg also ignores other research on the impact of percentage plans on the academic mission of institutions. As I discuss in my opening report, Koretz, et al. (2002) used data on California students to investigate how a place-based admissions policy would affect the profile of accepted students. Their simulations suggest that doing so would result in institutions admitting a cohort of students that would have much lower average SAT scores and high school GPAs regardless of race (Long Report ¶ 99).[15]

25. Beyond the research evidence, the experience of Texas universities also counters Mr. Kahlenberg's claim that race-neutral strategies would not compromise academic standards and a university's ability to achieve its broad, self-defined goals. As I note in my opening report, in Texas, the state with the most prominent percentage plan, institutions have continually voiced concerns that the Top 10% Plan is a "blunt instrument" that severely restricts the university to considering only one metric—class rank—when they would prefer to also consider measures such as SAT scores, extracurricular activities, and life circumstances (Long Report ¶ 95). In response to continual concerns about the percentage plan's effects on its academic mission, UT-Austin successfully petitioned the state legislature in 2009 to change the rule. UT-Austin can now cap the number of applicants admitted automatically under the Top 10% Plan.[16] This demonstrates, in practice, how a percentage plan can have negative consequences for an institution—so much so that the institution petitions the state government to alter the policy.

26. In summary, Mr. Kahlenberg incorrectly asserts there are universities successfully implementing race-neutral approaches by overstating the experience and evidence regarding the effectiveness of such strategies.

---

[15] Koretz, Daniel, Michael Russell, Chingwei David Shin, Cathy Horn, and Kelly Shasby. (2002) "Testing and diversity in postsecondary education: The case of California." *Education Policy Analysis Archives* 10(1): 1-39.
[16] Watkins, Matthew. (April 5, 2017). "Texas senators mull eliminating Top 10 Percent Rule." *The Texas Tribune*. Available here: https://www.texastribune.org/2017/04/05/texas-senators-mull-eliminating-top-10-percent-rule/

## V. INSTITUTIONS ALREADY USE MULTIPLE RACE-NEUTRAL APPROACHES AND THEY ARE STILL NOT EFFECTIVE ENOUGH TO REPLACE RACE-CONSCIOUS ADMISSIONS POLICIES

27.     Mr. Kahlenberg also asserts that my report focuses on race-neutral approaches that are implemented in isolation (Kahlenberg Rebuttal Report, p. 13-14). This is not a correct characterization. Contrary to Mr. Kahlenberg's assertion, my report considers multiple cases in which institutions have attempted to implement a race-neutral approach in conjunction with other admissions practices advocated by Mr. Kahlenberg, such as financial aid (Long Report ¶¶ 44, 55-56). Stated another way, I emphasize studies that convincingly provide evidence about the effects of institutions introducing a new policy *on top of* existing efforts to achieve and recruit a diverse student body.

28.     For example, when UT-Austin and Texas A&M implemented the Texas Top 10% Plan, they also put special effort into boosting the recruitment and admissions probabilities of African-American and Latino applicants in race-neutral ways by targeting financial aid and special recruitment at certain high schools. These are admissions strategies Mr. Kahlenberg advocates for, but these efforts, *on top of* the implementation of the race-neutral admissions policy, were not enough to counteract the negative effects of the Top 10% Plan on racial and ethnic diversity (M. Long and Tienda, 2008). Even when implementing multiple approaches simultaneously, highly-selective universities have not been successful in identifying effective race-neutral approaches.

29.     The additional admissions practices Mr. Kahlenberg discusses are already in use at many institutions, including UNC-CH, and so his suggestion that they will help make a race-neutral approach workable is wrong (Long Rebuttal Report ¶ 46). A prime example is his assertion that UNC-Chapel Hill could dramatically increase financial aid as part of implementing race-neutral admissions. Mr. Kahlenberg seems to completely ignore the fact that UNC-Chapel Hill already has an exemplary financial aid program, the Carolina Covenant. The program awards students who fall below 200 percent of the poverty line a combination of scholarships, grants, and work study support to meet 100 percent of financial need without requiring the students to take out college loans. It has been in place since 2004 and has received a great deal of attention as a successful effort among public institutions. Mr. Kahlenberg does not point to any evidence that suggests increasing UNC-Chapel Hill's already generous financial aid would be enough to make a race-neutral alternative successful at the institution.

30.     Notably, on page 22 of his rebuttal report, Mr. Kahlenberg cites one of my research studies to support his claim that financial aid can increase the enrollment of minority students. He is referring to a study I completed on the effects of the Florida Student Access Grant (FSAG).[17] My co-author and I found that the FSAG, a need-based grant of $1,300 in 2000-01, had a positive effect on college attendance and persistence for eligible students. However, contrary to Mr. Kahlenberg's assertion, our analysis did not find that financial aid had a

---

[17] Castleman, Benjamin and B.T. Long. (2016) "Looking Beyond Enrollment: The Causal Effect of Need-Based Grants on College Access, Persistence, and Graduation." *Journal of Labor Economics, 34(4),* 1023–1073. Also available as NBER Working Paper No. 19306, which is what Mr. Kahlenberg cites.

differential effect for Black and Hispanic students in comparison to other students.[18] Eligible, low-income students were helped more generally, and our results suggest that the FSAG would not have helped Florida institutions to especially recruit minority students. Moreover, the average beneficiary in our study had a high school GPA of 2.80, an achievement level that would not qualify them for admittance to a highly selective institution like UNC-Chapel Hill. This suggests the study has limited applicability to this case, and yet again, Mr. Kahlenberg fails to consider the details of a study when reviewing the evidence.

31.     Another shortcoming regarding his arguments related to financial aid is that Mr. Kahlenberg provides no evidence that it would be feasible for UNC-Chapel Hill to greatly increase its financial aid beyond its already generous programs. The size of a public university's endowment does not mean that the institution can just simply increase its financial aid. The annual payout from an institution's endowment is only a small percentage of the base, and with declining support from state appropriations, it is a particularly challenging funding environment for public colleges and universities.[19] Resources must be spread across multiple needs, including operations, faculty, buildings, and academic supports. Moreover, endowment funds are often restricted by the donor to only be used for specific purposes, which would preclude the funds from being used on financial aid. Based on these limitations and the fact that many institutions, like UNC-Chapel Hill, already give a great deal of financial aid, it is unreasonable to assume a public university would have enough resources to dramatically increase financial aid in a way to make a race-neutral alternative successful. Mr. Kahlenberg provides no data or evidence to support his proposition.

## VI.    CONCLUSION

32.     In conclusion, it is my opinion that Mr. Kahlenberg fails to present convincing evidence that workable, race-neutral alternatives exist that would apply to the circumstances of UNC-Chapel Hill due to the fact that his survey of research literature and adopted alternative admissions policies does not adequately consider the quality and quantity of the evidence available on admissions policies. Much of the Kahlenberg report focuses on an entirely different admissions goal: increasing the representation of low-income students at selective institutions. Although that goal may be admirable and already part of UNC-Chapel Hill's overall mission, Mr. Kahlenberg does not present evidence of any university that has used (or even tried) to implement a race-neutral admissions policy that relies upon his broad definition of socioeconomic status that includes wealth and neighborhood poverty information. Similarly, many of Mr. Kahlenberg's assertions are based on studies with limited data and unrealistic assumptions and theoretical models about how applicants and institutions behave, and he focuses on contexts and institutions that differ greatly from UNC-Chapel Hill. Finally, Mr. Kahlenberg's characterization of my report and opinions is incorrect.

---

[18] In the version Mr. Kahlenberg references, this is described in footnote 22. In the final published version, this is discussed in footnote 21.
[19] Long, B. T. (2016) *State Support for Higher Education: How Changing the Distribution of Funds Could Improve College Completion Rates*. National Commission on Financing 21st Century Higher Education. University of Virginia, Miller Center.

33. As such, the Kahlenberg rebuttal report does not change any of the opinions offered in my affirmative or rebuttal reports with respect to the race-neutral alternatives that I concluded UNC-Chapel Hill should consider evaluating.


Dated: June 8, 2018


                                        Respectfully submitted,


                                        Bridget Terry Long

10

**Exhibit A: Materials Relied Upon**

**Case Materials**

- Expert Report of Bridget Long, January 12, 2018, including materials relied upon
- Rebuttal Expert Report of Bridget Long, April 6, 2018, including materials relied upon
- Expert Report of Richard D. Kahlenberg, January 12, 2018, including materials relied upon
- Rebuttal Expert Report of Richard D. Kahlenberg, April 6, 2018, including materials relied upon

**Other Materials Relied Upon But Not Previously Cited**

Alderman, Chad. (2016) "2016 FAFSA Completion Rates by State." Bellwether Education Partners blog, Ahead of the Heard. Available here: https://aheadoftheheard.org/2016-fafsa-completion-rates-by-state/

Bettinger, E., B. T. Long, P. Oreopoulos, and L. Sanbonmatsu. (2012) "The Role of Application Assistance and Information in College Decisions: Results from the H&R Block FAFSA Experiment." *Quarterly Journal of Economics 127(3)*: 1-38

Castleman, Benjamin and B.T. Long. (2016) "Looking Beyond Enrollment: The Causal Effect of Need-Based Grants on College Access, Persistence, and Graduation." *Journal of Labor Economics, 34(4),* 1023–1073

Dynarski, Susan M. and Katherine Michelmore. (2017) "The Gap within the Gap: Using Longitudinal Data to Understand Income Differences in Student Achievement." *AERA Open* (February)

Haskins, Ron. (2008) "Wealth and Economic Mobility." In *Getting Ahead or Losing Ground: Economic Mobility in America.* Ron Haskins, Julia B. Isaacs, and Isabel V. Sawhill, Eds. Washington, DC: The Brookings Institution.

Long, B. T. (2010) "Making College Affordable by Improving Aid Policy." *Issues in Science and Technology.* Washington, D.C.: National Academy of Sciences, Division of Behavioral and Social Sciences and Education, Summer.

Long, B. T. (2016) *State Support for Higher Education: How Changing the Distribution of Funds Could Improve College Completion Rates*. National Commission on Financing 21st Century Higher Education.  University of Virginia, Miller Center.

Page, Lindsay C. and Judith Scott-Clayton, J. (2016) Improving college access in the United States: Barriers and policy responses. *Economics of Education Review, 51*, 4–22

U.S. Census Bureau, Current Population Survey, 2017 Annual Social and Economic Supplements.