# Exhibit 15

**American Bar Association**
www.supremecourtpreview.org

No. 11-345

IN THE

# Supreme Court of the United States

ABIGAIL NOEL FISHER,

*Petitioner*,

v.

UNIVERSITY OF TEXAS AT AUSTIN, *et al.*,

*Respondents.*

**On Writ of Certiorari to the United States
Court of Appeals for the Fifth Circuit**

**BRIEF OF *AMICUS CURIAE*
THE UNIVERSITY OF NORTH CAROLINA
AT CHAPEL HILL SUPPORTING RESPONDENTS**

JOHN CHARLES BOGER
   *Counsel of Record*
MARK DOROSIN
ELIZABETH HADDIX
THE UNIVERSITY OF NORTH CAROLINA
   AT CHAPEL HILL
Chapel Hill, NC 27599-3380
(919) 962-4417
jcboger@email.unc.edu

LESLIE STROHM
VICE CHANCELLOR AND
   GENERAL COUNSEL
JOANNA CAREY CLEVELAND
THE UNIVERSITY OF NORTH CAROLINA
   AT CHAPEL HILL
Chapel Hill, NC 27599-9105
(919) 962-1219

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICUS CURIAE* . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. THE UNIVERSITY OF NORTH CAROLINA AND OTHER PUBLIC UNIVERSITIES HAVE A COMPELLING STATE INTEREST IN PREPARING STUDENTS FOR A DIVERSE SOCIETY AND ASSURING A POOL OF STRONG STATE LEADERS BY ADMITTING UNDERGRADUATES DRAWN FROM EVERY BACKGROUND . . . 12

    A. The University Has Developed an Individualized, Holistic Review of Applicants as Its Narrowly Tailored Approach to Prepare Graduates for the State's Diverse Future . . . . . . . . . . . . . . . 12

    B. The University's Admission Practices Offer a Fair and Individualized Assessment of Each Applicant in Which Consideration of Race Plays a Modest Though Useful Role . . . . . . . . . . . . . . . . . 15

    C. The University Has Strong Empirical Evidence That a Racially Diverse Collegiate Setting Substantially Benefits Its Students and Helps Fulfill Its Broader Mission to the State . . . . . . . . . . 19

i

**Table of Contents continued**

*Page*

D.  The State of North Carolina Has Substantially Benefited From a Flow of Well-Trained University Graduates Educated in Racially Diverse Settings . .  23

II.  PETITIONER'S PROPOSED REVISION OF *BAKKE* AND *GRUTTER* WOULD CREATE A NEW, STRICTER STANDARD FOR UNIVERSITY ADMISSIONS THAT WOULD UNDO DECADES OF SUPREME COURT JURISPRUDENCE, MATERIALLY WEAKEN THE EDUCATION OFFERED BY U N C   A N D   O T H E R   P U B L I C UNIVERSITIES, AND DIMINISH THE CAPACITY OF THEIR GRADUATES TO WORK AND LEAD EFFECTIVELY IN THE 21st CENTURY . . . . . . . . . . . . . . . . . . . . . . . .  25

A.  Petitioner's Proposal Would Jettison Three Decades of Jurisprudence and Erect a New, Effectively Impregnable Barrier To the Consideration of Race in Undergraduate Admissions . . . . . . . . . . .  25

B.  Requiring UNC and Other Public Universities to Adopt an Ostensibly 'Race-Neutral' Alternative Such As the Texas Ten Percent Plan Would Weaken the Overall Strength of UNC's Entering Classes, Exclude Some of Its Strongest Applicants, and Undermine Its Compelling Interest in Achieving Meaningful Diversity . . . . . . . . . . . . . . . .  33

ii

**Table of Contents continued**

*Page*

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

iii

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Adams v. Richardson*, 351 F. Supp. 636 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Board of Curators of Univ. of Mo. v. Horowitz*, 235 U.S. 78 (1978) . . . . . . . . . . . . . . . . . . . . . . 27

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) . 2, 3, 13

*Grutter v. Bollinger*, 539 U.S. 306 (2003) . . . passim

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) . . . . . . . . . . . . . . . . 21

*Leandro v. State*, 346 N.C. 336 (1997) . . . . . . . . 35

*McKissick v. Carmichael*, 187 F.2d 949 (4th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No 1*, 551 US 701 (2007) . . . . . . . . . 16, 28

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) . . . . . . . . . . . . . . . . . . . . . . . . passim

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Sweatt v. Painter,* 339 U.S. 629 (1950) . . . . . . . . 13

Table of Authorities continued

*Page(s)*

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) . 27

**Constitutional and Statutory Provisions:**

North Carolina Constitution of 1868, art. 9, § 2
(1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Other Authorities:**

William B. Aycock *An Evolving Institution: The
Deanship of Robert Gray Byrd (1974-79)*, 73
N.C. L. Rev. 622 (1995) . . . . . . . . . . . . . . . . . 14

William G. Bowen, *Admissions and the
Relevance of Race*, Princeton Alumni Weekly
7 (Sept. 26, 1977) . . . . . . . . . . . . . . . . . . . . . . 21

William K. Boyd, 2 *History of North Carolina:
The Federal Period 1783-1860* (1919) . . . . . . . 1

Julie Cullen, Mark C. Long & Randall Reback,
*Jockeying for Position: Strategic High School
Choice Under Texas' Top Ten Percent Plan*
(Nat'l Bureau of Econ. Research, Working
Paper No. 16663) . . . . . . . . . . . . . . . . . . . . . . . 9

Charles E. Daye, *African-American and Other
Minority Students and Alumni*, 73 N.C. L.
REV. 675, 686–92 (1995) . . . . . . . . . . . . . . 14, 25

Charles Daye et al., *Does Race Matter in
Educational Diversity? A Legal and
Empirical Analysis*, 13 Rutgers Race & L.
Rev. __ (forthcoming 2012), *available at*
http://ssrn.com/abstract=2101253 . . . . . . . . . . 6

v

**Table of Authorities continued**

*Page(s)*

Harry T. Edwards, *A New Role for the Black Law Graduate-A Reality or an Illusion?*, 69 Mich. L. Rev. 1407 (1971) . . . . . . . . . . . . . . . . 2

*Facts About Carolina.* UNC News (Feb. 2012), http://uncnews.unc.edu/content/view/30/97/ . 15

Interview with *Stephen Farmer, UNC Vice Provost for Enrollment and Undergraduate Admissions,* in Chapel Hill, NC (May 24, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Richard Kluger, *Simple Justice: The History of* Brown v. Board of Education *and Black America's Struggle for Equality* (1975) . . . . . 13

Anthony T. Kronman, *Is Diversity a Value in American Higher Education?*, 52 Fla. L. Rev. 861 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Leaders and Laggards: Rankings of Black Enrollments at the Nation's 50 Highest-Ranked Universities*, J. BLACKS HIGHER EDUC., Autumn 2003 . . . . . . . . . . . . . . . . . . . 14

James L. Leloudis, *Schooling the New South: Pedagogy, Self, and Society in North Carolina*, 1880-1920 . . . . . . . . . . . . . . . . . . . . . 1

William A. Link, *William Friday: Power, Purpose, and American Higher Education* (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

vi

Email from Roger Nelsen, UNC Director of Alumni Records and Information Systems, to Catherine Pierce, UNC School of Law Assistant Dean for Policy, (June 26, 2012, 9:38 a.m.) (on file with Catherine Pierce) . . .  24

Sandra Day O'Connor & Stewart L. Schwab, *Affirmative Action in Higher Education over the Next Twenty-five Years: A Need for Study and Action*, *in The Next Twenty-Five Years: Affirmative Action in Higher Education in the United States and South Africa*, (David L. Featherman et al. eds.,(2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

John V. Orth, *The North Carolina State Constitution: A Reference Guide* (1993) . . . . .  2

William S. Powell, *The First State University* (3d ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . .  1

William D. Snider, *Light on the Hill: A History of the University of North Carolina at Chapel Hill* (1992) . . . . . . . . . . . . . . . . . . . . .  13

Marcia G. Synnott, *The Evolving Diversity Rationale in University Admissions: F r o m Regents v. Bakke to the University of Michigan Cases*, 90 Cornell L. Rev. 463 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

# Table of Authorities continued

*Page(s)*

Rick L. Weddle, *Research Triangle Park:
   Evolution and Renaissance* (2006),
   http://www.rtp.org/sites/default/files/RTP_
   History_0.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Wikipedia, http://en.wikipedia.org/wiki
   List_of_University_of_North_Carolina_at_
   Chapel_Hill_alumni . . . . . . . . . . . . . . . . . . . . . . 2

viii

# INTEREST OF AMICUS CURIAE[1]

The University of North Carolina at Chapel Hill ("UNC" or "University") is the nation's oldest public university.[2] As a flagship public institution, generously supported by North Carolina's General Assembly, it embraces a mission far broader than providing rigorous education to individual students. UNC must assess the multiple challenges facing the State and region—economic, social, legal, medical, educational, and political—and prepare thousands of graduates in every generation to meet those challenges.

UNC alumni have long taken roles as leaders in all areas of public life, both in the State and beyond. During the seventy years before the Civil War, the University produced one United States president, a vice president, twenty governors, eight senators, forty-one members of the House of Representatives, and "innumerable numbers of judges, state legislators, and justices of the peace."[3] Since that

---

[1] Letters from the parties, consenting generally to the filing of brief by *amici curiae,* are on file with the Court. Pursuant to Rule 37.6, counsel represent that this brief was not authored in whole or in part by counsel for any party. No entity other than the *amicus curiae* made a monetary contribution to the preparation or the submission of the brief.

[2] William S. Powell, *The First State University* 4–10 (3d ed. 1992). The University was authorized by the North Carolina Constitution of 1776 and chartered in 1789. It first opened its doors to students in 1795. *Id.*

[3] James L. Leloudis, *Schooling the New South: Pedagogy, Self, and Society in North Carolina, 1880-1920* 50 (1996). *See also* William K. Boyd, 2 *History of North Carolina: The Federal Period 1783-1860* 362–63 (1919).

1

time, a flow of remarkably talented graduates have left UNC to become governors, authors, journalists, judges, legislators, playwrights, among other distinguished careers[4]. Yet in the era of rigid racial segregation stretching from the late 19th century until well into the middle of the 1960s, UNC, like virtually every Southern college and university, excluded all African Americans and Native Americans.[5] Only when confronted with litigation did UNC begin to desegregate. In 1955, the year

---

[4] The University's many distinguished graduates have included Taylor Branch, Erskine Bowles, David Brinkley, Mary Sue Coleman, Lawrence Ferlinghetti, Sallie Krawcheck, Charles Kuralt, David Sentelle, Paul Wellstone, and Thomas Wolfe. See http://en.wikipedia.org/wiki/List_of_University_of_North_Carolina_at_Chapel_Hill_alumni

[5] A post-Reconstruction era amendment to the North Carolina Constitution of 1868, art. 9, § 2, provided: "And the children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor of, or to the prejudice of, either race." This section was not abolished until the Court's decision in *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). *See* John V. Orth, *The North Carolina State Constitution: A Reference Guide* 145 (1993). Over a century later, a federal court noted that, as of 1970, "the states of Louisiana, Mississippi, Oklahoma, North Carolina, Florida, Arkansas, Pennsylvania, Georgia, Maryland, and Virginia were operating segregated systems of higher education in violation of Title VI". *Adams v. Richardson*, 351 F. Supp. 636, 637–38 (D.D.C. 1972). See Harry T. Edwards, *A New Role for the Black Law Graduate—A Reality or an Illusion?*, 69 MICH. L. REV. 1407, 1409 (1971) (reporting U.S. Census data showing that in 1970, despite a population of over 8.8 million, there were only 393 African American lawyers, combined, in the southern states of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Tennessee, and Virginia).

after this Court's *Brown* decision, brothers Ralph and LeRoy Frasier and John Brandon became its first African American undergraduates.[6] Even a decade later, only a handful of African Americans had ever set foot, as students, onto the Chapel Hill campus.

Thanks to the national dialogue in the 1960s over civil rights, the Civil Rights Act of 1964, significant changes in leadership and attitudes within the State and at UNC, as well as this Court's guidance, the University began to undertake, slowly at first but with increasing speed, a program to open its doors to students of all racial and ethnic backgrounds.[7] In so doing, UNC sought not only to redeem its past legacy of exclusion but to build a future educational training ground that would nurture all of the State's most talented individuals to serve the State's unfolding needs.

These transformative changes—and similar steps to broaden admissions by colleges and universities across North Carolina—led to an unparalleled expansion in the overall educational attainment of the State's residents and an enriched educational environment in which cross-cultural understandings have been nurtured. The presence of a larger, multi-racial pool of well-trained college graduates has, in turn, helped the State flower as a national center for banking, high-tech

---

[6] William A. Link, *William Friday: Power, Purpose, and American Higher Education* 82-83 (1995).

[7] Throughout this brief, to avoid redundancy, *amicus* will refer to diversity by race, ethnicity, and national origin as "racial diversity."

pharmaceutical and technology research, and electronics innovation. The Research Triangle in North Carolina now lures corporations and research facilities from around the world, principally because of its outstanding pool of college-trained workers and the proximity of highly sophisticated research universities open to all of the State's most talented youth.[8]

The University knows that its present and future prospects depend upon drawing students with a broad range of talents from every source—from the remotest counties of its mountainous west, from its easternmost Outer Banks, and from every school in between.[9] In so doing, it individually considers each potential student's talents and academic achievements, character, and initiative in surmounting family and community circumstances, including poverty and/or attendance at substandard K-12 schools. As part of this holistic review, UNC has found that some careful and limited

_____

[8] *See generally* Rick L. Weddle, *Research Triangle Park: Evolution and Renaissance* 2-9 (2006), http://www.rtp.org/sites/default/files/RTP_History_0.pdf.

[9] In that spirit, the UNC School of Law, in 2003, with the University's approval, filed an *amicus* brief in *Grutter v. Bollinger*, 539 U.S. 306 (2003)*,* urging continued approval of the practices sanctioned by Justice Powell in *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), and citing many of the goals eventually held to be constitutionally compelling interests in Justice O'Connor's majority opinion. Since that time, along with the vast majority of public colleges and universities, the University has continued to admit entering classes of promising students after holistic consideration of their individual promise, with race as one among a myriad of potential considerations.

4

consideration of race is indispensable in fulfilling its mission.

As a flagship state university, UNC believes that the freedom to recruit and enroll a diverse student body is necessary to fulfill its educational mission and its core commitments to the State and its future. This conviction is based on more than untested belief; the University has strong empirical evidence of the positive value of bringing students from differing racial backgrounds into its classrooms, its dormitories, and its extra-curricular activities. Any holding that would foreclose its ability to consider race in admissions would undercut decades of Supreme Court precedents and establish a new standard of review that would prohibit UNC and other public institutions of higher education—long recognized as special marketplaces of ideas—from making their own determinations about who will be successful students. To confirm the wisdom and utility of the Court's traditional jurisprudence in this area and to warn of the troubling implications of Petitioner's argument to the contrary, constitute our interest in this case.

## SUMMARY OF ARGUMENT

UNC's mission is to serve as a center for research, scholarship, and creativity, and to turn a diverse community of students into the next generation of leaders. To develop this diverse community and meet the growing needs and interests of the State, UNC has carried out its program of undergraduate admissions in faithful response to *Regents of the University of California v. Bakke* and, more recently, *Grutter v. Bollinger*. It

5

has done so contextually, mindful not only of its obligation to individual students, but also of its wider obligation to provide the State of North Carolina with well-prepared graduates who can lead in this increasingly diverse society. Although the number of undergraduate applicants to UNC has grown from 10,397 in 1978 to 29,501 in 2012, UNC's admissions process remains highly nuanced and multi-faceted, considering more than forty factors in eight broad areas to make selections for an incoming class of approximately 4,000 undergraduates. The process is far from mechanistic; not only are no rigid numerical formulae applied, but every student's file is read by multiple readers. Race is never a basis for classifying or separately considering applicants.

The University's commitment to individualized, holistic admissions practices relies upon internal evaluations and social scientific evidence about the positive impact of such practices. For example, a vast, soon-to-be-published empirical study, completed by Professors Charles E. Daye and A.T. Panter (UNC) Walter R. Allen (UCLA) and Linda F. Wightman (UNC-Greensboro) of the Educational Diversity Project ("the EDP Study"), explores three overlapping ways in which racial diversity produces positive, measurable, educational differences.[10] The EDP Study's evidence reinforces, with extensive

---

[10] *See* Charles Daye et al., *Does Race Matter in Educational Diversity? A Legal and Empirical Analysis*, 13 Rutgers Race & L. Rev. __ (forthcoming 2012), *available at* http://ssrn.com/abstract=2101253. The study used a random sample of 6,100 students from a random sample of 50 ABA-approved law schools, with high minority student representation, followed over three years.

6

quantitative data, key insights that the University has long observed first-hand: that outstanding students from diverse backgrounds can come to campus, thrive academically, enrich the experience of their fellow students, and go forth to become leaders in vital areas of state life.

Prompted by its dual commitment to excellence as one of the world's great research universities and to the mission of improving society, UNC bears the burden to assure a steady flow of talented doctors, lawyers, pharmacists, nurses, public health officials, elementary and secondary teachers, business leaders, scientists, entrepreneurs, political leaders, and judges—all of whom will need to be comfortable working in racially diverse settings. This is a compelling state interest of the highest order. Any university that cannot provide its 21st century undergraduates with ample exposure to the multi-racial settings in which they will spend their professional lives will have failed them and the broader society that sorely needs their professional expertise.

In sum, the University's nuanced consideration of race as one factor among many is grounded in its academic judgment that racial diversity improves the education of all UNC students while building a stronger state, nation and world. Both UNC's choice of an educational mission and its judgment that students from different racial backgrounds best serve that mission constitute exercises of the academic freedom that Justice Powell acknowledged in *Bakke* as a special concern of the First Amendment. The University's considered judgment concerning the selection of its students should be

7

afforded, as Justice Powell instructed and Justice Kennedy later affirmed in his *Grutter* dissent, "wide discretion" due to the "countervailing constitutional interest" of the First Amendment,[11] which should continue to be recognized by the Court.

The petitioner's exceedingly narrow reinterpretation of the Equal Protection Clause would undermine the constitutional foundation on which UNC and other public institutions of higher education have built for nearly two generations. Since *Bakke* in 1978, UNC and most public universities have been constitutionally supported in considering race as a limited, though important, factor, among scores of others, when making admissions decisions. Public universities have undertaken this consideration in measured fashion, with no apparent societal destruction or documented educational decline, free from the serious threat of federal litigation from disappointed eighteen-year-old applicants or their parents.

Yet petitioner presses the Court for a radical new regime in which universities brave enough to consider race as a factor in admissions must first commission recurrent social science studies to assess the necessity, effectiveness, and impact of their practices—assembling *prima facie* evidence that would require evaluation of scores of factors in tens of thousands of applications over many years. Even armed with such studies, public universities would need to stand on constant watch to defend themselves, in federal court, against disappointed

---

[11] *Grutter*, 539 U.S. at 370 (Kennedy, J., dissenting) (citing *Bakke*, 438 U.S. at 313).

8

applicants willing to claim that the denials of their individual applications turned upon the use of race. This regime would inaugurate a new era of educational "strike suits," in which only the richest, or bravest, or most foolhardy colleges would continue to consider race, even to advance institutional and societal goals that many embrace in the greatest good faith.

As a consolation, petitioner assures the Court that all will be well by pointing to Texas's top 10% automatic admissions practice, which ostensibly achieves the diversity deemed desirable by universities in a "race neutral" manner. Yet whatever the value of such a system in Texas, its adoption in North Carolina would assure racial diversity only by (1) depriving UNC of the judgment of its wisest and most experienced admissions officials in selecting 80% or more of each entering class; (2) using rigid mathematical formulae to identify entrants, both white and non-white; (3) lowering the overall quality of UNC's entering freshman classes; and (4) implicitly allowing gamesmanship by anxious parents who might well search for weaker school districts in which to enroll their high school juniors or seniors to improve their "top ten percent" chances of college admission.[12]

---

[12] *See, e.g.*, Julie Cullen, Mark C. Long & Randall Reback, *Jockeying for Position: Strategic High School Choice Under Texas' Top Ten Percent Plan* 2–3 (Nat'l Bureau of Econ. Research, Working Paper No. 16663, 2011) (reporting that, among Texas high school students with the opportunity to choose, as many as 25% enroll in a different, less competitive high school in order to improve their chances of being in the top

9

Before accepting this invitation to abandon *Bakke* and *Grutter*, diminish the academic freedoms of universities, and transform admissions practices nationwide, the Court should ask what, short of truly "compelling interests," presently motivates universities from coast to coast—public and private, religious and secular, coeducational and single-sex, elite doctoral research universities and regional four-year colleges—to include some modest consideration of race in their otherwise very different admissions systems? Why would hundreds of boards of trustees, led by leaders of business, industry, and public life—each of whom owes deep fiduciary duties to their respective institutions—persist in supporting admissions officials who seek diverse student bodies, if not for their genuine conviction that this diversity affords meaningful educational benefits to the schools and their graduates?[13]

Yet to petitioner, neither the good faith judgment of these trustees nor the vast experiences of the thousands of officials who administer America's universities day-to-day, appear to matter

---

ten percent upon graduation, and adding that they "typically displace minority students from the top ten percent pool").

[13] Beyond college administrators and trustees, UNC has evidence that its students highly value diversity in their undergraduate experience. Each year UNC surveys every admitted first-year student to ask why they have accepted or declined its offer of admission. One question reads: "How important a factor was diversity in choosing the school you will attend?" In 2011, 48 percent of those who responded said diversity was "Very important" (13 percent) or "Important" (35 percent); only 19 percent said it was "Unimportant (13 percent) or "Very unimportant" (6 percent).

10

much. Instead, petitioner urges the Court to deviate from its clearly established precedents and embrace a newly hewn constitutional standard that would create an impregnable, one-size-for-all judicial rule, designed to be "fatal in fact," indeed, destined to ban, in practice, all use of race by any college admissions official ever again.

In justification, petitioner invokes unspecified harms "'to the entire body politic,'" warning of a "'very real' danger" of "racial classification[s that are] merely the product of unthinking stereotypes or a form of racial politics."[14] But there is no convincing evidence to support this cry of havoc. UNC itself earnestly seeks to avoid harm to the body politic. It condemns racial stereotypes and racial politics. It longs for a time in which race will no longer matter, when no consideration of race will be necessary in college admissions. Yet UNC knows first-hand, from the daily experience of its skilled educators, that this time has not yet arrived. To the contrary, it believes that rigid judicial decrees forbidding all consideration of race in college admissions would inadvertently bring far greater societal harms and invite far more widespread racial stereotyping than the narrowly tailored, good-faith use of the practice at which petitioner takes dead aim.

---

[14] Pet'r's Br. 33 (internal citation omitted).

# ARGUMENT

I. THE UNIVERSITY OF NORTH CAROLINA AND OTHER PUBLIC UNIVERSITIES HAVE A COMPELLING STATE INTEREST IN PREPARING STUDENTS FOR A DIVERSE SOCIETY AND ASSURING A POOL OF STRONG STATE LEADERS BY ADMITTING UNDERGRADUATES DRAWN FROM EVERY BACKGROUND

A. The University Has Developed an Individualized, Holistic Review of Applicants as Its Narrowly Tailored Approach to Prepare Graduates for the State's Diverse Future

For more than 160 years, from the day UNC opened its doors to its first undergraduate student in 1795 until the mid-1950s, African American and Native American families knew that those selfsame doors were firmly closed to even their brightest children. Both during slavery and the long era of strict educational segregation that followed the Civil War, although African American communities constituted some 21-36% of the State's population, and although these communities desperately needed university-trained teachers, doctors, lawyers, social workers, nurses, pharmacists, and business leaders, these families derived minimal assistance from UNC, except on terms circumscribed by the State's white majority.

In the early 1930s, the NAACP began to challenge this long pattern of exclusion in North Carolina, taking up the case of Thomas Hocutt, an African American graduate of the North Carolina

12

College for Negroes who had been denied admission to the UNC School of Pharmacy.[15] Hocutt lost his case, and it was not until 1951 that the NAACP, through counsel Thurgood Marshall, again sued the University, this time on behalf of young Floyd McKissick and three other African American students who sought admission to the UNC School of Law. Under this Court's newly announced principle in *Sweatt v. Painter*,[16] McKissick and his fellow plaintiffs eventually prevailed in the United States Court of Appeals for the Fourth Circuit and became the first post-baccalaureate students admitted to University.[17] Four years later, on the heels of this Court's pivotal ruling in *Brown v. Board of Education*, the first cohort of African American male undergraduates were admitted to the University, albeit with reduced privileges and benefits. The first African American woman was not admitted until 1963.

The following two decades witnessed continuing efforts to transform UNC from an all-white institution into one that reflects our diverse society. In 1977, in *Adams v. Richardson*, the United States District Court for the District of Columbia ruled that North Carolina and five other Southern states would

---

[15] Richard Kluger, *Simple Justice: The History of* Brown v. Board of Education *and Black America's Struggle for Equality* 155-158 (1975).

[16] 339 U.S. 629 (1950).

[17] *McKissick v. Carmichael*, 187 F.2d 949 (4th Cir. 1951), *cert. denied*, 341 U.S. 951 (1951). *See* William D. Snider, *Light on the Hill: A History of the University of North Carolina at Chapel Hill* 247 (1992).

13

lose federal funding until they complied with Title
VI of the Civil Rights Act of 1964 by increasing
enrollment of black students in historically white
colleges and universities.[18] After being threatened a
second time in 1979 with a cutoff of federal funding
for lack of progress, the consolidated UNC system
entered into a consent decree that spelled out a
specific plan for desegregating all of its sixteen
constituent campuses.

Thereafter, through firm leadership and
responsive administrative action, UNC rapidly
became a more racially diverse campus.[19]  In recent
years, guided now by its affirmative desire to
enhance the educational experience of all students
and to strengthen leadership of the region, UNC has
pursued admissions practices that welcome to
Chapel Hill the finest students from every
background, nurturing them, pushing them to grow,

---

[18]  351 F.Supp. 636 (D.D.C. 1972)

[19]  *See, e.g.*, Marcia G. Synnott, *The Evolving Diversity
Rationale in University Admissions: From Regents v. Bakke to
the University of Michigan Cases*, 90 CORNELL L. REV. 463, 499
(2005) ("As of the fall of 2003, the . . . highest ranked
universit[y], not including the Ivy League, with the largest
enrollment[] of black undergraduates [was] UNC-Chapel
Hill[.]") (citing *Leaders and Laggards: Rankings of Black
Enrollments at the Nation's 50 Highest-Ranked Universities*, J.
BLACKS HIGHER EDUC., Autumn 2003, at 76). *See generally*
Charles E. Daye, *People: African-American and Other Minority
Students and Alumni*, 73 N.C. L. REV. 675, 686–92 (1995)
(identifying the 1970s as "a new era" at UNC Law in terms of
welcoming minority students and faculty); *accord* William B.
Aycock, *An Evolving Institution: The Deanship of Robert Gray
Byrd (1974-79)*, 73 N.C. L. REV. 622, 623–24 (1995).

14

and sending them forth to serve as effective leaders.[20]

## B. The University's Admission Practices Offer a Fair and Individualized Assessment of Each Applicant in Which Consideration of Race Plays a Modest Though Useful Role

Ranked the fifth best public university in the country, the University has carefully crafted admissions policies that in 2011 selected an entering class of 3,960 students from a pool of 29,486 applicants.[21] UNC has reviewed its admissions policies several times in the years since the *Grutter* decision, each time deciding that diversity is an essential part of the undergraduate experience. To achieve diversity in a fair and individualized manner, each applicant is assessed using more than

---

[20] UNC has been repeatedly recognized for its efforts in recruiting and retaining minority students. For example, UNC is among the top 100 U.S. colleges and universities awarding undergraduate degrees to minority students, according to a 2011 issue of *Diverse: Issues in Higher Education* magazine. UNC was also "2nd among major U.S. universities in the percentage of African-American students in the 2008 first-year class, according to *The Journal of Blacks in Higher Education.* Carolina had held the No. 1 spot for six of the previous nine years. Black students made up 10.8 percent of the entering class in 2008." *See Facts About Carolina.* UNC News (Feb. 2012), http://uncnews.unc.edu/content/view/30/97/.

[21] As part of the admissions process, applications are randomly assigned among UNC Admissions staff. Each application is read by at least two admissions officers. Periodically, applications are read by committees formed of six to seven admissions officers to assure consistency in decision-making and opportunities for additional consideration.

15

forty criteria, grouped in the areas of academic performance, academic program, standardized testing, extracurricular activity, special talent, essay, background, and personal criteria.

Race may be considered if the applicant chooses to provide such identifying information,[22] but only as an additional 'plus' factor in this comprehensive review. Applicants are never separated into different racial groups.[23] There are no raw number or percentage goals that the University is working to achieve. While the University consults census data about the racial makeup of the State's population, it does not seek proportionality in its entering classes. Instead, the comparison is used as a rough way to assess whether the University is fostering a scholarly community that allows students to learn from classmates whose backgrounds, experiences, and perspectives will help them prepare for the challenges they will someday face as leaders. Consistent with *Grutter*, the University believes that enrolling a "critical mass" of non-white students

---

[22] This demographic information is requested but not required. Students are encouraged to describe a range of background factors to help UNC understand the multiple contexts in which each student lives, including, for example, languages spoken at home, interruptions in secondary school enrollment, occupation or education level of parents or guardians, and whether other family members have attended the University.

[23] *Cf. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No 1*, 551 US 701, 706 (2007) (Kennedy, J., concurring) (contending that school districts should be "free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race").

16

helps ensure that no student feels singled out as merely a token of his or her race. When known, an applicant's race is always viewed in the context of the entire application, mindful of all the contributions a student might make.

The University's multi-faceted holistic review is also the means by which "individual assessment is safeguarded through the entire process."[24] The process eschews the "numerical concept of critical mass," which Justice Kennedy warned "has the real potential to compromise individual review."[25] The consideration of an applicant's race as a non-predominant part of the whole person recognizes that "critical mass" is principally a qualitative, not a quantitative, value. The University's individualized admissions process has been refined through ongoing internal research, review and revision, prompted by its compelling educational interest in achieving meaningful diversity, in assembling the strongest possible entering class, and in respecting diversity's appropriate scope and limits.[26]

---

[24] *Grutter*, 539 U.S. at 392–93 (Kennedy, J., dissenting).

[25] *Id.* at 389.

[26] In a 2010 article reflecting on racial diversity in higher education, former Justice Sandra Day O'Connor called for more research and analysis of this critical educational and constitutional issue. Sandra Day O'Connor & Stewart L. Schwab, *Affirmative Action in Higher Education over the Next Twenty-five Years: A Need for Study and Action*, *in The Next Twenty-Five Years: Affirmative Action in Higher Education in the United States and South Africa*, 58, 58–73 (David L. Featherman et al. eds., 2010).

17

This approach has been vindicated by outside analysis which has affirmed that UNC admissions officials are exceptionally skilled in applying this individualized process. In a 2007 analysis of admissions and graduation rates at colleges and universities nationwide, William Bowen, a labor economist and former president of Princeton, found that students admitted to UNC but enrolling elsewhere graduated at higher rates than students with similar high school test scores and grade-point averages who had not been admitted.[27] The differences in performance were consistent and in some cases dramatic; students who had been admitted to UNC graduated at rates 15 percentage points higher than those denied admission at UNC who enrolled in another research university. Such large differences among similarly-credentialed students—students whose scores and grades would have rendered them indistinguishable in a formulaic approach to admissions—vindicates the exceptional effectiveness, at least in North Carolina, of using holistic admissions review rather than any rigid mathematical or mechanical formula, such as the Texas Top Ten Percent Plan.

---

[27] Interview with *Stephen Farmer*, *UNC Vice Provost for Enrollment and Undergraduate Admissions,* in Chapel Hill, NC (May 24, 2012).

C. **The University Has Strong Empirical Evidence That a Racially Diverse Collegiate Setting Substantially Benefits Its Students and Helps Fulfill Its Broader Mission to the State**

UNC offers its undergraduates a series of educational experiences that benefit them and the larger society they eventually join. Over four years, undergraduates are introduced to sophisticated ideas in science, mathematics and the humanities. They are also invited to reflect on the past, the present, and their society's deepest values and commitments. Through a wide range of extra-curricular activities – student government, school newspapers, public service organizations, ROTC, athletics, and band -- UNC deliberately provides opportunities for students to engage in socially useful activities and to learn to cooperate with others from different racial and ethnic backgrounds. These too are crucial educational moments, and they build skills upon which most graduates will rely throughout their adult lives.

But can the benefit of this broad exposure to diversity in various contexts and settings be quantified? One recently completed and published meta-analysis, the EDP Study,[28] initiated in 2002, demonstrates a clear positive relationship between

---

[28] The EDP study, conceived in the era of *Grutter,* focuses on law school students. However, the study's findings that students of different races bring differences to their educational settings, and that these differences offer positive educational benefits to all students, has direct implications for undergraduates and others in higher education settings.

19

racial diversity and educational benefit.[29]  The EDP Study has analyzed two empirical questions in a law school setting: (1) do students differ by race in significant ways upon admission; and, if so, (2) do these differences provide unique educational benefits to students, to the institutions they attend, or to society?[30]

The EDP Study examines the first question by looking at students according to six "diversity construct" areas: (1) personal background (race, gender, geographic origin, marital status, religion/spirituality, education, work experience); (2) family background (socio-economic status, family size, culture, traditions); (3) experience (positive and negative life experiences that might influence a student's perspective); (4) educational expectations (predispositions that students bring to curricular interpretations, classroom dialogues, and co-curricular interactions); (5) career goals and aspirations (including reasons for pursuing higher education); and (6) perspectives (differences in values, beliefs, political orientation).[31]

---

[29] *Id.* at 48-53, 74-76.

[30] *Id.* at 7.

[31] The study's authors note: "It has been persuasively argued that a group of students whose members hold different beliefs about what is important, worthy, beautiful and good in life will be more likely to discover for themselves the depth and interminability of the disputes in which human beings find themselves entangled than a group of students whose members share values that are homogenous within the group." *Id.* 19-20 & n. 50.  (citing Anthony T. Kronman, *Is Diversity a Value in American Higher Education?*, 52 Fla. L. Rev. 861 (2000). Justice Powell made this same observation in *Bakke*: "People

20

The EDP Study examines the second question—
the impacts of diversity on educational settings—
through a tripartite structure derived from
*Grutter*.[32] First it considers diversity's 'direct
impacts' (the individual domain); it next considers
'derivative impacts' (the institutional domain); and
finally, 'mediated impacts' (the societal domain).
Direct impacts enhance individual students'
educational experiences.[33] Derivative impacts
prompt an increased range of activities and
programs on campus, and enhance the University's
concomitant reputation, stature and ranking.[34]
Mediated impacts enhance the ability of students to
succeed later in life, in diverse communities, and to
contribute meaningfully to society.

To focus on just one example, a university might
set a goal to "achieve a mix of students who will
respect and learn from each other." Accomplishing
this goal would have a direct impact in the
individual domain by advancing learning among
students; it would have a derivative impact by

---

do not learn very much when they are surrounded only by the
likes of themselves." *Bakke*, 438 U.S. at 312 n.48 (quoting
William G. Bowen, *Admissions and the Relevance of Race*,
Princeton Alumni Weekly 7, 9 (Sept. 26, 1977). He then went
further, noting that "it is not too much to say that 'the nation's
future depends upon leaders trained through wide exposure' to
the ideas and mores of students as diverse as this Nation of
many peoples." *Bakke*, 438 U.S. at 313 (quoting Keyishian v.
Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603
(1967)).

[32] *Grutter*, 539 U.S. at 329–33.

[33] *Id.* at 50-51.

[34] *Id.* at 51.

21

enhancing the university as a place in which students can learn; and it would have a mediated impact on society by improving students' learning and preparing students to succeed in a diverse society and global world. [35]

The detailed, longitudinal analysis of the EDP Study reaches important conclusions that support UNC's careful and judicious consideration of race in its admissions process. The analysis also confirms, through empirical statistical data, UNC's conclusion, recognized by the *Grutter* majority, that racial diversity can be a compelling governmental interest. The EDP Study additionally supports the continuing need to utilize affirmative means to achieve meaningful, educationally beneficial diversity.

The EDP Study's conclusions were intuitively recognized by this Court as early as 1950, when Chief Justice Vinson noted in *Sweatt v. Painter* that "[f]ew students. . . would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views . . . . With . . . a substantial and significant segment of society excluded, we cannot conclude that the education offered . . . is substantially equal to that" in a racially diverse setting.[36]

This is the key insight about the value of educational diversity. The "contribution of diversity" that Justice Powell described in *Bakke*, includes

---

[35] The EDP Study at 52-53. Table 12 (p. 54) analyzes goals. Table 13 (p. 55) analyzes actions. Table 14 (p. 56) analyzes outcomes.

[36] 339 U.S. 629, 634 (1950).

22

those "experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity."[37] Justice Powell clearly saw the value of race-conscious college admissions, not just as a backward-facing remedial effort but as a forward-looking interest in building a competent, college-trained future work force. As reaffirmed in *Grutter* and demonstrated empirically in the EDP Study, a holistic admissions process in which race plays some modest role remains the most effective, if not indeed the only realistic and workable, way to achieve the full measure of meaningful diversity that will serve UNC's compelling interests to educate, train and best serve the people of North Carolina.[38]

### D. The State of North Carolina Has Substantially Benefited From a Flow of Well-Trained University Graduates Educated in Racially Diverse Settings

UNC's experience has been that racial diversity offers more than lifelong, transformative educational benefits to individual graduates. Thousands of the State's corporations and small businesses, its hospitals and schools, its legislative chambers and courtrooms, now count on UNC graduates who are better prepared for public or private life because of college experiences which have taught them to thrive in interracial and multi-ethnic settings. In recent

---

[37] *Bakke*, 438 U.S. at 314.

[38] The EDP Study contains many additional findings that are pertinent to the Court's consideration of this case. We commend it to the Court's careful attention.

23

decades, UNC has sent scores of alumni, broadened by their campus experiences, into important professional or business positions in the State of North Carolina.[39]

In the field of law alone, the University has provided the State with five of its eight most recent governors, all seven of its current members of the North Carolina Supreme Court, and its first African Americans serving as Associate Justice and Chief Justice of the North Carolina Supreme Court, its first African American federal district judge, its first Native American state judge, many non-white State legislators, judges, federal and state prosecutors, a university chancellor, and an array of African American state and local bar leaders, as well as

---

[39] Among UNC's living alumni who have earned degrees, the following self-reported, UNC Alumni Office data suggest how many have moved into important professional or business positions in the State of North Carolina in recent decades:

| | | |
|---|---|---|
| Lawyers/Attorneys: | 4953 | (959-nonwhite) |
| CEOs: | 324 | (17-nonwhite) |
| Executive Directors: | 503 | (42-nonwhite) |
| Teachers: | 4458 | (319-nonwhite) |
| Nurses: | 2572 | (243-nonwhite) |
| Pharmacists: | 3247 | (190-nonwhite) |
| Presidents: | 2983 | (111-nonwhite) |

Email from Roger Nelsen, UNC Director of Alumni Records and Information Systems, to Catherine Pierce, UNC School of Law Assistant Dean for Policy (June 26, 2012, 9:38 a.m.) (on file with Catherine Pierce).

many prominent private firm practitioners and corporate directors.[40]

This is not the parochial experience of UNC alone. Briefs filed by corporations, military officials and others in *Grutter*, as the Court knows, have attested to the special and irreplaceable skills that graduates of racially diverse colleges bring to the nation's corporate workplaces, its armed forces, and to American political and economic life.

## II. PETITIONER'S PROPOSED REVISION OF *BAKKE* AND *GRUTTER* WOULD CREATE A NEW, STRICTER STANDARD FOR UNIVERSITY ADMISSIONS THAT WOULD UNDO DECADES OF SUPREME COURT JURISPRUDENCE, MATERIALLY WEAKEN THE EDUCATION OFFERED BY UNC AND OTHER PUBLIC UNIVERSITIES, AND DIMINISH THE CAPACITY OF THEIR GRADUATES TO WORK AND LEAD EFFECTIVELY IN THE 21st CENTURY

### A. Petitioner's Proposal Would Jettison Three Decades of Jurisprudence and Erect a New, Effectively Impregnable Barrier To the Consideration of Race in Undergraduate Admissions

Petitioner proposes a new version of the Court's traditional two-pronged "strict scrutiny" test under the Equal Protection Clause that would tighten each of its elements, thereby creating a doctrinal barrier

---

[40] *See generally,* Charles E. Daye, *African-American and Other Minority Students and Alumni*, 73 N.C. L. Rev. 675, 681-704 (1995).

high enough to condemn any limited use of race by the respondents. Indeed, petitioner's "super-strict-scrutiny" would likely bar consideration of race by virtually every public university or governmental actor in any future context, except in remediating an adjudicated wrongdoing.

The Court has never before accepted such an absolute position. To the contrary, it has offered assurance as recently as *Grutter*, that "strict scrutiny is not 'strict in theory but fatal in fact,'" and, that "not all [governmental uses of race] are invalidated by it."[41] The *Grutter* Court stressed that "[c]ontext matters," and that strict scrutiny should be seen as a device "designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decision maker for the use of race in that particular context."[42]

In the very context now under consideration— higher education— *Grutter* recognized "a compelling interest in attaining a diverse student body."[43] In so doing, the Court deferred to the University of Michigan Law School's "educational judgment that such diversity is essential to its educational mission."[44] This approach also recognized the important First Amendment rights of public universities, "in keeping with [its] tradition of giving

---

[41] *Grutter*, 539 U.S. at 326–27 (2003) (quoting *Adarand Constructors, Inc. v. Pena¸* 515 U.S. 200, 237 (1995)).

[42] *Id.* at 327.

[43] *Id.* at 328.

[44] *Id.*

a degree of deference to a university's academic decisions, within constitutionally prescribed limits."[45] The Court cited earlier cases invoking that principle, including Justice Powell's opinion in *Bakke*.[46] Justice Powell in turn had looked to Justice Frankfurter, who laid the constitutional groundwork for a claim of educational autonomy in 1957, citing among a university's 'four essential freedoms' the choice of "who may be admitted to study."[47] Justice Powell's "wide discretion" naturally evolved into what Justice O'Conner meant by the term "deference" in *Grutter.* Such discretion (or deference), however, does not weaken, but rather informs, strict scrutiny.

---

[45] *Id.* at 328.

[46] *Id.* at 328–29 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); *Board of Curators of Univ. of Mo. v. Horowitz*, 235 U.S. 78, 96 n.6 (1978); and *Bakke*, 438 U.S. at 319 n.53).

[47] Justice Powell explained: "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment. The freedom of a university to make its own judgments as to education includes the selection of its student body. Mr. Justice Frankfurter summarized the 'four essential freedoms' that constitute academic freedom: 'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail the four essential freedoms of a university - - to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Bakke,* 438 U.S. at 312 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (citation omitted) (internal quotation marks omitted)).

27

The *Grutter* majority concluded that student diversity was a compelling interest only after assessing diversity's specifically identified benefits to the Law School—including the promotion of better learning outcomes, an increase in cross-racial understanding, better preparation of students for an increasingly diverse workforce and society, better preparation for professional responsibilities, and the cultivation of leaders with legitimacy in the eyes of the citizenry.[48] Finding those benefits to be "substantial,"[49] the Court held that they sufficed to justify a cognizable "compelling interest" in student body diversity.[50]

Turning to the "narrow tailoring" branch of strict scrutiny, *Grutter* reemphasized that this test was not meant to forestall, in practice, all race-conscious actions by a governmental actor, but instead "to ensure that 'the means chosen fit th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate

---

[48] *Grutter*, 539 U.S. at 330–32.

[49] *Id.* at 330.

[50] Justice Kennedy's opinion in *Parents Involved in Community Schools v. Seattle School District No. 1*, similarly concluded that the consideration of race can be part of a compelling governmental interest. He wrote that "parts of the [plurality] opinion . . . imply an all-too-unyielding insistence that race cannot be a factor in instances when, in my view, it may be taken into account." 551 U.S. 701, 787 (2007) (Kennedy, J., concurring). Moreover, "the plurality's postulate that '[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race,' is not sufficient to decide these cases." *Id.* at 788 (quoting plurality opinion, 551 U.S. at 748).

28

racial prejudice or stereotype.'"[51]  Furthermore, the Court emphasized that context *also* counts when assessing narrow tailoring: "[T]he contours of the narrow-tailoring inquiry with respect to race-conscious university admissions programs . . . must be calibrated to fit the distinct issues raised by the use of race to achieve student body diversity in public higher education."[52] While no quota system is ever appropriate, the Court declared that narrow tailoring is *not* violated when  "a university . . . consider[s] race or ethnicity . . . as a 'plus' in a particular applicant's file, without insulat[ing] the individual from comparison with all other candidates for the available seats."[53]

Finally, in analyzing a claim identical to the primary one now made by petitioner, *Grutter* rejected the contention that the Michigan plan was not narrowly tailored simply because race-neutral means might have been substituted:

---

[51] *Grutter*, 539 U.S. at 333 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion) (internal quotation marks omitted)).

[52] *Id.* at 333–34.

[53] *Id.* at 334 (internal quotation marks omitted). That a race-conscious admissions program does not operate as a quota does not, by itself, satisfy the requirement of individualized consideration. When using race as a "plus" factor  a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race the defining feature of the application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount. *Id.* at 336–37.

29

Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative. Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups. . . . Narrow tailoring does, however, require serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks.[54]

The Court specifically rejected an idea that a law school might be required to consider a race-neutral lottery system to select among its applicants, since to do so would "require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both."[55] Thus good-faith consideration of race-neutral alternatives does not require admissions officials to substitute a mechanical formula for a system based on individual consideration of all applicants, so long as that consideration is narrowly tailored to achieve the compelling interest of assembling a diverse student body.

Petitioner would turn the strict scrutiny regime re-affirmed in *Grutter* on its head. First, she proposes a new dichotomy, not recognized in *Grutter*, to circumscribe radically the legitimate goals a university might pursue, suggesting that the Court has endorsed diversity only in support of a school's "inward-facing concerns", not any "outward-

---

[54] *Id.* at 339.

[55] *Id.* at 340.

facing" concerns about the relationship between its classes and the broader needs of society.[56]  However, the Court recognized and accepted such concerns in *Grutter*, specifically: (1) Michigan's desire to create diversity to "prepare[] students for an increasingly diverse workforce and society;"[57] (2) its desire to "better prepare[] [students] as professionals;"[58] and (3) its desire "to cultivate a set of leaders with legitimacy in the eyes of the citizenry" so that the "path to leadership," from the law school to the larger society, would be "visibly open to talented and qualified individuals of every race and ethnicity."[59]

Second, with absolutely no attention to "context," petitioner proposes to import the "strong basis in evidence" rule – a demand for an exceptionally rigorous factual inquiry limited heretofore by the Court to public contracting, public employment, and Section 5 voting cases – into the very different world of higher education.[60]  In these other contexts, where

---

[56] Pet'r's Br. 26.

[57] *Grutter,* 539 U.S. at 330.

[58] *Id.*

[59] *Id.* at 332.

[60] Petitioner quotes Justice Kennedy in support of her contention that a strong basis in evidence is required.  In fact, Justice Kennedy's dissent in *Grutter* made a far more nuanced point by demanding *not* a "strong basis in evidence" but only some "empirical evidence."  *Grutter,* 539 U.S. at 387-88 (Kennedy, J., dissenting).  As Justice Kenndy's comments highlight, the strong basis in evidence test is more appropriately suited to the remedial model of diversity in employment and contracting cases, not the forward focused, compelling interest model of diversity recognized in higher educational contexts.

31

the question is whether particular local or regional actors should be allowed to exercise race-conscious choices for quasi-remedial purposes, the Court has rightly called for a close evidentiary examination of whether the announced needs are sufficiently 'compelling' to justify what might easily become a political 'spoils system.'

In the realm of higher education, by sharp contrast, the Court in *Grutter* – after extensively examining the educational justifications for racial diversity– reached a broad legal conclusion that there indeed exists a "compelling interest in a diverse student body."[61] *Grutter* identified multiple, overlapping compelling interests, none of them 'remedial,' none limited to Michigan Law School alone, but all instead founded in the educational objective to create positive learning conditions that benefit all students and the societies they will eventually service. While careful evidentiary scrutiny remains appropriate in evaluating whether different colleges and universities have in fact tailored their diversity policies lawfully, the underlying lawfulness of student diversity itself has become, in *Grutter*, a binding principle of law that surely need not be relitigated in every subsequent case. For student diversity to be declared "compelling" at Michigan but not at Michigan State, permissible at Berkeley but not at UCLA, would be irrational, given the common goals virtually all institutions of higher education share.

---

[61] *Grutter*, 539 U.S. at 329; *see also id.*, 330-33.

Third, petitioner levels a Goldilocks-like complaint against the University of Texas at Austin's plan under the narrow tailoring branch, sometimes suggesting that Texas' consideration of race is "too large" since "race is a factor in admission, placement, or both for every in-state undergraduate applicant,"[62] and at other times complaining that Texas's consideration is too small, since "UT's use of race has had an infinitesimal impact on critical mass in the student body as a whole,"[63] Tellingly, petitioner never concedes a context in which racial consideration would be "just right," and instead argues implicitly that use of race is never permissible. In effect, petitioner would require a policy approach with a degree of precision rarely if ever attainable in the real world.

## B. Requiring UNC and Other Public Universities to Adopt an Ostensibly 'Race-Neutral' Alternative Such As the Texas Ten Percent Plan Would Weaken the Overall Strength of UNC's Entering Classes, Exclude Some of the Strongest Applicants, and Undermine Its Compelling Interest in Achieving Meaningful Diversity

What would happen if UNC were required to end its flexible, holistic admissions practice in favor of a mechanical, ostensibly "race-neutral" system, such as the Texas Ten Percent Plan, to attain diversity? One answer is clear: many of UNC's brightest and

---

[62] Pet'r's Br. 8.

[63] Pet'r's Br. 10 (citation omitted) (internal quotation marks omitted).

33

most promising future students, both white and non-white, would be denied admission. Indeed, the UNC Admissions Office has calculated the impact of such a change on the class entering the University in the fall of 2012. Drawing on extensive, individualized data on all high school seniors across the State, it calculates that imposing a Top Ten Percent plan in 2012 would increase by only 1% the overall percentage of non-white and underrepresented students who would enroll at Chapel Hill (from 15% to 16%).

Yet that choice would simultaneously depress almost every other indicator of academic quality. For example, average entering SATs in the fall of 2012 would decline by more than 50 points, from 1317 to 1262. Predicted first-year GPA averages among freshman students would dip from 3.26 to 3.16. Moreover, applicants who did not rank in the top 10% of their high school classes, would face far fiercer competition for the few open seats after the top 10% had been selected. The UNC Admissions Offices estimates that a non-top 10% student who applied to the University would see her chances of admission reduced from 31% (under UNC's present individualized, holistic system) to 10% (under a Top Ten Percent system).

In effect, reliable data suggest that a Top Ten Percent plan would be a significantly less satisfactory admissions system for UNC in most respects. The University would experience a negligible, 1% increase in non-white students, bought through a 56 point average decline in average SAT scores, a 0.10 point fall in predicted first year GPAs, and a far narrower window of

34

opportunity for admission among white and non-white applicants who were *not* in the top 10% of their high school classes. Many of the non-white and white students UNC most wanted to enroll could not be admitted.

Were the state's schools and school districts all equally strong and their populations evenly distributed by race, a Top Ten Percent policy might have far less devastating educational effect. Yet in 2012, North Carolina school districts are characterized (as are school districts in many other states) by wide educational disparities and inequities well-documented over the past eighteen years during the State's ongoing school finance/school adequacy litigation, *Leandro v. State*.[64] Because of these disparities, any top 10% admissions policy in North Carolina would create a disturbing irony: less-well-prepared white and non-white graduates from the State's under-financed and low-performing high schools would displace, in UNC's entering classes, many other highly-qualified "second 10%" graduates from some of the state's stronger and more competitive high schools, resulting in a less selective and less well-rounded class in conflict with the University's mission and in contravention of the University's First Amendment rights to determine for itself who is admitted to study.

Under such a system, UNC anticipates that many of the new "automatic admits" would quickly find themselves educationally lost amid the faster

_____

[64]  346 N.C. 336, 488 S.E.2d 249 (1997).

pace of Chapel Hill—flocking to remedial courses to overcome their relatively weak secondary school education and facing increasingly difficult challenges to reach graduation. At the same time, UNC would be obliged to reject other white and non-white applicants with far better academic preparation – familiar with advanced geometry and calculus, acquainted with biochemistry, veterans of a string of Advanced Placement courses -- simply because they had not made the rigid top 10% cut in one of North Carolina's stronger school districts.

In fact, after analyzing the entering credentials of several recent classes at UNC, the Admissions Office has found another basis for concern about a "Top Ten Percent" approach. Among the cohort of the 391 first year students who made the Dean's List in the spring of 2012, 82, or 21%, had been outside the top 10% of their high school classes. In addition, among the 12 UNC undergraduate students who were named Fulbright Scholars in 2011–2012, five ranked outside the top 10% of their high-school graduating class. Among the graduating seniors inducted into Phi Beta Kappa in the fall of 2010, nearly 15%, ranked outside the top 10% of their high school graduating classes. These Phi Beta Kappa graduates and Fulbright Scholars included recipients of campus, state, and national postgraduate fellowships, as well as several university-wide awards for leadership and service. None of them would have qualified for automatic admission under the Texas Ten Percent Plan.

36

## CONCLUSION

Each year, especially since the 1970s, UNC and thousands of other American colleges and universities have brought into close proximity—often for the first time in their lives—large numbers of racially diverse students. They have lived together in dormitories, eaten together in student cafeterias, worked together on student newspapers and politicked together in student government. They have played together on athletic fields, learned together in classrooms, and socialized together in clubs and organizations. After graduation, they have become part of a more racially diverse American workforce, a more racially heterogeneous military and officer corps, a more racially inclusive political system, and indeed, a more diverse judiciary.

The special mission of public colleges and universities to train and sustain this multi-racial society constitutes a compelling interest of the very highest sort. The individualized, holistic review of every applicant's file, with consideration afforded to dozens of factors—race being only a modest consideration among them—is the most narrowly tailored means to assure both diversity and a high quality of successful applicants, white and non-white.

Higher education, especially in residential settings, does far more than transmit facts and data to willing learners. At least since the founding of the residential colleges at Oxford and Cambridge, great universities have been among the most effective means to infuse, into its most talented youth, society's deepest values and goals. In every

37

generation, colleges convey powerful, implicit instruction, including powerful messages about "who counts," and who does not. It is indispensable to UNC's missions and, we earnestly believe, the future of the State and the nation, for 21st century collegians to learn the lessons that diversity teaches.

UNC urges the Court to adhere to the judgment reached in *Grutter* in 2003, presaged by Justice Powell's influential opinion in *Bakke* in 1978, intuitively recognized by Chief Justice Vinson in *Sweatt* in 1950, and followed by UNC and most American institutions of higher education ever since. The judgment of the Court of Appeals should be affirmed.

Respectfully submitted,

JOHN CHARLES BOGER
    *Counsel of Record*
MARK DOROSIN
ELIZABETH HADDIX
THE UNIVERSITY OF NORTH CAROLINA
    AT CHAPEL HILL
Chapel Hill, NC  27599-3380
(919) 962-4417
jcboger@email.unc.edu

LESLIE CHAMBERS STROHM
VICE CHANCELLOR AND GENERAL COUNSEL
JOANNA CAREY CLEVELAND
THE UNIVERSITY OF NORTH CAROLINA
    AT CHAPEL HILL
Chapel Hill, NC  27599-9105
(919) 962-1219

Counsel for *Amicus Curiae*

August 9, 2012