# Exhibit 43

# CADWALADER

# Investigation of Irregular Classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill



C. Folt
DEPOSITION
EXHIBIT
15
PENGAD 800-631-6989
5-31-17

**Kenneth L. Wainstein**
A. Joseph Jay III
Colleen Depman Kukowski

October 16, 2014

# CADWALADER

I.   EXECUTIVE SUMMARY ...................................................................................... 1

II.  INTRODUCTION ................................................................................................. 7

III. INVESTIGATIVE PLAN AND METHODOLOGY ........................................ 9

    A.   The Scope of the Investigation ................................................................... 9
    B.   Preliminary Steps of the Investigation ................................................... 10
        1.   Review Prior Reports .................................................................. 10
        2.   Consult with District Attorney Woodall and the SBI ........... 10
        3.   Request Input from the Public .................................................. 11
        4.   Secure Access to FERPA Information ....................................... 11
        5.   Distribute Broad Document Preservation Directive ............... 11
    C.   Collection and Review of Electronic Documents ................................. 11
    D.   Personal Interviews .................................................................................. 12
    E.   Review of Student Transcripts and Academic Records ....................... 13
    F.   Review of Student Papers ......................................................................... 13

IV.  FACTUAL NARRATIVE OF AFAM IRREGULARITIES ........................... 14

    A.   Debby Crowder's Focus on Helping Challenged Students ................. 14
    B.   Strong Leadership in AFAM's Early Years ............................................ 14
    C.   Nyang'oro's Hands-off Approach to Management ............................... 15
    D.   Crowder's Use of Independent Studies for Paper Classes ................. 16
    E.   Crowder's Use of Lecture Classes for Paper Classes .......................... 17
    F.   The Popularity of Crowder's Paper Classes .......................................... 19
    G.   The Steering of Student-Athletes to These Classes ............................. 19
    H.   Submission of Papers with Text that was Copied or Written by Others .................... 20
    I.   Isolated Questions About the Paper Classes ........................................ 20
    J.   Crowder's Retirement and its Effect on the Paper Classes ................. 21
    K.   The Paper Classes After Crowder's Retirement ................................... 23
    L.   The Administration's Discovery of the Paper Class Scheme in August 2011 ............. 24
        1.   Earlier Reviews Related to Irregular Courses ......................... 24
            a.   NCAA Investigation ........................................................ 24
            b.   Hartlyn-Andrews Review of Courses .......................... 25
            c.   Independent Study Task Force ...................................... 26
            d.   The State Bureau of Investigation ................................ 26
            e.   Special Subcommittee of the Faculty Executive Committee .............. 27
            f.   The Governor Martin Review ....................................... 27
            g.   The Baker Tilly Review .................................................. 28
            h.   The UNC Board of Governors Academic Review Panel ................... 29
            i.   The SACS Review ........................................................... 29
            j.   The Resumption of the NCAA Inquiry ....................... 30

# CADWALADER

V. FINDINGS ...........................................................................................................31

    A.    Examination of the Paper Class Scheme .....................................................31
        1.    The Identification of Paper Classes..................................................32
            a.    Independent Study Paper Classes ........................................33
            b.    Lecture Paper Classes ...........................................................34
            c.    Post-Crowder Paper Classes .................................................35
            d.    Bifurcated Classes..................................................................36
            e.    Student Add-ons.....................................................................37
            f.    The Total Numbers of Paper Classes and Paper Class Students.......37
        2.    Grade Manipulation in the AFAM Paper Classes............................38
        3.    The Motivation Behind Offering the AFAM Paper Classes ............42
        4.    Use of the Paper Classes by the Student Body.................................46
            a.    Student-Athletes .....................................................................46
                 i.    Distribution of Paper Class Enrollees per Sports Program ..47
                ii.    Reasons for the Distribution of Paper Class Enrollees by Sports Program ......................................................49
                iii.    Reasons for Fluctuations in Student-Athlete Enrollment in the Paper Classes ..........................................50
            b.    Non-Athlete Students .............................................................51
         5.    The Analysis of Student Papers in the Paper Classes ......................53
            a.    The Submission of Papers with Text Written by Others....................54
            b.    The Submission of Papers with Copied Text .......................57
            c.    Originality Review ..................................................................58
        6.    The Analysis of the Impact of Paper Classes on Student GPAs .....61
            a.    Impact Analysis Methodology................................................61
            b.    Impact Analysis Findings .......................................................62
    B.    Assessment of University Employee Knowledge or Involvement in the Paper Classes ...................................................................................................63
        1.    The ASPSA Academic Counselors and Steele Building Academic Advisors 63
            a.    The ASPSA Academic Counselors ........................................63
                 i.    Knowledge of ASPSA Counselors.............................64
                ii.    Active Involvement in the AFAM Paper Classes by ASPSA Counselors ......................................66
        2.    Advisors in Academic Advising.......................................................68
        3.    Athletics Department Personnel......................................................69
            a.    Athletics Department Management........................................69
            b.    Football Personnel .................................................................70
                 i.    Coach John Bunting...................................................70
                 ii.    Coach Butch Davis.....................................................70
                 iii.    Associate Athletics Director Corey Holliday............71
            c.    Men's Basketball Personnel ...................................................72
                 i.    Coach Matt Doherty ..................................................72
                 ii.    Coach Roy Williams ...................................................72
            d.    Women's Basketball Personnel ..............................................74
            e.    Baseball Personnel..................................................................75
            f.    Women's Soccer Personnel.....................................................75

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 4 of 137

    4.  The AFAM Faculty.................................................................................75
      a.  Tim McMillan ...............................................................76
      b.  Alphonse Mutima ........................................................77
      c.  Eunice Sahle ..................................................................80
      d.  Other AFAM Faculty Members ...............................81
    5.  University Faculty Outside of AFAM..............................81
      a.  The Faculty Athletics Committee ..............................82
      b.  The Faculty Athletics Representative ........................89
    6.  Chapel Hill Administration.................................................90
      a.  The Senior Associate Dean for Social Sciences and Global Programs ...........................................................................90
      b.  The Senior Associate Dean for Finance and Planning ........90
      c.  The Senior Associate Dean for Undergraduate Education................91
      d.  Dean of the College of Arts and Sciences .............................91
      e.  Chancellor......................................................................91
  C.  Assessment of the University's Oversight of the AFAM Department and ASPSA...................................................................................92
    1.  Oversight of AFAM ...........................................................92
    2.  Oversight of ASPSA..........................................................94
  D.  Assessment of the University's Response to the Paper Class Revelations .................95
  E.  Comparison with the Findings in the Martin Report.......................................97
    1.  Number of Irregular Classes and Enrollees .......................................98
    2.  Duration of Irregular Classes ................................................98
    3.  Student-Athlete Composition of Irregular Classes .............................98
    4.  Knowledge of AFAM Faculty.............................................99
    5.  Knowledge of ASPSA .........................................................99

VI.  **WITNESS ACCOUNT SUMMARIES** ................................................100

  A.  UNC and Chapel Hill Leadership ............................................... 100
  B.  Chapel Hill Faculty.......................................................................... 106
  C.  AFAM Faculty and Staff Members............................................... 108
  D.  Current and Former Members of the Faculty Athletics Committee......................... 113
  E.  Chapel Hill Staff and Advisors ..................................................... 116
  F.  Academic Support Program for Student-Athletes Staff ........................................... 117
  G.  Chapel Hill Athletics Department.................................................. 123
  H.  Others................................................................................................ 129
  I.  Witnesses who Refused to Cooperate ........................................... 130

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 5 of 137

# CADWALADER

## I. EXECUTIVE SUMMARY

Deborah ("Debby") Crowder was hired in 1979 as the Student Services Manager in the African and Afro-American Studies Curriculum at the University of North Carolina at Chapel Hill ("Chapel Hill"). As a non-faculty member, her official responsibilities were limited to serving as office secretary and administrator for the Curriculum (later to become the Department of African and Afro-American Studies ("AFAM")). By the time she retired in 2009, however, Crowder had not only handled those responsibilities for 30 years; she had also started and managed a line of academically unsound classes that provided deficient educational instruction to thousands of Chapel Hill students.

Debby Crowder's whole life has revolved around Chapel Hill. She grew up dreaming of attending Chapel Hill; she was an undergraduate student at Chapel Hill from 1971 to 1975; and she spent all but four years of her career working there. Despite her love for the University, she often told people that she had a difficult experience during her student years at Chapel Hill, feeling that she was left adrift by faculty and staff that focused on "the best and the brightest" and failed to pay attention to students like herself who needed direction and support. Because of that experience, Crowder felt a strong affinity for students with academic or other challenges in their lives. She believed it was her duty to lend a helping hand to struggling students, and in particular to that subset of student-athletes who came to campus without adequate academic preparation for Chapel Hill's demanding curriculum.

From the beginning of her AFAM tenure, Crowder thought about ways to help challenged students with watered-down academic requirements. Though tempted to bend the rules for the first 13 years of her AFAM service, that impulse was kept in check by strong leadership that was focused on the rigor of the curriculum.

That changed, however, when Dr. Julius Nyang'oro became chair of the curriculum in 1992. Nyang'oro brought a hands-off approach to management, and was willing to delegate substantial authority to Crowder. He also shared some of Crowder's sympathy for struggling students – and in particular for student-athletes. Crowder took advantage of the more permissive environment under Nyang'oro and started to implement a plan to offer classes that awarded high grades with little regard for the quality of a student's work.

Specifically, she designed and offered what are called "paper classes." These were classes that were taught on an independent study basis for students and student-athletes whom Crowder selected. Like traditional independent studies at Chapel Hill or any other campus, these classes entailed no class attendance and required only the submission of a single research paper. Unlike traditional independent studies, however, there was no faculty member involved in managing the course and overseeing the student's research and writing process. In fact, the students never had a single interaction with a faculty member; their only interaction was with Crowder, the Student Services Manager who was not a member of the University faculty.

Crowder provided the students with no actual instruction, but she managed the whole course from beginning to end. She registered the selected students for the classes; she assigned them their paper topics; she received their completed papers at the end of the semester; she graded the papers; and she recorded the students' final class grades on the grade rolls. When Crowder

graded the papers, she did so generously – typically with As or high Bs – and largely without regard to the quality of the papers. The result was that thousands of Chapel Hill students received high grades, a large number of whom did not earn those high grades with high quality work.

These paper classes were taken by students of all types, but were especially popular among student-athletes, particularly those who played the "revenue" sports of football and men's basketball. Many of these student-athletes were referred to these classes by academic counselors in the Academic Support Program for Student-Athletes ("ASPSA") who were always under pressure to maintain student-athlete eligibility and saw these classes – and their artificially high grades – as key to helping academically-challenged student-athletes remain eligible and on the playing field.

Due to curricular changes and limits on the number of independent studies per student, Crowder modified her approach in the late 1990s and started offering these paper classes under the guise of traditional lecture classes. Despite their lecture designation on the schedule, these classes continued to operate in the same fashion. There was no class attendance or student interaction with anyone other than Crowder, and Crowder continued to grade the papers.

Although Nyang'oro acquiesced in Crowder's paper class scheme and facilitated it in a number of ways, Crowder was the one who coordinated it. When Crowder retired from the University in 2009 and she was no longer in position to arrange these classes, under-prepared students and student-athletes began to struggle to maintain academic eligibility. At the request of ASPSA football counselors, Nyang'oro offered several classes after Crowder's retirement that followed a similar format and were equally lacking in academic rigor.

Despite the fact that these classes involved thousands of students and coordination between Crowder and numerous University employees, the Chapel Hill administration never scrutinized AFAM's operations or the academic integrity of their course offerings. It was only when media reports raised questions about AFAM classes in 2011 that administration officials took a hard look at the AFAM Department. They were shocked with what they found.

The University took a number of actions in reaction to the paper class revelations. They immediately self-reported the misconduct to the NCAA. They then commissioned a series of inquiries to investigate and learn how these classes had developed. However, with both Nyang'oro and Crowder unwilling to be interviewed for these reviews because of a pending criminal investigation, none of these inquiries were able to truly get to the bottom of what happened with the paper classes.

That changed at the end of 2013, once the criminal investigation came to an end and the University learned that it would have access to Debby Crowder and to the information from the State Bureau of Investigation's criminal investigation. Soon thereafter, the University retained us to take advantage of this opportunity and conduct a thorough, probing investigation to answer the lingering open questions about the paper class scheme.

We have done just that over the past eight months, interviewing 120 witnesses, collecting and searching 1.6 million emails and other electronic documents and analyzing student transcripts and Chapel Hill course records dating back to the 1980s. Over the course of that investigation, we have arrived at a number of findings, including the following:

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 7 of 137

- Between 1993 and 2011, Crowder and Nyang'oro developed and ran a "shadow curriculum" within the AFAM Department that provided students with academically flawed instruction through the offering of "paper classes." These were classes that involved no interaction with a faculty member, required no class attendance or course work other than a single paper, and resulted in consistently high grades that Crowder awarded without reading the papers or otherwise evaluating their true quality.

- Crowder and Nyang'oro were primarily motivated to offer these classes by a desire to help struggling students and student-athletes. Both felt sympathy for under-prepared students who struggled with the demanding Chapel Hill curriculum. Crowder felt a strong affinity for student-athletes in particular, and she gave them ready access to these watered-down classes to help them manage their competing athletic and academic time demands.

- Over the 18 years these classes existed, Crowder and Nyang'oro were responsible for offering 188 different lecture classes as well as hundreds of individual independent studies in the "paper class" format – with no class attendance or faculty involvement, and with Crowder managing the class and liberally grading the papers. Through this scheme, over 3,100 students received one or more semesters of deficient instruction and were awarded high grades that often had little relationship to the quality of their work.

- The grades earned in these AFAM paper classes were significantly higher than grades awarded in the regular AFAM classes. The average grade issued to all identified students in the paper classes was 3.62, as compared to an average grade of 3.28 for the regular AFAM classes. That difference was even greater for student-athletes. The average grade given to all student-athletes for the paper classes was 3.55, as compared to an average student-athlete grade of 2.84 for the regular AFAM classes.

- The inflated grades from the paper classes had a significant impact on student and student-athlete GPAs and academic standing. Each paper class grade increased a student's GPA, on average, by approximately .03 grade points. The significance of this effect could be seen in the number of students for whom the paper class grade made the difference in reaching or not reaching the 2.0 grade threshold. In the case of 329 students, the grade they received in a paper class provided the "GPA boost" that either kept or pushed their GPA above the 2.0 level for a semester. For 81 of those students, that GPA boost was the margin that gave them the 2.0 GPA that allowed them to graduate.

- Student-athletes accounted for a disproportionately high percentage of enrollments in the AFAM paper classes. Of the identifiable enrollments in the lecture paper classes, 47.4% were student-athletes, even though student-athletes make up just over 4% of the Chapel Hill undergraduate student body. Of those student-athlete enrollments, 50.9% were football players,

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 8 of 137

12.2% were men's basketball players, 6.1% were women's basketball players, and 30.6% were Olympic and other sport athletes.

- A good number of these student-athletes were "steered" to the AFAM paper classes by certain academic counselors in ASPSA. This steering was most prevalent among the counselors for the revenue sports of football and men's basketball. While some of these counselors knew only that these were easy classes, others were fully aware that there was no faculty involvement and that Crowder was managing the whole course and grading the papers. Those counselors saw these paper classes as "GPA boosters" and steered players into them largely in order to help them maintain their GPAs and their eligibility under the NCAA and Chapel Hill eligibility rules. At least two of those counselors went so far as to suggest what grades Crowder should award to their players who were taking her paper classes.

- Several of the ASPSA football counselors grew dependent on the paper classes and were very concerned when Crowder announced her upcoming retirement. They immediately took steps to prepare for the end of the paper classes. They instructed players to submit their papers before Crowder's departure to receive the benefit of her liberal grading; they warned the football coaches that with Crowder's retirement they no longer had access to classes "that met degree requirements in which [the football players] didn't go to class...didn't take notes [or] have to stay awake...didn't have to meet with professors [and] didn't have to pay attention or necessarily engage with the material;" and they undertook an effort to persuade Nyang'oro to continue the paper classes. They succeeded in getting Nyang'oro to offer a few classes, but not before the football team's GPA fell to its lowest point in ten years.

- It became common knowledge among certain quarters of the student and student-athlete body that Crowder did not grade paper-class papers with a discriminating eye and that a student could receive a high grade for turning in a paper of any quality. As a result, a significant proportion of the papers submitted in these classes included large amounts of unoriginal text. In a number of cases, students submitted papers with original introductions and conclusions, but with copied "fluff" text in between, because they knew that Crowder typically just skimmed the beginning and the end of a paper before awarding a high grade.

- ASPSA made tutors available to all student-athletes, and those tutors often helped the student-athletes with their paper-class papers. While most conducted themselves appropriately, several of the tutors crossed the line between permissible and impermissible assistance and drafted parts of the papers that the student-athletes submitted for credit in these classes.

- Although Crowder took steps to mask the true nature of the paper classes, there were University employees who had varying degrees of knowledge about the paper classes:

  - Besides those ASPSA counselors mentioned above who were actively colluding with Crowder and Nyang'oro, there were a number of ASPSA counselors and Athletics Department staff who knew that these were easy courses that required no class attendance and that they resulted in consistently high grades for the student-athletes. Several also recognized the anomaly that these classes were taught in an independent study format even though they were often designated on the course schedule as lecture classes.

  - A number of the Academic Advisors in the Office of Academic Advising occasionally referred academically-challenged students and students with other hardships to Crowder's paper classes, although they apparently did not know that Crowder managed the classes and graded the papers without the involvement of a faculty member.

  - At least three members of the AFAM faculty – besides Nyang'oro – had some knowledge of the paper class scheme and took actions that assisted or facilitated the paper class scheme.

  - Several administrators were aware of red flags about potential irregularities in AFAM but took little or no action to inquire about them. For example, one administrator became aware in 2005 or 2006 that Nyang'oro was routinely listed as the instructor-of-record for a number of independent studies – approximately 300 per year – that was clearly well beyond what any professor could physically handle. That administrator's response was just to ask Nyang'oro to reduce his independent studies numbers and then to let the matter drop. She never asked how he or his small department could possibly teach 300 different independent studies in a single year and never challenged him on the quality of instruction these students were or were not receiving in these independent studies. If she had, she would have learned that the students were effectively getting no instruction and that these were largely paper class students who were writing papers for Debby Crowder. The administrator's inexplicable decision not to press this obvious issue allowed the paper class scheme to continue for another five years.

  - Beyond those University personnel who were aware of red flags about the AFAM classes, there were a larger number among the Chapel Hill faculty, administration and Athletics and ASPSA staff who knew that these were easy-grading classes with little rigor and knew that there was a process – like similar processes that exist in many colleges around the country -- where some number of student-

athletes were deliberately steered toward these classes. Several of those same people also made a conscious decision not to ask questions even though they had suspicions about the educational content of those classes.

- Like many universities, the Chapel Hill administration took a loose, decentralized approach to management of its departments and department chairpersons, on the theory that strong management in the college environment unduly constrains the academic independence that fosters creative instruction and research. As a result of this approach, the University failed to conduct any meaningful oversight of the AFAM Department and ASPSA, and Crowder's paper class scheme was allowed to operate within one of the nation's premier academic institutions for almost two decades.

- We found no evidence that the higher levels of the University tried in any way to obscure the facts or the magnitude of this situation. To the extent there were times of delay or equivocation in their response to this controversy, we largely attribute that to insufficient appreciation of the scale of the problem, an understandable lack of experience with this sort of institutional crisis and some lingering disbelief that such misconduct could have occurred at Chapel Hill.

# CADWALADER

## II. INTRODUCTION

The University of North Carolina at Chapel Hill has been the subject of a series of academic misconduct allegations over the past three years. These allegations have focused on the offering of irregular courses in the Department of African and Afro-American Studies ("AFAM").[1] These classes were irregular in that they required no class attendance or course work other than a single paper, and were managed by the AFAM office secretary without any involvement by a faculty member. They were very popular among students for many years, largely because the office secretary graded the papers and handed out consistently high grades largely without regard to the quality of the work in those papers. These classes were known as "paper classes" on the Chapel Hill campus, and that is the term that we will use in this report when referring to the AFAM classes with the above-listed characteristics.

Since these classes first came to light in August 2011, the University of North Carolina ("UNC") has worked hard to understand their origins and the motivations behind them. A number of very well-conducted reviews and investigations were undertaken by distinguished persons from inside and outside the University. Lacking access to certain critical information and witnesses, however, these reviews were unable to provide a definitive accounting of how these paper classes developed.

In late 2013, District Attorney James Woodall (District Attorney of Orange and Chatham Counties) informed the University that a State Bureau of Investigation ("SBI") criminal investigation would conclude with the indictment of former AFAM Department Chairman Julius Nyang'oro ("Nyang'oro") for receiving payment for a paper class that he never taught. District Attorney Woodall suggested that he may soon be in a position to provide the University with access to investigative information relating to the irregular AFAM courses and to possibly arrange access to the individual who colluded with Nyang'oro to arrange these irregular classes – former AFAM Student Services Manager Deborah Crowder ("Crowder"). After brief consideration, the University decided – and District Attorney Woodall agreed – that the University should bring in a completely independent investigative team to receive this information and conduct a thorough investigation.

On February 21, 2014, University of North Carolina ("UNC") President Thomas W. Ross and Chancellor Carol L. Folt of the University of North Carolina at Chapel Hill ("Chapel Hill") selected us to lead that effort.[2] In announcing our appointment, the President and Chancellor explained that they had directed us "to ask the tough questions, follow the facts wherever they lead,

---

[1] Effective July 1, 2013, the department changed its name to the Department of African, African American, and Diaspora Studies. Because African and Afro-American Studies (AFAM) was the name used during the period of time we examined in our investigation, we will use that name throughout our report.

[2] In addition to Mr. Wainstein, the Cadwalader, Wickersham & Taft LLP team included attorneys A. Joseph Jay III, Thomas M. Guerin, Colleen Depman Kukowski, and Katherine A. Preston; law clerk Peter T. Carey; and paralegals Christian A. Moore and Caitlin E. Ptak.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 12 of 137

# CADWALADER

and [...] take any further steps necessary to address any questions left unanswered during previous reviews commissioned by the University."[3]

Importantly, President Ross and Chancellor Folt directed that we conduct our investigation with complete independence from officials in the UNC system and at Chapel Hill. As such, we have operated without any direction, guidance or limitations imposed from UNC. We alone have determined what questions to ask, which individuals to interview, what materials to request and review and what conclusions to draw from our investigative findings. We want to acknowledge the UNC system and Chapel Hill for respecting that independence and for their complete cooperation in every facet of our investigation.

[3] *Independent counsel to conduct inquiry of information about academic irregularities*, U. OF N.C. AT CHAPEL HILL NEWS (Feb. 21, 2014), http://uncnews.unc.edu/2014/02/21/independent-counsel-conduct-inquiry-information-academic-irregularities/.

# CADWALADER

## III. INVESTIGATIVE PLAN AND METHODOLOGY

We developed the investigative plan and methodology for this investigation much the same way as we routinely design and implement them for investigations of corporations and other large organizations. Specifically, we conduct extensive email and document reviews to develop an understanding of the communications relating to the conduct under investigation. We then use what we learn from those communications to formulate our investigative strategy, to identify potential witnesses and to prepare our interviews with those witnesses.

We followed that approach on this matter, searching over 1.6 million emails and other documents to find communications relating to the AFAM paper classes and interviewing 126 individuals as to their knowledge of or role in these classes.

The following section details the specific steps we took throughout the course of this investigation.

### A. The Scope of the Investigation

The first step of our investigation was to clearly define the scope of our review. We did this by identifying a series of questions that were left unanswered or partially answered by the prior reviews. These questions became the core around which we built our investigation, and they included:

- What exactly were these irregular classes? How and why had they been offered?

- Is there any evidence that these paper classes existed in other departments at Chapel Hill?

- Is there evidence that students, including student-athletes, received grades or credit in these classes that they did not earn?

- Did Dr. Nyang'oro and Debby Crowder offer these classes with artificially high grades specifically to provide a way for student-athletes to maintain their eligibility?

- Did the Athletics Department, athletics counselors and/or student-athletes use these classes as a means of maintaining student-athlete eligibility?

- What was the involvement, if any, of Chapel Hill administrators, faculty and staff in offering, facilitating and/or directing students and student-athletes to these paper classes?

- What did Chapel Hill administrators, faculty and staff know about these paper classes, even if they were not actively involved in facilitating them?

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 14 of 137

# CADWALADER

- What was the response of Chapel Hill administrators, faculty, and staff as red flags emerged concerning these classes?

B. Preliminary Steps of the Investigation

Once we established the scope of our review, we laid the groundwork for our investigation by taking the following preliminary steps:

1. Review Prior Reports

As an initial step, we carefully reviewed each of the reports that were generated by the previous inquiries of the irregular AFAM classes. Those reports included the following:

- The Hartlyn-Andrews Report dated May 2, 2012;

- The Independent Study Task Force Report dated May 2, 2012;

- The Faculty Executive Committee Report dated July 26, 2012;

- The Governor James G. Martin Report dated December 20, 2012, Addendum dated January 24, 2013, and the Clarification dated February 5, 2013;

- The Baker Tilly Report dated December 20, 2012; and

- The Board of Governors Review Report dated February 7, 2013.

It was clear from our review of these reports that each of the previous inquiries was conducted very capably and in good faith by those charged to undertake them. Though limited by scope and mandate and by their lack of access to Crowder, Nyang'oro, and the information gathered by the SBI, they all provided critically important insights and information that formed the building blocks of our investigation. We are grateful to each of the prior reviewers, especially Deans Jonathan Hartlyn and William Andrews, Governor James G. Martin, and Raina Rose Tagle of Baker Tilly Virchow Krause LLP ("Baker Tilly"), each of whom spent a considerable amount of time meeting with us and walking us through their findings.

2. Consult with District Attorney Woodall and the SBI

We were also fortunate to have the opportunity to consult closely and regularly with District Attorney Woodall, SBI Assistant Director Eric Hooks and SBI Agent Blane Hicks regarding the findings of their exceptionally thorough criminal investigation. In addition, thanks to District Attorney Woodall's efforts, we were able to interview Crowder, the former Student Services Manager in AFAM, Nyang'oro, the former Chair and Professor of that department, and Jennifer Wiley Thompson ("Wiley"), a former tutor for the Academic Support Program for Student-Athletes. Our ability to meet with each of these critical witnesses proved invaluable to our review. We are extremely grateful for District Attorney Woodall's assistance in this regard.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 15 of 137

### 3. Request Input from the Public

On several occasions, we requested that anyone with relevant information contact the investigative team. A number of people did so by phone, by email or in person, and those contacts led to valuable information and a number of important investigative leads.

### 4. Secure Access to FERPA Information

Immediately upon our engagement, we executed a letter agreement with the University that permitted us access to information protected by the Family Education Rights and Privacy Act ("FERPA").[4] Under this agreement, we received unfettered access to protected student information, including transcripts and other academic records, with the understanding that we would not further disseminate such information, including in this report.[5]

### 5. Distribute Broad Document Preservation Directive

Shortly after our engagement, we worked with the University to identify current employees who may have relevant information on their computer systems and to issue a broad document preservation order to those employees. In April 2014, the UNC System – known as "General Administration" – and the Chapel Hill campus issued those orders to identified faculty and staff reminding them of their responsibility to preserve and not to delete or destroy electronic data of potential relevance to our review.[6]

### C. Collection and Review of Electronic Documents

Immediately upon our engagement by the University, we set out to identify the availability of email and other relevant electronic documents. We consulted with University counsel and IT specialists regarding the University's email system and electronic document storage environment. It became clear in these meetings that a comprehensive review of email and other electronic documents had not been conducted in the prior investigations. Although Governor Martin's team had collected and reviewed a subset of the relevant emails, there had not been the sort of broad email review that is a necessary ingredient of a comprehensive investigation. Upon taking office, Chancellor Folt had noticed this deficiency and directed a review of certain employee emails. She reviewed the results and found some of the results troubling, in part encouraging her to seek this investigation.

---

[4] 20 U.S.C. § 1232g; 34 C.F.R. pt. 99.

[5] We spoke with several current and former students (both athletes and non-athletes) during our investigation. Because our discussions concerned their academic record, such discussions are protected by FERPA. Accordingly, while we may reference these discussions or information learned therefrom, we will not include the students' names or attribute any statements or information to a particular current or former student.

[6] Prior to our investigation, both the UNC System and Chapel Hill campus had a document preservation directive in place. This directive was broadened after our engagement in terms of scope and in the number of people receiving it.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 16 of 137

# CADWALADER

We worked with both the University and Baker Tilly (the accounting firm that had assisted Governor Martin) to gather all email and electronic document files that had previously been collected. We then identified a list of additional employees whose email potentially contained relevant information and requested that the University provide their email to us. Cadwalader's electronic discovery group then processed all the emails we received and loaded them into a robust electronic discovery database. In total, we collected and processed over 100 GB of data from 39 different current or former Chapel Hill faculty and staff. After taking out duplicates, we compiled a database of over 1.6 million emails and electronic documents.

We formulated a list of 48 keywords that related to the subject matter of our investigation – words such as "paper class" and "independent study" – and our IT specialists ran these terms against the 1.6 million electronic documents in the database. Our staff then reviewed emails and documents that hit on those terms to identify those that had some bearing on the issues we were investigating.[7] We then used the information gleaned from those emails to craft our investigation and interview strategy.

### D. Personal Interviews

The personal interviews were the core of our investigative efforts. During our investigation, we interviewed 126 individuals in person or by telephone.[8] This number included 20 current and former Chapel Hill Chancellors and high-ranking administrators, 15 AFAM faculty and staff members, 12 current and former ASPSA staff members, four tutors for student-athletes, and 22 current and former students, including 17 current and former student-athletes.[9]

As explained above, our interviews were aided by our document review. In many of our interviews, we showed the witness emails or other documents to prompt their memory of events that took place years before. Many of the emails and documents we showed to witnesses during their interviews are excerpted or otherwise referred to in this report.

---

[7] In addition to the Exhibits to this report, we have compiled an additional volume (the "Supplemental Volume") of documents upon which we relied, in part, in making the findings in this report. This Supplemental Volume contains 583 documents (900 pages).

[8] *See* Exhibit 1 for a list of persons interviewed.

[9] We received full cooperation from the vast majority of people we sought to interview. There were, however, five notable exceptions who refused to speak with us, four of whom were associated with the football program. Former ASPSA Associate Director and head football counselor Cynthia Reynolds refused multiple requests for an interview, despite the encouragement of her current employer, Cornell University. *See* Exhibit 2: Emails and Letters Regarding Cynthia Reynolds. Former ASPSA football counselor Octavus Barnes refused our request for an interview through an attorney. Former assistant and interim head football coach Everett Withers refused multiple requests for an interview as well as an attempt by his current employer, James Madison University, to urge him to cooperate. *See* Exhibit 3: Emails and Letters Regarding Everett Withers. Similarly, former assistant coach and current head coach of the NFL Indianapolis Colts Charles "Chuck" Pagano declined our request for an interview. *See* Exhibit 4: Emails Regarding Chuck Pagano. Finally, former Associate Dean of Academic Advising Carolyn Cannon ignored multiple requests for an interview. *See* Exhibit 5.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 17 of 137

E.    Review of Student Transcripts and Academic Records

As described more fully in Section V.A.6, we worked closely with University Registrar Christopher Derickson and his staff to access and review student transcripts and grade information going back to the 1980s. We also worked to understand how grades from paper classes affected student GPAs. To do this, we developed a methodology that permitted us to determine instances in which the grade or grades that a student received in those classes proved essential to their GPA remaining above 2.0, the requirement for graduation.[10] This analysis required Mr. Derickson and his staff to undertake complicated and time-consuming programming and data analytics, and we are grateful to him and his staff for their hard work and consummate professionalism throughout this long process.

F.    Review of Student Papers

As explained above, the only work typically required by these paper classes was the submission of a single paper. It was therefore important that any assessment of these classes' academic soundness include an examination of student papers and a determination whether they reflect genuine work by the students. The importance of that examination has only been enhanced by the continuing public allegations that some number of the papers submitted in these classes were the product of plagiarism.

At the outset of our investigation, we were under the impression – as Governor Martin and his team had been – that the student papers in these classes had all been destroyed after the mandatory one-year retention period.[11] Through our email review, however, we identified 150 student papers that appear to have been final drafts submitted for credit in the AFAM paper classes. In light of remaining questions regarding the integrity of such papers, we designed a review process that would determine whether each paper appeared to represent original student work. As described in Section V.A.5.c, this review was led by three professors from non-UNC institutions with expertise in African politics, African American studies and undergraduate writing.

---

[10] As discussed more fully in Section V.A.6, *infra*, there are inherent limits to what we can conclude from this analysis, as we could not definitively predict the grade that a student would have received if he or she had taken another course in place of the irregular AFAM class.

[11] In an op-ed published in the *News & Observer*, Governor Martin wrote: "Leading up to our report and immediately afterward, [the newspaper] issued demands that we examine term papers for plagiarism. What term papers? None is retained beyond a year. I assumed that [the newspaper's] conclusion was correct: that extensive plagiarism was likely. I commented that it was likely that not all of the hundreds of term papers submitted in these courses were actually read for the grades posted. We could not proofread papers that no longer exist." Jim Martin, Letter to the Editor, *Jim Martin: We found what we could at UNC*, NEWS & OBSERVER, Jan. 2, 2013, http://www.newsobserver.com/2013/01/02/2579556_jim-martin-we-found-what-we-could.html?rh=1.

# CADWALADER

## IV.    FACTUAL NARRATIVE OF AFAM IRREGULARITIES

Over the past eight months, we have pursued the foregoing investigative plan to learn how and why the paper class scheme[12] came into being at Chapel Hill. The following is a detailed narrative of the evolution of the paper class scheme from its inception in 1993 through its discovery in 2011 and the ensuing investigations.

### A.    Debby Crowder's Focus on Helping Challenged Students

Crowder came to Chapel Hill as an undergraduate student in the 1970s. After earning her degree in English and working for a few years at a department store, Crowder returned to Chapel Hill in 1979 as a secretary in what was then the Curriculum of African and Afro-American Studies – essentially the same position she would hold for 30 years until she retired from the University in September 2009.

Crowder was known throughout campus as a "do-gooder" who was always willing to help out a student who was struggling. This compassionate approach derived from her firm belief that Chapel Hill should be a school that welcomes and supports students of all types – and "not just the best and the brightest" – and also from her own experience of feeling left adrift as a Chapel Hill student without any support or guidance from the Chapel Hill faculty or staff. Crowder was passionate about helping struggling students of all kinds, and often adopted "special cases," who were students she saw as particularly deserving of her assistance – from sexual assault victims to students with mental health issues to under-prepared student-athletes from difficult backgrounds.

Crowder was also passionate about Carolina athletics. Her affinity for Chapel Hill's teams – and particularly the men's basketball team – was well known. She kept the men's basketball calendars on her office walls; her office was a regular gathering place for the players; and according to several faculty members, she cared so much about the fortunes of the basketball team that she was occasionally unable to come to work for a day or two after the Tar Heels lost a basketball game.

These two passions – her desire to help underprepared students and her love of Chapel Hill athletics – would ultimately lead her to cut corners to help students and student-athletes make their grades. But, that would not happen for several years, due to the strong leadership and high academic standards imposed by the two chairpersons who led the AFAM Department in its early years.

### B.    Strong Leadership in AFAM's Early Years

In 1980, Colin Palmer ("Palmer") was appointed Chair of the AFAM Curriculum. By all accounts, Palmer ran a "tight ship" as a manager, believed strongly in academic rigor and focused on ensuring that AFAM was seen as a challenging curriculum. He carefully reviewed reports

---

[12] We will use the term "scheme" throughout this report to refer to the operation of the paper classes. We recognize that "scheme" is a loaded term, but we use it here without any connotations simply as a concise way of referring to the collaboration between Crowder, Nyang'oro and certain ASPSA personnel to offer and make use of the AFAM paper classes.

summarizing average grades across the College of Arts and Sciences, and was "particularly happy one semester when the only [disciplines] with lower grades were math and science."[13] Palmer imposed a series of strict curriculum requirements known as the "Palmer Rules," which remained in place for years.

Palmer was later appointed Chair of the History Department and eventually stepped down as AFAM Chair. After a series of interim chairs, English Professor Trudier Harris ("Harris") began her term as AFAM Chair. Like Palmer, Harris was particularly demanding as Chair, requiring faculty members to review their course syllabi, tests, and examinations with her to ensure that they were sufficiently rigorous.

Both Palmer and Harris were known for their focus on academic achievement and hands-on management, and neither Chairperson would have been an ally in Crowder's designs to cut corners for challenged students. That changed with Harris' departure in 1992 and the appointment of Nyang'oro as AFAM Chair.

      C.     Nyang'oro's Hands-off Approach to Management

Nyang'oro first arrived at Chapel Hill in 1984 as a visiting assistant professor in AFAM. A year later, Nyang'oro applied for and received a post-doctoral fellowship in which he spent two years researching and writing a book.[14] Thereafter, he attended Duke University Law School and earned his Juris Doctor in 1990. While in law school, Nyang'oro realized he did not want to practice law and decided instead to join the academy and to "cast [his] lot with the new AFAM chair, Trudier Harris," who was building up the AFAM Department. Nyang'oro became a visiting professor in 1989 and joined the permanent faculty after receiving his law degree in 1990.

Nyang'oro's early years in AFAM saw tremendous personal success. He quickly published a second book that was well received by the academic community, and was granted tenure by Chapel Hill in 1992 – after just two years on the permanent faculty, rather than the six years typically required. Harris resigned as AFAM Chair shortly thereafter and recommended that Nyang'oro become Chair of the Curriculum. Nyang'oro's appointment as Chair was formalized in 1992, and he remained as Chair of the Curriculum (and later, the Department) until August 2011, serving nearly 20 years in the position.

Nyang'oro's administration of AFAM was more hands-off than his predecessors. While he sought to grow the Department and increase the number of faculty, he paid less attention to the curriculum and quality control. He also increasingly relied on Crowder to handle many tasks – such as scheduling courses, overseeing registration and approving enrollments – that would normally be handled or at least overseen by a faculty member or department chair. He also gave her approval to sign his name on Department paperwork, a delegation that Crowder used effectively to increase the scope of her personal authority. Over time, Crowder took on an outsize role in AFAM, which

---

[13] Harold Woodard, a lecturer in AFAM in the 1980s, was one of the people who told us about Palmer's tenure.

[14] For a short time while in his post-doctoral program and/or in law school, Nyang'oro tutored student-athletes as part of a program that later became the Academic Support Program for Student-Athletes.

15

became recognized throughout the campus, as students started referring to her as "Professor Debby."

  D. Crowder's Use of Independent Studies for Paper Classes

  Before long, Crowder started to take advantage of her authority and autonomy under Nyang'oro to cut corners for struggling students and student-athletes. She did this by designing and offering independent study classes that awarded high grades with little to no regard for the quality of the student's work in the course.

  These irregular classes evolved out of the traditional independent study classes that have been available at Chapel Hill for decades and are a routine and often valuable part of any college-level curriculum. Such courses permit students to work directly with a faculty member to explore a discrete subject area. A traditional independent studies course requires periodic meetings between the student and the supervising faculty member to discuss the student's progress on a set of defined readings and the completion of a fairly involved writing project. It is typically a rather intensive effort by the student and by the faculty member who carefully supervises and grades the student's research paper.

  Nyang'oro initially undertook to conduct all of his independent studies in accordance with the traditional format and requirements, demanding regular student meetings and updates on their paper progress. Over time, however, he began to get complaints directly from Crowder and indirectly from the ASPSA academic counselors about demanding too much from the student-athletes and requiring too many meetings. On one occasion, Crowder told him that the ASPSA academic counselors believed he was "being an ass" for demanding so much from the players and were rethinking whether they should be steering student-athletes to AFAM classes.

  In light of that push-back from the ASPSA counselors, Crowder took it upon herself to improvise with AFAM's independent study classes. She did so by designing an irregular independent study class that essentially took the professor out of the picture – substituting herself for the professor and substituting her standards for those that traditionally apply to independent studies.

  Crowder managed all aspects of these independent study classes and personally handled the following steps throughout the course of the semester:

> - She created the classes in the old Student Information System (the student and course records database that preceded the current ConnectCarolina system);
>
> - She typically listed Nyang'oro as the instructor of record for these irregular courses, even though she knew that Nyang'oro would play no role in their instruction;
>
> - She registered the individual students who asked – or were proposed by ASPSA counselors – to be enrolled;

- She sent the paper topics out to the students (or through the ASPSA counselors for student-athletes);

- She received the completed papers from the students and graded them herself,[15] cursorily skimming them over and awarding As or Bs so long as they satisfied the page-length requirement;

- She typically filled out and signed the grade sheet with Nyang'oro's name;

- And, she handled any grade changes from an incomplete to a letter grade in those instances when a student submitted his paper after the end of the semester.

It is not clear whether Crowder ever got Nyang'oro's explicit approval to arrange these irregular independent studies. It is clear, however, that he ultimately learned about these classes and acquiesced in them by taking no action to put a halt to them.

He acquiesced, in part, because he was happy to cede decision-making authority to her, especially since his busy consulting and personal schedule kept him away from campus for long periods of time. Beyond his practical interest in delegating responsibilities to Crowder, there was a more compassionate reason for Nyang'oro's willingness to go along with Crowder's irregular independent studies classes -- he had developed his own sympathy for student-athletes and his own interest in helping them to remain eligible. According to Nyang'oro, he had taught two student-athletes early in his career who were later forced to leave the school because they had become academically ineligible. One of those student-athletes was murdered shortly after returning to his rural hometown; the other soon got in legal trouble and wound up in jail. When he learned about their fates, Nyang'oro committed himself to preventing such tragedies in the future and to helping other struggling student-athletes to stay in school.

E.    Crowder's Use of Lecture Classes for Paper Classes

With Nyang'oro giving her the green light – at least implicitly – Crowder enrolled a steadily increasing number of students and student-athletes in the independent study paper classes. For the first seven to eight years, Crowder limited her irregular class offerings to courses that were labeled as independent studies. In about the fall of 1999, Crowder revised her approach and added standard lecture courses to her course offerings. These classes had all the same attributes as the irregular independent studies classes, with no work requirements beyond the submission of papers that were graded by Crowder. Unlike the independent study paper classes, however, these were listed on the course schedule as lecture classes, often with meeting dates, times and classrooms assigned. Despite those entries on the course schedule, these classes never actually met, the students never had to appear in class, and their only interaction with the AFAM Department was through Crowder.

There were two reasons that Crowder started offering these irregular lecture classes. First, they were a response to new undergraduate curriculum requirements that required students to take

---

[15] In a very limited number of cases each semester, Crowder reported that Nyang'oro would work with a student in a more traditional manner and would grade papers prepared by those few students.

classes within a certain number of different curriculum areas or "Perspectives." Independent Studies did not count for this purpose; only regular lecture classes could be used to satisfy the Perspective requirements. By designating the irregular courses as lecture classes which met these Perspective requirements, Crowder was able to help students boost their GPAs and satisfy their Perspectives requirements at the same time.

This lecture designation also allowed students and student-athletes to get around the limit on the number of independent study hours that a student could take. Crowder – and nearly all the faculty we interviewed – believed that students were limited to 12 hours of independent study credit toward the 120 hours required for a Chapel Hill degree.[16] Rebranding these independent study paper classes as lecture classes avoided the danger that the administration might someday question the record of a student who took a number of these courses.

These irregular lecture-designated classes were offered in both the African Studies and African American Studies disciplines within AFAM, and among the topics offered were: AFAM Bioethics, Southern Africa, Contemporary Africa, Black Nationalism, and AFAM Arts as an Aesthetic. One particularly popular class was the third level of Swahili, which was offered in this irregular format specifically so that students – and particularly student-athletes -- who struggled in lower levels of Swahili could satisfy their foreign language requirement by writing a paper about Swahili culture *in English* rather completing a regular Swahili 3 paper class *in Swahili*. Eighteen students were enrolled in these Swahili 3 paper classes, including 12 student-athletes.

In addition to those lecture-designated paper classes, the AFAM Department also developed a hybrid model that we call the "bifurcated classes." The bifurcated classes were lecture classes in which some of the enrolled students were expected to attend regular lectures and complete all assignments like any other lecture course, while others were exempted from those standard class requirements and were allowed to complete the class by simply turning in a paper, pursuant to the typical paper class process.

We found that some students were selected for paper-class treatment because they were considered behavior problems in the classroom, while others were selected simply because they were student-athletes  On one occasion, for example, a Swahili instructor apparently requested that up to six football players be enrolled in a Swahili 3 paper class because they were under-performing in the Swahili 3 lecture class. Of the 154 student enrollments we have identified in the five bifurcated classes, 88 (57% ) of them were student-athletes.[17]

---

[16] It is unclear whether Chapel Hill in fact had any limitation on the number of independent study courses that could be counted towards a degree. We reviewed several sections of the Undergraduate Bulletin over the relevant time period and were unable to determine whether such a rule existed given the unclear language we found. *Compare* U. OF N.C. AT CHAPEL HILL, UNDERGRADUATE BULLETIN, 1991-1993 (suggesting 12 hour limit in "Special Studies for Credit" section), *with* U. OF N.C. AT CHAPEL HILL, UNDERGRADUATE BULLETIN, 1988-1990 ("A student may earn thirty semester hours of credit toward a degree at . . . through independent study courses."). Regardless of the limit that was actually listed in the Bulletin, Crowder, Nyang'oro, and every witness we interviewed about the topic believed that the limit was 12 hours.

[17] Of those student-athletes, 53 were football players, nine were men's basketball players, five were women's basketball players, and 21 were athletes in other sports. There were two enrollments for multi-sport student-athletes, which accounts for the slight discrepancy in these calculations.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 23 of 137

# CADWALADER

F.    The Popularity of Crowder's Paper Classes

Over time, the paper classes became very popular among certain groups on campus, and by the summer of 2011 there were 3,933 undergraduate enrollments in these classes. Of these enrollments, 2,081 were by non-athlete undergraduate students. Some of the students were genuinely interested in the subject matter and took the class and its paper assignment seriously. Others were simply attracted to the ease with which one could satisfy the paper requirement and obtain a high grade for very little work. Members of certain fraternities, for example, started to sign up for these paper classes, causing Crowder to bemoan to one assistant dean in 2005 that word about them had "gotten into the frat circuit."

These paper classes were also very popular among student-athletes, and especially among those from the "revenue sports" of football and men's basketball. Approximately 1,871 of the 3,933 total enrollments between 1999 and 2011 were student-athletes, of whom 1,189 were members of the football and men's basketball teams. In percentage terms, that means that 47.6% of the paper class enrollments were student-athletes and 24.5% were football or basketball players. By comparison, approximately 4% of the Chapel Hill student body are student-athletes in any given year, and approximately 0.6% are football players.[18]

Like the other students, some student-athletes took these paper classes out of genuine interest in the subject matter. Some took these classes because they – like any independent study – required no class time and were therefore well-suited for the student-athlete with a demanding practice, travel and game schedule. And, others gravitated to these paper classes simply because they allowed one to receive an inflated grade without having to earn it with meaningful academic work.

It was common knowledge among student-athletes that it was the norm to receive an A or B in the paper classes, regardless of the quality of their submitted papers – an understanding that was borne out by the fact that grades in the paper classes were 10% higher than those awarded in the regular AFAM courses. While the average grade for the paper classes between 1999 and 2009 was a 3.62, the average grade for the regular AFAM courses over that same period was 3.28.

G.    The Steering of Student-Athletes to These Classes

The academic counselors in ASPSA were well aware that these courses existed, that they required relatively little work and that they generally resulted in high grades. For those reasons, some counselors routinely steered their student-athletes into these classes. They would identify those student-athletes who needed extra help to maintain their eligibility, steer those student-athletes toward the paper classes and then work closely with Crowder to register them. In football, for example, ASPSA Associate Director Cynthia Reynolds ("Reynolds") and her staff sent Crowder lists of players to be enrolled in paper classes each term, and in some cases apparently even indicated for Crowder the grade or grade range the player would need to earn in the class to maintain eligibility. In men's basketball, academic counselor Burgess McSwain ("McSwain") and her successor Wayne Walden routinely called Crowder to arrange classes for their players.

---

[18] There were 19 enrollments for multi-sport student-athletes, which accounts for the slight discrepancy in these calculations.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 24 of 137

# CADWALADER

H.     Submission of Papers with Text that was Copied or Written by Others

As explained above, students and student-athletes effectively needed only to submit a paper of a certain length in order to earn a high grade in the paper classes. While some took the paper classes seriously and worked conscientiously to produce a thoughtful paper that deserved a strong grade, others did not. There were instances in which students and student-athletes prepared papers that were largely "cut and paste" jobs that simply copied text from publicly-available sources. Knowing that Crowder graded the papers and that she gave them only a light skim before assigning a grade, many paper class students and student-athletes would submit a paper with quality text in the introduction and conclusion and nothing but "fluff" or largely unoriginal material in between.

Some student-athletes also took advantage of overly helpful tutors who would write parts of their papers for them. In every tutor-student relationship, there is a fine line between the appropriate and inappropriate level of assistance the tutor can provide in the paper drafting process. While gentle suggestions as to topics or text for the student to consider would generally be appropriate, feeding the student with paragraphs of completed text would not.

There were certain ASPSA tutors who crossed that line in assisting student-athletes with their papers for the paper classes. One example was a tutor for the football players, Jennifer Wiley. She started out on the right side of that line, helping to guide the players in the formulation of their papers without doing any drafting for them. After struggling with the challenged writing proficiency of many players, she eventually found herself actually drafting sections of papers for several of the struggling players. Given their seeming inability to draft a passable paper on their own and the pressure she felt to keep them on track toward eligibility, Wiley felt she had little choice but to cross the line and do some of their work for them.

I.     Isolated Questions About the Paper Classes

Despite fairly widespread knowledge about them on the Chapel Hill campus, these paper classes continued without much interruption for years. We have identified only two occasions when questions about the propriety of the AFAM Department's course offerings were even tangentially raised. First, in July 2006, *The New York Times* published a story which suggested that a professor at Auburn University had offered irregular independent studies to student-athletes. The article received attention at Chapel Hill and was noted in emails among the Faculty Athletics Committee ("FAC"), which, according to the Faculty Code of University Government, was responsible for "informing the faculty and advising the chancellor on any aspect of athletics, including, but not limited to, the academic experience of varsity athletes, athletic opportunities for members of the University community, and the general conduct and operation of the University's athletic program."

In its November 2006 and January 2007 meetings, members of the FAC discussed independent study courses with Senior Associate Athletics Director John Blanchard, Director of ASPSA Robert Mercer and Athletics Director Dick Baddour. These three recall that they raised concerns about AFAM paper classes and that the FAC members responded by citing the professor's prerogative to choose the right teaching method in a class and instructing them not to pursue their concerns any farther. Although there are radically differing recollections of this meeting (*see* Section V.B.4.a for a full analysis of the two different accounts of this meeting), the upshot is that the most troubling aspects of these paper classes — the total lack of faculty involvement and grading by the

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 25 of 137

# CADWALADER

department secretary – were not explained to the FAC. In ignorance of those critical facts, the FAC saw no need to inquire further about the issue.

The only other questions about the AFAM classes were raised by Senior Associate Dean for Undergraduate Education Roberta "Bobbi" Owen. In 2005 or 2006, Dean Owen had lunch with Nyang'oro and complained to him about the extremely high number of independent studies he was handling (sometimes more than 300 per academic year). She directed him to reduce that number and to "get [Crowder] under control," suggesting that Crowder was somehow behind the high numbers of independent studies in the AFAM Department. When Nyang'oro returned from lunch that day, he told Crowder that Owen was watching the independent studies enrollments and instructed her to scale them back. Crowder did as instructed, and the number of independent studies enrollments immediately went down. Owen noticed the decline in enrollments, and in November 2006 she sent Nyang'oro an email entitled "Ind Studies," noting that "it has gotten quieter from your side of campus," and conveying her thanks.[19]

While Dean Owen's inquiry resulted in a reduction of independent studies classes, it failed to address the root problem. By focusing only on the quantity of the classes, she missed the bigger issue of quality – the quality of the instruction provided in those classes. She never asked what sort of instruction Nyang'oro was actually providing to those hundreds of independent studies students registered under his name each year. With further reflection on the issue, she could have realized that it was impossible for him to provide meaningful instruction to so many independent studies students at one time. Moreover, by focusing on independent studies, she overlooked the lecture-designated paper classes that had by that time become the primary vehicle by which Crowder was implementing her irregular curriculum. And finally, by failing to follow up on her lunch-time admonition to Nyang'oro beyond sending her single email, Dean Owen missed the chance to put an end to these paper classes five years before their eventual discovery in 2011.

J.    Crowder's Retirement and its Effect on the Paper Classes

In 2008, Crowder announced that she would retire the next year, and news of her impending retirement quickly spread throughout campus. Among the football counselors in ASPSA, there was a sobering recognition that Crowder's retirement would mean an end to the courses they had relied upon to keep struggling student-athletes eligible. Those counselors quickly moved to mitigate the effect of this development. First, they urged all football players to submit their summer school papers in time to have them graded by Crowder. In one email to a football operations coordinator, André Williams, during the second summer session of 2009, Cynthia Reynolds, the Associate Director for ASPSA and Director of Football, wrote that "Ms. Crowder is retiring at the end of July . . . if the guys papers are not in . . . I would expect D's or C's at best. Most need better than that . . . ALL WORK FROM THE AFAM DEPT. MUST BE DONE AND TURNED IN ON THE

---

[19] Dean Owen claims not to remember having this lunch with Nyang'oro or admonishing him about independent studies. Despite Owen's failure of memory, we find strong corroboration for Nyang'oro's account of this episode. It is corroborated by Debby Crowder, who recalls Nyang'oro coming back from lunch and recounting Owen's admonition, by Owen's follow-up email, by Mercer and Woodard who recall hearing that Owen was trying to rein in AFAM's independent studies in that time period, and by the Registrar records that reflect Crowder's effort to reduce the number independent studies in accordance with Owen's direction.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 26 of 137

LAST DAY OF CLASS." As reflected in that email, the football counselors were painfully aware that many of their charges would not get the grades they "need" to remain eligible if someone other than Crowder graded their papers.

They were also painfully aware that Crowder's retirement would require the whole football program to adjust to a new reality of having to meet academic requirements with real academic work. They conveyed this point loud and clear in a meeting with all of the football coaches in November 2009.[20] In that meeting, Beth Bridger ("Bridger") and Jaimie Lee ("Lee") of the ASPSA football counseling staff explained (1) that the AFAM paper classes had played a large role in keeping under-prepared and/or unmotivated football players eligible to play and (2) that these classes no longer existed. To emphasize those points, the counselors used the following slide in their presentation to the football coaches:[21]

---

### What was part of the solution in the past?

- We put them in classes that met degree requirements in which
  - They didn't go to class
  - They didn't take notes, have to stay awake
  - They didn't have to meet with professors
  - They didn't have to pay attention or necessarily engage with the material

- AFAM/AFRI SEMINAR COURSES
  - 20-25 page papers on course topic
  - **THESE NO LONGER EXIST!**

---

To further make their point, they followed this slide with two slides that compared eight players' GPAs in the AFAM paper classes against their GPAs in other classes.[22] The average AFAM

---

[20] Beth Bridger, Associate Director of Football for ASPSA led the meeting, and was accompanied by Jaimie Lee, an ASPSA academic counselor for the football team. Most, if not all, of the football coaching staff was present at this meeting, to include: Butch Davis, Corey Holliday, André Williams, and the position coaches. After the meeting, Bridger sent the PowerPoint that she prepared to ASPSA Director Robert Mercer and Senior Associate Director of Athletics John Blanchard.

[21] Exhibit 6.

[22] The compared GPAs were:

|  | AFAM paper class GPA | Other GPA |
|---|---|---|
| Player 1 | 3.7 | 1.86 |
| Player 2 | 3.2 | 1.9 |
| Player 3 | 3.7 | 1.98 |
| Player 4 | 3.63 | 2.036 |
| Player 5 | 3.5 | 2 |

paper class GPAs for these players was 3.61 – far higher than their average GPA of 1.917 for their other classes.

While the counselors' long-term message was that the coaching staff should recruit better-prepared players and encourage them to pay more attention to their studies, the short-term message was a warning that grades were going to fall precipitously with Crowder's retirement. That prediction came true that very semester. The Fall 2009 semester – the first in over a decade without Crowder and her paper classes – resulted in the lowest football team GPA in ten years – 2.121.[23] Forty-eight players earned a semester GPA of less than 2.0.

     K.    The Paper Classes After Crowder's Retirement

In the face of this downward GPA trend, the ASPSA football counselors decided to approach Nyang'oro directly and to ask him to resume the paper classes that had ended with Crowder's retirement. Before retiring, Crowder had sent an email suggesting that football counselor Lee deal directly with Nyang'oro after her departure.[24] Seizing on that idea, Bridger instructed Lee to approach Nyang'oro and noted in an email that the Lee-Nyang'oro relationship is "a GREAT relationship to build."

As instructed, Lee went on to build that relationship, sending Nyang'oro regular emails, meeting with him in his office and over lunch, and personally delivering student papers to him. In the course of this interaction, she lobbied Nyang'oro to offer certain paper classes. In one email exchange, for example, she asked Nyang'oro if the Swahili 3 paper class that had been offered in summer 2009 – before Crowder's retirement – might be repeated. In his reply, Nyang'oro noted jocularly that Lee was "[d]riving a hard bargain," promised to "think about" it and invited her to "talk to [him]" about her request. Soon thereafter, Nyang'oro sent a follow-up email advising her that he had "added AFAM 398 [an AFAM independent study course] to [AFAM's] summer schedule."[25]

In total, Nyang'oro offered six classes after Crowder's retirement that had the elements of Crowder's "paper classes," except for her grading of the term papers. Two of these were paper classes like the ones Crowder had offered and one was an independent study paper class with 13 football athletes. The other three were what we have called "bifurcated classes," which were

| Player 6 | 3.85 | 1.99 |
|---|---|---|
| Player 7 | 3.6 | 1.77 |
| Player 8 | 3.7 | 1.8 |
| Average | 3.61 | 1.917 |

[23] Exhibit 56.

[24] In an August 26, 2009 email, Lee wrote Crowder and asked if, given her impending retirement, she was "considering dropping the AFAM 396 course," noting that several players "could definitely use it and it would be great if they could hold on." Crowder replied later that day that if Lee "really need[ed] it, [they] can keep it." She added "[m]y preference would be to cancel it for a number of reasons but if you need it I am sure JN would work with you." Exhibit 7.

[25] Exhibit 8.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 28 of 137

essentially two classes within a single class roll – one set of students that attended class and completed it the traditional way and another set of students who completed the course as a paper class. The vast majority of those completing a bifurcated class as a paper class were student-athletes.[26]

For each of these classes, Nyang'oro graded the papers, but did so with an eye to boosting student GPAs, regardless of paper quality. Prior to deciding on the grades in each of these classes, Nyang'oro asked Crowder's successor, Travis Gore ("Gore"), to look up each student's GPA. This information, along with the occasional request from an academic counselor for leniency with a particular student-athlete who needed a GPA boost, informed Nyang'oro's grading and allowed him to make sure that any grade he assigned would not lead to academic ineligibility for any students or student-athletes.

> ### L.  The Administration's Discovery of the Paper Class Scheme in August 2011

The fact of the paper classes first came to public attention in the summer of 2011, after two media reports raised questions about the AFAM Department. One report involved an incoming football player who earned a B+ in a 400-level AFAM Bioethics class, AFAM 428, during the summer before his freshman year in 2007, even though he had yet to take an introductory English writing course. The other report involved the discovery that football player Michael McAdoo had submitted a plagiarized paper in a Swahili 403 class in the summer of 2009.

Upon hearing these reports, Senior Associate Dean Jonathan Hartlyn immediately called Nyang'oro to a meeting. When they met and Dean Hartlyn asked Nyang'oro about these reports, Nyang'oro claimed no memory of teaching either the incoming football player in the Bioethics course in 2007 or Michael McAdoo in the 2009 Swahili course. His explanation was that these may have been classes that Crowder had arranged and managed on her own. This appears to have been the first formal acknowledgement by AFAM personnel to the Chapel Hill administration that irregular paper classes were being offered.

Dean Hartlyn immediately apprised the Chapel Hill leadership of what Nyang'oro had told him, and soon thereafter the Athletics Department advised the NCAA of Nyang'oro's disclosure.[27] These notifications then trigged a three-year series of related and partially overlapping inquiries into the AFAM irregular classes.[28]

> #### 1.  Earlier Reviews Related to Irregular Courses

This section provides a summary description of the investigations that ensued after Nyang'oro disclosed the paper classes in his meeting with Dean Hartlyn.

---

[26] *See* Section V.A.1.d, *infra*, for a discussion of "bifurcated classes."

[27] At the time, the NCAA was already on campus investigating allegations involving agent-related misconduct and inappropriate assistance provided to student-athletes by ASPSA tutors.

[28] Nyang'oro was forced to resign his position of Department Chairman, and ultimately was asked to resign from the faculty the next year. He was later indicted on criminal charges relating to his receipt of compensation for teaching a summer school paper class that never met.

# CADWALADER

### a. NCAA Investigation

Shortly after Hartlyn's meeting with Nyang'oro, Chapel Hill formed an Internal Working Group to look into Nyang'oro's revelations with the NCAA investigators. The Internal Working Group included Dean Hartlyn, University Counsel Leslie Strohm and former Faculty Athletics Representative Jack Evans ("Evans"). In August and September 2011, the Internal Working Group and an NCAA investigator conducted interviews of nine faculty – including Julius Nyang'oro[29] – and staff members and seven student-athletes.

During this review, the Internal Working Group and NCAA investigator gained an understanding of the broad outlines of paper classes. In light of the fact that these classes were available to – and used by – students as well as student-athletes, the NCAA apparently concluded that there was insufficient evidence of an athletic purpose behind the classes to establish an academic integrity violation under the NCAA by-laws. The NCAA therefore closed its investigation of the paper classes and went forward on an enforcement action against Chapel Hill only on the pre-existing allegations involving agent and tutor misconduct.[30]

### b. Hartlyn-Andrews Review of Courses

On the heels of the Internal Working Group's preliminary inquiry, Dean of the College of Arts and Sciences Karen Gil charged Dean Hartlyn and Senior Associate Dean William Andrews to undertake a full review of all courses in the AFAM Department between Summer 2007 and Summer 2011.[31] The Deans' charge was to determine those courses in which irregularities existed; identify possible patterns and explanations for those courses; recommend follow-up actions and measures; and provide initial recommendations regarding policies and procedures to prevent such irregularities from occurring in the future.[32]

---

[29] Nyang'oro admitted to us that he shaded the account he gave to the NCAA and the Internal Working Group to "minimize any damage that would fall on the Department."

[30] Chapel Hill appeared before the NCAA's Division I Committee on Infractions in October 2011. The Committee on Infractions found that a former ASPSA tutor and three football student-athletes engaged in academic fraud; that the student-athletes subsequently competed while ineligible due to that violation; that the former tutor provided football student-athletes with impermissible extra benefits; that the former tutor failed to cooperate with the NCAA's investigation; that seven football student-athletes received impermissible benefits from prospective agents; that the University failed to monitor its football program; and that a former assistant coach failed to cooperate with the investigation and failed to report outside income. The Committee on Infractions then imposed penalties consisting of vacating the football team's wins in the 2008 and 2009 seasons, reducing the number of football scholarships by 15, requiring a fine of $50,000, and placing the University on probation through 2015. *See* NCAA, UNIVERSITY OF NORTH CAROLINA, CHAPEL HILL PUBLIC INFRACTIONS REPORT (Mar. 12, 2012), *available at* http://www.ncaa.org/sites/default/files/UNC%2BPublic%2BInfractions%2BReport.pdf.

[31] We understand that this five-year period was chosen to encompass the time from the 2007 summer session when the entering football player earned a B+ in the 400-level AFAM Bioethics course up through the discovery of the matter in the summer of 2011.

[32] *See* JONATHAN HARTLYN & WILLIAM L. ANDREWS, REVIEW OF COURSES IN THE DEPARTMENT OF AFRICAN AND AFRO-AMERICAN STUDIES, COLLEGE OF ARTS AND SCIENCES 3 (May 2, 2012), *available at*

---

In the course of their review, Hartlyn and Andrews spoke with 22 AFAM Department faculty and staff members, reviewed documents relating to course registrations, enrollments and grade rolls, and prepared a report that made a number of specific factual findings,[33] including the following:

- Between summer 2007 and summer 2009, nine courses (with a total of 59 registered students) were "aberrant," meaning that "there is evidence that students completed written work in these courses, submitted it to the department and received grades, but no evidence that the faculty member listed as instructor of record or any other faculty member actually supervised the course and graded the work, although grade rolls were signed and submitted."[54]

- An additional 43 courses (with a total of 599 registered students) were "irregular," meaning "the instructor provided an assignment and evidently graded the resultant paper, but engaged in limited or no classroom or other instructional contact with students."[55]

- After summer 2009, no aberrant courses were offered, and only two courses may have been taught irregularly.[56]

Chapel Hill publicly released the Hartlyn-Andrews report on May 2, 2012.

c.    Independent Study Task Force

Shortly after assigning Dean Hartlyn to do a retrospective review of the AFAM curriculum, Dean Gil charged Dean Owen with leading a task force to examine the use of independent studies at Chapel Hill and to develop guidelines addressing issues such as the expectations for independent study assignments and the conditions under which a traditional lecture course might be taught as an independent study.[37]

The Independent Study Task Force Report was publicly released on May 2, 2012, the same date as the Hartlyn-Andrews Report.

---

http://www.unc.edu/news/050412/Review%20of%20courses.pdf      [hereinafter      HARTLYN-ANDREWS REPORT].

[33] *Id.* at 3-6.

[54] *Id.* at 3-4.

[55] *Id.* at 4.

[56] *Id.*

[37] *See* INDEPENDENT STUDY TASK FORCE REPORT 1 (Apr. 10, 2012), *available at* https://www.med.unc.edu/ahs/for-faculty-staff/academic-policies/independent-study-report.pdf [hereinafter INDEPENDENT STUDY TASK FORCE REPORT].

# CADWALADER

d. The State Bureau of Investigation

In the wake of the release of the Hartlyn-Andrews Report, Chancellor Thorp, in consultation with UNC System President Thomas Ross, directed the University's Department of Public Safety to advise the State Bureau of Investigation ("SBI") about the academic irregularities that had been revealed. The SBI conducted a lengthy investigation, led by Special Agent Hicks and Assistant Director Hooks, and overseen by District Attorney Woodall. Their investigation was probing, thorough and conducted with consummate professionalism, and it was of enormous assistance to our effort. It resulted in the December 2013 indictment of Nyang'oro on one felony charge of obtaining property by false pretenses, related to $12,000 that Nyang'oro was paid to teach AFAM 280 in Summer Session II in 2011, a paper class that never actually met.[38]

e. Special Subcommittee of the Faculty Executive Committee

Shortly after the issuance of the Hartlyn-Andrews Report, the Faculty Executive Committee appointed a Special Subcommittee to analyze all investigative reports and related materials about the irregular AFAM classes, identify areas of policy and practice that require scrutiny and revision and recommend any changes necessary to prevent such breaches of academic integrity as were found within the AFAM Department. The Subcommittee consisted of Professors Steven Bachenheimer (Microbiology and Immunology), Michael Gerhardt (Law), and Laurie Maffly-Kipp (Religious Studies).

In carrying out its charge, the Subcommittee met with 31 individuals, reviewed various reports and policy documents and issued policy and procedural recommendations in regard to "four areas of continuing concern:" advising and counseling; departmental supervision and faculty conduct; the tension between athletics and Chapel Hill's educational mission; and the need for institutional transparency about athletics.[39] The FEC Subcommittee Report was publicly released on July 26, 2012.

f. The Governor Martin Review

In response to further questions about the Hartlyn-Andrews Report findings and indications that the "aberrant" classes had started before the 5-year period that that review examined, Chancellor Holden Thorp ("Thorp") reached out to former North Carolina Governor James G. Martin and asked him to undertake an independent review of the anomalies in the AFAM curriculum.[40] Chancellor Thorp specifically asked that he determine when it was that these anomalies started in the AFAM Department; what environmental circumstances allowed these anomalies to occur; and whether the anomalies identified in the AFAM Department existed in other

---

[38] In July 2014, the District Attorney dismissed the criminal charge against Nyang'oro as a result of Nyang'oro's cooperation with his office and with our investigation.

[39] REPORT OF THE SPECIAL SUBCOMMITTEE OF THE FACULTY EXECUTIVE COMMITTEE 5-9 (Jul. 26, 2012), *available at* http://faccoun.unc.edu/wp-content/uploads/2010/10/20120726ReportFECSub_9_FINAL.pdf.

[40] James G. Martin, Ph.D., served as North Carolina's governor from 1985 to 1993. Prior to his election as Governor, Governor Martin had been a Professor of Chemistry at Davidson College. He earned his Ph.D. in chemistry from Princeton University in 1960.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 32 of 137

academic subjects or departments.[41] Governor Martin agreed and conducted this extensive investigative effort without asking for or receiving any compensation for his work.

In conducting his review, Governor Martin and his team from the accounting firm Baker Tilly interviewed 84 individuals,[42] including faculty members, administrators, students (both athletes and non-athletes), parents, University trustees, and members of the broader University community. Governor Martin and Baker Tilly also undertook a data-driven analysis of all 172,580 course sections offered by UNC between Fall 1994 and Fall 2012,[43] filtering and screening this data for red flags that could indicate potential anomalies in a course section. This process resulted in the identification of 216 courses in the AFAM Department with proven or potential anomalies dating as far back as the fall of 1997. These anomalous courses were categorized into three "Types" based on the demonstrable degree of their irregularity.

Governor Martin's team identified a total of 39 courses as Type 1, meaning that each was a "lecture course section in which the instructor of record denied teaching the course section and signing the grade roll, or the chair stated that the course section had not been taught."[44] They identified 167 courses as Type 2 classes, which meant that each was a "course section for which the identity of the instructor was not evident via review of the grade rolls, grade change forms, or discussion with personnel in the related academic unit; or for which neither the instructor of record nor the chair could confirm whether the course section had been taught."[45] Finally, they found ten courses to be Type 3, meaning that each course was "a course section for which the instructor of record noted the presence of an unauthorized signature on the grade roll."[46]

The Martin Report also determined that no AFAM staff member other than Crowder and Nyang'oro was unethically involved in the irregular courses and that no such courses were found outside of the AFAM Department. The Martin Report was publicly released on December 20, 2012.[47]

---

[41] JAMES G. MARTIN, PH.D., THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL ACADEMIC ANOMALIES REVIEW REPORT OF FINDINGS 3 (Dec. 19, 2012), *available at* http://www.unc.edu/news/12/UNC-Governor-Martin-Final-Report-and-Addendum.pdf [hereinafter MARTIN REPORT].

[42] Crowder and Nyang'oro declined invitations to be interviewed by Governor Martin.

[43] MARTIN REPORT, *supra* note 39, at 3-5.

[44] *Id.* at 20.

[45] *Id.*

[46] *Id.*

[47] On January 24, 2013, Governor Martin issued an Addendum to his report that provided "details [about] the enrollment composition of the anomalous courses and grade changes that were identified" in his review. JAMES G. MARTIN, PH.D., ADDENDUM TO THE ACADEMIC ANOMALIES REVIEW REPORT OF FINDINGS 2 (Jan. 24, 2013), *available at* http://www.unc.edu/news/12/UNC-Governor-Martin-Final-Report-and-Addendum.pdf [hereinafter MARTIN ADDENDUM]. On February 5, 2013, Governor Martin issued a Clarification to his report regarding references to a particular Faculty Athletics Committee meeting in 2007. [hereinafter MARTIN CLARIFICATION]. *See* Section V.B.4.a, *infra.*

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 33 of 137

# CADWALADER

g. The Baker Tilly Review

Chapel Hill engaged Baker Tilly on a related effort "to provide an objective, external assessment of the plans of the University of North Carolina at Chapel Hill . . . to implement a number of enhancements to academic policies, processes, procedures, and systems in response to recommendations" from the Independent Study Task Force and the Hartlyn-Andrews Report.[48] Baker Tilly analyzed Chapel Hill's response to the AFAM paper classes and "did not identify any gaps between the Risks referenced in the Reports and the University's implementation plans." The Baker Tilly Report was publicly released on December 20, 2012.

h. The UNC Board of Governors Academic Review Panel

UNC President Thomas Ross and the UNC Board of Governors charged an Academic Review Panel of Board of Governors members with conducting a "careful and independent assessment of the adequacy and completeness of the campus-based investigations and remedial measures" that had been initiated to date.[49] The panel went on to review the five separate campus-initiated reports and interview nearly 20 individuals.[50] The Panel then issued its findings, with the caveat that they might revisit those findings once the SBI finished its investigation.

In its findings, the Panel "concluded that all necessary investigations and analyses of the past academic misconduct have been completed [and] that it is now time for the University of North Carolina to move ahead, to commit to the prompt implementation of effective policies and practices throughout the system, and to remain vigilant and accountable for the stewardship of the academic enterprise throughout the University of North Carolina."[51] Among its findings, the Panel found no evidence "to support a conclusion that a conspiracy or collusion existed between the Athletics Department and the Academic Support Program for Student-Athletes . . ., on the one hand, and the two complicit employees in the AFAM Department [Julius Nyang'oro and Deborah Crowder] on the other hand."[52] The Panel did note, however, that it is was "reasonable to assume that many students – athletes and non-athletes alike – enrolled in these irregular AFAM Department courses expecting to achieve good grades with little rigor."[53] The UNC Academic Review Panel Report was publicly released on February 7, 2013.

---

[48] Raina Rose Tagle, BAKER TILLY BEERS & CUTLER, PLLC, REVIEW REPORT 1 (Dec. 19, 2012), *available at* http://www.unc.edu/news/12/UNC-Baker-Tilly-Academic-Policies-Procedures-Report-12-19-12-Final.pdf [hereinafter BAKER TILLY REPORT].

[49] THE REPORT OF THE UNC BOARD OF GOVERNORS ACADEMIC REVIEW PANEL 1-2 (Feb. 7, 2013), *available at* http://www.unc.edu/news/12/THE-REPORT-OF-THE-UNC-BOG-ACADADEMIC-REVIEW-PANEL-2_7_13.pdf [hereinafter UNC BOG REPORT].

[50] *Id.* at 2.

[51] *Id.* at 29.

[52] *Id.* at 3.

[53] *Id.*

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 34 of 137

# CADWALADER

           i.       The SACS Review

UNC's accrediting body, the Southern Association of Colleges and Schools' Commission on Colleges ("SACSCOC"), reviewed matters related to the irregular AFAM courses, and in June 2013 its Board of Trustees decided not to sanction Chapel Hill.[54] After monitoring Chapel Hill's implementation of remedial policies to prevent a recurrence of such irregularities, SACSCOC notified Chapel Hill in June 2014 that it would take no further action.

           j.       The Resumption of the NCAA Inquiry

When University officials asked us to conduct our investigation earlier this year, they were fully aware that our investigation would be examining issues that could indicate possible violations of NCAA by-laws. For that reason, they instructed us that, notwithstanding the confidentiality of our investigation, we should advise them if we learned of any conduct that amounted to a concrete violation of NCAA by-laws, so that the University could then notify the NCAA.[55]

Once our investigation matured to the point that we began to get a clear picture of the paper class scheme, the University asked us to fully brief the NCAA investigators about our findings. We did so on at least three different occasions, pursuant to confidentiality restrictions to ensure that our findings were not being disclosed to anyone else, and particularly to UNC or Chapel Hill personnel.[56] After receiving our briefing, the NCAA Enforcement Staff advised the University that it was resuming the investigation it had closed back in 2011. Since that time, we have pursued parallel investigations and have enjoyed a strong cooperative relationship with the NCAA investigators. We have continued to provide them information as we have developed it, and at the direction of the University we will offer them a full briefing on the findings detailed in this report.

---

[54] *See* Press Release, Message from Chancellor Holden Thorp: Accrediting Agency Decision (Jun. 20, 2013), *available at* http://oira.unc.edu/files/2013/06/HoldenThorpCampusMessageJune202013FINAL.pdf.

[55] It was understood that any evidence of student-athletes taking irregular paper classes raised at least the possibility of NCAA by-law violations, which, of course, was the predicate for the NCAA's investigation with the Internal Working Group in 2011. This notification requirement was intended to extend beyond that issue and apply to any other conduct we discovered that demonstrated an apparent violation of NCAA by-laws.

[56] The University's regular counsel for NCAA matters, Richard Evrard, was present for those meetings. His presence was in keeping with the NCAA tradition and expectation that a university representative collaborate with the NCAA's investigation on that university's campus. To effectuate that meeting without disclosing details of our investigative plan and findings to the University and its personnel, we entered into an agreement with Mr. Evrard that provided that any information shared by us with the NCAA would not be provided to any UNC or Chapel Hill personnel until after our report is publicly released. That agreement is attached as Exhibit 9.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 35 of 137

# CADWALADER

## V. FINDINGS

In the preceding part of the report, we told the story of the Chapel Hill paper classes in a chronological, narrative fashion. This part of the report will lay out our specific findings as to each of the main issues raised by that narrative, and is composed of the following five sections: an examination of the paper class scheme, an assessment of University employee knowledge or involvement in the paper classes, an assessment of the University's oversight of the AFAM department and ASPSA, an assessment of the university's response to paper class revelations, and a comparison of our findings with those of Governor Martin.[57] It will first describe our findings about the paper classes and the use of these classes by some in the student body. Then, it will identify those University employees who knew about and/or were involved in the paper class scheme and assess the extent of that knowledge or involvement. It will then move into an assessment of the University oversight processes that allowed these paper classes to exist and our evaluation of the reforms and remedial measures the University has adopted since the initial paper class revelations in 2011. It will then conclude with comparison of our findings with those in Governor Martin's report.

### A. Examination of the Paper Class Scheme

A critical objective of our investigation has been to identify each instance in which a course was offered as a paper class. As an initial matter, we looked across all Chapel Hill departments and found no other department that offered classes like the AFAM paper classes. While there certainly were easy classes in other departments, none had the irregular characteristics that distinguished the paper classes. Therefore, the discussion in this section will focus solely on the AFAM Department.

Starting with the initial revelations in Nyang'oro's August 2011 meeting with Dean Hartlyn, Chapel Hill attempted to get an accurate accounting of the number and types of irregular classes offered by the AFAM Department over the years. Each review contributed to that effort, with the Martin team applying a rigorous data-driven analysis to come up with its list of 216 anomalous courses and 3-type categorization scheme. While the Martin team did significant analytical work to identify these anomalous courses, their ability to develop a complete listing was severely handicapped by their inability to talk with the two central players, Professor Nyang'oro and Crowder.

In our review, we were fortunate to have access to Nyang'oro and Crowder, and we took full advantage of that access, spending dozens of hours questioning them about the paper classes and reviewing hundreds of course rosters and grade change forms to come up with as definitive and final a list of paper courses as possible. This section describes our efforts in that regard.

---

[57] Although it necessarily entails some retelling of the facts, this two-part approach is critical to a complete understanding of the situation, as it allows us to first provide the reader with the context of the story before isolating and addressing each of the relevant issues.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 36 of 137

1.    The Identification of Paper Classes

As explained above, a "paper class" in our typology is one in which (1) students did not have to attend class; (2) there was no faculty-student interaction; (3) the sole assignment was the submission of a paper (or occasionally two short papers); and (4) the papers were liberally graded by Crowder (or by Nyang'oro for the few paper classes offered after Crowder's retirement (*see* Section IV.D)). Using these criteria, we identified five different types of paper classes offered between Fall 1989 and Summer 2011.

Our process for identifying the paper classes was straightforward. First, we identified a population of AFAM classes to be examined by aggregating three different categories of suspect classes:

- All courses for which Nyang'oro was instructor of record during his career at UNC (from 1984 through 2012);

- All AFAM courses for which "Staff" was listed in Chapel Hill's records as instructor of record during Nyang'oro's career at Chapel Hill, based on Crowder's explanation that she often entered "Staff" as the instructor of record for her paper classes;[58] and

- All other courses examined and identified as anomalous in the Martin Report.

Next, we added to that list all courses that exhibited one of a number of characteristics we identified during our investigation as being potentially associated with an AFAM paper class. Those characteristics included:

- The absence of a class meeting time and location in the school's registration system;

- The entry of grades on the grade roster in Crowder's handwriting,[59] as paper class grades were always recorded by Crowder, even if Nyang'oro signed the grade roster;

- The entry of Nyang'oro's signature on the grade roster in Crowder's handwriting, which was common for the paper classes;

- The presence of "tick marks" on the grade roster, which was Crowder's way of keeping track of who had turned in their papers in the paper classes;

---

[58] Courses that had no instructor of record were also considered suspect.

[59] Nyang'oro and Crowder each have distinctive, recognizable handwriting.

- A smaller number of enrollees (at times fewer than 10-12) than the average AFAM class, which was typically the case with the lecture-designated paper classes;

- A high average class grade, as the grade rosters for irregular paper classes typically included only As and Bs, whereas regular courses taught by Nyang'oro often included grades of C or lower; and

- The scheduling of the class during summer session when Nyang'oro was working on a research or consulting project away from campus, which were times when Crowder was more likely to arrange a paper class.

Once we compiled our list of suspect classes, we separately sat down with Crowder and Nyang'oro for extensive sessions devoted to examining these classes. Through this process, we identified five different categories of paper classes. These categories are:

- Independent Study Paper Classes

- Lecture Paper Classes

- Post-Crowder Paper Classes

- Bifurcated Classes

- Student Add-ons

We will now address each of the five paper class variants and describe how they were offered and used by the Chapel Hill student body.

a. Independent Study Paper Classes

Independent study paper classes were classes in which a student was enrolled in an independent study course but had no meaningful contact with Nyang'oro or any other faculty member. The sole academic requirement for an independent study paper class was the completion of a research paper on a topic supplied by Crowder. Once completed, the papers were submitted to Crowder, and she graded them without any involvement by a faculty member.

It is impossible to identify the number of students who were enrolled in independent study paper classes because of the way course enrollments for independent studies were handled in AFAM. During the relevant time period, all students enrolled in an independent study course for a particular semester were enrolled in a single section, regardless of which professor was supervising their individual work. At the end of each semester, the grades were collected from all professors who had independent studies students, and Crowder entered all grades on the grade sheet without distinguishing between those students who were taking independent study paper classes under Nyang'oro from those who were taking legitimate independent studies. As a result, we cannot isolate which students received a traditional independent study experience (with faculty oversight) from those who had an irregular experience (with no faculty oversight and papers assigned and graded by Crowder). Based on confident assertions by Crowder and Nyang'oro that "most" of the

independent studies offered by AFAM during that period were irregular, however, we can reasonably assume that over 50% of the total AFAM independent studies enrollments were irregular.

Between 1989 and 2011, there were a total of 2,707 total student enrollments in AFAM independent studies.[60] Applying the assertion by Crowder and Nyang'oro, that means that more than 1,354 of those enrollments received a Crowder-managed independent study with no interaction with a faculty member. Of the 2,707 enrollments, 686 were student-athletes (361 in football, 128 in men's basketball, 34 in women's basketball, and 163 in other sports).[61] Analyzing these enrollments, we found 2,090 individual students who took one or more AFAM independent studies during that period. Of that number, 91 students were enrolled in three AFAM independent studies, 23 students were enrolled in four, six students took five, and one student was enrolled in six. Of the 30 students enrolled in four or more AFAM independent studies, 15 (50%) were student-athletes.

The following chart summarizes enrollments in AFAM independent studies between 1989 and 2011:

*Chart I: AFAM Independent Studies Enrollments, 1989-2011*



b.      Lecture Paper Classes

The second brand of paper classes is the lecture paper class, which was a course section that bore a number and title of a traditional lecture course but was taken as an independent study without faculty supervision or oversight. These were designated as traditional lecture classes with

---

[60] This total includes 84 graduate student enrollments.

[61] A table outlining the enrollments in all AFAM independent studies between 1989 and 2011 is appended as Exhibit 10. These numbers include 15 multi-sport athletes, which create a slight discrepancy in calculating the total numbers of student-athletes.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 39 of 137

required class attendance, readings, examinations and other assignments, but they never actually met for class and required only the submission of a paper, which was graded by Crowder and typically received nothing lower than an A or a B.

Between 1999, when the first lecture paper class was offered, and Crowder's retirement in 2009, a total of 186 lecture paper classes were offered with a total of 3,906 undergraduate enrollments in those classes. 1,852 (47.4%) of those enrollments were student-athletes, including 944 football players, 226 men's basketball players, 114 women's basketball players, and 568 student-athletes in other sports.[62]

In terms of the number of lecture paper classes per student and student-athlete, we found 2,097 individual students took one or more of them between 1999 and 2011. Of that number, 135 students took between five and nine paper classes, 17 students took between ten and 12, one student enrolled in 13 and another took a total of 16 lecture paper classes. Of 154 students who enrolled in five or more, 109 (70.8%) were student-athletes.

The following chart depicts enrollments in the lecture paper classes:

*Chart II: Lecture Paper Class Enrollments, 1999-2009, by Athlete Status*



c.     Post-Crowder Paper Classes

Immediately after Crowder retired, Nyang'oro hoped to limit or even eliminate the paper classes in the AFAM Department. His commitment to that objective was short-lived, however, as it faltered in the face of football counselor Lee's focused effort to persuade him to keep them going. As the email traffic reflects,[63] Nyang'oro quickly gave in to Lee's entreaties, and ultimately offered

---

[62] A table summarizing enrollments in the Crowder paper classes is attached as Exhibit 11. These numbers are approximate, as there were 19 enrollments for multi-sport student-athletes, which created a slight discrepancy in these calculations.

[63] *See* Section IV.D, *supra*.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 40 of 137

two paper classes and one independent study paper class (along with three bifurcated classes) between Crowder's retirement in 2009 and the summer of 2011.[64]

The paper classes and independent study paper class were AFAM 428: AFAM Bioethics in Fall 2010, AFRI 396: Independent Studies in Summer Session I 2011, and AFAM 280: Blacks in North Carolina in Summer Session II 2011. There were a total of 44 student enrollments in these three classes, of whom 33 were student-athletes – 32 football enrollments and one women's basketball enrollment.[65] In addition, he offered two bifurcated classes in which between one-third and one-half of the enrolled students took a paper class in lieu of a regular lecture class.

The three paper classes were identical to the paper classes offered before Crowder's retirement in that they never actually met and involved no meaningful professorial contact. They were different, however, in that Nyang'oro – and not Crowder – graded the submitted papers.

Despite this important difference, we feel comfortable counting these among the paper classes due to Nyang'oro's admission that the grades he assigned were based not on the quality of the paper but on his assessment of the grade each student needed in order to remain academically or athletically eligible. As Nyang'oro explained to us, he was very lenient in grading these post-Crowder paper classes, and would typically just skim the papers. He asked Gore to provide him the GPAs of all the students, and would then assign grades based largely on his assessment of the impact that grade would have on the student's ability to remain eligible. The result was an average grade of 3.37 across the three paper classes he offered after Crowder's retirement.

### d. Bifurcated Classes

In addition to the foregoing paper classes, we identified five classes that were bifurcated between two sets of students – those who were taught in the traditional lecture-class format and those who took the same class in a paper-class format. As Nyang'oro explained, these were standard lecture classes in which individual students were permitted to complete the class by simply turning in a paper, while the others had to attend class and complete all class assignments in the traditional manner.

We discovered the bifurcated classes during our review of grade rosters with Nyang'oro, who identified this phenomenon. He explained that there were a limited number of such instances. While we identified five such courses, it is possible that there were more.

There were a total of 154 enrollments in the classes we identified. While we cannot definitively state which students had the paper class experience and which had the traditional lecture experience in each class, Nyang'oro estimated that between one-third and one-half of the enrollments of each bifurcated class had the paper class experience. According to Nyang'oro,

---

[64] The three bifurcated classes offered after Crowder's retirement were: AFRI 370: Policy Problems in African Studies in Spring 2010, AFRI 521: East African Society in Fall 2010, and AFRI 266: Contemporary Africa in Spring 2011.

[65] A table summarizing enrollments in the post-Crowder paper classes is attached as Exhibit 12.

virtually every one of the students who was designated for paper-class treatment was a student-athlete.[66]

### e. Student Add-ons

In addition to offering independent study paper classes, lecture paper classes and the bifurcated classes, Crowder also described instances in which she unilaterally added students to a traditional lecture course taught by a member of the AFAM faculty. Those students would never actually attend the lecture course, but would instead simply complete a research paper that Crowder would assign and ultimately grade. Crowder would then enter that student's final grade on the grade sheet for the class, without the instructor having any knowledge of or say in the student's final grade. Crowder would make this arrangement typically for students who could not attend the lecture class at the time it was offered, perhaps due to a conflict with sports practice times or because the student was away from Chapel Hill for that semester.

One case is particularly illustrative of this phenomenon. In Spring 2006, Professor Bereket Selassie taught a lecture class on North-East Africa, AFRI 124, with 25 enrolled students. At the end of the semester, Professor Selassie recorded a grade of AB (an incomplete grade that technically means "absent from the exam") for a football player who never attended the lectures or the exam. When we asked Professor Selassie about this student, he was flabbergasted to see that the AB for that football player had been changed to an A- through a grade change form.

We then interviewed both Crowder and the football player and learned that he was one of Crowder's add-on students. She had placed the football player on Professor Selassie's class roll, given him a paper topic and graded his paper.[67] Crowder changed the grade from an AB to an A- using a grade change form and signed Nyang'oro's name as instructor.[68]

We tried to calculate the number of students who were treated as add-ons in this fashion, but with no way to distinguish the add-on students from regular students on the existing course records, we were unable to definitively identify any other student besides the one football player. Crowder could not remember any others by name, but she estimated that there were probably "a handful" of students whom she handled as add-ons over the years. Of that number, she believed that the majority were student-athletes.

### f. The Total Numbers of Paper Classes and Paper Class Students

As explained above in Section IV.E.1, a major focus of the Hartlyn-Andrews and Martin Reports was to determine the number of flawed AFAM classes – whether called "anomalous" or "aberrant" or classed into Martin Report's three-level typology. Given the limitations under which

---

[66] A table summarizing overall enrollments in the bifurcated classes is attached as Exhibit 13.

[67] The player told us that he had interacted only with Crowder and did not even know who Professor Selassie was. From his perspective, the football player saw this process as typical and consistent with the 19 other AFAM paper classes he took during his Chapel Hill career.

[68] Crowder explained that she would frequently sign Nyang'oro's name on grade change forms because she understood that Nyang'oro, as department chair, could sign any form in the department.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 42 of 137

they were operating, those inquiries were able to identify only a subset of the truly irregular classes, *i.e.* those with the features that we are using for our definition of "paper class" – no class meetings or teacher contact and the sole assignment of a paper that was graded by Crowder (or by Nyang'oro in the case of the post-Crowder paper classes). The Hartlyn-Andrews Report ultimately identified nine "aberrant" classes and 43 "irregular" classes. The Martin Report identified 39 "Type 1" classes ("lecture course section[s] in which the instructor of record denied teaching the course section and signing the grade roll, or the chair stated that the course section had not been taught").

Thanks to our access to Nyang'oro and Crowder, we were able to identify many more. However, we still cannot give a definitive number. Because of our limited ability to distinguish between regular and irregular independent studies and the absence of records showing how many students received paper class treatment under the bifurcated classes and as student add-ons, we cannot calculate exactly how many AFAM paper classes were offered or exactly how many students were taught irregularly. We can, however, come up with a number that is a close approximation of the actual totals.

There are certain categories of irregular classes for which we do have exact numbers.[69] First, we know from our interviews and review of the registrar's records that there were 188 lecture paper classes – both the 186 lecture paper classes that Crowder managed and the two post-Crowder paper classes – which had a total of 2,097 individual students enrolled in them.

That total significantly underestimates the number of students who received paper class instruction in the AFAM Department, as it does not include any of the 2,090 students in AFAM independent studies between 1989 and 2011. In light of the statements by Nyang'oro and Crowder that "most" of the independent studies over that period were paper classes, we are comfortable positing that at least 50% of those students – or 1,045 students – received paper class instruction. Adding that to the total number of students in verified paper classes, we estimate a potential total of more than 3,100 students who received irregular instruction in the AFAM paper classes.[70] While that number very likely falls short of the true number, it is as close as we can get to a definitive total without engaging in speculation.

2.    Grade Manipulation in the AFAM Paper Classes

Having identified and calculated the number of paper classes and paper class students, we now turn to an examination of the grading process in those classes. A review of the previous reports and news coverage over the past few years reveals a number of allegations and suggestions that there was grade manipulation in the AFAM paper classes. These allegations suggest that the grade manipulation took the following forms:

- That Crowder assigned passing grades even where the student or student-athlete never turned in a paper.

---

[69] From our interviews with Crowder and Nyang'oro we know of 13 specific independent study students who were taught irregularly and at least one student they identified as being a student add-on.

[70] A total of 3,631 unique students enrolled in a paper class and/or an AFAM independent study between 1999 and 2011.

- That Crowder increased grades that had been assigned by other faculty in non-irregular courses in order to keep certain student-athletes eligible.

- That Crowder and Nyang'oro assigned grades to student-athletes based on input from ASPSA counselors as to the grades needed to keep each student-athlete eligible.

- That Crowder and Nyang'oro assigned inflated grades in the paper classes in order to boost student and student-athlete GPAs.

We examined these allegations and came to the following conclusions as to each:

1.     Assigning a passing grade for no paper:  Crowder was adamant in our interviews that she never gave a passing grade in a paper class if the student failed to submit a paper. We tested that contention and found no evidence to contradict her statement. To the contrary, we found abundant evidence that Crowder would give a grade only upon submission of a paper. The grade sheets reflect ABs assigned to students who submitted no paper, and the email record is replete with examples of Crowder urging students and student-athletes to turn in their papers. This documentary evidence is supported by our interviews of staff and students, none of whom knew of any instance where a student got a passing grade without submitting a paper.

2.     Increasing a grade assigned by another faculty member:  Crowder was equally adamant that she never changed a grade assigned by a faculty member without having a legitimate reason to do so. We identified 677 grade change forms that Crowder submitted for both regular and irregular courses during her tenure. Of those, we found only seven that changed one grade to another; the other 670 were changing an incomplete grade (an I or an AB) to a letter grade, presumably for students who submitted their paper class papers after the end of the semester. Of those seven changes from one grade to another, Crowder no longer recalls the reasons for each grade change. She insisted, however, that they were done for legitimate reasons and often at the request of the student's instructor. We found no evidence in our investigation that cast doubt on that assertion.

3.     Assigning Specific Grades upon Request:  We found evidence that both Crowder and Nyang'oro received requests that they award specific grades to certain student-athletes. Those requests came from two persons – Associate Director of ASPSA and Director of Football Cynthia Reynolds and women's basketball academic counselor Jan Boxill ("Boxill").

According to Crowder, Reynolds routinely provided her at the beginning of each semester with a list of the football players registered in her paper classes and the grade that each player needed to remain in good standing.[71] Crowder said that she ignored the grade suggestions, knowing full well that she would award any student who submitted a paper with a fairly high grade.

---

[71] We did not find any such lists in our email review, but that is not necessarily surprising. To the extent these lists were sent by email, a large amount of email traffic was lost when the Chapel Hill systems were upgraded over the course of time, including in 2010-2011. Also, it is quite conceivable that Crowder and Reynolds deleted emails from their accounts to keep their email boxes below university-imposed size limits or for other reasons.

In addition to Reynolds' grade guidance, our email review disclosed several instances where Boxill made specific grade suggestions for her women's basketball players. In September 2008, for example, Boxill forwarded a paper on behalf of one of her players, to which Crowder responded that "[a]s long as I am here, I will try to accommodate as many favors as possible," presumably signaling her willingness to grant grade requests up to the point of her retirement. As to that particular student's paper, Crowder then said "Did you say a D will do for [the basketball player]? I'm only asking because 1. no sources, 2, it has absolutely nothing to do with the assignments for that class and 3. it seems to me to be a recycled paper. She took [another class] in spring of 2007 and that was likely for that class." Boxill replied "Yes, a D will be fine; that's all she needs. I didn't look at the paper but figured it was a recycled one as well, but I couldn't figure out from where."[72]

When we asked Crowder and Boxill about this exchange, they admitted their collusion on the grade, but explained that it had nothing to do with eligibility. This was a student-athlete whose playing days were over, who was on the verge of graduation and who needed only a passing grade to get her diploma. They simply ignored the glaring deficiencies in her paper so as to allow her to graduate.

Boxill continued these grade suggestions after Crowder retired. In July 2010, she sent an email to Gore, Crowder's successor in the AFAM office, forwarding the paper for a woman's basketball player who was taking a paper class. In the cover email, Boxill commented that the paper "is very good and informative. I would give it an A- or at least a B+." Gore replied that the player "did a good job" on the paper, and that it "looks like an A- to me." Boxill responded with one word – "GREAT!!!" – and the student was ultimately awarded an A- in the course.[73]

When we pressed Gore about this exchange, he denied having assigned the A- himself, but suggested that he may well have passed Boxill's suggestion on to Nyang'oro, who was the instructor of record for that paper class. Nyang'oro had no memory of that particular basketball player or of Boxill's suggestion. He did acknowledge, however, that he would occasionally assign specific grades if asked to do so by Boxill. He recalled one particular situation when he gave a women's basketball player a B+ even though he felt her paper was "terrible" and was a "clear F." He assigned that grade because Boxill had suggested that he do so.

4. <u>Assigning Significantly Inflated Grades</u>: Beyond those apparent instances of specific grade manipulation for individual students, there was the general practice of awarding artificially inflated grades to all paper class students, with little regard to the quality of their work on the final papers.

Crowder followed a certain process when grading the papers in these classes. As she explained to us, she did not carefully review each paper, but would instead simply flip through it to ensure that it was of requisite length and included some amount of citation. She would then assign a grade (nearly always some form of an A or B) to each paper and record the grade on the grade sheet for the class.

---

[72] *See* Exhibit 14.

[73] *See* Exhibit 15.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 45 of 137

Nyang'oro continued Crowder's lax grading practices for the three paper classes and three bifurcated irregular classes he offered after Crowder retired. As explained above, he graded with an eye on the students' GPAs to make sure that he gave them grades that would keep them eligible. As a result, the grading pattern remained largely the same.

An argument could be made that a pattern of consistently high grades in a class or group of classes is not necessarily indicative of "grade manipulation." It is a fact of life on college campuses that every instructor grades differently and that every department develops and applies its own standards and expectations in the grading process. As a result, it is not uncommon to see classes or curricula with less-rigorous grading standards offered alongside those with very rigorous standards on the same campus. Every campus in the country offers classes that are known for handing out high grades for relatively little work, and most of us who went through college probably found ourselves in one or two of them along the way. Looked at in this light, one could argue that these irregular paper classes cannot be distinguished from any other easy-grading classes on campus.

While we recognize that easy-grading classes are not a unique phenomenon, we nonetheless believe that the paper classes were, in fact, distinguishable from other such classes. There are two features that set these irregular classes apart.

The first distinguishing feature is what we have learned about their purpose. Unlike other classes, there was no pretense that these classes were intended in any meaningful way to educate students about the subject matter. It was clear to us that the overriding purpose of these classes was to serve as "GPA boosters" (a term that tutor Jennifer Wiley said was used within ASPSA) that allowed students to remain in good academic and athletic standing.

That purpose is reflected in the significantly inflated grades that Crowder and Nyang'oro awarded students in these classes. The average grade issued across the AFAM paper classes over time was 3.62,[74] which is significantly higher than the average grade of 3.243 across all undergraduate programs at Chapel Hill during that same period.[75] Tellingly, it is also significantly higher than the 3.28 average grade for students in the regular AFAM classes during that time, which highlights the disparate treatment of the regular and irregular students and therefore suggests a manipulative purpose behind the irregular classes.[76]

---

[74] Student-athletes earned an average grade of 3.55 in the paper classes. Football players earned an average 3.50, men's basketball players earned an average 3.58, women's basketball players earned an average 3.51, other sport athletes earned an average 3.71, and non-athletes earned an average 3.69.

[75] As part of our investigation, we also sought to identify the grading patterns in a series of other non-AFAM classes that were widely known to be less rigorous. These included certain courses in the departments of Drama, French, Portuguese, Communications and Exercise and Sport Science. In our review of course rosters and transcripts, we observed many student-athletes regularly taking several or all of these courses. In those classes, the average class grade was 3.46. Football players earned an average of 2.77 in those classes, men's basketball players earned an average 2.93, and women's basketball players earned an average 2.92 – each significantly lower than the average grades they earned in the paper classes. While such courses may have been less rigorous, it is worth noting that, unlike the paper classes, these classes all exhibited the elements of regular college instruction, including class attendance and faculty involvement.

[76] Student-athletes earned, on average, a 2.84 in the non-paper AFAM classes.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 46 of 137

The second distinguishing feature of these classes was the irrelevance of the quality of the student's work to the grade awarded. Crowder admitted that she assigned high grades largely without paying attention to their quality, and Nyang'oro admitted that he similarly looked past the strength of the paper when he handled grading for the post-Crowder paper classes. It was clear that, in their minds, the strength of student work – and thus the quality of the learning experience that work represents – was a purely secondary consideration to their desire to give students an inflated grade.

That is clear from a comparison of different papers that received equally high grades among the 150 papers we collected from our email review (*see* Section III.G). One example is highlighted in the Experts' analysis of those papers, where they focus on two papers – one that contains very little original work and is full of text copied from other sources and one that is "an excellent paper . . . thoroughly researched, well organized and carefully written." Both papers received the same grade.

It was also well known that quality played little to no part in the paper class grading process. In fact, it was even the subject of jokes among the ASPSA football counselors and tutors. In one email chain, for example, Learning Specialist Amy Kleissler ("Kleissler") and Lee joke about how tutor Whitney Read ("Read") is worried that a particular football player may not have enough time to get his paper done for his paper class. Kleissler comments that "I still don't think [Read] is absorbing what I am saying about the paper. I finally just said 'think middle school report, not college seminar paper.'"[77] This one comment speaks volumes about the low expectations placed on the players in the paper classes and the irrelevance of quality to Crowder's grading decision.

### 3. The Motivation Behind Offering the AFAM Paper Classes

Given the scale and brazenness of this scheme, it is clear that Nyang'oro and Crowder recognized the possibility that its existence could become public knowledge and that there would be negative fallout from its disclosure. In our interviews, both acknowledged that they had been concerned about the ramifications if these classes were subject to scrutiny.[78] In fact, Crowder attributed her decision to retire largely to the emotional toll of trying to balance the fear of disclosure with the pressure she felt to keep these classes going.

Despite their recognition that there was a danger to them and to the AFAM Department in offering these classes, Crowder and Nyang'oro persisted in doing so to the tune of more than 3,000 students over 19 years. A central question for our review is why: Why would two intelligent and seemingly well-intentioned members of the academic community engage in conduct that could – and ultimately did – bring so much criticism onto them, their department and university, and even onto the students they were trying to help in the first place?

---

[77] Exhibit 16.

[78] In one telling email chain from 2002, Crowder revealed her concern with getting caught. Reynolds wrote to Crowder requesting several independent study courses for a senior football player who needed to graduate. Crowder replied that Reynolds was "asking for more creativity than [she] can muster," noting that "we never ever put an athlete into a special section alone—just too many red flags and we have a little bit of academic credibility to try to uphold." Exhibit 17. In another email in March 2006, she wrote to Wayne Walden about adding a student-athlete to a particular paper class, noting that she "had added several non-athletic persons to classes this week so am comfortable adding him to it." Exhibit 18.

In an effort to answer this question, we identified the following six possible motives for their actions:

- They were compassionate people who wanted to lend a helping hand to struggling students and student-athletes who needed academic support.

- They were sports fans and wanted to boost the fortunes of Chapel Hill's teams by helping to keep the players eligible.

- They were pressured to offer these paper classes by the Athletics Department and/or the ASPSA counselors.

- They believed that the University and the administration wanted them to help student-athletes in this way.

- They used these paper classes as a way of attracting more students and thereby enhancing both AFAM's enrollment numbers and the Department's stature within the University.

- They used these classes as a means of boosting their compensation from the University.

We extensively interviewed Crowder, Nyang'oro and many others about each of these possible motives, and our findings are the following:

1. <u>Desire to Help Struggling Students and Student-athletes</u>: Our investigation revealed that the main reason Crowder and Nyang'oro undertook this scheme was their interest in helping students and student-athletes who were having difficulties in school. As for Crowder, it quickly became clear that this was her overriding passion in life. For a variety of reasons arising from her own experiences as a student (explained in Section IV.B.1), she saw it as her life's mission to lend a helping hand to those who struggled, and she believed she was carrying out that mission through these paper AFAM classes. That belief came through in her emails – in which she routinely talked about helping students "plead their cases"[79] – and every interviewee who knew Crowder emphasized the compassion she felt for troubled students.[80]

---

[79] Exhibit 19.

[80] Crowder's compassion was broadly acknowledged. In one case, a non-athlete student wrote Crowder a thank-you note for all of her assistance:

> Thank you so much for all that you do. The past few months have been the hardest of my life and your care and support has helped me get through it. You have gone out of your way to make sure my classes are straight, my emotions are under control, and my <u>head</u> is still <u>attached</u>. I have not met many people that take such a genuine interest in <u>all</u> people they come in contact with. You are truly a special woman with a selfless attitude and an enormous heart. Thank you for being <u>you</u> and allowing me to share my life with you. I don't know where I'd be without you. (emphasis in original).

While not the driving force of his life, this compassion for struggling students – and specifically student-athletes – was apparently also the primary motivator for Professor Nyang'oro. In a general sense, he shared Crowder's compassion for the student in need – once complaining in an email to Crowder that some AFAM faculty members "bitch as if there's no tomorrow . . . when you ask them to . . . help out a sinking kid."[81]

While Nyang'oro had some compassion for any struggling student, he told us that his particular interest was in helping struggling student-athletes to remain eligible. Having seen the fates of the two former student-athletes who lost their eligibility – one was murdered and the other imprisoned[82] – Nyang'oro felt a special obligation to help prevent other student-athletes from becoming ineligible and meeting similar fates.

This particular interest in student-athletes was the main reason he was willing to buy into Crowder's paper class scheme, and evidence suggests that it may even have given him a grading bias in favor of student-athletes over non-athlete students. An example of this bias may be seen in his grading of the two lecture paper classes he offered after Crowder's retirement. In the first, an AFAM class composed of 19 student-athletes and no non-athletes, the average grade was a 3.43. In the second class, composed exclusively of non-athlete students, the average grade was a 2.75.

While this desire to lend a helping hand to students and student-athletes was the main driving force for both Crowder and Nyang'oro, several of the other motivating factors listed above also played a role in their decision making.

2. Desire to Advance the Prospects of Chapel Hill's Sports Programs: Both Crowder and Nyang'oro were fans of Chapel Hill sports programs, particularly the football and men's basketball teams. Nyang'oro followed the teams and went to the occasional men's basketball or football game during his tenure at Chapel Hill. He was far from passionate about the teams, however, and maintains that his fan loyalty had little bearing on his decision to offer the paper classes.

Crowder, by contrast, was a very passionate Chapel Hill sports fan, and she has close personal ties to Chapel Hill athletics, with her closest friend having been ASPSA basketball counselor Burgess McSwain and her companion being a former Tar Heels basketball player. While Crowder cited compassion as her primary driver, there is no question that her strong love for and identification with the sports program contributed to her willingness to offer paper classes that were disproportionately taken by student-athletes.

3. Pressure from the ASPSA Counselors: Pressure from the ASPSA counselors was another contributing factor. There are countless emails to Crowder in which ASPSA counselors keep up a steady drumbeat of requests for paper classes and student-athlete enrollments. In addition, there is the demonstrably concerted effort by the counselors to have Lee persuade Nyang'oro to continue the classes after Crowder's retirement, an effort that is clearly laid out in the email traffic between them[83] and that paid off with three additional paper classes that Nyang'oro agreed to offer between

---

[81] Exhibit 20.

[82] *See* Section IV.B.4, *supra.*

[83] *See* Section IV.D, *supra.*

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 49 of 137

2009 and 2011. Both Crowder and Nyang'oro acknowledge having felt this pressure, but they emphasize that it would not have persuaded them to offer paper classes unless they were already disposed to bend the rules on behalf of struggling student-athletes.

4. Perceived Affirmation of the Paper Classes by the Administration: Both Crowder and Nyang'oro indicated their belief that the Chapel Hill administration wanted them to provide this assistance to the student-athletes. When we asked about the basis for this belief, both cited the administration's inaction throughout the years as evidence of its acquiescence in the classes. In addition, Nyang'oro cited several comments he received over the years from administrators and faculty suggesting an awareness and approval of the AFAM Department's efforts on behalf of student-athletes.

This supposed affirmation by the administration finds little support in the record, and likely had no meaningful effect on their decision to maintain the paper class scheme. For instance, the only allegedly approving comments that Nyang'oro could cite were remarks by then-Dean Holden Thorp commending him for AFAM's handling of student-athletes. Thorp allegedly told Nyang'oro that he knew "it was tough" to teach so many student-athletes and that he appreciated what AFAM was doing with them. Nyang'oro interpreted this as an implicit endorsement of the irregular class scheme. However, that interpretation is hard to credit. In our interview with him, Thorp could not recall making those remarks, but insisted that any such remarks would have simply been intended to recognize the difficulty of teaching so many student-athletes with their challenging schedules and other distractions and to acknowledge the AFAM faculty's efforts in doing so. Given that logical explanation, Thorp's absolute denial that he knew anything about the paper classes and the absence of anything in those remarks suggesting such knowledge, it is hard to see how Nyang'oro could reasonably have taken them as an affirmation of the paper class scheme.

Nor do we believe it reasonable that the absence of any decisive administration effort to halt the paper classes could have reasonably suggested to Crowder and Nyang'oro that the administration approved of the classes. While that it may have suggested a lack of oversight, it is hard to see how that administration inaction – without more – could have been construed as administration approval. As such, we do not see any supportable basis for Nyang'oro's suggestion that his decision to maintain these irregular classes was a response to encouragement – implicit or explicit – by the administration.

5. Desire to Enhance the Stature of the AFAM Department: We initially suspected that Crowder and Nyang'oro may have been willing to offer these paper classes as a way to boost AFAM's enrollments and therefore its stature within the University. It quickly became clear, however, that the stature of the AFAM Department played little to no role in their thinking. They denied any such motivation in their interviews; there are no emails to that effect; and we are aware of no important personnel, budget or other University decisions between 1989 and 2011 in which the AFAM Department's fortunes hinged in any way on these classes and the number of their enrollments. There is no evidence that either Crowder or Nyang'oro showed a desire to enhance the department's stature with these classes. If anything, they showed a surprisingly cavalier willingness to compromise the stature of the AFAM Department by offering academically unsound classes in its name.

6. Desire to Supplement their Compensation: Nor do we find that they entered into this scheme out of any sort of pecuniary motive. Crowder clearly had no such motive, as her

compensation was not affected in any way by the existence of these classes and/or the number of their enrollments. Nyang'oro's compensation was affected, but only as to the paper classes that were offered in the summer sessions. Even though he was eligible for supplemental compensation for teaching during the summer session, he never sought payment for any of the dozens of summer session paper classes for which he was the instructor of record. It was only at the insistence of Summer School Dean Jan Yopp that he accepted payment for teaching AFAM 280 in the summer of 2011 – the payment that formed the basis for the criminal charge against him of obtaining property by false pretenses.

Nyang'oro insisted in our interview that his acceptance of Yopp's offer was more of an afterthought on his part and that his objective was never to make money off of the paper courses. We find this contention supported, not only by his financially disinterested approach to the irregular classes, but also by the absence of any emails or witness accounts suggesting that he ever saw them as an avenue to higher compensation.

4.     Use of the Paper Classes by the Student Body

Having determined how and why Crowder and Nyang'oro offered these paper courses, we now turn to a discussion of how and why Chapel Hill students took them. We will address first the participation of student-athletes in these classes and then the participation of non-athlete students.

a.     Student-Athletes

The controversy surrounding these paper classes has largely focused on their use by student-athletes. Given the central role that athletics plays in the history, traditions and campus life of Chapel Hill, it is not surprising that the focus has been on the athletic dimension of this controversy. In considering the athletic purpose and use of these classes, however, it is useful to recognize that this controversy is but one part of a broader issue that affects college athletics across the country.

Chapel Hill is one of the few universities that has succeeded at having both a premier academic reputation and an elite sports program. In recent years, it has been consistently ranked among the top five public universities in the United States according to *U.S. News & World Report*. At the same time, it has built an athletics program that fields some of the best teams and athletes in college sports. The North Carolina Tar Heels have won 238 Atlantic Coast Conference post-season championships and 43 NCAA team championships, including six Men's Basketball Championships and 22 Women's Soccer Championships. The school has produced over 100 Olympians and countless star athletes, including Michael Jordan, Vince Carter, Antawn Jamison, Mia Hamm and Davis Love III.

Academically elite universities like Chapel Hill often feel a tension between their high academic standards and the effort to build a strong athletic program. One symptom of this tension is that academically selective schools often feel it necessary to admit academically under-prepared athletes in order to field competitive teams. They do so with the expectation that the inclusion of such student-athletes will be a mutually enriching experience; the university benefits from having the student-athletes' special talents and the student-athletes benefit from getting access to an excellent education.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 51 of 137

This is a perfectly legitimate and laudable approach to admissions, and it has resulted in countless success stories where such student-athletes have excelled both on the field and in the classroom. At the same time, the admission of under-prepared student-athletes presents universities with difficult challenges, as many require intensive academic support and remedial instruction, and even with this assistance some continue to struggle when confronting the demanding academic curriculum of an academically elite university.[84]

It is this tension – the tension between academics and athletics – that partly explains how the academic irregularities came to be at Chapel Hill. At some point in 1993, Crowder took it upon herself to relieve this tension by offering classes with watered-down academic requirements that made it easier for struggling student-athletes to get a passing grade. Nyang'oro signed on to this scheme soon thereafter, and these classes quickly became popular among Chapel Hill athletes. By the mid-2000's, these classes had become a primary – if not the primary – way that struggling athletes kept themselves from having eligibility problems.

It is clear just from the numbers that these classes became very important to many student-athletes. Of the 3,933 enrollments in the AFAM paper classes between 1999 and 2011, 1,871 – or 47.6% – were student-athlete enrollments.[85] That meant that 21% of the student-athletes at Chapel Hill in those years took at least one of those classes. By contrast, only 2% of the general population of non-athlete students took a paper class during that time period.

We interviewed a number of student-athletes in the most highly-enrolled sports, and they provided important insights about the central role these classes played for them and their teams. They explained how these classes were particularly appealing to student-athletes for two reasons: First, since they never actually met, these classes were useful for student-athletes who had demanding practice, game and travel schedules.[86] Second, the easy high grades were helpful to all student-athletes who had limited time to study, and particularly to those with GPAs that were hovering around the eligibility cut-off.

                i.    Distribution of Paper Class Enrollees per Sports Program

In our examination of course records, we found a number of sports represented among the AFAM paper class enrollees during that period. In this section, we summarize the enrollment numbers for players from each sport.

Football: There were 963 enrollments of football players in the AFAM paper classes between 1999 and 2011. We interviewed four recent football players, and each described being steered to these classes by their ASPSA counselors, typically either Reynolds or Bridger. These

---

[84] The scope of our investigation did not include an assessment of the viability of admissions standards for student-athletes at Chapel Hill. We note the prevailing admissions standards only by way of explaining why Chapel Hill faced the challenge of supporting student-athletes who struggled with the demanding curriculum.

[85] These 1,871 enrollments include any student who was an athlete at any time. Thus, for purposes of this calculation, we included any student who was a student-athlete at any time, even if they were no longer competing when they took the irregular class.

[86] We heard of a meeting at which Coach Davis, the then-head football coach, asked if there were additional classes that did not have attendance requirements. Coach Davis does not remember asking that question.

players often knew very little about these classes when they signed up and took them. They were registered for these classes by their counselors; they worked on the paper solely with the assistance of the counselors or tutors; and they typically never even knew the name of the assigned professor for the class. As one player explained, they "really had limited information about everything related to the class[es]" and took them simply because the counselors directed them to do so.

Men's Basketball: There were 226 enrollments of men's basketball players in the paper classes between 1999 and 2009. We spoke with 12 men's basketball players who had knowledge of or took the classes. As with the football players, it was common knowledge among their teammates that these classes required little work for high grades. Unlike the football players, however, the basketball players seemed to find their way to these classes through a variety of routes. While the ASPSA basketball counselor –McSwain and then Walden – would occasionally suggest these classes, they did not routinely steer players into the classes without the players' knowledge. More often than not, the basketball players found these classes either through referrals from their teammates – "locker room advising" – or via their direct relationship with Crowder, who always maintained close ties among the basketball team. Moreover, unlike the football players who largely conceded that these classes held little educational value, several of the basketball players insisted that they read extensively and worked hard to produce their papers for these classes.[87]

Women's Basketball: There were 114 enrollments of women's basketball players in the paper classes between 1999 and 2009. It appears that many of these players were likely steered to these classes by their counselor, Boxill. In fact, one email chain suggests that Nyang'oro would not consider a women's basketball player's request to enroll in one of his paper classes unless Boxill explicitly supported her request.[88]

Other Sports: There were 568 enrollments of student-athletes in other sports in the AFAM paper classes between 1999 and 2009. We spoke with several athletes in these sports, and they acknowledged that they and their teammates were well aware of the paper classes and that some of them were steered to these classes by their ASPSA counselor. Women's soccer counselor Brent Blanton ("Blanton") acknowledged that he often directed players who also played on the U.S. National Team toward these classes. Blanton and the athletes contended, however, that these classes were not used to keep students eligible, but simply as a means of reducing their workload. One baseball player explained that he routinely took one paper class a semester to offset the four other demanding classes he took. Another compared taking these classes to "tasting the forbidden fruit" and explained that it was hard to justify taking a difficult class once you realized how easy it was to get a high grade in one of the AFAM paper classes.

Once we calculated the total student-athlete enrollments across the Athletics Department, we examined the numbers to answer two questions. First, what variables explain the differing

---

[87] One former Tar Heel player described how he would bury himself in the library for a full week, read five to six books and produce a lengthy paper for every irregular AFAM class he took. Two others similarly described working hard to research and write these papers while playing in the NBA.

[88] *See* Exhibit 21. A former women's basketball student emailed Nyang'oro requesting to be enrolled in an irregular class. Nyang'oro forwarded the email to Crowder and directed that the student not be enrolled in the course "[u]nless it is a request from Jan Boxill."

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 53 of 137

enrollment numbers for each sport? Second, what are the athlete enrollment trends over time and what explains those trends?

        ii.    Reasons for the Distribution of Paper Class Enrollees by Sports Program

In an attempt to answer the first question, we identified several characteristics of the sports programs that may help to explain why certain sports were more represented in the AFAM paper classes than others. The number of players per team is one obvious factor – and helps to partly explain why football, with more than 100 players each year, has by far the most enrollments – but there are others that may help to explain the allocation across sports. Among the other variables are the following:

- The average GPA of the sports team: There was an inverse correlation between a particular team's average GPA and the number of its players enrolled in these paper classes during that period. Football had the lowest average GPA at 2.43 and the highest total number of paper class enrollees. This correlation certainly tends to confirm what we heard from Crowder, *i.e.* that the need for a grade boost played an important part in the decision to steer and admit a student-athlete into these classes.

- The number of "special admit" admissions[89] per sports team: There was a similar correlation between the number of "special admit" student-athletes on a team and the number of players from that team who enrolled in these paper classes. This is consistent with the oft-raised concern that overly relaxed admissions standards can increase the pressure to cut academic corners.

- The level of interaction between the ASPSA counselors and each sports team: There was a direct correlation between the degree of ASPSA's involvement with a team and the number of players from that team who found their way to the AFAM paper classes. This correlation reflects the practice of some counselors of "steering" their student-athlete charges toward these classes.[90] With the revenue sports having the highest number of dedicated ASPSA staff, it is not at all surprising that they account for the bulk of the paper class enrollments.

- The relationship between Crowder and the individual ASPSA counselors for each sports team: As explained above, the number of paper class enrollments in a sport was based, at least in part, on the friendship between

---

[89] Chapel Hill's admissions policies require that prospective students, including recruited student-athletes, whose academic records do not meet certain minimum thresholds be considered by the Committee on Special Talent. Students and student-athletes admitted through such review have been referred to as "special admits" by some Chapel Hill officials.

[90] *See* Section V.B.1.c, *infra.*

# CADWALADER

Crowder and its counselors. We found that Crowder's friendship and close working relationship with football counselor Reynolds, men's basketball counselors McSwain and Walden and women's basketball counselor Boxill contributed to the high enrollments from their sports.

      iii.    Reasons for Fluctuations in Student-Athlete Enrollment in the Paper Classes

After studying the possible reasons for different paper class enrollment numbers across the sports programs, we turned to analyze the possible reasons for fluctuations in sports enrollments across the years. The following chart summarizes paper class enrollments by sport between 1999 and Crowder's retirement in 2009:

*Chart III: Paper Class Enrollments, 1999-2009, by Sport*



We examined the fluctuations in student-athlete enrollment specifically to determine if we would find any evidence that the sports programs ever took the initiative to limit their players' use of the paper classes. For example, a number of commentators have questioned whether the drop-off in men's basketball enrollments in the middle of the last decade was due to a policy change by the new coaching or ASPSA basketball staff.

It appears, however, that the fluctuations are largely attributable to factors extrinsic to the sports teams. Specifically, as explained above in Section IV.B.9, the mid-decade decline was largely due to Dean Owen's intervention in 2005-2006 and Crowder's fear that the spike in popularity of these classes would bring scrutiny to her scheme. The self-policing theory is further weakened by the spike in football and other sports' enrollments in 2009, which represents the rush to get into the last paper classes before Crowder's retirement.

As for men's basketball specifically, there is no downturn in enrollments in 2005 to suggest that the new coaching staff brought in a new policy disfavoring the paper classes. There is a gradual decline in enrollments starting in 2007 – and no spike right before Crowder's retirement while football players and other athletes were desperately trying to load up on the last paper classes –

50

# CADWALADER

which likely does reflect the conscious effort by the coaches and Wayne Walden to encourage their players to take lecture classes that require attendance.[91]

### b. Non-Athlete Students

Although most of the attention over the past three years has been focused on student-athlete involvement in the paper classes, it is important to remember that a majority – 52.9% – of the enrollees in these classes were non-athlete students. These students largely fell into two groups – the accidental paper class student who enrolled expecting a regular class and the student who enrolled specifically because it was a paper class. We spoke to several students of the first group who explained that they signed up for a paper class out of interest in the stated class topic, were surprised when they learned that the supposed lecture class never actually met, and gave a genuine effort to write a solid paper to earn a good grade. This was the distinct minority of students who took these classes.

The majority of non-athlete students who took these paper classes did so with full awareness of – and largely because of – their lack of structure and rigor. Through our interviews and email review, we learned that there were a variety of means by which these students learned of and were directed toward these classes.

First, there was the general word-of-mouth network on campus. With up to 400 enrollments in some semesters, their existence was hardly a secret. As with any course that offers an easy path to a high grade, word of these classes got around.

Beyond mere word-of-mouth, there were several other avenues by which non-athlete students learned about these classes. One was through the academic advisors at the Steele Building who assist students in planning their schedules and progress through Chapel Hill's curriculum. Over her 30-year tenure, Crowder became a part of what was affectionately called "the good old girls network," which was a network of like-minded women in various roles on campus who took it upon themselves to support those students who were struggling with school. Some of these women were Steele Building academic advisors. These advisors knew about the paper classes; they knew that Crowder controlled enrollment; and they often referred academically-challenged students to Crowder for placement in those classes. For years, advisors like Betsy Taylor and Alice Dawson sent struggling students to Crowder, in the hope that these classes would alleviate the pressure on them.[92]

Another referral venue was through the advisors for scholarship programs, including Carolina Covenant and Morehead-Cain Scholars.[93] For example, we heard of one Morehead-Cain

---

[91] Both Walden and Holladay explained that they preferred that their players be in structured classes that required attendance.

[92] As explained below at Section V.B.1.d, while these advisors clearly knew that these classes required no attendance and resulted in consistently high grades, they insisted in our interviews that they were unaware that the listed faculty member played no role in the class and that Crowder actually graded the papers. We have seen no emails or other evidence to contradict that assertion.

[93] The Carolina Covenant and Morehead-Cain programs are two scholarship programs at Chapel Hill.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 56 of 137

Scholar who was referred to Crowder for placement in a paper class when his GPA started to slip and he was in danger of losing his scholarship. Crowder placed him in a paper class, he got an A, and was able to keep his scholarship.

The largest source of referrals for non-athlete students – besides word-of-mouth – was the fraternity network on campus. We spoke with several former Chapel Hill fraternity members who explained that the paper classes were widely known among the fraternities. One student ("Fraternity Member #1") learned early on from his brothers about an AFAM administrator named Debby Crowder who was very accommodating. If he visited her office at the beginning of the semester, they told him, she would enroll him in a "paper class," which he understood to be an independent studies class for which one was guaranteed an A or A- simply for submitting a 10-page paper. Fraternity Member #1 ended up taking two AFAM paper classes.

Another fraternity brother ("Fraternity Member #2") told us that he also had Crowder place him in paper classes, and explained that he took them as an easy way to fulfill Chapel Hill's curricular Perspective requirements.[94] Both fraternity members explained that they saw these classes as somewhat of a "loophole" in Chapel Hill's otherwise demanding curriculum, and they never conceived of these classes as being in any way tailored to athletes. In fact, they recalled that a number of their non-athlete fraternity members took so many AFAM classes that they inadvertently ended up with AFAM minors by the time they graduated.

These classes became so popular among the fraternity members looking for an easy high grade that Crowder and the Steele Building advisors became concerned that they would crowd out the challenged students who, in their eyes, were truly deserving of an academic break. In one telling 2005 email, Assistant Dean Dawson (currently an Assistant Dean in Academic Advising) explained to Crowder how she had declined to steer one fraternity brother toward the AFAM irregular classes because he was simply looking for a "slack" class and was not truly a "problem kid."[95]

> You had also told me one day in Betsy's office last semester that word about your independent studies had sort of gotten into the frat circuit so I've tried to remember to give a student one of my cards before sending them over to you and to actively squash students who are being slack. When Betsy referred this kid to me today, I confirmed with her that you still had all the problem kids you could handle so I very specifically was not going to offer any of your courses as a solution to him; my lips were sealed.

Despite Dawson's discretion on that occasion, the word got out among the fraternities and the brothers came in large numbers. Over the course of ten years, there were 729 enrollments in the paper classes by members of fraternities (and some sorority sisters).

---

[94] *See* discussion regarding Perspectives requirements at Section IV.B.5, *supra*.

[95] Exhibit 22.

# CADWALADER

*Chart IV: Paper Class Enrollments, 1999-2011, by Greek Affiliation*



Besides the individual fraternity brothers' desire for an easy class, the fraternities themselves had an incentive to direct their members to these classes. Like the athletic teams whose members need to maintain a minimum GPA to compete under NCAA eligibility rules, fraternity and sorority houses are subject to minimum GPA requirements to retain institutional recognition.[96] We understand that the need to meet these requirements played a role in the decision among fraternity members to take these classes.

### 5. The Analysis of Student Papers in the Paper Classes

To this point, the report has focused on the substantial evidence that these paper classes were academically unsound and existed largely to give students and student-athletes the opportunity to get an inflated grade for very little work. As we said above, however, the fact that a student or student-athlete was in a paper class does not necessarily mean that he or she did little work or received a grade that was not deserved. We learned of numerous instances where students and student-athletes diligently worked on their papers and turned in a product that deserved a strong grade.[97] We also learned, however, of instances where students and student-athletes took advantage of the fact that Crowder was doing the grading to turn in a paper that did not represent a legitimate effort on their part.

In order to gauge the extent to which students used these paper classes to skirt the work requirements of a regular class, we undertook an examination of the legitimacy of the work reflected in their papers. Specifically, we looked for evidence that the papers contained text that that was not drafted by the students.

---

[96] Starting in spring 2011, the Greek organizations also became subject to a new Chapel Hill policy providing that a house can engage in the rush recruitment of new members only if that house maintains an average GPA that meets or exceeds the average Chapel Hill undergraduate GPA.

[97] For example, the Experts' report of their analysis of student papers (attached at Exhibit 35 and discussed in Section V.A.5.c, *infra*) refers to a paper they reviewed that was "excellent . . . thoroughly researched, well organized and carefully written [and] could have easily been written by an advanced undergraduate committed to doing some scholarly research."

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 58 of 137

# CADWALADER

There are two possible means by which that might happen. First, a student could have another person write all or portions of the paper and then submit the paper as his or her own work. Second, a student could copy pre-existing text from another source (*e.g.* Wikipedia), insert the copied text into his or her draft and submit it for credit. Numerous allegations have surfaced over the years suggesting that students engaged in both varieties of cheating in regard to the papers submitted in the AFAM paper classes. We investigated and found evidence to support these allegations.

### a. The Submission of Papers with Text Written by Others

We first sought to identify instances where paper class students received improper drafting assistance from others. That examination was limited in two respects. First, it was not feasible for us to definitively identify such cheating from a mere examination of the papers. Without any familiarity with each student's writing style, we were not equipped to detect text that deviated from that style and might therefore suggest the involvement of another person in the drafting process. While we certainly saw passages that raised questions about authorship, we could not conclusively determine that these passages were drafted by someone other than the paper-class student. Moreover, we had no access to most of the persons – classmates, friends, girlfriends, etc. – who were the likely sources of such assistance. As such, we were greatly limited in our ability to identify situations where others helped to draft the submitted paper.

There was one situation, however, where we were equipped to identify instances of such cheating – *i.e.* the situation where an ASPSA tutor provided excessive assistance to a student-athlete. As explained above, ASPSA made tutors available to all student-athletes who needed assistance with their studies, and many of the student-athletes in the AFAM paper classes worked with the tutors in drafting their papers. As explained above,[98] there is a fine line between appropriate and inappropriate tutor assistance in the drafting of a paper. According to the ASPSA Tutor Handbook, student-athletes "are to do their own work" and, while tutors and student-athletes can "brainstorm" about a paper, it is the student-athlete's job to develop his own thesis and argument.[99]

We undertook to identify any instances where tutors crossed that line in regard to the paper class papers. First, we interviewed a number of student-athletes about the degree of drafting assistance they received from the ASPSA tutors. To a person, these student-athletes insisted that they drafted their papers and that the tutors' assistance was limited to general suggestions and corrections. The only student-athlete who has deviated from that line is Rashad McCants, a player on the Chapel Hill men's basketball team from 2003 to 2005. On June 6, 2014, McCants gave an interview to ESPN's "Outside the Lines" program in which he described how unnamed tutors wrote papers for him and his teammates, which they turned in for credit. In a June 11, 2014 follow-up interview, McCants explained:

> I didn't write any papers. I didn't write any papers, but I know that the tutors did help guys write papers – as far as help them through the grammar, the structure, paragraphs, so on and so forth. But, for some of the premier players, we didn't write our papers. It was very

---

[98] *See* Section IV.B.8, *supra*.

[99] Exhibit 23.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 59 of 137

> simple. When it was time to turn in our papers for our "paper classes," we would get a call from our tutors, we would all pack up in one big car, or pack up in two cars, and ride over to the tutor's house, pick up our papers and go about our business.[100]

McCants gave this interview and several subsequent interviews out of a purported desire to tell the truth about exploited student-athletes.[101] However, this interest in full disclosure did not translate into any interest in assisting our investigation. We sent McCants a letter via Federal Express to his address on record with Chapel Hill and emailed him twice requesting an interview – including an email sent a month before his first public announcement of these allegations in the June ESPN interview.[102] McCants ignored every one of these requests.[103] Given McCants' failure to provide details about this alleged cheating – such as the names of either the tutor(s) who allegedly drafted these papers or the other basketball players who allegedly turned them in for credit – and his unwillingness to be interviewed, we are left with no evidence to support those allegations.

Although we were unable to assess McCants' allegations, we were able to identify other occurrences of analogous misconduct through our interviews with several of the tutors. We interviewed nine individuals who provided tutoring assistance with the AFAM paper class papers. Those tutors were:

- Jan Boxill – Academic Counselor for women's basketball

- Beth Bridger – Learning Specialist and Academic Counselor for football

- Catherine Frank – Tutor for men's basketball

- Janet Huffstetler – Tutor for men's basketball

- Amy Kleissler – Tutor, mentor, and part-time Learning Specialist for football

- Jaimie Lee – Tutor, mentor, and Academic Counselor for football

- Whitney Read – Tutor and mentor for football

---

[100] Interview of Rashad McCants, ESPN's "Outside the Lines" (Jun. 11, 2014).

[101] *See, e.g.*, Interview of Rashad McCants, ESPN's "Outside the Lines" (Jun. 11, 2014); Interview of Rashad McCants, SiriusXM Radio (Jul. 4, 2014); Interview of Rashad McCants & Mary Willingham, SiriusXM (Jul. 7, 2014).

[102] Each of our letters, emails, and text messages to Mr. McCants are attached as Exhibit 24.

[103] When asked by interviewer Andy Katz on June 11, 2014 whether he planned to interview with us, McCants deflected the question, saying "What are we talking about . . . I think that he [Wainstein] should discuss that with the 16 guys who said they had an excellent experience," referring apparently to the 11 former teammates who gathered after his interview and publicly denied the truth of his allegations.

Case 1:14-cv-00954-LCB-JLW  Document 166  Filed 01/18/19  Page 60 of 137

- Jennifer Wiley – Tutor and mentor for football

- Mary Willingham – Learning Specialist in ASPSA

Of those nine tutors, only three admitted to going over the line and "feeding" text to the student-athlete they were tutoring. As explained above in Section IV.B.8, one of those was football tutor Jennifer Wiley. Thanks to the assistance of District Attorney Woodall, we were able to interview Wiley in July 2014. Wiley was completely cooperative and forthcoming, and her story is a telling lesson in how easily a tutor with the best of intentions can allow herself to slip across the line between appropriate and inappropriate assistance.

As Wiley explained, she started as an ASPSA tutor in 2007 and sat through an initial tutor training class in which a compliance officer from the Athletics Department laid out strict, bright-line rules limiting the amount of drafting assistance they could provide. The compliance officer made it clear that these rules -- such as a prohibition on the tutors making so much as a mark on the student-athletes' papers – were designed to keep the tutors far away from any inappropriate behavior. Those rules quickly got diluted, however, when then-Learning Specialist Beth Bridger called a meeting with the tutors and explained that they had more latitude than suggested by the compliance officer. Although Bridger said nothing to suggest that the tutors could do the players' work for them, Wiley took from her comments that they were being "given some grace" to be more involved in the drafting process than the compliance officer's rules would permit.

In the beginning, Wiley largely adhered to the rules and limited herself to providing an appropriate level of assistance. Over time, however, she became increasingly involved in the drafting process as she came to realize that many of the players were simply incapable of completing a college-level paper on their own. Under constant pressure from ASPSA to make sure the players finish their papers and remain eligible, she crossed further and further over the line until "[she] got to the point where [she] was writing significant portions of a paper" for the players.

When we asked Wiley why she – a person who had lived a life of generally following the rules – would agree to cross that line for the players, she explained that she simply felt sorry for them. She realized that a number of them just could not write a paper on their own, that she was their only hope and that their lives would be turned upside down if they failed their classes. There were numerous occasions when players would come to her in tears, begging for her help in completing a last-minute paper that would save them from failing a class and possibly losing their athletic eligibility. As she described those incidents and the effect they had on her, it was clear that human sympathy and compassion were what drove her to cross the line between legitimate and illegitimate tutoring assistance.

Another tutor who apparently crossed the line – although to a much lesser extent than Wiley – was football tutor Whitney Read. Like Wiley, she tried to follow the strict rules, but eventually found that a number of the players were so woefully underprepared that they could not draft a paper without assistance. At that point, she deviated from the rules and started to "rewrite and heavily edit" the papers her players were drafting for the AFAM paper classes.

The third tutor who admitted stepping across that line to some extent was women's basketball academic counselor Jan Boxill. In our review of Boxill's emails, we discovered a number of instances where Boxill helped her players by drafting small amounts of original text for their

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 61 of 137

papers. On one occasion, for example, she reviewed a player's draft paper and emailed it back to the player saying that she had "made a few changes" to the paper.[104] On another occasion, Boxill emailed a player a revised paper and explained that she had "add[ed] some stuff for the intro and conclusion."[105] She later sent that same player a revised paper for a different class, noting that she "added a brief conclusion which follows nicely from what you have."[106]

These are just several of the instances where Boxill provided text for her players' papers. While we never found evidence that she wrote lengthy sections like Wiley did, she clearly was "feeding" her players with sentences and the occasional paragraph of text. When we pressed her on the appropriateness of this conduct, Boxill expressed the belief that it was acceptable for a tutor to make such modest contributions to a paper. While it would clearly be wrong to do wholesale drafting, she said, a tutor's suggestion of a sentence or two or a brief conclusion was "minor" and "not substantive."

Aside from these three, all the other tutors insisted that they stayed on the right side of the line and refrained from "feeding" text to the student-athletes. In our document review, we found a number of tutor and mentor feedback forms that raised the possibility of inappropriate assistance, with tutors reporting that they had "revised" or "edited" students' coursework during tutoring sessions,[107] and students emailing papers to tutors for substantive edits, sometimes at the tutor's request.[108] However, none of these reports provides conclusive evidence that a tutor drafted text for a student-athlete.

b.    The Submission of Papers with Copied Text

In addition to the inappropriate tutor assistance, there were also allegations that students and student-athletes routinely appropriated existing text – often from the Internet – and incorporated it into their papers for the AFAM paper classes. The clearest example of this was the plagiarized paper that Michael McAdoo submitted for a Swahili 3 course in Summer 2009.[109]

We heard from a number of our interviewees that plagiarism was much more common in the paper classes than in other classes. Students who were inclined to cheat were emboldened to do so in these classes because they knew that their papers would not be reviewed with a discriminating eye. To the contrary, it was common knowledge that Crowder simply skimmed the introduction

---

[104] Exhibit 25.

[105] Exhibit 26.

[106] Exhibit 27.

[107] *See* Exhibits 28, 29, 30, and 31.

[108] *See* Exhibits 32, 33, and 34.

[109] McAdoo's paper became the center of controversy regarding his eligibility to play football. Initially, Chapel Hill discovered that he had been provided assistance by Wiley in citing certain material and was found to have violated the University's honor code. McAdoo was subsequently declared to be permanently ineligible by the NCAA in light of this infraction. He challenged the finding in court, and attached the paper to his complaint. Once made public in summer 2011, fans of a rival school found that large portions of the paper had been plagiarized.

and conclusion of each paper, and rarely, if ever, looked at the material in between. Some students and student-athletes reportedly took advantage of Crowder's lax grading process by filling their papers with "fluff" that often included material that they blatantly copied from sources on the Internet.[110]

Once we learned about the causal connection between Crowder's lax grading practice and the incidence of potential plagiarism, we realized that we would need to focus on the plagiarism issue as a component of our review. It was our job to investigate and assess the academic soundness of these paper classes. We had already determined that they lacked several essential components of an academically sound course – such as faculty involvement and grading. Though academically deficient on those grounds alone, one could still argue that those classes were not totally bereft of value because they at least required the student to research and write a paper. If it turned out, however, that the student's paper was plagiarized, then it is hard to see how his experience with a paper class held any educational value at all for him.

With that in mind, we undertook to assess the degree of original and unoriginal work in the paper classes. Thanks to the discovery of 150 final papers during our email review, we had a means of conducting that assessment through an analysis of those papers. The challenge, however, was to design a process for examining and identifying the unoriginal material in these papers. We determined that we did not have the necessary expertise and that we needed the assistance of experts both in the subject matters of the papers – *i.e.* African and African-American studies – and in the field of student writing. We then identified and retained three professors from other universities who had backgrounds with those areas of expertise. At our request, these professors designed a process for identifying unoriginal material that combines the use of commercially-available plagiarism detection software with their own expert review of the papers. We call this process the "Originality Review," and we detail its process and findings in the following section.

      c.      Originality Review

To do this important part of our review, we retained the services of three experts – professors at major universities in the fields of African Studies and African American Studies and a professor with expertise in undergraduate writing:

- **Edmond J. Keller Ph.D.**, Research Professor, Department of Political Science, University of California, Los Angeles. Dr. Keller specializes in comparative politics with an emphasis on Africa. He has taught at Indiana University, Dartmouth College, the University of Wisconsin-Madison, Xavier University (New Orleans), and the University of California-Santa Barbara. Keller was the recipient of the African Studies Association Distinguished Africanist Award for 2008. He is the author of numerous books and articles on African politics and development. Keller's main research is on issues of political transitions in Africa; cultural pluralism, identity politics and citizenship; and conflict and conflict management in Africa.

---

[110] Jennifer Wiley reported that it was widely understood among football players that the middle sections of these papers could be "fluff."

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 63 of 137

- **Derek Malone-France Ph.D.**, Executive Director, University Writing Program, and Associate Professor of Writing, of Religion, and of Philosophy, The George Washington University. Malone-France teaches undergraduate and graduate courses on philosophy of religion, political and legal philosophy, political rhetoric, political dissent, human rights theory and practice, and the philosophical and religious implications of astrobiology and space exploration. He directs the University Writing Center, an independent unit housed within the Columbian College of Arts and Sciences. The program is composed of three divisions: First-Year Writing, responsible for the required first-year student course; Writing in the Disciplines, which includes upper-level courses in various undergraduate majors and minors; and the Writing Center, which tutors roughly 6,000 students each year. Approximately 400 faculty members are involved in administering the program.

- **Imani Perry Ph.D., J.D.**, Professor, Center for African American Studies, Princeton University. Dr. Perry is an interdisciplinary scholar who studies race and African American culture using the tools provided by various disciplines including: law, literary and cultural studies, music, and the social sciences. She has published numerous articles in the areas of law, cultural studies, and African American studies. She also wrote the notes and introduction to the Barnes and Noble Classics edition of the *Narrative of Sojourner Truth*. Perry teaches interdisciplinary courses that train students to use multiple methodologies to investigate African American experience and culture.

Together, we refer to Drs. Keller, Malone-France, and Perry as the "Experts."

We charged the Experts with determining whether, and to what extent, the 150 papers we identified appeared to represent original undergraduate academic work. The Experts were provided the student papers[111] and the course designation for which the paper was submitted. They were not provided any additional information, such as the academic levels (freshman, sophomore, etc.) of the students or any indication regarding whether each student was a student-athlete.[112]

The Experts undertook to accomplish their charge by employing a methodology that included use of plagiarism detection software followed by a detailed review of each and every paper.

---

[111] Each Expert executed a letter of engagement that provided, among other things, that he or she not disclose personally-identifiable student information that he or she received in the course of their engagement.

[112] We are limited in the conclusions that we can draw from the findings of the Experts. First, the Experts were only able to review (because we could only locate) a small percentage of the student papers for the paper classes. We cannot – and do not – extrapolate the findings from this limited collection to the much larger population. Second, because the Experts did not have precise information regarding the nature of the assignment, the directions given to students regarding use of source materials and citation, or other academic directions provided to the students, we cannot – and do not – make any findings about whether the students complied with such requirements. Third, the Experts were not engaged to – and did not – consider whether the grade awarded for each paper was appropriate.

Case 1:14-cv-00954-LCB-JLW  Document 166  Filed 01/18/19  Page 64 of 137

For the purposes of their review, the Experts defined unoriginal content as content of a paper that was taken verbatim from other sources as opposed to having being written by the student. Their full report is attached at Exhibit 35 but their top-level findings are as follows:

- In over 40% of the 150 papers (61 papers), 25% or more of the text was deemed unoriginal.

- In 17% of the 150 papers (26 papers), 50% of the text was deemed unoriginal.

Of those 61 papers with 25% or more of unoriginal content, the average grade was a 3.69 (or almost an A-).

In addition, the Experts found that students often tended to use large amounts of unoriginal content – often properly cited – between the introduction and conclusion of their papers. As they explained:

> there are a number of papers in which, rather than plagiarize, students overused quoted material to such a degree that anyone reading the paper for the purposes of a serious academic evaluation would have been unable to ignore it. For example, in one paper that was ostensibly about the life and work of Nikki Giovanni as it related to larger dynamics in African-American culture, the student had simply written a two-page introduction and a last page of text, and the entire rest of the paper in-between those pages is almost nothing other than transcriptions of poems and other texts by Giovanni, formatted to take up maximal space. In a way, such papers are even more telling than the plagiarized papers, because, while plagiarism is not always easy to detect, students who used large amounts of "filler" quotes did nothing whatsoever to hide the fact that they were turning in mostly unoriginal work. The quote marks and citations are there, making it clear to the reader that most of the paper was not written by the student.[113]

These findings tend to corroborate two related points that we heard throughout our investigation. First, it supports the contention that Crowder did not critically read the submitted papers, as even a cursory review would have revealed that a number of them contained large amounts of copied material. Relatedly, it supports what we heard about some students taking advantage of Crowder's grading by drafting a passable introduction and conclusion but then filling in the middle section with large amounts of "fluff" (*see* Section IV.B.8).

---

[113] EDMOND J. KELLER, DEREK MALONE-FRANCE & IMANI PERRY, EXPERT ACADEMIC EVALUATION OF RETRIEVED PAPER SET, AFRICAN AND AFRICAN AMERICAN STUDIES DEPARTMENT, UNIVERSITY OF NORTH CAROLINA, CHAPEL HILL, SPRING 2005 – SPRING 2011 [hereinafter EXPERT REPORT] (emphasis added). The Expert Report is appended as Exhibit 35.

# CADWALADER

6.    The Analysis of the Impact of Paper Classes on Student GPAs

As part of our investigation, we were tasked with determining whether and how the paper classes affected student GPAs. This required us to team up with Chapel Hill Registrar Christopher Derickson and to conduct a statistical analysis of student records to determine the impact that the inflated paper class grades had on student GPAs.

a.    Impact Analysis Methodology

We considered two separate measures for this impact analysis. The first, and most simple, was a simple calculation of the average percentage increase in GPA caused by the grades student received in the AFAM paper classes. After careful research and calculations by Registrar Derickson, we determined that on average a three credit-hour AFAM paper class raised a student's GPA by approximately .03 points. That is a meaningful increase, especially when it is considered that many students took multiple AFAM paper classes.

The second, and more complicated, measure we employed was a determination of the impact the AFAM grades had on a student's ability to maintain a certain threshold GPA. The threshold we used for that analysis was the 2.0 GPA mark, which is the standard threshold for graduation at Chapel Hill and other schools.

We considered whether to also conduct an impact analysis using NCAA and/or Chapel Hill athletic eligibility standards as a threshold for student-athletes, but ultimately decided that that analysis was not practically feasible for our purposes. Those eligibility standards have changed over the period that the paper classes existed,[114] and they also change throughout the course of a student-athlete's college career.[115] In addition, GPA is just one of two factors of eligibility, the other being a student's progress toward his or her degree. As such, we determined that the traditional 2.0 threshold was the most feasible standard by which to measure the impact of the paper classes.

Once we determined our threshold, we then identified every student who was ever enrolled in one of the 188 identified paper classes[116] and isolated each student's cumulative GPA at the end of the semester in which he or she took the paper class. In order to determine the impact that paper class had on the student's GPA that semester, we then took the three-credit grade that was awarded for the paper class and excluded it from that end-of-semester GPA. The result was what we call the "recalculated GPA," which reflects that student's GPA without the benefit (and it was almost always a benefit) of the paper class grade. We then compared that recalculated GPA number for each paper class student to the 2.0 threshold to identify those students for whom the paper class grade made the difference between exceeding or not exceeding 2.0 for that particular semester. Because the effect of a grade continues to impact GPA for the rest of a student's college career, we then

---

[114] In 2003, the NCAA enacted a complex eligibility scheme that required students meet certain benchmarks in progressing towards a degree in their declared major in order to remain eligible. We understand that Chapel Hill has also changed its academic eligibility requirements, including by introducing a probationary status.

[115] Eligibility requirements are based on a student's year in school.

[116] For purposes of this analysis, we also included the five bifurcated classes we identified.

61

# CADWALADER

analyzed whether that AFAM grade was the margin between an above or below-2.0 GPA in a student's future semesters. We conducted this analysis for every student who ever took a paper class, and for those students who took multiple paper classes we calculated the combined impact that the paper class grades had on their GPAs.

Before laying out the results, it should be noted that this methodology has an inherent limitation – it cannot be used to conclude that a student would necessarily have ended up with a lower GPA if he did not take the paper class. It is quite possible that if the AFAM paper class were not available, the student would have taken another easy class that awarded him or her an equally high grade. In fact, that is quite likely given how many students admitted that they were looking specifically for an easy-grading class when they selected the paper class. Therefore, while we can use this analysis to calculate the GPA enhancement caused by the paper class grades, we cannot go beyond that and conclude that the student would not have gotten that GPA enhancement but for the paper class. With this limitation in mind, the following lays out our impact analysis findings.

        b.      Impact Analysis Findings

A total of 2,152 individual students who enrolled in the paper classes were included in this impact analysis. Of that number, 329 students (including 169 student-athletes) had at least one semester in which the grade they received in their paper class either pushed or kept their GPA above 2.0. In other words, for at least one semester in their college career, each of those students had an actual cumulative GPA above a 2.0 but a recalculated GPA (excluding the paper class grade(s)) below a 2.0. This number includes 123 football players, 15 men's basketball players, eight women's basketball players, and 26 Olympic sport athletes. Of that number, we identified 81 students who earned degrees from Chapel Hill whose recalculated final GPA excluding the grade(s) from their paper class or classes was less than the 2.0 required to graduate.

In addition to calculating the number of students whose GPAs were so impacted for one semester, we also performed an analysis to determine the impact across all of the paper class students' college careers. To do this, we first identified every student semester that was ever affected by the grade that a student received from a paper grade –either from that semester or a previous semester. That total population ended up being approximately 10,018 student semesters. Out of that population, we isolated those student semesters where the paper class grade had the effect of raising the student's GPA for that semester. We then compared that population of semesters against the 2.0 GPA threshold and calculated the percentage of those semesters where that rise in GPA attributable to the paper class either maintained or pushed the student's GPA over 2.0.

In reporting these results, we distinguished between non-athlete students and student-athletes. In general, we found that the paper class grades had a disproportionately higher impact on student-athlete GPAs across semesters than on non-athlete student GPAs. While we found that a paper class grade kept or pushed non-athlete GPAs above 2.0 for only 7% of the impacted semesters, it did so for student-athletes in 17% of their semesters.

In terms of different sports, we found that the paper class grades had the greatest impact on men's football, a lesser impact on men's and women's basketball, and relatively little impact on Olympic sport athletes. For football players, the paper class grade allowed the player to reach or maintain a 2.0 in 25% of the impacted semesters; for men's basketball it did so in 14% of the

impacted semesters; in women's basketball it was 9% of the semesters; and for Olympic sports the number was only 4%.

B.     Assessment of University Employee Knowledge or Involvement in the Paper Classes

As explained in the previous section, Professor Nyang'oro and Debby Crowder were the two main actors in this paper class scheme. They were the ones who designed, implemented and maintained these classes over the course of nearly 20 years. It is clear that nobody else was centrally involved in that process.

That does not end the inquiry, however, as there were a number of University employees who knew about the paper classes; who took advantage of the classes for their own ends; and/or who took actions that facilitated the scheme. One important piece of our investigative mandate was to identify the employees who fell into each of those categories and to determine their level of knowledge or involvement.

In discussing our findings about each employee's knowledge of the classes, we are careful to indicate specifically what he or she did or did not know about how the paper classes were conducted. For instance, while many on campus had heard about the AFAM paper classes and knew that they were easy-grading classes, it was a much smaller number who actually knew about their irregularities – *i.e.* that no faculty member was involved and that Crowder handled everything, including the grading. While it would be fair to question why an employee in the latter category took no action to call attention to the classes, that criticism would probably not be fair as to a person who knew only that these were easy classes, and in that sense no different from other easy classes across campus.

In the following section, we go through the relevant groups on campus and lay out our findings as to each group.

1.     The ASPSA Academic Counselors and Steele Building Academic Advisors

As is evident from the narrative above, a number of the ASPSA counselors and advisors in Academic Advising had knowledge and/or involvement in placing students into these classes.

a.     The ASPSA Academic Counselors

Crowder saw the ASPSA counselors as full partners in her effort to make paper classes available to struggling student-athletes. She was personally close with a number of the counselors over the years, and had particularly strong relationships with men's basketball counselors McSwain[117] and Walden, football counselor Reynolds and women's basketball counselor Jan Boxill. Crowder contended that there was a collaborative effort between her and these counselors to support the counselors' athletes with these classes.

---

[117] Crowder described her relationship with McSwain as being like sisters. The two were very close friends for decades. They spoke to each other by phone or saw each other nearly every day until McSwain's death in 2004.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 68 of 137

This contention was of particular importance to our investigation. With the Martin Report having found no "confirmation for speculation that the Academic Support Program for Student-Athletes (ASPSA) academic counselors colluded with instructors or administrators to offer anomalous course sections for the benefit of student-athletes or engage in any improper activities to maintain eligibility of a student-athlete,"[118] it was incumbent on us to test Crowder's opposite contention and determine whether any ASPSA counselors did, in fact, collude with Crowder. We ultimately concluded that Crowder's contention was accurate and that several of the ASPSA counselors were knowingly complicit in Crowder's paper class scheme.

Our investigation revealed that certain ASPSA counselors both knew about these classes and made full use of them for their student-athletes. This section will first describe the level of knowledge that certain counselors had about these paper classes, and will then explain the role that several played in their use and perpetuation.

### i.    Knowledge of ASPSA Counselors

We determined that a number of ASPSA counselors had a complete understanding of the characteristics of these paper classes – specifically that there were no class meetings; that there was no faculty involvement; that Crowder graded the papers; and that any student-athlete could receive a high grade for low quality work on his paper. We found such knowledge among counselors for the following sports:

#### a)    Football

Football counselors Cynthia Reynolds, Beth Bridger and Jaimie Lee were aware of every irregular aspect of these paper classes. Their slide presentation to the football coaching staff in November 2009 (described above in Section IV.C) and their email urging players to submit their papers before Crowder's retirement – "Debbie Crowder is retiring . . . if you would prefer that she read and grade your paper rather than Professor Nyang'oro you will need to have the paper completed before the last day of classes, Tuesday, July 21st"[119] – clearly evidence their full knowledge about these classes.

#### b)    Men's Basketball

Basketball counselor Wayne Walden acknowledged knowing how the classes worked, including that Crowder did at least some of the grading.

#### c)    Women's Basketball

Jan Boxill was fully aware of the lax work requirements and grading standards in the paper classes and that Crowder played a substantive and substantial role in the classes and the grading. In our interview, she asserted a belief that Nyang'oro was somehow involved in grading the papers, yet

---

[118] MARTIN REPORT, *supra* note 41, at 9.

[119] Exhibit 36.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 69 of 137

acknowledged an understanding that Crowder may have been grading papers with Nyang'oro's authorization.[120]

### d) Women's Soccer

Women's soccer counselor Brent Blanton told us that he knew about the AFAM paper classes, though he believed that Nyang'oro was somehow involved in them. Although we have reason to believe that he understood these classes were unorthodox at best,[121] we have no evidence to dispute his claim that he was unaware that Crowder was handling and doing the grading for these classes with no involvement by a faculty member.

### e) Olympic Sports

Olympic sports counselors Kym Orr and Spencer Welborn said they were aware that the paper classes existed as independent studies that required no class attendance, but knew nothing more about how the classes were handled.

---

[120] Boxill has been the subject of allegations that she tried to sanitize an official report to minimize exposure of the paper class scheme. On July 26, 2012, Chapel Hill released the Report of the Special Subcommittee of the Faculty Executive Committee. That report, which sought to provide a faculty review of prior University-initiated reviews and offer recommendations for further action, was principally authored by Professors Steven Bachenheimer, Michael Gerhardt, and Laurie Maffly-Kipp, each of whom was appointed to the Subcommittee by then-Faculty Chair Jan Boxill. Almost a year later, articles appeared in the media suggesting that "the faculty leader at UNC-Chapel Hill [Jan Boxill] watered down [this] report into academic fraud to lessen the chances the NCAA would come back to campus."

In support of this allegation, reporters cited email correspondence from Boxill to the authors on the morning of the report release date requesting that the draft report be edited to remove Crowder's name as well as a reference that she was "extremely close" to the personnel in the Athletics Department. Boxill cautioned that the report, without this change, "could raise further NCAA issues and that is not the intention." Dan Kane, *UNC Faculty Leader Pushed Rewrite of Key Report to Keep NCAA Away*, NEWS AND OBSERVER, July 20, 2013, http://www.newsobserver.com/2013/07/20/3044746_unc-faculty-leader-pushed-rewrite.html?rh=1.

We spoke with Professor Michael Gerhardt, one of the authors of the report, regarding Boxill's requested edits. He did not believe Boxill's edits reflected any nefarious intent. Given the forward-looking nature of the project and the insignificance of the proposed changes, he did not find that she was out of line to propose those refinements. When we asked Boxill about these edits in our interview, she denied they were intended to prevent NCAA scrutiny. Her main concern was that the reference to Crowder being "extremely close" to athletics personnel could be construed as a "gossipy" reference to the fact that her companion is a former Tar Heels basketball player.

Based on our investigation and the accounts from Gerhardt and Boxill, we find it likely that Boxill was trying to insulate the Athletics Department from further scrutiny to some degree, which is essentially what she admitted when she expressly cited the concern that the references about Crowder "could raise further NCAA issues and that is not the intention." We do not believe, however, that there is sufficient evidence to conclude that Boxill was trying to mislead or obscure the truth with those edits.

[121] Exhibit 37. In one particularly revealing October 2008 email exchange between a student-athlete, Crowder and Blanton, the student-athlete asks to take an independent study and Crowder responds "We don't call them Independent Studies, but we make 'special arrangements.'"

# CADWALADER

f)      ASPSA Management

Senior Associate Athletics Director John Blanchard ("Blanchard") and Director of ASPSA Robert Mercer ("Mercer") acknowledged knowing that the paper classes were lecture-designated courses that never met, but believed that they were otherwise legitimate courses. While we cannot prove that either man knew the full extent of the irregularities with those classes, there is reason to suspect that Mercer had a pretty good idea what was going on. ASPSA counselor Jenn Townsend recounts a conversation shortly after her arrival at Chapel Hill in 2009, during which Mercer made a comment that the AFAM paper classes would be coming to an end with Crowder's retirement because there would be nobody to administer them – a comment that at least suggests his knowledge that Crowder, and not a professor, was playing the central role in these classes.

There is also good reason to question whether Mercer and Blanchard made a conscious effort not to learn the specifics about the paper classes. That possibility is suggested by a telling email in the wake of the Auburn University independent studies scandal, in which Mercer acknowledges that Chapel Hill has independent studies and then asks rhetorically "Do I or anyone in the Department of Athletics have any say in how departments structure their courses – NO!"[122] At one level, this comment makes the simple and accurate point that the personnel at ASPSA and the Athletics Department have no control over faculty curriculum decisions. At another level, it suggests the belief – a very convenient one – that since they have no say in how faculty teach their courses, they therefore have no responsibility for policing them for academic integrity.

ii.      Active Involvement in the AFAM Paper Classes by ASPSA Counselors

We ascertained that a number of ASPSA counselors not only knew about these classes, but also took an active role in making them available to their student-athletes. That active role took several forms:

Steering:   A number of ASPSA counselors "steered" players into these paper classes. Among those counselors who did this steering were Reynolds, Bridger, Lee, Octavus Barnes, McSwain, Walden, and Blanton.[123] In some cases, that "steering" consisted of the counselor simply suggesting that a player take one of these classes. In other cases, the counselor took it upon himself or herself to select and register a player for a paper class without even asking the player.[124] Once a player was in the class, the counselor often served as the liaison with Crowder, receiving the topic assignment from her and submitting the final paper for the player at the end of the semester. Many of them also made significant and sincere efforts to police the players' progress on the papers and to assist the players with researching, outlining and drafting the paper.[125]

---

[122] Exhibit 38.

[123] Please note that this list includes both those counselors who were fully aware of all irregular aspects of these classes as well as those who assertedly believed them to be legitimate independent studies classes.

[124] Former ASPSA Learning Specialist Mary Willingham told us, for example, that she would often overhear Cynthia Reynolds speaking on the telephone to Crowder and requesting classes for football players.

[125] The ASPSA staff members went so far as to create charts showing all the athletes enrolled in the paper classes, the due dates of their papers, and how much progress the athletes made on their papers on a weekly

In addition to steering players to the irregular classes, counselors often steered players toward AFAM majors. While all student-athletes who interviewed with us insisted that they chose their own majors, there is undeniable evidence that ASPSA counselors, particularly those working with football student-athletes, encouraged players to major in AFAM. As recently as the 2011-2012 academic year, the ASPSA football staff was showing players PowerPoint presentations that touted their ability to advise players on major selection and listed AFAM as one of the majors they specifically advised students to consider (along with Communications, Exercise and Sport Science, and Management and Society degrees).[126] When asked about the level of guidance that counselors provided on major selection, Mercer said that ASPSA counselors often felt that they had to steer some student-athletes toward certain majors. As he explained, there were certain players, particularly those who had SAT scores between 600 – 700 and demanding sports schedules, who simply could not be expected to succeed at many of the 96 majors on campus. As such, the counselors felt that they were doing what was right and necessary by steering such players toward AFAM or one of the other easier majors.

Proposing Specific Grades for Players: As explained above, there were two counselors – Reynolds and Boxill – who suggested specific grades that Crowder should give to their players (*see* Section V.A.2).

Urging Continuation of the Irregular Classes after Crowder's Retirement: As described above (*see* Section IV.D) football counselors Beth Bridger and Jaimie Lee successfully persuaded Nyang'oro to continue offering paper classes after Crowder retired.

When asked whether they ever questioned the propriety of facilitating and encouraging the use of these classes, the ASPSA counselors explained that they simply relied on the fact that the classes were seemingly sanctioned by the faculty, or at least by the AFAM faculty. They believed it was not their place to question the integrity of classes that the faculty deemed appropriate to list on the course register, especially given that these were open to and taken by non-athletes as well as student-athletes. To further justify their lack of concern, a number of counselors cited the 2006 Faculty Athletics Committee meeting and their understanding that ASPSA managers Blanchard and Mercer raised a concern about the irregular classes at that meeting, only to be told that professors have wide latitude in crafting their teaching approach and that they should therefore not concern themselves about course formats.[127]

---

basis. Exhibit 39. While we found evidence that some tutors went over the line in helping players with their papers, we did not find evidence that any of the counselors (with the exception of Jan Boxill, who was unofficially, if not officially, a member of ASPSA) provided inappropriate assistance on the players' papers.

[126] Exhibit 40.

[127] This was the characterization of that meeting that was disseminated among the ASPSA staff. As fully described above at Section V.B.4.a most of the faculty participants in that meeting vehemently reject that characterization. They deny that Blanchard and Mercer fully described the irregularities of these classes and therefore maintain that any reference to professorial latitude would have related only to the uncontroversial point that a professor would be well within his rights to teach a lecture class as an independent studies class.

---

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 72 of 137

2.    Advisors in Academic Advising

Like the ASPSA counselors, a couple of the advisors in the Office of Academic Advising (known on campus as "Steele Building" for the building which houses the office) also steered students with academic or other challenges into these paper classes. Much like Crowder and Nyang'oro, these advisors were motivated by a desire to help students and to provide a safety net for those who were falling into academic trouble.

The Steele Building advisors who most frequently worked with Crowder were two members of her "good old girls' network,"[128] Betsy Taylor and Alice Dawson. Advisor Betsy Taylor was responsible for approving Chapel Hill students' applications to graduate, and often referred students to Crowder when she realized that a student was missing a course necessary to graduate. Taylor also referred students who had physical or mental health issues, or who had gone through a traumatic experience, such as being abused or sexually assaulted.[129]

Dawson, the Assistant Dean for Academic Advising, also referred one or two students to Crowder per year for the same reasons. In one email chain, for example, we see Dawson counseling a student to take an AFAM independent research class because the student was going through a "very difficult ongoing family situation" (which reportedly involved an abusive father).[130]

These advisors knew that Crowder was willing to work with struggling students and help them find a class they could handle. They knew that she would add students to independent studies after the registration deadline had passed, and would at times create a course section that a student needed to graduate. The advisors understood that these courses – both the independent studies and the lecture sections that Crowder created – required a long paper but no class attendance. They all assumed, however, that a faculty member was overseeing the independent study format and that Crowder was simply acting as the conduit linking the student and that faculty member.[131]

Although the advisors appeared to be ignorant of the specific details of Crowder's irregular class scheme,[132] there were two incidents in which suspicions about the AFAM courses were raised in the Steele Building. On one occasion, Dawson learned that a student who was struggling to maintain his eligibility took four independent studies with the AFAM Department in one semester. Dawson considered this an abuse of the system, and informed her supervisor, Associate Dean and Director of Academic Advising Carolyn Cannon, who apparently in turn reported the issue to her supervisor, Dean Owen.

---

[128] *See* Section V.A.4.b, *supra.*

[129] Nyang'oro referred to these students as "Betsy's people."

[130] Exhibit 41.

[131] Alice Dawson, the Assistant Dean for Academic Advising, stated that the Steele Building advisors were surprised and upset when they later learned that there was no faculty oversight of many of the courses in which Crowder had enrolled their students.

[132] As explained above, referrals to the AFAM paper classes were also made by the Morehead-Cain and CarolinaCovenant advisors. We have seen nothing to suggest that those advisors knew any more about the workings of the AFAM paper classes than their colleagues at the Steele Building.

According to Dean Owen, on another occasion, Cannon approached Owen and raised a concern that an abnormally high number of grade changes were being authorized in the AFAM Department. In addition, Cannon said, she had noticed that Nyang'oro's signature varied across the forms[133] and suspected that he was not personally signing them all (as a department chairman was required to do). Owen explained that she approached Nyang'oro and required him to give Cannon an exemplar of his signature so that she could confirm the legitimacy of future grade change forms.

These incidents appear to have given Dean Cannon serious concerns about the propriety of the class offerings in the AFAM Department. As Steele Building advisor Chloe Russell recounted, Cannon once told her to stop referring students to the AFAM Department. When she asked Cannon for an explanation, Cannon simply said that she did not trust what was happening in the AFAM Department, without providing any further elaboration.

We sought to interview Cannon about the basis and depth of her concerns about the AFAM curriculum, but she failed to reply to repeated emails, letters and phone messages that we left with her family. Based upon the above accounts by her subordinates and supervisor, however, there is clear reason to suspect that she had deep suspicions – and possibly concrete knowledge – about irregular practices in the AFAM Department.

### 3. Athletics Department Personnel

We interviewed a number of staff and coaches from the Athletics Department, and got a generally similar response to our questions about their knowledge of the irregular AFAM classes. Those who conceded any knowledge insisted that it was limited to an understanding that these were easy, unstructured classes and denied knowing that Crowder managed them without any faculty involvement.

The following summarizes what we learned from those current and former Athletics Department personnel we were able to interview:

#### a. Athletics Department Management

Dick Baddour: Baddour was Athletics Director from 1997 to 2011. He acknowledged knowing that student-athletes tended to cluster in the AFAM classes, and that the AFAM classes were perceived as some of the least rigorous on campus. He also knew that many student-athletes were taking AFAM independent studies, but assumed that they involved regular interaction between the student and professor.

Baddour also became aware of two instances when these classes were questioned. First, Baddour heard that Dean Owen wanted to "get tough on AFAM" and address the leniency of AFAM's grading – likely in the 2005 – 2006 time-frame when Owen had lunch with Nyang'oro and directed him to "get [Crowder] under control" and reduce the number of AFAM independent studies. He also recalls Blanchard and Mercer raising a concern about the number of AFAM independent studies the student-athletes were taking. This led to the three of them attending the

---

[133] Cannon would have seen these grade change forms, because, under Chapel Hill's policy at the time, the Dean of Academic Advising was responsible for reviewing and approving grade change forms.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 74 of 137

2006 Faculty Athletics Committee meeting (*see* discussion of the meeting at Section V.B.4.a) and the discussion about these classes.

Neither of these situations prompted Baddour to carefully scrutinize the AFAM classes and their use by student-athletes. Thus, while he certainly knew the classes were unstructured and had lenient grading, he never probed to learn about their irregularities.

John Blanchard: John Blanchard was ASPSA Director from 1985-1999 and from 2001-2002 and served as Senior Associate Athletics Director from 2002 until his retirement in 2013. In our interview, he acknowledged hearing that the AFAM Department was offering independent studies that were inaccurately listed as lecture classes and recounted the 2006 FAC meeting where he and his colleagues raised the issue (*see* Section V.B.4.a). He insists, however, that he had no knowledge of the classes' other irregularities.

b.      Football Personnel

Chapel Hill had four different head football coaches during the period in which the AFAM paper courses were offered. During the Mack Brown era (1988-1997), 35 football players enrolled in AFAM independent studies.[134] In the four years of Carl Torbush's tenure (1997-2000), there were 35 football enrollments in paper classes. There were 747 enrollments in paper classes during Coach John Bunting's tenure (2001-2006), and 181 enrollments in paper classes under Coach Butch Davis (2007-2010). We were able to interview two of these former coaches about their knowledge of the irregular AFAM classes.

i.      Coach John Bunting

Coach Bunting contended that he made academics a focus of his tenure and that he personally kept a close eye on his players' academic progress – a contention that was largely confirmed in interviews with his staff. Coach Bunting also candidly told us that he knew about the AFAM paper classes, and fully understood that they could be satisfied by submitting a paper without any class attendance. He knew that they yielded consistently high grades for his players, and was told by ASPSA counselor Cynthia Reynolds that they were a key element of her strategy for keeping some players eligible. He had not realized, however, that an office administrator was managing the classes without any faculty involvement. In short, Coach Bunting knew the irregular courses were available and knew they were being used to help keep some players eligible, but believed that they were worthwhile classes.

ii.      Coach Butch Davis

Butch Davis' recruitment as head coach in 2007 was a watershed moment in the Chapel Hill football program. Then-Chancellor James Moeser and Athletics Director Dick Baddour were attracted to Coach Davis' record of academic and athletic success at the University of Miami as well as his experience as an NFL head coach. They saw in him the opportunity to take the program to

---

[134] As discussed earlier, we cannot say with any certainty which of these independent studies were traditional independent studies and which were irregular independent studies (paper classes).

the next level, but to do so while still maintaining the academic standards that have historically distinguished Chapel Hill from so many other strong football schools.

As described more fully below (*see* Section VI.G), Coach Davis came to Chapel Hill with the expectation that he would find a strong infrastructure for maintaining high academic standards among the players. According to Davis, he quickly realized that there was lots of talk about the importance of academics without anything to back up that talk. He found Chapel Hill's attitude toward student-athlete academics to be like an "Easter egg," beautiful and impressive to the outside world, but without much life inside.

Once he arrived, Coach Davis took some important steps to enhance academic standards. For one, he reduced the number of players who were admitted as "special admits," *i.e.* recruits whose scores were sufficiently far below the Chapel Hill average that they needed to be approved by the Committee on Special Talents. He also questioned ASPSA's steering of students into Swahili classes in the AFAM Department, objecting to the argument that other non-AFAM language classes were "too difficult" for his players.

While Coach Davis emphasized the importance of academic progress to his staff and players, he largely delegated the handling of academic issues to his assistant coaches and to ASPSA counselors Cynthia Reynolds and Beth Bridger who were at the same time increasingly steering his players to the AFAM paper classes. When asked about these classes, Davis acknowledged awareness that many of his players were taking them and that these classes were keeping many of them afloat academically.[135]

In terms of knowing how the AFAM paper classes worked, he certainly knew by the time of the November 2009 presentation from Beth Bridger that football players in these courses "didn't go to class... didn't take notes... didn't have to meet with professors... [and] didn't have to pay attention or necessarily engage with the material."[136] When asked about this presentation, Coach Davis said he did not remember it and that he did not realize the paper classes were so bereft of academic rigor. He also denied knowing that the papers were graded by an office administrator who summarily awarded high grades, largely without regard to quality.

### iii. Associate Athletics Director Corey Holliday

Corey Holliday is a former captain of the Tar Heels football team who worked first as an assistant football coach under Coach Bunting and then as Associate Athletics Director for Football Administration under Coach Davis. Holliday acknowledged knowing about the AFAM paper classes and understanding that they had an independent studies format. He believed that they were no different from any other independent studies course offered at Chapel Hill and denied knowing about their irregularities. While he conceded knowing that they were easy classes and were used to "balance" players' schedules, he never heard that they were used specifically to keep players eligible.

---

[135] In fact, one account has him affirmatively asking for more such classes "without attendance" because of the flexibility they afforded players' schedules. We heard this account from Faculty Athletics Representative Lisa Broome and it related to a meeting that allegedly included Coach Davis, Baddour, and Blanchard. Coach Davis told us that he does not recall making this statement.

[136] *See* Exhibit 6.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 76 of 137

# CADWALADER

When presented with Bridger's November 2009 slides, he said he could not specifically remember the presentation, but did not dispute that he may well have heard her give that description of the paper classes.

c.     Men's Basketball Personnel

Chapel Hill had four different head men's basketball coaches during the period in which the AFAM paper courses were offered. During the Dean Smith era (1961-1997), there were 54 basketball player enrollments in AFAM independent studies.[137] In the three years of Coach Bill Guthridge's tenure (1997-2000), there were 17 basketball enrollments in paper classes. There were 42 enrollments in paper classes under Coach Matt Doherty (2000-2003) and 167 under Coach Roy Williams (2003-present).

We were unable to interview Coaches Dean Smith and Bill Guthridge because of health issues, but were able to speak about the paper classes with Coaches Doherty and Williams.

i.     Coach Matt Doherty

Matt Doherty is a former Tar Heel player who went on to coach at the University of Notre Dame before being recruited to Chapel Hill as head coach in 2000. Doherty explained that upon assuming the coaching position, he inherited the academic support system developed by prior Coaches Dean Smith and Bill Guthridge. That system had academic oversight being handled by McSwain, the counselor with close ties to Debby Crowder. While he felt free to make significant changes to the rest of the team's coaching and support staff, Doherty was told by Smith and Guthridge, who both had a continued presence on campus, that he should not change the academic support system. As a result, the McSwain-Crowder pipeline continued to operate, and there were 42 enrollments of men's basketball players in paper classes during Doherty's tenure.

When asked about his approach to academics, Doherty explained that he met with each player at the start and end of every season to discuss their classes and general academic progress. Through these meetings and general word-of-mouth, Doherty knew that many of his players were taking AFAM classes. It was his understanding that AFAM was the easiest major at Chapel Hill, and that the AFAM professors were particularly athlete-friendly with class demands and scheduling. He never knew that there was any sort of process in place to channel the players to these AFAM classes, and simply believed that his players were finding their way to these easier classes "just like water finds the lowest course." Doherty stated convincingly that he never had any reason to doubt that the classes were academically legitimate or that they required class attendance like any other lecture class. He also never heard that they were being used specifically to protect the players' eligibility.

ii.     Coach Roy Williams

Roy Williams, a Chapel Hill alum and former assistant coach under Dean Smith, left the head coaching position at the University of Kansas and returned to his alma mater as head coach in 2003. During his time at Kansas, Williams had primarily relied on two people to conduct academic

---

[137] As discussed earlier, we cannot say with any certainty which of these independent studies were traditional independent studies and which were irregular independent studies.

Case 1:14-cv-00954-LCB-JLW  Document 166  Filed 01/18/19  Page 77 of 137

oversight for his players: Assistant Coach Joe Holladay and academic counselor Wayne Walden. Williams brought both men with him to Chapel Hill, and they jointly managed academic oversight until they both eventually left the University, Walden in 2009 and Holladay in 2013.

Williams, Holladay and Walden brought the same oversight process they had used in Kansas. Walden focused on keeping up with the players' classes and monitoring their eligibility. He provided regular reports about academic progress to Holladay, who would counsel and/or discipline players with academic issues. Holladay, in turn, reported to Williams on the general status of player academics. On occasion, Williams would question a player about his studies or talk to the team about the importance of academics. Beyond that, he largely delegated academic responsibilities to Holladay and Walden.

As Williams, Holladay and Walden told us in their interviews, a large number of the team that they inherited were majoring in AFAM. Five of the 15 members of the 2003–2004 team were AFAM majors, and 10 of the 15 players on the 2005 team were AFAM majors. The three men were uneasy about this situation. Coach Williams was uncomfortable with that clustering in AFAM because it looked like the players were being steered into that major, and after a year or two on the job he asked Holladay to make sure that basketball and ASPSA personnel were not steering players to the AFAM Department.[138]

Walden acknowledged knowing about irregular aspects of the paper classes, including that Crowder was doing at least some of the paper grading. When asked whether he shared this information with Coaches Holladay or Williams, he could not recall doing so. Both of the coaches claim that they never learned from Walden or anyone else that there was a question about faculty involvement in the classes or that Debby Crowder was doing the grading.

As discussed above (*see* Section V.A.5.a), former Tar Heel player Rashad McCants has given an account that is at odds with the coaches' claims. McCants publicly announced that he took a number of paper classes during his three years at Chapel Hill, including four during the 2005 championship season, and that tutors wrote his papers for him. He alleges that these classes were designed specifically to keep him and other athletes eligible, and he claims that Coach Williams was "100% aware of the 'paper class system.'"[139] In fact, he describes a conversation in which Williams allegedly told McCants that he had eligibility issues but that Williams would "swap" a class to prevent any problem.[140] The allegation that Coach Williams was "100% aware of the 'paper class

---

[138] Coaches Holladay and Williams also had a preference against independent studies and for the structure of a regular lecture class. As such, they directed Walden to encourage players to opt for lecture classes over independent studies. That direction took a while to take effect, as the numbers show that men's basketball enrollments in the paper classes do not start to decline until 2007, four years after Coach Williams took over as head coach. Wayne Walden's successor, Jennifer Townsend, also recalls Coach Holladay saying he preferred lecture classes over independent studies for their players.

[139] Steve Delsohn, *UNC's McCants: 'Just show up, play'*, ESPN (Jun. 6, 2014), http://espn.go.com/espn/otl/story/_/id/11036924/former-north-carolina-basketball-star-rashad-mccants-says-took-sham-classes.

[140] McCants told ESPN that Williams told him "we're going to be able to change a class from, you know, your summer session class and swap it out with the class that you failed, just so the GPA could reflect that you are in good standing." *Id.*

system'" finds some support in the recent public allegation by former learning specialist Mary Willingham that she once had a conversation with Williams, in which Williams said that her job was to keep his players eligible. It is important to note that Willingham said nothing about this alleged encounter with Coach Williams either in her initial public statements about the paper classes or in our interview with her.

We undertook to test the veracity of these two allegations. We first tried to talk with McCants about his public statements, but, as explained above, he refused multiple requests for an interview. We also tried to re-interview Willingham about her supplemental allegation about Coach Williams, but her attorney in her civil lawsuit against the University did not grant us permission.

We then sought interviews with all 23 of the players who were McCants' teammates during his Tar Heel playing years of 2002 through 2005. After 11 of them appeared together on ESPN and signed a statement[141] to refute McCants' allegations, we asked the Chapel Hill Athletics Department to request that they submit to interviews with us. We ultimately succeeded in interviewing seven, all of whom acknowledged that players took these classes because they were easy, but denied that there was anything fraudulent about them or that tutors had drafted papers for them or others.

Finally, we spoke with Coach Williams about these two allegations, and he was emphatic that both are false. As for McCants' allegations, he acknowledged knowing that McCants was taking several AFAM classes in his last semester and talking with McCants to make sure he took his last semester seriously and got passing grades. He denies ever saying anything about "swapping" classes for McCants, and cannot even fathom what that means. In addition, he explained, McCants had already announced that he was leaving for the NBA by this time, so eligibility would not have been a concern to him.

As for Willingham's allegation that Williams said that her job was to keep players eligible, Coach Williams flatly denies it for two reasons. First, to his knowledge, he believes he has never spoken to Mary Willingham. Second, even if he had spoken to her, he would never make that statement, as it is directly contrary to the belief that he constantly preaches that their number one responsibility as coaches and counselors is to make sure their players get a good education.

### d. Women's Basketball Personnel

Sylvia Hatchell has been the head women's basketball coach since 1986. During that time, there were 114 enrollments of women's basketball players in paper classes. Hatchell was aware that many of her players took AFAM classes over the years. She also knew that Jan Boxill (for whom she has great respect)[142] had a strong working relationship with Crowder, and assumed that their relationship led to the high enrollment by women's basketball players. She was unaware, however,

---

[141] The statement released to ESPN said that the players attended class and did their own academic work. It also said: "We also want to make it clear that Coach Williams and his staff operated with the highest level of ethics and integrity within their respective roles." Steve Delsohn, *UNC's McCants: 'Just show up, play'*, ESPN (Jun. 6, 2014), http://espn.go.com/espn/otl/story/_/id/11036924/former-north-carolina-basketball-star-rashad-mccants-says-took-sham-classes.

[142] Hatchell is not alone in that assessment of Boxill. Numerous interviewees told us of their admiration for Boxill and how much Boxill has given of herself to the University and to the women's basketball team.

that these enrollments were in "paper classes" that required no actual class attendance. She believed that they required attendance, just like any other regular class.[143] She was also unaware that these classes were completely managed by an office administrator.[144] According to Hatchell, she had relied on Boxill to coordinate these classes, and Boxill never let on about their irregularities.

### e.   Baseball Personnel

The baseball coaches similarly professed little knowledge about the AFAM paper classes, although two baseball players told us that the paper classes were common knowledge among their teammates. Head Baseball Coach Mike Fox explained that he had no knowledge of the paper classes or any other course that was designed to keep student-athletes eligible. Fox knew that Chapel Hill offered independent studies, but he discouraged his players from taking them, preferring that his players physically attend class. Fox stated, and his assistant coaches and former players confirmed, that he places an emphasis on academics and would bench his athletes if he learned that they were not attending class. Assistant Baseball Coach Scott Forbes explained that the team has a strict class attendance policy, and it is well known in the baseball program that if you do not go to class, you do not play. Forbes claimed that he was generally aware of what classes his players were taking, although he did not recall any student-athletes taking AFAM courses.

### f.   Women's Soccer Personnel

Women's Soccer Coach Anson Dorrance was not aware of the AFAM paper classes, but would not necessarily have had concerns if his players were taking an AFAM independent study paper class. In fact, he worked closely with Blanton to arrange for his athletes to take online or independent studies courses that accommodated their schedules. He explained, for example, that he has athletes who play and travel with the national teams, and thus tries to get them in as many online courses or independent studies as are allowed under Chapel Hill's policies.[145]

### 4.   The AFAM Faculty

The Martin Report found no evidence that the other AFAM faculty members were involved with Crowder and Nyang'oro and their irregular class scheme. To a person, the AFAM professors echoed that finding in their interviews with us. While they admitted – in varying degrees – to seeing red flags over the years and sensing that Crowder was using unorthodox practices, they all claimed to have been surprised when they read the initial news reports about the paper classes.

---

[143] Hatchell certainly acknowledged knowing of instances when players took independent studies, such as summer courses when her players did research papers and during semesters with overseas travel when the players would work on a project for credit. However, she did not realize they were routinely taking AFAM classes with an independent study format.

[144] In fact, Hatchell had believed that Crowder was a member of the AFAM faculty.

[145] Dorrance also acknowledged that he talked to recruits about taking independent studies and lamented that Chapel Hill's limits on independent studies prevent him from recruiting players with the promise that they can take all independent studies and online courses. Dorrance explained that this places him at a recruiting disadvantage, as many of Chapel Hill's peer schools have more flexible policies that allow their athletes to spend more time away from campus on national teams but still remain institutionally and NCAA eligible. Exhibit 42.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 80 of 137

We tested that finding through aggressive interviews of all AFAM faculty and through a review of their emails.[146] While they may not have been fully briefed into the details of the scheme – and some may have consciously avoided getting such a briefing – we found that several of the AFAM faculty had a clear understanding that Crowder was running some kind of "a shadow department" (as Nyang'oro referred to it) that made exceptional accommodations for students, and particularly for student-athletes. We did not find evidence that any actually signed on as active collaborators with Crowder and Nyang'oro, but there were several who at least tacitly accepted the existence of these classes.[147] Of that number, several arguably took specific steps to facilitate Crowder's efforts, even if they were not fully aware of all dimensions of the irregular classes.

We will now recount our interviews and observations regarding those faculty members who were best-positioned to know about the paper classes.

> a.    Tim McMillan

The faculty member who had the clearest opportunity to learn about these classes was Tim McMillan, a Senior Lecturer who did his graduate studies at Chapel Hill and has since then spent the bulk of his career in the Department. Crowder and McMillan had known each other since his time as a graduate student, and they were very close. They each considered the other to be their strongest ally in the Department. As McMillan recalled, Crowder helped proofread his dissertation as a graduate student and later became McMillan's biggest advocate, playing an instrumental role in McMillan being rehired after a period away from Chapel Hill and in his becoming a permanent lecturer. As Nyang'oro explained to us, McMillan was so close to Crowder that he never would have done anything to stand in her way.

McMillan insisted that he did not know the full extent of the irregular classes, but he did acknowledge seeing numerous red flags that could have – and should have – put him on notice that something highly irregular was going on. Among those red flags were the following:

- McMillan knew that Crowder had a practice of adding students to lecture classes after enrollment had closed, much to the consternation of the AFAM faculty, who had to teach ever growing numbers of students.

- McMillan learned that Dean Owen had chastised Nyang'oro and Crowder for having too many AFAM independent studies and that the numbers of such classes decreased immediately thereafter.

---

[146] Our interviews and email review focused on those faculty who were members of the AFAM Department when Nyang'oro and Crowder were a part of the staff.

[147] Nyang'oro maintained that the faculty generally knew that something irregular was going on, but that no one wanted to look into it. As several faculty members explained, this reluctance to inquire or object was based in part on their fear of retaliation. They were all very conscious that Nyang'oro was a chairman who brooked no criticism and that Crowder had amassed substantial power over the years, which she would readily use to make their lives difficult. As such, it is understandable why they would have ducked an opportunity to cross swords with either of them over this issue.

- As the AFAM Department's summer school administrator in 2011, McMillan approved Nyang'oro's request to teach AFAM 280, the Blacks in North Carolina class that ended up being the final irregular AFAM class. McMillan thought it strange that Nyang'oro, an African Studies expert, would want to teach a course about African-American studies. He decided not to object or ask questions, given Nyang'oro's authority as chairman of the Department.

In addition to his knowledge of red flags that should have put McMillan on alert, we also found several instances where he agreed to take steps that helped Crowder administer the classes. For example, Crowder often asked McMillan for suggestions for paper topics, and he always provided ideas without asking why the office administrator would be performing that faculty function.[148]

McMillan also gave Crowder an occasional hand in grading the papers from her irregular classes. McMillan acknowledged there were times when he would be sitting in Crowder's office and she would hand him a paper and ask him to "eyeball" it and tell her what grade it deserved. McMillan would do as requested,[149] once again without questioning why an office administrator would be deciding on grades.

Finally, there were times when Crowder created paper classes and listed McMillan as the professor. For at least seven of these classes, Crowder had McMillan sign the grade sheet. When we asked McMillan why he had signed a grade sheet for a class he did not teach, he said that he had been thinking about that question but could not answer it. "I don't know why [my signature] is there, but it is there," he said.

Given his closeness with Crowder, the numerous red flags he saw and the above-listed instances when Crowder enlisted his assistance, we have to conclude that McMillan effectively knew what was happening, even if he was careful not to learn all of the details.

b.    Alphonse Mutima

Another AFAM faculty member who appeared to have some knowledge of the paper classes was Alphonse Mutima, a lecturer who taught the Department's Swahili courses. Unlike McMillan, Mutima did not have a good relationship with Debby Crowder. In fact, they argued quite frequently. More often than not, the argument started with Crowder objecting to a low grade that Mutima gave to a student. Crowder routinely pushed back when Mutima issued a low grade, and

---

[148] A May 2007 email exchange between Crowder and McMillan illustrates McMillan's willingness to assist Crowder without asking questions. Crowder wrote to McMillan that she had "three of mine, some of the worst of the worst, registered in 395 this term" and that when she asked Nyang'oro for an assignment for them, she just received a "blank stare." Crowder then wrote, "Can you help me?" McMillan responded by providing Crowder with a paper assignment that, he said, "should be do-able, instructive, and not too taxing." Exhibit 43.

[149] Crowder confirmed that she had McMillan grade the occasional paper from her paper classes.

particularly when the student was a student-athlete.[150]  On other occasions, Mutima would be the one to object, complaining that students whom Crowder had enrolled in his class were not attending his lectures or completing their assignments.

Many of Mutima's complaints related to student-athletes.  As described above, the ASPSA counselors routinely steered their athletes to Swahili on the theory that Swahili was the easiest language on campus.  Mutima was constantly frustrated with the apathetic and often disrespectful approach that some student-athletes took toward him and his class, and he blamed Crowder for placing them in his class.

Mutima's frustration was not without cause.  At one point, the behavior of student-athletes in his Swahili 3 course was so unruly that the ASPSA tutor, Susy Dirr, wrote about it in an email to her supervisors.[151]  In a letter attached to her email, Dirr wrote, "Their behavior is so rude and juvenile that from across the room I was trying to get them to shut up."[152]  Later in the letter, Dirr noted that one student-athlete had learned so little in his two-plus semesters of Mutima's Swahili instruction that he could not even say the word "hello" in Swahili.  In Mutima's defense, Dirr explained that "[a]ll Mutima is asking for is a little respect.  These kids owe [Mutima] for even being put in a level 3 Swahili course, but I have the feeling that he will flunk them right out of there if they can't do the minimum amount of work necessary."[153]

It was clear to us that Mutima was philosophically opposed to Crowder's effort to weaken academic rigor in the AFAM Department and understandably found himself between a rock and a hard place with Crowder pushing these under-prepared student-athletes into his Swahili classes.  Nonetheless, our investigation found that Professor Mutima had a general knowledge about the irregular courses, failed to raise any questions about them with the administration[154] and even grudgingly took advantage of them in certain instances.  The following will explain that finding.

Like many colleges and universities across the country, Chapel Hill required that all undergraduate students satisfy a foreign language requirement to graduate.  To satisfy that requirement, a student needs to take and pass three semesters of his or her chosen foreign language.  Many students – and student-athletes in particular – were steered toward taking Swahili for their language requirement out of the belief that it was easier to learn than other languages.[155]  The sole

---

[150] Crowder recalled that on at least one occasion she told Mutima that if he gave a certain student-athlete a low grade, the student-athlete would not be eligible.  On another occasion, she sent him an email with the subject line, "I need to talk to you about your student."  In the email, Crowder wrote, "Please talk to me before you do anything drastic regarding your student.  There are complicating factors."  When we spoke with her, Crowder could not recall the "complicating factors."  Exhibit 44.

[151] Exhibit 45.

[152] Id.

[153] Id.

[154] As mentioned above in footnote 142, AFAM faculty members were understandably concerned that Nyang'oro and/or Crowder would retaliate against them for raising concerns about their paper classes.

[155] Coach Davis was particularly frustrated that his athletes, many of whom had studied Spanish in high school, were being steered toward Swahili.  He and other members of his staff explained that they objected to

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 83 of 137

Swahili professor was Mutima, and he taught all three levels of Swahili – SWAH 401, 402[156] and 403. In SWAH 403, it was expected that the student would write a term paper in the Swahili language.

As explained above (*see* Section IV.B.5), Crowder set up a paper class version of Swahili 403 for students – and typically student-athletes – who were believed incapable of succeeding in the regular SWAH 403 course. Those students were instead allowed to work through Crowder – *a la* the typical paper class – and earn SWAH 403 credit for writing a paper. Unlike the written assignment required in Mutima's lecture version of SWAH 403, the papers written by Crowder's paper class students could be written entirely in English.

Crowder instituted this paper class apparently without Mutima's involvement or knowledge. Eventually, however, Mutima got wise to it as he kept noticing that students who had been in SWAH 401 and 402 were mysteriously missing from the last class, which was required for graduation.

ASPSA tutor Whitney Read tutored many football players in Swahili and confirmed that Mutima came to know about these SWAH 403 paper classes. In addition, she said, he started taking advantage of them by occasionally referring the behavior problems among these student-athletes to those paper classes to prevent disruption of his regular lecture class.[157] Faced with the choice of having a disruptive student-athlete in his class or off-loading the behavior problem to Crowder's paper class, Read said, Mutima occasionally opted for the latter.

Read's account on this point finds support in the tutoring feedback forms and emails she submitted to counselors Bridger and Lee about her players and their classes. On at least two occasions, she described Mutima making specific requests for paper class placement.[158] It is also

---

this practice, and were told by Mercer and Reynolds that university-level Spanish was simply too difficult for many student-athletes.

[156] Mutima would also offer a combination Swahili 401 and 402 course each summer. That six-credit course, Swahili 112, met nearly every day during a summer session. Students who successfully completed it would normally enroll in Swahili 403 the following fall semester.

[157] Read stated that Mutima cared very much for his class and was upset and frustrated that students would not work to be successful in his regular class. He also was very disappointed when students, including student-athletes, disrupted or misbehaved in his class.

[158] On one such form, she wrote:

> Bwana Mutima talked to me after class and told me [REDACTED] got a very low score on his test from Friday (we are getting them back tomorrow). He said [REDACTED] got like 10 out of 100. He is concerned because he does not want to put [REDACTED] in a regular Swahili 3 class. Exhibit 46.

On another occasion, Read wrote to Bridger and stated:

> Bwana Mutima wants [REDACTED], [REDACTED], and [REDACTED] to definitely be in an independent study (paper class) for SWAH 403 in the fall. [REDACTED] and [REDACTED] also might fall into this category. He is all right with [REDACTED] being in a regular class with regular

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 84 of 137

corroborated by Crowder, who recalls that on at least one occasion Mutima told her that certain student-athletes could not be in his Swahili 403 course and had to be placed in a paper class.

Given the strength of this evidence and the understandable nature of his actions, we expected that Professor Mutima would acknowledge the accuracy of tutor Read's account. He did not do so. Instead, he flatly denied knowing about the SWAH 403 paper class and rejected her suggestion that he had ever referred students to the paper classes. He explained that it was impossible that he ever talked to Read about student placement in the SWAH 403 paper classes, as he would never discuss a student's grades or progress with a tutor.

We asked Mutima if he could provide any evidence to contradict Read's contemporaneous emails and reports about him referring students to the Swahili 403 paper course and he was unable to do so. Nor was he able to proffer a likely reason as to why Read or Crowder would have made such statements if they were not true. His only speculation was that there was a desire to sabotage him because he refused to give student-athletes inflated grades. While that motivation could conceivably apply to Crowder, who was often angry about the low grades he gave to student-athletes, it does not apply to Read, who had no history of objecting to his grades and actually sympathized with his plight of trying to teach a class with unruly athletes.

c.     Eunice Sahle

Eunice Sahle, the current chair of the AFAM Department, also knew about Crowder's irregular class operation to some extent, but her actions suggest that she likely had less direct knowledge than McMillan and Mutima. Professor Sahle's knowledge came about because of Crowder's practice of placing students on the roll of a professor's lecture class. Those students would never attend the professor's class and instead would receive credit for the class by submitting a paper to Crowder at the end of the semester. We found several instances where Crowder placed students in a Sahle lecture class, and the students took the class as a paper class.

According to Crowder, Professor Sahle was aware that she was adding paper class students and "agreed that a few students could get away with not showing up and doing a paper at the end [of the semester]."[159] Crowder's recollection is corroborated by an email in which she tells Wayne Walden that one of his players can take a Sahle lecture class without having to attend. In that email, she proposes AFRI 116, Sahle's class, and says "I have already spoken to the professor [Sahle] and she is aware he [the student-athlete] can not [sic] come because of the time and she will just give him an independent assignment. We can get by with 1 or 2 of those."[160] Crowder's recollection is further supported by Nyang'oro's recollection that Sahle complained to him about Crowder's placement of students on her class rolls but apparently never took any action to prevent the practice.

Professor Sahle denied knowing about the paper classes and claimed that Crowder and Nyang'oro never told her that the added students were getting course credit without attending her

---

students, but he could always change his mind. Therefore, be prepared for the possibility all six might have to be in independent study. Exhibit 47.

[159] Crowder also asserted that Sahle would provide her with signed, blank grade change forms for the add-on students in Sahle's classes that Crowder could use when they submitted their papers.

[160] See Exhibit 48.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 85 of 137

classes. In fact, she told a story to illustrate her opposition to such classes. In the fall of 2007, she was designated as the instructor-of-record for a class, AFRI 416, which she did not know about. She first heard about the class when students started contacting her late in the semester and asking for their class assignments. When she confronted Crowder about the class, Crowder simply explained that she had created the class because the enrolled students needed the course to graduate with a minor in social justice. Sahle responded by trying to convert the course back into a regular class, meeting with the students and requiring them to do written assignments and take an exam. The students had been expecting a Crowder paper class, and were upset with Sahle for imposing these regular requirements.[161]

While there are questions about this story, it echoes points about Sahle that we know from other sources – that she was not a proponent of irregular classes and that she probably was not completely aware of the wholesale paper class system. It does appear likely, however, that she knew that Crowder was adding students to class rolls and that those students were allowed to complete the course with a paper and without having to satisfy the regular requirements of a lecture class.

### d. Other AFAM Faculty Members

The other AFAM faculty members voiced complaints about how the AFAM Department was run under Nyang'oro and Crowder, but they claimed to have had little awareness of the irregular courses. We tested those claims in our interviews, but found no evidence to the contrary. While they may have seen red flags, we have found nothing to suggest that any of the other faculty had a clear understanding of Crowder's paper class scheme.

### 5. University Faculty Outside of AFAM

We also examined the level of knowledge about the paper classes among the faculty outside the AFAM Department. It was widely known among the faculty that the AFAM Department offered some of the easiest classes on campus. In fact, a number of them acknowledged that they would occasionally recommend AFAM classes to students looking for a less rigorous course.[162] We

---

[161] We have found no corroboration for this story. There is some reason to question the claim that Sahle met with students and gave them an exam, given that at least a few of the enrolled students were not even in Chapel Hill for the semester. Sahle offered no explanation when confronted with this fact, stating that she could not explain how a student who was not on campus could have met with her and taken an exam.

[162] Todd Austell, a Research Assistant Professor in the Department of Chemistry and a faculty Academic Advisor for the Sciences, explained that he would advise science majors to take what he understood to be less-rigorous courses, such as those in the AFAM or Communications Departments, during semesters when they were taking particularly challenging and time-consuming science courses in order to balance difficult course schedules. While Austell did not know about the paper classes, he knew that the courses within that Department were less rigorous. Similarly, Fred Clark, a recently deceased Professor Emeritus in the Department of Romance Languages & Literatures and a former faculty Academic Advisor, also advised students to take courses in the AFAM Department because he knew that the Department was known for being both very student-oriented and willing to help students. Unlike Austell, Clark had some awareness of the nature of the paper classes, as he understood that the courses required the students to complete a single assignment – one long paper. Like many of the faculty members we interviewed, Clark maintained that he did not question the nature of the AFAM courses because professors do not question other professors'

found nothing to suggest, however, that there was any general understanding among the non-AFAM faculty about how the AFAM paper classes worked. While it is possible – and quite likely, given the number of students who took these classes – that some number of individual faculty members knew about the workings of the classes through general word-of-mouth on campus, we did not identify any (beyond Jan Boxill) in the limited number of faculty interviews we conducted.

Beyond word-of-mouth, the University has established mechanisms in place which are designed to ensure that the faculty is kept apprised of the Athletics Department's level of adherence to the University's academic standards and expectations. Those mechanisms are the Faculty Athletics Committee (FAC) and the Faculty Athletics Representative (FAR). This section will examine whether and to what extent the FAC or the FAR learned about these irregular classes.

### a. The Faculty Athletics Committee

The FAC is a body of nine faculty members elected by the faculty. According to Section 4-7(b) of the Faculty Code, "[t]he committee is concerned with informing the faculty and advising the chancellor on any aspect of athletics, including, but not limited to, the academic experience of varsity athletes, athletic opportunities for members of the University community, and the general conduct and operation of the University's athletic program."[163]

There were two occasions when the FAC may have discussed the topic of student-athletes in the irregular AFAM classes. The first occasion was in 2002 when the frequency of student-athlete enrollments in independent studies across the campus became an issue after an ESPN "Outside the Lines" program featured a segment that criticized Duke for allowing student-athletes to cluster in certain classes and majors and encouraging basketball players to enroll in less-challenging courses of study. After a local news program noted that student-athletes at Chapel Hill were similarly clustered – with three AFAM majors and four Communications majors on the basketball team that year[164] – Senior Associate Athletics Director John Blanchard decided to review student-athlete clustering in particular majors and courses.

At the FAC's April 2002 meeting, Blanchard and FAC member Jim Murphy presented data that the ASPSA academic counselors had compiled.[165] That data showed that there were 40 student-athlete enrollments in seven different independent studies courses across the campus during the 2000-2001 academic year.[166] According to the meeting minutes, the FAC reviewed the data and concluded that it "did not feel that the level of independent study registrations by student-athletes reflects abuse of the opportunity."[167] Although the Committee noticed that an AFAM class, AFAM

---

courses. Clark believed, like many others, that so long as a department was offering a course, it was a legitimate course.

[163] U. OF N.C. AT CHAPEL HILL, THE FACULTY CODE OF UNIVERSITY GOVERNMENT § 4-7(b) (Jul. 2006), *available at* http://www.unc.edu/faculty/faccoun/code/code2006.pdf.

[164] *See ESPN Dissin' Duke Basketball Over Degree Program*, WRAL.COM, Mar. 8, 2002, http://www.wral.com/news/local/story/101227/.

[165] Exhibit 49.

[166] *Id.*

[167] *Id.*

190, AFAM Independent Studies, was one of two courses that accounted for the majority of student-athlete independent study enrollments, it "did not find any cause for concern in this situation."[168]

It would be more accurate to say, however, that the FAC did not *try to* find any cause for concern. As explained in the report submitted by Blanchard and Murphy, "No examination of the syllabus of any of these [independent study] courses was made since they are approved by the faculty in the respective departments."[169] This assumption – that a course is academically legitimate based upon the mere fact that it was offered by a department – prevented further scrutiny by the FAC in 2002 and served as the justification for much of the reticence to scrutinize the paper courses in the AFAM Department for so many years thereafter.

The other obstacle to FAC scrutiny was the data presented by Blanchard and Murphy. Our review of Registrar records demonstrates that the FAC received only partial data and therefore an incomplete snapshot of student-athlete enrollments in independent studies. Rather than a total of 40 student-athletes in seven different independent studies classes across the campus in 2002, we found that there were 15 different independent studies classes *in the AFAM Department alone* that year with an enrollment of 52 student-athletes. Had the accurate data been presented, it is much more likely that the FAC would have identified the AFAM Department as a particular problem that warranted more scrutiny. The inaccurate data obscured what otherwise would have been a red flag that may have exposed and brought the irregular AFAM classes to an end in 2002, nine years before they ultimately were.[170]

In late 2006 and early 2007, the FAC renewed their discussion of independent studies, prompted by revelations of a scandal at Auburn University. In July 2006, *The New York Times* ran an article, "For Some Auburn Athletes, Courses With No Classes," which recounted how a faculty member in Auburn's Sociology Department offered hundreds of "directed readings," which required no class attendance and "helped athletes in several sports improve their grade-point averages and preserve their athletic eligibility."[171] Immediately after this article was published, FAC member Lissa Broome circulated it to Faculty Athletics Representative Jack Evans and the other FAC members.[172]

---

[168] *Id.*

[169] *Id.* at x004359.

[170] We know about the substance of this meeting from review of the meeting's minutes and Blanchard's report on independent studies, as well as from our conversations with Blanchard. We also spoke with five FAC members who attended that meeting, but none of them had a clear recollection of the independent study discussion.

[171] Pete Thamel, *For Some Athletes, Courses With No Classes*, N.Y. TIMES, Jul. 13, 2006, http://www.nytimes.com/2006/07/13/sports/13cnd-auburn.html?pagewanted=print&_r=0.

[172] Exhibit 50.

This triggered an email discussion among the FAC members. Jack Evans wrote an email to the FAC listserv emphasizing the need for the FAC to look for similar problems at Chapel Hill.[173] In addition, Evans commented that the FAC "should inquire about whether the University has any courses that are single-assignment courses (*e.g.*, read one book and write one paper)" – a clear reference to the paper class type of scenario. Broome emailed in agreement that "faculty groups need to have access to appropriate data to monitor the bona fides of the course of study of student-athletes" and suggesting that the FAC discuss what additional information they should be reviewing.[174] Evans replied to everyone, proposing that they invite ASPSA Director Robert Mercer to an FAC meeting "for his perspective on the types of courses for which our student-athletes are registering."[175]

Mercer then appeared at an FAC meeting on November 7, 2006 to discuss student-athletes' use of independent studies. The minutes from that meeting read as follows:[176]

> The committee has previously reviewed data regarding majors and will review an updated version of such data at a future meeting. A general discussion followed regarding the use of independent study and on-line courses. The committee has conducted a review of student-athletes [sic] registrations in independent study courses and has an interest in receiving current information in this regard. Mr. Gallo will prepare additional information on these topics for consideration by the committee.

Subsequently, at the January 2007 FAC meeting, John Blanchard, Dick Baddour, Executive Associate Athletics Director Larry Gallo, and Mercer were present for a discussion of student-athlete majors. According to the meeting minutes, the FAC reviewed data provided by the Athletics Department and determined that there were four majors that were particularly prevalent among student-athletes: AFAM, Communications, Exercise and Sport Science, and Management and Society.[177] According to the minutes, "the discussion then shifted from majors to individual classes

---

[173] Evans' email reads as follows:

> And while my reaction to the [Auburn] story is that the facts suggest serious questions about academic integrity, I think there's a bit of a silver lining in the fact that the issue was addressed at the institution through faculty processes.... The cautionary note for us, I think, is that we should do two things under the heading of 'constant vigilance'. One is that we should continue to track where our student-athletes major, relative to where non-athlete students major, and we should be tracking courses taken by student-athletes. The second is that we should inquire about whether the University has any courses that are single-assignment courses (*e.g.*, read one book and write one paper). Exhibit 51.

[174] Exhibit 51.

[175] *Id.*

[176] Exhibit 52.

[177] Exhibit 53.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 89 of 137

and the question of whether any concentrations of student-athletes tend to occur."[178] The minutes reflect the FAC's sentiment that "no sense exists of a current problem," but notes that Mercer will track registrations in independent study and on-line courses.[179] The minutes do not reflect whether there was or was not any discussion of "single assignment courses," as Evans suggested, or any discussion of the "bona fides" of courses, as Broome suggested.[180]

Governor Martin's team examined this meeting during their investigation. They interviewed Blanchard, Mercer and Baddour in an attempt to fill in the gaps in the minutes and to determine what, if any, discussion was had about the irregular AFAM classes in the 2006-2007 FAC meetings. Based on their interviews and a review of the FAC minutes, they concluded in their report that the Athletics and ASPSA administrators had "raised a general question to the FAC regarding the propriety of lecture courses that were being taught in an independent study format."[181] They further concluded that when this issue was raised, the FAC responded that "instructors have wide latitude in how they teach approved course content," *Id.*, and "that it was incumbent upon each instructor of record to determine how to teach his/her own course and that it was therefore unnecessary for ASPSA personnel to question the instructional methods used."[182] In sum, the Martin Report found that the Athletics and ASPSA administrators had tried to raise their general concerns about the academic integrity of certain AFAM classes and that the faculty on the FAC had told them to mind their own business.

These findings were immediately challenged by the members of the 2006-2007 FAC, none of whom had been interviewed by the Martin investigators. Lloyd Kramer and seven other FAC members issued a statement definitively stating that "[t]he Martin Report on 'Academic Anomalies' mischaracterizes the actions of the Faculty Athletics Committee (FAC). The abuses that the Report rightly condemns were not condoned by the FAC, and the principle of academic freedom was not used to justify academic misconduct."[183]

This direct contradiction caused skeptics to question whether the account from the Athletics and ASPSA personnel was simply an attempt to absolve the Athletics Department of responsibility for sending their players to classes that were as irregular as those that got Auburn in trouble. It also caused the Martin team to ultimately to publish a clarification that acknowledged the faculty's account of the meetings and assured them that the team had "no intent to imply that the FAC or its members were aware of the now-known issues prior to initial reports of academic anomalies discovered in the Department of African and Afro-American Studies." The Clarification then went

---

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] MARTIN REPORT, *supra* note 41, at 53.

[182] MARTIN REPORT, *supra* note 41, at 9.

[183] LLOYD KRAMER, STATEMENT OF THE CHARACTERIZATION OF THE ACTIONS OF THE FACULTY ATHLETICS COMMITTEE IN THE MARTIN REPORT (Feb. 8, 2013), *available at* http://faccoun.unc.edu/faculty-council/meeting-materials-past-years/meeting-materials-2012-13/february-8-2013/#heading-4.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 90 of 137

CADWALADER

on to predict that "what was said [in the 2007 FAC meeting], or not, when, and by whom will not be determined with certainty."[184]

Given the importance of this factual issue to the question of faculty knowledge and the level of controversy that ensued after the Martin team issued its findings, we made it a priority to learn as much as we could about that meeting.

We interviewed all three Athletics participants, and they gave fairly consistent accounts. Blanchard stated that he raised the issue of the AFAM classes at the end of a discussion about student-athlete clustering. He told the FAC that there was a professor in the AFAM Department who advertises courses as though they are regular lecture classes but teaches them as independent studies.[185] Blanchard recalls the FAC members responding firmly that the teaching method employed by a professor is a matter of his or her academic freedom and that he and his Athletics Department colleagues should not question a professor's choice of teaching method. Blanchard said that he was struck by the harshness of the response, and interpreted it as signaling the end of the conversation.

Mercer had a similar recollection. He explained that he was the one who initially became aware that the AFAM Department was offering regular lecture courses as independent studies. He brought the issue to Blanchard's attention, and they in turn decided to report it to the FAC. According to Mercer's memory of the ensuing meeting, Blanchard led the discussion and explained that they were seeing student-athletes enrolling in what were listed as traditional lecture courses, but taking them as independent studies. Like Blanchard, he recalled being told by the FAC members (neither he nor Blanchard could remember any specific individual) that the faculty were in charge of their classrooms and could decide how to teach their courses.

Dick Baddour largely supports the account given by Blanchard and Mercer. According to Baddour, Blanchard and Mercer approached him sometime after the Auburn revelations and said they wanted to alert the FAC that the AFAM Department was teaching certain classes as independent studies, even though they were listed as lecture courses. Baddour recalled that they discussed the issue at the FAC meeting, but does not remember much about the specific conversation other than the consensus response from the FAC members that faculty are in charge of their classroom and have the authority to design their classes as they see fit.

After getting the account from the Athletics and ASPSA personnel, we interviewed the FAC members, and they were unanimous in their rejection of that account. We spoke with eight of the nine FAC members present at the January 2007 meeting. To a person, they claimed no recollection of any discussions specifically about irregular classes in the AFAM Department.[186] To their

---

[184] MARTIN CLARIFICATION, *supra* note 47, at 1.

[185] Blanchard stated that he did not discuss any more specific details of the courses – such as Crowder's grading or the use of grade changes – because he was unaware of them.

[186] Sociology Professor Kathleen Harris, for example, recalled some general discussion of independent study as a mode of instruction and the professor's prerogative to structure it how he or she likes. She also recalls a reference to concerns that might arise if too many student-athletes are enrolled in independent studies with one professor. She does not recall any discussion beyond those points, but is certain that the FAC did not

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 91 of 137

recollection, any discussion of independent studies remained very general and was not specific to the AFAM Department. To the extent that the AFAM Department might have been mentioned, there was certainly no reference to the irregular practice of teaching lecture-designated courses for student-athletes in an independent study format. Had they heard such a thing, they contend, they definitely would have taken further action back then, and would have a recollection of it today.

Like Governor Martin's investigative team, we have been unable to identify any evidence that definitively proves which account is the truth. The meeting minutes are vague, the participants give conflicting accounts, and we have found no subsequent emails or other documents that record what was discussed at the meetings. With no direct evidence to tell us what transpired, we have to instead analyze the available circumstantial evidence that may suggest which account is more plausible.

The key question in our analysis is whether the Athletics and ASPSA administrators clearly put the FAC members on notice about the irregularity of the AFAM classes that their student-athletes were taking. The circumstantial evidence indicates that they did not.

There are two possible explanations for that failure. The first would be the skeptic's view that the Athletics and ASPSA personnel brought this issue to the FAC's attention only to get cover for the Athletics program in the event that the paper classes became an issue. Under that theory, they would have been intentionally vague in their disclosure to the FAC, as they were more interested in simply creating a record of having raised the issue before the FAC than they were in truly sensitizing the FAC members to the problems with these classes that their players were taking in large numbers.

There are several circumstances that might suggest such an agenda on their part. First, the timing of their disclosure to the FAC raises a question. They did not spontaneously raise their concern as soon as they discovered that mis-designated lecture classes were being taught as independent studies. Rather, they only went to the FAC after they saw that similar classes had gotten Auburn in hot water. In fact, our investigation has revealed that Mercer knew about the mis-designated AFAM lecture classes as of July 2006, yet never raised the issue with the faculty until after the Auburn scandal broke. At the very least, this timing suggests that their concern was less about the integrity of the academic curriculum and more about a fear of ending up like their counterparts in Auburn.

Second, it bears mentioning that Mercer previously gave the FAC partial data in their 2002 meeting, which gave the FAC a false sense of comfort about the student-athletes' use of independent studies and likely caused the FAC's inaction at that time. We have no reason to believe that there was any intent to deceive the FAC, but the incompleteness of the data presented in the 2002 meeting makes one wonder whether there was sufficient interest in telling the full story,

---

receive a more detailed description of the AFAM paper classes. Another FAC member, English Professor George Lensing, recalled discussion about the large number of student-athletes enrolled in independent studies, but he could not recall if there was any discussion of the AFAM Department or of irregular independent studies. Jack Evans had no memory of anyone discussing the AFAM Department's paper classes – as now understood – but he did recall that the FAC discussed who had the responsibility of determining whether a course was sufficiently rigorous.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 92 of 137

especially where that full story may not reflect well on the Athletics program and the practice of placing student-athletes in paper classes.

Lastly, it is worth remembering that the FAC tasked the Athletics administrators – and Mercer specifically – with "track[ing] registrations in independent study and on-line courses" as an output of their discussion at the 2007 meeting.[187] Mercer conceded in our interview that he never acted on that tasking and completely let it drop. That is a telling fact, and it lends support to the suspicion that the Athletics and ASPSA personnel were more interested in creating a record of advising the FAC about these classes than in following up and addressing the issue.

While one could make the argument – and many supporters of the faculty's version of events have made it – that the Athletics and ASPSA personnel approached the 2007 FAC meeting with just such an agenda in mind, we do not find that that necessarily happened. Nor do we need to make that finding in order to conclude that they failed to put the FAC on notice about the AFAM paper classes.

The dispute over the FAC meeting revolves around whether the Athletics and ASPSA personnel told the FAC specifically that an AFAM professor was treating lecture-designated classes as independent studies. Blanchard and company claim that they did; the faculty members on the FAC claim that they did not.

Importantly, nobody on either side has suggested that they told the FAC about the more egregious irregularities of the AFAM paper classes – namely, that no faculty member was involved and that the classes were managed and graded by an office administrator. If you take Blanchard, Mercer and Baddour at their word, they could not possibly have conveyed that information because they did not know about those aspects of the paper class system at the time. Therefore, the most they conveyed was that an AFAM professor had decided to teach lecture-designated courses as independent studies, which, in and of itself, is more of a technical violation of course-labeling protocols. For all the FAC knew, the professor running these mis-labeled independent studies was doing everything the right way – working closely with the students, monitoring the students' work and providing them with valuable feedback and guidance along the way. Without a more complete picture about the absence of these standard instructional elements, it is understandable how the FAC would have failed to appreciate the full gravity of the situation.

In light of the above, we believe the weight of the circumstantial evidence supports the FAC's position that they were not put on notice about the paper classes, that "[t]he abuses that the [Martin] Report rightly condemns were not condoned by the FAC, and [that] the principle of academic freedom was not used to justify academic misconduct."[188]

---

[187] Exhibit 53.

[188] Once we find that the FAC was not fully apprised about the irregular AFAM classes, it becomes somewhat academic whether the FAC did or did not invoke the principle of academic freedom during the 2007 meeting. For purposes of completeness, however, we do find that the Athletics personnel may be completely accurate in contending that that principle was invoked. We find it quite plausible that a faculty group – this FAC or any other faculty group – might respond to questions about the substance or format of a class by pointing out that professors are given, and should be given, substantial latitude to decide how to teach their classes. That is, in fact, the case across most campuses in the United States, and it was particularly the case at Chapel Hill in

88

b.    The Faculty Athletics Representative

The second mechanism by which the faculty monitors athletics is through the Faculty Athletics Representative ("FAR"). Under NCAA legislation, each member school is required to designate a faculty member as the FAR to "represent the institution and its faculty in the institution's relationship with the NCAA and its conference(s), if any."[189]   At Chapel Hill, Jack Evans, a professor and former dean of the Kenan-Flagler School of Business, served as FAR from 1995-2010.

As FAR, Evans served as an *ex-officio* member of the Faculty Athletics Committee and was responsible for preparing minutes of the Committee's meetings. As such, Evans attended all FAC meetings, including both the 2002 and 2006 meetings at which independent studies were discussed.

Beyond those meetings, there is no evidence that Evans was ever alerted to concerns about the academic integrity of AFAM classes and failed to take action. If anything, the email record suggests that he would have acted on such concerns if he had heard them. As explained above, it was Evans who reacted to the 2006 Auburn story by suggesting that Chapel Hill should take a look at itself. In an email to the FAC, Evans urges it to do the following:[190]

> two things under the heading of 'constant vigilance.' One is that we should continue to track where our student-athletes major, relative to where non-athlete students major, and we should be tracking courses taken by student-athletes.   The second is that we should inquire about whether the University has any courses that are single-assignment courses (*e.g.*, read one book and write one paper).

This email and the rest of the record suggest that it is unlikely Evans had and failed to act on knowledge about the paper classes.[191]

---

2006. Many of our faculty witnesses cited academic independence and professorial prerogative as critical to the functioning of an elite university, even while recognizing that this autonomy may have been exploited by Nyang'oro and Crowder when they were running their "shadow department." As such, we find it quite plausible that the FAC may have made that point when the Athletics administrators raised a concern about classes offered by the faculty.

It is an altogether different question, however, whether the FAC invoked the principle of academic freedom specifically to shield academic misconduct from scrutiny. That question is not before us, as we have no evidence that the FAC was made sufficiently aware of any academic misconduct during the conversations in the 2007 meeting.

[189] NCAA Const. art. 4, § 02.2, *available at* http://www.ncaapublications.com/productdownloads/D110.pdf.

[190] Exhibit 51.

[191] The finding that the FAR did not know about the paper classes begs the question whether the FAR should have known about them. His lack of awareness that the paper and independent study classes were being taken by at least 3000 students makes one wonder whether the FAR was truly expected and empowered to peel back the cover and learn the inside operations of the University's athletics programs.

# CADWALADER

6.  Chapel Hill Administration

The last group we examined for knowledge about these irregular AFAM classes was the Chapel Hill administration. We conducted interviews and reviewed emails that shed light on the degree of contemporaneous knowledge by administrators in each level of administration above the AFAM Department. Those administrators, in ascending order of hierarchy, include: the Senior Associate Dean for Social Sciences and Global Programs, the Senior Associate Dean for Finance and Administration, the Senior Associate Dean for Undergraduate Education, the Dean of the College of Arts and Sciences, and the Chancellor.

a.  The Senior Associate Dean for Social Sciences and Global Programs

There were four different Senior Associate Deans for Social Sciences and Global Programs between 1998[192] and 2011: Dick Soloway (1998 – 2006), Arne Kalleberg (2006- 2008); Karen Gil (2008 – 2009), and Jonathan Hartlyn (2009 – present). In his role as Senior Associate Dean, as well as his prior role as Chair of the Political Science Department, Hartlyn knew Nyang'oro and regularly interacted with him during meetings of the department chairpersons. He claims, however, that he never had any inkling that Nyang'oro was offering the paper classes and only learned about them when Nyang'oro disclosed their existence during their meeting in the aftermath of the media disclosures in August 2011. Hartlyn's prompt and decisive efforts to follow up on those disclosures supports his contention that he had not previously been aware of the paper classes.[193]

Arne Kalleberg served in this position between 2004 and 2007. He was the last Senior Associate Dean to re-appoint Nyang'oro as chair of the AFAM Department. In making that decision, Kalleberg reported that he spoke with faculty members in the department and learned nothing that alerted him to the irregular courses in the AFAM Department. He recalls – and the faculty we interviewed confirm – that there were no concerns raised about irregular courses or independent studies during those interviews.

b.  The Senior Associate Dean for Finance and Planning

Tammy McHale has served as Senior Associate Dean for Finance and Planning since 1998. In that position, she analyzes professor teaching loads, and would have looked at Nyang'oro's independent studies load, which was up to 300 students each year. When we asked whether she had ever realized that Nyang'oro was teaching an excessive number of independent studies – which might have caused her to question whether he actually was teaching them – McHale said she had not and explained that she was more focused on ensuring that faculty members were teaching a minimum number of courses and less concerned with the prospect of a faculty member teaching too

---

[192] The position of Senior Associate Dean for Social Sciences and Global Programs was created in 1998.

[193] There was one email we identified that made us initially question whether Hartlyn might have known more than we had been led to believe. In an email from September 2010, Hartlyn thanked Nyang'oro for accepting a student for an independent study in a class, AFRI 521, which was denominated as a lecture course. When we asked Hartlyn and Nyang'oro about this email, neither recalled the specific instance. Upon further review of emails with Hartlyn and Nyang'oro, it appears as though Hartlyn had spoken with Nyang'oro and arranged for the student to enroll in the course without a necessary prerequisite. Exhibit 54.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 95 of 137

many. While she concedes that she might have noticed that he was teaching more than required,[194] she does not recall anything that was terribly out of the ordinary. Aside from this possible understanding about Nyang'oro's course load, there is no evidence that McHale had any knowledge about irregularities in the AFAM Department.

### c.   The Senior Associate Dean for Undergraduate Education

The position of Senior Associate Dean for Undergraduate Education was held by Bobbi Owen from 2005 to 2014. As we discuss in Section IV.B.9, Dean Bobbi Owen appears to have had knowledge of at least some of the issues in the AFAM Department. In 2006, Owen apparently knew that the AFAM Department was enrolling far too many students in independent studies and told Nyang'oro to limit the numbers and "rein" Crowder in. Owen was also advised by then-Dean of Academic Advising Carolyn Cannon of her concern that signatures on grade change forms purportedly signed by Nyang'oro had actually been signed by someone else. In response to Cannon's concern, Owen got a sample signature from Nyang'oro and gave it to Cannon to use as a comparison for future grade forms. Owen took no further action and apparently never shared the concerns about either the high independent studies numbers or the suspect grade form signatures with anybody above her in the administration.

### d.   Dean of the College of Arts and Sciences

The position of Dean of the College of Arts and Sciences was held by eight different faculty members over the time that these paper classes were in existence. We interviewed current Dean Karen Gil (2009– present) and Holden Thorp (2007-2008) about their knowledge of the paper class scheme and found nothing to suggest that either of these deans or their predecessors were aware of the irregularities within AFAM.

### e.   Chancellor

There were five permanent or acting Chancellors over the period that the AFAM paper classes took place. Holden Thorp served as Chancellor from 2008 to 2011. James Moeser immediately preceded him and served as Chancellor of Chapel Hill from 2000 to 2008. William O. McCoy served as Acting and Interim Chancellor between 1999 and 2000. Michael Hooker served as Chancellor from 1995 to 1999 and Paul Hardin served as Chancellor from 1988 to 1995. We interviewed Thorp and Moeser and looked for any evidence that they or their predecessors knew about the AFAM paper classes and found none.

Both Moeser and Thorp explained that they made a conscious effort to keep close track on developments in the Athletics Department. They routinely attended FAC meetings and were directly involved in personnel decisions in the Athletics Department. When the Auburn independent study scandal broke in 2006, for example, Moeser convened a meeting with senior

---

[194] Nyang'oro recalled that during one such review with McHale, she pulled out a chart listing all the courses for which he was the Instructor of Record, which showed that he was teaching an inordinate number of independent studies. Realizing that these were Crowder's paper classes for which he was listed as Instructor of Record as a formality, he deflected McHale with a joke about how he was just a very hard worker. McHale did not recall this conversation.

administrators in Chapel Hill's South Building to discuss the matter. As Moeser recalled, they had lively discussions, but no one raised a concern that there might be similar issues with independent studies at Chapel Hill, likely due to the commonly-held – but naïve – belief that Chapel Hill was "above" such academic improprieties.

Moeser's protégée, Thorp, was among those who believed that Chapel Hill was above an academic scandal like that at Auburn, and he was blindsided by the AFAM revelations in 2011. Although Thorp told us he knew that the AFAM Department issued higher grades than most other departments and was popular among student-athletes, he knew nothing about the irregularities in the department before Jonathan Hartlyn reported them to him in August 2011.[195]

      C.     Assessment of the University's Oversight of the AFAM Department and ASPSA

In the last section, we examined who on campus knew about the AFAM irregularities and determined that the administration was largely in the dark about the scheme that Crowder and Nyang'oro were running. In this section, we ask why. Why did it escape the administration's attention for 19 years that some 3,000 students and student-athletes were taking classes that were so academically unsound?

The answer lies in the University's failure to exercise meaningful oversight of the two University components that were involved in this scheme – the AFAM Department and ASPSA.

      1.     Oversight of AFAM

It was a woeful lack of oversight of the AFAM Department and Chairman Nyang'oro that made it possible for him and Crowder to carry out their paper class scheme. As far as we could tell, there was almost no structured oversight of the AFAM Department's operations during Nyang'oro's tenure from 1992 to 2011. There were occasional meetings between Nyang'oro and his direct superior, the Senior Associate Dean for Social Sciences and Global Programs, but little oversight beyond that.[196] The Senior Associate Deans typically did not involve themselves in the workings of each department, and instead saw their role as focusing on faculty recruitment and promotion,

---

[195] As we explain in Section V.A.3 above, Nyang'oro contends that then-Dean Thorp twice commended and thanked him and the AFAM Department for its hard work in teaching so many student-athletes. Thorp did not recall making these comments, but acknowledged that he may have done so. It was well known both that many student-athletes took the less rigorous AFAM classes and that the handling of student-athletes with the demands on their time could be challenging for a professor. As such, he would have felt genuinely grateful for AFAM's efforts with the student-athletes and it would have been perfectly in keeping for him to thank Nyang'oro for those efforts. Thorp's explanation makes sense, and there is no basis for deducing from that remark that Thorp knew anything about the paper classes.

[196] On occasion, Tammy McHale, the Senior Associate Dean for Finance, would conduct an audit of the Department in order to determine its budget for the academic school year. McHale, who served in her role since 1998, explained that these audits did not address substantive academic issues and she did not recall these audits ever turning up anything unusual about AFAM.

development of academic programs, and fundraising.[197] Consequently, department chairs were allowed significant autonomy and control of their department, with little to no intervention from the administration.

We have attempted to diagnose why the academic oversight at Chapel Hill was so lacking for so many years, and we have identified both cultural and structural reasons. Culturally, the minimal oversight can be attributed to the same value that was allegedly expressed by the faculty in the 2007 FAC meeting – the cherished academic independence that professors enjoy in elite institutions. As former-Dean Kalleberg explained to us, the ethos of Chapel Hill's administration revolved around trust and a resistance to structured management. At all levels of the University, the inclination was to minimize management and interference from the administration and maximize the professor's latitude to design his or her own approach to instruction and research. This hands-off management approach was laudable as a means of fostering academic creativity but lamentable as a mechanism for detecting and preventing the type of academic misconduct that existed in the AFAM Department for so many years.

In addition to this cultural reason, there were also several procedural and policy flaws that served to shield the AFAM Department from established oversight mechanisms. First, the University had a policy requiring each department to undergo an external review of the department's curriculum every five years. This policy applied to all departments at Chapel Hill that have graduate programs, which is the majority of the College's 45 academic departments and curricula. Unfortunately, the AFAM Department was a purely undergraduate program and therefore was not subject to this external review requirement.

Another University policy required that every tenured faculty member undergo a review by his or her department peers once every five years.[198] Once again, this oversight mechanism failed to reach the problem in the AFAM Department because the policy exempted Nyang'oro – the one tenured faculty member whose review may have detected the paper classes – from the review requirement by merit of his position as Chair of the department. The policy exempted department chairs out of concern with putting professors in the awkward position of evaluating their superior. While one can question the thinking behind that exemption, the result was that Nyang'oro was spared from peer review for his whole tenure in the AFAM Department.

The third missed oversight opportunity was during the department chairman appointment process that took place every five years. As part of that process, it was the policy of the Social Sciences Dean to interview every faculty member in the AFAM Department as well as the incumbent chairman. While these interviews would have been a good opportunity to detect the paper classes, it appears that they were not designed or conducted as probing assessments of the incumbent's performance. Rather, as Deans Kalleberg and Hartlyn explained, they were more of an opportunity to gauge whether any of the faculty members might have an interest in applying for the

---

[197] As Deans Jonathan Hartlyn and Arne Kalleberg explained to us, they had twenty four direct reports, which included departments, curriculums, and various global programs, and were therefore limited in how much oversight they could personally exercise over each chair and each department.

[198] *See* Section 2.c.8, Post-tenure review, "Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill," *available at* http://policy.sites.unc.edu/files/2013/04/tenure.pdf.

Case 1:14-cv-00954-LCB-JLW Document 166 Filed 01/18/19 Page 98 of 137

# CADWALADER

position and determining whether any have concerns about allowing the incumbent to continue in the position. Apparently, these interviews failed to smoke out any concerns about the irregular classes on the three occasions when Nyang'oro was reappointed in 1997, 2002, and 2007.

As a result of the administration's hands-off approach and these flaws in their management processes, the AFAM Department operated effectively without meaningful oversight and the paper class scheme was allowed to continue unabated for almost twenty years.

### 2. Oversight of ASPSA

The oversight of the ASPSA staff was also deficient during this time period, but for different reasons. This deficiency derived primarily from the divided reporting relationship that ASPSA had with the Athletics Department and the College of Arts and Sciences – two University components that had very different views of ASPSA's purpose.

ASPSA had traditionally been housed in and funded by the Athletics Department. In the late 1980s, then Athletics Director John Swofford sought to move ASPSA over to the College of Arts and Sciences in order to foster a stronger connection between athletics and academics. Although ASPSA continued to be funded out of the Athletics Department budget – due to the simple fact that Athletics was the only department with the requisite funds in its budget – its oversight and management formally shifted to the College, and specifically to the Center for Student Success and Academic Counseling in the Office of Undergraduate Education.

These responsibilities may have shifted as a matter of the organizational chart, but they did not fully shift as a matter of practice. For all intents and purposes, the ASPSA managers and staff still believed that they reported to a large degree to Senior Associate Athletics Director John Blanchard and the coaches.

This belief was understandable, given the circumstances under which they operated. First, they were physically located with the Athletics Department near Kenan Stadium (and eventually in the Loudermilk Center), nearly a half-mile away from the Office of the Dean of Undergraduate Studies. Second, they continued to be funded by the Athletics Department and had to get its approval for any new staff. Third, it was clear to all that the coaches had the power over the counselors' employment. It was not lost on anybody that Roy Williams was able to bring Walden in from Kansas, install him in ASPSA and have him supplant long-time counselor McSwain. Nor was it lost on the counselors that Reynolds was out of her job once Davis lost patience with her. It was quite clear to the counselors – at least those in the revenue sports – that they were being evaluated by the coaches and judged by their success in keeping players eligible to play ball.

ASPSA's functional integration with the Athletics Department and its distance from the College resulted not only in a tendency to prioritize athletic over academic objectives; it also undermined oversight from the College. It is true that College officials kept tabs on ASPSA at some level. The Associate Dean of CSSAC Harold Woodard and Director of ASPSA Robert Mercer held bi-weekly meetings, and Woodard attended the occasional ASPSA staff meeting. Dean Owen also attended ASPSA meetings on occasion and kept a regular channel of communication open with Senior Associate Athletics Director John Blanchard. While nice gestures, these meetings never graduated into meaningful oversight and scrutiny of ASPSA's mission and methods. As a result,

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 99 of 137

# CADWALADER

Dean Owen, Dean Woodard and others at the College never learned about the ASPSA counselors' efforts to boost student-athlete GPAs by placing them in academically-suspect paper classes.

Looking back from today, it is hard to understand how College officials allowed this oversight failure to happen. One can speculate that it may have been the product of inertia, a lack of management-level leadership and the acceptance of certain supposed truisms – *e.g.* that strong oversight cannot coexist with academic independence in an elite university or that such oversight is unnecessary in a school with traditions of academic and athletic excellence – that nobody questioned until it was too late. Regardless the cause, the result of this oversight failing was an education failing that ran counter to the very ethos of this exceptional university and caused it to embark on a self-reflective process that started as soon as Dr. Nyang'oro told Dean Hartlyn about the paper classes in 2011. The following section will describe that process and the changes it has brought about.

### D. Assessment of the University's Response to the Paper Class Revelations

The University has been criticized for the lamentable oversight failure that allowed these classes to remain undetected and unaddressed for almost 20 years, and we believe that criticism is fair. The University has also been received substantial criticism for its response to the revelations of these classes starting in August 2011, with some accusing Chapel Hill administration officials of trying to minimize the severity of the conduct and avoid a full accounting of the AFAM paper class scheme.

We found no evidence that the higher levels of the University tried in any way to obscure the facts or the magnitude of this situation. To the extent there were times of delay or equivocation in their response to this controversy, we largely attribute that to insufficient appreciation of the scale of the problem, an understandable lack of experience with this sort of institutional crisis and some lingering disbelief that such misconduct could have occurred at Chapel Hill.

The best evidence of the administration's intentions has been the series of investigative efforts they commissioned. The Hartlyn-Andrews and Governor Martin investigations were both genuine efforts to get to the bottom of the situation.[199] The University deserves credit for commissioning these reviews in 2011 and 2012, and for seeing the further need to commission our investigation when Crowder and Nyang'oro became available for interviews earlier this year.

In addition, University personnel deserve credit for the cooperation they have provided to this investigation. For the past eight months, we have peppered them with requests for assistance of all kinds, and on every occasion they have come through. We never felt even the slightest reluctance to cooperate. To the contrary, there were many times that they were willing to go above and beyond to get us what we needed. We saw that attitude the many times that Registrar Christopher

---

[199] To the extent they did not get to the bottom of the situation, that was due to factors other than a lack of desire to be thorough. One factor was their lack of access to the key players in the scheme. Another was the unavailability of the findings of the SBI investigation. And, a third factor was the University's demand that Martin complete his work in a time-frame that did not permit the comprehensive email review that is necessary to dig out the facts in this type of investigation. As Chancellor Carol Folt recognized when she ordered supplemental email review after the issuance of the Martin Report, the University now appreciates the importance of a thorough email review.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 100 of 137

Derickson agreed to work long hours and over weekends to get us the data that fed the statistical analyses reflected in this report. We also saw it when we advised the Chancellor's office that a University-affiliated former student was refusing our interview request, and word was immediately sent that he would be summarily terminated unless he submitted to an interview.[200] It was that sort of cooperation by the administration – and the clear message it sent to the rest of the University – that made it possible for us to develop the findings in this report.

Finally, it should be noted that the University has dealt forthrightly with the NCAA ever since the revelations came out about the paper classes. The Athletics Department immediately self-reported to the NCAA the substance of what Nyang'oro reported to Hartlyn in August 2011 before it had more than the haziest understanding of the nature or extent of the issue. It arranged for the NCAA investigator to investigate those allegations along with Chapel Hill's Internal Working Group in the fall of 2011. And, the University also directed us to cooperate fully and share our findings in real time with the NCAA investigators as we conducted our investigation, recognizing that the University would be denied access to that same information until the end of our investigation.

In addition to this investigative activity, the University's response can be evaluated by the series of structural, procedural and policy reforms that Chapel Hill has adopted to protect against a recurrence of such irregularities. Those reforms range from small-bore process refinements to major structural changes. Those reforms include:

- Initiated Student-Athlete Academic Initiative Working Group. Chapel Hill launched the Student-Athlete Academic Initiative Working Group to review all aspects of a student-athlete's experience.

- Revitalized the ASPSA Advisory Committee. Originally founded in the 1980s, the Advisory Committee was revitalized and is composed of faculty and staff to serve as a sounding board for long-term programming and as a source of advice on day-to-day issues that may arise for advising student-athletes.

- Reorganized the Academic Support Program for Student-Athletes. Chapel Hill relocated ASPSA out of the College of Arts and Sciences to the Office of the Executive Vice Chancellor, where its personnel now report directly to the Provost.

- Developed new Athletics Department structure and direction. The Athletics Department completed a comprehensive analysis that led to the strategic plan, "Carolina Leads," to educate and inspire through athletics.

- Reorganized Athletics Department leadership. The department was reorganized in 2012 with several new hires including a new Athletics Director, head football coach and football coaching staff, as well as three hires who brought external experience and perspective in key roles: a Senior

---

[200] That student agreed to an interview and was completely cooperative.

Associate Athletics Director who oversees Compliance staff and Student-Athlete Development, an Associate Athletics Director for Compliance who led an evaluation of compliance systems, and an Associate Athletics Director for Risk Management who led efforts to address risk analysis and management.

- Updated the Summer School policies and procedures. The Summer School Policies and Procedures manual was updated with more specific guidelines for faculty and summer administrators regarding teaching assignments including a regular examination of course registration summary data to ensure consistency on faculty summer school teaching loads.

- Instituted new annual teaching assignment review. Senior associate deans now review teaching assignments for all faculty in the College of Arts and Sciences.

- Developed the My Academic Plan (MAP) initiative with input from ASPSA's academic counselors and student-athletes. The MAP program offers better support for student-athletes through creating a weekly plan individually designed for student-athletes based on their preparedness, course selection and specific needs.

- Implemented classroom checks. Chapel Hill has implemented an ongoing process of random classroom checks to determine that classes are taking place as scheduled.

- Instituted new instructions for structuring course syllabi. New instructions require detailed explanation of academic requirements.

- Implemented best practices for independent study in all academic departments. Required every student and faculty member in an independent study to develop and sign an independent study contract and limited faculty members to no more than two independent study students per session.

E. Comparison with the Findings in the Martin Report

The people of North Carolina owe Governor Martin and his colleagues from Baker Tilly Virchow Krause, LLP a debt of gratitude for their 2012 inquiry into the AFAM irregularities. Governor Martin answered the call and devoted more than five months of his life to leading that investigation without receiving a single penny in compensation. Their findings – and in particular their statistical analyses – went a long way to disclosing the true breadth of this irregular class scheme and served as important building blocks for our investigation.

As explained above, however, Governor Martin and his team could only go so far with their investigation because the two central actors – Professor Nyang'oro and Crowder – were unwilling to be interviewed due to the ongoing criminal investigation and prosecution. Thanks to the good offices of District Attorney Woodall, we were able to extensively interview both of them. We were also given access to the results of the SBI investigation, which provided us numerous leads that were

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 102 of 137

not available to the Martin team. As a result, our findings go beyond those of the Martin Report in a number of important respects. The following lists the key differences between our findings and the reasons therefor:

        1.      Number of Irregular Classes and Enrollees

Governor Martin found "216 course sections. . . with proven or potential anomalies" that included more than 4,200 course enrollments.[201] Of those, they found 39 Type I classes with 464 enrollments.[202] The Type I courses were those "lecture course section[s] in which the instructor of record denied teaching the course section and signing the grade roll, or the chair stated that the course section had not been taught."[203] As described in Section V.A.1, we found 188 paper classes and five bifurcated classes. We also found that hundreds of students took independent study paper classes. In total, we estimate that over 3,100 students took paper classes.

        2.      Duration of Irregular Classes

Governor Martin concluded that "[t]he presence of confirmed anomalous course sections in the Department of African and Afro-American Studies extended as far back as Fall 1997."[204] Based upon our interviews with Nyang'oro and Crowder and our review of the Registrar's records, we found independent study paper classes dating back to 1993.

        3.      Student-Athlete Composition of Irregular Classes

Governor Martin found that "[t]he percentage of student-athletes enrolled in anomalous course sections was consistent with the percentage of student-athletes enrolled in all courses offered by the Department."[205] After a comprehensive examination of the Registrar records, we came up with a very different statistical picture. We found that student-athletes accounted for 48% of all enrollments in the irregular classes, but only 8.3% of the enrollments in the regular AFAM courses.[206] Accordingly, unlike Governor Martin, we found that student-athletes were far more represented in paper classes than they were in other courses offered by the department.

---

[201] MARTIN REPORT, *supra* note 41, at 8 (including Types I, II, and III). It is worth noting that through our interviews with Nyang'oro and Crowder and our email review, we were able to determine that a number of the courses identified by Governor Martin were not irregular. For example, we identified a series of courses the Martin team had deemed potentially anomalous that were actually legitimately associated with a study abroad program.

[202] *Id.* at 36.

[203] *Id.* at 20.

[204] MARTIN REPORT, *supra* note 41, at 8.

[205] MARTIN REPORT, *supra* note 41, at 8.

[206] For more detail on course statistics and data, *see* Section V.A.1, *supra.*

# CADWALADER

### 4. Knowledge of AFAM Faculty

Governor Martin found that "[w]ithin AFRI/AFAM, no other faculty member was involved unethically, other than former Chairman Nyang'oro and Administrator Crowder."[207] That statement was read by some as completely absolving the rest of the AFAM faculty from any responsibility for the irregular classes.

While we agree that Nyang'oro and Crowder were the only AFAM personnel involved in running the classes, we did find that Professors McMillan, Mutima and Sahle each knew about the classes to some degree. In addition, as explained above in Section V.B.3, these three professors engaged in some conduct that reflected a recognition and acceptance of the classes' existence.[208] While those actions may have been comparatively minor and tangential to the operation of the paper classes, they do reflect a level of AFAM faculty knowledge and involvement that was not found by the Martin team.

### 5. Knowledge of ASPSA

Governor Martin and his team examined the role of the ASPSA personnel in this irregular class scheme. They found "evidence that certain ASPSA employees were aware that certain courses within the AFAM Department were so-called "Term Paper Courses," and that lecture courses were being taught in an independent study format.[209] However, they found "no confirmation for speculation that the Academic Support Program for Student-Athletes (ASPSA) academic counselors colluded with instructors or administrators to offer anomalous course sections for the benefit of student-athletes or engage in any improper activities to maintain eligibility of a student-athlete."[210]

As we explained in Section V.A.2, we found that some members of the ASPSA staff intentionally used these classes as GPA boosters and relied on them to maintain or help restore their players' eligibility. Beyond that, we found close coordination of enrollments in these classes between Crowder and the ASPSA counselors for football, men's basketball and women's basketball. Among the ASPSA football staff, we found systematic efforts to enroll players in these classes[211] and then to persuade Nyang'oro to continue offering them after Crowder retired.[212] In short, we conclude that certain ASPSA counselors did, in fact, "collude[] with instructors or administrators to offer anomalous course sections for the benefit of student-athletes."

---

[207] MARTIN REPORT, *supra* note 41, at ii.

[208] As detailed in Section V.B.3, *supra*, this conduct ranged from actual facilitation to mere acquiescence. McMillan facilitated Crowder's efforts when he signed the paper class grade sheets, provided her with suggested paper topics and recommended grades for papers she was grading. Mutima did not facilitate the classes, but he did use them to out-source the teaching of disruptive student-athletes whom Crowder had placed in his lecture course. Sahle also took no steps to facilitate the classes, but did acquiesce in Crowder's practice of placing paper class students on her lecture class rolls.

[209] MARTIN REPORT, *supra* note 41, at 9.

[210] *Id.*

[211] *See* Section V.B.1.b.i., *supra.*

[212] *See* Section IV.D, *supra.*

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 104 of 137

# CADWALADER

VI. **WITNESS ACCOUNT SUMMARIES**

We interviewed a total of 126 individuals in over 220 separate interviews and investigative meetings in the course of our investigation. We have woven the relevant points of their respective accounts into the narrative and findings in this report. For purposes of completeness, we provide the following interview summaries for each person we interviewed.[213] These are high-level summaries of some of the main points made by each interviewee.

A. UNC and Chapel Hill Leadership

**William L. Andrews**
E. Maynard Adams Professor of English,
Department of English;
Senior Associate Dean for the Fine Arts and Humanities (former)

Andrews, an English Professor, served as the Senior Associate Dean of the Fine Arts and Humanities between 2005 and 2012. In 2011, he was asked by Dean Karen Gil to assist Jonathan Hartlyn in conducting a review of courses in the AFAM Department. Andrews supported Hartlyn by taking notes in the meetings conducted as a part of the review as well as providing assistance in drafting and editing what became known as the Hartlyn-Andrews Report. Recalling his report, Andrews explained that Nyang'oro and Crowder were able to evade detection of the paper because the University only had controls in place to identify faculty who taught too few classes – not for those who taught too many.

**Jeanette M. Boxill**
Senior Lecturer in Philosophy,
Department of Philosophy;
Chair of the Faculty (former);
Academic Counselor,
Academic Support Program for Student-Athletes (former)

Boxill is a Senior Lecturer in the Philosophy Department and former academic counselor for women's basketball, a position she held for more than 20 years, beginning in 1988. Boxill served as Faculty Chair from 2011 to 2014. She had a friendly relationship with Crowder and arranged for many of her women's basketball students to enroll in AFAM courses – including paper classes and – which Boxill said were used as a "cushion" for student-athletes who needed additional credit hours or a grade boost.

Boxill stated that she knew the paper classes were "self-paced" or "independent" classes, and stated that her understanding was that the paper classes met at least once. She knew that Nyang'oro was often away from campus, and she said she was not sure about his level of involvement in his classes. Boxill denied any knowledge that Crowder graded papers. However, emails reflect at least two instances in which Boxill opined on grades for her students enrolled in independent courses – once to Crowder, and once to Travis Gore, after Crowder's retirement.

---

[213] We do not include interview summaries for those witnesses whose accounts were protected by FERPA or other privileges and protections.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 105 of 137

Boxill acknowledged that she would sometimes edit her student-athletes' papers, and emails show instances in which she revised and added text to the students' work. However, she viewed the edits as "minor" and "not substantive."

**M. Richard Cramer**
Associate Dean,
Academic Advising Program (former)

Cramer was a Faculty Advisor in the College of Arts and Sciences, where he held various positions since the late 1970s. He also previously taught in and served in multiple administrative roles in the Sociology Department. Cramer explained that he became aware of the paper classes when a student asked him for "the name of that course where all you have to do is write a paper." Cramer did not think he had ever told a struggling student to take an AFAM class, and explained that while he could have asked more questions about the classes, he had assumed that each department was adequately policing itself.

**James W. Dean, Jr.**
Executive Vice Chancellor and Provost;
Professor of Organizational Behavior,
Kenan-Flagler Business School

Dean is the Executive Vice Chancellor and Provost at Chapel Hill. He served as the Dean of the Kenan-Flagler Business School from 2008-2013, when Carol Folt appointed him as Provost in 2013. Within his first month as Provost, Dean recalled that he determined that the University needed to take a new look at academics for student-athletes – a determination that lead to the ongoing work of the student-athlete initiative.

**Stephen M. Farmer**
Vice Provost for Enrollment and Undergraduate Admissions

Farmer is the Vice Provost for Enrollment and Undergraduate Admissions; he has served as the Director of Admissions since Fall 2004. While Farmer denied knowing about the paper classes prior to the courses being discussed in local media, he did remember hearing some discussion of AFAM independent study courses, though he could not recall specific information.

**Carol L. Folt**
Chancellor

Folt was installed as Chancellor at Chapel Hill on July 1, 2013. Early in her tenure at Chapel Hill, Folt reviewed the prior reports regarding the irregular classes and discussed the reports with senior University officials. She determined that the emails of the key actors in the conduct, including Crowder, had not been fully reviewed during any of the prior inquiries. Recognizing this deficiency, she directed a preliminary review emails of relevant individuals that identified a number of suspicious emails between Crowder and others. Combined with other unanswered questions, Folt saw a need for a further review of the matters. She subsequently met with President Ross and, with him, authorized a new independent investigation.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 106 of 137

# CADWALADER

**Karen M. Gil**
Dean of the College of Arts and Sciences;
Professor,
Department of Psychology

Gil is Dean of the College of Arts and Sciences. Prior to becoming Dean in 2009, Gil served as the Senior Associate Dean for Social Sciences from 2007-2009. Gil recalled that she met Nyang'oro and interacted with him regularly when he was chair of the AFAM Department and she was the Senior Associate Dean, but denied having knowledge about the paper classes until they were uncovered during a meeting between Hartlyn and Nyang'oro in August 2011. As a result of that conversation, Gil sought Nyang'oro's resignation as department chair and directed a number of reviews, including what became known as the Hartlyn-Andrews Review and the Independent Study Task Force.

**Jonathan Hartlyn**
Senior Associate Dean for Social Sciences and Global Programs in the College of Arts and Sciences;
Kenneth J. Reckford Distinguished Professor of Political Science,
Department of Political Science

Hartlyn is the Senior Associate Dean for Social Sciences and Global Programs. Hartlyn has served as Senior Associate Dean since 2009, prior to which he was the chair of the Political Science Department from 2000-2005. Hartlyn came to know Nyang'oro when they were both chairs of their respective departments and have interacted with Nyang'oro during meetings among the chairs. Regarding Nyang'oro's and Crowder's success at evading detection of the irregular courses by the Dean's Office, Hartlyn explained that the University administration at the time was more concerned with faculty members not teaching enough courses – not whether they were teaching too many courses. Hartlyn also acknowledged that there was a disconnect between the College and Summer School which resulted in a lack of oversight as to how many courses faculty were teaching in the summer. Hartlyn also explained that Nyang'oro's conduct was also not detected because, as chair of the AFAM Department, he was exempt from post-tenure review during his nearly 20 years as chair.

In response to media requests, Hartlyn met with Nyang'oro in August 2011 to discuss Summer School courses that Nyang'oro appeared to have taught. Hartlyn reported that he first became aware of anomalies in the AFAM Department at this meeting. He immediately reported the issue to Gil, and was soon tasked to conduct a review of the AFAM Department.

**Arne L. Kalleberg**
Senior Associate Dean for Social Sciences and International Programs (former);
Kenan Distinguished Professor of Sociology,
Department of Sociology

Kalleberg, a Sociology Professor, served as the Senior Associate Dean for Social Sciences and Global Studies from 2004 until 2007. Kalleberg was responsible for reappointing Nyang'oro as chair of the AFAM Department in 2007. As a part of that process, Kalleberg spoke with various AFAM faculty members and determined that no other professor was interested in becoming chair, or would have been an appropriate chair, leading him to persuade Nyang'oro to remain chair for another term. Like other administrators, Kalleberg acknowledged that Nyang'oro would not have

# CADWALADER

been reviewed other than for reappointment because department chairs were not subject to post-tenure review.

### Madeline G. Levine
Interim Dean of Chapel Hill's College of Arts and Sciences (former);
Kenan Professor of Slavic Literatures, Emerita
Department of Germanic and Slavic Languages and Literatures

Levine, a retired professor of Slavic Languages, was the interim Dean of the College of Arts and Sciences between 2006 and 2007. She signed the letter appointing Nyang'oro to his final term as AFAM Department chair at the recommendation of Kalleberg. She stated that she was unaware of any irregularities in the AFAM Department prior to them becoming publicly known, though she acknowledged that AFAM was perceived as less-rigorous than other departments at Chapel Hill.

### Tammy J. McHale
Senior Associate Dean for Finance and Planning

McHale has been the Senior Associate Dean for Finance and Planning since 1998. In that role, she is responsible for preparing data to analyze student enrollments and faculty teaching loads. This analysis is done in part, McHale reported, so that the administration can ensure that faculty members are teaching enough courses. McHale did not recall having specific knowledge about or conversations with Nyang'oro about Nyang'oro teaching so many courses. McHale did acknowledge that it was possible that she may have commended Nyang'oro for teaching so many classes in the AFAM Department, particularly since he was chair of the department.

### James C. Moeser
Chancellor Emeritus;
Professor,
Department of Music

Moeser was Chancellor at Chapel Hill from 2000 until 2008, when he retired to the faculty. As Chancellor, Moeser oversaw athletics, to include the hiring of Coach Butch Davis. Moeser, along with Dick Baddour and two members of the Board of Trustees, traveled to Florida to interview Davis, and were ultimately responsible for Davis's hire. Moeser saw Davis as someone who could coach at the highest level, win with integrity, and recruit the right student-athletes. Moeser denied any knowledge about paper classes in AFAM.

### Roberta A. Owen
Senior Associate Dean for Undergraduate Education (former);
Michael R. McVaugh Distinguished Professor of Dramatic Art,
Department of Dramatic Art

Owen served as the Senior Associate Dean for Undergraduate Education between 2004 and 2014. She also served in multiple administrative roles in the 1990s. Despite Nyang'oro's and Crowder's recollections to the contrary, and at least one corroborating email, Owen reported that she had no recollection of concerns about the number of independent studies in AFAM. She also had no recollection of telling either Nyang'oro to "rein Crowder in" as Nyang'oro recalled. However, Owen did recall addressing concerns that Crowder was signing grade change forms on

# CADWALADER

Nyang'oro's behalf, stating that the issue had been raised by Carolyn Cannon, then-Dean of Academic Advising. In response to that concern, Owen stated that she asked Nyang'oro to provide Cannon with an exemplar of his signature, and after that, Cannon's concerns abated.

Owen stated that she would occasionally be invited to attend ASPSA's staff meetings, but she did not recall ever discussing AFAM courses with Mercer, or telling anyone in ASPSA to reduce their enrollments in AFAM. Owen did, however, recall having conversations with John Blanchard about the propriety of AFAM lecture courses that were reportedly being conducted as independent studies. Blanchard approached Owen with his concern, and while Owen does not recall precise details of the conversation, she stated that she would have told Blanchard that the professors decide how to teach their classes. Owen explained that even as the Senior Associate Dean for Undergraduate Education, she was not responsible for course content; instead, she reported, the faculty are responsible for what happens inside their classrooms.

**Thomas W. Ross**
President
University of North Carolina

Ross is the President of the University of North Carolina, a position he assumed in 2011. Ross first heard of the irregularities in the AFAM Department in the fall of 2011, when then-Chancellor Thorp told Ross that he was appointing Hartlyn to conduct an inquiry into the department. Ross explained that after District Attorney Woodall indicted Nyang'oro in December 2013, Ross, Folt, and others recognized that the University needed to have a completely independent investigator review the matter fully.

**Erin Schuettpelz**
Chief of Staff to the Chancellor (former)

Schuettpelz worked in the Chancellor's Office from 2009 through early 2014. She became Thorp's chief of staff in 2011, at which point she became familiar with the Hartlyn-Andrews Report and Chapel Hill's efforts to investigate the academic irregularities. Schuettpelz helped establish the scope and parameters of Martin's investigation, but, she said, the Chancellor's Office never told Martin not to pursue a particular issue or denied him access to persons or materials. She reported that Baker Tilly and Governor Martin made periodic, but never broad, requests to review emails and the Chancellor's Office provided them with materials responsive to those requests.

**H. Holden Thorp**
Chancellor (former);
Kenan Professor,
Department of Chemistry (former)

Thorp joined the Chapel Hill faculty in 1993 and, after holding a variety of senior leadership roles at Chapel Hill, was installed as Chancellor in 2008, a position he held until 2013. Thorp came to know Nyang'oro when they both served as chairs of their respective departments, and continued to interact with Nyang'oro while Thorp was the Dean of College of Arts and Sciences. Although Thorp recalled meeting with Nyang'oro on various occasions, he did not recall discussing how the AFAM courses were helping student-athletes or thanking Nyang'oro for his efforts. Thorp did acknowledge that it was possible that he could have thanked Nyang'oro, as Nyang'oro attested, or

any other faculty member, for teaching what he considered to be challenging students, including student-athletes. Thorp was aware that student-athletes tended to major in AFAM, along with Communications and Exercise and Sport Science.

Thorp first became aware of the AFAM paper classes during the NCAA's investigation. After learning about Hartlyn's conversation with Nyang'oro in August 2011, Thorp knew that the University was going to have to disclose the matter, but he thought that the Hartlyn-Andrews Report would be a definitive account of irregularities in the AFAM Department. By the summer of 2012, however, it became clear to Thorp that there were more questions around the irregularities in the AFAM Department and a possible connection to athletics. Consequently, Thorp appointed Governor Martin to conduct an additional investigation. Thorp reported that he gave Governor Martin an open mandate to investigate the matter and access to whatever information he needed.

### Samuel R. Williamson
Provost and Vice Chancellor for Academic Affairs (former)

Williamson served as Chapel Hill's Provost and Vice Chancellor for Academic Affairs from 1984-1988; previously, he also served as Dean of the College. Williamson stated that during his time at Chapel Hill, the administration closely monitored academic issues among student-athletes. For example, toward the beginning of his tenure, Williamson recalled that a professor had been permitting student-athletes to rapidly enroll in and complete correspondence courses during summer school, and Williamson had had to intervene. Williamson said that generally, when he interacted with any university Athletics Department, he felt that "every time we closed the barn door, the Athletics Department built a new barn."

### Harold Woodard
Associate Dean
Center for Student Success and Academic Counseling;
Interim Director, Academic Support Program for Student-Athletes (former);
Lecturer,
Department of African/Afro-American Studies (former)

Woodard began working at Chapel Hill full-time in 1982 and is currently the Associate Dean and Director of the Center for Student Success and Academic Counseling ("CSSAC"). While Woodard has served the University in a variety of roles, he began his career at Chapel Hill as a lecturer in AFAM. After Woodard assumed his present role, which included supervision of ASPSA until it was relocated to the Provost's Office, he learned that student-athletes were heavily enrolled in independent studies. He stated that he was not aware of the paper classes. Woodard recalled that his superior, Owen, was aware that there were many independent studies in AFAM. He said that she had asked him why that was. Woodard reported that he told her his own understanding – that ASPSA needed to find courses that students could be successful in and that would meet the needs of student-athletes. Woodard reported that he understood that independent studies in AFAM were to be scaled back. He recalled Mercer discussing how this reduction in AFAM independent studies would cause difficulties for student-athletes.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 110 of 137

# CADWALADER

**Jan Johnson Yopp**
Dean of Summer School for Academic Affairs;
Walter Spearman Professor
School of Journalism and Mass Communication

Yopp, a professor in the Journalism School, has been the Dean of Summer School since 2008. As the Dean of Summer School, Yopp approved the late addition of Nyang'oro's AFAM 280 class in the second summer session of 2011. She stated that she was unaware that Nyang'oro was not going to be present for the majority of the course. Rather, she recalled that Nyang'oro contacted her in June 2011 to say that he had a class that had to be offered so that students could graduate. Yopp understood from Nyang'oro that the students who needed the course were AFAM majors, and given that Summer School had the flexibility to add courses, she approved it thinking that this was an opportunity to serve Chapel Hill students. She said she was shocked when she learned the following February that Nyang'oro was not present for the majority of the class. Yopp stated that the reason that Nyang'oro had received payment for the class was because she believed he taught it as a "face to face" course. It was only after the AFAM 280 class came to her attention in Fall 2011 that she went back through the Summer School records and saw the unusually large number of courses taught by Nyang'oro and "Staff" in the AFAM Department. Yopp explained how the old enrollment system and the associated paperwork could be exploited to allow such over-teaching to remain undetected, as faculty members did not receive notice of every course listed under their name.

      B.      Chapel Hill Faculty

**Todd L. Austell**
Research Assistant Professor
Department of Chemistry;
Academic Advisor
Academic Advising Program in the College of Arts and Sciences and the General College

Austell has been a Research Assistant Professor in the Chemistry Department and a faculty Academic Advisor for the Sciences since July 1998. Austell advised students who majored in the sciences and frequently advised his students to take less rigorous courses, such as those in the AFAM or Communications Department, in order to balance otherwise difficult course schedules. Austell's understanding of the AFAM Department being less rigorous than other departments arose from his conversations with students. Austell did not know about the paper classes.

**Kenneth S. Broun**
Henry Brandis Professor of Law Emeritus
School of Law

Broun is a professor emeritus at the Chapel Hill School of Law; he first came to Chapel Hill in 1968. Broun consulted with various members of the AFAM faculty regarding District Attorney Woodall's investigation and ultimately participated in the State Bureau of Investigation's interviews with Leslie Strohm, Jonathan Hartlyn, and William Andrews. Broun knows Nyang'oro personally and stated that Nyang'oro is very well regarded as an African scholar. According to Broun, Nyang'oro had no apparent interest in athletics.

# CADWALADER

### Fred M. Clark
Professor of Portuguese Emeritus
Department of Romance Languages & Literatures;
Academic Coordinator for the Carolina Covenant (former)

Clark, who passed away in September 2014, was a professor emeritus in the Department of Romance Languages & Literatures and a former faculty academic advisor; he first came to Chapel Hill in 1967. Clark knew both Nyang'oro and Crowder and considered them to both be very student-oriented and willing to help students. Clark was aware of the AFAM paper classes at the time that they were offered; his understanding was that they were courses that required a long paper and did not require attendance. Clark explained that that professors do not question other professors' courses, and so long as a department was offering a course, it was a legitimate course.

As an advisor, Clark would frequently advise students to consult with the AFAM Department to see what courses were available, as he knew that the AFAM courses were not overly taxing and were popular with students. Clark himself taught a course that was very popular with student-athletes, Brazilian Fiction in Translation. Clark described himself as not being a tough grader and stated that he told his students that if they completed their readings and took their exams, the course would serve them well.

### Michael J. Gerhardt
Samuel Ashe Distinguished Professor in Constitutional Law
School of Law

Gerhardt has been a Professor in the School of Law since 2005 and is a member of the FEC at Chapel Hill. Jan Boxill appointed Gerhardt to an FEC subcommittee and charged the subcommittee to review all the reports relevant to the academic irregularities, identify any remaining questions regarding the irregularities and take steps to address those remaining questions. Gerhardt stated that the subcommittee had no staff or resources to conduct any investigative work, however they interviewed approximately 31 people prior to writing their report. According to Gerhardt, the subcommittee did not know that the FEC was going to review the report for its endorsement, and was confused and surprised when Boxill began making comments on the draft. The subcommittee accepted most of Boxill's changes because they realized that they were not finding facts and they did not want to inadvertently state that there was an NCAA rules violation. Gerhardt did not believe that the final draft of the report was substantially different than the original draft of the report.

### Jay M. Smith
Professor
Department of History

Smith is a History professor who previously served as an Associate Dean for Undergraduate Curricula from 2005-2009. As Associate Dean, one of Smith's principal responsibilities was to review new course proposals and to approve courses with draft syllabi that included meeting schedules, reading assignments, and topics to be covered. Smith denied that that professors at Chapel Hill had the autonomy to teach a course in any manner they desired. Smith stated that when a course is approved, it is understood that it is approved in a specific format, and the professor is obligated to seek approval for any change to that format.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 112 of 137

# CADWALADER

**Deborah Stroman**
Lecturer
Department of Exercise and Sport Science;
Member of the Faculty Athletics Committee

Stroman is a lecturer in the Department of Exercise and Sport Science, where she has worked since 2007, and a current member of the FAC. Stroman, a former student-athlete, stated that she took it upon herself to work with African American students, particularly athletes, as she feels that it is important for the students to have a comfortable environment. Stroman explained that she enjoys doing independent studies with students, but the students she works with realize that they have to meet with her and do work.

**Jonathan Weiler**
Adjunct Assistant Professor of Global Studies
Curriculum in Global Studies;
Faculty Adviser
Academic Advising Program in the College of Arts and Sciences and the General College

Weiler worked as an Advisor in the Steele Building from 2002 until 2005, and since 2005 has served as a faculty member in Global Studies. Weiler rarely worked with athletes when he was in the Steele Building. As an advisor, Weiler refused to answer students' questions about which courses at the University were easy courses. Instead, he would advise the students to balance a writing course with a course that does not require lengthy papers. Weiler stated that while everyone, advisors and students, knew of courses that were easier, he never advised his students to take those classes specifically.

C.     AFAM Faculty and Staff Members

**Deborah Crowder**
Department Administrator
Department of African and Afro-American Studies (former)

Former Student Services Manager Debby Crowder served as *de facto* manager of the AFAM Department from 1979 until her retirement in 2009. After Julius Nyang'oro became Chair in 1992, Crowder began offering independent study courses that required only a single paper to be submitted by the student, with no course attendance or professor contact. Beginning in the late 1990s, Crowder also offered courses that were listed as lecture classes, but administered in the same manner. Crowder ran every aspect of these courses, from creating the course and enrolling the students to assigning paper topics and doing the grading; she often listed Nyang'oro as the instructor of record and had broad authority to sign grade sheets on his behalf. Because Crowder graded these courses very generously, she was able to help students and student-athletes boost their GPAs while also satisfying curriculum requirements.

Crowder offered these courses for a variety of reasons, including a desire to help struggling students out of sympathy. Crowder was also a passionate sports fan, and she developed ties to ASPSA through her extremely close friendship with former counselor and tutor McSwain. As a result, Crowder would frequently enroll student-athletes in paper classes and independent studies at the request of ASPSA counselors. Crowder began to scale back the paper classes in 2005 or 2006,

108

after receiving word from Nyang'oro that Dean Owen was monitoring the AFAM Department's independent study enrollments. Crowder's retirement in September 2009 put an end to the majority of the AFAM Department's paper class offerings, with only a small handful of such courses offered directly by Nyang'oro over the next two years

**S. Travis Gore IV**
Administrative Support Associate
Department of African and Afro-American Studies

Gore has served as an administrative support associate in AFAM since 2001. Gore graduated from Chapel Hill in 2000 and started working in the Athletics Department after McSwain, a family friend, referred him to a job as class attendance monitor. A year later, the AFAM Department hired Gore to work under Crowder. While Crowder worked in the Department, Gore assisted her by performing administrative tasks such as answering the phone, running office errands, and occasionally doing travel reimbursements. After Crowder left, Gore took on many more responsibilities, including interacting with and assisting Nyang'oro, and eventually assisting with scheduling. Gore stated that Crowder never consulted with him before she left about how to handle independent studies or other classes; rather, Nyang'oro would hand Gore a schedule and Gore would enter it into the computer systems.

Gore acknowledged that his understanding of a paper class was a course that did not meet and required the student to write a paper. Gore recalled that for the paper classes after Crowder left, Nyang'oro would give him a list of topics that the class could write on, and Gore would provide the topics to the students. Gore stated that he never graded papers and he did not sign grade change forms or other paperwork unless a professor authorized him to do so on his or her behalf.

**Perry A. Hall**
Associate Professor
Department of African and Afro-American Studies

Hall joined the AFAM faculty in 1992. He stated that he was unaware of the paper classes and other irregularities until the media began reporting on them. Hall said he was shocked to learn that Nyang'oro had been involved in the matter. While he said that Nyang'oro was not notably a sports fan, Hall stated that one could tell that Crowder was an ardent Tar Heels fan by looking at her office. Hall described Crowder as one who enjoyed being a "savior" and said that she always had struggling students coming and visiting her in her office. Hall explained that he assumed students visited Crowder because she was adept at directing students towards resources on campus.

**Reginald F. Hildebrand**
Associate Professor
Department of African and Afro-American Studies

Hildebrand is a professor in the AFAM Department. Hildebrand worked in the AFAM from 1981-1984, left Chapel Hill to teach at Williams College, and returned to Chapel Hill in 1994. He had no knowledge of any of the paper classes or other academic irregularities within the department. Hildebrand recalled that Nyang'oro delegated many of his responsibilities and was inordinately dependent upon Crowder, in part because of her institutional knowledge. Hildebrand described Crowder as someone who identified with students who came from diverse or

underprivileged backgrounds. He said that Crowder believed these students were treated unfairly by the system. According to Hildebrand, it was characteristic of Crowder to help both athletes and non-athletes with both their personal and academic issues.

## Kenneth R. Janken
Professor
Department of African and Afro-American Studies

Janken has been on the faculty of the AFAM Department since 1991. Janken recalled that when Nyang'oro was chair, AFAM Department decisions were made without faculty input or collective deliberation, and he assumed that Nyang'oro made all the decisions for the Department. Janken was unaware of the paper classes and did not know that Crowder had a role in grading papers.

## Timothy J. McMillan
Senior Lecturer and (former) Associate Chair
Department of African and Afro-American Studies

McMillan is a senior lecturer in the AFAM Department and, with the exception of a seven-year period when he worked in California, has worked in the Department since the 1984.[214] McMillan has known Crowder since he was a graduate student, and described a good relationship with Crowder. Nyang'oro and McMillan, on the other hand, never had close relationship, and McMillan credits Crowder with getting him hired back into the Department after he left California. McMillan acknowledged that he remained one of Crowder's favorite people in the Department throughout his career. McMillan stated that Crowder was very close with students and had a set of students that were her "special projects" – students that had physical or mental health issues, students with challenging family backgrounds, and other students that struggled on campus.

## S. Alphonse Mutima
Lecturer
Department of African and Afro-American Studies

Mutima has been a lecturer in the AFAM Department, where he teaches Swahili, since 1996.[215] Mutima struggled to work with student-athletes, whom he said frequently misbehaved in class and showed little interest in Swahili. He complained to Crowder about the number of student-athletes in his classes and their poor behavior. Crowder did little to rectify the situation, he said. According to Mutima, student-athletes considered Crowder to be in charge of them and paid little attention to him. Crowder, he claimed, would get upset with him when he gave student-athletes the low grades that they deserved.

---

[214] McMillan's knowledge of the paper classes is discussed at Section V.B.3.a, *supra*.

[215] Mutima's knowledge of the paper classes is discussed at Section V.B.3.b, *supra*.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 115 of 137

# CADWALADER

**Julius Nyang'oro**
Chair and Professor
Department of African and Afro-American Studies (former)

Nyang'oro was a Professor in the AFAM Department from 1989 to 2011 and also served as Chair of the department beginning in 1992. Unlike his predecessors, Nyang'oro took a hands-off approach to administering the Department and relied on Student Services Manager Debby Crowder to handle many tasks, allowing her to obtain an outsized role. Nyang'oro's lack of close oversight of the Department was one of the main factors that allowed Crowder to offer irregular independent studies and paper classes throughout his tenure as Chair. Although Nyang'oro did not initially offer these classes himself, he was aware of them, and he acquiesced to them by failing to take action to stop them. Nyang'oro allowed Crowder to continue to offer these courses partly because his busy schedule frequently sent him out of the country, but also due to his own sympathy for student-athletes' struggles.

In 2005 or 2006, Nyang'oro recalls going to lunch with Dean Owen, who complained to him about the extremely high number of independent studies he was handling and told him to rein Crowder in; Nyang'oro complied, and the number of independent study courses were reduced. After Crowder's retirement in September 2009, ASPSA Academic Counselor Jaimie Lee began approaching Nyang'oro and lobbying him to offer certain paper classes. In response to these requests, between Fall 2009 and Summer 2011, Nyang'oro offered three bifurcated classes and two paper classes, including the Summer 2011 AFAM 280 course that resulted in his December 2013 indictment.

**Georges Nzongola-Ntalaja**
Professor
Department of African and Afro-American Studies

Nzongola-Ntalaja has been a professor in the AFAM Department since 2007. Nzongola stated that he knows Nyang'oro well and that Nyang'oro recruited Nzongola to teach at Chapel Hill. When Nzongola first arrived in the AFAM Department, however, he was surprised to learn that the department faculty only met once a year. Nzongola recalled that Nyang'oro traveled frequently and was heavily involved in consultancies. Crowder, from Nzongola's perspective, was the one who ran the AFAM Department and made sure that things that were supposed to be done were done, including the scheduling of classes.

**Robert Porter**
Lecturer
Department of African and Afro-American Studies

Robert Porter has been a lecturer in the AFAM Department since 1989. Porter stated that his sense of Nyang'oro was that Nyang'oro did not "run a tight ship." Porter viewed Crowder as having some level of power and described her as one who cared greatly about all students, not just student-athletes.

**Charlene Regester**
Associate Professor
Department of African and Afro-American Studies

Regester is a professor in the AFAM Department; she taught courses as a Teaching Assistant in the 1980s and formally joined the AFAM faculty around 1990. Regester stated that the former AFAM chairs, Colin Palmer and Trudier Harris, ran the Department in a tight manner; however, she described Nyang'oro's leadership as absentee. Regester stated that Crowder was essentially in charge of the Department.

**Walter C. Rucker**
Associate Professor
Department of African and Afro-American Studies

Rucker was a professor in the AFAM Department between 2011 and 2014. Rucker stated that Nyang'oro recruited him to come to Chapel Hill in part because of his administrative experience and his capacity to lead. Rucker described Nyang'oro as an affable person and a smooth talker who put everyone at ease, but noted that Nyang'oro was away from campus very often.

**Eunice Sahle**
Associate Professor and Chair
Department of African and Afro-American Studies

Sahle is a professor and Chair of the AFAM Department; she joined the Department in 2001.[216] Like other faculty members, Sahle stated that there was very little faculty governance and the Department as a whole was "fractured" under Nyang'oro's leadership. Sahle stated that Crowder became the *de facto* chair of the Department during Nyang'oro's frequent absences from campus and it was Crowder who did the scheduling, informed faculty of when grades were due, and generally made sure that the Department ran appropriately

**Mamarame Seck**
Assistant Professor
Department of African and Afro-American Studies

Seck has been a member of the AFAM faculty since 2008. Like other faculty members, Seck recalled that Nyang'oro held faculty meetings rarely – usually only once in the beginning of the school year, and then when it was necessary for a hiring issue.

---

[216] Sahle's knowledge of the paper classes is described at Section V.B.3.c, *supra*.

# CADWALADER

**Bereket Selassie**
William E. Leuchtenburg Professor of African Studies,
Department of African and Afro-American Studies
Professor
School of Law

Selassie has been a professor in the AFAM Department since 1994. Selassie, who was very close with Nyang'oro, described Nyang'oro as a brilliant scholar, but stated that Nyang'oro "strayed from the norm" with his frequent travels to Africa. Selassie described Crowder as someone who was compassionate with students who were facing problems, and acknowledged that she, too, may have "strayed from the norm" in order to help students.

D.      Current and Former Members of the Faculty Athletics Committee

**Lissa L. Broome**
Wells Fargo Professor of Banking Law
Director of the Center for Banking and Finance
School of Law
Faculty Athletics Representative

Broome has been professor in the School of Law since 1984 and has served as Chapel Hill's Faculty Athletics Representative ("FAR") since 2010. As the FAR, Broom sits *ex officio* on the Faculty Athletics Committee and also previously served on the FAC from 1991-1996, 2000-2008, and 2009-2010. Broome did not independently recall the FAC's 2002 review of independent studies. Although Broome had a clearer recollection of discussing independent studies during the FAC's 2006 review, she did not recall any discussion of academic freedom at either the November 2006 or January 2007 FAC meetings, despite having heard Blanchard explain his firm recollection of that discussion. Broome did, however, recall some discussions which in retrospect may have pertained to the paper classes. On one occasion, Broome stated that she talked to Coach Sylvia Hatchell and Hatchell mentioned to Broome after these matters came to light that Crowder was "such a good professor." Later, in January 2013, while in a meeting with Baddour, Mercer, and Blanchard, Broome was told about a past meeting in which Butch Davis told Mercer and Blanchard that he wanted "more courses without attendance." Broome said that she never told anyone about this account of Butch Davis. Davis denied ever making such a statement.

**John P. "Jack" Evans**
Professor Emeritus of Operations
Kenan-Flagler Business School;
Faculty Athletics Representative (former)

Evans is the former FAR for the University, having served in that role from 1995 to 2010. He has been a member of the Kenan-Flagler Business School faculty since 1970. Evans did not recall anyone discussing the AFAM Department's independent studies at an FAC meeting, nor did he recall, as Blanchard alleged, stating that the manner in which a faculty member conducts a course, and the level of rigor in a course, is a matter of academic freedom. Evans did recall discussions regarding clustering of student-athletes in certain majors, including in AFAM.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 118 of 137

# CADWALADER

**Kathleen M. Harris**
James Haar Professor
Department of Sociology
Member of the Faculty Athletics Committee (former)

Harris is a professor of Sociology and served on the FAC from 2003 to 2011. Harris recalled discussing independent studies in 2006 following the Auburn story, and coming away from the discussion feeling good about the status of independent studies at Chapel Hill. Harris recalled some general discussion about what constitutes an independent study – that it can be structured however the professor wants, and that overrepresentation of independent studies with one professor, or with many student-athlete enrollments, would not be acceptable – but was certain that the FAC did not receive a more detailed description of the paper classes.

**H. Garland Hershey, Jr.**
Professor
School of Dentistry;
Member of the Faculty Athletics Committee (former)

Hershey is a professor in the School of Dentistry and was a member of the FAC from 2001 to 2006. Hershey stated that he did not remember the issue of classes without attendance requirements being raised before the FAC. Hershey stated that he recalled occasions when John Blanchard and Robert Mercer would attend FAC meetings but he did not recall the specifics of their conversations. Hershey recalled that the FAC did review the number of students enrolled in certain departments and did an analysis of major clustering, but he did not recall any discussions regarding anomalies in the AFAM Department specifically.

**Lloyd S. Kramer**
Professor
Department of History;
Member of the Faculty Athletics Committee (former)

Kramer is a Professor of History and served on the FAC from 2003 to 2007. He believes that the FAC may have asked in a general way whether independent courses were legitimate, but there was no data presented in 2006 or 2007. Kramer did not recall discussion of academic freedom and was certain that the FAC did not hear specifics about the paper classes. Kramer led the effort to challenge the statement in the Martin Report that was ultimately clarified.

**George S. Lensing, Jr.**
Mann Family Distinguished Professor
Department of English & Comparative Literature;
Member of the Faculty Athletics Committee (former)

Lensing, an English Professor, served on the FAC from 2003 to 2008. Lensing recalled that in 2006, the FAC reviewed *The New York Times* article on Auburn University's use of independent studies and discussed the issue at the November 2006 FAC meeting. Lensing stated that the committee discussed how there was a large number of student-athletes enrolled in independent studies, but Lensing did not recall any other context in which this was discussed. Lensing could not

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 119 of 137

recall whether there was any discussion of the AFAM Department nor could he recall whether there was a discussion of abnormal uses of independent studies.

**Mary Lynn**
Professor and Assistant Director,
School of Nursing
Member of the Faculty Athletics Committee (former)

Lynn, a professor and Chair of the Faculty in the School of Nursing, served on the FAC from 2004 to 2007. She recalled no discussion of independent studies, and she said that the types of independent studies described in the newspapers would have raised red flags to her.

**Joy J. Renner**
Clinical Associate Professor
Department of Allied Health Sciences;
Director, Division of Radiologic Science;
Chair of the Faculty Athletics Committee

Renner is the current chair of the FAC. Renner stated that it was important for the University to review student transcripts and determine how many irregular courses were counted towards degrees.

**J. Steven Reznick**
Professor
Department of Psychology;
Member of the Faculty Athletics Committee (former)

Reznick is a professor of Psychology and served on the FAC from 2006-2012, including service as chair of the committee from 2008-2012. Reznick recalled the discussion of independent studies in 2006 and 2007, but he did not recall any discussion of how independent studies should be conducted or the issue of academic freedom for professors leading independent studies.

**Barbara M. Wildemuth**
Professor and Associate Dean
School of Information and Library Science;
Member of the Faculty Athletics Committee (former)

Wildemuth is a professor and Associate Dean of the School of Information and Library Science and served on the FAC from 2005 to 2008. Wildemuth recalled the FAC discussed the independent study scandal at Auburn University, however she did not recall anyone questioning whether a similar scandal could happen at Chapel Hill, nor any discussions of the student-athletes' use of independent studies.

# CADWALADER

**Rachel A. Willis**
Bowman and Gordon Gray Professorship for Distinguished Undergraduate Teaching Department of American Studies;
Member of the Faculty Athletics Committee (former)

Willis is a professor of American Studies and served on the FAC from 2006 to 2009. Willis recalled discussions of major distribution among student-athletes and some discussions of independent studies, but stated that the nature and extent of the AFAM paper classes was not presented to the FAC during the 2006 meeting.

      E.      Chapel Hill Staff and Advisors

**Alice C. Dawson**
Senior Assistant Dean
Academic Advising Program in the College of Arts and Sciences and the General College

Dawson is a Senior Assistant Dean for Academic Advising and has worked at Chapel Hill since 1984. Dawson stated that she first met Crowder around 2001. Dawson learned from her colleagues that Crowder was a very kind person who was known for helping students. According to Dawson, there was a general understanding in Academic Advising that the AFAM Department was willing to add students to an independent study late in the semester. Thus, if an advisor had a student who was in a crisis situation, Crowder might be able to help. Dawson stated that she probably heard about Crowder and AFAM Department independent studies from Betsy Taylor, who was part of a "good old girls network" with Crowder. Dawson estimated that she would send one or two students to Crowder for help each year. Dawson assumed that the AFAM Department independent studies had faculty oversight.

**James R. "Jim" Kessler**
Director
Department of Accessibility Resources and Service (retired)

Kessler served as the Director of Accessibility Resources for sixteen years until he retired in 2013. Kessler stated that there was a lot of concern and discussion among the staff in his department regarding under-prepared student-athletes who were matriculating to Chapel Hill. Kessler stated that while he was assisting with registration as part of his duties, he witnessed athletic counselors directing student-athletes to certain courses. Kessler explained that he asked Beth Bridger about why the athletes were being enrolled in these courses in such large numbers, and Bridger stated that ASPSA had to make sure the student-athletes were successful.

**Chloe J. Russell**
Assistant Dean
Academic Advising Program in the College of Arts and Sciences and the General College Steele Building

Russell is an advisor in the Steele Building and a Chapel Hill alumna. Russell stated that she began working in advising in 2008 and learned early on to send struggling students to the AFAM Department. However, Dean Cannon later told her that she did not trust was happening in the AFAM Department and preferred that the advisors not refer students to the Department. Russell

# CADWALADER

did not know why Cannon was suspicious of the Department and had little interaction with AFAM after that.

## Elizabeth B. "Betsy" Taylor
Student Services Manager
Academic Advising Program in the College of Arts and Sciences and the General College

Taylor worked at Chapel Hill in various positions for over 20 years and retired in 2008. Taylor stated that she started working as the graduation coordinator in the Steele Building in 1988. In this role, Taylor was responsible for approving students' applications to graduate. Taylor came to know all of the directors of undergraduate studies and secretaries in the College departments, and she likely met Crowder in the 1990s. At some point Taylor learned that Crowder was someone who was able to help students, including through paper classes. Taylor thought Crowder told her about the paper classes. Crowder would set up classes for students who needed the courses to graduate. Taylor recalled that Crowder told her that the students did not have to attend the class and would write a paper instead. Taylor stated that her assumption was that the students were being supervised by, and working with, a faculty member. Taylor said that most of the advisors knew about these classes, including Carolyn Cannon. Taylor stated that she had specific conversations about the classes with Cannon, and it was Taylor's understanding that Cannon spoke to Dean Owen about the classes as well.

F.  Academic Support Program for Student-Athletes Staff

## Bradley Bethel
Learning Specialist
Academic Support Program for Student-Athletes

Bethel has worked as a learning specialist in ASPSA since the fall of 2011. Bethel works exclusively with the football team, and works one-on-one with under-prepared football athletes to help them develop reading, writing, and learning skills. Bethel stated that in his experience, Chapel Hill admitted some student-athletes who were so under-prepared that they were unable to succeed at the University.

## Brent Blanton
Associate Director
Academic Support Program for Student-Athletes

Blanton joined ASPSA in 2005 and has been an Associate Director of ASPSA since 2006. Currently, he serves as an academic counselor for men's golf and wrestling, runs the ASPSA database, and supervises four other ASPSA staff members; previously, he served as an academic counselor for various Olympic sports, including women's soccer. Blanton knew about the paper classes, which he said that he and others in ASPSA considered the same as independent studies. Blanton knew Crowder and would call or email to ask her for help with his students, but he did not know that Crowder was grading papers or that there was no faculty oversight.

Blanton directed some of his players toward paper classes. Besides being easy grades, these classes held an added advantage for some top women's soccer players who traveled extensively to play on national soccer teams while enrolled at Chapel Hill. Blanton also helped Coach Anson

Dorrance attract top women's soccer recruits to Chapel Hill by suggesting a hypothetical slate of courses that a recruit could take – often including include paper courses – so that she could both travel with the national team and stay enrolled at Chapel Hill.[217]

### Beth Bridger
Associate Director
Academic Support Program for Student-Athletes (former)

Bridger worked in ASPSA for seven years beginning in 2006. She was hired as a learning specialist and initially reported to Cynthia Reynolds. Bridger was ultimately promoted to Associate Director and oversaw ASPSA's football staff after Reynolds' departure. According to Bridger, while ASPSA officially reported to the College of Arts and Sciences, there was an undeniable reporting line to the football coaches and stated that Coach Davis would hold her accountable if there was an issue with a football player's eligibility. Bridger stated that when she was in charge of the football academic program, she formalized regular meetings between the ASPSA football staff and the coaches. Bridger stated that the coaches were aware that their players were taking independent studies, and the Chapel Hill administration was definitely watching the enrollments of independent studies. Bridger recalled that Robert Mercer held an ASPSA staff meeting in which he told the attendees that Owen was monitoring the enrollment of AFAM courses and they needed to limit their enrollment of student-athletes in those courses.

Bridger said that she learned about the paper courses during her first semester at Chapel Hill. She recalled that she asked Reynolds about the courses, and Reynolds explained that the classes did not meet. Instead, Reynolds explained, the professor would run the class by giving students an assignment to complete over the course of the semester. Bridger said that the ASPSA staff did not know in advance what paper classes were going to be offered each term, so they would call the Department and then ask what courses were going to be available. Bridger explained that the ASPSA staff would facilitate the completion of the papers during team study halls. Bridger stated that she heard comments about the paper class assignments being turned into Crowder, but she did not concern herself with whether Crowder was grading the papers. Bridger acknowledged that without the high grades received in these courses, it is possible that players might not have been eligible to compete under NCAA rules.

### Catherine Frank
Tutor
Academic Support Program for Student-Athletes (former)

Frank was an ASPSA tutor from the late 1980s until 2010. She always worked with men's basketball players and saw her role as helping students on specific assignments, in addition to helping them become better writers. Frank said that she never wrote sections of a student's paper, and she never heard of a student driving to a tutor's house to pick up papers. Frank said that she was not usually focused on students' grades, and although she knew who Crowder was, she did not know that Crowder was grading papers.

---

[217] For example, on one occasion, Blanton specifically suggested that Dorrance mention Crowder, and the past use of "AFAM/AFRI independent study courses" by women's soccer players, while communicating with a potential recruit. Exhibit 55.

Case 1:14-cv-00954-LCB-JLW    Document 166    Filed 01/18/19    Page 123 of 137

# CADWALADER

**Janet Huffstetler**
Tutor
Academic Support Program for Student-Athletes (former)

Huffstetler was an ASPSA tutor from approximately 1996 until the late 2000s. Huffstetler worked mainly with men's basketball players on a variety of subjects. As a tutor, Huffstetler knew that some of her students were taking independent study courses in the AFAM Department, but she thought the students had been required to meet with the professor five times over the course of the semester. Huffstetler knew Crowder socially through her friendship with McSwain, but did not know that Crowder was grading papers. On the subject of academic assistance, Huffstetler said that she never wrote a paper for a student; she typed out "suggestions for what a paper might cover," but never whole sections of a student's paper. Huffstetler vehemently denied Rashad McCants' allegations that tutors would write papers for students.

**Amy Kleissler**
Learning Specialist
Academic Support Program for Student-Athletes (former)

Between 2005 and 2012, Kleissler worked for ASPSA in various capacities, including as a tutor, mentor, and learning specialist. Kleissler recalls learning about the paper classes from Beth Bridger, who explained how the classes worked and how Kleissler would help "shepherd" students through the paper-writing process. Kleissler did not question the legitimacy of the courses because she trusted her ASPSA colleagues, and she felt that the papers could provide a good learning experience for struggling students. Kleissler did not know who Crowder was, and as a tutor, Kleissler had assumed that the professor was grading the papers.

Kleissler described her role in working with students as teaching them skills, rather than ensuring the quality of their work. Kleissler said that initially, tutors were permitted to provide written comments on a student's paper, but these rules changed over time. Kleissler recalls extensive discussion regarding the line between appropriate and inappropriate assistance. She drew a distinction between altering content (which was never allowed) and providing comments or circling mistakes. Kleissler said that when she did provide written notes on a student's work, she would ask for approval from Beth Bridger to ensure that her comments were appropriate.

**Jaimie Lee**
Academic Counselor
Academic Support Program for Student-Athletes

Lee started working as a tutor and mentor in 2006 and became a full-time ASPSA staff member in 2007; initially, she worked with students in all different sports, but she soon began working exclusively with football players. Lee first encountered paper classes as a tutor and mentor, and she became fully aware of them when she became a counselor. Lee stated her view that the paper classes provided an opportunity to work on the building blocks of a research paper, such as how to write a thesis statement, how to create an abstract, how to conduct research, and ultimately, how to do critical analysis. Nonetheless, Lee, along with Beth Bridger, delivered a presentation to the football coaches in November 2009 that described the football team's past reliance on AFAM paper classes for eligibility purposes.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 124 of 137

# CADWALADER

After Crowder retired, Lee built a relationship with Nyang'oro by emailing him and visiting him on a regular basis. She asked him to offer certain paper classes, with some success; for example, the Summer 2011 AFAM 280 paper class was offered in response to a request from Lee. Lee stated that she does not recall the specifics and denied having influenced Nyang'oro's decision to offer the course, although she acknowledged that she had asked Nyang'oro whether a class would be offered that student-athletes might be interested in.

## Robert Mercer
Director
Academic Support Program for Student-Athletes (former)

Mercer was the Director of ASPSA from 2002 to 2012; in that role, he was in charge of overall administration of the program rather than advising individual students. Formally, Mercer reported to the Associate Dean of CSSAC in the College of Arts and Sciences, but he said that in reality, John Blanchard served as Mercer's supervisor on a day-to-day basis. Mercer said he was in closer communication with the Athletics Department than with Harold Woodard or others in the College of Arts and Sciences.

Mercer knew about the paper classes, but he believed the courses to be legitimate independent studies that were also open to non-athletes. He recalled that students did the required work in each class. He emphasized that the paper classes were part of a path to eligibility that also included courses in Drama, Communications, and Exercise and Sport Science. Mercer recalled that there was inherent pressure to ensure that students remained eligible to play; therefore, the grades that students received in AFAM paper classes became part of a strategy to keep them academically eligible. Similarly, with respect to major selection, Mercer explained that the ASPSA counselors struggled to advise certain student-athletes who wished to pursue more challenging majors when those student-athletes were under-prepared for the rigors of the curriculum and, additionally, had balance time commitments to their sport.

Mercer recalled having concerns that the AFAM classes were similar to the classes at Auburn, and bringing those concerns to John Blanchard, who raised them during the 2006 FAC meeting. Mercer recalls that Blanchard described the nature of the paper classes and was firmly advised by the FAC that faculty decide how courses are taught. Regarding the FAC's direction that Mercer track independent studies going forward, Mercer recalled discussion of the subject, but said he never followed up because he was never asked about it again.

Mercer also remembers Owen occasionally attending ASPSA staff meetings and remembers hearing from Owen about a cutback of AFAM classes.

## Kym Orr
Academic Counselor
Academic Support Program for Student-Athletes

Orr is an academic counselor for Olympic Sports, including cross country, track, rowing, and fencing. He joined ASPSA in late 2002. Orr stated that he was aware that there were independent studies that students took in the AFAM Department, however he thought the AFAM independent studies were conducted in the same manner as any other department's independent studies. Orr stated that he also knew that Swahili was popular among student-athletes.

# CADWALADER

**Tia Overstreet**
Academic Counselor
Academic Support Program for Student-Athletes

Overstreet began working as an academic counselor in ASPSA in 2010, however she worked in a part time capacity as a study table monitor and tutor prior to becoming a counselor. Overstreet explained that her job was to do research and find classes that were available for her student-athletes. Overstreet stated that she and the ASPSA staff met with the student-athletes who were taking independent studies two to three times a week to make sure they were progressing on their assignment.

**J. Whitney Read**
Tutor
Academic Support Program for Student-Athletes (former)

Read is a Chapel Hill alumna, a member of the Class of 2009 who graduated with a B.A. in African Studies. After graduating, Read worked as a tutor from January through June 2010, and was primarily responsible for tutoring football players in Swahili and African Studies paper courses. Read, a former Swahili student, explained that Professor Mutima would frequently discuss his frustrations with teaching student-athletes. She said he viewed the student-athletes as uninterested in learning. Read recalled that student-athletes would receive very low Swahili test grades throughout the semester, yet they would still receive passing final grades for the course. Read recalled that Mutima recommended that certain student-athletes take Swahili 403 as a paper course.

When tutoring students in paper courses, Read would provide student-athletes with paper topics that she developed. Read said she aggressively guided student-athletes to the content they should include in their papers, and would heavily edit their papers. While Read did not encounter student-athletes intentionally plagiarizing articles, she found that many student-athletes struggled with paraphrasing ideas, and she frequently assisted them in paraphrasing and citing work appropriately. Read acknowledged that there were times in which she provided more tutoring assistance than was appropriate.

**Jennifer Wiley Thompson**
Tutor
Academic Support Program for Student-Athletes (former)

Wiley worked as a tutor for ASPSA when she was an undergraduate at Chapel Hill from 2007 to 2009.[218] Wiley and the other ASPSA tutors did not receive formal training for their role as tutors; instead they had a meeting with a compliance officer who gave a presentation on what constituted providing appropriate academic assistance to provide to student-athletes. According to Wiley, Bridger spoke with the tutors after the compliance meeting, and told the tutors that they could have some flexibility with the black and white rules that compliance presented. As a tutor, one of the issues Wiley was supposed to monitor for was plagiarism; however, Wiley explained that her vigilance on plagiarism in student-athletes' writing was often frustrated because she had no control over what the student-athletes put in their papers after they left the tutoring sessions. Wiley

---

[218] *See* Section V.A.5.a, *supra*, that addresses Wiley's conduct.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 126 of 137

was frequently frustrated in her role as a tutor, and she believed that this was in part because most of the student-athletes she worked with had little motivation to do well academically – their goal, and ASPSA's goal for them, she said – was to stay eligible. In keeping with this focus on eligibility, Wiley explained that student-athletes would generally be put in a paper class if they was ineligible or close to becoming ineligible, as the paper classes were "huge GPA boosters."

Many of the student-athletes that Wiley worked with were admitted to Chapel Hill with severe academic disadvantages and often had very few writing mechanics. Wiley recalled that she would often tell the student-athletes that she saw an error in a sentence, but they would be unable to spot the error on their own. Eventually, Wiley explained, it became easier to suggest how to phrase something and the student-athletes would write the statement down verbatim. It was at this point, Wiley stated, that she realized she had crossed the line into inappropriate assistance. Wiley stopped working for ASPSA when she graduated in 2009, however the athletes continued to contact her and ask for her help. Wiley stated that she cared deeply for the student-athletes and continued to help them. By this point, Wiley stated that she was exhausted dealing with the student-athletes' lack of skills, and it became faster for her to type and write portions of papers for them. Wiley acknowledged that she eventually would write significant portions of student-athletes' papers.

### Jennifer Townsend
Associate Director
Academic Support Program for Student-Athletes

Townsend has been an Associate Director of ASPSA since 2009, when she replaced Walden. She currently serves as the academic counselor for men's basketball and women's swimming, and supervises four other staff members. Townsend has never met Crowder, who retired prior to her arrival, and only briefly met Nyang'oro. Townsend learned about paper classes from Mercer when she first came to Chapel Hill, but she did not have much direct involvement in part because Crowder was no longer in the AFAM Department. Townsend also explained that men's basketball assistant coach Joe Holladay wanted the basketball athletes to go to class and not take independent study courses.

### Wayne Walden
Associate Director
Academic Support Program for Student-Athletes (former)

Walden was the Associate Director of ASPSA and academic counselor for multiple sports, including men's basketball from 2003 to 2009. Initially, Walden worked in collaboration with academic counselor Burgess McSwain, and he found that a large number of basketball student-athletes were majoring in AFAM and taking paper classes. Walden was aware of the paper classes and thought they had been approved by the University because they were open to all students. Walden said that he tried to limit the number of enrollments in the paper classes for the students Williams recruited. He explained that he wanted to avoid developing a culture that depended on these classes, preferring the structure of a regular lecture course.

Walden did not know Nyang'oro, but he would work with Crowder to enroll his students in AFAM and AFRI classes. He knew that students enrolled in paper classes had no contact with faculty, and he said that he thought Crowder was probably doing some of the grading, though he

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 127 of 137

never knew for sure. Walden did not feel that there was anything wrong with these courses, however, because they were open to and taken by regular students in addition to student-athletes.

**Spencer Welborn**
Assistant Dean
Academic Advising Program in the College of Arts and Sciences;
Academic Counselor
Academic Support Program for Student-Athletes (former)

Welborn served as an academic counselor for Olympic sports from 2008 until the spring of 2014. Welborn stated that he learned of the paper classes from talking with students with whom he worked. Welborn explained that his understanding is that the paper courses were run by the Department chair who would meet with the students a "few" times and required a research paper that the students could complete at their own pace. Welborn stated that he did not recall anyone questioning the propriety of the courses. Welborn also knew Crowder and stated that she was known for always helping students.

**Mary Willingham**
Academic Advisor
The Center for Student Success and Academic Counseling (former);
Learning Specialist
Academic Support Program for Student-Athletes (former)

Willingham is a former academic advisor and learning specialist. Willingham joined ASPSA as a learning specialist in the Fall 2003 and worked with students that had learning disabilities or needed reading and writing remediation. Willingham stated that around 2006, she began working with men's basketball, and stated that she found "a whole new world with respect to keeping student-athletes eligible." Willingham explained that she would do grade checks on students and see the paper classes on their transcripts, and realized that these classes were keeping student-athletes eligible. Willingham stated that coaches would call the academic counselors and state that they needed a certain student-athlete eligible, and then the counselors would do whatever was necessary to keep that student-athlete eligible, including getting the student-athlete into the "right classes." Willingham also recalled one meeting in which Dean Owen came to ASPSA and said that the University was going to "shut down the independent studies."

G. Chapel Hill Athletics Department

**Richard A. Baddour**
Director of Athletics (former)

Baddour was Athletics Director from 1997 to 2011 and Assistant Athletics Director from 1985 to 1997. Baddour became aware of the irregular classes when Blanchard and Mercer approached him about AFAM professors assigning independent work before the issue was taken to the FAC in 2006. Baddour did not remember the specifics of the FAC discussion in 2006. Although Baddour knew that a large number of student-athletes were enrolled in these classes, he understood them to be open to non-athletes and to involve regular dialogue between the professor and the student. Baddour remembered hearing from Blanchard and Mercer about Owen's oversight of AFAM, but he thought she was concerned about easy grading – not about independent courses.

Baddour recalled hearing from Roy Williams about McCants' four independent studies courses in Spring 2005, but does not recall when he and Williams had this conversation. He thinks it was sometime after the Spring 2005 semester. Baddour recalled that Williams asked Baddour whether the number of independent studies McCants had taken troubled him, and Baddour replied that it did trouble him and that he wondered how the college had allowed it to happen.

### John Blanchard
Senior Associate Director of Athletics (retired)

Blanchard was Senior Associate Director of Athletics from 2002 to 2013, and previously served as Director of ASPSA from 1985 to 1999 and 2001 to 2002. Blanchard knew about the paper classes beginning in the 2000s, but his knowledge of the courses evolved over time. Initially, he only understood that student-athletes were taking traditional independent studies. He eventually came to learn from the ASPSA counselors that the paper classes were actually listed as lectures, but taught as independent studies.

Blanchard has some recollection of reviewing whether student-athletes were clustering in independent studies for the FAC in response to similar problems at Duke. During the April 2002 FAC meeting, he and Jim Murphy presented data on student-athlete enrollments in such independent study courses. Blanchard more clearly recalled telling the FAC about the AFAM classes in 2006 and 2007, following the Auburn story in *The New York Times*. He recalled he told the FAC that the courses were taught as independent studies despite being advertised as lecture courses, but he was firmly advised by the faculty not to question how professors teach their classes.

### John S. Bunting
Head Coach
Football (former)

Bunting was the head football at Chapel Hill from 2001-2006. Bunting stated that he was aware that there were paper classes and that they were available to athletes and other students. Bunting stated that he thought that the paper courses were only available during the summer and he knew that the requirement was that the student write a paper. He said he knew the paper courses did not require attendance and he was told by ASPSA that these courses were what a player needed to take to get eligible or stay eligible for the coming semester. Bunting said he was never aware of plagiarism in the courses.

### Lawrence R. "Bubba" Cunningham
Director of Athletics

Cunningham has served as Chapel Hill's athletics director since October 2011. Cunningham was hired a few days before Chapel Hill appeared before the NCAA's Committee on Infractions. When he became aware of the academic issues, Cunningham decided that the Athletics Department needed a change in leadership in order to have credibility. Cunningham explained that Blanchard retired, and ASPSA went into a transition, with Harold Woodard serving as the interim director. Cunningham stated that he pushed for ASPSA to be moved to the Provost's Office where it could not be influenced in an undue manner. Cunningham stated that the University also has a new approach to admissions, that includes higher standards for student-athletes and focuses on recruiting students with higher GPAs and SAT scores.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 129 of 137

**Paul Hilton "Butch" Davis, Jr.**
Head Coach
Football (former)

Davis was named the head football coach at Chapel Hill in late 2006 and remained the head coach until he was fired at the end of July 2011. Davis stated that a member of the Chapel Hill Board of Trustees vetted him for 18 months, and then he was recruited to come to Chapel Hill by two Trustees, James Moeser and Dick Baddour. Davis recalled that during his first two years at Chapel Hill, he had to remove 27 players from the football team because of academic and behavior issues.

Davis explained that he knew that a lot of the African American players were taking AFAM classes, but he did not know that it was a major. Davis said that he was aware of the paper classes, but ASPSA made it appear as though other departments had paper classes as well. Davis also recalled that he complained to Cynthia Reynolds about the football players taking Swahili as their foreign language, which he did not think was appropriate. He said that he was told that Swahili was easier than other college-level languages.

**Matthew S. Doherty**
Head Coach
Men's Basketball (former)

Doherty served as an assistant basketball coach under Roy Williams at the University of Kansas from 1992-1999, then served as head coach at Notre Dame before returning to his alma mater, Chapel Hill, to serve as the head men's basketball coach from 2000 through 2003. Doherty stated that as a coach he was aware that AFAM was an easy major. Doherty explained that he did feel as though his athletes were put into easier classes, but he never had the impression that there was anything inappropriate about the classes. Doherty stated that much like water finds the lowest course, students will find the easiest major and athletes will find athlete-friendly professors.

**Anson Dorrance**
Head Coach
Women's Soccer

Dorrance has been the head women's soccer coach at Chapel Hill since 1979. Dorrance stated that he first heard about the AFAM classes when he read about them in the newspaper and he was not aware that any of his athletes took the courses. Dorrance stated that he is not certain how common it is for his athletes to take independent studies. He explained that he has athletes that take time off from Chapel Hill's team to play on and travel national teams, and thus ASPSA tries to get these athletes as many online courses or independent studies as they can under Chapel Hill's policies. Dorrance acknowledged that he talked to recruits about taking independent studies, but that his hands are tied because he cannot recruit students by promising them that they can take all independent studies and online courses. Because of this, Dorrance stated that when he recruits, he is often at a disadvantage compared to schools that have more flexible policies that allow their athletes to spend more time away from campus on national teams.

# CADWALADER

**Scott Forbes**
Associate Head Coach / Pitching Coach
Baseball

Forbes is the pitching coach for the baseball team. Forbes said that he follows his athletes' schedules and is aware of what classes they are taking, but did not recall any student-athletes taking AFAM courses, nor did he recall hearing his athletes talk about AFAM classes or paper classes.

**Michael Fox**
Head Coach
Baseball

Fox has been the baseball coach at Chapel Hill since 1998. Fox stated that he places a great emphasis on academics and requires all his athletes to attend class. When players do not attend class, he said they are benched. Fox explained that everyone was aware of the independent studies that student-athletes frequently took, however he had never heard of the paper classes. Fox explained that he preferred that his students did not take independent studies because it was difficult to monitor the athletes' progress in the course.

**Larry Gallo, Jr.**
Executive Associate Athletics Director

Gallo is currently the Executive Associate Director of Athletics, serving as Cunningham's number two in some respects, and has been a member of the Athletics Department since 1997. For many years, he was in charge of Compliance, and he attended FAC meetings from 1997 until approximately 2012. Gallo knew about independent study courses, and he learned about paper classes around the time of the Auburn story in 2006. However, he said that his focus in compliance was on ensuring that students had registered for the correct number of credit hours to maintain eligibility, rather than examining course content. Gallo recalled the 2006 FAC meeting about independent studies and a comment from a faculty member that a professor has latitude to teach a class the way he or she would like to teach it.

**Sylvia R. Hatchell**
Head Coach
Women's Basketball

Hatchell has been the Head Women's Basketball Coach since 1986. Hatchell worked with Jan Boxill for many years and spoke very highly of Boxill, their experience working together, and the academic success of their student-athletes. Hatchell knew Crowder and Nyang'oro only through the guest coaching program. Hatchell was aware that her students were taking AFAM classes, and she thought Crowder was an actual faculty member in the department.

**Amy S. Herman**
Associate Athletics Director for Compliance (former)

Herman worked in compliance at Chapel Hill for 13 years from 1999 to 2012. Herman knew about the paper classes and described them as "common knowledge" in the Athletics Department; her focus was on whether they were University courses available to all students — not on whether they were valid or rigorous from an academic perspective. She assumed that the paper

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 131 of 137

courses were run by faculty members and knew that the courses required a lengthy paper, however she did not know whether attendance was required or not.

**Joe R. Holladay**
Director of Basketball Operations (former);
Assistant Coach
Men's Basketball (former)

Holladay was Assistant Coach and Director of Basketball Operations from 2003 to 2013; part of his job was to oversee academics for the men's basketball team, and he met regularly with the team's academic counselor and acted as the disciplinarian for academic issues. Holladay knew about independent study classes. When he came to Chapel Hill he found that a large percentage of the team was majoring in AFAM and taking independent study courses in that department. Although Holladay ultimately discouraged his players from taking independent study courses due to their lack of structure, he did not question their legitimacy due to his complete trust in Walden, whom Holladay views highly as an honest person who cared a great deal about his students.

**Corey L. Holliday**
Associate Athletics Director for Football Administration

Holliday is the Associate Athletics Director for Football administration and a former captain of the Chapel Hill football team. Holliday started working in the Athletics Department in 2001, and became Associate Director in 2006. Holliday stated that he became aware of student-athletes taking independent studies in 2001, and while he knew of the AFAM paper classes, he did not think that they were any different than independent studies in other departments. It was Holliday's understanding that the student-athletes who took these courses had a syllabus and worked with a professor. Holliday explained that he knew that the ASPSA staff had the student-athletes working on their papers in study hall. Holliday stated that he did not recall any discussions about independent studies being used to keep athletes eligible, although he did recall discussions about independent studies helping students balance their schedules.

Holliday explained that the various head football coaches had different approaches to academics. Holliday stated that John Bunting was very serious about academics and had his assistant coaches monitor academics. Butch Davis was also strong on academics, but he held the ASPSA staff more accountable for academics, rather than the coaches. Holliday stated that he worked closely with Cynthia Reynolds, and recalled that he knew that Cynthia Reynolds worked with Crowder in the AFAM Department. He did not know whether Crowder was a professor or not.

**Susan B. Maloy**
Assistant Athletics Director for Certification and Eligibility (former);
Tutorial Coordinator,
Academic Support Program for Student-Athletes

Maloy began working as an Academic Counselor in ASPSA in May 1998; she subsequently spent several years as the Assistant Athletics Director for Compliance and Eligibility before rejoining ASPSA as its Tutorial Coordinator in 2012. During her time in Compliance, Maloy focused on student-athlete eligibility, academic progress, and graduation rates. Maloy was aware that many student-athletes were taking AFAM courses, but she thought of them as standard independent

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 132 of 137

studies and was unaware of their irregular features; her focus was on whether courses were degree applicable, rather than their content. Although Maloy did not communicate frequently with Debby Crowder, Maloy did know of Crowder as someone whom student-athletes could consult if they needed classes.

## Lance Markos
Director of Compliance

Markos has worked in Compliance at Chapel Hill since 2004 and is currently the Director of Compliance. Markos heard about paper classes in which students were required to write 20-page papers, but he had not been aware of whether students were required to attend class or meet with professors in those classes.

## John Shoop
Offensive Coordinator and Quarterbacks Coach
Football (former)

Shoop is the former offensive coordinator and quarterback coach under Butch Davis from 2007-2011. Shoop recalled that the football coaching staff had regular weekly meetings with the ASPSA staff in which they reviewed each player's academic progress. Shoop stated that he was responsible for the quarterbacks and offensive players; he reviewed their schedules, spoke with them about their classes, and would occasionally attend their study hall sessions. Shoop recalled that his players were taking independent studies, and explained that his understanding was that the players would meet with a professor and turn in a 10-15 page research paper, which he thought was standard for an independent study.

## John Swofford
Athletics Director (former);
Commissioner
Atlantic Coast Conference

Swofford served as Athletics Director at Chapel Hill from 1980 until 1997, when he was named Commissioner of the ACC. During Swofford's tenure, ASPSA was significantly expanded, received its own facility, and Swofford tapped John Blanchard to serve as its director. Swofford was not aware of athletes taking either independent studies more generally or AFAM paper classes specifically, and he did not recall discussing those issues with any of his staff. Swofford stated that during his time at Chapel Hill, he thought that the special admissions process performed meaningful review of potential recruits, and that the school did well balancing athletics and academics.

## André Williams
Director of Football Student-athlete Development (former)

Williams is the former Director of Football Student-Athlete Development and now works in the College of Arts and Sciences. Williams stated that he was aware of the paper classes but did not have any concern about them because they were offered to the entire student body. Williams stated that he trusted the University to offer classes that were appropriate. He understood that all the coaches knew about the paper classes, and stated that for the coaches it was a big issue for them to make sure their athletes were completing their papers.

# CADWALADER

**Roy A. Williams**
Head Coach
Men's Basketball

Williams has been the head men's basketball coach at Chapel Hill since 2003. Upon arriving at Chapel Hill, Williams said he believed that McSwain was too close with the basketball players, and he wanted his academic advisor to have a clear separation from the athletes and be more professional. Williams explained that players went to McSwain's house to do work, and while he did not believe that McSwain wrote papers for the students, he thought she was too much of a mother to them. Williams stated that Wayne Walden was his academic person at Kansas and described Walden as the most ethical and professional person he knew. This caused him to bring Walden and his assistant coach for academics, Joe Holladay, with him to Chapel Hill.

Williams said that he had regular meetings with Walden and Holliday. Williams explained that he learned about independent studies and AFAM paper classes at some point, but he was not concerned because he trusted the University to put on legitimate classes. Williams stated that in 2006, after noticing that many of his players were AFAM majors, he and Holladay discussed encouraging their players to pursue other majors. Williams stated that he thought that the athletes were becoming AFAM majors because their teammates and friends were all AFAM majors. Williams explained that he did review the players' class schedules and at some point learned that Rashad McCants was taking three or four independent studies in one semester. Williams acknowledged that he would have met with McCants during the Spring 2005 semester to discuss his classes, but this was because he was concerned about McCants completing the semester, as he knew that McCants was going to leave for the NBA draft and his eligibility for the following year was not an issue. Williams stated, contrary to McCants' claim on ESPN, that he would not have had a discussion with McCants about swapping out classes.

> H.  Others

**Donald Curtis**
Member of Board of Trustees for the University of North Carolina at Chapel Hill

Curtis was elected to the Board of Trustees in 2009. He was not involved in the search for Butch Davis, but he has been involved in the University's response to the academic irregularities. Curtis encouraged efforts to investigate the issues and provide information regarding the irregularities, and he lamented that the irregularities had occurred due to the amount of trust that the University had historically placed in chairs such as Nyang'oro to manage their own departments.

**A. Donald Stallings**
Member of Board of Trustees for the University of North Carolina at Chapel Hill (former)

Stallings served on the Board of Trustees from 1994 until the mid-2000s. He was on the Board when Butch Davis was hired, but he was not a part of the committee that hired Davis. Stallings thought highly of Davis, but he opined that – as is typical for professional coaches – Davis had allowed his players to manage themselves, which may have ultimately caused problems to occur. Stallings said that generally he was proud of the balance that Chapel Hill struck between academics and athletics, and of the University's high graduation rate for student-athletes.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 134 of 137

I.    Witnesses who Refused to Cooperate

**Octavus Barnes**
Academic Counselor for Football
Academic Support Program for Student-Athletes (former)

Barnes, a former football player, served as an academic counselor for football between 2002 and 2009.  He reported to Cynthia Reynolds.  We left messages for Barnes at his place of employment requesting to meet with him.  We learned through an attorney that he did not wish to speak with us.

**Carolyn Cannon**
Associate Dean and Director of Academic Advising
College of Arts & Sciences (former)

Cannon served as the Associate Dean and Director of Academic Advising between 1999 and 2010.  She served as the principal academic advisor to the men's basketball team.  According to Owen, Cannon also raised concerns regarding the authenticity of Nyang'oro's signature on grade change forms.  We sent emails, wrote letters, and left a message with her husband in an attempt to arrange a meeting with her.[219]  She never responded to our requests.

**Cynthia R. Reynolds**
Associate Director & Director of Football
Academic Support Program for Student-Athletes (former)

Reynolds served as the Associate Director of ASPSA and Director of Football between 2002 and 2010.  She is now the Academic Programs Coordinator  at the School of Applied and Engineering Physics at Cornell University.  We attempted to speak with Reynolds regarding her work at Chapel Hill, but she refused.  On April 4, 2014, we contacted Reynolds via email at her current employer, Cornell University, and requested that she speak with us regarding her employment at Chapel Hill.  She replied four days later, writing that "I am now almost 4 years removed from my last appointment at UNC and not inclined to revisit my experiences at this time."[220]  On April 17, 2014, we wrote to Reynolds requesting that she reconsider her decision in light of the important academic questions we were investigating.  On April 29, 2014, Reynolds replied by email, reiterating that she did not wish to speak with us.

In an attempt to encourage her cooperation, given her critical role as the lead football academic counselor at a time when enrollments in the paper classes spiked, we wrote to her supervisor at Cornell University on April 29, 2014 asking if her employer could facilitate an interview.   Cornell University replied on May 5, 2014, acknowledging that, while it would "unquestionably appreciate cooperation from the University of North Carolina in similar circumstances, the extent of appropriate assistance" it could offer was limited.  On May 21, 2014, we received a letter from Reynolds' attorney stating that any further attempts by Cadwalader to contact Reynolds would be "construed as harassment and reported to the police accordingly."

---

[219] *See* Exhibit 5.

[220] *See* Exhibit 2 for all emails and letters seeking Reynolds' cooperation.

Thus, we were unable to interview Reynolds, a critical witness to our investigation. We are able to make findings with respect to her knowledge and participation in the paper classes based upon the numerous emails and other documents authored, sent, or received by her, as well as the statements of other witnesses. We regret that Reynolds declined to meet with us to offer her perspective on this information.

## Everett Withers
Interim Head Football Coach (former)

Withers served as an Assistant Coach and later Interim Head Football Coach in 2011. He is now the Head Football Coach at James Madison University. We attempted to speak with Withers regarding his work at Chapel Hill, but he refused. Specifically, we wished to interview Withers about his knowledge of the paper classes, particularly in light of Bridger's presentation in November 2009 that outlined the nature and use of those classes. On July 7, 2014 – well in advance of training camp and football season – we contacted Withers by email and requested an opportunity to speak with him. He replied on July 11, writing that:

> My experience was a very bittersweet one split into 2 parts; (1) The 1st
> year and a half-Positive growth in a [sic] athletic program headed in a
> direction never reached at UNC. (2) –a very negative and attacking
> experience both toward the student athlete in FB and the FB staff.
> Therefore, since my dismissal as HFC, I have moved on and do not
> want to "Go Back" to that time.[221]

We wrote a letter to Withers on July 16, 2014, requesting that he reconsider his decision, noting that obtaining his "perspective on this information, and documents [he] authored, received, and sent, is important as we continue our inquiry." We did not receive a response to our letter. When we followed up on the letter by email, saying that we would prefer to schedule a meeting directly with Withers, rather than through his current employer, James Madison University, Withers replied curtly that our email "[s]ounds like a threat to me." We then wrote to James Madison University, and while officials there tried to encourage Withers' cooperation, and while we again wrote Withers with more details of the topics we would explore in an interview, we were ultimately unsuccessful in securing an interview. Withers' agent wrote to us on September 3, 2014, in part:

> During the past few months, Coach Withers has consistently
> expressed his willingness to work with your firm regarding the
> investigation. However, it must be noted that your firm's aggressive
> and, at times, arrogant demeanor is off-putting, to say the least.
> Coach Withers is under no obligation to assist you with your
> investigation, especially since it now appears to have little, if anything,
> to do with Coach Withers.

With all due respect to Withers' agent, Withers never expressed willingness to work with us in our investigation. We regret that we were unable to interview Withers regarding his knowledge of the paper classes and Bridger's presentation to the coaching staff, including Withers, in November 2009.

---

[221] *See* Exhibit 3 for all emails and letters regarding our attempt to speak with Everett Withers.

Case 1:14-cv-00954-LCB-JLW   Document 166   Filed 01/18/19   Page 136 of 137

CADWALADER

Cadwalader, Wickersham & Taft LLP
www.cadwalader.com