# Exhibit 46

| From: | Arthur, Ashley |
|---|---|
| Sent: | Wednesday, December 18, 2013 3:04 PM |
| To: | Akos, Patrick; Polk, Barbara Jo; Clayton, Taffye Benson; Hirth, Garrett Michael; Jakubiak, Maria; Kretchmar, Jen; Max, Katherine Angeli; Perez, Louis A; Pierce, Catherine Ringo; Simmons, Kara E; Stroman, Deborah L; Williford, Lynn E |
| Subject: | Reminder: first work group meeting tomorrow |

Good morning, everyone.

This is a reminder that the work group for race-neutral alternatives in admissions will have its first meeting tomorrow, Dec. 19, 2:00-3:30. The meeting will take place in Jackson Hall's lobby conference room.

Attached are the materials for the meeting if you would like to review them in advance. A copy will be provided for you tomorrow.

Thank you again for agreeing to participate in this group! We look forward to seeing you tomorrow.

Ashley

Ashley Arthur
Assistant to the Director of Undergraduate Admissions
University of North Carolina at Chapel Hill
Jackson Hall, Campus Box 2200
Chapel Hill, NC 27599
(919) 962-2219



EXHIBIT
22
POLK
PENGAD 800-631-6989

1

UNC0079625

Members of the Work Group on Race-Neutral Admissions Alternatives

- Patrick Akos – pakos@email.unc.edu
- Taffye Clayton – taffye@unc.edu
- Jen Kretchmar – jkretchmar@admissions.unc.edu
- Lew Perez – perez@email.unc.edu
- Catherine Pierce – cringo@email.unc.edu
- Barbara Polk – bjpolk@email.unc.edu
- Kara Simmons – kara_simmons@unc.edu
- Debby Stroman – dstro@unc.edu
- Lynn Williford – lynn_williford@unc.edu

UNC0079626

Texas University's Race Admissions Policy Is Debated Before a Federal Court

By MANNY FERNANDEZ

Published: November 13, 2013

AUSTIN, Tex. — An affirmative-action program at the University of Texas at Austin that takes applicants' race into account was unnecessary because the campus had achieved a "critical mass" of minority students, lawyers for the white applicant who sued the university told a federal appeals court here on Wednesday in a case with high stakes for the future of race-conscious admissions policies at public colleges and universities.

University lawyers denied a critical mass of underrepresented students had been reached. They said the institution was entitled to supplement its race-neutral admissions policies with ones that take race into account to achieve diversity. But the reaction of the appeals judges, who expressed skepticism at times about the manner in which the university applied race-conscious decisions and the university's abstract definition of "critical mass," illustrated the complex path for the Texas flagship university, as it tries to show that its admissions program was necessary.

Bert Rein, the lawyer for the white applicant, Abigail Fisher, said the university had no numerical standards to determine when its student body was sufficiently diverse. "They have no metric," he said. " 'We know it when we see it.' That's the university's position."

The lawyers for Ms. Fisher, the university and minority student groups appeared before the United States Court of Appeals for the Fifth Circuit on Wednesday to sort through a tangle of new legal issues raised by the Supreme Court in June. The Supreme Court sent the case back to the Fifth Circuit, instructing it to apply a greater degree of scrutiny to the university's race-conscious admissions program.

The decision, while generally upholding the use of race as a factor in the program, jeopardized the future of it at the same time, by instructing courts to use tougher standards and to verify that race-neutral alternatives were not available to the university.

On Wednesday, the question of whether the university had any race-neutral alternatives available, and whether the campus had reached a so-called critical mass of minority students, was the focus of debate.

The Fifth Circuit judges, who appeared equally skeptical of some of the arguments made by Ms. Fisher's lawyer, wondered aloud whether they should send the case back to a district court. They listened to arguments from all sides without making any rulings. A decision is not likely to come for weeks or months.

Lawyers for the university as well as those representing black and Hispanic students argued that there were no race-neutral alternatives available that would allow it to achieve the benefits of diversity.

UNC0079627

Many black students, they argued, experienced racial isolation on campus between 1997 and 2004, when the university did not consider race in admissions. During that period, they said, African-Americans never made up more than 4.5 percent of any freshman class.

The case was filed by Ms. Fisher, who said that because she is white the University of Texas had denied her admission in 2008. The university said she would not have been admitted even without any policies focused on diversity. She has since graduated from Louisiana State University.

When the appeals court first heard Ms. Fisher's case in 2011, it upheld the admissions program, saying it had been authorized by the Supreme Court's 2003 decision in Grutter v. Bollinger. That decision, by a 5-to-4 vote, said that public colleges and universities could not use point systems or quotas to increase minority enrollment but could take race into account in vaguer ways. But the Supreme Court was not satisfied with the Fifth Circuit's analysis. In its 7-to-1 decision in June, it told the court to take a more skeptical look at the university's admissions practices.

Justice Anthony M. Kennedy, writing for the majority, reaffirmed that educational diversity is an interest sufficient to overcome the general ban on racial classifications by the government. But he added that public universities must have good reasons for the particular methods they use to achieve that goal. They must, he wrote, show that "available, workable race-neutral alternatives do not suffice" before taking account of race in admissions decisions.

On the issue of critical mass, Gregory Garre, the university's lawyer, described it to the judges as an abstract process that met Supreme Court standards, and was based on data on minority admissions as well as faculty observations. The Supreme Court has used the term to describe a university's qualitative rather than quantitative assessment of whether it has achieved sufficient diversity.

William C. Powers Jr., the university's president, expressed concern about the effect that losing the case would have. "It would be a setback to diversity, not just at the University of Texas, but at universities across the country," he said after the hearing.

Adam Liptak contributed reporting from Washington.

UNC0079628

University of North Carolina at Chapel Hill
Office of Undergraduate Admissions
Foundations and Practices Regarding the Evaluation of Candidates

## The Mission of the University

The admissions policies and practices of the University of North Carolina at Chapel Hill derive
from and are aligned with the mission of the University. The University's mission statement
confirms that the University "embrace[s] an unwavering commitment to excellence as one of the
world's greatest research universities." The statement also observes that Carolina exists to "serve
as a center for research, scholarship, and creativity and to teach a diverse community of
undergraduate, graduate, and professional students to become the next generation of leaders."

## Trustee Policy on Undergraduate Admissions

The Board of Trustees' policy on admissions establishes a framework of competitive admissions
and mandates that candidates be selected largely on the basis of the University's "special
responsibility to residents of North Carolina" and its "judgment of the applicant's relative
qualifications for satisfactory performance" in the program to which the applicant seeks
admission. At the same time, this policy explicitly states that these two broad selection criteria

> ... shall not prevent the admission of selected applicants (a) who give evidence of
> possessing special talents for University programs requiring such special talents,
> (b) whose admission is designed to help achieve variety within the total number
> of students admitted and enrolled, or (c) who seek educational programs not
> readily available at other institutions.

The policy goes on to frame this interest in variety as an affirmation of the University's
"commitment to achieve excellence, to provide for the leadership of the educational,
governmental, scientific, business, humanistic, artistic, and professional institutions of the state
and nation, and to enrich the lives of all the people of North Carolina."

For admission to the first-year or freshman class, the policy specifies several criteria—including
"satisfactory evidence of scholastic promise" gleaned from the applicant's academic record,
recommendations, test scores, application, and predicted first-year performance—but delegates
to the Faculty Advisory Committee on Undergraduate Admissions the authority to approve
procedures to assess this evidence.

## The Academic Plan

Adopted in 2011, the University's current academic plan, Reach Carolina, articulates "six
interlocking priorities," all of them designed to help faculty, students, and staff "attain levels of
accomplishment and distinction befitting Carolina's mission as a leading public university."
These priorities include "ensur[ing] that every student at Carolina ... will have a
transformational academic experience." In keeping with this first priority, Reach Carolina calls
upon the University to "continually re-invigorate the academic experience at Carolina and

UNC0079629

transform our students' intellectual skills, knowledge of the world, preparation for citizenship, and vision of our common future."

Critical to the provision of these transformational academic experiences, and a distinct priority in its own right, is a commitment to "[a]chieving equity and inclusion"—a commitment borne of our faculty's academic judgment that diversity is "a vital ingredient of creative change." *Reach Carolina* defines equity and inclusion as "an institutional educational priority that recognize[s] how much Carolina's learning environment is enhanced by students, faculty, and staff from multiple backgrounds and ethnicities interacting together."

## Other Statements of Guidance Regarding Undergraduate Admissions

The principles inscribed in *Reach Carolina* have been anticipated or echoed in many other documents endorsed by the University's Board of Trustees, Chancellor, and Faculty Council. In 1995, the Chancellor's Task Force on the Recruitment and Retention of Minority Students and Faculty emphasized the fundamental educational value of diversity and called upon the University to continue its efforts to identify, recruit, and enroll talented students of every background. In 1998, the Faculty Council passed a resolution encouraging the University to continue its efforts to recruit and enroll students of diverse backgrounds, perspectives, and experiences, since interactions within such a student body constituted a necessary precondition for educational excellence. In 2000, the Chancellor's Minority Affairs Review Committee found diversity to be "a fundamental prerequisite to both educational excellence and to the University's ability to serve all the people of the state."

The University's first academic plan, adopted in 2003, defined six academic priorities, all grounded in the critical principle that the University must provide "the strongest possible academic experience for undergraduate, graduate and professional students." These priorities differed in focus but reflected shared judgments about the nature of Carolina academics: that diversity, broadly construed, is fundamental to student success; that different students may contribute to this success in different ways; and that Carolina, to fulfill its mission, must educate leaders who are prepared to engage deeply with and function effectively within an increasingly multicultural society. The 2003 plan observed that Carolina undergraduates "gain from a diverse residential environment that complements and enriches their academic work" and called for greater enrollment of students who would "add to the geographic, intellectual, artistic, and cultural diversity of the student population." The plan also called upon the University to "increase diversity among faculty, students and staff," because diversity is "critical to the University's effectiveness in fully preparing students for the world."

In 2005, after a formal, year-long assessment found "widespread agreement" among students, faculty, and staff that "they [had] learned and benefited" from their interactions with colleagues from different backgrounds, the University issued its first diversity plan. The plan found that Carolina could not "achieve its educational, research, and service mission"—including its mission to prepare students to "become leaders in [a] complex world"—without a University community diverse in "social backgrounds, economic circumstances, personal characteristics, philosophical outlooks, life experiences, perspectives, beliefs, expectations, and aspirations." Calling for "the admission of students" who could contribute to such diversity, the plan also established, as an institutional goal, the "achieve[ment] of critical masses of underrepresented

UNC0079630

populations," since the absence of such critical masses "impedes the educational process" and "can place undue pressure on underrepresented students and interfere with all students' experiencing the educational benefits of a diverse learning environment."

**Guidance of the Faculty Advisory Committee on Undergraduate Admissions**

The Faculty Advisory Committee on Undergraduate Admissions is delegated authority by the Trustees to set procedures for assessing undergraduate applications. The Committee has defined procedures designed to help the University achieve its mission by affording each candidate a series of comprehensive, holistic, and individualized evaluations. Since approving the addition of an essay to the first-year application in 1997, the Committee has acted consistently to maintain and strengthen the University's commitment to such evaluations. The Committee added a required teacher recommendation to the application in 2001; affirmed the use of comprehensive review in 2002; and, in 2003, reviewed and affirmed the University's admissions practices, including its flexible and nuanced use of race and ethnicity as one factor among many, in light of the *Gratz* and *Grutter* decisions.

In addition to taking these steps, the Advisory Committee has endorsed two general statements about the practices, procedures, and criteria applicable to the University's undergraduate admissions process. Both statements ground admissions practices in the mission of the University, mandate comprehensive and individualized evaluations for all candidates, and articulate a broad range of criteria to be used in these evaluations.

In 1998, the Committee reviewed and endorsed the Faculty Statement on Principles of Service, Diversity and Freedom of Inquiry. Adopted by the full Faculty Council in April 1998, this statement confirmed that diversity "in its many manifestations" was essential to the fulfillment of the University's educational and service missions, and that such an expansive notion of diversity required that admissions decisions include

> ... consideration of (1) quantifiable data and qualitative information regarding educational preparation (including, when relevant, class rank, courses, degree(s), educational program, employment, grades, major, standardized test scores, volunteer activities, and work experience); (2) life experiences (including their variety, type, uniqueness, duration, and intensity); (3) factors that may contribute to diversity of presence (including, without limitation, age, economic circumstances, ethnic identification, family educational attainment, disability, gender, geographic origin, maturity, race, religion, sexual orientation, social position, and veteran status); (4) demonstrated ability and motivation to overcome disadvantage or discrimination; (5) desire and ability to extend knowledge-based services to enhance the quality of life of all citizens; and (6) motivation and potential to make a positive contribution to the educational environment of the University and to the University's fulfillment of its mission to serve all the people of the State, to enhance the quality of life for all people in the State, and to improve the conditions of human life.

In September 2007, the Committee unanimously approved a statement on the evaluation of candidates for admission. This statement endorses admissions practices that are designed to yield a "scholarly community" which in turn will help the University achieve its mission:

UNC0079631

In evaluating candidates for admission, we do not seek to maximize the average SAT score or the average eventual GPA of the entering class. Rather, we seek to shape the class so that its collective strengths will foster excellence within the University community; enhance the education of everyone within it; provide for the leadership of the educational, governmental, scientific, business, humanistic, artistic, and professional institutions of the state and nation; and enrich the lives of all the people of North Carolina.

In so doing, we aim to help the University fulfill its mission to serve "the people of the state, and indeed the nation, as a center for scholarship and creative endeavor" and to be "a community engaged in original inquiry and creative expression, while committed to intellectual freedom, to personal integrity and justice, and to those values that foster enlightened leadership for the state and nation.

The qualities sought in each class are those that foster such a scholarly community: intellect, talent, curiosity, and creativity; leadership, kindness, and courage; honesty, perseverance, perspective, and diversity. While each successful candidate will demonstrate strengths in many of these areas, no individual candidate is expected to be equally strong in all of them. Just as there is no formula for admission, there is no list of qualities or characteristics that every applicant must present.

In shaping the class, candidates are evaluated individually, rigorously, and sympathetically. Each candidate is assessed in ways in which he or she will likely contribute to the kind of campus community that will enable the University to fulfill its mission. This assessment requires that not only the noted achievements and the potential of each applicant be considered but also that the context within which achievements have been realized and potential forged is clearly understood.

These comprehensive and individualized evaluations aim to draw together students who will enrich each other's education and strengthen the campus community. In so doing, they help the University achieve its broader mission.

**The Evaluation Process**

In keeping with principles established by the Advisory Committee, the Office of Undergraduate Admissions assigns no fixed weights or points to any specific parts of the application for admission, and it uses no formula to assess the students who have applied. With the exception of the 18-percent limit on out-of-state enrollment, there are no quotas of any kind. Applications are read over a period of roughly six months by more than thirty admissions officers, who collectively form the admissions committee.

Each application is assigned randomly to one of these committee members. The committee member reads the application, formulates an opinion about whether the student should be offered admission and writes a comment defending his or her recommended decision. If the committee member determines that a second, thorough review of the application is warranted to arrive at the best possible decision, the application will be identified and receive a second, individual review. In addition to the preliminary evaluation, the process includes an additional review of each decision prior to its being released. Committee members are instructed to approach each case with

UNC0079632

an open mind, seek first to understand the individual student, and take into account the many qualities that we seek in each entering class.

Once all candidates have been reviewed and preliminary decisions entered, the admissions committee uses a statistical model to predict the number of spaces in the entering class that are likely to be filled by the students who have been earmarked provisionally for admission. After comparing this predicted enrollment to the total number of spaces available for the entering class, the committee may need to fine-tune the number of admitted students and then reevaluate applications. If applications need to be reevaluated, that reevaluation is conducted by one of the following: the director of admissions, the deputy director of admissions, or a sub-committee of the larger admissions committee that is specifically constituted for this purpose.

Throughout these many evaluations, members of the admissions committee are expected to exercise their judgment as educators and to make cases for the admission of individual candidates who they believe will contribute substantially to the scholarly community at Carolina and to the achievement of the University's mission. As the Trustee policy stipulates, committee members are charged with assessing each candidate's "relative qualifications for satisfactory [academic] performance." But they are also explicitly and repeatedly encouraged to base their recommendations on everything they know about candidates rather than on one or two criteria. They are also strongly encouraged to seek out students who would bring an interesting or unusual talent, perspective, or set of experiences that might enliven their interactions with their classmates and professors. The goal, again, is to create a class that, taken together, will help all of its students learn more than they might have learned separately, and to provide these students with the kind of experiences that will allow them to prepare themselves effectively for their eventual lives as citizens and leaders.

**Criteria for Admission**

The evaluation process does not use formulas, and because the goal of each evaluation is to understand the candidate holistically, the relative weight or credit assigned to any individual criterion may vary from candidate to candidate. Candidates for admissions are evaluated on everything the admissions process reveals about them. Because individual students differ widely from one another, it is difficult, if not impossible, to list every criterion that might be used over the course of an admissions season in which 30,000 candidates are evaluated.

Typically, however, more than forty criteria, grouped roughly into eight categories, are used at every stage in the admissions process. Exceptional strength in one or more of these areas, or an exceptional combination of strengths, may make up for relative weaknesses in other areas, provided the candidate demonstrates the capacity to succeed academically at the University.

• **Academic performance criteria**: grade-point average, rank in class, individual grades, trends in grades, and patterns in grades, all viewed within the contexts of the entire applicant pool and the student's high school.

• **Academic program criteria**: rigor, breadth, and pattern of courses taken, all viewed within the context of the entire applicant pool and the student's high school.

UNC0079633

- **Standardized testing criteria**: results from the SAT, ACT with Writing, SAT Subject, Advanced Placement, and International Baccalaureate exams, as well as occasional results from state-mandated end-of-course exams, all viewed in light of the documented strengths and limitations of these tests.

- **Extracurricular activity criteria**: engagement outside the classroom; persistence of commitment; demonstrated capacity for leadership; contributions to family, school, and community; work history; unique or unusual interests.

- **Special talent criteria**: in music, drama, athletics, ,and in writing,

- **Essay criteria**: voice, organization, fluency, and persuasiveness; evidence of self-knowledge and reflection; insightfulness; unique or unusual perspectives.

- **Background criteria**: relative advantage or disadvantage, as indicated by family income level, education history of family members, impact of parents/guardians in the home, or high school environment; experience of growing up in rural or center-city locations; status as child or step-child of Carolina alumni.

- **Personal criteria**: curiosity; kindness; creativity; honesty and integrity; motivation; history of overcoming obstacles or setbacks; openness to new cultures and new or opposing ideas; talent for building bridges across divisions in school or community or among individuals from different backgrounds.

Again, this is a list of typical criteria—neither a checklist that all candidates must satisfy nor a limit on what any candidate may present. Because each student is unique, the admissions committee does not arbitrarily limit the range of individual qualities that may be considered. Nor does the committee limit the number of considerations, including background and personal considerations, which may benefit any individual candidate. Students who are first-generation college, for example, may on balance be stronger candidates for admission if they also come from single-parent households or demonstrate a history of building bridges or overcoming obstacles.

In addition to quantifiable data such as grade-point average and rank in class, admissions criteria include many indicators that cannot be easily quantified: individual course grades, as well as trends and patterns in grades; the rigor, breadth, and pattern of courses taken; the fluency, insightfulness, originality, and persuasiveness of the candidate's application essays; and the curiosity, motivation, persistence, and openness to new ideas that are revealed in the application, and especially in the recommendations and essays.

### Race, Ethnicity, and National Origin

While race, ethnicity, or national origin may be used at any stage in the admissions process, it is never used as anything other than one part of the comprehensive, holistic, and individualized review afforded to each candidate. At no point in the process are candidates of different racial or ethnic backgrounds reviewed in separate groups. Nor does the University have explicit or implicit quotas for any particular racial or ethnic group, or for underrepresented students as a whole, or for students of color as a whole. Moreover, any student's race or ethnicity may act as a "plus" in the decision, depending on the student's individual circumstances as revealed in his or her application.

UNC0079634

Within this flexible and non-numbers-based consideration of race, and in support of the cultivation of diversity broadly construed, the University also aims to enroll critical masses of students who identify themselves as members of groups the University deems underrepresented. In this context, the term "underrepresented" means those groups whose percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina, a framework established in the 1981 consent decree between the University of North Carolina system and the United States Department of Health, Education, and Welfare. Given this definition, the University has for more than three decades considered as underrepresented those students identifying themselves as African American or black; American Indian or Alaska Native; or Hispanic, Latino, or Latina.

The race or ethnicity of students who identify themselves as underrepresented may—or may not—receive a "plus" in the admissions decision process. And, while a "plus" that is awarded may be significant in an individual case and tip the balance towards the admission of the student, it is not automatically awarded, and even if awarded, does not necessarily prevent a student from being denied admission. Rather, this factor is always viewed in the context of everything else that the admissions committee knows about a candidate, and in light of the range of contributions the candidate might make to the University community.

**Socioeconomic Status**

The University works strongly to attract and retain disadvantaged students regardless of race. This is a critical component of the institution's obligation to the State of North Carolina and indeed to the nation. As part of its broad effort to foster diversity within the scholarly community on campus, the University's admissions process takes into account the socioeconomic status of each candidate, with an eye towards increasing the number of disadvantaged students who are admitted and eventually enroll. As with other criteria considered by the admissions committee, relative disadvantage is assessed in ways that are both flexible and individualized—a continuum of consideration rather than a simple on-off switch. Assessment of disadvantage must also in turn inform the University's interpretation of the candidate's SAT scores and other academic indicators.

**Other Aspects of Diversity**

Because the University construes diversity broadly rather than narrowly, members of the admissions committee seek to identify students who would offer their classmates and professors an unusual or unique perspective, aptitude, achievement, or experience. As a means to this end, and as part of the holistic and comprehensive review afforded to everyone, committee members evaluate each candidate on the basis of his or her potential contribution to the broad diversity of the student body and the University community.

UNC0079635

# The Playbook:
## *Incorporating Neutral Strategies into Coherent, Comprehensive, Effective, and Sustainable Diversity Strategies in Higher Education*

### Introduction/Overview

The 21st century presents a host of new challenges and opportunities for institutions of higher education that are pursuing mission-based goals to foster the educational benefits of diversity for their students and faculty members, including changing demographics, pressures related to access and affordability, and shifting workforce demands. In this context, institutions must engage in deliberate, careful policymaking that incorporates clear thinking, nimble action, and embedded evaluation with a focus on continuous improvement.

Meeting diversity goals also requires compliance with evolving legal requirements established by federal courts. Though institutions can (and should) remain principally focused on their mission-based educational goals related to diversity, they must also ensure that their programs and policies align with federal legal standards – particularly those associated with student enrollment.[i] In 2013, the U.S. Supreme Court added a new case to this body of law – *Fisher v. the University of Texas at Austin*.

In *Fisher*, the U.S. Supreme Court emphasized, among other points, the importance of race-neutral[ii] strategies in the development of diversity policies in higher education. *Fisher* reaffirmed that institutions must "seriously consider" race-neutral alternatives to race-conscious policies as they determine how to create and reap the benefits of a diverse student population on campus.

With a focus on necessity – the question of whether an institution can demonstrate that it needs to consider race in admissions to meet its institutional goals – *Fisher* also (arguably) upped the ante for institutions with a strong (if ambiguous) statement that institutions may not use race or ethnicity if a workable race-neutral strategy could promote the substantial interest about as well and at tolerable administrative expense. Though the precise meaning of this statement from the Court is likely to be debated for some time, the message to institutions is clear: to justify the use of a race-conscious policy or policies, institutions must conduct a serious review of their policies and practices, use viable race-neutral strategies (as appropriate), and pursue race-conscious policies and practices only to the extent necessary to achieve their mission-based goals. In other words, institutions have some homework to do – and *Fisher* provides an important opportunity for them to get started.

An important first step for every institution involves surveying the landscape of current diversity policies and practices – both on campus and across the country. Institutions should be able to draw from the broader field to inform their own unique judgments on diversity policies, and every institution should not have to undertake this alone. Though significant research and institutional reflection has been done, little effort has been put into gathering this information into a single comprehensive, easily digestible resource.

To begin to fill this void and help institutions through the first step in their decision making process, the College Board's Access & Diversity Collaborative presents a new resource: "The Playbook." The Playbook is designed to help institutions understand the full array of race-neutral strategies that have been adopted in higher education settings, with a principal focus on those with some evidence of impact

1

UNC0079636

and effectiveness, as a foundation for institution-specific discussions and evaluation of broader enrollment options.

The Playbook borrows from the sports world and is intended to help institutions understand the various options available and the context in which those options are most likely to be effective. Just as a coach never covers every play in his or her playbook in a single game, an institution is unlikely to use all of the neutral strategies included here. But, just as a coach shifts plays from game to game, so may an institution change its diversity strategies over time. The Playbook is intended to help institutions through that transition as well.

At the same time, the Playbook, however, is not designed to serve as a pro-forma checklist or as a substitute for an institution's probing review of options in light of its relevant mission and goals. It is also not intended to represent new research regarding neutral strategies. Rather, it gathers and analyzes many different resources and ideas in a single place to help institutions understand the bottom line for each strategy and make a decision on whether to pursue it further.

Just as the picture of race-neutral strategies continues to evolve, this initial version of the Playbook may be the first of several editions (potentially to serve as the basis for an online, interactive resource for institutions). Suggested revisions and additions are welcome.

The Playbook . . .

✓ IS a resource to help institutions understand the array of options related to race-neutral strategies
✓ IS a collection of different resources and research findings

✗ IS NOT a pro-forma checklist or a substitute for an institution's own review of neutral strategies in light of its unique mission and goals
✗ IS NOT new research

2

UNC0079637

### A Primer on Strict Scrutiny for Race-Conscious Enrollment Practices

Race-conscious policies trigger the most rigorous type of judicial review, strict scrutiny, because they confer a benefit or advantage to some individuals based on their racial or ethnic background.[i] (Strict scrutiny should not apply, though, to policies and practices that are authentically inclusive and do not result in excluding individuals based on their race or ethnicity.[ii]) For an institution to meet the strict scrutiny test, it must show the following two elements (also captured in the graphic on the next page):

◆ **A compelling interest**, which is the end that must be established as a foundation for maintaining lawful race- and ethnicity-conscious programs that confer opportunities or benefits to students. Federal courts have recognized a limited number of interests that can be sufficiently compelling to justify the consideration of race or ethnicity in a higher education setting, including a university's mission-based interest in promoting the educational benefits of diversity among its students.

◆ **Narrow tailoring**, which refers to the requirement that the means used to achieve the compelling interest "fit" that interest precisely, with race or ethnicity considered only in the most limited manner possible to achieve compelling goals. Federal courts examine several interrelated criteria to determine whether a given program is narrowly tailored, including:
   ○ Necessity of using race or ethnicity (including evidence of its material impact),
   ○ Flexibility of the program,
   ○ Burden imposed on non-beneficiaries of the racial/ethnic consideration, and
   ○ Whether the policy has an end point and is subject to periodic review.

There is an indication that the Court also considers the impact of policies as part of a narrow tailoring inquiry, though this has not been formally established by the Court.[v]



UNC0079638

### Policy and Legal Context

For all institutions working toward the achievement of mission-based diversity goals, decisions about which policies to implement require a careful consideration of the required investment and projected impact, essentially a cost-benefit analysis. It is important for institutions to remember that, even though race-conscious policies are treated differently from race-neutral policies in a legal context (as described below), they should not be considered and evaluated in isolation. Rather, institutions should consider the full array of enrollment strategies and how different policies affect and interact with each other. Only with fully consistent and aligned strategies will institutions be able to meet their goals of attaining the educational benefits of diversity for their academic communities.

*Fisher* focused on necessity – a question that precedes and informs all others in the narrow tailoring analysis (because, after all, if an institution cannot demonstrate that it needed to use race-conscious policies to meet its goals, it does not matter if its admissions policy only considered race/ethnicity as part of an individualized, holistic review of applicants).

In his majority opinion, Justice Kennedy explained the elements of the necessity question as follows:

> Narrow tailoring also requires that the reviewing court verify that it is "necessary" for a university to use race to achieve the educational benefits of diversity. . .[and] involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications. Although "[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative" (emphasis supplied) strict scrutiny does require a court to examine with care, and not defer to, a university's "serious, good faith consideration of workable race-neutral alternatives . . . Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If "a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense . . . then the university may not consider race. A plaintiff, of course, bears the burden of placing the validity of a university's adoption of an affirmative action plan in issue. But strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."[vi]

4

UNC0079639



These are challenging questions, but preserve an institution's ability to incorporate its "experience and expertise" into its decision to use race-conscious strategies.[vi] Not every neutral strategy will work for every institution, and does not expect perfection from institutions seeking to achieve mission-based diversity goals. But, when an institution chooses to use race-conscious policies to fulfill its mission-based diversity goals, it must to be able to show clearly why such policies are necessary. A central part of that inquiry involves consideration of race-neutral alternatives, an exercise that the Playbook is intended to help jump start.

5

UNC0079640

## The "Plays": A review of diversity-focused, race/ethnicity-neutral strategies

The "plays" contained in this section are intended to represent the wide array of race-neutral strategies that an institution may consider and employ as part of the broader effort to achieve its mission-based diversity goals. Just as a sports playbook requires significant practice and conversation to ensure that plays are executed as intended, the discussion and analysis here is intended to trigger a more detailed and rigorous institution-specific inquiry by readers. And, just as a coach might call up a certain play at different points in a game, so too can a college or university use some of these plays at various junctures in the enrollment management enterprise.

As described in the chart on the following page, the race-neutral plays explored in this guidance are grouped into the following five categories of enrollment strategy and action:

♦ **Outreach** programs broadly provide general college information or enrichment to prospective applicants and students, including through academic support programs in middle and high schools, weekend and summer enrichment opportunities, and motivational and family support programs. These types of programs are premised on improving rates of college entry.[viii]

♦ **Recruitment** programs tend to highlight institution-specific features to prospective students in an effort to attract an applicant pool that has the qualifications and background characteristics the institution seeks. Recruitment activities not only build an awareness of an institution, but also increase confidence in students who might otherwise believe that a university or college is out of their reach. Institutions may also provide resources specifically to aid students in the college application process.[ix]

♦ **Admissions** involve the considerations that go into a holistic, individualized review of prospective students' applications in order to admit students to an institution. Admissions involve attention both to individual student applicants and to the entire incoming class composition.

♦ **Financial aid** includes grants, scholarships, and loan programs to attract students to an institution and help them be able to afford tuition and associated costs, including living expenses, instructional materials, room and board, and insurance and health care.

♦ **Non-financial incentives** refer to specialized programs intended to attract and support special groups of students, such as those who may be first-generation college students and those with special academic interests.

For each individual play, the Playbook provides a brief description and overview of the strategy, a list of additional resources to explore, and an assessment of the strategy also assessed along the following key institutional considerations:

♦ Types of Institutions that Have Used This Strategy
♦ Resources Required
♦ Evidence of Success
♦ Questions to Consider
♦ Examples

Some race-neutral efforts – particularly those adopted by public institutions in states that ban the use of race in admissions – have been more rigorously examined by practitioners and researchers than others. Even though the specific efforts in these institutions may not be duplicable by many institutions due to

6

differences in mission and context, the body of research and analysis on the impact and effects of these policies is likely to yield important lessons for all institutions pursuing mission-based diversity goals. Thus, institutions may draw insight and inspiration from a wide variety of plays, even if they do not actually put every play into place.

Finally, to repeat an earlier message, the Plays here are intended to trigger an in-depth, rigorous program evaluation and assessment on campus, which should include a gathering of institution-specific evidence and information to inform the adoption, adaptation, or rejection of any particular strategy.

| Neutral Strategy | Outreach | Recruitment | Admissions | Financial Aid | Non-Financial Incentives |
|---|---|---|---|---|---|
| 1. Zip code, neighborhood data-informed strategies | ✓ | | ✓ | | |
| 2. Relationships with high school counselors | ✓ | ✓ | | | |
| 3. Community engagement | ✓ | ✓ | | | |
| 4. Partnerships with CBOs | ✓ | ✓ | | | |
| 5. Dual-enrollment courses for high school students | | | ✓ | | |
| 6. Recruitment consortia | ✓ | ✓ | | | |
| 7. Pathways among institutions to facilitate students' academic progression | | | ✓ | ✓ | |
| 8. Socio-economic status (SES) admissions considerations | | | | | |
| 9. Removal of other admissions factors (legacy preferences, testing requirements) | | | ✓ | ✓ | |
| 10. Percent plans | | | ✓ | | |
| 11. Lottery systems | | | ✓ | | |
| 12. Need-based aid | | | | ✓ | |
| 13. Need-based scholarships | | | | ✓ | |
| 14. Special programs for first generation students or other affinity groups | | | ✓ | | ✓ |
| 15. Programs for students with specialized academic interests | | | ✓ | | ✓ |

UNC0079642



## 1. Zip Code/Neighborhood-Informed Strategies

Rather than considering demographic information about individual prospective students, an institution of higher education might target outreach and recruitment efforts to neighborhoods or zip codes that exhibit certain characteristics, based on aggregate demographics. Similarly, in admissions, a college or university might choose to provide preferences to any applicant, regardless of race and ethnicity, from neighborhoods that similarly meet certain qualifications. For example, institutions might create composite scores for zip codes based on information such as average income, average adult education level, population density, and/or level of racial isolation and/or racial diversity as a way to create greater student diversity on campus. By using aggregate data on neighborhoods/zip codes to inform enrollment management functions, institutions can aim to attract and enroll students with a diversity of backgrounds and experiences.

Public institutions that draw heavily from an in-state population as well as private schools that tend to conduct enrollment activities within a specific region may be able to compile this type of information in-house. Alternatively, schools could use data tools created by third parties to assist with this exercise. For example, College Board's Segment Analysis Service provides colleges and universities with information about where prospective students live and where they go to high school.

Notably, a college or university might include aggregate racial composition/diversity when applying weights or preferences to neighborhoods/zip codes as part of a composite index. The consideration of race and ethnicity as such is disassociated from any individual student and therefore, this practice may be considered race-neutral. Indeed, a California appellate court upheld a K-12 school assignment policy that considered a composite neighborhood score that included a measure of racial diversity as one element for assigning students to schools. Because each student within a given neighborhood received the same diversity score, regardless of his or her individual race, the court found that the policy did not violate California's state ban on race-conscious policies and practices.[x]

How does this policy address race or ethnicity (if at all)?
- ♦ Race/ethnicity of individual students is not directly considered as part of this strategy.
- ♦ A review of applicant and admissions statistics after the adoption of a zip code/neighborhood weight/preference that notes its impact on the enrollment of racial minorities is permissible.

---

*Additional Resources*

- Arthur Coleman, Katherine Lipper, and Jamie Lewis Keith, *Beyond Federal Law: Trends and Principles Associated with State Laws Banning the Consideration of Race, Ethnicity, and Sex Among Public Education Institutions* (AAAS 2012) [discusses California case]
- College Board Segment Analysis Service (need to add other vendors?)
- LA Times, "LA Diversity" (measures diversity index of Los Angeles's 272 neighborhoods), available at http://maps.latimes.com/neighborhoods/diversity/neighborhood/list/

---

UNC0079643

**Types of Institutions**

- IHEs aiming to create greater student background (residential, family) diversity among students.
- IHEs that are legally barred from using race/ethnicity in admissions (e.g., those in states with voter initiatives that ban the use of race: AZ, CA, FL, MI, NE, NH, OK, WA).

**Resources Required**

- Data-collection and-tagging tool that enables enrollment managers to know more about where prospective students live and attend high school.
- Training for staff on including a neighborhood/zip code metric into outreach/ recruitment opportunities and, where appropriate, admissions decisions.

**Evidence of Success**

- Depending on how a school designs and computes neighborhood composite scores, this approach can create diversity in a number of factors, including racial diversity, socioeconomic diversity, and geographic diversity.
- Depending on the metrics used in the composite score, IHEs employing this strategy may see an increase in the number of applicants and admitted students who qualify as low-income and/or identify as racial/ethnic minorities.

**Questions to Consider**

- What metrics will the college or university use in its neighborhood/zip code composite score?
- Where the composite score is used in admissions decisions, does an applicant need to demonstrate residency in the neighborhood for a certain number of years?

**Examples**

- Berkeley Unified School District: student assignment policy considered each student's "diversity score," a factor computed based on the average income, adult education level, and racial diversity of the student's neighborhood, as one element for assigning students to schools or to academic programs within school; under the district policy, each student within a given neighborhood received the same diversity score, regardless of his or her individual race.

9

UNC0079644

## 8. Socio-economic Status (SES) Admissions Considerations



Socio-economic status (SES) considerations can be used by institutions as a way to create a diverse admissions pool along a number of factors, including, most directly, applicants' financial background.

The most basic approach to incorporating SES attributes into admissions decisions relies on asking indicator questions about a student's parents' income, occupation, marital status, and parents' and/or siblings' education level in the application for admission. Many of these attributes are captured in the Common Application. A companion or alternative to this general approach looks deeper at the accumulated wealth of a family, including income and all other assets, rather than simply at the income of the parent – a potentially important distinction given research demonstrating a "wealth gap" between race/ethnic groups. A new possibility, borrowing from modern marketing practices for various businesses, may involve looking at a student's household's purchasing habits and buying information to predict SES, rather than relying on students' self-reported information.

Institutions should take care to align any SES-related admissions considerations with financial aid policies to ensure that students admitted are able to enroll. Institutions that use need-blind admissions, for example, will likely need to determine how to preserve financial aid policies while also considering SES-related considerations during admissions.

How does this policy address race or ethnicity (if at all)?
- ♦ Race and ethnicity are not directly considered as part of this strategy.
- ♦ A review of admissions statistics after the adoption of an SES admissions preference that notes its impact on the enrollment of racial minorities is permissible.

---

**Additional Resources**
To be added: short descriptions of key lessons/observations from each resource.
- Anthony Carnevale and Jeff Strohl, *Separate & Unequal: How Higher Education Reinforces the Intergenerational Reproduction of White Racial Privilege.* Georgetown Public Policy Institute. (2013)
- Richard Kahlenberg and Halley Potter, *A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences.* (2012).
- Mark Long, University of Washington, "The Promise and Peril for Universities: Using Correlates of Race in Admissions in Response to the Grutter and Fisher Decisions"
- Sean Reardon, Stanford University, "Simulation Models of the Effects of Race- and Socioeconomic-Based Affirmative Action Policies on Elite College Enrollment Patterns"

10

UNC0079645

**Types of Institutions**
- IHEs aiming to create greater income-related diversity among students
- IHEs that are legally barred from using race/ethnicity in admissions (e.g., those in states with voter initiatives that ban the use of race)
- Public IHEs in states with legal limitations on the use of race in admissions: AZ, CA, FL, MI, NE, NH, OK, WA

**Resources Required**
- Admissions staff must be trained in the appropriate, effective application of SES preferences.
- This strategy will likely require careful financial aid planning and dedicated need-based aid to ensure that low income students admitted are able to enroll.

**Evidence of Success**
- This approach can create socioeconomic diversity on campus, which may also lead to an increase in the number of admitted students who both qualify as low income and identify as racial/ethnic minorities as an effect of this strategy. (See Kahlenburg)

**Questions to Consider**
- Studies have shown that SES preferences do not always result in significant racial/ethnic diversity, particularly at highly selective institutions (Carnevale & Strohl; Reardon) – can SES preferences alone allow an IHE to meet its goals around all kinds of diversity, including both SES and race/ethnicity?
- What admissions considerations or applicant information does the institution choose to use to assess SES factors?
- Does incorporating SES considerations into admissions complicate need-blind or other financial aid policies?

**Examples**
- In addition to considering race in admissions, UT-Austin includes SES factors as a consideration. The statewide ApplyTexas application asks for the parents' highest educational level, family income, and household size. In addition, it asks applicants, "Do you have family obligations that keep you from participating in extracurricular activities? If you have family obligations, do you: a. have to work to supplement family income? b. provide primary care for family member(s)? c. have other family obligations that prevent participation?" It also invites applicants to submit optional essays or letters addressing special circumstances. UT also offers several scholarships for low-income students.(Kahlenburg at 27-28)
- At UCLA Law School, under a 2011 program counting wealth and single-parent family status alongside other traditional SES factors, African Americans were 11.3 times and Latinos were 2.3 times as likely to be admitted under the socioeconomic program as other programs. (Kahlenburg at 13)

11

UNC0079646

---

[i] Federal legal requirements apply to public institutions and private institutions that receive federal aid. [INSERT CITATION]

[ii] The terms "race" and "ethnicity," despite their different meanings, are used interchangeably in this document, given that the strict scrutiny analysis required by federal non-discrimination law treats them the same.

[iii] Under the Fourteenth Amendment to the U.S. Constitution and Title VI of the Civil Rights Act of 1964, classifications based on race (or ethnicity) are inherently suspect, disfavored by courts, and, therefore, subject to "strict scrutiny," the most rigorous standard of judicial review. The Fourteenth Amendment prohibits any state actor, including public institutions of higher education, from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. Title VI prohibits discrimination on the basis of race or ethnicity "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[iv] Even though race-neutral strategies do not trigger strict scrutiny, some questions remain about whether neutral strategies, when explicitly used as a proxy for race-conscious policies, could activate more rigorous judicial review. See Brian Fitzpatrick, Strict Scrutiny of Facially Race-Neutral State Action and the Texas Ten Percent Plan, 13 Mich. J. Race & L. 277 (2007) ("The Court in [cases that were foundational to the decisions in Grutter and Parents Involved] seems to be saying that one solution to the constitutional problems with explicit racial classifications is to use race-neutral means to achieve the same racial ends. But that is the very thing that . . . the Court has held in previous cases is no less constitutionally suspect.")

[v] Consider Chief Justice Roberts' majority opinion in Parents Involved in Community Schools v. Seattle School District No. 1 (PICS), which rejected two K-12 student assignment plans that assigned students to schools based on several factors, including students' race and ethnicity. A significant part of the Court's reasoning was that the districts' race-conscious policies only had a "minimal effect" on student assignments (just 54 students in Seattle and 3% of students in Louisville). The Court concluded that the districts had failed to demonstrate that the "marginal" benefits associated with the race preferences "outweighed] the cost" of subjecting numerous students to "disparate treatment solely upon the color of their skin." See also Arthur Coleman, Scott Palmer, & Steven Winnick, Not Black and White: Making Sense of the United States Supreme Court Decisions Regarding Race-Conscious Student Assignment Plans (Sept. 2007), http://diversitycollaborative.collegeboard.org/sites/default/files/document-library/not-black-white-college-board-version.pdf.

[vi] Fisher v. Univ. of Tex. at Austin, 133 S. Ct. 2411, 2420 (2013).

[vii] Fisher, 113 S. Ct. at 2414.

[viii] Coleman et al., Federal Law and Recruitment, Outreach, and Retention: A Framework for Evaluating Diversity-Related Programs 7 (2005).

[ix] Id.

[x] American Civil Rights Foundation v. Berkeley Unified School District, 172 Cal. App. 4th 207 (2009).

12

UNC0079647

UNDERGRADUATE ENROLLMENT—UNC COMPARED TO OTHER UNIVERSITIES

| | UNC | US News Top 30 | US News Top 60 | AAU (60 Schools) | AAU Public (34 Schools) | Peers (16 Schools) |
|---|---|---|---|---|---|---|
| American Indian | 1% | 2nd tied | 2nd tied | 1st tied | 1st tied | 1st tied |
| African American | 9% | 3rd | 4th | 5th | 2nd | 3rd tied |
| Hispanic | 8% | 16th tied | 30th tied | 18th tied | 14th tied | 7th tied |
| All underrepresented | 18% | 6th tied | 13th tied | 14th tied | 10th tied | 3rd tied |
| Pell | 21% | 5th tied | 14th tied | 25th tied | 23rd | 7th |
| Asian American | 8% | 27th tied | 45th tied | 41st tied | 17th tied | 13th tied |
| Non-resident alien | 3% | 29th tied | 56th tied | 51st tied | 26th tied | 14th tied |

All data are from the National Center for Education Statistics.

Pell data are for 2011-2012 academic year.

Enrollment data are for Fall 2012.

UNC0079648