# Exhibit 48

| From: | Kretchmar, Jen <jkretchmar@admissions.unc.edu> |
|---|---|
| Sent: | Friday, October 31, 2014 8:52 PM |
| To: | Polk, Barbara Jo <bpolk@admissions.unc.edu> |
| Subject: | Race-Neutral Draft |

Hi BP,

I'm think I've been hitting my head up against the wall with this long enough. Not sure if that's the right expression, but it's time to let this go for now. I know most of this won't likely make the cut for the final draft, but I felt like I needed to at least make an attempt. So, I hope it's a start, at least.

Let me know if you have any questions, want me to make changes, etc. Happy Halloween!

Jen



EXHIBIT
26
POLK
PENGAD 800-631-6989

UNC0097417

Exploring Race-Neutral Alternatives in Undergraduate Admissions
The University of North Carolina at Chapel Hill
Office of Undergraduate Admissions
DRAFT

**Introduction**

In November 2013, the University of North Carolina at Chapel Hill convened a campus-wide working group to explore alternatives to race-conscious practices in admission. The members of the working group are named in Appendix A. The charge of the group was to identify reasonable alternatives to race-conscious practices in admissions; evaluate each alternative to determine whether it yields an entering class with equal or greater diversity and academic quality; and to present its findings to the Advisory Committee on Undergraduate Admissions.

This report summarizes the work of the committee. Because our efforts were informed by larger legal, institutional, and research contexts, we framed our findings within a brief discussion of the legal history of affirmative action in the United States, our institutional mission especially as it relates to diversity and academic quality, a description of our current admissions policies and practices, and our knowledge of other research being conducted on race-neutral alternatives. Each of these contexts influenced the race-neutral alternatives we chose to pursue, as well as the criteria used to evaluate them.

**Legal History of Affirmative Action**

The U.S. Supreme Court first ruled on the use of race in university admissions in 1978 in *Regents of the University of California v. Bakke.* In a split vote, the Court declared set-aside programs unconstitutional, but reserved the right of universities to use a student's race or ethnicity as one factor among many when making admissions decisions. The use of race, Justice Powell wrote, must be "precisely tailored to serve a compelling governmental interest" (*Bakke*, 438 U.S., at 299). Using this standard, Justice Powell approved the use of race to further one interest and one interest only – the attainment of a diverse student body – arguing that the "nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples" (*Id.*, at 313). Importantly, Justice Powell defined diversity broadly: "the diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element" (*Id.*, at 315).

The Court revisited affirmative action in higher education twenty-five years later in 2003, in *Gratz v. Bollinger* and *Grutter v. Bollinger.* Writing the majority opinion in both cases, Justice O'Connor affirmed student body diversity as a compelling government interest, explaining that the "educational judgment that...diversity is essential to [the institution's] educational mission is one to which we defer" (*Grutter*, 539 U.S., 16). Even when the use of

UNC0097418

race is permitted to further a compelling state interest, however, the government must show that the means to achieve that end are narrowly tailored. The Court concluded that the individualized, holistic review used by the University of Michigan Law School met the narrow tailoring requirement, while the awarding of bonus points to students of particular races/ethnicities – a system used in undergraduate admissions at The University of Michigan – did not. The Court advised:

> When using race as a 'plus' factor in university admissions, a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount (*Grutter*, 539 U.S., 24-25).

The Court also instructed universities to make "serious, good faith consideration of workable race-neutral alternatives," though without requiring "exhaustion of every conceivable race-neutral alternative," nor consideration of alternatives that would jeopardize other aspects of an institution's mission (*Id.*, 27). In *Grutter v. Bollinger*, for example, the Court agreed with the Law School that race-neutral alternatives like lottery systems and the lowering of admissions criteria would jeopardize the school's mission. "Because a lottery would make... nuanced judgment impossible, it would effectively sacrifice...every other kind diversity" (*Id.*, 28). And because lowering admissions standards would sacrifice academic quality, the Law School would become a different kind of institution altogether.

Although *Grutter v. Bollinger* upheld the use of race in admissions, the Court nonetheless stipulated that race-conscious admissions programs must have a logical end point. Justice O'Connor concluded by prophesying "that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today" (*Id.*, 31). Until that time, however, the Court advised universities to conduct periodic reviews to determine if race-conscious policies are still necessary to achieve student body diversity, and to pay attention to the results of race-neutral alternatives already implemented in states like California, Texas and Washington where racial preferences in admissions are prohibited by state law. "Universities in other States can and should draw on the most promising aspects of these race-neutral alternatives as they develop" (*Id.*, 30).

Most recently, in *Fisher v. Texas*, the Supreme Court remanded the case back to the Fifth Circuit court for failing to hold the university to the demanding burden of strict scrutiny, which requires the university to prove that the use of race serves a compelling government interest, and that it is narrowly tailored to achieve that end. The courts may grant deference to universities' judgment that diversity is essential to its academic mission, but with respect to narrow tailoring, the university receives no deference. Justice Kennedy writes, "It is at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that...it is 'necessary' for the university to use race to achieve the educational benefits of diversity. The

UNC0097419

reviewing court must ultimately be satisfied that no workable race-neutral alternatives" would achieve the same ends (*Fisher*, 570 U.S., 2).

**Existing Research on Race-Neutral Alternatives**

The Courts instructed universities across the nation to pay attention to the results of "natural experiments" being conducted in states like California, Texas, and Washington, all three of which banned affirmative action in the late 1990s. Although the impact of eliminating affirmative action varies across state – given the demographics of a particular state, for example, or the number of public institutions it houses – the research conducted on outcomes resulting from actual policy changes has obvious advantages over simulations and modeling (e.g. eliminating the need to make assumptions about student behavior, shedding light on unanticipated consequences, documenting change over time). Before investigating our own alternatives, the working group familiarized itself with alternatives being implemented in other states and existing research on current practices. The research falls under three broad (albeit somewhat arbitrary) categories: impact on minority representation, impact on applicant behavior, and impact on academic quality.

(1) Impact on Minority Representation

In an article titled "Affirmative Action and its Alternatives in Public Universities: What Do We Know?" Long (2007) investigates the impact of affirmative action bans in Texas, California, Washington, and Florida. Texas, California, and Florida all implemented some version of a top x% plan; Washington focused on increasing outreach and recruitment. Long (2007) concludes that "despite the many alternative strategies implemented at public universities in these states, schools have not been able to maintain minority enrollments absent affirmative action...they have discovered no true substitutes" (315). Furthermore, he argues, any rebounds in minority enrollment have resulted from the growing minority population in these states; in other words, the share of minorities in the population of students at select public universities has *declined* relative to their share in the population of high school graduates. At UC Berkeley, for example, minority student underrepresentation in the student body was minus 5 to minus 10 percent relative to their representation among high school graduates prior to the ban on affirmative action in 1997. After 1997, underrepresentation increased to minus 20 percentage points below, and has changed very little in the last seven years. Similar patterns were found across states with the exception of Florida, where the ban on affirmative action has had little impact on minority representation. Long (2007) attributes Florida's success to efforts made by universities in the 1990s to increase applications from underrepresented minorities.

Research suggests that the impact of bans on minority representation plays out differently at different kinds of institutions. In examining the pool of students admitted to *all* public institutions in Texas between 1998 and 2004, Chapa and Horn (2007) found that the share of White students dropped from 66 to 58%, while Hispanic representation increased and

UNC0097420

African-American representation remained constant. When Long and Tienda (2008) investigated enrollment at the public flagships, however, a different picture emerged. At UT-Austin, for example, the share of Hispanic and African American students fell from 20% to 17.7%. Similarly, Hinrichs (2010) modeled the impact of a nation-wide ban on affirmative action, and concluded that public universities ranked in the top 50 according to US News and World Report would experience the greatest declines in minority enrollment and subsequent increases in white enrollment. He concludes that "affirmative action bans do not affect who goes to college, but they have some effect on where people go to college" (712). Howell (2010) also modeled a disproportionate impact, estimate a 2% decline in African American and Hispanic representation at most four-year colleges as a result of a nation-wide ban, but as much as a 10% drop at the most selected institutions.

Koretz, et. al. (2002) used data from the California state system to model the impact of various admissions policies on the diversity of student bodies at selective, moderately selective, and less selective universities within the state. Using only HSGPA and SAT data (from 1995-1998), and categorizing matriculation as a series of steps – taking the SAT, establishing UC system eligibility, applying to specific UC system campus, and gaining admission to a UC system campus – Koretz, et. al (2002) were able to model the potential impact of each step on the diversity of the student body in the absence of affirmative action. At highly selective universities like UCLA and Berkeley, for example, diversity was impacted by each of the following: underrepresentation of Hispanic students in the SAT-test taking population; the disproportionate number of Black students impacted by UC eligibility criteria; and a race-neutral admissions policy that further reduced Black and Hispanic representation.

Koretz et. al. (2002) also modeled the impact of various X% plans on the diversity and academic qualifications of students admitted to the UC system. The four models considered were: 1) admitting the top 12.5% of all students statewide (the baseline condition); 2) admitting the top 12.5% of students at each school; 3) admitting the top 6% at each school, and the top 6.5% statewide; and 4) admitting the top 4% at each school, and the top 8.5% statewide. The third and fourth models, they concluded, had little impact on the average SAT score or the proportion of underrepresented students in the admitted pool. Admitting the top 12.5% at each school had the largest positive impact on diversity – nearly doubling the representation of both Black and Hispanic students – but also the largest negative impact on academic qualifications, with an average drop in SAT of over 100 points for underrepresented minorities. Admitting the top 12.5% at each school also increased representation of first-generation college students, students from urban schools, and bi-lingual students. Finally, the authors also modeled the impact of admissions policies that preference demographic factors other than race, such as school type, mother's education, income, etc. Ultimately, "none of the alternative admission models analyzed could replicate the composition of the student population that was in place before the termination of affirmative action in California" (p. 27).

Epenshade and Chung (2005) examined how preferences for different types of students – athletes, legacies, underrepresented minorities – impacted the composition of admitted

UNC0097421

students at three private, elite, research institutions. According to their model, eliminating affirmative action would reduce acceptance rates for African Americans from 33.7% to 12.2%, while the proportion of African American students in the admitted group would drop from 9.0 to 3.3%. The change in policy would impact Hispanic students similarly; their acceptance rate would be cut in half (from 26.8% to 12.9%), while their representation in the admitted pool would fall from 7.9% to 3.8%. The authors also looked at who would benefit most from the elimination of affirmative action, and concluded that 4 out of 5 spaces not taken by African American and Hispanic students would be filled by Asian students. By contrast, Epenshade and Chung (2005) found that athlete and legacy preferences have minimal impact on the diversity of the admitted pool: "preferences for athletes and legacies do little to displace minority applicants largely because athletes and legacies make up a small share of all applicants to highly selective universities" (p. 304).

Although class-rank plans are by far the most widely used race-neutral alternative, some institutions have combined class-rank plans with consideration of other factors like geography. As Rendon, Novack, and Dowell (2005) report, The University of California-Long Beach was recently faced with competing objectives – to reduce enrollment while maintaining and/or increasing diversity using race-neutral admissions policies. In Fall 2002, the university adopted a new admissions policy favoring students in the local service area who also met the statewide eligibility index for moderately selective state schools. The eligibility criteria were increased for students who lived farther away from the local service area. Because even the lesser stringent criteria were known to disproportionately impact African American and Latino students, university officials were not surprised when the diversity of the enrolling class was compromised. The school was able to shrink enrollment by 32.8%, but African American enrollment declined by 52.3%, while Latino representation fell 39.7%. The following year, the university altered its geographic boundaries, extending the local service area to include several more schools, thereby increasing the number of students eligible for admission under the less stringent standards. Because the new service areas were ethnically diverse, the university was able to meet its diversity goals. The authors noted that although geographic preference models worked in Southern California, they would not necessarily work for universities in less diverse parts of the country.

Although UC-Long Beach was able to use geographic preferences to create a diverse student body, socioeconomic preferences have received the most attention in the research literature as a viable race-neutral alternative. Kahlenberg (2003), writing on behalf of The Century Foundation and using data from 146 of the nation's top colleges, concluded that economic affirmative action provides the best way to meet a number of different goals. Basing many of his conclusions on the work of Carnevale and Rose (2003), Kahlenberg (2003) argues that economic affirmative action is a better approximation of merit (e.g. the notion of academic achievement taken in context of obstacles overcome) than race-based affirmative action; achieves nearly as much racial diversity yet much greater economic diversity (e.g. students in the bottom half economically would comprise 38% of students at elite colleges, as opposed to 10% under current models); and results in the same graduation rates. Kahlenberg (2003)

UNC0097422

concludes that economic affirmative action, unlike racial affirmative action and percentage plans, is the only model that addresses "the fundamental root source of inequality: the division between the haves and the have nots" (p. 4).

More specifically, Carnevale and Rose's (2003) study examines the impact of five different types of admissions models – a race-neutral model based on test scores and grades; a lottery system; class-rank preferences without a minimum test score; class-rank preferences with a minimum test score; and a model based on economic preferences – and places each in the context of the population currently attending elite institutions (of which the least-represented group, they argue, are low SES students). Using data from the top 146 colleges and universities, the authors find that a race-neutral model based on academic merit would reduce representation of underrepresented minorities (the only model of the five to do so), a class-rank model without a minimum SAT score would increase racial and economic diversity, but puts some students at risk academically, a class-rank model with a minimum SAT would have a negative impact on racial and economic diversity but a positive impact on graduation rates, while a model based on economic status would compromise racial diversity only slight, improve economic diversity substantially, and maintain student performance. Carnevale and Rose's (2003) conclusion, however, differs slightly from Kahlenberg's (2003). Economic affirmative action, they recognize, is not a substitute for race-based affirmative action. "Income-based policies are not an effective substitute for conscious racial and ethnic enrollment targets, unless low-income African American and Hispanics can be chosen disproportionately from the qualified pool of low socioeconomic status students…" (p. 153).

St. John, Simmons, and Musoba (2002) build upon the publicly accepted notion of merit as academic achievement in the context of obstacles overcome. Merit, they argue, "is not simply where you wind up, but what you did with what you were given" (p. 37). Using this as their theoretical foundation, they built a merit index that accounts for the quality of school attended by each individual student. They calculate a simple index by subtracting the average SAT score of an applicant's high school from the applicant's own score, and a more complex index by assigning higher weights to schools with disproportionately poor performance. According to their analysis, using data from two universities, the simple merit index increased diversity in the applicant pool, while the more complex index predicted persistence as well as the SAT. They conclude that although "the merit-aware approach can provide a fair and just way to screen admissions applicants, it is not a substitute for affirmative action" (p. 44)

(2) Impact on Applicant Behavior

Harris and Tienda (2009) investigated an often overlooked component of race-neutral admission policies –their impact on the application rates of minority and non-minority high school graduates. "Despite their centrality in shaping the composition of entering classes, with few exceptions application rates have been relatively ignored as a focus of inquiry. Partly this reflects data constraints and partly the fact that litigation targets criteria used in institutional admissions decisions, not individual decision to apply…or enroll" (p. 2). Building on the findings

UNC0097423

of Koffman and Tienda (2008), who reported that the top 10% law did little to raise the application rates at public flagships of students from poor high schools, Harris and Tienda (2009) investigated application rates by ethnicity. Using ten years' worth of data (1993-2003) from public high schools in Texas, the authors found that Hispanic and black application rates to the Texas flagship universities fell after affirmative action was banned, and that there disadvantage has grown over time. "This result," they conclude, "has profound policy implications that transcend admission regimes because they redirect attention away from the seemingly irresolvable differences about race or class rank preferences to encouraging greater numbers of qualified applications to apply" (p. 20). They identify the cultivation of a college-going culture at under-resourced high schools, coupled with financial aid, as a short-term, low cost strategy for improving diversity.

Five years earlier, Long (2004) found a similar impact on the application behavior of underrepresented minorities in both Texas and California. The changes, he discovered, widened an already existing gap between the number of SAT score reports sent to in-state public colleges, particularly in California, by minority and non-minority students. In addition, Long (2004) discovered that minority students began sending SAT scores to lower quality colleges post-affirmative action, while White and Asian American students began doing the opposite. This indirect effect of the elimination of race-based preferences, he argued, could be more detrimental than the direct impact caused by the policy change itself. Like Harris and Tienda (2009), Long (2004) argues that "college administrators and policymakers should focus their attention on efforts to boost minority applications. Such a strategy could ultimately be the most effective method to maintain minority enrollments after the elimination of affirmative action" (p. 341).

Similarly, Niu, Tienda, and Cortes (2006) document disparate educational aspirations of minority and non-minority students in Texas, within the context of the Top 10 percent law. Using data from 2002, they found that high school seniors from low-income schools, compared to their affluent counterparts, were less likely to choose selective institutions as their first choice school. In addition, Black and Hispanic students were less likely than white students to choose selective institutions, as either their first preference when planning for college, or when choosing to enroll. Within top decile students, however, minority group status and high school type did not impact enrollment; students from affluent and low-income schools, for example, were equally as likely to choose selective institutions. What these results concealed, however, were differences in application rates of students by high school type; even top-decile students from low-income schools and/or underrepresented minority groups were much less likely to actually seek admission than other top-decile students.

Like underrepresented minority students in Texas and California, underrepresented minority students in Washington reacted similarly to affirmative action bans in their state. Brown and Hirschman (2006) discovered that representation of minority students at the flagship university – University of Washington – fell from 8.2% of the first-year class to 5.7% of the first-year class following the passage of I-200 (the law banning affirmative action). While

UNC0097424

admission rates declined the first year of the ban – from 84 to 70% for African American students - the authors concluded that the drop in applications explained the decline in minority student representation more than the change in admission rates due to the ban. By 2003, the application rates of minority students in Washington had largely rebounded to pre I-200 levels; nevertheless, the gap in application rates between minority and non-minority students persists, and the authors concluded that even a modest gain in the proportion of minority applicants who apply would have significant impact on the composition of the first-year class. They conclude that affirmative action policies signal an "institutional welcoming environment" that "serves as a counterweight to the normal reluctance of prospective students to apply to institutions that may be perceived as intimidating" (p. 106).

Others, however, have found little change in the application behavior of underrepresented minority students in the face of affirmative action bans. Card and Kreuger (2004) used SAT-sending patterns as a proxy for applying to an institution, and found little difference in the rates of application for Hispanic and Black students pre and post affirmative action in California or Texas. Their sample, however, was limited to highly-qualified underrepresented minority students. "A particular concern," they write, "is that highly qualified minorities – who were not directly affected by the policy change – would be dissuaded from applying to elite public schools, either because of the decline in campus diversity or because of uncertainty about their admission prospects" (abstract). They found no evidence to support the concern.

More conflicting evidence comes from Long, Saenz, and Tienda (2009), who like Koffman and Tienda (2008), investigated the application behavior of students in Texas by high school. Koffman and Tienda (2008) concluded that students from affluent high schools are more likely to seek admission to public flagships compared to graduates of schools serving students of low to moderate socioeconomic means, even after the implementation of the Top 10 percent law. In the end, they found that the admission guarantee did little to raise flagship application rates from poor high schools. Long, Saenz, and Tienda (2009), however, contend that the applicant pool at Texas flagships has become more geographically diverse in the post-Hopwood era; a smaller share of students come from traditional feeder schools, while applicants from students attending rural and high-poverty schools has increased. "After 1998, the overrepresentation of students from low-poverty high schools began a downward trend, as the share of UT enrollment from the highest poverty high schools inched upward. Most impressive is the growing representation of students from schools where 40 to 60% of students receive free or reduced lunches" (p. 15). Long, Saenz, and Tienda (2009) believe the transparency of new admissions policies – possibly even more than the "institutional welcoming environment" attributed to affirmative action – encourages traditionally underrepresented students to apply.

(3) Impact on Student Quality/Academic Performance

UNC0097425

Chan and Eyster (2003) modeled the impact of race-neutral alternatives on student quality, recognizing that most universities value both academic preparedness as well as diversity. In both theory and practice, they argue, the elimination of affirmative action leads universities to adopt admissions policies that partially ignore student qualifications, resulting in a less academically able student body. "For any admissions rule that partially ignores qualifications, there exists an affirmative action rule that yields the same diversity and strictly higher student quality. In fact, affirmative action maximizes total student quality for any level of diversity" (p. 859). Furthermore, the authors argued that using socioeconomic status as a proxy for race would reduce quality and diversity; since class is negatively correlated with academic performance across all ethnic groups, a policy favoring all low-income students would reduce quality. Because very few academically qualified low-income students are minorities, a policy admitting only qualified low-income students would compromise diversity.

Furstenburg (2009) examined the academic performance of students admitted as a result of class-rank policies, who would not have been competitive otherwise. Whereas little evidence has been found to support the mismatch hypothesis – the notion that students admitted under affirmative action are academically unqualified – Furstenburg (2009) demonstrated that students admitted under race-neutral policies in Texas had lower first and sixth-semester GPAs, and lower probability of graduation. The effect was strongest for White and Hispanic students. He concluded, "To the extent that administrators at selective institutions want to maintain their academic standards, policy makers should reconsider policies such as Top Ten Percent Law. Admissions policies without guarantees and admissions decisions based on individual evaluations of applicant's qualifications are likely to avoid this problem" (p. 17). [Note: Furstenburg's (2009) findings seem to contradict those of Chapa and Horn (2007), though he focused on a subpopulation of students – those not likely to be admitted otherwise – while Chapa and Horn (2007) included all students admitted under the Top 10 percent plan].

Fletcher and Tienda (2009) approach the question of academic performance and affirmative action from a different angle, investigating the relationship between the quality of the high school a student attends and his/her college success. The persistence of an achievement gap between minority and non-minority students has puzzled scholars for quite some time; "despite voluminous social science literatures that document and evaluate the dimensions and evolution of academic achievement gaps," the authors write, "they remain poorly understood" (p. 1). In this study, Fletcher and Tienda (2009) replicate previous research, reducing – but not eliminating -the achievement gap between minority and non-minority students by controlling for test scores and class rank. When they take into account differences across high schools, however, gaps between black-white and Hispanic-white students in several college outcomes are eliminated or reversed, regardless of institutional selectivity. The authors claim their study illustrates "how high school quality foments race and ethnic inequality in college performance" (p. 1).

UNC0097426

**The University's Philosophy, Policies, and Guiding Principles Regarding Diversity, Academic Excellence, and Undergraduate Admissions.**

In a 2008 policy paper prepared by the College Board's Access and Diversity Collaborative, the Board advises universities seeking race-neutral alternatives to ask itself a series of questions, the first and most important of which is whether or not the institution's diversity-related goals are clearly defined and understood. "If goals are not clear, then the viability of race-neutral policies can't be evaluated with any precision. The determination of the viability of a policy designed to achieve some goal is dependent on the goal itself" (Coleman, Palmer, & Winnick 2008). Indeed, all institutional goals – not just goals related to diversity – much be clearly defined for the purpose of this project, since any race-neutral alternative is evaluated not only on the merits of its ability to create a diverse class, but also the degree to which it supports and/or conflicts with other institutional goals. The Supreme Court does not expect universities to pick and choose among its priorities. For this reason, the working group outlined the university's longstanding commitment to diversity, as defined and documented in various policy statements, with special attention to the ways in which this commitment informs current practices in undergraduate admissions.

(1)     The Mission of the University.

The admissions policies and practices of The University of North Carolina at Chapel Hill derive from and are aligned with the mission of the University (Appendix C). Our mission statement confirms that Carolina exists "to serve all the people of the State, and indeed the nation, as a center for scholarship and creative endeavor." The University's mission statement explicitly recognizes Carolina's long history of preparing undergraduate students for leadership roles both within North Carolina and nationwide. We are charged to "provide high-quality undergraduate instruction to students within a community engaged in original inquiry and creative expression, while committed to intellectual freedom, to personal integrity and justice, and to those values that foster enlightened leadership for the state and nation."

(2)     The Board of Trustees' Policy on Undergraduate Admissions.

The Board of Trustees' policy on admissions establishes a framework of competitive admissions and mandates that candidates by selected largely on the basis of the University's "special responsibility to residents of North Carolina" and its "judgment of the applicant's relative qualifications for satisfactory performance" in the program to which the applicant seeks admission. At the same time, this policy explicitly states that these two broad selection criteria

> ...shall not prevent the admission of selected applicants (a) who give evidence of possessing special talents for University programs requiring such special talents, (b) whose admission is designed to help achieve variety within the total number

UNC0097427

of students admitted and enrolled, or (c) who seek educational programs not readily available at other institutions.

The policy goes on to frame the interest in variety as an affirmation of the University's "commitment to achieve excellence, to provide for the leadership of the educational, governmental, scientific, business, humanistic, artistic, and professional institutions of the state and nation, and to enrich the livers of all the people of North Carolina."

For admission to the first-year or freshman class, the policy specifies several criteria— including "satisfactory evidence of scholastic promise" gleaned from the applicant's academic record, recommendations, test scores, application, and predicted first-year performance—but delegates to the Faculty Advisory Committee on Undergraduate Admission the authority to approve procedures to assess this evidence.

(3) The Academic Plan.

The University's Academic Plan, adopted in 2003 after more than a year of campus-wide deliberation, elaborates on our mission by articulating six overriding academic priorities, all grounded in the critical principle that the University must provide "the strongest possible academic experience for undergraduate, graduate and professional students." These priorities differ in focus but reflect shared judgments about the nature of Carolina academics: that diversity, broadly construed, is fundamental to student success; that different students may contribute to this success in different ways; and that Carolina, to fulfill its mission, must educate leaders who are prepared to engage deeply with and function effectively within an increasingly multicultural society. The plan observes that Carolina undergraduates "gain from a diverse residential environment that complements and enriches their academic work," and calls for greater enrollment of students who will "add to the geographic, intellectual, artistic, and cultural diversity of the student population." The Plan also calls upon the University to "increase diversity among faculty, students and staff," because diversity is "critical to the University's effectiveness in fully preparing students for the world."

(4) Other Statements of Guidance Regarding Undergraduate Admissions.

The principles inscribed in the Academic Plan are anticipated or echoed in many other documents endorsed by the University's Board of Trustees, Chancellor, and Faculty Council. In 1995, the Chancellor's Task Force on the Recruitment and Retention of Minority Students and Faculty emphasized the fundamental educational value of diversity and called upon the University to continue its efforts to identify, recruit, and enroll talented students of every background. In 1998, the Faculty Council passed a resolution encouraging the University to continue its efforts to recruit and enroll students of diverse backgrounds, perspectives, and experiences, since interactions within such a student body constituted a necessary precondition for educational excellence. In 200, the Chancellor's Minority Affairs Review Committee found

UNC0097428

diversity to be "a fundamental prerequisite to both educational excellence and to the University's ability to serve all the people of the state."

Finally, in 2005, after a formal, year-long assessment found "widespread agreement among students, faculty, and staff that "they [had] learned and benefited" from their interactions with colleagues from different backgrounds, the University issued its first diversity plan. The plan found that Carolina could not "achieve its educational, research, and service mission"—including its mission to prepare students to "become leaders in [a] complex world"—without a University community diverse in "social backgrounds, economic circumstances, personal characteristics, philosophical outlooks, life experiences, perspectives, beliefs, expectations, and aspirations." Calling for "the admission of students" who could contribute to such diversity, the plan also established, as an institutional goal, the "achieve[ment] of critical masses of underrepresented populations," since the absence of such critical masses "impedes the educational process" and "can place undue pressure on underrepresented students and interfere with all students' experiencing the educational benefits of a diverse learning environment."

(5)     Guidelines and Procedures of the Faculty Advisory committee on Undergraduate Admissions.

The Faculty Advisory Committee on Undergraduate Admissions is delegated by the Trustees to set procedures for assessing undergraduate applications. The Committee has defined procedures designed to help the University achieve its mission by affording each candidate a series of comprehensive, holistic, and individualized evaluations. Since approving the addition of an essay to the first-year application in 1997, the Committee has acted consistently to maintain and strengthen the University's commitment to such evaluations. The Committee added a required teacher recommendation to the application in 2001; affirmed the use of comprehensive review in 2002; and, in 2003, reviewed and affirmed the University's admissions practices, including its flexible and nuanced use of race and ethnicity as one factor among many, in light of the *Gratz* and *Grutter* decisions.

In addition to taking these steps, the Advisory Committee has endorsed or drafted two general statements about the practices, procedures, and criteria applicable to the University's undergraduate admissions process. Both statements ground admissions practices in the mission of the University, mandate comprehensive and individualized evaluations for all candidates, and articulate a broad range of criteria to be used in these evaluations.

In 1998, the Committee reviewed and endorsed the Faculty Statement on Principles of Service, Diversity and Freedom of Inquiry. Adopted by the full Faculty Council in April 1998, this statement confirmed that diversity "in its many manifestations" was essential to the fulfillment of the University's educational and service missions, and that such an expansive notion of diversity required that admissions decisions include

UNC0097429

...consideration of (1) quantifiable data and qualitative information regarding educational preparation (including, when relevant, class rank, courses, degree(s), educational program, employment, grades, major, standardized test scores, volunteer activities, and work experience); (2) life experiences (including their variety, type, uniqueness, duration, and intensity); (3) factors that may contribute to diversity of presence (including, without limitation, age, economic circumstances, ethnic identification, family educational attainment, disability, gender, geographic origin, maturity, race, religion, sexual orientation, social position, and veteran status); (4) demonstrated ability and motivation to overcome disadvantage or discrimination; (5) desire and ability to extend knowledge-based services to enhance the quality of life of all citizens; and (6) motivation and potential to make a positive contribution to the educational environment of the University and to the University's fulfillment of its mission to serve all the people of the State, to enhance the quality of life for all people in the State, and to improve conditions of human life.

In April 2007, the Committee discussed and approved a statement on the evaluation of candidates for admission. The statement endorses admissions practices that are designed to yield a "scholarly community" which in turn will help the University achieve its mission:

In evaluating candidates for undergraduate admission, the University of North Carolina at Chapel Hill seeks to shape the entering class so that its collective strengths will foster excellence within the University community; enhance the education of everyone within it; provide for the leadership of the educational, governmental, scientific, business, humanistic, artistic, and professional institutions of the state, nation and world; and enrich the lives of all the people of North Carolina.

In doing so, we aim to help the University fulfill its stated mission: to serve "the people of the state, indeed the nation, as a center for scholarship and creative endeavor," and to be "a community engaged in original inquiry and creative expression, while committed to intellectual freedom, to personal integrity, and justice, and to those values that foster enlightened leadership for the state and nation," and indeed the world.

The qualities we seek in each class are those that foster such a community, including intellect, talent, curiosity, and creativity; leadership, kindness, and courage; honesty, perseverance, perspective, and diversity. Although we expect each successful candidate to demonstrate strength in many of these areas, we do not expect every candidate to be equally strong in all of them. Just as there is no formula for admission, there is no list of qualities or characteristics that every applicant must present.

UNC0097430

In shaping the class, we evaluate individual candidates rigorously, holistically, and sympathetically. We seek to assess the ways in which each candidate will likely contribute to the kind of campus community that will enable the University to fulfill its mission. This assessment requires not only that we note the achievements and potential of each applicant but also that we understand the context within which achievements have been realized and potential forged.

These comprehensive and individualized evaluations, taken together, do not aim to maximize any single, narrow outcome—for example, the average SAT score or the average eventual GPA of the entering class. Rather, they aim to draw together students who will enrich each other's education, strengthen the campus community, contribute to the betterment of society, and help the University achieve its broader mission.

**Race-Neutral Alternatives at UNC-Chapel Hill**

Prior to the convening of the working group, The Office of Undergraduate Admissions (UADM) conducted preliminary analyses of the viability of race-neutral alternatives. Using data from the Fall 2012 applicant pool, UADM modeled the impact of a top 10% plan on the academic quality and diversity of the enrolling class of North Carolinians (Appendix B). According to the model, granting automatic admission to *all* North Carolina applicants with an official class rank in the top 10% of their graduating class would have led to a decline in the average SAT and predicted first-year GPA of the enrolling class, and a one percentage point gain in underrepresented minority students. The admission rate for North Carolinians who did not officially rank in the top 10% of their graduating class would have dropped from 31 to 10 percent. In the context of the applicant pool, a top 10% plan would yield a less academically qualified class, even if a slightly more diverse one.

Because the preliminary model does not account for changes in applicant behavior that might result from changes in admissions policies (i.e., students who had not previously applied under comprehensive, holistic review might apply under a top 10% plan), the working group wanted to model the impact of race-neutral alternatives on the entire population of North Carolina public high school graduates rather than those already in the applicant pool. In addition, while North Carolinians comprise 82% of the enrolling class each year – of which over 80% graduate from North Carolina Public High Schools – the preliminary analyses did not attempt to model the impact of a top 10% plan on out-of-state students or North Carolina students attending private, parochial, or independent schools. By examining the impact of race-neutral alternatives on each sub-group of the class, we aimed to achieve a clearer understanding of the impact on the whole. Finally, although top x percent plans are frequently the most common alternatives explored, we wanted to explore other admission criteria like strength of the high school curriculum, test scores, and type of high school attended, in addition to class rank.

UNC0097431

The working group received IRB approval (study #: 14-0605) from the University of North Carolina at Chapel Hill on May 1, 2014 to conduct an exploratory study of race-neutral alternatives in admissions using data for North Carolina Public High School graduates. We then submitted a proposal to the North Carolina Department of Public Instruction (DPI) via the North Carolina Education Research Data Center (NCERDC) on June 4, 2014 requesting data for all spring 2012 graduates of North Carolina public high schools, the most recent year for which data was available. The NCERDC approved our request on June 16, 2014 granting us access to seventeen student, teacher, school, and district level files for spring 2012 graduates. The files include data points that describe students academically (e.g. rank, test scores, number of Advanced Placement courses taken, etc) and demographically (e.g. gender, ethnicity), as well as data points that describe the socio-economic environment in which schools reside (e.g. % of students receiving free and reduced price lunch, expenditures per student, teacher turnover, etc). We paid $2,210 dollars to NCERDC for access to the data.

Because we receive applications from students in nearly all fifty states as well as many foreign countries, it was not feasible to obtain a data set for the entire population of spring 2012 high school graduates for out-of-state students. For these groups we had to follow the methodology established by UADM in the preliminary analyses, attempting to model the impact of race-neutral alternatives using the applicant pool. Similarly, data for high school graduates of North Carolina private and parochial schools is not housed in a single location as is data for graduates of North Carolina public schools, nor do these students often have an official class rank. For this segment of the population, we obtained aggregate data from the College Board Enrollment Planning Service (EPS) for UNC's top 20 private feeder high schools; these top 20 feeder high schools account for nearly 60% of all admitted students attending NC private high schools.

Because admissions yield models are based on data available to the university only after students apply, and because we are relying on non-applicant data for NC public and private high school graduates, we cannot predict the probability of enrollment for any individual student in this study; unlike the preliminary analyses that relied on data from the applicant pool, and modeled the impact on the *enrolling* class, this analysis will rely on data from the pool of high school graduates, but model the impact of race-neutral alternatives on the *admitted* class. By modeling the impact of race-neutral alternatives on the admitted class, we are making two necessary assumptions: that the students we identify would, in fact, apply; and that their enrollment patterns would be similar to the enrollment patterns of the actual admitted class, yielding an enrolling class of comparable size.

The admitted classes that resulted from the various race-neutral alternatives explore were evaluated on two grounds – the extent to which they resulted in an admitted class of equal or greater academic quality, and the extent to which they resulted in an admitted class of equal or greater diversity. As is outlined in our institutional mission and guiding principles, the University defines diversity broadly; in addition to race and ethnicity, diversity includes differences in social background, economic circumstance, age, philosophical outlooks, family

UNC0097432

educational attainment, sexual orientation, religion, disability, veteran status, and life experiences, among other characteristics. Because diversity manifests itself in ways that are not easily quantified, the goal of admitting and enrolling a diverse class can only be accomplished using a holistic, comprehensive, individualistic review, as is current practice. In assessing the diversity of classes admitted using race-neutral alternatives, we are necessarily focusing on diversity narrowly, in terms of race/ethnicity, and to some extent, socio-economic background. As such, this exercise cannot capture the loss of diversity, as it is more broadly defined, that might result from top x % plans, and other race-neutral alternatives.

When conducting holistic, comprehensive, and individualized review of applicants, academic potential is similarly assessed in multiple ways. Traditional, quantifiable measures like standardized test scores, GPA, and class rank are considered. But applicant essays, letters of recommendation, and extracurricular activities are taken into account as well, all of which give a more nuanced understanding of the academic achievement and potential of each student. Again, this analysis reduces academic quality to the quantifiable. Academic indicators available across data sets included class rank, percent of students taking Advanced Placement course average number of Advanced Placement courses taken, and average and middle 50% test scores.

Definitions of the variables used in the study to measure diversity and academic quality are included in appendix D. When necessary, lengthier explanations/definitions are provided to alert the reader to the ways in which the data source from which the variable was derived impacted its meaning. Finally, a note on two other important terms that merit definition: race-neutral and race-conscious. The working group referenced guidelines provided by the College Board in determining which alternatives might meet the standard of 'race-neutral' (Coleman, Palmer, & Winnick 2008). The two terms are defined as:

1) Race-conscious policies include two types of policies: a) those that involve explicit racial classifications; and b) those that are neutral on their face but that are motivated by a racially discriminatory purpose, resulting in racially discriminatory effects.

2) Race-neutral policies include two types of policies: a) those that, with respect to both operation and intent, are neutral; and b) those 'inclusive' outreach and recruitment policies that expand efforts to generate additional applicant interest, which may be facially race-conscious and/or race-conscious in intent, but which do not confer material benefits to the exclusion of non-targeted students

Thus, as the College Board points out, "facially neutral policies may in some cases actually qualify as race-conscious, given the underlying motivation" (4). Which creates the somewhat paradoxical effect, the working group notes, that any race-neutral alternative sought to achieve the same end (e.g. diversity), is not, by definition, a race-neutral alternative. As Long (2014)

UNC0097433

writes: "It would therefore seem that any policy that attempted to give weight in admissions decisions to any other factors aside from race with the goal of boosting minority admissions would be deemed to be not 'race-neutral' and would instead be deemed 'race-conscious' and face the strict scrutiny test.' (5). Or, as Justice Ginsberg notes in her dissenting opinion in *Fisher*, "only an ostrich could regard the supposedly neutral alternatives as race unconscious. As Justice Souter observed, the vaunted alternatives suffer from 'the disadvantage of deliberate obfuscation.'"

Despite this inherent tension between race-neutral and race-conscious, the working group selected alternatives in the context of the following: 1) by taking note of alternatives implemented by peer institutions in other states; 2) by paying attention to the research literature, which documents actual and simulated results of race-neutral alternatives; 3) by drawing on our own knowledge/research about which factors predict academic success at UNC-Chapel Hill; 4) by considering which alternatives would be practicable/feasible in their implementation; and 5) by choosing those alternatives most likely to bear results in line with other institutional goals.

(1) Preliminary Results - NC Public

A. Top 10% Plan

The first race-neutral alternative the working group explored was a top 10% plan, granting automatic admission to all NC public high school graduates ranked in the top 10% of their high school class. This yielded an admitted class nearly double the size of the actual admitted class, making it an unviable alternative. Given the popularity of top 10% plans, however, we decided to compare the demographic and academic characteristics of this population to the actual admitted class as an exploratory and information gathering exercise. By all available indicators, the ethnic/racial diversity of the top 10% pool is equal to that of the admitted class – 16.7% underrepresented minority compared to 16.4%, and 30.4% non-white compared to 30.6%. In terms of geographic diversity, all 100 NC counties are represented by the top 10% plan, only 98 in the actual admitted class. A larger share of the top 10% are attending schools with more than 50% of students on free-and-reduced-price lunch – 38.4% compared to 20.2% - suggesting greater socio-economic diversity. The academic quality of the top 10%, however, falls short relative to the actual admitted class. A smaller proportion of students are pursuing Advanced Placement courses – 71.8% of the top 10% are taking at least one, compared to 99.0% of the actual admitted class – and they're taking fewer overall - five on average, compared to nearly eight in the admitted class. The average SAT (CR+M) of the top 10% class is 130 points lower than the actual admitted class as well.

B. Top 4.5% Plan

We continued to explore top x % plans; for our second attempt, we determined that granting automatic admission to the top 4.5% of all NC public high school graduates yielded an

UNC0097434

admitted class of 4,040 students, compared to the actual admitted class of 4,097. Although nearly equal in size, the top 4.5% admitted class is both less diverse and less academically qualified than the actual admitted class. The average SAT (CR+M) of the top 4.5% is 75 points lower than the actual admitted class, and less than half of those ranked in the top 4.5% are taking 5 or more AP courses, compared to 92% of students in the admitted group. Only 24% of students identify as non-white, compared to 30.6% in the admitted class; the proportion of underrepresented minorities dropped more than two percentage points as well.

## C. Top x % & Socioeconomic Diversity Plan

In our third and final top x % plan, we incorporated socioeconomic diversity as part of the admissions criteria, granting automatic admission to the top 7.5% a students attending high-poverty schools, and the top 3% attending low poverty schools. Although this increased the representation of underrepresented minority students from 16.4 to 17.8%, and increased socioeconomic diversity as measured by the proportion of students attending high poverty schools, the academic quality of this group suffered. The average SAT (CR+M) dropped over 100 points relative to the actual admitted class, and only 40% of these students pursued a curriculum of 5 or more AP courses.

## D. Strength of Curriculum Plan

Previous research conducted by UADM suggests that students who take five college level courses throughout their high school career perform just as well as their peers who pursue more extreme programs (Kretchmar & Farmer 2013). Students who don't pursue any college-level work, however, don't perform as well as those who take five or more. On the basis of this finding, we used strength of high school curriculum rather than class rank as the criterion for admission; in order to admit a class equal in size to the actual admitted class, a testing threshold of 1150 SAT or higher was added as well. Granting automatic admission to all NC public HS graduates pursuing 5 or more AP courses who have also met the testing criterion yielded an admitted class of 4,108 students. This group of students earned an average SAT just 4 points lower than the actual admitted class, and pursued an equally rigorous curriculum. Although a smaller proportion are ranked in the top 10% of the class, they come closest to mirroring the overall academic quality of the actual admitted class. The diversity of the group, however, declined significantly. Only 6.4% of the class identified as underrepresented minority, and only 12.7% attended a high school with more than 50% of students qualifying for free-and-reduced-price lunch. In addition, these students represented just 81 of the 100 North Carolina counties.

## E. Testing Plan.

Lastly, we examined the academic qualifications and diversity of a class admitted on the basis of test scores alone, granting automatic admission to all students earning a combined score of 1280 or higher on the Critical Reading and Math portions of the SAT. The resulting

UNC0097435

class would outpace the actual admitted class in terms of testing (by 60 points, on average), but would fall short on class rank and strength of the curriculum. Diversity would be significantly compromised, with declines in geographic, socioeconomic, and racial/ethnic diversity. Only 4.8% of this group identified as underrepresented minority, only 11.8% attended a high-poverty school, and only 91 North Carolina counties would be represented.

(2) Preliminary Results – Out-of-state Students

A. Top 10% Plan

Admitting all students in the out-of-state applicant pool with an official class rank of top 10% or higher yielded an admitted class two-thousand students larger than the actual out-of-state admitted class. Even so, only 43% of the out-of-state applicant pool reported an official class rank, which means many viable candidates were excluded from consideration altogether. Thus, although not likely a viable alternative, we approached this model as an exploratory and information gathering exercise.

Although less racially/ethnically diverse – the percent of underrepresented minorities drops from 27.1% to 14.7% - a larger proportion of the top 10% requested fee waivers and were first-generation-college. Academically they pursued nearly as rigorous a curriculum as the actual admitted class, but a smaller proportion were ranked in the top 5 and 3% of their class, and their average SAT was 100 points lower.

B. Top 5% and Testing Threshold

In order to achieve a class size similar to the size of the actual admitted class, we combined a testing and class rank threshold, granting automatic admission to anyone ranked in the top 5% of their class with a combined score on the Critical Reading and Math portion of the SAT of 1230 or higher; this yielded 2,880 students, just five more than the actual admitted group. Although comparable in size and academic quality, only 5.4% of this group identified as underrepresented minority, compared to 27.1% of the actual admitted class.

C. High School Grades (Performance = 10) and Testing Threshold

In order to include students not reporting official ranks, we developed a threshold based on test scores and high school grades, granting automatic admission to all applicants with straight A's in their four years of high school who also earned a combined score on the Critical Reading and Math portion of the SAT of 1220 or higher. Again, this yielded a class similar in academic quality, with nearly equal test scores and strength of curriculum. Of those reporting an official rank, a higher proportion were ranked in the top 5 and 3%, relative to the actual admitted class. But again, diversity was compromised. A higher proportion were non-resident alien – 16.3 percent compared to 10.6 percent – but only 7.2 percent identified as

UNC0097436

underrepresented minority and 33.2 percent as non-white, compared to 27.1 and 51.1 percent in the actual admitted class, respectively.

(3) Preliminary Results – NC Private

Because so few students attending North Carolina private and parochial high schools report official class ranks, modeling a top x % plan with this segment of our population was not feasible. Instead, we pulled aggregate academic and demographic data from the College Board for each of our top 20 NC private feeder high schools; these 20 schools accounted for 60% of all admitted students from NC private high schools. For each school, we calculated the percent non-white, percent underrepresented minority, the average SAT (Note: the average SAT for each school was approximated based on number of graduating students in each SAT band), percent first-generation college, percent taking at least 1 AP course, and average number of AP courses taken for the graduating class. In order to model a hypothetical admitted class on the basis of our top 20 feeder schools, we then weighted these indicators by the number of students graduating from each high school. In essence, the resulting profile is an estimate of the profile of all NC private high school graduates, as reasonably as it can be approximated.

The hypothetical class was similar to our actual NC private admits in terms of diversity – 9.0% underrepresented minority compared to 9.8% in the actual class and 17.5% non-white compared to 19.8%. And a larger proportion were first-generation college. Academic quality, however, declined – with an estimated 200 point drop in SAT, and a 25 percentage point drop in the number of students taking at least 1 AP. Strength of curriculum, in general, declined with students from the top 20 feeder schools pursuing, on average, 3 college level courses, compared to students in our actual admitted class, who pursued 6, on average.

In sum, no single model, applied to any three of the segments of our population, would produce an admitted class that is equal to or stronger than our actual admitted class in terms of *both* diversity and academic quality. Some of the alternatives mirror or exceed the actual admitted class in terms of diversity, but not academics, or vice versa, but no alternative allows us to achieve the same level of excellence *and* diversity as our current practice of holistic review.

(4) Applications Quest

Two members of the working group – Barbara Polk (chair) and Jen Kretchmar – attended a webinar on October 23, 2014 hosted by Dr. Juan Gilbert of the University of Florida, developer of a patented software program called Applications Quest. Applications Quest is described as a holistic review software program designed to maximize diversity without giving preferential treatment to applicants on the basis of race. After speaking with Dr. Gilbert, Ms. Polk and Ms. Kretchmar shared the information they learned with other members of the working group for the purpose of deciding whether to conduct a pilot study.

UNC0097437

In general terms, Applications Quest works by creating clusters of students from the available applicant pool; similarities among applicants are maximized *within* clusters, thereby maximizing differences *between* clusters. The number of clusters created corresponds to the number of offers of admission being made; the member of the cluster who is "most different" from the other members is identified for admission. Differences and similarities are determined using any nominal or numeric variables identified as relevant and/or important by the admissions staff (e.g. race, nationality, major, family income, etc). Significantly, no single factor is weighted more heavily than another, so that no applicant receives *preferential* treatment on the basis of any single characteristic.

The software gives admissions staff the capability of entering minimum admissions standards using one or more variables. If no standards are used, the average academic qualifications of the selected group will generally mirror the average academic qualifications of the applicant pool. When using more than one minimum standard, standards can be set using 'and' or 'or' statements (e.g. GPA >=3.0 and SAT>=1200, GPA >=3.0 or SAT>=1200). Students who do not meet the minimum standards are dropped from the applicant pool. Any students who are admitted despite not having met the minimum standards, referred to here as 'exceptions,' are also removed from the applicant pool.

The working group foresaw a number of significant obstacles to adapting Applications Quest to our needs. First, the software would require the use of predefined, minimum standards in order to select an admitted class with comparable academic quality to the one selected using individualized, holistic review. The standards are rigid and mechanistic, such that anyone who falls below them is automatically disqualified from further consideration. Pre-defined cut-offs are antithetical to our guiding principles and mission. Just as individualized, holistic review protects students from race or ethnicity becoming the defining feature of his/her application, individualized, holistic review protects students from *any* single variable – such as a test score or GPA - becoming the defining feature of his/her application. As stated in our guidelines for evaluating candidates, "there is no list of qualities or characteristics that *every* student must present."

Second, the implementation of Applications Quest would essentially result in a tri-partite admissions model, such that different groups of students would be subjected to different processes and/or standards – the group falling below the minimum standards evaluated in a formulaic, mechanistic way; the second group evaluated using Applications Quest; and the third, the 'exceptions,' according to other standards/processes altogether. This too, is at cross-purposes with our current practices, in which every candidate receives the same individualized, holistic review and is evaluated according to the same standards.

UNC0097438

Appendix A. Members of Race-Neutral Alternatives Working Committee

Patrick Akos
Taffye Clayton
Jen Kretchmar
Lou Perez
Catherine Pierce
Barbara Polk
Kara Simmons
Debby Stroman
Lynn Williford

UNC0097439

Appendix B. Preliminary Analysis of Race-Neutral Alternatives

Our goal for the Fall 2012 first-year class is 3,960 students, including 3,247 from North Carolina. More than 10,000 North Carolinians applied. Fifty percent of those who applied were offered admission; 65 percent of those admitted will enroll.

The applicants from North Carolina included 4,179 whose high schools reported official class rank and who ranked within the top 10 percent of their graduating class.

Through the practice of comprehensive review described in our reading document, 3,194 of these students, or 76 percent, were offered admission. Of these students, 2,117, or 66 percent of those admitted, have accepted our offer of admission and will enroll next fall. These enrolling students will comprise 65 percent of the 3,247 North Carolinians in the entering first-year class.

If we had offered admission to all 4,179 of the top-10-percent North Carolinians who applied, our yield model projects that we would have enrolled an additional 751 students, increasing the number of top-10-percent students in the entering class to 2,868, or 88 percent of all North Carolinians enrolling.

A total of 379 spaces would have remained for the more than 5,800 other North Carolinians applied. Assuming that 65 percent of the students admitted from this group would have enrolled, we would have needed to offer admission to 583 students. The resulting admission rate for North Carolinians who did not officially rank in the top 10 percent of their graduating class would have been 10 percent, as opposed to a rate of 31 percent under comprehensive review. The students denied would have included hundreds of non-underrepresented minority students attending independent high schools and public magnet and suburban high schools— students who were admitted under comprehensive review.

A top-10-percent policy would have yielded a first-year class with a higher percentage of underrepresented students: 16 percent vs. 15 percent under comprehensive and holistic review. In effect, more non-underrepresented students would have been denied admission under a top-10-percent policy than under comprehensive and holistic review.

Under a top-10-percent policy, every academic indicator other than the share of the class ranking in the top 10 percent of the high-school class would have declined. For example, the average SAT (Critical Reading and Math combined) would have been 1262, as opposed to 1317 under comprehensive and holistic review.

The predicted GPA of the class after the first year at UNC would also have declined to 3.16 from 3.26 under comprehensive review.

UNC0097440

C. Mission Statement of the University of North Carolina at Chapel Hill

The University of North Carolina at Chapel Hill, the nation's first public university, serves North Carolina, the United States, and the world through teaching, research, and public service. We embrace an unwavering commitment to excellence as one of the world's great research universities.

Our mission is to serve as a center for research, scholarship, and creativity and to teach a diverse community of undergraduate, graduate, and professional students to become the next generation of leaders. Through the efforts of our exceptional faculty and staff, and with generous support from North Carolina's citizens, we invest our knowledge and resources to enhance access to learning and to foster the success and prosperity of each rising generation. We also extend knowledge-based services and other resources of the University to the citizens of North Carolina and their institutions to enhance the quality of life for all people in the State.

With lux, *libertas*—light and liberty—as its founding principles, the University has charted a bold course of leading change to improve society and to help solve the world's greatest problems.

*Approved by the UNC Board of Governors, November 2009*

UNC0097441

Appendix D. Data Definitions

**Application Fee Waiver.** Granted to students for whom the $80 dollar application fee presents a financial hardship; student must submit College Board fee waiver form or a letter from a school official requesting fee waiver on student's behalf.

**Class rank.** A student's numeric position in their high school class, based on grade point average. Often expressed as percentile, or the student's numeric position divided by the total number of students in the class.

**First Generation College.** Student for whom neither parent and/or legal guardian has attained a four-year degree.

**Free and Reduced Price Lunch.** Federally-assisted meal program operating in public and nonprofit private schools and residential child care institutions, providing nutritionally balanced, low-cost or free lunches to children each school day.

**Non-white.** Any racial/ethnic category other than Caucasian, including African-American, Asian-American, Hispanic/Latino, American Indian/Alaskan Native, Native Hawaiian/Pacific Islander, or any combination thereof. Percent non-white is calculated by dividing number of no-white by the total number of students (as opposed to total number of students reporting a race/ethnicity).

**Highest Reported Score.** Highest official score earned by each student on either the SAT (Critical Reading and Math combined) or the ACT Composite, with the ACT Composite converted to the SAT Critical Reading and Math scale using the standard concordance table approved by the College Board and ACT. This method of summarizing test scores best represents the way that scores are used by the University. Under guidelines for standardized testing approved by the Advisory Committee on Undergraduate Admissions, when any candidate for admission submits results from both the SAT and the ACT, the University considers the test with the stronger results.

**North Carolina County.** One of the one hundred counties located in the state of North Carolina.

**Middle 50% SAT (CR+M).** The values between which 50% of all SAT (CR+M) scores in the group fall.

**Performance rating.** A 1-10 rating given to each applicant to UNC-Chapel Hill as a measure of high school grades/performance. A student who has earned straight A's in all four years of high school is scored a 10; a student earning 1-2 B's is scored a 9; a student earning 3-4 B's is scored an 8, a student presenting an even mix of A's and B's earns a 4. The scale is calibrated to our

UNC0097442

applicant pool, such that the lower values typically represent students with C's and D's, rather than students with failing grades.

**Program rating.** A 1-10 rating given to each applicant to UNC-Chapel Hill as an indicator of the strength of a student's high school curriculum. Strength is measured as a function of the number of college-level courses (Advanced Placement, International Baccalaureate, Dual Enrollment) pursued between 9th and 12th grades. A student with 10 or more college-level courses is scored a 10, a student with 1 to 3 college-level courses is scored a 3, while students with no college level courses are scored a 1 or 2.

The average program rating for all actual and hypothetical admitted classes derived from our applicant data is a proxy for average number of college-level courses pursued during high school. Because many of our students take more than 10 college-level courses, the proxy is likely an underestimate. The average program rating for hypothetical admitted classes derived from data provided by the Department of Public Instruction or the College Board is based on participation in Advanced Placement Courses only. While the average for these students is based on an actual count of AP courses taken (as opposed to an average of score given on the 1-10 scale described above), it is still an underestimate of participation in college-level courses given the absence of data on participation in International Baccalaureate and Dual Enrollment courses.

**SAT (CR+M).** Score earned by student on the Critical Reading and Math portion of the SAT. Average SAT scores for NC public and private *actual* admitted classes are calculated using all reported scores, regardless of whether or not a student reported a higher ACT score. Although this isn't representative of the way we use scores in the admissions process (see *highest score reported*), this method of calculating makes for a more fair comparison to average SAT scores calculated for NC public and private hypothetical admitted classes, since ACT data is not available for those populations .

**Top 10%.** Student who is ranked in the top 10% of his/her high school class.

**Top 5%.** Student who is ranked in the top 5% of his/her high school class.

**Top 3%.** Student who is ranked in the top 3% of his/her high school class.

**Underrepresented minority**. Any student who identifies as African-American, Hispanic/Latino, and/or American Indian/Alaskan Native.

UNC0097443

References:

Bok, D. (2000). Assessing the results of race-sensitive college admissions. *The Journal of Blacks in Higher Education*, *29*, 106-111.

Brown, S.K., & Hirschman, C. (2006). The end of affirmative action in Washington State and its impact on the transition from high school to college. *Sociology of Education*, *79*, 106-130.

Card, D., & Krueger, A.B. (2004). Would the elimination of affirmative action affect highly qualified minority applicants? Evidence from California and Texas. Industrial and Labor Relations Review, 93(3), 858-872.

Chan, J., &Eyster, E. (2003). Does banning affirmative action lower college student quality? *American Economic Review*, *93*(3), 858-72.

Chapa, J., & Horn, C.L. (2007). Is anything race neutral? Comparing 'race-neutral' admissions policies at the University of Texas and the University of California. Los Angeles, CA: The Civil Rights Project, UCLA.

Coleman, A.L., Palmer, S.R., & Winnick, S.Y. (2008). Race-Neutral Policies in Higher Education: From Theory to Action. A Policy Paper Prepared in Conjunction with the College Board's Access and Diversity Collaborative.

Epenshade, T.J., & Chung, Y.C. (2005). The opportunity cost of admission preferences at Elite Universities. Social Science Quarterly, 86(2), 293-305.

Furstenburg, E. (2009). Academic outcomes and Texas' Top Ten Percent Law. *ANNALS of the American Academy of Political and Social Science*, *X,* XX.

Harris, A., & Tienda, M. (2009). Minority higher education pipeline: Consequences of changes in college admissions policy in Texas. *ANNALS of the American Academy of Political and Social Science*, *627,* XX.

Hinrichs, P. (2010). The effects of affirmative action bans on college enrollment, educational attainment, and the demographic composition of universities. *The Review of Economics and Statistics*, *94* (3), 712-722.

Howell, J.S. (2010). Assessing the Impact of Eliminating Affirmative Action in Higher Education. *Journal of Labor Economics*, *28*(1), 113-166.

UNC0097444

Koretz, D., Russell, M., Shin, C.D., Horn, C., & Shasby, K. (2002). Testing and diversity in postsecondary education: The case of California. Education Policy Analysis Archives, 10(1).

Kretchmar, J., & Farmer, S. (2013). How much is enough? Rethinking the role of high school courses in college admission. *Journal of College Admissions, 220*, 28-33.

Long, M.C. (2014). Is there a 'workable' race-neutral alternative to affirmative action in college admissions? *Journal of Policy Analysis and Management, 00*, 1-23.

Long, M.C., Saenz, V., & Tienda, M. (2009). Policy transparency and college enrollment: Did the Texas Top 10% Law broaden access to the public flagship? *ANNALS of the American Academy of Political and Social Science, X*, XX.

Long, M.C., & Tienda, M. (2008). Winners and losers: Changes in Texas University admissions post-Hopwood. *Educational Evaluation and Policy Analysis, 30*, 255-280.

Long, M.C. (2007). Affirmative action and its alternatives in public universities? What do we know? *Public Administration Review, 67*(2), 315-330.

Long, M.C. (2004). College applications and the effect of affirmative action. *Journal of Econometrics, 121*(1-2), 319-342.

Niu, S.X., Tienda, M., & Cortes, K. (2006). College selectivity and the Texas top 10% Law: How Constrained are the Options?"*Economics of Education Review. 25*(3): 259-272.

Orfield, G. (2007). Foreword. In Gary Orfield, Patricia Marin, Stella Flores, & Liliana Garces (Eds.), Charting the Future of College Affirmative Action (pp. xi – xiv). Los Angeles, CA: The Civil Rights Project at UCLA.

The Century Foundation. (2003). Socioeconomic status, race/ethnicity, and selective college admissions. New York, NY: Carnevale, A.P., & Rose, S.J.

The Century Foundation. (2003). Economic affirmative action in college admissions. New York, NY: Kahlenberg, R.

Tienda, M., Leicht, K.T., Sullivan, T., Maltese, M., & Lloyd, K. (2003). Closing the gap? Admissions and enrollments at the Texas Public Flagships before and after affirmative action. Unpublished manuscript.

Rendon, L.I., Novack, V., & Dowell, D. (2004). Testing race-neutral admissions models: Lessons from California State University-Long Beach. The Review of Higher Education, 28(2), 221-243.

UNC0097445

St. John, E.P., Simmons, A.B., & Musoba, G.D. (2002). Merit-aware admissions in public universities. Thought and Action, 17(2), 35-46.

Steinecke, A., Beaudreau, J., Bletzinger, R.B., & Terrell, C. (2007). Race-neutral admission approaches: Challenges and opportunities for medical schools. Academic Medicine, 82(2), 117-126.

U.S. Department of Education. (2004). Achieving diversity: Race-neutral alternatives in American education (Publication No. ?). Washington, DC: Government Printing Office.

U.S. Department of Education. (2003). Race-neutral alternatives in postsecondary education: Innovative approaches to diversity (Publication No. HE 035 789). Washington, DC: Government Printing Office.

UNC0097446


Document Produced in Native Format

UNC0097447

# NC PUBLIC ADMITS: ACTUAL v. HYPOTHETICAL

| | All NC Public HS Admits, Fall 2012 | Race-Neutral Alternatives | | | | |
|---|---|---|---|---|---|---|
| | | Top 10% | Top 4.5% | >= 5 AP courses and >=1150 | >=1280 SAT CR+M | Top 7.5% High Poverty Schools, Top 3% Low Poverty Schools |
| **Demographics** | | | | | | |
| # of students | 4,097 | 9,592 | 4,040 | 4,108 | 3,924 | 4,051 |
| % First Generation College | 20.0% | -- | -- | -- | -- | -- |
| % Eligible for Free-Reduced Price Lunch | -- | 17.1% | 13.9% | 6.6% | 5.4% | 19.6% |
| % Attending School with >50% FRPL | 20.2% | 38.4% | 38.0% | 12.7% | 11.8% | 56.2% |
| % Receiving Application Fee Waiver | 8.8% | -- | -- | -- | -- | -- |
| % Underrepresented Minority | 16.4% | 16.7% | 13.9% | 6.4% | 4.8% | 17.8% |
| % Non-white | 30.6% | 30.4% | 23.9% | 19.3% | 17.3% | 27.8% |
| % Male | 40.3% | 37.7% | 38.2% | 47.8% | 56.5% | 37.7% |
| # NC Counties Represented | 98 | 100 | 100 | 81 | 91 | 100 |
| **Academics** | | | | | | |
| % with rank | 92.7% | 100.0% | 100.0% | 98.0% | 98.0% | 100.0% |
| Top 10% | 81.4% | 100.0% | 100.0% | 65.7% | 60.8% | 100.0% |
| Top 5% | 58.5% | 51.6% | 100.0% | 45.5% | 42.9% | 84.6% |
| Top 3% | 43.9% | 31.7% | 75.3% | 33.1% | 31.0% | 69.2% |
| Program Rating | 7.6 | 5.0 | 5.5 | 6.7 | 5.8 | 5.3 |
| % taking at least 1 AP course | 99.0% | 71.8% | 80.1% | 100.0% | 83.3% | 78.1% |
| % taking at least 5 AP courses | 92.0% | 35.1% | 47.9% | 100.0% | 55.9% | 42.3% |
| Average SAT (CR+M) | 1303 | 1173 | 1227 | 1299 | 1361 | 1190 |
| Middle 50% SAT (CR+M) | 1220-1390 | 1060-1280 | 1130-1330 | 1220-1370 | 1310-1400 | 1070-1310 |
| % Students w/ SAT Score | 95.9% | 94.9% | 96.1% | 100.0% | 100.0% | 99.8% |

NOTES:

- Average SAT of Fall 2012 Admits based on all reported SAT scores

- Program rating, and % participation based on all college-level courses (e.g. IB, AP, DE) for Fall 2012 actual class; hypothetical classes based on AP courses only

- High poverty school is defined as any school with >50% of students eligible for free-reduced price lunch

- Low poverty school is defined as any school with <=50% of students eligible for free-reduced price lunch

- Data Source: Department of Public Instruction, NC Public High School Graduates, Spring 2012

# OOS ADMITS: ACTUAL vs. HYPOTHETICAL

| | All OOS Admits, Fall 2012 | Race-Neutral Alternatives | | |
| --- | --- | --- | --- | --- |
| | | OOS Top 10% Applicant Pool | OOS Top 5% Applicant Pool and Highest Test Score >=1230 | OOS - All Applicants with Performance Rating = 10 and Highest Test Score >=1220 |
| *Demographics* | | | | |
| # of students | 2,875 | 4,934 | 2,880 | 2,882 |
| | | | | |
| % First Generation College | 10.6% | 14.5% | 11.2% | 8.4% |
| % Eligible for Free-Reduced Price Lunch | -- | -- | -- | -- |
| % Attending School with >50% FRPL | -- | -- | -- | -- |
| % Receiving Application Fee Waiver | 5.5% | 7.9% | 9.8% | 3.4% |
| % Underrepresented Minority | 27.1% | 14.7% | 5.4% | 7.2% |
| % Non-white | 51.1% | 33.8% | 30.1% | 33.2% |
| % Male | 43.4% | 35.1% | 36.5% | 34.9% |
| | | | | |
| % Non-resident alien | 10.6% | 7.6% | 8.1% | 16.3% |
| # US States represented | 49 | 50 | 50 | 50 |
| *Academics* | | | | |
| % with rank | 43.0% | 100.0% | 100.0% | 55.8% |
| Top 10% | 88.3% | 100.0% | 100.0% | 97.1% |
| Top 5% | 75.0% | 66.4% | 100.0% | 87.6% |
| Top 3% | 62.5% | 46.4% | 71.1% | 73.9% |
| | | | | |
| Program Rating | 7.9 | 7.1 | 7.6 | 7.1 |
| Performance Rating | 8.5 | 8.5 | 9.1 | 10.0 |
| % taking at least 1 AP course | 97.2% | 98.5% | 99.2% | 98.7% |
| % taking at least 5 AP courses | 90.3% | 81.3% | 88.2% | 86.5% |
| | | | | |
| Highest Reported Test Score | 1432 | 1332 | 1392 | 1412 |
| Middle 50% of highest reported scores | 1380-1520 | 1250-1430 | 1320-1460 | 1340-1480 |

Notes:

- Average SAT calculated using only highest reported scores (rewrite this definition)

- Top 5 and 10% hypothetical class pulled from the 43% of the OOS applicant pool who reported official rank.

- Data Source: All OOS applicants to UNC-Chapel Hill, Fall 2012

- Highest Test Score: ACT scores converted to SAT equivalent scores; if student reports both, only higher of the two is used

# NC PRIVATE: ACTUAL ADMITS vs. TOP FEEDER SCHOOLS

| | All NC Private School Admits, Fall 2012 | NC Private - Top 20 Feeder Schools |
|---|---|---|
| *Demographics* | | |
| # of students | 875 | NA |
| % First Generation College | 5.3% | 17.5% |
| % Eligible for Free-Reduced Price Lunch | -- | -- |
| % Attending School with >50% FRPL | -- | -- |
| % Receiving Application Fee Waiver | 2.4% | -- |
| % Underrepresented Minority | 9.8% | 9.0% |
| % Non-white | 19.8% | 17.5% |
| % Male | 45.3% | 51.0% |
| # NC Counties Represented | 63 | |
| *Academics* | | |
| % with rank | 17.8% | -- |
| Top 10% | 73.1% | -- |
| Top 5% | 44.9% | -- |
| Top 3% | 29.5% | -- |
| Program Rating | 6.3 | 3.0 |
| % taking at least 1 AP course | 97.3% | 71.4% |
| % taking at least 5 AP courses | 83.1% | -- |
| Average SAT (CR+M) | 1371 | 1180 |
| Middle 50% SAT (CR+M) | 1290-1450 | -- |
| % Students w/ SAT Score | 73.4% | 87.3% |

Notes:

-Values for Top 20 Feeder Schools represented weighted averages

- Data Source for Top 20 Feeder Schools: EPS

-Program rating, and % participation based on all college-level courses (e.g. IB, AP, DE) for Fall 2012 actual class; top feeder class based on AP courses only