# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR
ADMISSIONS, INC.,

               Plaintiff,

v.                                                           CASE NO. 1:14-CV-954

THE UNIVERSITY OF NORTH
CAROLINA, et al.,

               Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    The University's Compelling Interest in the Educational Benefits of Diversity Is Undisputed. ......................................................................... 2

     A.    The University's Interest Is Sufficiently Well-Defined. .............................. 3

     B.    The University's Interest Is Genuine. .......................................................... 5

II.   The University's Use of Race in Admissions Is Properly Narrowly Tailored. .................................................................................................... 6

     A.    SFFA Misrepresents and Mischaracterizes the Record. ............................... 8

     B.    SFFA's Statistical Evidence Regarding the Role of Race in the Admissions Process Is Immaterial and Disputed. ...................................... 13

         1.    SFFA's Statistical Evidence Is Immaterial. ..................................... 13

         2.    SFFA's Statistical Evidence Is Disputed. ........................................ 15

            (a)    The University does not use race in a mechanical or formulaic way. ...................................................................... 15

            (b)    Arcidiacono's "academic index" and corresponding claims about applicant academic qualifications are immaterial to questions regarding the University's admissions process. ............................................................ 17

            (c)    The University does not give "large racial preferences." ...................................................................... 19

III.  The University Met Its Burden to Prove That There Is No Workable Race-Neutral Alternative to Its Current Admissions Approach. .................................... 22

     A.    The Court Should Find as a Matter of Law That the University Has Given Serious, Good-Faith Consideration of Race-Neutral Alternatives. ............................................................................................. 22

i

B.     The Court Should Find as a Matter of Law That the University Already Employs the Majority of the Race-Neutral Strategies for Which SFFA Advocates. ............................................................ 25

     1.     The University Engages in Extensive Recruiting Efforts Designed to Increase Diversity Within Its Applicant Pool. ............. 25

     2.     The University Offers Generous Financial Aid. ............................ 27

     3.     The University Partners With Disadvantaged High Schools. .......... 28

     4.     The University Encourages Community College Transfers. ........... 30

C.     The Court Should Find as a Matter of Law That Certain Race-Neutral Strategies Are Not Likely to Increase Racial Diversity. ................ 31

     1.     Elimination of Legacy Preferences Would Have No Material Impact on Admissions. ...................................................... 31

     2.     Elimination of Early Action Would Have No Impact on Admissions. ...................................................................... 33

D.     No Workable Race-Neutral Alternative to the University's Current Admissions Process Is Available. ............................................... 34

     1.     Hoxby's Analysis Supports That No Alternatives Are Workable. ...................................................................... 34

     2.     SFFA's Simulations Are Flawed, Unreliable, and Disputed. .......... 37

CONCLUSION ............................................................................. 39

Case 1:14-cv-00954-LCB-JLW   Document 175   Filed 03/04/19   Page 3 of 46

# TABLE OF AUTHORITIES

**Cases**                                                                                                                     **Page**

*Brooke Group. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .......................................................................................... 18, 25, 28

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ......................................................................................... 30

*Fisher v. University of Texas at Austin*,
  136 S. Ct. 2198 (2016)............................................................................................passim

*Fisher v. University of Texas at Austin*,
  570 U.S. 297 (2013) ...............................................................................................passim

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................................................ 6, 16

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ...............................................................................................passim

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ................................................................................... 19, 25

*Reyazuddin v. Montgomery County*,
  789 F.3d 407 (4th Cir. 2015) ......................................................................................... 39

*Scott v. Harris*,
  550 U.S. 372 (2007) ......................................................................................................... 8

*Sylvia Development Corp. v. Calvert County*,
  48 F.3d 810 (4th Cir. 1995) ........................................................................................... 12

*Talley v. Danek Medical, Inc.*,
  179 F.3d 154 (4th Cir. 1999) ................................................................................... 19, 25

# INTRODUCTION

The Supreme Court recognizes that pursuing the educational benefits of diversity is a compelling interest that can justify the narrowly tailored consideration of race in higher education admissions. Consistent with the Constitution, Title VI, and this controlling precedent, The University of North Carolina at Chapel Hill may consider the race and ethnicity of an applicant for admission alongside all other attributes that might contribute to a diverse learning environment. The University's individualized and holistic admissions process closely follows Supreme Court guidance. Moreover, as required under the law, the University has given, and continues to give, serious, good faith consideration of whether any race-neutral alternative to its current admissions practices could achieve its educational goals about as well. Thus far, the University has concluded that none do; however, the University supplements its current race-conscious process with numerous race-neutral strategies, including extensive recruiting and generous financial aid, all designed to attract a diverse array of applicants.

The overwhelming record evidence conclusively demonstrates that this admissions process is constitutional. Nevertheless, SFFA moves for summary judgment contending—falsely—that the University cannot carry its burden of proof. (Dkt. 159 ("SFFA Br.").) SFFA argues that the University cannot demonstrate that its admissions process is narrowly tailored or that there is no race-neutral alternative that could serve its interests about as well. As demonstrated in the brief supporting the University's cross-motion for summary judgment (Dkt. 153 ("UNC Br.")), this is wrong. The relevant and

material record evidence establishes that the University's admission process is constitutionally sound and that no reasonable race-neutral alternative would allow the University to maintain even its current levels of both racial diversity *and* academic preparedness.

SFFA's contrary arguments are supported by only a few non-representative and largely mischaracterized University communications, cherry-picked from a voluminous record, and expert testimony that answers inapposite questions, distorts the admissions process, and otherwise reaches conclusions that are disputed by the University's experts and the facts. This is not enough to withstand the University's cross-motion for summary judgment, much less merit summary judgment in SFFA's favor. The Court should deny SFFA's motion in its entirety.

## ARGUMENT

## I.   The University's Compelling Interest in the Educational Benefits of Diversity Is Undisputed.

SFFA does not seriously challenge that the University has a compelling interest in pursuing student body diversity, including racial and ethnic diversity. Indeed, SFFA concedes that it is settled law that the pursuit of the educational benefits of diversity is a sufficiently compelling interest that can justify the narrowly tailored consideration of race in college admissions decisions. (SFFA Br. at 28.) Here, the record overwhelmingly establishes both the educational advantages that flow from a diverse learning community, as well as the University's commitment to fostering an environment where the benefits of a diverse student body can be realized. (UNC Br. at 5-10, 27-28.)

2

Because SFFA cannot credibly contest the University's compelling interest as a factual or legal matter, it resorts to arguing that the University's interest is not defined with enough precision and questioning the genuineness of the University's interest. (SFFA Br. at 28-30.) On both fronts, SFFA falls short.

## A.    The University's Interest Is Sufficiently Well-Defined.

The Supreme Court recently reiterated that, to establish a compelling interest in diversity, universities must articulate concrete and precise goals that are "sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2211 (2016) ("*Fisher II*"). In *Fisher II*, the petitioner complained that the University of Texas ("UT") failed to "articulate[] its compelling interest with sufficient clarity" because UT had not precisely set forth "the level of minority enrollment that would constitute a 'critical mass.'" *Id.* at 2210. The Court disagreed, explaining that "the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students." *Id.* Because quotas are prohibited, the Court expressly rejected the notion that "critical mass" "can or should be reduced to pure numbers" and explained that a university "cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained." *Id.*

Instead, the Court looked to the educational values UT pursued through its admissions process, including, among others, the destruction of stereotypes, promotion of cross-racial understanding, preparation of students for a diverse workforce, and

cultivation of leaders with legitimacy in the eyes of the citizenry. *Id.* at 2211; *see also Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (endorsing concept of critical mass as "defined by reference to the educational benefits that diversity is designed to produce"). The Court held that these goals were sufficiently concrete to support UT's compelling interest in diversity. *Fisher II*, 136 S. Ct. at 2211.

Here, SFFA argues that the University has no "'measurable' definition of critical mass" and that the University's diversity goals are consequently impermissibly amorphous. (SFFA Br. at 30-31.) SFFA improperly seeks to use critical mass as a trap, knowing that precedent forbids reducing this concept to numbers. In so doing, SFFA attempts to resurrect arguments that the Supreme Court flatly rejected in *Fisher II*.

The record overwhelmingly demonstrates the benefits the University seeks to attain by admitting diverse students, including promoting the robust exchange of ideas, broadening cross-cultural understanding, fostering innovation and problem-solving, preparing engaged and productive leaders, and enhancing respect and empathy. (2017 Provost's Report, UNC Ex. 34 at UNC0349698-99; *see also* UNC Ex. 13 at 29:14-31:20 (Chancellor testifying goals include creating environment where students are exposed to and interact across the "broad spectrum of difference and diversity"); UNC Ex. 6 ¶13 (Dean of Undergraduate Education stating goal of encouraging "analytical and creative thinking and the development of strong communication and collaboration skills"); UNC Ex. 1 ¶7 (Provost highlighting mission of preparing leaders who can adapt to changing

world); UNC Exs. 32-33, 39.) These are precisely the sort of concrete goals that the Supreme Court has expressly sanctioned.[1]

### B.    The University's Interest Is Genuine.

SFFA also attempts to cast doubt on the sincerity of the University's commitment to the educational benefits of diversity by pointing to an irrelevant third-party report related to irregular classes formerly offered by a single University department years before this lawsuit began. (SFFA Br. at 29-30.) SFFA hypothesizes that because this report opines that a handful of former University employees unilaterally offered less demanding courses, the University as a whole is indifferent to fostering an environment where underrepresented minorities ("URMs") can thrive. (*Id.* at 29.)

Not only is there no evidence that any student admitted during the time period at issue in this litigation took an irregular course, but the Court also already has ruled that this post-admission "evidence" is irrelevant. SFFA previously moved to compel production of information regarding academic performance, academic preparedness, and these specific classes. (Dkt. 86, 87.) Magistrate Judge Webster denied that motion in its entirety, ruling that this post-admissions process data, including information regarding these classes, is "inapposite to the core responsibilities of UNC's admissions department" and immaterial to SFFA's claims, which seek injunctive relief. (Dkt. 101 at 9-11.)

---

[1]    The University's decision to pursue these educational goals through the admission of a diverse student body is unquestionably an academic judgment entitled to judicial deference. *Fisher II*, 136 S. Ct. at 2208.

5

SFFA's attempt to obscure the good work of a great many by referencing the years-old conduct of a few fails. The undisputed evidence demonstrates that the University goes to extraordinary lengths to create a community where students of all backgrounds feel supported and can excel. (UNC Br. at 7-8; UNC Ex. 20 at 29-31.) The report SFFA cites, by contrast, is a red herring. In short, all relevant record evidence demonstrates that the University has a genuine and compelling interest in the educational benefits of diversity. The Court should award summary judgment to the University on this issue.

## II. The University's Use of Race in Admissions Is Properly Narrowly Tailored.

To determine whether the use of race is narrowly tailored, the crucial inquiry is whether the admissions process is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337; *see also Gratz v. Bollinger*, 539 U.S. 244, 271 (2003). Contrary to SFFA's implication, the Supreme Court has *not* restricted the permissible consideration of race to only the "last few seats in the class" (SFFA Br. at 3). *See Grutter*, 539 U.S. at 334 (finding admissions process constitutional where it allowed for the consideration of any applicant's race); *Fisher II*, 136 S. Ct. at 2214 (finding admissions process constitutional where it allowed for the consideration of race for the last 25% of the class). Likewise, no precedent limits the consideration of race to only those applications that indicate "race affected the student's life" (SFFA Br. at 3). Instead, the Supreme Court has emphasized that a race-conscious

admissions program must consider each individual applicant in a way that "ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race." *Grutter*, 539 U.S. at 337.

The University's admissions program closely adheres to this guidance. Race is one factor among many in a comprehensive, holistic process in which the University carefully evaluates the potential contributions of each and every applicant *as an individual*. (UNC Br. at 10-13, 29-34.) Undisputed testimony of admissions officers and application readers and application reading guidelines all confirm that the University undertakes a highly individualized review of each application for admission across a number of factors, which may include race, if voluntarily disclosed. (UNC Ex. 4 ¶24; UNC Ex. 7 ¶¶25, 42.) Indeed, even SFFA's experts agree that the University's admissions process is "holistic." (UNC Ex. 19 at 77:13-15, 78:17-21, 91:13-19 (Kahlenberg testifying that any quantitative analysis should seek to embody the University's "holistic" admissions process); UNC Ex. 18 at 77:1-10 (Arcidiacono testifying that University admissions officers do not specifically and intentionally follow a formula for admissions).)

SFFA cites no evidence sufficient to dispute these facts. Instead, SFFA resorts to mischaracterizing the record and relying on isolated documents that are not representative of the University's admissions process. Recognizing such paltry "evidence" is not enough to support summary judgment—much less withstand the University's cross-motion— SFFA falls back on its statistical expert testimony. But as explained in the University's brief, and as further discussed below, this testimony is immaterial because SFFA's expert

7

failed to assess the University's entire applicant pool, and instead artificially focused on a subset of applicants.

### A.    SFFA Misrepresents and Mischaracterizes the Record.

SFFA's description of the University's admissions process reflects numerous evidentiary mischaracterizations and hinges on isolated documents that do not accurately reflect the process or are otherwise taken out of context. This "evidence" cannot properly support summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (improper on summary judgment to adopt a version of the facts that is "blatantly contradicted by the record").

For example, SFFA attempts to undermine the holistic nature of the University's admissions process by claiming that "[r]eaders are keenly focused on the applicant's race, especially for URMs." (SFFA Br. at 8.) Yet, despite reviewing more than 330,000 pages of University documents and taking nearly 20 depositions, the only evidence SFFA can muster to support this contention is a single instant message conversation between three application readers. (*Id.*, SFFA Ex. 16.) To be sure, some of their language is inappropriate. But a single conversation does not establish that the University's entire admissions process is inappropriately focused on race. Rather, the isolated nature of this exchange is far more consistent with the admissions process being proper. SFFA's other examples in support of an alleged "focus on race" merely note an applicant's race in context of legitimate admissions questions (SFFA Exs. 26-27, 49 (undergraduate admissions), 28 (transfer student admissions)) or are wholly irrelevant because they do

8

not contain commentary from admissions staff (SFFA Exs. 29-31 (reflecting discussion among athletics staff regarding recruited athletes).)

In any event, when viewed in the proper context of the voluminous record, SFFA's cherry-picked examples do not support summary judgment in its favor or even create a genuine issue of fact. The overwhelming evidence, including that cited by SFFA, demonstrates that the University considers each applicant individually and holistically, and race is only one factor among many that may be considered. (*See*, *e.g.*, Admissions Reading Document, SFFA Ex. 5 at UNC0323610 ("the race and ethnicity of any applicant is always viewed in the context of everything else that the admissions committee knows about a candidate and in light of the range of contributions the candidate might make to the University community"); SFFA Ex. 72 at 132:2-17 (Senior Admissions Officer testifying that "I read each applicant as an individual. I'm looking through all of the pieces of information in the file . . . all the information from the letter of rec to their extracurriculars, to their essays, to their parent education background and occupation, to how many languages they speak. [Race is] one factor that I take into account in getting to know that person as an individual."); UNC Ex. 127 at 17:4-10 (Admissions Director); UNC Ex. 130 at 20:12-15, 26:12-27:18 (Admissions Officer); UNC Ex. 131 at 155:18-22 (Admissions Officer); UNC Br. at 10-15 (discussing fact and expert evidence showing race is not dominant in admissions decisions); *see also* UNC Br. at 30.)

9

Likewise, SFFA incorrectly claims that the University evaluates applicants' test scores differently based on race. (SFFA Br. at 8.) The evidence that purportedly supports this assertion is irrelevant, out-of-date, and mischaracterized. SFFA points to emails that discuss the purchase of high school student test score data in the University's *recruitment* of potential applicants and asserts that non-URM students need higher test scores than URMs to merit recruitment. (SFFA Br. at 6; SFFA Exs. 17-19.) These emails are irrelevant; they discuss recruiting and say nothing about the admissions process. SFFA's argument also relies upon outdated (and therefore moot) information. The University has not considered race as a factor in its purchase of College Board-provided test score data for years. (UNC Ex. 132 at 219:25-221:11.) But perhaps most fundamentally, these very documents contradict SFFA's characterizations by showing that the University recruited a broad variety of diverse talent, including first generation college students of all races and ethnicities, through its purchase of College Board data. (SFFA Ex. 17 at UNC0087530-31.)

SFFA also mischaracterizes the testimony of a single admissions officer to support its false assertion that Asian Americans are required to have higher test scores than applicants of other racial backgrounds. (SFFA Br. at 8.) But this employee actually testified that applicants are *not* treated differently in the admissions process on the basis of race:

> Q: Is it fair to say that UNC treats URMs with low test - - scores differently than non-URMs at the same testing levels?

10

A: No. Because I wouldn't say ethnicity's the only thing we're looking at to interpret their scores. . . .

Q: Does UNC have lower - - lower testing criteria for admitting URM students?

A: Well, we don't have a criteria in mind. So I would say no because we don't [have] any type of preset criteria that guides us. . . .

Q: So, is it easier for an African American to get into UNC than it is for an Asian American student?

A: No. I wouldn't say that.

Q: Why wouldn't you say that?

A: Because we still look at all the different factors involved [in] an applicant for an African American the same as we would for an Asian American.

(UNC Ex. 130 at 208:13-20, 210:1-5, 213:1-10.)

As a final example of SFFA's mischaracterization of the record, SFFA asserts that the University uses its School Group Review ("SGR") process to "shape[] and fine-tune" its admitted class "from a racial/ethnic standpoint." (SFFA Br. at 10.) SFFA's own evidence belies this assertion and shows that race is taken into account during the SGR process precisely as it is throughout the University's entire admissions program—as one potential factor among many. (2013 Reading Proposal, SFFA Ex. 34 at UNC0179481 ("Ethnicity is one of many factors we may consider, alongside other aspects already flagged on the SGR reports. . . . Adding ethnicity just adds one additional piece of information to consider."); SGR Policy 2013-2014, SFFA Ex. 36 (only statement regarding race is a reminder that SGR participants should "[b]e aware of additional considerations such as [first generation college student], ethnicity, residency and alum

11

status"); SFFA Ex. 76 at 187:17-22 (Admissions Officer testifying that an applicant's ethnicity might be looked at during SGR "just like I'll be looking at whether they're first generation college, whether they're fee waiver students, and reading the ratings and comments that other readers have provided").)

SFFA selectively quotes reader comments made during the SGR process that appear to justify admission based on race alone. (SFFA Br. at 10 (quoting "Defer to admit. [Underrepresented]." from SFFA Exhibits 37 and 38).) But, consistent with holistic review, these very documents note other attributes, including ratings and test scores, that contributed to the changed decision. (SFFA Ex. 37 at UNC0194911 ("Defer to admit. [Underrepresented]. *Strong across the board. 10, 10, 7, 7, 7. 34 ACT. 1510 SAT.*" (emphasis added)); SFFA Ex. 38 at UNC0194935 ("Defer to admit. [Underrepresented]. *Testing is 30 ACT. SAT 1360 with +60 writing. All other areas are strong.*" (emphasis added)).) In short, SFFA's assertion that the SGR process is used to shape the class on the basis of race is factually unsupported and wrong.[2] (*See also* UNC Br. at 13.) SFFA cannot rely on mischaracterized and contradicted evidence to support its motion. *Sylvia Dev. Corp. v. Calvert Co.*, 48 F.3d 810, 821-22 (4th Cir. 1995) (improper on summary judgment to "ignore or distort the plain meaning of words or conveniently . . . read them out of context" (citations omitted)).

_____

[2] Tellingly, SFFA's own experts admitted they would offer no opinions on the SGR process. (UNC Ex. 128 at 28:8-12; UNC Ex. 19 at 44:8-11.)

B. **SFFA's Statistical Evidence Regarding the Role of Race in the Admissions Process Is Immaterial and Disputed.**

The clear and consistent record evidence demonstrates that the University uses race in admissions in a constitutionally sound matter—as part of a holistic, non-formulaic review of each individual applicant. (UNC Br. at 10-13.) Failing to uncover any evidence that the University explicitly employs unlawful admissions methods, SFFA relies exclusively on its expert, Peter Arcidiacono, to argue that the University's process is implicitly unconstitutional. (SFFA Br. at 30-34.) Citing Arcidiacono's modeling, SFFA contends that statistical outputs prove the University uses race in a "mechanical, formulaic way" and "gives substantial preferences to URMs." (*Id.* at 12, 31-34.)

Arcidiacono's analysis cannot support summary judgment in SFFA's favor for two reasons. First, as explained in the University's brief, Arcidiacono's analysis cannot create a material issue of disputed fact because it focused on a subset of applicants rather than the admissions process as a whole. (UNC Br. at 32-34.) Second, even if Arcidiacono's conclusions are germane, they are contested by the University's expert, Stanford University Professor Caroline Hoxby, making summary judgment inappropriate.

1. **SFFA's Statistical Evidence Is Immaterial.**

Arcidiacono's testimony is immaterial because it cannot contradict the overwhelming evidence that the University admissions process as a whole considers race in a holistic, individualized manner. As discussed in the University's brief, when analyzing the University's *entire* applicant pool and process, unrebutted statistical evidence offered by Hoxby shows that race explains, at most, a very small share of

13

admissions outcomes. (UNC Br. at 31 (citing Ex. 22 ¶¶53-55, Ex. 1, Table 1).) Moreover, as SFFA fails to acknowledge, Hoxby reached the same conclusion even when applying this accepted statistical methodology to Arcidiacono's models, (UNC Br. at 30-34 (citing UNC Ex. 23 ¶¶12-18, Ex. 1, Table 1)), and even after making adjustments to respond to Arcidiacono's criticisms of her model. (UNC Ex. 24 ¶45 ("Thus, no matter whether my or Prof. Arcidiacono's model is used, standard empirical analysis that Prof. Arcidiacono does not challenge shows that race plays a very small role in determining outcomes in UNC's overall admissions decisions.").)

Arcidiacono cannot credibly rebut this evidence because, among other faults in his analysis, he did not consider the entire applicant pool. As he admits, he intentionally excluded applicants, including those for whom he agrees race played no role in admissions, and focused his analysis of purported racial preferences on a small set of applicants, including hypothetical applicants. (UNC Ex. 26 at 29 n.20; UNC Br. at 32.) Consequently, Arcidiacono's resulting conclusions are immaterial to the germane question of whether the University's *entire* admissions process is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337.

Context matters and Arcidiacono's analysis distorts it, rendering his opinions immaterial and incapable of supporting summary judgment in SFFA's favor. Instead, summary judgment should be awarded to the University. (UNC Br. at 30-34.)

## 2.     SFFA's Statistical Evidence Is Disputed.

Even if the Court does not agree that SFFA's statistical evidence is immaterial, SFFA nonetheless cannot prevail on summary judgment because Arcidiacono's analysis and conclusions present disputed issues of fact. Hoxby directly disputes Arcidiacono's conclusion that race is a dominant factor in overall admissions decisions. (UNC Ex. 23 ¶¶7, 12-73; UNC Ex. 24 ¶¶2-9.) Indeed, both Hoxby and the University's Committee on Race-Neutral Strategies reached this conclusion. Significantly, SFFA's selective citation of the Committee's report (SFFA Br. at 13 n.3) ignores the finding that "underrepresented minority status does not meaningfully drive the prediction accuracy of the final multivariate model . . . [or] [p]ut differently, applicants' racial/ethnic status does not dominate the outcome decision within the current admissions process." (UNC Ex. 65 at UNC0380388.)

Additionally, each of Arcidiacono's sub-findings is disputed by Hoxby and other record evidence, preventing summary judgment in SFFA's favor. Specifically, the University disputes that it uses race in a "mechanical, formulaic way," that "non-URMs have far stronger academic qualifications," and that "UNC gives substantial preferences to URMs." (SFFA Br. at 12.)

### (a)     The University does not use race in a mechanical or formulaic way.

SFFA contends that, because Arcidiacono's models are accurate in predicting admissions outcomes, the University's admissions process necessarily must be formulaic, including with respect to the use of race. (*Id.* at 21.) SFFA goes so far as to assert that the

15

purported accuracy of Arcidiacono's model in predicting outcomes means that the University's use of race is "functionally no different" than giving every minority applicant an automatic 20-point bonus. (*Id.* at 33 (quoting *Gratz*, 539 U.S. at 270, 272).) This is pure hyperbole.

To begin, as Hoxby explained, Arcidiacono's focus upon the accuracy of his model is "not appropriate, nor informative for the question at hand" because when Arcidiacono touts his model as "'accurate,' what he means is that the model does a better job of predicting whether a student is admitted than a random model (like choosing names from a hat or lottery jar) would." (UNC Ex. 24 ¶5.) Simply because the University's admissions process is not random does not mean that it is formulaic. (*Id.* ¶¶5-6.)

This is true even without considering Hoxby's extensive criticisms of Arcidiacono's models themselves, including his selection of the applicants to include, his selection of variables, and his decisions regarding how those variables interact with each other. (UNC Ex. 23 ¶¶74-78; UNC Ex. 24 ¶¶57-60.) These criticisms demonstrate that although Arcidiacono's models may appear on the surface to embody the University's admissions process, they actually do not. (UNC Ex. 23 ¶8(i); UNC Ex. 24 ¶¶5-6.) Moreover, any suggestion that the purported accuracy of Arcidiacono's models makes them credible or reliable is one that Hoxby expressly contests. (UNC Ex. 24 ¶¶32-41.)

Furthermore, SFFA's claim that the University's admissions process is mechanized or gives an automatic, uniform "point bump" on account of race is

16

contradicted by both the factual record and SFFA's own experts. As discussed above, *supra* at 8-12, SFFA presents no credible evidence to contradict the University's proof that its admissions process is holistic and individualized, considering race alongside all other applicant factors. SFFA's experts acknowledged as much. *See supra* at 7. Thus, the notion that the University engages in a process that effectively results in the automatic awarding of points for race is simply false.

Finally, Hoxby provides contradictory evidence on the non-formulaic nature of the University's admissions process that precludes summary judgment in SFFA's favor. (UNC Ex. 24 ¶¶32-46.) Hoxby conducted an empirical analysis, using the University's admissions data, to assess whether its admissions decisions could be explained formulaically. Based on her affirmative analysis *and* after considering Arcidiacono's, she found that "UNC admissions decisions cannot be explained using a formula based on verifiable student characteristics. . . . UNC's admissions process is not formulaic—a result that is consistent with a holistic admissions process." (*Id.* ¶2; *see also id.* ¶¶3, 5-7.)

> **(b)** **Arcidiacono's "academic index" and corresponding claims about applicant academic qualifications are immaterial to questions regarding the University's admissions process.**

SFFA posits that the University must be using race improperly because Arcidiacono's contrived "academic index, which is a weighted average of an applicant's SAT score and high school GPA[,]" demonstrates that "non-URMs have far stronger academic qualifications." (SFFA Br. at 12, 13.) According to SFFA, Arcidiacono's "analysis demonstrates that, *if admission to UNC were based only on the academic index,*

the admitted classes would shift to a substantially larger population of non-URM students." (*Id.* at 16 (emphasis added).)[3]

But admission to the University is not based on this hypothetical academic index. When making its admissions decisions, the University considers—and values—a vast array of applicant qualities that go far beyond GPA and test scores. (UNC Br. at 10-11.) Thus, Arcidiacono's conclusions based on this hypothetical academic index are immaterial. Expert analysis untethered to the University's actual admissions process and flatly contradicted by the record cannot support summary judgment in favor of SFFA. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and therefore cannot support a motion for summary judgment); *Talley v. Danek Med., Inc.*, 179 F.3d 154, 162 (4th Cir. 1999) (holding that district court appropriately disregarded expert opinion that was "entirely speculative" and had "no apparent support in the record" in considering a motion for summary judgment); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's [conclusory] opinions that are without factual basis and

---

[3]  By its own logic, this conclusion supports the University's position, not SFFA's. It demonstrates that a race-neutral alternative plan based exclusively on metrics such as high school GPA, like a percentage plan, would almost assuredly result in a marked decrease in racial diversity—a result at odds with the University's compelling interest.

are based on speculation or conjecture are [] inappropriate material for consideration on a motion for summary judgment." ).

Moreover, as Hoxby explains, a comparison of average qualifications among subgroups of students is not probative of the role of race in admissions. (UNC Ex. 23 ¶¶20-26.) Hoxby also disputes the other conclusions drawn from Arcidiacono's index and subsequent analysis, which are based upon Arcidiacono's artificial approach of dividing applicants up into deciles within this hypothetical index—another method the University does not employ. Hoxby finds that Arcidiacono's conclusions are misleading and fail to support that race is a dominant factor within the admissions process. (*Id.* ¶¶27-43.)

### (c)    The University does not give "large racial preferences."

SFFA's final claim that the University affords substantial preferences to URM candidates (SFFA Br. at 31-32) fares no better. SFFA cites Arcidiacono's analysis that calculates a change in the purported admissions probability if he "treats" applicants as though they were another race. Arcidiacono purports to do this for *hypothetical* individual applicants, as well as sub-groups of applicants (what he calls the "marginal effect of race"). Specifically, Arcidiacono claims that "hypothetical non-URM applicants who are highly likely to be rejected would be transformed into highly likely admits if they were URMs, and all other characteristics stayed the same." (*Id.* at 31-32 (citing Arcidiacono).) Based on these examples, SFFA claims the data "conclusively" demonstrates that race plays a dominant role in individual admissions decisions. (*Id.* at 32.)

19

Not so. As Hoxby explains, these *hypothetical* examples are not representative of the entire applicant pool and were purposefully selected to maximize the odds that race may have influenced an applicant's admission. (UNC Ex. 23 ¶58 ("Thus, Prof. Arcidiacono has decided to focus on specific, and highly non-representative, applicants for whom race/ethnicity could be most likely to play a role."); *id.* ¶60 ("By selecting this subset of students for his transformation examples. . . Arcidiacono makes it appear that race/ethnicity plays a much more important role in admissions than it actually does.").) But the Supreme Court recognizes that, legally, race *may* be "likely outcome determinative" for a small portion of admissions decisions. *See Grutter* 539 U.S. at 339; *see also Fisher II*, 136 S. Ct. at 2212 ("The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality.").

To determine whether race plays an outsized role, therefore, one must look to *all* admissions decisions—not just the few where race might tip the scale.[4] To hold otherwise would effectively mean that race could never be considered in admissions without becoming the "dominant" factor. Tellingly, SFFA characterizes Hoxby's competing analysis as a "sleight of hand" because it "spread[s] the effect of UNC's racial

_____

[4]  This approach of considering only an isolated, non-representative subgroup of applicants is both at odds with the Supreme Court's guidance and divorced from the reality of a highly competitive applicant pool, like the University's. In distinguishing among extraordinary applicants, any single factor could make the difference.

20

preferences over the pool of non-URM applicants." (SFFA Br. at 21.) But Hoxby's approach is consistent with the governing law. It is not a "sleight of hand" to address the question as framed by the Supreme Court, and SFFA cannot challenge that when the entire applicant pool is properly considered, all material evidence establishes that race is not a dominant factor. (*See, e.g.*, UNC Ex. 24 ¶¶7-8, 20-21.)[5]

Hoxby also disputes Arcidiacono's attempt to consider a broader number of applications through his calculations of a "marginal effect of race" or "share [of admissions decisions] due to racial preferences" relating to subgroups of applicants.[6] (*Id.*¶¶25-31.) Based on this analysis, Arcidiacono claims that the share of admissions decisions due to "racial preferences" for in-state African-American applicants is nearly 42%. (SFFA Br. at 18.) But as Hoxby articulates:

> [T]his "share" is extremely misleading because it does not measure the relative importance of race among all factors that determine admissions decisions. [Arcidiacono's] use of "%" and the word "share" implies that he is apportioning 100% of the admissions decision across various factors and that 41.7% of the 100% is due to racial preferences. But this is not the case.

---

[5]  Although SFFA argues that Hoxby's analysis shows "racial preferences for 70% of out-of-state URM admits" (SFFA Br. at 21), SFFA cites only *Arcidiacono's* final report in support. Hoxby reached no such conclusion.

[6]  SFFA claims that Hoxby's models show a significant percentage of URM admissions are "attributable to racial preferences." (SFFA Br. at 32 (citing Arcidiacono's rebuttal report).) But as discussed here, Hoxby disagreed with both Arcidiacono's initial and rebuttal analysis on this very point. (UNC Ex. 24 ¶¶25-31.)

21

(UNC Ex. 24 ¶26.) Hoxby goes on to show that using Arcidiacono's methodology, the "share" or "marginal effect" of SAT scores, for example, is essentially 100%. (*Id.* ¶27.) And, if all of Arcidiacono's shares are totaled, they add up to far more than 100%. (*Id.* ¶¶8, 28, Ex. 1.) In other words, even if race does play a role in *some* admissions decisions (as the law allows), there is no statistical evidence that race is a *dominant* factor across the pool and process. Moreover, Hoxby also demonstrates that Arcidiacono's large putative "marginal effects of race" are driven by small numbers of students—much like his individual, hypothetical transformation examples discussed above. (*Id.* ¶¶30-31, Ex. 2.)

Accordingly, despite SFFA's claims to the contrary, for these and all the reasons articulated in the University's brief, the only reasonable conclusion a factfinder could draw from the material statistical evidence is that race does not dominate the University's entire holistic admissions process. (UNC Br. at 10-15, 29-30.) The Court should find that the University uses race in a narrowly tailored, permissible manner. At a minimum, because SFFA's evidence is disputed, the Court should deny SFFA summary judgment.

## III. The University Met Its Burden to Prove That There Is No Workable Race-Neutral Alternative to Its Current Admissions Approach.

### A. The Court Should Find as a Matter of Law That the University Has Given Serious, Good-Faith Consideration of Race-Neutral Alternatives.

The parties' cross-motions make clear that there is no factual dispute regarding the efforts taken by the University to consider race-neutral alternatives: both the University and SFFA cite the same facts. (*Compare* UNC Br. at 18-20 (citing evidence of the

University's efforts) *with* SFFA Br. at 22-23 (characterizing this same evidence as inadequate).) The only remaining question is whether, as a matter of law, these efforts amount to a serious, good faith consideration as required by the Supreme Court.

Under any reasonable interpretation, they do. Over the course of many years, the University has devoted substantial resources to considering whether race-neutral alternatives could allow it to meet its educational goals. (UNC Br. at 18-20, 35.) The University periodically assessed various alternatives available, including those implemented by other institutions or studied in academic literature. (*Id.* at 18-20; UNC Ex. 4 ¶¶86-89, 94; UNC Ex. 41 (2009 Literature Review).) *Cf. Grutter* 539 U.S. at 342 ("Universities in other States can and should draw on the most promising aspects of these race-neutral alternatives as they develop."). It also established multiple committees comprised of experienced, dedicated stakeholders who drafted work papers, conducted simulations, and invested significant time and resources to careful, conscientious deliberation of admissions strategies that might work within the specific context of the University. (UNC Br. at 20; UNC Ex. 4 ¶¶91-95, 97, 104; UNC Ex. 5 ¶¶8-16, 18-48; UNC Ex. 6 ¶¶45-49.)

SFFA suggests these efforts are inadequate largely because the University did not run certain simulations that SFFA's expert, Richard Kahlenberg, proposes as appropriate. But running simulations that an academic *thinks* might work or should be studied is not

23

what the law requires.[7] *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013) ("*Fisher I*") ("Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." (quoting *Grutter*, 539 U.S. at 339-40)). Instead, the law requires that a university undertake a serious, good faith effort to consider whether the use of race in admissions remains necessary. *Grutter*, 539 U.S. at 339-40. Notably, a "*university's experience and expertise* in adopting or rejecting certain admissions processes" is relevant to this consideration. *Fisher I*, 570 U.S. at 311 (emphasis added). Thus, Kahlenberg's generic assertions regarding possible race-neutral alternatives that are divorced from the realities of the University are not enough to support a finding that the University has failed its obligation to engage in a good-faith consideration of race-neutral alternatives, much less defeat the University's own motion for summary judgment. *Brooke Grp. Ltd.*, 509 U.S. at 242; *Talley*, 179 F.3d at 162; *Major League Baseball*, 542 F.3d at 311.

Finally, any argument that the University's efforts are insufficient because they remain ongoing rings hollow. Consistent with its "continuing obligation" to assess the necessity of considering race, *Fisher II*, 136 S. Ct. at 2209-10, the work of the University's Committee on Race-Neutral Strategies persists, including using "multiple pathways of analyses to identify potential race-neutral alternatives for undergraduate

---

[7]    And, as discussed below, Hoxby ran these suggested simulations and was unable to find a successful race-neutral alternative. *See infra* 34-38.

admissions at UNC-Chapel Hill." (UNC Ex. 65 at UNC0380391.) This is what the law requires.

Because there is no genuine issue of material fact, the Court should find that the University has made a serious and good faith attempt to consider race-neutral alternatives as a matter of law.

**B.      The Court Should Find as a Matter of Law That the University Already Employs the Majority of the Race-Neutral Strategies for Which SFFA Advocates.**

Relying on Kahlenberg, SFFA suggests that the University has failed to "*fully implement*" a portfolio of race-neutral strategies and that summary judgment should therefore be awarded in its favor. (SFFA Br. at 23, 34 (emphasis added).) SFFA does not dispute that the University already implements numerous race-neutral strategies—including recruiting diverse students, offering financial aid, partnering with disadvantaged high schools, and encouraging community college transfers—designed to increase diversity within its applicant pool. (UNC Br. at 15-18.) The only open question is whether the Court should, as Kahlenberg flatly asserts, require the University to do "more" under applicable legal standards. The answer is no.

**1.      The University Engages in Extensive Recruiting Efforts Designed to Increase Diversity Within Its Applicant Pool.**

The record firmly establishes that the University engages in significant and broad recruiting efforts, including targeting URM and socioeconomically disadvantaged students. (UNC Br. at 15-16; UNC Ex. 27 at 58.) Citing Kahlenberg, SFFA nevertheless contends that the University could further *increase* these efforts to lessen or eliminate its

25

need to consider race within admissions.[8] (SFFA Br. at 24.) In particular, Kahlenberg asserts that "thousands" of high-achieving, low-income minority students exist and are available to be targeted through recruiting. (UNC Ex. 27 at 60.)

This conjecture is directly contradicted by Hoxby. As Kahlenberg acknowledges, Hoxby is "perhaps the nation's most well-known proponent of the idea that there is a large pool of talented low-income students who are not now applying to selective colleges and could be recruited." (UNC Ex. 28 at 30.) Indeed, the Complaint quotes Hoxby's research. (Compl. ¶126.) But when Hoxby applied standards from her research to consider the effects of enhanced recruiting on the University's racial diversity and academic preparedness, she found that the vast majority—86%—of high-achieving students not applying to the University are *not* URMs; indeed, only 7% are African-American, 5% are Hispanic, and 2% are Native American. (UNC Ex. 22 ¶¶281-285.) In other words, Hoxby concluded that increased recruiting could not reasonably be expected to successfully replace the University's current holistic admissions approach. (*Id.* ¶¶286-287.) Kahlenberg's only response is to suggest Hoxby does not properly apply her own

---

[8]   Kahlenberg walked back some of this speculation: "[I]f for example, there were 72 percent of students in North Carolina [without a college degree who] were African-American and 21.8 percent of applicants were African-American, to me that would raise a red flag that more could be done to recruit such students. As I say, *this isn't dispositive* but it's a red flag to suggest more could be done." (UNC Ex. 129 at 168:15-169:3 (emphasis added).)

research and that she should have set an even lower standard for what qualifies as "high achieving." Such *ipse dixit* cannot create a genuine issue of material fact.

Additionally, another of the University's experts, Dean of the Harvard Graduate School of Education, Bridget Long, noted that many of Kahlenberg's suggestions for supplemental race-neutral strategies were theoretical, overstated in terms of impact, and potentially infeasible. (UNC Ex. 31 ¶¶55-56.) For example, Long observed that other institutions that attempted to enhance recruiting and/or financial aid have not observed a corresponding increase in racial diversity. (*Id.* ¶33 (noting that universities' efforts to enhance recruitment through targeted student fellowships still observed negative effects on racial and ethnic diversity under a Top 10% Plan).) *See also Fisher II*, 136 S. Ct. at 2212-13 (finding that intensified outreach to minority applicants failed to enhance diversity).

This Court should disregard SFFA's suggestion that the University has failed to implement the race-neutral alternative of increasing recruitment efforts. (SFFA Br. at 24.) It is at odds with the record evidence and based solely on Kahlenberg's broad, unsupported assertions that the University has "missed opportunit[ies]" to do more. (UNC Ex. 27 at 60.) This sort of "evidence" cannot support SFFA's motion. *Brooke*, 509 U.S. at 242.

### 2. The University Offers Generous Financial Aid.

Again looking to Kahlenberg, SFFA claims that the University has ignored a race-neutral alternative because it has not increased financial aid. (SFFA Br. at 24.) As with

27

recruiting, Kahlenberg's proffered opinions concerning financial aid are pure conjecture. There is no evidence—and Kahlenberg points to none—that increasing financial aid would enhance racial diversity. Moreover, Kahlenberg's opinions in this regard are a veiled attempt to substitute his judgment regarding spending priorities for that of the University.

Even if there were a concrete basis to suggest that increasing financial aid would increase racial diversity, implementing this strategy as Kahlenberg suggests would impose intolerable administrative expense. *Cf. Fisher II*, 136 S. Ct. at 2208 (workable alternatives must promote the universities goals "about as well and at tolerable administrative expense"). Kahlenberg admitted he did not analyze the funding sources for, or feasibility of, increased financial aid; he merely considered the issue at a "high level." (UNC Ex. 19 at 165:15-18.) This conjecture cannot stand up to the undisputed record evidence, which firmly demonstrates that the University has a real commitment to increasing access to higher education for low income students—both by seeking to understand their achievements in the context of socioeconomic challenges they face and by making it financially possible to attend UNC through generous and award-winning financial aid initiatives, including meeting 100% of demonstrated financial need. (UNC Br. at 16-18.)

### 3. The University Partners With Disadvantaged High Schools.

SFFA also asserts that the University has failed to consider partnerships with disadvantaged high schools as a "workable race-neutral alternative." (SFFA Br. at 24.)

28

Not so. The record reflects that, through the Carolina College Advising Corps program, the University works to extend its outreach to underserved, low-income, first generation college students and minority populations in partner high schools across North Carolina. (UNC Br. at 16 (citing UNC Ex. 4 ¶60).)

SFFA again falls back on purported expert evidence to criticize the University's efforts. Although SFFA alleges that Kahlenberg "[did] what UNC was supposed to do" (SFFA Br. at 23) to analyze race-neutral alternatives, Kahlenberg provides *no* detail in any of his reports about how additional or different partnerships with disadvantaged high schools would be implemented or how they would affect diversity other than observing that another university works with two high schools. Instead, Kahlenberg hypothesizes that these types of partnerships are "yet another missed opportunity" by the University. (UNC Ex. 27 at 64.) Vague speculation is not undisputed record evidence that can support summary judgment.

Only Hoxby provides any evidence concerning what might happen if the University attempted to operationalize Kahlenberg's theory. Even though developing a pipeline of high school students could take years, Hoxby sought to analyze what might happen if the University admitted more students from the most disadvantaged North Carolina high schools. After running multiple simulations, Hoxby concluded that this approach would result in a class with substantially lower levels of academic preparedness than the University currently achieves in both its admitted and matriculating class. (UNC Ex. 24 ¶¶98-104.) Kahlenberg's only response was to say that Hoxby failed to capture all

29

available candidates by not applying broader thresholds for disadvantage. (UNC Ex. 129 at 177:21-178:19.) Mere criticism—whether of the University's actual efforts or unrebutted empirical expert evidence—without any concrete evidence beyond speculation does not create a genuine issue of material fact. *Dash v. Mayweather*, 731 F.3d 303, 321 (4th Cir. 2013) ("An expert . . . [r]eport . . . [must] . . . describe[] both 'the factual basis and the process of reasoning which makes the conclusion viable.' [If] . . . lacking such explanation[, the report] will be insufficient to rebut a properly supported motion for summary judgment."). The record is clear that SFFA has no evidence to support its assertion that partnerships with disadvantaged high schools would somehow have a tangible impact on the University's ability to eliminate the consideration of race in its admissions process.

### 4. The University Encourages Community College Transfers.

Finally, SFFA asserts through Kahlenberg that admitting community college transfer students is another workable race-neutral alternative underutilized by the University. (SFFA Br. at 24.) This is untrue. The University makes substantial efforts to recruit transfer students through its Carolina Student Transfer Excellence Program. (UNC Br. at 18 (discussing recruitment of North Carolina partner community college students).)

Nonetheless, Kahlenberg opines the University could do more, extolling this strategy in all three of his reports. But Kahlenberg never attempted to quantify the impact that it might have, whether at UNC-Chapel Hill or any university. Although the University bears the burden of assessing race-neutral alternatives, it cannot be the case

30

that SFFA—or an expert it retains—can do no more than theorize alternatives and consequently force the University to engage in extensive analysis to *disprove* the theory, no matter how vague or amorphous. *See Fisher I*, 570 U.S. at 312. Yet again, *Hoxby* sought to empirically analyze possible results of an increase in transfer students from community colleges. She concluded based on two separate analyses that the University would likely suffer a decrease in both racial diversity and academic preparedness. (UNC Ex. 24 ¶¶86-90, 91-97.)

### C. The Court Should Find as a Matter of Law That Certain Race-Neutral Strategies Are Not Likely to Increase Racial Diversity.

In addition to suggesting race-neutral strategies that the University already uses, SFFA also suggests strategies that would have no impact on the University's ability to achieve racial diversity without considering race. SFFA asserts that the University could eliminate legacy preferences and Early Action admissions decisions as part of a greater commitment to not employ race. (SFFA Br. at 24.) There is no evidence that these proposals, alone or in conjunction with other efforts, would have any real impact on the University's admissions outcomes; the speculative suggestion that they could is based on a fundamental misunderstanding of the record. The Court should reject these "alternatives" as matter of law.

### 1. Elimination of Legacy Preferences Would Have No Material Impact on Admissions.

Relying on Kahlenberg, SFFA claims that the University could increase the efficacy of its admissions process in achieving diversity by eliminating legacy

31

admissions. (*Id.* at 24.) But SFFA *admits* that Arcidiacono found that legacy admissions play almost no role in the University's admitted population. (*Id.* at 17, n.4 ("UNC gives preferences to legacy applicants, but they have relatively little effect on the racial composition of UNC's admitted classes." (citing Arcidiacono)).) SFFA cannot have it both ways with its experts reaching opposite conclusions.

The University's experts also provided compelling, unrebutted evidence that Kahlenberg is wrong to assert that implementing this type of change would have a meaningful impact. Hoxby found, using Arcidiacono's model—*and* consistent with Arcidiacono's own conclusion—that the impact of alumni preferences is too small for the elimination of such preferences to serve as a race-neutral alternative. (UNC Ex. 23 ¶¶171-172.) Long also rebutted Kahlenberg's sweeping assertion that other universities have successfully used race-neutral strategies, including the elimination of legacy preferences, to increase racial diversity. (UNC Ex. 31 ¶¶45, 57.) As Long notes, Kahlenberg incorrectly assumes that what might work in one state or institution will work at UNC-Chapel Hill. (*Id.* ¶¶4(b), 40; *see also* UNC Ex. 30 ¶¶42-46.)

Kahlenberg's only response is to assert that the elimination of legacy preferences should be used in conjunction with other strategies. But Long directly refuted this point. (UNC Ex. 125 ¶3 ("Kahlenberg mischaracterizes the conclusions from my report by suggesting that my report focuses on race-neutral alternatives being used in isolation. To the contrary, my review acknowledges many of the admissions practices that Mr. Kahlenberg advocates for, and in most cases, the research I discuss examines the impact

of a race-neutral approach being used in conjunction with other admissions practices. Even when race-neutral approaches are implemented as part of a larger collection of admissions practices, they have still been found to be ineffective.").) Likewise, Hoxby's simulations of race-neutral alternatives eliminated legacy preferences *and still* do not maintain racial diversity and academic preparedness. Consequently, no evidence exists that this strategy, even when combined with others, would have a meaningful impact on the University's ability to achieve a diverse and academically prepared class. *Supra* at 25-31.

### 2. Elimination of Early Action Would Have No Impact on Admissions.

Through Kahlenberg, SFFA also claims the University's elimination of its Early Action program is a race-neutral alternative. (SFFA Br. at 24.) This notion is contradicted by Arcidiacono, who testified that the data fails to support that race plays any role in differences in admissions rates between Early Action and regular decision candidates. (UNC Ex. 128 at 30:9-14.) More fundamentally, however, Kahlenberg—throughout his reports—misunderstands how the University's Early Action program works. Early Action is non-binding; it allows an applicant to apply and receive an admission decision early, without being committed to attend if admitted. (UNC Ex. 7 ¶¶8-9.) This is different than "Early Decision" processes employed by other colleges, which require applicants to enroll if admitted. Kahlenberg simply gets this wrong and treats the University's Early

33

Action program as though it were binding Early Decision. (UNC Ex. 27 at 63.)[9]

Fundamentally incorrect expert testimony cannot preclude summary judgment for the

University.

>    **D.      No Workable Race-Neutral Alternative to the University's Current
>             Admissions Process Is Available.**

The only remaining issue is whether any of the race-neutral alternative simulations

run either at Kahlenberg's direction or by Hoxby prove that an alternative to the

University's current race-conscious admissions practices is available and "workable." For

the reasons set forth in the University's brief, and the additional reasons set forth below,

the answer is no. The University has met its burden to prove that no such alternative

could achieve the University's goals about as well, and SFFA's evidence fails to establish

otherwise.

>    **1.      Hoxby's Analysis Supports That No Alternatives Are Workable.**

As the Supreme Court has made clear, a university bears the burden to prove that

"available, workable race-neutral alternatives" are insufficient. *Fisher I*, 570 U.S. at 312;

*Fisher II*, 136 S. Ct. at 2208. To be a "workable" alternative, the non-race conscious

approach must promote the university's "interest in the educational benefits of diversity

'about as well and at tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208

---

9    Moreover, as Hoxby observed, Kahlenberg's conflation of Early Action with Early
     Decision "is not only misleading but also wrong; it contradicts research and logic that
     indicate that early action programs give an advantage to *lower-income* students rather
     than affluent students." (UNC Ex. 24 ¶112.)

34

(quoting *Fisher I*, 570 U.S. at 313). An alternative that would force the university to choose between diversity and academic excellence is—by definition—unworkable, and need not be implemented. *Id.* (*Cf.* UNC Ex. 129 at 96:15-19 (Kahlenberg testifying that "workable" means feasible or viable).)

SFFA contends that the University has not met its burden in this regard because Hoxby testified that she did not offer a specific opinion concerning whether any particular race-neutral alternative is "workable." (SFFA Br. at 26.) This argument elevates form over substance. Hoxby comprehensively analyzed all reasonable race-neutral alternatives, including the levels of racial diversity and academic preparedness that might be achieved under the best-case scenarios. She compared these levels to the outcomes currently achieved under the University's holistic, race-conscious approach and found that *none* of the race-neutral alternatives she simulated would result in the levels of racial diversity or academic preparedness currently achieved by the University. (UNC Ex. 24 ¶61 ("there is no race-blind alternative available to UNC that could be used, even in some practical combination with another alternative, that would allow UNC to maintain its current level of academic preparedness and racial diversity"); UNC Ex. 23 ¶¶183, 120; *see also* UNC Ex. 129 at 187:15-188:5 (Kahlenberg acknowledging that the experts in

35

this case, including Hoxby, covered the waterfront of potentially available race-neutral alternatives).)[10]

Because the Supreme Court does not require the University to sacrifice either racial diversity or academic excellence, Hoxby's conclusions necessarily demonstrate that race-neutral alternatives are not workable, regardless of what terminology is employed. Hoxby assessed the question of whether a race-neutral approach could achieve the University's current levels of racial diversity without sacrificing academic excellence. She found that none do and thus the inquiry ended there.

Indeed, Hoxby's reluctance to overstep her mandate is consistent with the governing law, which requires that any viable alternative must not only promote the University's educational goals, but also impose only "tolerable administrative expense" in order to be "workable." *Fisher I*, 570 U.S. at 312. Neither Hoxby nor Kahlenberg can reliably consider the question of "tolerable administrative expense." This makes sense because whether a new admissions process should be adopted or rejected based on administrative expense should be informed by the experience and expertise of the

_____

[10]  Kahlenberg criticizes Hoxby for comparing the results of her analysis against the University's current levels of racial diversity and academic preparedness, urging that this is an "overly strict standard." (SFFA Br. at 25.) This criticism is unwarranted. The University is still working toward attaining the educational benefits of diversity. (UNC Br. at 8-9.) Consequently, it is both logical and reasonable that any alternative admissions process *should* be evaluated against the current levels of racial diversity and academic preparedness; *any* decrease in those levels will only make the University's goals that much more difficult to realize.

36

University—not expert witnesses. And, regardless of what either expert opines, it is the "*reviewing court* [that] must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity." *Id.*

### 2. SFFA's Simulations Are Flawed, Unreliable, and Disputed.

Kahlenberg's competing simulations do not compel summary judgment in SFFA's favor. As set forth in the University's brief, Kahlenberg's simulations are immaterial. (UNC Br. at 37-38.) He advocates for the pursuit of increased socioeconomic diversity without regard for effect on racial diversity—pushing for a standard that is neither endorsed nor required by the controlling precedent. In essence, Kahlenberg seeks to answer the wrong question.

Even if the Court were to consider Kahlenberg's opinions, summary judgment in favor of SFFA is still inappropriate because those opinions are clearly disputed. SFFA attempts to characterize several of Kahlenberg's race-neutral alternatives—"Simulations" 8, 9, 11, and 13—as either unrebutted or so successful that even a "non-expert" could endorse them. (SFFA Br. at 37.) This is disingenuous. Hoxby had no opportunity to respond to Simulations 8, 9, 11, and 13 because they appeared for the first time in Kahlenberg's final report. Moreover, Hoxby directly disputed the analysis underlying these Simulations and concluded that Kahlenberg's previously proffered alternatives would *not* allow the University to maintain its current levels of racial diversity without sacrificing academic preparedness. (UNC Ex. 24 ¶73.)

Specifically, Kahlenberg's Simulations 8 and 9 are versions of a percentage plan based upon Arcidiacono's flawed model of the University's admissions process and a hypothetical "ranking" of applicants based upon that model. Simulations 8 and 9 present disputed issues of fact because Hoxby refutes the reliability of the model on which they are based, noting, in particular, that it is premised on unrealistic and unreliable assumptions about the applicants who might apply under a new admissions program. (UNC Ex. 23 ¶¶149-168; UNC Ex. 24 ¶¶80-81.)

Simulations 11 and 13 are versions of a socioeconomic status-based plan reflected in Kahlenberg's original report (Simulation 4), modified by two rounds of revisions in response to Hoxby's analysis and criticism. As Hoxby described in both her rebuttal and reply reports, Kahlenberg's Simulation 4—the underlying basis for Simulations 11 and 13—is unreliable because "it gives such large increases in admissions probabilities ('bumps') to students whom Mr. Kahlenberg deems low [socioeconomic status] that it effectively removes UNC's holistic review and replaces it with a formulaic approach based almost entirely on socioeconomic status." (UNC Ex. 24 ¶¶74, 78-79.) Requiring the University to focus on socioeconomic status to the detriment of all other applicant characteristics cannot be a proper application of strict scrutiny.

At a minimum, because Kahlenberg's opinions are disputed, the Court cannot find as a matter of law that a workable race-neutral alternative exists. *See Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 417 (4th Cir. 2015) ("The evidence therefore sets up a battle of the experts, which should not be resolved at summary judgment."). However,

38

the Court reasonably could go a step further and rule in favor of the University: Hoxby's

properly focused analysis proves that no workable race-neutral alternative exists.

## CONCLUSION

Defendants respectfully request that the Court deny SFFA's motion for summary

judgment and grant Defendants' cross-motion for summary judgment.

39

Respectfully submitted this 4th day of March, 2019.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

/s/ Patrick Fitzgerald
Patrick Fitzgerald
Amy Van Gelder
Lara Flath
Marianne Combs
Skadden, Arps, Slate, Meagher
   & Flom, LLP
155 North Wacker Drive
Chicago, IL 60606-1720
(312) 407-0700
E: patrick.fitzgerald@skadden.com
E: amy.vangelder@skadden.com
E: lara.flath@skadden.com
E: marianne.combs@skadden.com

JOSHUA H. STEIN
  ATTORNEY GENERAL

/s/ Stephanie Brennan
Stephanie Brennan
Special Deputy Attorney General
NC State Bar No. 35955
E: sbrennan@ncdoj.gov

/s/ Nora Sullivan
Nora Sullivan
Assistant Attorney General
NC State Bar No. 43284
E: nsullivan@ncdoj.gov

*Attorneys for UNC-Defendants*

40

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed the limit of 9,500 words established by the Court's August 28, 2018 Order. (Dkt. 145.)

This 4th day of March, 2019.

/s/ Patrick Fitzgerald
Patrick Fitzgerald

41

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and all related exhibits via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 4th day of March, 2019.

/s/ Patrick Fitzgerald
Patrick Fitzgerald