# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br>      Plaintiff, <br><br>   v. <br><br> UNIVERSITY OF NORTH CAROLINA, et al., <br><br>      Defendants. | Civil Action No. 1:14-cv-954-LCB-JLW |

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029 Winston Salem, NC
27120-1029
(336) 714-4147
aruley@belldavispitt.com

Michael H. Park
Consovoy McCarthy Park PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(212) 247-8006
park@consovoymccarthy.com

Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
Bryan K. Weir
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

March 4, 2019

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................................1

STANDARD OF REVIEW ......................................................................................................................2

COUNTERSTATEMENT OF FACTS ...................................................................................................2

ARGUMENT ..........................................................................................................................................2

CONCLUSION .....................................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 225-26 (1995) ......................................................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) ...........................................................1

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) ........................................................5

*FDIC v. Cashion*, 720 F.3d 169, 181 (4th Cir. 2013) ........................................................................2

*Fisher v. Univ. of Tex. at Austin (Fisher I)*, 570 U.S. 297, 310-11 (2013) ........................................3

*Fisher v. Univ. of Tex. at Austin (Fisher II)*, 136 S. Ct. 2198, 2208 (2016) .....................................3

*Fisher v. University of Texas at Austin*, 758 F.3d 633, 643 (5th Cir. 2014) ....................................4

*Gratz v. Bollinger*, 539 U.S. 244, 273 (2003) .................................................................................6

*Grutter v. Bollinger*, 539 U.S. 306, 333-35 (2003) ..........................................................................5

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) ..............................2

*Lomack v. City of Newark*, 463 F.3d 303, 310 (3d Cir. 2006) .........................................................4

*Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No.1*, 551 U.S. 701, 735 (2007) .................15

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ......................20

*Wessmann v. Gittens*, 160 F.3d 790, 799-800 (1st Cir. 1998) .........................................................18

# INTRODUCTION

In seeking summary judgment, Plaintiff Students for Fair Admissions ("SFFA") explained that, although summary judgment is sometimes inappropriate in cases like this, it is warranted here because "the record 'is so one-sided that [SFFA] must prevail as a matter of law.'" Brief in Supp. Pl.'s Mot. for Summ. J. ("SFFA Br.") at 1 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In light of UNC's opening brief, it is clear that to the extent there any factual disputes in this case, none of them are material. In short, *someone* is entitled to summary judgment.

That someone is SFFA. UNC acknowledges: (1) that it uses race in admissions for the benefit of underrepresented minority ("URM") applicants; (2) that those racial preferences are massive; (3) that SFFA's expert can use a formula to predict more than 90% of admissions decisions; and (4) that SFFA has proposed a race-neutral alternative that increases racial diversity, increases socioeconomic diversity, and increases the average GPA of the admitted class. Based on these undisputed facts, SFFA is entitled to judgment as a matter of law.

Rather than disputing these facts, UNC offers a series of flawed legal arguments based on its misinterpretation of Supreme Court precedent. The Court must decide these important legal disputes. But once the Court does, it will become clear that UNC cannot meet its heavy burden of proving that its use of race in admissions in narrowly tailored. Under the appropriate legal framework, there can be no doubt that UNC's use of race is not individualized, that racial preferences dominate its admissions decision

1

for URM applicants, and that UNC has workable race-neutral alternatives to the use of racial classifications. In all events, UNC is not entitled to summary judgment.

## STANDARD OF REVIEW

SFFA's brief in support of its own motion for summary judgment sets forth the applicable standard of review. SFFA Br. 27.

## COUNTERSTATEMENT OF FACTS

This matter is before the Court on cross-motions for summary judgment. Each party has set forth the facts that are material to resolution of this dispute in accordance with L.R. 56.1(d) and (e) and Section C of the Court's civil case policies. SFFA Br. 2-27; UNC Br. 5-23. SFFA's statement of facts, incorporated by reference, identifies the parties' factual disputes; any disputes that are pertinent to adjudicating these cross-motions are further addressed herein. But as explained below, those disputes are not "material" because they will not "affect the outcome of the suit under governing law." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and quotations omitted). And they are not "genuine" because "the record taken as a whole could not lead a rational trier of fact to find" for UNC on those factual disputes. *FDIC v. Cashion*, 720 F.3d 169, 181 (4th Cir. 2013) (citations and quotations omitted).

## ARGUMENT

UNC's summary judgment motion should be denied. It is SFFA—not UNC—that is entitled to summary judgment because of the overwhelming evidence that UNC is violating federal law. SFFA Br. 27-38. But even if the Court disagrees, the record

2

evidence clearly is not so one-sided in UNC's favor as to entitle UNC to summary judgment.

## I. UNC is not entitled to summary judgment on its argument that its use of race is narrowly tailored.

UNC is not entitled to summary judgment on SFFA's claim that UNC uses race as more than a "plus" factor for URM applicants. UNC Br. 27-34. The record evidence instead shows that SFFA is entitled to summary judgment. SFFA Br. 28-34. But if the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to resolution of this issue.

As UNC concedes (at 25-28), the deference to which it is entitled is quite limited. SFFA Br. 28-30. UNC receives "some" deference on only one issue: whether "a diverse student body would serve its educational goals." *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 310-11 (2013). UNC receives no deference on whether it is actually pursuing "the benefits of a student body diversity that encompasses a broad array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.* at 314-15. "Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way." *Id.* at 313. The Supreme Court also "clarified" that universities receive "no deference" on whether their use of race is "narrowly tailored." *Fisher v. Univ. of Tex. at Austin* (*Fisher II*), 136 S. Ct. 2198, 2208 (2016) (citing *Fisher I*, 570 U.S. at 311-12).

3

Here, UNC claims that it has made an "academic judgment ... that pursuing the educational benefits of diversity is integral to fulfilling its mission to prepare the next generation of leaders." UNC Br. 27. Under controlling precedent, UNC "has a compelling interest in fostering diversity." *Id.* at 28. But any suggestion that SFFA is not contesting whether UNC made an academic judgment to pursue the educational benefits of diversity is wrong. The record contradicts UNC's assertion and shows that the university does not use race to achieve academic or educational goals. UNC uses race heedless of the demonstrated harm it causes to the very applicants it purports to benefit. SFFA Br. 28-31; *see also Fisher I*, 570 U.S. at 331-34 (Thomas, J., concurring).

Regardless, UNC's use of race is not narrowly tailored for at least three reasons. SFFA Br. 30-34. ***First***, UNC does not use race to achieve "critical mass." SFFA Br. 30-31. Indeed, the phrase "critical mass" does not even appear in UNC's brief. That should be decisive. The "critical mass" interest was the *only* basis for upholding the University of Michigan Law School's use of race as narrowly tailored. *See Fisher v. University of Texas at Austin*, 758 F.3d 633, 643 (5th Cir. 2014) ("*Grutter* approved the University of Michigan Law School's goal of 'attaining a critical mass of under-represented minority students.'"), *aff'd, Fisher II*, 136 S. Ct. 2198 (2016); *Lomack v. City of Newark*, 463 F.3d 303, 310 (3d Cir. 2006) (same). Nor is there any doubt that UT Austin relied on "critical mass" as its diversity goal. *See Fisher*, 758 F.3d at 644 ("UT Austin had achieved sufficient diversity to attain the educational benefits of diversity, a critical mass, before it adopted a race-conscious admissions policy"); *id.* at 667 n.9 (Garza, J., dissenting)

4

("'[C]ritical mass' represents the goal the University purports to seek"). There is no other goal the Supreme Court has endorsed as narrowly tailored "to achieve student body diversity." *Grutter v. Bollinger*, 539 U.S. 306, 333-35 (2003). Because UNC's use of race is not narrowly tailored to achieve that goal, its use of race is unlawful.

**Second**, UNC's use of race is mechanical and, as a consequence, "operates as an implicit formula" in violation of *Gratz* and *Grutter*. SFFA Br. 33-34. UNC does not acknowledge or directly address this record evidence. UNC instead argues (at 11-12, 29-30) that it is immune from this charge because it does not use an *explicit* formula. According to UNC, its use of race is individualized because the record does not reveal that it "uses quotas, engages in racial set asides or point allocations, or intentionally discriminates against applicants based on race." UNC Br. 30. But Supreme Court precedent is not so easily evaded.

An implicit formula no more complies with federal law than does an explicit formula. The issue is not whether UNC is candid about the formulaic way it uses race in its admissions process. The issue is whether the record evidence shows that UNC is actually using race in a formulaic way. After all, the "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race" that are lurking beneath the surface of a purportedly legitimate policy. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *accord Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 225-26 (1995). UNC's assertion (at 29-30) that SFFA neither contests that its use of race is "individualized and holistic" nor will "offer expert opinions contending otherwise" is inaccurate. SFFA does not

dispute that UNC's system purports to be holistic. But it is UNC that cannot dispute that "Professor Arcidiacono's model predicts over 90% of both in-state and out-of-state admissions decisions" because "'UNC's undergraduate admissions process is very formulaic: the various characteristics of applicants can be assigned numerical scores and added up; those who are above some threshold are admitted, and the rest are rejected.'" SFFA Br. 33 (quoting Arcidiacono Rebuttal 24). And it is this uncontradicted evidence—not UNC's self-serving characterization of its admissions system—that is decisive. Contrary to UNC's assertion, then, no reasonable factfinder could find that it uses race as a "flexible factor among many in" the "admissions process." UNC Br. 29.

The closest UNC comes to responding is its assertion (at 30) that its use of race does not "guarantee admission" for URMs. Foremost, SFFA does not have to construct a model that predicts 100% of admissions decisions. *See Gratz v. Bollinger*, 539 U.S. 244, 273 (2003). If a statistical model can predict over 90% of admissions decisions, the use of race in admissions is mechanical under any legitimate definition. Nor does limited individualized treatment of a few applicants alter anything. There was a "possibility of an applicant's file being flagged for individualized consideration" even within the points-based system the University of Michigan employed. *Id.* But that did not make the use of race individualized. An admissions process is impermissibly mechanical when a formula can explain the "bulk of admissions decisions" year over year. *Id.* at 274. That is the case here. Whether or not it guarantees admission for *every* URM applicant, UNC

is using an implicit formula that "automatically gives a plus for an applicant's race." UNC Br. 30.

***Third***, UNC uses race as more than a "plus" factor in deciding whether to admit URMs. SFFA Br. 31-34. UNC responds (at 31-32) that in exposing the *massive* preferences it gives to URMs, Professor Arcidiacono inappropriately excluded some applicants from his statistical model. According to UNC, the model "must address the applicant pool in its entirety" because "'[t]he fact that race consciousness played a role in only a small portion of admissions decisions should be the hallmark of narrow tailoring, not evidence of unconstitutionality.'" UNC. Br. 32 (quoting *Fisher II*, 136 S. Ct. at 2212). By making this modeling choice, UNC argues, Professor Arcidiacono "ignore[d] the central question here: whether race was a predominant factor in the *overall* admissions system." *Id.* (citation omitted). UNC's position is legally flawed, factually misleading, and irrelevant.

The legal inquiry is *not* about determining the "overall" role of race in admissions decisions. As the Supreme Court has explained, the question is whether, for an applicant who receives a racial preference, race is "the defining feature of *his or her* application," *Grutter*, 539 U.S. at 337 (emphasis added), or whether race was instead "a 'factor of a factor of a factor'" in the admissions decision, *Fisher II*, 136 S. Ct. at 2207. That question can only be answered, in turn, by determining whether, *for those applicants*, UNC "uses race in an outsized way that negates the [allegedly] individualized nature of its holistic admissions process." UNC Br. 31 (citing Compl. ¶ 199). Looking at what "overall" role

7

race plays in an abstract sense sheds no light on the answer. That does not mean the legal inquiry must focus on individual admissions decisions. UNC Br. 30. But it does mean that UNC is not permitted to dilute the role of race in admitting URMs by offsetting the preference against the lack of a role race plays in admitting white and Asian-American applicants.

Imagine, for instance, if UNC stopped giving a racial preference to Hispanic applicants and then commensurately increased the racial preference it gives to African Americans. UNC could not argue that the role of race in admitting African Americans has not increased because the use of race across the "*entire admissions program*," UNC Br. 31, remained the same. Such an argument would be meritless on its face. Yet that is what UNC asks the Court to accept in arguing that "race is *not* a dominant factor in admissions" once the effect of race in admissions is evenly divided across the "entire applicant pool." *Id.* at 32. Such an approach contradicts Supreme Court precedent and should be rejected for that reason alone.

It also contradicts common sense. Assume, for example, that recruited basketball players are admitted irrespective of any other factor (assuming they meet basic qualifications). UNC would have the Court determine that the effect of being a recruited basketball player has almost no effect on admissions as a whole and, accordingly, is not a dominant factor in its admissions system. But the truth of course is that being a recruited basketball player would be the "defining feature" for those applicants. That is because to evaluate whether a certain attribute is a dominant factor

8

in admissions, the Court must evaluate how that attribute affects those who receive a preference for possessing it. Here, the attribute is being African American or Hispanic. And for those who possess that attribute, it plays a dominant role in whether they are admitted to UNC.

Moreover, UNC's suggestion (UNC Br. 32) that Professor Arcidiacono's calculation of the marginal effect of race is somehow unreliable because it does not include so-called "perfect predictions" is misleading and, at bottom, a meritless argument. Professor Arcidiacono's preferred model includes 162,341 applicants to UNC over the six-year period for which UNC produced admissions data. *See* Arcidiacono Rebuttal Rep. at Table A4.1.R & A4.2.R. The model reveals that some sets of applicant characteristics result in "perfect predictions" where, for example, particularly low ratings may guarantee rejection, or particularly high ratings may guarantee admission, regardless of race. *See* Arcidiacono Decl. [Doc. 160], Ex. B ("Arcidiacono Rebuttal Rep.") at 29 n.20. Professor Arcidiacono did not include these "perfect predictions" when calculating the average marginal effect of race.

This is the purported problem that UNC identifies in claiming that Professor Arcidiacono's calculation of the average marginal effect of race "is based on a non-representative subset of applicants." UNC Br. 32. UNC puts great emphasis on this point; indeed, it is UNC's primary attack. And UNC refers to Professor Arcidiacono's calculation of the marginal effect of race in scare quotes as "evidence"—as if to imply this was a sleight of hand. But Professor Arcidiacono's treatment of "perfect

predictions" is standard practice. Indeed, Stata—the analytics software both experts used—automatically excludes "perfect predictions" when computing the average marginal effect of race. *See* Stata margins, *available at* https://www.stata.com/manuals13/rmargins.pdf.

Even setting aside the fact that Professor Arcidiacono's treatment of perfect predictions is standard practice, the key problem for UNC is that the sum total of those perfect predictions in Professor Arcidiacono's preferred model is only 507 applicants— *or less than one-third of one percent of the 162,341 applicants in the model*. It does not take a statistician to recognize that including 507 more applicants would have no meaningful impact on the average marginal effect of race on admission.[1] UNC's misleading characterization of 99.7% of UNC applicants as a "subset"—and a "non-representative" one at that—just proves how weak UNC's position is and underscores why SFFA is entitled to summary judgment. No rational factfinder could rely on this as a basis for rejecting Professor Arcidiacono's analysis.

UNC's criticism (UNC Br. 33) of Professor Arcidiacono's transformational analysis, SFFA Br. 32, is equally misleading and meritless. As Professor Arcidiacono

---

[1] Professor Hoxby proves the point. After Professor Arcidiacono explained that she erred by including in her model applicants who did not complete or who had withdrawn their applications, Professor Hoxby correctly removed these applicants from her model. Doc. 166-9, EX58 at 19-20 & n.76. There are 10,612 such applicants over the six-year period, and 7,577 of them in the four years that Professor Hoxby analyzed. Arcidiacono Decl. [Doc. 160], Ex. A ("Arcidiacono Rep.") at Tables A2.1 & A2.2. Professor Hoxby stated that removing these 7,577 applicants from her model—*a group approximately 15 times the size of the number of perfect predictions in Professor Arcidiacono's preferred model*—has no meaningful impact on calculating the effect of race on admissions. Doc. 166-9, EX58 at 19-20 & n.76.

demonstrated, changing an applicant from non-URM to URM status (while keeping all other characteristics the same) would have a dramatic effect on that applicant's chances of admission. Consider, for example, "a male, non-FGC Asian-American applicant whose observed characteristics would imply a 25% chance of admission." Arcidiacono Rebuttal Rep. at 22. "If he was an in-state applicant, his probability of admission would increase to over 67% (i.e., more than double) had he been treated like an in-state Hispanic applicant, and to over 90% (more than triple) had he been treated like an in-state African American applicant." *Id.* "If he was an out-of-state applicant, his probability of admission would increase to over 86% had he been treated like an out-of-state Hispanic applicant and over 99% had he been treated like an out-of-state African-American applicant." *Id.*

Notably, UNC does not quarrel with Professor Arcidiacono's calculations, nor his conclusion that "[s]imply changing this hypothetical Asian-American applicant's race to either Hispanic or African-American … thus would transform him from an unlikely admit to an almost certain admit." *Id.* at 22. Nor does UNC try to characterize this dramatic swing in admission chances as something less than a "dominant" effect of race on admissions. *Id.* at 1. Rather, UNC argues that Professor Arcidiacono's example of an applicant with a 25% chance of admission is somehow "not representative" of "outcomes across the entire admissions process," that is, of the overall applicant pool. UNC Br. 33.

11

As an initial matter, an admissions process that makes race such a dominant factor for *any* applicant is constitutionally suspect. Whether Professor Arcidiacono's example is representative of the overall applicant pool is beside the point. But Professor Arcidiacono's example is in fact highly representative of the overall pool. UNC's average admit rate for its entire applicant pool across the six-year period for which UNC produced applicant data is 25.61%. *See* Arcidiacono Rep. 19, Table 2.1. So the example of an applicant with a 25% chance of admission in fact reflects almost exactly the same likelihood of admission as "outcomes across the entire admissions process."[2]

In contrast, Professor Arcidiacono's criticisms of Professor Hoxby's statistical work are well-founded. To begin, Professor Hoxby fails to separately analyze in-state and out-of-state applicants—notwithstanding the fact that a UNC study produced after the close of fact discovery revealed that, when the entire applicant pool is taken as a whole, residency is the variable with the largest impact on admission. Doc. 167-5, EX71 173:7-174:7; Doc. 166-15, EX64 25:5-18. By failing to account for residency, Professor Hoxby's model fails to capture the way different factors (including race and legacy) interact with residency. Her models thus are infected by large inaccuracies in their

---

[2] Professor Arcidiacono showed similar dramatic effects for hypothetical non-URM applicants with a 10% chance of admission. *See* Arcidiacono Rebuttal Rep. at Tables 4.1.R & 4.2.R. UNC also attacks this example as "non-representative," (UNC Br. 32-33), but an applicant with a 10% chance of admission approximates the average admit rate for the entire subset of out-state applicants for the six-year period and thus fairly reflects that group of applicants. *See* Arcidiacono Rep. at 19, Table 2.1. These same admit rates demonstrate that UNC is wrong to suggest that a better example would be the median applicant. Indeed, among out-of-state applicants, the median applicant is a near-certain reject and thus does not represent "outcomes across the entire admissions process." UNC Br. 33.

prediction of URM admit rates both for in-state and out-of-state applicants. *See* Arcidiacono Decl. [Doc. 160], Ex. C. ("Arcidiacono Reply Rep."), at Table 2.7. Indeed, Hoxby's prediction of the admit rate for out-of-state African-American applicants is off by more than 23%. *See id.* As a result of these and other flaws, *see, e.g.*, Arcidiacono Rebuttal Rep. 3-20, Professor Hoxby's model is clumsy and inaccurate. Whereas Professor Arcidiacono's model perfectly matches the actual admit rates in all six years for which UNC produced applicant data, Professor Hoxby misses the mark (sometimes badly) in each of the four years she analyzes. Arcidiacono Reply Rep. Tables 2.6 & 2.7.

In any event, these dueling expert criticisms are irrelevant. Professor Hoxby's own work confirms that UNC's racial preferences for URMs are massive. First, in order to determine the impact that UNC's racial preferences have on admissions, she observed the effect on non-URM applicants of equalizing admission rates for URM and non-URM applicants within deciles using of an "admissions index" she derived from Professor Arcidiacono's admissions model. Curiously, though, Professor Hoxby did not report the effect of her analysis on URM applicants. That is likely because the underlying data disclosed with her reports reveals that UNC's "racial preferences account for *70% of out-of-state URM admits*" or "2,399 URM admits over the six-year period." Arcidiacono Reply Rep. 7-8.[3] In other words, Professor Hoxby's own work

---

[3] More broadly, Professor Hoxby's admit-rate equalization analysis reveals that 30% of in-state URMs and 57% of out-of-state URMs are admitted on account of race. *See* Arcidiacono Reply Rep. 58-59. And in reality, UNC's racial preferences are even larger, as Professor Hoxby's analysis "substantially understates" their magnitude. Arcidiacono Reply Rep. 60; *see generally id.* at 55-62. In reality, UNC's racial preferences "account for nearly a fourth of admissions for in-state Hispanic

13

reveals that approximately 400 URM applicants are admitted each year on account of race—from the out-of-state pool alone.

Second, Professor Arcidiacono used Professor Hoxby's model to show that race is a determinative factor for many African-American and Hispanic applicants. Taking the entire set of admitted students from Professor Hoxby's preferred model, Professor Arcidiacono calculated their average probability of admission with racial preferences "turned off." *See* Arcidiacono Reply Rep. 48. This analysis showed that removing racial preferences would transform large numbers of URM admitted students into likely rejects. For in-state admits—again, under Professor Hoxby's own preferred model— more than one-eighth of Hispanic admits and more than one-third of African-American admits would have been likely rejects if not for UNC's racial preferences. And for out-of-state admits, more than half of Hispanic admits and nearly 85% of African-American admits would have been likely rejects without racial preferences. *See id.* at 49 & Table 3.1.

Third, Professor Hoxby claims that SFFA's expert on race-neutral alternatives (Richard Kahlenberg) employs "extremely large" SES preferences, Doc. 166-8, EX 57 at 58—*when UNC utilizes racial preferences of even larger magnitude.* Specifically, Professor Hoxby claims that an SES preference Mr. Kahlenberg employs equates to 278 points

---

applicants, … nearly 42% of African-American in-state admissions, … 70% of out-of-state Hispanic admissions, [and] 91% of out-of-state African-American admissions." Arcidiacono Reply Rep. 46; *see also id.* at 47-50; SFFA Br. 31-32.

on the SAT, *id.*, but her own methodology reveals that UNC's racial preferences for out-of-state URMs equate to nearly 400 points on the SAT for African-American applicants. SFFA Br. 21-22; Arcidiacono Reply Rep. 8. Given that UNC's own expert analysis confirms that UNC's racial preferences are enormous, the record evidence is clear that UNC does not use race merely as a "plus" factor to achieve the educational benefits of diversity. No reasonable factfinder could conclude otherwise.

## II. UNC is not entitled to summary judgment on its argument that it considered in good faith and correctly rejected race-neutral alternatives as unworkable.

UNC is not entitled to summary judgment on SFFA's claim that it is unnecessary for UNC to use race to achieve racial diversity. UNC Br. 34-39. The record evidence instead shows that SFFA is entitled to summary judgment. SFFA Br. 34-38. But if the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to resolution of this issue.

As UNC concedes (at 34-35), it bears a heavy burden in proving that it lacks a race-neutral alternative. SFFA Br. 34. First, UNC must prove that it considered race-neutral alternatives, *Grutter*, 539 U.S. at 339, "*before* turning to racial classifications," *Fisher I*, 570 U.S. at 312 (emphasis added); *accord Fisher II*, 136 S. Ct. at 2211 ("[A] university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan"); *Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No.1*, 551 U.S. 701, 735 (2007) ("[R]acial classifications [are] permitted only 'as a last resort.'"). And that consideration must be "serious" and in

"good faith." *Grutter*, 539 U.S. at 339. Second, UNC must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. A race-neutral alternative need not be perfect; it only needs to achieve racial diversity "about as well and at tolerable administrative expense." *Id.* UNC receives "no deference" on either question. *Id.* at 311.

Even assuming that UNC considered race-neutral alternatives in good faith, *but see* SFFA Br. 22-23, there is no doubt it has at least one workable alternative to the use of race, *id.* 35-37. Kahlenberg Simulation 11 would *increase* the number of African-American applicants in the admitted class, it would *increase* the number of Hispanic applicants in the admitted class, it would *increase* the number of socioeconomically-disadvantaged applicants in the admitted class, and it would *increase* the average GPA of the admitted class. *Id.* at 36. Under this specific alternative, then, UNC can "achieve sufficient diversity without using racial classifications." *Fisher I*, 570 U.S. at 312.[4]

Any suggestion that *this* race-neutral alternative would undermine "academic quality," UNC Br. 35, because the average SAT score of the admitted class would drop—from 1305 to 1279—is meritless. To be certain, a race-neutral alternative is not workable, *inter alia*, if it would "force [the university] to choose between a diverse

_____

[4] Perhaps because Kahlenberg's simulations so clearly demonstrate that UNC has available race-neutral alternatives, UNC resorts to suggesting that it was inappropriate for him to rely on Professor Arcidiacono to implement the simulations as Kahlenberg directed. UNC Br. at 36 n.10. But this is standard practice in the field and fits with their expertise in their respective fields. Kahlenberg Rep. 65 & n.255.

student body and a reputation for academic excellence." *Fisher II*, 136 S. Ct. at 2213 (citing *Grutter*, 539 U.S. at 339). But a slight dip from the 90th percentile in SAT scores to the 88th percentile is not the kind of "dramatic sacrifice" in academic quality that would put UNC to such a choice. *Grutter*, 539 U.S. at 340. To repeat, the race-neutral alternative must work "about as well"—not precisely replicate—the race-based admissions system. *Id.* at 339. This alternative meets that standard as a matter of law.[5]

UNC's remaining objections are factually irrelevant, legally foreclosed, or (in most instances) both. UNC complains (at 35) that some of the proposed alternatives would not maintain "the same level of racial diversity" as the current race-based system. But that is immaterial because the criticism does not apply to Kahlenberg Simulation 11. As noted, the level of racial diversity would increase. In any event, UNC does not have a vested right in freezing the "current level of racial diversity." UNC Br. 35; *Fisher I*, 570 U.S. at 311 (no compelling interest in maintaining a certain percentage of URM enrollment). UNC instead must prove that, if URM enrollment decreases, it could not achieve the "educational benefits of diversity." *Id.* at 312. Yet UNC has not "concretely demonstrated" that any particular drop in URM enrollment would be "significant in

---

[5] Moreover, SAT scores may be more standardized than GPA, UNC Br. 21 n.4, but they must be considered in context. That is, a "modest decline in SAT scores should be considered in light of the greater level of socioeconomic disadvantage present in the class." Kahlenberg Reply Rep. 51. For example, UNC's own expert has noted that whether a particular applicant "had more challenging childhood circumstances" makes a difference. EX57 at 13 n.24. On top of that, UNC's own internal studies and the testimony of its officials underscore the fact that high school GPA is a better predictor of college academic performance than the SAT. Kahlenberg Rep. at 45 n.165, 47-48 & n.170.

any [educational] way, such as students' capacity and willingness to learn," *Wessmann v. Gittens*, 160 F.3d 790, 799-800 (1st Cir. 1998), or lead to "racial isolation," *Parents Involved*, 551 U.S. at 727.

UNC argues (at 35) that its expert's simulations did not produce a "class with the same level of racial diversity and academic preparedness as the University currently achieves." But that is immaterial because SFFA is not relying on Professor Hoxby's simulations. And she has not criticized *this* proposal. Indeed, UNC has not offered expert testimony on the workability of SFFA's alternatives. SFFA Br. 37. In any event, applying the proper legal standard, it is clear that Professor Hoxby actually identified two workable race-neutral alternatives: her 750/20% SES preference simulation and her Top 5% plan simulation. Both of these simulations would increase both racial and socioeconomic diversity while maintaining academic quality. *See* Kahlenberg Decl. [Doc. 161], Ex. B ("Kahlenberg Rebuttal Rep.") at 45-50.

UNC argues (at 37) that Mr. Kahlenberg does not simulate alternatives such as creating partnerships with disadvantaged high schools or increasing transfers from community colleges. But that is immaterial because *this* alternative does not depend on UNC "enhancing" such strategies. In any event, UNC is wrong. It could better utilize wealth and geographic-based factors to improve race-neutral alternatives.[6] And, as

---

[6] Though UNC claims to lack access to applicant wealth data, *see* UNC Br. 36, it is "among almost 400 colleges that … require parents seeking aid to fill out the College Board's CSS Profile," which "is used by colleges to award institutional aid [and] includ[es] [wealth] data on small businesses and primary residence home equity." Kahlenberg Reply Rep. 14. Similarly, UNC could better utilize

Kahlenberg showed, "the inclusion of additional socioeconomic factors and better recruitment of low-income students" would enable both experts' simulations to "produce *even greater* racial, ethnic, and socioeconomic diversity." Kahlenberg Rebuttal Rep. 56 (emphasis added).

Finally, in a last-ditch effort to avoid summary judgment, UNC (at 37-39) mischaracterizes SFFA's position as attempting to force it to pursue socioeconomic diversity. This argument—that "socioeconomic diversity … is not a substitute for racial diversity," UNC Br. 38—is a classic strawman. Under controlling precedent, UNC has a compelling interest in the educational benefits of diversity, including racial diversity. SFFA Br. 28. But it is equally clear that if UNC can achieve racial diversity through "a nonracial approach … then the university may not consider race." *Fisher I*, 570 U.S. at 312 (quotations omitted). UNC, in other words, must show that it is "necessary" to use racial classifications to achieve racial diversity. *Id.* at 309. UNC's problem is that SFFA has shown that it is *un*necessary to use racial classifications to achieve racial diversity.

That SFFA's proposal achieves racial diversity by increasing the size of the preference based on being socioeconomically disadvantaged changes nothing. The Supreme Court has made clear that "altering the weight given to … socioeconomic factors" is a workable race-neutral alternative so long as it "does not force universities to choose between a diverse student body and a reputation for academic excellence."

---

neighborhood and school socioeconomic data that it currently possesses in order to "positive[ly] impact … racial, ethnic, and socioeconomic diversity." *Id.* at 15.

*Fisher II*, 136 S. Ct. at 2213. As explained, that is the situation here. Perhaps UNC disagrees with the Supreme Court decisions concerning race-neutral alternatives, just as SFFA disagrees with the Supreme Court decisions allowing the use of race in admissions at all. UNC Br. 5. But as UNC knows, the Supreme Court has the "prerogative of overruling its own decisions," whereas lower courts must follow them. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). Because UNC has workable race-neutral alternatives, under controlling precedent it may not use race in admissions.

## CONCLUSION

For the foregoing reasons, SFFA respectfully requests that the Court deny Defendants' motion for summary judgment.

Dated: March 4, 2019                                    Respectfully submitted,

*/s/ Alan M. Ruley*                                     */s/ Thomas R. McCarthy*
Alan M. Ruley                                           Thomas R. McCarthy
N.C. State Bar No. 16407                                William S. Consovoy
BELL, DAVIS & PITT, P.A.                                J. Michael Connolly
P.O. Box 21029                                          Bryan K. Weir
Winston Salem, NC 27120-1029                            CONSOVOY MCCARTHY PARK
(336) 714-4147                                          PLLC
aruley@belldavispitt.com                                3033 Wilson Boulevard, Suite 700
                                                        Arlington, Virginia 22201
                                                        (703) 243-9423

Michael H. Park
Consovoy McCarthy Park PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(212) 247-8006
park@consovoymccarthy.com

Patrick Strawbridge
Consovoy McCarthy Park PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

March 4, 2019

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the word limit contained in the Court's Order filed August 28, 2018 (Docket No. 145) using the word count feature of the word processing software in making this certification.

/s/ *Thomas T. McCarthy*

Thomas R. McCarthy
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
tom@consovoymccarthy.com

22

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 4th day of March, 2019.

/s/ *Thomas T. McCarthy*

Thomas R. McCarthy
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-9423
tom@consovoymccarthy.com

23