**UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-954-LCB-JLW |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | |
| Defendants. | |

## DEFENDANT-INTERVENORS' BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant-Intervenors, by and through their undersigned counsel, hereby file this Brief in Response to Plaintiff Students for Fair Admissions, Inc. ("Plaintiff" or "SFFA")'s Motion for Summary Judgment (ECF Nos. 158, 159). For many of the reasons set forth in the Defendants University of North Carolina at Chapel Hill, et al. ("Defendants" or "UNC-Chapel Hill")'s Motion for Summary Judgment (ECF Nos. 152, 153) and the additional reasons discussed below, Plaintiff's Motion must be denied.

Defendant-Intervenors ("Students" or "Intervenors") are students of color who attend or attended UNC-Chapel Hill. They have a significant interest in ensuring that future applications are considered under a holistic process that includes the lawful consideration of race, because otherwise, they cannot obtain the "educational benefits

that flow from a diverse student body."[1] The Supreme Court has concluded that a university's determination that it will seek such benefits is entitled to deference, and that proposed admissions processes can be evaluated in light of whether and how those processes would contribute to the development of such benefits.[2]

Finding that "the result of this litigation will have a direct and significant impact on North Carolinians' access to UNC-Chapel Hill," the Court granted permissive intervention, allowing Intervenors to present information on the history of segregation and discrimination at UNC-Chapel Hill and in North Carolina; and the effect of admissions processes on the critical mass of diverse students at UNC-Chapel Hill. *See* Jan. 13, 2017, Mem. Op. and Order at 13-14 (ECF No. 79).

In accordance with that mandate, Students now submit this response to highlight four specific reasons why Plaintiff's Motion for Summary Judgment cannot be granted— reasons closely related to the issues on which they were permitted to intervene. *First*, Plaintiff argues that it is now unnecessary for UNC-Chapel Hill to use race to achieve racial and ethnic diversity in its student body. However, Plaintiff's argument ignores the unique history of racial segregation and discrimination in North Carolina generally and at UNC-Chapel Hill specifically—a history which has created and continues to create obstacles to dismantling racial barriers on campus. Plaintiff's claim also overlooks

---

[1] *Grutter v. Bollinger*, 539 U.S. 306, 307, 317, 328, 330-33, 343 (2003); *see Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 306 (1978) (controlling opinion of Powell, J.) (recognizing interest in "obtaining the educational benefits that flow from an ethnically diverse student body").
[2] *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016) (*Fisher II*).

sociological evidence and the testimony of numerous students and alumni demonstrating that race is a unique, integral part of a person's experience. This evidence establishes that, contrary to Plaintiff's assertions, race is something that must be acknowledged and evaluated in assessing whether and how a university can obtain the educational benefits associated with a truly diverse student body.

*Second*, Plaintiff's analyses of race-neutral alternatives are insufficient to support summary judgment because they fail to consider relevant evidence. Assessing whether a particular race-neutral alternative will obtain educational benefits comparable to UNC-Chapel Hill's current process turns not only on the demographic composition of the class that would be admitted, but also on a host of other factors. Plaintiff's analyses ignore, for example, the likely decrease in minority applications that would occur if a ban on race-conscious admissions is implemented, and the likely decrease in diversity *within* racial groups on campus (an essential ingredient in obtaining the full educational benefits of a diverse campus). Because Plaintiff's race-neutral alternatives fail to consider relevant information, they are insufficient to sustain summary judgment in its favor.

*Third*, many of Plaintiff's race-neutral alternatives (and its broader analysis of the use of race in UNC-Chapel Hill's admissions process) are flawed because they erroneously assume that high academic scores alone establish a candidate as qualified and desirable. This analysis ignores the evidence that such metrics are unreliable predictors of college performance, as well as insufficient to obtain the well-rounded applicants that UNC-Chapel Hill has long sought to attract and enroll. Because many of Plaintiff's

proposed alternatives rely solely on narrow, academic metrics like class rank, test scores, and grades, they fail to account for a variety of other qualifications that UNC-Chapel Hill reasonably seeks in its students and are thus inadequate replacements for its current system.

*Fourth*, Plaintiff's blanket assertion that UNC-Chapel Hill's current system does not focus on admitting students of color who are equipped to succeed academically is entirely unsupported by the record. The evidence that Plaintiff cites for this point establishes that there are not meaningful distinctions between underrepresented minorities and other students, and that the gaps that exist have been shrinking as UNC-Chapel Hill has made efforts in recent years to address potential disparities. Although the relevance of this assertion to Plaintiff's legal claims is unclear, Plaintiff has utterly failed to adduce any evidence, much less sufficient evidence, to warrant summary judgment on this point.

Plaintiff's analyses are riddled with substantive flaws and they have failed to identify a proposed race-neutral alternative that would produce a class with the same diverse demographics and academic preparedness as UNC-Chapel Hill's current holistic process, much less an alternative that would produce the same depth of diversity within racial groups and intangible personal characteristics necessary to satisfy both UNC-Chapel Hill's broader goals and its pursuit of the educational benefits of diversity. Because Plaintiff's evidence is demonstrably lacking, Plaintiff is not entitled to summary judgment and its Motion must be denied.

## I. Plaintiff's Analyses Are Flawed Because They Fail to Consider the Uniqueness of Race and the History of Segregation and Discrimination at the University and in North Carolina

As a preliminary matter, Plaintiff does not dispute that all of UNC-Chapel Hill's students benefit from a racially diverse student body: through enhanced learning because of exposure to diverse perspectives, through increased ability to work and live with people from different backgrounds and cultures, and through the destruction of harmful racial stereotypes. This is because the law and the sociology is clear: "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."[3]

Plaintiff asserts, however, that "[i]t is unnecessary for UNC-Chapel Hill to use race to achieve student body diversity."[4] It does so by pointing at a number of "workable" race-neutral alternatives it claims will eliminate the need to consider race at UNC-Chapel Hill.[5] For the reasons set forth in Defendants' response brief and the additional reasons set forth below, the evidence does not establish that Plaintiff's proposed "race-neutral" alternatives are workable. But as a preliminary matter, Plaintiff's analysis and approach are fundamentally flawed for two additional reasons.

---

[3] *Grutter*, 539 U.S. at 332; *see also* Defs.' Ex. 21 (Jayakumar Exp. Rep.) ("Jayakumar Rep.") at 4-6 (ECF No. 154-21); Defs.' Ex. 20 (Chang Exp. Rep.) at 14-23 (ECF No. 154-20).

[4] Pl.'s Br. in Supp. of Pl.'s Mot. For Summ. J. ("Pl.'s Br.") at 34 (ECF No. 159).

[5] *Id.* at 34-38.

*First*, race is a unique, significant part of a person's experience, and an admissions process that seeks to obtain the educational benefits of diversity must be able to explore the individual ways in which an applicant's race has affected the candidate. That is, admitting a student body that is diverse across and within racial groups is critical to achieving the educational benefits of diversity and cannot be accomplished with the race-neutral alternatives Plaintiff proposes.

Courts have recognized that race has been, and continues to be, a unique and integral part of a student's experience. "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters."[6] Individual students of color have noted how their race or ethnicity has played a major role in their life experiences. In addition to the testimony of the numerous declarants discussing the importance of the consideration of race at the University,[7] Intervenor Laura Ornelas observed, "I came to UNC-Chapel Hill from a high school that was predominantly white, and I am one of only a handful of minority students from my school who went to a top-tier university. This environment was very different than the upbringing my parents had, so I have a varied perspective on what it means to experience life as a Latina."[8] Intervenor Cecilia Polanco described how

---

[6] *Grutter*, 539 U.S. at 333.
[7] *See* Defs.' Exs. 66-117 (declarations) (ECF Nos. 157-2-157-29, 162-1-162-24).
[8] Ex. 1 (Decl. of L. Ornelas) ¶ 5. All exhibits are attached to the Declaration of L. Gaztambide-Arandes (attached as Ex. A).

6

she "grew up very conscious of race, how my appearance categorizes me, and what assumptions people have about me."[9] These statements and many others[10] establish how race and ethnicity contribute to a person's identity in a unique fashion.

Students also explain how their racial and ethnic identities affect their experience on campus. Intervenor Andrew Brennen described the ways in which being black in a predominantly white space sometimes "play[s] out in harmless ways, like how my friends are always taken aback by the prominence of black Santa Clauses in my house during Christmas[,]" while other times, it is more "insidious," like when he was "accused of 'acting white' by my classmates because of my willingness to speak up in class and the ease with which I grasped the material."[11] Similarly, students and alumni relate how having diverse racial and ethnic backgrounds on campus enhances both their own educational experiences and those of their peers. Lisa-Anne Staton Dyer relayed an incident where a white male student questioned the legitimacy of an African-American female professor.[12] After class, an African-American upperclassman "took him to task and detailed why what he said was disrespectful, racist and sexist."[13] The white student "dissolved into tears and apologized" to both Dr. Stone and the student who had spoken

---

[9] Ex. 3 (Decl. of C. Polanco) ¶ 5.
[10] Ex. 2 (Decl. of L. Acosta) ¶ 5; Ex. 4 (Decl. of A. Brennen) ¶ 11; Ex. 5 (Decl. of S. Scarbrough) ¶ 8; Ex. 6 (Decl. of H. Watson) ¶ 4.
[11] Ex. 4 (Decl. of A. Brennen) ¶ 11; *see also* Ex. 7 (Decl. of D. Gatewood) ¶ 8.
[12] Ex. 8 (Decl. of L. Dyer) ¶ 7.
[13] *Id.*

up, creating a "powerful" learning moment.[14] Multiple other students and alumni discussed how they contributed to and learned from conversations about race and diversity.[15]

It is the very uniqueness of race that helps provide educational benefits—when a variety of diverse students participate in educational environments, students can "learn [that] there is no 'minority viewpoint' but rather a variety of viewpoints among minority students."[16] Eliminating UNC-Chapel Hill's ability to consider race would impede its capacity to admit a student body that is diverse across and within racial and ethnic groups, undermining the educational benefits of cross-racial and intra-racial diversity (benefits that Plaintiff does not dispute exist and does not dispute UNC-Chapel Hill can legitimately pursue).[17]

*Second*, UNC-Chapel Hill and North Carolina have a specific sociohistorical context involving legal and cultural barriers to racial integration and equality. This history both increases the salience of race on campus and creates additional challenges associated with cultivating a campus climate that fosters dynamic diversity.

---

[14] *Id.*; *see also* Ex. 9 (Decl. of K. Ward) ¶ 8.

[15] Ex. 10 (Decl. of J. Mencia) ¶ 9; Ex. 7 (Decl. of D. Gatewood) ¶ 6; Ex. 3 (Decl. of C. Polanco) ¶ 7; Ex. 10 (Decl. of J. Mencia) ¶ 7; Ex. 11 (Decl. of P. Zeigler) ¶ 11; Ex. 12 (Decl. of G. Parker) ¶ 13.

[16] *Grutter*, 539 U.S. at 320; *accord* Jayakumar Rep. at 19 (explaining that "diversity within diversity" helps reveal "social similarities and differences across other significant identity markers").

[17] *See* Pl.'s Br. at 23-27.

North Carolina has a "sordid," "shameful," and "disgraceful" history of state sponsored racial discrimination,[18] which includes excluding African-American and other students of color from UNC-Chapel Hill.[19] Even after UNC-Chapel Hill was forced by court order to admit students of color, the State continued to fight integration; UNC-Chapel Hill's leadership then turned a blind eye to the discrimination experienced by those same students once admitted.[20] To this day, issues of race, white supremacy, and the historic legacy of slavery and Jim Crow discrimination continue to pervade UNC-Chapel Hill's campus environment.[21] This history affects student life on campus, and exacerbates barriers to achieving meaningful educational benefits of diversity at UNC-Chapel Hill.[22]

These factors demonstrate why, contrary to Plaintiff's assertions, racial diversity is an essential component in its own right in promoting the educational benefits associated with a diverse student body. Proxies for race, including socioeconomic diversity, are "not

---

[18] *N. Carolina State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 425, 428, 432 (M.D.N.C. 2016), *reversed and remanded on other grounds*, 831 F.3d 204 (4th Cir. 2016), *cert. denied sub nom. North Carolina v. N. Carolina State Conference of the NAACP*, 137 S. Ct. 1399 (2017); *Covington v. Montgomery County School Board*, 139 F. Supp. 161 (M.D.N.C. 1956); *see also* Ex. 13 (Cecelski Exp. Rep.) ("Cecelski Rep.") at 19-25.

[19] *See* Cecelski Rep. at 8-13*; see also McKissick v. Carmichael,* 187 F.2d 949, 950-51 (4th Cir. 1951); *Frasier v. Bd. of Trustees of Univ. of N.C.*, 134 F. Supp. 589 (M.D.N.C. 1955), *aff'd mem.* 350 U.S. 979 (1956).

[20] *See, e.g.*, *Adams v. Richardson*, 356 F. Supp. 92, 94 (D.D.C. 1973), *modified and aff'd*, 480 F.2d 1159 (D.C. Cir. 1973); *see also* Cecelski Rep. at 14-19.

[21] *See* Cecelski Rep. at 8-9, 26; Jayakumar Rep. at 49-52.

[22] *See* Jayakumar Rep. at 48-54.

interchangeable with racial diversity when it comes to contributing to a diversity in opinions regarding certain educationally relevant topics."[23] Richard Kahlenberg, Plaintiff's expert, has acknowledged this fact,[24] but Plaintiff's analyses ignore the unique salience of race, as well as how race is implicated in UNC-Chapel Hill's specific sociohistorical context.

## II. Plaintiff's Proposed Race-Neutral Alternatives Fail to Fully Assess (and Would Impede) UNC-Chapel Hill's Ability to Obtain the Educational Benefits of Diversity It Seeks

To support its claim that there are race-neutral alternatives that UNC-Chapel Hill could employ that would meet its educational objectives, SFFA relies on several simulations offered by its expert, Mr. Kahlenberg.[25] Yet Plaintiff's methodology is fundamentally flawed because it performs only one part of an appropriate analysis of race-neutral alternatives—namely, it predicts the projected class's overall demographic representation and academic scores. Based on these numbers alone, SFFA summarily concludes that workable race-neutral alternatives exist.[26] But Plaintiff never addresses any of the other facets of diversity that are essential to promoting the educational benefits of diversity.[27] While numerical representation of underrepresented minority students and

---

[23] Ex. 14 (Chang Rebuttal Rep.) at 6; *see also* Ex. 15 (Decl. of V. Newsome Hayes) ¶ 8; Ex. 5 (Decl. of S. Scarbrough) ¶ 6; Ex. 16 (Decl. of S. Wingate-Bey) ¶ 7.
[24] *See* Defs.' Ex. 29 (Kahlenberg Reply Rep.) at 29 (ECF No. 154-29).
[25] Pl.'s Br. at 35.
[26] *Id.* at 34-38.
[27] *See, e.g.*, *id.* at UNC0349698-99 (discussing Simulation 11).

academic preparedness are an important prerequisite, numbers alone are insufficient to produce the crucial benefits sought by UNC-Chapel Hill.[28]

In this way, Plaintiff's evidence is incomplete. Even if Plaintiff's analyses showed that a particular race-neutral plan admitted a comparable number of underrepresented minority students who satisfied particular academic standards (which they do not, for reasons discussed below and in Defendants' Motion for Summary Judgement), Plaintiff's failure to address the other contextual factors that are essential to obtaining the benefits of diversity make Plaintiff's simulations inadequate to support its ultimate conclusion that those alternatives are legitimately comparable and workable.[29]

Defendant-Intervenor's expert Dr. Uma Jayakumar explained that harnessing diversity's benefits—achieving a "critical mass" of underrepresented minority students or "dynamic diversity" on campus—depends not only on the overall demographic composition of the admitted class, but also on a number of contextual factors which enhance or impede the educational environment.[30] These include: the institution's sociohistorical context, the institution's commitment to diversity, and the incoming

---

[28] *See* Defs.' Ex. 34 (Educational Benefits Report) at 4-5 (ECF No. 154-34).
[29] Defendants' expert Dr. Hoxby, on the other hand, found that no race-neutral alternatives identified by either the University or the Plaintiff ever established that threshold question – that is, obtained a level of racial diversity and academic preparedness comparable to that currently achieved by the University's holistic review process. Defs.' Ex. 24 (Hoxby Reply Rep.) ¶ 61 (ECF No. 154-24). Thus, Dr. Hoxby did not need to turn to whether any particular plan would also provide the necessary contextual factors to facilitate the acquisition of the educational benefits of diversity.
[30] Jayakumar Rep. at 6-7, 20-21.

student body's characteristics, such as whether students predominantly attended segregated high schools and whether each racial group reflects a full range of diverse backgrounds.[31] Mr. Kahlenberg similarly recognizes that context is critical and that numbers alone will not convey whether a race-neutral alternative is feasible, opining that he would "[not] want to put an exact number on it," and he "would want to look at a variety of factors in making that judgment."[32]

Thus, an evaluation of whether race-neutral alternatives achieve comparable benefits should not be limited to a consideration of anticipated changes to the demographic composition or academic benchmarks of the admitted class. Although it is reasonable to begin with an analysis of how those metrics might change, it is premature to conclude from such an analysis that a race-neutral alternative would be sufficient. Rather, it is necessary to also consider whether a particular plan materially impacts other factors that work together to produce the educational benefits of diversity, including the specific benefits associated with racial and ethnic diversity.[33]

The record shows that UNC-Chapel Hill appropriately analyzes race-neutral alternatives using a more comprehensive framework. In addition to performing simulations, UNC-Chapel Hill has undertaken a number of measures to assess the

---

[31] *Id.* at 27-33.
[32] Defs.' Ex. 19 (Kahlenberg Dep. Tr.) at 95, 98 (refusing to opine on what percentage constitutes a "modest decrease" by explaining such an evaluation requires knowing "the whole picture") (ECF No. 154-19).
[33] *See, e.g.*, *Fisher II*, 136 S. Ct. at 2213-14.

12

workability of race-neutral alternatives, including a comprehensive literature review on how banning racial considerations impacted flagship institutions in other states,[34] and the creation of a subcommittee to analyze the student experience in ways that could inform UNC-Chapel Hill's analysis of race-neutral alternatives.[35] And the record also supports UNC-Chapel Hill's educational judgment that Plaintiff's race-neutral alternatives will not produce educational benefits comparable to its current policy, because Plaintiff's analyses fail to take into account the implications of its proposals beyond the numbers.

*First*, SFFA's estimates of race-neutral alternatives systematically overpredict minority representation while underpredicting decreases in diversity, because a ban on race-conscious admissions may result in a decrease in minority applications. As set forth by Defendants' expert Professor Long, the use of such bans can signal a negative campus climate for racial and ethnic minorities and make the institution "a less appealing place to enroll."[36]

This is not merely theoretical—experiences in Texas and California reveal that flagship institutions in both states experienced a notable drop in minority applicants following bans on race-conscious admissions.[37] Based on this, it is appropriate to anticipate similar declines in minority application rates at UNC-Chapel Hill. However,

---

[34] Defs.' Ex. 49 (White Paper) at UNC0283542-48 (ECF No. 156-1); *see also* Defs.' Ex. 30 (Long Exp. Rep.) ("Long Rep.") (ECF No. 154-30).
[35] Defs.' Ex. 65 (May 2018 Interim Report) at UNC0380385-86 (ECF No. 157-1).
[36] Long Rep. at 20.
[37] Defs.' Ex. 49 (White Paper) at UNC0283545-47 (ECF No. 156-1); Long Rep. at 14-15.

Plaintiff's models failed to account for a likely reduction in minority applications to UNC-Chapel Hill.[38]

Similarly, the imposition of a ban on race-conscious admissions would likely lead to a decline in the enrollment of minority students at UNC-Chapel Hill,[39] which would reduce educational benefits for all students by suppressing cross-racial interaction and exacerbating racial isolation.[40] While UNC-Chapel Hill has made progress towards reaching a critical mass of students of color, UNC-Chapel Hill admits that minority students still report heightened feelings of tokenization, racial diversity is uneven across subject areas and spaces, and enrollment of certain subgroups—such as Black males— remains markedly low.[41]

UNC-Chapel Hill students confirm that *more*, not less, diversity is needed on UNC-Chapel Hill's campus.[42] And any reduction in representation only perpetuates the

---

[38] Mr. Kahlenberg's simulations using UNC-Chapel Hill's existing admissions data made no adjustments for a reduction in minority applicants as experienced by flagship institutions in California and Texas. *Id.* at 65-67. Mr. Kahlenberg also ran simulations similar to Dr. Hoxby's on a dataset containing North Carolina high school students. Defs.' Ex. 29 (Kahlenberg Reply Rep.) at 47 (ECF No. 154-29). But Dr. Hoxby recognized the likely change in applicant pool and explained that her modeling choices were built to favor the viability of the race-neutral alternative plan. Defs.' Ex. 22 (Hoxby Exp. Rep.) at 61-62 (ECF No. 154-22). While Dr. Hoxby situated her data findings accordingly, Mr. Kahlenberg ignored the ways in which his simulations overpredict the representation of minority students.
[39] Long Rep. at 14-15.
[40] *See* Jayakumar Rep. at 22-27.
[41] Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. at 9 (ECF No. 153).
[42] *See, e.g.*, Ex. 4 (Decl. of A. Brennen) ¶ 17; Ex. 3 (Decl. of C. Polanco) ¶ 9; Ex. 16 (Decl. of S. Wingate-Bey) ¶ 9.

14

cycle – a drop in diversity would likely be mirrored by a downward spiral in minority enrollment. Campuses perceived as less diverse and less welcoming to minority students will experience declines in the number of minority students who apply and engage in cross-racial interactions on campus.[43] Currently, many students attend UNC-Chapel Hill, in part, based on their impression that it offers a diverse and welcoming learning environment.[44]

*Second*, even with Plaintiff's systemic overprediction of minority enrollment, some of Plaintiff's proposed race-neutral alternatives would, under its own analysis, likely lead to declines in the representation of specific minority groups. For example, SFFA's Race-Neutral Simulation 3 reduces the share of African American students on campus.[45] UNC-Chapel Hill is entitled to reject such a decline as unfeasible in light of overwhelming evidence from student surveys that African American students already experience a heightened sense of isolation on campus.[46]

*Third*, SFFA is wrong to suggest that gains in socioeconomic diversity make up for declines in minority representation. As noted above, socioeconomic diversity may produce educational benefits, but it does not replicate those arising from greater racial

---

[43] Jayakumar Rep. at 32-33; Long Rep. at 20.
[44] *See, e.g.*, Ex. 4 (Decl. of A. Brennen) ¶ 8; Ex. 17 (Decl. of A. Douglass) ¶ 4; Ex. 18 (Decl. of D. Dwyer) ¶ 5; Ex. 19 (Decl. of A. Frazier) ¶ 3; Ex. 20 (Decl. of M. Gomez Flores) ¶ 4; Ex. 5 (Decl. of S. Scarbrough) ¶ 5.
[45] Defs.' Ex. 27 (Kahlenberg Exp. Rep.) at 70 (ECF No. 154-27).
[46] *See* Jayakumar Rep. at 58-66.

diversity.[47] For example. Hoxby's unrefuted analysis shows SFFA's proposed alternatives would prevent UNC-Chapel Hill from admitting many high-performing minority applicants.[48] These students are critical to fostering the kind of diversity within each racial group that plays a key role in achieving educational benefits.[49] Dr. Jayakumar explains that preserving admission of minority students from all socioeconomic backgrounds fosters intra-racial diversity (that is, diversity within each racial group), which fosters even greater educational benefits.[50] SFFA offers no direct response to this anticipated loss associated with its suggested race-neutral approaches.

Greater diversity within each identity group prevents the solidification of commonly-held stereotypes.[51] Intra-racial diversity also promotes higher levels of cross-racial interaction as students bond over social similarities, such as common socioeconomic status or interests.[52] In line with these findings, the record shows that highly-qualified and exceptionally-prepared minority students are well-positioned to dismantle many of the stereotypes prevalent among UNC-Chapel Hill's incoming students.

---

[47] Ex. 14 (Chang Rebuttal Rep.) at 5-6.
[48] Defs.' Ex. 22 (Hoxby Exp. Rep.) at 82-83 (ECF No. 154-22); Defs.' Ex. 24 (Hoxby Reply Rep.) at 39 (ECF No. 154-24).
[49] Jayakumar Rep. at 18-19.
[50] *Id.* at 21-22.
[51] *Id.*
[52] *Id.*

Students report that classmates commonly presume that minority students are, as a group, less qualified and "not capable of intellectual discussion" compared to white peers.[53] For example, Rimel Mwamba was told by students she tutors in chemistry and biology that she is "smart for a black person."[54] Bringing in high-achieving minority students is necessary to dismantle stereotypes and fulfill UNC-Chapel Hill's mission of cultivating "the next generation of leaders" in North Carolina, leaders who can engage meaningfully and respectfully with individuals from a variety of racial and ethnic backgrounds.[55]

For all of these reasons, SFFA has not established as undisputed that its alternatives are viable substitutes for the benefits obtained by UNC-Chapel Hill's holistic, race-conscious review. Summary judgment for SFFA is not warranted.

## III. Plaintiff's Analyses Overemphasize Academic Credentials Above All Other Qualifications, Achievements, and Successes

Many of SFFA's arguments are premised on the view that standardized test scores and grades are an objective benchmark for determining whether an admission system is fair to students of different races. Using the "academic index"—a calculation based entirely on SAT scores and grades, which UNC-Chapel Hill has never used[56]—SFFA's

---

[53] Ex. 20 (Decl. of M. Gomez Flores) ¶ 7; *see also* Ex. 4 (Decl. of A. Brennen) ¶¶ 11, 17; Ex. 3 (Decl. of C. Polanco) ¶ 10; Ex. 10 (Decl. of J. Mencia) ¶ 8; Ex. 21 (Decl. of S. Searles) ¶ 6.

[54] Ex. 22 (Decl. of R. Mwamba) ¶ 7.

[55] Defs.' Ex. 4 (Decl. of S. Farmer) ¶ 9 (ECF No. 154-4).

[56] Pl.'s Br. at 13; Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. at 33 n. 9.

expert Dr. Peter Arcidiacano ranked UNC-Chapel Hill applicants by academic decile.

Noting that more non-underrepresented minorities ("URMs") fall into high academic

deciles, SFFA makes an unjustified analytical leap and concludes that "[n]on-URM

applicants have substantially stronger qualifications."[57] SFFA then observes that different

races have different admission shares when arranged by academic decile. From this,

SFFA suggests that UNC-Chapel Hill gives "substantial preferences" to underrepresented

minority students.[58]

SFFA's arguments around racial preferences fail because they are based on a

faulty premise that equates merit with high academic scores. While grades and SAT

scores may provide some limited information for assessing academic achievement or

capacity, they do not define merit in and of themselves. *First*, these metrics are not

particularly reliable, as studies have revealed they do not strongly predict a student's

performance in college.[59] Moreover, such scores are subject to their own biases; research

---

[57] Pl.'s Br. at 13.

[58] *Id*. at 12.

[59] *Id.* at 13; *see also* Anthony P. Carnevale & Jeff Strohl, "How Increasing College
Access is Increasing Inequality, and What to Do About It," in *Rewarding Strivers:
Helping Low Income Students Succeed in College,* 71*,* 110 (Richard D. Kahlenberg ed.,
2010), https://www.luminafoundation.org/files/resources/increasing-inequality.pdf;
James J. Heckman & Tim Kautz, *Fostering and Measuring Skills: Interventions That
Improve Character and Cognition*, National Bureau of Economic Research 3-4 (Nov.
2013), http://www.nber.org/papers/w19656.

shows that they systematically underpredict the potential of African American, Hispanic, and other groups of students with less privilege and educational opportunity.[60]

*Second*, UNC-Chapel Hill has long recognized that grades and SAT scores do not provide a full picture of an applicant's "qualifications" for admission or the characteristics sought by the university. UNC-Chapel Hill's "individualized evaluations . . . do not aim to maximize any single narrow outcome—for example average SAT score or the average eventual GPA . . . [but rather] draw together students who will enrich each other's education, strengthen the campus community, contribute to the betterment of society, and help the University achieve its broader mission."[61]

The character skills sought by UNC-Chapel Hill are not captured by the academic index, and its individualized review allows for a more nuanced assessment of an applicant's qualifications and potential. A growing body of research shows that character rivals cognition in predicting educational attainment.[62] For example, one study concluded that conscientiousness and a willingness to work hard matter more than SAT scores and

---

[60] *See generally* Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 Harv. Educ. Rev. 1 (2003); *see also id.* at 28 (noting that there is "evidence for this bias pattern across a wide span of tests" and mentioning evidence of cultural bias on Advanced Placement exams, the GRE, and high school vocabulary exams); Jerry Kang, Rachel D. Godsil & John V. Wintermute, Brief of Experimental Psychologists as *Amici Curiae* in Support of Respondents, at 4, *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (Nov. 2, 2015) (No. 14-981).
[61] Defs.' Ex. 49 (White Paper) at UNC0283553 (ECF No. 156-1).
[62] James J. Heckman & Tim Kautz, *Fostering and Measuring Skills: Interventions that Improve Character and Cognition*, National Bureau of Economic Research 3-4 (Nov. 2013), http://www.nber.org/papers/w19656.

high school GPA in determining college GPA.[63] SFFA's myopic focus on academic metrics cannot prove that admitted URM students have lesser qualifications, nor can it prove UNC-Chapel Hill awards unlawful racial preferences.

In short, the foundation upon which SFFA's argument is based—that grades and SAT scores define "qualification" for admission—is fatally flawed. This alone is sufficient to invalidate SFFA's entire argument that UNC-Chapel Hill uses oversized "racial preferences."

SFFA also overemphasizes academic metrics in formulating many of its race-neutral alternatives.[64] For his class-rank simulations, Mr. Kahlenberg uses three mechanical metrics to compose the *entire* UNC-Chapel Hill student body: standardized test scores, grades, and class rank.[65] The Supreme Court recognized in *Fisher II* that "[c]lass rank is a single metric, and like any single metric, it will capture certain types of people and miss others . . . . [T]o compel universities to admit students based on class rank alone is in deep tension with the goal of educational diversity as this Court's cases have defined it."[66] Expanding that reliance to three metrics fares no better. These purely

---

[63] Eric E. Noftle & Richard W. Robbins, *Personality Predictors of Academic Outcomes: Big Five Correlates of GPA and SAT Scores*, 93 J. Personality & Soc. Psychol. 116, 126 (2007).

[64] Defs.' Ex. 29 (Kahlenberg Reply Rep.) at 60, 63 (ECF No.154-29). For example, Mr. Kahlenberg's "class rank" simulations admit a certain percentage of students based on rank, and then fill the remaining seats with students possessing the top "academic index" based on their grades and test scores. *Id.*

[65] *Id.*

[66] *Fisher II*, 136 S. Ct. at 2213–14.

numerical criteria ignore the many other attributes that enrich an educational environment.[67]

Through holistic review, UNC-Chapel Hill is able to evaluate an applicant's demonstrated leadership skills, impressions of their achievements reflected in letters of recommendation, and all the other "intangible" characteristics which "are incapable of objective measurement but which make for greatness."[68] UNC-Chapel Hill is entitled to deference[69] on its determination that comprehensive, individualized review best fulfills its mission by creating a community of students who are "diverse in every way," "well-qualified," and collectively "provide for the leadership of the educational, governmental, scientific, business, humanistic, artistic, and professional institutions of the state, nation, and world."[70]

Accordingly, SFFA's proposed alternatives do not account for (let alone maintain) a host of qualifications that UNC-Chapel Hill (consistent with educational studies) seeks in its students, which are not reflected in narrow metrics like class ranks, test scores, and

---

[67] Mr. Kahlenberg's other simulations include some additional variables to capture an applicant's socioeconomic status, but these plans are similarly formulaic. As Dr. Hoxby explained, Mr. Kahlenberg gives "such large increases in admission probabilities ('bumps') to students whom Mr. Kahlenberg deems low [socioeconomic status] that it effectively removes UNC's holistic review and replaces it with a formulaic approach based almost entirely on socioeconomic status." Defs.' Ex. 24 (Hoxby Reply Rep.) ¶ 74 (ECF No. 154-24); *see also id.* ¶¶ 77-79.

[68] *Fisher II* at 2214 (quoting *Sweatt v. Painter*, 339 U.S. 629, 634 (1950)).

[69] *Id.*

[70] Defs.' Ex. 34 (Educational Benefits Report) at 8 (ECF No. 154-34); Defs.' Ex. 4 (Decl. of S. Farmer) at ¶ 16 (ECF No. 154-4).

grades. SFFA's proposed alternatives therefore fail to maintain the same level of qualifications in admitted students and are insufficient to establish summary judgment for Plaintiff.[71]

## IV. Plaintiff's Blanket Assertion That UNC-Chapel Hill Does Not Admit Applicants Equipped to Succeed Academically Is Entirely Unsupported By the Record

Finally, Plaintiff asserts that UNC-Chapel Hill's system does not focus "on admitting URM applicants who are equipped to succeed academically."[72] Regardless of whether this assertion is relevant to Plaintiff's legal claims, Plaintiff's claim that URM applicants at UNC-Chapel Hill are failing academically is incorrect and unsupported by the record—and therefore far from undisputed.

As a preliminary matter, Plaintiff's argument is incorrect because it insinuates that all URM applicants who gain admission to UNC-Chapel Hill are admitted because of the University's consideration of race. There is no basis for that assumption—and Plaintiff points to no evidence that identifies academic differentials between those for whom race was a factor in the decision-making process and those for whom it was not. Thus, even if the record showed that underrepresented minorities performed significantly less well than other students (which it does not, as discussed further below), the suggestion that the overall rate of underrepresented minority academic success is an indication of whether race should or should not be considered in the admission process is baseless.

---

[71] *See, e.g.*, *Trana Discovery, Inc. v. S. Research Inst.*, 915 F.3d 249, 255 (4th Cir. 2019) ("A[] model that simply ignores key evidence veers into speculation.").
[72] Pl.'s Br. at 29.

Moreover, Plaintiff's cites do not support the proposition that URM students are "struggling" academically as a whole. They cite to two different sets of (outdated) statistics, which do not separately or collectively support that conclusion. *First*, SFFA cites to UNC-Chapel Hill's finding that the average GPAs of graduating African American and American Indian students who entered from 2005 to 2009 were lower than those of graduating White students who entered during those years.[73] These distinctions, however are small —for students who entered in 2009, the total average GPA of graduates was 3.29; the average GPA for Hispanic students was 3.18, the average GPA for American Indian students was 3.14, and the average GPA for Black students was 3.03.[74] There is no citation or discussion about whether these are *meaningful* differences. Moreover, the charts Plaintiff cites show that the average GPAs of underrepresented minorities have been increasing over time.[75] And, at their core, these statistics are evaluating students who *graduated* – who, by definition, met UNC-Chapel Hill's requirements and obtained a degree.[76] These numbers cannot and do not provide a basis for the broad conclusion that underrepresented minorities are failing.

*Second*, SFFA cites to statistics regarding graduation outcomes by demographic characteristics[77] and discussions about the same that identify that graduation rates are

---

[73] Pl.'s Ex. 39 (2012-2014 Diversity Report) at UNC0236941 (ECF No. 165).
[74] *Id.*
[75] *Id.*
[76] Benefits flow from being a graduate of UNC-Chapel Hill, regardless of small differentials in graduating GPA. *See, e.g.*, Ex. 23 (Decl. of P. White) ¶ 7.
[77] Pl.'s Ex. 40 (Undergraduate Retention Study) at UNC0124112-13 (ECF No. 165-1).

lower for Black, American Indian, and Hispanic students.[78] These numbers are from a

2010 study looking at students who entered in 2002 and 2003.[79] Such studies obviously

do not capture the results of efforts put into place by UNC-Chapel Hill over the last

decade.[80] Nor does Plaintiff acknowledge that the same report it cites for GPA

information shows that retention rates have improved in recent years.[81] These outdated

statistics do not support the statement that underrepresented minority students are failing

as a whole, much less establish it as undisputed.

If anything, the comprehensive reports and analyses prepared by UNC-Chapel Hill

and cited by SFFA only establish the University's careful attention to the make-up of the

student body and the success of the students who are admitted (of all races). Since these

studies are all that Plaintiff has cited for this proposition, there is no basis for Plaintiff's

assertion that summary judgment can or should be granted on this basis (if it is, in fact,

related to any of Plaintiff's legal claims).[82]

---

[78] Pl.'s Ex. 42 (Workgroup Recommendation Report) at UNC0326479 (ECF No. 165-3).
[79] Pl.'s Ex. 40 (Undergraduate Retention Study) at UNC0124088-89 (ECF No. 165-1).
[80] *See, e.g.*, Defs.' Ex. 34 (Report Benefits of Diversity) at UNC0349703-05, UNC0349708-09 (ECF No. 154-34) (expansion of Carolina Covenant program since 2004, increasing enrollment rates, retention rates, and academic success); Pl.'s Ex. 39 (2012-2014 Diversity Report) at UNC0236952-53 (ECF No. 165) (discussing efforts to improve retention rates).
[81] Pl.'s Ex. 39 (2012-2014 Diversity Report) at UNC0236939-40 (ECF No. 165).
[82] The hypocrisy of Plaintiff's position is underscored by the fact that these reports also show that first-generation college students and students who need financial aid (both of whom would be admitted in higher numbers under Plaintiff's proposed race-neutral alternatives) show similar gaps in both GPA and graduation rates to those of underrepresented minorities. *See id.* at UNC0236941.

Plaintiff's suggestion that the outdated average GPAs and graduation rates of URM students are relevant to this inquiry is questionable; but even if they were relevant, they do not justify Plaintiff's blanket assertions that underrepresented minority students are, as whole, failing academically and, even more unfounded, that UNC-Chapel Hill does not care about underrepresented minority students.

\* \* \* \* \*

For the reasons set forth above, Plaintiff's motion for summary judgment must be denied.

Dated: March 4, 2019

Respectfully submitted,

/s/ Laura Gaztambide-Arandes
Reed N. Colfax*
Laura Gaztambide-Arandes*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
rcolfax@relmanlaw.com
larandes@relmanlaw.com
Tel: (202) 728-1888

/s/ Jack Holtzman
Jack Holtzman, N.C. Bar No. 13548
Emily P. Turner, N.C. Bar No. 49578
NORTH CAROLINA JUSTICE CENTER
224 South Dawson Street
Raleigh, NC 27601
jack@ncjustice.org
emilyt@ncjustice.org
Tel: (919) 856-2165

/s/ Jon M. Greenbaum

Jon M. Greenbaum*
Brenda L. Shum*
Genevieve B. Torres*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Avenue NW, Suite 400
Washington, DC 20005
jgreenbaum@lawyerscommittee.org
bshum@lawyerscommittee.org
gbonadies@lawyerscommittee.org
Tel: (202) 662-8600

ATTORNEYS FOR DEFENDANT-
INTERVENORS

* *Special Appearance*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this responsive

brief, including headings and footnotes, does not exceed 6,250 words.

/s/ Laura Gaztambide-Arandes
Laura Gaztambide-Arandes

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.3(b)(2), I hereby certify that this document, filed through the CM-ECF system on March 4, 2019, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Laura Gaztambide-Arandes
Laura Gaztambide-Arandes