# EXHIBIT

# 14

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA

---

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | : | Case 1:14-cv-00954-LCB-JLW |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF NORTH CAROLINA, et al., | : | |
| Defendants. | : | |

---

RESPONSE TO THE EXPERT REPORT OF RICHARD D. KAHLENBERG

BY MITCHELL J. CHANG, PH.D.
PROFESSOR OF EDUCATION – UNIVERSITY OF CALIFORNIA, LOS ANGELES

APRIL 6, 2018

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

## I. Introduction

Counsel for the University of North Carolina at Chapel Hill ("UNC-Chapel Hill") asked me to respond to the *Expert Report of Richard D. Kahlenberg*. I read his report and offer my major concerns regarding some of his assumptions, claims, and conclusions.

It is my understanding that other expert witnesses engaged by UNC-Chapel Hill will respond to the *Expert Report of Peter S. Arcidiacono*, as well as Mr. Kahlenberg's opinions regarding race-neutral admission policies and alternatives. I confine this response to the areas in which Mr. Kahlenberg's report relate to my own expert witness report, particularly regarding the educational benefits of diversity.

In his report, Mr. Kahlenberg asserts that "there is extensive empirical evidence and academic research documenting the myriad (and innovative) ways in which colleges and universities such as UNC-Chapel Hill can use race-neutral alternatives to produce the educational benefits of diversity" (p. 5). He claims that UNC-Chapel Hill certainly could have considered and potentially adopted the "… numerous race-neutral alternatives available that have the potential to obtain the educational benefits of diversity…" (p. 21). Implicit in Mr. Kahlenberg's report is that there are significant educational benefits that derive and flow from racial and ethnic diversity. Moreover, Mr. Kahlenberg does not dispute the research demonstrating the importance of these educational benefits.

Although Mr. Kahlenberg points to empirical research to support his claims and conclusions, including the *Expert Report of Peter S. Arcidiacono*, his discussion fails to consider seriously a larger body of research and current institutional practices. This oversight led him to:
(1) largely dismiss UNC-Chapel Hill's existing efforts to increase socioeconomic status ("SES") diversity;
(2) overstate the relationship between race and SES, and therefore overstate the educational benefits derived from SES diversity; and
(3) understate the potential for and consequences of enrollment declines among African Americans and the impact on the educational outcomes that would result from such a decline.

Those key flaws in Mr. Kahlenberg's report have pivotal implications and serve to negate his conclusion "… that there are race-neutral alternatives available

2

that could provide UNC with the educational benefits of diversity without the use of racial preferences" (p. 5).

## II. Kahlenberg Dismisses UNC-Chapel Hill's Programmatic Efforts and Initiatives that Promote SES Diversity

In Section V. of his report, Mr. Kahlenberg discusses other programmatic efforts and initiatives undertaken by UNC-Chapel Hill (pp. 36-65). He quickly dismisses these efforts and initiatives, suggesting that they are inadequate and are "missed opportunit[ies]" (p. 62). For example, he discusses favorably the *Carolina Student Transfer Excellence Program* ("C-STEP"), but subsequently indicates that its impact is more limited than similar programs at peer schools (pp. 61-62).

As noted extensively in my *Expert Report*, UNC-Chapel Hill's individual programmatic efforts and initiatives are part of a larger comprehensive multi-prong approach implemented by the University to obtain diversity in its fullest forms, including racial and SES diversity. This comprehensive approach is evident in dozens of initiatives and programs throughout the University, and are discussed and summarized at length in my *Expert Report* (*see* pp. 26-41). I concluded, based on my overall review of those initiatives and programs, that:

> [I]t is my opinion that UNC-Chapel Hill provides, manages, and promotes a wide range of many different initiatives that, taken together, is an intentional and effective plan for actualizing the associated benefits from the diversity of its student body. Clearly, the University has not acted as a passive participant, but is making conscientious and deliberate efforts on all fronts to foster diversity through interactions between individuals and group, diversity-related events, and creating a welcoming and inclusive campus environment. Those efforts have ramped up over time and have improved the institution's overall capacity to maximize the educational benefits from diversity, enriching learning experiences for students at UNC-Chapel Hill. (p. 26.)

Among those efforts, it is clear that UNC-Chapel Hill has initiatives that focus mainly on enhancing SES diversity among its student body. For instance, I noted, as does Mr. Kahlenberg, that C-STEP is one successful program aimed at increasing SES diversity by encouraging students to transfer from community colleges throughout North Carolina and attend UNC-Chapel Hill (p. 29). UNC-Chapel Hill also has the Carolina Covenant program, which, as noted in my Expert

3

Report, "is a program that provides low-income students with grants, scholarships, and work study opportunities so that they can graduate from UNC-Chapel Hill debt-free" (pp. 29-30). I additionally pointed to several other programs that support low income students at UNC-Chapel Hill, including the Carolina First Program (p. 31), and Thrive@Carolina (pp. 31-32). Taken together, these four programs, along with UNC-Chapel Hill's overarching efforts, are specifically cultivating, fostering, and promoting SES diversity on campus as part of the University's broader diversity approach. Mr. Kahlenberg's failure to fully investigate, evaluate and consider the full range of UNC-Chapel Hill's diversity efforts undermines his claim that the University ignores SES diversity and approaches diversity with a sole focus on race.

### III.  Kahlenberg Overstates the Relationship Between Race and SES

Mr. Kahlenberg claims that "… when socioeconomic affirmative action programs are constructed using a wide variety of variables … they can produce substantial racial and ethnic diversity, because this wider array of socioeconomic factors better captures the economic impact of ongoing and past racial discrimination than does income (or race) alone" (p. 22). The underlying assumption is that admissions committees could achieve racial diversity in the accepted pool by using preferences for economically disadvantaged students because families of color tend to be more disadvantaged. Yet, Mr. Kahlenberg concedes in his analysis that alternatives focusing only on SES would have a negative impact on racial diversity, particularly among African Americans (*see, e.g.*, p. 70). The negative effect of these race-neutral alternatives focusing on SES will be further discussed in section four of this response.

Mr. Kahlenberg also argues that "The enhancement of socioeconomic diversity that flows from these plans is critical from an educational and legal perspective, because the educational benefits of diversity arise from the interchange of ideas and experiences with those from different financial circumstances just as surely as those from different racial backgrounds…" (p. 9). This claim, unlike the previous one, emphasizes the educational rather than the demographic relationship between SES and race. While socioeconomic diversity may well contribute to educational benefits, Mr. Kahlenberg failed to cite any empirical research or evidence to support his claim that SES diversity would yield similar educational benefits as racial diversity.

I have studied and written on issues of racial diversity for the past 25 years, attended dozens of conferences and workshops on the importance of diversity, and

4

followed the scholarship of others in this same area and cannot recall anyone claiming that racial diversity and SES diversity are not distinct but interchangeable.

Instead, the literature that I am aware of is rather clear that SES differences are not the same as racial differences. One fundamental distinction in that it is much more difficult for an undergraduate to disguise one's race than one's SES, making race much more visually and physically salient (Carbado & Gulati, 2013). This saliency has educational implications when it comes to having students interchange ideas and experiences. For example, one of my experimental studies (antonio, Chang, Hakuta, Kenny, Levin, & Milem, 2004) varied the race (African American, White) of the research collaborator who participated in a small-group discussion with all White college students. The topic of the discussions concerned either child-labor practices or the death penalty and the collaborator followed a predetermined script. We found that the presence of an African American research collaborator generally led to greater perceived novelty of the collaborator's contributions to the group discussion and a greater level of integration of multiple perspectives as rated by the White participants. In other words, the saliency of race contributes to small-group discussions in unique ways that affected students' ratings of peers and enhanced their reasoning. In applying this finding to a classroom setting, it suggests that unlike in racially homogeneous class settings, the presence of African American students or instructor in a class that is enrolled predominantly by White students can elevate the educational impact of course discussion, especially for those White students.

My experimental study on small-group discussions is supported by the evidence collected by UNC-Chapel Hill. As noted by Regan Buchanan, a White female recent UNC-Chapel Hill graduate, cited in my *Expert Report* (p. 50): "Being around people who did not look like me at UNC-CH and hearing their experiences about racism … opened my eyes to the way the world works and has dramatically changed the way I think about the world." And, as Mary Ann Smith Distinguished Professor Michael T. Crimmins explains (p. 54): "Students who are part of a diverse classroom setting receive many important benefits. For one, the students may get to know those around them, helping them to understand differing cultural backgrounds. They are also exposed to different points of view when a classroom is more diverse. It has also been my experience that diversity helps students to better understand difficult concepts by looking at the concept from a different direction or point-of-view."

5

Another critical difference between SES and race is that socioeconomic diversity does not contribute to the intellectual atmosphere in the same way as racial diversity because experiences based on different financial circumstance are qualitatively different than experiences based on race. Again, pointing to another one of my studies (Chang, Seltzer, & Kim, 2002), we examined students' opinions regarding the extent to which they believe that racial inequity is a pressing social problem that requires remedies such as affirmative action. Since racial prejudice and racism are pressing social issues, those subjects stand to be educationally relevant with a high probability of being raised during a student's undergraduate education. We found that accounting for students' mother's education as a proxy for socioeconomic status did not explain differences in opinion between underrepresented students (African American, Latino, and Native American) and their White and Asian American counterparts. In educational terms, socioeconomic diversity is not interchangeable with racial diversity when it comes to contributing to a diversity in opinions regarding certain educationally relevant topics.

In applying this finding to a classroom setting, it suggests that when a topic concerning racial inequality is addressed in a course, there will likely be greater variation in opinions and perspectives when the students enrolled in that class are more racially diverse than if they were more socioeconomically diverse. The Supreme Court has recognized that having a broader range of viewpoints collectively held by students provides an atmosphere that is conducive to speculation, experiment, and better equips them for civic engagement. This type of environment also aids in training future leaders by exposing them to ideas and cultural mores of students as diverse as the nation itself.

Indeed, I further discussed and summarized the academic literature of the educational benefits from racial and ethnic diversity in my report, including:
- enhanced learning outcomes (pp. 14-17);
- increased democratic outcomes—increased citizenship engagement, racial-cultural engagement, and tolerance for differences (pp. 17-18);
- a reduction of prejudice (pp. 18-19);
- increased satisfaction with the college experience (pp. 19-20);
- increased persistence to graduation (pp. 20-21);
- combatting tokenism (e.g., stereotype threat) and racial isolation (pp. 21-22); and
- increased material benefits and material outcomes (pp. 22-23).

6

Mr. Kahlenberg does not discuss these benefits and their correlation with SES diversity in any meaningful way in his report. Instead, Mr. Kahlenberg treats SES diversity as interchangeable and coextensive with racial and ethnic diversity even though the majority of the academic literature points out that SES and race are qualitatively different and those differences are educationally meaningful. He does not explain how, for example, focusing on SES diversity would help to achieve an educational setting that exposes students to the diverse ideas and mores of the peoples of our nation. He does not explain how SES diversity leads to a reduction of prejudice, combats tokenism, or increases satisfaction with college or persistence to graduation. His argument basically assumes that SES diversity would result in largely the same educational benefits provided by a multifaceted approach that includes both racial and SES diversity, without elaboration, discussion, or empirical evidence.

In short, Mr. Kahlenberg overstates the relationship between SES and race from both a demographic and educational standpoint. Those two constructs are not interchangeable and if UNC-Chapel Hill were to substitute SES for race in its admissions policy rather than consider both as it does now, it stands to compromise not only the racial diversity of the student body but also the educational benefits associated with racial diversity.

## IV. Kahlenberg Understates the Potential for and Consequences of Enrollment Declines Among African Americans

Although Mr. Kahlenberg acknowledges the potential for declines in African American student matriculation if UNC-Chapel Hill were to abandon the consideration of race when admitting students, he understates the potential negative consequences for the University and for the educational benefits of diversity the University aims to achieve. He cites, for example, the results of a simulation (Model #3) from Professor Arcidiacono's *Expert Report*, which provides a bump to students from the most socioeconomically disadvantaged families. By its very terms, Arcidiacono's simulation yielded a decline in African American representation from 8.8% to 7.9%.[1] Kahlenberg subsequently asserts, that "A small decline in racial and ethnic diversity accompanied by a substantial increase in socioeconomic diversity constitutes a net increase [sic] the educational

---

[1] I have not independently verified the numbers and assumptions presented in Mr. Arcidiacono's simulations, and note the differences presented by Dr. Caroline Hoxby's simulations. However, I use the numbers Mr. Kahlenberg relies on to illustrate the problems in his analysis.

7

benefits of diversity..." (p. 44). This contention comes with no explanation; no reference to any support; and no grounding in anything but rank speculation.

Indeed, Mr. Kahlenberg's suggestion that such a decline in African American representation would be "small" is way off the mark. When measured under the very numbers Kahlenberg relies on, and assuming that approximately 4300 freshmen enroll at UNC-Chapel Hill per year, the decline in the African American student enrollment from 8.8% to 7.9% of the total freshmen class would amount to a loss of about 38 African American students. Because such a decline would amount to a 10% loss of African American students, there is no way – especially for students who, by definition, are underrepresented, such a loss of African American students can fairly be called "small." If the 7.9% rate were to hold steady for four years of admissions, Kahlenberg's position would result in 152 fewer African American students than at an 8.8% rate over the same time frame.

Contrary to Kahlenberg's assertions, a 10% decline would not be trivial for African American students or the University as a whole. As consistently noted in witness declarations by African American males reported in my *Expert Report*, the already low numbers are stark and present difficult educational challenges:

**Merrick Osborne**, an African American male, 2016 UNC-Chapel Hill graduate (p. 71): "As a Black male, I faced many challenges at UNC-CH. Sometimes, in classes of 200 or more, I would be the only person of color or the only Black male. In fact, I dropped my business major because I felt ostracized. I distinctly remember not seeing anyone like me in the business school building on the days when I had classes there. As the only Black male in the classroom, I do not have the psychological safety of being supported by someone who shares my sentiments about society …. I wish I had had more minority peers who could walk through the experience with me."

**Jordan Peterkin**, an African American male, 2017 UNC-Chapel Hill graduate (p. 71): "As the only Black member in many classes, I was often called out by professors based on my race for my perspective …. One professor in the business school had a class in which we discussed the market share of Walmart and how it appealed to lower socioeconomic people and Black and Hispanic people. He asked me to comment on behalf of these people. It was humiliating and alienating."

**Marty Davidson**, an African American male, 2016 UNC-Chapel Hill graduate (p. 72): "Although I had a great overall experience at UNC-CH and benefited somewhat from the diversity on campus, I also experienced significant isolation and tokenism. In several of my classes, I was one of ten or fewer students—and sometimes even the only student—who was Black or a person of color. In a 200-person class, I could sometimes count the number of Blacks and Latinos on one hand."

8

Case 1:14-cv-00954-LCB-JLW   Document 179-15   Filed 03/04/19   Page 9 of 11

**Kendall Luton**, an African American male, current UNC-Chapel Hill student, class of 2018 (p. 72): "[T]here were several times when I was only one of two or three Black students in class. Whenever there was discussion in class about something happening in the Black community, people would ask or look to me for an explanation. There was an expectation that if I was a Black person in a predominantly White space, they would look to me to represent the entire Black community. I would not give into that and would not answer for the entire Black community … being a Black male on campus still poses real challenges due to the low number of diverse students."

A decline of even a small magnitude in the enrollment of African American students, who are already underrepresented in the student body, almost certainly would have a negative impact on campus climate and undermine the educational benefits that flow from racial diversity, to the detriment of the University. An even larger decline, as indicated by Dr. Hoxby's simulations, would be even more devastating and extremely difficult to overcome. For example, on my campus, UCLA, the ban for considering race in admissions went into effect in 1998 and we immediately experienced a steep decline in the number of African American enrollees (Watanabe, 2016). The number of African American freshmen enrolled fell by nearly half from 264 in 1995 to 144 in 1998. In 2014, we exceeded 250 African American freshmen enrollees for the first time since 1995. Despite efforts to increase numbers and a significant growth in the total undergraduate enrollment, it still took us nearly two decades to reach the same level of African American freshmen enrollment as we had in 1995 before the ban on considering race in admissions. The slow and difficult recovery continues to be a major source of campus tension and frustration among our African American students (*see* Sy Stokes' video: https://www.youtube.com/watch?v=BEO3H5BOlFk).

## V. Conclusion

Mr. Kahlenberg goes to great length to show that increasing preferences in admission based on socioeconomic disadvantage would not undermine the racial diversity of the student body. He argues that "… the critical measure is the net impact on socioeconomic and racial diversity taken together" (p. 73). However, as discussed, Mr. Kahlenberg's analysis is flawed, failing to fully consider UNC-Chapel Hill's existing SES efforts, overstating the relationship between race and SES, including their associated educational benefits, and understating the potential impact and consequences of enrollment declines among African Americans in particular.

In looking at the educational benefits of diversity, accounting for the racial diversity of the student body independent of socioeconomic diversity in

considering those benefits is essential. Treating those two forms of diversity separately rather than conflating them, however, does not necessarily diminish UNC-Chapel Hill's capacity to also consider socioeconomic or other forms of diversity to enhance the overall "net impact" favored by Mr. Kahlenberg. As I concluded in my *Expert Report*, UNC-Chapel Hill has over time improved their overall capacity to maximize the educational benefits from diversity and enrich learning experiences for all students. This effort includes a wide range of many different programs and initiatives, including some key ones that take students' race into account. Because SES and race are qualitatively different and those differences are educationally meaningful, Mr. Kahlenberg's proposed race-neutral admissions plans that abandon race altogether will compromise not only the racial diversity of the student body but also the well documented educational benefits associated with racial diversity.

I reserve the right to amend or supplement my response and opinions. I affirm this response.

_____  
Dr. Mitchell J. Chang

4/6/18  
_____  
Date

## VI. References

antonio, A. L., Chang, M. J., Hakuta, K., Kenny, D. A., Levin, S., & Milem, J. F. (2004). Effects of racial diversity on complex thinking in college students. *Psychological Science*, *15*(8), 507-510.

Carbado, D. and Gulati, M. (2013). *Acting white: Rethinking race in "post-racial" America.* New York, NY: Oxford University Press.

Chang, M. J., Seltzer, M., & Kim, J. (October 2002). *Diversity of opinions among entering college students: Does race matter?* Research paper presented at the National Academy of Education Annual Meeting, Toronto, Canada.

Watanabe, T. (2016, June 23). How UCLA is boosting campus diversity, despite the ban on affirmative action. *Los Angeles Times*, Retrieved April 5, 2018 from http://www.latimes.com/local/california/la-me-ucla-diversity-20160620-snap-story.html