# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:14-cv-00954-LCB-JLW

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | ) |
| | ) |
| Defendants. | ) |

**CORRECTED [CONDITIONAL] BRIEF OF AMICUS CURIAE ASIAN AMERICANS ADVANCING JUSTICE AND ORGANIZATIONS AND PROFESSORS SUPPORTING HOLISTIC ADMISSIONS POLICIES**

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ...................................................................... 1

INTRODUCTION .............................................................................................. 2

I. UNC's Nuanced View of Test Scores Does Not Hold Asian Americans to a
Higher Academic Standard Than Underrepresented Minorities ........................... 3

    A. Standardized test scores fail to predict academic potential or future
success ...................................................................................................... 4

    B. Racial biases cause disparities in test scores for underrepresented
minorities independent of socioeconomic disadvantage ............................... 5

    C. UNC considers the context of achievement on standardized tests to
provide a fair appraisal of academic potential ............................................. 8

    D. UNC's consideration of context to evaluate standardized test scores
does not harm Asian Americans .................................................................. 10

II. Eliminating the Consideration of Race Will Not Address the Needs of
Underrepresented Asian Americans and Pacific Islanders .................................... 12

    A. Aggregated data obscures the needs of underrepresented Asian
Americans and Pacific Islanders in North Carolina .................................... 13

    B. Eliminating the consideration of race will disadvantage the most
marginalized Asian American and Pacific Islander applicants ..................... 16

CONCLUSION .................................................................................................. 22

STATEMENT PURSUANT TO L.R. 7.5(d) ....................................................... 25

CERTIFICATE OF WORD COUNT ................................................................. 26

i

## INTERESTS OF AMICI CURIAE

This brief is submitted by several member organizations of Asian Americans Advancing Justice ("Advancing Justice"), including the following nonprofit, nonpartisan organizations: Advancing Justice – Los Angeles, Advancing Justice – Asian Law Caucus, Advancing Justice – AAJC, Advancing Justice – Atlanta, and Advancing Justice – Chicago. Through litigation, direct legal services, policy advocacy, community outreach and education, and organizing, Advancing Justice's mission is to promote a fair and equitable society for all by working for civil and human rights and empowering Asian Americans and Pacific Islanders ("AAPIs") and other underserved communities.

Advancing Justice is joined in this brief by seventy-two civil rights groups, advocacy organizations, bar associations, business associations, academic institutions, student organizations, and other associations and organizations and twenty-one professors, including several based in North Carolina. *See* Exhibit A. *Amici* have longstanding histories of serving the interests of Asian Americans, Native Hawaiians, and Pacific Islanders. The undersigned *Amici* have a substantial interest in this case because they support race-conscious programs designed to improve equal access for all.[1] *Amici* recognize that AAPIs and other communities of color have fought together against racial discrimination and segregation and for greater equity and justice in this country. *Amici*

---

[1] National opinion polls consistently show that a majority of AAPIs are in favor of race-conscious programs. *See* Karthick Ramakrishnan & Janelle Wong, *Survey Roundup: Asian American Attitudes on Affirmative Action*, Data Bits (June 18, 2018), http://aapidata.com/blog/asianam-affirmative-action-surveys/.

recognize that AAPIs have obtained greater rights and opportunities in employment, contracting, and education because of historic civil-rights struggles led by other communities of color.[2]  Accordingly, *Amici* respectfully file this brief in opposition to Plaintiff's Motion for Summary Judgment (Dkt. 158).

## INTRODUCTION

Asian Americans have become central to the legal and public debate around race-conscious admissions.[3]  In moving for summary judgment, Students for Fair Admissions, Inc. ("SFFA") notes that the University of North Carolina at Chapel Hill "holds Asian Americans to a higher academic standard" than underrepresented minorities,[4] which includes African American, Latino, and Native American applicants.[5]

*Amici* reject this contention.

First, there is no evidence that UNC holds Asian Americans to a higher academic standard than underrepresented minorities or that Asian Americans are disadvantaged by UNC's race-conscious holistic admissions policy.  Second, eliminating the consideration

---

[2] Mari J. Matsuda, *We Will Not Be Used: Are Asian Americans the Racial Bourgeoisie?*, *in* Where is Your Body? 149–60 (1996).

[3] *See, e.g.*, Mihir Zaveri, *'It's Like Reliving My Past': Harvard Lawsuit Echoes Previous Fight Over Race and Admissions*, N.Y. Times, Nov. 12, 2018, https://www.nytimes.com/2018/11/12/us/affirmative-action-asian-americans.html.

[4] Dkt. 159 at 7 & n.2.

[5] Pursuant to a 1981 consent decree between the UNC system and the United States Department of Health, Education, and Welfare, UNC defines underrepresented minorities as racial groups whose percentage enrollment in the UNC undergraduate study body is lower than their percentage within the general population in North Carolina.  Dkt. 163-5 at 8.

2

of race will not address the needs of underrepresented Asian American sub-groups, and no reasonable race-neutral alternatives exist.

*Amici* support the promise of integrated and equal public education set forth in *Brown v. Board of Education*[6] and believe that eliminating the consideration of race would be devastating to all communities of color, including AAPIs.

## I. UNC's Nuanced View of Test Scores Does Not Hold Asian Americans to a Higher Academic Standard than Underrepresented Minorities

SFFA asserts that UNC holds Asian Americans to a higher academic standard than underrepresented minorities because UNC considers context when evaluating standardized test scores.[7] Because Asian Americans have higher average test scores than underrepresented minorities, SFFA assumes that this practice disadvantages Asian Americans.[8]

But SFFA's argument is only as solid as the test scores upon which it is based. In fact, test scores are neither good indicators of academic ability nor race-neutral. The predictive limitations and inherent racial biases of standardized tests are well-documented

---

[6] 347 U.S. 483 (1954).
[7] *See* Dkt. 159 at 7 n.2 (citing EX73 207:4-24) (offering testimony by admissions officer regarding consideration of test scores when reading applications); *id.* at 10 (noting use of SAT scores in recruiting); *id* at 12 (noting SAT score gap between Asian American admits and African American admits).
[8] *Id.* at 7 n.2.

by social scientists[9] and have been acknowledged by the courts.[10] UNC's use of test scores as part of a holistic review does not hold Asian Americans to a higher academic standard; it merely levels the playing field for underrepresented minorities who would otherwise be unfairly disadvantaged.

A. **Standardized test scores fail to predict academic potential or future success**

Numerous studies show that test scores fail to predict success beyond first-year college grades.[11] For example, the leading study on U.S. graduation rates found that test scores have no statistically significant effect on college graduation rates—a far better measure of academic success than first-year grades.[12] Another study of law-school

---

[9] *See generally* Brief of the American Educational Research Association et al. as Amici Curiae in Support of Respondents, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6668475.

[10] *See, e.g.*, *DeFunis v. Odegaard*, 416 U.S. 312 (1974) (Douglas, J., dissenting) (noting that "there is no clear evidence that the LSAT and GPA provide particularly good evaluators of the intrinsic or enriched ability of an individual to perform as a law student or lawyer"); *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 647 (5th Cir. 2014) (noting the importance of race in UT Austin's holistic admissions policy because the test score gaps between minority and non-minority applicants would otherwise make holistic admissions "an all-white enterprise"), *aff'd*, 136 S. Ct. 2198 (2016); *Grutter v. Bollinger*, 288 F.3d 732, 771 (6th Cir. 2002) (Clay, J., concurring) (noting that the record indicated "that LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions"), *aff'd*, 539 U.S. 306 (2003).

[11] *See* Sigal Alon & Marta Tienda, *Diversity, Opportunity, and the Shifting Meritocracy in Higher Education*, 72 Am. Sociological Rev. 487, 506 (2007) (discussing the low predictive validity of test scores); Kimberly West-Faulcon, *More Intelligent Design: Testing Measures of Merit*, 13 U. Pa. J. Const. L. 1235, 1269 (2011) (concluding that standardized admission tests "measure only a relatively small proportion of the differences in test-takers' future academic success").

[12] William G. Bowen et al., *Crossing the Finish Line: Completing College at America's Public Universities* 113–15 (2009).

4

graduates determined that a combination of LSAT scores and undergraduate GPA failed to predict career success, as measured by income, satisfaction, and service contributions.[13]

Additionally, some studies have found that SAT test scores' predictive value is limited even for first-year college grades. For example, analyses of the University of California system have shown that SAT scores explain less than two percent of the variance in first-year grades and are largely redundant of other information provided through the holistic application process.[14] In short, overreliance on SAT scores to compare and rank similar students incorrectly predicts who will ultimately perform well in college and beyond, particularly for students of color.[15]

## B. Racial biases cause disparities in test scores for underrepresented minorities independent of socioeconomic disadvantage

On average, African American, Latino, Native American, and certain AAPI ethnic groups have lower standardized test scores than white students.[16] Unfortunately, these test

---

[13] Richard O. Lempert et al., *Michigan's Minority Graduates in Practice: The River Runs Through Law School*, 25 L. & Soc. Inquiry 395, 468–79, 485–90 (2000).

[14] Saul Geiser, *Norm-Referenced Tests and Race-Blind Admissions: The Case for Eliminating the SAT and ACT at the University of California* at 9 (Research & Occasional Paper Series CSHE.15.17 Dec. 2017), https://cshe.berkeley.edu/sites/default/files/ /2.rops.cshe.15.2017.geiser.testsrace-blind_admissions.12.18.2017.pdf.

[15] *Id.*; *see also* Herman Aguinis et al., *Differential Prediction Generalization in College Admissions Testing*, 108 J. of Educ. Psych. 1045, 1053 (2016).

[16] For the high school graduating class of 2018, the mean score for white test takers was 1123 compared to 946 for African Americans, 949 for Native Americans, 986 for Pacific Islanders, and 990 for Latinos. *SAT Suite Results: 2018*, The College Board, https://reports.collegeboard.org/sat-suite-program-results/class-2018-results. Although Asian Americans score higher than average as a group, research shows that certain subgroups score much lower than average. *See* Robert Teranishi et al., *iCount: A Data Quality Movement for Asian Americans and Pacific Islanders in Higher Education* 18 (2013), https://aapip.org/sites/default/files/publication/files/2013_icount_report.pdf

Case 1:14-cv-00954-LCB-JLW   Document 180   Filed 03/05/19   Page 7 of 47

score gaps are continuing to grow as our school system re-segregates.[17] The racial disparities in standardized tests are often attributed to socioeconomic factors because students of color are disproportionately low-income and cannot afford expensive test-preparation courses that inflate scores for wealthier students.[18] These students are also more likely to be taught by less-skilled or less-experienced teachers,[19] attend schools in distressed neighborhoods or suburban areas where they are socially isolated,[20] and be unfairly assigned to lower academic tracks throughout their elementary and high school years,[21] all of which are factors that contribute to poor test-readiness and lower

---

(reporting that 48.3% of California test-takers received a total SAT score greater than 1500, whereas only 7.6% of test-takers at a predominantly Hmong high school and 12.8% of a predominantly Filipino high school test-takers received a score in the same range).

[17] Geiser, *supra* note 14 at 5–6 (explaining the correlation between growing school segregation in California and the expanding test score gap for black and Latino students).

[18] *See* Julie J. Park & Ann H. Becks, *Who Benefits from SAT Prep?: An Examination of High School Context and Race/Ethnicity*, 39 Rev. Higher Ed. 1, 20 (2015); Jay Rosner, *Disparate Outcomes by Design: University Admissions Tests*, 12 Berkeley La Raza L.J. 377, 383–84 (2001) (explaining the effect of test preparation courses on test scores). Further, East Asian American students were most likely to take commercial test preparation courses and received the greatest benefit from this particular form of SAT coaching. *See also* Soo-yong Byun & Hyunjoon Park, *The Academic Success of East Asian American Youth: The Role of Shadow Education*, 20 Sociology of Ed. 1 (July 29, 2011).

[19] *See, e.g.,* Demetra Kalogrides & Susanna Loeb, *Different Teachers, Different Peers: The Magnitude of Student Sorting Within Schools*, 42 Educational Researcher 304 (2013) (documenting patterns of teacher assignment that disadvantage low-income minority students).

[20] *See, e.g.*, William C. Kidder & Patricia Gándara, *Two Decades After the Affirmative Action Ban: Evaluating the University of California's Race-Neutral Efforts* 4–5 (Oct. 2015), http://www.ets.org/Media/Research/pdf/kidder_paper.pdf (documenting racial segregation and its impact on the gap in college readiness).

[21] Jeannie Oakes, *2016 AERA Presidential Address: Public Scholarship: Education Research for a Diverse Democracy*, 47 Educational Researcher 91–104 (2018) (providing a general synthesis on educational research about K-12 tracking).

6

performance on standardized tests. However, socioeconomic disadvantage does not adequately explain the racial disparities in standardized testing on its own.[22] Instead, "race has a large, independent, and growing statistical effect on students' SAT/ACT scores after controlling for other factors. Race matters as much as, if not more than, family income and parents' education in accounting for test-score difference."[23] For example, one factor contributing to the role that race plays in creating the testing gap is "stereotype threat," which artificially lowers test scores for students of color who internalize messages that they are intellectually inferior.[24]

The significant effect of race on SAT/ACT scores reflect the inherent racial bias in the development of standardized tests.[25] According to test expert Jay Rosner:

> Each individual SAT question . . . is required to parallel the outcomes of the test overall. So, if high-scoring test-takers—who are more likely to be white (and male, and wealthy)—tend to answer the question correctly in pretesting, it's a worthy SAT question; if not, it's thrown out. Race and ethnicity are not considered explicitly, but racially disparate scores drive question selection, which in turn reproduces racially disparate test results in an internally reinforcing cycle.[26]

---

[22] Geiser, *supra* note 14 at 3.

[23] *Id.*

[24] For a general discussion of "stereotype threat," see Claude M. Steele, Whistling Vivaldi: And Other Clues How Stereotypes Affect Us (2010). *See also* Brief of Experimental Psychologists as *Amici Curiae* in Support of Respondents, *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6774020.

[25] William C. Kidder & Jay Rosner, *How the SAT Creates Built-in-Headwinds: An Educational and Legal Analysis of Disparate Impact*, 43 Santa Clara L. Rev. 131, 157 (2002).

[26] Jay Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in *SAT Wars: The Case for Test-Option College Admissions* 134 (2015).

Because the very process of test construction favors test questions that white test-takers answer correctly more often than black test-takers,[27] it is dangerous to take standardized test scores at face value without recognizing the racial context of those scores.

At bottom, "[a] combined score of 1000 on the SATs is not always a 1000. When you look at a Striver [a student disadvantaged in the testing process by socioeconomic status, race, or other factors] who gets a 1000, you're looking at someone who really performs at a 1200."[28]

### C. UNC considers the context of achievement on standardized tests to provide a fair appraisal of academic potential

According to the *National Standards for Educational and Psychological Testing* developed by the American Educational Research Association, Psychological Association, and National Council on Measurement in Education, disparities between groups in test scores should "trigger heightened scrutiny for possible sources of test bias."[29] These standards encourage universities to mitigate the adverse impact of biased tests, which often involves taking race, ethnicity, and socioeconomic status into consideration when evaluating a student's test scores[30]—which is precisely what UNC does.

---

[27] *Id.* (noting that out of 276 SAT questions, none favored black test-takers even though such questions were pre-tested).
[28] Geiser, *supra* note 14 at 6.
[29] *Id.*
[30] *Id.* at 13.

UNC explicitly recognizes the limitations of standardized test scores.[31]  As a result, admissions officers consider test score gaps for underrepresented minorities, first-generation applicants, and students from lower socioeconomic backgrounds when reading applications.[32]  This accords with industry best practices.

By putting test scores in their proper place, UNC is able to consider a wider, more diverse range of candidates who have other characteristics that are *better* predictors of college and career success than test scores.  Indeed, a growing body of empirical research shows that *character skills* rival cognition in predicting educational attainment.[33]  For example, a 2007 study found that a lower SAT score is associated with a greater degree of "grit," which in turn, is associated with a higher GPA at an elite institution.[34]  Another study concluded that conscientiousness and a willingness to work hard matter more than

---

[31] *See* Dkt. 155-4 at 7 (specifying in the Reading Document that results from standardized tests must be "viewed in light of the documented strengths and limitations of these tests"); *id.* at 9 (stating that "[a]ssessment of disadvantage" must "inform the University's interpretation of the candidate's scores on standardized tests and other academic indicators").

[32] *See* Dkt. 167-7 at 20.   *See Honadle v. Univ. of Vt. & State Agric. Coll.*, 56 F. Supp. 2d 419, 427–28 (D. Vt. 1999); *see also Weser v. Glen*, 190 F. Supp. 2d 384, 399–400 (E.D.N.Y.) (holding that where the admissions policy does not seem to subject applicants to different standards, recruiting efforts that seek to be inclusive of certain races do not run afoul of the law), *aff'd*, 41 F. App'x 521 (2d Cir. 2002).

[33] *See, e.g.*, James J. Heckman & Tim Kautz, *Fostering and Measuring Skills: Interventions That Improve Character and Cognition* 6 (National Bureau of Economic Research, Working Paper No. 19656, 2013).

[34] Angela L. Duckworth et al., *Grit:  Perseverance and Passion for Long-Term Goals*, 92 J. of Personality & Soc. Psychol. 1087, 1093 (2007).

9

SAT scores and high school GPA in predicting college GPA.[35]  Thus, UNC's holistic race-conscious admissions process allows for the recognition of individual applicants' whole-human dignity and unique qualifications in a way that lifeless numbers could never do.

### D.  UNC's consideration of context to evaluate standardized test scores does not harm Asian Americans

UNC's consideration of context to evaluate standardized test scores does not disadvantage anyone, including Asian Americans, because it merely cures "established inaccuracies in predicting academic performance."[36]  A higher test score is a poor predictor of a person's ultimate capacity to be successful at UNC and does not—and should not—entitle anyone to admission at UNC or any other selective university.  In fact, UNC explicitly rejects the notion that its goal is "to maximize the average SAT score or the average eventual GPA of the entering class."[37]  Instead, UNC employs a holistic admissions process that "consider[s] each person as a unique and complex human being" and seeks to enroll "accomplished and capable students who are diverse in all ways."[38]

Under UNC's holistic admissions process, SAT scores by themselves explain less than twelve percent of admissions decisions.[39]  Therefore, the fact that Asian American admits to UNC have SAT scores that are higher than African-American admits[40] is

---

[35] Eric E. Noftle & Richard W. Robbins, *Personality Predictors of Academic Outcomes: Big Five Correlates of GPA and SAT Scores*, 93 J. of Personality & Soc. Psychol. 116, 126 (2007).
[36] *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 306 n.43 (1978).
[37] Dkt. 155-4 at 5.
[38] Dkt. 154-4 at 6.
[39] Dkt. 154-22 at 24.
[40] *See* Dkt. 159 at 12.

immaterial. Even if UNC did not consider race when evaluating SAT scores, the test score gap would remain, as it did at UC Berkeley and UCLA after Proposition 209 banned the consideration of race in the admissions process.[41] SFFA's own expert conceded that Asian Americans have the highest admission rate of any racial group for in-state residents,[42] which is inconsistent with any suggestion that UNC's race-conscious admissions process disfavors Asian Americans.[43]

---

[41] *See* William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case*, 39 J. Coll. & Univ. L. 53, 96 (2013).

[42] See Dkt. 160-1 at 23 (reporting that for in-state applicants, Asian Americans have a 53.56% admission rate, compared to 30.53% for African Americans, 40.96% for Hispanics, and 48.10% for Native Americans). The appropriate inquiry in this case is to examine the way that North Carolina residents are impacted by its admissions policy. For example, UNC's Code of the Board of Governors caps out-of-state enrollment at no more than eighteen percent. *See also* N.C. Gen. Stat. § 116-1(b) (dictating that UNC is "dedicated to the service of North Carolina and its people"); *Rosenstock v. Bd. of Governors of the Univ. of N.C.*, 423 F. Supp. 1321, 1323 (M.D.N.C. 1976) ("Because the University is a State institution, created for and supported by the bona fide residents of North Carolina, in-state students should be insured a place at the State school insofar as possible.").

[43] According to SFFA's expert, a male, non-first-generation, Asian American applicant with a twenty-five percent chance of admission would more than double if his race were switched to Latino and more than triple if he were African American. Dkt. 159 at 23, 35–36. These statistics are highly misleading because they (1) do not mirror the actual holistic admissions process, (2) overemphasize the role of racially biased criteria like test scores, and (3) focus on a small group of applicants for whom race makes the most difference in admission, thus improperly magnifying the impact of race. Dkt 154-23 ¶¶ 53–61. Most problematic, however, is SFFA's assumption that an individual's race can be changed without impacting everything else about their life experiences. A non-first-generation Asian American male is much less likely to be racially profiled, tracked to less rigorous academic classes, subjected to school discipline, and internalize stereotypes that depress academic performance than a non-first-generation African American male. Race permeates every aspect of our lives and is not reducible to an "on/off" switch. Therefore, Arcidiacono's race-switching analysis is not entitled to any evidentiary weight.

11

## II. Eliminating the Consideration of Race Will Not Address the Needs of Underrepresented Asian Americans and Pacific Islanders

SFFA contends that UNC's admission system treats Asian Americans as a monolithic block of similar applicants.[44]  In fact, it is SFFA's position that would elide the important distinctions among AAPIs.  As *Amici* well know, AAPIs are a uniquely heterogeneous racial group.[45]  Contrary to the popular and insidious misconception that AAPIs are universally successful in the education context, many Southeast Asian, Native Hawaiian, and Pacific Islander subgroups suffer from school segregation,[46] inadequate

---

[44] *See* Dkt. 159 at 7 n.2 ("Although Asian Americans comprise numerous ethnicities, UNC views them as an undifferentiated mass of 'majority' students.").

[45] Robert T. Teranishi et al., *The Data Quality Movement for the Asian American and Pacific Islander Community: An Unresolved Civil Rights Issue*, in *Race, Equity, and Education: Sixty Years from Brown* 139, 142 (2015) ("[D]isaggregated data on the AAPI population reveal a wide range of demographic characteristics that are unlike those of any other racial group in America with regard to their heterogeneity.  According to the U.S. Census Bureau, the AAPI racial category consists of forty-eight different ethnic groups that occupy positions along the full range of the socioeconomic spectrum, from the poor and under-privileged, to the affluent and highly skilled.").

[46] *See, e.g.*, Robert  Teranishi, *Southeast Asians, School Segregation, and Postsecondary Outcomes*, Commission on Asian American Research in Higher Education (2004), http://care.igeucla.org/wp-content/uploads/2015/04/save_congress_brief_9-20-04.pdf (describing residential isolation and ethnic enclaves among poor immigrant communities from Southeast Asia and the attendant educational inequities); Wayne E. Wright & Sovicheth Boun, *Southeast Asian American Education 35 Years After Initial Resettlement: Research Report and Policy Recommendations*, 6 J. Southeast Asian Am. Educ. Advancement 1, 22 (2011) (noting that focus groups of Southeast Asian students revealed problems with "segregation, tracking, unmotivated teachers, overcrowded and underfunded schools, gangs, and overly strict rules").

preparation for college,[47] standardized test score gaps,[48] and other barriers to higher education.[49] When AAPIs are viewed as a homogeneous group, the needs of the most underserved AAPIs are obscured.[50]

SFFA misses this important detail. Its proposed remedy of eliminating race from the admissions process would only further disadvantage the most marginalized AAPIs in UNC's admissions process. The most under-served AAPIs need race-conscious admissions policies *and* disaggregated data to achieve educational equity for *all* AAPIs in North Carolina and across the United States.

### A. Aggregated data obscures the needs of underrepresented Asian Americans and Pacific Islanders in North Carolina

Asians and Asian Americans do not qualify as underrepresented minorities because they represent eighteen percent of the undergraduate student body at UNC,[51] even though

---

[47] *See, e.g.*, Asian American, Native Hawaiian, Pacific Islander Report, *The State of Higher Education in California* 27–31 (2015), https://advancingjustice-la.org/sites/default/files/2015-State-of-Higher-Education_AANHPI2.pdf (explaining that, in California, Native Hawaiians and Pacific Islanders experience lower college preparatory coursework completion rates; more than sixty percent of Cambodian and Filipino community college students enroll in pre-college-level or remedial work; and nearly three-quarters of Hmong admits need remediation).

[48] *See* Teranishi et al., *supra* note 16, at 18 (charting SAT score gaps); The Education Trust-West, *Overlooked and Underserved: Debunking the Asian "Model Minority" Myth in California Schools*, 3–4 (Aug. 2010), https://west.edtrust.org/wp-content/uploads/sites/3/2015/01/ETW-Policy-Brief-August-2010-Overlooked-and-Underserved.pdf (discussing elementary school and secondary school standardized testing gaps).

[49] *See generally* Asian American, Native Hawaiian, Pacific Islander Report, *supra* note 47.

[50] *See generally id.*

[51] The University of North Carolina at Chapel Hill, *Carolina's Newest Class* 3, https://admissions.unc.edu/files/2018/10/Class-Profile_FINAL.pdf.

13

Asians only represent 3.1% of the population in North Carolina.[52]  However, this aggregated data very likely obscures *underrepresentation* of particular AAPI subgroups.

AAPI communities in North Carolina are extremely diverse.  The largest AAPI ethnic group is the Asian Indian community, followed by the Chinese, Vietnamese, and Filipino communities.[53]  North Carolina is also home to significant ethnic minority communities from Southeast Asia, such as the Montagnard community from Vietnam and the Hmong community, many of whom settled in North Carolina as refugees.[54]  As of the last census, more than 6,600 Native Hawaiians and Pacific Islanders lived in North Carolina.[55]  The most commonly spoken Asian languages in North Carolina are Chinese (including Mandarin, Cantonese, and other varieties of Chinese language), Vietnamese, and Arabic.[56]  Thirty percent of Asian Americans in North Carolina report speaking English less than "very well," with some subgroups reporting much lower levels of English proficiency, such as the Vietnamese community, fifty percent of whom report speaking

---

[52]  Quick Facts—North Carolina, https://www.census.gov/quickfacts/nc (last visited Mar. 4, 2019).

[53] Institute for Southern Studies et al., *A Growing Voice: Asian American Voters in North Carolina* 10 (Oct. 2016), https://ncasians.files.wordpress.com/2016/03/a-growing-voice-asian-american-voters-in-north-carolina-report-october-2016.pdf.

[54] *Id.* at 10–11.

[55]U.S. Census Bureau, Community Facts, https://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml (filter for North Carolina and then "General Population and Housing Characteristics") (last visited Mar. 4, 2019).

[56] Institute for Southern Studies et al., *supra* note 53, at 11.

English less than "very well."[57] AAPIs in the state also practice a range of religions including Buddhism, Hinduism, Islam, Sikhism, and Christianity.[58]

These diverse AAPI communities in North Carolina experience varying economic and educational barriers. For example, according to the 2011–2015 American Community Survey, Hmong, Korean, Pakistani, and Cambodian Americans had a higher rate of poverty than an average of 13.5% for Asian Americans overall,[59] with Pakistani Americans experiencing a 27% rate of poverty.[60] Additionally, only between 58 and 75% of Cambodian, Laotian, Vietnamese, and Hmong Americans in North Carolina have a high school diploma,[61] compared to over 85% of North Carolinians overall who have a high school diploma.[62] Only about 7.8% of Cambodian Americans, 14.3% of Hmong Americans, 9.2% of Laotian Americans, and 18% of Vietnamese Americans have a bachelor's degree or higher in North Carolina,[63] compared to 28.4% for the state overall.[64]

Although disaggregated admissions data for North Carolina is not available, studies from other regions have found substantial disparities in representation in admissions as

[57] *Id.* at 15.

[58] *Id.* at 11.

[59] *Compare* U.S. Census Bureau, *American Community Survey*, Table S1701: Poverty Status in the Past 12 Months, 2011–2015, *with* U.S. Census Bureau, American Community Survey, Table B17001: Poverty Status in the Past 12 Months by Sex by Age, 2011–2015.

[60] U.S. Census Bureau, *American Community Survey*, Table B17001: Poverty Status in the Past 12 Months by Sex by Age, 2011–2015.

[61] U.S. Census Bureau, American Community Survey, Table B15002: Sex by Educational Attainment for the Population 25 Years and over, 2011–2015.

[62] U.S. Census Bureau, American Community Survey, Table S1501, Educational Attainment, 2011–2015.

[63] U.S. Census Bureau, American Community Survey, *supra* note 61.

[64] U.S. Census Bureau, American Community Survey, *supra* note 62.

well. For example, a 2015 study of California's AAPI population revealed underrepresentation of Filipinos, Native Hawaiians, Samoans, Guamanians, and Fijians in the University of California system compared to their percentage of California's AAPI population.[65] A 2013 study of UCLA admission rates found that some AAPI sub-groups, such as Hmong, Bangladeshi, Filipino, Thai, Cambodian, Indonesian, and Pakistani, have significantly lower admit rates than the average for all AAPIs.[66] The same study similarly showed significant disparities in the representation of AAPI sub-groups at UC Berkeley relative to their proportional representation in the state. For example, Southeast Asians (Laotians, Cambodians, Hmong, and Vietnamese), Filipinos, Pacific Islanders (Samoans, Guamanians, Tongans, and Native Hawaiians) are all underrepresented in UC Berkeley's applicant pool.[67]

**B.    Eliminating the consideration of race will disadvantage the most marginalized Asian American and Pacific Islander applicants**

SFFA tries to paint Asian Americans as victims of UNC's race-conscious admissions policy, but its requested remedy of eliminating race completely from the admissions process—to make it impossible to discern the race or ethnicity of any applicant[68]—will be extraordinarily detrimental for AAPIs, particularly the most marginalized AAPIs in North Carolina. Eliminating the consideration of race would not make UNC's admissions process race-neutral; it would only serve to reinforce racial

---

[65] *See* Asian American, Native Hawaiian, Pacific Islander Report, *supra* note 47, at 13.
[66] *See* Teranishi et al., *supra* note 16, at 17.
[67] *Id.* at 16.
[68] Dkt. 1 at 64.

segregation and widen the existing racial disparities in educational opportunity for students of color, including many AAPIs.

Nor would a strictly class-conscious admissions system be an adequate alternative, because class is not a sufficient proxy for race to understand "each person as a unique and complex human being"[69] or to achieve comparable levels of racial diversity.[70] SFFA's proposal—"a multi-faceted socioeconomic preference"[71]—would *reduce* Asian American representation at UNC, increase racial disparities, and result in a more racially hostile campus for all students of color, including AAPIs. Against the backdrop of biased test scores and unequal distribution of prior educational opportunities, this alternative is neither race-neutral nor workable.

First, UNC cannot possibly accomplish its goal "to understand [each] candidate individually, comprehensively, and holistically," without the consideration of race. Race is a unique and inextricable aspect of a person's identity for which there is no substitute. As one student testified in *SFFA v. Harvard*:

---

[69] *See* Dkt. 154-4 ¶ 14.

[70] Although inquiry in this area has relied upon different methodologies and samples, the results are the same—specifically, class-based admissions policies cannot substitute for race-based ones when it comes to ensuring racial diversity. *See generally* William C. Kidder, *How Workable Are Class-Based and Race Neutral Alternatives at Leading American Universities?*, 64 UCLA L. Rev. 100 (2016), https://www.uclalawreview.org /wp-content/uploads/2016/06/Kidder-D64-update.pdf. In his analysis, William Kidder concludes: "The weight of social science research . . . supports the conclusion that socioeconomic status is not an effective alternative to race-conscious measures with respect to undergraduate diversity at selective colleges and universities in the United States." *Id.* at 131.

[71] Dkt. 159 at 39.

17

Race-blind admissions is active erasure. To try to not see my race is to try to not see me simply because there is no part of my experience, no part of my journey, no part of my life that has been untouched by my race. And because of that, it would be nearly impossible for me to try to explain my academic journey to try to explain my triumphs without implicating my race.[72]

The same is true for Asian American students, like Sally Chen, a Chinese-American Harvard student who testified, "Being Chinese-American, being the daughter of Chinese immigrants . . . [and] how I navigated being a translator and advocate. That was so fundamental to my background and my story, my identity, that I don't think I could have left it out."[73] Thang Diep, a Harvard senior who immigrated to the United States from Vietnam when he was eight years old wrote his college essay about rejecting his Vietnamese identity after being bullied as a child and then learning to embrace his ethnic identity as he began to understand institutionalized racism in high school. He testified: "[T]o portray my growth authentically and really show . . . the admission officer [who] I really am . . . [was] crucial for me to . . . share this journey of not just learning English, but this journey of rejecting and erasing my own identity [that is] . . . such a huge part of who I was when applying and still who I am now."[74]

---

[72] Proposed Findings of Fact and Conclusions of Law at 13–14, *Students for Fair Admissions v. President and Fellows of Harvard College*, No. 1:14-cv-14176 (D. Mass. Jan. 9, 2019), Dkt No. 626.

[73] *Id.* at 13.

[74] *Id.* at 12.

Case 1:14-cv-00954-LCB-JLW   Document 180   Filed 03/05/19   Page 20 of 47

Second, the educational benefits of diversity cannot be achieved when socioeconomic diversity is substituted for racial diversity.[75]  Models that rely exclusively on class-based affirmative action perform poorly in terms of ensuring racial diversity, such that "even relatively aggressive [socioeconomic status]-based affirmative action policies do not mimic the effects of race-based policies on racial diversity."[76]  This is evident in SFFA's preferred model, which reduces Asian American representation in favor of greater white representation in SFFA's simulation.[77]  This is not an adequate alternative because it fails to "promote [the university's] interest in the educational benefits of diversity" as effectively as UNC's current race-conscious admissions policy.[78]  In fact, a 2015 study of multiple colleges revealed that an admissions scheme that gives significant weight to both race and class—as UNC's policy does—results in more class diversity than one that relies on class alone.  The authors write that, "In tandem, race and [socioeconomic status]-based policies seem to improve both race and [socioeconomic] diversity beyond what is achieved using either plan in isolation."  Although these results are perhaps initially surprising, they underscore the fact that students cannot be reduced to simply race or class.  Considering both in relation to one another most closely resembles the actual lived experience of students and better informs their likely enrollment decisions.

---

[75] *See generally* Julie Park, *Is Class-Based Affirmative Action the Answer*, *in* Race on Campus: Debunking Myths with Data 49, 49–70 (2018).

[76] Sean Reardon et al., *Can Socioeconomic Status Substitute for Race in Affirmative Action College Admissions Policies? Evidence from a Simulation Model* 19 (2015), https://www.ets.org/Media/Research/pdf/reardon_white_paper.pdf.

[77] Dkt. 159 at 39–40.

[78] *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016).

19

Third, some race-neutral alternatives—like those proposed by SFFA—rely on standardized tests, such as the SAT and ACT, which are known to be racially biased. As discussed in detail above, while standardized admissions tests may appear race-neutral on their face, they are not. For reasons related to sampling, testing, and design, standardized tests "guarantee[] the lower performance of African Americans and Chicanos on the SAT."[79] Therefore, racial disparities in admissions at UNC would increase if UNC did not consider race. Although AAPIs tend to have high test scores in the aggregate, there are tremendous disparities in SAT scores among AAPI sub-groups. For example, a 2013 study of SAT scores in Asian ethnic enclaves showed that test-takers in Chinese ethnic enclaves scored an average of 1656, whereas Hmong and Filipino enclaves averaged 1174 and 1208, respectively.[80] In Alhambra, California, a city that is predominantly Chinese, about seventy percent of test takers scored more than 1500 on their SAT; in contrast, in a predominantly Hmong ethnic enclave in Sacramento and a predominantly Filipino ethnic enclave in Daly City, only 7.6% and 12.8% of test-takers respectively achieved the same results.[81] Under SFFA's race-blind models, the most marginalized AAPIs will experience even more structural barriers to admission while also losing the tools to demonstrate their unique contributions to diversity.[82]

---

[79] Kidder & Rosner, *supra* note 25, at 156.

[80] Teranishi et al., *supra* note 16, at 18.

[81] *Id.*

[82] *Cf.* Sally Chen, *I'm An Asian-American Harvard Student—Here's Why I Testified In Support Of Affirmative Action*, Bustle (Oct, 30, 2018), https://www.bustle.com/p/im-asian-american-harvard-student-heres-why-i-testified-in-support-of-affirmative-action-13028469 (recounting the story of the daughter of working class Chinese immigrants, who

Fourth, numerous studies have documented the negative impact on campus climate when a race-conscious admissions policy is eliminated.[83]  AAPIs are not immune from these impacts.  A recent empirical study reported that AAPI students experienced direct racial hostility in the forms of racial bullying, racial slurs, and racial profiling,[84] as well as indirect intimidation as a result of witnessing racist acts directed towards other students of color.[85]  Studies show that colleges and universities that reach the highest levels of diversity have fewer incidents of racial hostility.[86]  AAPI students also reported experiencing pressure to segregate from or assimilate to the dominant White culture, feeling silenced in

---

explains that Harvard's consideration of race allowed her to "break through the model minority myth" and "present [her]self as a whole person—beyond stereotypes—in a way that flat numbers could not"); Young Jean Lee, *I'm Asian-American. Affirmative Action Worked for Me*, N.Y. Times (Feb. 9, 2019) https://www.nytimes.com/2019/02/09/opinion/sunday/im-asian-american-affirmative-action-worked-for-me.html (recounting the story of Broadway's first Asian American woman playwright, who attributes her college admission to the English department's recognition of the diversity she would bring to the department, notwithstanding her low SAT scores).

[83] *See, e.g.*, Kidder, *supra* note 41, at 56–70.

[84] Samuel D. Museus & Julie J. Park, *The Continuing Significance of Racism in the Lives of Asian American College Students*, 56 J.C. & Student Dev. 551, 557 (2015).

[85] *See, e.g.*, *id.* at 557–58 (discussing how a hate crime against a Black student and incidents involving other Asian American students made one student feel that "[i]t's pretty scary to be a minority around here sometimes").

[86] *See, e.g.*, Rebecca L. Stotzer & Emily Hossellman, *Hate Crimes on Campus: Racial/Ethnic Diversity and Campus Safety*, 27 J. Interpersonal Violence 644, 654 (2012); *cf.* Shaun R. Harper & Sylvia Hurtado, *Nine Themes in Campus Racial Climates and Implications for Institutional Transformation*, *in* Responding to the Realities of Race on Campus 12–14 (2007); Julie J. Park, *Asian Americans and the Benefits of Campus Diversity: What the Research Says*, (2015), http://care.gseis.ucla.edu/wp-content/uploads/2015/08/CARE-asian_am_diversity_D4.pdf (showing that Asian Americans view other racial groups more favorably, and vice versa, in a racially diverse student body).

21

academic exchanges and campus spaces, and suffering from stereotyping as a perpetual foreigner or model minority. These experiences are exacerbated when universities do not consider and value race.

In sum, SFFA's effort to dismantle UNC's race-conscious admissions program would destroy racial diversity and exacerbate the disadvantages that the most underserved AAPIs already face in the admissions process. A more nuanced approach to AAPI prospective students, which uses disaggregated data in tandem with UNC's existing race-conscious admissions policy is the best path to serving the diverse AAPIs in North Carolina.

## CONCLUSION

*Amici* reject SFFA's efforts to dismantle UNC's race-conscious admissions program, which has increased educational opportunities for diverse North Carolinians, including Asian Americans. UNC appropriately considers context—including the racial biases inherent in standardized test scores—when evaluating applicants. This does not give an unfair preference to underrepresented minorities. Rather, UNC's race-conscious admissions process is only a small effort to level a playing field that is still stacked against underrepresented minorities. Moreover, neither race nor test scores predominate in UNC's holistic admissions process. *Amici* also reject SFFA's class-based alternatives to the consideration of race, which will undermine UNC's holistic admissions process, reduce racial diversity, and harm campus climate for everyone, including AAPIs. *Amici* recognize that these alternatives will harm, rather than benefit the most underrepresented AAPI

22

subgroups in North Carolina and refuse to be used as a weapon to limit opportunities for

their African American, Latino, and Native American brothers and sisters.

This the 5th day of March, 2019.

FOX ROTHSCHILD LLP

/s/ Matthew Nis Leerberg
Matthew Nis Leerberg
N.C. State Bar No. 35406
mleerberg@foxrothschild.com
P.O. Box 27525
Raleigh, NC 27611
Telephone:  (919) 755-8700
Facsimile:  (919) 755-8800

Kip D. Nelson
N.C. State Bar No. 43848
knelson@foxrothschild.com
Whit Pierce
N.C. State Bar No. 46327
wpierce@foxrothschild.com
300 N. Greene Street
Suite 1400
Greensboro, NC 27401
Telephone:  (336) 378-5200
Facsimile:  (336) 378-5400

OF COUNSEL:

Nicole Gon Ochi
Asian Americans Advancing Justice - LA
nochi@advancingjustice-la.org
1145 Wilshire Blvd.
Los Angeles, CA 90017
Telephone: (213) 977-7500

23

Phi Nguyen
pngyuen@advancingjustice-atlanta.org
Hillary Li
hli@advancingjustice-atlanta.org
Asian Americans Advancing Justice - Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, CA 30093
Telephone: (404) 585-8446

Winifred Kao
winifredk@advancingjustice-alc.org
Asian Americans Advancing Justice
 - Asian Law Caucus
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 848-7736

Niyati Shah
nshah@advancingjustice-aajc.org
Eri Andriola
eandriola@advancingjustice-aajc.org
Asian Americans Advancing Justice - AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
Telephone: (202) 815-1098

*Counsel for Amicus Curiae Asian Americans
Advancing Justice and Organizations and
Professors Supporting Holistic Admissions
Policies*

## STATEMENT PURSUANT TO L.R. 7.5(D)

*Amicus* Asian Americans Advance Justice represents that (1) no party's counsel authored the brief in whole or in part, (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (3) no person—other than *amicus*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

This the 5th day of March, 2019.

/s/ Matthew Nis Leerberg
Matthew Nis Leerberg

## CERTIFICATE OF WORD COUNT

This is to certify that the foregoing brief contains fewer than 6,250 words, after excluding the caption, signature lines, and certificate of service. Therefore, the foregoing brief complies with the length limitations set by Local Rule 7.3(d). The basis for this certification is the word count feature of the word processing software used to prepare this brief.

This the 5th day of March, 2019.

/s/ Matthew Nis Leerberg
Matthew Nis Leerberg

# Exhibit A:  Full List of *Amici Curiae* Joining Asian Americans Advancing Justice

## Organizations

### 1.  18MillionRising.org

18MillionRising.org (18MR.org) brings Asian American communities together online and offline to reimagine Asian American identity with nuance, specificity, and power. It is using this Asian American identity as the foundation to build a more just and creative world where Asian American experiences are affirmed, their leadership is valued, and all of them have the opportunity to thrive.  Using technology and popular culture, 18MR.org develops new ways for Asian Americans and allies to collaborate, create new ways of being, and transform the world around them. 18MR.org utilizes digital-first advocacy tactics to elevate the voices of and mobilize its over 120,000 members to take action on issues that matter to them. 18MR.org creates meeting places online where young Asian Americans can deliberate together about what it means to be Asian American in the 21st century.

### 2.  AAPIs for Civic Empowerment Education Fund

AAPIs for Civic Empowerment Education Fund is a network of grassroots AAPI organizations working to advance policies, campaigns, and issues that support low-income Asian American and Pacific Islanders (AAPIs). AAPIs for Civil Empowerment EF believes that increased civic participation amongst AAPIs is critical to ensure political representation and achieve genuine democracy. AAPIs for Civil Empowerment EF believes that race-conscious policies are critical to underserved and underrepresented AAPI communities.

### 3.  After Bruce

After Bruce is a PR and marketing firm committed to the advancement of AAPI and other underrepresented communities in the media landscape. After Bruce believes in the power of independent filmmakers, community-minded organizations, and socially conscious businesses to elevate voices, influence audiences, and impact the most pressing issues AAPIs face.

### 4.  American Citizens for Justice

American Citizens for Justice is a 501(c)(3) civil rights advocacy organization dedicated to protecting the civil rights interests for Asian Americans among all Americans.

27

### 5. American Muslim Voice Foundation

The mission of American Muslim Voice Foundation is to foster friendships among all Americans by bridging cultural and religious gaps. The organization works towards protecting and preserving civil liberties and constitutional rights for all.

### 6. Asian Pacific Islander Americans for Civic Empowerment (APACE)

Asian Pacific Islander Americans for Civic Empowerment (APACE) in Washington strives to increase access and participation in electoral and civic affairs by registering, educating, and protecting APIA voters. APACE stands in unequivocal support of affirmative action in Washington state and across the nation.

### 7. API Equality – Northern California

API Equality - Northern California works to build LGBTQ API power through training and developing new leaders, establishing intergenerational connections, and documenting and disseminating our histories. APIENC is committed to racial justice and solidarity with all people of color.

### 8. Arab American Action Network

The Arab American Action Network (AAAN) strives to strengthen the Arab community in the Chicago area by building its capacity to be an active agent for positive social change. As a grassroots nonprofit, AAAN's strategies include community organizing, advocacy, education, providing social services, leadership development, cultural outreach, and forging productive relationships with other communities. AAAN's vision is for a strong Arab American community whose members have the power to make decisions about actions and policies that affect their lives, and access to a range of social, political, cultural, and economic opportunities in a context of equity and social justice.

### 9. Arizona Asian & Pacific Islander American VoteTable

Arizona Asian & Pacific Islander American VoteTable works to advance justice, fairness, and equal opportunity for all Americans through voting advocacy.

### 10. Asian & Latino Solidarity Alliance of Central Virginia

The Asian & Latino Solidarity Alliance of Central Virginia is a non-profit, non-partisan organization based in Central Virginia whose mission is to advance common objectives impacting the Asian and Latino communities. The alliance strives for equitable representation, visibility, and access to economic and social programs that enrich their lives. The alliance acts as the connective tissue between the various community groups within the Central Virginia multicultural community. The alliance engages in partnerships

28

with community, faith-based, local government, and business groups to amplify their voices; connect and support their work; and empower and engage current and future leaders.

## 11. Asian American Legal Defense and Education Fund

The Asian American Legal Defense and Education Fund ("AALDEF"), headquartered in New York City and founded in 1974, is a national organization that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF protects the rights of Asian Americans and supports educational equity in higher education. AALDEF has an interest in this litigation because its work with community-based youth advocates across the country has revealed that Asian American students benefit from individualized race-conscious admissions policies as well as from diverse educational settings. AALDEF opposes any cap, quota, or negative action against Asian Americans. However, AALDEF believes that narrowly tailored, individualized admissions programs strongly benefit the Asian American community. AALDEF has filed amicus curiae briefs in several higher education affirmative action cases including *Fisher I* & *Fisher II*.

## 12. Asian American Political Alliance (AAPA), University of California, Berkeley

AAPA stands in solidarity with all oppressed peoples nationally and internationally fighting for self-determination in their communities and respective countries. AAPA rejects racist attempts to divide Asian Americans and Third World peoples from their common struggle for real equality.

## 13. Asian Community Development Council (ACDC)

The mission of the Asian Community Development Council (ACDC) is to improve the general well-being and education of the Asian, Pacific Islander and other ethnic communities in Nevada. ACDC's goal is to educate, connect, and empower our youth.

## 14. Asian Counseling and Referral Service

ACRS promotes social justice and the well-being and empowerment of Asian Americans and Pacific Islanders and other underserved communities—including immigrants, refugees, and American-born—by developing, providing, and advocating for innovative, effective, and efficient community-based multilingual and multicultural services.

### 15. Asian Law Alliance

The Asian Law Alliance, founded in 1977, is a non-profit public interest legal organization with the mission of providing equal access to the justice system to the Asian and Pacific Islander communities in Santa Clara County, California.

### 16. Asian Pacific American Bar Association of Los Angeles County

The Asian Pacific American Bar Association of Los Angeles County, formed in 1998, advocates on issues that impact the AAPI community and is committed to civil rights, racial justice, and equal opportunity. APABA-LA opposes initiatives designed to deprive immigrants, people of color, and other minorities of their civil rights, and advocates for equal treatment and opportunity in education for AAPIs and all people of color.

### 17. Asian Pacific American Labor Alliance (APALA), AFL-CIO

Founded in 1992, the Asian Pacific American Labor Alliance (APALA), AFL-CIO, is the first and only national organization of Asian American and Pacific Islander (AAPI) workers and allies. APALA works to advance worker, immigrant and civil rights. APALA is committed to defending race-conscious admission because 76% of Asian Americans support policies that increase educational opportunities for women and minorities. These policies are crucial for AAPI workers to gain access to educational opportunities for their youth.

### 18. Asian Pacific Policy and Planning Council

As a coalition of forty community-based organizations serving the 1.5 million Asian Pacific Islanders in the greater Los Angeles area, Asian Pacific Policy and Planning Council (A3PCON) strongly supports race conscious holistic admissions policies that seek to provide equitable access to higher education for millions of students of color. Since 1976, A3PCON and our member organizations have worked to combat systemic racism against all communities of color. A3PCON joins this brief to reflect its long-standing commitment to social justice.

### 19. Asian/Pacific Islander Law Students Association at University of California, Los Angeles School of Law

APILSA serves as a valuable resource for law students to succeed academically, socially, politically, and professionally. APILSA coordinates numerous events and activities that educate and inform members about current Asian Pacific Islander issues, and prepare members to manage such issues in both academic and professional legal settings. APILSA also provides a common forum for expressing members' needs and concerns as Asian Pacific Islander law students. APILSA strives to develop innovative programs that

lend academic and peer support, and aspire to continue the organization's long-standing success.

## 20. Association for Asian American Yale Alumni (AAAYA)

The Association of Asian American Yale Alumni is a volunteer-run, membership based, 501(c)3 nonprofit organization that provides a vehicle for Yale University alumni to promote the civic participation, leadership and service of Asian Americans and Asians at Yale and in the broader society.

## 21. Baltimore Asian Resistance in Solidarity

Baltimore Asian Resistance in Solidarity (BARS) brings together Asians and Pacific Islanders of all backgrounds in Baltimore for learning, mutual support, and radical organizing. BARS is organized against all oppressive systems, including racism and anti-blackness, in solidarity with all peoples of color. As BARS amplifies the voices of API people, it does so in harmony with all marginalized peoples because their liberation is tied together.

## 22. Berkeley Law Asian Pacific American Law Students Association (APALSA)

The Asian Pacific American Law Students Association (APALSA) is dedicated to the empowerment of Asian American and Pacific Islander law students and strives to meet the political, cultural, social, academic, and career needs of Berkeley law students interested in Asian Pacific Islander issues. In addition, the group's mission includes recruitment of under-represented students, particularly Southeast Asian and Filipino students.

## 23. Chinese American Citizens Alliance (C.A.C.A.), Los Angeles Chapter

One of the main purposes and objectives of C.A.C.A., the nation's oldest, continuous civil rights and advocacy organization for citizens of Chinese ancestry is to assure the education of our youth and community. C.A.C.A. understands the distinction between race-bias and race-conscious admission practices.

## 24. Chinese American Progressive Action

CAPA shares with Chinese Americans and the broader U.S. public how progressive, forward-looking policies benefit our communities. CAPA believes in justice, fairness, and an inclusive economy that provides opportunity for all Americans. CAPA lifts up Chinese American voices on the important issues that affect our country's future and encourages Chinese Americans to take political action, lead its communities, and build coalitions to ensure a strong and diverse America. As such, CAPA opposes this lawsuit which threatens racial integration at UNC.

31

### 25. Chinese for Affirmative Action (CAA)

Chinese for Affirmative Action (CAA) is a 50-year old community-based organization dedicated to defending the civil rights of Chinese Americans and advancing multiracial democracy in the United States. CAA engages in direct services, leadership development, civic engagement, policy advocacy, strategic communications, and movement building on a range of social justice issues. These issues include immigrant rights, education equity, affirmative action, language diversity, economic opportunity, and community safety and justice.

### 26. Chinese Progressive Association

The Chinese Progressive Association (San Francisco, CA) was founded in 1972 and educates, organizes and empowers the low income and working class immigrant Chinese community in San Francisco to build collective power with other oppressed communities to demand better living and working conditions and justice for all people. Racial justice is a key value and part of its work for the past 46 years, and Chinese Progressive Assocation understands how critical racial justice, equity, and diversity are if its communities are to be healthy and thrive.

### 27. Claremont South Asian Student Association

Claremont South Asian Student Association (SASA) is an organization for South Asian identifying students at the Claremont Colleges. SASA strives to be a space that is inclusive of all of its members, especially those from historically marginalized South Asian identities. As an organization, it wants to pursue advocacy around issues that directly affect South Asian communities both in the United States and in South Asia. In building a community that is inclusive of all South Asians, it strongly support race-conscious admissions.

### 28. Coalition for a Diverse Harvard

Coalition for a Diverse Harvard ("Diverse Harvard") is a group of over 1,100 Harvard students and alumni of diverse racial and ethnic backgrounds, including approximately 250 Asian American members. Diverse Harvard was launched in 2016 by Harvard and Radcliffe alumni to take a stand against an anti-affirmative action slate of candidates for Harvard's Board of Overseers, the University's second-highest governing body. Diverse Harvard's mission is to fight for diversity, equity, and inclusion at our own University and in higher education at large. Diverse Harvard believes that assembling a diverse student body and creating an environment where all students can thrive is central to the mission of higher education: developing successful citizens and leaders in a diverse nation and world.

32

### 29. Coalition for Asian American Children and Families (CACF)

CACF advocates for equity and opportunity for marginalized Asian Pacific American (APA) children and families. CACF is building a community too powerful to ignore by: Using and sharing information that counters the model minority myth and sheds light on community needs, activating APA youth and community members as "social justice" leaders, and mobilizing a coalition of partners to fight for systems and policy change. CACF's vision is for all children and families, including Asian Pacific Americans, in New York City to be safe, healthy, and able to reach their full potential in life.

### 30. Council on American-Islamic Relations, California

The Council on American-Islamic Relations, California (CAIR-CA) is one of the largest American Muslim civil rights and advocacy organizations. CAIR-CA's mission is to enhance the understanding of Islam, encourage dialogue, protect civil liberties, and empower American Muslims. Through its four offices, CAIR-CA serves California's estimated one million American Muslims by providing direct legal services to victims of discrimination, working with the media, facilitating community education, and engaging in policy advocacy to advance civil rights and civic engagement. CAIR-CA serves individuals from mostly Arab, Middle Eastern, Muslim and South Asian (AMEMSA) communities.

### 31. Duke Asian American Studies Program

Duke University's Asian American Studies Program (AASP) offers interdisciplinary perspectives on the historical and current-day status of Asian Americans and Pacific Islanders in its society. AASP is committed to supporting the University of North Carolina's race-conscious holistic admissions policies.

### 32. Duke Asian Students Association

Duke Asian Students Association (DASA) stands in support of the affirmative action policies at UNC Chapel Hill. DASA refuses to see Asian/American students be exploited and complicit as a wedge against important equity practices, under the guise of "fair admissions," especially at a university with whom the organization's members share many strong ties. DASA refuses to see the hard work of progressive activists, which indeed includes Asian activists and supporters at an earlier point in history, be dismantled in the fight against affirmative action today.

### 33. East Coast Asian American Student Union

The East Coast Asian American Student Union (ECAASU) is a non-profit organization that serves to inspire, educate, and empower those interested in Asian

American and Pacific Islander issues. ECAASU was originally founded after the Bakke decision in 1978, in recognition of the need to build an advocacy network that fosters mutual support and solidarity. ECAASU fights for justice and equal opportunities for all marginalized communities.  Its members are veterans of the Third World Liberation Front student strike at UC Berkeley in 1969. For the past 50 years ECAASU has been standing up and fighting for justice and equity for students of color. The organization is proud to join this amicus brief and AAAJ and others in this important fight.

### 34. Empowering Pacific Islander Communities

Empowering Pacific Islander Communities (EPIC), a non-profit organization based in Los Angeles, strives for the empowerment of Pacific Islander communities. The persistence of institutional discrimination in higher education presents a significant barrier to Native Hawaiians and Pacific Islanders. EPIC's mission is to mobilize Pacific Islander communities to foster opportunities for achieving social justice through advocacy, research, and development.

### 35. GAPIMNY—Empowering Queer & Trans Asian Pacific Islanders

GAPIMNY—Empowering Queer & Trans Asian Pacific Islanders (GAPIMNY) is an all-volunteer, membership-based community organization that empowers queer and transgender Asian Pacific Islander people in the greater New York metropolitan area. GAPIMNY is committed to advancing racial justice and LGBTQ rights for intersectionally marginalized communities, and supports affirmative action as a policy that equalizes opportunity.

### 36. Harvard Asian American Women's Association

The Asian American Women's Association (AAWA) was created in 2005 as an inclusive, welcoming space for those on campus who identify with the experiences of Asian American women, including those who identify as gender non-conforming. AAWA's mission is to be a space where students can learn from and consequently empower each other. AAWA's founding members felt that Harvard students needed a community that was non-competitive and open to understanding each other's experience; as such, membership to AAWA is open to anyone without membership fees or requirements. AAWA has been cultivated so that students do not feel as though they must conform to or abide by any expectations to be included. Because AAWA values every lived experience as inherently valid and valuable, it has been committed to diversity and supporting fellow students from the very beginning of its existence. AAWA has and always will endeavor to foster a sense of belonging for people of very different backgrounds. AAWA also realizes that communities of color are stronger when they are united. AAWA therefore refuses to be used as a racial wedge and political tool by those who do not have its community's interests at heart.  AAWA believes that the proposed end of race-inclusive

admissions policies is tantamount to the erasure of the racial inequality in education systems and society at large. Although AAWA serves primarily Harvard students, it also realizes that the fight for educational justice and greater educational accessibility cannot be confined to our campus. Therefore, it stands in solidarity with communities of color and students throughout the country.

### 37. Harvard Vietnamese Association

Harvard Vietnamese Association (HVA) is a cultural organization that aims to foster a sense of community for Vietnamese-identifying students on campus. HVA is committed to diversity and inclusion at Harvard and recently signed on to be part of an amicus brief for the *SFFA v. Harvard* lawsuit. As a group representing students who are often erased in conversations around Asian American issues, HVA hopes to bring the experiences of Vietnamese students to the table.

### 38. Jakara Movement

The Jakara Movement is the largest Sikh youth organizing community benefit organization in the nation and our membership includes a large Asian American population. It believes race-conscious holistic admissions policies play an important role in building an American civic life that is open and representative of its diverse communities and populations.

### 39. Japanese American Citizens League

The Japanese American Citizens League is the nation's largest and oldest Asian American civil rights organization whose mission is to secure and safeguard the civil and human rights of Asian and Pacific Islander Americans and all communities who are affected by injustice and bigotry. The leaders and members of the JACL also work to promote and preserve the heritage and legacy of the Japanese American community.

### 40. Lambda Phi Epsilon at North Carolina State University

Lambda Phi Epsilon at North Carolina State University is an Asian-Interest fraternity that strives to help each brother achieve their fullest potential. We believe that personal development cannot be complete without social justice and civil rights. Asian Americans bring new perspectives to the Greek system through involvement in our communities, and we encourage our brothers to be catalysts for change. We believe that race-conscious admissions benefits our brothers and support UNC's admissions policies.

### 41. MinKwon Center for Community Action

The mission of MinKwon Center for Community Action is to empower the Korean American community and work with the broader Asian American and immigrant

35

communities to achieve social and economic justice for all. The center believes that being blind to race, especially in the context of admissions and access, is to be blind to the unique and structural problems that continue to exist for different racial groups.

### 42. Muslim Student Association West (MSA West)

Muslim Student Association West (MSA West) is a grassroots organization comprised of Muslim Student Associations (MSAs) representing campuses across the West Coast of the United States. MSA West is a cohesive coalition of Muslim students united for the sake of Allah (God) who aim to embody the concepts of unity, strength, and activism.

### 43. National Asian Pacific American Families Against Substance Abuse (NAPAFASA)

NAPAFASA is the nation's sole advocacy organization focused on the behavioral health needs of Asian Americans, Native Hawaiians, and Pacific Islanders. NAPAFASA supports the continuing usage of race-conscious admissions policies for higher education. In its work with local communities, students of Southeast Asian and Pacific Islander descent are at significantly higher risk for substance use disorders and related addictions (as well as those of African and Latino descent). Universities and colleges can make better decisions in their holistic admissions procedures with this limited additional information. NAPAFASA therefore joins as an amicus in support of UNC's race-conscious admissions policy.

### 44. National Asian Pacific American Women's Forum

The National Asian Pacific American Women's Forum (NAPAWF) is the only national, multi-issue Asian American and Pacific Islander (AAPI) women's organization in the country. NAPAWF's mission is to build the collective power of all AAPI women and girls to gain full agency over their lives, families, and communities. NAPAWF's work is centered in a reproductive justice framework that acknowledges the diversity within their community and ensures that different aspects of their identity—such as ethnicity, immigration status, education, sexual orientation, gender identity, and access to healthcare—are considered in tandem when addressing their social, economic, and health needs.

### 45. National Council of Asian Pacific Americans (NCAPA)

National Council of Asian Pacific Americans (NCAPA) is a national coalition of 33 Asian American and Pacific Islander (AAPI) organizations striving for equity and justice by organizing their diverse strengths to influence policy and shape public narratives. Their coalition members work together on policy issues that are deeply tied to their communities,

36

ranging from civil rights, education, health, housing & economic justice and immigration. They recognize that race-conscious holistic admissions policy is essential to creating a more racially diverse and equitable learning environment. The coalition believes that this attempt to dismantle such policy is an attempt to drive a wedge between AAPIs and other minority and underserved communities. In fact, the coalition believes that the community has directly benefited from efforts to increase racial diversity in higher education. The coalition further believes that educational attainment and socioeconmoic data on Southeast Asian, Native Hawaiian and Pacific Islander communities clearly illustrate the need for the continuation of race-conscious holistic admissions policies for many within their communities.

### 46. National Queer Asian Pacific Islander Alliance (NQAPIA)

The National Queer Asian Pacific Islander Alliance is a federation of lesbian, gay, bisexual, and transgender (LGBT) Asian American, South Asian, Southeast Asian, and Pacific Islander (API) organizations. NQAPIA builds the capacity of local LGBT API groups, develops leadership, promotes visibility, educates the community, invigorates grassroots organizing, encourages collaborations, and challenges anti-LGBT bias and racism.

### 47. National Tongan American Society (NTAS)

The National Tongan American Society was created in 1994 providing assistance with immigration and translation services. It is the oldest nonprofit organization of its kind in Utah. Today, NTAS works in various sectors, including immigration, healthcare and public benefits, education, wellness, and voter engagement, to support and advocate for civil rights, equity, and social justice.

### 48. New Mexico Asian Family Center

New Mexico Asian Family Center is the only nonprofit, nonpartisan organization that provides culturally-specific and linguistically-appropriate services to the Pan-Asian population in the state of New Mexico. Its programs and services include survivor-centered, trauma-informed case management, counseling, and legal support for survivors of gender-based violence, as well as multigenerational family programming, cross-racial collaboration building, and early childhood education initiatives. It is heavily invested in nonpartisan civic engagement and policy change in order to work towards a more culturally accessible and equitable New Mexico.

### 49. North Carolina Asian Americans Together

North Carolina Asian Americans Together (NCAAT) is a nonpartisan, nonprofit organization committed to supporting equity and justice for all by fostering community

among Asian American Pacific Islanders (AAPIs) and allies in North Carolina through civic engagement, leadership development, grassroots mobilization, and political participation. NCAAT's work is guided by principles and strategies including increasing visibility of the rapidly growing AAPI population in North Carolina by adding voices to the public discourse, working within an intersectional framework for racial justice and civil rights, and creating structural change, as well as greater justice within current systems.

### 50. North Carolina State University Asian Students in Alliance

The Asian Students in Alliance (ASIA) is a council overseeing 14 Asian-interest organizations at North Carolina State University. ASIA consistently collaborates with Asian American student groups at University of North Carolina - Chapel Hill to bring more visibility to Asian American identities. Therefore, ASIA firmly believes that it should support UNC in this case with the resources available at its campus.

### 51. OCA - Asian Pacific American Advocates

OCA - Asian Pacific American Advocates is dedicated to advancing the social, political, and economic well-being of Asian Americans and Pacific Islanders. OCA supports holistic admissions practices (inclusive of race, ethnicity, and sex) and seeks to prevent the dismantling of Affirmative Action in higher education admissions.

### 52. OCA Greater Phoenix

As an Asian Pacific American civil rights organization, OCA Greater Phoenix has always advocated for, and will continue to advocate for, equity in the education system. OCA Greater Phoenix believes that affirmative action policies in higher education are the cornerstone of socioeconomic justice and progress for the underrepresented communities that the organization's members are a part of and strive to serve.

### 53. Pacific Islander Health Partnership

Pacific Islander Health Partnership's (PIHP's) mission is to improve the health of Native Hawaiians and Pacific Islanders (NHPIs) by engaging communities, researchers, and policymakers. The organization educates Pacific Island communities about chronic illnesses, promotes research that sheds light on Pacific Islander health disparities, and advocates for policies that ensure NHPI communities receive resources that address the root causes of health disparities. PIHP is participating in this amicus brief because race-conscious admissions policies are necessary to address the historical underrepresentation of NHPIs in higher education institutions and in healthcare professions. PIHP believes that education achievement level has a profound impact on community health by improving the ability to navigate health care systems, increasing access to resources, and enhancing the health characteristics of community environments.

### 54. Pilipino American Law Society at Berkeley Law

Pilipino American Law Society (PALS) is a student-led group that strives to address the needs of law students of Filipino decent through mentorship, career advising, and social activities. Born of the common experiences and challenges of students from Filipino-American backgrounds, PALS is a community that fosters inclusiveness, well-being, and academic achievement throughout students' time at Berkeley Law.

### 55. Pilipino Workers Center of Southern California

Pilipino Workers Center (PWC) was formed in 1997 to promote safe working conditions, living wages, decent living conditions, access to quality healthcare, and basic human dignity. PWC advocates in the areas of employment, immigration, healthcare, housing, and youth empowerment. PWC believes in creating a level playing field for marginalized communities.

### 56. Reappropriate

Reappropriate is the web's longest-running and one of its most widely-read AAPI race and feminism blogs.

### 57. South Asian Americans Leading Together (SAALT)

SAALT is a national, nonpartisan, non-profit organization that fights for racial justice and advocates for the civil rights of all South Asians in the United States. The organization's ultimate vision is dignity and inclusion for all.

### 58. South Asian Law Students Association at the University of Michigan Law School

SALSA seeks to foster a cohesive South Asian community at Michigan Law School whose members will go on to become active members in the South Asian community at large. SALSA aims to encourage the South Asian community at the Law School, as well as the larger law student body and other organizations around campus, to engage in legal and social issues important to South Asia and the South Asian diaspora.

### 59. Southeast Asia Resource Action Center (SEARAC)

SEARAC is a national civil rights organization that seeks to empower Cambodian, Laotian, and Vietnamese American communities to create a socially just and equitable society. As representatives of the largest refugee community ever resettled in the United States, SEARAC stands together with other refugee communities, communities of color, and social justice movements in pursuit of social equity. SEARAC's National Equity

Agenda includes education policy priorities focused on college access, affordability, and completion, such as support for race-conscious college admissions policies that look beyond test scores to assess a student's capacity to thrive in college. SEARAC was also a signer of the Asian American Legal Defense and Education Fund's amici brief in support of Harvard's race-conscious admissions policies in 2018.

**60. Task Force on Asian and Pacific American Studies at Harvard College (TAPAS)**

TAPAS was founded in 2016 as a student organization dedicated to establishing a robust ethnic studies curriculum at Harvard. To date, TAPAS' central mission remains the same, although the organization has also begun to address other issues relating to Asian American advocacy. Over the past couple of years, TAPAS has coordinated meetings with key administrators at Harvard, organized a rally for ethnic studies, and planned events related to ethnic studies for students on campus. In 2017, TAPAS released a petition to the Harvard administration that garnered thousands of signatures from students, student groups, and faculty members.

**61. Third World Liberation Front (TWLF), University of California, Berkeley**

TWLF is in solidarity with all oppressed peoples nationally and internationally fighting for self-determination in their communities and respective countries. TWLF rejects racist attempts to divide Asian Americans and Third World peoples from their common struggle for real equality.

**62. Third World Liberation Front '69 Ad Hoc Committee**

TWLF '69 Ad Hoc Committee is composed of veterans of the Third World Liberation Front (TWLF) student strike at UC Berkeley in 1969. For the past 50 years, the Committee has been standing up and fighting for justice and equity for students of color. The Committee is proud to join this amicus brief and AAAJ and others in this important fight.

**63. U.S. Palestinian Community Network (USPCN)**

The U.S. Palestinian Community Network (USPCN) is a Palestinian community-based organization, founded in 2006 to revitalize grass-roots organizing in the Palestinian community in the U.S. The organization's members and leaders believe that affirmative action in college and university admissions policies must be upheld. Institutional and structural racism have devastated communities of color in this country for centuries, and it is only through equitable policies in government and the private sector that all people in America—not just the privileged—can live productive and fruitful lives.

### 64. University of California, Los Angeles South Asian Law Students Association

UCLA SALSA is dedicated to providing a forum for South Asian law students to exchange thoughts and ideas, develop a community support and referral network, and address the needs of the larger South Asian community—particularly its most marginalized members.

### 65. University of North Carolina alpha Kappa Delta Phi

The Associate chapter of the alpha Kappa Delta Phi International Sorority at UNC fosters the making of successful leaders by assisting and challenging its members to reach their maximum potential. The organization strives to maintain the highest levels of integrity and innovation in the promotion of sisterhood, philanthropy, scholastic excellence, and Asian-Awareness in the community while creating lifelong relationships. As an Asian-interest sorority, the chapter would like to stand in support of and solidarity with UNC and the AAPI organizations spearheading this case in defending UNC's holistic race-conscious application process.

### 66. University of North Carolina Asian American Law Students Association

Asian American Law Students Association (AALSA) is a diversity student organization at UNC School of Law. The mission of AALSA is to promote diversity and to serve Asian Pacific American students' interests at the school of law. By holding diversity events and offering legal services to the Asian Pacific American community, AALSA has been dedicated to ensuring that minority students' voices are heard and promoting a more inclusive studying environment at the school of law.

### 67. University of North Carolina - Chapel Hill Asian American Students Association

UNC-CH Asian American Students Association is dedicated to advancing the needs and interests of UNC's Asian/Asian American population. The association stands in solidarity with other student groups of color in supporting race-conscious admissions practices at UNC-CH and everywhere.

### 68. University of North Carolina - Chapel Hill Campus Y Executive Board

The Campus Y, UNC's Hub for Social Justice and Social Innovation, is the university's oldest and largest student-run organization. Founded in 1860, the Campus Y's mission centers on engaging students, the UNC campus, and communities in the pursuit of social justice. The organization's work ranges from criminal justice advocacy to environmental organizing to youth programming and more.

### 69. Union of North American Vietnamese Student Associations

Union of North American Vietnamese Student Associations is a non-profit, community based organization dedicated to cultivating the next generation of leaders who will serve as advocates for the Vietnamese community. UNAVSA educates and mobilizes student and young Vietnamese North Americans on economic, political, and social issues affecting the Vietnamese diaspora.

### 70. University of Michigan, Asian Pacific American Law Students Association

The Asian Pacific American Law Students Association (APALSA) is an organization of law students dedicated to advocating for the Asian Pacific American community at Michigan Law, providing academic and professional resources for its members and creating a social and professional network to connect students and alumni. APALSA sees the recent lawsuits by those opposed to holistic race-conscious admissions and the use of Asian Pacific Americans as a wedge in that agenda as an affront to the Asian Pacific American community and APALSA's commitment to seeking racial justice. The organization has worked to educate its members and their communities to dispel the misinformation spread by the lawsuits and is unwavering in its support of efforts in opposition to these divisive acts.

### 71. University of Pennsylvania Asian Pacific Student Coalition

The purpose of APSC is to voice and support the common interests and concerns of the Asian Pacific Islander community, to provide a forum for discussion, action, and exploration of issues of concern to students, and to present and to celebrate the richness of the diverse Asian Pacific cultures and backgrounds to the University community and beyond. Within the Asian Pacific Islander community, APSC works to strengthen the relationships among its 22 constituent groups by planning cultural and social events that build a sense of unity around the idea of the Pan-Asian experience. Outside of the Asian Pacific Islander community, APSC serves as the voice of 20% of the undergraduate student body by acting as the representative of the Asian Pacific Islander community in meetings with faculty, administration, student groups, and media. APSC supports this amicus brief because the organization strives to uplift the voices and lived experiences of all minority students and will not condone the utilization of Asian Americans as a wedge between other communities of color in this, or any other, instance.

### 72. Vietnamese American Bar Association of Southern California

The Vietnamese American Bar Association of Southern California is an association of attorneys, judges, law professors, and law students, providing a network for its members and affiliates with practice settings ranging from solo practices to large firms, corporations,

legal services organizations, non-profit organizations, law schools, and governmental agencies.

**Professors**

73. C. Casey Ozaki, University of North Dakota

74. C.N. Le, University of Massachusetts, Amherst

75. Cheryl D. Ching, University of Massachusetts, Boston

76. Corinne Kodama, University of Illinois at Chicago

77. David Hòa Khoa Nguyễn, Indiana University – Purdue University Indianapolis

78. Dian Squire, Northern Arizona University

79. Christin DePouw, University of Wisconsin – Green Bay

80. Jennifer Ho, University of North Carolina – Chapel Hill

81. Stephanie Kim, Georgetown University

82. Janelle Wong, University of Maryland

83. Julie J. Park, University of Maryland

84. Kevin Kumashiro, consultant and former Dean of the School of Education at the University of San Francisco

85. Liliana M. Garces, University of Texas at Austin

86. Liza A. Talusan, consultant and former professor at University of Massachusetts Boston

87. Marc Johnston-Guerrero, Ohio State University

88. Min Zhou, University of California, Los Angeles

89. Nancy Leong, University of Denver, Sturm College of Law

90. Oiyan Poon, Colorado State University

91. Sunaina Maira, University of California, Davis

92. Matthew Witenstein, University of Dayton

43

93. Varaxy Yi Borromeo, California State University, Fresno

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been filed electronically with the Clerk of Court using the CM/ECF system, which will send notification to counsel

This the 5th day of March, 2019.

/s/ Matthew Nis Leerberg
Matthew Nis Leerberg