**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISIONS, INC., <br><br>      Plaintiff, <br><br> v. <br><br> UNIVERSITY OF NORTH CAROLINA, et al., <br><br>      Defendants. | Case No. 1:14-cv-00954-LCB-JLW |

***AMICUS CURIAE* BRIEF OF THE CENTER FOR CONSTITUTIONAL JURISPRUDENCE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.     Controlling Precedent Requires this Court to Invalidate the UNC
Affirmative Action Program because It Harms Under-Represented Minority
("URM") Students and Treats Them Unequally. ........................................................ 2

II.    The Fourteenth Amendment's Original Public Meaning Repudiates All
Racial Discrimination by State and Local Officialdom. ........................................... 9

CONCLUSION ............................................................................................................. 20

CERTIFICATE OF WORD COUNT ............................................................................ 22

Case 1:14-cv-00954-LCB-JLW   Document 181-1   Filed 03/12/19   Page 2 of 28

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 239 (1995) ........................... 12, 18, 20

*Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ................................................... 19

*Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ("*Brown II*") .............. 16, 18

*Brown v. Board of Education*, 347 U.S. 483, 494 (1954) (*Brown I*) ............... 8, 13, 16, 20

*Buck v. Davis*, 137 S.Ct. 759, 777 (2017) ........................................................ 9

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989) ............................... 18

*Civil Rights Cases*, 109 U.S. 3, 36 (1882) ....................................................... 14

*Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526 (1979) ........................................ 17

*DeFunis v. Odegaard*, 416 U.S. 312, 337 (1974) ............................................... 16

*Fisher v. Univ. of Tex.*, 136 S. Ct. 2198 (2016) (*Fisher II*) ................................. 1

*Fisher v. Univ. of Tex.*, 570 U.S. 297, 309-10 (2013) (*Fisher I*) ........................... 3, 6, 7, 8

*Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) ................................................... 3

*Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430 (1968) ............... 16, 18, 20

*Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218 (1964) ................... 16, 18

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .............................................. passim

*Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ....................................... 19

*Hardie v. Nat'l Collegiate Athletic Ass'n*, 861 F.3d 875 (9th Cir. 2017), *opinion amended and superseded on denial of reh'g en banc*, 876 F.3d 312, 326 (9th Cir. 2017) .......... 20

*Hi-Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal. 4th 537 (2000) ...................... 17

ii

*Muller v. Oregon*, 208 U.S. 412 (1908) ............................................................. 15

*Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ...................................................... 15

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 746

    (2007) ............................................................................................................. 3, 9

*Plessy v. Ferguson*, 3 U.S. 537 (1896) ....................................................... 13, 17

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315-20 (1978) .............................. passim

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ............................................................. 1

*Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight*

    *for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291 (2014) ........................ 1, 17

*Scott v. Sandford*, 60 U.S. 393 (1857) ........................................................ 11, 12

*Shaw v. Reno*, 509 U.S. 630, 643 (1993) ............................................................. 3

**Statutes**

Wash. Rev. Code Ann. § 49.60.400(1) (Washington Initiative 200) ............................... 17

**Other Authorities**

Brief amici curiae of Richard Sander and Stuart Taylor, Jr., in Support of Neither Party . 8

Brief for Appellants in Nos. 1, 2, and 4, and for Respondents in No. 10 on Reargument in

    *Brown v. Board of Education*, O.T. 1953 .................................................... 21

Brief of Amicus Curiae the University of North Carolina at Chapel Hill Supporting

    Respondents .............................................................................................. 6, 7

Charles E. Daye et al., *Does Race Matter in Educational Diversity? A Legal and*

    *Empirical Analysis*, 13 RUTGERS RACE & L. REV. 1-S (2012) ...................................... 6

Case 1:14-cv-00954-LCB-JLW   Document 181-1   Filed 03/12/19   Page 4 of 28

Clint Bolick, *Blacks and Whites on Common Ground*, 10 Stan L. & Pol'y Rev. 155, 158 (1999) ...................................................................................................... 17

Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, THE FUTURE OF AFFIRMATIVE ACTION 203-212 (2014) ...................................................... 6

DECLARATION OF INDEPENDENCE.................................................................................... 10

Frederick Douglass, What The Black Man Wants (Jan. 26, 1865), reprinted in 4 FREDERICK DOUGLASS PAPERS 59, 68-69 (Blassingame & McKivigan, eds. 1991).... 14

Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, *in* THE FUTURE OF AFFIRMATIVE ACTION 74-90 (Richard D. Kahlenberg ed., 2014) ...................................................... 6

James Otis, *Rights of the British Colonies Asserted and Proved* ("The colonists are by the law of nature freeborn, as indeed all men are, white or black"), *reprinted in* PAMPHLETS OF THE AMERICAN REVOLUTION 439 (B. Bailyn, ed. 1965) ..................... 10

Letter from Abraham Lincoln to H. L. Pierce (Apr. 6, 1859), reprinted in 3 THE COLLECTED WORKS OF ABRAHAM LINCOLN 374, 376 (R. Basler ed. 1953)............... 10

Letter from Jefferson to Henri Gregoire (Feb. 25, 1809).................................................. 11

Letter to Roger C. Weightman (June 24, 1826), reprinted in JEFFERSON: WRITINGS 1516, 1517 (M. Peterson, ed., 1984) ....................................................................................... 11

Lino Graglia, "*Affirmative Action*," *Past, Present, And Future*, 22 OHIO N.U. L. REV. 1207, 1219 (1996) ....................................................................................................... 18

Martin Luther King, Jr., "I Have A Dream" (1963), reprinted in A TESTAMENT OF HOPE:

iv

THE ESSENTIAL WRITINGS AND SPEECHES OF MARTIN LUTHER KING, JR. 217, 219

(James Washington ed. 1986).........................................................................13

Mass. Dec. of Rights (1780), reprinted in 1 THE FOUNDERS' CONSTITUTION ................10

Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV.

947, 953-1117 (1995) ...........................................................................12

R. Brad Malone, *Note: Marginalizing Adarand: Political Inertia and the SBA 8(A)*

*Program*, 5 TEX. WESLEYAN L. REV. 275, 298-99 (1999)..........................................18

Ruth Bader Ginsburg, *Constitutional Adjudication in the United States As A Means of*

*Advancing The Equal Statute of Men And Women Under The Law*, 26 HOFSTRA L.

REV. 263, 269 (1997) ............................................................................15

Terry Eastland, ENDING AFFIRMATIVE ACTION: THE CASE FOR COLORBLIND JUSTICE

164-65 (2d ed. 1997) ............................................................................17

The Federalist No. 10, p. 78 (Rossiter ed. 1961) ..............................................11

The Federalist No. 36..........................................................................11

THOMAS SOWELL, THE ECONOMICS AND POLITICS OF RACE 200 (1983) .............................8

Va. Dec. of Rights § 1 (1776), reprinted in 1 THE FOUNDERS' CONSTITUTION 6 (P.

Kurland & R. Lerner, eds., 1987)..............................................................10

**State Constitutional Provisions**

Cal. Const. art. I, 31, cl. A (1996) (Proposition 209)....................................6, 17

v

# INTEREST OF *AMICUS CURIAE*[1]

The Center for Constitutional Jurisprudence is the public interest law arm of the Claremont Institute, whose stated mission is to restore the principles of the American founding to their rightful and preeminent authority in our national life, including the central importance of individual equality at issue in this case. The Center has previously appeared before the Supreme Court as *amicus curiae* in several cases addressing similar equal protection issues, including *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198 (2016) (*Fisher II*); *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291 (2014); *Ricci v. DeStefano*, 557 U.S. 557 (2009); and *Grutter v. Bollinger*, 539 U.S. 306 (2003).

# SUMMARY OF ARGUMENT

This case asks whether public universities may discriminate against certain applicants on the basis of their races. Under false assurances by university administrators that race would be used carefully and narrowly and only as a last resort, the Supreme Court said yes. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315-20 (1978) (opinion of Powell, J.). History has shown, however, that these universities never had any

---

[1] Pursuant to Local Rule 7.5, counsel for *amicus curiae* states that (1) this brief was authored by counsel for *amici curiae* and not by counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money that was intended to fund preparing or submitting this brief; and (3) apart from *amicus curiae* and their counsel, no person contributed money that was intended to fund preparing or submitting this brief.

1

intention of using race carefully once they got what they treated as their blank check from the courts. The day of reckoning has come.

The University of North Carolina at Chapel Hill's ("UNC-Chapel Hill") affirmative action program ("the Program") discriminates against Asian and Caucasian applicants for its undergraduate class by preferring applicants it deems more desirable because of their races: African American, Hispanic and Native American students. This preferment violates Supreme Court precedent as well as the Fourteenth Amendment and federal civil rights statutes. In any event, even the relevant controlling cases, notably *Bakke*, 438 U.S. at 265 (opinion of Powell, J.), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), and their progeny, were predicated on a since-discredited assumption: that public university administrators would use race narrowly and circumspectly and only as a last resort. The opposite has been true.

## ARGUMENT

I. **Controlling Precedent Requires this Court to Invalidate the UNC Affirmative Action Program because It Harms Under-Represented Minority ("URM")[2] Students and Treats Them Unequally.**

The Program is inconsistent with prevailing precedent, and must be struck down. Traditional equal-protection principles render racial preferences (writ large)

---

[2] The term "under-*represented* minority" candidate is itself troubling, and symptomatic of the worldview of some universities, because it burdens URM students with the curious obligation of having to represent their race(s) on campus. And it deprives members of those races of *their* agency by determining for them who their campus "representative" is going to be. Therefore, these institutions augment their role at the cost of minimizing those of the URM students and communities.

2

constitutionally suspect because they are "odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted). Racial preferences are "subject to the most rigid scrutiny." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 309-10 (2013) (citation and internal quotation marks omitted) (*Fisher I*). Not only do racial classifications generally "stigmatize individuals by reason of their membership in a racial group," *Shaw*, 509 U.S. at 643 (citations and quotations omitted), they also "incite racial hostility," *id.* (citations and quotations omitted), and fragment our Nation and our society into antagonistic "racial blocs," *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 746 (2007) (plurality opinion of Roberts, C.J.) (citation and internal quotation marks omitted).

As the law now stands, public universities may prefer certain races over others in the admissions process so long as that preferment provides the benefits of educational diversity to all students—benefits that race-neutral alternatives could not deliver—and that race is only a limited "plus factor." *Compare Grutter*, 539 U.S. at 328 (use of race upheld in holistic admissions program because it is one of many "plus factors"), *with Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) (use of race invalidated in admissions program that awarded automatic points to candidates because of their races); *see also Bakke*, 438 U.S. at 299 (opinion of Powell, J.). Racial blocs apparently are monoliths, carrying, for instance, the curious presupposition that everyone who self-identifies as Asian—from Afghanistan to Indonesia—brings a similar, and perhaps close to identical,

perspective to an American college campus; the same presumption of boxed-in race-viewpoint match-up, of course, is applied to a tenth-generation African American living in New York, to an affluent, liberal first-generation Shona immigrant from Zimbabwe, and to a poor, conservative second-generation Yorùbá student from Nigeria. Your race is believed to inexorably determine the precise viewpoint you bring to the table; every other aspect of your identity is, at most, negligible.

The only thing going for the Supreme Court's mandate was that this diversity formulation was supposed to be applied circumspectly and narrowly. Countless public universities, though, have converted this narrow license into a sweeping mandate for creating favored races in admissions, thereby surreptitiously overturning *Bakke* and *Grutter* in practice. They have not bothered to consider whether race-neutral alternatives are at all available. And they have made a mockery of race's circumscribed "plus factor" role by infusing today's applicants' entire candidacy, from top to bottom, with race. Such defiance of the Supreme Court's directives should not be allowed to stand.

To elaborate, the delicate justification of advancing diversity in order to deliver successful student-body unification fails to support the manner in which some universities use race. *See Bakke*, 438 U.S. at 305-15 (opinion of Powell, J.). Instead, settling what they view as racial debts in the vast expanse of history is their real and invidious motivation. These public universities do little to achieve actual unification. Diversity is the pretext they invoke in order to insulate their admissions processes from

4

equal-protection scrutiny the best they can. The Program typifies all these cardinal sins at their worst.

For one thing, UNC-Chapel Hill, like countless other public universities, is using race as a pervasive and overriding factor, not a limited "plus factor," in its admissions process. Asian and Caucasian applicants have eclectic achievements and activities, just as African American, Hispanic, and Native American applicants do. Only race is keeping Asian and Caucasian applicants from being admitted on the same terms. In practice, too, UNC-Chapel Hill's application of its racial preferences regime is baffling. How UNC-Chapel Hill can maintain with a straight face that a Vietnamese refugee applicant (racial code for Asian, which is the kind of shorthand the university's admissions process will disproportionately factor into its decision) who grew up in a refugee camp upon arriving destitute in the United States or a similarly-situated Syrian applicant (again, Asian) or a Bosnian one (viewed as Caucasian) brings a categorically less valuable experiential viewpoint diversifying the college campus and thus exalting the academic experiences of her peers than an affluent URM applicant from Upper East Side of Manhattan's or Beverly Hills' privileged surroundings and private, elite schools does is beyond comprehension. But that is exactly how UNC-Chapel Hill and its peer schools have designed and continue to apply their racial discrimination systems.

For another thing, UNC-Chapel Hill adamantly is pursuing a racially discriminatory program while knowing fully well that a race-neutral one would work. Other elite public universities, such as the University of California system reined in by

5

Proposition 209, have shown that socioeconomic factors work just as well, and likely better, in promoting a racially diverse student body. Furthermore, the enhanced use of financial aid, scholarships, and recruitment to attract and enroll minority applicants, increased consideration of personal and/or family disadvantage (including a record of overcoming it), and the elimination of certain admissions policies and practices, such as legacy preferences and early admission, help create a racially diverse student population. *See*, *e.g.*, Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, *in* THE FUTURE OF AFFIRMATIVE ACTION 74-90 (Richard D. Kahlenberg ed., 2014); Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, THE FUTURE OF AFFIRMATIVE ACTION 203-212 (2014) (stating that parental education and wealth are the most important indicators for student-body diversity). Indeed, UNC-Chapel Hill's own study, addressing the impact of affirmative action under the specific circumstances of that university, has so demonstrated. *See* Charles E. Daye et al., *Does Race Matter in Educational Diversity? A Legal and Empirical Analysis*, 13 RUTGERS RACE & L. REV. 1-S (2012) (failing to prove that the use of race in admissions was essential for attaining a diverse student body); *see also* Brief of Amicus Curiae the University of North Carolina at Chapel Hill Supporting Respondents 6-7, 19-23, *Fisher I* (same). In fact, these criteria might lead the universities to enroll proportionally *more*, not fewer, URM applicants than the current regime does.

6

But UNC-Chapel Hill has failed to make any and/or adequate use of these tools. Among its many lamentable omissions, it is only UNC-Chapel Hill's self-serving attachment to maintaining legacy admission—and retaining its historic fruits, ripening since 1795,[3] for its own advantage—that keeps the university from abolishing the vestiges of a privileged admissions policy. Not only do these failings hurt many poor and/or middle class Caucasian and Asian applicants, they also harm URM applicants. This is because many more worthy URM applicants might have been admitted (and might be admitted still) had the university bolstered diversity through legacy-neutral and other race-neutral means. We *all* suffer when the university privileges a "class that looks right, even if it does not perform right." *Grutter*, 539 U.S. at 372 (Thomas, J., concurring in part and dissenting in part).

The effort to find a race-neutral alternative is an important constitutional rule for many reasons, not least because when a discriminatory regime "touch[es] upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest. The Constitution guarantees that right to every person regardless of his background." *Bakke*, 438 U.S. at 299 (opinion of Powell, J.). Presently, just as a URM student might doubt her own place at the university or suffer the stigma of having her achievements doubted by potential employers and society at large, the rejected Asian or Caucasian student too suffers for no fault of her own. *See*, *e.g*., Brief of amici curiae

---

[3] UNC-Chapel Hill began to admit students in 1795. *See* Brief of Amicus Curiae the University of North Carolina at Chapel Hill Supporting Respondents 12, *Fisher I*.

Richard Sander and Stuart Taylor, Jr., in Support of Neither Party 2-14, *Fisher I*; Thomas Sowell, RACE AND CULTURE 176-77 (1994); THOMAS SOWELL, THE ECONOMICS AND POLITICS OF RACE 200 (1983).[4] Racial discrimination has no winners.

Under *Bakke* and *Grutter*, this affirmative action program is unlawful. But those precedents themselves are also failed experiments because the whole idea of letting university administrators use race narrowly by giving students individualized consideration in university admissions is a myth. As long as the tendentious officialdom gets to use race at all, the impetus to reach an aesthetic goal of racial heterogeneity consistently will trump individualized consideration. They will use race pervasively, predominantly and arbitrarily. *But see Bakke*, 438 U.S. at 320 (opinion of Powell, J.). While contrasting the University of California at Davis ("UC-Davis") program he was invalidating with Harvard's model program of which he was approving, Justice Powell never could have foreseen that his opinion would be construed as the blank check for every school to camouflage its program as the Harvard program but behave like the UC-Davis program—or worse. *See id*. This is because the universities' interstitial pull to do so was always going to be irresistible, particularly in light of the academic-freedom

---

[4] Unfortunately, even the most academically successful URM admittee might always be tormented by the concern, raised openly or believed covertly, that she did not earn her *seat* at the university the same way that her peers did. Because there are many more able candidates than there are seats available, that charge will be difficult for this admittee to refute. If she could have been admitted on merit alone, this devaluation of her achievements leaves her worse off going forward. "To separate [URM students] from others of similar age and qualifications" right at the start "solely because of . . . race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Board of Education*, 347 U.S. 483, 494 (1954) (*Brown I*).

shibboleth they were permitted to invoke. *See id*. at 311-15. This genie, once released, was going to be difficult to put back in the bottle; and no one should be particularly surprised that deference to "elites bearing racial theories," *Parents Involved in Community Schools*, 551 U.S. at 780 (Thomas, J., concurring), has yielded today's unfortunate reality of pervasive racial discrimination in admissions. And while deferring, up to a certain point, to political actors and their appointees might be appropriate in other circumstances, such deference is wholly inappropriate where *racial* discrimination is concerned, and is tantamount to approving a "dose[]" of "deadly" "toxin[]." *Buck v. Davis*, 137 S. Ct. 759, 777 (2017). History shows that this approach to race is loaded with danger because the officialdom can just as easily invoke whatever it chooses to proffer as a "compelling interest" (and at a convenient level of granularity) to wreak havoc and undo the Fourteenth Amendment. In other words, the use of race in university admissions is impermissible.

Ending all consideration of race in university admissions is the only way to restore the constitutional promise attending the equal protection of the laws. Otherwise, we always will remain a divided society and a divided Union. After all, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools*, 551 U.S. at 748 (plurality opinion of Roberts, C.J.).

## II. The Fourteenth Amendment's Original Public Meaning Repudiates All Racial Discrimination by State and Local Officialdom.

9

Our Nation was founded on the fundamental creed that "all men are created equal." DECLARATION OF INDEPENDENCE ¶ 2. President Abraham Lincoln regarded this principle as a "great truth, applicable to all men at all times." Letter from Abraham Lincoln to H. L. Pierce (Apr. 6, 1859), reprinted in 3 THE COLLECTED WORKS OF ABRAHAM LINCOLN 374, 376 (R. Basler ed. 1953). "All men" meant all human beings— women as well as men, African Americans as well as Caucasians, Asians and everyone else. *See*, *e.g.*, James Otis, *Rights of the British Colonies Asserted and Proved* ("The colonists are by the law of nature freeborn, as indeed all men are, white or black"), *reprinted in* PAMPHLETS OF THE AMERICAN REVOLUTION 439 (B. Bailyn, ed. 1965); *id.* ("Are not women born as free as men? Would it not be infamous to assert that the ladies are all slaves by nature?").

These ideas were codified in the first State constitutions established after the American colonies declared their independence. To illustrate, the Virginia Declaration of Rights provided that "all men are by nature equally free and independent." Va. Dec. of Rights § 1 (1776), reprinted in 1 THE FOUNDERS' CONSTITUTION 6 (P. Kurland & R. Lerner, eds., 1987). The Massachusetts Declaration of Rights stated simply, "All men are born free and equal[.]" Mass. Dec. of Rights (1780), reprinted in 1 THE FOUNDERS' CONSTITUTION at 11.

The Founders knew, though, they were falling short in many respects. But even those Founders who owned slaves recognized that slavery was inconsistent with the principle of equality the Declaration of Independence articulated. "The mass of mankind

has not been born with saddles upon their backs," wrote Thomas Jefferson, "nor a favored few, booted and spurred, ready to ride them legitimately, by the grace of God." Letter to Roger C. Weightman (June 24, 1826), reprinted in JEFFERSON: WRITINGS 1516, 1517 (M. Peterson, ed., 1984). This principle held firm, according to Jefferson, irrespective of people's capabilities or competence. "[W]hatever be their degree of talent it is no measure of their rights," wrote Jefferson shortly before the end of his second term as President. Letter from Jefferson to Henri Gregoire (Feb. 25, 1809), in *id*., at 1202.

The Founders demonstrated a commitment to equality of opportunity, not equality of result. Indeed, James Madison presupposed that persons' "different and unequal faculties" would result in their "possessi[ng] . . . *different* degrees and kinds of property." The Federalist No. 10, p. 78 (Rossiter ed. 1961) (J. Madison) (emphasis added). Alexander Hamilton agreed, writing that "[t]here are strong minds in every walk of life that will rise superior to the disadvantages of situation, and will command the tribute due to their merit, not only from the classes to which they particularly belong, but from the society in general. The door ought to be equally open to all." The Federalist No. 36, p. 217 (A. Hamilton).

It did not initially work out that way in practice. Close to a century after the Founding, the Supreme Court's anticanonical decision in *Scott v. Sandford*, 60 U.S. 393 (1857), dealt a body blow to the principle of racial equality and accelerated the fratricidal Civil War. Nullifying the Missouri Compromise, *Scott* considered African Americans, enslaved or emancipated, "a subordinate and inferior class of beings who had been

11

subjugated by the dominant race," a group that "remained subject to [that dominant race's] authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them." *Id*. at 404-05. About a decade later, slavery's abolition and the subsequent enactment of the Fourteenth Amendment delivered, at least as a parchment guarantee, on the promise of legal equality for all.

The Fourteenth Amendment's guarantees of equal protection of the laws and its Privileges or Immunities Clause reversed *Scott's* holding that African Americans were not equal to other citizens. The Fourteenth Amendment also takes pains to "focus" its zone of protection "[]on the individual," albeit on the *basis* of race. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in judgment) (citing Amdt. 14, § 1 ("[N]or shall any State . . . deny to *any person*" the equal protection of the laws) (emphasis added)). But that is the very opposite of permitting discrimination on the basis of *which* race is being victimized. Indeed, the original meaning of the Fourteenth Amendment, confirmed by the historical record of State legislation at the time, indicates that the States were obligated to treat citizens equally irrespective of race. *See* Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV. 947, 953-1117 (1995). That the state sovereign must act impartially towards its citizens regardless of race was dispositive to the Fourteenth Amendment ratifying generation's view of the racial equality they were ensconcing into the Constitution.

Unfortunately, in *Plessy v. Ferguson*, 3 U.S. 537 (1896), the Supreme Court, in another one of its darkest hours, held that legal mandates separating Americans by race were acceptable under the Constitution.   Alone in dissent, the first Justice Harlan eloquently penned the judicial equivalent of the Declaration's creed:

> Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.

*Id.* at 559 (Harlan, J., dissenting).   Fifty-eight years after *Plessy*, in *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*) and its progeny, the Supreme Court repudiated *Plessy's* separate but equal doctrine.   Future Justice Thurgood Marshall, as the lawyer for the challengers in *Brown*, argued: "When the distinctions imposed are based upon race and color alone, the state's action is patently the epitome of that arbitrariness and capriciousness constitutionally impermissive under our system of government."   Brief for Appellants at 6, *Brown I* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Skinner v. Oklahoma*, 316 U.S. 535 (1942)).   The Supreme Court ultimately renewed America's dedication to what Dr. Martin Luther King Jr., would later describe as his dream, "that one day this nation will rise up and live out the true meaning of its creed: 'We hold these truths to be self-evident: that all men are created equal.'"   Martin Luther King, Jr., "I Have A Dream" (1963), reprinted in A TESTAMENT OF HOPE: THE ESSENTIAL WRITINGS AND SPEECHES OF MARTIN LUTHER KING, JR. 217, 219 (James Washington ed. 1986).

The evils of racial discrimination are not lessened because they are allegedly created to benefit previously excluded groups. After the Civil War, new racist laws, such as Black Codes and Jim Crow laws, were created in order to keep newly freed slaves from voting, earning a living, or owning property. But the paternalism of "benign" Caucasians limited the freedom of African Americans in many ways, too. The former slave Frederick Douglass addressed this problem when he maintained, "in regard to the colored people, there is always more that is benevolent, I perceive, than just, manifested toward us. What I ask for the Negro is not benevolence, not pity, not sympathy, but simply justice." Frederick Douglass, What The Black Man Wants (Jan. 26, 1865), reprinted in 4 FREDERICK DOUGLASS PAPERS 59, 68-69 (Blassingame & McKivigan, eds. 1991). Douglass continued:

> Everybody has asked the question . . . 'What shall we do with the Negro?' I have had but one answer from the beginning. Do nothing with us! . . . All I ask is, give him a chance to stand on his own legs! . . . If you will only untie his hands, and give him a chance, I think he will live.

*Id*. Douglass understood that paternalistic programs such as the one at issue here "constitute badges of slavery and servitude." *Civil Rights Cases*, 109 U.S. 3, 36 (1882) (Harlan, J., dissenting). They have inflicted "positive injury" on the URM socioeconomic underclasses. 4 FREDERICK DOUGLASS PAPERS at 68-69. They are akin to legislation that once blocked women from entering a variety of professions, legislation "apparently designed to benefit or protect women" but that "could often, perversely, have the opposite effect." Ruth Bader Ginsburg, *Constitutional Adjudication in the United*

14

*States As A Means of Advancing The Equal Statute of Men And Women Under The Law*, 26 HOFSTRA L. REV. 263, 269 (1997) (Ginsburg); *cf. Muller v. Oregon*, 208 U.S. 412 (1908). Such legislation was "ostensibly to shield or favor the sex regarded as fairer but weaker, and dependent-prone," Ginsburg, at 269, but was in fact "premised on the notion that women could not cope with the world beyond hearth and home without a father, husband, or big brother to guide them." *Id*. at 270. This insult to URM students is the soft bigotry of low expectations at work. It shatters these students' self-confidences and inflicts stigma so that the officialdom cosmetically can take the easy, and ineffectual, way out.

Racial preferences, whether in hiring or contracting, the provision of government benefits, or, as here, university admissions, are ostensibly designed to shield URM students, but in fact are premised on the notion that they are incapable of competing without a paternalistic big brother to give them a significant leg up. If gender paternalism is not just improper but also constitutionally impermissible, then there is no reason to reach an opposite conclusion concerning racial paternalism. But even if the racial discrimination UNC perpetrates and perpetuates were borne of only benign intentions, including the desire to neutralize the adverse effects of private discrimination, that would not save it. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be

15

outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").[5]

As Justice Douglas wrote, "A [person] who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability, no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner." *DeFunis v. Odegaard*, 416 U.S. 312, 337 (1974) (Douglas, J., dissenting); *see also Bakke*, 438 U.S. at 298 (opinion of Powell, J.) ("there is a measure of inequity in forcing innocent persons in [Bakke's] position to bear the burdens of redressing grievances not of their making"); *id.* at 290 ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color").

Regrettably, experience has shown that racism is not overcome easily, whether it be in segregated schools or in legal classifications like the UNC program at issue here. In the wake of *Brown I*, the courts spent more than two decades fighting such classifications. *See Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218 (1964); *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430 (1968); *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ("*Brown II*"); *Cooper v. Aaron*, 358

---

[5] Outside the select context of affirmative action, courts do not tolerate official discrimination—as it pertains to race or any other basis—in order to neutralize the impact of private prejudices or to preclude turbulence and conflict in the community. *See Watson v. Memphis*, 373 U.S. 526, 535 (1963); *Wright v. Georgia*, 373 U.S. 284, 293 (1963). The only thing that explains this incongruity is that, to some judges, certain kinds of racial discrimination just happen to be permissible. Nothing other than these judges' personal predilections, private views and policy preferences can justify this incongruity. It has nothing to do with the Constitution.

16

U.S. 1 (1958); *Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526 (1979). Since then, America has made remarkable progress. Today, Americans generally believe that race is an illegitimate factor for government classification. Across the country, Americans have rejected the notion of racial classifications, including supposedly "benign" ones. *See* Clint Bolick, *Blacks and Whites on Common Ground*, 10 STAN. L. & POL'Y REV. 155, 158 (1999); Terry Eastland, ENDING AFFIRMATIVE ACTION: THE CASE FOR COLORBLIND JUSTICE 164-65 (2d ed. 1997). States have begun to incorporate Justice Harlan's *Plessy* dissent into their law. *See* Cal. Const. art. I, 31, cl. A (1996) (Proposition 209); *Hi-Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal. 4th 537 (2000) (noting that Proposition 209 "adopt[s] the original construction of the Civil Rights Act"); Wash. Rev. Code Ann. § 49.60.400(1) (Washington Initiative 200). Indeed, Michigan voters recently adopted such a measure in response to *Grutter*—a decision the Supreme Court upheld in *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291, 313-14 (2014) (plurality opinion); *id.* at 317-18 (Scalia, J., joined by Thomas, J., concurring in judgment); *id.* at 332 (Breyer, J. concurring in judgment). Yet today, defenders of racially discriminatory laws, as emphatically as their predecessors in bygone eras, are exhibiting the same determination to avoid the Fourteenth Amendment's commands. Reliance upon *Grutter* to rationalize racial classifications that violate the Constitution's fundamental commands is no more acceptable than the long and sordid reliance on *Plessy* to rationalize separate-but-equal segregation and its scheme of racial classifications.

17

The time for government to cease treating individuals on the basis of their skin color rather than their merit is long overdue. As the Supreme Court held in *Croson*, any discrimination on the basis of race must cease, except (perhaps) as a remedy for government's own prior or continuing discrimination on the basis of race. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989). "The time for mere 'deliberate speed' [to fully enforce this principle] has run out." *Griffin*, 377 U.S. at 234; *see also Green*, 391 U.S., at 438; *cf. Brown II*, 349 U.S. at 301 (ordering that assignment of pupils to schools based on race be ended "with all deliberate speed").

Racial discrimination is not easily eradicated. Professor Lino Graglia has noted the "intense resistance that can be expected from academics and the educational bureaucracy" in eliminating racial preferences. Lino Graglia, "*Affirmative Action*," *Past, Present, And Future*, 22 OHIO N.U. L. REV. 1207, 1219 (1996). Despite California laws prohibiting such preferences, for instance, "the Governor and the Board of Regents . . . encountered the recalcitrance, not to say insubordination, of the President of the University System who [sought] to delay implementation of [a racially-neutral admissions policy] as long as possible." *Id.* The federal government's response to *Adarand Constructors* paralleled California's experience. As one commentator noted, despite *Adarand's* holding, awards to racially-preferred contractors actually increased in the years following the decision. R. Brad Malone, *Note: Marginalizing Adarand: Political Inertia and the SBA 8(A) Program*, 5 TEX. WESLEYAN L. REV. 275, 298-99 (1999). No honest attempt was made to end the preference scheme—instead, those who

18

defended racially discriminatory laws sought "to marginalize *Adarand's* holdings by tinkering with the operation of set-aside programs, but by no means calling for their termination." *Id.*

Only by insisting, as the post-*Brown* Court did, that racial discrimination is no longer tolerable, can the courts finally end racial classifications in the law. Because an impartial sovereign usually must apply the same rules to persons irrespective of race, affirmative action violates equal-protection principles. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ("The federal sovereign, like the States, must govern impartially."); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions, and hence constitutionally suspect.").

The time has come for the recognition that the Declaration's principles, codified at long last in the Constitution via the Fourteenth Amendment, will not countenance racial discrimination that purports to remedy past wrongs against individuals of one race by conferring benefits upon others who happen to share the same skin color, at the expense of those who do not. As Dr. King also noted, "In the process of gaining our rightful place [as beneficiaries of the Declaration's promise of equality,] we must not be guilty of wrongful deeds." King, *I Have A Dream*, in Washington, *supra* at 218. In sum, "there has been entirely too much deliberation and not enough speed in enforcing the constitutional rights" of everyone to be treated without regard to the color of their skin.

*Green*, 391 U.S. at 229. This recalcitrance is unacceptable and legal categorization by race must end "now." *Id*. at 439.

It is time to return to these principles. Otherwise, we would in perpetuity commit ourselves and our posterity to a constitutional contortion, one that takes *Unum*—a vital symbol of our united nationhood—out of *E Pluribus Unum*, and divides Americans into debtor and creditor races that resent, mistrust and skeptically confront and assess one another. *Adarand Constructors*, 515 U.S. at 239 (Scalia, J., concurring in part and concurring in judgment). This is the antithesis of our promise of living together as *One Nation Under God With Liberty and Justice For All*.

## CONCLUSION

Racial preferences are shifting and moving quotas. In many ways, the "critical mass" moving quotas are even more radical and dangerous than the fixed quotas because the former arm officialdom with arbitrary discretion to racially experiment with the lives of other people's children; they are suffused with the assurance that the officialdom's racial decisions will, in all likelihood, be rubberstamped. All racial preferences "confine[] a participant to the playing room allotted to her race; like Linda Brown and her contemporaries more than sixty-[four] years ago, today's participant [is forced] to tailor her aspirations to the quota system's ingenious *separate but equal* regime." *Hardie v. Nat'l Collegiate Athletic Ass'n*, 861 F.3d 875 (9th Cir. 2017), *opinion amended and superseded on denial of reh'g en banc*, 876 F.3d 312, 326 (9th Cir. 2017) (Faber, J., concurring in part and concurring in judgment) (citing *Brown I*, 347 U.S. at 483).

20

Douglass' hope and our Constitution's promise remain held in abeyance, for the color of one's skin still matters over the content of one's character. The Fourteenth Amendment and Supreme Court precedent demand the exact opposite. The lawyers who successfully litigated *Brown*,[6] the better angels in our Framers' natures, and of course our Constitution and laws kept faith that the ultimate vindication of racial equality would come. That day has arrived.

Consequently, the Plaintiff's motion for summary judgment should be granted.

Date: March 12, 2019                                    Respectfully submitted,

John C. Eastman*                                        /s/ Natalio D. Budasoff
Anthony T. Caso*                                        Natalio D. Budasoff
Center for Constitutional Jurisprudence                     *Local Counsel of Record*
c/o Chapman University                                  N.C. Bar No. 53404
Dale E. Fowler School of Law                            110 West Third Street #1110A
One University Drive                                    New York, NY 10012
Orange, CA 92866                                        (336) 447-8015
(877) 855-3330                                          ndb327@nyu.edu
jeastman@chapman.edu
caso@chapman.edu

Riddhi Dasgupta*                                        * Appearing by special appearance
13330 Ridgewood Drive                                  pursuant to Local Rule 83.1(d)
Ellicott City, MD 21042
(703) 927-1148
rdasgupta@cantab.net

*Counsel for Proposed Amicus Curiae*

---

[6] *See, e.g.*, Brief for Appellants in Nos. 1, 2, and 4, and for Respondents in No. 10 on Reargument in *Brown v. Board of Education*, O.T. 1953, p. 65 ("That the Constitution is color blind is our dedicated belief"); Brief for Appellants in *Brown v. Board of Education*, O.T. 1952, No. 8, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone").

21

**CERTIFICATE OF WORD COUNT**

This is to certify that the foregoing brief contains fewer than 6,250 words, after excluding the caption, signature lines, and certificate of service. The foregoing brief complies with the length limitations set by Local Rule 7.3(d). The basis for this certification is the word count feature of the word processing software used to prepare this brief.

/s/ Natalio D. Budasoff
Natalio D. Budasoff

*Counsel for Proposed Amicus Curiae*

Case 1:14-cv-00954-LCB-JLW   Document 181-1   Filed 03/12/19   Page 28 of 28