IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC.,**<br><br>       **Plaintiff,**<br><br>v.<br><br>**THE UNIVERSITY OF NORTH CAROLINA, et al.,**<br><br>       **Defendants.** | **CASE NO. 1:14-CV-954** |

**REPLY IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.  The University Established Its Compelling Interest in the Educational Benefits of Diversity as a Matter of Law. ........................................................... 2

   A.  The University Pursues Educational Benefits Endorsed by the Supreme Court. ............................................................................................ 2

   B.  No Evidence Undermines the University's Academic Judgment to Pursue the Educational Benefits of Diversity. ............................................. 5

II. The University's Consideration of Race in Admissions Is Narrowly Tailored to Achieve Its Compelling Interests ............................................... 6

   A.  The University Considers Race Flexibly as Part of a Holistic Review. ........................................................................................................ 6

   B.  No Race-Neutral Alternative Exists That Could Promote the University's Compelling Interest in Diversity as Well. ............................. 10

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page**

*Fisher v. University of Texas at Austin*,

   136 S. Ct. 2198 (2016) ............................................................................................. passim

*Fisher v. University of Texas at Austin*,

   570 U.S. 297 (2013) ........................................................................................................ 3

*Fisher v. University of Texas at Austin*,

   758 F.3d 633 (5th Cir. 2014) ........................................................................................... 4

*Grutter v. Bollinger*,

   539 U.S. 306 (2003) ........................................................................................... 3, 8, 11, 12

*Peters v. Jenney*,

   327 F.3d 307 (4th Cir. 2003) ........................................................................................... 5

*Regents of the University of California v. Bakke*,

   438 U.S. 265 (1978) ....................................................................................................... 11

# INTRODUCTION

The University met its burden to prove both that it has a compelling interest in the educational benefits of diversity and its limited use of race, as one factor among many in its admissions process, is narrowly tailored to achieve that interest. All evidence supports that the University pursues well-established diversity goals unique to the educational setting; carefully adheres to Supreme Court guidance, considering race flexibly as part of a holistic and individualized admissions process; and has given serious, good-faith consideration to race-neutral alternatives and found none that could achieve its goals about as well.

SFFA offers no material evidence to dispute this proof. Instead, it attempts to distract the Court from the relevant questions and undermine settled law. SFFA wrongly asserts that the University must use the term "critical mass" and pursue it as its sole diversity goal; wrongly claims that the constitutionality of the University's admissions process can be assessed based only on a subset of non-representative applicants, rather than across the entire applicant pool; and wrongly contends that a "workable" race-neutral alternative exists in the form of an admissions plan that values socioeconomic status above all other applicant characteristics. SFFA rests its entire case on improperly focused expert testimony, which ignores or misconstrues the factual record, and then wrongly asserts—despite overwhelming evidence and argument to the contrary—that the University agrees with this testimony.

Erroneous assertions and inapposite expert testimony cannot defeat a motion for summary judgment. Because SFFA's arguments and evidence are immaterial to the critical questions at issue, this Court can and should grant summary judgment in favor of the University.

## ARGUMENT

### I. The University Established Its Compelling Interest in the Educational Benefits of Diversity as a Matter of Law.

The University established a compelling interest in pursuing the educational benefits of diversity. (Dkt. 153 ("UNC Br.") at 27-28; Dkt. 175 ("UNC Opp.") at 2-4.) SFFA concedes this interest is valid under "controlling precedent," but second guesses the University's articulation of the educational benefits it seeks and its "academic judgment" to pursue those benefits. (Dkt. 177 ("SFFA Opp.") at 3-4; *see also* Dkt. 159 ("SFFA Br.") at 28-29.) SFFA's challenges are meritless. The University's diversity goals are grounded in established precedent and its judgment to pursue such goals is entitled to deference. *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016) ("*Fisher II*").

#### A. The University Pursues Educational Benefits Endorsed by the Supreme Court.

Overwhelming evidence shows that the University deliberately pursues well-recognized educational benefits of diversity, including enhanced learning, understanding, innovation, problem-solving, and empathy—to name but a few. (UNC Br. at 5-7; UNC

2

Opp. at 4-5.) SFFA disregards the legitimacy of the University's objectives, urging instead that the achievement of "critical mass" is the *only* "diversity goal" sanctioned by the Supreme Court. (SFFA Opp. at 4-5 (claiming "the 'critical mass' interest" is the "only" permissible goal).) SFFA goes so far as to contend that because the University did not use the words "critical mass" in its opening brief, it loses. (*Id.* at 4 ("[T]he phrase 'critical mass' does not even appear in UNC's brief. That should be decisive.").) This argument is spurious. As an initial matter, it disregards that the University's policy documents have recognized the goal of enrolling critical masses of underrepresented minorities ("URMs") (*see, e.g.*, UNC Ex. 39 at UNC0323609), a fact on which SFFA itself relied in its cross-motion for summary judgment (SFFA Br. at 4). More importantly, SFFA's argument depends on a legal fallacy.

No case holds that "critical mass" is the singular justification for a race-conscious admissions program. To the contrary, in *Fisher II*, the Supreme Court made clear that the compelling interest that justifies the consideration of race in admissions is "not an interest in enrolling a certain number of minority students. Rather, a university may institute a race-conscious admissions program *as a means of obtaining the educational benefits that flow from student body diversity*." *Fisher II*, 136 S. Ct. at 2210 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013)) (emphasis added) (internal quotations omitted); *see also, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (recognizing that the "concept of critical mass is defined by reference to the educational benefits that diversity is

3

designed to produce"). "Critical mass" is simply a way to describe "sufficient diversity to attain the educational benefits." *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 644 (5th Cir. 2014).

In its opening brief, the University provided "'a reasoned, principled explanation' for its decision" to pursue the educational benefits of diversity. *Fisher II*, 136 S. Ct. at 2208. Accordingly, "deference must be given" to the University's determination that diversity serves its educational goals. *Id.* SFFA confuses matters, claiming that the University's "*use* of race is not narrowly tailored" because it "does not use race to achieve 'critical mass.'" (SFFA Opp. at 4 (emphasis added).) This conflates the hoped-for ends (*i.e.*, sufficient diversity to attain educational goals) with the means the University may use to pursue those ends (*i.e.*, consideration of race). It is the latter that must be narrowly tailored. *See Fisher II*, 136 S. Ct. at 2208.

At bottom, SFFA does not dispute that the University has set permissible educational goals and continually assesses its progress toward achieving those goals, just as the Supreme Court requires. (UNC Br. at 5-10, 27-28; UNC Opp. at 2-5.) The determination of whether the University's consideration of race in admissions is narrowly tailored must be made in reference to those permissible, compelling goals, *see Fisher II*, 136 S. Ct. at 2208, and not—as SFFA insists—based upon terminology the University used to describe those goals.

4

### B. No Evidence Undermines the University's Academic Judgment to Pursue the Educational Benefits of Diversity.

All evidence demonstrates the University's long-standing and genuine commitment to achieving the educational benefits of diversity. (UNC Br. at 5-10.) SFFA overlooks this evidence, asserting that the University considers race in admissions "heedless of the demonstrated harm it causes" to URM applicants. (SFFA Opp. at 4.) Tellingly, SFFA fails to point to any concrete support for this assertion and instead recycles by reference its argument that this purported harm is lower graduation rates among some racial or ethnic groups. (*Id.* (citing SFFA Br. at 28-31).) But SFFA's cited evidence overwhelmingly reinforces that the University devotes substantial care and resources to closing this gap and fostering an environment where all admitted students can thrive. (SFFA Br. at 29 (citing SFFA Exs. 39 at UNC0236952-53 (diversity plan discussing efforts to support and retain URMs), 40 (retention study analyzing methods to encourage student success), and 42 (report examining methods to support URM males)).)

SFFA's reliance on these documents highlights its inability to challenge the University's compelling interest in pursuing the educational benefits of diversity. The Court should disregard the "mere scintilla" of misconstrued evidence SFFA offers and find that the University has established a compelling interest in the educational benefits of diversity as a matter of law. *See Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

5

## II. The University's Consideration of Race in Admissions Is Narrowly Tailored to Achieve Its Compelling Interests.

### A. The University Considers Race Flexibly as Part of a Holistic Review.

The evidence conclusively shows that the University's admissions process is holistic and individualized, considering race flexibly as one factor among many; does not use quotas, racial set-asides, or automatic point allocations; and does not intentionally discriminate against applicants. (UNC Br. at 11-12, 30; *see also* SFFA Opp. at 5-6 (admitting the University's process is facially holistic).) This evidence proves false the core claim of SFFA's complaint, which alleges that the University uses race in an outsized way that negates the individualized nature of its holistic process. (Compl. ¶199.)

Undeterred, SFFA turns to the expert testimony of Peter Arcidiacono to argue that the University's admissions process is "implicitly" formulaic and unconstitutional. (SFFA Opp. at 5.) But Arcidiacono's analysis is immaterial to the central dispute—whether race dominates the admissions process—because his conclusions are drawn from a small, non-representative subset of applicants. (UNC Ex. 24 ¶¶29-41.) Arcidiacono built a regression model, which he claims embodies the University's admissions process, in order to generate an *estimated* admissions probability for applicants. (UNC Ex. 23 ¶¶44-46.) In so doing, Arcidiacono placed heavy weight on observable applicant characteristics such as test scores, grades, and race. (*Id.* ¶47.) He then artificially focused his "transformation" analysis on hypothetical applicants who have either a 10% or 25% estimated chance of admission. (*Id.* ¶¶58-61.)

6

Notably, this analysis ignores the highly competitive nature of the University's admissions process. According to Arcidiacono's own models, roughly 80% of the University's admitted in-state students come from the top 40% of the applicant pool with the highest estimated chance of admission. (*Id.* ¶53.) Similarly, again based on Arcidiacono's own models, roughly 57% of admitted out-of-state students come from the top 10% of the applicant pool with highest estimated chance of admission. (*Id.* ¶64.) Nevertheless, Arcidiacono chose to base his in-state analysis on applicants who comprise only 19% of admitted applicants. (*Id.* ¶53.) Indeed, 75% of Arcidiacono's hypothetical transformation examples are drawn from a subset that, according to his model, comprises *only 6%* of admitted applicants. (*Id.* ¶60.)[1]

SFFA attempts to justify Arcidiacono's decision *post hoc*, claiming that because, on average, only approximately 25% of applicants are admitted, it is appropriate to focus on applicants who have only a "25% chance of admission." (SFFA Opp. at 12.) This reasoning defies logic. An analysis based on an applicant who has a low estimated chance

---

[1] SFFA suggests that the University takes issue only with Arcidiacono's exclusion of so-called perfect predictions. (SFFA Opp. at 9-10.) Although disregard for this data certainly contributes to the flawed and unreliable nature of Arcidiacono's model (UNC Br. at 32), it is not the sole basis for Hoxby's conclusion that Arcidiacono's analysis is driven by a small, non-representative subset of applicants. (*See, e.g.*, UNC Ex. 23 ¶¶43, 68 (criticizing as misleading Arcidiacono's focus on applicants in deciles 4 through 6 of his academic index); UNC Ex. 24 ¶¶29-30 (criticizing as misleading Arcidiacono's "marginal effects of race" as "driven by small numbers of students").)

7

of admission is not representative of an admitted class comprised primarily of applicants who have higher chances of admission.

SFFA's argument also underscores the key legal question for the Court: should the constitutionality of the University's admissions process be assessed across the entire applicant pool as the University contends, or by reference to only a small subset of applicants who have reduced chances of admission as SFFA urges? (*Compare* UNC Br. at 31 ("the germane question" is "whether *the entire admissions program*" properly considers race) *with* SFFA Opp. at 7 ("The legal inquiry is *not* about determining the 'overall' role of race in admissions decisions.").)

The answer, of course, is the entire applicant pool, which is precisely what Hoxby analyzed. This is because the Supreme Court already has recognized that an admissions program may be narrowly tailored even though race could play a larger role for URM applicants whose chances of admission may otherwise seem more remote. *See Grutter*, 539 U.S. at 339 (accepting that race may be "'likely outcome determinative for the many members of minority groups' who do not fall within the upper range of [test] scores and grades"). Indeed, when the Supreme Court revisited this issue in 2016, it reaffirmed that it is a "hallmark of narrow tailoring" for race to play a role in a small portion of admissions decisions across the admitted class. *See Fisher II*, 136 S. Ct. at 2212.

Against the weight of authority, SFFA urges that "an admissions process that makes race … a dominant factor for *any* applicant is constitutionally suspect." (SFFA

8

Opp. at 12.) This argument overreaches. Race-conscious admissions would be meaningless if race could never tip the scales. *See, e.g.*, *Grutter*, 539 U.S. at 326 ("Strict scrutiny is not 'strict in theory, but fatal in fact.'" (citation omitted)).

Compounding the problems with its analysis, SFFA relies on *hypothetical* admissions outcomes for individual, *hypothetical* applicants to purportedly show that race is a dominant factor for at least some University applicants.[2] (SFFA Opp. at 11, 12 n.2 (citing Arcidiacono's hypothetical transformation examples).) Of course, a person's race cannot simply be turned "on" or "off" in isolation and without collateral impact as Arcidiacono does in his analysis. Even setting this aside, SFFA has not identified a single *actual* applicant who did not receive individualized, holistic consideration or whose admission was affected by race or ethnicity. Thus, even by SFFA's own standards, the University's admissions process is sound.

In the end, a trial is not needed here. Supreme Court guidance provides the answer to the legal question of how to assess the constitutionality of the University's admissions program and the material facts are not in dispute. Only the University, through Hoxby,

---

[2] SFFA wrongly contends that "UNC does not quarrel with Professor Arcidiacono's calculations nor his conclusion" concerning his hypothetical transformation examples. Hoxby consistently rejected Arcidiacono's conclusions and his calculations. (*See, e.g.*, UNC Ex. 23 ¶¶44-45; UNC Ex. 24 ¶31.) Moreover, SFFA's contention ignores the University's position that Arcidiacono's analysis is *immaterial* and can be set aside without consideration of its reliability. (UNC Br. at 31-33.)

properly analyzed the entire applicant pool. Hoxby found that race is not a dominant factor within the University's admissions process and instead explains, at most, a very small portion of admissions outcomes. (UNC Br. at 31.) Tellingly, SFFA's opposition does not mention this point and Arcidiacono never disputed it. The Court's inquiry could, and should, end here by finding that the University's use of race in admissions is properly narrowly tailored.

### B. No Race-Neutral Alternative Exists That Could Promote the University's Compelling Interest in Diversity as Well.

The University has given serious, good-faith consideration to race-neutral alternatives through the efforts of its Admissions Office, previous working groups, and current Committee on Race-Neutral Strategies. (UNC Br. at 18-20.) Moreover, the University and Hoxby both concluded that no race-neutral alternative would allow the University to achieve its diversity goals about as well, without sacrificing academic quality. (UNC Br. at 35; UNC Opp. at 22-38.) SFFA virtually ignores the University's self-evaluative efforts (SFFA Opp. at 16), instead effectively arguing that these efforts do not matter because a workable race-neutral alternative exists—specifically, Kahlenberg Simulation 11.

Simulation 11 is a variation of the socioeconomic status ("SES")-based race-neutral alternative set forth in Kahlenberg's opening report and modified in his rebuttal

report.[3] (UNC Ex. 27 at Table C.1a, Simulation 4; UNC Ex. 28 at 51; UNC Ex. 29 at 53.) To create this hypothetical admissions plan, Kahlenberg used an overbroad measure of socioeconomic status that has never been employed by any university. (UNC Ex. 125 ¶¶8-17.) Kahlenberg then "provided a boost in admissions" to students who came from socioeconomically disadvantaged families, disadvantaged neighborhoods, and/or disadvantaged high schools. (UNC Ex. 28 at 51.) Applicants are "eligible for up to three socioeconomic bumps." (UNC Ex. 29 at 53 n.202.)

As a matter of law, this "alternative" to the University's holistic admissions process is unworkable for at least two reasons. First, the "boosts" employed would unduly interfere with holistic review, depriving the University of its academic freedom to set and pursue its educational mission. As Hoxby explained, Kahlenberg's socioeconomic "bumps" are so large that they would effectively "remove[] [the University's] holistic review and replace[] it with a formulaic approach based almost entirely on socioeconomic status." (UNC Ex. 24 ¶74; UNC Ex. 23 ¶148.) Kahlenberg attempted to

---

[3] SFFA claims that Hoxby did "not criticize *this* proposal." (SFFA Opp. at 18.) This is disingenuous. Kahlenberg presented Simulation 11 for the first time in his final report, to which Hoxby did not have the opportunity to respond. Although Hoxby has not yet (because she could not) criticized "this" precise proposal, SFFA ignores that Hoxby challenged the approach and assumptions underlying Kahlenberg's original and revised SES-based plans (Simulations 4 and 6), which form the basis for Simulation 11. (UNC Opp. at 37-38.) Hoxby also demonstrated why Kahlenberg's SES-based simulations are otherwise unreliable, including poor modeling choices and the consideration of only past University applicants. (UNC Ex. 23 ¶¶121-135.)

mitigate Hoxby's critiques by applying a smaller range of "boosts" in his final report, among other adjustments. These meaningless adjustments cannot change that Kahlenberg's proposal fundamentally values socioeconomic diversity above all else—including racial diversity. (UNC Ex. 29 at 56 ("socioeconomically disadvantaged students *should* receive larger preferences than African-American students") (emphasis added).) The Supreme Court has rejected proposals, like this one, that would "preclude the [U]niversity from conducting individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the [U]niversity." *Grutter*, 539 U.S. at 340; *see also, e.g.*, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (recognizing as paramount university's freedom to select its student body).

Second, Hoxby's analysis indicates that Kahlenberg's SES-based plans would result in an unacceptable drop in academic preparedness, a sacrifice the Constitution does not require the University to make. SFFA claims that Simulation 11 shows that the University could achieve racial diversity without a substantial drop in test scores. (SFFA Opp. at 16-17.) This conclusion reflects the flaws of the approach that produced it: when Hoxby attempted to apply Kahlenberg's "preferred" SES-based plan and Arcidiacono's model of the admissions process to the pool of anticipated applicants, she determined the University would experience a drop of nearly 200 points in average test scores. (UNC Ex. 23 ¶¶129-130, Ex. 6.) SFFA cannot simply ignore this analysis. Hoxby consistently

12

concludes that no feasible race-neutral alternative exists that would allow the University to attain even its current levels of racial diversity and academic preparedness.[4]

As the Supreme Court has made clear, "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Grutter*, 539 U.S. at 339. Nevertheless here, as Kahlenberg admitted, Hoxby examined the "waterfront" of potential alternatives. (UNC Ex. 129 at 187:15-188:5.) She concluded that none serve the University's educational goal of attaining racial diversity about as well. Kahlenberg's attempt to substitute socioeconomic diversity for racial diversity is not only unsuccessful, it is also legally unsupported. (*See* UNC Br. at 37-39.) The Court should find as a matter of law that no workable race-neutral alternative exists.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants' motion for summary judgment and deny SFFA's cross-motion for summary judgment.

---

[4] This conclusion extends equally to Hoxby's SES preference and Top 5% simulations, which SFFA describes as "workable" (SFFA Opp. at 18). (*See* UNC Ex. 24 ¶76 (a SES preference plan would result in a class that was less academically prepared and less racially diverse); *id.* ¶81 (a "Top X% Plan would result in a matriculating class with substantially lower average test scores").)

13

Case 1:14-cv-00954-LCB-JLW   Document 183   Filed 04/04/19   Page 16 of 19

Respectfully submitted this 4th day of April, 2019.

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | JOSHUA H. STEIN ATTORNEY GENERAL |
| /s/ Patrick Fitzgerald<br>Patrick Fitzgerald<br>Amy Van Gelder<br>Lara Flath<br>Marianne Combs<br>Skadden, Arps, Slate, Meagher & Flom, LLP<br>155 North Wacker Drive<br>Chicago, IL 60606-1720<br>(312) 407-0700<br>E: patrick.fitzgerald@skadden.com<br>E: amy.vangelder@skadden.com<br>E: lara.flath@skadden.com<br>E: marianne.combs@skadden.com | /s/ Stephanie Brennan<br>Stephanie Brennan<br>Special Deputy Attorney General<br>NC State Bar No. 35955<br>E: sbrennan@ncdoj.gov<br><br>/s/ Nora Sullivan<br>Nora Sullivan<br>Assistant Attorney General<br>NC State Bar No. 43284<br>E: nsullivan@ncdoj.gov |

*Attorneys for the UNC-Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed the limit of 3,125 words.

This 4th day of April, 2019.

/s/ Patrick Fitzgerald<br>
Patrick Fitzgerald

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Reply in Further Support of Defendants' Motion for Summary Judgment via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 4th day of April, 2019.

/s/ Patrick Fitzgerald
Patrick Fitzgerald