IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, INC.,
    Plaintiff,
  v.
UNIVERSITY OF NORTH CAROLINA, et al.,
    Defendants.

Civil Action No. 1:14-cv-954-LCB-JLW

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Alan M. Ruley
NC State Bar No. 16407
Andrew A. Freeman
NC State Bar No. 41248
BELL, DAVIS & PITT, P.A.
P. O. Box 21029
Winston-Salem, NC 27120
336.714.4147
aruley@belldavispitt.com

Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
Bryan K. Weir
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
bryan@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

April 4, 2019

# TABLE OF CONTENTS

I. SFFA is entitled to summary judgment on race-neutral alternatives ............................................. 1

II. SFFA is entitled to summary judgment on the issue of narrow tailoring ................................... 5

CONCLUSION ........................................................................................................................................ 9

# TABLE OF AUTHORITIES

**Cases**

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989) ........................................................................6

*Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993) ........................................................7

*Fisher v. Univ. of Texas at Austin,* 570 U.S. 297, 312 (2013) ..................................................................... 1, 3

*Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2211 (2016) ....................................................................6

*Grutter v. Bollinger,* 539 U.S. 306 at 318 (2003) ...................................................................................... 2, 5

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) .......................................2

*United States v. Bd. of Educ. of Twp. of Piscataway*, 832 F. Supp. 836, 850 (D.N.J. 1993) ..............................7

This case should be resolved on summary judgment. As to race-neutral alternatives, there is no material fact dispute and UNC has workable, race-neutral alternatives as a matter of law. Second, no rational factfinder could conclude that UNC's use of race is narrowly tailored. UNC's contrary arguments miss the mark.

## I. SFFA is entitled to summary judgment on race-neutral alternatives.

There is no triable issue. The relevant legal principles are undisputed. The parties agree that UNC must prove that "available, workable race-neutral alternatives do not suffice," *i.e.*, that "a nonracial approach" would not promote its diversity interest "about as well and at tolerable administrative expense." *Fisher v. Univ. of Texas at Austin* (*Fisher I*), 570 U.S. 297, 312 (2013); SFFA Br. 34; UNC Opp. 34-35.

The relevant facts also are undisputed. For summary-judgment purposes, SFFA has zeroed in on Simulation 11. SFFA Br. 35-37; SFFA Opp. 16-17. There is no dispute over the racial diversity this socioeconomic-based approach would produce or the academic qualifications of its admitted class. The dispute is over whether it is workable, which UNC argues is for the Court to decide as a matter of law. UNC Opp. 37. Thus, the issue is which party is entitled to summary judgment under controlling legal principles.

SFFA is entitled to summary judgment. Simulation 11 would *increase* the number of African-American applicants in the admitted class, *increase* the number of Hispanic applicants in the admitted class, *increase* the number of socioeconomically disadvantaged applicants in the admitted class, and *increase* the average GPA of the admitted class. SFFA Br. 34-37; SFFA Opp. 16. This alternative, in other words, would not just "result in the levels of racial diversity [and] academic preparedness currently achieved by the University," UNC Opp. 35; Intervenors 14-16—it would exceed them. SFFA Opp. 16-17. Simulation 11 thus is "workable" under *any* legitimate conception of that standard.

1

UNC's counterarguments cannot meet its strict-scrutiny burden. UNC incorrectly argues that Simulation 11 should be ignored because SFFA's expert, Richard Kahlenberg, "advocates for the pursuit of increased socioeconomic diversity without regard for the effect on racial diversity" and thus "seeks to answer the wrong question." UNC Opp. 37; Intervenors 9-10. What makes Simulation 11 a race-neutral alternative is that it shows that more focus on socioeconomic status will allow UNC to achieve racial diversity. SFFA Opp. 19. Adopting UNC's Orwellian position, *viz.*, that socioeconomic preferences may not be considered a race-neutral alternative precisely because they do not consider an applicant's race, would altogether negate the concept of race-neutral alternatives in violation of governing precedent. *Id.* 19-20.

Intervenors' argument that "race is a unique, integral part of a person's experience" and, as a consequence, "must be acknowledged and evaluated" in the admissions process, Intervenors 3; *id.* 6-8, also defies Supreme Court precedent. Not only has the Court held that racial preferences be limited in time, but it has made clear that diversity can be achieved without resort to racial classifications, *Grutter v. Bollinger*, 539 U.S. 306, 340, 342 (2003). Intervenors' stance would "effectively assure that race will always be relevant in American life, and that the 'ultimate goal' of 'eliminating entirely from … decision making such irrelevant factors as a human being's race' will never be achieved." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007).

UNC then argues (at 37) that it would be inappropriate to grant summary judgment to SFFA because Kahlenberg's "opinions are clearly disputed." But that is factually incorrect and contrary to UNC's own position. UNC's expert, Caroline Hoxby, refused to dispute Kahlenberg's conclusion that UNC has workable race-neutral alternatives available to it. SFFA Mot. 37-38. She refused to do so because offering such an opinion would "overstep her mandate" since whether a race-neutral alternative is workable is not an issue upon which an expert should opine. UNC Opp. 36-37. In UNC's view, "the '*reviewing court*'"—not experts—"'must ultimately be satisfied that no workable race-neutral

alternative would produce the educational benefits of diversity.'" *Id.* 37 (quoting *Fisher I*, 570 U.S. at 312).[1] If UNC is right, there is no material factual dispute—whether Simulation 11 is workable is a question for the Court. If UNC is wrong, it has failed to rebut Kahlenberg's opinion. Either way, there is no triable issue.

UNC tries to split the difference by arguing (at 36) that, although Hoxby declined to offer an opinion on workability, it was unnecessary because she "assessed the question of whether a race-neutral approach could achieve the University's current levels of racial diversity without sacrificing academic excellence." But even assuming that such a rudimentary issue can be the subject of expert opinion, SFFA Br. 37-38, UNC's argument is built on a flawed legal premise. Whether a race-neutral alternative is workable does not turn on whether it replicates "current levels of racial diversity and academic preparedness." UNC Opp. 36 n.10. It need only work "about as well and at tolerable administrative expense," *Fisher I*, 570 U.S. at 312, and UNC has never attempted to explain why Simulation 11 does not, SFFA Br. 37-38. But this dispute is irrelevant in any event. Simulation 11 *increases* URM enrollment and the academic preparedness of the admitted class. SFFA Br. 36-37; SFFA Opp. 17.

UNC complains (at 37) that it "had no opportunity" to respond to Simulation 11 because it "appeared for the first time in Kahlenberg's final report." But, as UNC acknowledges, "Simulations 11 and 13 are versions of a socioeconomic status-based plan reflected in Kahlenberg's original report (Simulation 4), modified by two rounds of revisions in response to Hoxby's analysis and criticism." UNC Opp. 38. Moreover, "Hoxby comprehensively analyzed all reasonable race-neutral alternatives,

---

[1] UNC adds (at 36) that experts cannot reliably consider the question of "'tolerable administrative expense.'" That too is irrelevant. UNC has *never* argued that implementing Simulation 11—or, for that matter, the simulations upon which it is modeled—would be prohibitively expensive or otherwise inadministrable. Nor could it. These simulations merely fine tune UNC's existing admissions process. SFFA Br. 25-26. It is difficult to imagine a race-neutral alternative that is less disruptive to UNC's admissions process. Intervenors' assertion (at 11) that SFFA failed to "address the other contextual factors that are essential to obtaining the benefits of diversity" misses the mark because Simulation 11 is modeled on UNC's existing process.

including levels of racial diversity and academic preparedness that might be achieved under best-case scenarios." *Id.* 35. Hoxby has raised every objection she has.

Regardless, UNC had every opportunity to further pursue the issue. But it asked Kahlenberg *no* questions about Simulation 11 at his deposition. Nor did UNC seek to submit a supplemental expert report, even though it sought (and received) leave to submit other evidence on race-neutral alternatives after discovery closed. SFFA Br. 23; UNC Opp. 24-25. UNC stayed quiet about Simulation 11 because Hoxby does not dispute the underlying calculations, nor that this simulation "would allow UNC to maintain its current level of academic preparedness and racial diversity," UNC Opp. 35 (quoting UNC Ex. 24 ¶ 61), and she is unwilling to opine on workability.

UNC's complaint is especially weak given that its own committee on race-neutral alternatives never examined Kahlenberg's simulations. SFFA Br. 23. According to UNC, "running simulations that an academic *thinks* might work or should be studied is not what the law requires." UNC Opp. 23-24. That is legally wrong given the requirement of good-faith consideration. SFFA Opp. 15-16, 22-23; UNC Opp. 22-25. But that is beside the point. UNC cannot complain about its inability to further investigate a race-neutral alternative that it has made unmistakably clear it will never consider.

UNC substantively criticizes Simulation 11 in passing, arguing that it is unworkable because it is modeled on simulations that give "'such large increases in admissions probabilities ('bumps') to students whom Mr. Kahlenberg deems low [socioeconomic status] that it effectively removes UNC's holistic review and replaces it with a formulaic approach based almost entirely on socioeconomic status.'" UNC Opp. 38 (quoting UNC Ex. 24 ¶¶74, 78-79). That is incorrect. Simulation 11 employs SES bumps that are less than one-third of the magnitude of the racial preferences UNC currently gives to out-of-state African-American applicants. Kahlenberg Reply Rep. 56-57. Unless UNC has decided to concede that its racial preferences are so unreasonably large as to amount to "a formulaic approach

4

based almost entirely on [race]," Mr. Kahlenberg's SES bumps are clearly not so large that it "effectively removes UNC's holistic review."

Finally, UNC offers a series of additional arguments criticizing race-neutral alternatives in general, and SFFA's proposed race-neutral alternatives in particular. UNC Opp. 25-37. But none of these arguments creates a triable issue. SFFA Opp. 17-20. The parties have disputes over recruiting, financial aid, partnerships with disadvantaged high schools, community college transfers, early action, legacy preferences, and other simulations. UNC Opp. 25-34; Intervenors 20-21; SFFA Br. 24, 36 n.9. But Simulation 11 does not depend on SFFA prevailing on any of them. SFFA Opp. 18-19. The dispute boils down to one issue: whether Simulation 11 is a workable alternative. The Court can—and should—resolve this dispute as a matter of law in SFFA's favor.

## II. SFFA is entitled to summary judgment on the issue of narrow tailoring.

SFFA is entitled to summary judgment on narrow-tailoring. SFFA Br. 28-34; SFFA Opp. 3-15. Any disputes are over whether UNC's use of race in admissions is narrowly tailored are not *genuine* because no reasonable factfinder could rule for UNC. SFFA Mot. 1, 27.

*First*, UNC is not pursuing the only goal that the Supreme Court has found to be narrowly tailored: critical mass. SFFA Br. 28-31; SFFA Opp. 4-5. Indeed, despite SFFA's urging it to do so, at no point in its own summary-judgment motion or in opposition to SFFA's motion does UNC *ever* state that it is using race to enroll a "critical mass of underrepresented minority students ... so as to realize the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 318. That is because the record developed in this case makes that impossible. UNC has gone from giving lip service to critical mass to abandoning the concept altogether because the admissions office has no coherent understanding or what critical mass is, how it should be defined, or when that goal would be achieved. SFFA Br. 30-31.

5

UNC responds (at 4) that SFFA is improperly using critical mass "as a trap, knowing that precedent forbids reducing this concept to numbers." But it is UNC that wants have it both ways. After scolding SFFA for asking for a "'measurable' definition of critical mass," UNC Opp. 4, UNC then argues that whether it is achieving its goals must be "evaluated against the current levels of racial diversity" because "*any* decrease in those levels will only make the University's goals that much more difficult to realize," *id.* 36 n.10; Intervenors 14-15. UNC—not SFFA—has reduced the diversity interest to a numerical concept.

SFFA agrees that, under controlling precedent, critical mass is not purely numerical. But "asserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher v. Univ. of Texas at Austin (Fisher II)*, 136 S. Ct. 2198, 2211 (2016); SFFA Br. 30. UNC ignores that warning, claiming that its use of race in admissions is narrowly tailored because it is all about "promoting the robust exchange of ideas, broadening cross-cultural understanding, fostering innovation and problem-solving, preparing engaged and productive leaders, and enhancing respect and empathy." UNC Opp. 4. That just restates the proposition that UNC has a compelling interest under precedent in pursuing the educational benefits of diversity. UNC Opp. 2-3.[2]

Such platitudes do not meet UNC's obligation to prove it is pursuing diversity in a way that will not "[e]nshrin[e] a permanent justification for racial preferences." *Grutter*, 539 U.S. at 342; *accord City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989) (rejecting any rationale for using race that

---

[2] Although SFFA may not contest in this Court whether student body diversity is a compelling government interest, it may contest whether UNC is genuinely pursuing that interest. SFFA Br. 29-30. The parties disagree over whether the paper-classes scandal and other evidence cast doubt on the sincerity of UNC's interest in achieving the educational benefits of diversity. UNC Opp. 5-6; Intervenors 22-25. If the Court concludes that there is a triable dispute over the issue, SFFA will introduce extensive evidence (including about the "paper classes" scandal and inappropriate internal university communications) demonstrating that UNC is pursuing racial diversity for superficial and cynical reasons, and is indifferent to the serious harm it causes to the intended beneficiaries of these preferences.

"'has no logical stopping point'" or "could be used to 'justify' race-based decisionmaking essentially limitless in scope and duration"). After all, "it defies common sense that an affirmative action plan adopted for ... the permissible purpose of increasing diversity ... could be permitted to exist without end. If the goal of the plan is to enrich the educational experience of students ... , this goal will be achieved at some point." *United States v. Bd. of Educ. of Twp. of Piscataway*, 832 F. Supp. 836, 850 (D.N.J. 1993). To meet strict scrutiny, UNC needed to define what it means to attain meaningful representation; assess whether it has attained that goal already; if not, identify the juncture at which it will be achieved; and communicate all of this to its admissions officers. *Id.*; *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993). Because UNC has failed to do so, its use of race is not narrowly tailored.

**Second**, UNC uses race in a mechanical and formulaic way contrary to precedent. SFFA Br. 31-34; SFFA Opp. 5-7. Notably, UNC does not dispute that Professor Arcidiacono's model is "accurate in predicting admissions outcomes." UNC Opp. 15. But he is not just more accurate "than a random model." *Id.* 16. He is able to predict admissions decisions—year in and year out—at over 90%. SFFA Br. 20; Arcidiacono Decl. [Doc. 160], Ex. C ("Arcidiacono Reply Rep.") 24. UNC counters (at 16) that Hoxby contests Professor Arcidiacono's methodology. But any such dispute is immaterial. If UNC's admissions process were genuinely individualized, *no* formula could accurately predict over 90% of admissions decisions year over year.

Hoxby's assessment that "UNC admissions decision cannot be explained using a formula," UNC Opp. 17, also does not create a triable issue. Hoxby's primary point is that an admissions process is not formulaic unless a model can predict admissions decisions with 100% accuracy. EX58 ("Hoxby Reply Rep.") 14. But this is not the standard, as it would mean that the point system that the University of Michigan used in *Gratz* was not formulaic. SFFA Opp. 6. Hoxby thus is forced to retreat from demanding perfect accuracy, stating that "[i]n statistics, as in everyday life, we say that a prediction is

7

accurate if it gets the answer right a very high percentage of the time." Hoxby Reply Rep. 14. The problem for UNC, of course, is that Professor Arcidiacono's preferred models easily meets this "very high percentage" standard.

Finally, UNC claims (at 16-17) that the "factual record" proves that the admissions process is not formulaic and that "SFFA's own experts" agree. Neither is true. The record confirms that race dominates UNC's process, and that the admissions office is keenly focused on the racial makeup of the admitted class. SFFA Br. 8-10. And, SFFA's experts never agreed that UNC's system is holistic. Professor Arcidiacono acknowledged that UNC's promotes its admissions system as holistic. But he has been unequivocal that, in reality, it is highly formulaic. SFFA Opp. 5-6.

*Third*, UNC gives racial preferences to URMs that are far beyond the "plus" factor that the Supreme Court permits. SFFA Br. 31-33; SFFA Opp. 7-15. UNC claims that, "when the entire applicant pool is properly considered, all material evidence establishes that race is not a dominant factor." UNC Opp. 21. UNC's position is untenable for reasons that have been thoroughly explained. UNC seeks to dilute the role race plays in the admissions chances of URMs so that it can proclaim that race is only decisive "for a small portion of admissions decisions." *Id.* at 20. But its mode of analysis fails both as a matter of law and as a matter of logic. SFFA Opp. 7-9. SFFA has conclusively demonstrated that racial preferences are decisive for nearly all URM applicants who are admitted. SFFA Br. 17-20.

UNC also challenges (at 21-22) Professor Arcidiacono's "marginal effect" analysis. But that criticism is unfounded. SFFA Opp. 9-10. Hoxby objects to Professor Arcidiacono's calculation of the average marginal effect of race, claiming that he improperly states the average marginal effect in terms of a "share" or "percentage." UNC Opp. 21-22. She is wrong, but more importantly, Hoxby never challenges the underlying conclusion that in-state African American admit rates increase from 17.8% to 30.5% as a result of racial preferences, SFFA Br. 18; she just disputes the characterization of this

8

massive change in terms of a percentage or share of admissions due to race. The reason why UNC does not dispute these massive changes is because Hoxby's models exhibit similar effects. Removing racial preferences from her model more than doubles African American admit rates, increasing them from 11.7% to 24.3%. Arcidiacono Decl., Ex. B ("Arcidiacono Rebuttal Rep.") at 15-16 & Table 2.2. Here too, UNC limits its objection only to the characterization of average marginal effect as a share or percentage not the underlying conclusions. UNC Opp. 21 n.6.[3]

Finally, UNC uses race as more than a "plus" factor under Hoxby's own analysis. SFFA Opp. 13-15. UNC's only response to Professor Arcidiacono's conclusion that Hoxby's analysis shows "racial preferences account for 70% of out-of-state URM admits" (SFFA Br. at 21) is that "Hoxby reached no such conclusion." UNC Opp. 21 n.5. But the relevant issue is whether "the data underlying Professor Hoxby's analysis" reveals this massive effect of UNC's racial preferences—not whether she will admit it. Arcidiacono Reply Rep. 7; SFFA Br. 21. UNC cannot avoid the consequences of its own expert's analysis by hoping no one will notice.

## CONCLUSION

SFFA respectfully requests that the Court grant it summary judgment on all counts.

---

[3] UNC also claims that Arcidiacono's average marginal effect analysis is "driven by small numbers of students." UNC Opp. 22. UNC's argument appears to be that the bulk of the affected students come from the band of applicants in which the most competition occurs. But even assuming UNC is correct, this does nothing to undermine the massive jumps in URM admit rates that result from UNC's racial preferences.

9

Dated: April 4, 2019                                              Respectfully submitted,


*/s/ Alan M. Ruley*                                              */s/ Thomas R. McCarthy*

Alan M. Ruley                                                    Thomas R. McCarthy
NC State Bar No. 16407                                           William S. Consovoy
Andrew A. Freeman                                                J. Michael Connolly
NC State Bar No. 41248                                           Bryan K. Weir
BELL, DAVIS & PITT, P.A.                                         CONSOVOY MCCARTHY PARK PLLC
P. O. Box 21029                                                  3033 Wilson Boulevard, Suite 700
Winston-Salem, NC 27120                                          Arlington, Virginia 22201
336.714.4147                                                     703.243.9423
aruley@belldavispitt.com                                         will@consovoymccarthy.com
                                                                 tom@consovoymccarthy.com
                                                                 mike@consovoymccarthy.com
                                                                 bryan@consovoymccarthy.com

                                                                 Patrick Strawbridge BBO #678274
                                                                 CONSOVOY MCCARTHY PARK PLLC
                                                                 Ten Post Office Square
                                                                 8th Floor South PMB #706
                                                                 Boston, MA 02109
                                                                 617.227.0548
                                                                 patrick@consovoymccarthy.com


*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

10

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d), the undersigned certifies that this Brief complies with the word limit contained in L. R. 56.1(c) using the word count feature of the word processing software used to prepare this brief in making this certification.

*/s/ Alan M. Ruley*
Alan M. Ruley
NC State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P. O. Box 21029
Winston-Salem, NC 27120
336.714.4147
aruley@belldavispitt.com

*Attorneys for Plaintiff*
*Students for Fair Admissions*

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This the 4th day of April, 2019.

                                                */s/ Alan M. Ruley*
                                                Alan M. Ruley

12

Case 1:14-cv-00954-LCB-JLW   Document 184   Filed 04/04/19   Page 15 of 15