IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, INC.,  )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )          1:14CV954
                                     )
UNIVERSITY OF NORTH CAROLINA, *et al.* )
                                     )
                    Defendants.      )

# MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff, Students for Fair Admissions, Inc. ("SFFA") initiated this action against Defendants (collectively, the "University" or "UNC"), alleging that the University's use of race in its undergraduate admissions process violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981, 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). (ECF No. 1 at 2.) Before the Court are: (i) Defendants' Motion for Summary Judgment, (ECF No. 152); (ii) SFFA's Motion for Summary Judgment, (ECF No. 158); and (iii) Plaintiff's Motion to File Under Seal Pursuant to Local Rule 5.4(c), (ECF No. 170). For the reasons set forth below, the parties' cross-motions for summary judgment will be denied and the motion to seal will be granted.

## I. BACKGROUND

### A. <u>Parties</u>

SFFA is a nonprofit corporation which states that its purpose is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." (ECF No. 163-1 at 9.) SFFA's membership is comprised of over 22,000 members, including, among others, applicants who have applied for and were denied admission to UNC. (*See id.* at 9–10; ECF No. 113-9 at 2; ECF Nos. 114-5, 114-6.)

Founded in 1789, UNC is "the nation's first public university." (ECF No. 154-1 ¶ 16; ECF No. 154-4 ¶ 7; *see* ECF No. 163-2 at 2.) As a public university, UNC "receives a portion of its funding from the State of North Carolina and enrolls students who receive financial assistance from the Federal Government." (ECF No. 30 at 19.) UNC states that its "mission is to serve as a center for research, scholarship, and creativity and to teach a diverse community of undergraduate, graduate, and professional students to become the next generation of leaders." (ECF No. 154-32 at 2.) According to the University, its "experience has shown that [it] cannot achieve this mission without enrolling a broadly diverse student body where everyone feels empowered to be, speak, and act as unique individuals." (ECF No. 154-4 ¶ 10.)

### B. <u>UNC's Admissions Process</u>

UNC's undergraduate admissions policy is "broadly set by the Board of Trustees," which, in turn, has "delegated authority over the establishment of policies and procedures for undergraduate admission to the University's [Faculty] Advisory Committee on Undergraduate Admissions [(the 'Advisory Committee')]." (ECF No. 154-4 ¶¶ 15–16; ECF No. 155-4 at 4.)

On September 5, 2007, the Advisory Committee adopted a "Statement on the Evaluation of Candidates for Admissions" which states, in part, as follows:

> Just as there is no formula for admission, there is no list of qualities or characteristics that every applicant must present.
>
> In shaping the [entering] class, we evaluate individual candidates rigorously, holistically, and sympathetically. We seek to assess the ways in which each candidate will likely contribute to the kind of campus community that will enable the University to fulfill its mission. This assessment requires not only that we note the achievements and potential of each applicant but also that we understand the context within which achievements have been realized and potential forged.
>
> These comprehensive and individualized evaluations, taken together, . . . aim to draw together students who will enrich each other's education, strengthen the campus community, contribute to the betterment of society, and help the University achieve its broader mission.

(ECF No. 155-2 at 2.)

For the class of 2022, UNC received approximately 43,500 applications for undergraduate admission to a class of approximately 4,325 students. (ECF No. 154-4 ¶ 17; ECF No. 154-7 ¶¶ 15–16.) "To enroll a class of this size, the University offered admission to approximately 9,500 applicants, resulting in an overall admissions rate of approximately 22 percent." (ECF No. 154-4 ¶ 17; *see* ECF No. 154-7 ¶ 16.)

UNC's admission process for first-year applicants consists of two deadlines: (i) "a non-binding[1] early action [application] deadline" of October 15; and (ii) "a non-binding regular

---

[1] "'Non-binding' means that applicants admitted at either deadline may choose freely whether to enroll and have until May 1 to do so; none are obligated to enroll if admitted or to withdraw any applications they may have submitted to other colleges or universities." (ECF No. 154-7 ¶ 8.)

decision [application] deadline" of January 15. (ECF No. 154-7 ¶¶ 8–9.) All applicants are required to submit a Common Application which is "an application for undergraduate admission [that] may be used to apply to over 700 colleges." (*Id.* ¶ 10.) Though not required, the Common Application offers applicants the option of providing demographic information, "such as gender, race, and ethnicity." (*Id.*) In addition to the Common Application, applicants must also submit the following materials: (i) a Common Application essay;[2] (ii) two short answers (consisting of 200–250 words) to prompted questions posed by UNC; (iii) "standardized test scores from either the SAT or the ACT"; (iv) a recommendation letter from at least one teacher who taught the applicant in a core academic subject; and (v) for applicants claiming North Carolina residency, a residency verification. (*Id.* ¶¶ 11, 14.) In addition, a counselor from the applicant's school is required to submit the applicant's official high school transcript, as well as a secondary school statement.[3] (*Id.* ¶ 12.) Although not required, applicants may submit additional information for consideration including "additional letters of recommendation, resumes, artwork, music samples, or disability-related documentation." (*Id.* ¶ 13.)

UNC's Office of Undergraduate Admissions "has a staff of approximately 120 full- and part-time individuals." (ECF No. 154-4 ¶ 5.) Each application submitted to UNC is "read in its entirety by at least one" of approximately 40 individuals—referred to as

---

[2] The Common Application essay "is a 250–650 word response to one of seven prompts common to all schools accepting the Common Application." (ECF No. 154-7 ¶ 11.)

[3] "The secondary school statement provides information about an applicant's high school[,] . . . the available curriculum," and "information about how the applicant compares with the rest of [his or her] high school class through comparative statistics on class rank and grade point average . . . distribution." (*Id.* ¶ 12.)

"application readers" or "readers"—consisting of both full time admissions office staff members and seasonal employees.[4] (*Id.* ¶ 20; ECF No. 154-7 ¶ 17.) "All readers undergo annual training" by UNC's admissions office staff and they "receive an up-to-date version of the University's admissions policy document, known as the Reading Document." (ECF No. 154-7 ¶¶ 20, 22; *see* ECF No. 154-4 ¶ 21; ECF No. 155-4.) According to UNC, readers are instructed "to consider each applicant as an individual based on all relevant factors revealed in his or her application in order to understand the candidate holistically and comprehensively." (ECF No. 154-7 ¶ 24; *see* ECF No. 154-4 ¶ 22.) Also according to UNC, readers are trained to consider "an applicant's self-disclosed race or ethnicity . . . as one factor among many based on a holistic review of all circumstances relevant to an individual applicant." (ECF No. 154-7 ¶ 25.) During the application review and evaluation process, readers continue to receive training and feedback. (*Id.* ¶ 26.)

During the evaluation process, readers are tasked with assessing each applicant using "more than forty criteria," grouped roughly into the following eight categories:

(i)     academic program;

(ii)    academic performance;

(iii)   standardized testing;

(iv)    extracurricular activity;

(v)     special talent;

(vi)    essay;

---

[4] "[S]easonal readers are part-time employees who read and evaluate applications between October and March." (ECF No. 154-7 ¶ 19.)

(vii)   background; and

(viii)  personal attributes.

(ECF No. 154-4 ¶ 23; ECF No. 154-7 ¶ 31; ECF No. 155-4 at 7–8.)  "Though readers consider a candidate's attributes and experiences across all of the [above] eight broad categories[,] . . . they assign scores for only five of them: academic program, academic performance, extracurricular activity, essays, and personal qualities."  (ECF No. 154-7 ¶ 32.)  The remaining categories are considered "when assessing the candidate as a whole in the context of the entire applicant pool, but [UNC] do[es] not assign numerical scores for these elements."  (*Id.*)  With respect to a candidate's race or ethnicity, should a candidate choose to disclose this information on the application, it "may be considered at any stage of the evaluation process . . . within the context of an individual candidate."  (*Id.* at ¶ 42; *see* ECF No. 154-4 ¶ 24; ECF No. 155-4 at 8.)   In addition, "[r]eaders are . . . trained to consider the socioeconomic circumstances of the applicant during the evaluation."[5]  (ECF No. 154-4 ¶ 26.)

Since 2014, UNC has divided its readers into two tiers—Tier 1 readers who "exclusively conduct initial evaluations of applications" and Tier 2 readers who "primarily conduct secondary evaluations of applications."  (ECF No. 154-7 ¶ 43.)  Once received, applications are randomly assigned to Tier 1 readers who "will read [each] application in its entirety, assess the applicant across all the specified categories, and assign ratings for the five scored categories."  (*Id.* ¶ 44; *see* ECF No. 154-4 ¶ 27.)  Then, the Tier 1 reader will either: (i) request

---

[5] The following circumstances serve as indicators from which a reader becomes aware of an applicant's socioeconomic status: (i) "whether a candidate received an application fee waiver"; (ii) "the candidate's status as a first-generation college student"; (iii) "the occupation and employment status of the applicant's parents or guardians"; and (iv) "whether the candidate attends a school where a high percentage of students receive free or reduced-price lunch."  (ECF No. 154-4 ¶ 26.)

6

a second read of an application; or (ii) recommend that the candidate be admitted or denied admission and provide a comment to support or explain the recommendation. (ECF No. 154-7 ¶ 44; *see* ECF No. 154-4 ¶¶ 27–28.) "Tier 1 readers may also choose to waitlist an early action applicant." (ECF No. 154-7 ¶ 44.) "Depending on the candidate's residency and the Tier 1 reader's recommended decision, the reader may forward the application for a Tier 2 reader's review or the Tier 1 reader's decision may become provisionally final." (ECF No. 154-7 ¶ 45.)

Tier 2 readers are comprised of "experienced Admissions staff and experienced seasonal reviewers," and they are responsible for "read[ing] applications requiring secondary review." (ECF No. 154-7 ¶ 46; *see* ECF No. 154-4 ¶ 28.) Upon reading each application "in its entirety," Tier 2 readers "make independent assessments of the candidate across all the specified categories." (ECF No. 154-7 ¶ 46.) The Tier 2 reader will then input his or her own recommendation that a candidate be admitted, denied, or waitlisted. (*Id.*) "The Tier 2 reader's recommended decision then becomes the provisionally final decision for that application." (*Id.*) "Typically, Tier 1 and Tier 2 readers complete their review of applications three to four weeks prior to the release of admissions decisions for that particular admissions cycle." (*Id.* ¶ 47.)

Next, "over the three-week period prior to [UNC's] release of [final] admissions decisions to applicants," each provisional decision made by Tier 1 and Tier 2 readers is subjected to another review, known as a School Group Review ("SGR"). (*Id.* ¶ 49 (citing ECF No. 156-12); *see* ECF No. 154-4 ¶ 31.) A yield assessment projection is prepared to predict the "number of spaces in the entering class that students who have been provisionally selected for admission are likely to fill." (ECF No. 154-7 ¶ 51.) "Based on [this] predicted enrollment,

[during the SGR process, UNC] may adjust the number of applicants who will receive an offer of admission." (*Id.*) According to UNC, the goals of the SGR are: (1) to "allow[ ] the Office of Undergraduate Admissions to . . . avoid over- or under-enrollment [by] adjust[ing] up or down the total number of students provisionally designated for admission"; and (2) to "serve[ ] as a quality-control measure." (*Id.* ¶ 50; ECF No. 156-12 at 2.) The SGR review process is also used to "ensur[e] a correct proportion of in- and out-of-state applicants." [6] (ECF No. 154-7 ¶ 55.)

During the SGR process,

> [e]ach SGR committee member[7] receives an assigned group of high schools to review. Reports generated for each high school from which an applicant applied for admission to the University facilitate this review. These reports include which admissions cycle each applicant applied under, as well as each applicant's provisional admission decision, class rank, grade point average, test scores, admissions ratings, residency status, legacy status, first-generation college status, recruited student-athlete status, and beginning in 2018, fee waiver status. These reports do not include a candidate's race or ethnicity.
>
> SGR committee members review these reports and make an initial determination regarding whether the listed factors, when viewed in their totality, appear consistent with the provisional admissions decision for each candidate. If the reviewer identifies an inconsistent decision, the reader will re-review the underlying application for admission and determine whether the decision should be changed.

---

[6] In accordance with the policy of UNC's Board of Governors, the University's enrollment of out-of-state students "cannot exceed 18 percent, meaning that at least 82 percent of the students in each incoming class must be residents of North Carolina." (ECF No. 154-4 ¶ 18.)

[7] The SGR committee is "comprised of experienced Tier 2 reviewers." (ECF No. 154-7 ¶ 52; *see* ECF No. 156-12 at 2.)

(ECF No. 154-7 ¶¶ 53–54; *see* ECF No. 156-12 at 2.) Upon completion of the SGR process, "the yield assessment projections are updated to ensure the targeted numbers of in-state and out-of-state admit[tees] have been reached. This is typically completed at least two days before [UNC] release[s] final decisions to allow time for any additional required adjustments." (ECF No. 154-7 ¶ 56.) Admission decisions are then released to each applicant. (ECF No. 154-4 ¶ 36.) "Candidates admitted to the University have until May 1 to accept their place in the incoming class . . . [whereas] [a]pplicants who are denied admission may appeal their admissions decisions." (*Id.* ¶¶ 36–37.)[8]

C. **Procedural History**

SFFA initiated the instant action on November 17, 2014 alleging that UNC "has intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and [federal law]" by: (i) "employing an undergraduate admissions policy that does not merely use race as a 'plus' factor in admissions decisions in order to achieve student body diversity"; (ii) "employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity"; and (iii) "employing an undergraduate admissions policy that uses race as a factor in admissions." (ECF No. 1 ¶¶ 198, 205, 215.)

---

[8] UNC may also "offer a small subset of highly qualified applicants . . . a place on [its] Waiting List," and should "spaces become available in the entering class, [UNC] may select Waiting List candidates to receive an offer of admission." (ECF No. 154-7 ¶ 57; *see* ECF No. 154-4 ¶ 38.) For those candidates who accept a space on the waiting list, final decisions are made no later than June 30 of each year. (ECF No. 154-4 ¶ 39; ECF No. 154-7 ¶ 60.)

On October 25, 2017, UNC moved to dismiss SFFA's Complaint, pursuant to Rule 12(b)(1), for lack of standing to sue. (ECF No. 106.) On September 29, 2018, this Court entered a Memorandum Opinion and Order denying the motion to dismiss.[9] (ECF No. 150.) Each party has filed cross-motions for summary judgment[10] on each of SFFA's claims, (ECF Nos. 152, 158), and SFFA has filed a motion to seal certain documents submitted in connection with the pending summary judgment motions, (ECF No. 170). The Court will first address the parties' cross-motions for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the litigation, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the nonmoving party bears the burden of proof on an issue, the moving party is entitled to judgment as a matter of law if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case." *Celotex Corp. v.*

---

[9] In its opening summary judgment brief, SFFA again argues that it has standing. (ECF No. 159 at 31.) UNC makes no argument in response. (*See generally* ECF Nos. 153, 175, 183.) However, as stated above, this Court has already found "that SFFA has standing to sue on behalf of its members." (ECF No. 150 at 12.) Thus, pursuant to the "law of the case" doctrine, the Court's decision on SFFA's standing shall "continue to govern" this issue in subsequent stages in this case. *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988)). *See Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 519 n.33 (D. Md. 2007) ("The Court understands that standing is an issue that is subject to review at all stages of the litigation[;] [h]owever, that legal principle does not defeat application of the law of the case doctrine.").

[10] In addition to having considered SFFA's and UNC's summary judgment briefing, the Court has also considered Defendant-Intervenors' Brief in Response to Plaintiff's Motion for Summary Judgment, (ECF No. 179), and the Brief of *Amici Curiae* Arcelormittal USA LLC, *et al.* in Support of Defendants' Motion for Summary Judgment, (ECF No. 168-1; *see also* ECF No. 174.)

10

*Catrett*, 477 U.S. 317, 323 (1986) (noting that a "complete failure of proof" on an essential element of the case "renders all other facts immaterial").

The party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. To defeat summary judgment, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The nonmoving party must support its assertions by citing to particular parts of the record, such as affidavits, depositions, answers to interrogatories, and admissions on file. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp.*, 477 U.S. at 324.

The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). When reviewing a motion for summary judgment, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Further, where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each of them separately to determine if either party is entitled to judgment as a matter of law. *Rossignol*, 316 F.3d at 523.

## III. DISCUSSION

### A. <u>Cross-Motions for Summary Judgment</u>

SFFA and UNC each seek summary judgment on each of Plaintiff's three claims for alleged violations of the Equal Protection Clause of the Fourteenth Amendment[11] and Title VI.[12] (*See* ECF Nos. 152, 158.) SFFA argues that "[n]o rational factfinder could conclude that the admissions system of [UNC] complies with the Fourteenth Amendment and Title VI." (ECF No. 159 at 5.) UNC, in turn, argues that "the undisputed material facts demonstrate that [its] admissions approach is constitutionally sound [in that] its practices are narrowly tailored to achieve the educational benefits of diversity recognized by the Supreme Court." (ECF No. 153 at 10.)

The parties agree that because UNC's consideration of race in undergraduate admissions is at issue, the Court must engage in a strict scrutiny analysis. (*See id.* at 30; ECF No. 159 at 32); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013) ("*Fisher I*") ("Race may not be considered unless the admissions process can withstand strict scrutiny.") "Strict scrutiny requires the university to demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary .

---

[11] "The Equal Protection Clause provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting U.S. Const. amend. XIV, § 2).

[12] Title VI was designed to prohibit discrimination by organizations receiving federal funding. *See* 42 U.S.C. § 2000d. Specifically, the statute provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*

. . to the accomplishment of its purpose.'" *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016) ("*Fisher II*") (alteration in original) (quoting *Fisher I*, 570 U.S. at 309.).

As instructed by the Supreme Court, at the summary judgment phase, this Court "must assess whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity." *Fisher I*, 570 U.S. at 314. The University "must make a showing that its plan is narrowly tailored to achieve . . . the benefits of a student body diversity that 'encompasses a . . . broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Id.* at 314–15 (second and third alterations in original) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978)).

### 1. Count I – Failure to use race as a "plus" factor in admissions decisions

In seeking summary judgment on Count I, SFFA argues that "UNC may use race only to enroll a 'critical mass of underrepresented minority students . . . so as to realize the educational benefits of a diverse student body.'" (ECF No. 159 at 32 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 318 (2003).) According to SFFA, "[e]ven then, race may only be [used as] a 'plus' factor," and "UNC is violating both preconditions." (*Id.*) As an initial matter, SFFA appears to argue that "UNC must articulate a definition of 'critical mass' . . . with some precision," (*id.* at 34), yet "UNC's definition of critical mass could not be more elusory or amorphous," and "[f]or this reason alone, UNC fails strict scrutiny," (*id.* at 35). It is important to note, however, that "critical mass," was a term used in the specific university admissions policies at issue in the *Grutter* and *Fisher* cases. *See, e.g., Grutter*, 539 U.S. at 318 (discussing the law school's efforts "to ensure that a critical mass of underrepresented minority students

would be reached so as to realize the educational benefits of a diverse student body"); *Fisher I*, 570 U.S. at 301 (explaining that the University refers to its goal of "increasing racial minority enrollment on campus . . . as a 'critical mass'"); *Fisher II*, 136 S. Ct. at 2219 (Alito, J. dissenting) (describing a proposal by the university to consider race and ethnicity in admissions which "stated that [the university] needed race-conscious admissions because it had not yet achieved a critical mass of racial diversity" (internal quotation marks omitted)). The Supreme Court has not, however, defined the term nor has it held that a university must define, understand, or pursue a "critical mass" in order for a race-conscious admissions policy to survive strict scrutiny. *See id.* at 2216 (Alito, J. dissenting) (stating that the term "critical mass" "remains undefined"). Therefore, despite Plaintiff's argument, UNC is not required to "articulate a definition of 'critical mass,'" (ECF No. 159 at 34), in order for its admissions policy to survive strict scrutiny.

Rather, the Supreme Court has explained that the compelling interest that justifies a university's consideration of race in admissions "is not an interest in enrolling a certain number of minority students;" instead, it is a broader interest in "obtaining 'the educational benefits that flow from student body diversity.'" *Fisher II*, 136 S. Ct. at 2210 (quoting *Fisher I*, 570 U.S. at 310). The Court has recognized that "enrolling a diverse student body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Id.* (quoting *Grutter*, 539 U.S. at 330). The Court has nonetheless cautioned that while "[i]ncreasing minority enrollment may be instrumental to these educational benefits, . . . [such a goal is not one] that can or should be reduced to pure numbers." *Id.* Therefore, a university "cannot impose a fixed quota" or "specified

14

percentage" to define diversity. *Id.* at 2208. The Supreme Court has also recognized that "the decision to pursue the educational benefits that flow from student body diversity . . . is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper." *Id.* (alteration in original) (quoting *Fisher I*, 570 U.S. at 310).

The record contains evidence from UNC in support of its objective in pursuing the educational benefits that flow from a diverse student body including the following:

(i)  UNC's mission statement which states, in part, that UNC's "mission is to serve as a center for research, scholarship, and creativity and to teach a diverse community of undergraduate, graduate, and professional students to become the next generation of leaders." (ECF No. 154-32 at 2.)

(ii)  UNC's "Academic Plan," dated July 2003, which states, in part, that "[d]iversity is critical to the University's effectiveness in fully preparing students for the world. The University is committed to reflecting the rich and changing diversity of the state and nation. . . . The University should meet its responsibility to contribute to the diverse pool of outstanding leaders needed for business, education, government, health care, and non-profits." (ECF No. 154-35 at 2, 29.)

(iii)  UNC's 2011 "Academic Plan" which states, in part, that UNC's "approach to equity and inclusion on campus must proceed from a moral conviction, a social commitment, and an institutional educational priority that recognize how much [UNC's] learning environment is enhanced by students, faculty, and staff from multiple backgrounds and ethnicities interacting together." (ECF No. 155-1 at 2, 47.)

(iv)  A "2014-2015 Diversity Plan Report," in which UNC states that it "strives to be a truly diverse community that is well-represented by individuals from different races, ethnicities, sexual/gender orientations, religions, and other sociocultural groups." (ECF No. 155-12 at 2.)

(v)     A declaration from UNC's Executive Vice Chancellor and Provost, Robert Blouin, that UNC's "commitment to diversity . . . reflects the University's proven understanding and experience that diversity yields enlightening, lasting, and transformational educational benefits." (ECF No. 154-1 ¶¶ 1, 17, 20.)

(vi)    A 2016 UNC resolution enacted by UNC's Faculty Council,[13] titled "Faculty Council Resolution 2016-12— On Commitment to Diversity and Inclusion" which, among other things: (a) "recognized that diversity in the student body is a critical element of academic excellence and a deeply-held institutional value"; and (b) "reaffirm[ed] the faculty's commitment to the values of diversity and inclusion." (*Id.* ¶¶ 24–26; ECF No. 154-33.)

(vii)    Testimony from Carol Folt, Chancellor of UNC, that because "questions of race and difference and socioeconomic political perspectives are some of the most important issues facing [UNC's] students[,] . . . a critical part of their understanding and being a part of the world, is that they have an opportunity to learn in and be a part of a world that really represents the broad range of diversity that they're going to experience." (ECF No. 154-13 at 5.)

(viii)    A declaration from Winston Crisp, Vice Chancellor for Student Affairs at UNC, that "[w]ithout a diverse student body, we would be severely limited in our ability to help our graduates develop key skills and competencies that they need for their future success through their academic and co-curricular experiences." (ECF No. 154-2 ¶ 1, 79.)

Such objectives, "as a general matter, mirror the 'compelling interest' [that the Supreme Court] has approved in its prior cases." *Fisher II*, 136 S. Ct. at 2211. However, while UNC's decision to pursue the educational benefits of a diverse student body is entitled to deference, no such deference is owed when this Court determines whether its "use of race is narrowly

---

[13] UNC's Faculty Council serves as "the main faculty governance body [with] the primary responsibility for setting University-wide educational policies." (ECF No. 154-1 ¶ 13.)

tailored to achieve the university's permissible goals." *Id.* at 2208 (citing *Fisher I*, 570 U.S. at 311). "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (alteration in original) (internal quotation marks omitted). Accordingly, "[t]o be narrowly tailored, a race-conscious admissions program . . . may consider race or ethnicity only as a 'plus in a particular applicant's file,' without 'insulat[ing] the individual from comparison with all other candidates for the available seats.'" *Id.* at 334 (third alteration in original) (quoting *Bakke*, 438 U.S. at 315, 317). "When using race as a 'plus' factor in university admissions, a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 336–37. As emphasized by the Supreme Court, "[t]he importance of this individualized consideration in the contest of a race-conscious admissions program is paramount." *Id.* at 337.

UNC moves for summary judgment based on the testimony of its admissions officers, and training and policy documents which reflect that race is a flexible factor among many other factors in the university's admissions process. (*See* ECF No. 153 at 15–20, 34–39; *see also, e.g.,* ECF Nos. 154-4 ¶¶ 23–29; 154-7 ¶¶ 28–48; 155-4 at 7–9.) UNC also points to the findings and statistical analysis of its expert, Dr. Caroline Hoxby,[14] showing that "an

---

[14] Dr. Hoxby is "the Scott and Donya Bommer Professor in Economics at Stanford University, the Director of the Economics of Education Program at the National Bureau of Economic Research, and a Senior Fellow of the Hoover Institution and the Stanford Institute for Economic Policy Research." (ECF No. 154-22 ¶ 7.)

applicant's race/ethnicity is not the dominant factor in whether an applicant is admitted or rejected" by UNC. (ECF No. 154-22 ¶¶ 32–34, 53–56; *see* ECF No. 153 at 19–20; *see generally* ECF No. 154-23.) Based on her analysis of UNC applicant data from the 2013-14, 2014-15, 2015-16, and 2016-17 admissions cycles, Dr. Hoxby, concludes that the "data . . . demonstrate[ ] that UNC's admissions process is holistic, qualitative, and examines students as individuals." (ECF No. 154-22 ¶¶ 47, 52.)

On the other hand, in support of SFFA's motion for summary judgment, it points to contrary expert evidence showing that "[r]ace is not a 'plus' factor that has a marginal effect on [an underrepresented minority applicant's admission] chances," but rather that race is "the predominant consideration" for under-represented minority applicants. (ECF No. 159 at 36– 38.) SFFA's expert, Professor Peter S. Arcidiacono,[15] concludes that "race plays a dominant role in individual admissions decisions." (ECF No. 160-3 at 5.) Specifically, according to Professor Arcidiacono, his "statistical and econometric methods of analysis" reveal that, "[s]ignificant preferences are given to in-state [underrepresented minority] applicants over their non-[underrepresented minority] counterparts," and "[r]acial/ethnic preferences are even larger for out-of-state [underrepresented minority students]." (ECF No. 160-1 at 6–7; *see generally* ECF Nos. 160-1; 160-2; 160-3.)

The Court's determination whether UNC considers race as a "plus" factor, or a dominant factor, in its admissions decisions is critically dependent on competing expert evidence regarding UNC's admissions data, as well as the credibility of the testimony of UNC's

---

[15] Peter S. Arcidiacono is a Professor of Economics at Duke University whose "area of academic expertise is labor economics." (ECF No. 160-1 at 5.)

admissions personnel regarding the manner in which an applicant's race is factored into admissions decisions. At the summary judgment stage, however, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (quoting *Liberty Lobby,* 477 U.S. at 255)). Moreover, where the Court is confronted with "a classic duel between competing experts, . . . judging the credibility of experts falls squarely within the province of the jury." *Schwaber v. Hartford Accident & Indem. Co.,* Civ. No. JFM 06-0956, 2007 WL 4532126, at *4 (D. Md. Dec. 17, 2007); *see Textron Inc. v. Barber-Colman Co.,* 903 F. Supp. 1570, 1579 (W.D.N.C. 1995) (stating that on summary judgment, "the Court cannot choose between [the parties' conflicting expert] opinions"). Thus, based on the conflicting evidence in the record on this issue, including the parties' expert evidence, the Court concludes that there exists a genuine dispute of material fact regarding whether UNC considers race as more than a "plus" factor in its admissions decisions. The Court must, therefore, deny the parties' cross-motions for summary judgment on Count I.

### 2. Count II – Race-neutral alternatives

SFFA moves for summary judgment on Count II, contending that because "UNC has workable racial neutral-alternatives available to it[,] [i]t is thus both unnecessary and unlawful for UNC to use race in [its] admissions decisions." (ECF No. 159 at 38.) Conversely, UNC argues that it is entitled to summary judgment on this count because "[t]he record establishes that the University has carried its burden and undertaken a good faith consideration of race-neutral alternatives." (ECF No. 153 at 44.) UNC further contends that, having found no

race-neutral alternative "that could feasibly achieve the diversity or academic standards it seeks, the University has established that its current use of race is permissible." (*Id.*)

Under a strict scrutiny analysis, the Court must "verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity." *Fisher I*, 570 U.S. at 312 (quoting *Bakke*, 438 U.S. at 305). "This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Id.* The Supreme Court has explained that "[a]lthough '[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative,' strict scrutiny does require a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* (second alteration in original) (quoting *Grutter*, 539 U.S. at 339–40). "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity." *Id.* "If a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Id.* (first alteration in original) (internal quotation marks and citation omitted). UNC thus bears "the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Id.*

According to UNC, its evidence shows that it "has rigorously assessed potential race-neutral alternatives that might replace its current admissions process, and continues to do so." (ECF No. 153 at 23 (citing ECF No. 154-4 ¶¶ 86, 107.) The University's evidence includes the following:

(i)     In 2007, UNC engaged in an "analysis of a socioeconomic race-neutral alternative [that] tested whether giving increased weight during the evaluation process to socioeconomic status would yield a class with similar diversity and academic credentials to the class that was actually admitted through our current admissions approach." (ECF No. 154-4 ¶ 92.) Based on this analysis, the University "concluded that giving increased weight to socioeconomic status would not yield comparable levels of diversity and academic excellence to those attained through the University's holistic review." (*Id.* ¶ 93.)

(ii)    In 2009, UNC's Senior Assistant Director of Admissions, Jennifer Kretchmar, conducted an "extensive review of published studies of [nationwide] race-neutral admissions practices." (*Id.* ¶ 94.) As a result of her review, Dr. Kretchmar concluded, in part, that "most research suggests that race-neutral alternatives . . . have been ineffective in reproducing the same level of diversity" as race-conscious policies. (ECF No. 155-6 at 2.)

(iii)   In 2012, the Admissions Office considered a "Top 10 Percent Plan" in which UNC would offer admission to "every student in [its] applicant pool who ranked in the top 10 percent" of his or her high school class. (ECF No. 154-4 ¶ 95; *see* ECF No. 155-5.) The University's analysis of its yield models showed that "[a] top-10-percent policy would have yielded a first-year class with a [slightly] higher percentage of underrepresented students: 16 percent vs. 15 percent under comprehensive and holistic review." (ECF No. 155-5 at 2.) However, under such a policy, "more non-underrepresented students would have been denied admission . . . than under comprehensive and holistic review." (*Id.*)

(iv)    In 2013, the University convened a campus-wide "Race-Neutral Alternatives Working Group (the 'Working Group') . . . [which] was charged with investigating alternatives to race-conscious admissions practices, reviewing research to determine anticipated results of alternative approaches, and making appropriate recommendations." (ECF No. 154-4 ¶ 97; *see* ECF No. 156-1.) The Working Group consisted of UNC personnel, including Admissions office members, as well

as faculty and staff members. (ECF No. 154-4 ¶ 97.) "The Working Group considered several race-neutral alternatives to admission and conducted a statistical analysis to determine the kind of student body several race-neutral alternatives would yield." (*Id.* (citing ECF No. 156-1).) These alternatives included: (a) "granting automatic admission to all [North Carolina] public high school graduates ranked in the top 10% of their high school class"; (b) "granting automatic admission to the top 4.5% of all [North Carolina] public high school graduates"; (c) "incorporate[ing] socioeconomic diversity as part of the admissions criteria, granting automatic admission to the top 7.5% . . . students attending high-poverty schools, and the top 3% attending low poverty schools"; (d) using the "strength of high school curriculum rather than class rank as the criterion for admission" in addition to "a testing threshold of 1150 SAT or higher"; and (e) "granting automatic admission to all students earning a combined score of 1280 or higher on the Critical Reading and Math portions of the SAT." (ECF No. 156-1 at 18–20.) Based on its analysis of these race-neutral alternatives, "the Working Group concluded that no race-neutral alternative would allow the University to achieve the same levels of academic excellence and diversity as [its] current practice of holistic review." (ECF No. 154-4 ¶ 102; *see also* ECF Nos. 156-1, 156-3.)

(v)     In February 2016, the University "formally established the Committee on Race-Neutral Strategies . . . [which] is charged with considering whether workable race-neutral strategies and admissions practices exist that would allow the University to achieve its full diversity objectives without sacrificing other components of its admissions criteria and objectives. The Committee's work is ongoing." (ECF No. 154-4 ¶ 104.)

In addition, UNC's expert, Dr. Hoxby conducted assessments and simulations of race-neutral alternatives potentially available to UNC and concluded that "there is no race-blind alternative available to UNC that could be used, even in some practical combination with another alternative, that would allow UNC to maintain its current level of academic

preparedness and racial diversity." (ECF No. 154-24 ¶¶ 61–62; *see also* ECF No. 154-22 ¶¶ 92–257.)

SFFA's expert, Richard D. Kahlenberg,[16] has concluded, however, that "UNC failed to accurately consider or fully implement any of the numerous available race-neutral alternatives that could achieve the educational benefits of diversity." (ECF No. 159 at 27 (quoting ECF No. 161-1 at 9.) According to Mr. Kahlenberg, the "numerous available race-neutral alternatives" available to UNC include:

(i)     "Increasing socioeconomic preferences";

(ii)    "Increasing financial aid";

(iii)   "Adopting policies using geographic diversity, including percentage plans and the use of zip codes and Census tract data";

(iv)    "Reducing or eliminating preferences for legacies";

(v)     "Increasing recruitment efforts";

(vi)    "Increasing the admission of community college transfers";

(vii)   "Eliminating the Early Acton admissions option"; and

(viii)  "Developing partnerships with disadvantaged high schools."

(ECF No. 161-1 at 9; *see also* ECF No. 161-2 at 24–40; ECF No. 161-3 at 31–44.) Mr. Kahlenberg also prepared "several tailor-made simulations" to "show that UNC has multiple race-neutral alternatives available to achieve the educational benefits of diversity while

---

[16] Mr. Kahlenberg is "a senior fellow at The Century Foundation, a non-profit, non-partisan research organization founded in 1919." (ECF No. 161-1 at 5.)

maintaining the institution's high standards of academic excellence." (ECF No. 161-3 at 65, 68–90; *see also* ECF No. 161-1 at 105–119; ECF No. 161-2 at 66–133.)

Here again, as with Count I, there is a genuine dispute between the parties as to whether UNC has engaged in a "serious, good faith consideration of workable race-neutral alternatives," and that such alternatives "do not suffice." *Fisher I*, 570 U.S. at 312 (internal quotation marks omitted). The Court's determination of this issue would require that the Court weigh the evidence in the record, including the conflicting expert evidence, and draw conclusions with respect to the credibility of witnesses. As previously discussed, at this stage in the proceedings, "[i]t is not the role of the court to weigh expert credibility, and where qualified experts on both sides of the case offer competing opinions[,] . . . summary judgment is improper." *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 863 (W.D.N.C. 2016); *see Boyd v. Armstrong*, Civ. A. No. ELH-17-2849, 2019 WL 1440876, *at 9 (D. Md. Mar. 29, 2019) ("[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility."). The Court will therefore deny the parties' cross-motions for summary judgment on Count II.

### 3. *Count III – Any use of race as a factor in admissions*

Although each party moves for summary on each of the three counts alleged by SFFA, (*see* ECF No. 152 at 1; ECF No. 158 at 2), neither party appears to advance specific arguments as to why it should be granted summary judgment on Count III which alleges that any use of race as a factor in UNC's admissions decisions violates federal law. (ECF No. 1 ¶¶ 214–227.)

As previously discussed, however, (and as acknowledged by both parties)[17] under existing Supreme Court precedent, a university "may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'" *Fisher II*, 136 S. Ct. at 2210 (quoting *Fisher I*, 570 U.S. at 310). The Supreme Court has "made clear" that such a goal is a "compelling interest that justifies consideration of race in college admissions." *Id.* Accordingly, UNC's use of race in its admissions decisions would be constitutionally permissible if it is narrowly tailored to achieve this compelling interest. However, in light of the parties' failure to specifically address this Count, the Court will deny the parties' cross-motions for summary judgment on Count III.

### B.  <u>Motion to Seal</u>

The Court will next address Plaintiff's Motion to File Under Seal Pursuant to Local Rule 5.4(c), (ECF No. 170). Plaintiff moves this Court to file under the following materials under seal:

> (i)　　portions of Exhibit 16, filed in support of Plaintiff's Motion for Summary Judgment, (ECF No. 163-16), "which is an instant messaging conversation between [UNC] employees," (ECF No. 170 ¶ 4);

---

[17] (*See* ECF No. 153 at 30–32; ECF No. 159 at 32.)

(ii)     portions of Exhibit 31, filed in support of Plaintiff's Motion for Summary Judgment, (ECF No. 163-31), "which is a UNC applicant's transcript," (ECF No. 170 ¶ 6); and

(iii)    the entirety of Exhibit 33, filed in support of Plaintiff's Motion for Summary Judgment, (ECF No. 163-33), "which is a 'School Group Review' document containing the statistics and ratings of UNC applicants from a particular high school along with several annotations," (ECF No. 170 ¶ 8).

"It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014). "The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny." *Id.* "The common law," however, "does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). "The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that 'countervailing interests heavily outweigh the public interests in access.'" *Doe*, 749 F.3d at 265–66 (quoting *Rushford*, 846 F.2d at 253). The First Amendment presumptive right of access, in contrast, extends "only to particular judicial records and documents." *Id.* at 266. Further, the First Amendment presumptive right of access may only be restricted upon a showing that such a restriction is "necessitated by a compelling government interest and . . . narrowly tailored to serve that interest." *Id.* (internal quotation marks omitted).

"When presented with a request to seal[18] judicial records or documents, a district court must comply with certain substantive and procedural requirements." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 576 (4th Cir. 2004). Substantively, a district court must "first 'determine the source of the right of access with respect to each document.'" *Doe*, 749 F.3d at 266 (quoting *Va. Dep't of State Police*, 386 F.3d at 576). The Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion." *Id.* at 267. Therefore, the First Amendment right of access applies in this case, as the documents which are the subject of the motion to seal were filed with the Court in support of SFFA's motion for summary judgment.

Procedurally, a district court presented with a sealing request must

> (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Id.* at 272. Local Rule 5.4 outlines similar requirements.[19] LR 5.4. The burden rests on the party seeking to keep information sealed. *Va. Dep't of State Police*, 386 F.3d at 575. Here, UNC, as the party seeking to maintain the confidentiality of the documents at issue, bears this burden.

---

[18] Courts construe a request to redact a document as a request to seal in part. *ATI Indus. Automation, Inc. v. Applied Robotics, Inc.*, 801 F. Supp. 2d 419, 424–25 (M.D.N.C. 2011) (collecting cases).

[19] These requirements are: (1) stating "the reasons why sealing is necessary;" (2) explaining "why less drastic alternatives to sealing will not afford adequate protection;" (3) "[a]ddress[ing] the factors governing sealing of documents reflected in governing case law;" and (4) stating "whether permanent sealing is sought and, if not, stat[ing] how long the document should remain under seal and how the document should be handled upon unsealing." LR 5.4(b).

Considering both the substantive and procedural requirements necessary to rebut the First Amendment presumption of public access to the document in question, UNC has satisfied its burden. First, public notice of the request to seal presently before the Court was provided in January, 2019 and February, 2019, when SFFA filed the motion to seal and UNC filed its supporting brief. (*See* ECF Nos. 170, 173.) Next, as to Exhibit 16, UNC seeks "the sealing of a limited part" of this document which conceals the names and contact information of UNC's employees. (ECF No. 173 at 5.) Indeed, "the interest in protecting the personal privacy of [a] [d]efendant's employees and former employees represents a compelling interest sufficient to overcome both the common-law and the First Amendment right of access to *some* of the information . . . filed in connection with [SFFA's] summary judgment motion." *Corl v. Burlington Coat Factory of N.C., LLC*, No. 1:10CV406, 2011 WL 2607942, at *3 (M.D.N.C. June 30, 2011).

With respect to Exhibits 31 and 33, UNC "seeks to maintain under seal an applicant's high school transcript . . . and a document created during the course of the University's admissions process that contains information about a small set of applicants from a specific high school along with several annotations." (ECF No. 173 at 2; *see* ECF No. 170 ¶¶ 6, 8.) The Court finds that UNC's interest in preserving the confidentiality of the sensitive personal information regarding applicants who are non-parties to this action is sufficiently compelling to overcome the First Amendment presumptive right of access. *See Robinson v. Bowser*, No. 1:12CV301, 2013 WL 3791770, at *4 (M.D.N.C. July 19, 2013) (explaining that the interest in keeping "sensitive personal material regarding third parties[ ] private outweighs the First Amendment right of access"); *Nettles v. Farmers Ins. Exch.*, No. C06–5164RJB, 2007 WL

858060, at *1 (W.D. Wash. Mar. 16, 2007) (granting motion to seal in part because information at issue related to nonparties "who have not sought to place [their] private information in the public sphere"); *Vassiliades v. Israely,* 714 F. Supp. 604, 605 (D. Conn. 1989) ("Both the common law and the [F]irst [A]mendment protect the public's right of access to court documents. . . . The right of access, however, is not absolute. It can be overcome by a showing that placing the documents in question under seal will further other substantial interests, for example, . . . a third party's privacy interests.").

Further, as UNC correctly argues, the substantial interest protected by "the Family Educational Rights and Privacy Act ('FERPA') . . . and North Carolina law, including N.C. Gen. Stat. § 132-1 *et seq.*[,]. . . strongly weigh[ ] in favor of granting the motion to seal with respect to Exhibit 31 (the high school transcript of an applicant who matriculated at the University)." (ECF No. 173 at 3 (citing *Rosenfeld v. Montgomery Cty. Pub. Schs.*, 25 F. App'x 123, 132 (4th Cir. 2001) ("There is no doubt that the district court should consider FERPA in making its determination whether sealing of the documents in question is appropriate under the applicable First Amendment standard.")).)

The Court also finds that the proposed redactions of Exhibits 16 and 31, which appear narrowly tailored to serve the compelling interests, is a less drastic alternative to sealing the entire documents. Additionally, as to Exhibit 33, given the nature of the information contained in this document—namely, "the statistics and ratings of UNC applicants from a particular high school, along with several annotations," (ECF No. 170 ¶ 8)—the Court finds that permanently sealing the contents of the document is warranted. The Court will, therefore,

grant Plaintiff's motion to seal portions of Exhibits 16 and 31, as well as Exhibit 33 in its entirety.

## IV. CONCLUSION

Based on the above, the Court concludes that there are genuine issues of material fact as to each of the three counts alleged in SFFA's Complaint which preclude judgment as a matter of law on behalf of either party. Accordingly, the Court will deny the parties' cross-motions for summary judgment on each count. The Court further concludes that UNC has carried its burden of satisfying the requirements to permanently seal the limited information outlined above. The Court will, therefore, permanently seal the unredacted material filed in support of SFFA's motion for summary judgment, *i.e.*, ECF Nos. 171, 171-1, 171-2. A redacted version of these materials, (ECF Nos. 163-16, 163-31, 163-33, 170-1, 170-2, 170-3), shall remain accessible to the public.

For the reasons stated herein, the Court enters the following:

**[ORDER TO FOLLOW ON NEXT PAGE]**

# ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 152), is DENIED.

IT IS FURTHER ORDERED that SFFA's Motion for Summary Judgment Pursuant to Rule 56, (ECF No. 158), is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion to File Under Seal Pursuant to Local Rule 5.4(c) is GRANTED, and Exhibits 16, 31 and 33 (ECF Nos. 171, 171-1, 171-2), are and shall be permanently sealed. A redacted version of these materials, (ECF Nos. 163-16, 163-31, 163-33, 170-1, 170-2, 170-3), shall remain accessible to the public.

This, the 30th day of September 2019.

/s/ Loretta C. Biggs
United States District Judge