# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 1:14-CV-954

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **DECLARATION OF PATRICK FITZGERALD IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO SO-CALLED "PAPER CLASSES"** |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, et al., | ) ) ) | |
| Defendants. | ) | |

I, Patrick Fitzgerald, being over 18 years of age and fully competent to make this declaration, declare the following pursuant to 28 U.S.C. 1746:

1.      Attached as Exhibit 1 are true and accurate excerpts from the transcript of the deposition of Taffye Clayton.

2.      Attached as Exhibit 2 are true and accurate excerpts from the transcript of the deposition of Barbara Polk.

3.      Attached as Exhibit 3 are true and accurate excerpts from the transcript of the deposition of Carol Folt.

4.      Attached as Exhibit 4 are true and accurate excerpts from the transcript of the deposition of James Dean.

5.      Attached as Exhibit 5 is a true and accurate copy of SFFA's Pre-Trial Disclosures.

I declare under penalty of perjury that the foregoing is true and correct. '

Executed on October 19, 2020

/s/Patrick Fitzgerald
Patrick Fitzgerald

2

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-00954-LCB-JLW


STUDENTS FOR FAIR
ADMISSIONS, INC.,

                        Plaintiffs,

        vs.

UNIVERSITY OF NORTH
CAROLINA, et al.,

                        Defendants.


            _____


                    AMENDED DEPOSITION
                           OF
                DR. TAFFYE BENSON CLAYTON

        THIS DEPOSITION CONTAINS HIGHLY CONFIDENTIAL AND
    PROPRIETARY INFORMATION AND IS SUBJECT TO A PROTECTIVE
      ORDER RESTRICTING PUBLIC DISCLOSURE OF ITS CONTENTS


            _____




TAKEN AT THE OFFICES OF:
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
222 East Cameron Avenue
110 Bynum Hall
Chapel Hill, NC  27514


                        05-24-17
                        8:55 A.M.


            _____

                Michael B. Lawrence
                  Court Reporter


            Civil Court Reporting, LLC
                   P.O. Box 1146
                Clemmons, NC  27012
                  (336) 406-7684

1      Q.   (Mr. McCarthy) You've been handed what's

2  marked as ==Exhibit Number 28==.

3      A.   Okay.

4      Q.   Are you familiar with this document?

5      A.   I can't say that I've read this

6  document.

7      Q.   And I'll represent that this is not the

8  entirety of the investigation into regular classes

9  in the Department of African American Studies.

10      A.   Okay.

11      Q.   For shorthand, this is -- can I call

12  this the Wainstein report.  It's formally known

13  was the Investigation of Irregular Classes in the

14  Department of African and Afro-American Studies at

15  the University of North Carolina at Chapel Hill.

16      A.   Uh-huh (yes).

17      Q.   Okay.  I'll represent that this is an

18  excerpt.  It's not the entirety.  The whole thing

19  is several hundred pages long.

20      A.   Okay.

21             MS. COMBS:  Can we go off the

22  record for a moment?

23             MR. McCARTHY:  Sure.

24  (Off-Record: 4:42 p.m. to 4:47 p.m.)

25      Q.   (Mr. McCarthy)  Okay, Dr. Clayton.  If

1    I've already asked this, I apologize, but are you

2    -- are you aware of this controversy surrounding

3    these fraudulent classes?

4                    MS. COMBS:  Objection.

5        A.   I'm certainly aware of what's been

6    called the issues of academic fraud, but not with

7    any intimate ---

8        Q.   (Mr. McCarthy)  Okay.

9        A.   --- detailed nature.

10       Q.   Okay.  That's fine.  Could you turn this

11   to page 3

12       A.   Uh-huh (yes).

13       Q.   This was handed to you before the break.

14   I'll represent that this is an excerpt of the

15   larger report.

16       A.   Okay.

17       Q.   Okay.  The first bullet, can you read

18   there?

19       A.   "Between 1993 and 2011, Crowder and

20   Nyang'oro developed an ran a 'shadow curriculum'

21   within the AFAM Department that provided students

22   with academically flawed instruction through the

23   offering of 'paper classes.' There were classes

24   that involved no interaction with a faculty

25   member, required no class attendance or course

1    work other than a single paper, and resulted in

2    consistently high grades that Crowder awarded

3    without reading the papers or otherwise evaluating

4    their true quality."

5         Q.    Okay.  Can you read the next paragraph,

6    too?

7         A.    "Crowder and Nyang'oro were primarily

8    motivated to offer these classes by a desire to

9    help struggling students and student athletes.

10   Both felt sympathy for under-prepared students who

11   struggled with the demanding Chapel Hill

12   curriculum.  Crowder felt a strong affinity for

13   student athletes in particular, and she gave them

14   ready access to these watered-down classes to help

15   them manager their completing athletic and

16   academic time demands."

17        Q.    Okay.  So do you understand that this is

18   an independent investigation and one of the things

19   that it found was that this program here was being

20   run to the benefit of under-prepared and

21   unprepared students at UNC?

22                   MS. COMBS:  Objection.

23        A.    It appears that that's what I'm reading.

24        Q.    (Mr. McCarthy) And if you look down at

25   the third bullet, about halfway down the third

1    bullet on that same page.  So this is till page

2    three right beneath what you read before.

3            A.   Uh-huh (yes).

4            Q.   That third bullet where it says,

5    "Over..."?

6            A.   Yes.

7            Q.   Okay.  If you jump down a few lines for

8    the next sentence, you see this, "Through this

9    scheme..."?

10            A.   Uh-huh (yes).

11            Q.   "Through this scheme, over 3,100

12    students received one or more semesters of

13    deficient instruction and were awarded high grades

14    that often had little relationship to the quality

15    of their work."  Did I read that correctly?

16            A.    It appears that you read what's printed.

17            Q.   Okay.  And I'd like to jump to the

18    bullet at the bottom, same page.

19            A.   Uh-huh (yes).

20            Q.   The second sentence there says, "Of the

21    identifiable enrollments in lecture paper classes,

22    47.4 percent were student-athletes."  Did I read

23    that correctly?

24            A.    It appears that you did.

25            Q.   Okay.  So then most of the students in

1    these classes were non-athletes, correct?

2              MS. COMBS:  Objection.

3         A.   I don't know.  I mean, I see what's on

4    the paper, but I -- according to what's stated

5    here, it would appear that that is the case.

6         Q.   (Mr. McCarthy)  Okay.  The bullet just

7    above that, the fifth one, the second from the

8    bottom of it?

9         A.   Uh-huh (yes).

10        Q.   Can you read that for me?

11        A.   "The inflated grades from the paper

12   classes had a significant impact on student and

13   student-athlete GPAs and academic standing.  Each

14   paper class grade increased a student's GPA on

15   average by .03 grade points.  The significance of

16   this effect could be seen in the number of

17   students for whom the paper class grade made the

18   difference in reaching or not reaching a 2.0 grade

19   threshold."  Keep reading?

20        Q.   Sure.  Please.

21        A.   "In the case of 329 students, the grade

22   they received in the paper class provided the GPA

23   boost that either kept or pushed the GPA above the

24   2.0 level for a semester.  For 81 of those

25   students, the GPA boost was a margin that gave

1    them the 2.0 GPA they needed to graduate" -- or

2    "that allowed them" -- excuse me -- "to graduate."

3         Q.   Okay.  Does any of this -- what you read

4    here, does any of this make you question whether

5    or not UNC sometimes admits students who are

6    unprepared or under-prepared for the academic

7    rigors at UNC?

8                   MS. COMBS:  Objection.

9         A.   I'm not able to speculate.

10        Q.   (Mr. McCarthy) Okay.  Is it something

11   that you'd be interested in looking into if you

12   were still the head of DMA?

13                  MS. COMBS:  Objection.

14        A.   I'm not going to speculate.  I mean, I'm

15   -- I'm not still the head of DMA.

16        Q.   (Mr. McCarthy) I understand.  If this

17   were happening at Auburn, would it concern you?

18        A.   It is not happening at Auburn.

19        Q.   I understand.  You spent a lot for time

20   at UNC working on initiatives that relate to an

21   achievement and performance gap that relates to

22   minority males, correct?

23        A.   Depends -- really not being difficult,

24   it depends on what you believe is a lot of time.

25        Q.   Okay.

1          A.    I spent a lot of time on a number of

2     other things as well.

3          Q.    I'm sure you do.  You've very --

4     obviously a busy person here at the University.

5          A.    So there are many things that are a part

6     of the DMA portfolio.

7          Q.    Okay.

8          A.    Outside of minority male success.

9          Q.    Understood.  I don't doubt it.

10          A.    Okay.

11          Q.    Is it -- is it accurate that that was

12     one of the many things that you focused on?

13          A.    It was one of the many things.  One of

14     many.

15          Q.    Okay.  Learning this information, does

16     it make you consider further whether level of

17     preparedness has something to do with the

18     achievement and performance gap?

19                    MS. COMBS:  Objection.

20          A.    I don't consider my information to be

21     complete with respect to this and I don't want to

22     speculate.

23          Q.    (Mr. McCarthy)  I understand that.  I

24     wouldn't ask you to draw a conclusion based solely

25     on this.  Does it make you interested in

1    investigating the issue?

2          A.    It -- I can't answer that.  I'm no

3    longer here.

4          Q.    Okay.  Turn back to page 2 real quick,

5    the third and fourth paragraph down from the top.

6          A.    Uh-huh (yes).

7          Q.    Where it says, "Although..."?

8          A.    Yes.

9          Q.    Can you read that, please?

10         A.    "Although Nyang'oro acquiesced in

11   Crowder's paper class scheme and facilitated it in

12   a number of ways, Crowder was the one who

13   coordinated it.  When Crowder retired from the

14   University in 2009, she was no longer in a

15   position to arrange these classes, under-prepared

16   students and student-athletes began to struggle to

17   maintain academic eligibility.  At the request of

18   the ASPSA football counselors, Nyang'oro offered

19   several classes after Crowder's retirement that

20   followed a similar format and were equally lacking

21   in academic rigor."

22         Q.    So we've talked about on several

23   occasions the performance and graduate gaps.  I'll

24   just stop there with that.  I'm done with this

25   one.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-00954-LCB-JLW


STUDENTS FOR FAIR
ADMISSIONS, INC.,

                          Plaintiffs,

        vs.

UNIVERSITY OF NORTH
CAROLINA, et al.,

                          Defendants.



            _____

                        DEPOSITION
                            OF
                       BARBARA POLK

        THIS DEPOSITION CONTAINS HIGHLY CONFIDENTIAL AND
    PROPRIETARY INFORMATION AND IS SUBJECT TO A PROTECTIVE
      ORDER RESTRICTING PUBLIC DISCLOSURE OF ITS CONTENTS
            _____




TAKEN AT THE OFFICES OF:
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
222 East Cameron Avenue
110 Bynum Hall
Chapel Hill, NC  27514


                        05-19-17
                        8:30 A.M.


            _____

                      Dale L. Ring
                      Court Reporter


               Civil Court Reporting, LLC
                      P.O. Box 1146
                    Clemmons, NC  27012
                      (336) 406-7684

1        Q.   She used -- so she used to have that

2   role several years ago?

3        A.   Yes.

4        Q.   If you go back to the second page of

5   that exhibit with the base of 298, number 4 refers

6   to a student-level report on the academic progress

7   of nine special-talent student athletes who

8   enrolled in 2014.  Do you see that reference?

9        A.   Yes.

10        Q.   And without describing anything about

11   who those students are, can you tell me, does the

12   Faculty Advisory Committee typically review the

13   academic progress of special talent student-

14   athletes?

15        A.   They will receive updated reports from

16   time to time on the progress of student-athletes.

17        Q.   And sometimes student level reports?

18        A.   On occasion, student level reports.

19        Q.   And has that been true of the entirety

20   of the time you've served as a consultant to the

21   committee?

22        A.   For the most part, yes.

23        Q.   Is there a period of time where that was

24   not the case that you're thinking of when you say,

25   "for the most part"?

1      A.   It is not a report that is pre-defined in

2   time so, in other words, it is not a report that

3   says every November you will report on.  So there

4   may have been a year in there when the report was

5   not as specific.

6      Q.   Okay. Item number 5, refers to the

7   Faculty Advisory Committee's meeting jointly with

8   the Faculty Athletics Committee to receive

9   detailed information about athletics admissions,

10  including protected and confidential student

11  information discussed in closed session.  Do you

12  see that ---

13     A.   Yes.

14     Q.   --- item?  Did I read that correctly?

15     A.   Yes, you did.

16     Q.   Okay.  And is that a regular report or

17  is that some kind of specific meeting, you know,

18  to this year.

19     A.   That was a specific meeting to this

20  year.

21     Q.   And what was the reason for that

22  meeting?

23     A.   I was invited to attend the meeting.  I

24  was not one of the people involved in calling for

25  that meeting.  I believe the Faculty Athletics

1                    MR. SCUDDER:  Objection.

2          A.    Yes. I am aware that there have been

3    reports of that.

4          Q.    (Mr. Strawbridge)  Have you, in fact,

5    reviewed the report commissioned by the University

6    and prepared by lawyers from the Cadwalader law

7    firm?

8                    MR. SCUDDER:  Objection.

9          A.    I have reviewed part of that report, not

10   the report in its entirety.

11         Q.    (Mr. Strawbridge)  Is it called the

12   Wallenstein Report?

13                   MR. SCUDDER:  Objection.

14         Q.    (Mr. Strawbridge)  Or the Waynestein

15   Report.

16         A.    The Waynestein Report.

17         Q.    And what part of the Waynestein Report

18   did you review?

19                   MR. SCUDDER:  Objection.

20         A.    Elements of it related to admissions and

21   just flipping through it, various portions of it.

22         Q.    (Mr. Strawbridge)  Okay.  And what

23   specifically do you recall in that report relating

24   to admissions?

25                   MR. SCUDDER:  Objection.

```
 1                    MR. STRAWBRIDGE:  Counselor, would

 2      you like a standing objection?  I'd be happy to

 3      give it to you.

 4                    MR. SCUDDER:  Yeah, to the entire

 5      subject matter.

 6                    MR. STRAWBRIDGE:  And that's fine.

 7                    MR. SCUDDER:  All right.

 8           A.   References made to admissions and

 9      perceived admissions of students who were not

10      qualified to be at the University.

11           Q.   (Mr. Strawbridge)  Do you know whether

12      the admissions office generally concluded that, in

13      the wake of the Waynestein Report, that there were

14      some students whose admission to the University

15      was inconsistent with the standards of the

16      admissions office?

17           A.   No, I do not believe that the admissions

18      office concluded that.

19           Q.   In response to the issues raised by the

20      Waynestein Report, do you know whether the

21      admissions office made any changes at all to its

22      procedures with respect to special talent

23      admissions?

24           A.   The admissions office has made changes

25      to the procedures, but not in response to that
```

1    rise to the level that would make them competitive

2    applicants ---

3          A.    Correct. ---

4          Q.    --- to the University?

5          A.    Correct.

6          Q.    Do you know in a given year how many

7    students are admitted approximately through the

8    special talent committee who do not meet the

9    minimum admissions requirements?

10         A.    Through the special talent committee?

11         Q.    Right.

12         A.    Last year I believe there were none.

13   Year before that, there were fewer than -- there

14   were five or fewer.  Before that, I don't recall

15   that the numbers have been single digit numbers or

16   zero.

17         Q.    Were you interviewed at all as part of

18   the Waynestein Report?

19         A.    I was not.

20               MR. SCUDDER:  Same standing

21   objection to that subject matter.

22         Q.    (Mr. Strawbridge)  And do you know

23   whether anyone else in the admissions office was

24   interviewed as part of that report?

25         A.    I believe Mr. Farmer was interviewed.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-00954-LCB-JLW

STUDENTS FOR FAIR
ADMISSIONS, INC.,

                         Plaintiffs,

    vs.

UNIVERSITY OF NORTH
CAROLINA, et al.,

                         Defendants.

_____

DEPOSITION
OF
CAROL LYNN FOLT
_____

TAKEN AT THE OFFICES OF:
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
222 East Cameron Avenue
110 Bynum Hall
Chapel Hill, NC  27514

05-31-17
8:32 A.M.

_____

Cindy A. Flethcer
Court Reporter

Civil Court Reporting, LLC
P.O. Box 1146
Clemmons, NC  27012
(336) 406-7684

 1      that we weren't going to use it, talk about it or

 2      do anything with it.  But -- so I did not pursue

 3      -- review this in great detail.

 4             Q.   Did you refuse to have any -- any

 5      communications with the students who presented

 6      this list of demands?

 7             A.   I don't even know who the students were.

 8      There wasn't a set group of students.  I met with

 9      many students about many things all in the town

10      hall.  I didn't ask any one of them if they had

11      anything to do with the production of this

12      document.

13             Q.   All right.  Did you express -- did you

14      express appreciation for the sharing of their

15      ideas at the town hall?

16             A.   Of this particular group?  I expressed

17      my appreciation for the sharing of everybody's

18      ideas at the town hall.

19             Q.   Was this list of demands read at the

20      town hall out loud?

21             A.   I think they did read part of it.  Some

22      students stood up and asked them to stop reading

23      and they did and left.

24             Q.   Are you familiar with the Wainstein

25      Report?

1          A.    Yes.

2          Q.    And what is the Wainstein Report?

3          A.    Well, it's not actually called the

4     Wainstein Report, but it was a report that was

5     produced by Cadwalader Firm to investigate

6     academic irregularities here.

7          Q.    And, I guess, it's not called the

8     Wainstein Report.  What do -- what do you refer to

9     it as?

10          A.    Well, is the -- it was produced by the

11     Cadwalader Group.  But I mean, I know what it is,

12     the Wainstein Report.

13          Q.    Who hired the Cadwalader Group?

14          A.    Tom Ross, the President of the system.

15          Q.    Is that who proceeded Margaret

16     Spellings?

17          A.    Yes.

18          Q.    Okay.  So he was hired by the University

19     system?

20          A.    Yes.

21          Q.    Okay.

22          A.    You know, in conjunction with UNC, but

23     he's the lead official on that.

24          Q.    It was paid for by the University

25     system?

```
 1              A.    No.   We paid for it.

 2              Q.    But UNC paid for it?

 3              A.    Yes.  But it was not -- we were not --

 4       we didn't do the hiring.  The lawyer was the

 5       system lawyer.  The president was the person on

 6       record.

 7              Q.    Right.  Have you reviewed the report?

 8              A.    Yes.

 9              Q.    And do you disagree with its findings?

10                    MR. SCUDDER:  I'm just going to

11       make a subject matter -- standing objection to the

12       subject matter just so I don't object all the

13       time.

14                    MR. STRAWBRIDGE:  Yeah.  I

15       recognize -- I recognize your standing objection

16       to this line of inquiry.

17                    MR. SCUDDER:  Okay.  Thank you.

18              A.    Are you asking me for a blanket

19       statement of agreement in which case I won't --

20       can't give you that.

21              Q.    (Mr. Strawbridge)  All right.  Do you

22       have -- just sitting here today can you think of

23       any specific disagreements you have with the

24       factual findings?

25              A.    There are many.  We had a number of
```

1    people who -- when we talked to Mr. Wainstein

2    himself, he said, "This is not to be used as an HR

3    document.  I've given you some information.  You

4    have to pursue it."  We found areas, even down to

5    what the name of a person's title was, whether

6    they were present in a meeting or not, so I can't

7    -- you know, many other details.  It's pretty --

8    pretty -- a pretty long list.

9         Q.   Okay.

10              (EXHIBIT NUMBER 15 WAS MARKED)

11        A.   Two hands for this one?

12        Q.   I obviously don't expect you to read the

13   document.

14        A.   Thank you.

15        Q.   Why don't we just try to make this

16   simple.

17        A.   Okay.

18        Q.   Do you -- do you disagree with the --

19   with the finding that there were classes offered

20   that are described in the Wainstein Report that

21   didn't meet the academic standards for UNC?

22        A.   Yes.

23        Q.   You agree that -- that students were

24   given the opportunity to -- to earn grades in

25   classes that -- that did not meet UNC's academic

 1    standards?

 2          A.   Yes.

 3                MR. SCUDDER:  Patrick, hopefully we

 4    can keep this line of questions short.  The report

 5    is what it is.

 6          A.   I've also made a lot of public

 7    statements and, you know, I might be in the middle

 8    of an NCAA investigation, so I can't, nor will I,

 9    talk about much of it.

10          Q.   (Mr. Strawbridge)  Well, I want to talk

11    just a few specific findings with respect to ---

12          A.   Some of those might be covered in that.

13          Q.   Let me ask you this.  Do you know, for

14    example, whether or not the University has looked

15    to see what the ethnic breakdown was of the

16    students who took these paper classes?

17          A.   Can I talk to my legal counsel about

18    this?  I can't talk about things that might have

19    been gone -- you know, that there might be

20    conversations amongst people who were preparing

21    reports that I was not a part of, looking at the

22    data.  I really am not a part of all of that

23    information.

24          Q.   I know you said -- my question is just,

25    do you know whether or not the University is

```
 1        undertaking that analysis?
 2                    MR. SCUDDER:  Well, let me -- let
 3        me just -- let me say this out loud.  Why don't
 4        you answer it yes or no within the confines of
 5        your own personal knowledge.  Do you have
 6        knowledge of whether somebody has done what he
 7        just asked?  Just answer it yes or no and then
 8        stop there.
 9        A.    Yeah.  Yes.
10        Q.    (Mr. Strawbridge)  Okay.  You do know?
11        A.    I think -- I think so.
12        Q.    Okay.  All right.  So my -- my question
13        is has somebody looked at that?  Yes or no?
14        A.    And I'm going to say I think so.
15        Q.    You think somebody has.  Okay.  And who
16        has looked at that?
17        A.    As part of our analysis for the NCAA I
18        think people have looked at who was in the
19        classes.
20        Q.    Right.  And it is in fact -- is it UNC's
21        position, including the public statement they
22        released back -- within the last week or two that
23        the majority of the students who took those
24        classes were not athletes?
25        A.    Yes.
```

Case 1:14-cv-00954-LCB-JLW   Document 217   Filed 10/20/20   Page 27 of 57

```
 1           Q.   And ---
 2           A.   Seventy -- 70 percent or so were not.
 3           Q.   Right.  And I believe there's some
 4      dispute as to how you determined whether someone's
 5      an athlete given their ---
 6           A.   No.  I think there's no dispute that
 7      that -- I think that's, again -- it's defined by
 8      someone participating in athletics when they take
 9      the class.
10           Q.   You don't -- you don't -- do you think
11      that the -- that the NCAA has a different figure
12      for how many of those students were athletes?
13                     MR. SCUDDER:  I object.  I wouldn't
14      answer that.
15           A.   NCAA looks at athletes as people who are
16      participating in ---
17                     MR. SCUDDER:  I wouldn't --
18      Chancellor, I wouldn't answer that on behalf of
19      the NCAA.
20                     THE WITNESS:  Okay.
21           Q.   (Mr. Strawbridge)  On page three of the
22      Wainstein Report, the second-to-last bullet from
23      the bottom.  It starts with, "The inflated
24      grades..."
25      (Witness examined document)
```

1          Q.   Have you had a chance to read that

2    paragraph?   The paragraph is describing the

3    findings of the -- the this Cadwalader

4    investigation with respect to the number of

5    students for whom the grades they received in the

6    paper classes affected their -- their ability to

7    graduate or maintain a 2.0 grade threshold.

8    That's the -- that's the topic of this paragraph,

9    correct?

10         A.   Yes.

11         Q.   Okay.  We talked about, you know,

12   whether you disagreed with anything in the report

13   or not and you said there were lots of errors.  Do

14   you know whether or not you have any basis to

15   challenge the accuracy of this paragraph of the

16   report?

17         A.   Yes, we do.

18         Q.   Do you challenge the accuracy?

19         A.   We do challenge the accuracy.

20         Q.   And can you describe to me what you

21   think is in error in this paragraph?

22         A.   That would be part of the document that

23   has been produced.  I can't give you the details

24   on that.

25         Q.   You -- you think that the explanation as

1    to why this paragraph is wrong is in the document

2    that UNC just released ---

3         A.   Yes.

4         Q.   --- in it's response ---

5         A.   Yes.

6         Q.   --- to the incident investigations?

7         A.   Yes.

8         Q.   Okay.  I'll ask you just about one or

9    two more things in this report.  On the same

10   page ---

11        A.   That was page?

12        Q.   Page three of the Cadwalader report --

13   the second bullet point discusses the motivations

14   of the two individuals who this report identifies

15   as sort of being at the head of the -- the paper

16   classes effort, and it says, quote, "Both felt

17   sympathy for under-prepared students who struggled

18   with the demanding Chapel Hill curriculum."  Do

19   you see that ---

20        A.   I do.

21        Q.   --- those first two sentences of that

22   bullet point?

23        A.   I do.

24        Q.   Sitting here today, do you have any

25   basis to challenge the accuracy of this statement

1     regarding their motivation as to why they -- why

2     they undertook the -- the paper classes process?

3                    MR. SCUDDER:  So you're asking her

4     to speak to the motivation of two individuals,

5     Debbie Crowder and Professor Nyang'oro, in a case

6     that's about whether undergraduate admissions

7     practices comply with U.S. Supreme Court

8     standards.  Is that the question?

9                    MR. STRAWBRIDGE:  My question is

10    whether or not she has any factual basis to

11    challenge the -- the reason given for the

12    motivation of the individuals who were providing

13    the paper classes.  That's the question.

14                   MR. SCUDDER:  I'm -- I'm really

15    close to instructing her not to answer the whole

16    line of inquiry.  She's going on a trip tomorrow

17    to Africa.  The report is what it is.  The

18    University's put everything out there publicly.  I

19    think this is, with all respect, at the extreme

20    fringes of anything even remotely close to

21    relevant here.

22                   MR. STRAWBRIDGE:  This is my

23    question, Counselor.

24                   MR. SCUDDER:  You said you have one

25    or two more?  Answer that question.  We'll hear

```
 1    one more and then I think that's it.
 2         A.   So are you asking me to say whether I
 3    think Wainstein, whoever wrote that, had factual
 4    -- I don't know what you're asking me.
 5         Q.   (Mr. Strawbridge)  That's not -- my
 6    question is -- the same question -- do you -- do
 7    you have any basis to challenge the statement as
 8    to the motivation of these individuals?
 9         A.   I do.
10         Q.   Okay.  You think they were motivated by
11    something else?
12         A.   I've never spoken to them, so I have no
13    reason to support or decline it.  I don't -- I
14    have no basis ---
15         Q.   You don't know one way or the other?
16    You don't -- you don't have any basis to know
17    whether this is true or not true, the statement of
18    their motivation?
19                   MR. SCUDDER:  I think that was the
20    answer.  What's the next question?
21                   MR. STRAWBRIDGE:  Well, no.  Please
22    just let the witness answer the question, Mike.
23         A.   I can't comment on your question.  I've
24    never spoken to them.  I wasn't -- you know, I
25    don't have any basis to even comment on the
```

Case 1:14-cv-00954-LCB-JLW   Document 217   Filed 10/20/20   Page 32 of 57

 1     question.

 2          Q.   (Mr. Strawbridge)  Okay.  You don't know

 3     one way or the other?

 4          A.   I don't know their motivation.

 5          Q.   Okay.

 6          A.   This didn't instruct me.  I don't know

 7     it.

 8                    MR. STRAWBRIDGE:  Why don't we take

 9     a -- take a short break here and I may have just

10     one more segment.

11                    MR. SCUDDER:  Okay.

12                    THE WITNESS:  Okay.

13     (Brief recess: 3:21 p.m. to 3:30 p.m.)

14          Q.   (Mr. Strawbridge)  Before we stop, Ms.

15     Folt, I just want to say is there anything from

16     your testimony today that you'd like to clarify or

17     otherwise expand upon or that you don't think you

18     answered, you know, to the best of your ability?

19          A.   I don't think so.

20          Q.   Okay.

21                    MR. STRAWBRIDGE:  We're going to

22     just reserve the right -- there's some time

23     remaining -- we'll leave it open just as a

24     precaution because there are still some documents

25     to be produced.  I don't anticipate any need to

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-00954-LCB-JLW


STUDENTS FOR FAIR
ADMISSIONS, INC.,

                        Plaintiffs,

      vs.

UNIVERSITY OF NORTH
CAROLINA, et al.,

                        Defendants.


_____

DEPOSITION
OF
JIM DEAN

THIS DEPOSITION CONTAINS CONFIDENTIAL AND
PROPRIETARY INFORMATION AND IS SUBJECT TO A PROTECTIVE
ORDER RESTRICTING PUBLIC DISCLOSURE OF ITS CONTENTS

_____




TAKEN AT THE OFFICES OF:
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
222 East Cameron Avenue
110 Bynum Hall
Chapel Hill, NC  27514



                        06-23-17
                        9:03 A.M.


_____

Diane W. Ellison
Court Reporter


Civil Court Reporting, LLC
P.O. Box 1146
Clemmons, NC  27012
(336) 406-7684

 1    you have guaranteed access to one of the

 2    universities in Georgia.  Whether it's the

 3    flagship campus or not, I'm not sure.  And I think

 4    at some level they provide you a scholarship.

 5         Q.   And by "performance" are you referring

 6    to, like, standardized test scores?

 7         A.   I thought that it was grades, to tell

 8    you the truth.

 9         Q.   Okay.  In your role as, sort of, chief

10    academic officer at the university, did you have

11    responsibility for managing the issues that arose

12    with respect to the so-called paper classes

13    controversy?

14              MR. SCUDDER:  Objection.

15         A.   I was part of the team that had the

16    responsibility, yes.

17         Q.   (Mr. Strawbridge)  Did that -- did --

18    are you familiar with the Wainstein report?

19         A.   Yes.

20         Q.   Did the Wainstein report -- was that

21    issued before or after you assumed the role of

22    provost?

23         A.   After.

24         Q.   After?

25              MR. SCUDDER:  Patrick, can I -- can

 1    I lodge a standing objection to ---

 2                    MR. STRAWBRIDGE:  You can lodge a

 3    standing objection on relevance to this line of

 4    questioning.

 5         Q.   (Mr. Strawbridge)  And do you -- did

 6    the -- did the events that the Wainstein report

 7    analyzes -- did those precede or take place when

 8    you were provost?

 9         A.    Preceded.

10         Q.    Preceded.  So in particular we're

11    talking about concerns about classes within

12    certain departments for which there -- there were

13    concerns they were not up to UNC's academic

14    standards?

15         A.    Right.

16                    MR. SCUDDER:  Object to the form.

17         A.    Right.  And to be more precise, my

18    understanding is that those classes ended -- I

19    believe it was in 2011.  It might have been 2010.

20    And, again, I became provost in 2013.

21         Q.    (Mr. Strawbridge)  At the time you

22    became provost, had -- had information about those

23    classes already been publicized or otherwise had

24    the Wainstein -- had Mr. Wainstein began working

25    on his report?  Were you aware of the

1    investigation?

2                        MR. SCUDDER:  Objection to the

3    form.

4                        MR. STRAWBRIDGE:  That's a lot of

5    questions, actually.

6                        THE WITNESS:  Okay.  So two.

7        A.    So had information about the classes

8    become generally known?  Yes.

9             Had the Cadwalader firm started working

10   on the report?  No.

11       Q.    (Mr. Strawbridge)  Do you know whose

12   decision it was to hire the Cadwalader firm?

13       A.    It was a joint decision between the

14   chancellor of the university, Carol Folt, and the

15   then president of the university system, Tom Ross.

16       Q.    Okay.  And what role, if any, did you

17   have with respect to the university's

18   investigation into those -- into that issue?

19       A.    Okay.  So I want to be really clear I'm

20   answering the question that you're asking.  So the

21   investigation into that issue broadly construed?

22       Q.    I assume that, among other things -- did

23   you cooperate with the Wainstein investigation?

24       A.    Yes.  I was interviewed by one of his

25   associates.

 1          Q.   Did you undertake your own investigation

 2     or your own efforts to address the issues that

 3     came to light as part of this underlying concern

 4     about these classes?

 5                    MR. SCUDDER:  Object to the form.

 6          A.   Yes.

 7          Q.   (Mr. Strawbridge)  And can you just

 8     generally describe to me what your -- what your

 9     own efforts entailed?

10          A.   Uh-huh (yes).  Well, my particular role,

11     along with some colleagues, was to try and

12     understand the role that various individuals on

13     campus had played with respect to the classes in

14     question and try and understand what their level

15     of culpability might have been.

16          Q.   Okay.  Do you know, was any discipline

17     imposed as a result of your investigation?

18                    MR. SCUDDER:  Objection.

19          A.   I don't actually know if I can talk

20     about this, because it's a personnel issue, and I

21     don't know who gets to say whether I can talk

22     about it or not.  I mean, these are personnel

23     decisions that are ---

24          Q.   (Mr. Strawbridge)  Still ongoing?

25          A.   Well, they're not necessarily ongoing,

 1   but the university has some controls about being

 2   able to talk about personnel issues.

 3        Q.   Let me ask you this:  Is there any

 4   public-disclosed discipline that has taken place

 5   that you're aware of?

 6        A.   I'm trying to remember whether we had to

 7   report that or not.  I believe that we did

 8   ultimately disclose that certain individuals had

 9   left the university as a result of this.

10        Q.   Okay.  And do you know where that would

11   have been disclosed publicly?

12              MR. STRAWBRIDGE:  I think that will

13   avoid the privilege issue if I just ask him where.

14              MR. SCUDDER:  Yeah.

15              MR. STRAWBRIDGE:  We can refer to

16   that outside the context of this deposition.

17        A.   I don't remember exactly.  I don't

18   exactly think we would have done a press release

19   saying certain people have left.  So I don't

20   really remember exactly how it was disclosed, but

21   I believe that it was.

22        Q.   (Mr. Strawbridge)  Do you know whether

23   any part of your investigation included an

24   analysis as to the demographics of the students

25   who were involved in the classes that were the

 1    subject of that investigation?

 2                    MR. SCUDDER:  Objection.

 3        A.    No.

 4        Q.    (Mr. Strawbridge)  You don't know or you

 5    know that their -- your investigation did not

 6    include that?

 7        A.    That wasn't the focus of my

 8    investigation, correct.

 9        Q.    Do you know whether anyone else at the

10    university has analyzed that question?

11        A.    Has analyzed the demographic makeup of

12    the students who took the classes?

13        Q.    Correct.

14        A.    We're involved in an investigation with

15    respect to the NCAA, and have been for a number of

16    years, and my understanding is that the law firm

17    that we're working with on that case has done some

18    analysis of that.

19        Q.    Do you know whether or not anybody has

20    done any analysis of the ethnicity of the students

21    who were involved in taking those classes?

22        A.    I believe ---

23                    MR. SCUDDER:  Outside of the

24    context of the NCAA investigation?

25                    MR. STRAWBRIDGE:  I guess in any

 1    investigation.  I don't know if -- if his answer

 2    was limited to the NCAA investigation.  I'm just

 3    asking whether there's any -- if he has any

 4    knowledge of any -- of any analysis of the

 5    ethnicity of the students who took the classes.

 6                    MR. SCUDDER:  So, Jim, to the

 7    extent that you can answer that question without

 8    revealing information that's confidential with

 9    respect to an ongoing investigation by the NCAA,

10    you can answer it.  Otherwise I'm going to ask you

11    not to answer it.

12                    THE WITNESS:  Okay.

13         A.    Outside the context of the NCAA

14    investigation, to my knowledge, there's been no

15    such analysis.

16         Q.    (Mr. Strawbridge)  Okay.  And you're --

17    and you're not answering one way or the other with

18    respect to within the context of the NCAA

19    investigation?

20         A.    Correct.

21         Q.    Okay.  What -- to what extent did this

22    issue affect admissions policies during your

23    tenure in the provost's office?

24                    MR. SCUDDER:  Objection, including

25    to the form.

1        A.    And when you say "this issue," you're

2    referring to the paper class issue?

3        Q.    (Mr. Strawbridge)  Yes.

4        A.    Okay.  And the question was, just to be

5    sure I got it right, to what extent did that whole

6    thing influence admissions policies at the

7    university?

8        A.    Put it this way.  As part of your review

9    of the -- of the paper classes issue, was there a

10   review done of the special-talent admissions

11   process at UNC?

12              MR. SCUDDER:  Same objection.

13       A.    There was a review done.  It was not

14   part of my specific review coming out of the

15   Wainstein report, because we actually started it

16   before that.

17              And so when -- when I started as

18   provost, I approached the athletic director --

19   this is all public information -- I approached the

20   athletic director, Bubba Cunningham -- when it

21   became clear that there still may be unresolved

22   issues, again, post me becoming provost, pre

23   Wainstein report, I approached him and said that I

24   thought that we needed to really take a deep dive

25   in everything having to do with student athletes

 1    at the University of North Carolina.  And the

 2    approach that we agreed on was -- is sometimes

 3    called process reengineering, if that's something

 4    you're familiar with.

 5            And so basically what we did is, we

 6    identified effectively 20 different processes that

 7    had to do with student athletes, from the initial

 8    recruiting of student athletes all the way through

 9    and beyond graduation, and we formed a team of ten

10    people to review literally every element of it.

11    It took two years to do that, and we're now going

12    back through it on a systematic basis, going

13    through the processes.

14            One of the 20 processes is admissions,

15    and so in that context we looked at the admissions

16    policies for special talent, including but not

17    limited to student athletes.

18       Q.   (Mr. Strawbridge)  And do you know

19    whether any changes were made to the

20    special-talent admissions policy as part of that

21    review?

22       A.   Yeah.  I know that there weren't,

23    because we reviewed the policy.  It was somewhat

24    new at the time, maybe a couple of years in, and

25    the group felt that it was too -- too recent to

 1    really draw any conclusions as to whether it was

 2    effective or not.

 3            We have subsequently reviewed that

 4    policy again and basically are pleased with the

 5    outcome of the admissions decisions and have not

 6    changed the policy.

 7        Q.   So is it -- is it your testimony that

 8    the special-talent admissions process had been

 9    reformed a few years earlier, before you began

10    doing this look following your conversation with

11    the athletic director?

12            MR. SCUDDER:  Objection, including

13    to the form.

14        A.   That is my understanding.

15        Q.   (Mr. Strawbridge)  Okay.  And that --

16    and that change took place independent of any

17    publicity or concerns that arose out of the paper

18    classes dispute?

19        A.   That I couldn't say.  It was before my

20    time.  I'm not sure exactly.

21        Q.   And you said that -- you said that your

22    process review was -- was pre Wainstein report,

23    but I take it ---

24        A.   We started it pre Wainstein, but it

25    continued.

1           Q.   But I take it, it was prompted in part

2    by some of the -- some of the public concern over

3    the academic issues with respect to the athletic

4    department that were investigated by the Wainstein

5    report?

6                    MR. SCUDDER:   Objection to the

7    form.

8           A.   Yes.

9           Q.   (Mr. Strawbridge)  Do you understand

10   that you've been designated in this case to

11   testify about reports, analysis, or assessments in

12   the admissions office of progress toward the

13   university's diversity goals?

14          A.   Yes.

15          Q.   Okay.  Now, I'll say I think you've been

16   designated on that topic for a specific period of

17   time.

18          A.   Uh-huh (yes).

19          Q.   And let me ask you this:  At any point

20   in time have you had oversight over the Office of

21   Diversity and Multicultural Affairs?

22          A.   Yes.

23          Q.   Okay.  When -- when have you had

24   oversight over that office?

25          A.   When I became provost, I had oversight

```
1    of that office, and roughly a year later -- I

2    don't have the exact date, but roughly a year to

3    maybe a year and a half later we decided to move

4    that office under a newly created position of the

5    vice chancellor for workforce strategy, equity,

6    and rngagement.

7         Q.   Okay.  And is that an office that

8    doesn't directly report to you?

9         A.   Correct.

10        Q.   So now -- does that office now report

11   directly to the chancellor's office?

12        A.   Yes.

13        Q.   And do you know why the decision was

14   made to shift that line of reporting?

15        A.   Yes.  We were creating a comprehensive

16   organization under our new vice chancellor,

17   Felicia Washington, who had a deep background in,

18   effectively, human resources law, and we felt that

19   grouping the diversity and multicultural affairs

20   office with the other offices over which Felicia

21   has responsibility made more sense than to have it

22   in the provost's office.

23        Q.   And is there any particular reason why

24   it made more sense?

25        A.   Well, there was the equal opportunity
```

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:14-CV-954**

| | |
|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S PRETRIAL DISCLOSURES** |
| **UNIVERSITY OF NORTH CAROLINA et al.,** | |
| **Defendants.** | |

Pursuant to Rule 26(a)(3) of the Federal Rules of Civil Procedure and Local Rule 40.1, Plaintiff Students for Fair Admissions, Inc. submits the following pretrial disclosures:

**A. Witness expected to testify at trial.**

In addition to those witnesses identified below, Plaintiff reserves the right to call any witness identified by Defendants. Plaintiffs also reserve the right to call any witnesses as may be necessary to rebut or impeach testimony or other evidence presented by Defendants. Plaintiff identifies the following witnesses expected to testify at trial:

(1) Jennifer Kretchmar

(2) Yolanda Coleman

(3) Peter Arcidiacono

(4) Richard Kahlenberg

**B. Witnesses whose testimony is expected to be presented by means of deposition.**

Plaintiff intends to introduce witness testimony through the deposition designations identified below.

| Witness | Deposition Designations |
|---|---|
| Andrew Parrish | 8:8-10:11; 13:9-15; 13:18-15:16; 16:1-6; 21:22-24:10; 31:3-32:3; 33:22-36:16; 40:2-41:2; 42:2-18; 46:19-48:15; 70:2-71:12; 86:6-88:12; 113:3-24; 115:8-121:16; 122:11-123:12; 124:10-16; 199:23-202:2; 207:4-24; 217:1-25; 223:2-10; 237:22-241:8 |
| Lynn Williford | 8:12-15; 18:24-21:20; 102:4-17; 105:2-19; 139:1-15; 162:7-25; 193:16-197:5 |
| Rumay Alexander | 8:12-9:4; 13:15-17:25; 55:20-56:19; 79:25-87:4 88:17-89:19; 91:1-93:23; 95:19-97:5; 200:22-201:8; 255:16-256:10; 257:20-259:13; 260:17-264:23 |
| Ni-Eric Perkins | 8:8-10; 11:10-14:17; 37:19-38:19; 40:3-43:10; 44:25-45:8; 92:5-95:7; 97:3-15; 98:24-100:4; 101:24-102:2; 105:10-19; 111:16-112:7; 117:11-18; 119:15-121:7; 170:19-171:25; 224:19-230:17; 231:9-22; 247:22-248:24; |
| Carol Folt | 7:14-20; 12:9-15:14; 34:24-46:17; 51:5-58:1; 68:5-13;72:5-8; 75:19-76:3; 76:16-79:2; 118:2-132:25; 143:14-145:6; 146:7-148:2; 167:4-168:5; 172:8-174:1; 174:13-175:17; 176:6-184:8; 303:24-305:8; 306:23-307:2; 307:13-309:2 |
| Michael Kosorok | 7:13-18; 13:18-17:21; 28:1-8; 29:2-30:7; 42:1-8; 43:20-45:20; 47:11-50:17; 82:19-84:18; 85:20-86:1; 88:10-98:20; 104:5-107:2; 107:19-108:16; 116:16-130:24; 149:23-174:7; 175:3-9; 177:13-181:1; 186:2-189:6; 190:24-191:7; 194:2-199:9; 201:1-203:9; 203:21-204:23; 207:23-208:18; 215:1-217:14; 221:6-223:25; 224:19-225:15; 230:2-232:24; |
| Patrick Curran | 7:15-19; 12:2-13:17; 13:24-14:7; 15:5-18:4; 19:6-21:3; 23:5-25; 24:24-25:20; 27:10-23; 30:24-31:7; 33:11-34:14; 34:25-37:8; 42:5-23; 43:17-45:3; 49:20-50:5; 94:5-95:3; 95:16-96:2; 96:17-99:12; 99:24-100:8; 100:15-102:17 |
| Jim Dean | 7:15-23; 18:20; 19:24-21:13; 26:4-8; 29:1-38:8; 46:9-23; 47:5-49:17; 50:3-21; 51:9-18; 55:7-56:8; 56:19-58:22; 65:24-69:22; 73:13-81:25; 82:8-89:11; 90:1-101:12; 103:3-115:2; 126:10-127:22; 128:15-129:14; 131:1-12; 142:22-145:5; 152:9-21; 166:8-168:5; 177:11-178:24; 183:16-186:3; 188:19-190:7; 191:6-192:7; 193:15-195:6; 196:4-18; 209:6-11; 220:15-221:7; 222:5-226:4; 268:14-271:20; 292:20-293:23 |
| Christopher Faison | 7:18-23; 13:23-17:8; 22:10-29:10; 99:11-107:24; 159:2-19; 287:16-325:22 |

| Dr. Mitchell Chang | 6:4-7:18; 12:2-14; 13:14-16:1; 19:8-17; 23:8-21; 25:21-26:4; 86:23-87:12; 89:5-17; 90:4-11; 134:11-135:1 |

## C. Exhibits expected to be offered at trial.

Plaintiff identifies the following items for possible presentation at trial. Where a document is identified by its Bates number, that number is for the parent document and the exhibit includes any members of the parent's family.

(1)    UNC's Answer

(2)    UNC's Objections and Responses to Plaintiff's First Set of Interrogatories

(3)    UNC's Objections and Responses to Plaintiff's Second Set of Interrogatories

(4)    UNC's Responses and Objections to Plaintiff's First Requests for Admissions

(5)    UNC0079951: Email from S. Farmer to B. Polk concerning OCR Guidance and *Fisher* (June 26, 2013)

(6)    UNC0324038: Email from S. Farmer to B. Polk concerning meeting after *Fisher* was decided (July 18, 2013)

(7)    UNC0080085: Email from S. Farmer to J. Kretchmar concerning data provided for *Fisher* amicus brief (July 30, 2013)

(8)    UNC0325551: Email from K. Simmons to others concerning OCR investigation (Sept. 3, 2013)

(9)    UNC0080315: Email from B. Haven to Undergraduate Advisory Committee concerning *Fisher* decision (Sept. 4, 2013)

(10)   UNC0080443: Email from S. Farmer to B. Polk concerning starting RNA group (Sept. 19, 2013)

(11)   UNC0080714: Email from S. Farmer to B. Polk concerning RNA group agenda (Oct. 1, 2013)

(12)   UNC0081010: Email from S. Famer to B. Polk concerning RNA group invitation (Oct. 22, 2013)

(13)   UNC0079651: Draft Agenda for Working Group to Consider Race-Neutral Alternatives to Admissions (Sept. 7, 2013)

(14)   UNC0096472: Email from Stephen Farmer to Deborah Stroman concerning working group to consider race-neutral alternatives (Nov. 21, 2013)

(15)   UNC0079624: Agenda for Working Group to Consider Race-Neutral Alternatives to Admissions (Dec. 19, 2013)

3

(16)  UNC0103667: Email from J. Kretchmar to B. Polk & L. Williford concerning RNA 10% analysis (Jan. 10, 2014)

(17)  UNC0103670: Email from J. Kretchmar and L. Williford concerning literature review (Jan. 10, 2014)

(18)  UNC0079713: Agenda for Working Group to Consider Race-Neutral Alternatives to Admissions (Feb. 26, 2014)

(19)  UNC0323911: Email from K. Simmons to others concerning OCR letter about RNA (April 21, 2014)

(20)  UNC0324931: Email from B. Polk to others concerning RNA group (June 13, 2014)

(21)  UNC0147850: Email from Yolanda Coleman to Yolanda Keith concerning NACAC presentation (June 18, 2014)

(22)  UNC0079650: Agenda for Working Group to Consider Race-Neutral Alternatives to Admissions (Oct. 14, 2014)

(23)  UNC0079625: Email from A. Ashley to others concerning RNA working group (Dec. 18, 2013)

(24)  UNC0096542: Email from J. Kretchmar to L. Williford concerning RNA literature review (Jan. 10, 2014)

(25)  UNC0116078: Email from B. Polk to T. Clayton concerning RNA group (Jan. 14, 2014)

(26)  UNC0104748: Email from J. Kretchmar to A. Legge concerning RNA literature review (April 28, 2014)

(27)  UNC0160298: Email from J. Kretchmar to bgill@umd.edu concerning race-neutral alternatives (Oct. 3, 2014)

(28)  UNC0087661: Email from B. Polk to S. Farmer concerning first draft of RNA report (Oct. 19, 2014)

(29)  UNC0099539/UNC0097417: Email from J. Kretchmar to B. Polk with draft RNA report (Oct. 31, 2014)

(30)  UNC0325570: Email from H. Kallem to B. Polk concerning RNA report (Nov. 18, 2014)

(31)  UNC0097612: Email from B. Polk to H. Kallem concerning RNA report (Nov. 12, 2014)

(32)  UNC0097721: Email from B. Polk to S. Farmer & J. Kretchmar concerning H. Kallem comments to RNA report (Nov. 18, 2014)

(33)  UNC0323474: 9-page draft of RNA report with handwritten notes

(34)  UNC0323611: 11-page draft of RNA report (Oct. 30, 2014)

(35)  UNC0323622: 29-page draft of RNA report (Oct. 31, 2014)

(36)  UNC0326127: Email from B. Polk to K. Simmons concerning RNA agendas (July 14, 2014)

(37)  UNC0100525: Email from J. Gregory to S. Farmer, B. Polk, & others (July 21, 2015)

(38)  UNC0283495: Minutes of Advisory Committee on Undergraduate Admissions meeting (Feb. 25, 2016)

4

(39)  UNC032680: Powerpoint presentation concerning RNA report (Jan. 19, 2016)

(40)  UNC0283498: Description of Advisory Committee on Undergraduate Admissions, Committee on Race-Neutral Strategies

(41)  UNC0283499: Meeting minutes for Committee on Race-Neutral Strategies (May 10, 2016)

(42)  UNC0283505: Meeting minutes for Committee on Race-Neutral Strategies (Sept. 29, 2016)

(43)  UNC0283517: Meeting minutes for Committee on Race-Neutral Strategies (Oct. 14, 2016)

(44)  UNC0283523: Meeting minutes for Committee on Race-Neutral Strategies (Nov. 30, 2016)

(45)  UNC0283530: Meeting minutes for Committee on Race-Neutral Strategies, Data Analytics Subcommittee (Nov. 30, 2016)

(46)  UNC0283528: Meeting minutes for Committee on Race-Neutral Strategies, Literature Review Subcommittee (Dec. 16, 2016)

(47)  UNC0283531: Meeting minutes for Committee on Race-Neutral Strategies, Data Analytics Subcommittee Dec. 16, 2016)

(48)  UNC0283525: Meeting minutes for Committee on Race-Neutral Strategies (Feb. 8, 2017)

(49)  UNC0283527: Meeting minutes for Committee on Race-Neutral Strategies (Feb. 8, 2017)

(50)  UNC0384053: Email from M. Kosorok to A. Panter and others concerning analysis for the Committee on Race-Neutral Strategies (March 5, 2018)

(51)  UNC0380208: Meeting minutes for Committee on Race-Neutral Strategies (Sept. 12, 2017)

(52)  UNC0380210: Meeting minutes for Committee on Race-Neutral Strategies (Sept. 26, 2017)

(53)  UNC0380212: Meeting minutes for Committee on Race-Neutral Strategies (Nov. 27, 2017)

(54)  UNC0380378: Meeting minutes for Committee on Race-Neutral Strategies, Data Analytics Subcommittee (April 29, 2018)

(55)  UNC0384119: Email from M. Kosorok to others concerning yearly reports for the Committee on Race-Neutral Strategies (June 22, 2018)

(56)  UNC0380381: Race Neutral Alternative Strategies: Impact of Diversity on the Student Experience

(57)  UNC0380383: Interim Report: Examining Potential Race-Neutral Strategies in Undergraduate Admissions at University of North Carolina at Chapel Hill (May 2018)

(58)  UNC0081617: Email from W. Prasertpol to others with Core Report Comparison (Dec. 4, 2013)

(59)  UNC0082912: Email from S. Farmer to J. Dean concerning Enrollment Diversity Benchmarks (Feb. 17, 2014)

(60)  UNC0082952: Email from S. Farmer to L. Williford concerning Enrollment Diversity Benchmarks (Feb. 18, 2014)

(61)  UNC0082983: Email from B. Polk to S. Farmer and others concerning Enrollment Diversity Benchmarks (Feb. 18, 2014)

(62)    UNC0083090: Email from J. Kretchmar to B. Polk and others concerning enrollment projections (Feb. 24, 2014)

(63)    UNC0146037: Email from P. Baum to A. Parrish concerning data request (July 3, 2014)

(64)    UNC0087530: Email from A. Memory to others concerning Annual Search (Oct. 7, 2014)

(65)    UNC0324603: Email from B. Polk to S. Farmer concerning waitlist (May 4, 2015)

(66)    UNC0143440: Email from B. Barkley to others concerning yield-team plans (Aug. 25, 2014)

(67)    UNC0108650: Email from J. Kretchmar to A. Memory concerning admission rates (April 29, 2015)

(68)    UNC0380807: Draft report from the Data Analytics Subcommittee of the Race Neutral Strategies Task Force (March 1, 2018)

(69)    UNC0079824: Diversity Recruitment & Engagement Plan for Entering Class of Fall 2016

(70)    UNC0179477: Email from J. Rosenberg to others concerning a reading proposal (Aug. 27, 2013)

(71)    UNC0209034: Email from J. Rosenberg to B. Polk concerning an applicant (Nov. 7, 2013)

(72)    UNC0216314: Email from A. Treske to P. Baum concerning student applications (Nov. 19, 2013)

(73)    UNC0103716: Email from W. Prasertpol to A. Parrish and J. Kretchmar concerning priority groups (Jan. 14, 2014)

(74)    UNC0209194: Email from J. Boyl to J. Rosenberg concerning student applications (Feb. 10, 2014)

(75)    UNC0230512: Email from A. Feler to N. Perkins concerning an applicant (March 6, 2014)

(76)    UNC0231015: Email from J. Renner to N. Perkins concerning an applicant (May 14, 2014)

(77)    UNC0145990: Email from J. Kretchmar to P. Baum concerning applied, admitted, and enrolled statistics (June 10, 2014)

(78)    UNC0170928: Email from A. Felder to others concerning test score bands (July 22, 2014)

(79)    UNC0175699: Email from A. Parrish to B. Barton concerning CSS issues (Aug. 20, 2014)

(80)    UNC0194844: Email from L. Markos to B. Polk concerning an applicant (Sept. 15, 2014)

(81)    UNC0194840: Email from L. Markos to B. Polk concerning an applicant (Sept. 15, 2014)

(82)    UNC0171436: Email from A. Memory to J. Kretchmar (Oct. 9, 2014)

(83)    UNC0146621: Email from A. Treske to P. Baum concerning student applications (Nov. 6, 2014)

(84)    UNC0224136: Messenger chat concerning applicants between Y. Coleman and others (Nov. 6, 2014)

(85)    UNC0209654: Email from J. Rosenberg to Y. Coleman concerning student application (Dec. 12, 2014)

(86)　UNC0128124: Email from J. Rosenberg to Y. Coleman concerning application evaluations (Dec. 15, 2014)

(87)　UNC0194910: Email from B. Hurd to B. Polk concerning California SGR (Jan. 8, 2015)

(88)　UNC0194934: Email from B. Hurd to B. Polk concerning Florida SGR (Jan. 17, 2015)

(89)　UNC0176458: Email from A. Parrish to M. Frank concerning CSS issues (Jan. 29, 2015)

(90)　UNC0128687: Email from J. Rosenburg to Y. Coleman concerning reader feedback (Feb. 19, 2015)

(91)　UNC0148802: Email from J. Rosenberg to Y. Coleman concerning reader feedback (Feb. 19, 2015)

(92)　UNC0193165: Email from A. Panter to others concerning admissions report (April 21, 2015)

(93)　UNC0109318: Email from A. Parrish to others concerning yield team efforts (July 14, 2015)

(94)　UNC0212598: Email from A. Parrish to J. Rosenberg & B. Barton concerning pre-admit plan (Aug. 10, 2015)

(95)　UNC0212600: Email from A. Parrish to M. Davis concerning pre-admit plan (Aug. 10, 2015)

(96)　UNC0186754: Email from P. Baum to E Medina and others concerning Carolina 101 and Search (Aug. 14, 2015)

(97)　UNC0186917: Email from M. Davis to others concerning student recruiting (Aug. 20, 2015)

(98)　UNC0379534: SGR report (Dec. 12, 2014)

(99)　UNC0064291: Description of School Group Review for 2013-2014

(100)　UNC0064294: Description of School Group Review for October 2015

(101)　UNC0079503: Reader Training guide for 2015

(102)　UNC0138688: Email from C. Eilers to X. Qin and L. Williford concerning GPA and other data (Dec. 19, 2014)

(103)　UNC0109850: Email from D. Stroman to others concerning the Carolina Black Caucus (Oct. 10, 2013)

(104)　UNC124077: Email from T. Clayton to others with Undergraduate Retention Study and Diversity Report (June 30, 2015)

(105)　UNC0326476: Provost's Minority Male Workgroup: Recommendation Report

(106)　SFFA-UNC 0000052: SFFA By-Laws

(107)　UNC0000003: UNC Admissions Office organization chart.

(108)　UNC0000010: Reading Document

(109)　UNC0323603: Reading Document for the 2016-2017 Application Year

(110)　UNC0378072: Email from M. Pyecha to S. Farmer and B. Polk concerning *Fisher* (July 11, 2013)

7

(111) UNC0326352: Email from B. Haven to Undergraduate Admissions Committee concerning *Fisher* (Sept. 4, 2013)

(112) UNC0236923: Email from F. Washington to others concerning the Diversity Report and other issues (Dec. 20, 2014)

(113) UNC0098990: Email from S. Keadey to B. Polk with Common Application materials

(114) History and Traditions Page (Exhibit 2 to SFFA's Motion for Summary Judgment)

(115) Investigation of Irregular Classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill (Oct. 16, 2014) (Exhibit 43 to SFFA's Motion for Summary Judgment)

(116) UNC's Amicus Brief filed in *Fisher v. University of Texas*, 11-345

(117) Expert reports of Peter Arcidiacono

(118) Expert reports of Richard Kahlenberg

(119) Expert reports of Mitchell J. Chang

Respectfully submitted this 13th day of October, 2020.

/s/ Thomas R. McCarthy
Thomas R. McCarthy
Bryan Weir
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-4923
E: tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, Massachusetts 02109

/s/ Alan M. Ruley
Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27012
(336) 704-4147
E: aruley@belldavispitt.com

*Attorneys for Plaintiff*

9