# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., Plaintiff, v. UNIVERSITY OF NORTH CAROLINA et al., Defendants. | **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE REGARDING UNC'S "PAPER CLASSES"** |

## PLAINTIFF SFFA'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE

Plaintiff, Students for Fair Admissions (SFFA), respectfully submits this brief in opposition to Defendants' motion *in limine* to exclude evidence related to UNC's so-called "paper classes."

## ARGUMENT

### I. Evidence Of UNC's "Paper Classes" Is Relevant.

In its most recent decision assessing the constitutionality of the use of race in the admissions process, the Supreme Court was clear that universities must assess "the effects, both *positive and negative*, of the affirmative-action measures [they] deem[] necessary." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2215 (2016) ("*Fisher II*") (emphasis added). This assessment is key to the Defendants' ability to "satisfy the burden of strict scrutiny"—UNC must engage in "periodic reassessment" of the "efficacy[] of its admissions program." *Id.* at 2210. And it must do so "in light of the experience the school has accumulated and the data it

has gathered since the adoption of its admissions plan." *Id.*

Given this binding authority, the limited evidence regarding UNC's "paper classes" that SFFA plans to introduce is plainly relevant. According to the investigation that UNC itself commissioned, the paper classes were designed to "help challenged students with watered-down academic requirements," in particular those students who "who came to campus without adequate academic preparation for Chapel Hill's demanding curriculum." Pl.'s Mot. for Summ. J., Ex. 43, *Investigation of Irregular Classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill* (Oct. 16, 2014), at 1. This desire by some University officials to help "struggling students" led to the creation of the "paper classes"—which had no attendance requirement and for which papers were uniformly given high grades regardless of their quality. *Id.* at 1-2.

Thousands of students benefitted from UNC's scheme. In total, more than 3,100 students took at least one "paper course." *Id.* at 3. Academically challenged students were a large fraction of these undergrads. In fact, many advisors in the Office of Academic Advising would specifically refer "academically-challenged students … to [the] paper classes." *Id.* at 5. "The result was that thousands of Chapel Hill students received high grades, a large number of whom did not earn those high grades with high quality work." *Id.* at 2. Moreover, these classes persisted for *eighteen years*, during which a number of "Chapel Hill faculty, administration and Athletics … staff … knew that these were easy-grading classes with little rigor[.]" *Id.* at 5.

This longstanding tolerance of substandard classes dovetails with another undisputed fact: that underrepresented minority[1] students admitted to UNC, on average, struggle academically compared to other students. For example, UNC's Diversity Plan Reports

---

[1] At UNC, "underrepresented minority" is a term of art used to describe African-American, Hispanic, and Native-American students.

highlight the wide achievement gap that exists between these groups. *See, e.g.*, *id.*, Ex. 39 at 12 (four-year graduation rates for Black and American Indian male students lagged behind white male students by an average of more than 20% over the five year period from 2009 to 2013); Def.'s Mot. for Summ. J., Ex. 47 at 10 (noting similar data). And UNC's Provost empaneled a specific task force, the "Minority Male Workgroup," which noted that nearly 40% of Black males fail to graduate within four years, and that those who do graduate "have lower GPAs" than "their White peers" and "those low GPAs affect post-graduate study potential, lessening UNC's effectiveness in supplying the diverse talent pipeline for graduate study and completion." Pl.'s Mot. for Summ. J., Ex. 42 at 11-12.

The evidence that UNC seeks to suppress thus bears directly upon the "negative" "effects" of UNC's use of race in the admission process, including whether it has forced UNC to compromise its academic standards—or at least lessened any claimed need to maintain a particular level of academic achievement. *Fisher II* makes plain that this information is essential in applying the strict scrutiny test, and that University officials are expected to reassess their use of race "in light of the experience the school has accumulated … since the adoption of its admissions plan." 136 S. Ct. at 2210.

Rather than deal with these difficult issues, UNC seeks to sweep them under the rug and banish them from consideration in this case. Their reasons for doing so cannot be reconciled with the burdens of strict scrutiny, the specific requirements of *Fisher II*, or basic common sense.

UNC's primary argument is that the paper classes have nothing to do with the admissions process. *See* Def.'s Mot. in Limine 2. But as explained above, the Supreme Court requires analysis of the not only the admissions process itself but also its effects—including its

negative effects. Indeed, UNC has flooded the record in this case with testimony about the positive effects it contends that its admissions process has had on campus: delivering educational benefits of racial diversity. *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 68 at 2-3 (describing positive classroom experiences that occurred in 2001 or earlier); *id.*, Ex. 78 at 2-3 (learning the benefits of diversity while campaigning for and serving as student body president in 2011); *id.*, Ex. 87 at 7 (describing interactions with fellow students that occurred in 2007 or earlier); *id.*, Ex. 96 at 2-3 (describing experiences as URM at UNC from 2005-2009); *id.*, Ex. 116 at 1-5 (describing experiences as URM at UNC from 2003 to 2007); *id.*, Ex. 126 at 2-3 (learning the benefits of diversity during UNC study abroad semesters in 2007 and 2008). UNC cannot have it both ways; this Court's analysis must include the bitter with the sweet. No doubt every Defendant in UNC's position would prefer that the Court only consider evidence of the benefits of its policies and ignore any costs, but strict scrutiny simply does not work that way. Instead, it requires "a searching examination," *Fisher II*, 136 S. Ct. at 2222, and "the most rigid scrutiny," *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2419 (2013) ("*Fisher I*") (quoting *Loving v. Virginia,* 388 U.S. 1, 11 (1967)); *see also Fisher II*, 136 S. Ct. at 2209 (highlighting the "stringency of the strict-scrutiny burden for a school that employs race [in admissions]").

UNC's second argument is that the "paper classes" scandal is too old to be considered here, since they apparently ceased in 2011 and the complaint was not filed until 2014. *See* Def.'s Mot. in Limine 2. But again, this ignores the Supreme Court's admonition thar the effects of the admissions process must be considered "in light of the experience the school has accumulated … *since the adoption of its admissions plan*." *Fisher II*, 136 S. Ct. at 2210 (emphasis added). The eighteen years that paper classes were offered to academically struggling students all post-dated the adoption of UNC's use of race in admissions.

Nor is it ancient history. The report UNC commissioned regarding the scandal was released only a month before the Complaint in this case was filed. *See* Pl.'s Mot. for Summ. J., Ex. 43. And a number of reports, assessments, and other evidence in this case relies upon data generated during the time when the classes were in full swing. *See id.*, Ex. 39; *id.*, Ex. 40; *id.*, Ex. 42; Def.'s Mot. for Summ. J., Ex. 47; *id.*, Ex. 68 at 2-3; *id.*, Ex. 78 at 2-3; *id.*, Ex. 87 at 7; *id.*, Ex. 96 at 2-3; *id.*, Ex. 116 at 1-5; *id.*, Ex. 126.

UNC's focus on timing is again untenably one-sided. In offering extensive evidence as to the educational benefits of diversity, UNC has not confined itself only to experiences on campus since the Complaint was filed. Instead, its witnesses draw upon years—and in some cases, decades—of experience. *See, e.g.*, *id.*, Ex. 82 at 14 (citing professor's experience with diverse student research group in 2002); *id.*, Ex. 95 at 1-3 (describing the educational benefits of diversity during professor's tenure at UNC from 1991-2011). So UNC does not really believe that only evidence from 2014 or later is relevant; it simply wishes to selectively exclude evidence from before then that it deems unfavorable.

Finally, UNC repeatedly implies that the magistrate judge already decided that all evidence of the paper classes is irrelevant. Not so. Magistrate Judge Webster was asked only to decide whether to compel the production of *additional data* regarding student performance and the individual students who may have taken the paper classes. *See* Doc. 101 at 9-11. Judge Webster had no occasion to decide whether the limited evidence SFFA intends to submit was relevant or admissible.

And even if he had, that decision would not preclude SFFA's use of the proffered evidence at trial. Fed. R. Civ. P. 54(b) provides that "any order or other decision … that adjudicates fewer than all the claims or the rights … *may be revised at any time before the entry of a*

*judgment* adjudicating all the claims and all the parties' rights and liabilities." *Id.* (emphasis added). In short, UNC's suggestion that the matter has been resolved is without merit; but even if it had been, the court is free to revise Judge Webster's decision.

**II. The Limited Evidence SFFA Seeks to Introduce Will Not Waste The Court's Time**

UNC asserts adding the "paper classes" would waste time at trial. To support this erroneous assertion, UNC claims that there is no evidence "in the record about the … classes," and the only "information about the [paper] classes in the record comes from the Cadwalader report," which allegedly contains "inadmissible hearsay statements." Def.'s Mot. in Limine 10. The University further claims that introducing evidence "about the irregular classes" would require UNC to "vigorously defend itself against … spurious allegations that attempt to tar the University's reputation," thus, "disrupt[ing] the parties' efforts to streamline" the trial." *Id.* at 10-11. None of this is correct.

*First,* the report that UNC itself hired Cadwalader to prepare is hardly "inadmissible hearsay." To the contrary, it is a textbook statement of an "agent" of a party opponent, which is non-definitional hearsay under Fed. R. Evid. 801(d)(2)(D). UNC poured thousands of hours, millions of dollars, and decades of goodwill into that report. The University retained a half a dozen lawyers, four paralegals, and three professors to write a 130-page report that was the product of nearly 5,000 man-hours and three million dollars. Univ. of N.C. at Chapel Hill, Frequently Asked Questions—Issues Related to the Academic Irregularities, https://tinyurl.com/y48prbtw (last visited October 26, 2020). The Report involved over 1,100 pages of exhibits, around 1.7 million unique records, and totaled more than 5 million pages. *Id.* The University itself has repeatedly claimed the report was "the most thorough and complete report possible," *id.*—meaning that the report is also a statement "adopted" by UNC under

Fed. R. Evid. 801(d)(2)(B). As result, UNC "acted decisively … and implement[ed] more than 70 wide-ranging reforms and initiatives," that, according to UNC, attempt to "transform [UNC's] culture, structure and policies from the top down and ground up." *Id.* The report is not "spurious," as UNC now claims. The University commissioned, funded, and advertised the Cadwalader report for the better part of a decade, and it continues to post it on a University website dedicated specifically to the investigation and its aftermath. Especially given that UNC recognizes "[t]he Cadwalader [report as] a comprehensive and impressive study," Def.'s Mot. in Limine 10 n.1, UNC cannot now disown it.

*Second*, SFFA does not intend to inordinately focus on this evidence at trial. In fact, except as necessary to introduce the report, it has no intention of asking witnesses any questions at all about it. The report itself is sufficient from SFFA's perspective. And the handful of deposition designations touching upon it are hardly objectionable given that UNC has had the opportunity to make counter-designations. So there is no need for this issue to occupy any meaningful time at trial.

*Finally,* the University's claim that introducing "evidence about the irregular classes" is only an "attempt to tar the University's reputation," is equally unconvincing. Again, UNC itself commissioned and paid for the Cadwalader Report and published it and continues to host it publicly on the University's website. That its introduction into the trial record would somehow harm UNC's reputation is nonsense. There would be no burden on the Court or the parties from admitting this evidence into the trial record. Especially given that this is a bench trial, the Court should allow SFFA to introduce this evidence into the trial record.

Moreover, Rule 403 "has no logical application to bench trials." *United States v. Bilugan*, No. 90-5852, 1991 WL 120312, at *2 (4th Cir. July 9, 1991). Accordingly, the Fourth Circuit

repeatedly has "h[e]ld that in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial." *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994); *see also United States v. Jones*, No. 97-4745, 1998 WL 545894 *7 (4th Cir. Aug. 14, 1998) ("[I]n the context of a bench trial, evidence should not be excluded under Rule 403 on the grounds of unfair prejudice because a judge is better able to weigh the probative value of the evidence and to reject any improper inferences.").

## CONCLUSION

For the reasons explained above, the SFFA-plaintiffs respectfully request that the Court deny defendant's motion in limine to exclude under Federal Rules of Evidence 402 and 403 evidence related to so-called "paper classes."

Respectfully submitted this 26th day of October, 2020.

| | |
|---|---|
| Alan M. Ruley<br>N.C. State Bar No. 16407<br>BELL, DAVIS & PITT, P.A.<br>P.O. Box 21029<br>Winston Salem, NC 27120-1029<br>(336) 714-4147<br>aruley@belldavispitt.com | /s/ *Thomas R. McCarthy*<br>Thomas R. McCarthy<br>J. Michael Connolly<br>Bryan K. Weir<br>CONSOVOY MCCARTHY PLLC<br>1600 Wilson Boulevard, Suite 700<br>Arlington, Virginia 22209<br>(703) 243-9423<br>tom@consovoymccarthy.com<br><br>Patrick Strawbridge<br>CONSOVOY MCCARTHY PLLC<br>Ten Post Office Square<br>8th Floor South PMB #706<br>Boston, MA 02109<br>(617) 227-0548<br>patrick@consovoymccarthy.com |

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 26th day of October, 2020.

                                                   */s/Thomas R. McCarthy*
                                                   Thomas R. McCarthy

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the body of this brief, including headings and footnotes, does not exceed 6,250 words.

This 27th day of October, 2020.

                                                     */s/Thomas R. McCarthy*
                                                     Thomas R. McCarthy