IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA
CASE NO. 1:14-CV-954

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br> Plaintiff, <br> v. <br> UNIVERSITY OF NORTH CAROLINA et al., <br> Defendants. | **PLAINTIFF'S MOTION FOR CLARIFICATION OR RECONSIDERATION** |

Plaintiff, Students for Fair Admissions (SFFA), respectfully submits this motion for clarification, or in the alternative for reconsideration, concerning the Court's decision on UNC's objection to Prof. Peter Arcidiacono testifying to the models he conducted that Richard Kahlenberg relied upon for his race-neutral analysis. UNC's objection was based on an incorrect representation of the record and expert disclosures in this case, and SFFA should not be denied the opportunity to present its proper and properly disclosed expert testimony.

## BACKGROUND

SFFA retained Dr. Peter Arcidiacono to "review and analyze data and information produced by [UNC] and to answer several questions about UNC's admissions process," including the role that "an applicant's race/ethnicity play in the admissions decisions made by UNC" and whether race is "a predominant factor in UNC's admissions process." PX117.1, at 4. To conduct that analysis, Prof. Arcidiacono used "techniques that are standard in the field of economics" to "construct[] a model of UNC's admissions decisions." *Id.* at 4-5. That "model includes a battery of controls that ensures the effect of any applicant characteristic can be

1

accounted for—including test scores, grades, UNC's ratings of the files among five dimensions, … gender, and race, among others." *Id.* at 5.

SFFA retained Richard Kahlenberg "to provide an opinion regarding the availability and feasibility of race-neutral alternatives to the use of race at [UNC]." PX118.1, at 6. To reach his conclusions, Mr. Kahlenberg first "draw[s] … upon [his] extensive knowledge of the history and study of race-neutral alternatives," including "author[ing], co-author[ing], edit[ing], or review[ing] virtually every major study or analysis on race-neutral alternatives from the past 20 years." *Id.* Mr. Kahlenberg also expressly relies on "the admissions data, analysis, and conclusions from SFFA's other expert witness, Duke Professor Peter Arcidiacono." *Id.*

This division of labor was disclosed from the beginning; as expressly stated in expert reports, Prof. Arcidiacono was responsible for modeling the admissions process, and Mr. Kahlenberg relied on that work to direct the creation of potentially workable race-neutral alternatives. And UNC was fully aware of it, as evidenced by numerous statements in the reports of UNC's expert Dr. Caroline Hoxby. Not only was this fully disclosed years ago, but UNC had the opportunity to question Prof. Arcidiacono and Mr. Kahlenberg about their respective areas of responsibility and expertise at their depositions—and in fact did so. And both testified to the same division of labor.

Yet yesterday, UNC objected when SFFA elicited testimony from Prof. Arcidiacono about how he conducted his statistical analysis for Kahlenberg. Because the Court sustained UNC's objection, but then allowed some testimony on this point, SFFA moves for clarification (or reconsideration) of the Court's decision. In SFFA's view, Prof. Arcidiacono should be permitted to testify to the models he that he ran for Kahlenberg, and if UNC wishes to question the construction of those models, it should cross-examine Prof. Arcidiacono on any question

2

about the modeling process (as opposed to the inputs Mr. Kahlenberg selected or the results upon which he opined). If the Court would like further briefing or argument on this issue, SFFA requests that it be able to elicit Prof. Arcidiacono's testimony while he is on the witness stand tomorrow (Tuesday, November 9th) pending the Court's decision. That will keep trial moving forward seamlessly while the Court makes a decision.

## ARGUMENT

### I. Experts are permitted to rely on the work of other experts in forming their opinions.

There is no question that "it is permissible for an expert to rely upon the 'opinions and findings of other experts' to reach his or her expert conclusion." *Funderburk v. S.C. Electric & Gas Company*, 395 F. Supp.3d 695, 717 (D.S.C. 2019). So long as the facts and data relied upon are the kind that would be relied upon by other experts in the field, there is "nothing objectionable about an expert relying upon the work [of] a colleague," and the Rules of Evidence "explicitly contemplate[]" "[s]uch a scenario." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017); *see id.* ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed." (quoting Fed. R. Evid 703)); *see also* Advisory Committee Note to Fed. R. Evid. 702 ("Subpart (1) of Rule 702 calls for a quantitative rather than qualitative analysis. The amendment requires that expert testimony be based on sufficient underlying 'facts or data.' The term 'data' is intended to encompass the reliable opinions of other experts.").

Reality dictates that the practice of relying on the expertise of others is especially common "in technical fields." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). Indeed, reliance on others with statistic expertise is "quite routine" when the expert "merely want[s] to use" statistical or economic models to bear out a theoretical point. *Id.* at 615. The

3

expert in question is "not being offered as an expert statistician" but is instead simply relying on statistics to form an independent expert judgment. *See Coles v. Jenkins*, 1998 WL 964506, at *2 (W.D. Va. Dec. 22, 1998) *cf. St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2005 WL 1168380, at *10 (E.D. Pa. 2005) ("The Court certainly acknowledges that an expert cannot simply be the mouthpiece of another expert, but that is not the case with Mr. Wistar. Mr. Wistar relied upon a statistician to do the mathematical calculations from Mr. Wistar's findings.").

In such a situation, "the court cannot accept [a party's] argument that any expert witness who relies on statistics must demonstrate that he has performed the regression analyses or similar tests on the statistics," let alone that he has personally performed such tests. *See id.*; *see also Bowoto v Chevron Corp.*, 2006 WL 1627004, at *4 (N.D. Cal. 2006); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, 2008 WL 3819752, at *1-2 (M.D. Fla. Aug. 12, 2008). To the extent there are concerns about "the significance of the figures," those concerns go "to the weight, not the admissibility" of the statistics or testimony and "can be adequately brought out in cross-examination." *Coles,* 1998 WL 964506, at *2. To the extent there are concerns about the statistical model itself, or the discretion used in running the model, those concerns are properly directed at the *creator* of the model and disappear if "the person who produced the study" is present to "testify to its adequacy." *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp.3d 825, 846 (N.D. Ill. 2018); *see also Dura*, 285 F.3d at 613.

## II. Prof. Arcidiacono is the expert witness who should address the statistical modeling in this case.

UNC has known for years about SFFA experts' division of labor. Prof. Arcidiacono is an expert economist who regularly constructs statistical models like the ones at issue here; Mr. Kahlenberg is not. Mr. Kahlenberg has always relied on Prof. Arcidiacono to conduct the statistical analysis on his behalf, and he disclosed this fact from the outset of this case; and both

testified about this division of labor at their depositions. Until yesterday, UNC never raised any concerns about that division, much less suggested that Prof. Arcidiacono is *barred* from explaining the statistical analysis he conducted for Mr. Kahlenberg to the Court.[1] Opposing counsel's suggestion otherwise cannot be squared with the actual record in this case.

In Mr. Kahlenberg's opening report (served on January 12, 2018), he explained:

> To simulate the likely results of adopting race-neutral strategies at UNC, Professor Arcidiacono tested the results of several race-neutral options using the admissions data provided by UNC. At my request, he conducted simulations of multiple race-neutral alternatives to forecast the likely outcomes thereof.

PX118.1, at 65. Mr. Kahlenberg likewise made clear in his subsequent reports that he directed Prof. Arcidiacono to run simulations on his behalf, using variables that Mr. Kahlenberg asked him to use or modify from Prof. Arcidiacono's existing models. And Prof. Arcidiacono provided Mr. Kahlenberg the raw results of those models for Mr. Kahlenberg to interpret. *See, e.g.,* PX118.2, at 54 (explaining that UNC's economist expert introduced a few "concepts that I asked Arcidiacono to incorporate into the model we used in the opening report for socioeconomic preferences."); *id.* at 53 (noting that Mr. Kahlenberg directed "Arcidiacono to quantify the weight of [the faculty child preference] in the admissions process); *id.* at 57 (noting that he "asked Arcidiacono to conduct new simulations that incorporate Hoxby's insights," including removing the "substantial" preference that Arcidiacono had calculated for children of faculty). Once these simulations were modeled, Kahlenberg would review the results and opine on why it was a workable race-neutral alternative. *Id.* at 59 ("All in all, Simulation 6 would provide a viable path for UNC to maintain academic excellence while promoting higher levels of overall racial/ethnic

---

[1] It is telling that UNC did not seek exclude any expert testimony at summary judgment despite having a strong incentive to do so. *See Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300 (4th Cir. 1998). Nor did UNC file a motion in limine on this point.

5

and socioeconomic diversity."). Other similar examples abound in Mr. Kahlenberg's rebuttal[2] and reply reports.[3]

UNC's own expert, Dr. Hoxby, herself clearly understood the division of labor between Prof. Arcidiacono and Mr. Kahlenberg. *See* PX111 at iii ("I have been asked to assess the simulations presented by Mr. Kahlenberg (which were actually performed by Prof. Arcidiacono), and his opinion that they show workable race-neutral alternative admissions plans."); DX111 at 4 (noting that "Prof. Arcidiacono's model is the foundation for [Mr. Kahlenberg's] simulations of race-blind alternatives. …"); DX 114 at 5 (discussing Mr. Kahlenberg's "analysis (which was implemented by Prof. Arcidiacono)").

This division of labor was also clearly disclosed at the experts' depositions. After counsel for UNC asked Prof. Arcidiacono whether he was "asked to perform any other assignments," he responded as follows:

> A: Was I asked to perform any assignments?
> Q: (Mr. Fitzgerald) Yes.
> A: Well, yes, in that I was – had to include Rick Kahlenberg's race-neutral simulations.
> Q: Okay. And we'll come back to that in a moment. …

---

[2] PX118.2, at 36 ("I asked Arcidiacono to analyze Hoxby's data to identify high achieving low-income students as those scoring above 1080 on the SAT.") *id.* at 40 ("In my opening report, I discussed findings from a number of race-neutral simulations that Professor Arcidiacono conducted at my request."); *id.* at 43 ("I asked Arcidiacono to apply Hoxby's methodology … to achieve a more complete picture of the results on these various dimensions."); *id.* at 45 ("Accordingly, I asked Arcidiacono to complete the class using a truly-race-neutral method."); *Id.* at 49 n.180 ("I also asked Arcidiacono to measure socioeconomic status by the percentage of students in a high school receiving free and reduced-price lunch—a clean apple to apples comparison.")

[3] PX118.3, at 46 n.185 ("In the exercise, I asked Arcidiacono to make a number of improvements to Hoxby's model, but consideration of non-applicants remained a central feature of the approach."); *id.* at 48 ("I asked Arcidiacono to apply a series of smaller socioeconomic preferences to Hoxby's large NCERDC pool of applicants and nonapplicants."); *Id.* at 49 n.193 ("I asked Arcidiacono to replicate the exercise employed here for Simulation 3 to my other earlier simulations: 4 and 6.'"); *id.* at 58 n.217 ("I also asked Arcidiacono to present the results of Simulations 4 and 6 by correcting the schools' coding error but making no other changes.").

Arcidiacono Tr. 26:4-10. Mr. Fitzgerald later asked questions on that topic and Prof. Arcidiacono explained that he used the model he constructed and adjusted variables at Mr. Kahlenberg's request to simulate the effect of those adjustments. *See id.* at 33:22-36:9; *e.g., id.* 34:21-35:2 (Q: "Okay. But who directed—who directed what adjustments should be made? Did that come from Mr. Kahlenberg or come from you?" A: "So Mr. Kahlenberg would say, 'I want to give, you know, a SES bump of this amount. Tell me what happens in that case.' And so we put that in the model and show what would happen.'").

Mr. Kahlenberg's deposition is painstakingly clear on this point. In direct response to UNC counsel's question about their division of labor, he testified:

> So we had a division of duties in our process, and I would provide instructions for how I would like the simulation to be conducted. Professor Arcidiacono has far more expertise than I do on how to run models, and so I didn't think it was – it didn't make sense for me to get into those … .

*Id.* at 146:9-15. Counsel followed up repeatedly and extensively questioned Mr. Kahlenberg the point. *See* Kahlenberg Tr. 62:7-74:1, 81:12-83:18, 86:6-15, 91:3-92:16, 145:1-146:15; 184:12-185:15.

In its objection yesterday, UNC mentioned none of this, instead mischaracterizing the following snippet of Prof. Arcidiacono's testimony:

> Q. And did you determine the parameters of each particular race-neutral alternative?
> A. No.
> Q. And I take it you're not planning to opine as to whether the Univer -- simulations that Mr. Kahlenburg had you -- **had you and your team perform** are the right ones, correct?
> A. Correct.
> Q. And I take it that you're not opining as to the results of these simulations, correct?
> A. Correct.

Arcidiacono Tr. 37:4-14 (emphasis added). This again is entirely consistent with the long-

7

disclosed division of labor; Mr. Kahlenberg relied upon Prof. Arcidiacono's statistical modeling expertise, but was responsible for the assumptions and results generated by those models.

For these reasons, Prof. Arcidiacono should not be precluded from explaining his model, any changes he made to that model at Mr. Kahlenberg's direction, and the process of generating the results that Mr. Kahlenberg relied upon. That is precisely what happened at trial in SFFA's case against Harvard without any objection from counsel or the Court. The same result should follow here.

## **CONCLUSION**

Respectfully submitted this 10th day of November, 2020.

Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy
Bryan K. Weir
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 10th day of November, 2020.

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy
