IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS,  *
INC.,                           *
                              *
          Plaintiff,      *  Case No. 1:14CV954
                              *
vs.                          *
                              *  November 9, 2020
UNIVERSITY OF NORTH CAROLINA,  *
et al.,                     *  **Volume 1**
                              *  **Pages 1-225**
          Defendants.    *
******************************

**EXPEDITED TRANSCRIPT OF TRIAL**
BEFORE THE HONORABLE LORETTA C. BIGGS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:        CONSOVOY MCCARTHY, PLLC
                    Thomas R. McCarthy, Esquire
                    Patrick Strawbridge, Esquire
                    James F. Hasson, Esquire
                    Bryan K. Weir, Esquire

                    BELL DAVIS & PITT, P.A.
                    Daniel Alan M. Ruley, Esquire

For UNC Defendants:   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                    Patrick J. Fitzgerald, Esquire
                    Lara A. Flath, Esquire
                    Amy L. Van Gelder, Esquire
                    Marianne H. Combs, Esquire

                    NORTH CAROLINA DEPARTMENT OF JUSTICE
                    Stephanie A. Brennan, Esquire
                    Tamika Henderson, Esquire

For Intervenors:      LAWYERS' COMMITTEE CIVIL RIGHTS UNDER LAW
                    David G. Hinojosa, Esquire
                    Genevieve Bonadies Torres, Esquire

                    NORTH CAROLINA JUSTICE CENTER
                    Jack Holtzman, Esquire
                    Emily P. Turner, Esquire

1                              **I N D E X**

2     **PLAINTIFF'S WITNESSES:**                                    **PAGE**

3        **JENNIFER KRETCHMAR**
           Direct Examination by Mr. Strawbridge              61

4         **PETER ARCIDIACONO**
5          Direct Examination by Mr. McCarthy               114

6

7

8                            **E X H I B I T S**

9    All Exhibits Admitted                                      10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **P R O C E E D I N G S**

2            **THE COURT:**  Madam Clerk, if you would please call the

3    case before the Court today.

4            **THE CLERK:**  Yes, ma'am.

5        Calling case 1:14CV954, Students for Fair Admissions, Inc.,

6    versus UNC, et al.

7            **THE COURT:**  Good morning.

8        Before I turn it over to counsel for opening statements, I

9    do want to make a few statements for the record; and if there

10   are issues that we need to resolve before our opening

11   statements, I will hear from you at that time.

12       As we all know, we are experiencing a worldwide pandemic

13   caused by coronavirus.  The President of the United States and

14   the Governor of the state of North Carolina have each declared

15   emergencies; and as we know from current reports, the cases are

16   increasing rather than decreasing at this time.  Moreover, the

17   last standing order that the Court imposed did not necessarily

18   encourage civil trials being conducted during this pandemic.

19       This Court is making an exception for very important

20   reasons.  This is a very important case with some significant

21   constitutional issues that will impact many people.  We have

22   had to continue this trial, primarily because of COVID, but for

23   other reasons, during the course of over a year.  The Court

24   believed it's absolutely necessary that we move forward at this

25   time and have this hearing.

1    However, as all in here know, we have established a

2   protocol which we will follow throughout the trial to try to

3   ensure that everyone in this courtroom and everyone involved

4   with the trial will be safe as we go through these matters.

5    While much of the protocol is germane to the manner in

6   which we will conduct ourselves during the trial, there are

7   certain things that I think need to be said so that the public

8   understands.  This courthouse, as well as certain courtrooms,

9   are open to the public.  By executive order of the Governor of

10  North Carolina, including Executive Order 69, and Amended

11  Standing Order 13 of this Court, no more than 25 people shall

12  be permitted in this courtroom at any given time.

13   To ensure that the public, likewise, has access to these

14  proceedings, we have set up a second courtroom where the trial

15  will be viewed and can be viewed by video link in this

16  courthouse.  We have also provided the public the opportunity

17  to hear the trial via audio conference call upon request, and

18  we have received a number of requests.

19   Though we are allowing members of the public to view by

20  video in one of our courtrooms and listen via video conference,

21  there will be no videotaping or audio recording of these

22  proceedings.  There is a general prohibition against recording

23  equipment in the federal courthouse, and the prohibition

24  applies in this case to all involved.  It is my obligation to

25  advise everyone that operation of video or audio recording

equipment for purposes of recording these proceedings is
prohibited and violation of such can be sanctioned.  We have a
court reporter that is, of course, transcribing these
proceedings, and that is the only official record of the
proceedings.

    Now, one of the things that we have addressed in our
protocol but I want the public to understand, there may be
those occasions that we have bench conferences; and if we do
have bench conferences, all those persons who should not be
privy to those conferences will be asked to leave the
courtroom.  In addition, we will mute the sound for both those
that are viewing via audio, as well as those in the second
courtroom.

    With those matters addressed, I did ask that local counsel
for each of the parties be present at the beginning so that we
could make certain findings on the record with respect to their
presence.

    With respect to local counsel for the Students for Fair
Admissions, we have Andrew Freeman and Daniel Ruley.  Are those
persons in the courtroom?

        **MR. RULEY:**  Your Honor, I'm Alan Ruley with Bell Davis
& Pitt in Winston-Salem.

        **THE COURT:**  All right.  Now, Mr. Ruley, you are local
counsel.  I don't know if you are playing a part in the
proceedings.  Why don't you put on the record what your role

1  will be in these proceedings.

2      **MR. RULEY:**  Yes, Your Honor.  Good morning, Your

3  Honor.  Alan Ruley with Bell Davis & Pitt.  I will play a small

4  role in the proceedings.  I will examine one witness.

5      Pursuant to the Court's pretrial order, I acknowledge my

6  obligations under Local Rule 83.1.  I believe that the

7  attorneys from the Consovoy McCarthy firm, who are specially

8  appearing on behalf of the Plaintiff, are familiar with this

9  court's local rules and Your Honor's policies and procedures.

10  I'm confident that they will conduct the trial in accordance

11  with the federal rules, this court's local rules, and

12  Your Honor's policies and procedures and will appropriately

13  observe all required courtroom decorum.

14      **THE COURT:**  All right.  Thank you very much.  I will

15  not require that you be in the courtroom for the entire 10-day

16  trial, even though our local rules require such attendance.  I

17  will let you be the judge of that.  I will require that you

18  ensure that we have the information necessary to contact you if

19  you are needed.

20      **MR. RULEY:**  Thank you, Your Honor.

21      **THE COURT:**  With respect to the University of North

22  Carolina at Chapel Hill, we have Tamika Henderson and Stephanie

23  Brennan.

24      **MS. BRENNAN:**  Good morning, Your Honor.  I'm Stephanie

25  Brennan from the Attorney General's office.  Tamika Henderson

1 is here as well in the overflow courtroom.  I do plan to be

2 present here during the trial in the courtroom, and

3 Ms. Henderson will also play a small role in the trial as well.

4          **THE COURT:**  All right.  Thank you.  I appreciate that.

5 So you will be here at all times?

6          **MS. BRENNAN:**  I will, but I'm also happy to certify

7 that my cocounsel, the Skadden attorneys, are fully prepared to

8 follow all of the applicable rules, federal and local, as well

9 as to observe appropriate courtroom decorum.

10          **THE COURT:**  Thank you very much.

11     And now we will hear from Student Intervenors and lead

12 counsel Jack Holtzman or Emily Turner.

13          **MR. HOLTZMAN:**  Yes, ma'am.  Jack Holtzman from the

14 North Carolina Justice Center and Emily Turner, also from the

15 North Carolina Justice Center, and one of us will be here at

16 all time.  We will play a small role examining a few of the

17 witnesses.

18     I can say that I will be following all local rules and

19 I'm -- my cocounsel, David Hinojosa and Genevieve Bonadies

20 Torres, understand their obligations under local rules and

21 federal and civil rules.

22          **THE COURT:**  All right.  Thank you very much.  I

23 appreciate that.

24     All right.  Now, having done that, are there matters that

25 we need -- let me first of all say that I have had the occasion

1  to work with each of the attorneys in this case up to this

2  point and have found everyone to be very professional, very

3  prepared, very cooperative with the Court.  So I don't envision

4  any issues, but I thought it was important that we observe that

5  local rule of this court.

6      With that said, are there any matters that we need to

7  address before we begin opening statements?

8          **MR. STRAWBRIDGE:**  Your Honor, just a couple of small

9  things.  First of all, I did just want to put on the record for

10  the Plaintiffs that we're very appreciative of all the efforts

11  that not only the Court and the courtroom staff, but that other

12  opposing counsel have made to work together, given the

13  circumstances.  We are very appreciative of everyone's best

14  efforts, and this is a case that has some weighty and emotional

15  issues, but everyone has been professional from the beginning

16  of the case until the end.  Students for Fair Admissions is

17  very appreciative of the conduct of everybody involved in this

18  case.

19      The only other matter I wanted to raise for Your Honor was

20  that the parties have a joint stipulation of facts that they've

21  entered into, and I believe we provided Your Honor with a hard

22  copy of that --

23          **THE COURT:**  You did.

24          **MR. STRAWBRIDGE:**  -- at the beginning of the hearing.

25  If Your Honor would like us to submit that in some other way,

1  by e-mail or filing on the docket, we're prepared to do so,

2  however you prefer.

3         **THE COURT:**  I think filing on the docket makes a lot

4  of sense to me.

5         **MR. STRAWBRIDGE:**  We'll take care of that today.

6         **THE COURT:**  Thank you.

7         **MR. STRAWBRIDGE:**  That's all I have, Your Honor.

8         **THE COURT:**  Anything further?

9         **MR. FITZGERALD:**  Good morning, Your Honor.  Other than

10  sharing the mutual appreciation on behalf of the University of

11  North Carolina for the Court, the court staff, opposing counsel

12  allowing us to proceed, we have nothing else to raise.

13         **THE COURT:**  Thank you.

14     Anything from the Student-Intervenors?

15         **MR HINOJOSA:**  David Hinojosa for the Intervenors, and

16  the only thing -- and I'm not sure -- I probably should have

17  visited with cocounsel before.  If the Court intends to issue

18  an order admitting the exhibits that we presented and agreed

19  to, you know, by stipulation, if the Court wants to enter an

20  oral order admitting all those exhibits en masse that are

21  unobjected to.  I don't know what the Court's practice and

22  preference is regarding that.

23         **THE COURT:**  All right.  So are you asking that I do

24  that before opening statements?  I don't have a preference with

25  respect to that at all.

1          **MR. STRAWBRIDGE:**  No objection here, Your Honor.  The

2   parties already agreed as to the admission of all the exhibits

3   at this point.  Whatever is most efficient is fine.  But that

4   would be fine with us.

5          **MR. FITZGERALD:**  We have the same view.

6          **THE COURT:**  All right.  Then I will issue an order

7   that indicates that all of the exhibits that have been agreed

8   to by the parties to be admitted are hereby admitted into

9   evidence.  I won't go through the specifics because there are a

10  lot of them, but we will -- we will perhaps do a written order,

11  but be it known that they are admitted into evidence at this

12  time.

13         **MR HINOJOSA:**  Thank you, Your Honor.

14         **THE COURT:**  Thank you.

15         **THE CLERK:**  Did you tell me there was a typo in the

16  joint stipulation that you wanted to tell the judge?

17         **MR. STRAWBRIDGE:**  That has been remedied in the copy

18  that we provided this morning, and it will be remedied in the

19  one we file on the docket.

20         **THE COURT:**  That's this?

21         **THE CLERK:**  Yes, there was a typo.

22         **MR. STRAWBRIDGE:**  There was a slight -- I say "slight"

23  because of the size.  There's a representation in there about

24  the number of applicants in the data file, and it was off by

25  probably a few thousand, but we're talking about 200,000.  So

 1  we just corrected that number.

 2          **THE COURT:**  All right.  I see.  Thank you very much.

 3  And that will be placed on ECF.

 4      All right.  With that said, I will now call on the

 5  Plaintiffs to give their opening statements.

 6          **MR. STRAWBRIDGE:**  Good morning, Your Honor, and may it

 7  please the Court.

 8      The United States Constitution guarantees the equal

 9  protection of law to every person, regardless of race.  The

10  University of North Carolina-Chapel Hill is bound to honor that

11  obligation in its admissions process.  Indeed, the United

12  States Supreme Court has repeatedly underscored that the use of

13  race in college admissions is, like all governmental racial

14  classifications, subject to strict scrutiny.  The trial in this

15  matter, Your Honor, is to determine whether UNC can satisfy

16  that demanding burden.  The evidence will show that it cannot.

17      I know that Your Honor is familiar with the basics of the

18  admissions process at UNC from the summary judgment

19  proceedings, as well as the parties' joint stipulation, but to

20  help frame our discussion, I did want to start with just an

21  overview of some of what the UNC admissions office does when it

22  decides who will pass through its gates.

23      UNC, like a number of universities, has adopted what is

24  known as a holistic admissions process, meaning that admission

25  is supposed to be based on a consideration of the applicant's

1  materials as a whole and not disproportionately shaped by one

2  factor.  Thus, UNC says test scores for one successful

3  applicant may be lower than those for another because the

4  second applicant may have some experience or factor in their

5  life that makes them a potentially successful and valuable

6  student, taking care of a sick parent or overcoming extreme

7  financial circumstances or the like.  So, according to UNC,

8  they want to consider the entire file, or as they say in the

9  reading document that guides their decisions, a copy of which

10  is up here on the display:  "The Committee has defined

11  procedures designed to help the University achieve its mission

12  by affording each candidate a series of comprehensive,

13  holistic, and individualized evaluations."

14      That's what their guidance says.  Now what does that mean

15  in practice?  Well, it means that when readers in UNC's

16  admissions office are reviewing those files, they certainly

17  look at and consider standardized test scores and teacher

18  evaluation or teacher recommendation letters, guidance

19  counselor recommendation letters.

20      They also assign some numerical ratings across a number of

21  dimensions, and the evidence will show that the ratings they

22  assign include, first, the performance rating.  This is where

23  they rate the student's academic performance:  Their GPA, their

24  class rank, whether their grades are improving as their high

25  school career goes along.  They assign a ranking of 1 to 10 to

1   these types of candidates, 10 being the highest.

2       UNC also provides a program rating.  This is where the

3   reader of the file will rate the rigor and breadth of the

4   academic course of study:  Is the person taking challenging

5   classes or easy classes?  Are they maximizing the opportunities

6   available to them at their particular high school?  Again, this

7   is ranked on a 1 to 10 scale.

8       The next category in which they provide ratings when they

9   read a file is the extracurricular rating.  The evidence will

10  show that this is an assessment of an applicant's pursuits

11  outside of the classroom.  Did they achieve something notable

12  in their personal life in a club or at work?  This is also

13  graded on the same 1-to-10-point scale.

14      The next rating is the personal rating:  Is the applicant a

15  curious, creative, kind, person with integrity?  What kind of

16  personality are they going to bring to campus?  And although it

17  uses similar numerical grades, there is a slight difference.

18  This one is assessed only with five potential scores:  1, 3, 5,

19  7, and 9.  So it's on the ten-point scale, but there are only

20  five scores assigned for the personal ranking.

21      The same is true with the essay ranking.  This is an

22  assessment of the essay that the candidates submit as part of

23  their application.  The grade is assigned largely on the

24  substance of the essay, although organization and

25  persuasiveness are factors that can be considered, at least

1 according to the reading document that is in evidence. And,

2 again, this is assessed on the same 1, 3, 5, 7, 9 modified

3 ten-point scale.

4     Now, there are also other parts of a file that UNC

5 admissions officers can see. They can take into account a

6 student's socioeconomic status: If they've asked for a fee

7 waiver or perhaps they're known to attend a poor high school in

8 the city. They look to whether someone is the child of a UNC

9 alum, which will sometimes be referred to as a legacy. They'll

10 look sometimes to see if they're the first generation of their

11 family to attend college, and they obviously consider those who

12 might have special talents, whether that's a musical instrument

13 or they play a sport and are a recruited athlete at UNC.

14     But UNC also considers the applicant's race, and the way

15 they consider race is important. It is not confined only to

16 those cases when an applicant has described how they had to

17 overcome some obstacle, such as personal experience of

18 discrimination because of their race.

19     And this is disclosed in the reading document as well. You

20 can see it here on the screen. It separately categorized

21 consideration of an applicant's race or ethnic identification

22 from one's life experiences, which is under number two in this

23 list, or from number four, a demonstrated ability and

24 motivation to overcome disadvantage or discrimination. These

25 are all separate considerations.

1    And so what that means is that race in and of itself,

2  independent of other circumstances, is something that UNC can

3  and does take into account in deciding who to admit to its

4  campus.  Your Honor will hear and see testimony on this point.

5  UNC admissions officers can consider an applicant's race, even

6  when it is not mentioned anywhere else in the application file

7  other than in the box the applicant checked at the time they

8  applied.  They can consider it at every single stage of the

9  process, whether that's the first read, whether -- if an

10 applicant receives a second read or even in the later stages of

11 the admissions cycle.

12    Moreover, UNC's use of racial preferences is focused on

13 what they described as underrepresented minorities, or URM for

14 short.  That definition includes those who are African

15 American, Hispanic, and Native American.  It does not include

16 those who identify as Asian or White.

17    Now, I'll discuss in a minute what the evidence is going to

18 show regarding how UNC's deployment of these criteria in

19 practice was, but first I think it's helpful to remind

20 ourselves of the Supreme Court's requirements for universities

21 like the University of North Carolina-Chapel Hill that have

22 decided to use racial preferences in their admissions process,

23 and the starting point is the Court's decision in *Grutter.*

24 Seventeen years ago the Court set forth the framework; some

25 points are excerpted here.

1    As we've already discussed, the racial classification is

2  subject to strict scrutiny.  That means it must be narrowly

3  tailored to further compelling governmental interests.  And

4  although not shown here, the Supreme Court has observed in

5  *Grutter* that searching judicial inquiry into the justification

6  for such race-based measures is required to determine what

7  classifications are benign or remedial or what classifications

8  are, in fact, motivated by illegitimate notions of racial

9  inferiority or simple racial politics.  In other words, strict

10  scrutiny, in the words on the screen here, help "smoke out

11  illegitimate uses of race by assuring that the government is

12  pursuing a goal important enough to warrant the use of a highly

13  suspect tool."

14    In *Grutter,* the Court held that achieving student body

15  diversity could be a compelling governmental interest.  That is

16  a topic that we recognize is foreclosed by precedent.  Your

17  Honor has already issued an order on that aspect of the count

18  in this case, and so it is not an issue for trial here.

19    However, that is only the first step in the strict scrutiny

20  analysis that places the burden on UNC here.  UNC still has to

21  prove that its use of race advances that interest in a narrowly

22  tailored way.  In *Grutter*, the Court accepted the university's

23  argument that it needed to use race in order to admit a

24  critical mass of underrepresented minorities in order to

25  further its interest in the educational benefits of diversity.

1     It, likewise, approved the same argument in *Fisher* where

2  the University of Texas also linked its admissions policy to

3  the need to obtain a critical mass of minority students.  UNC

4  must make the same showing here, and while UNC does not need to

5  articulate a specific enrollment target or a quota to achieve

6  that interest, it also cannot -- as the Court said in its most

7  recent pronouncement on this topic in *Fisher*, it cannot assert

8  "an interest in the educational benefits of diversity writ

9  large."  That is insufficient.  "A university" --

10          **COURT REPORTER:**  Slow down, please.

11          **MR. STRAWBRIDGE:**  I apologize.

12     "A university's goals cannot be elusory or amorphous.  They

13  must be sufficiently measurable to permit judicial scrutiny of

14  the policies adopted to reach them."

15     Whether UNC's use of racial preferences is narrowly

16  tailored to advance an interest in enrolling a critical mass of

17  the URM students is the first question to be answered at trial

18  here.

19     The second question for trial goes to the weight that UNC

20  gives to its racial preferences.  Even where the Supreme Court

21  has upheld the use of racial preferences, it has underscored

22  that race must be used, quote, in a flexible, nonmechanical

23  way.  There must be true individualized consideration.  The

24  process cannot, quote, make an applicant's race or ethnicity

25  the defining feature of his or her application, unquote.

1  Whether UNC can satisfy its burden and prove that its process

2  complies with this command is the second issue for trial.

3     The third and final inquiry that goes to the question of

4  narrow tailoring is whether UNC can prove that it cannot

5  achieve its goals through race-neutral means.  In *Grutter* back

6  in 2003, the Court made clear that universities must engage in

7  serious, good-faith consideration of workable race-neutral

8  alternatives.  In *Fisher*, the Court reiterated that

9  universities bear the burden of demonstrating that available

10  workable race-neutral alternatives do not suffice; in other

11  words, that a nonracial approach would not promote its

12  diversity interest about as well and at a tolerable

13  administrative expense.

14     That last part is important, Your Honor.  It does not

15  suffice for UNC to show that a race-neutral option would

16  precisely replicate the specific characteristics of the current

17  class.  Just as UNC's use of race cannot be premised on a

18  specific quota, it cannot reject a race-neutral alternative by

19  treating the current characteristics -- racial, academic or

20  otherwise -- as a hard floor.  If there are alternatives

21  available that come reasonably close, then UNC cannot simply

22  dismiss them.  Strict scrutiny requires the university to prove

23  that available race-neutral alternatives do not come close to

24  achieving the necessary critical mass of underrepresented

25  minority students.  And that will be the third and final

1  question to be addressed at this trial.

2      With a clear understanding of the burden of proof that UNC

3  carries here, I'll turn briefly to each of the questions that

4  we just outlined and explain why the evidence will support

5  Students for Fair Admissions on each of them.

6      We'll begin with whether or not UNC's admissions process is

7  narrowly tailored to achieve a critical mass of minority

8  students.  *Grutter* and *Fisher* both approved of plans that were

9  explicitly designed to achieve a critical mass of racially

10  diverse students on campus.  Both of those universities tied

11  their interests to achieving critical mass and met their burden

12  of demonstrating this goal was, in the Supreme Court's words,

13  measurable and concrete, not elusory or amorphous.

14      The evidence is going to show otherwise here.  Like its

15  predecessors, UNC's reading document itself, here up on the

16  screen, invokes critical mass as the reason why it provides

17  racial preferences.  It says here the university also aims to

18  enroll critical masses of students who identify themselves as

19  members of groups the university deems underrepresented.  It's

20  right there in their primary reading document that instructs

21  people how to evaluate applications.

22      But the evidence in this case is going to show that UNC has

23  made no further attempt to define critical mass, explain what

24  it means or even to measure progress toward that goal.  Indeed,

25  multiple UNC witnesses reject the concept of even trying to

1 measure critical mass. And we have examples of that in the
2 record already. The chancellor of UNC at the time, Carol Folt,
3 testified that she does not know of any attempts to measure
4 critical mass and does not even know what the term means. The
5 university's former director of diversity and inclusion, Taffye
6 Benson Clayton, testified the term was amorphous and that there
7 was really not a way to make the determination. Barbara Polk,
8 the assistant director of admissions, testified that there's no
9 concrete definition. There's nothing that says when you get to
10 X, you have reached critical mass. And Jared Rosenberg, one of
11 the witnesses Your Honor will hear from at trial, will also
12 testify that he has no understanding of how critical mass might
13 be measured.

14 Other long-term employees of the admissions office are
15 unable to even offer a broad definition of the concept of
16 critical mass. You will hear from Ms. Jennifer Kretchmar, who
17 will testify in her 14 years of working at the admissions
18 office she has never had a discussion about what critical mass
19 means or how it could be achieved on campus; and Michael Davis,
20 another one of the witnesses Your Honor will hear from, will
21 say the same thing. Yolanda Coleman, a former admissions
22 officer, testified that she's never even heard the term in the
23 admissions office, and it has no meaning to her in the
24 admissions context.

25 Now, UNC's own admissions director, Steve Farmer, may claim

1 that critical mass is something the admissions office and the

2 UNC administration are always thinking about, but the actual

3 evidence will not support this assertion.  He will testify that

4 he does not recall any document that defines critical mass or

5 looking at anything that might measure it more recently than

6 2006.

7      UNC, thus, will be unable to demonstrate that its goals of

8 critical mass are measurable and not elusory, that they are

9 concrete and not amorphous.

10      That brings us to the second question, which is whether

11 race is a predominant feature of UNC's admissions process.  The

12 evidence will show that it is.  There are two types of evidence

13 on this point, documentary evidence about UNC's own process, as

14 well as the statistical evidence from data produced in this

15 case.  Both demonstrate the disproportionate weight that the

16 Defendant places on race and confirm that UNC cannot satisfy

17 its burden of narrow tailoring.

18      I'll start with the nonnumerical evidence.  Although UNC's

19 witnesses claim that race is just one aspect of many, its

20 myopic focus on race goes far beyond any attention it gives to

21 the representation of other aspects of diversity such as

22 religion, such as sexual orientation, such as veteran status,

23 and all the other dimensions they claim to value.

24      Until SFFA filed this suit, UNC created and distributed a

25 periodic core report to track the process of its admissions

1 process. That report included information about the race of

2 those who had applied and had been admitted, underscoring the

3 heavy importance that those qualities played in UNC's process.

4 UNC also used to distribute that report with a comparison to

5 the prior year's racial composition. You can see the reports,

6 Your Honor, and you will be able to judge for yourself which

7 other diversity-enhancing characteristics UNC prioritized to

8 the same degree it is prioritizing race.

9 There are also e-mails that underscore the extent to which

10 applicants are commonly boiled down to their race. We have a

11 couple of examples on the screen. This is an e-mail between an

12 admissions reader and Mr. Rosenberg in which the reader notes

13 that "The candidate is an AA female," meaning African American

14 female, "and solid everything. That adds up to an admit for

15 me."

16 We have another example. This is PX78. It notes that an

17 admissions officer testified that they're going through a lot

18 of trouble because the applicant is a biracial black-white

19 male. There are a number of documents in the record that

20 indicate a shorthand discussion of candidates boiling them down

21 to their race.

22 The statistical evidence that Your Honor will see will

23 confirm the overriding size of racial preferences that UNC is

24 using. Students for Fair Admissions has obtained an economist,

25 a professor at Duke, Peter Arcidiancono, to analyze six years'

1   worth of data that UNC has produced in this case.  Using

2   standard logistic progression methodology accepted in his field

3   and commonly relied upon by courts in cases of this type,

4   Professor Arcidiacono was able to model the admissions process

5   at UNC.  That model allows him to determine the probability

6   that a given candidate, controlling for all observable aspects,

7   such as UNC's ratings, test scores, gender and race, among

8   others -- it allows him to determine the probability that an

9   individual candidate could have obtained admission to UNC; and

10  it allows us to see the weight that UNC actually gives to each

11  of those factors.  In other words, we can determine the size of

12  the racial preferences that UNC deploys through the statistical

13  analysis.

14      A few points about modeling.  Professor Arcidiacono

15  separately modeled UNC's in-state and out-of-state admissions

16  process.  And that's going to make a lot of sense because the

17  two pools are very different.  UNC faces a budgetary penalty

18  under state law if it admits more than 18 percent -- or if it

19  enrolls a class containing more than 18 percent of

20  nonresidents.  This means that UNC is very careful to limit its

21  admitted class and cap the number of out-of-state enrollees.

22  As a result, admission for UNC to nonresidents is significantly

23  more competitive than admission for North Carolina residents.

24      The second point about the models:  The models that

25  Professor Arcidiacono will testify about show that his model is

1   very accurate.  They can accurately predict the admission

2   decisions more than 90 percent of the time for both in-state

3   and out-of-state admissions pools.  The prediction of in-state

4   admits is accurate in nearly 92 percent of cases.  That's a

5   level of accuracy that he'll explain is almost unheard of in

6   economic circles.  And what that means is that UNC's admissions

7   process is highly formulaic.  Key factors in the decision make

8   it relatively easy to determine who will be admitted and who

9   will be denied, and a predominant factor in that

10   decision-making process is race.

11       You're going to hear plenty of detailed testimony from both

12   sides about what the statistics say on this point.  I'll focus

13   here on just one example that you'll hear about from Professor

14   Arcidiacono that will help quantify the size of UNC's racial

15   references.  One way to think about this is to take a candidate

16   and, using the model, see what would happen to the admission

17   probability for that candidate if you were to change only their

18   race.  We have an example of that here.  Professor Arcidiacono

19   will explain that you can take a hypothetical in-state

20   applicant who is a male, non-first-generation college applicant

21   who would normally, because of his characteristics, have a

22   10 percent chance of admission to UNC.  If you hold all the

23   other information about that hypothetical candidate constant

24   but you change their race to African American, the model of

25   UNC's admissions process shows that the chance that applicant

1   might be admitted jumps eight-fold.

2       You can see the other examples for some other candidates

3   with other probabilities here.  If that same candidate were

4   Hispanic, it would increase to 44 percent from 10 percent.

5       Out of state the numbers are even more striking.  You can

6   see here, for example, that a white female,

7   non-first-generation student, sees the admissions process -- or

8   admission probability go from 10 percent to 98 percent if you

9   simply change the race of the applicant.  That goes from a

10  likely reject to an almost certain admit.  Those are the sizes

11  of the preferences that UNC is actually employing and is one in

12  which the numbers tell the truth.  Race is a predominant, if

13  not the predominant, defining characteristic for thousands of

14  applicants in UNC's admissions process.

15      Now, having seen the tremendous weight that UNC's process

16  places on race, it brings us to the third question, which is

17  whether UNC has seriously considered if there are race-neutral

18  alternatives that would allow them to achieve their goals about

19  as well without causing dramatic sacrifices on the quality of

20  the class.  And the answer on this point is that, yes, racial

21  preferences are not the only way that UNC can achieve diversity

22  of all kinds, including racial diversity, among its student

23  body.  There are other ways.  As Your Honor may know, there are

24  a number of states that have eliminated racial preferences and

25  replaced with them with other methods.  Michigan has done so.

1  California has done so.  A ballot in Michigan -- to repeal that

2  state law just failed by popular vote in California.

3      Schools in these type of jurisdictions have explored other

4  ways of obtaining the benefits of diversity without resorting

5  to the highly suspect tool of racial classifications; and,

6  indeed, the law requires UNC to make that same inquiry itself

7  on an ongoing basis.  The Students for Fair Admissions will

8  present testimony from an education policy expert, Rick

9  Kahlenberg, to testify about the numerous workable options that

10 are available to UNC here.

11     Now, before I discuss the shortcomings of UNC's historical

12 efforts on this front, I just want to return briefly to the

13 standard set by the Supreme Court.  *Grutter* has made claim that

14 universities are required to give serious, good-faith

15 consideration to workable race-neutral alternatives that do not

16 result in the dramatic sacrifice of diversity or academic

17 quality.  In 2012, *Fisher* reiterated that a university must

18 adopt any nonracial approach that would promote substantial

19 interest about as well and at tolerable administrative expense.

20 UNC's record on this front falls far short of the

21 constitutional requirements.  The entire record of its

22 consideration consists of five efforts over the course of 17

23 years, none of which come close to the level of serious

24 consideration that precedent requires.

25     The first effort is a spreadsheet that Steve Farmer ran at

1  his desk in 2007, four years after *Grutter*.  This apparently

2  involved the analysis of some statistics if UNC were to switch

3  over to an academic-based criteria with some level of

4  socioeconomic consideration.  Frankly, I can't tell Your Honor

5  much about this effort because Mr. Farmer will not be able to

6  tell us much about that effort.  He remembers hardy anything

7  about the exercise.  There's no record of a report or an

8  analysis being circulated beyond his desktop of his computer,

9  and he does not remember discussing it with a single other

10 admissions employee.

11      The second effort was a literature review in 2009 that

12 Mr. Farmer assigned to Ms. Kretchmar to explore what other

13 universities were doing as alternatives to using race.

14 Ms. Kretchmar is going to testify that she had no idea why she

15 was tasked with doing this review, and that review never takes

16 the necessary step of actually considering whether those

17 alternatives could be implemented at UNC and what would happen

18 if they were.

19      Now, as part of an advocacy piece defending its admissions

20 process in the *Fisher* litigation, UNC prepared an analysis to

21 support its current process; and in that analysis and in the

22 amicus brief, UNC claimed -- or UNC identified the fact that

23 they're -- a top-10-style admissions plan would actually

24 improve the level of racial diversity at UNC, but it rejected

25 this as insufficient because it would reduce average SAT

1   scores.  Indeed, UNC told the Supreme Court that students who

2   were admitted with those lower SAT scores would likely be

3   overwhelmed by the curriculum at UNC.  Now, believe it or not,

4   Mr. Farmer will testify that he actually disagrees with what

5   UNC told the Supreme Court on that point.  But in any event,

6   given that this was expressly prepared to support an advocacy

7   piece, it hardly qualifies as a serious, good-faith

8   consideration the Supreme Court and this law required.

9       In 2012, the university told the U.S. Department of

10  Education, Office of Civil Rights, it would complete a

11  race-neutral alternative analysis, a real one, and the

12  department asked that it be completed within one year, by

13  September 2013.  The record will show UNC failed to take any

14  steps to meet that deadline.  It ignored that deadline.  That

15  deadline came and went without UNC conducting any serious,

16  good-faith consideration of race-neutral alternatives.  Its

17  caviler treatment of its promise to the Department of Education

18  aptly illustrates the lack of seriousness it has given to the

19  Supreme Court's requirements.

20      Finally, in 2013, UNC actually convened a working group to

21  analyze race-neutral alternatives.  The record will show this

22  group again fell well short of the Supreme Court's standards.

23  It would meet only five times over a two-year period.  It would

24  disband in 2016, after adopting the very first draft of the

25  report it issued without any changes.

1    The report itself does not give serious, good

2 faith-consideration to race-neutral alternatives, in part

3 because Mr. Farmer instructed that committee only to explore

4 alternatives that met or exceeded UNC's current level of racial

5 diversity and other criteria.  But as we've seen, that is not

6 the Supreme Court's standard.  It only requires that

7 alternatives work about as well without creating dramatic

8 declines.

9    Now, after this litigation advanced, UNC impaneled a new

10 committee to study race-neutral alternatives, but you will not

11 see any actual analysis from this committee during this trial.

12 As of late 2018, it still had not prepared any analysis of

13 race-neutral alternatives or even reviewed the expert reports

14 submitted by the parties in this case.

15    And thus, 17 years after *Grutter*, UNC has not produced any

16 evidence that its admissions office has actually engaged in a

17 serious, good-faith analysis that meets the Supreme Court's

18 standards.  Even UNC's opposing expert in this case -- and I

19 submit an opposing expert report in contested litigation is not

20 the kind of self-evaluation that the Supreme Court had in mind

21 as a good-faith consideration of alternatives.  But even she

22 will concede that she is opining only on whether the

23 alternatives precisely match UNC's current levels of diversity

24 and academic achievement, was not opining on workability of

25 those alternatives beyond that question.  UNC bears the burden

1  of proof on this strict scrutiny.  The evidence alone will

2  warrant judgment against UNC on this point.

3      Were there any doubt, Your Honor, UNC won't be able to show

4  that there are a number of workable race-neutral alternatives

5  available to UNC for its admissions process, you will hear

6  testimony from Mr. Kahlenberg who worked with Professor

7  Arcidiacono to model adjustments that UNC could make to its

8  admissions process and achieve even greater diversity than it

9  does today.  These simulations will show that replacing UNC's

10 massive racial preferences with a preference for those who are

11 socioeconomically disadvantaged, along with some other

12 adjustments, would allow UNC to maintain its current levels of

13 racial diversity, even though that's not the standard the

14 Supreme Court has set, and it would actually improve

15 socioeconomic diversity, which is something that UNC itself

16 allows as central to its mission.  Doing so would not lead to

17 any dramatic sacrifices in quality at UNC.

18     We have an example here of one of Mr. Kahlenberg's analyses

19 that Your Honor will hear about, and it shows that using a

20 race-neutral admissions policy, UNC could maintain the level of

21 racial diversity, including the percentage of African American

22 and Hispanic students.  It would increase the percentage of

23 students who come from disadvantaged families, schools and

24 neighborhoods without affecting academic quality at all.

25 Mr. Kahlenberg will explain that there are numerous other

 1  alternatives like this that could satisfy UNC's goals and which

 2  UNC has not demonstrated would impose any intolerable

 3  administrative difficulties.

 4      The evidence is going to show then, Your Honor, this case

 5  does not present to the Court with the demand somehow to

 6  convert the UNC campus to a monolithic bastion without a

 7  meaningful minority population.  UNC does not have to use

 8  racial preferences to achieve its goals.  Students for Fair

 9  Admissions is not here advocating that UNC make its admission

10  selection solely on the base of academic characteristics or

11  even that it abandon its current admissions process.  That is a

12  false choice.

13      The evidence will show that UNC does not have to cling to

14  its system of racial classification.  It does not have to

15  insist on using race for an indeterminate period in the future,

16  setting de facto quotas of its current precise racial makeup.

17  It does not have to center such a highly suspect tool as an

18  institutional priority.  That it chooses to do so in this day

19  and age speaks volumes.  The Constitution forbids UNC's

20  unyielding commitment to racial preferences and the evidence

21  will show that it is time for UNC to stop using applicants'

22  race as a basis to deny them entry into its ranks.

23      Thank you, Your Honor.

24          **THE COURT:**  Thank you.

25      Yes, sir.

1           **MR. FITZGERALD:**  Good morning, Your Honor.

2           **THE COURT:**  Yes, sir.

3           **MR. FITZGERALD:**  This is a case about the right of the

4    university to treat its applicants as whole people, not

5    numbers.  This is a case about the right of UNC, its choice to

6    look at its applicants as the individuals that they are.  It's

7    plain and simple.  UNC is proud to do that.

8           Now, we have heard a description of UNC's holistic

9    admissions process, much of which I largely agree with.  When

10   UNC sees an application, they decide to look at every aspect of

11   a person, what could be easily quantified, what cannot.  That

12   look at the different facets of each applicant, yes, it

13   includes race.  It includes race and many other factors.  UNC

14   takes the student in high school who says, "I would like to

15   come to your campus."  They take apart the application.  They

16   know the person's name.  They know where they're from in terms

17   of residence between the in-state and out-of-state pool.  But

18   for the in-state folks, they know what part of the state they

19   come from.  They know what high school they went to, what level

20   of courses are available, what level of courses they took.

21   They know how they performed in classes.  They know their test

22   scores.  And they also know their activities:  Did they play

23   volleyball?  Did they write for in the student newspaper?  Did

24   they tutor?

25          They get letters of recommendation from teachers who know

1  that student in the classroom far better than the person trying

2  to read through the file.  They read about obstacles overcome,

3  rate different determinations.  They read essays that the

4  students write about themselves, which both tells them

5  information about the students, but also really indicates what

6  the students think are important, which gives insight.

7      At the end of that process, they decide, not based upon a

8  grid, not based upon the formula that we'll talk about in a

9  moment, because there is no formula -- they decide who should

10 be admitted and who should not.  In that process, race is a

11 factor to be considered, along with so many other things,

12 including socioeconomic status and other aspects of diversity.

13     The goal of that process is for the UNC admissions staff to

14 create a diverse campus, the best learning environment to

15 pursue the educational benefits of diversity.  Because the

16 educational benefits of diversity is a legal phrase that we all

17 use, it's sometimes easy to think of it as a catch phase or

18 abstract, but it is real.  It is real.  You will learn that

19 from the people who live it, breathe it, and deal with it every

20 day.  They are the folks who want to see an environment in

21 which people of all different backgrounds can come to a

22 classroom and learn from each other.  Those witnesses will take

23 the stand.  They will talk to you about UNC's mission

24 statement, their policies, their programs, what they do, what

25 they don't do.

 1   But one point I'd like to make at the very beginning is we
 2   should not look at UNC's efforts to create the educational
 3   benefits of diversity as some effort by one group for a noble
 4   reason to give a gift to another group.  This is an effort to
 5   enrich all, all the students, whether racially diverse or not,
 6   who enter a campus where the full richness of diversity will
 7   benefit.  Think about the obvious.  Think about a classroom
 8   where students go in to learn about American history.  They're
 9   past grammar school or early high school where they learn dates
10   and facts and figures.  They want to learn what our country is
11   about, where it's been, where it is, where it's going.  Having
12   a classroom filled with people from all different backgrounds
13   who look at life through different lenses, look at our history
14   through different lenses, how can that not be a compelling
15   interest, to have a diverse classroom to exchange points of
16   view, for folks to find out that the people they know from
17   their dorm, who they like and respect, look at the world very
18   differently.  It can cause them to question their own views,
19   wonder whether they could be wrong, wonder whether they and
20   their classmate could somehow both be right.  They have to
21   learn how to navigate difference, different opinions in the
22   classroom.
23   That's important.  It's important not just to the students
24   but to the faculty, to keep them on their toes.  We like to
25   think of faculty as teachers because they are, but faculty are

1  also learners, and they're improved by having a more diverse

2  courtroom -- classroom, whether it's history or other subjects.

3      Diversity provides benefits outside the classroom, in the

4  dorm rooms where people think they're not learning.  I remember

5  before I went to college, a friend of the family, an older man,

6  told me, "You'll learn more out of the classroom than in the

7  classroom."  I thought that was the craziest thing I had ever

8  heard.  It took me years to appreciate it.  The students who

9  live in diverse dorms, go to the cafeteria or bump into

10 different people carry with them quiet assumptions about how

11 people different from them think or act.  In those environments

12 where there's diversity and backgrounds, and specifically

13 including racial diversity, students learn from each other

14 quiet assumptions that confront a different reality.  People

15 realize in many respects they may be different or think they're

16 different.  Then they're surprised in many other respects

17 they're exactly the same.

18     That is the goal that UNC seeks properly to achieve through

19 the effort of a holistic admissions process to achieve the

20 educational benefits of diversity, and that diversity arms

21 those students when they become graduates to go out into a real

22 world where there's plenty of differences, difference in

23 backgrounds and difference of thinking.  They will be better

24 equipped in a school that is diverse to beat those challenges.

25 Diversity benefits all.

1    Now, if UNC's mission is to educate the citizens for the
2 future -- future professionals, future citizens, future
3 leaders -- how can they not energetically pursue all the
4 benefits of diversity?  For that reason, UNC has exercised its
5 academic freedom to pursue the benefits of diversity through a
6 holistic admissions process.  We are proud to represent them in
7 that effort.

8    Now, if I could turn to the particulars of this case, as
9 Your Honor is well aware, the complaint here gives us a
10 roadmap, and it's filed in three counts, and those three counts
11 are on the screen.  I will focus first on Count III for the
12 reason that, as Your Honor is well aware, that is not on trial
13 before us today.  We understand that the Plaintiff would like
14 to eliminate the Supreme Court precedent that we believe fully
15 endorses the practice that UNC engages in, to see people as who
16 they are and where they are and treat them as individuals, and
17 they'd like to end that.  We strongly disagree.  That is an
18 important question for another day, another court.

19    What we're left with is to see whether or not UNC is
20 complying with the current law.  The first aspect of that is
21 Count I.  The question presented to the Court is whether or not
22 UNC uses race as the predominant factor in the admissions
23 process.  We recognize that anytime that a university has to
24 resort to considering race in the admissions process, that
25 brings strict scrutiny.  It should.  We recognize that strict

 1  scrutiny in the context of this case means that UNC has the

 2  burden of proof.  We understand that.  We embrace that.  We

 3  will meet that burden of proof here at this trial.

 4      What we should be plain and clear about, though, is that

 5  the allegations in Count I are that, basically, UNC is

 6  cheating; they're looking at the current legal system and

 7  pretending to do one thing, holistic admissions, but really

 8  putting race before -- before others.  It's an allegation that

 9  holistic admissions is a sham.

10      Let me show you what I mean by a reference to the complaint

11  by SFFA.  In the complaint at page 7, the Plaintiff says with

12  regard to universities, "they will use any leeway the Supreme

13  Court grants them to use racial preferences in college

14  admissions -- under whatever rubric -- to engage in racial

15  stereotyping and other forms of discrimination to advance their

16  social-engineering agenda.  Strict scrutiny has proven to be no

17  match for concerted disinformation hidden behind the veil of

18  'holistic' admissions."

19      Your Honor, you will see in this case UNC's admissions

20  people aren't hiding behind any veil.  They're engaging in

21  legitimate holistic admissions.

22      The complaint goes on in different sections to frame how it

23  is that the Plaintiff claims that UNC is cheating, and a

24  particular process that we'll go through in just a moment is

25  called school group review.  I think it's a very important

1  insight into the process. Your Honor has read about it and

2  will hear more about it, but I'll give a brief description.

3      During the course of the admissions process, admissions

4  readers read files and applications. Through a process we'll

5  cover later, they come to tentative decisions near the end of

6  the admissions process on all the people they think they will

7  admit, all the people they expect to deny, and the people they

8  expect to put on the waitlist.

9      At that point there's a different process called school

10  group review where the university admissions folks get in a

11  room, look at each applicant from a particular high school

12  together. So if 20 applicants came from one high school in

13  North Carolina, they line up the applications, compare them by

14  grades, and say, "Can we reconcile all these decisions? Do

15  they make sense? Why did the valedictorian not get in, if

16  that's the plan? Why did a person whose grades are slightly

17  lower get in?" That's a good question. There may well be

18  great answers, because the person who has the third highest

19  average may have so many different qualities. But they go

20  through that process to make sure they can look the guidance

21  counselor in the eye and say, "This all makes sense."

22      The second part of that process is important and very

23  practical. You have to admit a certain size class. You don't

24  want to admit too many and have no place to put them, and you

25  don't want to admit too few. So the school group review

1  process, they also have to right-size the class.

2      Now, according to SFFA, this is the place where UNC cheats:

3  And if you look at the allegations in the complaint, it says

4  UNC-Chapel Hill claims to use the SGR process for, among other

5  things, quality-control purposes.  They point out that the

6  admissions director is aware of the projected racial

7  composition of the tentatively admitted students during the

8  process.  You'll see why that makes sense, because different

9  folks have different yields of classes.  And they say:

10 "Although UNC-Chapel Hill claims to use an applicant's race and

11 ethnicity only as one of many factors within its 'holistic'

12 system, statistical and other evidence establishes that race is

13 a dominant factor in admissions decisions...."  And then they

14 point to the fact that race is the only nonacademic factor that

15 is known about an applicant during the school group review

16 process.

17     Now, let me pause there and agree with the Plaintiff on one

18 thing.  If UNC wants to cheat, this is the place to do it.

19 Think about the hypothetical where you are right about cheating

20 the system, hiding behind the veil of holistic admissions, and

21 you say, "You know, in this class we have too few black males.

22 Let's get in a room at school group review where the final

23 decisions are made and let's change some of this to fix that."

24 Their logic makes perfect sense if, but only if, people are

25 cheating.

1    We've had years of discovery, years of data, years of
2  facts; and I will tell you right now, Your Honor, when we stand
3  up at closing, there will be no evidence showing that UNC ever
4  cheated at the school group review process.  There will be no
5  evidence that UNC ever cheated and used race to dominate the
6  process at the waitlist.  There will be no evidence that UNC
7  cheated at any stage of the admissions process.  This is an
8  allegation they threw out that would make sense if UNC was
9  cheating, but they're not.  This is the dog that didn't bark.
10    Now, what really happened is UNC engaged in a proper,
11  constitutional, lawful process to see people as people.  Now,
12  perhaps recognizing that, the Plaintiffs -- the Plaintiff
13  offers instead statistical evidence; and what I submit to
14  you -- you'll hear a lot about the statistical evidence in this
15  case.  I'll be happy to discuss that more in closing.  When it
16  comes to statistics, all that glitters is not gold.  I'd ask
17  Your Honor to consider that snapshot frame in your mind, if you
18  can, the impression you had when you saw that chart about what
19  we call transformation examples.  At the end of the case, I
20  want to return to that chart and discuss it with you.
21    To give you a few highlights, it's based upon a model with
22  many faulty assumptions.  Second, it is comparing hypothetical
23  people who don't exist to other hypothetical people who don't
24  exist.  There is a holistic admissions process that looks at
25  individuals and makes decisions.  There is a mathematical

1 model, a little bit on steroids, that comes out and tells --
2 tries to tell this Court this is a formula that admissions
3 officers follow.  They don't.  It then predicts one
4 hypothetical person of one race and converts it into another,
5 and it makes a fundamentally flawed assumption that even that
6 model, if race and something else are correlated, that there's
7 causation.  Sick people go to the doctor.  The fact that
8 there's a correlation between being sick and going to the
9 doctor doesn't mean the doctor made you sick.
10      The statistics in this case -- we're happy to meet them on
11 the battlefield for statistics.  They will call their experts.
12 We will call our experts, a prominent economist from Stanford
13 named Dr. Caroline Hoxby and a prominent economist from Harvard
14 named Dr. Bridget Long, and we'll be happy to discuss what they
15 have to say after you've heard from both direct and cross.  But
16 one thing I want to make very, very clear.  We don't view this
17 case as a battle of statistics or a battle at times to fight
18 statistics.  We view this case as a battle of facts.
19      If you're going to accuse the very fine folks at UNC in the
20 admissions office of cheating, they're going to be here.
21 They'll sit in the witness stand, look you right in the eye.
22 They'll tell you what they do, and they'll tell you what they
23 don't do.  And we're firmly convinced that at the end of this
24 case, you'll be convinced that they are honest people doing an
25 honest job and not cheating the Constitution or anyone else.

1    At the end of this case, what you'll see with regard to
2  Count I is that UNC sees applicants as individuals and all
3  their different aspects, not as formulas, not as coefficients;
4  and the statistical measures on an artificial model don't tell
5  you what's going on with the admissions officers, in their
6  heads and in their actions.

7    Now I'll turn to the Count II.  Count II raises the
8  question of whether or not Carolina could employ a host of
9  race-neutral alternatives that could achieve student body
10 diversity without resorting to racial preference.  UNC would
11 have you believe that the reason why UNC -- I'm sorry.
12 Plaintiff would have you believe that the reason that UNC had
13 not identified a race-neutral alternative that works to date is
14 because they're really not trying, they're phoning it in; they
15 don't want to find one.  That's their claim.  The evidence will
16 show that the reason why UNC hasn't found a race-neutral
17 alternative that works about as well today is because there is
18 none, not because of lack of trying.

19   Now, first of all, they give a very truncated view of what
20 the efforts by UNC were to date, and you'll hear the testimony
21 for yourself.  I will point out a couple of things.  They
22 talked about some of the work that the people on campus have
23 done, and you will see from those folks and hear from those
24 folks from the witness stand.

25   They left out other efforts.  For example, there are

1  race-neutral strategies that people engage in.  What I mean by

2  that is you'll hear that one of the race-neutral alternatives

3  they propose is to have increased financial aid or to increase

4  recruiting or to work in partnership with the community.  Well,

5  that's not a race-neutral alternative in this case because it's

6  not an alternative.  UNC is engaged heavily with financial aid.

7  You will learn that UNC has one of the most generous financial

8  aid programs of any public university in the country.  UNC is

9  heavily engaged in recruiting.  UNC is heavily engaged in

10  community partnerships.

11      We're doing some of the things their expert proposes we

12  should be doing, and they're telling us we're not trying.  And

13  they're dismissive of the hard work and excellent work done by

14  the experts retained in connection with this case, the efforts

15  by different committees, the efforts by people to pursue

16  strategies.  The efforts you will hear about our experts will

17  convince you that there's a good-faith effort to seek to pursue

18  race-neutral alternatives that work, but they haven't been

19  found simply because they're not available today.

20      Let me put this in context with three things that help

21  frame the issue.  Mr. Strawbridge is right.  There's a lot of

22  schools out there.  This country is a great big laboratory at

23  times that allows for experiments, but I submit to you the

24  evidence will show that no selective university in the country

25  has someone found a race-neutral alternative that works to

1   date.  Full stop.  We stand behind that.  And certainly no

2   university has found a race-neutral alternative that works that

3   would work in the context of UNC here and now given the

4   demographics of the population and other factors that our

5   experts will talk about.

6       Second, it makes sense that it's difficult to find a

7   race-neutral alternative.  What is the process now?  Sure

8   there's some math.  Sure there's some quantitative statistics,

9   but a lot of it is qualitative.  The human brain has learned

10  how to assess other people.  The essence of trying to find out

11  about an applicant, view them as an individual and figuring out

12  whether they will help to contribute to the various educational

13  missions of the university involve judgment.  It involves

14  assessing those letters of recommendation.  It involves

15  assessing essays.  It involves looking at different aspects.

16  You can't just sort of say, "Well, let's figure out who lives

17  in what ZIP code, and we'll let those folks in."  When you

18  carve out the nonquantitative aspects in the admissions

19  process, you lose valuable information.  You tie your hands

20  behind your back.  The admissions process is about people, not

21  algorithms.  You will see during the course of this case the

22  algorithm on the right which starts to lay out the model that

23  their expert says guides admissions decisions when any

24  admissions officer would look at that document and wonder what

25  in the world it is.  This is an admissions process based upon

1  human people assessing other human beings in a legitimate way.

2      Their process of converting things in a model, take human

3  beings, blanch their individuality out of them, reduce them to

4  dots on a graph, when UNC's process is the opposite.  UNC sees

5  dots on a graph and tries to understand individuals, and that's

6  an appropriate process.

7      The third thing I would mention is that not only has no

8  university successfully had a race-neutral alternative work,

9  certainly not one that would work in the context of UNC, no

10  court today has found a race-neutral alternative that works.

11  People have been at this since *Grutter* and perhaps for a long

12  time.  As recently as last year, Judge Burroughs went through a

13  thorough hearing in Massachusetts, listening to evidence in the

14  *Harvard* case, listening to the same experts that SFFA will call

15  before you in this trial.  He concluded that there was no

16  race-neutral alternative that would work in the context of

17  *Harvard.*  Now, that's not a binding decision on this Court, and

18  each university has to look in its own context, but it tells

19  you something:  That this isn't easy.

20      We are confident at the end of this trial you will conclude

21  that there is no race-neutral alternative that works for

22  North Carolina and that the university has pursued those

23  efforts and continues to pursue those efforts in good faith.

24      Now, Your Honor, the university, UNC, is clear.  We wish we

25  didn't have to consider race in the admissions process.  When

1  the day comes that the issues in our society will be resolved

2  such that a race-blind admissions policy will populate our

3  campuses with people rich from different environments,

4  including racial diversity, we will all be elated.  If the day

5  comes in the interim where there are race-neutral alternatives

6  that will work, work about as well to create the great, vibrant

7  campus UNC seeks to create, that will be partial satisfaction.

8       But we're not there on either front, not this day, not now,

9  not at UNC.  What's going on at UNC isn't people cheating.

10  What's going on at UNC is people striving earnestly to create

11  the best possible campus environment with the best possible

12  students using their human judgment.  They're doing the right

13  thing for the right reason in the right way.

14       At the end of this case, we will stand up, we will review

15  with you how it is that school group review, that claim goes

16  nowhere.  We will review with you how the glitter of statistics

17  doesn't undo the facts, that UNC is not cheating the admissions

18  process.  They're not hiding behind a veil.  And we will review

19  with you why it is that race-neutral alternatives are just not

20  available to work at this time.  We will ask you then to deny

21  the request for the injunction and let UNC continue to do the

22  right thing for the right reason in the right way.

23       Thank you.

24           **THE COURT:**  Thank you.

25           **MR HINOJOSA:**  Good morning, Your Honor.  May it please

1  the Court.  David Hinojosa on behalf of the Defendant

2  Intervenors.

3      SFFA's far-reaching claims are not supported by the

4  evidence in this case, and they are refuted not only by the

5  substantial record that is already before the Court, through

6  the exhibits that have been admitted and also through the

7  presentation of the evidence that is expected from UNC, but

8  also from the direct evidence that will be presented by

9  Intervenors and Intervenor witnesses.

10      You will hear from students.  The only students that you

11  will hear from are from the Defendant Intervenors.  SFFA, the

12  Plaintiff in this case who argues that students are being

13  unlawfully discriminated against, are not presenting any

14  witnesses.  They're presenting two numbers experts, which, as

15  UNC has stated here, that's where they're reliant on

16  substantially just purely numbers.  But this case is much more

17  than numbers.  This is about people's lives.  This is -- as the

18  Supreme Court has held, this is about building a stronger

19  democracy, preparing students to not only study beside one

20  another, to live beside one another, but also to work and

21  participate in our democracy alongside one another.  And it's

22  imperative that the voices of students be heard in this case,

23  and we appreciate greatly the Court's order allowing for that

24  opportunity.

25      Now, the pictures of the eight people here on page 1 of

1  Defendant Intervenor's Demonstrative Exhibit 1 show a wide
2  range of students who have attended UNC, graduates from 1984 to
3  2020.  There's also 15 other declarations in the record from
4  people, sworn declarations, showing exactly how race remains a
5  critical aspect of their identity and experiences, how UNC's
6  limited but meaningful consideration of race in admissions
7  meets the Supreme Court's strict tenets of strict scrutiny.
8      These are children who are incredibly diverse, including
9  children of emigrants from the Democratic Republic of Congo,
10 from El Salvador, from Mexico; children descendants of fourth-
11 and fifth-generation Americans -- African Americans, some who
12 are on the free and reduced-price lunch program, some who are
13 children of professionals.  But, again, the one common
14 denominator is that race is an integral part of their identity
15 and is something that SFFA, by its own claim, which it
16 unabashedly asserts in Count III, wants to erase race entirely;
17 and if it can't erase it, what it wants to do is essentially
18 under-rule it.  And its claim is largely based not on the
19 Supreme Court precedent, but the dissents.  So if you want to
20 read the dissents and find out exactly how their case might
21 progress, that's exactly where the persuasiveness of their
22 argument lies, but that's not what the precedent is set by the
23 Supreme Court.
24     Now, the Court allowed us -- allowed the Intervenors to
25 present evidence on two issues, and we'll be focusing on

1  presenting evidence on the critical mass aspect of it.  We do

2  have two expert reports already in the record, one on critical

3  mass by Dr. Uma Jayakumar, which I will discuss here briefly,

4  another one by Dr. Cecelski on the history of discrimination at

5  UNC and in North Carolina.  It's a sordid history that presents

6  formidable foes for UNC in recruiting, retaining a more diverse

7  student body.  The evidence will show that despite progress

8  being made by UNC and good-faith effort, certainly UNC is not

9  there yet.

10     The Court has already heard today a little bit about the

11  compelling interests that, you know, students -- universities

12  have in attaining a diverse student body.  It's important to

13  understand also, and something that you did not hear, again,

14  from Students for Fair Admissions this morning, is that there

15  are incredible benefits that have been recognized by the Court

16  promoting cross-racial understanding, breaking down

17  stereotypes, reducing racial isolation, facilitating enhanced

18  dialogue, preparing students for work in a diverse society.

19  These are the incredible benefits that are beginning to be

20  realized in many ways, but also remain absent, as the evidence

21  will show.

22     Defendant Intervenors have in the record Exhibit DI1, which

23  is an expert report by Dr. Uma Jayakumar.  Her CV is in the

24  record attached to her report.  She's a well-accomplished,

25  well-published, and well-researched educator in diversity in

 1   higher education.  What she did was she examined the extent of

 2   critical mass and how the university's efforts are in some

 3   respects accruing those benefits and also in some respects are

 4   where progress still needs to be made.  She used the term

 5   "dynamic diversity" because she feels that critical mass itself

 6   has been reduced to just a pure numbers game, although when you

 7   read the Supreme Court's opinion, it certainly is not.  It

 8   feels and it captures, you know, the numeric and environmental

 9   factors that create the conditions for holistic benefits.

10       So what does that mean?  What does that look like?  That

11   essentially means that you're building a racial climate that

12   would allow you to sustain the benefits of a more diverse

13   student body.  There are key elements to that; and they

14   include, you know, the numbers and contextual factors, but it's

15   really zeroing in on not just numbers, but whether or not

16   persons are meaningfully participating on campus and in campus

17   activities and whether there is actually cross-racial

18   understanding.  And so among the contextual factors here are

19   multicultural programs and courses and students of different

20   races actually dialoguing with one another.

21       And when there is substantial evidence of meaningful

22   participation, cross-racial interaction, which aligns with the

23   mission of UNC, then you have accrued, you know, the benefits

24   that the Court has again and again recognized.  The Court has

25   again and again recognized that universities have struggled to

1  accrue these benefits despite their good-faith efforts at the

2  University of Michigan Law School in *Grutter,* at the University

3  of Texas at Austin through the *Fisher* case.

4      And the evidence will show that Professor Jayakumar

5  surveyed substantial documents in her analysis, applying this

6  framework, dynamic diversity framework, to the actual evidence

7  in the case and reviewing substantial reports and campus

8  surveys, looking at -- examining student declarations also that

9  were submitted into the record.

10     And what were her findings?  Her findings were that UNC has

11  taken numerous concrete steps towards achieving this goal; that

12  they, however, have significant obstacles to dynamic diversity,

13  and that many of the obstacles are rooted in UNC's unique

14  sociohistorical context; and that UNC, unfortunately, at this

15  time has not yet achieved the conditions for dynamic diversity.

16     But it's not just the report of Dr. Jayakumar.  It's not

17  just the surveys that have already been submitted into the

18  record, but it's also the testimony.  So the Court will hear

19  the testimony from eight witnesses, including five Intervenors

20  about their experiences with overcoming obstacles, about their

21  impact on -- about diversity's impact on academic -- on their

22  academic education and their social interaction.

23     What was interesting this morning, what Students for Fair

24  Admissions, you know, stated was that they suggested that,

25  well, if you're going to look at race, you have to actually

1 identify some type of obstacle where your race played a role in

2 it, and then perhaps you can consider it.  The Supreme Court

3 has never held that, not in *Fisher*, not in *Grutter,* not all the

4 way back to *Bakke.*  The Courts have recognized that race is a

5 much more nuanced factor, and that it is not limited to those

6 who have only experienced direct racism, discrimination, bias,

7 and prejudice.

8     The -- it's important also for the Court to recognize that

9 while the First Amendment right is grounded in the

10 universities, and the Supreme Court, you know, has held that

11 consistently, that right is grounded in the educational

12 benefits that are flowing on campus between students, among

13 students, and with the university administration itself in the

14 broader community.  And that's important because the students

15 themselves will be providing testimony on the benefits that

16 have accrued and their continuing struggles.

17     So we have Hanna Watson, the class of 2020.  She identifies

18 as black African American.  She is currently attending

19 Princeton and is in their master's degree program in the

20 divinity college.  Her ambitions are centered on bringing

21 justice to African Americans because of the racial experiences

22 that she had growing up, and she's relied on these discussions,

23 on these dialogues within her classes, such as her poetry

24 classes, and relied on that diversity to help improve her own

25 worth.  So it is adding to her critical thinking skills.  She's

1 also noticed that in her nondiverse poetry classes the lack of

2 diversity and the lack of life experiences has limited the

3 discussion and the feedback.

4     Luis Acosta, who is from Hendersonville, North Carolina,

5 the son of emigrants from Mexico, identifies as Mexican

6 American, is currently a medical student in UNC medical

7 college. He attended UNC. As a pre-med student, he was taking

8 classes with racially and ethnically diverse students, and one

9 of the classes that he took was -- and he will, you know,

10 testify to this. One of the classes he took was a sociological

11 class and among, you know, the discussion, he would -- ended up

12 learning more and more about the different perspectives from

13 the African American community and the students, you know, who

14 were sharing some of their different perspectives as well; and

15 all of that, you know, has helped inform his own perspectives.

16 And he's going into the healthcare industry. We know how

17 desperate the healthcare industry is on having

18 diversity-informed knowledge and skills in that respect.

19     We also have the benefits of reducing isolation that the

20 Court will receive evidence on. Laura Ornelas, who is from

21 Chapel Hill and will be applying to graduate school soon to

22 pursue her master's in education, she identifies as Hispanic

23 and Latina. In high school, there were fewer Latinx students.

24 She felt the need to blend in, to assimilate, rather than to be

25 herself. When she got to UNC and she was attaining some of the

1  courses that she was attending that were much more diverse, she

2  felt like she could participate more fully and didn't have to

3  hide her own true self.

4      Star Bey Wingate [sic] is another student, class of 2016,

5  who is now -- who identifies as black.  She is now in New York

6  City working with a marketing and advertising firm.  She will

7  be testifying about being one of the few African American

8  students in her classes and feeling like she was a fact checker

9  every time there was an issue that came up about blackness.

10  She seemed to have been reduced and isolated as the mere token

11  spokesperson for the black community in those.  She will

12  testify about how that makes her feel alone and frustrated and

13  how it ended up draining much of her own energy in having to

14  assume that role.

15      Another benefit is breaking down stereotypes and biases.

16  You'll hear from Kenneth Ward, who is now an executive director

17  for College Bound which actually helps mentor at-risk students.

18  He identifies as black and African American.  He's from

19  Enfield, North Carolina.  And he will talk about building these

20  lasting relationships with white students who he had never

21  affiliated with because when schools finally integrated in his

22  community, all of these private schools popped up, and most of

23  the white students ended up going to those private academies.

24  But once he got to North Carolina and was able to engage and

25  build relationships, you know, with many of these white

1  students, they both had the stereotypes broken down about each

2  other.

3      But he also will testify about the importance of diversity

4  within diversity, because it is important.  There is no

5  monolith of black students, for example, of being black, of

6  being African American, of being Latinx.  There are many

7  different experiences and different cultures, you know, that

8  must be shared and those must be valued.  It's important that

9  the Court receive evidence on the value of diversity within

10  diversity as experienced, you know, by former students at UNC.

11      Luis Acosta also was able to break down stereotypes

12  himself.  People had assumed -- they didn't know.  They had

13  assumed he was Asian American because he was in the pre-med

14  program; and when they found out he was Mexican American and he

15  was able to share his own story and his own values, he was able

16  to break down those stereotypes as well.  The Court will hear

17  evidence from Luis.

18      And, again, from Star, on cross-racial understanding, she

19  will talk about how she participated in one of the programs

20  from UNC, Carolina United, and interacted with students of

21  different racial and religious backgrounds.  It was an

22  eye-popping experience because she hadn't ever been immersed in

23  such an environment, and it was -- ended up being one of the

24  most impactful and meaningful experiences that she still

25  carries to this day.

1    The benefit of making UNC more inclusive, who is leading

2  this movement?  Oftentimes Cecilia Polanco, class of 2016, who

3  identifies as Latina and El Salvadorian American.  She spoke of

4  how she, when she first got -- or she will testify to when she

5  first arrived at UNC, she suffered from an imposter syndrome

6  because she felt like a complete outsider, and it wasn't until

7  she started being able to relate a little bit more with other

8  students that were, you know, Latinx students, African American

9  students who were also active on social justice issues; and

10  they were able to help, you know, combine their efforts to help

11  lead at UNC and make the university, you know, more effective

12  at enrolling students of color as part of the recruitment

13  program.

14    Andrew Brennen, who hails from Kentucky, is the class of

15  2019, and now is an education fellow at National Geographic.

16  He identifies as black, and he, too, will talk about how

17  students of color are leading the efforts to move UNC away from

18  its Confederate past towards a more inclusive culture.  And

19  this is a really difficult issue that UNC, you know, continues

20  to struggle and that the greater state of North Carolina, for

21  that matter, continues to struggle, which brings us to

22  Defendant Intervenors' Exhibit No. 2, which is the expert

23  report by Dr. Cecelski, a historian.

24    Within his report, he made several observations about the

25  University of North Carolina having been a strong and active

1   promoter of white supremacy and racist exclusion for most of

2   its history.  Some of his other observations show that the

3   founding -- you know, three of the four original trustees were

4   slaveholders, while 69 percent of the occupants in

5   North Carolina at that time did not own slaves; that when

6   reconstruction happened, there were several trustees playing

7   roles in the KKK; that even after *Brown v. Board,* so

8   fast-forward to 1954, the university continued to repel efforts

9   for decades after.

10      And it's important because that lays a foundation.  That

11  foundation is not silent.  That foundation, you know, has

12  become public, you know, through the history and storytelling

13  of this tragic place in time for UNC and the greater state of

14  North Carolina; and it creates a formidable foe in recruiting

15  and retaining a more diverse student body.

16      The Court will also hear from Kenneth Ward, again about his

17  own experience of being the first black mic man, the person who

18  ends up trying to get the crowds at football games excited and

19  involved in the game, you know, with different cheers.  And,

20  unfortunately, when he decided to try and use some of his

21  platform to speak about social and racial injustice, he was

22  asked to step down by the administration.  He will also testify

23  about the -- his own experiences as a student marching for more

24  black faculty -- tenured faculty at UNC because there were so

25  few at the time.

1    You will also hear from Rimel.  So you fast-forward 34

2  years from 1984 to 2018.  And Rimel is now doing public health

3  and research at -- under a grant by the National Institute of

4  Health, the Duke Global Health Institute.  She identifies as

5  black and African American, and from the Democratic Republic of

6  Congo.  She has, you know, experiences both in middle class

7  and -- being part of the upper middle class now, but also

8  having, you know, more challenged experiences, you know, with

9  her family previously.  And she will testify about how she has

10  experienced multiple instances of overt racial aggression at

11  UNC, including being called the N word, including being told

12  when she went to a party that no slaves were allowed.

13    The present-day effects of racial discrimination and

14  segregation unfortunately still find themselves at UNC and its

15  campus.  When this case was filed, more than half a dozen

16  buildings on the campus still bore the names of the white

17  supremacy campaign leaders.  It is, in the words of one of the

18  Student-Intervenors, the racist wall of graffiti that reminds

19  students of where they're at and where their history still

20  plays a role today.

21    In recent decades, the university's faculty and

22  administration, again, has made important strides, but it

23  continues to struggle with these issues.  The fight to remove

24  the Silent Sam statue is only, you know, one of the latest and

25  more public pieces of contention that, unfortunately, you know,

1  many on campus had to, you know, experience.  And it's not just

2  the fact that this is, you know, some type of, you know,

3  political issue.  Of course, you know, it's beyond that.  But

4  it's also been ingrained, you know, through the state's own

5  statutes such as that, you know, shown here at 100-2.1 that

6  show that a monument, a memorial or work of art owned by the

7  State may not be removed, relocated or altered in any way

8  without the approval of the North Carolina Historical

9  Commission.  So the legislature itself, the leadership itself

10 has made sure that if any of these statues are going to be

11 removed, they have to go through a process first, a very

12 politicized process, unfortunately.

13      And instead of recognizing, you know, many of these

14 challenges that face students on campus, the Plaintiffs

15 mentioned at the hearing the other day about how when they were

16 trying -- at the final pretrial hearing when they were trying

17 to get additional evidence to support their mismatch theory,

18 this mismatch theory is rooted in racism.  It suggests that by

19 allowing black and brown students with lower test scores that

20 you're just setting them up to fail because that number on that

21 test score reflects all of their grit, all of their

22 determination, and all of their values.  They don't suggest

23 that that is something that might apply to white students.

24 It's black and brown students.  Of course there's no precedent

25 that suggests that mismatch theory is actually relevant, you

1  know, to the claims here.

2      But what you will also hear, Your Honor, is evidence from

3  Student-Intervenors, some who had lower test scores, some who

4  had lower GPA scores, but also through UNC's holistic

5  admissions process, they were able to identify these super

6  talented, well -- highly qualified students of color, and the

7  incredible benefits that not only they would bring, but they

8  could also experience.  There's no credible evidence in the

9  record that students of color with lower test scores are

10  failing out of UNC.  In fact, hundreds of white students -- the

11  record will show that hundreds of white students are admitted

12  into UNC with lower standardized test scores.

13      This argument of the same -- of the mismatch theory was

14  also raised in *Grutter* and *Fisher*; and, again, you won't find

15  it in the precedential opinions, the majority of opinions of

16  that, but you will find it discussed in the dissenting

17  opinions.

18      Mr. Blum has made it no secret that he wants to erase race

19  entirely from the process.

20      I think I'm about at that time.

21      So, indeed, much work continues.  It is still needed.  The

22  Plaintiff's strategy, again, is no secret.  They want to

23  eliminate race or at least make it so irrelevant that no

24  university would be willing to pursue it.  The Intervenors

25  respectfully request that you deny all the relief requested by

1  Plaintiffs and assert that the evidence will definitely

2  demonstrate and support that.

3      Thank you, Your Honor.

4          **THE COURT:**  Thank you, sir.

5      I am assuming that our first witness is going to be fairly

6  lengthy; is that correct?

7          **MR. STRAWBRIDGE:**  Yes, Your Honor.  Maybe not the

8  whole time we reserved, but it will be 45 minutes at least.

9          **THE COURT:**  All right.  I am going to -- we will at

10  this point take our morning recess.  Let us now recess for 15

11  minutes.

12      (A morning recess was taken from 11:05 a.m. until

13  11:20 a.m.; all parties present.)

14          **THE COURT:**  All right.  At this time the Plaintiff can

15  begin its case.

16          **MR. STRAWBRIDGE:**  Your Honor, the Plaintiffs call

17  Jennifer Kretchmar.

18          **THE COURT:**  All right.  If you would come forward,

19  please.

20          **JENNIFER KRETCHMAR, PLAINTIFF'S WITNESS, SWORN**

21                    **DIRECT EXAMINATION**

22  BY MR. STRAWBRIDGE:

23          **THE COURT:**  Yes, sir.

24  Q.  Good morning, Ms. Kretchmar.

25  A.  Good morning.

1  Q.  Could you tell the Court your current title?

2  A.  I am the associate director for research in the Office of

3  Undergraduate Admissions at the University of North Carolina at

4  Chapel Hill.

5  Q.  And how long have you been at UNC-Chapel Hill?

6  A.  Eighteen and a half years.

7  Q.  And have you held that position for the entirety of your

8  time there?

9  A.  I was previously the senior assistant director of research.

10 I was promoted to associate director in 2017.

11 Q.  But the entirety of your time at UNC has been in the

12 admissions office?

13 A.  Correct.

14       **MR. STRAWBRIDGE:**  Your Honor, I have spoken to

15 opposing counsel about this, and I just want to make sure the

16 Court is okay.  Given her employment, we would like to proceed

17 with her as an adverse witness, although, of course, we will be

18 polite and respectful in doing so.

19       **THE COURT:**  Anybody care to be heard?

20       **MS. VAN GELDER:**  No objection, Your Honor.

21       **THE COURT:**  All right.  Yes, sir.

22 Q.  (By Mr. Strawbridge)  Part of your role in the admissions

23 office is to read applicant files; is that correct?

24 A.  That's true.

25 Q.  And also to help recommend admissions decisions after

 1  reading those files, correct?

 2  A.  Yes.

 3  Q.  And you're familiar with the training materials that are

 4  used in the admissions office?

 5  A.  Yes.

 6  Q.  And are you familiar with the document that's known as the

 7  reading document at UNC?

 8  A.  I'm familiar with it.

 9  Q.  Okay.  We have on the stand with you there a three-ring

10  binder that has a number of exhibits in there.  I think we're

11  also going to project this on the screen, but I'm going to

12  refer you to an exhibit that's been admitted called PX108.

13         **MR. STRAWBRIDGE:**  Are we able to get that on the

14  screen?  Okay.

15         **THE WITNESS:**  Okay.

16  Q.  (By Mr. Strawbridge)  Do you recognize this document,

17  Ms. Kretchmar?

18  A.  It looks like what you've referred to as the reading

19  document.

20  Q.  Okay.  And the title of this document, the third line that

21  we've got highlighted here on the screen, is the "Foundations

22  and Practices Regarding the Evaluation of Candidates," correct?

23  A.  I see that, yes.

24  Q.  And this document is provided to all of the admissions

25  officers at UNC at some point in their training?

1  A.  I believe so.  I believe it's shared in training.

2  Q.  I want to just ask a few questions generally about the

3  admissions office and refer to this document as we go through

4  throughout.

5      UNC has as one of its institutional goals achievement of

6  critical masses of underrepresented populations; is that right?

7  A.  One of our goals is diversity, yes.

8  Q.  And if you look at the bottom of the second page of this

9  document, do you see where it references as an institutional

10 goal the "achievement of critical masses of underrepresented

11 populations"?

12 A.  Yes, I see that.

13 Q.  It goes on to indicate that "...since the absence of such

14 critical masses 'impedes the educational process' and 'can

15 place undue pressure on underrepresented students and interfere

16 with all students experiencing the educational benefits of a

17 diverse learning environment.'"

18     Is that what this document says?

19 A.  Yes.

20 Q.  If you go down a little bit further on this page, you note

21 the reference to a Faculty Advisory Committee on Undergraduate

22 Admissions?

23 A.  It's referring to the Faculty Council on the screen right

24 now.  I'm not sure where in the document you're pointing to.

25 Q.  I'm sorry.  Just above the title.  And I apologize.  We can

1  move the page up a little bit.

2      Do you see the reference to "Guidance of the Faculty

3  Advisory Committee on Undergraduate Admissions"?

4  A.  Yes.

5  Q.  You're familiar with that committee, correct?

6  A.  Correct.

7  Q.  That is the primary faculty administrative committee that

8  has responsibility for the admissions office?

9  A.  Yes.

10  Q.  And this guidance from the Faculty Advisory Committee on

11  Undergraduate Admissions reviewed and endorsed a faculty

12  statement from the Faculty Council in April 1998, correct?

13  A.  Based on this document, I would agree with that statement.

14  Q.  Right.  And that statement that the committee for --

15  Faculty Advisory Committee on Undergraduate Admissions endorsed

16  and adopted was that "diversity 'in its many manifestations'

17  was essential to the fulfillment of the University's

18  educational and service missions...," correct?

19  A.  Yes.

20  Q.  And it then goes on to refer to "an expansive notion of

21  diversity required that admissions decisions include" a number

22  of criteria.  Would you agree?

23  A.  Yes.

24  Q.  And this is criteria that you're generally familiar with

25  from your work in the admissions office, correct?

1  A.  I would say so, yes.

2  Q.  And so among the criteria that's listed in this, if you go

3  down to No. 3, are factors that contribute to a diversity of

4  presence, right?

5  A.  I see that, yes.

6  Q.  And so some of the factors that contribute to a diversity

7  of presence, according to this reading document, are age,

8  right?

9  A.  That is listed in the document, yes.

10  Q.  Economic circumstance?

11  A.  Yes.

12  Q.  Ethnic identification?

13  A.  Correct.

14  Q.  Family educational attainment?

15  A.  Yes.

16  Q.  Can I just ask, does that refer to the concept of

17  first-generation college?

18  A.  It could, I suppose, at any level of educational attainment

19  in the family.

20  Q.  It also refers to disability?

21  A.  Correct.

22  Q.  It refers to gender, correct?

23  A.  Yes.

24  Q.  It refers to race?

25  A.  Yes.

1    Q.  It refers to religion?

2    A.  Correct.

3    Q.  It refers to sexual orientation?

4    A.  Yes.

5    Q.  It refers to social position?

6    A.  Yes.

7    Q.  And veteran status, correct?

8    A.  Correct, uh-huh.

9    Q.  And although it's not on this list here, you also

10   understand the expansive notion of diversity in the admissions

11   office to include things like political viewpoint, correct?

12   A.  I would agree with that, yes.  I mean, it's not limited to

13   the things listed here necessarily.

14   Q.  Would you also agree -- and I can refer you to the top of

15   the following page -- that UNC, in its evaluation of candidates

16   for admission, does not seek to maximize the average SAT score

17   or eventual GPA of the entering class?

18   A.  I would agree with that.

19   Q.  That's an accurate statement as to how the admissions

20   process works at UNC, correct?

21   A.  That's not one of our goals, correct.

22   Q.  If we go a couple pages down on this document, there's a

23   section that's actually entitled "Race, Ethnicity, and National

24   Origin."  Mr. Weir will scroll to that here in a second.

25        Do you see that section?

1   A.  Yes.

2   Q.  And this section indicates that race, ethnicity or national

3   origin may be used at any stage in the admissions process,

4   correct?

5   A.  Correct.

6   Q.  That's the guidance that admissions officers are given?

7   A.  Yes.

8   Q.  And if you go down a little further in this section, we see

9   again a reference -- and it's the top of the next page -- that

10  "...the University...aims to enroll critical masses of students

11  who identify themselves as members of groups the University

12  deems underrepresented."  Is that accurate?

13  A.  I see that sentence, yes.

14  Q.  And is that an accurate reflection of what the admissions

15  process does?

16  A.  We are trying to enroll a diverse class to achieve the

17  educational benefits of diversity, yes.

18  Q.  And in particular when it comes to racial diversity, the

19  university does focus on underrepresented minorities?

20  A.  That is one of the things we focus on, yes.

21  Q.  And sometimes in the admissions office that's abbreviated

22  to URM?

23  A.  Occasionally, yes.

24  Q.  And URM, for purposes of the admissions office, it says

25  here in this document, is defined specifically, correct?

1    A.   According to this document, I believe it is, yes.

2    Q.   And it's defined to include those who identify themselves

3    as African American or black, correct?

4    A.   Yes.

5    Q.   As well as American Indians or Alaskan Natives?

6    A.   Correct.

7    Q.   As well those who identify as Hispanic, Latino or Latina,

8    correct?

9    A.   Yes.

10   Q.   The next section in this document refers to socioeconomic

11   status.  Do you see that?

12   A.   Yes, I do.

13   Q.   And the statement in this document is that:  "The

14   University works strongly to attract and retain disadvantaged

15   students, regardless of race."

16        Do you think that's true?

17   A.   I do.

18   Q.   And that:  "This is," in fact, "a critical component of the

19   institution's obligation to the State of North Carolina and,

20   indeed, to the nation."

21        Do you agree with that statement?

22   A.   Yes, I think socioeconomic diversity is important to us.

23   Q.   And you would agree with me that the University of

24   North Carolina, in this document and elsewhere, prioritizes

25   socioeconomic diversity in its admissions process, correct?

1  A.  I don't know if I agree with prioritizes.  Relative to

2  what?  I'm not sure I would be in a position to say.

3  Q.  Well --

4  A.  It's important to us.

5  Q.  I'm sorry.  I didn't mean to interrupt you.  Was your

6  answer it is something that is important to you at the

7  admissions office?

8  A.  Yes, yes.

9  Q.  Okay.  Now --

10     **MR. STRAWBRIDGE:**  And we can take the document off the

11  screen.

12  Q.  (By Mr. Strawbridge)  You've read admissions -- I'm sorry.

13  When applicants provide their admissions documents to UNC,

14  there's a lot of information in those files, correct?

15  A.  Yes.

16  Q.  And some of that information relates to things that we just

17  saw.  For example, students generally provide or you can

18  discern the gender of a student from the admissions file,

19  correct?

20  A.  That's true.

21  Q.  And the same thing with respect to their race or ethnic

22  identification, should they choose to disclose that

23  information?

24  A.  Should they choose to report it, yes.

25  Q.  You can generally identify whether or not they're the child

1   of an alum of UNC?

2   A.  Yes.

3   Q.  Obviously, you can identify their test scores?

4   A.  Yes.

5   Q.  The admissions office also tracks certain indicators of

6   socioeconomic status; is that fair to say?

7   A.  We have information in the file that might give us

8   information about socioeconomic status, yes.

9   Q.  UNC can generally see, for example, if somebody has

10  requested a waiver of the application fee to apply to UNC,

11  right?

12  A.  Correct.

13  Q.  And what is the current application fee?

14  A.  I believe it's $85.

15  Q.  And in addition to the material that may be gleaned from

16  the file -- well, strike that.

17      Applicants also provide teacher recommendations with the

18  file?

19  A.  Yes.

20  Q.  They also provide an essay?

21  A.  Correct.

22  Q.  And readers are responsible for reviewing those files and

23  assigning a number of ratings, correct?

24  A.  We do have ratings, yes.

25  Q.  And the ratings that are assigned by the reviewers include

1  the program rating?

2  A.  Correct.

3  Q.  Performance?

4  A.  Yes.

5  Q.  Extracurricular?

6  A.  Yes.

7  Q.  Personal qualities?

8  A.  Yes.

9  Q.  As well as essay?

10  A.  We no longer rate the essay score.

11  Q.  When did you stop rating the essay score?

12  A.  I believe two years ago.

13  Q.  Up until two years ago, the readers would have assigned a

14  score for essay, correct?

15  A.  Yes.

16  Q.  Starting with program, that rates the course of study that

17  a particular applicant has taken; is that fair?

18  A.  It's a rating of the rigor of the course of study,

19  specifically with respect to college-level courses pursued

20  during high school.

21  Q.  So that refers to things like AP classes or international

22  baccalaureate classes?

23  A.  Correct, in addition to dual enrollment.

24  Q.  In other words, a student who is both enrolled in high

25  school and taking college courses at a local college, for

1   example?

2   A.   Right.

3   Q.   And is the numerical rating that's assigned for program

4   hinged specifically to the number of those classes they've

5   taken?

6   A.   To a certain extent.  The "10" captures any student who has

7   taken ten or more, and the lower end of the scale is similarly

8   compressed.  So a "1" is actually someone who has taken no

9   college-level courses, and I believe a "2" is someone who has

10  taken one or two.

11  Q.   Beyond the number of courses of college-level or advanced

12  courses that an applicant has taken, is there any other factors

13  that go into the program rating?

14  A.   No.

15  Q.   Performance rates the academic performance of an applicant,

16  correct?

17  A.   Correct.

18  Q.   And that rating -- and I should have said this before.

19  Both program and performance are assigned on a ten-point

20  rating?

21  A.   Yes.

22  Q.   So a "10," for example, on performance would be a student

23  who achieves straight As?

24  A.   Yes.

25  Q.   And a "9" would be a student who has one or two Bs on their

1  transcript?

2  A.  Correct.

3  Q.  Extracurriculars is another rating that's assigned?

4  A.  Yes.

5  Q.  On the same ten-point scale?

6  A.  I think it's a five-point scale now, but I'm not entirely

7  sure when that change was made, two or three years ago.

8  Q.  So within the last couple years?

9  A.  Yeah.

10  Q.  Perhaps since the last time you and I spoke?

11  A.  Maybe.

12  Q.  In any event, extracurriculars rate an applicant's

13  activities outside of the classroom; is that safe to say?

14  A.  Yes.

15  Q.  Whether that's a club or work?

16  A.  Any kind of extracurricular activity:  Family

17  responsibilities, work, school activities.

18  Q.  Are there any other ratings that are assigned?  I have

19  essay here in my outline, but I think we have already discussed

20  the fact that that's no longer assigned.

21  A.  The PQ rating.

22  Q.  Oh, personal rating, yes.  Thank you very much.

23      Is that also rated on the same five-point rating that we

24  discussed earlier?

25  A.  It has been.  I believe now it's a three-point scale.

1  Q.  Okay.  So it's been even further compressed?

2  A.  Yes.

3  Q.  And what would be the ratings that are actually assigned

4  for the PQ rating?

5  A.  1, 3, 5, 7, 10 was what it was previously.

6  Q.  Would it now just be -- do you know what the three are now?

7  A.  I think it's 3, 5, 7.

8  Q.  Okay.  After assigning those -- well, strike that.

9     UNC, I think you testified, provides training to its

10 admissions officers; is that correct?

11 A.  Correct.

12 Q.  One of the things that UNC does as part of its training is

13 some rough quality checking to try to make sure that the

14 ratings are being assigned on a roughly fair and evenhanded

15 basis?

16 A.  I would say that's true, but our ratings don't equal a

17 decision.  So we're probably more concerned about the quality

18 of the decision than we are the ratings.

19 Q.  Any occasion in the past have you reviewed, you know, first

20 reads in part to make sure that the ratings seem to fall within

21 the realm of what you think are reasonable ratings?

22 A.  I mean, it's one thing we look at.  But, again, I don't

23 think we spend a lot of time worrying about whether people are

24 completely aligned with the ratings.

25 Q.  After a reader reviews the application, assigns these

1  ratings, and completes their review, they make a tentative

2  admissions decision, correct?

3  A.  The first reader would make a decision on the file, yes.

4  Q.  And at that point in time, as they're reviewing the file,

5  assigning their rating, they can consider, among other things,

6  the race of the applicant, correct?

7  A.  Race is one factor that we consider among many, yes.

8  Q.  And then for some applications a second reader will review

9  the file, correct?

10  A.  Yes.

11  Q.  And at that point, the second reader basically can engage

12  in a complete review of the file; is that right?

13  A.  Yeah, they do another comprehensive holistic review, and

14  they can either agree or disagree with the decision of the

15  first reader.

16  Q.  And as part of that review, they can take race into

17  account, correct?

18  A.  Yes.

19  Q.  Eventually, as the process proceeds, the admissions

20  decision will proceed to the phase known as school group

21  review?

22  A.  Yes, decision review, school group review.

23  Q.  And that review process involves a smaller number of

24  admissions officers in the office reviewing the tentative

25  admission decisions?

1  A.  It typically involves more experienced readers reviewing

2  decisions, yes.

3  Q.  And what they actually do is they divide up the high

4  schools who have -- from whom the applicants have come to UNC,

5  correct?

6  A.  In some cases.  I think in out of state.  We sometimes look

7  state by state.  It depends.

8  Q.  Let's just talk about the in state just to keep it simple.

9  A.  Okay.

10  Q.  For the in state, for example, one reader will review all

11  of the admissions decisions with respect to applicants from a

12  particular high school?

13  A.  They will review them, yes.

14  Q.  And during that stage, readers can engage in the full

15  holistic review of the file; is that right?

16  A.  That's right.

17  Q.  And that means that they can consider an applicant's race

18  at the school group review stage, correct?

19  A.  Correct.

20  Q.  And you've participated in the school group review process

21  before?

22  A.  I have.

23  Q.  And during the school group review process, if a reviewer

24  wants to know something about the applicant, they can easily

25  access all the information in the applicant's file?

1  A.  The same way they would on a first read or a second read,

2  yes.

3  Q.  So they can obtain information about the race or ethnic

4  identity of the applicant?

5  A.  Yes.

6  Q.  And school group review reports used to include in a

7  summary report at the beginning the applicant's race, correct?

8  A.  I believe that's true, yes.

9  Q.  Up until, you know, sometime after 2012, 2013?  Does that

10  sound right?

11  A.  I believe that's right.

12  Q.  Now, remind me again -- I apologize.  I forgot already.

13  What is your actual title?

14  A.  Associate director of research in the Office of

15  Undergraduate Admissions.

16  Q.  And with -- your role in research includes other

17  responsibilities at the university besides reading files,

18  correct?

19  A.  Correct.  In addition to reading files and helping recruit

20  applicants, I respond to external and internal data requests.

21  I might conduct surveys, focus groups.  I've studied whether

22  the factors we take into account when we read applications

23  predicts student success at Carolina.  I help with the yield

24  model.

25  Q.  And so you were the primary person in the admissions office

1  that processes and analyze data regarding admissions

2  applications?

3  A.  I would certainly say I was one of the people doing that,

4  yes.

5  Q.  And I just want to talk a little bit about some of the

6  databases that UNC uses.  At least until 2017, there was a

7  database known as Carolina Connect; is that right?

8  A.  Yes.

9  Q.  That was what housed the data concerning applications to

10  UNC?

11  A.  Correct.

12  Q.  And that data basically arose from the application form

13  that the students themselves would fill out when applying to

14  UNC?

15  A.  From The Common Application, yes.

16  Q.  As well as any other information that UNC may have

17  requested?

18  A.  I'm sorry?

19  Q.  Would it also include any additional information besides

20  the normal Common App?  Does -- let me strike that.

21      Does UNC also request additional information beyond The

22  Common Application?

23  A.  Not -- no, I don't think so.

24  Q.  Okay.  So the information in Carolina Connect is just from

25  the Common App?

1  A.   Right.

2  Q.   Would Carolina Connect also include, for example, the

3  ratings that you -- that admissions officers provided regarding

4  applicants?

5  A.   I believe it did.  I couldn't say with a hundred percent.

6  I believe so, yes.

7  Q.   So you would be able to gather data on those ratings as

8  they were added for each particular applicant in the database?

9  A.   Right.

10  Q.   I assume -- well, strike that.

11      At least back at the time of 2017, you would be able to

12  download the flat files of data from Carolina Connect?

13  A.   Yes.  We had a daily download of application data from

14  Connect to an Excel file.

15  Q.   And that Excel spreadsheet would just basically show in an

16  aggregated data format all of the data that UNC had obtained or

17  provided so far from these applicants?

18  A.   It wasn't an aggregate data.  It was individual-level

19  student data, and it was housed on a secure drive that only a

20  few people in the office had access to.

21  Q.   And I believe you said this, but you would receive those

22  flat files daily?

23  A.   They were extracted daily and put on the drive -- the

24  secure drive.  I wouldn't necessarily look at them daily,

25  but --

1   Q.   They were available to you?

2   A.   Yes.

3   Q.   And one of the things that you would do with the data that

4   you had access to in the admissions office is respond to

5   requests for various analysis of UNC's applicant pool, correct?

6   A.   Yes.

7   Q.   And sometimes you would run analysis of that data in the

8   form of studies about what that data shows?

9   A.   That's fair to say, yes.

10  Q.   For example, you helped with studies that the admissions

11  office did that attempted to control for various factors and

12  predict enrolling students' first-year grade point average?

13  A.   Yes.

14  Q.   You also did a study that attempted to control for various

15  information in the data and look at the effect of taking

16  college-level classes when you're in high school?

17  A.   That's true.

18  Q.   You've also done studies attempting to control for other

19  factors in the data that would be useful in predicting the

20  reliability or usefulness of something you called grit factors?

21  A.   Yes, I was looking at the predictive validity of grit or

22  noncognitive characteristics, yes.

23  Q.   Grit was a measure of a student's consistency of interest

24  and perseverance of effort; is that right?

25  A.   That was how it was defined by Duckworth who created -- who

1  defined the concept and created the measurement scale, yes.

2  Q.  You've also done studies with the data controlling for the

3  various factors to determine the reliability of ratings that

4  the staff assigns?

5  A.  I did, yes.

6  Q.  You've done studies controlling for the other factors in

7  the data to determine the effect of a second read versus a

8  first read on an application?

9  A.  I didn't personally conduct that study.  The graduate

10  assistant who was working with me at the time did that for her

11  master's thesis.

12  Q.  Were you involved at all in that study?

13  A.  In helping her access the data and understand the data.

14  Q.  And, in fact, with respect to that study, UNC actually made

15  some adjustments to its admissions process as a result of that

16  analysis?

17  A.  I don't think only -- it wasn't entirely based on that

18  analysis.  I think it helped inform that decision, but that

19  wasn't the only reason.  That's my understanding.

20  Q.  And so after that analysis, which may have factored into

21  the decision, UNC went from reading every file twice to only

22  reading certain portions of files twice; is that right?

23  A.  That may be true, but it's my -- I remember that we -- we

24  switched from year to year over the years, so it might have

25  been that we didn't read every file twice prior to that point

1  in time.  So we've kind of gone back and forth several times

2  over the years.

3  Q.  At least with respect to that data, it was used to inform a

4  decision to make alterations to the process?

5  A.  I couldn't speak to how much it was used.  I mean, that

6  information from that analysis was passed along to the

7  leadership team, and I couldn't speak to how much they used

8  that or relied on that to make the decision.

9  Q.  In your time in the data office or in your time in the

10  research role at UNC, you've never conducted any studies

11  controlling for all other factors in the data to determine the

12  effect that race was having on the likelihood of admissions at

13  UNC; is that correct?

14  A.  Well, I wasn't -- I didn't conduct any studies looking at

15  probability of admission.  Most of mine were focused on

16  predicting first-year GPA and whether the factors we took into

17  account actually were related to student success.  So I have

18  not conducted a study that looked at probability of admission.

19      And as a reader, knowing that we do a holistic review, an

20  individual review without specific weights on any factor, I'm

21  not sure I would have felt like that analysis informed how we

22  read applications.

23  Q.  My question is:  You've never done that analysis, correct?

24  A.  That's correct.

25  Q.  And no one in the admissions office has ever asked you to

1  do that analysis, correct?

2  A.  Not that I can remember.

3  Q.  In fact, you never heard any discussions in the office

4  about the possibility of doing that kind of analysis, other

5  than perhaps with respect to this litigation?

6  A.  I guess that would be a fair statement.

7  Q.  Your office is also responsible for conducting the

8  statistical model using race, among other things, to predict

9  yield?

10 A.  We -- our yield model is based on a statistical analysis,

11 but I'm not sure I would call the actual yield model

12 statistical.  We don't run a regression every year to predict

13 enrollment.

14 Q.  But you do use a model to try to predict the number of

15 students that will accept UNC's offers of admission?

16 A.  We do.

17 Q.  Are you responsible for -- at least in the past have you

18 been responsible for administering that model?

19 A.  Yes.

20 Q.  And you've used that yield model for 10 years or so; is

21 that correct?

22 A.  Yeah.  It changes, but the factors that are in the yield

23 model have stayed consistent over the years.

24 Q.  And do you have an understanding as to what the

25 restrictions are on UNC's enrollment of out-of-state residents?

 1  A.   Yes.

 2  Q.   And it's true, in fact, that there's a financial penalty if

 3  UNC enrolls greater than 18 percent out-of-state residents?

 4  A.   I think there's a financial penalty if we do that two years

 5  in a row, yes.

 6  Q.   And that means it's important for UNC to have an accurate

 7  yield model, correct?

 8  A.   Yeah, for many reasons I would say.

 9  Q.   And at least as of 2017, the information that you used to

10  conduct your yield model included URM status?

11  A.   It included residency, URM status, the deadline which an

12  applicant applied, and a test score range.

13  Q.   And just to make sure everybody understands, when you refer

14  to the deadline, that means whether the applicant applied for

15  early admission or the regular admission cycle?

16  A.   Correct.

17  Q.   So is it sometimes referred to as D1 and D2?

18  A.   That's how we refer to it sometimes.

19  Q.   And when the yield model includes underrepresented

20  minorities, it includes that as a group, correct, not the

21  subethnicities that might be included?

22  A.   Yes, it's a 0/1.  It's a two-level factor.

23  Q.   So for purposes of that model, at least, an applicant is

24  just given a "1," for example, if they are African American,

25  Hispanic or American Indian?

1   A.   Yes.

2   Q.   You're familiar with what's known as a core report?

3   A.   Yes.

4   Q.   The admissions office used to run and distribute core

5   reports; is that correct?

6   A.   I don't know if I would agree with "distribute." It's my

7   recollection that they, again, were retained on a secure site

8   that only certain people had access to.

9   Q.   Let's talk a little bit about what a core report is.

10   A.   Okay.

11   Q.   A core report was a snapshot of where the admissions

12   decision process was at any particular point in time?

13   A.   A snapshot of what particular data?

14   Q.   Data about the admissions process.

15   A.   I mean, that's somewhat vague. I think it has a count of

16   applications. So, yes, by demographics it helped us see where

17   we were at any one point in time relative to years past.

18   Q.   Including the number of applications received?

19   A.   Correct.

20   Q.   As well as the number of students who had been tentatively

21   admitted?

22   A.   At one point in time I believe it did, as well as the

23   number who had been read by that date in time.

24   Q.   And then there was also something known as a core report

25   comparison. Are you familiar with that document?

1   A.   So the terminology is -- it's changed so much, so I'm

2   not -- and we called it so many different things, so I don't

3   know if I could say for sure.  If you could describe it, I

4   guess.

5   Q.   Sure.  Let me just ask generally, was there also a version

6   of the core report that would show the information you just

7   described but also compare it to a prior year's activity?

8   A.   Yes, we did benchmark against prior years on a number of

9   different variables.

10  Q.   Can we look at PX67?  It's in your notebook.  I think we're

11  going to pull it up on the screen here.

12       (Pause in the proceedings.)

13  Q.   All right.  There's a cover e-mail here.  You can see that;

14  is that correct?

15  A.   Yes.

16  Q.   And this is an e-mail from you to Ashley Memory?

17  A.   Correct.

18  Q.   From April of 2015; is that right?

19  A.   Yes.

20  Q.   Who is Ms. Memory?

21  A.   She was our communications director at the time.

22  Q.   Okay.  And you're just noting that you're up more

23  out-of-state than in-state applications; is that right?

24  A.   Yes.

25  Q.   And that you're down 17 1/2 percent for AA, correct?

1   A.   Right.

2   Q.   Does that refer to African Americans?

3   A.   Yes.

4   Q.   And so if we look at the attachment of this -- I understand

5   that this was -- this was attached to an e-mail you sent to

6   Ms. Memory.  But is this the basic format of the core report

7   that we're looking at here?  We've got the spreadsheet on the

8   screen, if that helps.

9   A.   It's a little small.  Yeah, I think -- it may have changed

10  slightly over the years, but this is the basic format at that

11  point in time.

12  Q.   And so in this one, it is a comparison report, correct?

13  A.   It does show year over year, yes.

14  Q.   2015, which is the current year, is on the left side,

15  correct?

16  A.   Yep.

17  Q.   And 2014, which is the prior year, is on the right side?

18  A.   Correct.

19  Q.   And then there's a series of columns that track the change,

20  correct?

21  A.   Yes.

22  Q.   And so the core report here lists, among other things, some

23  information about the testing of the applicant pool; is that

24  right?

25  A.   Yeah, the applicant and the admitted and the enrolling.

1  Q.   Right.   And it also includes information about ethnicity,

2  correct?

3  A.   Yes.

4  Q.   It also includes information about gender?

5  A.   Yes.

6  Q.   And residency?

7  A.   Correct.

8  Q.   As well as citizenship?

9  A.   Yes.

10 Q.   And legacy status, correct?

11 A.   Correct.

12 Q.   This report does not show anything about socioeconomic

13 status?

14 A.   At this point in time it doesn't appear that it did, but I

15 believe we include first-generation status and fee waiver on

16 our application reports now.

17 Q.   And this document, at least at the time it was circulating,

18 didn't include information about disability?

19 A.   I don't know that we easily track that information, so no.

20 Q.   It doesn't include any information about veteran status?

21 A.   No.

22 Q.   It doesn't include any information about religion?

23 A.   Again, we don't track that information, so it would be

24 difficult to report it.

25 Q.   It doesn't include any information about political

 1 │ affiliation?

 2 │ A.   No.

 3 │ Q.   I want to look at another example.  Let's go to PX58.

 4 │      The cover e-mail here, do you see that, Ms. Kretchmar?

 5 │ A.   Yes.

 6 │ Q.   You're copied on this e-mail, correct?

 7 │ A.   Correct.

 8 │ Q.   Is this the graduate assistant you referred to,

 9 │ Ms. Prasertpol --

10 │ A.   Yes.

11 │ Q.   -- who used to work in your office and helped out with some

12 │ of the studies we've discussed?

13 │ A.   Right.

14 │ Q.   This was an e-mail sent on December 2013, correct?

15 │ A.   Yes.

16 │ Q.   And went to UGA Associates, correct?

17 │ A.   Which is the leadership team.

18 │ Q.   So who would be on that -- who would receive these reports?

19 │ A.   At that point in time, I believe it would have been Steve

20 │ Farmer, Barbara Polk, Michael Davis, Jared Rosenberg, I think.

21 │ I'm not sure who else.  Maybe Yolanda Keith.

22 │ Q.   All right.  And if we look at the attachment to this

23 │ report, here we can see up in the upper left hand the document

24 │ is labeled "Core Report Year-on-Year Comparison," correct?

25 │ A.   Yes.

1  Q.  This one is dated December 4th, 2013; is that right?

2  A.  Right.

3  Q.  And if you look just briefly down the left side of this

4  report, it basically contains the same information as the

5  report we were just looking at?

6  A.  It looks that way.

7  Q.  Okay.  If you go down to the very bottom and look at the

8  last spreadsheet here, there's a number of tabs.  Do you see

9  that?

10  A.  Yes.

11  Q.  Those tabs have dates on them?

12  A.  Correct.

13  Q.  And so when this document was sent around, was it sent as a

14  cumulative collection of prior reports?

15  A.  I mean, it looks like she did.  I don't remember if --

16  again, it's not my recollection that we distributed these by

17  e-mail often, and I'm not quite sure why she was.  It's -- I

18  remember that they mostly sat on the secured drive that certain

19  people had access to, but I'm not 100 percent sure.

20  Q.  In any event, if you look at the tabs, it indicates that

21  there were a number of reports generated between October 17th

22  and December 4th?

23  A.  I see that, yes.

24  Q.  And even when it sat on the secured drive, to the best of

25  your memory, these were reports that were generated on a weekly

1  or biweekly basis; is that fair?

2  A.  I think that's fair.

3  Q.  Among the responsibilities that you had at the admissions

4  office was -- was to occasionally have responsibilities with

5  respect to review of information about race-neutral

6  alternatives?

7  A.  I was a member of a working group that was charged with

8  exploring race-neutral alternatives, yes.

9  Q.  Before that, in 2009, were you asked to prepare a

10 literature review regarding what other universities were doing

11 regarding race-neutral alternatives?

12 A.  Yes, I was.

13        **MR. STRAWBRIDGE:**  And if we can just bring up PX17

14 quickly.

15 Q.  (By Mr. Strawbridge)  This is an e-mail dated January 10th,

16 2014; is that correct?

17 A.  Yes.

18 Q.  And you're referencing a literature review of the now dated

19 race-neutral admissions research; is that correct?

20 A.  It looks like I was passing it along to a colleague across

21 campus and trying to note that I hadn't updated it fully since

22 I first conducted the lit review -- literature review.

23 Q.  And if you look up in the "Subject" line, it indicates it

24 was a literature review of race-neutral research up to 2009,

25 correct?

1  A.  Yes.

2  Q.  So this was the 2009 task that we were just discussing; is

3  that right?

4  A.  Right.

5  Q.  If you can just briefly look at the review, is that -- the

6  attachment there, is that the literature review that you did in

7  2009?

8  A.  It looks like it, yes.

9  Q.  And it was your understanding that Steve Farmer requested

10  this review?

11  A.  Yes.  I think I was reporting to Barbara Polk at that point

12  in time.  I believe that I understood the request came from

13  him.  It might have come through Barbara.  And I know that when

14  I completed the lit review, I did pass it to Barbara and not to

15  Steve, who I assumed shared it with Steve.

16  Q.  And when you were asked to prepare this document,

17  Mr. Farmer did not tell you why he wanted it, correct?

18  A.  I don't think he gave a specific reason.  But as someone

19  who works in admissions and was familiar with the *Grutter* case,

20  I think I would have had some general sense of why he was

21  asking, but I don't remember him specifically saying why.

22  Q.  In this literature review, you do not come to any

23  conclusions about whether race-neutral alternatives could work

24  at UNC, do you?

25  A.  I think I tried to summarize the conclusions that others

 1  came to in the research; and I believe I did write that no

 2  viable race-neutral alternatives, in my opinion, in my review

 3  of the literature had been found at that point in time.

 4  Q.  With respect to "would work at UNC," did you write that?

 5  A.  I'm sorry.

 6  Q.  Did you write that with respect to UNC in particular?

 7  A.  I -- I wrote that with respect to the research that I had

 8  reviewed in the literature review.

 9  Q.  But you didn't do any specific analysis in this of what was

10  being done at UNC?

11  A.  I mean, I understood from reading *Grutter* that in the

12  majority opinion they had instructed universities to pay

13  attention to natural experiments occurring in other states

14  where affirmative action had been banned and also other

15  research, and so this seemed like a reasonable first step

16  before doing anything specific to UNC.

17  Q.  Do you know whether or not this document, in fact -- strike

18  that.

19      You don't know whether this document was shared with anyone

20  else at UNC in 2009, do you?

21  A.  Anyone other than Barbara?

22  Q.  Correct.

23  A.  I -- I firmly believe Steve saw it.  I couldn't say with

24  100 percent, and I have -- I couldn't speak to who else they

25  might have shared it with.  I don't know.

1    Q.   Now, you mentioned that you -- strike that.

2         You also assisted UNC with an analysis that was presented

3    in an amicus belief filed with the Supreme Court in the *Fisher*

4    litigation; is that correct?

5    A.   I think I would reword that and say that an analysis that I

6    completed at Steve Farmer's request was later used.  I didn't

7    know at the time that it would be used for that purpose.

8    That's not why I conducted it.

9    Q.   You did it at his request, correct?

10   A.   Yes.

11   Q.   And you understand that it subsequently was part of what

12   was referred to in the amicus brief?

13   A.   Yes.

14   Q.   And you're saying Mr. Farmer didn't tell you why he wanted

15   that done?

16   A.   I mean, again, it was like the lit review.  I had a general

17   sense of why he might be asking me to do that kind of analysis,

18   but...

19   Q.   Before that model, you had not done any other modeling at

20   UNC with respect to race-neutral alternatives at UNC; is that

21   correct?

22   A.   I had not personally, no.

23   Q.   And if we look at PX7, there's a couple of covering

24   e-mails on -- well, let me just say for the record, this is an

25   exchange that you had with Steve Farmer in July of 2013?

1  A.  Yes.

2  Q.  And I think from the cover e-mails what you guys are

3  passing on there is the actual results of the work you did back

4  during the time of the amicus brief in 2012, correct?

5  A.  Right.

6  Q.  And that analysis is sort of summed up in the portion of

7  the chain that's dated May 25th, 2012?

8  A.  Correct.

9  Q.  And you had -- the process that you used to create this

10  analysis you haven't used for any other purpose in the

11  admissions office, correct?

12  A.  I mean, we -- we followed up with other percent plans, so I

13  don't -- I'm not sure if I would agree with that statement.

14  Q.  Did you use the particular formula or analysis that you

15  used here in those later efforts?

16  A.  Not the same exact process, no.

17  Q.  Now, you mentioned the working group on race-neutral

18  alternatives, correct?

19  A.  Yes.

20  Q.  That was a group that was formed in November of 2013; is

21  that right?

22  A.  Yes.

23  Q.  And it met for the first time in December of 2013?

24  A.  I believe that's correct.

25  Q.  Is it fair to say that committee met four or five times

1    over the course of the following two years?

2    A.  I don't know that it was convened for two years.  I

3    couldn't say the exact number of times we met.  I know that

4    there was -- it took some time to get the data for a number of

5    reasons, and we didn't meet while we were waiting to get the

6    data.

7    Q.  The report that you ultimately drafted for the working

8    group included the literature review?

9    A.  Part of the literature review, yes.

10   Q.  And is it fair to say that the final report that the

11   working group produced didn't have very many changes from the

12   2010 lit review you did?

13   A.  I think I added three or four more recent references to

14   more recent research.

15   Q.  Would you agree that you didn't add a whole lot?

16   A.  I would agree that I didn't conduct another full lit review

17   at that point in time.

18   Q.  And do you remember that one of the reasons why you didn't

19   add a whole lot is that you had time constraints and other job

20   responsibilities for prioritizing?

21   A.  Yeah, I would agree with that.  I had other job

22   responsibilities, and our work as a group was paused fairly

23   quickly after we completed that report, which made it a little

24   more difficult to incorporate changes.

25   Q.  I direct your attention to Defendants' Exhibit 42.  That's

 1  a DX number in the binder there.

 2      **MR. STRAWBRIDGE:**  Mr. Weir, would you put it up on the

 3  screen?

 4      (Pause in the proceedings.)

 5  Q.  (By Mr. Strawbridge)  There we go.  This is an agenda from

 6  January 15th, 2014; is that right?

 7  A.  So am I looking at DX42?  It doesn't --

 8  Q.  It's 41.  I apologize.

 9  A.  Okay.  Yes, it looks like an agenda from January 15th.

10  Q.  I'm sorry.  One second.

11      (Pause in the proceedings.)

12  Q.  I'm sorry for the confusion on our side.  We're going to go

13  back to the DX42.

14      So this is an agenda from February 26th, 2014, correct?

15  A.  It's hard to tell if it's an agenda or minutes.  I'm not

16  quite sure.  It doesn't say.  It just has the date.

17  Q.  Fair enough.  But does this reference a meeting of the

18  working group on race-neutral alternatives?

19  A.  Yeah.  I would say it's minutes because it says who was in

20  attendance, so it must have been drafted after the meeting.

21  Q.  That makes sense, and I appreciate that.

22      You were in attendance at this meeting, correct?

23  A.  Apparently, yes.

24  Q.  And the other members you recognize as members on that

25  working group?

1  A.  Correct.

2  Q.  And one of the questions that came up at this meeting,

3  according to the minutes at least, if you go down to the

4  "Questions to consider before we start" -- do you see that?

5  A.  Yes.

6  Q.  -- "How do we want to define a 'serious, good-faith

7  consideration of workable race-neutral alternatives?'"  Is that

8  correct?

9  A.  I see that written there, yes.

10  Q.  You don't actually recollect the specifics of this

11  discussion, do you?

12  A.  I don't.

13  Q.  I want to look at PX29.  This is a cover e-mail.  The top

14  e-mail, for the record, is from April 29th, 2015.  It was sent

15  from Ms. Polk; is that correct?

16  A.  Yeah, I guess so.  It doesn't say who it was sent to, but,

17  yes, I see that it was sent by Barbara on April 29th, 2015.

18  Q.  And she's forwarding an e-mail that you had sent her on

19  Halloween of 2014?

20  A.  I guess so, yeah.

21  Q.  And in that you -- the subject line of that e-mail was

22  "Race-Neutral Draft," correct?

23  A.  Correct.

24  Q.  And you say:  "I think I've been hitting my head up against

25  the wall with this long enough.  Not sure if that's the right

1  expression, but it's time to let this go for now.  I know most

2  of this won't likely make the cut for the final draft, but I

3  felt like I needed to at least make an attempt.  So, I hope

4  it's a start, at least."

5      Is that accurate?

6  A.  I did write that, yes.

7  Q.  But, in fact, this ended up being the final draft report

8  for the working group, correct?

9  A.  I -- I don't know.  I know that changes were made over

10 time, and I had sent several drafts to Barbara.  I couldn't say

11 with assurance how many changes were made from this point to

12 the final.

13 Q.  Do you have in front of you in the binder PX3?

14 A.  Yes.

15 Q.  Okay.  Does that indicate that these are the Defendants'

16 responses and objections to the Plaintiff's second

17 interrogatories?

18 A.  Yes.

19 Q.  Do you know whether you assisted in the preparation of the

20 responses to these interrogatories?

21 A.  If I did, I didn't know it was for interrogarory [sic] --

22 however you say that word.

23 Q.  Interrogatories.

24 A.  But --

25 Q.  All right.  I'm going to direct you to the response that

 1  UNC submitted in this case to Interrogatory No. 17.  Let's

 2  start with what the interrogatory itself says.  Does the

 3  interrogatory ask UNC to identify any changes that were made

 4  between Jennifer Kretchmar's draft report for the working

 5  committee on race-neutral alternatives from October 31, 2014,

 6  and the final report?

 7  A.  Yes, I see that.

 8  Q.  And it's referring to the document we were looking at

 9  before, the October 31st draft, correct?

10  A.  Yes.

11  Q.  And it asks for some information about any changes that

12  were made, and then it says:  "Do not identify immaterial

13  changes, such as fixing typos or removing the word 'draft.'"

14      Do you see that?

15  A.  I see that, yes.

16  Q.  And the response that UNC submitted in this case is that

17  "...Defendants state that any changes made to Jennifer

18  Kretchmar's draft report for the Working Group on Race-Neutral

19  Alternatives after October 31st, 2014, were 'immaterial' as

20  defined by Plaintiff in Interrogatory No. 17."

21      Do you see that response?

22  A.  I do see that response.

23  Q.  You know a person named Howie Kallem, correct?

24  A.  I don't know him personally.  I've become more familiar

25  with his name in preparing for trial.

1  Q.  You're aware that Mr. Kallem was a former employee of the

2  Department of Education's Office for Civil Rights?

3  A.  I think I knew that, yes.

4  Q.  And that at some point he was employed by UNC --

5  A.  Right.

6  Q.  -- after he left the Department of Education?

7  A.  Right.

8  Q.  And Mr. Kallem, in fact, provided some comments on your

9  draft report, correct?

10 A.  I believe he provided those to Barbara Polk, yes.

11 Q.  And those were provided to you as well, correct?

12 A.  I've seen an e-mail indicating that they were, yes.

13 Q.  Let's just briefly look at PX32.  Do you see that e-mail?

14 A.  I do.

15 Q.  Is this from November of 2014?

16 A.  Correct.

17 Q.  It's from Ms. Polk to you and Mr. Farmer?

18 A.  Right.

19 Q.  And she's indicating that she received a response from

20 Howie regarding this draft statement, correct?

21 A.  Yes.

22 Q.  And this is a couple weeks after October 31st, 2014?

23 A.  Yes.  And maybe in between this time you had filed the

24 lawsuit; is that correct?

25 Q.  November 18 -- you're testing my memory.  We have that on

1  the record.  We can figure it out.

2  A.  Okay.

3  Q.  But, in any event, in this e-mail she's indicating that

4  Mr. Kallem had provided comments, and she had placed them on

5  the H drive; is that right?

6  A.  Yeah.

7  Q.  And she's also included comments from his e-mail with the

8  draft document on that file, correct?

9  A.  Correct.

10  Q.  And if we look at PX30 -- just let me know when you're

11  there.

12  A.  Yes.

13  Q.  This is an actual e-mail from Mr. Kallem to Ms. Polk,

14  correct?

15  A.  Right.

16  Q.  It is dated November 18th, 2014?

17  A.  Right.

18  Q.  And Mr. Kallem -- this is the e-mail providing some

19  comments on the race-neutral alternatives analysis, right?

20  A.  Yes.

21  Q.  And if you look among the comments that Mr. Kallem had, one

22  of them was that your draft did not include more recent

23  research on race-neutral alternatives, correct?

24  A.  I see that, yes.

25  Q.  And he actually provides some suggestions as to where you

1  might find more information, correct?

2  A.  Yes.

3  Q.  No changes were actually made to the final draft in

4  response to these comments, though, were they?

5  A.  Right.  And I think that's why I asked about the date the

6  lawsuit was filed, because it was my understanding there was a

7  pause at that moment in time in our work and -- because we were

8  at a natural stopping point and the new race-neutral committee

9  was formed, I think that's part of the reason we didn't go

10 back, because one of the first activities that the new

11 race-neutral committee undertook was a lit review done by the

12 professor from the law school.

13 Q.  And we'll get to the chronology of when this report was

14 adopted and when the new committee started.

15 A.  Okay.

16 Q.  I just want to make sure I understand.

17     You never actually added these comments to the draft you

18 had prepared in Halloween 2014?

19 A.  I don't think I incorporated this feedback.

20 Q.  Yeah.  But by adding these comments, what I'm asking is you

21 didn't make adjustments to the draft in response to these

22 comments?

23 A.  I don't believe so.

24 Q.  Now, as you mentioned, this report was ultimately submitted

25 to the Advisory Committee on Undergraduate Admissions a couple

1  of years later?

2  A.  I don't know the exact timeline.  I think it was about a

3  year later.

4  Q.  February 2016?

5  A.  Okay.

6  Q.  Does that sound right?

7  A.  Yes.  And we submitted this in November 2014, so yeah.

8  Q.  Fair enough.  Between one and two years?

9  A.  Yeah.

10  Q.  PX38, can I just address your attention to that?

11  A.  Okay.

12  Q.  Do these appear to be meeting minutes from the Advisory

13  Committee of Undergraduate Admissions in February of 2016?

14  A.  They do.

15  Q.  You were among the people present at this meeting?

16  A.  It looks like I was a guest, yes.

17  Q.  It indicates that you presented findings from your work

18  exploring race-neutral alternatives at this meeting; is that

19  correct?

20  A.  Yeah.  I remember that Barbara was the primary presenter,

21  but I think I helped explain some of the results and the work

22  of the group.

23  Q.  And it was at this meeting, essentially, that the committee

24  accepted the draft report that we saw from 2014?

25  A.  I believe so.

 1   Q.   And it was also at this point in time that UNC formed a new

 2   committee to study race-neutral alternatives?

 3   A.   I believe that's what the minutes say, yes.

 4   Q.   That's a group that's sometimes referred to as the

 5   Committee on Race-Neutral Strategies?

 6   A.   I think so, yes.

 7   Q.   You provide staff support for that committee?

 8   A.   Yes.

 9   Q.   Just to say, you're not part of the decision-making body;

10   is that right?

11   A.   That's correct.

12   Q.   But if they need data from the admissions office, you help

13   obtain that data?

14   A.   Right.

15   Q.   You've given access to applicant data to the members of

16   that committee?

17   A.   I have.

18   Q.   And that includes data regarding UNC's applicant pool,

19   correct?

20   A.   Correct.

21        **MR. STRAWBRIDGE:**  Your Honor, I only have about a

22   couple more -- two or three more minutes of questioning.

23        **THE COURT:**  All right.  That's fine.

24        **MR. STRAWBRIDGE:**  I just wanted to give you an idea

25   since we are approaching 12:30.

1    **THE COURT:**  I appreciate it.

2  Q.  (By Mr. Strawbridge)  We looked earlier at the reading

3  document, and it references to the term "critical mass,"

4  correct?

5  A.  Correct.

6  Q.  You remember looking at PX108 and how it referred to that

7  document -- or referred to that term -- I'm sorry -- "critical

8  mass"?

9  A.  Yes.

10  Q.  At one point critical mass came up in the work of the

11  Working Group on Race-Neutral Alternatives; is that right?

12  A.  I know that from looking at agendas.  I don't remember the

13  specifics of the conversation, but I have no reason to believe

14  that that conversation didn't take place.

15  Q.  Let's look at DX40.

16  A.  I don't think I have PX40.

17  Q.  It's DX40.

18  A.  DX40.  Okay.

19  Q.  Do you see that document?

20  A.  Yes.

21  Q.  This is an agenda from the December 19th, 2013, meeting of

22  the working group?

23  A.  Yes.

24  Q.  And one of the questions on here is:  "How will we know

25  when we've reached 'critical mass'?"  Correct?

1   A.   Correct.

2   Q.   You don't have any recollection of actually discussing that

3   question at the meeting, do you?

4   A.   I don't have a recollection of the specifics of the

5   conversation, no.

6   Q.   You don't remember having -- you don't recollect having the

7   discussion at all, correct?

8   A.   Not at that meeting.

9   Q.   You've worked in the admissions office for 17 years now?

10  A.   Eighteen.

11  Q.   Eighteen.  And during your first 15 years in the office,

12  the admissions office had not had any discussions with its

13  employees about using race to achieve critical mass, had they?

14  A.   I would agree that critical mass isn't language that we use

15  in our everyday work, but to the extent that critical mass is

16  aiming toward certain ends, achieving educational benefits of

17  diversity, those are things that we talk about frequently.  So

18  I think our readers and our staff understand what we're aiming

19  for when we say we're trying to build a class of students who

20  bring diverse backgrounds and perspectives.  So even if we

21  haven't used that terminology, I think it's part of the

22  understanding of what we do in our work and what we're trying

23  to achieve.

24  Q.   Ms. Kretchmar, you've never actually discussed what

25  critical mass would be in the admissions office, correct?

1  A.  I'm not sure I understand your question.  Like define it,

2  specifically write down a definition?  I'm not sure beyond what

3  I just answered.  We've had discussions about what we're trying

4  to achieve by achieving critical mass.

5  Q.  You, during your time in the admissions office, have not

6  had a discussion specifically about how you use race to achieve

7  critical mass and that term?

8  A.  I guess that would be fair to say.

9  Q.  And you don't recall having that conversation during your

10  time on the Working Group on Race-Neutral Alternatives, right?

11  A.  I think -- based on the agenda I just saw, I think we must

12  have had some discussion about how we would know when we

13  achieved critical mass.

14  Q.  Do you recall any conversation?

15  A.  I couldn't say at that specific meeting, but I know I've

16  been a part of other conversations where that kind of topic

17  arose.

18  Q.  During your time on the race-neutral alternatives

19  committee, do you recall having any discussion as to what would

20  constitute a critical mass at UNC?

21  A.  Again -- I mean, other than how I've answered the question

22  already, I don't know.

23  Q.  And you don't recall any specific discussion as to how the

24  university defines that term, do you?

25  A.  I mean, other than what I just explained.  I mean, I think

1   we define it in terms of the ends that we're trying to achieve.

2   We aren't aiming for a specific number or a quota, but we are

3   trying to create an environment on campus.  I could go through

4   what I understand to be the educational benefits of diversity.

5       So I think we think of critical mass in terms of its

6   outcomes, and I think one of the ways that we try to determine

7   if we've achieved it is by asking our students whether we've

8   created the environment for them that they say they want in

9   terms of studying and living alongside people who are different

10  from them.

11  Q.  You remember giving a deposition in this case, right,

12  Ms. Kretchmar?

13  A.  Yes.

14  Q.  You gave that deposition.  You took an oath to tell the

15  truth?

16  A.  Yes.

17  Q.  Reviewed your deposition?

18  A.  Yes.

19  Q.  And you actually signed an errata sheet noting any errors

20  in your deposition?

21  A.  Yes.

22  Q.  I have a copy of your deposition there.  I'm going to ask

23  you to refer to page 168 of your deposition transcript.  We'll

24  show it on the screen, but you can look at it in the --

25  A.  I'm sorry.  What's the exhibit number?

1  Q.  It's a separate bound volume sitting next to you.

2  A.  Oh.  What page?  I'm sorry.

3  Q.  168.

4  A.  Okay.

5  Q.  Line 10.  "Question:  In all your work on the race-neutral

6  alternatives committee, you don't recall having discussion

7  about what would constitute critical mass?

8     "Answer:  Do you mean how other people define critical mass

9  or what --

10     "Question:  To how the university defines critical mass.

11     "Answer:  I don't.  I don't recall that conversation."

12  A.  Right.  And I --

13  Q.  Were you asked those questions, and did you give those

14  answers at your deposition?

15  A.  I did.  And I would say, in preparing for this trial I was

16  shown the agenda that said we discussed critical mass; and I

17  have no reason to believe we didn't, even though I don't recall

18  the specifics of the conversation.  So I think that's

19  consistent with what I said then.

20  Q.  Do you remember whether you were shown that agenda at your

21  deposition?

22  A.  I don't believe I was.  I don't recall though.  I don't

23  remember.  Can you tell me?

24  Q.  Can you turn to page 169?  I'm sorry.  Strike that.

25     What about your time on the committee for race-neutral

1  strategies?  At least as of March 2017, you didn't recall any

2  recollection there as to how the university defines critical

3  mass, did you?

4  A.  I don't remember specific conversations, no.

5          **MR. STRAWBRIDGE:**  I don't have any further questions

6  for Ms. Kretchmar.

7          **THE COURT:**  All right.  Thank you.

8      It makes sense for us to take our lunch break, and then we

9  will resume after this.  All right.  Let us recess until 1:35.

10     (A noon recess was taken from 12:33 p.m. until 1:35 p.m.;

11  all parties present.)

12         **THE COURT:**  All right.  She is your witness.

13         **MS. VAN GELDER:**  Thank you, Your Honor.  Amy Van

14  Gelder for the UNC Defendants.  I don't have any questions for

15  Dr. Kretchmar.

16     I just want to thank you for your time.

17         **THE COURT:**  All right.  Thank you.

18     Any questions from Student-Intervenors?

19         **MR HINOJOSA:**  No, Your Honor.

20         **THE COURT:**  All right.  Anything further for this

21  witness?

22         **MR. STRAWBRIDGE:**  I guess not, Your Honor.

23         **THE COURT:**  All right.  You may step down.  Thank you.

24     (The witness left the stand.)

25         **THE COURT:**  If you would call your next witness,

 1  please.

 2          **MR. MCCARTHY:**  Your Honor, I think the witness is

 3  coming in in just a minute.

 4          **THE COURT:**  All right.

 5          **MR. MCCARTHY:**  Before we get started, I'm going to try

 6  this standing up.  I've got a bit of a bad back, so I may

 7  change at some point and sit down.  I hope that's not a problem

 8  for anybody --

 9          **THE COURT:**  Not at all.

10          **MR. MCCARTHY:**  -- if I'm not doing too much dancing up

11  here, but I'm going to try to do this without getting my back

12  tightened up.

13          **THE COURT:**  All right.  That's not at all a problem

14  for me, so do what you need to do.

15          **MR. MCCARTHY:**  Thank you.

16      (Pause in the proceedings.)

17          **MR. MCCARTHY:**  The Plaintiff calls Peter Arcidiacono.

18          **THE COURT:**  Is this the witness where there was some

19  indication of -- let me see.  What was I thinking?  All right.

20  This says objection, Federal Rule 802.  This is on the joint

21  agreement.

22          **MR. FITZGERALD:**  Your Honor, I believe there's an

23  objection to the admission of his reports, and so the parties

24  have each objected to admitting the other's expert reports at

25  this point in time.

1           **THE COURT:**  Oh, I see.  All right.  I understand.

2           **MR. MCCARTHY:**  That's all it is.

3           **THE COURT:**  That's all it is.  All right.  Thank you.

4           **MR. FITZGERALD:**  And, Judge, perhaps I should just

5    note there might be -- there could be objections if some of the

6    testimony veers outside of the expertise.  I'm not waiving

7    that.  That was just directed at reports.  Thank you.

8           **THE COURT:**  Thank you for the clarification.

9       Yes, sir.

10          **MR. MCCARTHY:**  Thank you, Your Honor.

11          **PETER ARCIDIACONO, PLAINTIFF'S WITNESS, SWORN**

12                    **DIRECT EXAMINATION**

13   BY MR. MCCARTHY:

14   Q.  Could you please introduce yourself for the Court?

15   A.  My name is Peter Arcidiacono.

16   Q.  And for the record, can you spell your last name?

17   A.  A-r-c-i-d-i-a-c-o-n-o.

18   Q.  Thank you, Professor Arcidiacono.

19       Where do you work?

20   A.  I'm a professor of economics at Duke University.

21   Q.  And were you hired to provide testimony in this case?

22   A.  I was.

23   Q.  What issues are you addressing with your testimony today?

24   A.  I'll be looking at how formulaic UNC's admissions decisions

25   are and the role that race plays in those admissions decisions.

1  Q.  Did you reach any conclusions along those lines?

2  A.  Yes.  I'm able to predict UNC's admissions decisions

3  incredibly well, suggesting it's guided by an implicit formula.

4  This is especially true in state in that race plays a

5  tremendous role in the admissions process.  This is especially

6  true for out-of-state applications.

7  Q.  We'll come back to that.  First, I'd like to ask you a

8  little bit about your background, okay?

9  A.  Great.

10  Q.  What is your current position at Duke?

11  A.  I'm a full professor of economics.

12  Q.  And is that a tenured position?

13  A.  It is.

14  Q.  And when did you start at Duke?

15  A.  In 1999.

16  Q.  And how long after that were you awarded tenure?

17  A.  I believe it was 2006, somewhere around there.

18  Q.  And when did you become a full professor?

19  A.  2010.

20  Q.  Before you started at Duke, what were you doing?

21  A.  I was a Ph.D. student in economics at University of

22  Wisconsin-Madison.

23  Q.  And did you earn that Ph.D. there?

24  A.  I did.

25  Q.  And where were you before that?

1  A.  Before that I worked for one year for an economic

2  consulting firm named ECON Northwest.  Then I did my

3  undergraduate degree at Willamette University, and that's --

4  both these things are in Oregon.

5  Q.  And what degree did you earn at Willamette?

6  A.  Bachelor of science in economics.

7  Q.  Now that you're at Duke, what is the focus of your

8  research?

9  A.  Broadly under labor economics and applied microeconomics,

10  but a lot of my work within that focuses on the economics of

11  higher education.

12  Q.  And what areas within higher education?

13  A.  So I do a lot of work on how people choose their college

14  major.  I've done work about how physicians decide what

15  specialty to go into.  I've looked at peer effects in the

16  classroom.  I've looked at how -- what determines cross-racial

17  friendships, and I've done a lot of work on affirmative action

18  in higher education.

19  Q.  And in doing this work, do you specialize in using any

20  particular methods in your research?

21  A.  Well, I'm always estimating empirical models.  Virtually

22  all of my work is using empirical models.

23  Q.  How -- and when you say "empirical models," do you mean the

24  same or something different than econometric modeling?

25  A.  Pretty much the same.  With econometric modeling -- I

1    suppose for an econometrics-type paper, you could just be

2    developing sort of an estimator.  When we're doing empirical

3    work, you're actually using the estimator somehow on real data.

4    Q.  Are these kinds of modeling regularly employed in your

5    field?

6    A.  All the time.

7    Q.  Have you heard and read testimony from UNC in this case

8    describing its admissions system as holistic?

9    A.  I have.

10   Q.  Does that make it incapable of being modeled?

11   A.  Not at all.  You know, I've modeled the decision of

12   teenagers to have sex.  That is quite -- there's plenty of

13   subjectiveness for those decisions.

14   Q.  And is it common in your field that decisions that have

15   some subjective component to them are modeled?

16   A.  Yes, it's quite common.

17   Q.  Have you modeled admissions decisions before outside of an

18   academic setting?

19   A.  Outside of an academic setting?

20   Q.  Yes.

21   A.  Well, yes, from the *Harvard* case.

22   Q.  And have you published academic papers in which you've

23   modeled admissions processes?

24   A.  I have.

25   Q.  Do you also teach?

1  A.  I do.

2  Q.  What courses do you teach?

3  A.  So at the graduate level, it's primarily two courses.  The

4  first is on dynamic discrete choice, and the second is on sort

5  of beliefs in learning in economics.

6  Q.  What does dynamic discrete choice involve?

7  A.  Well, the discrete choice part refers to the cases where

8  you're trying to model decisions that are not continuous.  So

9  binary would be one example, like whether or not you're

10 admitted.  The dynamic part refers to the fact that when you're

11 making those decisions, you're forming expectations about the

12 future so that -- you know, you think about going to law

13 school.  That might be a painful experience, but you do that

14 with the expectation that there's going to be a payoff later.

15 Q.  Do you teach undergrad courses as well?

16 A.  I do.

17 Q.  What courses?

18 A.  Primarily intermediate microeconomics with calculus.

19 Q.  Have you published in your various areas of study?

20 A.  I have.

21 Q.  About how many publications would you say you have?

22 A.  I think it's around 40.

23 Q.  And did those involve econometric modeling?

24 A.  Almost all of them did, yes.

25 Q.  Do any of those publications relate to the area of

1  affirmative action?

2  A.  Yes, I think it's around nine relate to affirmative action.

3  Q.  Including econometric modeling related to affirmative

4  action?

5  A.  Virtually all of them have econometric modeling aspects

6  related to affirmative action, yes.

7  Q.  Have you received any recognition for this work?

8  A.  I have.  So I've been -- I've authored two survey pieces

9  that were invited.  One came out in the *Journal of Economic*

10 *Literature.*  This is all about affirmative action.  It's called

11 "Affirmative Action and the Quality-Fit Trade-Off."  *Journal of*

12 *Economic Literature* is sort of the premier place where work of

13 this sort would appear.  And then in 2015, I also wrote a paper

14 for the *Annual Review of Economics* which was on affirmative

15 action in undergraduate education.

16 Q.  And I think you said, but I just want to be sure, that you

17 were invited to write those publications?

18 A.  In both cases, yes.

19 Q.  Are you an opponent of affirmative action?

20 A.  I would not say I'm an opponent of affirmative action.  I

21 would say that I'm sometimes a critic of parts of affirmative

22 action, and a lot of my work is about bringing some nuance to

23 the affirmative action debate.  I think we often sort of view

24 affirmative action in very binary terms.

25 Q.  Can you give me an example?

1  A.   So I believe the paper came out in 2012.   There's a paper

2  called "What happens after enrollment?"   And in that paper,

3  we're looking at choice of major and grades.

4       And so what you see in the data -- this is at Duke -- is

5  that African American and white students come in wanting to

6  major in STEM subjects.   That's science, technology,

7  engineering, and mathematics.   They come in wanting to major in

8  those areas at the same rate as white students, but the

9  persistence is very different.   And so what this paper was

10 about was trying to understand why the persistence rates were

11 different.

12      So at Duke during this time period, white males who started

13 out in STEM, about 8 percent switched out of those majors, but

14 over half of African American males switched out.   And what my

15 analysis revealed is that that was basically due to differences

16 in academic qualifications coming in.   The way that that works

17 is that if you're coming in with lower SAT math scores than

18 your peers -- maybe you haven't had AP calculus and so on --

19 that really matters a lot more in the sciences than in other

20 fields.   So these students still graduated from Duke; they just

21 didn't graduate in STEM fields.   And that's sort of the nuance

22 I'm talking about, that there are trade-offs.

23      You could say that these results had nothing to do with

24 race, per se.   This had to do with differences in academic

25 background.   As an example, some legacy students -- like,

1  legacies come in.  Coming in behind relative to their peers,

2  they're going to also not persist in the science fields.  And

3  the reason all this relates to affirmative action is because of

4  what that does in terms of the skills students are coming in

5  with.

6  Q.  Are you familiar with something that has been referred to

7  as the mismatch theory?

8  A.  I am.

9  Q.  And what do you understand that to mean?

10  A.  Well, people have many different definitions of that.

11        **MR. FITZGERALD:**  Your Honor, I'm going to object to

12  relevance.  We had an understanding that this witness would not

13  be opining on mismatch in the deposition.

14        **THE COURT:**  Let me hear from you, sir.

15        **MR. MCCARTHY:**  Your Honor, we don't intend to have

16  Professor Arcidiacono draw any conclusions about this at all.

17  This is just a little bit of his background and, in fact, we

18  don't -- as I said, we don't intend to have him draw any

19  conclusions about this issue at all.  We just want to clear up

20  something about -- so his background is properly understood

21  because, for example, Intervenors suggested there was going to

22  be something about mismatch and basically mischaracterized what

23  I think some people think of as mismatch, and we would just

24  like to get out Professor Arcidiacono's position and background

25  on the issue, that's all.  No conclusions.

```
 1            THE COURT:  So are you offering evidence on this
 2   theory?
 3            MR. MCCARTHY:  No.
 4            THE COURT:  I'm asking you.
 5            MR. FITZGERALD:  No, Your Honor, but we asked at the
 6   deposition the witness -- I'll read the deposition transcript
 7   from page 26:  "And I take it you're not planning to offer any
 8   opinion about whether race-conscious admissions policies at
 9   Carolina resulted in what is known as mismatch?
10      "Answer:  Well, that was not part of this report."
11      So we understood this expert was not going to be discussing
12   mismatch at this trial.  So our objection is just to the scope
13   of his testimony.
14            THE COURT:  So if he is just going to describe what
15   the theory is, you're not objecting to that?
16            MR. FITZGERALD:  As long as we don't go too far, Your
17   Honor, and don't apply it to this case.
18            THE COURT:  All right.
19            MR. MCCARTHY:  We have no intention to apply it to
20   this case.
21            THE COURT:  All right.  You may proceed.
22            MR. MCCARTHY:  Thank you, Your Honor.
23   Q.  (By Mr. McCarthy)  So, Professor Arcidiacono, do you have
24   an understanding of what people mean when they refer to
25   mismatch?
```

A.   I think it can mean different things.  So some people would

characterize the results I just described as mismatch in the

sense that they were coming in with not as strong math

backgrounds.  That's a result both of affirmative action

policies and the legacy discrimination in the country, and

that's leading them to places where the STEM majors are not as

good of a fit.  So some people would call that mismatch.

     That's not really where I stand on mismatch.  When I think

about mismatch, I'm thinking about would they rather -- if they

had the right information, would they have made a different

decision.  So it may be the case that somebody, if they knew --

"Look, I'm going to Duke, and I know I'm not going to end up

majoring in one of the STEM fields.  That's okay.  I just -- I

want to go to Duke.  That's fine."

     The issue comes in when students don't have the

information, and that -- in my mind, my work has been more

saying that the conditions under which mismatch -- from that

perspective are very strict as to what -- where mismatch could

actually show up.

Q.   Let's move back to your qualifications.  Do you have any

editorial positions?

A.   I am an associate editor at the *Journal of Applied

Econometrics*, and I've served as coeditor or associate editor

for maybe five more journals.

Q.   Have you had any other appointments or honors?

1  A.  So, I'm a research associate, I believe, at the National

2  Bureau of Economic Research, which is called the NBER.

3  Q.  Who leads that education group?

4  A.  So I'm in the education group, and Professor Carolyn Hoxby

5  leads that group.

6  Q.  Have you had any other appointments or honors?

7  A.  Yes.  I think it was in 2018, I was elected a Fellow of the

8  Econometric Society, and in 2020, I was elected a Fellow of the

9  International Association of Applied Econometricians.

10      (Court reporter requests clarification.)

11          **THE WITNESS:**  Applied Econometrics.  Is that right?

12  Yeah.

13  Q.  (By Mr. McCarthy)  All right.  Let's move from your

14  background to your work in this case.

15      How does your work here compare to the work that you've

16  previously done in connection with your academic research?

17  A.  Well, a lot of the modeling is very similar.  It's just the

18  data is much better.

19  Q.  And when you say "the data is much better," what do you

20  mean?

21  A.  Well, we have data on multiple admission cycles.  So we

22  have six admission cycles on the full set of applicants, and

23  you have data that you typically do not see in most of the work

24  that I've done.  Things like UNC's ratings are something that

25  are not publicly available.

1  Q.  So that's data that's not normally available to economists

2  and researchers that do this type of work?

3  A.  That's correct.

4  Q.  Does the quality of the data have any effect on your work?

5  A.  Oh, it does.  It means you would be much more confident in

6  the models that you're estimating.

7  Q.  Are you being paid for your work on this case?

8  A.  I am.

9  Q.  How much?

10  A.  So my -- the hourly rate here is $450; and then for days

11  I'm testifying in trial, trial days, it's 5,000 a day; and on

12  travel days, it's a thousand dollars.

13  Q.  What were you asked to do for your testimony today?

14  A.  Talk about the two things I mentioned earlier, which was

15  how formulaic are UNC's admissions decisions and the role that

16  race plays in those admissions decisions.

17  Q.  How did you go about answering those questions?

18  A.  So I see it as a four-part process.  In the first part,

19  you're creating the data set; and that's sort of figuring out,

20  well, what is the relevant set of applications that we should

21  be looking at.

22      And the second part, it's more a descriptive analysis.

23  There we're just seeing what basic patterns are in the data.

24      And the third part is where you're building and estimating

25  your model of the admissions decisions.  So we've seen what the

1  basic patterns are in the data.  Then we're going to form a
2  model of the admissions decisions, and we're going to estimate
3  that model.
4       And then, given the essence of the model, we get to the
5  fourth part, which is, you know, seeing what would happen if we
6  changed something, in this case simply about turning on or off
7  racial preferences.
8  Q.  Is this the same approach that you take in connection with
9  your academic work?
10 A.  Yes.
11 Q.  Now, you identified four steps, the first of which was
12 creating the data set.  What data was your starting point here?
13 A.  So we have six admission cycles for the UNC data.  I
14 believe they were covering the graduating -- the groups that
15 would have graduated at UNC, if they did so in four years,
16 between 2016 and 2021.
17 Q.  And how many applicants were in that original set total?
18 A.  Over 200,000.
19 Q.  What kind of information about those 200-some thousand were
20 in that data set?
21 A.  So you've got things related to their demographics, so
22 that's going to be things like race, gender, whether you're
23 first-generation college, whether you applied for a fee waiver.
24 That's going to have things related to your academics, and this
25 is going to include things like your grades and test scores.

1  And then it's going to have the UNC's ratings as well.

2  Q.  Beyond the applicant data that you just described, did you

3  review any other materials produced in this case?

4  A.  Many other materials, you know, things from reports by

5  Carolina, you know, to deposition testimony, to, you know, the

6  expert reports in the case by Professor Hoxby and

7  Mr. Kahlenberg.

8  Q.  Let's turn back to the data set.  As we mentioned, there's

9  data on more than 200,000 applicants.

10     Did you do anything to prepare that data set for your

11  statistical analysis?

12  A.  I did.

13  Q.  And what was it?

14  A.  Well, there's a set of applicants I don't think are

15  relevant to the admissions process, and so what we're doing at

16  the beginning is focusing the data set on applicants that we

17  believe (indiscernible) --

18     (Court reporter requests clarification.)

19        **THE WITNESS:**  -- are relevant to the admissions

20  process here.  So, I mean, as an example, some people have

21  incomplete applications.  We know that they're rejected, so

22  they really shouldn't be a part of our model of admissions.

23  Q.  (By Mr. McCarthy)  Let's stop there for just a second.

24     Did you prepare a set of demonstratives for today?

25  A.  I did.

1  Q.  I'd like to take a look at the first slide.

2      Okay.  Can you tell me generally what this slide shows?

3  A.  Well, this shows the number of observations that we have

4  and the various cuts that I made to the data, both for in-state

5  and out-of-state applicants.

6  Q.  So you mentioned in-state and out-of-state applicants.  Did

7  you do anything to treat them separately?

8  A.  Well, a lot of -- almost all my analysis looks at them

9  separately.  We can, obviously, combine the two to get the

10  total.

11  Q.  And why did you group in-state and out-of-state applicants

12  separately?

13  A.  Well, it's quite clear that admissions is much more

14  competitive out of state than in state, and that in part has to

15  do with the way the Carolina system works, where you're only

16  supposed to have at most 18 percent of your class be out of

17  state.

18  Q.  Okay.  Let's take a closer look at this slide.  Starting

19  from the top, I think you said that this slide describes

20  different groups of applicants that you took out of the data

21  set?

22  A.  It does.

23  Q.  Okay.  And what was the first category of applicants?

24  A.  So the first category was the category I was just talking

25  about, which are those who either withdrew their application or

1  had an incomplete application, and all those people were

2  rejected.  So they're not really competing for admissions in

3  the same way.

4  Q.  And what's the next category of applicants you've

5  identified here?

6  A.  So the next one is if you got a rating of zero on one of

7  UNC's ratings.  And for that, that's just sort of bad data, so

8  we took them out.  They're a very small percent of the total

9  sample.

10 Q.  What is the next category of applicants on your list there?

11 A.  Next is any special, and there's a series of flags in the

12 UNC database.  Some of them I was able to identify, and others

13 I couldn't tell.  And these are going to be things like whether

14 or not you were a varsity athlete.  And so if we think about

15 something like varsity athletes, the admissions process

16 operates very differently for them.

17 Q.  By that do you mean recruited athletes?

18 A.  That's what I mean, yes.

19     And so for -- when we see these flags in the database,

20 these are coming from groups where they were admitted at least

21 97 percent of the time.  Now, we're going to come back to that

22 because you can put them back into the data set and it really

23 doesn't change my findings, as long as we handle them

24 appropriately.

25 Q.  So why is it that you at least initially removed those

1   observations from the data set?

2   A.  Because there was something different about those

3   applicants; and when we think about something like recruited

4   athletes, particularly in a place like UNC, the admissions

5   process is going to work differently for them.

6       Now, for others it may be the case that the admissions

7   process works just the same, they just happen to be really

8   good.  But that's not really going to affect.  That's just

9   going to hurt the accuracy of my model because those are people

10  that are very easy to predict their admissions decisions.

11  Q.  What's the next category of applicants?

12  A.  The next category are foreign applicants, so people not

13  from the U.S.

14  Q.  And why did you remove those from the data set?

15  A.  Well, my understanding is this case is about domestic

16  applicants; and at least at a lot of universities, for example,

17  need-blind admissions will not apply to foreign applicants.

18  Q.  So looking back on this task overall, at the end of this

19  process, how many applicants did you have both in state and out

20  of state for analysis?

21  A.  So in state I ended up with over 57,000, so we lost about

22  12 percent of the applicants.  And then out of state, we had

23  over 105,000, and we lose a higher percentage there primarily

24  because of the foreign applicants.

25  Q.  Thank you.

1        The next step that you previously identified in your

2   process was to conduct a descriptive analysis, and could you

3   remind us again what a descriptive analysis involves?

4   A.   That just involves looking at the patterns in the data.

5            **MR. MCCARTHY:**   Can you put up Slide 2, Mr. Lawrence?

6   Q.   (By Mr. McCarthy)  You previously mentioned residency.  Did

7   you look at residency to see whether there were any noticeable

8   patterns regarding admission of students by residency?

9   A.   I did.  What this slide shows is that while UNC's overall

10  acceptance rate is a little above 25 percent, that's masking

11  pretty large differences between in-state and out-of-state

12  applicants.  So out of state the acceptance rate is, you know,

13  13 1/2 percent, and in state it's just a little below 50.

14  Q.   So as a practical matter, what does this mean about

15  admission to UNC as between in-state on the one hand and

16  out-of-state applicants on the other?

17  A.   Well, admissions out of state is like applying to a, you

18  know, very selective school, whereas in state, you know, it's

19  much more of a moderately selective school.

20  Q.   Did you look at admit rates by race along these lines?

21  A.   I did.

22  Q.   And can you tell us what's on this slide?

23  A.   So this slide shows admission rates by race and residency

24  status.  I should say all these descriptive statistics are

25  after I made all my cuts to the sample.

1  Q.  And what do you see here in this slide?

2  A.  Well, the first row shows the in-state admission rate by

3  race, and what you can see here is that the white admission

4  rate and the Asian American admission rate are both above

5  50 percent.  And so that's actually substantially higher than

6  what it is for African Americans and Hispanics in state.  So

7  for African Americans, we're talking about over 20 percentage

8  points lower, at 30.5 percent, and for Hispanics, it's around

9  41 percent.

10  Q.  And did things look differently out of state?

11  A.  It looked much differently out of state.  Now whites have

12  the lowest admit rate at 10.9 percent.  Asian Americans are at

13  16.6 percent, which is very close to what it is for African

14  Americans at 16.7 percent, and Hispanics actually at the

15  highest out of state at 20 percent.

16  Q.  Just to be clear, these are simply overall admission rates

17  that do not account for differences in qualifications among

18  applicants, correct?

19  A.  That's correct.

20  Q.  Did you look at the basic qualifications of the applicants?

21  A.  I did.

22  Q.  And did you prepare a slide?

23  A.  I did.

24  Q.  What did the data show on this slide at a high level?

25  A.  It's showing the summary statistics by race for in-state

1  applicants, lots and lots of summary statistics.

2  Q.  I can see that it's organized by race, and in the first

3  three of the three columns for white applicants, there's a

4  header there that says "Reject."

5      What do the data in that column show?

6  A.  What this shows is the mean of each of these variables

7  conditional on being rejected.  So when we look at the first

8  entry, what that says is almost 57 percent of white rejects are

9  female.

10  Q.  And let's look at the second column.  This one has a header

11  that says "Admit."

12      What do the data in that column show?

13  A.  This shows the mean characteristics for those who have been

14  admitted to UNC.  And, again, now for the first entry there for

15  females shows that it's a little over 60 percent of admitted

16  student -- white students are female.

17  Q.  And I want to look at the third column there as well.  That

18  one has a header that says "All."

19  A.  So that's referring to all the white applicants.  Almost

20  59 percent of white applicants are female.

21  Q.  And so if we look at those three cells that you just

22  mentioned for white female applicants, what does that tell us

23  about their relative admission?

24  A.  I'm sorry.  Can you repeat the question?

25  Q.  I'm asking -- sorry.  If we look at those three entries

1  that you just mentioned there that show the rate -- not rate,

2  but they show different values for female white applicants in

3  each one of those categories, does that tell you anything about

4  female applicants there?

5  A.  Yes.  Basically, if the admit number is higher than the

6  reject number, then that's a variable that's positively

7  correlated with admission; and roughly, the further apart those

8  numbers are, the more strong that correlation is.  So you see

9  that for white admitted students, that number is a little bit

10 higher for female than for rejects, but they're pretty close.

11 In other cases, they're going to be much further apart.

12 Q.  And the other columns in here are all similarly organized

13 by race?

14 A.  That's right.

15 Q.  So you mentioned this idea of positive correlation.  What

16 did the data in this slide show about which factors are

17 important to admission at UNC?

18 A.  Well, this is just showing correlation.  So to say that

19 they actually are important, we're going to have to estimate

20 the model.  But with any trace, you know, you can see that

21 higher test scores, both math and verbal, are going to -- the

22 numbers are going to be higher in the "Admit" column, so it's

23 positively correlated.  They're going to have a higher rank in

24 their class, the high school percentile variable.  They're

25 going to have higher grades, the GPA variable.

1  Q.  Let me stop you there from --

2  A.  Yes.  I was going to say, then, for all the ratings, you

3  see the same pattern.

4  Q.  Thank you.  So I just want to note something on the slide

5  here.  You mentioned the SAT scores and the GPA.  There's a

6  note there that says "z-scores" next to those.

7  A.  That's right.

8  Q.  Is that a method that relates to standard deviations?

9  A.  Yes.  So here we've converted things into -- so that the

10  variable in the whole applicant pool as being zero and standard

11  deviation of "1" just so it's easier for economists to compare

12  the variables.

13  Q.  Thank you.  And those scores can be positive or negative?

14  A.  They can.

15  Q.  And what does that represent, if the z-score is positive or

16  negative?

17  A.  So positive would be above the mean, negative will be below

18  the mean.

19  Q.  What did you find specifically with respect to test scores?

20  A.  Well, test scores are positively related to admissions for

21  every racial group.  So you'll notice that in the "Reject"

22  column, for example, for whites, the SAT math is minus .69, but

23  for admits, it's .06, so over half a standard deviation higher

24  there.  You can see the same thing for Asian Americans.  That

25  gap is even bigger, you know, a full standard -- just about a

full standard deviation, not quite.  And similarly for African
Americans and Hispanics, the same pattern where admits have
substantially higher SAT math scores and higher SAT verbal
scores as well.

Q.  You mentioned that GPA is also positively correlated with
admission, correct?

A.  That's right.  And here again, you can see that -- all the
numbers for every race.  All the entries in the "Reject" column
are negative, and all the ones in the "Admit" column are
positive.

Q.  Are UNC's ratings, the five ratings that we've heard about
that they assign to applicants -- are those positively
correlated with admission too?

A.  They are.  So, again, you can see for whites, if we look
at, say, the program rating as an example, higher scores here
are better.  So you'd like to, you know, get a 10.  And, you
know, for admits, the average is 7 1/2; and for rejects, it's
5.3.  And that's going to hold true on each of those ratings,
performance and extracurricular.  For the essay and personal
quality rating, they don't really use the full ten-point scale,
and so I'm looking at whether you got above a 5 on that.  And,
again, you see that you're more likely to get above a 5 on your
essay, more likely to get above a 5 on personal quality if
you're admitted than if you're rejected.  And that, once again,
holds for every racial group.

1  Q.  Does your slide reveal anything about applicant test scores

2  and grades across races?

3  A.  It does.  So, you know, in part because of the history of

4  our country, these things are pretty different across racial

5  groups.  So African Americans who are applying in state have

6  substantially lower test scores, lower rank in their class, and

7  lower grades than other applicant groups.  So here under the

8  "All" column for African American for SAT math, it's negative

9  1.3.; whereas for Asian Americans, it's .04.  Those are the two

10  extremes here.  So as it turns out, Asian American students who

11  are rejected from UNC in their in-state process actually have

12  higher SAT math scores than African American students who are

13  admitted to UNC.  That's true for the SAT math score.  It's not

14  for the verbal.

15  Q.  What patterns do you see for UNC's ratings across races?

16  A.  For the first four ratings, they actually matched similar

17  to what we see for test scores and grades.  Namely, whites and

18  Asian Americans scored better on UNC's program rating,

19  performance rating, extracurricular rating, and essay rating

20  than African Americans and Hispanics.  When we get to the

21  personal quality rating, it flips, and there African Americans

22  and Hispanics rate higher on the personal quality rating than

23  whites and Asian Americans.

24  Q.  Let's stop there for a moment.  You've just explained that

25  on average white and Asian American applicants are stronger on

1  all academic qualifications and in all of UNC's ratings except

2  the personal quality rating, correct?

3  A.  That's correct.

4  Q.  Does that make sense when we think about the admit rates

5  you told us about for the various racial groups in the state?

6  A.  So that could be an explanation for why they're so

7  different, and maybe they would be even more different absent

8  racial preferences.  That's what we have to investigate.  But

9  it also might not explain it.

10  Q.  At this point this is just descriptive analysis?

11  A.  Exactly.

12  Q.  Did you also look at the basic qualifications of

13  out-of-state applicants?

14  A.  I did.

15  Q.  And did you prepare a slide?

16  A.  I did.

17  Q.  What -- at a high level, what did the data on this slide

18  show?

19  A.  Well, this is basically a repeat of the last slide, but for

20  out-of-state applicants.  So we're going to be looking at the

21  summary statistics by race, both conditional on being rejected

22  or conditional on being admitted and then just overall.

23  Q.  What factors positively correlate with admissions for

24  out-of-state applicants?

25  A.  They line up quite well with what's happening in state.

1  You're going to see that higher test scores are positively

2  related to admissions, so the entries for SAT math and SAT

3  verbal are always going to be higher in the "Admit" column

4  within race than in the "Reject" column.  You're going to see

5  the same thing with regard to UNC's ratings, high school GPA

6  and such.  It's always going to be the case that the admits

7  have better UNC ratings than the rejects, and that's going to

8  hold true for all the ratings.

9      The one thing that looks a little bit different in this

10 context is what's going on with legacies.  So if you look at

11 white legacies, you didn't see as near a big of a gap for in

12 state as you do for out of state.  So for white legacies,

13 17.8 percent of white admits are legacies, but only 2.6 percent

14 of white rejects are legacies.

15 Q.  Did you find any patterns along the lines of academic

16 qualifications across races for these out-of-state applicants?

17 A.  Yes.  The academic patterns are very similar.  It's again

18 the case that whites and Asian Americans have higher test

19 scores and higher class rank than African Americans and

20 Hispanics.  GPA, it's actually Hispanics are just slightly

21 higher than whites.  And then you can again see this pattern

22 where Asian American rejects actually have higher SAT math

23 scores than both African American admits.  This is comparing

24 the .48 for Asian American rejects to the minus .08 for African

25 American admits and the .4 for Hispanic admits.

1  Q.  So you've explained that on average white and Asian

2  American applicants are stronger on academic qualifications,

3  correct?

4  A.  Correct.

5  Q.  What kind of patterns do you see for UNC's ratings across

6  race for this out-of-state applicant pool?

7  A.  Well, UNC's ratings sort of mirrors what we had before.

8  So, for example, if you take the -- well, the program rating,

9  Hispanics do a little bit better than whites, but as a general

10  rule, they're fairly close there.  Asian Americans have by far

11  the highest program rating.  If you look at the performance

12  rating, whites and Asian Americans have substantially higher

13  performance ratings than African Americans and Hispanics.  They

14  have higher extracurricular ratings.  They have higher essays.

15  The whites and Hispanics are similar.  But then we get to the

16  personal quality, things change, and there the order is

17  Hispanic, African American and Asian American are the same and

18  then white.

19  Q.  So how does this square with the admit rates that you

20  showed earlier for the various racial groups out of state?

21  A.  Well, unless the personal quality measure sort of trumps

22  everything, it's hard to reconcile that.  It suggests a role of

23  racial preferences because African Americans and Hispanics had

24  higher admit rates but worse qualifications for everything

25  except the personal quality measure.

1  Q.  Thus far, your descriptive analysis has involved comparing

2  admit rates and qualifications of various racial ethnic groups

3  overall, correct?

4  A.  That's correct.

5  Q.  Did you do any descriptive analysis that involved comparing

6  applicants that had similar academic qualifications?

7  A.  I did.

8  Q.  Did you prepare this slide?

9  A.  I did.

10  Q.  Can you explain what it is?

11  A.  So what we're trying to do is just create a summary measure

12  of the academic strength of the applicant, and so here what

13  we're going to do is take their SAT score -- we're going to try

14  to equally combine their SAT score and their high school

15  grades.  And, of course, SAT scores are on a 1600-point scale,

16  and grades here are more on a 4-point scale.  So in order to

17  combine them, we calculate a z-score for each, and then we add

18  them together.  And this is just a sort of quick way of

19  summarizing the strength of the applicant on academics.

20  Q.  And this metric that you created, what do you call it?

21  A.  I call it an academic index.

22  Q.  And you constructed this with the data that UNC produced?

23  A.  That's correct.

24  Q.  And it's meant to be a summary statistic, you said?

25  A.  Just a summary of their academic qualifications, yes.

1  Q.  Have others used this type of summary statistic?

2  A.  Other people have created things like this in terms of an

3  academic index.  Harvard, for example, has one.  It has

4  slightly different weights than the one I have here, but it's

5  just a quick way of summarizing the strength of the applicant.

6  And, in fact, the whole Ivy League does.  And then I've used

7  something like this in my past papers just to illustrate -- as

8  a way of having a summary measure of academic ability.

9  Q.  Do other economists use this type of summary statistic in

10 this area?

11 A.  They do.

12 Q.  So why did you create this academic index?

13 A.  Well, what I'm interested in doing is in seeing how people

14 who have similar grades and test scores -- how they're treated

15 differently in the admissions process.

16 Q.  Did you create this academic index for every applicant in

17 the data set?

18 A.  No, and the reason for that is for about 5 percent of

19 in-state applicants and for about 30 percent of out-of-state

20 applicants some of the information is missing.  So you don't

21 have the information on either SAT or the high school grades.

22 And really, I shouldn't say it's always because it's missing.

23 You had to be graded on a 4-point scale, so that explains what

24 is going on out of state.  It may be graded on a 100-point

25 scale.  So we're only looking at the people for whom we have

1  these -- these measures.

2  Q.  Is that set of applicants for which -- whom you created the

3  academic index -- are they representative of the in-state and

4  out-of-state pools?

5  A.  They seem to be pretty representative.

6  Q.  Did you do any analysis of whether it is representative of

7  the entire pool?

8  A.  I did.

9  Q.  What do the data on this slide show?

10  A.  So what this slide shows is compares the admit rates in my

11  full sample, both in state and out of state, to the ones where

12  they actually had an academic index, so the 95 percent of

13  applicants who I created an academic index for in state and the

14  70 percent out-of-state applicants for which I created an

15  academic index.

16  Q.  Let's look at the second panel on this slide, the

17  out-of-state applicants there.  How do admit rates in the full

18  sample compare with those for whom you've created an academic

19  index?

20  A.  They're very close.  They're just a tiny bit higher in the

21  first row, but that's pretty much the same.

22  Q.  Then they're similar overall in -- within race?

23  A.  That's right.

24  Q.  Does UNC use an academic index?

25  A.  They do not.

1  Q.  So this was just a summary statistic that you created to

2  help aid your analysis?

3  A.  Yes, it's purely motivational to set up what the basic

4  patterns in the data are.

5  Q.  After you created this academic index for these applicants,

6  what did you do with it?

7  A.  So what I'm going to do is then see how that academic index

8  relates to the other ratings.  You know, so do people who get

9  high values on this academic index -- do they also get higher

10  ratings?  And then look to see, given the same sort of academic

11  index, what is your probability of being admitted and how does

12  that vary by race.

13  Q.  And how did you arrange them in order to compare applicants

14  with similar academic qualifications?

15  A.  I'm going to break it up into ten deciles, and so the way

16  you want to think about that is that the top decile, which is

17  going to be the tenth decile, these are the people who have --

18  they're at the 90 to 100 percent, you know, in terms of their

19  ranking on the academic index; and then we're going to take the

20  next 20 percent -- sorry -- next 10 percent to get the ninth

21  decile and keep on going down.

22  Q.  Have you conducted any analysis about whether higher

23  academic indexes are associated with higher UNC ratings?

24  A.  I have.

25  Q.  Did you prepare a slide?

1  A.  I did.

2  Q.  What is on the slide?

3  A.  This slide shows for in-state applicants -- I should have

4  also clarified, all these deciles are done so that this is

5  10 percent of in-state applicants in there.  We're not doing

6  out-of-state/in-state comparisons.

7  Q.  Thank you for that clarification.

8  A.  Think about 10 percent of the data being in that top decile

9  and so on.

10     But what this slide is showing is the share you get above

11  the median rating on each of UNC's ratings by academic decile.

12  Q.  So just to make sure I understand what you mean by deciles,

13  if we look at the first column, academic decile, that 10

14  underneath that, the 10 -- that's the one you said is the top

15  decile?

16  A.  That's right.  They're the ones who have the highest

17  academic indices.

18  Q.  So those would be the people between the 90th and 100th

19  percentile among a ranking of all the academic indexes?

20  A.  Among all the ranking of the academic indexes for in-state

21  applicants for whom we had an academic index.

22  Q.  Thanks again for the clarification.

23     What, then, do the numbers in the first column mean as you

24  look downward?

25  A.  So if we think about -- oh, in the first column?  So that's

1  just going to -- the academic decile column, we're just moving

2  down.  So we've got the top 90 to 100 percent.  Then you've got

3  the 80 to 90 percent and so on.

4  Q.  If we look at the program column right next to that, in the

5  very top cell right there, which would be the tenth decile,

6  what does that 88.7 figure mean?

7  A.  That means that if you're in that top 10 percent of the

8  academic index, over 88 percent of the time you're going to

9  have a rating in the program rating that's above the median.

10  So it's likely -- very likely you're going to have a high

11  program rating.

12  Q.  Okay.  Let's stick with that column.  What do the data in

13  this column show regarding the program rating?

14  A.  Well, every time you move down a decile -- so we're

15  starting at that tenth decile, you move down to ninth -- the

16  share of applicants getting above the median rating goes down.

17  So you can see it goes down from 88.7 to 74.6, then down to

18  65.2.  Every time it's going down.

19      Now, what that means is that people who do better on the

20  academic index also tend to do better on the program rating.

21  So these things are positively correlated.

22  Q.  And if we look at the next column, performance, do we see

23  the same pattern?

24  A.  You see the exact same pattern.  The highest number there

25  is in the top one for academic, Decile 10.  So over 84 percent

1  of the top decile is getting above the median rating on the

2  performance rating, but by the time you get down to the lowest

3  decile, Decile 1, it's less than 2 percent.

4  Q.  And if we look to the next column over, the same pattern?

5  A.  The same pattern for activities.  You don't get -- it's a

6  little bit more compressed, but it's the same pattern where,

7  again, as you move down the table, you're getting lower and

8  lower values.

9  Q.  And then if we look at the essay rating?

10 A.  Same exact -- same pattern.

11 Q.  Personal quality rating?

12 A.  Same pattern.

13 Q.  Did you do a similar analysis with out-of-state applicants?

14 A.  I did.

15 Q.  And did you prepare a slide showing your analysis?

16 A.  Yes.

17 Q.  And what do the -- at a high level here, what did the data

18 on this slide show?

19 A.  Well, it's repeating the same table we just looked at, but

20 this time for out-of-state applicants.  So we look at the share

21 above the median rating for each of UNC's ratings by these

22 academic index deciles.

23 Q.  And is there the same relationship between the academic

24 index and UNC's ratings for out-of-state applicants as there

25 were in state?

1    A.  There is, yes.  So, again, let's look at the program

2    rating.  In that top decile, we have 85.9 percent getting above

3    the median rating.  If you go down one decile, it's 79 percent,

4    and the numbers just keep on going down to the lowest decile,

5    which is 15.3 percent.

6    Q.  Similar patterns for performance rating for out-of-state

7    applicants?

8    A.  Similar patterns.  You start off at 82 percent.  By the

9    time you're at the end, you're at less than 4 percent.

10   Q.  Then we move over to the extracurricular activity rating.

11   Same pattern?

12   A.  Same pattern.  More compressed, but the same pattern.

13   Q.  And then again with the essay rating?

14   A.  Again with the essay rating and again with the personal

15   quality rating.

16       And so what this means is that when we think about these

17   academic index deciles, you could view it and it's just about

18   academics, but it is a bit more than that because it's

19   positively correlated with all of UNC's ratings as well.

20   Q.  So what's the overall takeaway here?

21   A.  Well, the overall takeaway is that higher academic --

22   higher scores on test scores and grades are also associated

23   with higher UNC ratings.

24   Q.  On both the academic and the nonacademic UNC ratings?

25   A.  On both, everything from program performance to personal

1  qualities, and that holds both in state and out of state.

2  Q.  Did you analyze how racial groups are distributed across

3  the deciles?

4  A.  I did.

5  Q.  And did you prepare a slide from that analysis?

6  A.  I did.

7  Q.  And what do the data in this slide show?

8  A.  So this slide shows the number of in-state applicants in

9  each academic index decile.

10  Q.  And the first column there -- I guess it's actually the

11  second column -- sorry -- where it says "White," what does that

12  show?

13  A.  That shows the number of white applicants in each of those

14  deciles.  And so generally the numbers are higher for the

15  "White" column because in the applicant pool there are a lot

16  more white students.

17      And what you see there is that, with the exception of

18  moving from Decile 10 to Decile 9, once you get to Decile 9,

19  the number of applications are falling.  So at Decile 9 we're

20  talking about 4,180 applicants, but by time you get to the

21  lowest decile, it's down to 1,848 applicants.  The fact that

22  it's falling means that white applicants are disproportionately

23  in the higher academic index deciles.

24  Q.  As we move to the right of the column, what kind of

25  pattern, if any, did you find with regard to Asian American

1  applicants?

2  A.  Well, Asian Americans also disproportionately have high

3  academic indexes.  There you can see that we start off with

4  1,139, and then as you move down, you're getting lower and

5  lower numbers.  There's a slight jump between the fifth and the

6  fourth decile that goes against that trend, but otherwise, the

7  numbers are always going down.  So we started off with 1,139,

8  and then it goes down to 376.

9  Q.  Let's move over one column more for African American

10  applicants.  Again, this is in state.  What kind of a pattern

11  do you see there?

12  A.  Really the reverse.  So there are very few African

13  Americans in that top decile.  There were 67.  And then as you

14  go down the deciles, the numbers grow substantially all the way

15  to the lowest decile where there's 2,462 African Americans.  So

16  African Americans disproportionately have lower test scores and

17  grades.

18  Q.  Move over one more column, Hispanic applicants.  Again,

19  this is in state.  And what kind of a pattern do you see there?

20  A.  Well, it's similar to what's going on with African

21  Americans, but it's a bit muted.  So for Hispanics, we have 128

22  applicants in the top decile, and then generally it's growing

23  as you move down deciles.  There's one exception when you move

24  from Decile 8 to Decile 7, but besides that, it's growing as

25  you go down the deciles.  So you end up -- you start off with

1  128, but by the time you get to the bottom decile, it's 582.

2  Q.  Overall, what does the distribution of applicants across

3  deciles tell you about academic qualifications?

4  A.  Well, there are large cross-racial differences in terms of

5  UNC's applicant pool in state.

6  Q.  Did you look at this same data on a percentage basis?

7  A.  I did.

8  Q.  And did you prepare a slide?

9  A.  I did.

10 Q.  And what do the data show in this slide?

11 A.  This slide shows the percentage of in-state applicants in

12 each academic index decile.

13 Q.  So starting at the top decile, what do you see there?

14 A.  So in the top decile, 10.7 percent of white applicants are

15 in the top decile.  Keep in mind that the sum of all those

16 numbers is going to equal 1.  So we're looking at the share of

17 whites who are in each decile.

18 Q.  And when you say the sum of all of those numbers, you mean

19 in that first column?

20 A.  In that first column, number 1.

21 Q.  If we added all that up, it would total a hundred percent?

22 A.  Yeah.

23 Q.  Okay.  Thank you.

24      And what else do we see if we look across on that top

25 decile?

1    A.  So 10.7 percent of whites are in the top decile.  Almost

2    20 percent of Asian Americans are in the top decile.

3    Unfortunately, less than 1 percent of African Americans are in

4    the top decile, and less than 4 percent of Hispanics are in the

5    top decile.

6    Q.  What happens as you move downward by decile?

7    A.  Well, if you move downward by a decile, then we're going to

8    see shifts.  So, for example, for Asian Americans, the numbers

9    are, you know, generally going down in terms of those shares,

10   and similarly for whites.  Once -- if you get outside the tenth

11   decile, the numbers are all going down on the shares.  And then

12   for African Americans and Hispanics, they're going up, again

13   because they disproportionately represent lower academic index

14   deciles.

15   Q.  So what happens when you get to the bottom decile?

16   A.  When you get to the bottom decile, you have a little over

17   5 percent of whites, 6 1/2 percent of Asian Americans, over

18   32 percent of African Americans, and a little less than

19   17 percent of Hispanics.

20   Q.  We've been discussing what your academic index deciles

21   reveal about the relative academic qualifications of

22   applicants.  Did you consider admit rates across deciles?

23   A.  I did.

24   Q.  And did you prepare a slide to show that analysis?

25   A.  I did.

1  Q.  What's on this slide?

2  A.  So this slide shows in-state admission rates by academic

3  index decile and race.

4  Q.  If we look over to the column on the far right where it

5  says "All Applicants," what does the data here tell us

6  generally about the academic qualifications of in-state

7  applicants?

8  A.  So the academic index is clearly strongly correlated with

9  admission to UNC.  So those in that top decile have an admit

10  rate of over 98 percent, and in the bottom decile, it's less

11  than 1 percent.  And you can see that if we just started at

12  that bottom decile, less than 1 percent, the numbers in blue

13  there are showing how much it goes up by moving up to the next

14  decile.  So you go from .89 percent to 5.44 percent.  That's a

15  4.55 increase, and then it just keeps going up from there until

16  you get to the top.

17  Q.  Is the same thing true across racial groups; that is, are

18  higher academic indexes correlated with admission for all

19  racial groups?

20  A.  They are.  The general pattern is going to be you start off

21  very low in the first decile, but by the time you get to the

22  top, the tenth decile, admissions are in the -- at least above

23  97 percent.

24  Q.  Overall, does this slide reveal anything about admit rates

25  as between racial groups?

1  A.  It does.  So --

2  Q.  And what does it show us?

3  A.  Well, when you're in the -- I should say it really depends

4  on what decile we're talking about, because when you're in the

5  very top decile, pretty much everybody is getting in.  They all

6  have admit rates, you know, above 97 percent.

7      But once you get outside of that top decile, then you start

8  to see differences begin to emerge.  It's always going to be

9  the case after the top decile that African Americans will have

10  the highest admit rates.  The differences are not going to be

11  so large at the ninth decile because, again, most people are

12  getting in.

13  Q.  Are there some deciles where there's greater disparities?

14  A.  There are.  So if we look at, for example, the fifth

15  decile, there you can see that whites and Asian Americans have

16  admit rates that are below 30 percent, but the African American

17  admit rate is over 40 points higher, at 71 percent, and the

18  Hispanic admit rate is almost 54 percent.

19  Q.  How is that, when African American and Hispanic applicants

20  have higher admit rates in the fifth decile?

21  A.  Well, you can have higher --

22  Q.  I'm sorry.  I want to look down at the bottom first.  If

23  you look down at the row on the very bottom that says "Total,"

24  what are the overall admit rates by race?

25  A.  So the overall admit rates are similar to what we were

1  looking at before in that whites in state and Asian Americans

2  in state have admit rates above 50 percent.  African Americans

3  have admit rates 30 percent and Hispanics almost 41 percent.

4  Q.  So how is that, that African American and Hispanic

5  applicants have the lowest admits rate when they actually have

6  higher admit rates throughout all deciles?

7  A.  Well, it has to do with how applicants are distributed

8  across these deciles.  So, you know, over half of African

9  Americans are in the bottom two deciles where admit rates are

10  much lower.  Whites and Asian Americans are more clustered at

11  the higher deciles where admit rates are higher.

12  Q.  Did you do a similar analysis for out-of-state applicants?

13  A.  I did.

14  Q.  And did you prepare a slide showing that analysis?

15  A.  I did.

16  Q.  What did the data show on this slide?

17  A.  So it shows out-of-state applicants in each academic index

18  decile by race.

19  Q.  Are the patterns similar to what you showed for in-state

20  applicants?

21  A.  They're generally similar.  The white numbers bounce around

22  a little bit more, but there are, again, very -- you know,

23  fewer white applicants in that bottom decile.  For Asian

24  Americans, the number of applicants in the top decile is at

25  1,900, and then it's going to keep falling from 1,900 down to

1  493.  And then you can see for African Americans the reverse

2  pattern of what's happening with Asian Americans.  In the top

3  decile, we have 123 African American applicants, and that rises

4  down to 2,674 in the bottom decile.

5  Q.  Did you look at shares by race in the same manner of what

6  you did for in-state applicants?

7  A.  I did.

8  Q.  And what do the data in this slide show us?

9  A.  They show broadly similar patterns to what we saw in state.

10  The white one is a little flatter here, but, again, whites --

11  their share in the bottom decile is 6.77 percent.  You know,

12  for Asian Americans, we start off with almost 17 percent in

13  that top decile, and then the numbers just keep falling until

14  we get to the bottom decile with 4.4 percent.

15      And then African Americans sort of -- have sort of a

16  reverse pattern to Asian Americans in that less than 2 percent

17  are in the top decile and, in fact, less than 2 percent are

18  also in the next-to-the-top decile.  But by the time you get to

19  the bottom, 39 percent of African American applicants are in

20  the bottom 10 percent for out-of-state applicants.

21      For Hispanics, it's a little bumpier, but it's still

22  Hispanics are slightly disproportionately represented in the

23  bottom deciles.

24  Q.  Did you identify any overall patterns in this slide with

25  regard to out-of-state applicants?

1    A.  Well, you can see that the African Americans are

2    disproportionately in those bottom deciles.  Asian Americans

3    are disproportionately in the top.  Whites are a little bit

4    higher at the top than at the very bottom and Hispanics a

5    little bit higher in the bottom than at the very top.

6    Q.  Did you also analyze admission rates by academic index

7    decile in race/ethnicity for out-of-state applicants?

8    A.  I did.

9    Q.  Did you prepare a slide?

10   A.  I did.

11   Q.  What did the data show in this slide?

12   A.  So this slide shows the out-of-state admission rates by

13   academic index decile and race.

14   Q.  Let's start again, like we did last time for in-state

15   applicants, by looking at the column on the far right where it

16   says "All Applicants."

17       What does that show generally about the academic

18   qualifications of the out-of-state applicants?

19   A.  Well, the first thing to notice is that the numbers are a

20   lot lower here because the out-of-state admissions is so much

21   more competitive.  But it shows the same pattern where

22   basically if you're in that bottom decile, you're probably not

23   getting in, so .4 percent admissions rate.  But then as you

24   move up -- every time you move up a decile, you see an increase

25   in admissions chances.  It's still going to be very low when

1 | you move from the first to the second, 0.4 percent to

2 | 1.5 percent to 2.6 percent and so on, but it's always going to

3 | be increasing.  And then by the time you get to the top, you're

4 | at almost 47 percent.

5 | Q.  Now, this pattern you see there with regard to all

6 | applicants, how the academic index positively correlates with

7 | admission, do you see this same pattern not only overall, but

8 | with regard to each racial group?

9 | A.  You do.  There will be an occasional blip here or there

10 | moving from one decile to another as a lower admit rate, but

11 | that's the general pattern.

12 |     So you can see it for whites.  You would start off with

13 | .49 percent admit rate in that first decile, and it goes all

14 | the way up to 41.6 percent, increasing every time.  For Asian

15 | Americans, it's increasing every time, except the second to the

16 | third decile where the difference is .28 versus .25 percent, so

17 | hardly anything.  And African Americans and Hispanics you see

18 | are always increasing.

19 | Q.  Do we see the same racial disparities within deciles that

20 | favor African American and Hispanic applicants in terms of

21 | admit rates?

22 | A.  Given the same academic index deciles, you're going to see

23 | higher admit rates generally for African Americans and

24 | Hispanics, at least once you get outside of the, you know,

25 | lowest decile where hardly anybody is -- anybody is getting in.

1  Q.  And I think before you looked at the -- for in-state

2  applicants, you looked at the fifth decile.  Why don't we take

3  a look at that for comparison here.  What does that data show?

4  A.  The numbers are really striking here.  The white admit rate

5  is 2.9 percent.  The Asian American admit rate is 1.4 percent;

6  and then you see for African Americans, it's 39.6 percent; and

7  for Hispanics, it's almost 16 percent.  That 39.6 percent is

8  bigger than all the numbers in the white and Asian columns,

9  except those at the very top.

10 Q.  Did you do anything to further analyze the academic indexes

11 in admissions?

12 A.  I don't believe so.

13 Q.  I'm sorry.  I don't mean from this slide.  I don't mean to

14 confuse you.

15 A.  I feel like I'm being set up here.

16 Q.  Sorry.  Did you analyze how admission by academic decile

17 might work out?

18 A.  Okay.  Yes.  So --

19 Q.  And did you prepare a slide?

20 A.  Yes.

21 Q.  Okay.  Thanks.  So what did the data show in this slide?

22 A.  So this slide shows the number and share of in-state admits

23 only if you're admitting from the top deciles.  This is not

24 what UNC does.  UNC takes into account lots of characteristics.

25 But it says if we just base it on the academic index alone,

1  which doesn't possibly correlate with UNC's ratings, what would

2  the class look like.

3  Q.  And this is in-state applicants here, right?

4  A.  This is in-state applicants.

5  Q.  So what did the data show in the first row of this slide?

6  A.  So this is showing the actual number of admits for the

7  people who are in the decile analysis.  So we have 18,080

8  admits, and the share just refers to just to the share among

9  these four racial groupings.  So the sum of the shares should

10  add up to 1.

11  Q.  And then what does the second row show?

12  A.  The second row shows what if we just admitted from the top

13  deciles until we filled the class.  And here again, we're only

14  looking at these four racial groups, so the sum of the number

15  of admits is going to be the same here.

16      And then what you can see is that the number of white

17  students would go up from, you know, a little over 18,000 to

18  over 19,000.  Asian Americans would go up from a little over

19  3,000 to over 3,400.  This comes at the expense of African

20  Americans and Hispanics.  So for African Americans, it falls

21  from 2,275 to 1,055; and for Hispanics, there's a loss from

22  1,414 to 1,031.

23  Q.  Did you do a similar exercise with out-of-state admits?

24  A.  I did.

25  Q.  And did you prepare a slide on that?

1  A.  I did.

2  Q.  What did the data show in this slide?

3  A.  So it's going to repeat the analysis of the previous slide,

4  but this time out-of-state.  So the first row is again going to

5  show the actuals.  So this is the actual admits for that decile

6  sample.  And then it says, well, what if we just took people

7  from the top deciles until we filled the class.  And there you

8  can again see that whites and Asian Americans would increase

9  and then pretty substantial drops for African Americans and

10  Hispanics.

11  Q.  And how would that affect the racial composition of the

12  admitted group?

13  A.  Well, the share African American, you know, would fall from

14  12.7 percent to 1.9 percent.  The share Hispanic would fall

15  from 14.1 to 8.2, and then you would see corresponding

16  increases for whites and Asian Americans.

17  Q.  Now, UNC doesn't actually make admissions decisions based

18  solely on academic qualifications, correct?

19  A.  That's correct.

20  Q.  So what was the point of this analysis here?

21  A.  The point of this analysis is just to get an idea as to

22  what's in the data and how strong you have to be on other

23  things to sort of make up for what we're seeing on the

24  academic -- on the academic front.

25  Q.  So let's stop for a moment there and look backward.  What

1  has your descriptive analysis, as you referred to it, shown so

2  far?

3  A.  Well, the descriptive analysis has shown that whites and

4  Asian Americans seem to be stronger on a lot of the things that

5  are associated with admission at UNC.  They're going to have

6  higher test scores, higher grades, typically, and higher

7  ratings on UNC's system.  And then when we look at -- with,

8  again, the one exception being the personal quality measure

9  that African Americans and Hispanics do better on.

10      Then when you look at conditions under the same academic

11  qualifications just with this rough measure, the academic

12  index, you can see pretty wide disparities in admit rates

13  across races.  With African Americans, you see you have the

14  highest admit rates by quite a bit, followed by Hispanics, and

15  then we have Asian Americans and whites.

16  Q.  Does your analysis thus far reveal the effect that race has

17  on admissions decisions at UNC?

18  A.  No, this is just suggestive.  We have to actually do the

19  modeling to try to capture the actual effects of race.

20  Q.  So what did you do to determine whether UNC's racial

21  preferences are driving African American and Hispanic admit

22  rates?

23  A.  Well, I'm going to put together a model of UNC's admissions

24  decisions and see what happens to -- what happens to the role

25  race plays as we account for all these different factors.

1  Q.  And what kind of a model is it you put together?

2  A.  I'm going to be using what's called the logit model, and

3  the logit model handles cases where the outcome is binary.  So

4  it's a 0/1; 1 will be if you're admitted, zero if you're not.

5  Q.  So because it's for binary choices, then is a logit model

6  useful in modeling admissions decisions?

7  A.  It is, because admissions decisions can be treated as zero

8  or 1.

9  Q.  Did you prepare some slides to help illustrate what a logit

10  model is and does?

11  A.  I did.

12  Q.  So in this graphical representation, what are the inputs to

13  the logit model here?

14  A.  So the inputs are going to be the things that you observe

15  in the data.  And we've talked about a lot of these things like

16  with regard to demographics.  This is going to include race,

17  and female, first-generation college and such.  And then you're

18  going to have things like the academic variables that we

19  discussed, you know, test scores, grades and the like.  And

20  then we also see things like UNC's ratings, and then there are

21  a couple of other things.  You know, maybe in one year UNC gets

22  a lot of applicants, so that makes things more competitive.

23      So it's going to take all those things and say, okay, given

24  what we know about all those things, how well can we do at

25  predicting the probability that an applicant was admitted or

 1  rejected.  And the reason it's a probability is because there's
 2  going to be some part that we don't see, right.  We only get to
 3  see all the -- we see an extraordinary amount of variables in
 4  this case, but you don't get to see everything.  It's part of
 5  what makes it holistic.
 6  Q.  Let's take a look at the next slide.  What is the goal that
 7  you're trying to reach with your logit model?
 8  A.  Well, we're trying to approximate what actually happens in
 9  UNC's admissions process as best we can.
10  Q.  What does the equation on this slide represent?
11  A.  So the way you want to think about it is we have these
12  observed characteristics, and we're using particular examples
13  here of, say, some of UNC's ratings.  So you have the program
14  rating and, you know, how much a program rating is going to
15  reflect -- matters is going to be reflected in the coefficient
16  on that.  The coefficients here are the things -- are the
17  letters.  So it's going to try to tell you how much each of
18  these different factors matters in the admissions decisions.
19  Q.  So what on this slide depicts the coefficients?
20  A.  The letters, so the A, B, C, D, and capital R.
21  Q.  And can those coefficients be positive or negative?
22  A.  They could.  So probably not on the ratings here.  We think
23  those things are going to positively affect your admission
24  status, but you could have a variable that negatively affects
25  your probability of being admitted, in which case the

1  coefficient would be negative.

2  Q.  What does the coefficient R represent?

3  A.  So the coefficient R represents what we see how race

4  matters in the admissions process, and that's all going to be

5  relative to some omitted group, right.  So in this case, our

6  omitted group is going to be whites; how much higher are your

7  admissions chances if you're black or Hispanic.

8  Q.  And by "omitted group," you mean like a baseline group?

9  A.  Baseline group, yes.

10  Q.  So if you have a baseline group, then what would the

11  coefficient be?

12  A.  Well, the coefficient for the baseline group is zero, and

13  so everything is sort of relative to that.

14  Q.  Does the magnitude of a coefficient matter?

15  A.  It certainly can, and particularly, you know, when the

16  variable is scaled appropriately, as it would be in the case of

17  race, it's going to tell you something about the size of -- the

18  size of the preference or penalty.

19  Q.  What can you do with the output of your logit model?

20  A.  They give you many things.  You can predict the probability

21  of being admitted, and you can also predict the probability of

22  being admitted once we turn off various features.  So we'll be

23  able to see how race affects the admissions process through

24  effectively, you know, treating black students as white in the

25  admissions process.

1  Q.  Did you use the outputs of your model in connection with

2  work with Richard Kahlenberg in this case?

3  A.  I did.

4  Q.  Let's talk about that briefly.  What did you do with

5  Mr. Kahlenberg?

6  A.  So --

7          **MR. FITZGERALD:**  Objection, Your Honor.

8          **THE COURT:**  Basis.

9          **MR. FITZGERALD:**  It's been very clear in this case

10 that Professor Arcidiacono has committed not to be offering

11 testimony as to Mr. Kahlenberg's models, and I don't think --

12 since we've been clear on that since the depositions,

13 Mr. Kahlenberg should justify his simulations on his own.  He

14 is dealing with Count II, and Professor Arcidiacono is dealing

15 with Count I, and I think that's been clear from discovery.

16         **MR. MCCARTHY:**  Your Honor, Professor Arcidiacono is

17 not going to be offering any opinions on Mr. Kahlenberg's

18 analysis.  The idea here is just that Mr. Kahlenberg and

19 Professor Arcidiacono worked together in that

20 Professor Arcidiacono created the models that Mr. Kahlenberg

21 used.  It was done at Mr. Kahlenberg's direction.  So I just

22 want to make sure and get in the record that

23 Professor Arcidiacono created those models for Mr. Kahlenberg

24 at Mr. Kahlenberg's direction.  He won't offer any opinion on

25 it at all.

1          **MR. FITZGERALD:**  But, Your Honor --

2          **MR. MCCARTHY:**  This is actually covered in the

3    deposition.

4          **MR. FITZGERALD:**  Your Honor, we disagree.  Just to be

5    plain spoken, Your Honor, Mr. Kahlenberg sponsored simulations,

6    and at his deposition when we handed him his work papers, he

7    had never seen them before.  So if Mr. Kahlenberg is the expert

8    to sponsor simulations for the Court -- we took discovery of

9    him, and we couldn't get information from him on this.

10   Professor Arcidiacono was not offered as a witness to sponsor

11   Mr. Kahlenberg's simulations; and to change now, to have a

12   witness put before the Court of somebody else's simulations

13   that he cannot sponsor, would be inappropriate.

14        And I would refer to the deposition we took of

15   Professor Arcidiacono, and we asked him the specific question:

16   "And I take it you're not planning to opine as to whether or

17   not the simulations that Mr. Kahlenberg had you and your team

18   perform were the right ones?

19        "Correct.

20        "I take it that you're not opining as to the results of the

21   simulations?

22        "Correct."

23        So having heard from the witness that he is not opining to

24   Mr. Kahlenberg's simulations, I don't understand why we're

25   hearing that here for the first time in court today.

**MR. MCCARTHY:** Your Honor, this is not the first time they would have heard about this, in court, and he is not opining on Mr. Kahlenberg's simulations. Mr. Kahlenberg actually disclosed in his expert reports that he relied upon Professor Arcidiacono to actually build the simulations that Mr. Kahlenberg opined on.

Mr. Kahlenberg is not an economist. He doesn't do econometric modeling, but in his line of work when he does his work on race-neutral alternatives, he typically relies on someone like Professor Arcidiacono to actually construct his models. They do it at his direction. So he's ultimately responsible for the opinions there, but just like he did here, he does in his outside work, he relies on someone else. Again, this was disclosed in Mr. Kahlenberg's reports.

**MR. FITZGERALD:** Your Honor, it was disclosed that Mr. Kahlenberg's simulations were produced to us in discovery. We found at the deposition when we handed him his work papers he had never seen them before. Having made clear that we understood Professor Arcidiacono is offering the modeling and only the modeling and made clear in his reports that he was offering as to those issues, his reports do not discuss how he created the work product for Mr. Kahlenberg. Mr. Kahlenberg says, "I deferred to him." We don't think that's a proper way to sponsor a model.

An expert can't just say, "I don't understand the subject."

1  Somebody else who hasn't given us discovery of what they've

2  done then gets to take the stand and sponsor the model for him?

3  Mr. Kahlenberg needs to own his own work, and this is very

4  clear.  And, you know, the person who decided

5  which coefficients to raise in the models was Mr. Kahlenberg.

6  Mr. Kahlenberg's simulations should be justified by, sponsored

7  by Mr. Kahlenberg; and he should defend them, not another

8  witness.

9          **MR. MCCARTHY:**  Your Honor, again, two things.  One is,

10  as I mentioned before, it was disclosed in Mr. Kahlenberg's

11  reports that Mr. -- that Professor Arcidiacono actually built

12  those simulations at Mr. Kahlenberg's direction.  So counsel

13  for UNC had ample opportunity to ask Professor Arcidiacono at

14  his deposition how he constructed those models for

15  Mr. Kahlenberg.

16      On top of that, if this were something that UNC wanted to,

17  you know, prevent any testimony on at all, it should have been

18  the subject of a motion in limine, and that deadline has come

19  and gone a while ago.

20      Last, again, Professor Arcidiacono is not going to offer

21  any opinions on the simulations that Mr. Kahlenberg did.  This

22  is just background, consistent with what Mr. Kahlenberg

23  disclosed in his expert reports, to explain that

24  Professor Arcidiacono built the model at Mr. Kahlenberg's

25  direction.  That's all.

1   It's entirely appropriate, fully disclosed.  They had an

2   opportunity to object if they wanted to before all of this, and

3   they didn't do it.  The testimony here that we plan to offer,

4   very short, very simple, just about the basics of

5   Mr. Kahlenberg giving Professor Arcidiacono direction about how

6   to construct the models, and that's it.  It's very short.

7   We'll be done with it quickly.

8       **MR. FITZGERALD:**  Your Honor, if I can have one last

9   word?  We shouldn't have to make a motion in limine to hold a

10  witness to his commitment at a deposition that he is not

11  offering testimony on topic.  Once we heard that

12  Professor Arcidiacono did not disclose in his reports how he

13  went about Kahlenberg's work and said he's not offering an

14  opinion, we're done asking him questions.

15      Now to suddenly say, well, if you wanted to keep him from

16  testifying in a way he told us he would not testify, we had to

17  file a motion in limine, that's not the case.  He gave reports

18  about his work on the modeling, not the simulations.  He said

19  he wasn't going to testify about Mr. Kahlenberg's simulations,

20  and now here he is trying to do so.

21      **THE COURT:**  Sustained.  I'm not going to allow it.

22      **MR. MCCARTHY:**  So, Your Honor, just so I understand,

23  Professor Arcidiacono is not going to offer any opinions at all

24  about that.

25      **THE COURT:**  I understood that.

1    **MR. MCCARTHY:**  Okay.  Am I permitted to ask him

2    whether or not Mr. Kahlenberg gave him high-level direction in

3    constructing those models?

4        **THE COURT:**  You can ask that question, but you can't

5    go further than that.

6        **MR. MCCARTHY:**  Okay.

7        **THE COURT:**  All right.  You can ask that question.

8        **MR. MCCARTHY:**  That's fine.  Thank you, Your Honor.  I

9    appreciate the clarification.

10   Q.  (By Mr. McCarthy)  Did Mr. Kahlenberg give you high-level

11   direction about how to construct the models you did for his

12   simulations?

13   A.  He did.

14   Q.  And did he give you high-level instruction about how to

15   construct simulations off of Professor Hoxby's models?

16   A.  He did.

17   Q.  Does your logit model take into account every factor that

18   UNC considers in making admissions decisions?

19   A.  It does, but some of those are unobservables.  So we're

20   going to be able to be predicting UNC's admissions with their

21   observables, but there are certainly unobservables that affect

22   the UNC admissions decision.

23   Q.  Are your models reliable, notwithstanding the fact that

24   there are some variables that you don't have, these so-called

25   unobservables?

1  A.  Yes.  In fact, all of empirical work in economics is

2  predicated in some part by having unobservables.

3  Q.  Are your models able to predict UNC admissions with a high

4  level of accuracy, notwithstanding there are some

5  unobservables?

6  A.  A quite high level of accuracy, better than what I've just

7  about seen almost anyplace else.

8  Q.  Thank you.  We'll come back to the accuracy of your models

9  later.

10      You mentioned the quality of the data.  Is there data here

11  that you normally don't have or wouldn't have?

12  A.  Yeah, you normally wouldn't have UNC's ratings primarily.

13  And then having, you know, six full years of admissions data is

14  great.  Typically admissions data is very hard to get your

15  hands on.

16  Q.  So in terms of UNC's ratings, those, in a normal setting,

17  would be unobservables, correct?

18  A.  That's correct.

19  Q.  But they're observables here?

20  A.  That's correct.

21  Q.  Because they were produced and in the data and you used

22  them?

23  A.  That's right.

24  Q.  Are you aware that Professor Hoxby criticizes you for

25  including UNC's ratings in your model?

1  A.  I am.

2  Q.  And what is her position on that?

3  A.  Well, it's sort of two-fold.  One is that when you're

4  interested in seeing how formulaic a process is, she objects to

5  the use of subjective factors, and the ratings do have a

6  subjective component to them.  And then there's another aspect

7  with regard to how race might influence those ratings.

8  Q.  And is it okay to include subjective factors in your model?

9  A.  It's most certainly okay to include subjective factors in

10  your model.

11      And then with regard to how race influences those ratings,

12  it really hinges on the question that you're asking.  So when

13  we're thinking about how formulaic UNC's admissions are, you

14  need to be taking into account the stuff that you have

15  available to you, regardless of whether race is influencing it.

16      Now, in my model, I'm typically controlling for the ratings

17  all the time.  Even though there is one rating where I do

18  believe race influences it, which is the personal rating, I

19  kept it in there to be conservative.  And I will show you a

20  model that doesn't have the personal rating in it, and that

21  will reveal that racial preferences are even larger when it was

22  removed.

23      But the reality was I just didn't want to have a fight

24  about something that matters so little in terms of the context

25  of the magnitude of the racial preferences.  What you see is

1    that most of the action on racial preferences is not operating
2    through the ratings for UNC.
3    Q.  I want to get back just briefly to the idea there's some
4    subjective factors among the variables UNC produced.
5          **THE COURT:**  Let me ask you:  How much longer are you
6    with this witness?
7          **MR. MCCARTHY:**  I was actually going to suggest I think
8    maybe after this question that we take a break because I'm at a
9    logical stopping point after this.
10         **THE COURT:**  That would be great.  Go ahead.
11         **MR. MCCARTHY:**  As long as I get it out, it will be
12   one, I promise, Your Honor.  It might take more than one.
13   We'll see.
14         **THE WITNESS:**  No more equations.
15   Q.  (By Mr. McCarthy)  Not for a little while.
16       Getting back to the subjectivity of some of the factors
17   that UNC considers in admissions, do economists often conduct
18   modeling that involves subjective factors?
19   A.  All the time.
20         **MR. MCCARTHY:**  We can stop there, Your Honor.
21         **THE COURT:**  All right.  Let us take a 15-minute
22   recess.  We will resume at 3:30.
23       (An afternoon recess was taken from 3:15 p.m. until
24   3:30 p.m.; all parties present.)
25         **THE COURT:**  Yes, sir.

1    **MR. MCCARTHY:**  Thank you, Your Honor.

2    **THE COURT:**  Uh-huh.

3    Q.  (By Mr. McCarthy)  Professor Arcidiacono, when we broke, we

4    were talking about -- I'm sorry.  Professor Arcidiacono, when

5    we broke, we were talking about what a logit model is and what

6    it does.

7       Now that we've talked about that, how do you go about

8    building such a model?

9    A.  So when we were looking at the summary statistics there, we

10   were sort of seeing some patterns.  So those are the types of

11   things that you might want to have in your model.  It's also

12   based on, you know, my previous experience in doing models in

13   higher education, but also reading, you know, the guidelines

14   for UNC's readers and the deposition testimony and thinking

15   about what factors that are in the data I can incorporate.

16   Q.  And this is all in trying to determine the appropriate

17   variables for the model?

18   A.  That's correct.

19   Q.  Did you prepare a slide to explain the types of variables

20   in your model?

21   A.  I did.

22   Q.  What generally does this slide show?

23   A.  This slide shows the controls I used for my opening report

24   model.

25   Q.  Now, before you get into all the controls and variables,

1  why is it that there are seven models listed here?

2  A.  So what you're trying to do here is see what happens as

3  you're adding additional variables to the model, and that can

4  give you a hint as to what's likely to happen if you had even

5  more data.

6      So, as an example, suppose that you saw for a particular

7  group you kept adding controls, and the coefficient kept

8  getting higher and higher.  Then all that's suggestive that if

9  you keep adding controls, it's just going to keep getting

10 higher, not smaller.  If, on the other hand, you start off with

11 a really big coefficient and then you add controls and keep

12 getting closer and closer to zero, then that might make you

13 suspicious that having even better controls it would go all the

14 way to zero and not be important.

15 Q.  Is it common practice in econometric modeling to have

16 several iterations of models like this where you add variables

17 to them?

18 A.  It is.

19 Q.  And when you say "controls," do you mean -- is it what

20 people often mean as variables?

21 A.  That's right.  Those are all the things that are located in

22 the first column of this slide.

23 Q.  So can you explain to us what controls or variables are in

24 those models?

25 A.  Well, we're going to start off with just some very simple

1    controls:  Your race, whether or not you're female, whether you
2    applied early or regular decision.  That's going to turn out to
3    matter.  And I should also say that these models are estimated
4    both in state and out of state separately, whether or not
5    you're an alum of UNC.
6        And then things that are somewhat related to disadvantage
7    status, such as whether you're a first-generation college
8    student, whether you applied for waiver of the application fee.
9    And then, you know, some people we don't actually have that
10   information on whether they had a fee waiver, so you include a
11   control for a missing.
12       And then you have controls for which admission cycle
13   because, you know, maybe -- UNC may be becoming more
14   competitive over time as more and more people apply.  So that's
15   going to take that into account.  So that sort of makes up
16   Model 1.  That's a baseline.
17       And then in Model 2, we're going to add a lot of things
18   that are related to academic measures, and so this is going to
19   include things like your SAT scores.  And I do math and verbal
20   separately, allowing for the effects to be different across
21   those two.  I should also mention that not everyone has an SAT
22   math score.  You may have an ACT score, so I'm going to convert
23   those ACT scores into math scores -- into SAT scores.
24       But even then there will still be some people who have
25   neither, and so here, for that small set of people, I'm also

 1   going to include an indicator where they are missing that SAT
 2   score.  And you'll notice that that variable there says missing
 3   SAT times race/ethnicity, and so what I'm doing there is I'm
 4   having separate variables for each of those.  There's a good
 5   reason for doing that, and that is effectively, if I just had
 6   one variable for that, just missing SAT, what that would mean
 7   is the model would say, hey, what SAT score can sort of
 8   rationalize the admissions decisions for people who are missing
 9   SAT.
10       By doing it interactive with race, then it's saying what
11   SAT score can rationalize the admissions decisions of African
12   Americans, what SAT score can rationalize the admissions
13   decisions for Hispanics and so on.  And that's actually
14   somewhat important here because it is the case that the test
15   scores are different across different racial groups.
16       There are different ways to sort of view these missing SAT
17   scores.  It could be it just happened to not be recorded in the
18   data, or there could be that they came up with the idea that
19   they truly were missing and they would come up with an idea of
20   what they might be, given the rest of the information there.
21   But I'm not posing anything here.  I'm just allowing the model
22   to tell me what those implied SAT scores would be for those who
23   are missing it and allowing it to be different across races.
24       Maybe a long answer for that, but --
25   Q.  Let's do this.  What's -- I think you've identified several

1  of the controls in Model 2.

2      What is the big difference between what's in Model 2 and

3  what's in Model 3?

4  A.  Well, in Model 3, I'm adding to that UNC's ratings.  So

5  Model 2 is just based on I guess what Professor Hoxby would say

6  were the nonformulaic-type stuff -- the formulaic-type stuff,

7  and then I'm adding UNC's ratings in Model 3.

8  Q.  And what about in Model 4?

9  A.  In Model 4, I'm sort of doing two things.  One, I'm

10  accounting for your intended college major, and then I'm

11  also -- and I'm actually also accounting -- let me just --

12  yeah, let me just say that.  And then I'm also looking at

13  allowing the effects of race to be different along two

14  dimensions:  One, differences between men and women; and, two,

15  with regard to first-generation college status.

16  Q.  Let's stop there for a minute.

17          **MR. MCCARTHY:**  Mr. Lawrence, can you highlight where

18  it says "first-generation interacted with race/ethnicity"?

19  There we go.

20  Q.  (By Mr. McCarthy)  So that's one of the variables,

21  Professor Arcidiacono, you said is in Model 4, correct?

22  A.  That's correct.

23  Q.  Okay.  And I want to make sure I understand this.  Why do

24  you have variables like this where it says "first-generation

25  interacted with race/ethnicity"?

1    A.   So in this case, it's to allow for preferences to operate

2    differently for first-generation college students dependent

3    upon your race.  And so what I found in my past research and

4    what I also found in the *Harvard* case is that things related to

5    disadvantaged status, you'll get a bump for it.  You also get a

6    bump for being African American, but you may not get the bump

7    for being disadvantaged if you're black.  And that -- that's

8    been something I've noticed in my work on affirmative action,

9    that it -- the beneficiaries seem to be more advantaged African

10   Americans than disadvantaged ones.

11   Q.   So is the idea behind an interaction variable that it

12   allows one variable to act differently over another variable?

13   A.   That's correct.

14   Q.   Did you prepare a demonstrative to help you explain how to

15   interpret coefficients that include interactions?

16   A.   I did.

17   Q.   Now, first, you mentioned coefficients before.  At a high

18   level, what do coefficients mean again?

19   A.   Coefficients give the weight of that particular variable in

20   the process.

21   Q.   And so a higher coefficient means what?

22   A.   Would be higher weight if they're sort of scaled the same

23   way.

24   Q.   So what are the coefficients here on this slide?

25   A.   Those would be the letters A, F, and X.

1  Q.  And as a starting point, what are these coefficients in

2  comparison to?

3  A.  So it's always going to be relative to a baseline group.

4  So in this case, the baseline group for race will be white

5  students.  So do you see that African Americans get a bump or a

6  penalty relative to white students.  That would be the

7  Coefficient A.  Similarly, for Coefficient F -- this is for

8  first-generation college -- the baseline group would be those

9  who are not first-generation college; is there a bump or a

10 penalty for first-generation college students.

11 Q.  And then what does the X coefficient mean?

12 A.  Well, the X coefficient gives you the effect on the

13 interaction term.  So does the bump, for example, for

14 first-generation college students differ depending on whether

15 you're African American or not.

16 Q.  So let's highlight that first equation there.  How do we

17 get preference for FGC African American applicants relative to

18 FGC white applicants when we're talking about your

19 coefficients?

20 A.  So the way we think about this is that FGC African

21 Americans will get the bump for being African American, which

22 is A.  They also get the bump for being first-generation

23 college, which is F.  But because this is relative to

24 first-generation college whites, first-generation college

25 whites also get the bump up.  So that part cancels.  That's why

1  there's a space there between the A and the plus sign.  Now,

2  this is where the interaction term kicks in because for African

3  American first-generation college, you get the additional bump

4  or penalty X.

5  Q.  And now what about the second equation?  If you have the

6  coefficients that you identified here, how would you compute

7  the preference for first-generation college African American

8  applicants relative to non-first-generation college African

9  American applicants?

10  A.  So in this case, first-generation African Americans and not

11  first-generation African Americans would both get the bump A,

12  so that part cancels.  That's why there's a space there.

13      But then the first-generation college African American

14  would get the bump for being first-generation college, plus

15  they'll get the bump for being African American

16  first-generation college, which is X.

17  Q.  And then last, let's look at the third one.  So if you have

18  these coefficients and you were trying to calculate and compute

19  any preference that FGC, first-generation college, that is,

20  African Americans might have relative to non-first-generation

21  college white applicants, how would you do that?

22  A.  Well, the non-first-generation white applicants, that's the

23  baseline across, so all of theirs are set to zero for this

24  example.  So then what you're doing is you're adding up A plus

25  F plus X:  The bump for being African American, or penalty, the

1  bump or penalty for being first-generation college, and then

2  the interaction bump or penalty for being both African American

3  and first-generation college.  So A plus F plus X.

4  Q.  Thank you.

5       **MR. MCCARTHY:**  Can we go back to Slide 21 for just a

6  minute?

7  Q.  (By Mr. McCarthy)  So now that you've explained what those

8  interaction variables are -- and I think you had talked about

9  Model 4 -- can you tell us what variables are in Models 5, 6,

10  and 7?

11  A.  Yes.  So Model 5 actually has the same variables as Model

12  4.  There's a check on the box for high schools with minimum

13  number of applications and admits.  That's actually referring

14  to the data.

15  Q.  So that's not a variable?

16  A.  So Model 5 -- yeah, it's not a variable.  Model 5 is best

17  understood in the context of Model 6.

18  Q.  So let's talk about Model 6 then.

19  A.  So what Model 6 does is it adds to the model high school

20  fixed effects, and so what that would take into account is that

21  some high schools may have harsher grade distributions or

22  better -- or seen by UNC as better preparing the students for

23  college, more rigorous high schools or something like that.

24  And so this is putting in a variable for every high school that

25  we see.

1    The issue with that is that there might be some high

2    schools where nobody gets in or some high schools that send

3    very few applications, and in that case, you're not really

4    picking up great information on those schools.  So what we're

5    going to do is restrict -- when we're doing high school fixed

6    effects, we're going to restrict it to high schools that have a

7    certain number of applicants and a certain number of

8    acceptances.  When we estimate Model 6, the coefficients will

9    change relative to Model 4 because we have high school fixed

10   effects in there.

11       But there's another reason that they could change, which is

12   that we've thrown out people from those particular high

13   schools; and so what Model 5 does is it says let's take the

14   same data we used in Model 6, just slightly smaller group, and

15   estimate Model 4.  And in that way, we can see how much of the

16   change in coefficients is driven by the change in the data

17   because we've thrown out students from those high schools --

18   that would be comparing Model 4 to Model 5 -- and then how much

19   is driven by accounting for the high school fixed effects,

20   which would be moving from Model 5 to Model 6.

21   Q.  Thank you.  And then what did you then change or add when

22   you went to Model 7?

23   A.  With Model 7, we added census track fixed effects, which,

24   again, that's putting really strong demands on the data because

25   now you have to have multiple applicants and admits from

1   different census tracks.  And this is really more designed to

2   see what's happening to the coefficient on race to see, well,

3   if we added additional information, is that moving racial

4   preferences up or down.  My preferred model is actually

5   Model 4.

6   Q.  When you say it's your preferred model, is that the model

7   that you highlight throughout your analysis?

8   A.  That's the one that -- if I'm only showing results for one

9   model, that's it, you know, and that's going to be a lot of

10  what all my examples are going to use in terms of figuring out

11  the effects of race.

12  Q.  At some point did you update your models to include

13  additional variables?

14  A.  I did.

15  Q.  Did you prepare a slide that shows that?

16  A.  I did.

17  Q.  And is that what this slide shows?

18  A.  It is.

19  Q.  What variables, then, are there that you added to your

20  models?

21  A.  So the process of the way these reports worked is both

22  myself and Professor Hoxby submitted simultaneous reports and,

23  in reading through her first report, there were some variables

24  that I thought that would be fine to add to my model, and so

25  those are what's highlighted in red.  So these are sort of the

1  variables that Professor Hoxby proposed that were not already

2  incorporated into my model.  They don't matter a lot, but I

3  think it's completely reasonable to include them, and so I did.

4  Q.  So I want to talk a little bit more about coefficients.

5  A.  Well, I would just like to point out what the variables

6  are --

7  Q.  Oh, sure.

8  A.  -- which this is whether you're a child of a faculty member

9  at UNC and then your rank within applicants from the same high

10  school.  So you might have a set of applicants from the same

11  high school and your rank within those and then whether you met

12  UNC's minimum admission requirements.

13  Q.  Thanks for explaining that.

14      Now I'd like to talk a little bit about your coefficients.

15  You've mentioned them a couple times.  Do you have a slide --

16  did you prepare a slide that shows some of the coefficients for

17  your in-state models?

18  A.  I did.

19  Q.  And at a general level, what are you showing in this slide?

20  A.  I'm showing the logit estimates of my in-state admissions

21  models.  I'm just showing the race coefficients here.

22  Q.  And so what we're looking at, these are the coefficients in

23  these models?  I'm sorry.  These are the coefficients on those

24  variables in those models?

25  A.  Yes, for the first four models.

1  Q.  Okay.  So up at the top there where it says "Spec 1," "Spec

2  2," "Spec 3," "Spec 4," what does that mean?

3  A.  Model 1, Model 2, Model 3, Model 4.

4  Q.  And this is for that updated Model 4 after you added those

5  variables?

6  A.  That's correct.

7  Q.  So what do you show in the first row there?

8  A.  So the first row shows the coefficients on African American

9  for each of my models, and what you'll notice is it starts out

10 negative.  This is when we just have those baseline controls of

11 gender, whether you were first-generation college, fee waiver

12 and such.  And that's sort of consistent with what we saw for

13 in-state admissions.  You recall that admissions for whites and

14 Asian Americans were over 50 percent, but for African

15 Americans, it was around 30 percent.  So it's consistent with

16 having a negative coefficient there.

17     When we go to Model 2 and account for those academic

18 variables, the coefficient switches sign, becomes fairly large.

19 1.8 is a pretty big effect in logit models and that -- you

20 know, that's strongly significant.  As we add UNC's ratings,

21 the coefficient increases further; and then when we put in

22 those interactions, you can see the coefficient increases even

23 further.

24     Now, that's -- that coefficient is interpreted differently

25 in Specification 4 because you have the interactions.  What

1  this coefficient in Specification 4 represents is the bump

2  African Americans receive for males who are not

3  first-generation college.  To get it for females and for

4  first-generation college, you have to add that to the

5  coefficients that are presented further down.

6  Q.  What about Models 5 through 7, which are not shown here?

7  A.  So Model 5, you recall, is just like Model 4, except on a

8  slightly smaller data set; and that doesn't really matter that

9  much in terms of differences in the coefficients.

10     But for Models 6 and 7, consistent with the patterns that

11 we see in 1 through 4, adding high school fixed effects or

12 adding the census tracks leads to higher coefficients on

13 African American.

14 Q.  Let's take a look at the second row.  What do the

15 coefficients in that second row show?

16 A.  So this is showing the coefficient on Hispanics, again for

17 my first four in-state models, and again you can see a similar

18 pattern to what was happening to African Americans, though

19 substantially muted.  So we start off with a small negative

20 coefficient, when we don't have any -- when we have very

21 limited controls, and that's consistent with Hispanics in the

22 in state having lower admissions rates.

23     But again, once we account for differences in academic

24 background through test scores and grades and such, the

25 coefficient goes substantially up.  It's now large and

1   positive.  And if you add UNC's ratings, it becomes even more

2   positive.  And then again, the last one is a little bit

3   different because now the coefficient is for male, not

4   first-generation college Hispanics.

5   Q.  And that's because of the presence of the interaction

6   variables you mentioned?

7   A.  That's right.

8   Q.  And we'll talk about those in just a minute.  Let's look at

9   the next two rows.  What do you see there in the Asian American

10  and the female coefficients?

11  A.  They're pretty small in magnitude.  That's probably the

12  biggest takeaway from that.  They're not going to matter that

13  much in terms of your probability of admission.

14  Q.  All right.  Let's go down a couple rows to where it says

15  "alum."  I take it that means legacy?

16  A.  That's right.  And so here you see a preference for legacy

17  students at -- you know, it's about a little less than half of

18  the bump for first-generation college.

19  Q.  Now, I want to look just below that where it says "female

20  times race" and then below that where it says "FGC times race."

21  These are the interaction variables we discussed, right?

22  A.  That's right.

23  Q.  And what do these interaction -- what do the coefficients

24  on these interaction terms reveal?

25  A.  So for female times African American, you get a negative

1  coefficient that's about the size and similar magnitude to the

2  legacy bump we were just discussing.  So African American women

3  don't get as big of a racial bump as African American men in

4  state, and you can see that a little bit way back on the

5  summary statistics for in state.  I was going to mention that.

6      There's a big gender gap in terms of who goes on to

7  college.  So I think generally it's like 55-45 more women than

8  men, but that gender gap is much more pronounced for African

9  Americans.  So I believe it was 70 percent of in-state

10 admits -- 70 percent of African American in-state admits were

11 female.  So they're not getting the full African American bump

12 here.  They're getting still a substantial bump because you

13 would add that negative .469 to the 3.5.  That's still going to

14 give you, you know, a bump of three, which is large, but it's

15 not as big as what their male counterparts would get.

16 Q.  Let's look down at the last row.  What is the last row down

17 there?

18 A.  I also wanted to mention on the first-generation college

19 cross-race because I think that's a key coefficient here.

20 Q.  Go ahead.  Let's do that.

21 A.  And what you see for African Americans -- this is what I

22 was mentioning before -- if you're first -- this is sort of the

23 measure of disadvantage we're working with here.  It seems like

24 that's where the big bump is.  The coefficient is negative 1.

25 That almost counterbalances the effect that you get if you're

1  white first-generation college, which is the 1.168.  So the way

2  that works is that if you're African American, you get a large

3  bump.  If you're first generation, you get a bump that's about

4  a third of that; but if you're African American and

5  first-generation college, you don't get the first-generation

6  college bump.

7  Q.  And this is -- this is what the slide a few slides ago

8  showed with the calculations with the A and the F and the X,

9  correct?

10 A.  Exactly.

11 Q.  So then let's go ahead and look down at the last row.  The

12 last row says "pseudo R-squared."  What does that -- what does

13 the data in that row show?

14 A.  The pseudo R-squared is trying to get a measure of fit for

15 the model.  It has a counterpart for what are called linear

16 models.  So this would be your normal regressions people

17 normally do.  That's what the R-squared is.  The pseudo

18 R-squared is trying to find a counterpart to that.  But what it

19 really does is it just says, you know, if it's a higher number,

20 it fits the data better.  You can't really interpret the number

21 itself in the same way and what --

22 Q.  When you say it's a "measure of fit," does that mean about

23 how well that the model fits the data?

24 A.  Exactly.  And what -- the classic citation on this says

25 pseudo R-squared .2 to .4 is an excellent fit of the data.

1  We're getting much higher values here.  Getting a pseudo

2  R-squared, you know, above .7, that hard -- that's not

3  something you normally see in models of this type.

4  Q.  Okay.  Let's shift to out of state.  Did you prepare a

5  slide that shows similar coefficients for your out-of-state

6  models?

7  A.  I did.

8  Q.  And what did the data show in this slide?

9  A.  They're going to show the logit estimates of my

10 out-of-state models, focusing in on the coefficients on race.

11 Q.  So let's look at the first row, just like we did for the

12 in-state applicants.  And what does that first row show in

13 terms of the coefficients on African American?

14 A.  So that shows in the first model sort of a fairly large

15 positive number and that -- keep in mind this is relative to

16 whites.  So if you recall, it was like 10 percent of white out

17 of states were admitted and about 16 percent of African

18 American out of states were admitted and about 16 percent of

19 Asian Americans are admits.  Actually, that coefficient on

20 African American, it's sort of a somewhat similar size to what

21 it is for Asian American in that first column.

22     Now, once you add in the academic variables, those two

23 coefficients diverge dramatically.  Okay.  So now the one for

24 Asian American shrinks.  You know, that's a fairly small number

25 there.  But the one for African American goes up to 4 point --

1  over 4.7.  That is a really big number for a logit model, and

2  we'll see how that impacts things as we go through.

3     Then when you add in the readings variables, the

4  coefficient goes up even more.  And then finally in the last

5  column, this is where we have the heterogeneity analysis.  This

6  is where we allow race to be different in its effects for

7  female and first-generation college.

8  Q.  Can I stop you there for a second?  Heterogeneity effects,

9  I don't think we've used that phrase yet today.

10  A.  Sorry.  That is the interaction terms.

11  Q.  Thank you.

12     Okay.  So go ahead.  You were talking about Model 4 and the

13  African American coefficient there and how it's affected by the

14  interaction terms.

15  A.  That's right.  So -- and really, in contrast, what we saw

16  in state, you don't see that African American female penalty

17  there, and the gender gaps are not as large out of state as

18  they are in state.

19  Q.  And overall when you look at this first row for

20  out-of-state admissions, how does that compare with the

21  coefficients for in state?

22  A.  They're much higher.

23  Q.  Let's look at the second row.

24  A.  So the second row shows the same results for Hispanics; and

25  if you recall, Hispanics actually had the highest out-of-state

1  admit rate, and so we're controlling for hardly anything.

2  That's going to give you that effect, that .98. And again,

3  once you add academic variables, that coefficient goes

4  substantially higher, not as high as for African Americans, but

5  still a substantial effect.

6      Then when you add UNC's ratings, it goes up even higher,

7  and then it's basically the same in Specification 4 where you

8  have to interpret it a little bit differently because this is

9  not first-generation college male, Hispanic.

10 Q.  And that's because of the interaction variables that are in

11 that fourth model?

12 A.  That's correct.

13 Q.  Let's look again at the alum or legacy status row like we

14 did in the in-state applicant pool. What do you see there?

15 A.  So here you start off with the big effect, and again that

16 goes up when you're adding the controls, and this is to the

17 point where it lies in between the bump that you get for being

18 African American and the bump you get for being Hispanic.

19 Q.  So is this different than what we saw for the in-state

20 applicants?

21 A.  Yes. For in state the coefficient, I think, was about a

22 tenth of the size.

23 Q.  Let's look at the FGC row just above that. What do the

24 coefficients there show for first-generation college

25 applicants?

A.   So the first one is negative, and that's going to be
consistent with the fact the first-generation college kids are
likely coming from places where they're not going to have as
strong of an academic background, not as good of schools in
those areas.  And then you see the flip when you move to
Specification 2 when you add the academic variables, and now
you see a bump, and that bump increases when you add in UNC's
ratings.  So we're moving from .91 to basically 1.37.

     Now, when you get to the last specification, this is where
the interactions matter.  So now you're up to 1.9 basically,
which is larger than what we saw in state.  And then when you
look at those interactions for African Americans, they don't
get the full bump again.  They're going to get some of a bump
here in contrast to in state where it just basically canceled
out.  To get the -- you have to add the two coefficients
together.

Q.   So if you wanted to figure out the coefficient for an
African American FGC applicant, how would you do that again?

A.   You would add the 1.889 to the negative 1.343 under that
first-generation college African American.

Q.   And that would tell you the preference or bump that an
African American applicant would get for being first-generation
college status?

A.   That's right, relative to an African American who is not
first-generation college.

1   Q.   Thank you.

2        So now we've talked about some of the output of your model

3   in the form of these coefficients that are indicators of what

4   factors drive admissions to some extent.   Are there ways to

5   determine how well your models are able to match UNC's actual

6   admissions decisions?

7   A.   There are.

8   Q.   And what are some of those ways?

9   A.   Well, one of the ways is the pseudo R-squared.

10  Q.   And that's the value at the bottom?

11  A.   That's the value at the bottom, and those numbers are high.

12  Q.   Who are those here for the out-of-state models?

13  A.   So it gets all the way up to slightly less than .6.   It's

14  not quite as high as the in-state models, but still well

15  outside the excellent fit between .2 and .4.

16  Q.   Is there another way to measure the accuracy of your models

17  in terms of --

18  A.   Yes, you can calculate the accuracy.

19  Q.   And how do you calculate the accuracy?

20  A.   So this is basically thinking about how well the

21  observables do at your forecasting the admissions decisions.

22  Q.   Again, I want to stop you real quick.   The observables are

23  the variables that are actually in your model, right?

24  A.   The variables that are in my model.

25  Q.   So when you're talking about figuring out how well those

1  observables do, you mean with the variables in your model, how

2  accurate does it predict admissions?

3  A.  That's right.  So if you recall, the variables had

4  coefficients on them.  So what we're going to do is take those

5  coefficients and multiply them times the value of the variable

6  for each applicant, and then you combine them all together,

7  okay.  And that's going to give you sort of the observable

8  strength of the applicant.  So maybe they have high SAT score,

9  and there's a coefficient on that SAT score.  Maybe they're an

10 alum, and so then they get the alum coefficient.  You put it

11 all together, and that's going to give you what we're going to

12 call an admissions index, which is the strength of the

13 applicant based on the observables alone.

14 Q.  So is this -- this admissions index, is this something that

15 captures the overall strength of an applicant based on all of

16 the variables that are in the model?

17 A.  That's right.  And that strength is revealed by UNC's

18 actual admissions decisions.  So I don't have to know, you

19 know, whether a particular reader thinks one rating is more

20 important than another.  That gets revealed by the admissions

21 decisions in the form of the coefficients.

22 Q.  Because those admission decisions are one of the things

23 that's in the model?

24 A.  Well, that's what we're trying -- that's like the deep end

25 of variable.  That's what you're trying to explain is what the

1  admissions decisions are.

2  Q.  Do you have a slide that displays the accuracy of your

3  in-state model?

4  A.  Yes.  I didn't quite finish explaining -- I got the

5  admissions index --

6  Q.  Sorry.

7  A.  -- but then I've got to tell you how we actually calculate

8  the accuracy.

9  Q.  Thank you.

10  A.  So the way to think about calculating the accuracy is you

11  take that admissions index and you sort it.  So we're going to

12  take it from highest down to lowest.  And then when we think

13  about the observables, we're going to fill up UNC's class,

14  right.  So we say, okay, how much in-state admits were there.

15  Then let's take the people in state who have the highest

16  academic indices until we fill the class.  That's going to tell

17  you -- and we can see how often did we get it right just based

18  on the observables.  There's always going to be some

19  observables, so we are not going to get it perfectly, but how

20  close are we getting just with the observables.

21  Q.  So to make sure I understand, the output of your model

22  allows the creation of this admissions index that is -- takes

23  into account all of the variables in the model and is this sort

24  of sum total of the strength of that applicant?

25  A.  That's correct.

1  Q.  And then you can rank those --

2  A.  That's correct.

3  Q.  -- from bottom to top?

4  A.  That's correct.

5  Q.  And then you can compare those to the actual admissions

6  decisions of those same applicants?

7  A.  Yes.  So we look at did I -- I predicted, using just your

8  observables, that you got in.  Did that applicant actually get

9  in.

10  Q.  And that's how we figure out how accurate your model is?

11  A.  That's right, how often did I get it right.

12  Q.  Okay.  So did you -- so in -- after you assessed the

13  accuracy of your models, did you actually produce a slide that

14  depicts those?

15  A.  I did.

16  Q.  What did the data in this table show?

17  A.  So this shows the accuracy for my preferred model for

18  in-state admissions.  My preferred model was Model 4, okay.

19  And it's going to show it separately for admits and for rejects

20  and then overall how well did I do.

21  Q.  And just to clarify, this is with your updated Model 4,

22  correct?

23  A.  That's correct.

24  Q.  So looking at this table, what is the accuracy of your

25  updated Model 4 for in-state applicants?

1  A.  So overall the accuracy is over 92 percent.  And I get --

2  for admits, just predicting the accuracy for people who were

3  actually admitted, how often do I get it right, almost

4  92 percent, 91.8 percent of the time.  It's a little higher for

5  rejects at 92 1/2 percent.

6  Q.  And then there's another row underneath that with some more

7  data, and that row says "model with no controls."  What does

8  that represent or indicate?

9  A.  Well, this is basically we're going to be filling the

10  class -- you have to fill the class somehow without using

11  characteristics at all, so initially this said random

12  assignment.  It means the same thing, you know, that

13  fundamentally we're trying to fill up the class just with a set

14  of students completely unrelated to their characteristics.  So

15  in that case, how well would you actually do.  The benchmark is

16  not zero here.  You're not comparing 91.8 to 0.  And, you know,

17  this shouldn't be the benchmark either in terms of the model

18  with no controls, but this will tell you how often you get it

19  right just based on luck.

20  Q.  So is that supposed -- meant to be a benchmark?

21  A.  Yes.  And the reason we have that in here is it's always

22  easier to predict the outcome that occurs more often.  So you

23  notice that the accuracy for rejects is slightly higher than

24  the accuracy for admits.  That's because more people are

25  rejected than admitted.  That doesn't look like that big of a

1  deal for in-state admissions, but for out-of-state admissions

2  it's going to matter quite a bit because the admission rate is

3  so much lower out of state.

4  Q.  Do you have any other ways of showing the accuracy --

5  A.  I do.

6  Q.  -- of this model?  Did you prepare a slide?

7  A.  I did.

8  Q.  What does this figure depict?

9  A.  So this figure shows the distribution of predicted admit

10 probabilities for in-state admits.  So what a predicted

11 probability is is what is the model saying your probability of

12 admission is, okay.  We take all those observables.  We figure

13 out what's -- what do we think your admissions probability is

14 based on that.  So on the X axis there, that is the predicted

15 probabilities.  That's the scale.

16 Q.  So "1" meaning a hundred percent?

17 A.  "1" meaning a hundred percent they were admitted.

18 Q.  And zero meaning zero -- a prediction of zero percent

19 chance of admission?

20 A.  That's right.

21 Q.  Okay.  So those are predicted probabilities of admission,

22 and they're represented in decimals but convert to percentages?

23 A.  That's right.  What's happening here is you've got a whole

24 bunch of these predicted probabilities for all these people and

25 (indiscernible) --

 1        (Court reporter requests clarification.)

 2    A.   You have predicted probabilities for every applicant, and

 3    what this distribution shows is it smooths it a little bit

 4    because otherwise it would be a bunch of jagged edges.

 5    Q.   Professor, I just ask you to go a little bit slower to make

 6    sure the court reporter gets your answers.

 7    A.   Sorry.

 8    Q.   That's okay.  So we just talked about what's on the X axis

 9    there.  What is on the Y axis in that figure?

10    A.   So the Y axis is the density, and that's -- all that's

11    trying to do is represent how many people were sort of in these

12    particular ranges.  So when the density is higher, that means

13    there's more people with those predicted probabilities than

14    when it's lower.

15    Q.   So then this U-shaped curve here, that's showing that there

16    are very few applicants that have predicted probabilities of

17    admission in the middle?

18    A.   That's correct.

19    Q.   Most of them --

20    A.   As an economist, the nerd in me just loves this picture

21    because that's not something you hardly ever see in models

22    where it would have such a nice U shape like this.  The model

23    is doing a great job of sort of splitting people up into either

24    you have a really high admit probability or a really low admit

25    probability.

1    Q.   And that's what's represented by the peaks on either side?

2    A.   That's correct.

3    Q.   That there are -- the vast majority of applicants in the

4    model are predicted to either be -- have a very, very high

5    probability of admission or very, very low probability of

6    admission?

7    A.   Right.  So that's what I mean by the admissions process

8    being very formulaic for in-state applicants.

9    Q.   And are you able to tell whether those high predicted

10   admissions probabilities are applicants that were actually

11   admitted or, conversely, actually rejected?

12   A.   I am.

13   Q.   Did you prepare a slide that shows this?

14   A.   I did.

15   Q.   And what does this slide show?

16   A.   So this slide shows the distribution of predicted admit

17   probabilities, but now conditional on being rejected or

18   admitted for these in-state applicants.  So the X axis is

19   exactly the same as what we had before.  There are actually two

20   Y axes here, one for rejects, which is in blue, and one for

21   admits, which is in red; and then we're showing the densities

22   here.

23   Q.   And so what does this figure say or show about the

24   predicted probabilities of those applicants who are actually

25   admitted?

1   A.   They are extremely high.   That big peak, you know, close to

2   "1" indicates we're predicting extremely high admit

3   probabilities for people who are actually admitted.

4       Now, you notice the red line goes all the way -- covers the

5   whole span, so there are a few people that we miss.   But

6   overall it predicts extremely well who those admits are.

7   Q.   So to make sure I understand it, if I look at that red

8   curve, what that's showing is that people who are predicted to

9   have a very high probability of admission in your model, by and

10  large they're actually admitted?

11  A.   That's correct.   And overall, people are either predicted

12  generally to have a very high probability of being admitted or

13  a low probability of being admitted.

14  Q.   And that's what you showed on the last slide?

15  A.   That's correct.

16  Q.   And do we see the similar -- a similar sort of result going

17  on the other way for the applicants for whom the model

18  predicted high likelihood of rejection?

19  A.   Exactly.   You can see that the peak is really close to zero

20  there.

21  Q.   This is the blue curve?

22  A.   This is the blue curve.   The peak is really close to zero

23  there.   We're getting really high -- I'm sorry -- really low

24  admit probabilities for the people who are actually rejected.

25  Q.   And when we look on the bottom of the scale there, just to

1  remember what we spoke about before, they're all very close to

2  zero?

3  A.   That's right.

4  Q.   Which means they have a predicted probability -- it's very,

5  very, very close to zero, and it turns out those people are --

6  A.   Are actually rejected.

7  Q.   Did you do a similar type of analysis regarding the

8  accuracy of your preferred model, Model 4, for out-of-state

9  applicants?

10 A.   I did.

11 Q.   And did you prepare a slide?

12 A.   I did.

13 Q.   What did the data on this slide show?

14 A.   This shows the accuracy of my preferred model for

15 out-of-state admissions, broken out separately for admits and

16 rejects and overall.

17 Q.   So if we look at the first row there, what does the data in

18 that row tell us?

19 A.   That shows my preferred model -- again, let's keep in mind

20 what we're doing here.  When we're calculating accuracy, we're

21 calculating your admissions index, which is basically taking

22 all those coefficients and matching them with your

23 characteristics and ranking you, then saying, "Based on those

24 observed variables alone, I'm going to predict your

25 admissions."  I'm going to take the highest ones until I fill

1  the class.  Okay.  I work my way down the list.

2      Then you see how well that matches with what UNC actually

3  did.  So what the preferred model shows here is that my

4  accuracy for admits, how well do I predict the admissions

5  decisions of admits, is a little over 75 percent.  The accuracy

6  for rejects is 96 percent, and then the overall accuracy is

7  93 percent.  And the reason it's so much closer to the accuracy

8  for rejects is because so many people are rejected, so we end

9  up weighting that part more.

10  Q.  This is because, as you pointed out earlier, the

11  out-of-state admission rate at UNC is about 13 1/2 percent?

12  A.  Yeah.  It's going to be 13.9 on the set that we're looking

13  at here.

14  Q.  So if we look down at that second row, this is what you're

15  alluding to, right?

16  A.  Exactly.

17  Q.  This is that model with no controls that you used as a

18  benchmark last time, right?

19  A.  That's right.

20  Q.  And what does that row tell us?

21  A.  So that row tells you, you know, how well would you do

22  without doing anything, you know, just filling the class, not

23  really taking characteristics, you know, into account.

24      And to me, the real big point here is you could look at

25  that number for the 96.1 and say, "Wow.  That's incredible."

1  That's not the impressive number to me.  It's the smaller

2  number that's actually the impressive one, which is the

3  75 percent.  It's easy to predict rejects because so many

4  people are rejected.  It's much harder to predict admits

5  because, you know, there's so few of them.  An analogy would be

6  it's a lot easier to predict who is not 7 feet tall than who is

7  7 feet tall.

8  Q.  Because there are so fewer number of people who are 7 feet

9  tall?

10 A.  Exactly.

11 Q.  Do you have any other ways of showing the predictive power

12 or accuracy of your out-of-state model?

13 A.  I do.

14 Q.  Did you do a similar analysis like you did for in state?

15 A.  I did.

16 Q.  And did you prepare a slide showing that?

17 A.  I did.

18 Q.  So what do these figures show in this slide?

19 A.  So this is going to show the distribution of predicted

20 admit probabilities conditional on being rejected or admitted

21 for out-of-state applicants.

22 Q.  So the idea, again, is for the applicants who your model

23 predicts a very high likelihood of admission, how do they

24 compare with the people that UNC actually admitted?

25 A.  That's right.  We calculate those predicted admissions

1  probabilities from the model.  They're probabilities precisely

2  because there are some things that are unobserved.  And I say,

3  well, how well does the model -- how high are those predicted

4  probabilities for people who are admitted versus people who are

5  rejected.

6  Q.  And what does the figure illustrate overall about the

7  predicted probabilities of those who are admitted?

8  A.  Well, what you see is, again, that sort of high spike --

9  the high predicted admissions probabilities, but it's not as

10  clean as what it was in state, and that's in part due to the

11  fact that it's much harder to predict those admits out of

12  state.  So you do see that there's, you know, definitely people

13  who are getting in who my model says had probabilities they

14  shouldn't, of .2 or .4 or something like that, and that's by

15  construction.  It's much harder to predict those admits.

16      So I find this incredibly impressive how well it does.  I

17  find what's going on with the red line more impressive than

18  what I find with the blue line.  The blue line shows it for

19  rejects.  In there, you know, we're showing that for the vast,

20  vast majority of rejects we're predicting fairly low admissions

21  probabilities.

22  Q.  What is your ultimate conclusion about the accuracy of your

23  models?

24  A.  That they're incredibly high, much higher than what I'm

25  used to seeing, and that it indicates that the process is

1  highly formulaic, especially in state.

2  Q.  And I think you mentioned this before, but just to be

3  clear, part of the reason why you're able to get models that

4  predict with such high accuracy is because of the quality of

5  the data?

6  A.  Because of the quality of the data, yes.  That is part of

7  it.  But as we'll see later on, even if you didn't use the

8  ratings, you get something that's pretty accurate.  UNC's

9  admissions decisions, it's -- for most of the applicants, it's

10  fairly easy to predict.

11  Q.  You mentioned previously that the output of your logit

12  model enables you to quantify the effect of particular

13  variables on admissions outcomes, correct?

14  A.  Correct.

15  Q.  Does that include quantifying the effect that race has on

16  admissions outcomes?

17  A.  It does.

18  Q.  Did you employ different methods of

19  quantifying (indiscernible) --

20      (Court reporter requests clarification.)

21      **MR. MCCARTHY:**  Sure.  I'm sorry I went too fast there.

22  Q.  (By Mr. McCarthy)  Did you employ different methods of

23  quantifying the effect of UNC's racial preferences on its

24  admissions decisions?

25  A.  I did.

1  Q.  Did you prepare a slide that shows those methods that you

2  used to quantify the effect of UNC's racial preferences on

3  admissions decisions?

4  A.  I did.

5  Q.  What is shown on this slide?

6  A.  So this slide shows the four ways that I'm going to talk

7  about measuring the effects of race on the admissions

8  decisions --

9  Q.  Can you talk a little -- I'm sorry.  Go ahead.

10  A.  -- today.

11  Q.  Can you provide a brief description of those four methods?

12  A.  Sure.  So the transformational analysis is going to say we

13  can take someone who has a particular probability of being

14  admitted, and I could do that for any probability you like, and

15  just with the coefficients that I've shown you, we could do

16  those calculations now for any probability that you like and

17  say -- suppose that probability was for a white male who was

18  not first-generation college, maybe they have a 10 percent

19  chance of getting in, I can say what their probability of being

20  admitted would be if they were instead treated as an African

21  American or treated as an Hispanic.

22  Q.  And your models allow you to isolate the effect of any one

23  variable in that manner, correct?

24  A.  Correct.

25  Q.  And so that's how -- that's -- you're describing there

1    your -- the one listed at the top, your transformational

2    analysis?

3    A.   That's right.

4    Q.   Can you describe for us how your analysis works involving

5    the average marginal effect?

6    A.   Yes.  So what the average marginal effect is going to do is

7    now we're going to be looking at the full set of minority

8    applicants.  We want to say, if they were instead treated as

9    white applicants, what would happen to their probabilities of

10   admission.

11       So what we're going to do there is take the model, get

12   their predicted admissions probabilities with and without the

13   bump you get for race.  Then when we look at the difference

14   there, that gives you the marginal effect for each

15   underrepresented minority applicant.  And we can average those,

16   and that gives you, you know, the average marginal effect.

17   Q.   So that's the average marginal effect analysis.

18       Now can you give us a description of the third method you

19   have on there, this -- what says "Admitted URMs Analysis"?

20   A.   That's right.  So here what we're doing is we say we know

21   that this set of underrepresented minorities was admitted to

22   UNC, and that tells you some information about those applicants

23   because they had to be good enough to get in, given how UNC

24   values particular characteristics.  So we know that they've

25   been admitted under a regime with racial preferences.

1    So now let's take those racial preferences away.  What's
2  the probability they would be admitted now.  These are the
3  people who would have actually benefited from racial
4  preferences.  I mean, if you were an African American reject,
5  you may have gotten a bump, but it wasn't enough to get you in.
6  This is the one where we're talking about people who were
7  actually admitted and saying, well, how would that change if
8  they were instead treated as whites.
9  Q.  Let's look at the fourth one there, capacity constraints
10  analysis.  Can you give us a basic description of what that
11  analysis involves?
12  A.  Yes.  So the fourth analysis is fundamentally different
13  from the first three in the following way:  With the first
14  three, you're talking about an effect for a particular
15  applicant.  You may be averaging it across all applicants, but
16  we're looking at it from the perspective of an individual
17  applicant.  If you actually got rid of racial preferences, now
18  some of those students that we said wouldn't get in, right, and
19  that means that some spots get opened up.  When we do capacity
20  constraints analysis, we're holding the number of admits in the
21  model fixed.  So we're going to admit the same number of
22  people, just remove racial preferences and then see how the
23  composition of the class changes.
24  Q.  So what you mean by that is you look at for a given year,
25  for example, however many students UNC actually admitted, and

 1  you're going to use the model in your analysis to figure out,

 2  okay, what would end up happening across that whole class if

 3  you took away racial preferences?

 4  A.  Exactly.

 5  Q.  Thank you for those descriptions.

 6      Let's -- having talked through at a high level what each

 7  one of those analyses involves, let's take a look at the

 8  results of your analysis.

 9      So starting with the first one, that transformational

10  analysis, did you prepare a slide discussing the methodology

11  you used?

12  A.  I did.  And this is a slide that you know that I prepared

13  the slide because there's a bunch of math on it here.  But what

14  we can do is we can consider someone who had a particular

15  chance of being admitted, and the way that works is there's

16  always going to be some set of observables that we can use that

17  would correspond to a particular probability of admission.

18      Now, the way this works is that logit analysis has a

19  particular expression, a mathematical expression for what that

20  probability of admission is, and that's this exp of A over 1

21  plus exp of A.  That gives you the probability of admission.

22  "A" is the admission index that we've been talking about.  This

23  is sort of how we're ranking all of those applicants based on

24  their observables.  So there's a particular value of A that

25  would give you a 25 percent chance of getting in.  It turns out

1  that that value of A, if you did the math here, would be a

2  little over a negative one.  So how do we get --

3  Q.  Can I stop you there for a minute?

4  A.  Yeah.

5  Q.  So is this working sort of in the opposite direction that

6  the model normally goes?  Normally you have that index and it

7  produces a probability of admission.

8  A.  Yes.

9  Q.  And now you're saying, "Okay, I can go the other way.  The

10  math allows me to go the opposite direction."  Just like

11  addition and subtraction are opposites and they undo each

12  other, here you're saying, "I've got a percentage.  I can work

13  back to find the index."

14  A.  That's right.  And I can do this for any percentage just

15  with the coefficients I've already shown you.  So, you know, if

16  you wanted to do it for somebody who had a 1 percent chance of

17  getting in, with the coefficients I've shown you, you could

18  back it out and calculate that formula.

19  Q.  So please continue with your explanation of the

20  methodology.

21  A.  So what A here represents is the admissions index

22  associated with a 25 percent chance of being admitted.  Now,

23  what we can do is then give you the racial preference and see

24  how your admissions probability would change.

25       So, for example, if we considered an in-state white male

1  who is not first-generation college, we can just add to the

2  admissions index the coefficients on African American from my

3  preferred in-state model.  I'm sure you all remember this, but

4  that number was 3.542.  Okay.  We can add that to the A and

5  recalculate what their probability of admission would be.  So

6  if you plug it into that formula, you'll get .92.  And so that

7  tells you that if you took that white male, not

8  first-generation college applicant with a 25 percent chance of

9  getting in and flipped on the racial preference for being

10  African American, your new probability of admission would be

11  92 percent.

12  Q.  Thank you for the explanation.

13     Did you prepare a slide that shows how this analysis worked

14  out?

15  A.  I did.

16  Q.  So let's take a look here.  At a high level, what is --

17  what do the data in this slide show us?

18  A.  So we're going to be looking at particular applicants of

19  particular probabilities of admission and saying what -- if we

20  changed their race, how would that affect their probability of

21  admission.

22  Q.  So if we start with -- let's say we start with the second

23  row, actually.  So if we look at "Original Admit Probability"

24  where it says 25 percent, if we just look at that 25 percent,

25  is that the one you were just talking about when you walked

1  through your methodology?

2  A.  It is.

3  Q.  And you explained how you used the formula to figure out

4  the index, figure out the new probability of admission, and you

5  said it was 92.  And that's shown in the second column right

6  there?

7  A.  That's correct.

8  Q.  Okay.  And that's if you changed -- that hypothetical

9  applicant you started with who was a white male, not

10 first-generation college, whose chance of admission was

11 25 percent, and if you changed just race to African American,

12 held all the other factors the same, then the probability of

13 admission is 92 percent?

14 A.  That's correct.

15 Q.  What would happen with that same applicant if you switched

16 his race to Hispanic?

17 A.  Then it would be almost 71 percent.

18 Q.  Let's go up a row then, and there -- what's the applicant

19 you're starting with?

20 A.  Now we're starting with someone who has a 10 percent chance

21 of admission.  And here we can see that if we gave this

22 applicant the bump associated with being African American, it

23 would go up to 79 percent; and if we did it for Hispanic, it

24 would go up to almost 45 percent.

25 Q.  And now, you carried out this analysis with different

1  factors, different characteristics of the original applicant,

2  right?

3  A.   That's right.

4  Q.   Because, as we've seen, you showed various coefficients

5  before that show that there are differences between

6  first-generation college and not first-generation college, for

7  example, differences between male and female, correct?

8  A.   Correct.

9  Q.   Okay.  So let's go down to where it says white, female, not

10 first-generation college.  Can you tell us what the data in

11 your table show there?

12 A.   Yes.  So this is for white, female, not first-generation

13 college who has a 10 percent chance of admission --

14 characteristics that would give them a 10 percent chance of

15 admission based on their observables and says that they would

16 have a 70.6 percent chance of admission if they were instead

17 treated as African American.

18       Now, that 70.6 percent chance is less than the 79.3 in the

19 first row, and that's reflected in what I was saying when I was

20 describing the coefficients, that African American females get

21 less of a bump than African American males in state.

22 Q.   And then what do we see when we go over one more column?

23 A.   Well, then the bump is 40.86 percent.

24 Q.   And that's --

25 A.   The bump -- I want to clarify that.  It's not the bump.

1 That's their admissions probability if they were treated as
2 Hispanic.  The bump would be the gap between the two, which
3 would be 30 percent.
4 Q.  Thank you.
5    Let's continue on down another row.  So now we have a
6 white, female, not first-generation college applicant with a
7 25 percent chance of admission.  What happens to her admission
8 probability if she's then treated -- or her race is changed to
9 African American?
10 A.  So it goes up to 87.8 percent; and if we change it to
11 Hispanic, it would go up to 67 -- basically 67 1/2 percent.
12 And, again, the numbers are slightly lower for the reasons we
13 already discussed.
14 Q.  Thank you.
15    Let's move down once more:  White, male, first-generation
16 college.  So this is like the first row, except instead of not
17 first-generation college, it's a first-generation college
18 applicant --
19 A.  That's right.
20 Q.  -- their chance of admission.  What happens if that
21 applicant changes race to African American but holds everything
22 else the same?
23 A.  So if we start off with 10 percent, it goes up to
24 57.9 percent.  That's a substantial increase when we're talking
25 about over 47 percentage points.  But it's also significantly

1  smaller than for not first-generation college, and that

2  reflects the peculiar way that racial preferences operate, not

3  just at UNC but at other places as well, of getting bigger

4  bumps for those who are -- bigger racial bumps for those who

5  are not disadvantaged.

6  Q.  And if we look all the way to the column on the right, the

7  third cell there, if that white, male, first-generation college

8  applicant with a 10 percent chance of admission was then race

9  switched to Hispanic, everything else is kept the same, the

10 probability of admission then is what?

11 A.  Over 35 percent.

12 Q.  Let's go down one more.  Can you tell us about this row?

13 A.  So now our base is 25 percent.  For changing to African

14 American, it would be over 80 percent.  Treating it as

15 Hispanic, it would be over 62 percent.

16 Q.  Let's look at the last set.  This is for white, female,

17 first-generation college applicant with a 10 percent chance of

18 admission.  What happens if her race is changed?

19 A.  So now we're moving from 10 to 46, and that's in contrast

20 because, again, African American women don't get as big of a

21 bump as African American men.  African American

22 first-generation college students don't get as big a racial

23 bump as non-first-generation college.  So that's why for all

24 the 10 percent numbers, for African American that number is

25 going to be the smallest at 46 percent, which is still a

1  36-percentage-point increase.  And then for -- if we treated it

2  as Hispanic, it's 31.8 percent.

3  Q.  And then let's look at the last row.  Starting from a

4  white, female, first-generation college applicant with a

5  25 percent chance of admission, what happens if everything else

6  is kept constant but her race is changed?

7  A.  It increases to 72 percent if she's treated as an African

8  American and 58 percent if treated as an Hispanic.

9  Q.  Did you do a similar transformational analysis for

10  out-of-state applicants?

11  A.  I did.

12  Q.  And did you prepare a slide showing the results of your

13  analysis there?

14  A.  I did.

15  Q.  So let's look -- since we started the last time with a

16  white, male applicant who is not first-generation college at a

17  25 percent probability of admission, let's start there again,

18  that second row.  Can you -- can you tell us what happens there

19  if his race is changed to African American or Hispanic?

20  A.  Well, now it's going up to above 99 percent.  So virtual

21  certain admit if they're African American.  And then for

22  Hispanic, it's 87 percent.

23  Q.  And if we look above the first row, if we start from a

24  white, male, not first-generation college applicant whose

25  admission probability is 10 percent, what happens to his

1  chances of admission if his race is changed and everything else
2  remains constant?
3  A.  Well, it's not much lower than it was at 25 percent because
4  you're already now in the tails of the distribution, right.  So
5  it's still -- at 10 percent, that's the base, it would go up to
6  98 percent out of state.  The out-of-state preferences are
7  simply enormous.
8  Q.  And what is the result if that applicant has his race
9  changed to Hispanic?
10  A.  It goes up to 69 percent.
11  Q.  Let's look down further, and we'll see if we see the same
12  type of patterns.  If you start from a white, male, not
13  first-generation college applicant -- I'm sorry -- white,
14  female, not first-generation college applicant with 10 percent
15  chance of admission, what happens to her chances of admission
16  if her race is changed and everything else is kept constant?
17  A.  Here you don't see much difference because we don't see a
18  differential treatment for black females out of state.  So the
19  number is pretty much identical to what it was for males at
20  98 percent; and for Hispanics, it's 76 percent.
21  Q.  If we go down to white, female, not first-generation
22  college with a 25 percent chance of admission, what happens
23  there?
24  A.  It goes up by just a little bit because there's not that
25  much room for it to increase to over 99.4 percent; and then for

1  Hispanic, it's above 90 percent.

2  Q.  Keep going down:  White, male, FGC, so first-generation

3  college applicant, with a 10 percent chance of admission.

4  These are a little bit lower, right?

5  A.  That's right.  This is, again, because you're not -- black

6  applicants are not getting the full first-generation college

7  bump.  So now that 10 percent initial admit probability goes up

8  to 93 percent, still a dramatic swing of, you know, 83

9  percentage points; and for Hispanics, it goes up to 45 percent.

10  The fact that the Hispanic numbers -- I haven't been

11  highlighting that, but Hispanics don't get as big of a

12  first-generation college bump either, particularly out of

13  state, though it's not as stark as it is for African Americans.

14  Q.  Let's go down to the 25 percent row, and we see, I think, a

15  similar pattern to what you just mentioned in the row above

16  that?

17  A.  Yes.

18  Q.  A little bit lower than they are up top?

19  A.  That's right.  So there's so much compression at the top

20  there that you're not going to see big differences there once

21  you get above 96 percent or something like that.  So it's a

22  97.6 percent chance of admission if they were treated as

23  African American and 71 percent if treated as Hispanic.

24  Q.  Going down a little further, white, female applicant is

25  not -- I'm sorry.  White, female applicant who is

1  first-generation college and 10 percent chance of admission,

2  everything else is held the same and her race is changed, what

3  happens to her admissions probabilities?

4  A.  Again, gender doesn't matter for this one for African

5  Americans.  It's 93.7.  That's a lot different than it was for

6  whites.  For Hispanics, it's slightly different at 54 --

7  54 percent.

8  Q.  Down one more:  White, female, first-generation college

9  applicant with a 25 percent chance of admission, what happens

10  to her if her race is changed?

11  A.  Almost 98 percent, 97.8 percent; and then for Hispanic,

12  it's 78 percent.

13  Q.  Looking back on that analysis overall, what's the upshot

14  there?  What's the takeaway?

15  A.  Well, the upshot is that, you know, these are very large

16  preferences.  So, you know, if you're somebody who, you know,

17  had some particular chance of admission, you know, like

18  10 percent, you're going to see those go up quite a bit.

19      Now, there are caveats to that, the caveats being, you

20  know, the model predicts really well, and so what that means is

21  we might not have a ton of people at those particular points,

22  and that's really what motivates the next analysis.

23  Q.  So having completed your discussion of your

24  transformational analysis, we'll go on next to your average

25  marginal effect analysis.

1  A.  Would it be all right if I took a bathroom break?

2          **MR. MCCARTHY:**  Is that okay, Your Honor?

3          **THE COURT:**  Well, we are scheduled to end here at

4  5:00.

5          **MR. MCCARTHY:**  Scheduled to end when?

6          **THE COURT:**  The trial protocol says 5:00.

7          **MR. MCCARTHY:**  Okay.

8          **THE COURT:**  It is ten till 5:00.  If he needs to take

9  a break, we may want to --

10         **THE WITNESS:**  I'm sorry.  I didn't know what time it

11 was.  I can make 10 minutes.

12         **MR. MCCARTHY:**  On the other hand, we just completed

13 that section.  I'm at a natural stopping point.

14         **THE COURT:**  You're at a natural stopping point now?

15 Is that what you're saying?  What are you saying?

16         **MR. MCCARTHY:**  Yes.  Because we just finished one of

17 these four things, I'm sort of at a natural stopping point.  If

18 you were planning on stopping in 10 minutes anyway, we're

19 probably better off calling it a day here.

20         **THE COURT:**  That's what I think.

21         **MR. MCCARTHY:**  Okay.  Thank you, Your Honor.

22         **THE COURT:**  All right.  Thank you so much.  We'll see

23 you tomorrow.

24         **THE WITNESS:**  Great.  Thank you.

25         **THE COURT:**  Yes.

1    Is there anything else that we need to address this

2 afternoon?

3          **MR. FITZGERALD:**  Not from the Defendant UNC, Your

4 Honor.

5          **THE COURT:**  All right.  Then let us adjourn court, and

6 we will resume in the morning at 9:30 a.m.

7          **MR. MCCARTHY:**  Thank you.

8          **THE COURT:**  All right.  Thank you.

9     (Proceedings recessed at 4:50 p.m.)

10

11

12                    **C E R T I F I C A T E**

13    I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
14 CERTIFY:

15    That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported
16 the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided
17 Transcription.

18

19 *Lori Russell*

20 Lori Russell, RMR, CRR          Date:  12/11/2020
Official Court Reporter

21

22

23

24

25