IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS,  *
INC.,                          *
                               *
            Plaintiff,         *  Case No. 1:14CV954
                               *
vs.                            *
                               *  November 13, 2020
UNIVERSITY OF NORTH CAROLINA,  *
et al.,                        *  **Volume 4**
                               *  **Pages 604-758**
            Defendants.        *
*******************************

**EXPEDITED TRANSCRIPT OF TRIAL**
BEFORE THE HONORABLE LORETTA C. BIGGS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:          CONSOVOY MCCARTHY, PLLC
                        Thomas R. McCarthy, Esquire
                        Patrick Strawbridge, Esquire
                        James F. Hasson, Esquire
                        Bryan K. Weir, Esquire

                        BELL DAVIS & PITT, P.A.
                        Daniel Alan M. Ruley, Esquire

For UNC Defendants:     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                        Patrick J. Fitzgerald, Esquire
                        Lara A. Flath, Esquire
                        Amy L. Van Gelder, Esquire
                        Marianne H. Combs, Esquire

                        NORTH CAROLINA DEPARTMENT OF JUSTICE
                        Stephanie A. Brennan, Esquire
                        Tamika Henderson, Esquire

For Intervenors:        LAWYERS' COMMITTEE CIVIL RIGHTS UNDER LAW
                        David G. Hinojosa, Esquire
                        Genevieve Bonadies Torres, Esquire

                        NORTH CAROLINA JUSTICE CENTER
                        Jack Holtzman, Esquire
                        Emily P. Turner, Esquire

```
 1                         I N D E X

 2   DEFENDANT UNC WITNESSES:                        PAGE

 3     STEPHEN FARMER (Continued)
           Direct Examination by Ms. Brennan         606
 4         Cross-Examination by Mr. Strawbridge      639

 5     JARED ROSENBERG
           Direct Examination by Ms. Van Gelder      675
 6         Cross-Examination by Mr. Weir             704

 7     MICHAEL DAVIS
           Direct Examination by Ms. Combs           723
 8         Cross-Examination by Mr. Ruley            745

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         THE COURT:  All right.  You can call your witness back
 3   to the stand, please.
 4         MS. BRENNAN:  Thank you, Your Honor.
 5      Mr. Farmer.
 6         THE CLERK:  Do you want him resworn?
 7         THE COURT:  Yes.
 8      Sir, we will swear you once again, please.
 9         STEPHEN FARMER, DEFENDANT UNC WITNESS, SWORN
10                  CONTINUED DIRECT EXAMINATION
11   BY MS. BRENNAN:
12   Q.  Good morning, Mr. Farmer.
13   A.  Good morning.
14   Q.  When we broke yesterday, we were talking about the
15   university's consideration of race-neutral alternatives.  Do
16   you recall that?
17   A.  I do.
18   Q.  I now want to show you an exhibit, DX39, and ask if you
19   recognize this?
20   A.  I do.
21   Q.  What is the date at the top of the letter?
22   A.  November 27th, 2012.
23   Q.  And who is the letter directed to?
24   A.  It's to Holden Thorp, who was the chancellor of the
25   university at the time.
```

1  Q.  And what is the letter concerning?

2  A.  The letter concerns the resolution of a complaint that the

3  Office of Civil Rights had received.

4  Q.  And the letter is from the Office of Civil Rights?

5  A.  It is from the Office of Civil Rights.

6  Q.  Okay.  I want to direct your attention to that first

7  paragraph and ask you to read it into the record.

8  A.  "The complaint alleged that the University's consideration

9  of race and national origin as factors to achieve diversity in

10  its undergraduate classes violates Title VI."

11  Q.  And this is a complaint that's referenced in that first

12  sentence that was filed with OCR?

13  A.  That's correct.

14  Q.  Do you recall when that complaint was filed?

15  A.  It was in December 2006.

16  Q.  Did the OCR conduct an investigation?

17  A.  It did.

18  Q.  I'd like to direct your attention to the bottom of the

19  first page and ask you to read that final paragraph on the

20  first page into the record.

21  A.  "OCR's investigation included extensive interviews of

22  University administrators and faculty, as well as a review of

23  relevant University policies, records, and applicant files.  As

24  discussed more fully below, the information gathered in the

25  investigation demonstrated the University's compliance with

1  Title VI, thus OCR is closing this complaint as of the date of

2  this letter."

3  Q.  And do you recall that that was the result of the

4  investigation?

5  A.  I do.

6  Q.  I'd like to ask also if OCR made any conclusions with

7  respect to the consideration of race-neutral alternatives

8  specifically?

9  A.  Yes, it did.

10  Q.  And let's look at page 5 of the letter, and there's a

11  section in the letter that's entitled "Narrow Tailoring:

12  Consideration of Race-Neutral Alternatives."

13          **MS BRENNAN:**  And then if you can pull up, on page 6,

14  the first paragraph which states the conclusion of that

15  section.

16  Q.  (By Ms. Brennan)  Could you, please, read this into the

17  record?

18  A.  "OCR concludes that the University has seriously and in

19  good faith considered race-neutral alternatives and notes that

20  the University is currently using some race-neutral diversity

21  factors, including socioeconomic status and first-generation

22  college status."

23  Q.  And is that consistent with what your understanding was at

24  the time of what OCR concluded?

25  A.  Yes, it is.

1  Q.  And I'd like to now look at the final page, I think, of the

2  letter, page 9, and look at the second paragraph of that where

3  it states "As explained above...."

4      Can you please read this into the record?

5  A.  "As explained above, the University has considered

6  race-neutral alternatives and determined that race-neutral

7  processes would not achieve sufficient levels of diversity

8  while maintaining the desired levels of academic achievement.

9  The University has committed to conduct a review of its use of

10  race and national origin in admissions by September 30th, 2013.

11  The review will comply with the strict scrutiny requirements

12  established by the Supreme Court, including consideration of

13  the continued necessity of the use of race and national origin

14  in admissions in order to achieve the University's compelling

15  interest in the educational benefits of diversity.  The

16  University has further committed to end or reduce the

17  consideration of race or national origin if the review shows

18  that the University can achieve diversity to a sufficient

19  degree without, or with a lesser reliance on, race or national

20  origin as among the factors used holistically in admissions."

21  Q.  Did you have an understanding at the time of this closure

22  letter that the university had committed to do additional work?

23  A.  Yes.

24  Q.  Okay.  And I want to look now at D -- I'm sorry -- PX6.

25  This is an e-mail chain with an attachment, I believe.

1    If we can start at the bottom of the e-mail chain, which is
2  on the second page, and blow that up a little bit.
3    So this appears to be an e-mail to the undergraduate
4  advisory committee sent from Bobbi Owen.
5    Who is Bobbi Owen?
6  A.  Bobbi Owen at the time was senior associate dean for
7  undergraduate education in the College of Arts and Sciences,
8  and she was the chair of the Advisory Committee on
9  Undergraduate Admissions.
10 Q.  And the subject of this is "Special Advisory Committee
11 Meeting Friday, September 6th, 1 to 2:30 p.m., Steele 3020."
12   Do you recall what year this was?
13   I can probably look.
14 A.  This was in 2013.
15 Q.  Okay.  And if you look at -- back at the content of what
16 she said, is she inviting the advisory committee to a meeting?
17 A.  She is.
18 Q.  Okay.  And if you could read what this invitation states
19 into the record.
20 A.  "As you may know, the U.S. Supreme Court recently
21 considered *Fisher v. University of Texas at Austin*.  One of the
22 results is that the Undergraduate Admissions Advisory Committee
23 must meet within 90 days of the June 24, 2013, ruling to
24 discuss the *Fisher* case and its potential impact on our campus.
25 In accordance with these requirements, Steve Farmer and I are

1  calling a special Committee meeting for Friday, September 6th,

2  from 1 to 2:30 p.m. in Steele 3020.  We will devote the entire

3  meeting to considering whether 'the University's race-conscious

4  admissions practices are achieving the goal of diversity so as

5  to facilitate an enhanced education experience for individual

6  students.'  We have also invited Kara Simmons and Neera Skurky

7  from the Office of University Counsel, as well as Dean Jack

8  Boger, Dean of the UNC-Chapel Hill School of Law to attend.

9  Please mark this on your calendars and plan to come, if at all

10  possible.  The other meetings will continue as originally

11  scheduled."

12  Q.  Were you part of the planning process for this meeting?

13  A.  I was.

14         **MS BRENNAN:**  Can we scroll up to the e-mails that are

15  further up?  Yeah, at the top of the page.  That's great.

16  Q.  (By Ms. Brennan)  And the e-mail chain continues on to

17  include some additional discussion.  And we see here an e-mail

18  from Barbara Polk.  Who is Barbara Polk again?

19  A.  Barbara Polk at the time was the senior associate director

20  of Undergraduate Admissions.

21  Q.  And she has a list there of some specific questions we need

22  to address.  Do you see that?

23  A.  I do.

24  Q.  Can you read those?

25  A.  "How do we define critical mass?  Are we attempting to

 1  achieve critical mass on the University-wide level, in the

 2  residence halls, in individual classrooms and labs, or all of

 3  the above?

 4      "How do we/will we know that critical mass has been

 5  achieved?

 6      "Can we terminate race-conscious admission practices?  If

 7  not now, when?"

 8  Q.  What was your response to her?

 9  A.  I wrote back to her:  "Great questions.  Thanks for asking

10  them and for getting us together."

11  Q.  You can set that document aside.

12      And now I want to look at PX8.  And this also has some

13  e-mails at the top.

14          **MS BRENNAN:**  If you can just scroll down to show us

15  the document.

16  Q.  (By Ms. Brennan)  Here -- is this also related to that

17  meeting --

18  A.  Yes.

19  Q.  -- those e-mails?

20      And Barbara's e-mail is to Bobbi Owen, who scheduled the

21  meeting and then some others, and you're copied on this.  Do

22  you recall that?

23  A.  I don't know that I recall this specific e-mail at the

24  moment, but I see it here.

25  Q.  Okay.  And could you read what this e-mail states?

1    A.   This is from Barbara Polk to Bobbi Owen:  "I anticipate

2    that we will have reading material for meeting attendees to

3    review before Friday's meeting.  I've just returned from an

4    extended period away from the office but anticipate sending

5    those materials to you and Ben by the end of the day tomorrow.

6         "The 90-day time limit was included in our response to an

7    OCR review that occurred during this past academic year.

8    Although that review had a very positive result, we did agree

9    to revisit the consideration of race in admissions within 90

10   days of the *Fisher* announcement."

11        And then to Kara Simmons: "Please feel free to weigh in."

12   Q.   And then if we can go up to the top with the response from

13   Kara Simmons in the Office of University Counsel, what does she

14   say?

15   A.   She says: "Yes, Barbara's exactly right.  We committed to

16   OCR at the conclusion of the investigation last year that we

17   would undertake a review of our admissions practices as they

18   relate to diversity within 90 days of the *Fisher* decision.

19   Attached is a letter that we provided to OCR, at OCR's request,

20   memorializing and describing this commitment."

21   Q.   And if you can scroll down to the bottom of this exhibit

22   where there's a letter attached, is this the letter that was

23   attached?

24   A.   It is.

25   Q.   Okay.  And this appears to be a letter to OCR from the

1  university?

2  A.   Yes.

3  Q.   What is the date on this letter?

4  A.   November 21st, 2012.

5  Q.   Okay.  And what -- what does it say in the first paragraph?

6  A.   "I am writing to advise you of The University of North

7  Carolina at Chapel Hill's commitment to conduct ongoing

8  periodic reviews of its consideration of the race of

9  undergraduate applicants as part of its 'highly individualized,

10  holistic review of each applicant's file' in order to achieve a

11  critical mass of students from diverse backgrounds."

12  Q.   And then there's a citation there you don't need to read.

13       Let's scroll down to the next paragraph.

14       What does it say there?

15  A.   "The University plans to conduct its next periodic review

16  regarding this use of race in its undergraduate admissions

17  process within 90 days following the date on which the United

18  States Supreme Court issues its decision in *Fisher v.*

19  *University of Texas at Austin* so that the University may

20  benefit from the latest judicial pronouncement regarding the

21  use of race in college admissions.  As part of this periodic

22  review, the Office of Undergraduate Admissions will engage the

23  Faculty Advisory Committee on Undergraduate Admissions in a

24  discussion regarding whether the University's race-conscious

25  admissions practices are achieving the goal of diversity so as

1   to facilitate 'an enhanced educational experience for

2   individual students.'  Additionally, this discussion will

3   address the concept of critical mass and whether critical mass

4   has been attained or whether members of the committee believe

5   that the University has yet to meet its diversity goals."

6   Q.  And then if you could, please continue by reading the next

7   paragraph.

8   A.  "As part of this periodic review, the Office of

9   Undergraduate Admissions will also revisit the use of

10  race-neutral alternatives to achieve diversity.  In the past,

11  the Office of Undergraduate Admissions has conducted some

12  statistical modeling to determine whether consideration of

13  socioeconomic status or first-generation collegiate status as a

14  substitute for race would achieve the University's diversity

15  aims.  The University concluded as part of its most recent

16  projection using these factors that the academic selectivity of

17  its entering class would decline.  Nevertheless, the University

18  commits to periodic 'serious and good-faith reviews of workable

19  race-neutral alternatives to achieve the diversity that it

20  seeks."

21  Q.  And let's continue on with the next paragraph, please.

22  A.  "At the conclusion of each periodic review, the Office of

23  Undergraduate Admissions, in consultation with the Office of

24  University Counsel, will determine:  (a) whether it remains

25  necessary for the University to continue its consideration of

1   the race of applicants as part of its highly individualized,

2   holistic review of each applicant's file in furtherance of its

3   goal of achieving diversity in undergraduate admissions, or (b)

4   whether the University has accomplished its ultimate objective:

5   To 'terminate its race-conscious admissions program as soon as

6   practicable.'"

7   Q.  And was it your understanding that the university would

8   continue to do reviews of its practices and race-neutral

9   alternatives?

10  A.  Yes.

11  Q.  Was this letter sent before or after the OCR letter?

12  A.  I believe this letter was sent after the OCR letter.

13  Q.  Let's look at the date.  So this one was sent on

14  November 21st, 2012, and I believe this was about a week before

15  that other OCR letter.

16      Do you recall the specific timing?

17  A.  I'm sorry.  I don't.

18  Q.  That's fine.

19  A.  I'm willing to have my memory refreshed.

20  Q.  Okay.  Let's look at one more exhibit, PX9.

21      **MS BRENNAN:**  If you can just blow that up a little

22  bit.

23  Q.  (By Ms. Brennan)  So this is also another e-mail related to

24  this.  Could you let us know what this states?

25  A.  This is from Bobbi Owens, Assistant to the Undergraduate

1  Admissions Advisory Committee.

2      "Dear Undergraduate Admissions Committee:  I apologize if

3  this message is received more than once; the UNC listserv

4  program was not working earlier.

5      "A special meeting of the Committee to discuss the *Fisher*

6  *v. University of Texas* at Austin Supreme Court case will be

7  held this Friday, September 6th, 2013, from 1 to 2:30 p.m. in

8  Steele 3020.  I have attached the agenda, the Opinion of the

9  Supreme Court, and the Office of Undergraduate Admissions

10  reading document for you to peruse before the meeting.  We look

11  forward to seeing you then."

12  Q.  If you could look at the second page of that document.  It

13  looks like this is the agenda; is that right?

14  A.  That's right.

15  Q.  Okay.  And could you walk through what was on the agenda

16  for that meeting?

17  A.  After introductions, the next item is a discussion of the

18  *Fisher v. University of Texas at Austin* ruling, led by Jack

19  Boger, the dean of the law school at UNC.

20      The next item on the agenda was a review of current

21  admissions policy led by me and by Barbara Polk.  We reviewed

22  the current policy at UNC-Chapel Hill, and then after that,

23  Bobbi Owen and I led a discussion of the committee members

24  about three questions.

25      And the first was:  "Does the University's current

1  admissions practice result in the needed diversity to enhance

2  the student experience?"

3      The second is:  "What is critical mass and has the

4  University attained it?"

5      And the third is:  "Are there race-neutral alternatives

6  that could potentially provide similar results to the current

7  policy?  If so, what are those alternatives?"

8      And then, finally, there were recommendations and next

9  steps led by Bobbi Owen and Kara Simmons.

10 Q.  Did this meeting occur?

11 A.  It did.

12 Q.  And was this the agenda that was followed at the meeting?

13 A.  This was the agenda.

14 Q.  What was the next step -- you can put that exhibit aside --

15 for the university with respect to the consideration of

16 race-neutral alternatives?

17 A.  I asked Barbara Polk to convene a working group to explore

18 race-neutral alternatives to our current practices.

19 Q.  And I want to look at PX10.

20      And if you can blow up the bottom e-mail first.

21      We'll start at the bottom which is an e-mail from Barbara

22 to you dated September 17th, 2013.

23      Do you recall this e-mail?

24 A.  I do.

25 Q.  What was this in reference to?

 1  A.  Ms. Polk was trying to form the committee and was thinking
 2  of potential members and was asking for advice.
 3  Q.  Okay.  And at the top e-mail, is this your response?
 4  A.  It is.
 5  Q.  And you gave her some advice, essentially?
 6  A.  I did.
 7  Q.  What was the context of this?
 8  A.  Well, again, Ms. Polk was asking for specific people, and I
 9  was encouraging her to think about what she wanted the group to
10  do, what the purpose of the group would be, what the goals for
11  the group would be, and then based on all of those
12  considerations, what skills and perspectives and what level of
13  expertise and commitment the group would need in order for her
14  to achieve the purpose of the group.
15  Q.  And it looks like this e-mail was sent September 19th,
16  2013?
17  A.  That's right.
18  Q.  Were invitations ultimately sent out for members to join
19  the group?
20  A.  There were.
21  Q.  And if we could look at PX14.  This is an e-mail that's
22  from Ashley Arthur, and it says it's sent on behalf of Steve
23  Farmer.
24      Who is Ashley Arthur?
25  A.  Ashley Arthur is my wonderful assistant.

1  Q.  And could you read the subject of the e-mail?

2  A.  "Invitation to join a work group on race-neutral

3  alternatives in admissions."

4  Q.  Okay.  And if we could look at the second paragraph of the

5  e-mail where it says "Towards this end...," could you read

6  that?

7  A.  "Towards this end, I am writing to ask you to participate

8  in a working group that will consider a range of alternatives

9  to our current practices.  This group will be led by Barbara

10  Polk, Deputy Director of Undergraduate Admissions, and will

11  include members of our faculty and staff.  The group will be

12  small in number but will enjoy strong support from the Office

13  of University Counsel, from the Office of Undergraduate

14  Admissions, and from other University administrators."

15  Q.  I want to stop you there and ask you a little bit about the

16  composition of the group.

17     Why did you choose Barbara Polk to lead the group?

18  A.  Barbara -- excuse me -- Ms. Polk was a very experienced

19  member of our team.  She had been responsible for leading the

20  evaluation of candidates previously.  She knew many people

21  around the university, and I thought she would do a great job

22  with the project.

23  Q.  Why did you invite members of faculty and staff to join the

24  group?

25  A.  I thought it was important that we broaden participation in

1  our efforts to consider race-neutral alternatives beyond the
2  staff in the admissions office.
3      The first modeling in 2007 I did my myself.  Then
4  Dr. Kretchmar completed the literature review in 2009.  Then
5  Dr. Kretchmar and I worked together on the top 10 percent
6  simulation.  And all of this work so far had been carried out
7  by people within the admissions office, and I thought it was
8  important, because this was a university issue and because we
9  would benefit from the expertise of other people with different
10 perspectives, that we bring faculty and staff beyond the
11 admissions office into this work.
12 Q.  Were you a member of the group?
13 A.  I was not.
14 Q.  Why not?
15 A.  I thought it was important that I not be involved because I
16 wanted other people's perspectives.  I had been involved
17 previously in the simulations, and I thought it was important
18 for others, and not me, to be involved this time.
19 Q.  Did you follow the efforts of the group?
20 A.  I did.
21 Q.  How closely did you pay attention to what they were doing?
22 A.  Very closely.  At the time, I was meeting with Ms. Polk
23 every week or every other week.  She kept me informed about the
24 progress of the group.  I tried not to intervene and at the
25 same time I was interested, and I offered thoughts when she

1    asked for them or when I thought they would be helpful to her.

2    Q.  I want to direct your attention to the next paragraph in

3    the e-mail which starts with "The group will be charged with

4    the following specific tasks."  Could you read the tasks for

5    the group?

6    A.  Task 1:  "Identifying reasonable alternatives to

7    race-conscious practices in admissions."

8        Task 2:  "Evaluating each alternative to determine whether

9    it will yield an entering class with equal or greater

10   diversity, academic quality, and extracurricular achievement

11   and potential."

12       Task 3:  "Presenting its findings to the Advisory Committee

13   on Undergraduate Admissions."

14   Q.  You can set that aside.

15       What approach did the group take to its work?

16   A.  My understanding is that the group began, again, by

17   reconsidering the literature.  Dr. Kretchmar completed her

18   literature review in 2009, but the group began by thinking

19   about what others had tried to do.  And then the group

20   identified a broad range of alternatives before narrowing in on

21   the ones that it felt to be most workable.

22   Q.  Did they -- what did they do in terms of data?

23   A.  That was complicated.  The previous work that we had done

24   had focused on applicant data only; in other words, the records

25   of people who had actually applied for admission to the

1   university.  And after reading the literature, I think the
2   group had some concerns that limiting decisions only to the
3   candidates who had applied to UNC might produce incomplete
4   results.  They wanted to understand as many students as they
5   could who might apply, not just the students who did, and so
6   they sought data -- high school data for students who were
7   attending public high schools in North Carolina.
8   Q.  Where did they obtain that data, if you know?
9   A.  In effect, they obtained the data from the Department of
10  Public Instruction through an intermediary that's been referred
11  to a couple of times so far this week.
12  Q.  Did the group, after doing its review, produce any written
13  work product?
14  A.  It did.
15  Q.  Did you receive a draft of that?
16  A.  I did.
17  Q.  When did you receive a draft?
18  A.  I believe it was in early October of 2014.
19  Q.  Did you review that draft?
20  A.  I did.
21  Q.  And did you talk with anyone about it?
22  A.  I did.  Ms. Polk and Dr. Kretchmar and I met together and
23  talked about it.
24  Q.  Did you later receive a more final draft?
25  A.  I did.

1  Q.  And did you review that as well?

2  A.  I did.

3  Q.  What was your reaction to the work?

4  A.  Well, I thought it was a terrific report.  I thought it was

5  far-ranging, careful, well done, and I thought it was better

6  than the work that we had done previously, and that really

7  pleased me.

8  Q.  I want to show you another exhibit.  This one is PX30.

9  This is an e-mail from Howie Kallem to Barbara Polk with a copy

10  to Kara Simmons.

11      Did you see this at the time?  Was it shared with you?

12  A.  I saw it eventually.  I wasn't included on this chain, but

13  I did receive a subsequent version of it.

14  Q.  Okay.  And this provides some feedback on the work of the

15  working group; is that right?

16  A.  It does.

17  Q.  And if we look at that first paragraph --

18          **MS BRENNAN:**  If you can zoom in on that.

19  Q.  (By Ms. Brennan)  -- the first part of it talks about an

20  article that Mr. Kallem suggests should be considered -- do you

21  see that -- from The Century Foundation?

22  A.  I do.

23  Q.  What do you recall about that?

24  A.  Well, I recall reading the article --

25          **MR. STRAWBRIDGE:**  Objection to foundation.

1    **MS. BRENNAN:**  My question is asking him what he

2  recalls about getting this feedback, so he has a foundation to

3  answer it.

4    **MR. STRAWBRIDGE:**  I didn't know there was any evidence

5  he received this e-mail.

6    **THE COURT:**  Overruled.

7    Proceed.  Ask your question again.

8  Q.  (By Ms. Brennan)  Okay.  The question was:  What do you

9  recall about this feedback in terms of the article that he

10  references?

11  A.  I recall reading the article and eventually reading the

12  book that the article was published in.

13  Q.  And when you saw this e-mail, were you familiar with that

14  article?

15  A.  I either was familiar with it already, or I was familiar

16  with it after I read it.

17  Q.  And did you believe that the working group needed to

18  incorporate this feedback into their work?

19  A.  I did not.

20  Q.  Why not?

21  A.  I understood that Mr. Kallem's advice was for the working

22  group to read a chapter that was eventually published in the

23  book that Mr. Kahlenberg was talking about the other day, the

24  2014 book about the future of affirmative action.  And the

25  chapter reviewed the results at colleges and universities,

1 flagships typically, that were located in, I think, ten states
2 that had proscribed the use of race or ethnicity in admissions.
3     I think Mr. Kahlenberg may have actually referred to this
4 chapter the other day, but the chapter describes what other
5 schools had done, and it describes what the results were.  So I
6 saw what other schools had done, and I saw what the results
7 were, and I had a couple of concerns.
8     The first concern was that most of the tactics that the
9 chapter recommended that schools employ we had either already
10 put into place or we had already modeled.  So, for example, the
11 chapter talks about increasing financial aid.  We had increased
12 financial aid.  The chapter talks about increasing enrollments
13 from the community college system.  We had launched the C-STEP
14 program.  The chapter talks about developing partnerships with
15 low-income high schools.  We had launched the Carolina College
16 Advising Corps.  The chapter talks about top 10 percent plans.
17 We had modeled a top 10 percent plan for the share of the class
18 that came from North Carolina.  The chapter talks about
19 providing additional socioeconomic bonuses to students in
20 admissions.  We had modeled that in 2007.  The chapter talks
21 about schools moving to comprehensive and holistic review.  We
22 had been doing that.
23     So for all those reasons, I thought that the tactics that
24 the chapter recommended were things we already had either done
25 or had explored in good faith.

1    But I had another concern.  At the very end of the chapter,

2  the author says, "Here are the results in these ten states."

3  And then the author says, "We really need to say that the three

4  most selective schools in these states have not been able to

5  achieve the same level of diversity that they had before they

6  were proscribed from using race."

7    And so the combination of our already having deployed or

8  tested the race-neutral strategies and approaches that the

9  chapter recommended and the really important, I thought,

10  qualification that these approaches aren't working at the most

11  selective schools in the country -- the combination made me

12  think that the group didn't need to explore those

13  recommendations.

14  Q.  I'd like to now turn to PX32.  Do you see that this is an

15  e-mail -- who is this from and who is it to?

16  A.  This is from Barbara Polk to me and to Dr. Kretchmar.

17  Q.  What is the date of the e-mail?

18  A.  November 18, 2014.

19  Q.  What does the e-mail state?

20  A.  "I received a response from Howie" -- that is Mr. Kallem --

21  "regarding this draft statement.  I have placed it on the H

22  drive, staff folders," and her folder.  "In addition to the

23  draft document, I have also included comments from his e-mail.

24    "Please let me know what thoughts you have regarding the

25  draft.  It has been shared with Kara, and I would like to share

1  it (still in draft form) with the members of the working group

2  ASAP."

3  Q.  And so does that indicate you received that feedback from

4  Mr. Kallem in 2014?

5  A.  Yes.

6  Q.  If you had had concern that there was something missing

7  from the working group's work, would you have done something

8  about that?

9  A.  Yes.

10 Q.  You've heard testimony that the paper was presented to the

11 advisory committee, the work of the working group.  Were you

12 present when that occurred?

13 A.  I was.  And I should say -- or I should have said Ms. Polk

14 was keeping the advisory committee informed about the progress

15 of the working group along the way.

16 Q.  If we could look at DX47, please.  Do you recognize this?

17 A.  I do.

18 Q.  What is this?

19 A.  This is a presentation that Ms. Polk gave to the advisory

20 committee in 2016.

21 Q.  Is this something that would provide a summary of the

22 group's work at a higher level than in the paper?

23 A.  It is.

24 Q.  Okay.  And I want to walk through some of this.  If we

25 could look at the first -- or the first slide.  This has the

1  working group members.

2      Does this look accurate to you?

3  A.  It does from my recollection, yes.

4  Q.  And who does this include from around the campus, generally

5  speaking?

6  A.  Patrick Akos, who was the professor in the School of

7  Education; Taffye Clayton, who at the time was head of

8  Diversity Inclusion; Lou Perez was a professor, I believe, in

9  history; Debby Stroman, who at the time, I believe, was an

10  instructor in the Kenan-Flagler Business School; Catherine

11  Pierce, who was chief of staff, I believe, to Jack Boger, the

12  dean of the law school; Dr. Kretchmar; Ms. Polk; and Dr. Lynn

13  Williford, who was the head of the Office of Institutional

14  Research and Assessment; and the consultant to the group was

15  Kara Simmons from the Office of University Counsel.

16  Q.  Okay.  Scroll to the next slide.  This restates the charge

17  of the committee; is that right?

18  A.  Yes.

19  Q.  Okay.  And this is -- is this consistent with the charge

20  that was in the e-mail?

21  A.  Yes.

22  Q.  Okay.  We can move on to approaches.

23      Does this slide summarize the approaches that the working

24  group considered?

25  A.  It does.

1    Q.   And what are those approaches?

2    A.   The literature review, review of the work of peer

3    institutions, and then research that the working group itself

4    had conducted.

5    Q.   And what are some of the approaches that they looked at in

6    their own research?

7    A.   For resident students, the group considered a top

8    10 percent plan, the group considered a top 4.5 percent plan, a

9    top percent plan that also took into account some socioeconomic

10   indicators, a plan that focused on the strength of the

11   student's high school curriculum, and a plan that focused on

12   standardized testing.

13        For nonresident students, the group focused on a top

14   10 percent plan, a plan that included top 5 percent plus

15   testing, and then a group that considered grades plus testing.

16        And then for all students, they considered a program that

17   had just been developed at the time by a professor, I believe,

18   at Clemson University called Application Quest.

19   Q.   If we can go to the next slide, please.

20        Does this share with the committee what some of the

21   findings were for the various plans?

22   A.   Yes.

23   Q.   And if we can go on to the ultimate conclusion, which I

24   think is the final slide of the report.

25        Could you please read the conclusion slide?

1  A.  It's the working group's conclusion:  "No identifiable

2  race-neutral approach was found that would result in an

3  admitted class that's academically as qualified while also

4  maintaining or enhancing racial/ethnic diversity.

5     "Therefore, the working group recommends that the Office of

6  Undergraduate Admissions continue to use race/ethnicity as one

7  of many factors when selecting the admitted class of first-year

8  students."

9  Q.  Based on your review of their work, including the white

10 paper, did you agree with this conclusion?

11 A.  I did.

12 Q.  Did you, nonetheless, believe that further review was

13 warranted?

14 A.  I did.

15 Q.  What was the next step that the university took to consider

16 race-neutral alternatives after the working group's work?

17 A.  Dean Panter convened the Committee on Race-Neutral

18 Strategies.

19 Q.  What was the origin of that group?

20 A.  That group grew out of the university's understanding that

21 we have an obligation to review periodically alternatives to

22 the use race or ethnicity in admissions, and it proceeded from

23 conversations, I believe, with Provost Jim Dean and others.

24 Q.  How involved have you been with the work of that group?

25 A.  I've been staffed to that group, and I've been to almost

1  all of the meetings.

2  Q.  And I want to ask you about that group's activities up

3  through the interim report.

4      What is your assessment of the group's open-mindedness in

5  terms of looking for a race-neutral alternative?

6  A.  I think they approached the task with intellectual

7  integrity and open minds.

8  Q.  What is your assessment of the group's work?

9  A.  I think they've done a remarkable job.  The faculty members

10  in the group are leading researchers in their own right.  They

11  have a lot of experience at the university.  They're extremely

12  smart and hardworking.  We've benefited from having a student

13  affairs perspective on the group in Dr. Bettina Shuford, and

14  we've benefited also from having the involvement, at least in

15  the first go-around, of Doug Shakelford, who is dean of the

16  School of Business.

17  Q.  What is your assessment of the group's pace in terms of its

18  work?

19  A.  Well, first of all, I think the group has worked extremely

20  hard.  At the beginning, they wanted to review the work that

21  had been done previously.  They wanted to meet with the provost

22  and hear the provost's perspective on the work of the

23  committee.  So there was a time at the beginning when the group

24  was forming that it needed to do some review.  But once it

25  completed that review, it quickly identified specific tasks

1   that it wanted to complete, and it got to work on those tasks.

2   Q.  And we're going to hear more from Dr. Panter, who was the

3   chair of the group on Monday, so -- but I do want to ask --

4   just ask you a couple more questions about the group.

5       As of the interim report in 2018, did the group plan to

6   look at the expert work in this case?

7   A.  Yes.

8   Q.  And did they intend to consider the expert reports of both

9   sides?

10  A.  Yes.

11  Q.  As of the interim report, had the group identified any

12  race-neutral alternative that it believed could eliminate

13  holistic admissions and the consideration of race as a part of

14  that?

15  A.  No.

16  Q.  I want to ask you a couple of questions about what would

17  happen if the university were to identify such an alternative.

18  And I want to look at Exhibit 54, which is -- this is the

19  interim report.  Do you recognize this?

20  A.  I do.

21  Q.  So is this the interim report of the Committee on

22  Race-Neutral Strategies from May 2018?

23  A.  Yes.

24  Q.  And I'm going to go down to one of the attachments in the

25  report, which is some minutes, and we're going to look at

1  page 36.

2      So this is the -- are these the minutes of one of the

3  meetings?

4  A.   Yes.

5  Q.   Which meeting is this?

6  A.   This is from November 30th, 2016.

7  Q.   And are you noted as being present at this meeting?

8  A.   Yes.

9  Q.   And I want to look at page 37, which is a continuation of

10 those minutes, and ask you about this particular statement.

11     Could you read that into the record?

12 A.   "Mr. Stephen Farmer stated that the admissions office will

13 adopt any alternative or combination of alternatives that can

14 be proven to be workable and effective in maintaining or

15 enhancing both diversity and quality."

16 Q.   Do you still agree with that statement?

17 A.   I do.

18 Q.   I want to ask you about a couple things in that statement.

19 First is the concept of workable.

20     Has there been any discussion in the group about workable?

21 A.   Yes, there has been.

22 Q.   What has been discussed?

23 A.   Well, really at a high level what's been discussed is what

24 steps we would need to take to turn a theoretical model into

25 something that we could actually execute and practice.

 1        Models, of course, are challenging and they require
 2    expertise, and we respect that expertise.  And members of the
 3    committee are developing models of their own, but at the end of
 4    it all, we have to do the work.  We have to consider real
 5    students, and we have to make decisions about them.  And so
 6    workability involves, in one sense, the ability to translate a
 7    theory into a practice.
 8        And then the second part of workable is just the expense of
 9    it.  There are things that theoretically we might be able to do
10    that we can't in practice do because we don't have the
11    resources to do those things.
12    Q.  I want to ask you also about the concept of effective.  And
13    there's been a critique in this case of the framing of the
14    issue.  Did you hear that?
15    A.  I have heard that critique.
16    Q.  And, in particular, there's been a critique of framing the
17    issue as maintaining or enhancing levels of diversity.
18        What is your response to that?
19    A.  We've always intended the term "maintaining" to be a
20    starting point.  That's -- that's a way of framing the
21    investigation.  The fact of the matter is that we've never
22    found an alternative that came close, but maintaining has been
23    a starting point for us, not the absolute.  We don't think of
24    this -- we don't think of this process in terms of absolutes.
25    We are testing hypotheses; we're considering the results; and

1  we're trying to decide whether those results are acceptable.

2  Q.  Would the university consider in good faith everything that

3  was a serious possibility?

4  A.  Yes.

5  Q.  Mr. Kahlenberg stated his belief of a lack of commitment to

6  the process.  What is your response to that?

7  A.  We are committed to this process.  We have been committed

8  to this process.  We have spent an enormous amount of time, as

9  we should.  We have worked really hard to get better over time,

10  as we should.  We've worked hard to learn from the examples of

11  others, as we should.  This committee alone has met dozens of

12  times since it was formed.  The faculty members have research

13  agendas of their own.  They have worked together.  They have

14  work to do outside of the work of this committee, and yet

15  they're working when this committee isn't meeting to help this

16  committee achieve its work.

17      I -- with respect, I would say that I don't agree with that

18  characterization of our efforts to consider race-neutral

19  alternatives.

20  Q.  Has the university been perfect?

21  A.  No.  We -- we're a human institution.  You know, we -- we

22  work hard to get better.  We don't want to rest.  The people I

23  work with in the admissions office work incredibly hard, and

24  they do not want to rest.

25      We make mistakes.  When we do, we try to make them right.

1  When someone suggests to us that we don't know something that

2  we should learn, we try to learn it so we can do a better job.

3     So, no, we're not perfect and we need to be better still,

4  but we're working extremely hard, and we're doing the best that

5  we can.

6  Q.  Mr. Farmer, I asked you at the beginning of your

7  examination a bunch of questions about the university's

8  mission.  How central to that mission is diversity at the

9  university today?

10  A.  Diversity is at the heart of the university's mission.

11  Diversity is at the heart of the excellence of the institution.

12  Diversity is at the heart of our ability to prepare young

13  people to go out into the world and do what only they can do,

14  what the world needs for them to do.  It's integral to

15  everything we do.

16  Q.  Mr. Farmer, I asked you a number of questions about the

17  admissions process.  Are you proud of the students that you

18  enroll through that process?

19  A.  Yes, I'm very proud of the students we enroll, and I'm

20  grateful to the students we enroll.  We have incredible young

21  people at the university, and they're not perfect either.

22  They're trying to get better too.

23     But, yes, I am proud of them and I'm grateful for them,

24  grateful that they chose UNC, grateful that they do what they

25  do for one another every day.

1  Q.  I asked you a series of questions about the university's

2  implementation of race-neutral strategies.  Have those efforts

3  been real and meaningful?

4  A.  Yes, they have been.  Whether it's financial aid or our

5  support for first-generation college students or the academic

6  and personal support that we provide to low-income students

7  through the Carolina Covenant, or our attempts to enroll more

8  community college transfer students and to see them succeed to

9  the fullest extent possible on our campus, or our revising the

10 way that we teach so that more students can succeed at the

11 highest level, or partnering with communities across

12 North Carolina through the College Advising Corps to help every

13 young person we come into contact with have a fighting chance

14 at finding a school that will serve them well, these approaches

15 have made a difference.

16 Q.  And I asked you a series of questions about the

17 university's consideration of race-neutral alternatives.  In

18 your experience, being at the university for many years and

19 thinking about these issues, can the university currently stop

20 considering race as a factor in its admissions process?

21 A.  No, we cannot.

22          **MS. BRENNAN:**  Thank you.

23          **MR. STRAWBRIDGE:**  Just one minute while we set up,

24 Your Honor.

25          **THE COURT:**  Yes.

1     (Pause in the proceedings.)

2                    **CROSS-EXAMINATION**

3  **BY MR. STRAWBRIDGE:**

4  Q.  Good morning, Mr. Farmer.

5  A.  Good morning, Mr. Strawbridge.

6  Q.  Congratulations on your new job.

7  A.  Thank you.

8  Q.  That starts at the end of this semester; is that correct?

9  A.  It will start on the 1st of January.

10 Q.  I sincerely hope that this lawsuit has not delayed your

11 ability to start at the University of Virginia.

12 A.  I appreciate that.

13 Q.  I want to talk to you a little bit about all the years that

14 you have worked at the University of North Carolina.

15     You joined the admissions office in September of 2000; is

16 that correct?

17 A.  That's right.

18 Q.  You took over as director of admissions in 2004?

19 A.  That's right.

20 Q.  And you have served in that role through today?

21 A.  That's correct.

22 Q.  At some point you gained the title of vice provost for

23 enrollment in undergraduate admissions?

24 A.  Yes.

25 Q.  Was that in September of 2004 as well?

1   A.   It was in October 2011.

2   Q.   I'm sorry.  I apologize for that.

3        And once you gained that title, you reported directly to

4   the provost, correct?

5   A.   That's right.

6   Q.   At least for some of the period of time in recent years,

7   that was James Dean?

8   A.   It was.  And, actually, may I amend what I just said?

9   Q.   Please.

10  A.   Because when I was assistant provost and director of

11  undergraduate admissions, I also reported directly to the

12  provost.

13  Q.   How long were you in the assistant role?

14  A.   From September 2004.

15  Q.   That maybe was the confusion.  Thank you.

16       Now, you mentioned some of the committees that you served

17  on, correct?

18  A.   Yes.

19  Q.   One of those committees is the Educational Benefits of

20  Diversity Committee?

21  A.   Yes.

22  Q.   And that committee was formed in late 2017?

23  A.   I believe so, yes.

24  Q.   That was more than three years after the lawsuit that we're

25  here today about was filed?

1    A.   That sounds right.

2    Q.   And I think you referred a little bit to the report that

3    you edited regarding the racial benefits of diversity at UNC.

4    That was DX3.   Correct?

5    A.   Yes.

6    Q.   That report was also written after this lawsuit was filed,

7    correct?

8    A.   It was.

9    Q.   In fact, we talked a little bit about the process of

10   writing that report at your deposition, didn't we?

11   A.   We did.

12   Q.   You told me that you worked on that document over one

13   weekend, correct?

14   A.   That's correct.

15   Q.   You also mentioned that you serve on the Committee on

16   Race-Neutral Strategies?

17   A.   I serve as staff for that committee, yes.

18   Q.   You mentioned that you had attended the meetings of that

19   committee?

20   A.   Almost all of them, yes.

21   Q.   And that committee was also created -- I'm sorry.

22        That committee was created in February of 2016, correct?

23   A.   Yes.

24   Q.   Two and a half years after this lawsuit was filed?

25   A.   Yes.

1  Q.  You're aware, right, that that committee has since

2  impaneled a data analytics subcommittee?

3  A.  Yes.

4  Q.  You didn't do anything to oppose the creation of that

5  committee, did you?

6  A.  No.

7  Q.  During the 20 years that you have worked in the admissions

8  office, UNC has always used race as a factor in admissions,

9  correct?

10  A.  Yes.

11  Q.  And race is one of the factors that UNC's instructions

12  instruct readers to consider when they're looking at a file?

13  A.  We instruct readers that they may consider race.

14  Q.  They can also consider gender?

15  A.  They may not consider gender.

16  Q.  Can they consider test scores?

17  A.  They may consider test scores.

18  Q.  Can they consider GPAs?

19  A.  They may.

20  Q.  Can they consider the number of AP classes that one might

21  have taken?

22  A.  Yes.

23  Q.  Can they consider an applicant's disability status?

24  A.  No.

25  Q.  Can they consider an applicant's veteran status?

1   A.   I'm sorry?

2   Q.   Can they consider an applicant's status as a veteran of the

3   United States military?

4   A.   To the extent that they know it, as a way of increasing

5   participation.

6   Q.   Can they consider whether or not one comes from a rural or

7   developed area?

8   A.   Yes.

9   Q.   Can they consider socioeconomic status?

10  A.   Yes.

11  Q.   Can they consider religious identity?

12  A.   Yes, with qualifications.

13  Q.   What are those qualifications?

14  A.   They may not use a student's religious faith ever against

15  them; but if the student's conception of the student's faith is

16  a part of the student's story, they may consider that.

17  Q.   Do you consider religious diversity to be an important

18  element of diversity on campus?

19  A.   I do.

20  Q.   Of all the factors we've just discussed that UNC can

21  consider, which of those is the most important?

22  A.   It depends on the student.

23  Q.   As a general matter, is race more important than those

24  other factors?

25  A.   I wouldn't say that.

1  Q.  Do you consider race to be a more important factor to be

2  considered across the UNC admissions process than socioeconomic

3  status?

4  A.  I would not consider that, no.

5  Q.  And UNC does actually prioritize increasing socioeconomic

6  status on campus, does it not?

7  A.  We do.

8  Q.  It's a critical component of the institution's obligation

9  to the state?

10 A.  Yes.

11 Q.  And UNC wants to increase the number of disadvantaged

12 students who apply and enroll?

13 A.  Yes.

14 Q.  In fact, shortly before this lawsuit was filed, you

15 publicly acknowledged that there was work to do in increasing

16 disadvantaged admissions and enrollment, didn't you?

17 A.  I've acknowledged that regularly, yes.

18 Q.  Did you tell *The Daily Tar Heel* that in 2014?

19 A.  Yes, I believe I did.

20 Q.  And, in fact, you told *The Daily Tar Heel* that UNC was not

21 as good as you wanted it to be with respect to admitting and

22 enrolling disadvantaged students?

23 A.  Yes.

24 Q.  And we talked a little bit -- or you talked a little bit

25 about with Ms. Brennan the number of programs that UNC has had

1   under your leadership and which it's trying to get better on

2   that score, correct?

3   A.  Yes.

4   Q.  Carolina Covenant is one of those programs?

5   A.  Yes.

6   Q.  And Ms. Brennan showed you some statistics from the

7   entering class of 2015.  Do you remember that during your

8   direct testimony?

9   A.  I remember the slide, yes.

10  Q.  Entering Class of 2015 would have been the class the year

11  after this interview in *The Daily Tar Heel* we're talking about,

12  correct?

13  A.  Yes.

14  Q.  And do you remember --

15  A.  Actually -- excuse me -- if I may?

16  Q.  Yes.

17  A.  I don't remember the date of *The Daily Tar Heel* article,

18  but I'm -- so I'm going on the assumption that you're stating

19  the timeline accurately.

20  Q.  Do you -- do you recall the percentage of students in the

21  enrolled class for 2015 who were Carolina Covenant scholars?

22  A.  I don't recall the specific percentage, no.

23          **MR. STRAWBRIDGE:**  Can we bring up DX22, please?

24      One moment.  We have to set up for the Court.

25      Go down a couple pages.  Okay.  Right there.  Can we zoom

1  in on the top page?

2  Q.  (By Mr. Strawbridge)  Do you see listed there the

3  percentage of the enrolled class in 2015?

4          **THE COURT:**  What page are you on?

5          **MR. STRAWBRIDGE:**  Sorry.  It's the top of this page.

6  We are highlighting it on the screen right now.

7      Is that the third page of the document?

8      It's the third page of the document -- I'm sorry.  It's the

9  fourth page.

10          **THE COURT:**  All right.  Thank you.

11  Q.  (By Mr. Strawbridge)  Do you see the percentage there?

12  A.  I do.

13  Q.  It's 14.4 percent?

14  A.  Yes.

15  Q.  Do you happen to know what the percentage of Carolina

16  Covenant scholars in the 2020 entering class is?

17  A.  It's lower than that.

18  Q.  It's 12 percent, correct?

19  A.  Roughly.

20  Q.  Staying on this exhibit, do you recall what the percentage

21  of first-generation college students in 2015 was?

22  A.  According to the slide, it's 18.6 percent.

23  Q.  And do you know what the percentage of the enrolled class

24  in 2020 of first-generation college students is?

25          **MS. BRENNAN:**  Your Honor, I just want to raise a

1 point, which is that we had to stop our evidence as of the

2 close of the discovery period; and, therefore, we have not had

3 a chance to counter any evidence that Plaintiffs might try to

4 put in the record about the current -- we've deliberately not

5 done that. So I would just ask that the current date

6 comparisons not be allowed, unless we're also going to be

7 allowed to put our evidence in the record about current day.

8        **MR. STRAWBRIDGE:** Well, I actually think there has

9 been some testimony, even from their own witnesses, about

10 changes that have been made to the admissions process since. I

11 do agree that the parties need a fair opportunity to test any

12 evidence submitted in this case. Asking the director of

13 admissions what the current level of enrollment is didn't seem

14 right to me. I can modify the question to 2017, if Your Honor

15 would prefer.

16        **THE COURT:** I'm going to allow you to proceed, and

17 then you can tell me after he has questioned on this whether or

18 not you need additional time to somehow counter that.

19        **MS. BRENNAN:** Thank you, Your Honor.

20 Q. (By Mr. Strawbridge) Do you need a reminder of the

21 question, sir?

22 A. Please.

23 Q. Do you know what -- for 2020 the percentage of the entering

24 class for the first-generation college?

25 A. I haven't seen this version of our statistics for this year

1  yet, but it's lower than 18.6 percent.

2  Q.  Do you know what it was in 2017?

3  A.  I don't recall specifically what it was in 2017.

4  Q.  Would you be surprised if I told you that UNC admissions

5  office had reported it as 20 percent?

6  A.  No.

7  Q.  C-STEP is another program that we discussed yesterday?

8  A.  Yes.

9  Q.  And C-STEP is a program where the University of North

10 Carolina accepts transfers from top students at partnered

11 community colleges?

12 A.  Yes.  But may I elaborate?

13 Q.  What do you need to elaborate on?

14 A.  Well, just -- I -- it's a partnership with community

15 colleges where we work together to identify students who will

16 thrive at UNC.

17 Q.  As of the time of your deposition, UNC was partnered with

18 ten community colleges; is that correct?

19 A.  I believe that's right.

20 Q.  And there are actually 58 community colleges in the state

21 of North Carolina, correct?

22 A.  That's correct.

23 Q.  C-STEP costs about $15,000 per year per participating

24 community college; is that right?

25 A.  For the community colleges, yes.

1  Q.  And we talked a little bit about the Carolina Advising

2  Corps as well?

3  A.  Yes.

4  Q.  Carolina Advising Corps, you testified, is a program to

5  place counselors in high schools in North Carolina?

6  A.  The Carolina College Advising Corps, yes.

7  Q.  Thank you.

8      That costs the university about $2 million a year?

9  A.  About $3 million a year.

10 Q.  Was it $2 million a year at the time of your deposition?

11 A.  Probably 2.1, 2.2.

12 Q.  You testified yesterday how the university's endowment

13 works, correct?

14 A.  I did.

15 Q.  Who manages the endowment?

16 A.  The university financial people.

17 Q.  Are you familiar with the name of the fund that manages the

18 endowment?

19 A.  It's the UNC Management Fund.

20 Q.  Is that the endowment for the Chapel Hill campus or for the

21 UNC system as a whole?

22 A.  They manage monies for different groups, including the UNC

23 system, I believe.

24 Q.  Are you familiar with the Chapel Hill Fund Management

25 Group?

1  A.  No.

2  Q.  Okay.  Do you know who sits on that board?

3  A.  I do not.

4  Q.  Are you privy to their meetings?

5  A.  I am not.

6  Q.  What is the basis of your testimony regarding 6 to 6 1/2

7  million dollars a year of unrestricted funds being available

8  from the endowment, I think you said, as of 2017?

9  A.  Actually, it was currently.  And I heard the university's

10 chief financial officer say that to Faculty Council Friday a

11 week ago.  There is a slide to that effect on the Faculty

12 Council website.

13 Q.  So it was based on that information, not any personal

14 knowledge beyond that?

15 A.  It was based on the chief financial officer's report, yes.

16 Q.  I'd like to talk a little bit about the data that UNC's

17 admission -- well, let me strike that.

18     Are you aware of any documents produced by UNC in this case

19 with respect to restrictions on the availability of endowment

20 funds?

21 A.  I'm not.

22 Q.  I want to talk a little bit about the data that UNC's

23 admissions office collects.

24     UNC collects a number of data about the criteria it uses in

25 its admissions process, correct?

```
1   A.  We collect a lot of data about students, yes.

2   Q.  Including their race?

3   A.  When students identify themselves, yes.

4   Q.  Including whether they are identified as first-generation

5   college?

6   A.  Yes.

7   Q.  Including gender?

8   A.  Yes.

9   Q.  Including their status as the child of an alumni of UNC?

10  A.  When they disclose that information, yes.

11  Q.  Including the ratings that the admissions office assigns?

12  A.  Yes.

13  Q.  Including the deadline to which an applicant may have

14  applied to UNC?

15  A.  Yes.

16  Q.  Whether it was the early deadline or the regular deadline,

17  right?

18  A.  Yes.

19  Q.  UNC collects data about the test scores of its applicants,

20  correct?

21  A.  Yes.

22  Q.  It collects data about the number of college-level classes

23  an applicant may have taken?

24  A.  Yes.

25  Q.  And collecting and analyzing this data is part of
```

 1  Dr. Kretchmar's responsibilities within the office?

 2  A.  Yes.

 3  Q.  And you would agree with me, sir, that your office needs to

 4  guarantee that its holistic admissions process has effective

 5  checks, balances, and quality control?

 6  A.  Yes.

 7  Q.  And you would agree with me, I assume, that one reason why

 8  you need checks, balances and quality control is because it's

 9  possible that a holistic admissions process could be abused?

10  A.  Yes, it's possible.

11  Q.  Are you familiar with the origin of the holistic college

12  admissions process used at Harvard?

13  A.  Yes.

14  Q.  And are you aware of the fact that its implementation

15  followed concerns about the rising number of Jewish students on

16  that campus in the 1920s?

17  A.  I am.

18  Q.  Do you, sir, believe in the concept of implicit bias?

19  A.  I do.

20  Q.  Do you think it is possible for people to behave in biased

21  ways without fully realizing it?

22  A.  I do.

23  Q.  In the past, UNC has used the data that its admissions

24  office collects to analyze how its admissions process works,

25  correct?

1  A.  Yes.

2  Q.  Now, yesterday you told us all -- and I wrote this down --

3  that in the admissions office you've never talked of formulas.

4  Is that what you said?

5  A.  We've never talked about formulas as a way of making

6  decisions about candidates.

7  Q.  Okay.  But you have talked about formulas, right?

8  A.  We have used formulas to predict the first-year GPA of

9  students, for example.  So, yes, we have done mathematical

10 modeling of different kinds.

11 Q.  Folks in your office, in fact, have developed formulas to

12 model the probability of admissions?

13 A.  Yes, on occasions.

14 Q.  And among other things, you had directed Ms. Kretchmar to

15 conduct that kind of analysis to see the effect that legacy

16 status has on the admissions process?

17 A.  Yes.

18 Q.  And, indeed, that analysis was specifically intended to

19 answer the question about whether UNC was, in fact, giving a

20 legacy preference to in-state applicants in departure of its

21 stated practices?

22 A.  Yes.

23 Q.  And you specifically requested an "all things being equal"

24 analysis to explore that question?

25 A.  Yes.

1   Q.   Ms. Kretchmar has also used the admissions data to analyze

2   the effect that gender has on the admissions process?

3   A.   Dr. Kretchmar has done that, yes.

4   Q.   Notwithstanding the fact that you've testified that gender

5   is something that should not be considered in the admissions

6   process?

7   A.   Yes.

8   Q.   And Ms. Kretchmar has also used that data to analyze the

9   effect on admissions decisions when a student applies during

10  the earlier deadline?

11  A.   Yes.

12  Q.   And Dr. Kretchmar has also used data to analyze whether the

13  number of college-level classes affects admissions outcomes?

14  A.   Yes, with a qualification.

15  Q.   And what is that qualification?

16  A.   I wouldn't characterize what she was predicting or what she

17  was assessing as admissions outcomes.  Specifically, she was

18  investigating their relationship between college-level courses

19  and first-year grade point average.

20  Q.   Okay.  Do you consider how students perform on campus an

21  outcome of the admissions process?

22  A.   I do.  An outcome, yes.

23  Q.   Now, despite everything we've just heard, in the 17 years

24  you've been at the UNC's admissions office and in the more --

25  of the decade that you've been leading it, you had never asked

1  Dr. Kretchmar to employ a similar analysis to determine the

2  extent to which race plays a role in the admissions process,

3  correct?

4  A.  Correct.

5  Q.  And as recently as 2017, almost two decades after you

6  joined the office, you believed that this analysis was not even

7  necessary, correct?

8  A.  I believe I said that in my deposition with you, yes.

9  Q.  And that is because you felt confident in what you were

10  doing?

11  A.  I felt confident in the work that our staff was doing.

12  Q.  But you couldn't really have been confident without doing

13  an analysis, right?

14  A.  I disagree.

15  Q.  Wasn't it possible that people in your office were giving

16  too much consideration to race the same way they had with

17  respect to legacy?

18  A.  I'm going to need to offer a bit of an elaborate answer, if

19  I may.  Please forgive me.

20  Q.  I welcome an explanation, but I would like to know if it's

21  possible.

22  A.  Yes, it's possible.

23  Q.  But you were still confident?

24  A.  May I elaborate?

25  Q.  Please.

1  A.   I believe what you said in your question was where legacy

2  was concerned, that legacy discovered that we were awarding a

3  preference and that an analysis would reveal it.  And I don't

4  know necessarily that I agree with that characterization, but,

5  yes, it is possible to do an analysis of the kind that she did

6  for first generation -- excuse me -- for legacy students.

7  Q.   I'm sorry.  Maybe you didn't understand my question -- and

8  we can revisit the legacy study, if you would like -- but my

9  question to you is:  Isn't it possible that people in the

10  admissions office were giving a preference based on race,

11  notwithstanding whatever guidance you had given to the readers?

12  A.   Thank you for clarifying.

13       Yes, it's possible.

14  Q.   Why were you so confident that they weren't if you had not

15  done the analysis?

16  A.   Because I had seen the hard work that our staff had done in

17  training, and I, myself, had read behind people in the office

18  on thousands of folders.  I participated in the school group

19  review process.  And so I had evidence before me that people

20  were doing what we instructed them to do.

21  Q.   And you didn't think it was necessary to test that against

22  an empirical analysis of the numbers?

23  A.   At the time I did not.

24  Q.   Even though you did with legacy?

25  A.   Yes.

1   Q.  You testified that in the fall of 2015, after this lawsuit

2   was filed, the university changed its practice with respect to

3   the data we've seen on the core reports?

4   A.  Yes.

5   Q.  And the change was -- was that it removed information about

6   the racial composition of the class that had previously been

7   available to people reading applications, correct?

8   A.  To some people, yes.

9   Q.  And, in fact, you imposed a requirement in your office that

10  anyone who looked at that data had to be recused from the

11  reading process?

12  A.  Yes.

13  Q.  If you were so confident before that date, despite never

14  doing -- running any numbers, why was it necessary to instruct

15  readers to recuse themselves and to stop looking at that data?

16  A.  I was confident in what we were doing.  I was less

17  confident in how others would interpret what we were doing.

18  Q.  Oh, because this order was given after the lawsuit was

19  filed, wasn't it?

20  A.  It was.

21  Q.  And you knew that your admissions process was going to be

22  subject to discovery, correct?

23  A.  Yes.

24  Q.  And you wouldn't want anybody to get the wrong idea?

25  A.  That's correct.

1   Q.  Mr. Farmer, you claim that UNC's -- I'm sorry.  I'll start

2   again.

3       Mr. Farmer, you claim the University of North Carolina's

4   use of race is very sparing, correct?

5   A.  Yes.

6   Q.  But after 20 years in the office -- well, let me strike

7   that.

8       After 17 years in the office, you are unable to say how

9   often race makes the difference in whether or not a student is

10  admitted to the University of North Carolina?

11  A.  That's true.

12  Q.  You can't say whether it makes a difference in only a dozen

13  cases each year?

14  A.  I can't.

15  Q.  You can't say whether it makes a difference in a hundred

16  cases each year?

17  A.  I cannot give you a number.

18  Q.  That means you can't even say whether it makes a difference

19  in thousands of cases a year?

20  A.  I can't give you a specific number, no.

21  Q.  As a long-time admissions director at the University of

22  North Carolina -- and I think you've testified this way, but

23  please correct me if I'm wrong -- you're familiar with the

24  Supreme Court's decision in *Grutter v. Bollinger*, correct?

25  A.  I am.

1  Q.  And you believe that UNC's use of race is tied to achieving

2  critical mass?

3  A.  I do.

4  Q.  But you cannot point to any document in the UNC admissions

5  office that attempts to define critical mass, can you?

6  A.  I cannot.

7  Q.  And you don't even know -- or at least as of your

8  deposition in this case you did not even know whether anyone

9  had figured how out to measure critical mass?

10 A.  I believe I said in my deposition, and I believe I said

11 yesterday as well, that there are assessments of critical mass

12 that involve both numbers and qualitative considerations.

13 Q.  You are not aware of any discussions at UNC, or at least

14 you were not at your deposition, about what a numerical

15 threshold might be for critical mass, correct?

16 A.  That's correct.

17 Q.  And you were not even aware of a numerical range, correct?

18 A.  That's correct.

19 Q.  At least as of 2017, the only formal attempts by UNC to

20 determine if it had obtained critical mass that you can

21 identify were some climate surveys conducted of the student

22 body, correct?

23 A.  I recall saying that, yes.

24 Q.  And as of 2017, you had not looked at the results of any

25 climate surveys conducted more recently than 2006?

1  A.  That's correct.

2  Q.  Now, I believe you testified, obviously, that you were

3  familiar with the working group on race-neutral alternatives?

4  A.  Yes.

5  Q.  That was the group formed in 2013?

6  A.  Yes.

7  Q.  With Ms. Polk chairing the committee?

8  A.  Yes.

9  Q.  And we actually saw an exhibit -- and we can bring it up

10  now, PX6 -- that in the run-up to the formation of that

11  committee, Ms. Polk had raised questions about "How do we

12  define critical mass?  Are we attempting to achieve critical

13  mass on the University-wide level, in the residence halls, in

14  individual classrooms and labs, or all of the above?"  And she

15  also asked:  "How do we/will we know that critical mass has

16  been achieved?"

17      Did I read that correctly?

18  A.  Yes, you did.

19  Q.  You thought those were great questions, correct?

20  A.  I did.

21  Q.  But no definition of critical mass was ever formulated by

22  that group, the working group that Ms. Polk chaired, correct?

23  A.  I believe that's right, yes.

24  Q.  No definition appears in its final report?

25  A.  That's correct.

1  Q.  Nor, for that matter, does the definition appear in the
2  report that you helped write after this litigation began on the
3  educational benefits of diversity?
4  A.  I believe that's correct.
5  Q.  Does the word "critical mass" even appear in that report,
6  sir?
7  A.  I don't recall, but I do recall that the document is about
8  the educational benefits of diversity, which, as I hope I
9  explained yesterday, we believed derived from the critical
10 mass.
11 Q.  Sitting here today, do you remember any definition of the
12 term "critical mass" in that report?
13 A.  I do not.
14 Q.  As of your June 2017 deposition in this case, you did not
15 even believe the Committee on Race-Neutral Strategies, which
16 was formed after this litigation began, was working on a
17 definition of critical mass, correct?
18 A.  I believe that's right.
19 Q.  I'd like to talk a little bit about the various efforts
20 made at UNC to discuss race-neutral alternatives.
21     The first time you ever remember looking at what an
22 alternative to UNC's system would be regarding the use of race
23 was in 2007, correct?
24 A.  That's not correct.
25 Q.  And what do you think constituted an effort by UNC to

1  consider race-neutral alternatives before that date?

2  A.  I think our paying attention to the natural experiments

3  that were going on in California constituted the consideration

4  of a race-neutral alternative.  And, in fact, I believe we were

5  instructed in that direction by the Department of Education.

6  Q.  Are you aware of responses to interrogatories that the

7  University of North Carolina submitted in this case?

8  A.  I'm aware that there are responses.

9  Q.  Are you aware those interrogatories included requests for

10  UNC to identify the efforts it had made to consider

11  race-neutral alternatives?

12  A.  I'm not aware specifically of that in the moment.

13  Q.  Did you help prepare the interrogatory responses for UNC in

14  this case?

15  A.  I believe I did.

16  Q.  And do you know whether those interrogatory responses make

17  any mention of these ongoing discussions you just referred to

18  prior to your 2007 analysis?

19  A.  I don't recall.

20  Q.  Speaking of the 2007 analysis, you testified about that

21  spreadsheet we saw yesterday, correct?

22  A.  I did.

23  Q.  That was an exercise that at least at your deposition you

24  deemed as mechanical?

25  A.  Yes.

1    Q.   It was not, for example, an analysis of how UNC's

2    admissions policies work if a holistic process like it is today

3    had simply declined to consider the race of an applicant?

4    A.   That's correct.

5    Q.   You do not remember what your standard that you used in

6    that analysis was for determining whether or not an alternative

7    result was sufficient for UNC's needs?

8    A.   No, with a qualification.

9    Q.   And what is that qualification, sir?

10   A.   In the model that I ran that weighted socioeconomic status

11   most heavily, I saw that the share of the first-year class

12   composed of underrepresented students would fall from about 18

13   and a half percent to about 12 percent.  And so although it

14   does not establish a standard, I observed that there was a

15   decline -- a substantial decline in the population of

16   underrepresented students using that method.

17   Q.   At your deposition did you testify that you do not think

18   you could replicate that study today?

19   A.   I did testify to that.

20   Q.   Did you -- with respect to the completion of that study,

21   you don't recall discussing it with anybody in the admissions

22   office, do you?

23   A.   I don't recall specifically, no.

24   Q.   Or sharing it with the faculty Advisory Committee on

25   Undergraduate Admissions?

1   A.  Not at the time.

2   Q.  Or preparing a written report or documentation of it?

3   A.  I did not.

4   Q.  You are familiar, sir, with the amicus brief that the

5   University of North Carolina filed with the Supreme Court in

6   2012?

7   A.  I am.

8   Q.  That brief advocates the continued use of holistic

9   admissions, including the use of race?

10  A.  Yes.

11  Q.  You've long advocated for the continued ability of colleges

12  to use race in the holistic admissions process, correct?

13  A.  I've advocated for the importance of diversity in providing

14  the education that we need to provide to our students and --

15  Q.  You've given -- I'm sorry.  I didn't mean to interrupt.

16  A.  No, go ahead.

17  Q.  You've given interviews to the *New York Times*, for example,

18  underscoring how concerned you were that colleges may lose the

19  ability to use race in college admissions?

20  A.  I have.

21  Q.  You have written articles about that in *The Hill* newspaper

22  in Washington, D.C.?

23  A.  I have.

24  Q.  And you guys submitted this amicus brief which was designed

25  to defend the use of race as an element of holistic college

 1  admissions, correct?

 2  A.  The university did, yes.

 3  Q.  You helped cooperate in the assembly of that amicus brief,

 4  correct?

 5  A.  I talked with the authors, yes.

 6  Q.  Provided them an interview that is cited in that brief?

 7  A.  I did.

 8  Q.  That amicus brief includes an analysis of the effects of a

 9  top 10 percent plan at UNC?

10  A.  Yes.

11  Q.  That was the analysis that was prepared by Dr. Kretchmar?

12  A.  Dr. Kretchmar and I, yes.

13  Q.  It uses one year of data?

14  A.  It does.

15  Q.  And it showed that the top 10 plan that you modeled there

16  would increase an underrepresented minority from 15 to

17  16 percent?

18  A.  In the share of the first-year class represented by North

19  Carolinians.

20  Q.  Because that was the data that you had available to you at

21  the time?

22  A.  It was because we didn't consider a top 10 percent plan for

23  nonresident students to be practicable because of the number of

24  nonresident candidates and the few number of places for them.

25  Q.  And you limited your analysis to one year because that was

1  the data you had on hand at the time, correct?

2  A.  I believe so, yes.

3  Q.  In addition to increasing underrepresented minority

4  enrollment in the class that you modeled from 15 to 16 percent,

5  it showed an average SAT increase of 55 points?

6  A.  I think that's close, yes.

7  Q.  And a decline in predicted GPA from 3.26 to 3.16?

8  A.  Yes.

9  Q.  I'd like to bring up -- let me just bring up PX116.

10        **MR. STRAWBRIDGE:**  Go to page 43 of the PDF.  Let's go

11  to the next page.  I'm sorry.  Okay.

12  Q.  (By Mr. Strawbridge)  Do you see at the bottom of page 35,

13  sir, the paragraph that says:  "Under such a system, UNC

14  anticipates that many of the new 'automatic admits' would

15  quickly find themselves educationally lost amid the faster pace

16  of Chapel Hill, flocking to remedial courses to overcome their

17  relatively weak secondary school education and facing

18  increasingly difficult challenges to reach graduation"?

19      Did I read that correctly?

20  A.  I do see that.

21  Q.  And so the difficult challenges to reach graduation, at

22  least as reflected in this brief, is the declination in the

23  average predicted GPA of the class by one-tenth of 1 percent?

24  A.  I'm sorry.  I don't understand the question.  Would you

25  restate it?

1  Q.  Yes.  The amicus brief refers to the average predicted GPA

2  of the alternative class model here as declining by a tenth

3  point, correct?

4  A.  It does.

5  Q.  You do not agree with this statement, do you?

6  A.  I do not.

7  Q.  And, in fact -- I think I heard you testify to this -- UNC

8  does not seek to maximize the average SAT score or the eventual

9  GPA of the entering class, correct?

10  A.  That's right.

11  Q.  UNC, in fact, admits dozens of students each year with a

12  combined SAT score below 1000, correct?

13  A.  Yes, usually.

14  Q.  And notwithstanding those scores, you do not believe that

15  UNC has ever admitted a student capable -- incapable -- I'm

16  sorry -- of thriving at UNC, do you?

17  A.  Yes, because we believe we've considered candidates one by

18  one on the basis of all of their strengths.

19  Q.  And you have not felt that despite admitting dozens of

20  students with SATs under 1000 points that any of them were

21  incapable of thriving at UNC?

22  A.  I do not believe that they were incapable of thriving

23  because we considered them one by one on the basis of all of

24  their strengths.

25  Q.  You provided the charge to the working group on

1  race-neutral alternatives, did you not?

2  A.  I did.

3  Q.  I want to talk a little bit about the OCR letters that you

4  looked at.

5      Ms. Brennan showed you a letter that UNC had sent to the

6  Office of Civil Rights, PX8, correct?

7  A.  Yes.

8  Q.  And we can look at it if we need to, but that letter was

9  dated November 12th, 2012, correct -- I'm sorry --

10  November 21st, 2012.

11  A.  I'm sorry.  I don't recall the specific date, but I accept

12  what you've said.

13  Q.  Let's just bring it up to make sure we're all on the same

14  page.

15      Do you see the date at the top, November 21st?

16  A.  I do, yes.  Thank you.

17  Q.  And the letter that OCR sent the following week is DX39.

18  We can bring that up.  That's November 27th, 2012.

19  A.  Yes.

20  Q.  And so that letter postdates the letter we looked at

21  earlier, correct?

22  A.  It does.

23  Q.  If we go to the last page of this letter --

24          **MR. STRAWBRIDGE:**  Page up one, the second full

25  paragraph -- yeah, the second paragraph.  Right there.  Let's

1  just zoom in on that.

2  Q.  (By Mr. Strawbridge)  The second sentence here says:  "The

3  University has committed to conduct a review of its race and

4  national origin in admissions by September 30th, 2013,"

5  correct?

6  A.  Yes.

7  Q.  "The review will comply with the strict scrutiny

8  requirements established by the Supreme Court, including

9  consideration of the continued necessity of the use of race and

10 national origin in admissions in order to achieve the

11 University's compelling interest in the educational benefits of

12 diversity."

13     Is that accurate?

14 A.  Yes.

15 Q.  Okay.  And Ms. Brennan showed you some e-mails regarding a

16 meeting in September of 2013, correct?

17 A.  Yes.

18 Q.  And I asked you earlier if you were familiar with the

19 interrogatories that were submitted by -- the answers to

20 interrogatories submitted by UNC in this case.

21     Do you know whether or not those interrogatories identify

22 any meeting in September of 2013?

23 A.  I don't recall.

24 Q.  Ms. Brennan also asked you -- strike that.  We'll get to

25 that in a second.

1       You provided the charge to the working group on

2    race-neutral alternatives?

3    A.   Yes.

4    Q.   And that charge -- we can look at PX14 for this.

5       That charge was specifically "to determine if race-neutral

6    alternatives could produce the same or enhanced diversity

7    within the University community while also maintaining or

8    enhancing the level of academic preparation and other qualities

9    we value," correct?

10   A.   That's what the charge says, yes.

11   Q.   And it was your decision to set the current level of

12   diversity as the benchmark, correct?

13   A.   As the starting point, yes.

14   Q.   And, in fact, at least with respect to the work that

15   Ms. Polk's committee did, that was also the ending point, was

16   it not?

17   A.   They produced studies, and they produced the results of

18   those studies.

19   Q.   And their report specifically used this exact same

20   standard, correct?

21   A.   It referred to this standard.

22   Q.   In fact, it referred to this standard as the standard it

23   was applying to assess --

24       (Court reported requests clarification.)

25           **MR. STRAWBRIDGE:**  To assess the alternatives it

1  modeled.

2  Q.  (By Mr. Strawbridge)  The answer was "It did," correct?

3  A.  The answer was yes, and the report also included the

4  results.

5  Q.  It talked a little bit about the advice that Mr. Kallem had

6  provided regarding changes to the draft report from this

7  working group?

8  A.  Yes.

9  Q.  Was your discussion and analysis of the sources that he

10  suggested be included in that report memorialized in writing

11  anywhere?

12  A.  No.  And -- excuse me.  May I add?

13        **THE COURT:**  You may.  Go ahead.

14        **THE WITNESS:**  I don't believe I said I discussed it.

15  I said I read and considered the chapter.

16  Q.  (By Mr. Strawbridge)  But you weren't responsible for

17  producing that report, correct?

18  A.  I was not.

19  Q.  That was Ms. Polk and Ms. Kretchmar's responsibility,

20  correct?

21  A.  That's correct.

22  Q.  And they also received Mr. Kallem's comments?

23  A.  They did.

24  Q.  Mr. Kallem used to work at the Office of Civil Rights for

25  the Department of Education?

1  A.  He did.

2  Q.  He thought that that discussion should be included?

3  A.  He offered that suggestion, yes.

4  Q.  Did you talk about your view as to the articles he

5  referenced with Ms. Polk and Ms. Kretchmar?

6  A.  I don't recall.

7  Q.  Are you aware of any evidence indicating that you had such

8  a discussion?

9  A.  No, I'm not.

10  Q.  Mr. Farmer, if the Court were to order UNC to stop using

11  race, the university would not give up on trying to obtain the

12  benefits of racial diversity, would it?

13  A.  No, we would not.

14      **MR. STRAWBRIDGE:**  Your Honor, I think it's about time

15  for the morning break.  I just want to check and see if I have

16  any further questions.  When we come back from the break, I may

17  or may not need anything else from Mr. Farmer.

18      **THE COURT:**  All right.  You can do that.

19      Sir, if you would step down.

20      **THE WITNESS:**  Thank you, Your Honor.

21      **THE COURT:**  And we will resume at ten after 11:00.

22      (A morning recess was taken from 10:55 a.m. until

23  11:10 a.m.; all parties present.)

24      **THE COURT:**  Yes, sir.

25  Q.  (By Mr. Strawbridge)  Mr. Farmer, we had just left a

 1   hanging loose end about what precisely was the nature of the

 2   legacy request that you had asked to have reviewed by

 3   Ms. Kretchmar.  And so I wanted to ask -- just make sure we're

 4   all on the same page there and give you a chance to refresh

 5   your recollection.

 6       If you could bring up PX301.

 7       This is an e-mail chain between you and Ms. Kretchmar and

 8   Ms. Polk from February 2014?

 9   A.  Yes.

10   Q.  And if you go down to the bottom, it's an e-mail that you

11   actually sent in November of 2013, correct?

12   A.  Yes.

13   Q.  And the questions that you asked Dr. Kretchmar to answer,

14   due to an inquiry from the Advisory Committee on Undergraduate

15   Admissions, were:  "One, do resident candidates who are

16   legacies enjoy an advantage over other resident candidates,

17   contrary to what we claim?"  Correct?

18   A.  Yes.

19   Q.  Your second question was:  "Among nonresident candidates,

20   how substantial is the consideration afforded to legacies, and

21   how does this consideration compare to the consideration

22   afforded to first-generation college and/or fee-waiver

23   candidates?"

24       That was the second question, correct?

25   A.  Yes.

1  Q.  The third question that you posed to Dr. Kretchmar was:

2  "How much does the consideration we afford to nonresident

3  legacies disadvantage other nonresident candidates, or, to put

4  this another way, how much easier would it be for other

5  nonresident students to earn admission if we eliminated

6  consideration for legacies?"

7      That was the third question?

8  A.  Yes.

9  Q.  And that's when you asked if it would be possible for

10 Dr. Kretchmar to do an "all things equal" analysis to explore

11 those questions, correct?

12 A.  Yes.

13 Q.  And Dr. Kretchmar did that analysis and uploaded it

14 sometime later, correct?

15 A.  Yes.

16          **MR. STRAWBRIDGE:**  I don't have any further questions.

17          **THE COURT:**  All right.  Anything further?

18          **MR HINOJOSA:**  No questions from Intervenors, Your

19 Honor.

20          **MS. BRENNAN:**  Your Honor, we have no further questions

21 for Mr. Farmer.  Thank you.

22          **THE COURT:**  All right.  Thank you.  You may step down.

23          **THE WITNESS:**  Thank you, Your Honor.

24      (The witness left the stand.)

25          **MS. VAN GELDER:**  Your Honor, the UNC Defendants call

1  Jared Rosenberg.

2      **THE COURT:**  Thank you.

3      For my purposes, would you tell me your name?

4      **MS. VAN GELDER:**  Amy Van Gelder.

5      **THE COURT:**  All right.  Thank you.

6      **JARED ROSENBERG, DEFENDANT UNC WITNESS, SWORN**

7                      **DIRECT EXAMINATION**

8  BY MS. VAN GELDER:

9  Q.  Good morning, Mr. Rosenberg.

10     Can you please introduce yourself to the Court and state

11 your position with the university?

12 A.  Sure.  I'm Jared Rosenberg, associate director for

13 undergraduate admissions and evaluation.

14 Q.  Thank you.  Mr. Rosenberg, where did you receive your

15 college education?

16 A.  At Washington University in St. Louis.

17 Q.  What degree did you receive?

18 A.  I received a degree in psychology with a minor in business.

19 Q.  Thank you.  Did you go on to any postgraduate education?

20 A.  Yes.

21 Q.  Where did you go?

22 A.  Miami University in Oxford, Ohio.

23 Q.  What sort of degree did you obtain?

24 A.  Sure.  It was a master's degree in college student

25 personnel in higher education administration.

1  Q.  How did you become interested in higher education?

2  A.  I was a tour guide in college, so a student volunteer tour

3  guide, and worked with student admissions recruiting.  And by

4  the time I graduated and done that for a few years, I knew I

5  wanted to work on a college campus in some student affairs

6  capacity.

7  Q.  Thank you.  And after you obtained your master's degree,

8  what did you go on to do?

9  A.  After I obtained my master's degree, I returned to my home

10  state of Florida and spent two years at Florida Atlantic

11  University as an admissions counselor.

12  Q.  And what did you do after your time at Florida Atlantic

13  University?

14  A.  After two years at Florida Atlanta University, I took a

15  position as an admissions counselor at UNC.

16  Q.  And what year was that?

17  A.  1999.

18  Q.  And how long did you hold the position of admissions

19  counselor at UNC?

20  A.  About one year.

21  Q.  And what did you go on to do next?

22  A.  After that year, I was promoted to assistant director of

23  admissions.

24  Q.  And that was in 2000?

25  A.  Yes.

1  Q.  And how long did you hold the position of assistant

2  director?

3  A.  I believe it was approximately two years or so.

4  Q.  And what did you go on to do next?

5  A.  I became senior assistant director of admissions.

6  Q.  And what were your responsibilities as the senior assistant

7  director of admissions?

8  A.  Sure.  When I began in that position, I still had a primary

9  responsibility for recruiting undergraduate students, for

10  reading first-year and transfer undergraduate applications.  I

11  was also managing our daily visit program and our UNC tour

12  guides, so managed our tours, our student ambassadors, and all

13  of our information sessions and daily visitors to campus.

14  Q.  Did there come a time when you became responsible for the

15  day-to-day management of application files?

16  A.  Yes.

17  Q.  When was that?

18  A.  That was later in the 2000s.  My responsibilities started

19  to increase over time in the late 2000s.  I don't remember

20  exactly which month or year, but around 2008, 2009, in that

21  general vicinity.

22  Q.  And what were those responsibilities?

23  A.  So those responsibilities became that I was managing the

24  day-to-day process of reviewing first-year and transfer

25  applications.  That included organizing training for our

1 readers.  It included making sure that files were distributed

2 to readers on a regular basis.  It included ensuring that we

3 completed the review of our applications on time and ultimately

4 released our decisions on time.

5 Q.  And how long did you hold the position of senior assistant

6 director in admissions?

7 A.  Until the summer of 2015.

8 Q.  And what position did you take at that point?

9 A.  Associate director of admissions.

10 Q.  And were you still focused on evaluation at that point?

11 A.  Yes.

12 Q.  How did your responsibilities change?

13 A.  So my responsibilities had changed at that point, and I

14 became a member of the senior leadership team as part of our

15 undergraduate admissions office.  I continued to manage

16 evaluation but at a higher level, so making sure that our

17 philosophy was upheld.  I took on more supervisory roles within

18 the office, so I had more direct reports at that time.  I

19 continued to supervise our seasonal leaders, and I really

20 became responsible for not just the day-to-day involvement, but

21 the overall philosophical direction of the review, as well as

22 the enrollment process of students over the summer.

23 Q.  And that is your current role, correct?

24 A.  Yes.

25 Q.  Who do you report to?

1   A.   Stephen Farmer.

2   Q.   And do you have any staff that report to you?

3   A.   Yes.

4   Q.   How many staff?

5   A.   Right now I have six direct reports.

6   Q.   And do those direct reports have any staff that report to

7   them?

8   A.   Yes.

9   Q.   How many staff report to them?

10  A.   I have one staff member that I directly supervise that

11  has -- I believe it's eight direct reports that report to her.

12  Another staff member that I supervise has the seasonal readers

13  that report to him, and that can vary.  This year it's 27.  The

14  rest of the individuals that I supervise do not have any direct

15  reports.

16  Q.   Thank you.

17       I'd like to talk a little about the goals for the

18  first-year admitted class.  What is the end goal of the

19  application evaluation process?

20  A.   Sure.  It's to admit a smart, caring, diverse group of

21  students who are going to come to campus and help build upon

22  the community that we already have and enhance both the

23  academic environment as well as the social environment on

24  campus.

25  Q.   You mentioned diversity.  What is your understanding of the

1  university's definition of diversity?

2  A.  Sure.  The university's definition, as well as the

3  undergraduate admissions office's definition, of diversity is

4  thinking that a diverse group of students on campus can be

5  beneficial.  And when we think about diversity, we think of it

6  in very broad terms.  So it's not just race or ethnicity, as

7  many people might think of when they first think of diversity.

8  It also includes socioeconomic status, first-generation college

9  status.  It can include things such as political beliefs,

10  religious beliefs.  It also includes diversity of thoughts,

11  experiences, ideas, and talents.

12  Q.  And why does diversity matter?

13  A.  Diversity matters because overwhelmingly over the years,

14  through surveys and feedback from our students is that our

15  students ultimately want to learn and be with students that are

16  different from them.  And what has really come to light through

17  our surveying and feedback and discussions is that we really

18  believe in the educational benefits of diversity and our

19  student body firmly believers in the educational benefits of

20  diversity.

21  Q.  Thank you.

22      I'd like to talk a little about the identity of the

23  application readers.

24      In the time period from 2013 to 2017, which we'll generally

25  focus on here, about how many readers of applications were

1  there in the office for admissions?

2  A.  Well, it varied a little bit from year to year.  During

3  that particular period of time, we had probably in the range of

4  30 to 33 or so readers a year, just depending a little bit upon

5  the year.

6  Q.  And at a high level, who comprises that team of readers?

7  A.  Sure.  So it's a combination of full-time staff, as well as

8  seasonal readers staff who are only hired to help us read.

9  Q.  Okay.  And I'd like to talk about each of those categories.

10    Do the full-time admissions staff read full time?

11 A.  The full-time admissions staff would read probably about 30

12 hours a week, so it's a major part of their job during the

13 reading portion of our application year.

14 Q.  Do they have other responsibilities during the reading

15 season?

16 A.  Yes.  They are still responsible for recruiting students,

17 fielding phone calls, e-mails, leading information sessions,

18 and occasionally recruitment travel.

19 Q.  What qualifications do the full-time staff have to read

20 applications?

21 A.  The vast majority have -- they all have undergraduate

22 degrees, and the vast majority have graduate degrees as well,

23 and many of them came to our office with previous postsecondary

24 or high school experience.

25 Q.  And how much experience do the full-time staff have reading

1  applications?

2  A.  It would vary from 1 year to as many as 12 to 15 years at

3  the time.

4  Q.  And the seasonal readers, you said that they are hired for

5  the reading season.  What is the reading season?

6  A.  So reading season, we're actually reading applications,

7  typically would be in September when training begins through

8  about March when reading would conclude.

9  Q.  And how many hours would the seasonal readers work per

10  week?

11  A.  On average 30 hours a week.

12  Q.  And what qualifications do the seasonal readers have?

13  A.  Sure.  The seasonal readers all had undergraduate degrees.

14  Some had graduate degrees.  Almost all had some type of

15  relevant experience.  So they may have worked in a high school

16  setting, a middle school setting, a college setting.  Some were

17  former high school counselors, principals, teachers, and

18  many -- and those that didn't work in that setting typically

19  still had responsibilities where they had worked with young

20  people in some respect.

21  Q.  Thank you.  How much experience do the seasonal readers

22  have reading applications for the University of North Carolina?

23  A.  It varies anywhere from the first year, as we always have a

24  couple of new seasonal readers each year, to some that have

25  been with us 15-plus years.

1  Q.  Considering the full-time staff readers and the seasonal

2  readers together, can you describe a little about the

3  demographics of those readers?

4  A.  Sure.  So I talked a little about their experience already.

5  In terms of demographics, we do want a diverse group of

6  readers, so they are racially diverse.  We want to have men.

7  We want to have women.  We have -- some of our readers are

8  first-generation college students.  Others have graduate

9  degrees and come from well-educated backgrounds.  So -- really

10 we're also interested in their backgrounds and experiences, so

11 what types of students have they worked with, where

12 geographically have they worked, and in what types of positions

13 they've worked.

14 Q.  Who is responsible for hiring the seasonal readers?

15 A.  That would be me.

16 Q.  And what are you looking for?  What makes a good reader?

17 A.  So when looking at readers, one, obviously we're interested

18 in their background, but we're looking for individuals who are

19 going to advocate for students, who can approach reading an

20 application empathetically, sympathetically, and also with an

21 eye towards understanding the entire student.  We don't want

22 them to just be focused on one or two things in an application.

23 We want them to focus on a wide range of things as they

24 formulate a decision.  And it's important to us that they also

25 believe and -- understand and believe in the mission of our

 1 │ office and the university to bring in a caring and diverse and
 2 │ smart class.
 3 │ Q.  And how do you ensure that the seasonal readers have those
 4 │ qualities when you're hiring them?
 5 │ A.  Sure.  So they're all part of an interview process, but one
 6 │ of the things that we would do as part of our interview process
 7 │ is we do a mock application exercise.  So we actually will have
 8 │ them read a couple of applications that are -- with information
 9 │ redacted, of course -- personal information redacted.  And
10 │ they'll read the applications for a little while, and then
11 │ we'll have a discussion about them.
12 │     And we're not asking them to understand the UNC admissions
13 │ specifically at that time.  We're just curious to understand
14 │ what stands out to them about each applicant, perhaps in the
15 │ positive and the negative.  The applications we give them are
16 │ not very -- they're borderline in some respects.  They have
17 │ pros and cons.  And we just have a discussion with them, very
18 │ much the way we would discuss an application in a committee
19 │ meeting or in discussion with other readers.  We just want to
20 │ see how they think, how they approach the applicant.  We're not
21 │ that interested in whether they necessarily want to admit or
22 │ deny.  We're more interested in the types of things that stand
23 │ out to them that lead their discussion.
24 │ Q.  Thank you.
25 │     I'd like to turn now and talk a bit about reader training.

1    A.   Uh-huh.

2    Q.   In 2013 to 2017, who was responsible for reader training?

3    A.   That would be me.

4    Q.   And how do -- how did you conduct the -- or how do you

5    train readers each year at the beginning of the application

6    cycle?

7    A.   Yes.  So it typically starts -- at that time it was

8    starting probably in late September.  We now start it in

9    earlier September.  But we would break down our initial

10   training into three phases.  So at some point during that time,

11   we would work with our new readers first for a couple of days

12   and introduce them to just the sort of ABCs of reading:  Going

13   through an application, making sure that they understand our

14   technology, our software, a lot of logistical training to get

15   them a bit caught up to where our returners are.

16        And then we would spend several days together as a full

17   reading group.  So that would be your new readers, both full

18   time and seasonal, everyone together for a couple of days of

19   training and discussion.

20        And then at some point in time -- I don't remember exactly

21   which year it was, but many years ago -- we started meeting

22   with the new readers again directly after our all-reader

23   training just because they've been exposed to a lot of

24   information, and we would use that time to help them digest

25   everything that they've learned.

1  Q.  What sort of training do the readers receive on

2  assigning -- on assigning ratings?

3  A.  Sure.  So in terms of assigning ratings, which we use to

4  help us distinguish or to rate particular characteristics of

5  the application, we would -- during our new reader training, we

6  would actually do a lot of work with ratings.  We would show

7  our new readers our rating scales, talk a little bit about what

8  they mean, and we would show them numerous examples as we would

9  go through the scale from 1 to 10, for example.

10  Q.  Do you introduce the new readers to the applicant pool?

11  A.  Yes, we do.

12  Q.  How do you do that?

13  A.  So, typically, we will show them last year's applicant

14  pool, as well as our admitted pool from last year and the pool

15  that we have enrolled.  So, typically, we will show them last

16  year's statistics, the current class that just entered Carolina

17  that fall.

18  Q.  And why is that important?

19  A.  It's important for a couple of reasons.  One, new readers

20  are always looking for some context.  They want to understand

21  what they're about to face, so just being interested in how

22  many applicants we receive, how many come from in state and out

23  of state, and how many do we admit, and a little bit about what

24  their characteristics are.  Part of it is self-interest.

25      But we also want our readers to understand that there are

1   so many considerations and so many things for us to think about

2   when reading an application.  And our job is not just as simple

3   as to say yes or no, but it's really to make sure that we

4   understand everything about the pool that we have because we

5   read each application individually, and the only real thing we

6   think about when we read each application individually is how

7   it may compare to our pool overall.

8   Q.   Do you practice reading applications during the reader

9   training?

10  A.   Yes.

11  Q.   How do you do that?

12  A.   Sure.  So for our all-reader training, we will typically

13  discuss some applications as a larger group, and over the years

14  we also started meeting in some smaller groups as well as part

15  of training to look at applications.  The groups would look at

16  individual applications together but the same applications

17  across the different groups.

18      I think the most important part for our new readers is when

19  we would get them back together.  More recently, we would

20  actually have them start reading this year's applications.

21  They would read them with our help.  They would write comments;

22  they would present them to the group; and with the help of some

23  experienced readers, we would discuss them and make some

24  decisions.

25  Q.   You mentioned writing comments.  What's the importance of

1  writing a comment?

2  A.  Sure.  So in terms of writing a comment on every

3  application, each person that reads each application writes a

4  comment, and that comment is really a summary of what you have

5  read.  It's meant to help the -- someone who might come behind

6  you understand why you're making the decision that you are.

7  Q.  During reader training, is there any training on the

8  consideration of race and ethnicity in the admissions process

9  in particular?

10  A.  Yes.

11  Q.  And what is that training?

12  A.  So we speak about race and ethnicity as one of many factors

13  as we think about diversity of our applicants.  We make -- we

14  want to make sure that readers understand that we are looking

15  to build a diverse class, and that does include racial and

16  ethnic diversity as well.  And we talk a little bit about how

17  to consider race and ethnicity within the context of all the

18  other parts of the application that we have as well.

19  Q.  Aside from the reader training that you've described at the

20  beginning of the application season, is there other reader

21  training throughout the year?

22  A.  Yes.

23  Q.  And what -- at a high level, what types of training are

24  there?

25  A.  Sure.  So we meet weekly, sometimes biweekly -- mostly

1 weekly throughout the reading season to have reader meetings,

2 and so we have reader staff meetings on Wednesdays -- or at the

3 time I think it was Tuesdays -- when we would update readers,

4 allow them to ask questions. We would sometimes go over some

5 applications that we may have read over the previous week that

6 we thought might be good discussion points or teaching tools,

7 and we also -- our more experienced readers would continue to

8 read behind our newer readers and try to provide them feedback

9 on a regular basis about how their reading is going.

10 Q. And how -- how long do your readers read -- or do

11 experienced readers read behind new readers?

12 A. Typically, it's about the first two weeks of reading season

13 we'll read every application they've read regardless. Each

14 reader is ultimately sort of let go into our regular rules, no

15 longer read behind on a case-by-case basis. Some readers pick

16 it up quicker than others. Some readers feel more comfortable

17 having an additional week of being read behind. So we really

18 do it on a case-by-case basis, but on average it's about two

19 weeks.

20 Q. Do readers communicate questions to you throughout the

21 reading season?

22 A. Yes.

23 Q. How do they communicate those questions?

24 A. Primarily through e-mail.

25 Q. And what kinds of questions do you receive?

1  A.  It -- it could run the gamut.  Everything.  Sometimes it's

2  just logistical questions, such as, "I'm looking at a

3  transcript.  I don't know how to interpret this curriculum."

4  Other times it may be "I'm unsure which GPA to enter."  And

5  some other times it may be trying to get our advice about how

6  to read a particular applicant.

7  Q.  And during a typical admissions cycle, approximately how

8  many e-mails with questions from readers would you estimate

9  that you receive?

10  A.  Hundreds.

11  Q.  What are the goals -- as the head of the evaluation

12  process, what are your goals for reader training?

13  A.  So our goals for reader training are to introduce our

14  readers to our individual, comprehensive and holistic review.

15  Our goal is for them to understand that when they read an

16  applicant, they're reading the entire applicant, not just the

17  test score, not just the GPA, not just an essay.  They're a

18  whole person.

19      And when we read the application, we want them to

20  understand the context in which they come from, so the context

21  of their homelife and environment, the context of their school

22  life and environment.  We want to train readers to meet our

23  applicants where they are and understand that they all come

24  from different walks of life and that context is extremely

25  important to consider as you make the decision.

1  Q.  Why is that context so important?

2  A.  The context is important because different students -- or I

3  think one way to think about it is success can be defined

4  differently in different environments, and so it's important to

5  understand that some students won't have the curriculum that

6  other students have simply because their high schools don't

7  offer it, that other students -- some students may have a lot

8  of test prep options, while other students may not.  Many

9  students have struggled and gone through a lot of adversity,

10  and that could potentially impact a particular part of their

11  academic record.

12      We always want to make sure that we're, you know, admitting

13  applicants that we feel would be successful and be a part of

14  the Carolina community, but it's also important to understand

15  that in the context in which they come from because no two

16  applicants are the same.

17  Q.  I'd like to turn now to the application review process.

18  A.  Uh-huh.

19  Q.  At a high level, what is the overall guiding principle for

20  review of an application for admission?

21  A.  Sure.  The overall guiding principle is that each

22  application deserves an individual, comprehensive and holistic

23  review.

24  Q.  What is the first thing that you do when you begin to

25  review an application for admission?

1    A.   Sure.  So we read electronically, and so the first thing I

2    do after I open an application that's in my queue is I look at

3    what's called the reader dashboard.

4    Q.   And what information is contained on the reader dashboard?

5    A.   On the reader dashboard is going to be some factual

6    information about the applicant, so obviously name, where

7    they're from, what high school they attend.  It does tell us

8    race and ethnicity.  It will tell us if they are a

9    first-generation college student.  Sometime during that time

10   frame we also added if the student was receiving a fee waiver.

11   As well, we'll see their SAT and ACT score.  That's --

12   that's -- that's primarily the general information that we'll

13   home in on at first.

14   Q.   And why are you looking at that the dashboard information

15   first?

16   A.   It just initially tells me who the applicant is, where

17   they're from, what high school they go to.  It provides a

18   little about bit of context.  Most of the context will come

19   later as we open up the application, but it just gives you a

20   little bit of a preview of what you may be about to see.

21        **MS. VAN GELDER:**  Your Honor, at this time I'm going to

22   ask Mr. Rosenberg to go through an application, and it is a

23   highly confidential document, so I would ask to turn off the

24   feed, and if there's nonattorneys in the room --

25        **THE COURT:**  Yes.

1     If there are people in the courtroom other than attorneys,

2 I would ask that you step out as well.

3     (Spectators left the courtroom and audio privacy settings

4 were turned on.)

5     (Sealed portion of trial testimony occurred next and

6 appears under separate cover filed with the court.)

7         **MS. VAN GELDER:** Your Honor, I'm not going to show any

8 more pages of the exhibit, although we'll continue talking

9 about the application process, but I don't think it will

10 involve the confidential information.

11         **THE COURT:** All right. So are you suggesting we can

12 allow these others to listen?

13         **MS. VAN GELDER:** Yes.

14         **THE COURT:** All right. If you can do that, Debbie.

15         **THE CLERK:** Okay.

16     (Spectators were allowed to return to the courtroom and the

17 audio privacy settings were turned off.)

18 Q. (By Ms. Van Gelder) Mr. Rosenberg, how are the SAT and the

19 ACT test scores considered during the application evaluation

20 process?

21 A. Sure. So the test scores are one of many data points that

22 we can think about and consider. We look at testing, again, in

23 concert with the entire application. So the test score is just

24 a number or an isolated score. It doesn't tell us everything

25 we need to know. It's important that we understand, again, the

1  context of the applicant and everything about them to consider

2  their test score appropriately.

3  Q.  When are below-average test scores more likely to affect an

4  applicant for admission negatively?

5  A.  A lower test score might impact a student more negatively

6  if other data points in the application are tending to point in

7  the same direction, so in concert perhaps with lower academic

8  performance, a weaker program perhaps.  We sometimes will see

9  lower SAT scores in concert with poorer writings, say, looking

10  at the reading or verbal score along with the essay.

11      So, yes, it can have a negative effect on some applicants.

12  Q.  Have you denied admission to applicants with high test

13  scores?

14  A.  Of course.

15  Q.  And have you granted admission to applicants with low test

16  scores?

17  A.  Of course.

18  Q.  If an applicant -- during the 2013 to 2017 time frame, if

19  an applicant submitted only ACT scores, how would readers look

20  at that?

21  A.  Sure.  So at the time students could submit either an SAT

22  or an ACT or both.  Students -- that was up to the student.  We

23  required one or the other.  What we would do is we would

24  concord the ACT score to its SAT equivalent and, in essence,

25  recalibrate everyone on an SAT scale.  So we were able to

1  compare everyone using a similar standard.  And so our readers

2  had a concordance chart, and so that was published, that they

3  would have.  And so, for example, if a student scored a 30 on

4  the ACT, that equates to about a 1340 at the time, or mid 1300s

5  generally, and so that student would, in essence, be thought of

6  as having a 1340 SAT score.

7  Q.  And that concordance table that you referenced, where did

8  that come from?

9  A.  It's published by the College Board.  SAT and ACT work to

10  try to concord their scores together, but it is published by

11  the College Board for SAT concordance.

12  Q.  If it is disclosed, how are race and ethnicity considered

13  during the evaluation process?

14  A.  Sure.  So if it's disclosed, similar in a way to SAT and

15  ACT, it's one of many factors, it's one of many characteristics

16  that we know about an applicant.  We consider, again, the

17  entire applicant individually, comprehensively and

18  holistically.  To the extent that race and ethnicity informs

19  their upbringing, their background, some students may talk more

20  about it; others may not.

21      But to the extent that we do consider diversity in our

22  class, race and ethnicity would be one of many factors that we

23  think about when reading an application, just as we would a

24  first-generation college student or a fee waiver or low

25  socioeconomic student.

1  Q.  Does the admissions office ever assign automatic points for
2  race in the reading process?
3  A.  No.
4  Q.  Do you review candidates of different racial backgrounds
5  separately or differently?
6  A.  No.  Everyone goes through the same evaluation process.
7  Q.  After you've assigned all the ratings to an application,
8  what do you do next?
9  A.  After we assign all of the ratings, the next thing I will
10  do -- or we would do is typically compose the comment that we
11  mentioned earlier where we summarize the information that we've
12  reviewed and also arrive at a provisional decision for that
13  applicant at that time.
14  Q.  And what information is important for the comment to
15  contain?
16  A.  Sure.  So the comment will typically contain the strengths
17  and weaknesses perhaps that the applicant is presenting to us,
18  again relative to our applicant pool.  We will also talk about
19  relevant context.  So typically in a comment we will share any
20  stories, or we might mention background information that we've
21  learned about a student's family or educational history.  And
22  so we will then take -- given that context and given the
23  strengths and weaknesses that we've pointed out about that
24  applicant, we would then use that information to arrive at our
25  best professional judgment of an admissions decision.

1  Q.  And in 2013 to 2017, what admissions decisions were

2  available to the reader?

3  A.  Sure.  So for the early action deadline, a reader could

4  choose to admit, defer, or deny an applicant.  And for the

5  regular decision deadline, they could choose to admit,

6  waitlist, or deny an applicant.

7  Q.  How do the ratings that were assigned during the reading

8  process play into that admissions decision?

9  A.  The ratings do not equal a decision at all.

10 Q.  What value do the ratings have?

11 A.  The ratings are valuable to us as really more of -- as an

12 internal discussion, so, for example, a way of having a quick

13 way to understand what an application may look like or

14 represent without having to read the entire application.

15 Q.  Are there any minimum ratings that are required for

16 admission?

17 A.  No.

18 Q.  Do the readers sum up or total the ratings in any way?

19 A.  No.

20 Q.  How does disclosed race or ethnicity affect the ultimate

21 decision to admit or deny or defer or waitlist an applicant?

22 A.  It can affect the decision in the same way any other part

23 of the application can affect the decision, and it's thought

24 about, again, in concert with all of the other information we

25 have about an applicant.  So in considering their socioeconomic

1  background, considering their educational opportunities,

2  considering any contextual stories, all of those things, we

3  will also think about race and ethnicity as we think about all

4  of that information about an applicant as we make a decision.

5  Q.  What happens once the first reader of an application makes

6  his or her decision?

7  A.  So the first reader will make their provisional decision,

8  and then the application at that point would move on a

9  predetermined path, depending upon the residency of that

10 applicant and the first decision that is given.

11 Q.  And what are the options for the predetermined path?

12 A.  Sure.  So if a student is a North Carolina resident at that

13 time, if a student -- excuse me -- if a reader voted admit or

14 deny on a North Carolina resident, that provisional decision

15 would stand, and the application would go into a completed

16 queue, if you will, where it would sit for a period of time.

17 If the first reader voted defer, which is really, in essence, a

18 borderline application -- we might see that as borderline -- it

19 would then go for a second read.

20     If the applicant was an out-of-state student or a

21 non-North Carolina resident and the first reader voted admit or

22 defer, the applicant would go for a second read.  If they voted

23 deny, it would go, again, to that evaluation complete queue or

24 area.

25 Q.  Are there any other circumstances when an application might

1  receive a second read?

2  A.  Yes.  A first reader at the time could also designate any

3  application to get a second read if they just felt unsure or

4  had further questions and wanted another opinion.

5  Q.  And who conducts the second read of applications during

6  this time frame, generally speaking?

7  A.  Sure.  It would be a small number of readers, typically

8  very experienced readers who have been with us for some time

9  and have proven themselves to be both effective and efficient.

10 Q.  And what is the process for conducting a second read of an

11 application?

12 A.  So when a second reader receives an application, they will

13 also look at the dashboard first, but they will also have the

14 benefit of seeing the first reader's ratings.  We typically ask

15 them not to read the comments or look at the decision until

16 they've gone back and gone through the entire application.

17 They will typically reread the application from beginning to

18 end, just the way the first reader did, and they will update a

19 rating.  If they feel that a first reader has incorrectly rated

20 someone or missed something -- for example, they missed

21 courses -- they will update the rating.  They will then enter

22 their own comment.  There's a place for the second reader to

23 put their summary, and then they will also come up with a

24 provisional decision.

25 Q.  And is the Tier 2 reader's decision the active decision at

1  that point?

2  A.  Yes, that is the decision that will be -- that

3  provisionally stands at that period of time until such time if

4  it's changed or released.

5  Q.  In 2013 to 2017, approximately how many applications would

6  you estimate were read twice?

7  A.  I would estimate it's probably somewhere in the 40 percent

8  range.  It would vary a little bit from year to year.

9  Q.  What happens after the second reader -- this Tier 2 read

10  process is completed?

11  A.  So after that process is completed, as I said, the

12  application would go to a virtual queue where it would be held;

13  and then at the conclusion of our individual reading period, we

14  would review our decisions before releasing them to students.

15  Q.  And is that the school group review process?

16  A.  Yes.

17  Q.  The Court has already heard a lot about that a bunch.  I

18  won't have you go through all that.

19      What happens once the school group review process is

20  completed?

21  A.  Sure.  Once the school group review process is completed,

22  we get ready to release our decisions to our applicants,

23  typically all at the same time in the afternoon, and they're

24  released to students.

25  Q.  I'd like to take a look at Plaintiff's Exhibit 65 and talk

```
 1  a little bit about the reporting that's available to the
 2  admissions office.
 3      So you see that there's an e-mail from Dr. Kretchmar to
 4  you --
 5  A.  Yes.
 6  Q.  -- attaching a report, and we'll take a look at the exhibit
 7  or the -- yeah.  Thank you -- the attachment to the e-mail.
 8      Mr. Rosenberg, do you recognize this sort of report?
 9  A.  Yes.
10  Q.  What is it?
11  A.  This is a prior year comparison report that simply shows us
12  how our applicant pool has changed from one year to the next,
13  and it allows us just to track data points of demographics
14  about our applications.
15  Q.  And in the 2013 to 2017 time frame, to the extent this
16  report was circulated or produced, who had access to it?
17  A.  Senior leadership.
18  Q.  Did seasonal readers have access to a report like this?
19  A.  No.
20  Q.  Did the staff who were readers have access to a report like
21  this?
22  A.  No.
23  Q.  Does the admissions office still complete these prior year
24  comparisons in this form?
25  A.  In this form, no.
```

1 Q.  In the 2013 to 2017 time frame, did seasonal readers or

2 admissions office staff have access to any reports showing the

3 racial and ethnic breakdown of the provisionally admitted

4 class?

5 A.  Not to my knowledge, no.

6 Q.  Did they have access to any reports showing the breakdown

7 of demographics of the provisionally admitted class?

8 A.  Not to my knowledge, no.

9 Q.  Why not?

10 A.  So when we're reading applications -- because they're read

11 randomly and in any random order, we typically do not want

12 readers to know specifically what our admit rates look like

13 from day to day and week to week.  Part of the reason is that

14 we don't want readers to change how they're reading from

15 Wednesday to Friday because they learned something on a

16 Thursday.  We would like to use the decision review to review

17 everyone equally and fairly at the same time and adjust

18 decisions at that point.  So we don't want to influence readers

19 in any which way simply because our admit rate might look

20 higher or lower on a particular day, because it could simply be

21 a product of the applications that we have randomly read up to

22 that point.

23 Q.  When do readers learn of the racial and ethnic makeup of

24 the first-year class?

25 A.  In the summer after our reading is completed, our waitlist

1  is disbanded, and our class is fully enrolled.
2  Q.  Mr. Rosenberg, as the leader of the evaluation team, what
3  are your observations regarding readers' compliance with the
4  reader policies and training that you provide?
5  A.  I think they do a great job.  I do think they follow the
6  guidelines and policies and do everything they can to support
7  our offices and the university's mission.
8  Q.  And what are your observations regarding the readers'
9  consideration of race and ethnicity in the admissions process?
10 A.  I do think they look at it appropriately.
11 Q.  And why are you confident that readers comply with policies
12 and training and properly consider race and ethnicity in the
13 holistic admissions process?
14 A.  In my role, as both a second reader and as someone who
15 participates in the decision review, I have the opportunity to
16 read behind everyone multiple times, many, many times
17 throughout the year.  So throughout the year, I am constantly
18 seeing or reviewing files that first readers have read.  I'm
19 reading their comments.  I'm understanding how they got to
20 their decisions.
21     And then when we get to decision review, I open hundreds of
22 applications and read comments and understand the thought
23 process behind different people's decisions.  And so over time
24 I can gain confidence in individual readers, that they are
25 considering all aspects of an application, that they've done

 1  that individual, comprehensive, and holistic review, and that

 2  they are appropriately considering race as one of many factors

 3  they can think about when reading the application.

 4          **MS. VAN GELDER:**  Thank you, Mr. Rosenberg.  I don't

 5  have any further questions.

 6          **THE COURT:**  Since it is about ten minutes -- I'm

 7  assuming it will take you will longer than ten minutes to

 8  cross?

 9          **MR. WEIR:**  Yes, Your Honor.

10          **THE COURT:**  All right.  Sir, you may step down at this

11  time.

12      We will recess, and we'll resume at 1:20.

13      (A noon recess was taken from 12:20 p.m. until 1:20 p.m.;

14  all parties present.)

15          **THE COURT:**  For the record, if you would give me your

16  name.

17          **MR. WEIR:**  Yes, Your Honor, Bryan Weir.

18          **THE COURT:**  Thank you.  You may proceed.

19                          **CROSS-EXAMINATION**

20  **BY MR. WEIR:**

21  Q.  Good afternoon, Mr. Rosenberg.

22  A.  Good afternoon.

23  Q.  We haven't actually met yet.  As I just said, I'm Bryan

24  Weir.  I represent the Plaintiff here, Students for Fair

25  Admissions.

1    So I want to start a little bit just talking about process,

2    which you went through with Ms. Van Gelder a bit ago, just

3    cover a little ground we've touched on.

4    When a reader reviews an application, they read the entire

5    application file, correct?

6    A.  Yes.

7    Q.  And everything -- they're trained to -- to consider

8    everything in that application file because everything matters

9    in the application file; is that correct?

10   A.  Yes.

11   Q.  And second readers, they conduct the same type of read as a

12   first reader would in that way?

13   A.  Yes.

14   Q.  So for a second reader, everything in the application

15   matters?

16   A.  Yes.

17   Q.  And that's also true for the school group review process?

18   A.  Yes.

19   Q.  And just a quick question about that process.  UNC used to

20   have race displayed on the actual SGR reports, correct?

21   A.  Yes, a long time ago, uh-huh.

22   Q.  And UNC removed race from those reports after the Office of

23   Civil Rights complaint, correct?

24   A.  Yes.

25   Q.  But at least during 2014 to 2017, a reader could still

1  click through the SGR report and learn the applicant's race,

2  correct?

3  A.   If they opened an application on that report, yes.

4  Q.   And so the race of the applicant was just one click away?

5  A.   Yes.

6  Q.   And you personally, when you conducted SGR review, would

7  look at -- had occasion to look at an applicant's race,

8  correct?

9  A.   Yes.

10  Q.   I want to talk a little about reader training.  I know you

11  covered that, again, with Ms. Van Gelder.

12      When a new reader comes into your office, they're trained

13  on the five ratings that the admissions office gives

14  applicants, correct?

15  A.   Yes.

16  Q.   And those are program, performance, extracurriculars,

17  essay, and personal qualities?

18  A.   Yes.

19  Q.   Mr. Farmer testified yesterday that the admissions office

20  takes quality control for these ratings seriously.  Do you

21  agree with that?

22  A.   Yes.

23  Q.   And do you agree that it's important for all readers to be

24  on the same page when it comes to scoring those ratings?

25  A.   Yes.  To an extent, yes.

1  Q.  So after -- I believe you testified that new readers, when

2  they come into the admissions office, will receive a couple of

3  days of training at the beginning?

4  A.  Yes.

5  Q.  And then after that they actually start reading

6  applications, correct?

7  A.  With other readers, not on their own, but yes.

8  Q.  But then after that, they will start reading their own

9  applications, correct?

10  A.  Usually, yes, a couple of weeks after that initial

11  training.

12  Q.  Okay.  So at some part of that process -- and maybe I

13  misunderstood your testimony earlier -- every single

14  application that a new reader will read is given a second read

15  by an experienced reader, correct?

16  A.  Yes, for at least their first two full weeks of individual

17  readings.  So starting in mid-October when they're on their

18  own, those first two weeks they would be read behind every

19  application, yes.

20  Q.  And the reason for doing that is to make sure that the new

21  readers' decisions are calibrated to what the admissions

22  office's priorities are, correct?

23  A.  Yes.  We review everything.  So we want to see if they're

24  applying ratings correctly, their comments are well written,

25  and the decisions that they're making, yes.

1  Q.  And so just to make sure that they're all calibrated with

2  the admissions office's priorities, correct?

3  A.  That they would be calibrated in a sense that the majority

4  of our readers may come to a similar decision, but we don't all

5  agree on every admissions decision.

6  Q.  And you would agree with me that once a new reader is

7  trained, 99 percent of the time the second reader doesn't have

8  to change the ratings of the first reader, correct?

9  A.  I don't know if it's 99 percent of the time, but the vast

10 majority of the time, no, they do not need to change the

11 ratings of the first reader.

12 Q.  Do you remember at your deposition saying that about

13 99 percent of the time the second reader doesn't need to change

14 the first reader's decision?

15 A.  Yes.  It would be about that, yes.

16 Q.  In fact, UNC actually conducted a reliability test of its

17 readers evaluating the ratings themselves, correct?

18 A.  Yes, I remember that.

19 Q.  And the point of that study was to give all readers the

20 same application to review so everyone would be properly

21 calibrated on the reading process, correct?

22 A.  That was part of the goal, yes, and to see how calibrated

23 we were, yes.

24 Q.  I believe you testified earlier that at the beginning of

25 every year, you know, the reading process ends sometime in the

1  spring, and there's six months where there's no reading

2  happening, correct?

3  A.  Yes.

4  Q.  So at the beginning of every year, the admissions office

5  will do an all-reader kickoff; is that right?

6  A.  Yes, that would be the all-reader training, uh-huh.

7  Q.  Thank you.

8      And at that training -- that just makes sure that everybody

9  is still on the same page as to reading applications after the

10  six-month layoff; is that correct?

11  A.  Yes, that's one part of the goal.  We do a lot of different

12  types of training during those couple of days.

13  Q.  And I believe you testified earlier that you have weekly

14  committee meetings where you discuss specific cases with

15  readers during the year, correct?

16  A.  Yes, typically, once a week we would have the opportunity

17  to meet in small groups and discuss applications that one of

18  the readers in that group may have read earlier in the week.

19  Q.  And that in itself is an additional form of training for

20  the readers in the office, correct?

21  A.  It's a chance -- partially, yes.  It's a chance for us to

22  discuss applications that often might not have clear decisions,

23  so it's a chance for us to try to reach a consensus; but

24  through the actual conversations that we have about applicants,

25  it does help newer readers to learn about some of the things we

1  talk about, learn something about a new high school or

2  something that might be worthwhile to note in an application.

3  Q.  You testified earlier about the seasonal readers that

4  assist the admissions office.  Do you recall that testimony?

5  A.  Yes.

6  Q.  The training that seasonal readers receive is identical to

7  the training that the permanent readers receive, correct?

8  A.  Yes.

9  Q.  I just have a quick question about personnel.

10     Patty Baum is a full-time employee in the admissions

11  office, correct?

12  A.  Yes.

13  Q.  She's worked there for about ten years; is that correct?

14  A.  Sounds about right.

15  Q.  And she's a second reader, correct?

16  A.  Yes.

17  Q.  And Ally Ahern worked in the admissions office from between

18  2013 to 2015, correct?

19  A.  Yes.

20  Q.  And she read applications during that time period?

21  A.  Yes, but a much more limited number than other full-time

22  staff.

23  Q.  And as far as you know, Ms. Baum and Ms. Ahern would have

24  gone through the same reader training as everyone else in the

25  office, correct?

1  A.  Yes.

2  Q.  I don't want to pull the actual application up because I

3  don't want to evict anybody from the courtroom, but you

4  remember going through an application earlier today?

5  A.  Yes.

6  Q.  And that application was over 30 pages, correct?

7  A.  Yes.

8  Q.  There's a lot of information in there to digest; is that

9  fair to say?

10  A.  Yes.

11  Q.  And when you go through that information, I think you

12  testified that you have to review it all in context; is that

13  right?

14  A.  Yes.

15  Q.  I want to talk about -- in that application there was a

16  couple of essays.  Do you remember that?

17  A.  Yes.

18  Q.  And it's fair to say that the essay is the only thing you

19  have from the student, his or herself, in their own voice?

20  A.  Yes, unless they've included any additional information

21  like an article they wrote or something like that, but, yes, in

22  their own voice, freeform writing, yes.

23  Q.  I think you said earlier the additional things that

24  students sometimes will do, but that's rare; is that right?

25  A.  I'm sorry.  Can you repeat that?

1  Q.  I think you said earlier that sometimes students will

2  append things to their application, but that's rare?

3  A.  Yes.

4  Q.  So in the typical case, the essay is the only thing you

5  have written by the student?

6  A.  Yes.

7  Q.  And that, is it fair to say, provides important context for

8  the student's application?

9  A.  It can, yes.

10 Q.  And it provides something you can't get from the numbers in

11 the application; is that fair to say?

12 A.  Potentially, yes.

13 Q.  And is that also true for the recommendations for teachers

14 and counselors?

15 A.  That we can get information we can't glean from the

16 numbers?

17 Q.  Correct.

18 A.  Yes.

19 Q.  And the recommendations themselves are the only things you

20 have about the applicant from people that actually know the

21 applicant personally, correct?

22 A.  Yes.

23 Q.  It provides important context about the student's

24 application?

25 A.  Yes, it can.

1  Q.  So I suppose, would you agree, that it's important to

2  digest the content provided both in those essays and in the

3  recommendations, correct?

4  A.  Yes, I would.

5  Q.  And you need to read them closely to do that?

6  A.  Yes, you do.

7  Q.  Is it fair to say it takes about three minutes to read a

8  student's essay?

9  A.  Depending upon the length, I would say anywhere from two to

10 four minutes.

11 Q.  From two to four minutes.

12     And the same true for -- is it fair to say the same is true

13 for the recommendations?

14 A.  It depends upon the length.  Some recommendations can be

15 very short and curt, so some could be as little as 30 or 40

16 seconds, and some could be as long to take three or four

17 minutes.

18 Q.  I want to go through the reading document a little bit to

19 look at all of the factors that readers need to consider.

20     If you could pull up DX10.

21     So is this -- this is the reading document for the

22 2016-2017 application year, correct?

23 A.  Yes.

24 Q.  And if we could go to page 6, the second paragraph, the one

25 just under the one you just highlighted.

1    So here it says typically there's more than 40 criteria

2  grouped together in eight categories that are used at every

3  stage of the admissions process, correct?

4  A.  Yes.

5  Q.  Is that an accurate statement of how applications -- the

6  fact -- the number of factors that are used in reading an

7  application?

8  A.  There are a lot of factors that we'll consider in using an

9  application.  I don't know today that I could list off 40 off

10  the top of my head, but there are an awful lot of data points

11  and things that we can think about.

12  Q.  I will not ask you to list them off the top of your head.

13  A.  Thank you.

14  Q.  I just want to start with the academic program criteria.

15  So when you're rating academic program, you have to review -- I

16  counted three here -- factors.  Is that more or less how it

17  works in practice?

18  A.  Yes.

19  Q.  And when you review these factors, you have to review them

20  all within the context of the entire applicant pool, correct?

21  A.  We consider them in the context of the student's school, as

22  well as in the context of the entire applicant pool, yes.

23  Q.  So as you're reading the application, you're also thinking

24  about how this applicant compares to the entire applicant pool?

25  A.  Yes.

1    Q.  Can you go to academic performance, please?

2        And readers are trained -- at least UNC's reading document

3    states in evaluating academic performance, you have to look at

4    all these criteria.  I counted five.

5        Is that an accurate representation of what a student needs

6    to -- a reader needs to do when reading an application?

7    A.  Yes.  I would focus more on the last three than the first

8    two because grade point average and rank in class in and of

9    themselves doesn't always tell us a whole lot, but the last

10   three, yes.

11   Q.  And, again, as with academic program, when you're reviewing

12   the application, this is all viewed -- the training, anyway, is

13   all viewed within the context of the entire applicant pool,

14   correct?

15   A.  Yes.

16   Q.  Can we go to essay criteria?  It's on the next page.

17       And when evaluating the essay, you have to take all of

18   these factors into consideration as well, correct?

19   A.  Yes.

20   Q.  I counted seven here.  Is that more or less how many

21   factors you consider when reviewing the essay?

22   A.  Yes, I would say that we consider all of these things.

23   Yes.

24   Q.  I'll save us going through the other extracurricular,

25   personal criteria.

1    But there's more to the application, am I right, than just

2  these five criteria?  I believe you testified to that earlier.

3  A.  Yes.

4  Q.  In fact, you review background criteria, which is listed

5  here on this page.  If you could -- so here I counted nine

6  separate factors that a reader needs to consider when reviewing

7  an application.  Is that about right?

8  A.  Yes, I would say at one time or another we consider these

9  factors in an applicant, uh-huh.

10 Q.  These are things that readers are instructed to consider

11 when reviewing an application, correct?

12 A.  Yes.

13 Q.  And for standardized testing criteria, there's actually

14 specific instructions on how to evaluate that as well, correct?

15 A.  Yes.

16 Q.  But even still, the -- what we've looked at so far, this is

17 not the entire universe, at least according to this reading

18 document, of what a reader needs to consider in reviewing an

19 application, correct?

20 A.  Yes.

21 Q.  The second line here says -- and I'll read it so you don't

22 have to:  "Because each student is unique, the admissions

23 committee does not arbitrarily limit the range of individual

24 qualities that may be considered.  Nor does the committee limit

25 the number of considerations, including background and personal

 1  considerations, which may benefit any individual candidate."
 2      Did I read that correctly?
 3  A.  Yes.
 4  Q.  So in addition to the 40-plus criteria we've looked at,
 5  readers are also instructed to consider more factors; is that
 6  accurate?
 7  A.  Yes.
 8  Q.  And then after doing all this, the reader has to make, I
 9  believe, a tentative decision is how you explained it earlier?
10  A.  Yes, a tentative or provisional decision.  No decision is
11  final until it leaves the office.
12  Q.  And after making that decision, the reader has to justify
13  that decision by writing out comments as well, correct?
14  A.  Yes.
15  Q.  They provide an explanation of why they made a
16  recommendation?
17  A.  Yes, they -- yes, they would -- we have them summarize some
18  of the, like I said before, strengths, weaknesses, considering
19  context and any other information they've learned and try to
20  arrive at the best decision they can.
21  Q.  And you have to do this for every single application,
22  correct?
23  A.  Yes.
24  Q.  There's no shortcuts for particular applications; is that
25  right?

1  A.  No.

2  Q.  I want to talk a little bit about how applications make

3  their way from the student to a particular reader --

4  A.  Okay.

5  Q.  -- which I'm not sure we touched on, but I just want to get

6  through that.

7      So at least in the 2014 to 2017 range, part of your job

8  used to be assigning applications to readers to read, correct?

9  A.  Yes, they would have to be manually done during that time.

10 Q.  And that was your responsibility?

11 A.  Yes, through 2016.  I believe it may have changed over to

12 Mr. Perkins sometime around 2016, 2017.

13 Q.  And it was your job, then, basically to keep -- for lack of

14 a better phrase, keep the trains running on time?

15 A.  Yes.

16 Q.  And the way that would work, am I right, the readers in the

17 office would get a weekly quota of applications they need to

18 review?

19 A.  Yes, we would assign applications on a Monday morning with

20 the goal that they would complete them by the following Sunday

21 evening.

22 Q.  And it used to be your job to make sure everyone was

23 completing review of those applications on time, correct?

24 A.  Yes.

25 Q.  And, again, to use -- for lack of a better phrase, you had

1    to crack the whip, so to speak, to make sure everyone was
2    getting through their stack on time?
3    A.   That would not be the phrase I would use.  We would talk to
4    people if they were struggling to finish their applications,
5    and there would often be very good reasons as to why not; and
6    sometimes we would reassign applications from one reader to
7    another.  But, in general, our goal was to reach out to
8    readers, if they weren't able to finish their files, to
9    understand why.
10   Q.   But you -- sometimes you would reassign to make sure they
11   got done in a timely fashion?
12   A.   Yes, we worked together as an entire team, and so we met
13   our goal as a team, not just as individuals.
14   Q.   And the reason you would do the weekly quotas and what you
15   just testified to was to make sure that the admissions office
16   could get through all 40,000 applications within the six-month
17   time frame?
18   A.   Yes.
19   Q.   Did there come a time when the admissions office switched
20   from a -- to what I would call a two-read process to a
21   one-read -- well, strike that.
22        Did UNC used to read every application twice?
23   A.   At one point, yes.
24   Q.   And did there come a time when a decision was made to not
25   require a second read for every application?

1   A.   Yes.

2   Q.   And when the admissions office made that switch, you put

3   together a proposal for a new system, correct?

4   A.   Yes.

5   Q.   And in putting together that new proposal, you received

6   feedback from readers; is that fair to say?

7   A.   Yes, I remember that summer we met with readers.  We always

8   do that each year to get feedback.  But we had specific

9   discussions with our readers about potentially making what at

10  that time would be a major change to our reading process.

11  Q.   And in getting that feedback, readers told you that they

12  could read about six applications per hour, correct?

13  A.   That sounds about right.  It depends on the applications

14  that you receive, but, yes, as a long-term average, yes.

15  Q.   That's what readers told you they could handle?

16  A.   In general as second readers, yes.  As first readers, I

17  feel like it would be a little bit less than that.  But

18  somewhere in that range, yes.

19  Q.   Sorry.  Maybe my question wasn't -- was hard to understand.

20       Did first readers tell you during that time period they

21  could read six applications per hour?

22  A.   It's possible some did.  I don't remember exactly what they

23  may have said.

24  Q.   Okay.

25            **MR. WEIR:**  Can you bring up PX70?

1  Q.  (By Mr. Weir)  Mr. Rosenberg, is this an e-mail from you

2  during the time period we were just discussing?

3  A.  Yes.  2013, yes.

4       **MR. WEIR:**  And if you could go to the attachment, the

5  first page of the attachment.

6  Q.  (By Mr. Weir)  And is this a proposal that you put together

7  that we were just discussing?

8  A.  Yes.

9  Q.  And here in this sentence -- hold on a second.  There you

10 go -- you wrote:  "Readers have previously suggested that they

11 could complete approximately six reads per hour."  Correct?

12 A.  Yes.

13 Q.  Does that refresh your recollection?

14 A.  Yes, it does.  Yeah.

15 Q.  Okay.  After UNC implemented this process, did it come to a

16 conclusion that readers -- excuse me -- it came to the

17 conclusion that readers could read about five applications per

18 how; is that fair to say?

19 A.  Yes.

20 Q.  So at five applications per hour, that's about 12 minutes

21 per application, correct?

22 A.  Yes.

23 Q.  I want to change pace just a little bit and talk a little

24 bit about critical mass.

25      You don't have any understanding, at least as of 2017,

 1  about how the critical mass goal would actually be measured,

 2  correct?

 3  A.  Numerically, no, but I understand the goal of critical

 4  mass.

 5  Q.  So do you recall testifying at your deposition about

 6  whether you had an understanding of how to measure critical

 7  mass?

 8  A.  Yes.

 9  Q.  And do you recall testifying that you did not have an

10  understanding of how to measure critical mass?

11  A.  Yes.

12  Q.  And you actually don't have an understanding about how to

13  determine when UNC has reached a critical mass, correct?

14  A.  Correct.

15  Q.  And you've never actually had a conversation with anyone in

16  the UNC admissions office about whether or not race should

17  cease being a factor in the admissions process, correct?

18  A.  Has it ever come up in any conversation?

19  Q.  That's my question, yes.

20  A.  It may have come up once or twice in a casual conversation,

21  but there were no formal discussions, no.

22  Q.  So -- just so I understand, as of 2017, my question is:

23  Have you ever discussed or been a party to discussions about

24  whether or not race should cease being a factor used for the

25  admissions process at the University of North Carolina?

1  A.  The answer would be no, yes.

2  Q.  And you've worked in the admissions office since

3  August 1999, correct?

4  A.  Correct.

5          **MR. WEIR:**  I have no further questions.

6          **THE COURT:**  All right.

7          **MS. TURNER:**  Defendant Intervenors have no questions.

8          **THE COURT:**  You have no questions?

9          **MS. TURNER:**  No, ma'am.

10         **THE COURT:**  Thank you.

11         **MS. VAN GELDER:**  We don't have any further questions.

12         **THE COURT:**  All right.  Thank you, sir.  You may step

13 down.

14     (The witness left the stand.)

15         **THE COURT:**  All right.  For the record, would you

16 please state your name?

17         **MS. COMBS:**  Yes, I'm Marianne Combs.

18         **THE COURT:**  Thank you.  You may proceed.

19         **MS. COMBS:**  We call Michael Davis.

20          **MICHAEL DAVIS, DEFENDANT UNC WITNESS, SWORN**

21                    **DIRECT EXAMINATION**

22 BY MS. COMBS:

23         **THE WITNESS:**  Your Honor, is it okay if I take my mask

24 off?

25         **THE COURT:**  You may.

 1   Q.  Good afternoon, Mr. Davis.

 2   A.  Good afternoon.

 3   Q.  Would you please state your name for the record.

 4   A.  Yes, I'm Michael Davis.

 5   Q.  Where are you currently employed?

 6   A.  At the University of North Carolina at Chapel Hill in the

 7   Office of Undergraduate Admissions.

 8   Q.  And what position do you hold in the Office of

 9   Undergraduate Admissions?

10   A.  I am the associate director for recruitment.

11   Q.  And how long have you been in the office?

12   A.  Just over five years now.

13   Q.  Can you tell us where you were educated?

14   A.  Yes.  So I -- I completed my bachelor's degree at the

15   University of Georgia and my master's degree at Drexel

16   University.

17   Q.  And what years did you complete those degrees?

18   A.  2007 and 2011, '10, one of the --

19   Q.  Sometime between 2010 and 2011?

20   A.  Yes.

21   Q.  What did you do before you joined the Office of

22   Undergraduate Admissions?

23   A.  I worked at Drexel University in the Office of Enrollment

24   Management.

25   Q.  And can you describe your job responsibilities at Drexel?

1  A.  Yes.  So I helped lead our recruitment efforts within

2  marketing and communications with a special focus on in-person

3  programming on and off campus.

4  Q.  And how long were you at Drexel?

5  A.  I was at Drexel for about eight years.

6  Q.  And did you go from Drexel to the University of North

7  Carolina?

8  A.  Yes, I did.

9  Q.  And you are an associate director?

10 A.  That is correct, yes.

11 Q.  Have you held that position your entire time at the

12 university?

13 A.  Yes, that is correct.

14 Q.  And who do you report to in that role?

15 A.  I report to Steve Farmer.

16 Q.  Can you describe your job responsibilities?

17 A.  Certainly.  So I sit on our senior leadership team in the

18 admissions office, and I work with my colleagues to lead our

19 efforts to engage students with the university, help them learn

20 about us, and to apply and enroll, if that's the right decision

21 for them.

22 Q.  And who else is on the senior leadership team in the

23 admissions office?

24 A.  Yes, so the senior leadership team is Steve Farmer, myself,

25 Jared Rosenberg, Allison Legge, Jen Kretchmar, Yolanda Keith,

1  and Ashley Authur.

2  Q.  Do you serve on any admissions office committees?

3  A.  I do sit on several, yes.

4  Q.  Can you name one -- can you give an example of a committee

5  you serve on?

6  A.  Sure.  I think the example I would give would be our Campus

7  Engagement Committee.

8  Q.  And outside the admissions office, do you serve on any

9  campus committees?

10  A.  Yes, I do.  I serve on the Faculty Advisory Committee for

11  Scholarships and Student Aid, and I regularly attend the

12  Faculty Advisory Committee for Undergraduate Admissions.

13  Q.  As a member of the senior leadership in the admissions

14  office, do you have an understanding of what the admissions

15  office's goal is?

16  A.  Yes, I do.

17  Q.  And what is your understanding of that goal?

18  A.  So my understanding of the admissions office's goal is that

19  we are working to bring in that diverse community of talented

20  students that is going to help the university achieve its

21  mission.

22  Q.  And how does the work that you do in recruitment help

23  further that goal?

24  A.  Certainly.  So our work in recruitment is really designed

25  to introduce students to Carolina, help them understand how

 1  they could potentially fit into our community, and really

 2  encourage them to take those actions in terms of applying, and

 3  if they're admitted to enroll, it would help them join us.

 4  Q.  And are your recruitment strategies guided by any

 5  principles?

 6  A.  Yes, they are.  And I would say, first and foremost, it's

 7  to act in the best interests of the students and of the

 8  university.  Secondly, I would say it's to treat each person

 9  with great care, respecting their dignity as an individual.  I

10  would say those are the two guiding principles.

11          MS. COMBS:  Aaron, would you please display

12  Defendants' 504?

13  Q.  (By Ms. Combs)  Can you see that on your screen, Mr. Davis?

14  A.  Yes, I can.

15  Q.  Have you seen that before?

16  A.  Yes, I have.

17  Q.  At a high level, can you tell us what this shows?

18  A.  Yes.  So this shows the recruitment life cycle or, stated

19  another way, our interactions with students as they are

20  considering the university.

21  Q.  And do you divide the recruitment cycle up into different

22  stages?

23  A.  Yes, I find it helpful to think of it in two stages.

24  Q.  And what are those stages?

25  A.  Yes.  So the first is to recruit prospective applicants, so

1  that's really before students apply, helping them understand

2  the university and make that decision.  And then the second

3  would be, after students have received their offer of

4  admission, working to help them decide if they should enroll at

5  Carolina.

6  Q.  In focusing on the first stage, recruiting prospective

7  applicants, how early do you start recruiting students?

8  A.  So we start recruiting some students actually as early as

9  middle school, but our efforts become more direct and

10 intentional during freshman, sophomore, junior years of high

11 school.

12 Q.  At a high level, what are the steps the university takes to

13 recruit prospective applicants?

14 A.  Yes.  So to recruit prospective applicants, first we

15 identify the students that we will be recruiting and form a

16 prospect pool.  We then engage with those students over a

17 period of time through communications, through events, both on

18 and off campus, to again introduce them to our community, help

19 us [sic] understand why we're a welcoming and inclusive place.

20 Q.  And what is the first step when you are recruiting

21 prospective students?

22 A.  The first step would definitely be to identify the prospect

23 pool.

24 Q.  How do you identify the prospect pool?

25 A.  So there's two primary ways.  The first is that students

1  can self-identify, so they can raise their hand, express

2  interest in the university.  The second is that we obtain

3  contact information from students from the College Board and

4  from ACT.

5  Q.  Is that process, the process of obtaining information from

6  the College Board and the ACT, known as Search?

7  A.  Yes, it is commonly called Search.

8  Q.  And why does a university use Search to identify

9  prospective applicants?

10  A.  So we use Search both to learn more about students that

11  perhaps have already expressed interest in the university, but

12  also to ensure that we are reaching a broad community of

13  students to let them know about Carolina and the opportunities

14  at the university.

15  Q.  And when you obtain the contact information from the

16  College Board and the ACT, are you obtaining the information of

17  every student who has sat for one of those exams?

18  A.  No, we are not.

19  Q.  And how do you narrow down the list of names you are

20  obtaining?

21  A.  Sure.  So we're able to apply criteria to narrow down the

22  list of students, and we separate that by in-state students and

23  out-of-state students.

24  Q.  Let's start with in-state students.  What criteria do you

25  apply to your purchase?

1  A.  Yes.  So we have two purchases for North Carolina.  The
2  first feeds directly into our prospect pool, and that's any
3  student who has scored an 1100 or higher on the SAT and the
4  corresponding ACT score, as well as a three or higher on any
5  Advanced Placement, or AP, exam.  All of those students also
6  have to have expressed that they have maintained a B average or
7  higher during their high school career.
8      And then the second purchase is really geared toward
9  college access.  So we purchase students who have made a 900 to
10 an 1100 on the SAT, or the corresponding scores in the ACT, to
11 send them advice from the Carolina College Advising Corps about
12 pursuing college and really thinking about their future.  If
13 any of those students subsequently take an action to express
14 interest in Carolina, they are also added to our prospect pool
15 as well.
16 Q.  And what time period are you referring to when you're
17 describing the test score bands that you're purchasing?
18 A.  So I'm referring to the time period of this case, so 2015
19 to 2017.
20 Q.  And that is the time that you have been at the university
21 during the time period we are discussing today?
22 A.  That's correct.
23 Q.  Thank you.
24     And can you describe the test score bands you purchased for
25 non-North Carolina residents?

1  A.  Certainly.  So for out-of-state students, we are purchasing

2  students who have scored a 1400 or higher on the SAT, again

3  same score -- or corresponding scores on the ACT, who have

4  maintained a B average or higher.  We are also then obtaining a

5  second group of out-of-state students.  That range is 1250 to

6  1390, still with that B average in high school, but for

7  students who specifically identify as either first-generation

8  college, low income, African American, Native American, or

9  Hispanic/Latinx, or students outside of the U.S.

10 Q.  And why do you obtain that second test score band for

11 non-North Carolina residents?

12 A.  Sure.  So we obtain that second band because those are the

13 students who fall into our priority populations for

14 recruitment.  So we're really just wanting to make sure that

15 we're casting as wide a net as possible to talk to those

16 students and let them know about the opportunities at Carolina.

17 Q.  And were those test bands that you described in place when

18 you joined the university in 2015?

19 A.  So they were largely in place, though I did make some

20 changes when I started.

21 Q.  And what changes did you make?

22 A.  Yeah.  So I actually expanded the buy in North Carolina

23 so -- we were not obtaining all students in -- in the state

24 when I first started, so I expanded that purchase so that it

25 was 1100 or above for everyone and added that college access

 1  piece as well.

 2  Q.  Just to make sure I understand you, it's 1100 and above for

 3  every North Carolina resident?

 4  A.  Yes, that is correct.

 5  Q.  And in a given application year, about how many prospects

 6  are in the university's prospect pool?

 7  A.  Yeah, so it can definitely vary year to year, but I would

 8  say 80,000 to 100,000 is very common.

 9  Q.  Once the prospect pool is formed, what's the next step you

10  take in recruitment?

11  A.  Yeah.  So the next step we take is communications, so

12  looking at how we are speaking to students, talking to them

13  about our community at Carolina, the opportunities academically

14  and beyond that they would have here.

15  Q.  And who communicates with prospective students?

16  A.  Yeah, so it's very much a wide range of folks, certainly

17  our admissions officers and the staff in undergraduate

18  admissions, the student workers and volunteers that are engaged

19  with our office.  Faculty, staff, and other current students

20  from around the university also participate, as well as alumni.

21  Q.  When you communicate with prospective students, what are

22  you talking to them about?

23  A.  Yeah.  So when we're communicating with them, our focus

24  really is on helping them understand the community, seeing it

25  for that welcoming place that it is, seeing how they could fit

1  into it and really achieve their goals and thrive, and if they

2  are seeing those things, how then to apply for admission.

3  Q.  And I believe you mentioned that at least for

4  North Carolina residents, you communicate with folks that might

5  have fallen under the 1100 SAT test score band; is that

6  correct?

7  A.  Yes, that is correct.

8  Q.  And is the communication for that group of students

9  different?

10 A.  Yes, it is different for that group of students.

11 Q.  And what are you communicating to those students about?

12 A.  Yes.  So we're communicating to those students just really

13 encouragement to think about their next steps after high school

14 and to think about college as being attainable for them, so

15 talking to them generally about admissions, about financial aid

16 and its importance in thinking about college and then really

17 the next steps in terms of visiting colleges and exploring

18 those options.

19 Q.  And why does the university engage in those types of

20 communications?

21 A.  So we engage in those types of communications because

22 that's really meeting the university's mission to be the public

23 institution here in North Carolina and really support students

24 from across the state in attaining higher education.

25 Q.  Do you also communicate with students about the Carolina

1  Advising Corps?

2  A.  Yes.  So actually that -- what I've just described just now

3  in terms of that advice about going to college is from the

4  Carolina College Advising Corps, and we really try to highlight

5  their advice, knowing how -- really how students look up to

6  them and view them.

7  Q.  Do you view the Advising Corps as being part of

8  recruitment?

9  A.  Yes, I do.

10 Q.  How are they part of recruitment?

11 A.  So the Carolina College Advising Corps does not directly

12 recruit for the university.  They are in those schools to

13 promote a general college-going culture and really encourage

14 students to find the best fit.  However, because they are

15 Carolina graduates, they have that knowledge, that love for the

16 institution that they're able to share with students.  They're

17 also an example right in front of these young people that

18 Carolina is very much attainable to them.

19 Q.  And the Carolina Corps advisors, they are meeting with

20 students in their home communities; is that correct?

21 A.  Yes, that is correct.

22 Q.  What are some other ways the university engages with

23 prospective applicants in their own communities?

24 A.  Yes.  So in terms of their own communities, we do try to

25 find students where they are, engage with them.  So we

1  participate in a wide range of activities across the state.
2  First, I'd highlight CACRAO, which is the professional
3  organization that arranges college fairs all across the state
4  that we participate in.  We conduct high school visits.  We
5  participate in parent nights, do other college fairs.  We host
6  UNC-specific information sessions across the state.  Our goal
7  really is to be accessible to every student in every county
8  across North Carolina.
9  Q.  And do you visit every county in the state of
10 North Carolina?
11 A.  Typically, yes, we're going to be in each county at least
12 once.
13 Q.  And do you host on-campus events for prospective
14 applicants?
15 A.  Yes, we do.
16 Q.  And what are those events?
17 A.  Yeah, so the primary event that admissions hosts is our
18 daily visit program, so that -- it contains an information
19 session led by an admissions officer, as well as a tour of
20 campus led by one of our current students.  That program
21 throughout the year brings 60- to 70,000 students and their
22 families to campus each year.
23     And then the second event that we run is a special series
24 of those information sessions specifically for first-generation
25 college students.

1   Q.   And what happens at those special events?

2   A.   Yeah, so at the first-generation college student events, it

3   also has an information session where we're talking about

4   Carolina admissions and financial aid, as we normally do.  We

5   also, though, add in a student panel with current students who

6   identify as first-generation college.  We have lunch for them

7   in the dining center, and there's more time for individual

8   questions.

9   Q.   Putting aside the campus tours and visit program and the

10  events for first-generation college students, are there other

11  events the university hosts to encourage students to apply for

12  admission?

13  A.   Yes.  So the Office of Diversity and Inclusion as well as

14  the American Indian Center hosts specific events that we

15  partner with them to recruit students to the university.

16  Q.   And can you give an example of one of those events?

17  A.   Yes.  The Project Uplift program is one of those events,

18  and it's actually the largest.

19  Q.   And who does the admissions office collaborate with to put

20  on Project Uplift?

21  A.   The Office of Diversity and Inclusion.

22  Q.   And who is invited to Project Uplift?

23  A.   Yes, so for Project Uplift, school counselors and teachers

24  are asked to nominate students to attend that program, and so

25  the Office of Admissions reaches out to our contacts across the

1  state and even outside of the state, letting them know about

2  Project Uplift, that we're looking for high-achieving students,

3  particularly those from underserved backgrounds, who want to

4  come and participate in this program.

5  Q.  And I believe you also mentioned that the American Indian

6  Center hosts events for prospective students.  What event are

7  you referring to?

8  A.  Yeah, so the American Indian Center specifically hosts

9  Carolina Horizons.

10 Q.  And what is that?

11 A.  So Carolina Horizons is an event that's geared towards

12 Native students to bring them on campus, to encourage general

13 college attendance; certainly if they're interested in applying

14 to Carolina, to highlight that, as well as to introduce them to

15 the Native community on campus.

16 Q.  And is that event only open to Native American students?

17 A.  No, it is not.  Any student could attend.

18 Q.  And when you say that the admissions office collaborates

19 with the Office of Diversity and Inclusion and the American

20 Indian Center for these events, what kind of support does the

21 office provide?

22 A.  Sure.  So we provide support throughout the process.  So,

23 generally, we are responsible for the invitations and any

24 marketing of the event.  We host registration in our CRN, which

25 then allows us to create a prospect record for that student so

1  that we can continue to communicate with them.  We handle all

2  of the follow-up communications from the event, including the

3  thank-you and surveys to attendees.  And then during the

4  program itself, we will deliver welcoming remarks.  We offer

5  our information session on applying and financial aid, and

6  we'll also do additional programming, such as parent sessions

7  or workshops on topics like essay writing.

8  Q.  Thank you.

9      And is the goal of these recruitment activities that you

10 described for students to ultimately apply to the university?

11 A.  That's certainly our hope is that, yes, after attending

12 these programs, students will apply to Carolina if they think

13 it's the right fit for them.

14 Q.  And turning to the second phase of recruitment, when does

15 that occur?

16 A.  Certainly.  So that second phase of recruitment, which we

17 typically call yield, occurs after a student has received an

18 offer of admission to Carolina.

19 Q.  And after a student has received an offer of admission,

20 what are some of the things that you do to encourage them to

21 enroll?

22 A.  So the first thing that I would highlight -- and it's

23 listed first on the visual here -- are special offers like

24 scholarships and programs within Excel@Carolina.

25 Q.  And is the admissions office involved in selecting students

1  for scholarships?

2  A.  We are for those scholarships that do not have a need -- a

3  requirement around financial need.

4  Q.  And who administers the scholarships that have a

5  requirement around financial need?

6  A.  The Office of Scholarships and Student Aid.

7  Q.  So today we can assume that when we're talking about

8  scholarships, we're talking about the non-need-based

9  scholarships?

10  A.  Yes, that is correct.

11  Q.  Great.  And when does scholarship nomination occur?

12  A.  So students are nominated for scholarship consideration

13  while the admissions committee is reviewing their application

14  for admission.

15  Q.  And what kind of training is given to readers on how to

16  select students for scholarships?

17  A.  Sure.  So our readers receive training during our annual

18  reader training at the beginning of the cycle, and we

19  specifically tell them to nominate students for scholarships

20  who will just really contribute to the community, to the life

21  of the university.  We encourage them to look beyond just

22  grades and think about how will this young -- this young person

23  contribute to Carolina.  And the kind of last framing that we

24  put around it is that these are the students that Carolina

25  would be worse off if they did not enroll at the university.

1  Q.  And do you know about how many scholarships are awarded a

2  year?

3  A.  It varies a little bit, but typically 400 to 450 are

4  offered.

5  Q.  And this is in addition to any scholarships that might be

6  awarded on the basis of financial need?

7  A.  That is correct, yes.

8  Q.  And what is the Excel program?

9  A.  So Excel refers to a collection of special programs that we

10  are able to offer to some students.  So that could be a place

11  in Honors Carolina.  It could be a place in -- an assured

12  admission to one of our professional school majors or

13  dual-degree programs.  There's a summer study abroad fellowship

14  as well as a research mentoring program.

15  Q.  And setting aside scholarships in Excel, what is another

16  way you encourage students to enroll in the university?

17  A.  Sure.  So, again, communication is key to our efforts to

18  recruit students to enroll, and even more so than at the Phase

19  I, we're really trying through our communications to introduce

20  admitted students to our community so that they really

21  understand who they will be in classes with, who their

22  roommates will be, who will be teaching them, et cetera.

23  Q.  And what form do these communications take?

24  A.  So they could be print mailings, e-mails, social media,

25  phone campaigns.  All of those happen.

1   Q.  And are you familiar with the term "segmented

2   communications"?

3   A.  Yes, I am.

4   Q.  And what does that term mean?

5   A.  So segmented communications is referring to if you take

6   just a subset of a population and craft a communication very

7   intentionally just for them.

8   Q.  And does the admissions office send any segmented

9   communications to admit students?

10  A.  Yes, we do.

11  Q.  And can you describe some of those?

12  A.  Sure.  So many of these -- the majority of them actually

13  are done in partnership, collaboration with other folks around

14  campus.  So one example I would give is that we partner with

15  folks like the Carolina Black Caucus, the American Indian

16  Center to do phone campaigns specifically to students.

17  Q.  And why do you partner with campus groups to send these

18  communications?

19  A.  So, again, we really want to introduce these admitted

20  students to campus, and we recognize that there may be some

21  shared identity between these groups and these admitted

22  students that -- that the student may want to inquire more

23  about.

24  Q.  And what's another way you introduce admitted students to

25  campus?

1  A.   So we have on-campus programs, and our largest event is our

2  Admitted Students Day.

3  Q.   And is Admitted Students Day open to every student who has

4  received an offer of admission to the university?

5  A.   Yes, that is correct.

6  Q.   And what happens at Admitted Students Day?

7  A.   So Admitted Students Day, first, all of the students are

8  together for a large welcome so they can sense the community,

9  the kind of corporate nature.  We then offer sessions based on

10 academic interest that students have.  And then the rest of the

11 day is really crafted to create space so that students can

12 really just explore their identity and their interests.  So it

13 will include sessions on things like study abroad, research,

14 housing.

15      My favorite part are the student organizations that

16 participate in the day, and they offer more informal moments so

17 that students can meet with them.  The Black Student Movement

18 Mi Pueblo, Student Government -- we've had dozens of them

19 participate.  That's a really exciting part of the day.

20 There's also campus tours and the opportunity to meet

21 individually with folks from admissions or from the Office of

22 Scholarships and Student Aid.

23 Q.   And for students who might not be able to afford to come to

24 Admitted Students Day, does the university do anything to make

25 sure they're able to attend?

1  A.  Yes.  So we have a travel grant program that will cover the

2  cost of a student, as well as partially the cost of a parent,

3  to come and visit campus so that they can experience Carolina

4  and have that experience be part of their decision-making with

5  finances not being a barrier.

6  Q.  How do the students learn about travel grants?

7  A.  So we actually outreach to any student who has applied with

8  a fee waiver or to students that the Office of Scholarships and

9  Student Aid have determined is eligible for a Pell Grant, and

10  we outreach to all of those students and let them know about

11  the travel grant program.

12  Q.  Does the travel grant program have any caps?

13  A.  No, it does not have caps.

14  Q.  So any student who wishes to avail themselves of it may?

15  A.  That is correct, yes.

16  Q.  And do you also meet the students off campus?

17  A.  Yes.  So similar to Phase I, we try to meet students where

18  they are.  So we host UNC-specific events across the state.

19  Those events are really neat because they allow admitted

20  students to meet other admitted students from their area that

21  are also considering Carolina.

22  Q.  And do you host any special events outside campus?

23  A.  Can you repeat that question?  I'm sorry.

24  Q.  Sure.  Earlier we discussed priority recruit -- groups that

25  might be priorities in recruitment.  Do you do anything in

1  particular off campus to engage with those students and

2  encourage their enrollment?

3  A.  I'm blanking on specific events off campus.

4  Q.  Sure.

5  A.  We do hold some on campus.

6  Q.  Off campus do you host admitted student dinners?

7  A.  Yes, we do.

8  Q.  And who is invited to those dinners?

9  A.  I'm sorry.  So our admitted student dinners across the

10  state, we do invite students that are within those priority

11  populations for recruitment.

12  Q.  And what is the goal of all these activities that we've

13  discussed?

14  A.  The goal, again, is to help students learn about Carolina

15  and determine if this is going to be the right place for them.

16  We really hope to highlight our welcoming, our inclusive

17  community and help students see that they can have a future

18  here.

19  Q.  And how do you know whether or not you're doing a good job

20  at recruiting prospective students and encouraging their

21  enrollment?

22  A.  Certainly.  So we do look at each program.  We get

23  immediate survey responses from the attendees, so we ask them

24  about their experiences, and we're looking at that, analyzing

25  that information to make tweaks and changes.  We also rely on

1  the admitted student questionnaire, which goes out in May to

2  all admitted students, to help us understand more about their

3  experiences with us along the way.  We also talk to our current

4  students quite regularly and solicit their feedback and advice

5  on what they experienced and see if they have advice for us in

6  the future.

7  Q.  And what has been your takeaway from this feedback?

8  A.  My takeaway during the time that I've been here, by and

9  large, is that these activities are very successful because

10 they really do rely on this idea of connecting people and

11 introducing students that are considering the university with

12 current students that are already part of the community.

13        **MS. COMBS:**  No further questions.

14        **THE COURT:**  Thank you.

15     And if you would first give your name for the record.

16        **MR. RULEY:**  Yes, Your Honor.  I'm Alan Ruley.

17        **THE COURT:**  Thank you, sir.

18                     **CROSS-EXAMINATION**

19 **BY MR. RULEY:**

20 Q.  Good afternoon, Mr. Davis.  I'm Alan Ruley, one of the

21 lawyers for the Plaintiff.  We haven't met yet, but I have a

22 few follow-up questions for you.

23     Just to clarify, you're currently the associate director of

24 recruitment at UNC-Chapel Hill; is that right?

25 A.  Yes, that is correct.

1  Q.  And you've been in that position since August of 2015?

2  A.  That's correct, yes.

3  Q.  As part of the recruitment process -- you had a chart up --

4  in Phase I, identify the prospect pool.  As part of that,

5  UNC-Chapel Hill purchases data from the College Board and from

6  ACT, correct?

7  A.  Yes, that is correct.

8  Q.  And I believe you called that Search in your direct exam?

9  A.  Yes, that's correct.

10  Q.  And in deciding what types of data to purchase from the

11  College Board and from ACT, UNC is looking for talented

12  students that based on the information available may indicate

13  that those students could potentially be admissible to UNC and

14  might be interested in coming to UNC; is that right?

15  A.  Yes, that's correct.

16  Q.  And at that stage, the only real information that UNC has

17  about those students is their test score and their

18  self-reported GPA; is that right?

19  A.  Yes, by and large, that's the information.

20  Q.  And those two data points, that is, test score and

21  self-reported GPA, are not the only data that UNC is able to

22  get, but that's the only data that to you signifies how

23  potentially admissible a student may later be, correct?

24  A.  Would you mind repeating that question?

25  Q.  Sure.  Those two data points, that is, test score and

1  self-reported GPA, are not the only data that UNC can purchase,

2  but that's the only data that to you signifies how potentially

3  admissible a student may later be; is that right?

4  A.  I'm not aware of other data we could purchase.

5  Q.  All right.  Well, you recall your deposition, I take it?

6  A.  That is correct, yes.

7  Q.  And I'm looking at page 53, lines 16 through 20.

8  Question:  "And that's the only data that you are able to

9  get from College Board and ACT?"

10  Answer:  "It's not the only data that we are able to get,

11  but it's the only data that to me signifies how admissible a

12  student may later be."

13  Do you recall that question and that answer?

14  A.  I see.  Yes, I do.

15  Q.  And is that the accurate?

16  A.  So we do receive other data from the College Board and ACT

17  when we purchase those students based on this criteria.

18  Q.  Right.  But the only data that to you signifies how

19  potentially admissible a student may later be are the test

20  scores and self-reported GPA, correct?

21  A.  Correct, because we don't have information on, like, the

22  student's extracurricular activities, their writing, their

23  letters of recommendation.  We don't have any of those other --

24  we don't have indication of those other components of the

25  student's application.

1  Q.  Right.  But at least at that point, it would be accurate to
2  say that those two data points are the ones that to you signify
3  how admissible a student may later be; is that right?
4  A.  How potentially admissible, yes.
5  Q.  And there's no additional data that you could get from the
6  College Board or ACT that you believe would go into whether or
7  not a student is potentially admissible, correct?
8  A.  Correct, not that I'm aware.
9  Q.  And, of course, UNC does not purchase data on students that
10  it does not believe would be potentially admissible; is that
11  right?
12  A.  Correct.  So we're not buying students, for instance, that
13  have a C average in high school.
14      **MR. RULEY:**  Could you pull up PX96, please?
15  Q.  (By Mr. Ruley)  I think you saw this at your deposition,
16  Mr. Davis, but this is an e-mail string regarding the Carolina
17  101 and Search criteria for that in 2015; is that right?
18  A.  I believe so, yes.
19  Q.  And looking at the e-mail that begins towards the middle of
20  the page from Mr. Medina on March 3rd, 2015, in that e-mail
21  Mr. Medina is talking about the final criteria that are going
22  to be used for the 2015 Carolina 101 filter, right?
23  A.  It -- yes, I believe that's what he says there.
24  Q.  And then looking at the heading "2015 Orders" there in the
25  middle of the page on the left, the first item 2015 Order 1 -

1  Top NC, that is the top test score band, correct, 140 PSAT --

2  140-plus PSAT and 1400-plus SAT, correct?

3  A.  That is how I would interpret this, yes.

4  Q.  That's included in what UNC purchases today, correct?

5  A.  Correct, yes.

6  Q.  And then look at 2015 Order 4 - Diversity NC.  Those are

7  students who have a PSAT score from 110 to 129 or an SAT score

8  of 1100 to 1290; is that right?

9  A.  Yes, that looks correct.

10 Q.  And the diversity buy at that time included students who

11 were African American, Native American, Hispanic, Latino,

12 and/or first-generation college students, correct?

13 A.  Correct.  Low income usually is there as well, though in

14 this particular document it looks like it was split out.

15 Q.  And UNC purchases that same band of data today, except that

16 you've expanded that to include any North Carolina student who

17 was above 1100 on the SAT, correct?

18 A.  Correct.

19 Q.  In other words, UNC no longer restricts that band by

20 diversity?

21 A.  Correct.

22 Q.  And UNC made that change in the fall of 2015; is that

23 right?

24 A.  Yes, it was one of the first things that I did.

25 Q.  So that was not long after this lawsuit was filed, correct?

1  A.  I am actually not 100 percent sure when this lawsuit was

2  filed.

3  Q.  If we assume the lawsuit was filed on November 17th, 2014,

4  then that would be correct; the change was made not too long

5  after the lawsuit was filed?

6  A.  I mean, it was a year later, but --

7  Q.  Let's look at PX97, please.  So this is an e-mail that you

8  wrote, correct, on August 20th of 2015?

9  A.  Yes.

10  Q.  And this is about Carolina and Beyond, which was a

11  recruitment event designed to generate applications and was a

12  replacement for an event that you had called Academic Days; is

13  that right?

14  A.  That is correct.

15  Q.  And then focusing on the middle of the page under the

16  heading "Target Audience," the first target audience group is

17  called NC Top PSAT, and that's North Carolinians who score 140

18  or higher on the PSAT and 1400 or higher on the SAT; is that

19  right?

20  A.  Yes, that looks to be correct.

21  Q.  And the next group, NC top ACT, that would be

22  North Carolina students who score between 32 and 36 on the ACT

23  exam?

24  A.  Correct.

25  Q.  And then the fifth line, NC Other PSAT, Underrepresented,

1  that means North Carolina students who score between 110 and
2  129 on the PSAT or 1100 to 1290 on the SAT?
3  A.  Yes, that's how I would read it.
4  Q.  Underrepresented in that context meant African American,
5  Native American, Hispanic, Latino, or first-generation college,
6  low socioeconomic status; is that right?
7  A.  That is my understanding of that, yes.
8  Q.  You've heard the term "critical mass," but you're not
9  really familiar with what it means, correct?
10  A.  That is correct.
11  Q.  And you don't know enough to hazard a guess as to what that
12  term means, and you haven't had discussions with anyone in the
13  admissions office about what critical mass means; is that
14  right?
15  A.  That's correct.
16          **MR. RULEY:**  I have no further questions, Your Honor.
17          **THE COURT:**  All right.  Anything?
18          **MS. TURNER:**  Defendant Intervenors have no questions,
19  Your Honor.
20          **THE COURT:**  All right.  Any redirect?
21          **MS. COMBS:**  No, Your Honor.
22          **THE COURT:**  All right.  Sir, you are excused.  Thank
23  you.
24          **THE WITNESS:**  Thank you so much.
25      (The witness left the stand.)

1          **THE COURT:**  Yes, sir.

2          **MR. FITZGERALD:**  If I could raise three matters.

3      First, when Ms. Van Gelder questioned Mr. Rosenberg, we

4  closed the courtroom regarding a certain portion regarding the

5  application.  We would just formally move to seal that portion

6  of the transcript.

7          **THE COURT:**  Do you care to be heard?

8          **MR. STRAWBRIDGE:**  That's fine with us, Your Honor.

9          **THE COURT:**  All right.  We will seal that portion of

10  the transcript.

11          **MR. FITZGERALD:**  The second matter, I think, as we

12  mentioned yesterday, that was our last witness for the day.  We

13  had three scheduled for today.  So we are -- our witnesses are

14  done for today, Your Honor.

15          **THE COURT:**  All right.  I was hoping you would get

16  ahold of that other witness that only has about an hour.  Did

17  you attempt to do that?

18          **MR. FITZGERALD:**  That was -- he just testified, Your

19  Honor.

20          **THE COURT:**  Oh, that was Michael Davis?

21          **MR. FITZGERALD:**  Yes, yes.

22          **THE COURT:**  All right.  So that you only have two

23  witnesses left?

24          **MR. FITZGERALD:**  Three witnesses left, Your Honor.

25  The first -- the next witness on Monday would be Dr. Abigail

1 | Panter.

2 |         **THE COURT:** Yes.

3 |         **MR. FITZGERALD:** She's our last live UNC fact witness.

4 | We believe -- I think that the Intervenors have been adjusting

5 | their schedule in cooperation with us, so I think there would

6 | be two Intervenor witnesses on Monday.

7 |         **MS. TORRES:** Yes, on Monday we will have Cecilia

8 | Polanco testify live and then also Kenneth Ward testify by

9 | video. We were able to rearrange their schedules for Monday.

10 |         **THE COURT:** All right. Thank you.

11 |         **MR. FITZGERALD:** And, Your Honor, I could walk

12 | through -- why don't I walk through the schedule and then make

13 | a suggestion.

14 |    On Monday, those three witnesses. On Tuesday, it's

15 | Professor Hoxby. So she's the second of the three witnesses

16 | left for UNC. She's the expert from Stanford.

17 |         **THE COURT:** Right.

18 |         **MR. FITZGERALD:** And we think that will be the day for

19 | Tuesday. She's an extensive witness, and she will be remote

20 | from California.

21 |         **THE COURT:** All right.

22 |         **MR. FITZGERALD:** And then Wednesday would be Professor

23 | Long from Harvard. She will also be remote. She will be a

24 | shorter witness than Dr. Long -- than Professor Hoxby.

25 |         **THE COURT:** I think that's the one I was thinking

1  about.  I thought you might have gotten her for this afternoon.

2       **MR. FITZGERALD:**  Dr. Long?

3       **THE COURT:**  Right.  No, it's on the list for later,

4  but I understood that you all were discussing -- these

5  witnesses are not taking as long, so I had hoped we could fill

6  in the afternoon with another witness.

7       **MR. STRAWBRIDGE:**  I apologize, Your Honor, but she's

8  an expert witness, and their disclosures have not yet been

9  exchanged, so we were not able to move her along.

10      **THE COURT:**  I see.  All right.

11      **MR. FITZGERALD:**  And I can tell you, Judge, from

12 personal experience, the disclosures -- part of the reason I

13 think we're running ahead is, for Professor Arcidiacono and

14 Mr. Kahlenberg, they gave us their disclosures of the slides

15 they were using 48 hours in advance, which allowed us to go

16 through and be more organized and to work out issues.  We, in

17 turn, the night before gave them materials we might use on

18 cross-examination and impeachment.  And I think that led to

19 both of those witnesses proceeding more rapidly.  And, in turn,

20 we're doing the same with regard to Professor Hoxby and

21 Professor Long.

22    And so that's why I think the scheduling is more rigid

23 around them, in addition to working out the exhibit exchange.

24      **THE COURT:**  I see.  All right.  So are there any other

25 matters that we need to address today?

1    **MR. FITZGERALD:**  Yes, Your Honor, two.

2    **THE COURT:**  Yes.

3    **MR. FITZGERALD:**  One -- this will make life easier --

4  if you recall, there's an outstanding motion by UNC to exclude

5  the three pages of testimony that Professor Arcidiacono

6  offered.

7    **THE COURT:**  Right.

8    **MR. FITZGERALD:**  And our papers are due on Monday.  We

9  are withdrawing the objection, and we consent to having

10 Professor Arcidiacono's proffer part of the record.  We are not

11 seeking a deposition.  We are not seeking to recall him.  So I

12 think that issue is put to bed.

13   **THE COURT:**  All right.  Do you care to be heard on

14 that?

15   **MR. STRAWBRIDGE:**  No, we're happy to have them

16 withdraw the objection.

17   **THE COURT:**  I thought you might.  All right.  Then

18 that testimony is accepted.

19   **MR. FITZGERALD:**  And then the last thing, Your Honor,

20 if I may, I just wanted to raise the issue of Monday morning

21 when we're next here and the numbers.  And we clearly

22 understand that there's this order by the State with the number

23 ten.

24    And obviously, Your Honor, we are going to do whatever you

25 tell us to do, and we appreciate the Court and staff and the

1   Court Security Officers accommodating us.  We wanted to put a
2   proposal out to see if it might be acceptable to the Court
3   where the number might drift over ten for some witnesses, and I
4   would walk through them with you.

5           **THE COURT:**  I'll hear from you.

6           **MR. FITZGERALD:**  With regard to Monday with
7   Dr. Panter, the proposal would be that besides the five -- the
8   Court and four staff members and the witness, which is six,
9   we'd have only one tech in the room at any time, whoever would
10  be examining the witness.  That's seven.  I believe the
11  Intervenors would have one at their table.

12      And then the request would be if we could have two at the
13  Plaintiff's table and two at the Defendants' table.  For most
14  of our witnesses, the examiner has had a copilot.  So that
15  would mean for Dr. Panter we would have twelve in the
16  courtroom.

17      For the Intervenors' witness that afternoon that comes
18  live, we would both scale back to one each at this table, but
19  because the witness is live, that live witness would have
20  eleven in the courtroom.  And then for the Intervenors' witness
21  who appears remotely, we would be at ten.

22      And then I believe the same thing would happen with -- with
23  Dr. Hoxby on Tuesday who will be remote.  If we had two at
24  UNC's table, two at the Plaintiff's table, one at the
25  Intervenors' table and only one tech at a time, we would be at

1  eleven.

2      And that would be the same thing for Dr. Long on Wednesday;

3  and then when we went to the Intervenor witnesses, we would go

4  back to one at the UNC table, one at SFFA table.  And for the

5  Intervenors who were live, we would be eleven in the courtroom;

6  and for the Intervenors who would be remote, we would be at ten

7  in the courtroom.

8          **THE COURT:**  I think we call that substantial

9  compliance, and we can live with that.

10         **MR. FITZGERALD:**  Thank you very much.

11         **THE COURT:**  I appreciate the work that you have done

12  to whittle down the persons in the courtroom, and I hate that

13  we have to do that; but under the circumstances, I think it's

14  important.

15         **MR. FITZGERALD:**  Thank you, Judge.  It's been a mutual

16  effort, and I thank the Intervenors' counsel and SFFA as well.

17         **MR. STRAWBRIDGE:**  Agreed.

18         **THE COURT:**  All right.  Anything further?

19         **MS. TORRES:**  The only technical question for Monday,

20  which we can work out with Efren as well, is whether it would

21  be possible to have a viewing room for attorneys who could

22  listen in when the -- when it's closed testimony?  So I'm not

23  sure if the viewing room will have the ability to listen to --

24  when there is sealed testimony.

25         **THE COURT:**  I think that's going to be a challenge.

1        **MS. TORRES:**  Okay.  Thank you.

2        **THE COURT:**  Yes.  Anything further?

3        **MR. STRAWBRIDGE:**  Not at this time, Your Honor, for

4    Plaintiffs.

5        **THE COURT:**  All right.  We will adjourn court until

6    Monday morning at 9:30 a.m.

7        (Proceedings recessed at 2:32 p.m.)

8

9

10                    **C E R T I F I C A T E**

11       I, LORI RUSSELL, RMR, CRR, United States District Court
     Reporter for the Middle District of North Carolina, DO HEREBY
12   CERTIFY:

13       That the foregoing is a true and correct transcript of the
     proceedings had in the within-entitled action; that I reported
14   the same in stenotype to the best of my ability and thereafter
     reduced same to typewriting through the use of Computer-Aided
15   Transcription.

16

17   _Lori Russell_

18   Lori Russell, RMR, CRR          Date:  12/11/2020
     Official Court Reporter
19

20

21

22

23

24

25