```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, *
INC.,                          *
                               *
            Plaintiff,         *  Case No. 1:14CV954
                               *
vs.                            *
                               *  November 19, 2020
UNIVERSITY OF NORTH CAROLINA,  *
et al.,                        *  Volume 9
                               *  Pages 1375-1484
            Defendants.        *
*******************************
```

## TRANSCRIPT OF TRIAL CLOSING ARGUMENTS
### BEFORE THE HONORABLE LORETTA C. BIGGS
### UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:        CONSOVOY MCCARTHY, PLLC
                          Thomas R. McCarthy, Esquire
                          Patrick Strawbridge, Esquire
                          James F. Hasson, Esquire
                          Bryan K. Weir, Esquire

                      BELL DAVIS & PITT, P.A.
                          Daniel Alan M. Ruley, Esquire

For UNC Defendants:   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                          Patrick J. Fitzgerald, Esquire
                          Lara A. Flath, Esquire
                          Amy L. Van Gelder, Esquire
                          Marianne H. Combs, Esquire

                      NORTH CAROLINA DEPARTMENT OF JUSTICE
                          Stephanie A. Brennan, Esquire
                          Tamika Henderson, Esquire

For Intervenors:      LAWYERS' COMMITTEE CIVIL RIGHTS UNDER LAW
                          David G. Hinojosa, Esquire
                          Genevieve Bonadies Torres, Esquire

                      NORTH CAROLINA JUSTICE CENTER
                          Jack Holtzman, Esquire
                          Emily P. Turner, Esquire

**P R O C E E D I N G S**

(All parties present.)

    **THE COURT:**  All right.  It appears that we're at the conclusion of the trial.  We're about to hear closing arguments.

  Are there issues that we need to address before we hear closing arguments?

    **MR. FITZGERALD:**  No, Your Honor.

    **THE COURT:**  I'm sorry.  Go ahead.

    **MR. FITZGERALD:**  No, I was saying no, Your Honor.

    **THE COURT:**  Oh.  Thank you.

  My deputy clerk is going to time you.  For Plaintiff and Defendant, it will be no more than one-and-a-half hours.  You can certainly do less.  And then the Intervenors have asked for 20 minutes.  She will give you each a two-minute warning.

  So with that said, I would call on Students for Fair Admissions for their closing.

    **MR. STRAWBRIDGE:**  Thank you very much, Your Honor.

    **THE COURT:**  Yes.

    **MR. STRAWBRIDGE:**  May it please the Court, I'm just going to begin briefly by expressing thank you on behalf of Students for Fair Admissions to the Court and to the staff that has helped make the trial possible.  These are, obviously, very challenging times, but we've been treated so well, not only by the Court and your clerks, but also by Ms. Blay and Ms. Russell

1    and Mr. Renteria and all the Court Security Officers.  We truly

2    appreciate everyone's efforts to make this process work so that

3    this important case can proceed.

4        And although we, obviously, disagree with opposing counsel

5    on the merits of the case, I, again, do want to put on the

6    record our sincere appreciation to them for their cooperation.

7    This is the model under which practitioners on opposite sides

8    of cases should proceed, and I really do mean that.  I thank

9    them for their cooperation.

10       With that said, we're ready to turn to the issues of this

11   case.

12                   **THE COURT:**  Yes, sir.

13                   **MR. STRAWBRIDGE:**  Those issues are fundamental.  They

14   go to the most important promises of our constitution; that the

15   government may not make decisions on the basis of race, except

16   in the most pressing of circumstances.

17       For purposes of this trial, it is assumed that UNC has a

18   recognized interest in obtaining the educational benefits of

19   diversity, including racial diversity, on campus.  UNC would

20   like that to be the end of its case.  That's why they have

21   spent so much time emphasizing those benefits.  But it's really

22   merely the starting point.  Because UNC seeks to take race

23   independent of any other factor into account at all stages of

24   its admissions process, it is subject to a standard that the

25   Supreme Court has set out.

1  As Your Honor knows, that standard is strict scrutiny.

2  Racial classifications have to be judged so that they are

3  narrowly tailored to further compelling governmental interest.

4  The university bears the ultimate burden of demonstrating,

5  before turning to racial classifications, that available,

6  workable, race-neutral alternatives do not suffice.  That's the

7  standard set forth by *Grutter* and *Fisher*.  We'll talk a little

8  bit more about that as we go through the closing argument.

9  There are three questions that we talked about in the

10  opening of the trial and that are the focus of our closing

11  today.  UNC has failed to define and measure critical mass in a

12  way that ensures that its goal of advancing its interests in

13  the educational efforts of diversity has a definite and

14  measurable ending point.  We also -- the evidence has shown

15  that UNC's review is formulaic; race frequently is the defining

16  feature in its admissions decisions; and UNC has failed to give

17  serious, good-faith consideration to race-neutral alternatives.

18  I'm just going to pause for a second and say the one thing

19  you did not hear from me in opening and you will not hear from

20  me in close is that somehow this case comes down to an

21  allegation of cheating at the school group review process.

22  Mr. Fitzgerald liked to focus on that in his opening, and he's

23  raised it occasionally throughout the trial.  And I suppose

24  it's understandable that he wants to focus on a claim that was

25  not developed for trial and avoid discussion of the claims for

1  which the evidence at trial has decidedly weighed against his

2  clients' case.

3      Moving to the first question as to critical mass -- and I

4  will just tell Your Honor, we have decided to divide this up.

5  I am going to handle the first question.  Mr. McCarthy is going

6  to handle the second question.  Then I will return to briefly

7  do the third question and wrap up.

8      The standard for critical mass, which is the only interest

9  the Supreme Court has ever upheld as the goal to achieve the

10 educational benefits of diversity, it was the interest that was

11 asserted by the University of Michigan in *Grutter*; it was the

12 interest that was asserted by the University of Texas in

13 *Fisher*; and that interest is very specific.

14     As the Court said in *Fisher*, you can't assert an interest

15 in the educational benefits of diversity writ large.  You have

16 to have a goal that is not amorphous, that is sufficiently

17 measurable, that permits judicial scrutiny; and it has to be a

18 concrete and precise goal, so you know when you have reached

19 it, it is no longer necessary to use race.  That's the standard

20 set forth in *Fisher*.

21     The evidence in this case -- as you know, the university

22 has asserted that it is aiming to enroll critical masses of

23 students, particularly from groups of -- members of groups the

24 university deems underrepresented, in order to obtain the

25 benefits of racial diversity.

1    But UNC has not been able to show any evidence in the 17

2   years since *Grutter* was decided, or even in the more -- last

3   eight years since *Fisher I* was decided, as to how they define

4   critical mass, what that goal is, how is it quantifiable in any

5   way, and how will they know when they get there.  This is a

6   question that has been on the minds of people at the University

7   of North Carolina.  They've known this is a question they need

8   to ask and they need to answer.

9    You can see that here.  This is an e-mail from 2013.

10   Ms. Polk, the second in command in the admissions office, wants

11   to know:  "How do we define critical mass?  Are we attempting

12   to achieve critical mass on a university-wide level, in the

13   residence halls, in the individual classrooms, or all the

14   above?  How will we know that critical mass has been achieved,

15   and can we terminate race-conscious admission practices?  If

16   not now, when?"  Those are the questions that are required by

17   the Supreme Court they answer.

18   But the evidence shows -- we presented some of it at trial,

19   and some of it is in the record through admitted exhibits or

20   through deposition designations -- that there is no definition

21   of critical mass.

22   This is Mr. Farmer's testimony at trial:  "You cannot point

23   to any document in the UNC admissions office that attempts to

24   define critical mass, can you?

25   "Answer:  I cannot."

1    We had testimony from Taffye Benson Clayton who
2  specifically said -- and this is a very keyword -- "Because
3  critical mass is amorphous, there is really no way to make the
4  determination."
5    Amorphous is the exact word the Supreme Court said cannot
6  be the nature of the goal.  It cannot be an amorphous goal.
7    The same thing with Ms. Polk.  This is her designated
8  deposition testimony.  "There's no concrete definition.
9  There's nothing that says when you get to X, you will have
10 reached critical mass."
11   This goes on and on throughout the admissions office and
12 the university as a whole.  The chancellor of the university:
13 "I don't find that term very useful because I don't know what
14 that means."
15   Michael Davis, his trial testimony here:
16   "You've heard the term 'critical mass,' but you're not
17 really familiar with what it means, correct?
18   "That is correct."
19   The deposition testimony of Yolanda Coleman:
20   "Are you familiar with this term 'critical mass'?
21   "Answer:  No.
22   "No?  Is that a term that was used in the admissions
23 office?
24   "Answer:  No, not that I recall."
25   Dr. Kretchmar, who testified here, said it was fair to say

1  that during her time in the admissions office she had not had a

2  discussion specifically about how the university is using race

3  to achieve critical mass.

4      Now, obviously, having the goal is important, but equally

5  important is that it be measurable; that we know when we're

6  making progress toward the goal.  One, that we know why it is

7  necessary to use race and, two, when can we stop using race.

8  And when we turn to the measurement side, the evidence has

9  shown that UNC for, you know, going on nearly two decades from

10 *Grutter* has not had any way to measure critical mass.

11      This is Mr. Farmer.  As of 2017 -- strike that.  I'm sorry.

12 As of 2017, the only formal attempts by UNC to determine if it

13 had obtained critical mass were some climate surveys of the

14 student body, but he admitted that he had not looked at any

15 such climate surveys since 2006.  That was more than 10 years

16 ago at the time he gave his testimony in his deposition, and

17 it's been even longer now.

18      And Lynn Williford's deposition -- designated deposition

19 testimony -- she's the person in charge of institutional

20 research, including the climate surveys -- testified that she

21 had never been asked to measure the extent to which any group

22 on campus had obtained critical mass, and she had never been

23 asked to measure or quantify critical mass for any group on

24 campus.  That was her testimony.

25      Mr. Rosenberg here at trial had no understanding about how

1  to determine whether UNC has reached critical mass.

2      The list goes on and on here.  This is a real problem for

3  UNC, especially given the strict scrutiny burden here.

4      Now, we did hear some testimony from Mr. Farmer about some

5  reports done, and one example was DX3.  This is their report on

6  the educational benefits of diversity and inclusion, but you

7  may remember that we asked Mr. Farmer if that report actually

8  contained any definition, quantification, even a range or any

9  sort of measurable effect of critical mass, and he could not

10  point to one.  It's merely a 16-page, give or take, report that

11  just talks about the interests that the university has in

12  achieving the educational benefits of diversity.  But that is

13  not sufficient.  The Supreme Court told us that in *Fisher*.

14  Asserting an interest in the educational benefits of diversity

15  writ large is insufficient.  That's exactly what this was.

16      I asked Mr. Farmer about this report.  The testimony in the

17  record is that he worked on redrafting this report in one

18  weekend.  Obviously, this report arose several years after the

19  lawsuit was filed, and it deserves at least some measure of

20  skepticism then, but even on its own terms, it doesn't actually

21  achieve any definition of critical mass.  It doesn't define

22  critical mass, and so it is not sufficient.

23      And if there were any question about this, the report was

24  given to Mr. Farmer to revise by his boss at the time, who was

25  the executive vice chancellor and provost, James Dean; and

1  James Dean's testimony on this point is both decisive and

2  designating because when he was asked whether this report had

3  any connection to what the university -- I'm sorry -- the term

4  "critical mass" had any connection to what the university was

5  trying to achieve with its use of race, he testified that in

6  all his conversations with Steve Farmer, that phrase had never

7  come up.  Neither -- "No one has directed anybody to achieve a

8  critical mass, and I'm not even sure we would know what it is."

9      Why does this matter?  It matters because if you don't know

10 what the critical mass that you're attempting to achieve is,

11 you're never going to know when you get there.  And the Supreme

12 Court has been clear about this, again, going all the way back

13 to 2003:  Race-conscious admissions policies must be limited in

14 time.  This requirement reflects that racial classifications,

15 however compelling their goals, are potentially so dangerous

16 that they may be employed no more broadly than the interest

17 demands.  They need to have a logical end point.

18     Those are the words of the Supreme Court, and without a

19 definition of critical mass or a way to measure it or any kind

20 of parameters by which one might understand what are we trying

21 to do and when will we know that we've gotten there, it doesn't

22 have a logical end point.

23     This was driven home very clearly by the testimony we heard

24 at trial.  We'll start with what Mr. Farmer said when asked

25 what critical mass was.  This is the closest I think the Court

1 came to hearing a definition of critical mass at any point in

2 the trial testimony. It "is a complicated idea, a complex

3 idea. It's really about the experience of students in our

4 community, and it's about their ability to contribute fully to

5 the experience of others and also benefit fully from the

6 experience that we offer."

7    "That is a nice sentiment, but it is not measurable. There

8 is no 'there' there. It has no tangible basis from which one

9 can derive some sort of concrete understanding of what exactly

10 are we trying to do and when will we know we're there so we can

11 stop using race."

12    And the final punctuation on this point I think came from

13 Ms. Panter, her testimony. She's heading up the group, again,

14 formed long after this litigation began, to actually examine

15 race-neutral alternatives, allegedly in good faith. But

16 Ms. Panter's testimony was that she could not even say if the

17 four racial groups that UNC -- that we've discussed were

18 equally represented on campus, if there were the same

19 percentage of white students, Asian students, African American

20 students, and Hispanic students, even then she would not be

21 able to say if the university was sufficiently racially diverse

22 at that point. She doesn't even know if that would constitute

23 critical mass.

24    That's disturbing. That's inconsistent with what the

25 Supreme Court required, and I think it underscores UNC does not

1   have any kind of measuring stick or process or concrete

2   nonelusory goal that would allow them to know when they have

3   achieved critical mass and can stop using race.  That in and of

4   itself should be sufficient for them to fail strict scrutiny.

5        I'll now let Mr. McCarthy address the second question.

6             **THE COURT:**  Thank you.

7             **MR. MCCARTHY:**  Thank you, Your Honor.

8        And before I address this question, I would like to

9   reiterate Mr. Strawbridge's comments about the appreciation for

10  the Court's time and effort and that of the court staff as

11  well.  We appreciate the hospitality.  It's been a Herculean

12  effort, I think, by everybody to make this thing go properly.

13  We do appreciate it very much.

14       In terms of UNC's use of race in admissions, there's an

15  important standard that comes down to two parts.  It must be

16  truly -- "truly individualized consideration demands that race

17  be used in a flexible, nonmechanical way"; and, distinctly, "a

18  university's admissions program must remain flexible enough to

19  ensure that each applicant is evaluated as an individual and

20  not in a way that makes an applicant's race or ethnicity the

21  defining feature of his or her application."

22       What we'll see here with these two distinct requirements:

23  The statistical and nonstatistical evidence in this case will

24  show, one, that UNC's admissions process is formulaic and

25  mechanical; and, two, that race is a dominant factor in UNC

1  admissions.

2      SFFA's statistical case in this case comes by way of

3  Professor Peter Arcidiacono, professor of economics at Duke

4  University.  Among other recognition in his field, Professor

5  Arcidiacono is a Fellow of the Econometric Society and a Fellow

6  of the International Association of Applied Econometrics.  In

7  the *Harvard* case, a well-known affirmative action case that has

8  run parallel to this one at times, Judge Allison Burroughs

9  described Professor Arcidiacono as highly respected and

10  well-qualified.

11      Drawing on his vast experience and expertise in the area of

12  discrete choice modeling, Professor Arcidiacono estimated a

13  logit model, the output of which yields a formula that

14  approximates UNC's admissions process.  Using the iterative

15  process commonly employed in this field, Professor Arcidiacono

16  made seven versions of his model.  His updated Model 4, he

17  testified, is his preferred model.  Notable, that model

18  includes the five ratings assigned by UNC's application

19  readers.

20      Deposition testimony in this case designated for trial here

21  shows that UNC's own data analytic subcommittee found that

22  including those five UNC ratings is important to modeling their

23  admissions process.

24      Professor Arcidiacono's statistical analysis shows that

25  UNC's admissions process is highly formulaic.  As Professor

1  Arcidiacono explained, his preferred model is highly accurate.

2  It accurately predicts admissions decisions over 92 percent of

3  the time for in-state applicants.  Similarly, his preferred

4  model is highly accurate with respect to out-of-state

5  applicants.  There it accurately predicts admissions decisions

6  more than 93 percent of the time.

7      Professor Arcidiacono helped illustrate how formulaic UNC's

8  admissions decisions are through his graphical representations.

9  This slide, for example, shows that his model easily divides

10  nearly all in-state applicants into near-certain rejects.

11  That's on the left side of the picture where the graph spikes

12  near the 0 percent chance of admission and divides on the other

13  side applicants into near-certain admits.  That's on the right

14  side of the graph where it spikes near 100 percent admission.

15      Further, he showed that the accuracy -- the accuracy of

16  that same model.  His modeling not only divides the in-state

17  applicants into near-certain rejects and near-certain admits,

18  but it does so with extraordinary accuracy.  Professor

19  Arcidiacono testified that his models have incredibly high

20  accuracy, much higher than what is normally seen in his field,

21  and that led him to opine that UNC's process is highly

22  formulaic and guided by an implicit formula.

23      You're likely to hear UNC claim that its process cannot be

24  reduced to an implicit formula and that its process is neither

25  mechanical nor formulaic.  UNC, in fact, claims that it

1  conducts individualized assessments of over 40,000 applicants

2  each cycle.  But the nonstatistical evidence in this case shows

3  that this process is highly mechanical, and it confirms

4  Professor Arcidiacono's conclusion that the process is highly

5  formulaic.

6      Jared Rosenberg, UNC's associate director of undergraduate

7  admissions, supervises the day-to-day work of the admissions

8  office.  He testified that UNC readers complete review of five

9  applications an hour, or one every 12 minutes.  Again, the

10 record shows that these applications average over 30 pages in

11 length.  In fact, the evidence shows that readers need only 10

12 minutes to review one of these 30-plus-page applications.

13     Mr. Rosenberg further testified that it was his job to keep

14 the trains running on time, to keep the machine running

15 smoothly, and he made clear that he manages UNC's readers to

16 ensure that they would read the same files in the same way and

17 score them in the same manner.  He emphasized that each

18 reader's decisions are calibrated to fit the admissions

19 office's priorities.

20     As Mr. Rosenberg's testimony before this Court shows, this

21 calibration process ensures that 99 percent of the time a

22 second reader does not need to change the first reader's

23 decision.  And other evidence shows that readers know that

24 they're being calibrated, and they seek confirmation that they

25 are getting the right answers when they review application

1   files.

2       It should not be surprising, then, that UNC boils down

3   applicants to a few key measures in race and ethnicity.  There

4   are numerous examples in the record of UNC readers being keenly

5   focused on race and ethnicity when reviewing application files.

6   Not surprisingly then, the nonstatistical evidence illustrates

7   how race dominates the process.  UNC's reading document --

8   UNC's reading document makes clear that race, ethnicity, or

9   national origin may be used at any stage of the process.

10      The record evidence shows that race, in fact, pervades the

11  entire process, starting with recruiting.  Race is a point of

12  focus in recruiting.  UNC purchases data from the College Bound

13  that is tiered by race.  These tiers show very large

14  disparities between what UNC views as admissible applicants as

15  between URM and non-URM applicants.

16      Furthermore, race pervades the process in terms of the

17  application review.  Readers focus on race throughout the file

18  reading, repeatedly highlighting the race of applicants as they

19  push through files.  For example, a reader here states that she

20  is going through this trouble of finding a way to admit an

21  applicant who happens to be a biracial male.

22      Race further pervades the process in other ways.  Before

23  UNC stopped the weekly circulation of core reports, the

24  admissions office used them to apprise admission office leaders

25  of a few key demographic benchmarks, among them race.  Race was

1    prominently reported on core reports, showing whether or not

2    UNC was ahead of the previous year's racial and ethnic numbers.

3         And although SFFA is not pressing a specific claim as to

4    the SGR process, UNC was keenly focused on race there as well.

5    The second readers regularly referenced race in making SGR

6    decisions.

7         All of this nonstatistical evidence demonstrates that race

8    pervades UNC's admissions process.  UNC was certainly aware of

9    its keen focus on race, but did they ever do anything to

10   inquire or investigate the effect race was having on their

11   process?  Here's what they had to say.  Stephen Farmer

12   testified on multiple occasions he directed Jennifer Kretchmar

13   to investigate whether and how other factors might have been

14   affecting UNC's admissions process.  He specifically asked her

15   to develop formulas to model the probability of admission to

16   determine whether UNC was affording in-state applicants legacy

17   preferences and to determine the effect gender has on the

18   admissions process.

19        But despite having ample reason to question the effect race

20   has in UNC's admissions process, Mr. Farmer never asked

21   Dr. Kretchmar to employ a similar analysis to determine the

22   extent to which race affects UNC's admissions decisions and

23   admissions process, not once in his nearly two decades.

24        Professor Arcidiacono took on the question UNC never

25   bothered to ask and modeled UNC's admissions process to

1  determine the effect race has in the process.  His statistical

2  analysis demonstrates that race is, in fact, a dominant factor

3  in admissions.  Professor Arcidiacono conducted four separate

4  and distinct analyses to quantify the effect of race in UNC's

5  admissions decisions.  Each shows the same thing:  Race is a

6  dominant factor.  It is determinative for many URM applicants.

7      First, Professor Arcidiacono conducted a transformational

8  analysis where he turned off the effect of racial preferences

9  in his model and showed how it would affect the probability of

10  admission for in-state URM applicants, and that analysis showed

11  that race has a massive effect on URM admissions.  For example,

12  as this slide shows, a white male, non-FGC applicant with a

13  25 percent chance of admission, if treated as an African

14  American applicant, would have more than a 92 percent chance of

15  admission.  Professor Arcidiacono did the same analysis out of

16  state, and the results there were even more striking.  For a

17  white male, non-FGC applicant with a 25 percent chance of

18  admission, if he were treated as an African American applicant,

19  he would have more than a 99 percent chance of admission.

20      And you may hear UNC claim that this analysis is skewed

21  because it focuses on nonrepresentative applicants, but an

22  applicant with a 25 percent chance of admission actually

23  reflects the overall chance of admission to UNC, which is

24  undisputably a little over 25 percent.

25      You may also hear UNC claim that Professor Arcidiacono

1  focuses improperly on deciles that are on the bubble, so to

2  speak.  But the deciles on the bubble are the ones most likely

3  to be the place where racial preferences will matter, and the

4  data show that those deciles are the ones where most URM

5  applicants are actually admitted.

6      Professor Arcidiacono also conducted an average marginal

7  effect analysis.  It involves removing the effect of racial

8  preferences and observing the changes in the probability of

9  admission across all applicants and then averaging that change

10  in probability across all applicants of each racial group.  For

11  in-state African American applicants, their average probability

12  of admission drops from 30.5 percent to 17.8 percent without

13  racial preferences, and for out of state, it drops from

14  17.1 percent with racial preferences to only 1.5 percent

15  without racial preferences.

16      This type of analysis that Professor Arcidiacono employed

17  is supported in the academic literature.  Indeed, Professor

18  Arcidiacono was invited to author a survey paper in the *Annual*

19  *Review of Economics,* a journal for which Dr. Caroline Hoxby was

20  an editor at the time.  Professor Arcidiacono's survey covered

21  over 70 academic papers involving economic analysis of

22  affirmative action in higher education, and it employed average

23  marginal effect analysis.

24      This analysis is further supported by competing expert work

25  in related litigation.  Harvard retained Professor David Card,

1  a John Bates Clark Medal award winner for his work in

2  economics, and Professor Card employed average marginal effect

3  analysis in defending Harvard, and that average marginal effect

4  analysis was discussed extensively in the decision in that

5  case.  Dr. Hoxby, on the other hand, calculated the median

6  instead of the average marginal effect, but she could not

7  support any -- she could not cite any support for her novel

8  median marginal effect analysis anywhere in the academic

9  literature.

10     Professor Hoxby's critique of Professor Arcidiacono's

11  average marginal effect analysis inadvertently shows massive

12  effect on race -- or massive effect of race on admissions

13  decisions.  For example, she showed that turning off racial

14  preferences has a larger effect on the admission for African

15  American applicants than switching their GPAs to straight Bs.

16     Next, Professor Arcidiacono showed the effect of racial

17  preferences on URM applicants who were actually admitted to

18  UNC.  This analysis similarly showed the massive effects of

19  UNC's racial preferences.  For example, out-of-state URM

20  applicants who were actually admitted to UNC would become very

21  likely rejections if racial preferences were turned off.

22  Importantly, Dr. Hoxby never mentioned this analysis in her

23  testimony, not once.

24     Professor Arcidiacono also conducted an analysis involving

25  capacity constraints whereby he could see the effect of race on

1   the entire class as a whole, and that analysis showed over six
2   years that turning off the effect of racial preferences at UNC
3   would change thousands of admissions decisions over that time.
4   Dr. Hoxby says little, if anything, about Professor
5   Arcidiacono's capacity constraints analysis. Undoubtedly, this
6   is for two reasons. Number one, Dr. Hoxby employed no capacity
7   constraint analysis of her own, and number two, Professor
8   Arcidiacono's capacity constraints analysis is designed to and,
9   in fact, perfectly matches the number of admits each year that
10  UNC actually has.

11      Dr. Hoxby did her own posit analysis, and that analysis
12  does nothing to undermine Professor Arcidiacono's conclusions
13  here. Dr. Hoxby's analysis focuses almost entirely on her
14  Shapley decomposition analysis of the pseudo R-squared metric
15  for her models. This slide here that she focused on quite a
16  bit in her testimony is based off of her opening report
17  Exhibit 1, Table 1.

18      The problem with Dr. Hoxby's analysis is that it is
19  unsupported by academic literature in the field. Dr. Hoxby's
20  position is that the pseudo R-squared represents the percent of
21  the admissions decision explained by the model, but textbook
22  economic -- textbook econometrics demonstrates this is wrong.

23      First, Professor McFadden himself. The pseudo R-squared
24  that Dr. Hoxby employs is McFadden's pseudo R-squared, and
25  Professor McFadden himself explains that his pseudo R-squared

1 gives values that tend to be considerably lower than those of

2 the R-squared.

3        Professor Train in his textbook explains that the pseudo

4 R-squared is not at all similar to the R-squared used in

5 regression.  In fact, he says it has no intuitively

6 interpretable meaning.

7        Professor William Greene says, similarly, pseudo R-squared

8 has no connection to the fit of the model to the data.  He even

9 gives an example with a pseudo R-squared of .083 that predicts

10 accurately more than 71 percent of the time.  Yet Dr. Hoxby

11 persists in saying that a pseudo R-squared of .248 predicts

12 only 42.8 percent of the admissions decisions.  Just as

13 Professor Greene explained, Professor Arcidiacono showed that

14 Dr. Hoxby's model is very accurate.

15        Not only is Dr. Hoxby's use of the pseudo R-squared

16 unsupported in the academic literature, but her Shapley

17 decomposition analysis is unsupported in the field.  She could

18 identify no academic paper in which an economist used it in the

19 same manner she did here.  And she conceded that the Shapley

20 decomposition analysis she employed would show a much smaller

21 effect if focused only on the affected racial group.

22        Dr. Hoxby purported to show that removing racial

23 preferences would only have a small effect on admissions

24 decisions because it would reduce Professor Arcidiacono's model

25 accuracy by only a small margin.  But the data underneath

1  Dr. Hoxby's analysis shows the opposite.  What it shows, in

2  fact -- I'm sorry.  My eyes are not good enough to be able to

3  read those numbers closely.  I'm going to flip to the slide.

4      Thank you.

5      In fact, those numbers showed that removing race causes the

6  accuracy of the model's ability to predict admission for

7  African American applicants in state to drop from over

8  86 percent to down around 65 or 66 percent, and out of state it

9  drops the accuracy of the model's ability to predict admission

10 for African American applicants from nearly 75 percent to less

11 than 18 percent.

12     Now, there was some discussion about overfitting here

13 during the trial.  Professor Arcidiacono used a textbook graph

14 illustrating the concept of overfit, and that concept is about

15 out-of-sample error, in particular, minimizing out-of-sample

16 error.  Professor Hoxby's overfit methodology, on the other

17 hand, was flawed in several respects.  Those errors in her

18 methodology caused overstatements of overfitting or it causes

19 it to report overfitting where there actually is none.

20     Indeed, as Professor Arcidiacono demonstrated, Dr. Hoxby's

21 shifting metrics for overfit actually defeat themselves by

22 suggesting that her least accurate models are actually the most

23 accurate.

24     In the end, when resolving competing expert analysis in

25 this case, it is worth emphasis that Professor Arcidiacono's

1    analysis is supported by numerous econometrics textbooks and

2    peer-reviewed academic work; among those, Professor Train's

3    textbook, Professor Greene's textbook --

4         **MR. FITZGERALD:**  Your Honor -- I'm sorry -- I hate to

5    object during a closing, but these text are not in evidence.

6    They were shown to the witness, but they've never been offered

7    as exhibits.  So I object to repeated references to exhibits

8    not in evidence.

9         **MR. MCCARTHY:**  They were cited by Dr. Hoxby in her

10   report and Professor Arcidiacono in his report.  The one, in

11   fact, on the screen was cited by Dr. Hoxby in her report, as

12   she acknowledged at trial, and she was familiar with the others

13   because they were cited by Professor Arcidiacono at trial, and

14   actually, she quoted some of the language --

15        **THE COURT:**  But whether or not they support your

16   expert's opinion is not really before the Court.

17        **MR. MCCARTHY:**  I'm sorry?

18        **THE COURT:**  Whether or not they support the opinion of

19   your expert is not before the Court, and you're telling me that

20   it is, correct?

21        **MR. MCCARTHY:**  Your Honor, I'm not telling you that

22   specific issue is before the Court.  All I'm saying is that

23   these were the text that were cited by the experts in their

24   competing analysis, so it's relevant to how they conducted --

25        **THE COURT:**  All right.  I can hear that they may have

1  been cited by someone in their analysis, which is different

2  from them supporting the expert's opinion.

3          **MR. MCCARTHY:**  Okay, Your Honor.  Understood.

4          **THE COURT:**  All right.  So limit it to that, please.

5          **MR. MCCARTHY:**  Understood.  We can move on.

6      Dr. Hoxby, on the other hand, repeatedly failed to identify

7  any academic work supporting her novel analysis:  Not her

8  Shapley decomposition analysis, not her novel McFadden pseudo

9  R-squared analysis, and not her novel median marginal effect

10 analysis.

11         **MR. STRAWBRIDGE:**  So, your Honor, that brings us to

12 the third and final aspect of the questions for trial and the

13 evidence that was presented here.  It has to do with the

14 evidence that goes to whether or not there are workable

15 race-neutral alternatives available to the University of

16 North Carolina in its admissions process.  And relevant

17 language from *Fisher* is here on the screen:  "The reviewing

18 court must ultimately be satisfied that no workable

19 race-neutral alternatives would produce the educational

20 benefits of diversity.  If 'a nonracial approach...could

21 promote the substantial interest about as well and at tolerable

22 administrative expense,' then the university may not consider

23 race."

24     Before we get to what the evidence in this case showed

25 about the availability of workable race-neutral alternatives,

1    it bears a brief review of the record of UNC's consideration of

2    race-neutral alternatives since 2003, in the 17 years since the

3    Supreme Court first laid down this approach in *Grutter*.

4        The only evidence that we have with respect to UNC's first

5    attempt to analyze an actual race-neutral alternative is this

6    spreadsheet that Mr. Farmer apparently used at his desk, but as

7    you heard his testimony at trial, he's able to tell us very

8    little about that.  He could not replicate that study today.

9    He -- with respect to the completion of that study, he didn't

10   recall discussing it with anybody in the admissions office

11   specifically, sharing it with the faculty undergraduate

12   commission, nor was it boiled down to a written report or a

13   written analysis.  So I think right there that falls well short

14   of the -- of the serious and good-faith consideration of

15   race-neutral alternatives that are required.

16       There was a literature review a couple of years later that

17   was simply just a survey of what was happening in other

18   schools.  It was actually not an attempt to analyze what would

19   happen at the University of North Carolina, so that can't

20   constitute a serious, good-faith consideration.

21       Then we have the analysis that was done for the amicus

22   brief, and I would submit that an analysis that was done after

23   the university had already decided to submit an amicus brief in

24   the pending *Fisher* litigation is not the kind of serious,

25   good-faith consideration that the Supreme Court had in mind.

1  The timeline with respect to the submission of the amicus brief

2  demonstrates that it was done as part of that effort.  I think

3  Mr. Farmer said he asked it be prepared in conjunction with

4  conversations he was having with people at UNC's law school who

5  were authoring that amicus brief.  By their own admission -- by

6  Dr. Kretchmar's own admission here in this particular document

7  that's on the screen, it was an unsophisticated analysis.

8      The next time that there was an effort to actually analyze

9  race-neutral alternatives came several years later and long

10  after the deadline that OCR had requested for a full review of

11  the university policies that passed.  In the fall of 2014,

12  there was a request -- or there was a working group assembled.

13      And the flaws of this are substantial, and I will not

14  recount all the evidence at trial.  I will just note that at

15  the outset the charge that was given to the members of that

16  working group was to determine whether each alternative would

17  yield an entering class with equal or greater diversity,

18  academic quality, and extracurricular achievement and

19  potential.  We know that's inconsistent with the Supreme

20  Court's standard which only requires that it work about as

21  well.  We cannot set a floor of our existing levels of any of

22  those criteria or else it essentially becomes a de facto quota.

23  That was the charge that they were given, and that was the very

24  specific standard upon which the various alternatives -- that

25  this report eventually discussed or analyzed.

1    Moreover, as we know, as part of preparing that report,
2  this working group never identified just how much of an effect
3  race was having in their admissions process today, nor did they
4  generate any kind of definition of critical mass or some sort
5  of goal for what they actually sought to achieve through the
6  ruse of race, which is a necessary step to analyzing whether a
7  race-neutral alternative would achieve that goal about as well.
8    What was the substance of this report?  Well, Dr. Kretchmar
9  eventually prepared a draft October 31, 2014.  She sent this
10 draft around to Barbara Polk and, in her own description, "I
11 know most of this won't likely make the cut for the final
12 draft, but I felt like I needed to at least make an attempt.
13 So it's a start, at least."  Now, that document that she sent
14 to Barbara Polk was not the start of this working group's
15 report.  It was the end of the working group's report.  No
16 substantive changes were made to that report for nearly two
17 years, at which point the undergraduate admissions committee
18 accepted to -- I'm sorry.  The Advisory Committee on
19 Undergraduate Admissions accepted that report basically in
20 full, without making any substantive changes whatsoever.  That
21 is conceded in interrogatory responses that are in evidence in
22 this case.  And notwithstanding the fact that it was a first
23 effort and a draft that Dr. Kretchmar herself did not think
24 would make the final cut, the Advisory Committee on
25 Undergraduate Admissions characterized it as the best efforts

1  of the first group charged specifically with exploring

2  race-neutral alternatives.

3      At that point, of course, the Committee on Race-Neutral

4  Alternatives chaired by Dr. Panter was established.  That

5  committee, having been established in 2016, has produced some

6  preliminary reports.  It has apparently conducted some

7  preliminary analysis, still has yet to provide any definition

8  of critical mass.  There is no actual findings of that

9  committee with respect to the availability of race-neutral

10 alternatives or any analysis as to what a race-neutral

11 alternative would be deemed successful.  None of that is before

12 the Court.  It's a -- that process is just getting off the

13 ground, despite having been underway for a number of years at

14 this point.  I think that that -- that underscores the lack of

15 a serious attempt to search for a race-neutral alternative.

16     Now, we did hear evidence in this case that there are

17 workable race-neutral alternatives available to UNC, and the

18 primary evidence presented by the Plaintiff was the simulations

19 prepared by Mr. Kahlenberg, who has dedicated his career to

20 writing about issues of race and class in schools, including

21 colleges, and studying the field of race-neutral alternatives.

22 He presented this Court with a number of simulations.  We're

23 going to go through them quickly, but I think Your Honor is

24 familiar with the basic idea of these simulations.

25     The most important note, I think, at the outset here is the

1  variety of different simulations that were run.  There were

2  simulations that were run that assumed, essentially, that UNC

3  kept its current admissions process, including its holistic

4  consideration, its ratings, its analysis of the candidates as

5  they do now, simply assuming that they got rid of any racial

6  preferences, as well as some other preferences they have for

7  legacy students and the such.

8      And we have three different examples of those.  We also

9  have a percentage plan race-neutral alternative that was

10 presented.  We have a hybrid plan that includes parts of a

11 percentage plan and parts of a holistic race-neutral

12 alternative, and we even have a plan that is based on

13 Ms. Hoxby's methodology.  And I think as we go through this,

14 what I want Your Honor to understand or at least what I would

15 like to emphasize is the fact that these simulations cover the

16 gamut.  Some of them include out-of-state students; some of

17 them are focused on in-state students; some of them include the

18 existing applicant pool, assuming nobody else applies to UNC;

19 some of them include a much broader applicant pool, assuming

20 that most of the in-state students, if not all in-state

21 students, in North Carolina apply to UNC.  It even uses

22 Professor Hoxby's methodology, which was to assume that

23 75 percent of the students in North Carolina would apply to

24 UNC.

25     So Mr. Kahlenberg's simulations have covered the waterfront

1  of different approaches.  I mean, I don't think they could be

2  fairly criticized on the ground that they focus only on one

3  particular set of assumptions or another.

4  　　What were those simulations?  Your Honor remembers them.  I

5  will not belabor the point.  Simulation 3 is the first one that

6  was presented.  This one includes in-state and out-of-state

7  applicants.  It -- as you can see, the results here do very

8  well with respect to the existing levels of racial diversity,

9  assuming that is UNC's unstated goal.  They actually increase

10  socioeconomic diversity, which UNC at least claims is just as

11  big of a priority with respect to the educational benefits of

12  diversity as racial diversity, and they do very well with

13  respect to the academic characteristics.  We're within one

14  percentile of the average SAT score, and we're very close to

15  the high school GPA.

16  　　And as we go through all these simulations, it's worth

17  remembering the second point that Mr. Kahlenberg made, which is

18  that when you are increasing the number of students who have

19  come from challenging socioeconomic circumstances, whether

20  that's a disadvantaged family situation, a disadvantaged school

21  or a disadvantaged neighborhood, the academic credentials of

22  those students have to be viewed in context, and, indeed, it is

23  more impressive that those students are able to obtain the same

24  types of academic achievements, and in particular their GPA,

25  than a student who goes -- or lives in a more advantaged area.

1  And so viewed in that context, the academic characteristics of

2  the classes in this simulation are very favorable.

3      The next simulation that was presented here, this is

4  Simulation 11.  This is providing a socioeconomic status

5  benefit or additional preference for socioeconomic status, and

6  you can see in this case you have a large uptick, not only in

7  the diversity among the underrepresented groups but in

8  socioeconomic diversity.  And, again, the academic credentials

9  are very good.

10      We have the next simulation, which is Simulation 8.  This

11  is a version of a top 4.5 percent plan.  It draws upon mainly

12  the existing applicant pool.  Again, you can see that the

13  underrepresented groups are represented just as well in this

14  simulation as they are under the status quo, socioeconomic

15  diversity increases, the academic characteristics remain highly

16  competitive.

17      The same is true with respect to this simulation.  This was

18  a hybrid.  You had top 4 percent based on a class rank

19  race-neutral admissions policy.  Again, general increase at

20  least with respect to disadvantaged schools; at least a

21  maintenance, if not a different improvement -- this is the

22  slide that does not include Native Americans broken down, which

23  is why the underrepresented minorities report is a little bit

24  smaller than it is in the others, but it certainly works about

25  as well.  And, again, the academic credentials remaining very,

1    very competitive.

2        And then we have the example that was taken from Dr. Hoxby.

3    We are using here her own methodology of finding applicants and

4    setting aside seats.  There can be no concern here that somehow

5    Mr. Kahlenberg's assumptions were different than Professor

6    Hoxby's, and still we're yielding an improvement in

7    socioeconomic diversity; an actual improvement, I think, in the

8    GPA; competitive test scores and very good representation

9    across all the racial groups.

10       So all these simulations demonstrate that UNC can achieve

11   diversity, not only with respect to its existing levels of

12   racial diversity, but also socioeconomic diversity, greater

13   diversity.

14       I want to talk a little bit about some of the criticisms

15   that we heard about Mr. Kahlenberg's simulations.  Dr. Hoxby's

16   standard, to begin with, I think was far too exacting for what

17   the Supreme Court requires in this process.  As we talked about

18   at the beginning, the standard under the Supreme Court is that

19   the race-neutral simulation needs to work about as well.  It

20   needs to be a workable solution.  It does not necessarily need

21   to hit particular numbers.  Dr. Hoxby's analysis -- and she

22   testified about this -- was framed only in terms of whether the

23   replications could hit UNC's current actuals.  And by

24   "actuals," she meant not only the average test score, but she

25   meant the precise numbers of students in each URM category.  If

1  it did not reach that, she considered it an unsuccessful
2  simulation.

3       Even setting that aside, she acknowledged that at least it
4  was theoretically possible that a race-neutral simulation might
5  be available, although she did not run a simulation that went
6  this far.  But she acknowledged that it was theoretically
7  possible and you could even meet her unnecessarily exacting
8  standard for precisely replicating the level of racial
9  diversity in test scores in the class.

10       She also -- I think her -- you remember the testimony that
11  I think kind of underscores the fundamental incoherence of both
12  her opinions.  She attempts to assert that race is playing a
13  very, very small effect in the admissions process; it is not,
14  you know, a major driver or a predominant fact in whether
15  someone gets in or not, and yet it is also very, very difficult
16  to model a race-neutral alternative.

17       And I think the only way to reconcile those two pieces of
18  testimony -- race is not having a big effect, but also there is
19  no race-neutral way to achieve anything close to what UNC is
20  doing -- the only way to reconcile that process is if you hold
21  to this kind of artificially specific standard that she
22  applied:  That you actually have to replicate the very precise
23  numbers, the very precise test scores of the admit class; and
24  even if you're just off by a few students here or there, that's
25  an insufficient solution.  I think that underscores why that

1  standard is the only way in which she can find there are no

2  workable race-neutral alternatives and reconcile with her prior

3  opinion.

4      As for Professor Long, I don't think her opinions have

5  provided much help to UNC in this case.  She certainly offers

6  her own observations on various studies that were made in this

7  area, but, as you may recall, she is not here to offer any

8  opinion on what UNC could actually implement.  She doesn't

9  offer any opinion on what are the necessary thresholds for

10  critical mass for UNC.

11      She certainly disputed how generally available richer

12  socioeconomic data may be for students -- or for colleges who

13  wanted to prioritize SES status, for example.

14      But she couldn't dispute at least one study that

15  Mr. Kahlenberg testified about where UCLA law school had

16  actually been able to find and deploy richer socioeconomic

17  criteria about wealth.  She couldn't dispute that that

18  information is available on the FAFSA form and the CSS.  There

19  is a question about how many people completed it, but she could

20  not testify as to whether UNC had access to that information,

21  how many people were completing that information who were

22  applying to UNC.  And I think the evidence at trial indicates

23  that, just as UNC asks its applicants for specific essay

24  answers, just as it asks its applicants to complete their

25  own -- the CSS Profile, UNC is certainly capable of acquiring

1  richer socioeconomic data if it wants to.

2     In any event, that's kind of beside the point because none

3  of the simulations we just looked at, none of the simulations

4  that Mr. Kahlenberg testified about actually relied on greater

5  wealth data being available.  That was all based on information

6  that was either available through the UNC applicant data that

7  was produced in this case or through the high school data,

8  which is presumably easy enough for UNC to obtain since it

9  obtained it for purposes of running their analysis here.

10 Professor Long's other -- and, of course, Professor Long did

11 not offer any opinion on simulations one way or the other.

12    Professor Long's other opinion was to contend that more

13 selective schools -- and she put UNC in the same bucket -- have

14 a hard time replicating the precise levels of racial diversity

15 through race-neutral alternatives.  She set to minimize all the

16 successful efforts on this front in the studies from the

17 University of Arizona, Colorado, Florida, Texas, and

18 Washington.  She preferred to focus on the California schools

19 and Michigan.  Of course, that meant that she had to at least

20 dismiss in some ways the recent success of the California

21 schools, which the testimony at trial indicated -- everybody

22 agrees it has made strides at least in recent years of

23 replicating or at least getting closer to the levels of racial

24 diversity that they had before.

25    But more importantly is that this testimony and this

1  attempt to kind of wall off the studies from less competitive

2  universities and put UNC in a different category isn't based on

3  UNC's own efforts, because Professor Long did not review any of

4  the deposition testimony or the records of UNC.  At no point in

5  the 17 years after *Grutter* is there evidence that UNC had

6  conducted the kind of analysis she did and somehow concluded

7  that they are more like Michigan and California and they're

8  less like Arizona and Washington.

9      In fact, as you may recall, Professor Long's focus here was

10 really on an article by Mr. Kahlenberg and Potter that was the

11 subject of an e-mail from a former Department of Education

12 official to UNC to include in the working group report -- to

13 update their report to address these kinds of articles and the

14 articles that appeared in the precise book; and, of course, we

15 know that suggestion was rejected.  It never made it into the

16 discussion that UNC had done.

17     More importantly, we have evidence in the record that UNC

18 has used benchmarks and looked to other universities as

19 comparable universities, specifically when discussing racial

20 diversity, and that's what's shown on the screen here.  This is

21 PX59.  It's admitted in the record.

22     This is an e-mail that Steve Farmer sent to Jim Dean

23 identifying a number of universities who are either designated

24 as peer universities by the UNC system itself, that are top 30

25 national universities or that are other AAU universities.  In

1  other words, Steve Farmer went out and prepared a list of

2  universities that they considered their peer universities for

3  purposes of comparing how they're doing on racial diversity.

4  And when one looks at those universities, what's striking about

5  this is that you're going to see a lot of schools that we just

6  talked about that have implemented race-neutral alternatives

7  that have done so successfully.

8      On the first set here, this is the peer university, the

9  University of Texas appears on that list right next to

10  UNC-Chapel Hill.  On the AAU list, if you look, there's a

11  number of universities:  Florida, which has successfully

12  implemented race-neutral alternatives; Arizona, which has

13  successfully implemented race-neutral alternatives.  There is

14  Texas again, which did so for a number of years.  There is --

15  the University of Colorado is on this list, which at least

16  briefly was under a race-neutral regime; Texas A & M, which has

17  successfully implemented race-neutral alternatives; the

18  University of Washington, again, another university that has

19  successfully implemented race-neutral alternatives.

20      The evidence in this case, I think, leads to the necessary

21  conclusion that UNC rejects these approaches because they don't

22  want to succeed in finding a race-neutral alternative.

23  Although UNC's officials may believe that their indefinite

24  commitment to the use of race comes from a benevolent place,

25  that they can and should be trusted to use race in a

1 responsible manner to achieve goals that they consider to be

2 laudable, there's a reason that the United States Constitution

3 renders any use of race as a highly suspect tool.  Racial

4 classifications have always been classified as being in the

5 best interest of those against whom they are deployed.

6     And as one Justice has aptly noted:  The Constitution

7 abhors classifications based on race, not only because those

8 classifications can harm favored races or based on illegitimate

9 motives, but also because every time the government places

10 citizens on racial registers and makes race relevant to the

11 provision of burdens or benefits, it demeans us all.

12     The evidence makes clear that UNC does not take the

13 requirements of the whole protection seriously and that it will

14 not forfeit its use of race voluntarily.  It falls to the Court

15 to step in and enforce the law in this area.  We respectfully

16 request that it do so.

17     We thank the Court for its time and attention to this

18 matter, and we request that it order the University of North

19 Carolina to cease its use of racial classifications in its

20 admissions process.

21     Thank you, Your Honor.

22         **THE COURT:**  Thank you.

23     Do you anticipate about an hour and a half for yours?

24         **MS. BRENNAN:**  We do, Your Honor.

25         **THE COURT:**  All right.  Why don't we take our

1  afternoon recess, and then we will resume -- why don't we get

2  back here at a quarter of so we can get started.

3          **MR. FITZGERALD:**  Thank you, Your Honor.

4          **THE COURT:**  Yes.

5     (An afternoon recess was taken from 2:35 p.m. until

6  2:45 p.m.; all parties present.)

7          **THE COURT:**  UNC.

8          **MS. BRENNAN:**  Thank you, Your Honor.

9     And may it please the Court.  I, too, would like to begin

10  by thanking the Court and its staff on behalf of the university

11  and our trial team.  The university very much appreciates the

12  opportunity to defend this important case under the

13  circumstances with a live trial to the greatest extent

14  possible.

15     In our opening argument, we told you that what's going on

16  at UNC is people striving earnestly to create the best possible

17  environment with the best possible students using human

18  judgment.  They're doing the right thing for the right reason

19  in the right way, and the testimony has established this.

20     I will be addressing first the university's compelling

21  interests; second, how the university's holistic admissions is

22  narrowly tailored to achieve the university's goals; and, third

23  the university's good-faith consideration of race-neutral

24  alternatives.  Mr. Fitzgerald will be addressing the expert

25  testimony, including why the expert testimony does not change

1   the facts in this case.

2       And I'll start with the burden in this case, which

3   Your Honor is very familiar with, and just simply state that

4   there's two burdens, one related to compelling interest and

5   second related to narrow tailoring.  We have met both of the

6   burdens in this case.

7       And I'll note before beginning that we will highlight some

8   testimony and evidence in our closing, but we will provide more

9   detail and specific citations in our posttrial submissions.

10      First, turning to the compelling interest, the university

11  has a compelling interest in diversity; and if you look at the

12  legal standard here, the Supreme Court has recognized that

13  attaining the educational benefits that flow from a diverse

14  student body is a compelling, constitutionally permissible

15  goal; and the decision to pursue those benefits is something

16  that the Supreme Court said "is, in substantial measure, an

17  academic judgment to which some, but not complete, deference

18  is" owed.  Thus, a university's reasoned, principled

19  explanation for its decision to pursue the educational benefits

20  of diversity deserves considerable judicial deference.

21      The university's compelling interest has been conceded in

22  this case, but it has also been established.  There are four

23  established facts related to this interest.  First, UNC has

24  exercised its academic judgment; second, UNC is deeply

25  committed to achieving the educational benefits of diversity;

1  third, the holistic approach is the permissible means that the

2  university has adopted to achieve these benefits; and, fourth,

3  UNC has carefully assessed the achievement of these benefits

4  and reasonably determined that there is more work to do.

5      Turning to the first fact, that the university has

6  exercised its academic judgment, UNC, in its academic judgment,

7  has decided that racial diversity yields specific and

8  compelling educational benefits that are very important to

9  provide to its student body.  What is the university's

10 reasoned, principled explanation?  It is the long-time

11 recognition that diversity is a critical component of

12 excellence.  The benefits are not theoretical, but they are

13 real.  They occur both inside and outside the classroom, and

14 the university very much wants these benefits for its student

15 and faculty, and the students want them too.  UNC bases this

16 judgment and its considerable expertise in its special

17 understanding of context, and the pursuit of these benefits has

18 been well documented over time.

19     On this next slide we've shown some of the places where you

20 can see the documentation of the pursuit of these benefits:

21 The mission, the academic plans, the faculty resolution and the

22 provost report, which actually articulates the five specific

23 areas that the university pursues benefits in and shows that

24 those are the same benefits that align with what the Supreme

25 Court has said is permissible.  The faculty in its resolution

1  made clear that this is an important part of the pedagogy at

2  UNC.  So this is at the very heart of UNC's academic judgment.

3      And as the Supreme Court has made clear, UNC's judgment is

4  entitled to First Amendment deference.  While the university

5  also pursues socioeconomic diversity, that should not be

6  confused with its interest in racial diversity.  Racial

7  diversity has unique benefits that are extremely important, and

8  Mr. Farmer testified about that.  He talked about the fact that

9  it's important that students have the experience of living and

10  learning alongside other students of other races and

11  ethnicities, because that's the world that they will join; and

12  then he talked about how the conversations they will have will

13  be richer, the discoveries they make will be better, the

14  discussion -- decisions that they make will be better informed

15  as a result of their experiences with students of other races

16  and ethnicities.

17      And SFFA's own expert does not dispute that racial

18  diversity relates to educational benefits and simply says

19  socioeconomic diversity does as well.  But racial and

20  socioeconomic diversity are both important, but not the same.

21      This would be enough to establish the university's

22  compelling interest.  In addition, however, each of the five

23  types of benefits are set forth in the provost's report and

24  then further supported and illustrated throughout the record.

25  And we've provided you with a slide.  I know that this trial

1  was very streamlined, but there's a great deal of testimony

2  that's in the record through declarations, and we have provided

3  in this slide an example of each of the types of educational

4  benefits and the ways that they play out in the real world at

5  UNC and they affect people's lives.

6      So, for example, diversity being necessary for a robust and

7  fully inclusive conversation about the history of the South;

8  students learning from diverse classmates who had been involved

9  with traffic stops and how that provides a powerful and

10  impactful learning moment; diversity providing fertile ground

11  for innovation in a research lab; UNC making a student

12  confident in her ability to work with, coach, and teach others

13  who do not look like her and have not had the same experiences;

14  and then two students, a black male from a wealthy suburb and a

15  white male from rural North Carolina, becoming study partners

16  and learning a real lesson about implicit assumptions.  These

17  declarations further illustrate these benefits are real, and

18  they matter to people at UNC.

19      Instead of disputing this, SFFA claims that a ruling in its

20  favor will require no sacrifice of racial diversity.  But

21  SFFA's contention is false.  Even setting aside Count III, as

22  we have done for purposes of this trial, SFFA wants to force

23  the university to adopt an alternative that, as Mr. Fitzgerald

24  will discuss later, will not work about as well at UNC.  So

25  this is all very much on the line.

1    I'll highlight one witness declaration that makes the

2  choice at hand very clear, and that's the declaration of

3  Richard Vinroot.  He is a white male.  He was the former mayor

4  of Charlotte and a former Republican nominee for governor of

5  North Carolina.  He attended UNC on a Morehead Scholarship,

6  played basketball for Coach Smith, and graduated in 1963.  He

7  only had three or four African American classmates in his

8  entire class.  He was fortunate to have dinner with Martin

9  Luther King, Jr., as a student at UNC and that got him thinking

10  more about diversity.  Vinroot's three children later attended

11  UNC-Chapel Hill.  Their experiences included hearing, seeing,

12  and living with diverse individuals.

13    And Mr. Vinroot provides the following testimony:  "Many of

14  my peers have overcome the lack of diversity, as I hope I have,

15  but some reflect the lack of diversity and sensitivity.  I do

16  not know of anyone in my kids' generation who does not have a

17  broader and better view of the world in which they live than

18  people in my generation simply because of their broader

19  experiences.  Without diversity, UNC would create warped

20  graduates who are technically sound but lack the humanity we

21  brag about at UNC.  We are a university of the people and for

22  the people.  We would not be true to our mission without

23  diversity of all kinds, in my opinion.  I've always felt better

24  about UNC as a place that believes in the value of diversity."

25    When Mr. Vinroot looks at his yearbooks, he sees a lot of

1    people that look like him.  When his children and the students

2    today look at theirs, they see a very different picture.  What

3    will UNC look like tomorrow?  This case will impact who each of

4    the 4,000 students who arrive in Chapel Hill each August see

5    next to them.  Will UNC be able to provide them with the full

6    experience that UNC, in its academic judgment, believes that

7    they should have?

8        The second fact is that UNC is deeply committed to

9    achieving the educational benefits of diversity.  I only

10   address this briefly because SFFA has not made a serious

11   challenge to the university's commitment and sincerity.  UNC

12   has never said that it is perfect in all respects, and our

13   witnesses were very clear there's a lot more work to be done.

14   On the other hand, the evidence is substantial that the

15   university has made deliberate and sustained efforts to pursue

16   the educational benefits of diversity, and the next slide shows

17   some of those programmatic efforts or where there is evidence

18   about them and that can be found.

19       The provost report provides a detailed discussion of what's

20   the -- some of the university's efforts are.  We've also

21   submitted the report of Mitchell Chang.

22       And I want to just say a word about Dr. Chang because he

23   was not one of the live witnesses in this case, but he has 30

24   years of experience studying issues of racial diversity in

25   higher education.  He's at UCLA.  And he assessed the

1  university's programming and -- including things like affinity

2  groups, housing initiatives, campus discussion forums,

3  mentoring programs, and the like; and he observed that UNC

4  systematically and effectively engages diversity in an attempt

5  to intentionally create the conditions for the achievement of

6  the educational benefits of diversity.

7      You also heard in this case from Dr. Panter about many

8  efforts that are being done in the academic space in order to

9  ensure that students can collaborate with each other and learn

10  in that way.

11      And then we have listed here three declarations from

12  witnesses who will testify through their declaration as to some

13  of the efforts that are being made at UNC outside of the

14  classroom.  And that's the Blattner, King, and Crisp

15  declarations.

16      The third fact:  The holistic approach is the permissible

17  means that UNC has adopted to achieve the educational benefits

18  of diversity, and the next slide is from the Faculty Advisory

19  Committee guidance, which you saw during the testimony, and it

20  sets forth a holistic admissions system.  Specifically, if you

21  look at the bottom paragraph, it states:  "In shaping the

22  class, we evaluate individual candidates rigorously,

23  holistically, and sympathetically."  So this is echoed also in

24  the reading document, and the evidence is very clear that the

25  system is holistic.  That was also conceded by Plaintiff's

1  expert, Professor Arcidiacono.

2      And UNC witnesses explained what holistic review means in

3  practice.  The next slide is from the testimony of Mr. Farmer

4  where he talked about holistic review, and he starts by saying

5  that "holistic review means that we try to make sense of whole

6  people.  We try to make sense of candidates as human beings."

7  He goes on to say, "Holistic admission really means that we

8  focus on the best in young people, that we try to see the best

9  in them, that we try to make sense of them, where they come --

10 if -- what they care about, what they're good at, what they've

11 struggled at, what they can get better at, what difference

12 they'll make in the lives of the people around them and in the

13 lives of other people who are going to depend on them forever."

14     Mr. Rosenberg also testified about what holistic review

15 means and how they train their readers.  He stated that "We

16 want to train readers to meet our applicants where they are and

17 understand that they all come from different walks of life and

18 that context is extremely important to consider as you make the

19 decision."

20     We'll talk more about the admissions process in a moment

21 and the consideration of race, but there's no dispute that this

22 is a holistic process.  And race is one factor, among many

23 other factors, in who people are, and where they choose to

24 provide it, it should not be erased in trying to understand

25 them as individuals.

1    The fourth fact is that UNC has carefully assessed the

2  achievement of the educational benefits of diversity and

3  reasonably determined that more work is needed.  The testimony

4  shows that UNC has paid careful attention to its achievement of

5  the educational benefits of diversity.  You heard testimony

6  from Steve Farmer that he has continuously been in discussions

7  with leadership on the campus and each year sharing the

8  admitted class profile.  He's talking to students and others on

9  campus, and he's getting their feedback.  He's paying attention

10 to the numbers, along with the qualitative feedback.

11   You also heard testimony from Dr. Farmer -- I'm sorry --

12 from Dr. Panter.  UNC has done numerous surveys and assessments

13 over time to obtain information from students relevant to the

14 educational benefits of diversity, and Dr. Panter testified in

15 detail about those efforts.  That includes the HERI climate

16 survey.  It includes specific questions from course

17 evaluations, which we saw some examples of, and much more

18 information.  And Dr. Panter talked about how they review that

19 information and they apply it.  They use that information to

20 actually improve their teaching and their delivery of the

21 educational benefits of diversity.

22   We also heard testimony about a substantial effort to

23 formalize and centralize the assessment in 2017 following

24 guidance from *Fisher II* with the formation of the Educational

25 Benefits of Diversity Working Group, and that work is

1  summarized in DX5.  We heard about how that group collected

2  prior assessments, so they made sure that they centralized and

3  knew what assessments were occurring, including national and

4  local surveys.  They reviewed key data on this topic, and they

5  developed a state-of-the-art assessment plan that will assess

6  students' experiences starting when they arrive at UNC, or even

7  prior, and going through their alumni status.  Their goal is to

8  be a national leader in this area.

9      Now I want to talk for a minute about Plaintiff's focus,

10  which has been critical mass.  SFFA claims that the only

11  permissible goal is to enroll a critical mass of

12  underrepresented minority students.  SFFA then claims that the

13  university fails strict scrutiny because it hasn't sufficiently

14  defined its critical mass pools and they are not measurable.

15  SFFA attempts to use critical mass as a trap.  On the one hand,

16  SFFA attempted to obtain a numerical goal from many of UNC's

17  witnesses.  They even showed in their closing and you heard in

18  testimony the question that they asked Dr. Panter at her

19  deposition about whether certain levels of racial diversity

20  would be sufficient.  That, of course, would be an

21  impermissible quota, and UNC doesn't have quotas and so they

22  were not able to provide a specific number.

23      SFFA then switched tactics to suggest that because there's

24  no specific numbers, UNC's definition of critical mass was too

25  amorphous, and, therefore, UNC failed strict scrutiny.  But the

1  Supreme Court has explained that the permissible compelling

2  interest is not a specific number.  It is in the educational

3  benefits of diversity, and as discussed, the pursuit of those

4  educational benefits sets a clear goal, and the university's

5  work is tied to that goal, and the goal is assessed.

6      Notably, however, UNC does pursue critical mass as a

7  component of achieving the educational benefits of diversity.

8  Plaintiffs in their closing showed the reading document where

9  it states that critical mass is an aim of the university, and

10 that was confirmed by witnesses, including Mr. Farmer.

11     Now, SFFA says that UNC's witnesses couldn't define it, but

12 that is not the case.  UNC's witnesses have consistently said

13 that there's a numerical component, but it's also contextual.

14 And I'll note, you know, that defining it can be tricky because

15 at bottom this is a legal construct that we're talking about.

16 Nonetheless, all of the witnesses consistently had some

17 understanding that it's not simply numerical; there's also

18 another component to it.

19     And if you look at the testimony of Dr. Kretchmar, she

20 illustrated it well.  She said, "I can go through what I

21 understand to be the educational benefits of diversity.  So we

22 think of critical mass in terms of its outcomes, and I think

23 one of the ways we try to determine if we've achieved it is by

24 asking our students whether we've created the environment for

25 them that they say they want in terms of studying and living

1    alongside people who are different from them."

2        You will see similar definitions in the testimony of

3    others, and if you look at the full testimony of Taffye

4    Clayton, who used to be head of the Office of Diversity and

5    Multicultural Affairs, you'll see that she actually had a very

6    good understanding of critical mass, including her statement

7    that it can be amorphous.  She then goes on to further explain:

8        "And certainly it would be no surprise that some

9    lower-level admissions officers may not use the term 'critical

10   mass' on a day-to-day basis in connection with their work, so

11   there's nothing surprising about that, nor would it be their

12   job to do the assessment efforts.  Those are things that are

13   being done by Mr. Farmer, Dr. Panter, and others at a higher

14   level."

15       SFFA then says that UNC's objectives are not measurable.

16   Again, this is not just a numerical concept, so it's not simply

17   pulling out a ruler and seeing where the university is.  We

18   heard that the university has paid careful attention to these

19   issues.  The documents confirm that critical mass was discussed

20   at UNC.  Plaintiff showed one of those in their -- in their

21   opening, and you can see a couple of them on the screen.  But I

22   think much more importantly the testimony and the documents

23   establish that the university is regularly discussing and

24   assessing issues related to the achievement of the educational

25   benefits of diversity, as you heard from Mr. Farmer and

1  Dr. Panter.

2      Now, SFFA also argues that the Court cannot assess whether

3  the university is done with the need to consider race if the

4  university doesn't provide a detailed definition that seems to

5  include some numbers.  That is simply not the case.  The

6  evidence is very clear that the university is working hard at

7  this but is not there yet, and the Court can confirm that

8  through substantial evidence in the record.  That includes the

9  university's own assessment and document such as the provost

10 report.  It includes testimony, which you'll see in our next

11 slide, from Mr. Farmer and Dr. Panter where they talk about the

12 work being far from complete.  Mr. Farmer talked about that

13 particular year where -- where it was really tough for the

14 students, and it led them to believe they needed more diversity

15 than we've been able to give them.  Dr. Panter talked about "We

16 are not done.  We are not done.  There is a lot of work to do

17 in many different spaces."

18     The expert assessments also confirm this.  You will see in

19 Dr. Chang's report that he talks about this issue and the fact

20 that this work is very complicated and challenging, and it is

21 an ongoing iterative process.  So there is much more work to be

22 done at UNC, and he based that on his review and evaluation of

23 substantial survey data at the university over time.

24     You'll also see additional evidence of this in many of the

25 declarations in the record.  Just to provide one example, there

1  are faculty declarations to this effect in the record.  One of

2  them is from Professor Cuadros, who teaches in the School of

3  Journalism.  He talks about the challenges for diversity in the

4  School of Journalism, and he concludes:  "We cannot effectively

5  teach our students these key skills that they will need to

6  achieve in the workplace without greater diversity."

7      You've also heard information from students.  You've heard

8  the Intervenors' very compelling testimony, and there are other

9  declarations in the record from students as well.  Some that

10 come to mind are Merrick Osborne, Ashley McMillan, and Jordan

11 Peterkin, who is one of the 98 black males who started in 2013,

12 among others; and they talk very compellingly about the

13 challenges that they have faced.

14     Significantly, there has been zero evidence from SFFA that

15 the university has reached a critical mass and can stop working

16 at this.  SFFA has offered no expert to assess the university's

17 achievement of the educational benefits of diversity, and SFFA

18 has presented no contrary evidence on this point.  So whatever

19 the day is where the university reaches critical mass and can

20 fully realize the educational benefits of diversity without the

21 consideration of race as a factor in its admissions process,

22 that day is not today.

23     I'll turn now to the second burden that the university has

24 in this case, and that is the university's consideration of

25 race is narrowly tailored.  There are two established facts

1  here:  One, race is not the predominant factor in admissions

2  decisions; and, two, UNC has given good-faith consideration to

3  race-neutral alternatives.  I will address our factual evidence

4  that fully establishes this, and Mr. Fitzgerald will add the

5  expert evidence.

6      The first key fact relates to the holistic admissions

7  process.  And your Honor is also very familiar with this case

8  law, but we have a slide with the legal standards talking about

9  admissions programs have been approved where they're highly

10 individualized, holistic review of each applicant's file,

11 giving serious consideration to the ways applicants might

12 contribute to a diverse class, and while a university may use

13 race as a plus factor, race cannot be the predominant factor in

14 decision-making.

15     So you've also heard in this case from four witnesses about

16 the admissions process.  You heard from Steve Farmer, the vice

17 provost for enrollment; Jen Kretchmar, the social director for

18 research; Jared Rosenberg, the associate director for

19 evaluation; and Michael Davis, the associate director for

20 recruitment.  These witnesses are good people.  They're

21 hardworking, caring, and honest; and they know a lot about what

22 is happening in the admissions office.  Mr. Farmer started

23 there in 2000.  Mr. Rosenberg started in 1999, and

24 Dr. Kretchmar started there in 2002.  They were all credible

25 and consistent about how they think about and review

1    applications.

2        Mr. Farmer and Mr. Rosenberg explained how the process

3    works.  It's a highly selective process that involves difficult

4    decisions, and Mr. Rosenberg specifically walked through an

5    application to show how he and his readers make their

6    decisions.  This testimony demonstrated that the university's

7    holistic process complies with the law.  You heard from

8    Mr. Farmer and you saw in the reading document that there's no

9    quotas; there is no automatic points; applicants are not

10   reviewed in any separate categories or under separate

11   thresholds with different standards.  In fact, UNC has exactly

12   the type of holistic and individualized admissions system that

13   has been approved by the Supreme Court.

14       Key to this is that race is only one factor among many.  As

15   you see in the reading document, UNC considers a whole variety

16   of factors when it evaluates applications, and it talks about

17   40 criteria that may be considered at every stage in the

18   admissions process.  Primary among them are academic factors

19   and other qualities that the university seeks, and this is not

20   an exhaustive list.  Only one of those factors is race.

21       You also saw proper guidance in the reading document on

22   race and its consideration as a -- and its appropriate

23   consideration in the process, and Steve Farmer confirmed that

24   that is how it actually works in practice.  Jared Rosenberg

25   also explained -- and we have some testify from him -- he says,

1 "If race is disclosed, it's one of many factors."  And then he

2 goes on to say, "To the extent that we do consider diversity in

3 our class, race and ethnicity would be one of many factors that

4 we think about when reading an application, just as we would a

5 first-generation college student or a fee waiver or a low

6 socioeconomic student."

7     I want to go back and just take a moment to look at one of

8 the allegations that was in SFFA's complaint.  SFFA, in its

9 complaint, made some fairly impressive allegations.  They

10 include that strict scrutiny has proven to be no match for

11 concerted disinformation hidden behind the veil of holistic

12 admissions.  That allegation has not been proven.  There's no

13 factual evidence of any cheating at school group review or

14 otherwise.  There's no factual allegation -- or factual

15 evidence of any racial balancing and, in fact, you saw very

16 little cross to establish any wrongdoing.  SFFA has pointed to

17 core reports, but they did not show that those are being used

18 for any proper purpose -- any improper purpose, and those have

19 not been used in any manner since 2015.

20     SFFA claims that there was little time spent on reviewing

21 each application and that the -- some of the ratings were

22 calibrated, but the UNC admissions office gets 40,000

23 applications a year, and of course it has to review them

24 efficiently.  That does not mean that they're not applying the

25 holistic and individualized review that they testified to.  And

1    the fact that there's some consistency on some ratings, such as

2    program rating, does not show anything other than the fact the

3    admissions office is being fair.  It does not show or suggest

4    that the readers are not looking at individual characteristics

5    in exactly the way that they talked about.

6        Now, to the extent that SFFA has relied or may later try to

7    rely on documents that they didn't ask our witnesses about, I'd

8    like to make a couple of points.  There -- there were more than

9    300,000 pages of documents produced in discovery.  SFFA had

10   access to reader comments on applications for four admission

11   cycles, so for more than 120,000 cycles.  SFFA didn't show you

12   a single reader comment on an application that would suggest

13   that readers are doing anything other than what Steve Farmer

14   and Jared Rosenberg have sworn to under oath.  And to the

15   extent that they later try to make an argument with some

16   documents, we urge the Court to recall that they had four

17   admissions officers and the head of the Advisory Committee on

18   Undergraduate Admissions here, and they didn't make their case.

19       Now, SFFA claims that there's an implicit formula, but

20   Mr. Farmer and Mr. Rosenberg explained that that is not how

21   they think about things and that there is no formula.  The next

22   slide shows some of Mr. Farmer's testimony to this effect.  He

23   states, "There is no formula.  We don't think formulaically

24   about complicated people, and every person who comes to us is

25   complicated."  He says, "We feel we owe them, that we have a

1  duty to them to consider them as whole complicated people and

2  not just subject them to some formula, implicit or explicit,

3  that doesn't do justice to their achievement and their

4  potential and their uniqueness." He says, "Further, I don't

5  know what this formula is. We've never talked a formula. I

6  don't think 40 people have an implicit formula."

7      SFFA also claims that the university is overweighting race,

8  but there no factual evidence of that either. SFFA notes that

9  UNC didn't test the role of race when the admissions office did

10 other studies, but they -- the university and the admissions

11 office looked at other issues as they arose when they had an

12 inquiry or when they were thinking about a policy change.

13 There was never any indication that that's been the case with

14 race, and they told you that they never thought to do that

15 about race because they were confident in how they were

16 considering it.

17     And how did they have that confidence? Jared Rosenberg

18 testified how it works. He's a second reader, and he

19 participates in decision review. So he has the opportunity to

20 read behind everyone multiple times, many, many times

21 throughout the year, and he goes on to state, "I open hundreds

22 of applications and read comments and understand the thought

23 process behind different people's decisions, and so over time I

24 can gain confidence in individual readers that they are

25 considering all aspects of an application, that they've done

1  the individual comprehensive and holistic review, and that
2  they're appropriately considering race as one of many factors
3  that they can think about when reading the application."
4      Steve Farmer also testified about quality controls within
5  the admissions process and expressed his confidence in the way
6  that the process works.
7      In addition, the current Committee on Race-Neutral
8  Strategies actually did run that test, and it confirmed
9  factually what the admissions office thought.  The Data
10 Analytic Subcommittee confirmed that race plays an important
11 but minimal role in the process, and that finding is reflected
12 in DX4, the interim report of the Committee on Race-Neutral
13 Strategies.  So the factual testimony in this case fully
14 confirmed that when it comes to admissions, UNC is doing this
15 in the right way.
16     The second fact is that the testimony shows that the
17 university has given good-faith consideration to race-neutral
18 alternatives, and here we've also provided some of the legal
19 standards related to this consideration, and I'd liked to just
20 address with respect to these standards what the requirement is
21 and what it isn't.
22     The Supreme Court requires that the university give
23 serious, good-faith consideration to workable race-neutral
24 alternatives, but they're also clear that exhaustion of every
25 conceivable race-neutral alternative is not required.

1  Importantly, the Supreme Court does not specify how the
2  university must consider race-neutral alternatives, such as the
3  running of simulations, as Plaintiffs have suggested.  Now, the
4  evidence fully supports that this is an issue that the
5  university has paid very close attention to for many years and
6  that they have engaged in various efforts to consider
7  alternatives.  Those efforts were reasonable, and they were
8  undertaken in good faith.

9      And in addition, the university did not stop there.  It
10 actually implemented several race-neutral strategies, including
11 diversity recruiting efforts and generous financial aid.
12 That's important.  The university did not just talk about this
13 in theory.  It actually adopted those -- those programs and
14 spent millions of dollars to improve access and increase
15 diversity through race-neutral strategies.

16     Now, we have also prepared a timeline, and ours looks a bit
17 different than Plaintiffs because it includes some additional
18 things that they're not giving UNC credit for, and I'll walk
19 through just some of the things on this timeline.

20     In 2004, Mr. Farmer and other admissions office leaders
21 began regularly attending meetings of the College Board's
22 Access & Diversity Collaborative.  And Mr. Farmer testified
23 that they were paying close attention to the natural
24 experiments that were occurring out there in different states
25 that had banned consideration of race, and they were also

 1  discussing these issues with other schools.

 2      In 2007, Mr. Farmer conducted an analysis of a low-SES

 3  plan.

 4      In 2009, he tasked Dr. Kretchmar, who was head of research,

 5  with conducting a literature review.

 6      Then in 2012, Mr. Farmer and Dr. Kretchmar conducted an

 7  analysis of a top 10 percent plan.  Now, SFFA claims that this

 8  was only for the *Fisher* litigation effort, but there is a lot

 9  of overlap in this area between the work and litigation, as

10  well as the broader legal environment that they were operating

11  in, and that doesn't mean that the effort wasn't part of UNC's

12  overall thinking and analysis.

13      In September of 2013, they began planning and having

14  discussions about a new working group to consider race-neutral

15  alternatives, and that fall invitations for the new

16  race-neutral alternatives working group were sent out, and that

17  group began to meet.

18      You then heard that in October of 2014, the working group

19  drafted a white paper summarizing all the work that it was

20  doing in the interim time.  They had gotten data from the

21  NCERDC, and they had run simulations on several different

22  race-neutral alternatives, including a 10 percent plan and a

23  4 1/2 percent plan; and that work is in the record.  This is a

24  much better effort than Dr. Kretchmar would give herself credit

25  for, and the people who received it considered it that way.

1  Mr. Farmer and Dr. Panter both testified that they considered
2  this a very good piece of work, and it became the basis for the
3  next committee's efforts.

4      In February of 2016, the Advisory Committee for
5  Undergraduate Admissions approves the working group's white
6  paper, and they establish the Committee on Race-Neutral
7  Strategies.

8      You see after that on the timeline that the subcommittees
9  began doing their work and providing various updates to both
10 the larger group and to the Advisory Committee; and in May of
11 2018, the Committee on Race-Neutral Strategies issues its
12 interim report to the chancellor and the provost.  And whatever
13 Plaintiffs want to say about that effort, it's in the record,
14 and Your Honor can review it.  It's an extensive, detailed, and
15 good-faith effort that included experts in their fields,
16 including about modeling, and people who were experts in the
17 student experience and people who were experts in looking at
18 the literature.  And that all came together for a very
19 extensive analysis.

20     And the work continued after that report, and the group
21 continued to provide updates.  I would note also that UNC
22 should get credit for the expert analysis that was done in this
23 case.  The sets of reports from Drs. Hoxby and Long in 2018,
24 those were reviewed by the chair of the Committee for
25 Race-Neutral Strategies with plans at the time of the interim

1  report for review by the larger committee.  Those reports

2  required significant resources and were part of UNC's

3  consideration of race-neutral alternatives.

4      The next line that you see on the timeline is where we set

5  forth the efforts to implement race-neutral strategies, and

6  this shows that those were also happening in the same time

7  frame.

8      In 2004, the Carolina Covenant was established.  That's a

9  program for low-income students that allowed them to attend

10 debt free.

11     In 2006, UNC established the C-STEP program, a program to

12 increase the number of transfer students from community

13 colleges.

14     In 2007, the Carolina Advising Corps was founded, and that

15 put college advisors in underserved high schools throughout

16 North Carolina.

17     And over time these programs were enhanced and grown

18 significantly.  And, of course, this is all in addition to the

19 ongoing recruitment and financial aid efforts.

20     And then in 2016, UNC was a founding member of the American

21 Talent Initiative, a program to increase access for talented

22 low- and middle-income students.

23     All of this establishes that the university did consider

24 race-neutral alternatives in good faith, but they haven't found

25 an alternative that meets the university's diversity in

1  academic objectives.  You heard that from both Mr. Farmer and

2  Dr. Panter.

3      Now, SFFA claims that UNC didn't meet legal requirements

4  because it framed the question as seeking alternatives that

5  would result in equal or greater diversity in academics.  UNC

6  had to set some kind of baseline, and the current one made,

7  especially because UNC is not where it wants to be on racial

8  diversity.  Regardless, you heard testimony that UNC didn't

9  take anything off the table.  They considered everything that

10 came close, and you can see -- we put testimony up from

11 Mr. Farmer and Dr. Panter.  Mr. Farmer states, "We always

12 intended the term 'maintaining' to be a starting point.  We

13 don't think of this process in terms of absolutes.  We would

14 consider in good faith everything that was a serious

15 possibility."  And Dr. Panter testified similarly, but nothing

16 has come close.

17     SFFA also claims there's no definition of "workable," but

18 you've heard that the Committee on Race-Neutral Strategies has

19 had discussion about what may go into that term and some of the

20 things that it includes, but that it needs to be a broader

21 discussion if and when they find something that will meet their

22 other objectives, and they are not there yet.  They have tried

23 hard and with an open mind, but they did not find a viable

24 alternative, and that is not surprising because, as

25 Mr. Fitzgerald will tell you, it's not out there.

1    Before I turn this over to Mr. Fitzgerald to talk about the
2    numbers, data, statistics and experts, I want to leave you with
3    one last takeaway from Mr. Farmer.  He testified in this case,
4    "Because at the end of it, our students aren't numbers.
5    They're people."
6         **MR. FITZGERALD:**  May I proceed, Your Honor?
7         **THE COURT:**  Yes, you may.
8         **MR. FITZGERALD:**  Good afternoon.  I will also express
9    my appreciation on behalf of myself, but also my client, to the
10   Court and court staff indulging us in a live trial.  It's much
11   appreciated.  I'll echo the mutual respect for engaging in this
12   trial with adversarial counsel on a very agreeable basis.  And
13   with that, I'll turn to my argument.
14       Your Honor, the university, with regard to Count I, has
15   proven in multiple ways that race is not the predominant factor
16   in the admissions decisions.  We started this case putting up
17   the slide framing the question as to whether or not UNC uses
18   race as the dominant factor in admissions decision.  It's also
19   been framed -- that comes from *Grutter*, but *Grutter* also asks
20   the question whether or not race is the defining feature in an
21   application.  We meet both those tests quite easily.
22       Ms. Brennan has reviewed with you what the facts are.
23   You've seen the evidence and the witnesses for yourself.  Race
24   is not the defining feature of an application.  People are
25   looked at as individuals.  The expert testimony in this case

1  does not refute that or change that; it reinforces that.  Let
2  me tell you what I mean.

3      First, Your Honor, this case is not breaking new ground on
4  the facts.  The case we talk about so often, *Grutter* from 2003,
5  is remarkably similar.  We will talk about that more in our
6  posttrial brief, but I'll frame it this way:  In that case they
7  had a plaintiff's expert who testified that race had an
8  extraordinarily large influence on the admissions process.
9  That was his claims.  And then there was evidence and claims by
10  the plaintiffs and recognition by the Court that race affected
11  a number of decisions -- a subset of decisions in the
12  admissions process.  The claims there and here are very
13  similar.

14      The takeaway in *Grutter* wasn't that race couldn't make a
15  difference.  That's sort of the point.  You have to consider
16  things -- race, gender, background, all different things --
17  that can make a point.  The takeaway is that in a proper and
18  holistic admissions process that considers applicants as
19  individuals, race can play a role in a subset of decisions.  It
20  just can't play a dominant role.  That is this case.

21      Now, the Plaintiff, and Professor Arcidiacono in
22  particular, don't want the question to be whether or not race
23  plays a dominant role in the admissions process and for a good
24  reason.  They can't meet that test.  We can disprove it.  We
25  have.  Professor Arcidiacono constantly wanted to measure

1  influences, factors in small groups and didn't want to talk

2  about how it affected the whole group, but that's the relevant

3  question we have to face.  And in the end, Professor

4  Arcidiacono agreed that race was not a predominant factor, and

5  I'll review that with the Court now.

6      He was asked the question:  "Question:  You were -- the

7  question you were to address is whether race is a predominant

8  factor in UNC's admissions process.  That was your assignment

9  as you described it in your first report, correct?

10      "Answer:  Correct."

11      Then later on in his examination, he was asked:  "So you

12  will agree with me that across the whole process of admissions,

13  considering all races, race is not the dominant factor?

14      "Answer:  Yes."

15      He takes the position -- he doesn't like it being measured

16  across the whole process, but what it is, race is not dominant.

17  Professor Hoxby finds the same thing.  There is agreement.  We

18  could almost stop there, except I think we want to make a very,

19  very clear record in this case, because both experts agree that

20  across the process race is not predominant.

21      Now, if you look at Professor Hoxby's testimony, after her

22  analysis she testified that "My conclusion is that race and

23  ethnicity explain only a very small share of the admissions

24  process."

25      Now, Professor Hoxby explained the proper way to figure out

1   how to measure how much is explained, and I think at this point

2   I should briefly talk about the fact that Plaintiff and

3   Professor Arcidiacono keep talking about prediction rates and

4   accuracy, and we also talked about explaining power, and

5   they're two different things, and maybe I can give an example.

6       If there was a congressional election held in a district

7   and there were two candidates and -- one from each of the major

8   parties, you could walk around and try to predict how a voter

9   might vote.  You might find out their age, their race, their

10  gender, their background, where they grew up, what they did for

11  a living, how far they went to school, all those sorts of

12  things.  You might find out if they're registered with a

13  political party.  If you knew all that, you could probably

14  predict pretty well which candidate they might vote for, but

15  that's a prediction.

16      If you wanted to ask them why they voted for someone, what

17  issue motivated them to vote for that candidate -- was it their

18  view on social justice, was it taxes, was it foreign policy,

19  was it immigration -- that's a harder question.  He keeps

20  talking about the ability to predict.  We're not here to

21  predict admissions.  We're here to explain admissions, explain

22  what role race played, and race played a smaller share -- much

23  smaller share than test scores, for example.  Race did not

24  dominate.

25      In that circumstance, Professor Hoxby explained there's a

1   tried-and-true method that's been used since the 1950s.  She

2   explained that the Shapley decomposition has been around since

3   the 1950s, and it's still the only method that satisfies the

4   free axioms that statisticians require.  The Shapley

5   decomposition is designed to show the marginal effect of any

6   factor reliably; and if, in fact, the factor was important even

7   for a subset of applicants, but it was important for them, the

8   Shapley decomposition would definitely show that.

9       Professor Arcidiacono backhandedly concedes that.  He was

10  asked about Professor Hoxby doing a Shapley decomposition, and

11  he fought it on the grounds that she's answering the wrong

12  question.  His testimony:  "So what's going on here is that

13  she's thinking about how race affects the entire admissions

14  process, and I don't think that's the right way of looking at

15  it."  That is the right way of looking at it.  That is a legal

16  question in this case.  She was right to look.  She was right

17  to do the Shapley decomposition process, which has been around

18  for 70 years.  And when she looked, she found that race was not

19  the predominant factor.  In essence, both experts agree with

20  the ultimate conclusion, and she did the work to verify that.

21      Now, it's a strange world where the Plaintiff's expert and

22  the defense expert would agree on the ultimate conclusion,

23  which means that Count I fails.  But let's talk about the

24  credibility issues between -- the difference between Professor

25  Arcidiacono and Professor Hoxby and put it on the table.

1    Professor Arcidiacono claimed that he was not able to sort
2  out the influence of test scores toward admissions.  We look at
3  his testimony here:
4    "You don't have the ability as an economist to tell us
5  whether or not getting high SAT scores has greater correlation
6  with the admissions outcome than race?
7    "Answer:  There's not an actual way to measure that.
8    "Question:  Did you make any effort to try to determine
9  whether or not SATs and grades were a more important factor in
10 the admissions process than race?
11   "Answer:  No."
12   Your Honor will see in the *Grutter* decision, the expert
13 there conceded that race was not as important as test scores;
14 and in this case, Professor Hoxby calculated the influence of
15 test scores.  The thing that you're not supposed to be able to
16 do, she did.  Professor Arcidiacono could measure the influence
17 of race being a fee waiver candidate, missing rank, missing
18 GPA, but somehow test scores couldn't be calculated.
19   I next turn to the most concerning point about
20 Arcidiacono's testimony when it goes to his credibility, and
21 that's the issue where Professor Arcidiacono changed applicant
22 scores to something other than what they were in the process.
23 If the admissions officers were seeing scores in UNC -- if
24 people got the same score on the same test for the same day,
25 radically, they gave them the same credit, but not Professor

1  Arcidiacono.

2      If we look here at this chart that we had to go through

3  with him by asking him about files on his computer that backed

4  up his reports, we learned about the penalties imposed on

5  people who took the ACT test and then had to convert it to the

6  SAT; and remarkably, Professor Arcidiacono would not admit that

7  changing the scores of applicants who took the ACT to the SAT

8  and deducting a different amount of points based upon the race

9  and gender was a penalty.  Here is that exchange:

10     "Question:  If an applicant were a black female, under your

11  model she would receive a penalty for being black of 22 points

12  on the SAT and a penalty -- slight larger penalty of 23.6 for

13  being female, so a total penalty of about 45 points, correct?

14     "Answer:  I don't view it as a penalty, but that is what

15  you get when you add those coefficients."

16     If you turn to the next slide, we illustrate the point.

17  He's supposed to be a first-rate economist modeling the process

18  of admissions.  Admissions officers see a file.  On the left is

19  what they would see in the real world if several different

20  folks who were applicants to UNC, different races and genders,

21  took the test and got the same score on the same day.  They'd

22  all get a 1300.

23     On the right is his model.  The white male applicant in

24  that circumstance would get a 1300.  The Asian male applicant

25  would actually get a 1309, and then depending on whether you're

1    a back male or Hispanic male or American Indian, you get

2    different scores.  And at the end, the black female would be

3    given 1254 for the same exact performance on the test, 46

4    points lower than a white male and 55 points lower than an

5    Asian male.

6        And yet his testimony is interesting:  "Then your model is

7    going to take the same two people, a white male and a black

8    female who took the test on the same day and gave the same

9    answers..." -- and then continuing -- "...there will be a

10   difference between the white male applicant who will have a

11   higher score than the black female applicant...?

12       "I think -- according to those regressions, correct."

13       Your Honor, I don't know where that comes from.  We saw

14   some textbooks this morning flashed on the screen.  I haven't

15   read them, but I hope there's nothing in a textbook on

16   economics these days that says that we should change scores

17   based upon race.  This is supposed to be a standard

18   methodology.

19       What's most disturbing about it is this was pointed out to

20   Professor Arcidiacono.  Did he say, "Wow, how did I make a

21   mistake like that?  How did my model get so gummed up that it

22   does these crazy things?  My bad.  I'll fix it"?  He stands by

23   it.  It's in his preferred model he puts before the Court.  He

24   stands there and says it's not a penalty, and he stands there

25   and says, "Maybe I did those applicants a favor."  It makes no

 1  sense.  It's not credible.

 2      What else does Professor Arcidiacono do?  He uses a few

 3  math tricks that I want to go through.  First, he shows us some

 4  statistics.  The first part of it is this decile analysis where

 5  he puts all the candidates into ten different deciles.  A few

 6  things about the decile analysis.

 7      Number one, the decile analysis is something he created.

 8  He makes an academic index, which UNC does not use.  Then he

 9  scores people on this academic index into ten different deciles

10  that UNC does not use.  The idea of a decile analysis, it's not

11  a model.  It doesn't account for all the other factors in the

12  world that might affect things.  That's why you build a model.

13  The decile analysis is, pure and simple, not scientific.  He

14  actually agrees with part of that.  He agreed in his testimony

15  when asked, "You'll agree with me that the decile analysis by

16  itself is insufficient to show that the differences of

17  admission rates are the result of racial preferences, correct?

18      "Answer:  Correct."

19      And lastly on the decile analysis, when he takes people and

20  makes them dots to go to the decile analysis, he is using his

21  academic index, which is based in part on the SAT; and when he

22  calculates the SAT, he's using that modeling that deducts

23  points from people who took the SAT based upon race and gender,

24  meaning some people are put in the wrong decile.

25      The second mathematical exercise he does is these -- are

1 these, quote, transformation examples, mathematics gone wild.

2 Here it is just written on a chart -- chart as if this is sort

3 of basic, changing the race of an individual. If you look at

4 the three points on the right, the first one recognizes that

5 you compare one hypothetical person generated by a model to a

6 different hypothetical person generated by the model.

7     I'll skip the second one for the moment.

8     The third part says it assumes away the portion of the

9 admissions decision that cannot be explained. Now, if we

10 recall, there's this unobservable stuff out there. That

11 includes personal essays, letters of recommendation, guidance

12 counselors. All that stuff is junked out of this model, but he

13 just thinks that he can predict what will happen when people

14 change race.

15     And then number two assumes one can change an applicant's

16 race and the rest of the applicants' life is unchanged. What

17 does Professor Arcidiacono and Professor Hoxby each say about

18 this?

19     You can skip to the next slide, Aaron. If you can go to

20 the next one.

21     Professor Arcidiacono says, "Obviously, people do not

22 change their race, but this is a standard practice in the

23 empirical world for economics. This is how we measure these

24 preferences."

25     Professor Hoxby diplomatically says in her answer, "This is

1  just not a sensible statistical thing to do under these

2  circumstances, creating models to predict and then changing

3  race and projecting outcomes."

4      And one last piece.  I find it odd we've heard now today, I

5  think for the first time, that the admissions process may be

6  mechanical.  I heard no evidence from folks involved in the

7  admissions process that it's mechanical.  This formulaic

8  becoming mechanical makes no sense to me, but it certainly

9  makes no sense to hear it from a side that sponsored a model

10  that can change race.

11      Let's talk about the last mathematical example, which

12  concerns percentages, and I'll put percentages in quotes.  We

13  learn that Professor Arcidiacono likes to measure things.  He

14  usually likes to measure the influence of race alone, in a

15  small section where the numbers might be higher.  And charts

16  were put before the Court on his direct referencing a number

17  for 91.1 percent of explaining something.  And when I grew up,

18  91.1 percent meant about 91 out of 100.  But as it turns out --

19  and our slides are pretty small -- Professor Hoxby went back

20  and said, "Wait a minute.  If you're measuring the influence of

21  race on a decision, what about the other things?"  And she goes

22  through and looks at what else affects the decision; and, lo

23  and behold, when you add up the percentages, it's 91 percent or

24  a couple of hundred percents, it all adds up to 543 percent

25  plus.  That's not a percent.  Percents are out of a hundred.

1    And more interestingly, Judge, besides being misleading

2  math, if you look at this chart, the 91.1 percent number he

3  gets is for share due to race/ethnicity under a column that's

4  looking at a subset of the applicants, just the African

5  American applicants.  That's 91.1 percent.  If you look across

6  the whole process at all the races, the column two to the right

7  is 21 percent.  That 21 percent is on a scale of, if my eyes

8  tell me correctly, 539.  I checked with my calculator

9  beforehand.  If you divide 21 by 539, a little bit less than

10  4 percent.

11    So here he has a modeling that would show the effect of

12  race by his model, that we don't agree with, would be

13  4 percent.  But he puts it on a scale of 500 and calls it

14  21 percent, then changes the question to how does this affect

15  one subgroup; and we've gone from 4 percent to 91 percent with

16  a couple of nifty moves.  This is misleading math.  This is not

17  math you'll find in a textbook when you get percentages that

18  are 500, 543.  That doesn't work and that is not credible.

19    As to his model, even if one put aside some of the other

20  issues, one would note he's always trying to find a way to

21  measure in a small group and not across the process.  I will

22  briefly talk about Professor Hoxby in comparison.  We firmly

23  believe that Professor Hoxby is far more credible than

24  Professor Arcidiacono and Mr. Kahlenberg as an expert.  I'll

25  come back later as to whether or not some of her testimony,

1  which was characterized as incoherent -- I will come back to
2  that at the end as a separate topic.

3      But just looking at how she dealt with race-neutral
4  alternatives, it was clear that Professor Hoxby went out of her
5  way to try to give every race-neutral alternative a shot.  She
6  wasn't gaming for one side or the other.  She said, If you had
7  a race-neutral alternative, what assumptions do we need to
8  make?  And then she had made the assumptions that were
9  generous, that favored the other side.  She wasn't trying to
10  predict an outcome.  Her models don't say what's likely to
11  happen.  Her models are measuring what would happen on the best
12  day for a race-neutral alternative.

13      And when she was pressed on cross-examination about her
14  role, I think she gave a very eloquent answer.  She said, "I
15  think I still owe it to people to choose assumptions that are
16  not so favorable that we're starting to make things up.  I
17  don't think that's my role as an expert.  I think I need to be
18  responsible to the data and to the truth."  And I think that
19  captures her.

20      I will briefly do one more digression into math because it
21  was raised this morning.  We heard a lot of testimony yesterday
22  about the pseudo R-squared and what it means, and we had some
23  passing references to textbooks, and there was a challenge
24  again today as to whether or not she could properly use the
25  pseudo R-squared.  It's a tempest in a teapot that I'll

1  explain.

2      First, they cited to a text that said something to the

3  effect that the pseudo R-squared has no logical connection to

4  the fit of the data.  In other words, what does the pseudo

5  R-squared mean?  It doesn't tell you how it fits.  That's an

6  interesting approach to take since their own expert testified

7  differently.  Professor Arcidiacono has a problem where he

8  disagrees and thinks the R-squared may not give full credit for

9  how much it fits the data, but there's a relationship between

10  pseudo R-squared and the fit.

11      Here's what he said in his testimony:  "The pseudo

12  R-squared is trying to get a measure of fit for the model.

13  Pseudo R-squared is trying to find a counterpart to R-squared.

14  But what it really does is it just says if it's a higher

15  number, it fits the data better."

16      Let me tell you why it's a tempest in a teapot.

17  Professor Hoxby says that with the pseudo R-squared in her

18  model, she thinks it explains -- not predicts, explains about

19  50 percent of the decision.  They both agree that her model

20  might predict 85 percent of the decision but explains

21  50 percent.  Professor Arcidiacono thinks it's more.  Putting

22  aside the fact that we fundamentally disagree with his model

23  and his assumptions and what else is baked in there, they can't

24  vary that much.  If she says it predicts half, there's no way

25  in the world it predicts all.  But let's just spot him there

1  for a hypothetical.

2      In the pie chart where she shows how much race explains --

3  race on the left is that small red bar, 1.2 percent, and on the

4  right, I believe it's 9.8 percent how much test scores show,

5  and that's a better model because it shows both race and test

6  scores.  The red, green, and orange is what is explained,

7  according to Professor Hoxby.  Professor Arcidiacono thinks

8  more is explained by those three colors, okay.

9      If we doubled it, if we gave it credit as if the model

10 didn't explain half but explained all, which would be totally

11 unrealistic, the red slice for race would go from 1.2 percent

12 to 2.4 percent.  That's what that fight is about, 1 percent or

13 2 1/2 percent.  In addition, SAT scores would go from

14 9.8 percent to 19 percent.  There's no change in the

15 fundamental fact that race is a less important factor.

16     And that takes us back to the initial point.  Both experts

17 agree that race is not the dominant factor across the

18 admissions process, and we can't lose sight of that.

19     I know counsel would prefer I not talk about school group

20 review, but I must.  It's important.  It was an allegation that

21 they made.  I know the passive voice can sometimes be very

22 elegant, but the complaint said that there was a school group

23 review process and the director of admissions, Steve Farmer,

24 knew what the race of the applicants were, and the complaint

25 put forward the thought that school group review and other

1    areas like waitlists were being used to cheat.  They brought

2    the claim.  They libeled Steve Farmer six years ago this week.

3    It was filed November 17th, 2014.  And he waited for his day in

4    court.  They never asked him a question about it.

5        Now, there's a logic to this.  If you're a cheater and you

6    want to cheat the rules, you want to put your thumb on a scale

7    improperly in the admissions process, that's the place to do

8    it.  Yet one expert worked for more than a thousand hours, the

9    other expert I forget how many hundreds of hours, and evidently

10   neither of them checked.  They just made the allegation.

11       Well, you don't need to be an economist from Duke or

12   Stanford or Harvard to figure that out.  You just count up the

13   tentative decisions.  How many black, white, Hispanic, Native

14   American applicants are there in the temporary decisions or the

15   tentative decisions?  Then count up how they changed.  You just

16   need a calculator.  Well, Professor Hoxby did it, and school

17   group review turns out to be the dog that didn't bark, the sign

18   that cheating wasn't going on.

19       And there's some important information in this slide that I

20   would like to cover.  If you look here, the first takeaway that

21   Professor Hoxby told us is that not a lot happened at school

22   group review, and that's clear.  When the changes were made,

23   they were small.  A lot of the blue bubbles showed no changes,

24   some went up and some went down.  So that tells you something.

25   But look at the top bar, and in the top bar, you look at 2013

1  and 2014.  When the applicants went into the school group

2  review process, 10.1 percent of the admits were black, and when

3  school group reviewed ended, that number didn't change.

4      Now, what's interesting about that is you can go to the

5  right.  The next year, at the beginning of the process,

6  9.3 percent of the admits -- the tentative admits were black.

7  And here is a fact that came out in the trial record in a

8  disconnected fashion.  The year before, 2013-'14, there were

9  less than 100 black males on campus in the freshman class at

10  UNC, less than 100 out of 4,000.  Steve Farmer told you it was

11  very upsetting.  Students were upset.  He was upset.  It was a

12  problem.

13      And yet the next year they went in that school group review

14  process, it was 9.3 percent black admits, lower than the year

15  before.  And what happened at school group review process?  The

16  red bar shows it.  The numbers went down.  Even when it was

17  most extreme, they didn't cheat.  That tells you something.

18      And I'll also tell you that's very, very ironic that they

19  would say here, I guess -- "evidence not developed at trial"

20  was a phrase used this morning, as if the allegation didn't

21  happen but might be there, or not pressing a specific claim to

22  the school group review process.  They called UNC and its

23  people cheaters, and it isn't true.  They never backed down.

24      And even now they're starting to back into a different

25  theory.  They allege racial balancing in the complaint.  No

1  evidence.  It never happened.  Now we're starting to hear about

2  what happens when they train people, the calibration theory, so

3  now some other scheme that's not school group review, it's not

4  waitlist review, not balancing review.  They even said today

5  that the admissions officers aren't trying.  When are they

6  going to stop libeling officers you've met and you saw, who

7  work hard, and without proof just cast aspersions on their

8  character?  And why do they have to do it?  Because the

9  evidence is otherwise amazingly weak.  There was no

10  manipulation of the school group review process.  There was no

11  manipulation of the waitlist.  There is no scheme to lie,

12  cheat, and fake.

13      Even when he was on the stand, they didn't ask him about

14  it.  They confronted him with the fact that after he was

15  falsely accused of using race to manipulate, he took race off

16  the core reports.  And he explained why.  If you're falsely

17  accused of something, then you don't want to leave the

18  impression that you're using race in the core reports to do

19  that.  And here was the question and answer:

20      "And you knew that your admissions process was going to be

21  subject to discovery, correct?

22      "Answer:  Yes.

23      "And you wouldn't want anyone to get the wrong idea?

24      "Answer:  That's correct."

25      Well, that's exactly right.  He was tired of people getting

1    the wrong idea.

2        So, Your Honor, I will wrap up Count I this way:  Race was

3    not the predominant factor in the admissions process.  It was

4    not the defining feature of an application.  You saw that

5    through the witnesses who testified.  You saw how they

6    explained what they did and what they didn't do.  You also know

7    that because both experts agreed on the answer to the ultimate

8    question that race is not the predominant factor across the

9    admissions process.  And you saw that because Professor Hoxby

10   did what people are supposed to do and tried to measure -- not

11   predict but measure the influence of a factor.  She did a

12   Shapley decomposition, and that bore out too and showed that

13   race was far less important than test scores and other things.

14       And finally, the school group review process proves it.

15   That's where they would have cheated if they wanted to, and

16   they didn't.

17       I will turn to Count II.  Here as well the university has

18   met its burden.  It has proved that there are no race-neutral

19   alternatives available to the university that would allow the

20   university to achieve about the same level of academic

21   preparedness and about the same level of diversity at a

22   workable and tolerable administrative expense.  It's a bit of a

23   mouthful.

24       I will tell you, because we've never gotten close to what

25   would be workable being discussed at this trial, we haven't

1 talked about cost.  We haven't talked about what tolerable

2 administrative expense would be.  We'll address that in our

3 papers.  We will make clear that when experts were asked to

4 measure to see if they could recreate the same numbers, that

5 wasn't a legal determination.  They were asked to measure

6 something objective.  There hasn't been anything close.

7 Imagine if you were to ask someone is someone about as tall as

8 six feet.  You wouldn't ask an expert that.  You would say, Go

9 measure them.  And in this example, Dr. Hoxby was asked to

10 measure.  What she would say is, "I gave them every edge I

11 could.  I let them wear platform shoes.  I let them stand on

12 their heels.  I let them do whatever they wanted to do, and

13 they couldn't reach six feet tall."

14     So I will make three points.  First, as a matter of

15 historical context, race-neutral alternatives had not worked at

16 other highly selective universities.  And I'll do this quickly.

17 The one that's been most cited is California.  California,

18 where race-conscious admissions ended in 1996, and we're now --

19 24 years later we may hear that the class of '20 may have

20 achieved success?  If the hope for the prior experience in

21 other universities is that UNC can replicate California, god

22 help UNC.  That's 20 years of failure -- 24 years of failure.

23 That doesn't work.  And as Professor Bridget Long said, "I find

24 it difficult to take a leap that a policy that started 20 years

25 prior is responsible for the current, you know, makeup of the

1    student body, especially given all the changes that have gone

2    on in California.  The past does not give us hope that there's

3    a current way to do it."

4        And that's after all the literature review by

5    Dr. Kretchmar, Dr. Panter, Steve Farmer within UNC, and all the

6    efforts of experts from both sides in this case.  Race-neutral

7    alternatives have not worked at selective universities before.

8        Second point of context:  No Court has found to date for a

9    selective university that a race-neutral alternative would

10   work.  I opened with that point a week ago now on Monday, and

11   the next day the First Circuit affirmed that same decision by

12   Judge Burroughs in *Harvard* where she found that one would not

13   work there.  And I agree different schools, different systems.

14   The fact that no other Court found one that worked is useful

15   context.

16       That leaves us the last hope for coming up with an

17   alternative that will work is in the simulation world, and I

18   submit when we go to the world of simulations and not the real

19   world, where no one has actually seen it happen, we need a

20   healthy dose of humility as to how much we can do with a

21   mathematical model that changes things.  As a case in point, if

22   the whole discovery process had stopped after the first expert

23   report by Mr. Kahlenberg in this case, he would have had a

24   report that said his simulation was, quote, superior to the

25   status quo in virtually every respect after careful

1  investigation.  And it wasn't true.  The report went out in

2  good faith.  Professor Hoxby spotted one mistake where they

3  missed filling 15 percent of the class.  Then she spotted

4  another mistake where they had missed another 15 percent of the

5  class.  The SAT numbers were very different.  That plan was a

6  failure.  We can't take chances on models unless people are

7  very careful.  As Professor Long says, the details matter.

8      Now, the assumptions in modeling are what's critical.  We

9  do bar graphs; they do bar graphs.  But what's more important

10 than the bar graphs is what is built into those bar graphs, and

11 that's the flaw in the Kahlenberg simulations that we'll talk

12 about.  I note that Professor Hoxby ran something like 109

13 different simulations of race-neutral alternatives.  She did it

14 with assumptions favoring the race-neutral alternative, and it

15 didn't work.  The fact that none of them worked -- and I'll

16 talk about the Kahlenberg simulations in a moment -- tells us a

17 lot.

18     A brief discussion of Mr. Kahlenberg.  We don't have any

19 issues with his views, but we have serious issues with his

20 qualifications to do modeling in the space and offer that as a

21 serious alternative to what the facts are.  This is a personal

22 cause for him, understood, but he edited the complaint; he

23 funded personally an amicus brief in the Supreme Court; and his

24 personal views for socioeconomic diversity are admirable,

25 shared by many, but they don't address the issues of the case,

1  whether or not racial diversity can be replicated in a manner

2  that is workable.  For example, his efforts -- he did not know

3  when Professor Hoxby would point out errors in his model.  He'd

4  have to ask Professor Arcidiacono whether that was correct, and

5  it was.

6      Now, before -- I'm going to -- in the interest of time,

7  Your Honor, I'm going to skip past a few things that

8  professor -- Mr. Kahlenberg indicated we should pursue as

9  race-neutral alternatives that we're already doing, so we'll

10  address it in our brief.

11      But we have -- UNC's engaged in extensive recruiting

12  efforts.  UNC has engaged in increased financial aid.  And I'll

13  talk briefly about that.  If you look at the slide to the

14  right, one point that's really, really critical to appreciate

15  is that UNC is but one of only two public universities that

16  meet 100 percent -- Aaron, go back.

17      It's only one of two public universities in the country

18  that meet 100 percent of demonstrated need.  There's the

19  Carolina Covenant program that allows people not only to have

20  their need met, but not even need to take out a loan.  That

21  value has been recognized as the best value among public

22  universities for the last 17 years in a row.  I won't dwell on

23  community college transfers or other programs.

24      Let me turn to one issue about wealth briefly.

25  Mr. Kahlenberg thinks that part of the solution to the problem

1  is to get more wealth information, and because one law school

2  has it and no college has it, that is workable.  Yet the issue

3  that Steve Farmer immediately spotted was the fact that

4  actually filling out more forms hurts low-income students

5  because it discourages them from applying.  That's the sort of

6  thing you learn when you're a person on the ground who knows

7  these things, rather someone who is well-intentioned who

8  doesn't know the details.  And then you heard if from Professor

9  Bridget Long when she said, importantly -- and she's an expert

10  in FAFSA and financial information who has testified before

11  Congress:  "This is a way we lose low-income students in terms

12  of going to college, because every form is a barrier."

13      So I will turn to the simulations, and I'll do them in

14  categories, and I'll move swiftly because I think the point can

15  be made succinctly.  In those simulations, Mr. Kahlenberg is

16  trying to will a race-neutral alternative across the finish

17  line, but he does that without realistically accounting for how

18  applicant behavior will change.  It's all in the assumptions.

19  So let me give you three different situations that his models

20  fall into.

21      In some he's worried that URM, underrepresented minority,

22  diversity may fall; it has to hold.  And that's a real concern.

23  If you have an admissions program like UNC where you tell the

24  world, "We're committed to diversity in the classroom, in the

25  lab, on the field, in the dorm, everywhere, and we will be

1  race-conscious in admissions; we will consider everyone's

2  different strengths -- socioeconomic diversity, racial

3  diversity, geographic diversity -- and we are a welcoming

4  environment, not perfect, but an environment that is welcoming

5  and trying to get better," that is one message.

6      And then one day you tell the world, "Not so much anymore.

7  We're not interested in racial diversity.  We'll not consider

8  it."  An applicant might well look at that school differently.

9  They have in the past.  That's what happened in Texas.  An

10  applicant might be an underrepresented minority who says, "I

11  don't feel so welcome there."  It might be a white male who

12  says, "I don't want to go to a school that's less committed to

13  diversity."  And people don't apply and they don't apply and

14  next year there's less diversity.  That can feed upon itself as

15  more and more people say, "This is not the place I want to go

16  to.  I want to go somewhere else."

17      What does his model do to account for this?  It just

18  assumes the problem away.  When he has those issues, he just

19  assumes that the applicant pool never changes; every

20  underrepresented minority who applied before where race was

21  given consideration and can be a plus factor keeps on applying,

22  and if they get in, they actually come.  It just assumes away

23  the problem and puts up a pretty graph that makes it sound like

24  underrepresented minority representation won't change because

25  the applicant pool doesn't change, and everyone who gets in

1  matriculates.  He doesn't allow for choice.

2      The second problem he faces is when they're trying to

3  maintain top test scores.  And I'll give you one example I

4  think we can explain cleanly with a slide.  Many of his SES

5  boost programs give lower income people extra points in the

6  SAT.  One of them was more than 400.  Now, think about what

7  incentives that creates.  Let's say you're a person who's low

8  income and you have an 1100 SAT score.  You may be thinking, "I

9  can't get into UNC.  My scores are too low and maybe I can't

10  afford to go there."  And someone from the College advisory

11  Corps tells you one day, "Things are different.  You're getting

12  an extra 400 or 420 points on your SAT score.  Your 1100 is now

13  a 1520; and, by the way, we're need blind; and, by the way, if

14  you're lower income, you'll graduate without any debt."  Wow.

15  That's attractive.  Think of it as a 17- or 18-year-old kid,

16  think of their parents saying, "This is a new day."  So they

17  apply, and with a 420-point bump, they'll get in.

18      This chart was trying to illustrate this.  It's -- I hope

19  I'm clear, but the top line would be the regular process as it

20  is now, and all those greens bars are different applicants with

21  different SAT scores, but they average out to a 1294.  Then if

22  the SES boost plan is announced where people are told they get

23  400 points more credit, they will get new applicants.  Those

24  are the blue bars.  Someone who has a 952 on the SAT,

25  ordinarily not a very strong chance of getting in, but with 400

1  points or more, they're now a 1352 as far as the model goes.

2  Now you're getting those applicants that are blue bars that

3  have low SAT scores, but they get plused up for admissions

4  purposes.

5      Now when you run the averages across the admissions class,

6  the SAT scores go down considerably because now they don't

7  count the 400 points.  That's not what they got on their SAT.

8  The 1100 is an 1100.  That's a problem if you're trying to

9  replicate the same level of academic preparedness because

10 you're bringing in a whole host of people who have lower

11 scores.

12      What does the Kahlenberg simulations do?  Assumes away the

13 problem.  No one new is allowed to apply in those models.  They

14 just assume that you announce an SES-boost, which opens the

15 doors to lower-income people to apply and get in and go and

16 graduate debt free, and nothing changes in applicant behavior.

17      Your Honor, that's how assumptions rig the system.  If you

18 have to assume that the program fails to make it work, it's not

19 workable.  They're betting on a model that appeals to

20 low-income students, but the only way the numbers can't fall,

21 they have to lock all those applicants out and then run their

22 regressions and come up with great answers.

23      Finally, there's a scenario where they do switch and allow

24 people to apply.  Well, what's clear is they're not

25 pressure-testing their assumptions.  They're not saying what's

1  the best case and what's the worst case.  Every time they pick

2  an assumption, they cherry-pick the one that favors the model.

3  If I'm worried about too many minority applicants not applying

4  anymore, don't let them leave.  They're stuck in an applicant

5  pool.  If I'm worried for modeling purposes that low-income

6  students come flooding in with lower scores, lock them out.

7  That's how they do it.  When they switch to the "let's open it

8  up to the broader universe," they need numbers.  They need lots

9  of minority applicants to apply in the hope of maintaining

10  racial diversity, and they need lots of really smart test

11  takers to apply.  Lots of 1600 kids would be great so you can

12  keep the average score up.

13      Well, there's a problem with that.  The problem is it takes

14  two to tango.  There's a university, and there's an applicant.

15  Applicants have choices, and applicants with high test scores

16  have lots of choices.  They just assume in their model that

17  they get them all.  Every valedictorian in the state of

18  North Carolina is assumed to apply, admitted, assumes to go --

19  to come to the University of North Carolina; no one stays

20  closer to home, no one goes to Duke, no one goes to MIT or

21  Stanford.  All their models are based upon these fictions which

22  cannot hold true in the real world.  Even with those

23  assumptions, they fall short of the actual numbers today, and

24  that tells you everything.

25      Your Honor, with regard to Count II, we have met the burden

1  of proof to show that there is no race-neutral alternative that
2  works.  We looked at the history of what's happened in the rest
3  of the country.  We've looked at Court opinions.  We've looked
4  at the models -- the 108 models that Professor Hoxby ran, and
5  we've looked at the Kahlenberg simulations which only look good
6  when you make crazy assumptions.
7      Let me turn to one comment which was brought up, that
8  Professor Hoxby was fundamentally incoherent, because how could
9  she explain why race is so important in the admissions -- so
10 unimportant in the admissions process, and yet it's so hard to
11 replicate diversity.  Well, I could ask the same question back:
12 If race is so dominant, how easily could you replace it?  But I
13 don't need to.  On a chart, if we had a decile, I think
14 Professor Hoxby has got four to five deciles above me in
15 coherence, but I'll try.
16     We can't mistake dominance for importance.  The UNC
17 admissions process does not have race as a predominant factor.
18 It allows race to play a role in some decisions, some decisions
19 on the bubble.  That's the point.  Those decisions are not
20 dominant, but they're important.  They make the difference
21 between whether you have a year with less than a hundred black
22 males enrolling in a freshman class or not.  Not being dominant
23 doesn't mean it's not important, doesn't mean it's not
24 fundamental to the learning and engaging that goes on campus;
25 and on the other hand, every time you take out race

1 consciousness for admissions, the arrow points down on

2 diversity. It has to. You're sending a message to the world

3 that it no longer counts as much, we no longer care as much,

4 and every incentive then is for folks to leave the applicant

5 pool who may be minorities, and if there's another program in

6 place, it may bring in folks or not. So it's important even

7 though it's not dominant, and it's hard to replace.

8     The fact that we don't have a race-neutral alternative

9 available now doesn't mean people aren't trying for it. Life

10 would be a whole lot easier for all of us when the day comes

11 when no race-neutral alternative is needed or until then a

12 race-neutral alternative will work.

13     I will end my remarks where we began a week ago. This case

14 is about factors, not simulated facts. The case is about

15 facts, not math. It's about people, not dots. I know that

16 there was an argument made that, gee, if you only spend 10

17 minutes on an application, maybe it's mechanical.

18     You may recall, Your Honor, that there was an applicant

19 from Kenya who we talked about -- and if we just blow that up a

20 little bit so I'm not trying to strain my eyes here -- who

21 talked about coming over from Kenya and being stereotyped by

22 the kids he met in America who expected him to be a certain

23 way. He said, "To my peers, I'm supposed to fit in with the

24 displaced African stereotype, the first time I felt classified

25 and like an outlier on a graph."

1     **THE CLERK:**   Two minutes.

2        **MR. FITZGERALD:**   Those applicants that you've heard

3  from, they're unobservables in all these models.   The

4  Intervenors, their stories from personal essays and life

5  stories, much of that is unobservable.

6        Steve Farmer is unobservable in these models, the role he

7  plays.   The role the admissions officers play are unobservable

8  because they don't fit into dots and graphs.   Steve Farmer and

9  those admissions officers were unobservables to you, Your

10 Honor, two weeks ago, but not anymore.   You saw them for who

11 they are, what they do, and what they don't do.   What they do

12 is they see applicants as real people.   They don't have race

13 define the features of any applicant.   What they don't do is

14 cheat or violate the Constitution.

15       We need those people.   UNC needs those people.   UNC needs

16 to have race-conscious admissions.   This is not the time or the

17 place to throw out that system and replace that system with an

18 academic index and a barrel of hope.   It's got to be right.

19 It's important.   This is not the time, I submit, that the Court

20 should enjoin UNC from doing the right thing for the right

21 reasons in the right way.

22       Thank you.

23       **THE COURT:**   Thank you.

24       Does anyone need a short break?   I just want to make sure

25 my staff is okay before we proceed with the next discussion.

1     All right.  Yes, ma'am.

2          **MS. TORRES:**   Thank you.  And Genevieve Bonadies Torres

3   for the Defendant Intervenors.

4     And I'll start as well by thanking the Court for navigating

5   us through this trial under difficult circumstances with both

6   generosity and expertise.  So thank you.

7     Good afternoon.  One moment.  Can I check if the clicker

8   works?

9          **THE COURT:**   Yes.

10         **MR HINOJOSA:**   Is it on?

11         **MS. TORRES:**   Thank you.  I turned it on.

12         **THE COURT:**   All right.

13         **MS. TORRES:**   Context matters when reviewing race-based

14  governmental action under the Equal Protection Clause.  Those

15  are the words of the Supreme Court in *Grutter*.  Context is key,

16  and the Student-Intervenors' testimony and application files

17  evidence how UNC's particularized context makes UNC's

18  race-conscious policy not only lawful but vital for producing

19  profound educational benefits and transforming our broader

20  society.  UNC's context is shaped by its campus climate.

21  Students express their interactions across diversity were

22  eye-opening and made them more empathetic.  It's shaped by

23  UNC's sociohistorical legacy of racial exclusion.  UNC has made

24  substantial strides toward racial inclusion, but its segregated

25  past permeates the campus today.  In the words of Star, there's

1  racist wallpaper across campus that makes students of color

2  feel alienated. And, finally, its shaped by the experiences of

3  UNC's student body who apply, enroll, and graduate to lead

4  communities across North Carolina and the country, students

5  like Laura Ornelas, whose racial identity is central to who she

6  is and must be referenced, in her words, "to provide a full

7  picture of who I am."

8      While the Student-Intervenors and Defendants have offered

9  extensive evidence of the student experience, the Plaintiff has

10 been silent. They've offered no student testimony and no

11 analysis of the student experience. Instead, the Plaintiff

12 seeks to take the facts of this case out of context. They

13 decontextualize race in the admissions process, and they ignore

14 the campus context altogether. It's a strategy that fails

15 under our constitutional standards, just as it's failed in

16 cases involving Michigan Law School, UT-Austin, and most

17 recently Harvard University.

18     When UNC's particularized context is properly considered,

19 UNC more than carries its burden on the two remaining counts in

20 this case, which I will address in reverse order. First,

21 race-conscious admissions remains necessary. The evidence

22 shows that there are no viable alternatives to considering race

23 that can comparably reap the very benefits of diversity on

24 UNC's campus. UNC has laid out its well-defined goals in DX3,

25 its report on the educational benefits of diversity and

1  inclusion.  These goals are consistent with the previously

2  approved goals in *Fisher*.  As our Student-Intervenors and the

3  student surveys attest, UNC is making meaningful progress

4  toward these goals.

5      To take just a few examples, racial diversity is helping to

6  promote the robust exchange of ideas.  Star Wingate-Bey shared

7  how she, as one of the few black women in the class, raised

8  critical points in a class discussion about voter ID laws.  She

9  voiced how such restrictions disenfranchise and inflict harm on

10  the black community, a problem that was otherwise overlooked by

11  her predominantly white classmates.

12      It broadens and refines understanding.  Hanna Watson

13  testified about how -- her close friendship with a white South

14  African woman, how her friend shared her perspective on

15  apartheid, and Hanna shared about what it means to be a black

16  women and all of its complexities.  It was healing, and

17  together they formed a better understanding of how to create a

18  racially reconciled society.

19      This student testimony is consistent with the student

20  surveys that UNC has conducted over decades to evaluate its

21  progress.  For example, the 2016 diversity survey, which is in

22  the record in this case, showed that 80 percent of students

23  agreed that "exposure to diversity has improved my ability to

24  understand people from racial or ethnic backgrounds different

25  from my own."

1    But while UNC has made substantial strides towards its

2  diversity goals, evidence suggests that more progress is

3  needed.  Stephen Farmer and Dr. Jayakumar both evaluated UNC's

4  progress towards its diversity goals using qualitative and

5  quantitative measures.  Both found that UNC has not yet fully

6  harnessed diversity's benefits based on ample evidence that

7  UNC's racial minority students express high levels of feeling

8  tokenized in class and uncomfortable participating.

9    The Supreme Court has endorsed precisely this type of

10  evaluative approach that UNC is pursuing.  Most recently in

11  *Fisher*, the Supreme Court affirmed UT-Austin's race-conscious

12  admissions policy after considering both statistical and

13  anecdotal evidence that African American and Hispanic students

14  experience feelings of loneliness and isolation.

15    Indeed, Student-Intervenor testimony provides painstaking

16  proof that more progress is needed at UNC.  First, black and

17  Latinx students remain woefully underrepresented in many

18  courses.  This makes black and Latinx students feel like

19  spokespersons for their race.  As Star explained, she was often

20  the fact checker for the black experience, which was exhausting

21  and a burden.

22    Such isolation also impedes cross-racial interaction.

23  Andrew Brennen explained that he felt like he could not

24  contribute to classroom discussions when he was one of the only

25  black students in the room and all of the eyes turned to him to

1  explain a racially charged topic.

2      Second, black and Latinx students continue to face

3  incidents of racial hostility on campus.  Rimel Mwamba shared

4  about how classmates told her slaves were not welcome at

5  parties.  Andrew was called racial slurs on numerous occasions.

6      Third, UNC's particularized history of racial exclusion

7  continues to have present-day effects that exacerbate racial

8  isolation felt by UNC's black and Latinx students.  Hanna

9  Watson shared about feeling terrified and targeted when the

10 relics of that history brought white supremacists onto campus

11 as part of a rally.

12     UNC student surveys demonstrate that these are not isolated

13 incidents, but reflective of patterns across the student body.

14 For example, the 2016 diversity survey showed approximately

15 half of black students and a third of Latinx students agreed

16 with the statement "I feel pressured in the classroom to

17 represent the views of all people from my racial and ethnic

18 background," as compared to 4 percent of white students.  The

19 survey also reflected such isolation suppresses meaningful

20 cross-racial interaction.  Approximately 40 percent of black

21 students and a third of Latinx students agreed or strongly

22 agreed with the statement "I feel that I need to minimize

23 aspects of my racial or ethnic culture to fit in here,"

24 compared to just 7 percent of white students.

25     Survey data likewise showed that racial hostility remains

1  commonplace on UNC's campus.  91 percent of students reported

2  hearing insensitive and disparaging racial remarks made by

3  other students, and the majority of students of color have

4  personally experienced bias at UNC.  Of those reporting bias,

5  70 percent of Latinx students, 95 percent of black students,

6  and 100 percent of American Indian students report they've

7  specifically experienced bias due to their race.

8      All of these challenges are eased by greater levels of

9  racial diversity across groups and within groups.  As Rimel

10  explained, when faced with racial hostility, she found relief

11  and recovery by surrounding herself with other African American

12  students.  It allowed her to grow more into herself and to find

13  pride in her black identity.

14      Students of color are also doing the work of moving the

15  campus toward a healthier, more inclusive culture.  Cecilia and

16  Laura were both heavily engaged in recruiting more students of

17  color onto UNC's campus, and Andrew Brennen explained that

18  black women in particular are leading the efforts to dismantle

19  the relics of UNC's exclusionary past and move it towards a

20  racially inclusive future.  By cultivating a depth of diversity

21  across and within racial groups, race-conscious admissions is

22  indispensable for reaping the transformational benefits flowing

23  to today's students.  It's indispensable as well for tackling

24  the current campus climate challenges so that UNC may continue

25  progressing towards fully achieving its diversity goals.

1    The Plaintiff does not dispute that race-conscious

2  admissions currently plays an important role in cultivating

3  racial diversity on campus.  While Dr. Arcidiacono's analysis

4  is flawed on many levels, his findings show the harms at stake.

5  He asserts that eliminating the consideration of race would

6  sharply reduce the number of black and Hispanic students by

7  3,580 students over six years.  That represents roughly a

8  50 percent reduction in the black and Hispanic students on

9  campus, students who are already highly marginalized and

10  isolated on campus.  All students would lose out from this

11  decline.

12    The Plaintiff's expert, Mr. Kahlenberg, tries to mitigate

13  these harms by saying UNC could achieve comparable benefits by

14  using so-called race-neutral alternatives, but his alternatives

15  do not make up for the losses.  It is worth underscoring up

16  front that Mr. Kahlenberg agreed that the best and most

17  efficient method for promoting racial diversity is to consider

18  race in admissions.  He also did not consult with any students

19  or provide any analysis of how students currently feel racially

20  isolated on campus.

21    Turning to Mr. Kahlenberg's model, the flaws are numerous

22  and extensive, as Defendants' counsel has just discussed.

23  Student-Intervenors further emphasize three critical

24  deficiencies.

25    First, the decline in underrepresented minority students

1  would likely be even greater than estimated because

2  Mr. Kahlenberg's models -- sorry -- do not account for the

3  real-world changes in applicant behavior.  The evidence shows

4  that highly qualified students of color would be less likely to

5  apply and less likely to accept those offers.  For example,

6  Laura Ornelas stated forthrightly that if UNC had not

7  considered race, it would signal to her that students of color

8  were not welcome, and she would have been less likely to apply.

9      As a second defect, Mr. Kahlenberg is flatly wrong to

10 suggest that socioeconomic status can serve as a proxy for

11 race.  As Andrew testified, his race and socioeconomic status

12 are not interchangeable or alike in how he experiences the

13 world.  When he's running through a nice neighbor, people

14 notice his skin color and assume he's an outsider, irrespective

15 of his relatively affluent status.

16     As a third defect, Mr. Kahlenberg's modeling threatens to

17 reduce the diversity within each racial group.  His mechanical

18 admission of students based on singular metrics, such as class

19 rank and large socioeconomic boosts, threatens to flatten the

20 very backgrounds of black, Latinx, and Native American students

21 who are currently admitted through UNC's process.  A drop in

22 interracial diversity reduces the benefits flowing to students.

23 As Cecilia Polanco shared, diversity within the Latinx

24 community taught her to deconstruct her own previously held

25 biases about her own people.  It showed her Latinos were not a

 1  monolith.

 2      Taken together, these significant deficiencies indicate

 3  Mr. Kahlenberg's proposed alternatives would lead to steep

 4  declines in racial diversity across and within groups.  The

 5  all-but-certain decline in diversity would further limit UNC's

 6  capacity to enroll diverse students since students of color

 7  play a leading role in UNC's recruiting efforts.  As you heard

 8  from Cecilia Polanco, it was seeing other students that looked

 9  like her at recruitment events that made her want to attend

10  UNC.  Altogether it's clear from the factual record that racial

11  considerations remain necessary at UNC.

12      The remaining question is whether UNC's manner of

13  considering race is individualized.  The substantial record

14  shows that it is.  Admitted black, Latinx, and Native American

15  students are eminently qualified and thrive once admitted.  UNC

16  considers all pertinent elements of diversity, and UNC does not

17  award predetermined points or insulate candidates from review.

18      The Plaintiff seeks to decontextualize UNC's highly

19  complex, individualized process by manipulating the data to

20  assert that race is the defining feature for admitting black

21  and Latinx students, but that claim is false.  And Luis

22  Acosta's file exemplifies why.  His file includes his career

23  interest in being a physician, his bilingual language

24  proficiency, his dad's career as an assembly worker, his wide

25  range of honors and AP classes, and nearly straight As, his

1  deep involvement in extracurriculars.  And situated within this

2  rich contextual information, Luis voluntarily checked the box

3  for Hispanic and Latino and further identified as Mexican

4  American.  He wrote one personal essay about his grandmother

5  who lacked effective medical care in Mexico who has driven him

6  to become a doctor, and a second essay on the problematic

7  stereotypical portrayals of minority men and the racial

8  prejudice he's encountered as a result.  The essay discusses

9  his efforts to dispel these stereotypes through cross-racial

10  conversations.

11      Luis shared all of this with UNC, and UNC listened and saw

12  him for his complexity.  The reader comments note his

13  socioeconomic circumstances noting his fee waiver status, his

14  being first generation, his lower test scores, which are

15  nevertheless countered by his bilingual language abilities,

16  varied extracurriculars with 300-plus volunteer hours, and

17  supportive recommendations.  Amidst all these comments is a

18  note that he would add diversity.  UNC did not reduce Luis to

19  only his grades and test scores, as done by Dr. Arcidiacono's

20  crude academic decile analysis.  Doing so is highly misleading.

21  As Luis testified, his standardized test scores were not as

22  high because he lacked the financial resources to take test

23  prep courses that are shown to boost scores.  UNC did not

24  reduce Luis to his class rank or solely his socioeconomic

25  status, as done by Mr. Kahlenberg's modeling, which captures an

1  incomplete picture of Luis's dynamic background.  Rather, the

2  comments show how UNC is engaging in precisely the type of

3  highly sensitive, individualized review process that the

4  Supreme Court has repeatedly affirmed.

5      And Luis is not a singular example.  All of the

6  Student-Intervenors testified to their strong academics, their

7  wide-ranging work in their communities, and their compelling

8  stories tied to racial identity.  And, in fact,

9  eliminating race-conscious admissions would significantly

10 undermine the highly individualized process that the Supreme

11 Court has repeatedly endorsed.  All eight of the

12 Student-Intervenors who testified expressed their ethnicity

13 remains an important inextricable aspect of their identity,

14 perspective, and future contributions.

15      The Plaintiff doesn't say that these strengths should not

16 be valued, but their requested remedy would compel universities

17 to blind themselves to any reference to race, a remedy that has

18 been rejected for over 40 years.

19      In sum, Your Honor, the context matters.  Our Constitution

20 does not require colleges to blind themselves to the meaningful

21 context of students' lived experiences.  Indeed, constitutional

22 standards suggest otherwise.  As *Grutter* explained, by virtue

23 of our nation's struggle with racial inequality, such minority

24 students are both likely to have experiences of particular

25 importance to an institution's mission and less likely to be

1  admitted in meaningful numbers on criteria that ignore those

2  experiences.

3     And just this past week the First Circuit acknowledged

4  students' experiences can justify the legality of

5  race-conscious policies.  The Court -- the First Circuit noted

6  how many students wrote in their applications how racial

7  identities have shaped their precollege experiences from which

8  admissions officers may appropriately infer a student's

9  leadership ability or other personal strengths.

10     Student experiences provide critical context in this case

11  as well.  Student-Intervenors, along with the UNC Defendants,

12  have developed a context-rich record which shows UNC's holistic

13  race-conscious admissions process cultivates the type of

14  citizen leaders who can support UNC, North Carolina, and the

15  country in the ongoing, yet still unfulfilled, efforts to

16  bridge racial divisions and lift up all of our increasingly

17  diverse communities.

18     Student-Intervenors trust that this Court's holistic review

19  of the evidence, much like the UNC admissions policy itself,

20  will account for their stories and affirm the lawfulness of

21  UNC's race-conscious admissions process.

22     Thank you.

23          **THE COURT:**  Thank you.

24     All right.  That concludes our trial.  Let me say -- and I

25  think I have been very clear throughout -- I have been so

1  pleasantly impacted by the way in which these teams have worked
2  together to make this happen in this very difficult
3  environment.  I don't think we could have made it through this
4  many days with this -- with the kind and quality of testimony
5  that we have dealt with if we didn't have attorneys the caliber
6  of each of you.  It has been my pleasure to preside over this
7  trial.
8      I do wish I could step down and shake each one of your
9  hands, but we'll leave that for another day.  But I will say I
10 think you have done an extraordinary job in very difficult
11 circumstances, and the Court appreciates that.
12     I would like to also thank my staff, who have been totally
13 committed to this process and making it work, and I appreciate
14 all of that support as well.
15     The next thing will be the findings of fact that I
16 understand you will file within 30 days of the final transcript
17 being produced.  I cannot make a -- an estimate of time that it
18 will take for that to happen.  I do know we have one of the
19 best court reporters that's working with us at this time, and
20 she will, based on her other commitments, work very hard to get
21 this done.  She knows this is a priority for me, and it's very
22 important.
23     Are there any other matters that we need to address before
24 I adjourn court today?
25          **MR. STRAWBRIDGE:**  None from Plaintiff, Your Honor.

1    **MR. FITZGERALD:**  None for Defendants, Your Honor.

2    **MS. TORRES:**  None from Student-Intervenors.

3    **THE COURT:**  Thank you very much.

4    And I will look forward to getting the final document

5 related to the trial, and I can't give you an estimate on when

6 I will get that to you.  Of course we have many other cases

7 that we have to deal with, and we are dealing with them in this

8 very difficult circumstance.  But it is a priority for me, and

9 I will get it back to you as soon as I possibly can.

10    All right.  Thank you very much.

11    And court is adjourned.

12    (Proceedings concluded at 4:37 p.m.)

13

14

15                    **C E R T I F I C A T E**

16    I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
17 CERTIFY:

18    That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
19 the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
20 Transcription.

21

22 *Lori Russell*

23 Lori Russell, RMR, CRR        Date:  12/18/2020
   Official Court Reporter

24

25