IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS,  *
INC.,                          *
                               *
              Plaintiff,       *   Case No. 1:14CV954
                               *
vs.                            *
                               *   November 12, 2020
UNIVERSITY OF NORTH CAROLINA,  *
et al.,                        *   **Volume 3**
                               *   **Pages 387-603**
              Defendants.      *   **REDACTED TRANSCRIPT**
*******************************

                **EXPEDITED TRANSCRIPT OF TRIAL**
            BEFORE THE HONORABLE LORETTA C. BIGGS
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:          CONSOVOY MCCARTHY, PLLC
                            Thomas R. McCarthy, Esquire
                            Patrick Strawbridge, Esquire
                            James F. Hasson, Esquire
                            Bryan K. Weir, Esquire

                        BELL DAVIS & PITT, P.A.
                            Daniel Alan M. Ruley, Esquire

For UNC Defendants:     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                            Patrick J. Fitzgerald, Esquire
                            Lara A. Flath, Esquire
                            Amy L. Van Gelder, Esquire
                            Marianne H. Combs, Esquire

                        NORTH CAROLINA DEPARTMENT OF JUSTICE
                            Stephanie A. Brennan, Esquire
                            Tamika Henderson, Esquire

For Intervenors:        LAWYERS' COMMITTEE CIVIL RIGHTS UNDER LAW
                            David G. Hinojosa, Esquire
                            Genevieve Bonadies Torres, Esquire

                        NORTH CAROLINA JUSTICE CENTER
                            Jack Holtzman, Esquire
                            Emily P. Turner, Esquire

1                          I N D E X

2      PLAINTIFF'S WITNESSES:                              **PAGE**

3         RICHARD KAHLENBERG
             Direct Examination by Mr. Strawbridge          390
4            Cross-Examination by Mr. Fitzgerald            460
             Cross-Examination by Ms. Torres                503
5            Redirect Examination by Mr. Strawbridge        506

6      DEFENDANT UNC WITNESSES:                            **PAGE**

7         STEPHEN FARMER
             Direct Examination by Ms. Brennan              507

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **THE COURT:**  Good morning. |
| 3 | (Simultaneous response from counsel.) |
| 4 | **THE COURT:**  There are two matters that I want to |
| 5 | address and -- before we go forward. |
| 6 | I did have my clerk to give you a call -- to e-mail you on |
| 7 | Friday -- on Tuesday to let you know that the Governor has |
| 8 | changed the capacity limit for what we call masked gatherings. |
| 9 | Whether we fit into a masked gathering is beyond me.  But I am |
| 10 | going to, as best I can, comply with that.  This goes into |
| 11 | effect on the 13th of -- at 5 p.m. on the 13th, meaning that |
| 12 | starting on the 16th, we will attempt to limit the courtroom to |
| 13 | 10 individuals. |
| 14 | I don't know if you have had an opportunity to talk about |
| 15 | it.  From my perspective, my group -- I can allow my clerks to |
| 16 | alternate.  One would be in the courtroom and one would be |
| 17 | upstairs.  That leaves us with five, meaning that you have five |
| 18 | people amongst you.  So if you would rather talk about it later |
| 19 | today and let me know what you have decided for tomorrow -- on |
| 20 | tomorrow for Monday, that would be great. |
| 21 | The other is I think everyone received the same e-mail that |
| 22 | I have received about a partner of someone who is on one of the |
| 23 | trial teams testing positive for COVID, and my understanding of |
| 24 | that e-mail is that no individual in this courtroom has seen |
| 25 | that partner since November the 2nd.  So I think -- in |

1  addition, I understand that the trial team that is in question

2  did, in fact, all test negative for COVID.

3       I just want to make sure we're all on the same page and

4  operating by the same rules.  I'm not concerned about that --

5  overly concerned about that, but I would appreciate if at any

6  time that kind of information comes to your attention you do as

7  was done in this case and quickly inform me of it.

8       Are there any other matters that we need to address before

9  we proceed at this time?

10            **MR. FITZGERALD:**  No, Your Honor.

11            **THE COURT:**  All right.  Then I'd ask that Plaintiffs

12  call the next witness.

13            **MR. STRAWBRIDGE:**  Yes.  Thank you, Your Honor.

14  Plaintiffs call Richard Kahlenberg.

15            **THE COURT:**  Sir, if you would proceed to here, and you

16  will be sworn.

17            **RICHARD KAHLENBERG, PLAINTIFF'S WITNESS, SWORN**

18                      **DIRECT EXAMINATION**

19  **BY MR. STRAWBRIDGE:**

20            **THE WITNESS:**  Your Honor, are you comfortable with me

21  taking off my mask?

22            **THE COURT:**  Yes, you may do so, sir.

23  Q.  Good morning, Mr. Kahlenberg.

24  A.  Good morning.

25  Q.  Could you please tell the Court where you live and what you

1  do for a living?

2  A.  Yes.  I am a senior fellow at The Century Foundation, which

3  is a progressive think tank that was founded about a hundred

4  years ago, and I live in -- outside of Washington, DC.

5  Q.  And just for clarity, are you appearing today on behalf of

6  The Century Foundation?

7  A.  I am not.  I'm here in my personal capacity.

8  Q.  And were you retained by Students for Fair Admissions to

9  give opinions in this case regarding race-neutral alternatives

10  to the admissions process that may be available to the

11  University of North Carolina?

12  A.  I was.

13  Q.  And when were you first retained by Students for Fair

14  Admissions?

15  A.  It was about 2014, I believe.

16  Q.  Before we get to your opinions in this case, I would like

17  to discuss your qualifications.  Can you give the Court a

18  synopsis of your professional background?  We can start with

19  your education.

20  A.  Yes, I was educated at Harvard College, and I wrote my

21  senior honors thesis on Robert Kennedy and his 1968 campaign

22  for president where he brought together working-class people of

23  all different races in a political coalition.

24      I then went to the University of Nairobi in Kenya for a

25  year as a Rotary scholar where I studied at the School of

1  Journalism.

2       And then I returned to Harvard Law School after that.

3  Q.  And when did you graduate from Harvard College?

4  A.  Harvard College, 1985.

5  Q.  And from Harvard Law School?

6  A.  1989.

7  Q.  What did you do following your graduation from law school?

8  A.  Well, I was looking at a number of different law firms and

9  decided I was more interested in public policy, per se, than

10 law, and so I went to work as a legislative assistant for

11 Senator Charles Robb, Democratic senator from Virginia.

12 Q.  And how long did you work -- strike that.

13      What did you work on for Senator Robb?

14 A.  So I worked on a variety of issues, from campaign finance

15 to judicial appointments, to energy, the environment, and civil

16 rights.

17 Q.  And how long did you work in Senator Robb's office?

18 A.  I worked for Senator Robb for four years.

19 Q.  What did you do once you left Senator Robb's employment?

20 A.  Well, after I finished with Senator Robb, I moved to George

21 Washington University Law School where I was a visiting

22 associate professor of constitutional law.

23 Q.  And how long were you at GW?

24 A.  I was there for a year.

25 Q.  And what was your next stop in your professional

1 background?

2 A.  So then I went to a small think tank in Washington, DC,

3 called the Center for National Policy, which was founded by

4 Edmund Muskie.

5 Q.  And how long were you at the Center for National Policy?

6 A.  I was there for a couple years.

7 Q.  Okay.  And what sort of matters did you work on at that

8 Center for National Policy position?

9 A.  So I worked on issues of inequality of opportunity, trying

10 to fight those inequalities, and I -- around that time I

11 published a book called *The Remedy:  Class Race and Affirmative*

12 *Action,* which outlined an argument for and the research

13 surrounding providing preferences to students from

14 socioeconomically disadvantaged neighborhoods.

15 Q.  And do you remember when you left the Center for National

16 Policy?

17 A.  Yes.  In 1998, I went to The Century Foundation, where I've

18 been for the last 22 years.

19 Q.  In addition to the book that you mentioned, have you

20 written any other books that address issues regarding race and

21 education policy?

22 A.  Yes.  I've written or edited several volumes.  So in --

23 *Remedy* came out in 1996.  Then in 2001, I published a book with

24 Brooking Institution Press called *All Together Now:  Creating*

25 *Middle-Class Schools through Public School Choice,* which looked

1   at using socioeconomic factors to integrate our K through 12

2   schools.

3       And then in 2004, I edited a volume called *America's*

4   *Untapped Resource:  Low-Income Students in Higher Education,*

5   and that included a number of chapters from authors who were

6   looking at inequality in higher education, including one by my

7   close colleague, Anthony Carnevale, at Georgetown University

8   who was looking at the degree to which race and class matter in

9   student admissions.

10      Then in 2010, I edited a volume called *Rewarding Strivers:*

11  *Helping Low-Income Students Succeed in College.*  That was

12  another collaboration with Professor Carnevale where he ran

13  some simulations of what would happen if we shifted from

14  race-based to class-based affirmative action in higher

15  education.

16      In 2010, I also edited a volume called *Affirmative Action*

17  *for the Rich:  Legacy Preferences in College Admissions* that

18  examined that issue.

19      In 2012, I edited a volume called *The Future of School*

20  *Integration:  Socioeconomic Diversity As An Education Reform*

21  *Strategy,* which looked at opportunities to integrate schools by

22  economic status, given some of the impediments imposed by the

23  parents-involved case and using race and school integration

24  matters.

25      And in 2014, I edited a volume called *The Future of*

1    *Affirmative Action: New Paths to Higher Education Diversity*

2    that was sponsored by the Lumina Foundation and included

3    chapters by a number of academic scholars on affirmative

4    action, both those who supported race-based affirmative action

5    and class-based affirmative action.

6    Q.  Were those books -- did those books garner favorable

7    reviews?

8    A.  I would say certainly from some quarters there were some

9    favorable reviews.  So William Julius Wilson, who is an eminent

10   sociologist at Harvard University, reviewed *The Remedy* in the

11   *New York Times* and said it was the most thoughtful and

12   comprehensive analysis of class-based affirmative action that

13   he had seen.

14      *The Washington Post* called *The Remedy* the best book of the

15   year.

16      And much more recently, in 2016, the former president of

17   Princeton University, William Bowen, said that I had

18   contributed more than anyone else to the examination of

19   socioeconomic inequalities in higher education.

20   Q.  Mr. Kahlenberg, have you written any articles regarding

21   alternatives to using race in college admissions?

22   A.  Yes, I've written probably more than a hundred articles on

23   this topic, including in law reviews.

24   Q.  Have you ever spoken on this topic at any seminars or

25   conferences?

1    A.    Yes, I've been invited to speak at dozens of seminars or

2    panels at various universities, including a couple at the

3    University of North Carolina-Chapel Hill.

4    Q.    Have you ever served as a consultant to schools who are

5    exploring alternatives to using race in their admissions

6    process?

7    A.    Yes.  So there are a number of school districts that have

8    over the years hired me to advise them on how to use

9    socioeconomic factors in their school integration programs.  So

10   I worked with the Charlotte-Mecklenburg school district, the

11   Chicago school district, Pasadena, New Haven, a number of

12   school districts.

13   Q.    Have you ever advised any higher-education organizations

14   with respect to race-neutral alternatives to college

15   admissions?

16   A.    Yes.  The College Board asked me to advise them in a number

17   of meetings on something they created called the adversity

18   index, which is a measure of socioeconomic indicators that

19   colleges could use to try to promote both socioeconomic and

20   racial diversity on campus, and -- so this is looking at

21   neighborhood factors and school factors.

22   Q.    Have you ever testified as an expert witness in a court

23   case on this topic before?

24   A.    Yes.  So I've testified twice in federal court.  The first

25   time was in Chicago.  The Chicago public school system was

1   under a racial desegregation order and was seeking unitary

2   status to end that court order, and they hired me to analyze

3   the possibilities of using socioeconomic status as a way of

4   maintaining both socioeconomic and racial diversity in the

5   Chicago public school system, particularly in their magnet

6   schools and their selective schools.  They believed that it was

7   important to maintain that diversity, and so they asked me to

8   advise them on that process and testify in federal court on

9   that issue.

10      And the second time I testified in federal court was in

11  a -- I guess you could say a companion case to this one,

12  Students for Fair Admissions versus Harvard University.

13  Q.  I'd like to discuss the methodology that you employed in

14  reaching your opinions in this case.

15      What materials did you review in the course of preparing

16  your opinion?

17  A.  So I reviewed probably more than a thousand documents that

18  UNC produced in this case that provided data on their use of

19  race-neutral alternatives or exploration, I should say, of

20  race-neutral alternatives and how the system works.  I reviewed

21  the expert reports of others in this case, so

22  Professor Arcidiacono, Professor Hoxby, Professor Chang,

23  Professor Long, and Professor Jayakumar.

24      In addition, I read a number of depositions, including

25  Stephen Farmer's, Jennifer Kretchmar's, Barbara Long, Abigail

1  Panter, and a few additional ones.

2  Q.  You said Barbara Long.  Did you mean Barbara Polk?

3  A.  Yes, Barbara Polk.  Sorry.

4  Q.  Did you review any literature regarding race-neutral

5  alternatives as part of the preparation of your opinion in this

6  case?

7  A.  Yes, I -- as part of my day job, I try to keep up on the

8  literature on race-neutral alternatives, and so I have made it

9  a point to make sure I'm examining all the available research

10  out there.

11  Q.  What else, if anything, did you do to inform your opinions

12  in this case?

13  A.  Well, I -- working with Professor Arcidiacono, I asked him

14  to prepare a number of simulations of what would happen if UNC

15  stopped using race in admissions and instead adopted a number

16  of race-neutral alternatives, such as providing a socioeconomic

17  preference or admitting students in the top percentage of their

18  high school class.

19  Q.  And have you done that type of simulation work before?

20  A.  Yes.  So I worked with Professor Arcidiacono in the *Harvard*

21  litigation to prepare similar simulations that the Court

22  reviewed and accepted.

23      The -- I've also worked over the years with

24  Professor Carnevale at Georgetown University to simulate what

25  would happen if institutions stopped using race in admissions

1  and instead shifted to socioeconomic alternatives.

2  Q.  And in reviewing all the materials you just described, did

3  you -- did you try to inform yourself as to the benefits that

4  the University of North Carolina is seeking to obtain from its

5  use of race in its admissions process?

6  A.  Yes.  So my understanding is the University of

7  North Carolina is seeking the educational benefits of diversity

8  that -- all kinds of diversity -- racial diversity, economic

9  diversity, and all forms of diversity -- and that when students

10 come to an institution with different life experiences, that

11 the learning is richer and deeper.  Students can be more

12 creative in their problem-solving.  Bias is reduced when

13 students come to learn -- meet people of other races as

14 individuals.  And I think all of those are -- are important

15 values that I -- that I agree with.

16 Q.  Do you have an understanding as to whether UNC seeks

17 benefits from diversity other than racial diversity in its

18 admissions process?

19 A.  Yes.  So there's evidence from a number of UNC documents,

20 as well as testimony from a number of the UNC officials, that

21 they value diversity in many dimensions, racial diversity being

22 a very important one, but socioeconomic diversity as well.

23 Q.  And how would you say that UNC does in achieving racial

24 diversity and other areas of diversity today compared to other

25 colleges, in your experience?

1  A.  Well, I would say it's a bit of a mixed bag.  In terms of

2  racial diversity, I think it's fair to say that UNC has as much

3  racial diversity as many of its competitors.  So, for example,

4  the University of Virginia has 6 percent African American

5  representation, 6 percent Latino representation; and UNC does

6  better than that on racial diversity.  When it comes to

7  socioeconomic diversity, I would say UNC has a long way to go.

8  Q.  Have you prepared some slides to discuss socioeconomic

9  diversity at UNC?

10  A.  I have.

11  Q.  Are we looking at that slide right now?

12  A.  Yes.

13  Q.  What can you tell us about socioeconomic diversity at UNC,

14  as far as your understanding?

15  A.  Well, there are many ways to measure socioeconomic

16  diversity, and one way to look at it is in terms of parental

17  income of the student body.  And as this slide suggests, UNC

18  is -- has a lopsided income distribution among its student

19  body.

20      So these are data from a study that Raj Chetty, a Harvard

21  University professor, did on a number of colleges, including

22  UNC; and he found that 60 percent of the students at UNC have

23  come from the top 20 percent of the income distribution and

24  just 3.8 percent from the bottom 20 percent of the income

25  distribution.  So another way of thinking about that is if

1  you're walking around the campus at Chapel Hill, you are about
2  16 times as likely to run into a wealthy student as a
3  low-income student.
4  Q.  And what about how the student body at UNC compares to the
5  median income in the state?
6  A.  Yes, there's a large disparity in that as well.
7       If we can go to the next slide.
8       The medium household income for North Carolina residents as
9  a whole is about $54,000.
10      If we can go to the next slide.  I'm sorry.  Am I supposed
11 to direct the slides or --
12 Q.  This is fine.  You helped prepare these slides.  Go ahead.
13 A.  Okay.  And the median family income for UNC students is
14 135,000.  And so, in other words, your median family income of
15 UNC students is more than twice the median family income of
16 North Carolina residents as a whole.
17 Q.  Is there another way to think about the socioeconomic
18 diversity at UNC?
19 A.  Yes, there are other measures that we can look at.  So one
20 way to look at socioeconomic diversity is not just by looking
21 at income, but looking at the level of parental education
22 that -- well, the level of education that the parents of
23 students have at UNC.
24      And there's a striking contrast here, where just 17 percent
25 of UNC students are first-generation college students, meaning

1  neither of their parents has a bachelor's degree; and by
2  comparison, 72 percent of North Carolina adults over age 25
3  lack a bachelor's degree.  So UNC is very far from being
4  representative of the North Carolina population on -- in terms
5  of parental education levels.
6  Q.  And you mentioned earlier a book you had written regarding
7  legacy admissions.
8  A.  That's correct.
9  Q.  Just for the record, what do you mean by legacy admissions?
10  A.  Legacies are the children of alumni of an institution.
11  Q.  And have you prepared a slide regarding the level of
12  socioeconomic diversity with respect to alumni or legacy
13  students at UNC?
14  A.  I have.
15  Q.  And what does this slide tell us?
16  A.  So there are quite a few legacy students on campus at UNC
17  and -- and, in fact, there are more legacy students than
18  first-generation students, and that's -- that's remarkable
19  given that there are 451 times as many adults without a college
20  degree as adults in the entire world with a UNC degree.
21  Q.  How does UNC's socioeconomic diversity compare to other
22  leading public institutions?
23  A.  Well, there are other institutions that do better on
24  socioeconomic diversity.  So to give you a couple of examples,
25  UC Berkeley, UCLA, both highly competitive institutions that

1   don't use race in admissions, have about twice as many students
2   coming from that bottom quintile, the bottom 20 percent by
3   income; and to me, that's an important issue.
4       I was -- I was moved by Mr. Fitzpatrick's opening statement
5   where he said that part of the reason you go to college is to
6   learn about America.  I think that's an important part of the
7   experience, given that students come from their various
8   backgrounds, and so this lack of socioeconomic diversity I
9   think is troubling for that reason.
10  Q.  Now, you mentioned that among the things you reviewed were
11  some of UNC's efforts to examine race-neutral alternatives?
12  A.  That's correct.
13  Q.  And what were those efforts, as you understand them?
14  A.  So there were -- I'll highlight three of the efforts.  So
15  at first there was an analysis done in conjunction with the --
16          **MR. FITZGERALD:**  Your Honor, I would just object to
17  this slide and this topic.  If Mr. Kahlenberg is going to opine
18  on language included or not included in a brief, I don't think
19  that's within the ken of his expertise, and we noted our
20  objection to that.  This slide is talking about what UNC filed
21  in a brief in the Supreme Court, and the analysis of what's in
22  the brief and what's out of the brief I don't think is
23  something that's a proper role of expert testimony.
24          **MR. STRAWBRIDGE:**  May I be heard, Your Honor?
25          **THE COURT:**  Yes.

1    **MR. STRAWBRIDGE:**  Mr. Kahlenberg has obviously
2    dedicated his professional career to race-neutral alternatives
3    in higher education.  Obviously, we recognize that Your Honor
4    is going to make the legal decision in this case, but his
5    expertise allows him to opine as to whether or not the efforts
6    undertaken by UNC are consistent with what his understanding is
7    of what's possible and what's available out there at other
8    universities.

9    Now, with respect to the amicus brief, he's only going to
10   testify about the actual analysis that UNC provided with
11   respect to what a race-neutral alternative would do to its
12   campus, which is not a legal question at all.  It's just a
13   comment on UNC's own numbers analysis.

14   **THE COURT:**  Overruled.

15   **THE WITNESS:**  So in preparation for -- for an amicus
16   brief that was filed in the *Fisher versus University of Texas*
17   case in 2012, UNC conducted an analysis of what would happen if
18   it were to adopt a top 10 percent plan.  So this is analogous
19   to what the University of Texas at Austin has done where they
20   admit the top 10 percent of students at different high schools,
21   irrespective of their SAT scores, just top 10 percent by grade
22   point average.

23   And UNC found in that analysis that racial diversity at UNC
24   would actually increase from 15 percent underrepresented
25   minorities to 16 percent, but they rejected the alternative

1  because there would be a 56-point drop in the SAT scores and

2  said that students would be flocking to remedial classes if

3  this happened.

4      Now, Stephen Farmer, the admissions dean, took exception to

5  that and said he didn't agree with that view that if there were

6  a 56-point drop in the SAT that students would flock toward

7  remedial classes.

8  Q.  And based on your experience, what was your view as to the

9  quality of that consideration of race-neutral alternatives?

10 A.  Well, I think there were a couple of problems.  One is it

11 was a fairly crude analysis that UNC's own officials said was

12 just kind of a quick take on the issue.  And I disagree with

13 the interpretation of the results.  To my mind, if you have a

14 race-neutral alternative that produces more racial diversity

15 and does not result in a dramatic decline in academic

16 achievement, which is something the Supreme Court has talked

17 about, then it at least deserves more exploration.  It's a

18 promising approach that should be examined more fully.

19 Q.  What was the next history of UNC's consideration of

20 race-neutral alternatives that you familiarized yourself with?

21 A.  Yes.  So the next group was what I'm going to refer to as

22 the Polk committee.  It's called -- the official name is the

23 Working Group on Race-Neutral Alternatives.  It was chaired by

24 Barbara Polk from the admissions community.

25      The origins for this working group came from a requirement

1    from the U.S. Department of Education's Office for Civil Rights
2    that it examine race-neutral alternatives.  And the examination
3    was supposed to be completed by September 2013, but UNC -- the
4    Polk committee actually didn't finish its analysis and complete
5    its -- submit its report until February of 2016, about two and
6    a half years later.  So that was, to my mind, an indicator of a
7    lack of commitment to the process not to complete the report
8    until two years late.
9        In addition, UNC in that working group used a -- a standard
10   for success of race-neutral alternatives that -- that required
11   that any race-neutral alternative, quote, maintain or increase
12   racial diversity, meaning it would produce a greater or equal
13   percentage of underrepresented minorities, by which UNC means
14   African Americans, Latinos, and Native Americans; and the
15   race-neutral alternatives had to maintain or increase academic
16   equality -- academic quality.
17       And so my -- my concern there with that race-neutral
18   standard is that it appears to me to be at odds with what the
19   Supreme Court has asked for, which is that race-neutral
20   alternatives work about as well as the current race-conscious
21   approach.  And this essentially set an absolute floor of
22   maintaining or increasing both racial diversity and academic
23   standards.  So I found that troubling.
24       In addition, UNC provided in this working group no analysis
25   of what level of diversity is required to achieve the

 1  educational benefits of diversity.  And the Supreme Court, of

 2  course, has used the language of "critical mass" that is --

 3  will allow students to feel comfortable participating in

 4  classroom discussion and participate fully in the life of a

 5  university.

 6      And so that's kind of a -- that's a basic question, in my

 7  view, that needs to be answered if we're going to assess the

 8  viability of race-neutral alternatives, because if we're

 9  looking at the question of whether -- whether something is

10  viable, you have to have a definition of success, you know,

11  what would make this race-neutral alternative viable or

12  successful, and UNC did not provide any guidance on that

13  question.

14      Interestingly, in some of the agenda items and other

15  background materials that UNC disclosed in this case, the

16  working group raised the question, What is critical mass?  You

17  know, What would be the level necessary?  But the report

18  doesn't answer -- answer that question.  So I found that to be

19  a deficit of this report.

20      In addition, there was a literature review provided by the

21  working group of, you know, how race-neutral alternatives have

22  fared at other institutions and what the research on -- and

23  modeling on race-neutral alternatives suggests about the -- you

24  know, what are some of the promising approaches, what are the

25  approaches that haven't worked so well.

1    During that process, UNC worked with a former Office for
2    Civil Rights official to seek advice on the working group --
3    working group's report, and this individual specifically said
4    that the literature review that UNC's working group had done
5    was inadequate, not up to date.  And, in fact, there was one --
6    in particular one volume that I had edited, *The Future of*
7    *Affirmative Action,* that included scholars from a number of
8    leading institutions across the country examining race-neutral
9    alternatives; and the OCR official pointed that out, that this
10   was missing from the literature review; it was a hole.  And yet
11   UNC -- the UNC final working group report never included any
12   mention -- there was no update of the literature review.  So
13   that was another concern.

14   In addition, the working group conducted no baseline
15   analysis of how important race is to the current UNC admissions
16   process.  So this is the analysis that I know was the subject
17   of discussion earlier in this proceeding; and essentially,
18   institutions doing serious race-neutral alternative analysis
19   would want to know the weight accorded to race and other
20   factors in -- in seeking to know what would happen if we
21   stopped using race, how significant is race in the current
22   environment.

23   And UNC did not do that analysis.  It clearly knew about
24   the idea of looking at the weights accorded to different
25   attributes of students because they did do an analysis of how

1    important gender is to university admissions, how important is

2    early decision and legacy status.  Those are three of the

3    attributes that they looked at, and they said, How much of a

4    bump, in essence, does a legacy student get?  How much of an

5    advantage is it to apply early rather than through the regular

6    admissions process?  And so they did that sort of analysis --

7    we are aware of it -- but did not do it with respect to race.

8         And my final concern is that UNC failed to -- this working

9    group, the Polk committee, failed to look at a broad array of

10   race-neutral alternatives, because if one alternative doesn't

11   work, there might be another that does, and it's incumbent on

12   any race-neutral analysis to look at a number of different

13   options.

14        So the UNC working group, the Polk committee, focused on

15   top, you know, percentage plans, like the top 10 percent plan

16   in UNC, and did no analysis of one of the other major leading

17   race-neutral alternatives, which is to provide a socioeconomic

18   preference to students of all races that would likely

19   disproportionately benefit underrepresented minority students.

20   So the committee did no such analysis of socioeconomic

21   preferences.

22   Q.  What is the third example of UNC's attempt to consider

23   race-neutral alternatives that you referenced reviewing in

24   preparing your opinions in this case?

25   A.  Yes.  So after this litigation commenced, the -- the UNC

```
 1   officials decided to disband -- eventually disband the Polk
 2   committee and instead appoint a successor group, the Committee
 3   on Race-Neutral Strategies, that was chaired by Abigail Panter.
 4   And the Panter committee has been in place now for a number of
 5   years, but has not -- at least by the end of the discovery
 6   process had not produced any report that outlined an analysis
 7   of race-neutral alternatives.  They've begun to -- begun the
 8   process of examining race-neutral alternatives but have only
 9   done the preliminary analysis and haven't actually made any
10   conclusions that we've seen on the workability of race-neutral
11   alternatives.
12       So one thing that's particularly -- one omission that was
13   particularly notable is the lack of review of the expert
14   reports that were provided in this case.  So, you know, I
15   provided three reports on race-neutral alternatives that I
16   worked with in conjunction with Professor Arcidiacono.
17   Professor Hoxby produced reports.  Professor Bridget Terry Long
18   produced reports.  There was -- there was no analysis of these
19   reports by the Panter committee to say whether or not any of
20   these reports produced race-neutral alternatives that were
21   either viable or not viable.  They were just silent on the
22   issue.
23   Q.  In this case, were you able to form an opinion as to
24   whether there are available race-neutral alternatives to UNC's
25   admissions process that would be sufficient to allow it to
```

1  achieve the educational benefits of diversity?

2  A.  I was.

3  Q.  And what is that opinion?

4  A.  In my view, UNC has available to it several possible

5  race-neutral alternatives that could maintain racial diversity,

6  in many cases expand socioeconomic diversity, which together

7  would provide the educational benefits of diversity while

8  maintaining strong academic standards at the same time.

9  Q.  And let's just break that down a little bit.

10     How did you go about determining what constitutes an

11  acceptable level of diversity for UNC's purposes?

12  A.  Right.  Well, this goes back to that important question of

13  critical mass, you know, what do we define as success.  And in

14  evaluating race-neutral alternatives, the first place I would

15  look for guidance is the findings or the statements of the

16  institution.  So in this case, UNC-Chapel Hill, what's its

17  definition of critical mass, of how much diversity is necessary

18  to achieve the educational benefits of diversity.  And as I

19  mentioned earlier, that -- that definition has not been

20  forthcoming from -- from UNC.  There's an absence of a

21  definition of critical mass.

22     So given that, the fact that UNC has not provided a

23  definition of success or critical mass, there are some other

24  guideposts that one can look to as kind of rules of thumb, if

25  you will.  So one place to look is what the Supreme Court has

1  said on this issue; and so in the *Grutter* decision in 2003, the

2  Supreme Court said that University of Michigan Law School could

3  use race in its admissions process in order to achieve a

4  critical mass of underrepresented minority students, which was

5  about 14 percent underrepresented minority.  So that's one

6  guidepost to look at.

7       Another is to consider what other comparable

8  institutions -- what levels of diversity other comparable

9  institutions have.  And so the University of Virginia, I

10  mentioned, has a combined black and Latino representation of

11  about 12 percent, 6 percent in each category; and so that's

12  another guidepost to -- to look to.

13      And a third guidepost would be UNC's own level of

14  diversity.  The difference between my approach, of course, and

15  UNC's is the one I outlined earlier, which is that I don't see

16  the existing level of racial and ethnic diversity as a -- as an

17  absolute floor that has to be maintained.  We would need to

18  know more about research that supports UNC's existing level of

19  diversity, but it is something to look at.  It is a

20  consideration, given that UNC hasn't itself provided a

21  definition of critical mass.

22  Q.  And how did you go about identifying the race-neutral

23  strategies that you considered in analyzing the options

24  available to UNC?

25  A.  Well, there are a number of states throughout the country

1  that have stopped using race at their selective public

2  colleges.  Many of these institutions were the subject of a

3  state initiative and referendum.  So, for example, California

4  voters have not -- have said that public institutions can't use

5  race.  Sometimes there are lower court decisions that at least

6  temporarily require institutions to seek race-neutral

7  alternatives.  In the case of Florida, there was an executive

8  order from the Governor that -- that did -- required

9  institutions to stop using race.

10       And the good news, from my perspective, is that none of

11  these institutions gave up on diversity.  They instead sought

12  creative ways to try and achieve the educational benefits of

13  racial and socioeconomic diversity without using race.  So a

14  number of different approaches popped up which I've already

15  alluded to.  Some give socioeconomic preferences.  Some provide

16  admissions to the top students in all the public high schools.

17  Some increase their transfers from community colleges given the

18  community colleges can be a rich source of diversity.  So

19  there's been a lot of creativity and ferment on race-neutral

20  alternatives that we can draw upon.

21  Q.  Are you, Mr. Kahlenberg, generally a supporter of

22  socioeconomic preferences in college admissions?

23  A.  I am.

24  Q.  And why is that?

25  A.  Well, there are a couple of reasons I would cite.  First,

1  as a basic matter of fairness, I think that universities in
2  seeking to identify talent should consider not only the
3  credentials that a student offers in terms of the strength of
4  their essays, their grades, their SATs, their extracurriculars,
5  but also what obstacles they've had to overcome in life to
6  achieve that record.

7     And so if a student comes from a low-income family where
8  the parents haven't had the benefit of a college education, if
9  that student -- those students live in neighborhoods that have
10 concentrations of poverty that we know to have negative effects
11 on academic achievement.  If they go to a high school that's
12 underresourced and has high poverty levels that are associated
13 with lower levels of achievement, then we should, in fairness,
14 consider those obstacles that students have overcome.

15    Now, obviously, in the American society, given our history
16 of discrimination and segregation by race, it's no accident
17 that African Americans and Latinos disproportionately fall into
18 the -- the lower income categories, more likely live in more --
19 lower-income neighborhoods and attend low-income schools.  And
20 so one positive benefit of this approach of looking at
21 obstacles and fairness is that it also produces racial
22 diversity and disproportionately benefits those victims of
23 discrimination.  So that's the first reason, having to do with
24 fairness.

25    Secondly, there are -- we've been discussing educational

1 benefits of diversity, and I believe strongly that racial

2 diversity brings educational benefits, but socioeconomic

3 diversity does as well.  According to the literature on the

4 benefits of diversity, socioeconomic diversity adds a key

5 component; and at institutions like UNC and a number of other

6 leading institutions, that socioeconomic diversity is sorely

7 lacking.  And so the educational experience of students would

8 be stronger if there were socioeconomic diversity, as well as

9 racial diversity, on campus.

10      And the third reason I would cite has to do with the

11 political sustainability of socioeconomic preferences and

12 socioeconomic affirmative action.  So there's a long line of

13 public opinion polls which indicate that Americans disfavor

14 using race in admissions by about 2 to 1, and those same sets

15 of individuals favor using socioeconomic status by about 2 to

16 1.  And so for someone like me who has a concern about making

17 sure that there is affirmative action in our public

18 institutions, the socioeconomic preference alternative is much

19 more politically viable as well.

20 Q.  Besides increased socioeconomic preferences, are there

21 other race-neutral alternatives to the way UNC runs its current

22 admissions process?

23 A.  Yes.  So -- so one of the things that an institution like

24 UNC could do is to eliminate what I would call the unfair

25 preferences that tend to benefit wealthy and white students.

1    So UNC has a system, as we've been discussing, of legacy

2  preferences, particularly for out-of-state students; and so

3  providing those types of preferences for students who, by

4  definition, are fairly advantaged educationally -- their

5  parents are not only -- or a parent of theirs not only received

6  a four-year degree but received a four-year degree at a very

7  well-respected and elite institution.  So the idea of keeping

8  advantage on an already advantaged population I think is

9  difficult to justify, and so removing that will

10 disproportionately benefit students who come from less

11 advantaged backgrounds and will disproportionately benefit

12 underrepresented minorities, in particular.

13     Another unfair advantage, in my view, is the preference

14 provided by UNC to the children of faculty and staff.  So this

15 is yet another instance of heaping advantage upon advantage or

16 heaping preference on top of already a fairly advantaged group

17 disproportionately white.

18     The third area where UNC could -- could move in a direction

19 of fairness and provide more racial and economic diversity is

20 in suspending the preference it provides to those who apply

21 early in the decision -- in the admissions process.  Students

22 who apply early receive a preference at UNC, and many of those

23 students are being advised by counselors who are in the know.

24 If those -- if a student in an underresourced school may not

25 know about the advantages of applying early, they lose out.

1  And so that was a third preference that UNC could discontinue

2  providing and thereby increase racial and economic diversity on

3  campus.

4  Q.  Have any other universities done away with these types of

5  additional considerations?

6  A.  Yes.  So in the case of legacy preferences, there are many

7  highly competitive institutions that have said they -- they

8  think it's unfair to provide advantages to the already

9  advantaged.  Oxford University, Cambridge University, Cal Tech,

10 University of California at Berkeley, UCLA all have disbanded

11 with legacy preferences; and UC Berkeley and UCLA also don't

12 use the early admissions process which tends to advantage white

13 and wealthier students.

14 Q.  And just before we go any further, I want to ask you this

15 question:  Do you oppose the use of race in all circumstances

16 by a college or university?

17 A.  No, I don't.  I think that in -- my reading of the evidence

18 is that in most cases socioeconomic preferences or percentage

19 plans, race-neutral alternatives generally, can provide the

20 educational benefits of diversity, producing both racial and

21 economic diversity; but in cases where there were no

22 race-neutral alternatives that were viable, I would support

23 using race in admissions.

24 Q.  Is that an area where you disagree with Students for Fair

25 Admissions?

1  A.  It is, although I understand that's not an issue at this

2  trial.

3  Q.  Now, in this case, how did you go about determining that

4  there were, in fact, alternatives available to UNC to its use

5  of race in the admissions process?

6  A.  Well, this goes back to the idea that I mentioned earlier

7  about creating simulations of what would happen if racial

8  preferences were, in essence, turned off and a number of

9  alternative mechanisms were put in place.

10     So Professor Arcidiacono created in this case a database of

11  students, 200,000 students, and was able to create a model in

12  which he could predict the -- or provide the weights that UNC

13  currently provides preferences based on race and legacy,

14  first-generation college students and the like.  And in this

15  simulation process, I was able to instruct

16  Professor Arcidiacono to -- to make adjustments to test what

17  would happen if UNC went -- adopted race-neutral alternatives

18  in place of its current use of race.

19          **MR. FITZGERALD:**  I think -- may I be heard for a

20  moment?  I am not lodging an objection.  I just want to make

21  one comment for the record, so the record is plain.

22          **THE COURT:**  Yes.

23          **MR. FITZGERALD:**  We do have concerns about

24  Mr. Kahlenberg's ability to opine on simulations in terms of

25  his background.  Recognizing that this is not a jury trial, we

 1  doubt that would kick into play.  Recognizing that Your Honor

 2  is the gatekeeper but also the fact finder, we are not lodging

 3  an objection, but I did not want to waive the right, obviously,

 4  to argue later as to the weight and reliability of his opinion.

 5      With that said, I will sit down.

 6          **THE COURT:**  All right.  Do you care to be heard at

 7  all?

 8          **MR. STRAWBRIDGE:**  No, but I actually have a couple

 9  questions on this point, so it will probably be sufficient.

10          **THE COURT:**  Yes.  All right.

11  Q.  (By Mr. Strawbridge)  Mr. Kahlenberg, are you, in fact, an

12  economist?

13  A.  I am not.

14  Q.  And are you yourself a statistical modeling expert?

15  A.  I am not.

16  Q.  So how did you go about forming opinions with respect to

17  simulations, given those constraints on your own professional

18  background?

19  A.  Well, as in the past when I worked with Carnevale at

20  Georgetown University, I would -- would give high-level

21  instructions to Professor Arcidiacono about the type of

22  race-neutral alternatives that I was interested in exploring,

23  you know, drawing on my research about what other universities

24  are doing and the research literature on what might be

25  effective, and -- but it was Professor Arcidiacono who is the

 1   individual who would actually conduct the simulations.  That's

 2   not something I know how to do, and it was in conjunction with

 3   him that we produced these simulations.

 4   Q.   And what is your understanding as to how he would go about

 5   adjusting UNC's admissions process for purposes of the

 6   simulations?

 7   A.   So Professor Arcidiacono's model identifies through

 8   logistic regression the coefficients that are indicators of

 9   what UNC now heavily values in its admissions process, what

10   preferences are provided on a number of different attributes;

11   and I would ask him to turn off race, obviously, as a

12   preference in order to make the system race-neutral and then

13   would -- would ask him to implement a number of alternatives.

14   Q.   And did UNC provide expert materials in this case that also

15   included some modeling of race-neutral alternatives?

16   A.   Yes, Professor Hoxby provided simulations.

17   Q.   And did you work with Professor Arcidiacono to -- to

18   address or to review some of her processes with respect to

19   the -- her modeling?

20   A.   Yes, that was part of the process as well; that in addition

21   to relying on the model that Professor Arcidiacono had created,

22   I thought it was important to look at the model that

23   Professor Hoxby had created for testing race-neutral

24   alternatives and examine what she had found and then make some

25   adjustments where I thought it was appropriate.

1  Q.  And were there differences with respect to the race-neutral

2  alternatives modeling that were done by Professor Arcidiacono

3  on the one hand and Professor Hoxby on the other?

4  A.  Yes, there were.  And, again, because I'm not an expert in

5  this area, I would just describe them in very broad strokes.

6       So Professor Arcidiacono and Professor Hoxby used different

7  databases in many of their simulations.  So

8  Professor Arcidiacono was using data provided by actual

9  applicants to UNC so that we could take advantage of the

10  holistic ratings that UNC employs.  So as you know, Your Honor,

11  the -- UNC includes a number of different ratings in its system

12  for extracurriculars and others, and we thought that was

13  important to honor in our simulation -- simulations.

14       Professor Hoxby, by contrast, took a different approach,

15  and she used the NCERDC data, which is all the public high

16  school students in North Carolina.  Under that approach, you

17  don't have access to UNC's ratings because many of the

18  applicants didn't apply, but the advantage is you do have a

19  broader set of students to draw upon.  So that's -- these are

20  just two alternative approaches that both have some validity.

21       The second major difference had to do with the way that the

22  two professors presented their findings.  So given the Supreme

23  Court's guidance that race-neutral alternatives should work

24  about as well as current systems of race-conscious admissions,

25  Professor Arcidiacono would actually kind of complete a full

 1   class of students to see what the student body would look like

 2   if -- if a race-neutral alternative were adopted.

 3       And Professor Hoxby had a different approach.  She would,

 4   for example, with a socioeconomic preference, set aside a

 5   certain percentage of seats for low-income students, admit

 6   those students, see, you know, their racial background, the SAT

 7   scores of those students; and then, rather than actually

 8   completing the class, she would run a lottery to see whether it

 9   would be possible to complete the class in a way that would

10   maintain UNC's existing level of racial diversity and academic

11   standards.  And so that didn't allow one to look to see whether

12   the race-neutral alternative worked about as well.  It simply

13   was adopting that floor that has to work exactly as well as --

14   as the current system.

15       The other major difference in the presentations of the

16   two -- the two approaches is that Professor Arcidiacono

17   provided in all of the simulations information about the

18   educational benefits of diversity with respect to race and

19   socioeconomic status.  By contrast, Professor Hoxby's

20   presentations generally focused on racial diversity only.

21       In terms of academic standards or academic quality of the

22   class, Professor Arcidiacono would present information about

23   the grades -- high school grades and the SAT scores of

24   students, given that UNC says it values both and, in fact,

25   values high school GPA a little more than SAT scores; and by

1  contrast, Professor Hoxby would limit her discussion of
2  academic factors to SAT scores, not to grades.
3  Q.  Before we go any further, did you reject some of the
4  alternatives available to UNC in this case?
5  A.  Yes.
6  Q.  Can you just describe an example of some race-neutral
7  alternatives that you find not workable or not available to
8  UNC?
9  A.  Yes.  So there were -- the Working Group on Race-Neutral
10 Alternatives, the Polk committee, ran some simulations of
11 race-neutral alternatives that I thought were not viable.  So,
12 for example, there was one in which the underrepresented
13 minority population would drop from 16 percent down to
14 6 percent; and to my mind, that was an unacceptable drop in
15 racial diversity.
16      There was another simulation where the academic quality in
17 the institution would drop in a more dramatic fashion than I
18 thought was acceptable.  So there was one in which SAT scores
19 would drop from the 90th percentile to the 76th percentile, and
20 I would not view that as a viable race-neutral alternative
21 given the -- the importance UNC places on maintaining high
22 academic standards.
23 Q.  But there were other simulations that worked -- that
24 yielded favorable results in your mind?
25 A.  There were.

1  Q.  Okay.  And have you prepared some slides to discuss those

2  simulations?

3  A.  I have.

4  Q.  This slide references Simulation 3; is that correct?

5  A.  That's correct.

6  Q.  Could you describe a little bit about how you went about

7  constructing this simulation?

8  A.  Yes.  So Simulation 3 is a holistic socioeconomic status

9  race preference -- race-neutral alternative.  So as I was

10  describing before, this is using Professor Arcidiacono's

11  approach where he's employing the data from UNC's admissions

12  process.  So it includes all of UNC's ratings, the SAT scores

13  and the like.

14      So -- and I'll just say this is fairly rare in the world of

15  simulations.  So when I worked with Professor Carnevale, he

16  didn't have access to the ratings that an institution employed.

17  And so this gives us a deeper level of understanding of

18  race-neutral alternatives.

19      So as Your Honor knows, there are five aspects to the

20  rating system that UNC employs:  The rigor of the academic

21  program, student performance (GPA -- high school GPA and

22  whether it's improving), a rating for extracurricular

23  activities, a rating for essay, and a rating for personal

24  qualities.  And we wanted -- or I wanted these ratings to be

25  part of the simulation, and they are in the Simulation 3.

1  Q.  Using that model that included that information, what

2  adjustments, then, did you make?

3  A.  Yes.  So there were a number of adjustments.  First of all,

4  in order to be race-neutral, we're going to turn off the

5  existing preference for race.  I also turned off the race

6  for -- or asked Professor Arcidiacono to turn off the race

7  for -- the preference for gender, early action or being a

8  legacy.

9      I also turned off the existing boosts that UNC gives to

10 first-generation college students and students who have asked

11 to waive their application fees because I didn't want to double

12 count or be providing preferences on those criteria and didn't

13 want to -- wanted to isolate the preferences that I'm

14 suggesting for those that already are provided by UNC.

15     And then finally, I asked that athletic preferences be

16 turned back on so that athletes would receive a preference

17 under this race-neutral alternative.

18 Q.  And why did you do that?

19 A.  Well, in my experience, the athletic program at a lot of

20 institutions is really important to the identity of the

21 institution, and I think it would be seen as radical to

22 eliminate that athletic preference.

23 Q.  Having adjusted these preferences under

24 Professor Arcidiacono's model of the existing admissions

25 process, what was the next step in creating the simulation?

1  A.  Okay.  So the next step is to provide the socioeconomic

2  preference, and at that point one has to make some decisions

3  about how we're going to define socioeconomic status and what

4  weight to provide to the preference.

5      So in Simulation 3, we look at -- define students as being

6  from disadvantaged families if they are first-generation

7  college, if they applied for a fee waiver, or -- for certain

8  years we had this data -- whether they were eligible for free

9  and reduced-price lunch for students who are in state.  We had

10  that information in state.

11      And in addition, I thought it was important, given the

12  literature on what -- what constitutes obstacles to student

13  achievement, to also consider the neighborhood that a student

14  grows up in.  So provided a preference to students who are from

15  socioeconomically disadvantaged neighborhoods.

16      And each of these applicants would -- each applicant would

17  receive one preference for each of these two possibilities.  So

18  there might be some students who would receive a preference for

19  living in a socioeconomically disadvantaged neighborhood,

20  others for being from socioeconomically disadvantaged families,

21  or if someone falls into both categories, then they would get

22  two -- two bumps in the admissions process.

23  Q.  And why did you use the socioeconomic status of

24  neighborhoods and not just families?

25  A.  Well, it's important, given -- given the literature on what

 1  imposes obstacles on students, to consider that -- that extra

 2  obstacle of the neighborhood, socioeconomic disadvantage.  So

 3  we know from a wide variety of research that it's one thing

 4  to -- basically, you have one strike against you if you're --

 5  on average if you grow up in a low-income family, and there's a

 6  second independent strike that comes into play when students

 7  live in high-poverty neighborhoods; and there's also a racial

 8  component to this in the sense that in the aggregate -- not in

 9  every case, but in the aggregate, low-income whites are more

10  likely to live in middle-class neighborhoods than low-income

11  African Americans and Latinos.  So it would be unfair in the

12  aggregate to African American, Latino students not to count --

13  and to all students who live in not disadvantaged neighborhoods

14  not to count that factor.

15  Q.  And how large was the boost that this simulation was giving

16  to applicants who fell within one of the two categories?

17  A.  So in this simulation, I asked Professor Arcidiacono to

18  apply the equivalent of a legacy -- out-of-state legacy

19  preference to each of those components.

20  Q.  And what -- what was your understanding of the relative

21  size of that preference compared to other preferences in

22  Professor Arcidiacono's model?

23  A.  So the legacy preference -- we're using his Model 4 to

24  provide these preferences and the weights in Model 4.  He found

25  that legacy preference -- out-of-state legacy preference was

 1  smaller than the preference provided for African American

 2  students, but larger than the preference provided to

 3  economically disadvantaged students.

 4  Q.  And did you prepare a slide that shows the results of this

 5  simulation?

 6  A.  Yes.

 7  Q.  Why don't you begin by reminding us exactly what the --

 8  what's being shown on this simulation with respect to both the

 9  status quo and what's otherwise reported.

10  A.  Yes.  So with each of these simulations, I think it's

11  important to identify three areas of -- that are critical to

12  achieving the educational benefits of diversity and maintaining

13  high academic standards.

14      So we look at -- in each case at racial/ethnic diversity,

15  socioeconomic diversity, and the academic characteristics of

16  students; and in each case, the light blue line will be the

17  status quo and the dark blue line will suggest the shares of

18  students who are -- are part of the simulation.

19      And the -- I'll just mention the years will jump around a

20  little bit because of data constraints.  So this simulation is

21  from the class of 2016 to '17 -- admitted class of 2016 to

22  2017, where some of the simulations will be from earlier years.

23  Q.  All right.  And what can you say were the results of this

24  simulation with respect to the level of racial or ethnic

25  diversity in the admitted class?

1  A.   So I view this is as a viable race-neutral alternative

2  because the racial and ethnic diversity is -- achieved through

3  this process is roughly comparable to the racial and ethnic

4  diversity achieved under the status quo.  So you can see that

5  the African American share and the Hispanic share are roughly

6  comparable to what they are today under the simulation.

7  Q.   And what about the socioeconomic characteristics of this

8  admitted class?

9  A.   Right.  Well, not surprisingly, given this is a

10  socioeconomic preference, we see expanded socioeconomic

11  diversity.  So while racial diversity remains strong, the

12  educational benefits of diversity in some fashion increases

13  because we have much more socioeconomic diversity.  So the

14  share of students coming from disadvantaged families increases

15  from 20 percent to 32 percent, and the share from disadvantaged

16  neighborhoods also increases markedly.

17  Q.   What about the academic characteristics of the class under

18  this simulation?

19  A.   The academic characteristics remain quite strong, and so

20  the average SAT is 1320, just 15 points different than the

21  status quo.  And I have the percentile rankings in each of

22  these slides next to the SAT.  So we're moving from between the

23  92nd and 93rd percentile in SATs to the 91st.  High school GPA

24  remains quite high at 4.69.

25       And I think what's -- what's really remarkable is that the

 1   academic standards remain very high even though this is a group

 2   of students who have had to overcome more obstacles -- more

 3   socioeconomic obstacles than the current class.  So this is --

 4   would include more children of bus drivers and -- and grocery

 5   clerks who manage to do very, very well academically even

 6   though they may not have had the income advantages or the

 7   educational advantages that come from -- on average that come

 8   from being in a more advantaged family.

 9   Q.  Let's talk about the next simulation.  Did you prepare a

10   slide with respect to that?

11   A.  Yes.  If I can just point out one more thing about

12   Simulation 3 which I think is important.

13   Q.  Okay.

14   A.  The slice of the population will -- will move from

15   simulation to simulation given -- given data availability, but

16   I think it's important to point out that this is -- this is the

17   entire class.  So this includes in-state and out-of-state high

18   schools, both, you know, public and private.  So we've got the

19   full array of students in Simulation 3.  Some of the other

20   simulations will have a slice of a population, but this has it

21   all.

22   Q.  If we can now move on to the next simulation.  This refers

23   to Simulation 13?

24   A.  That's right.

25   Q.  Can you just describe for the Court what adjustments you

1   made compared to the last simulation we were looking at in
2   modeling Simulation 13?
3   A.   Yes.   So Simulation 13, the way this is presented, the
4   bolded material is what's new and different about Simulation 13
5   compared to Simulation 3.   So we're refining the socioeconomic
6   preference.
7        So it's the same as Simulation 3, but the major added
8   component here is that we are going to provide a preference to
9   students who come from socioeconomically disadvantaged high
10  schools.   So I mentioned before the distinction between growing
11  up in a socioeconomically disadvantaged family and living in a
12  socioeconomically disadvantaged neighborhood.   A third
13  component in all the academic literature is that attending a
14  high-poverty school or a school where there are other
15  attributes to the school will on average produce lower levels
16  of academic achievement; and so if we can identify students who
17  have done quite well despite the fact that they face this
18  obstacle, that's -- there's something very special going on.
19       So we define socioeconomically disadvantaged high schools
20  as those who are in the highest one-third in terms of
21  percentage of free and reduced priced lunch.   So the classmates
22  we're talking about here are the highest one-third of
23  non-English-speaking population and the highest one-third of
24  percentage of single-parent families, and that information is
25  derived from the census block.   So that's the major innovation

1  with Simulation 13.

2      And, again, you know, there could be a student who comes

3  from a low-income family, lives in a disadvantaged

4  neighborhood, but then is able to win, you know, scholarship to

5  a highly accomplished private school.  That student wouldn't

6  receive the third bump, but a student who faced all three of

7  these disadvantages, we want to recognize that -- that

8  distinction.

9  Q.  And really quick before we move on, were some of those

10 adjustments made in response to the modeling of

11 Professor Hoxby?

12 A.  Yes.

13 Q.  Can you explain which ones?

14 A.  Yes.  So Professor Hoxby raised some of the issues that are

15 included here -- percentage of non-English-speaking population,

16 percentage of single-parent families -- and so we thought her

17 discussion of those issues warranted a refinement to

18 Simulation 3.

19     In addition, Professor Hoxby discussed the preference for

20 children of faculty and staff.  And so in Simulation 3, we had

21 not turned off the preference for children of faculty and

22 staff; and in this one, we did turn off that preference, in

23 addition to the preferences for legacy and other categories

24 like that.

25     So one distinction -- one other distinction between

1    Simulation 13 and Simulation 3 is that -- that we're limiting

2    this to in-state applicants, which is the approach that

3    Professor Hoxby takes throughout her process.

4    Q.   And why are you limiting it to in-state applicants, or why

5    do you understand Professor Hoxby to be doing so?

6    A.   Well, Professor Hoxby I think is right in pointing out that

7    82 percent of UNC's population -- student population comes from

8    in state, and so we're talking about the vast majority of

9    students here through the in-state population.

10   Q.   And did you mention there were also data limitations that

11   required limiting this scenario to that population?

12   A.   That's right.  So Professor Hoxby, you know, relies, as I

13   mentioned earlier, on the rich data in the NCERDC database of

14   all the public high schools, and that's an important resource

15   to try to tap into.

16   Q.   The next slide shows the results of this simulation?

17   A.   Yes.

18   Q.   Why don't you describe for us your view as to how this

19   simulation fares with respect to racial and ethnic diversity.

20   A.   Yes.  So I think this is another viable race-neutral

21   alternative.  Racial and ethnic diversity remains strong in

22   this simulation.  So African American shares and Hispanic

23   shares are comparable to the current levels of diversity.

24       On this slide, we -- we added a consideration of the

25   combined underrepresented minority admissions.  So in most of

1  the slides, this will include African Americans, Hispanics, and
2  Native Americans in the combined underrepresented minority
3  population.  Because in Simulation 13 the data were reported in
4  a way that we couldn't separate out Native American students,
5  this slide and this slide only, the 14.1 percent
6  underrepresented minority population doesn't include Native
7  Americans.  It's just the African American and Hispanic mix,
8  but in most of the cases, maybe all the cases subsequent, that
9  will include Native Americans.  But the combined percentages is
10 comparable.
11 Q.  And just really quick, when you -- when these -- on all of
12 these measures when you're referring to status quo, what is the
13 comparative group to the population that you're modeling here?
14 A.  Well, we're always trying to compare apples and apples.  In
15 this case, the status quo numbers would be different than the
16 first slide because this is in-state public and private high
17 school, whereas the earlier one included out-of-state students.
18 Q.  What does this simulation reveal with respect to the levels
19 of socioeconomic diversity in the status quo versus the
20 simulated admitted group?
21 A.  Yes.  So the educational benefits that derived from
22 socioeconomic diversity are stronger in this stimulation than
23 under the status quo.  So we see a rise in disadvantaged
24 families by almost ten percentage points.  Disadvantaged
25 neighborhoods have better representation, as do students coming

1  from disadvantaged schools.

2  Q.  And what can you say with respect to the results regarding

3  the academic characteristics of the simulated class here?

4  A.  Yes, once again the academic characteristics are very

5  strong, very similar in terms of both SAT scores and high

6  school GPA.  And, again, I'll reiterate, this is particularly

7  impressive, given that we're now -- we now have a student body

8  that has had to overcome more hurdles in life than under the

9  status quo.

10          **MR. STRAWBRIDGE:**  Your Honor, I know it's almost

11  11:00, and so this is a convenient time from my examination if

12  we want to take our morning break.

13          **THE COURT:**  All right.  We can do that.

14      Sir, you may step down.

15      Let us recess until 10 after 11:00.

16      (A morning recess was taken from 10:55 a.m. until

17  11:13 a.m.; all parties present.)

18  Q.  (By Mr. Strawbridge)  Mr. Kahlenberg, you prepared a slide

19  for the next simulation that you reviewed?

20  A.  Yes.

21  Q.  This refers to Simulation 11.  Can you describe the

22  differences with respect to this simulation from the ones we've

23  been looking at?

24  A.  Yes.  So Simulation 11 is also socioeconomics based on

25  Professor Arcidiacono's model, but it makes a few adjustments.

 1  The first is that it includes not only those students who

 2  applied to UNC but other potential applicants using the NCERDC

 3  high school data that Professor Hoxby used.

 4      So the disadvantage is that it does not include the

 5  holistic readings that UNC is able to employ, but it can use

 6  other criteria in the model that mattered to UNC, like SATs and

 7  grades.

 8      Because the -- one other distinction is that because we now

 9  have a broader set of students who are able to apply -- the

10  applicants and the nonapplicants in the North Carolina

11  database -- the size of the socioeconomic preference that is

12  accorded to students does not need to be as large as under the

13  earlier simulation because we can get the benefits of

14  educational diversity with a smaller socioeconomic boost.

15      So this preference -- you know, each of the three potential

16  boosts is about one-third as large as the out-of-state legacy

17  boost in this simulation.

18  Q.  And have you prepared a slide showing the results of this

19  simulation?

20  A.  I have.

21  Q.  Can you describe what is shown on this slide for Simulation

22  11?

23  A.  Right.  So this simulation, which again includes the

24  nonapplicants -- it's all the in-state public high schools --

25  students who attended in-state public schools -- actually sees

1    an increase in -- in racial and ethnic diversity.  So African

2    American shares move from 8.5 percent up to 10.4 percent.

3    Hispanic shares also increase, and the total underrepresented

4    minority population, which in Simulation 11 does include Native

5    Americans, moves from 16.3 percent to 17.7 percent.

6    Q.  Just really briefly before we go on, can you just explain

7    what the "1.5 SES Boost" in the upper left corner refers to?

8    A.  Yes.  So in Professor Arcidiacono's model, there are logit

9    coefficients he had that are associated with various

10   preferences, and so the legacy preference is 4.71 increasing

11   your chances of admission.  It gets to the magnitude of the

12   preference.  And so the 1.5 refers to a preference that's

13   roughly one-third the size of a legacy preference.

14   Q.  What does this simulation show with respect to the

15   socioeconomic diversity versus the status quo?

16   A.  So drawing on this larger population, we're able to see a

17   substantial increase in socioeconomic diversity.  So 29 percent

18   are disadvantaged under the status quo.  That moves to

19   44 percent.  Disadvantaged neighborhoods also see an increase,

20   and disadvantaged schools see an increase as well.

21   Q.  And what does this simulation show with respect to the

22   academic characteristics of the status quo versus the simulated

23   class?

24   A.  Yes, the academic characteristics remain strong.  The

25   students are achieving SAT scores, you know, a couple

1    percentiles different than the status quo.  Again, remarkable

2    given the large increase in socioeconomic diversity and the

3    obstacles those students have faced.  And high school GPA

4    actually increases under this simulation.

5    Q.   Now, Professor Kahlenberg -- I'm sorry.  Mr. Kahlenberg,

6    the simulations we've been looking at are all variations on the

7    model of UNC's current holistic admissions process with the

8    adjustments you've described?

9    A.   That's correct.

10   Q.   Did you model some other types of simulation of

11   race-neutral alternatives to UNC's admissions process?

12   A.   Yes.

13   Q.   And is that what we're going to look at next?

14   A.   That's right.  So UNC had modeled itself a number of

15   percentage plans, and so we wanted to explore that race-neutral

16   alternative where students at the top of various high school

17   classes would be admitted.  So this Simulation 8 that we're

18   about to discuss is the top 4.5 percent of students in various

19   high schools throughout North Carolina.

20       What's different about this approach than the UT-Austin

21   percentage plan where students in the top 10 percent by high

22   school GPA are admitted is that this is using -- this is a

23   holistic approach.  So it's the top 4.5 percent as UNC would

24   consider them to be among the top students, so including those

25   ratings on essay and extracurricular activities.  So they're

 1  defined more holistically than simply grades as in the UT
 2  system.  We turn off the same preferences as before:  Race,
 3  legacy, early decision, first-generation status, fee waiver,
 4  and female applicants.
 5  Q.  And then using this top 4.5 percent metric, how did that
 6  affect the simulation's ability to generate enough seats to
 7  compare to the existing admitted class at UNC?
 8  A.  Right.  So there was a -- there was a shortfall because you
 9  don't have students in the top 4.5 percent of every high school
10  who have applied, you know, and so some schools have so few
11  applicants that you couldn't even reach the top 4.5 percent.
12  And so about 30 percent of the seats were -- were vacant under
13  this plan.
14      And so in order to make up -- to complete the rest of the
15  class, we filled the remaining seats with top students across
16  the board.  These are the -- again, holistically rated by UNC,
17  but the top students irrespective of what high school they come
18  from to complete that 30 percent of the student body.
19      And this is analogous to what UT-Austin does.  So UT-Austin
20  doesn't say the top 10 percent plan will apply to every slot at
21  UT-Austin.  They allocate 75 percent of the seats for the
22  percentage plan, and then 25 percent of the seats at UT-Austin
23  are filled through other means.  And we're following that rough
24  model by saying 70 percent of the seats are filled through the
25  top 4.5 percent plan, and then the other 30 percent will be

1  filled using holistic ratings from the students that UNC
2  considers to be the top students.
3  Q.  And have you prepared a slide showing the results of this
4  simulation?
5  A.  Yes.
6  Q.  Can you describe what we're looking at on this slide with
7  respect to Simulation 8?
8  A.  Yes.  And I'll just point out that since the populations
9  are shifting a little bit, this is in-state public and private
10 schools because it's using the UNC data.  So we do have the
11 private schools in here.
12     So you can see that the racial diversity remains quite
13 strong.  African American shares increase by a percentage
14 point; Hispanic shares stay steady; and the overall combined
15 underrepresented minority shares remain -- remain identical to
16 the status quo.
17 Q.  And what does the simulation show with respect to the
18 socioeconomic diversity of the simulated versus status quo
19 classes?
20 A.  So the socioeconomic diversity increases in all three
21 respects:  Disadvantaged family, disadvantaged neighborhood,
22 and disadvantaged school.
23 Q.  And what can you say about the academic characteristics
24 under this simulation?
25 A.  Under this simulation, the SAT scores, even with a more

1 socioeconomically diverse class, remain quite high, within a

2 couple percentage points of the SAT of this current class, and

3 high school GPA remains strong as well.

4 Q. Now, you mentioned this simulation was based upon the

5 current applicant pool at UNC?

6 A. That's correct.

7 Q. Did you -- did you run a modification of this simulation

8 that would embrace the broader data set including high school

9 students who had not applied to UNC?

10 A. I did.

11 Q. What can you tell us about this simulation?

12 A. So this is also a -- Simulation 9 is also a percentage

13 plan. We take the top 4 percent through race-neutral

14 admissions. So it's similar to Simulation 8, but now we're

15 including the -- those who did not apply to UNC. Because we

16 don't have those -- because they're nonapplicants, we don't

17 have UNC's ratings for all the students, but we still have

18 Professor Arcidiacono's Model 2 which tells us information

19 about how -- what types of things UNC values in terms of SAT

20 scores and grades and that kind of thing.

21    So we awarded admission to the top 4 percent by high

22 school, and, following UT, we said 75 percent of the class

23 would be filled this way and the remaining 25 percent with

24 other top-performing students according to what -- again, to

25 what UNC values, not with the ratings, but what UNC values

1    otherwise.

2    Q.  And I trust you prepared a slide showing the results of

3    this simulation?

4    A.  I did.  So because Simulation 9 includes nonapplicants,

5    there's a different population.  We don't have the private

6    schools.  We just have the in-state public schools from the

7    larger NCERDC data.  You can see that African American shares

8    hold steady; Hispanic shares also are roughly comparable, as

9    are the combined underrepresented minority shares.

10   Q.  Are you able to explain, Mr. Kahlenberg, why there is such

11   a large jump in the column that's labeled "White Admits" in

12   this analysis?

13   A.  Yes.  This is an artifact of the data, so we're

14   combining -- the status quo numbers are coming from UNC, and

15   the simulation numbers are coming from the NCERDC.  And there

16   are differences between the two databases, but one of the

17   relevant differences here is that in the UNC data, some of the

18   students are -- do not have a race associated with them.

19   They've declined to provide that or for whatever reason they

20   don't have a -- not every student has a race accorded to him or

21   her in the admitted student discussion.  By contrast, the

22   NCERDC database includes race for all -- all -- virtually all

23   students, and so that's why we see the difference in the -- in

24   the white admits.

25   Q.  What does this simulation reveal with respect to the

1  socioeconomic diversity of the simulated class?

2  A.  So the socioeconomic diversity is -- unlike the other

3  simulations, we don't see a big jump in socioeconomic

4  diversity:  Slightly fewer disadvantaged families,

5  disadvantaged neighborhoods about the same, but we do see an

6  increase, you know, with the percentage plan in disadvantaged

7  school.

8  Q.  And what do we see about the academic characteristics of

9  this simulation?

10  A.  Academic characteristics remain very strong.  The SAT

11  scores are roughly comparable; and high school GPA, which UNC

12  says it values even more, goes up.

13  Q.  I believe you mentioned earlier in your testimony that

14  Professor Hoxby ran some of her own simulations with respect to

15  race-neutral alternatives?

16  A.  That's correct.

17  Q.  Did you find any of her approaches viable for consideration

18  by UNC?

19  A.  I did.

20  Q.  Can you describe an example of that?

21  A.  Yes.  So Professor Hoxby ran a number of simulations of

22  various race-neutral alternatives, and I want to highlight this

23  one, which I think is promising.  So -- and -- more than

24  promising.  Viable.

25      So in this -- I'm sorry for all the jargon here, but this

1  is her 750/20 simulation, which means that she sets aside 750

2  seats in the class for disadvantaged admits and defines

3  disadvantaged as the lowest 20 percent using a complex formula

4  that includes family, neighborhood, and school SES.

5      So this -- as I mentioned earlier, Professor Hoxby has a

6  different way of presenting the data than I do and

7  Professor Arcidiacono does.  We -- we complete the entire class

8  to show whether the simulation works about as well, and

9  Professor Hoxby doesn't do that.  So what she does with the

10 750/20 simulation is reports the racial characteristics and the

11 SAT scores for the students who are admitted through

12 disadvantaged segment of the admission system and then runs a

13 lottery to see whether -- using current UNC admits to see

14 whether you could create the precise level of racial and --

15 racial diversity and SAT score threshold as -- as the status

16 quo.

17     And I suggested to Professor Arcidiacono that he make a few

18 adjustments to the Hoxby plan.  The primary one was to actually

19 complete the class.  So let's not run a lottery, but let's see

20 what the whole class will look like if we use this alternative.

21     Because Professor Hoxby used actual UNC admits to complete

22 her class, the system was not race-neutral; that is to say,

23 some of the UNC admits may have received consideration of their

24 race in admissions.  And so I didn't think that was an

25 appropriate way to complete the class and, instead, completed

1   the class with the most academically qualified students

2   remaining using a measure of high school GPA and SAT, equally

3   weighted, for the in-state public high school students.  So

4   that was the approach I took.

5   Q.  And did you use the in-state public high school students

6   because that was what Professor Hoxby used, or was there a

7   different reason?

8   A.  Yes, that was Professor Hoxby's approach.

9   Q.  And you prepared a slide showing the results of this

10  simulation?

11  A.  Yes.

12  Q.  What can you tell us about what this simulation revealed?

13  A.  So the African American shares remained comparable; the

14  Hispanic shares increase; and the combined underrepresented

15  minority admits hold -- hold steady.  So I think this is

16  successful on that dimension of racial and ethnic diversity.

17  Q.  What does this simulation reveal with respect to the

18  socioeconomic diversity of the admitted class?

19  A.  So the socioeconomic diversity also increases under the

20  indicators that we have.  I'd like to point out, though, that

21  there are some anomalies in this socioeconomic data that's

22  different than the other simulations.

23      So the first is given the -- you know, we're working with

24  Professor Hoxby's data and then the -- the data that we had

25  been relying on, NCERDC.  So low income is defined two

1  different ways in this simulation for the low-income family.

2  For the status quo, the number is 12.5 percent based on the

3  percentage of students in the UNC data who are eligible for a

4  fee waiver -- who receive a fee waiver; and the results of the

5  simulation are presented in terms of free and reduced-price

6  lunch, so a different indicator.

7      So in theory, this should be fine because the way the

8  College Board and UNC decide whether someone eligible for a fee

9  waiver is whether they're eligible for free and reduced-price

10  lunch.  But I just want to acknowledge that it's possible that

11  some students who are eligible for free and reduced-price lunch

12  might not apply for the fee waiver.  So that's not a precise

13  apples-and-apples comparison.

14      The other thing I want to acknowledge is that the high

15  school low-income comparison has a complication to it as well.

16  That is that there was a -- an error that Professor Arcidiacono

17  committed in defining the school code early on in this process.

18  He fixed it for most of the simulations.  But just in short,

19  there -- high schools have a code associated with them, and

20  then there's a separate piece of the code that relates to

21  the -- there's kind of a prefix to the code.  He accident -- or

22  inadvertently neglected to include the prefix, and so, as a

23  result, I don't want to represent that these high school data

24  are -- are precise in any way.

25      I will say, though, that I think we can be fairly confident

1  that the socioeconomic diversity, even though -- will be strong
2  in this simulation even though these particular indicators have
3  some problems associated with them because, you know, the whole
4  point of Professor Hoxby's exercise here was to give a boost to
5  socioeconomically disadvantaged students.  So she does it by
6  setting 750 seats aside, which is 18.5 percent of the class.
7  So given -- this, again, is an imprecise comparison.  But we
8  know that UNC currently has only 3.8 percent of students coming
9  from that bottom 20 percent by income.  Professor Hoxby is
10 using a different measure of disadvantage, but she's talking
11 about a quite disadvantaged population, the bottom 20 percent,
12 which is different than, say, eligible for free/reduced-price
13 lunch, which is 50 percent of the North Carolina population.
14     So -- anyway, I'm probably saying too much.  But there's --
15 my point is that I think there is reason to believe that
16 socioeconomic diversity would also be part of the picture here
17 under the simulation, although I want to be clear these
18 particular indicators are not as strong as the racial criteria
19 or the academic criteria in this simulation, although the
20 socioeconomic indicators in all the other simulations are quite
21 precise.
22 Q.  And what does this simulation reveal with respect to the
23 academic characteristics?
24 A.  Academic characteristics remain quite strong with respect
25 to both SAT and high school GPA.

1  Q.  And briefly, what is the declining percentile?

2  A.  Just a two-percentile-point decline in SATs, and the GPA

3  remains very high at 4.63.

4  Q.  Before we move on, I just want to make sure -- this,

5  perhaps, was implicit in your testimony, but do you find that

6  all the simulations we have reviewed here, in your experience

7  and understanding of what's possible for colleges out there,

8  amount to available race-neutral alternatives to UNC?

9  A.  Yes.

10  Q.  Do you think that the alternatives we've been looking at

11  here are feasible to be implemented?

12  A.  I do.  I mean, there are -- as I was explaining before,

13  there are a number of universities now that have grappled with

14  the transition from race-conscious admissions to race-neutral

15  admissions, and a number of these universities employ

16  socioeconomic preferences.  They increase the weight associated

17  with consideration of economic disadvantage.  A number of them

18  have employed percentage plans.  So, in my opinion, these are

19  feasible, workable race-neutral alternatives that UNC officials

20  could -- could implement.

21  Q.  You mentioned you had read the expert reports of Ms. Long

22  in this case?

23  A.  I did.

24  Q.  Did she suggest that race-neutral alternatives had not been

25  successful in replicating underrepresented minority

 1   representation at other schools that stopped using racial
 2   preferences?
 3   A.  So she spoke broadly about many of the race-neutral
 4   alternatives not keeping up with the demographics of the state
 5   as a whole, which is a different question than critical mass.
 6   Q.  And do you believe that there are universities comparable
 7   to UNC that have been successful in replicating
 8   underrepresented minority representation using race-neutral
 9   means?
10   A.  Yes, there are a number of institutions that have been
11   successful, flagship institutions, so the top institutions in
12   the state.
13       So a colleague of mine at The Century Foundation conducted
14   an analysis of 10 flagship universities that were required for
15   various reasons to -- to move from a system of race-conscious
16   admissions to race-neutral admissions, and she's found that in
17   seven of the ten cases the institutions were able to maintain
18   or increase both African American and Latino shares of the
19   student body.
20       So these are -- include, you know, institutions like
21   UT-Austin -- she was looking when they were -- you know, were
22   completely race-neutral -- and other institutions:  University
23   of Washington, University of Florida, and a number of others.
24       There were three exceptions in her study, institutions that
25   were not able to maintain both African American and Latino

```
 1   shares at the same level as they had when using race.  It was
 2   UC Berkeley, UCLA, and University of Michigan.  Since then
 3   University of California-Berkeley and UCLA have admitted the
 4   most diverse classes they've ever had.
 5   Q.  Are there other race-neutral strategies available to
 6   UNC-Chapel Hill that have not been factored into the
 7   simulations you've just described?
 8   A.  Yes.
 9   Q.  And what would those be?
10   A.  Well, there are a number, but I'm just going to
11   highlight -- highlight three of them.
12       One has to do with the construction of a socioeconomic
13   preference.  You'll recall we looked at income.  We looked at,
14   you know, factors like eligibility for free and reduced-price
15   lunch or fee waiver.  We looked at first-generation college.
16   But one of the aspects that I would have liked to have used in
17   these simulations is wealth, that is, the net worth of
18   individuals.
19       There is a broad body of research to suggest that,
20   regardless of income, having higher wealth improves a chance --
21   a student's life chances and their chances to go to college and
22   to participate in a higher-education experience.  So it's
23   unfortunate that we don't have enough data in this case to
24   employ.
25       It's particularly significant that we don't have wealth
```

1  data, given the exercise of trying to find race-neutral ways of
2  producing not only economic diversity but racial diversity.
3  Because of the history of slavery and segregation in this
4  country, the wealth gap between black people and white people
5  is much greater than is the income gap.  You know, we had the
6  income indicators, but we didn't have the wealth indicators.
7      So research suggests that on average African American
8  families make about 60 percent of what white families make, but
9  when you compare the wealth differential, African American
10 families' median household net worth is just 10 percent of the
11 median net worth of white families.  And the reason that would
12 be relevant in a socioeconomic preference is there may be
13 African American students -- and I should say the same gaps
14 apply to Latino students.
15     There may be students who appear to be more advantaged
16 because they are higher income, they don't qualify for
17 free/reduced-price lunch, but typically, they may have very low
18 wealth.  That's a disadvantage that African Americans and
19 Latinos face disproportionately that white families are much
20 less likely to face.  Obviously, this isn't the case all the
21 time.  There are some white families that have low wealth too.
22 But, on average, not including wealth hurts African Americans
23 and Latinos in the -- in the socioeconomic preference process;
24 and so there is reason to believe that if we had wealth data
25 available that we could have produced higher levels of racial

1  and ethnic diversity using a socioeconomic preference.

2  Q.  And is it possible for colleges to collect data about

3  applicants' wealth?

4  A.  Yes.  So -- so normally wealth is a fairly private thing.

5  We don't usually, you know, know much about the wealth of

6  families, but in the case of colleges, especially, you know,

7  somewhat expensive colleges like UNC, there is a great deal of

8  information about family wealth.  So any student filling out

9  the FAFSA, for example, for student aid will have a place where

10  they would indicate wealth.  It's not for every student, but

11  for many students we'll get that wealth data.

12      UNC also participates in a program that the College Board

13  put together called the CSS Profile which provides -- which

14  asks families for additional information about wealth that is

15  not included in the FAFSA.  So UNC has access to wealth data

16  about students in a way that almost no other -- I should say

17  institutions of higher education have access to wealth data

18  that's almost unique in American -- in the American landscape.

19  So I do think that's something UNC could do.

20  Q.  And just briefly, have there been any examples of colleges

21  using wealth data as part of a race-neutral approach to

22  admissions?

23  A.  Yes.  So UCLA Law School has used wealth as a race-neutral

24  indicator for some of the very reasons I've been describing,

25  that it's a good indicator of opportunity and also has a

1  positive racial effect when it's considered.

2  Q.  What is the next additional strategy that was not factored

3  into your simulations?

4  A.  So better recruitment of applicants does not show up in at

5  least a subset of these simulations.  So you may recall that

6  Simulations 3, 13, and 8 all relied on actual UNC applicants.

7  So this assumes that no new students will apply to UNC through

8  better recruitment efforts.

9      Now, UNC has, you know, a number of good programs for

10  recruitment.  They have a program in which recent graduates go

11  into high schools and have tried to encourage students to apply

12  to UNC and to other institutions of higher education.  They're

13  doing some good work in this area.

14      But at the same time, we know from the applicant data that

15  only 22 percent of applicants to UNC are first-generation

16  college in a state where, as I've said before, 72 percent of

17  students -- I'm sorry -- of adults above age 25 lack a

18  four-year degree.  So that suggests additional recruitment in

19  those three simulations could have a positive impact on -- on

20  racial/economic diversity and on -- you know, if we find

21  high-achieving students who fit those categories, then on

22  academic qualifications as well.

23  Q.  What are the other race-neutral strategies that may be

24  available to UNC that are not factored in your simulations?

25  A.  So -- so these simulations all assume that UNC does nothing

1  to improve the transfer of community college students.  I
2  mentioned earlier that the -- there are institutions that have
3  sought to diversify through race-neutral means by recruiting
4  more promising students in the community college sector.
5  Because community colleges are less expensive, they tend to
6  draw on a population that has lower socioeconomic status than
7  four-year institutions, more likely to have racial diversity
8  than four-year institutions; and so increasing the transfer
9  process of community college students to UNC could increase
10 diversity.
11      Now, once again, UNC has some good programs in this area.
12 They have what's known as the C-STEP program where they work
13 with, I believe it's, about 14 of the 59 community colleges in
14 North Carolina.  And I applaud them for doing that, but -- but
15 programs like that could be increased, enhanced, extended to
16 try to increase racial economic -- racial and economic
17 diversity.
18      So just to give you one comparison, about 5 percent of UNC
19 students are community college transfer students.  At UC
20 Berkeley, you know, very elite institution with very high
21 standards, 20 percent of the students are community college
22 transfers.
23      So there does seem to be some -- some room for improvement.
24 We didn't model that, you know, so I'm not representing to you
25 that -- Your Honor, that -- you know, precisely what UNC could

1    do.   I just want to underline that the simulations we have
2    provided so far do not assume any increase in community college
3    transfers, and that's another race-neutral alternative that is
4    available.
5    Q.   Now, to the -- how in this litigation has UNC responded to
6    your simulations?
7    A.   Well, on the one hand, they -- you know, strictly speaking,
8    they haven't responded.   The Panter committee, which was
9    designed to examine race-neutral alternatives, as of the end of
10   discovery had not examined any of the race-neutral simulations
11   that either Professor Hoxby or I, in conjunction with
12   Professor Arcidiacono, provided.   So there's been no response
13   from the -- the body that has been impaneled to review
14   race-neutral simulations.
15       And Professor Hoxby herself has declared at her deposition
16   that she is not opining on whether race-neutral alternatives
17   are available.   She's providing data about whether UNC can
18   precisely match its racial demographics and precisely match its
19   academic criteria, but is not opining on whether a race-neutral
20   alternative is available.
21   Q.   Did Professor Hoxby provide some criticisms of parts of
22   your modeling approach?
23   A.   Yes.   So I would say, broadly speaking, Professor Hoxby
24   had -- had two concerns.   The first is that the socioeconomic
25   preferences that I suggested were too large.   In other words,

1  that because my models provide a substantial boost to

2  socioeconomically disadvantaged students, we would end up

3  admitting some students who might not be able to do the work.

4  That was the one -- that was one criticism.

5      The other main criticism, which wasn't fully articulated

6  but was -- was mentioned a number of times, is that this would

7  be just too expensive; that it's less expensive -- if your sole

8  goal is racial diversity, it's less expensive to admit, you

9  know, more economically advantaged underrepresented minorities

10 than it is to move to a system that provides, you know,

11 substantial consideration to socioeconomic obstacles under --

12 under consideration.

13 Q.  Let me just ask you first, can you -- are you persuaded by

14 concerns that your socioeconomic preferences in your models are

15 too large?

16 A.  I'm not persuaded.  So in Simulation 11, the socioeconomic

17 preferences that I am envisioning are smaller than the

18 preferences based on race are today for African American

19 students.

20     Now, there is literature for -- research from Georgetown

21 professor Anthony Carnevale that looks at -- tries to quantify

22 in terms of the SAT points the obstacle students face in terms

23 of race and socioeconomic status, and he finds that the most

24 socioeconomically disadvantaged students are on average

25 projected to score 399 points lower on the SAT than the more

1    advantaged -- socioeconomically advantaged students.

2        By contrast, when you look at students who are of the same

3    socioeconomic status, African Americans are projected to score

4    56 points lower than white students.  And so the disadvantages

5    that are captured by socioeconomic status are, you know, in

6    Carnevale's terms, seven times as large as the disadvantages

7    associated with race per se.

8        Now, I want to be clear that if -- if the -- if the race

9    number were zero, that would not mean that our society has

10   gotten beyond racism.  The -- you know, we know that African

11   Americans and Latinos are disproportionately poor because of a

12   legacy of discrimination and ongoing discrimination.  So the

13   fact that socioeconomic status captures most of the

14   disadvantages here says nothing about how prevalent racial

15   discrimination is in American society, but it does suggest that

16   race-neutral alternatives are promising and that -- that

17   socioeconomic -- that if you're trying to devise a system

18   that's fair and looks at economic -- looks at obstacles

19   overcome, that the primary obstacles can be captured by

20   socioeconomic status.

21       And so that's, I think, important context to consider

22   Professor Hoxby's criticism of our -- of the multiple bumps --

23   you know, the two or three bumps for socioeconomic status,

24   which in some cases are larger -- in Simulation 13 are larger

25   than the race -- race preferences.

1       Now, as to the concern about whether, you know, unqualified

2   students would be admitted because we're giving such a

3   substantial socioeconomic boost, Professor Arcidiacono's

4   analysis has found that there were only 20 students who

5   received those three bumps who scored below 1000 on the SAT.

6   So if UNC were to say, you know, "No matter how deserving these

7   students are, we just think below 1000 on the SAT -- we don't

8   think they'll do well here," they could decide not to admit

9   those 20 students; and you would still have, you know, broadly

10  speaking, the same results as the simulations outlined here.

11  Twenty students out of 4,000 is not going to make much

12  difference in the overall representation of groups.

13      So for all those reasons, I found that criticism

14  unconvincing.

15  Q.  And could you respond -- do you find -- the criticism about

16  increasing socioeconomic diversity in the class would be too

17  expensive, do you find that criticism compelling?

18  A.  I did not.  So under the -- the guidelines we're all

19  working under here from the Supreme Court, the burden is on the

20  universities to prove their race-neutral alternatives don't

21  work, not that no race-neutral alternatives are available.

22      And so, you know, one alternative for UNC in this case

23  would be to provide some evidence that, you know, the

24  socioeconomic preferences or the percentage-plan approach that

25  I've been -- the simulations that I've offered would simply be

1  not something that UNC could afford.  UNC provided no such

2  evidence of -- that these are unaffordable for them.  So that

3  would be the -- I think the most important point.

4      Although I did not myself do a -- you know, a complex

5  analysis of the financial ability of UNC given the fact they

6  did not provide any -- any research to suggest they couldn't

7  afford this, I just make a couple of observations.

8      One is that UNC has an enormous endowment.  It's

9  $3 billion.  There are 22,000 institutions of higher education

10 in the world.  UNC's endowment is the 35th largest.  So it's in

11 the very, very top worldwide, richest of the richest

12 universities.  So -- so that's one factor to consider.

13     There's also testimony from Steve Farmer and others that if

14 UNC couldn't use race in admissions, it remains committed to

15 finding new and different ways to create racial diversity,

16 which is an encouraging indication that perhaps UNC would find

17 the resources necessary to -- to make this possible.

18     UNC is justly proud of the fact that it has the Carolina

19 Covenant program to cover the cost for students below

20 200 percent of the income -- the poverty level, and I guess I

21 don't -- I'm not convinced that there's any -- that UNC

22 wouldn't be able to find the resources necessary to make this

23 change.

24     The last thing I'll mention is that in states where

25 institutions had to move to race-neutral alternatives, you did

1  see the state legislatures and governors step up with financial

2  resources, new scholarship programs to make race-neutral

3  alternatives viable.  This happened even in cases where there

4  were right-leaning Republican governors in office in Texas and

5  Florida where both governors opposed the use of race, but once

6  race wasn't allowed to be used, they felt it was their duty to

7  provide additional financial resources to institutions of

8  higher education to provide new scholarships to make the

9  race-neutral alternatives work.  So that's another observation

10 I will make about the -- about UNC's concern these alternatives

11 are too expensive.

12         **MR. STRAWBRIDGE:**  I have no other questions at this

13 time for Mr. Kahlenberg.

14         **THE COURT:**  All right.

15         **MR. FITZGERALD:**  Your Honor, if you will give me one

16 second.

17         **THE COURT:**  Yes.

18      (Pause in the proceedings.)

19                     **CROSS-EXAMINATION**

20 **BY MR. FITZGERALD:**

21 Q.  I guess it's good afternoon, Mr. Kahlenberg.

22 A.  Good afternoon.

23 Q.  So a few background questions.  Is it fair to say that

24 you've basically spent your whole career advocating for

25 class-based affirmative action?

1  A.  Well, I would say that I have, you know, tried to do a

2  number of things, but among them was raising -- you know,

3  looking at research and then advocating class-based affirmative

4  action.  So it's -- I would say it's support of class-based

5  affirmative action based on compelling research.

6  Q.  And, in fact, after you were engaged in this case, you

7  personally funded the filing of an amicus brief in your name in

8  the Supreme Court in *Fisher versus Texas*; is that correct?

9  A.  That's correct.

10  Q.  And just for background, your relationship with Mr. Blum,

11  who is the president of SSFA, dates back to 2003; is that

12  correct?

13  A.  Yes.

14  Q.  And that year you met him for the first time at a lunch

15  with several other people, correct?

16  A.  That's my recollection, yes.

17  Q.  And thereafter, you and he -- you, Mr. Blum, and others

18  went to the White House to advocate for the United States

19  Government to file an amicus brief in the *Grutter* matter?

20  A.  So Mr. Blum did not go to that meeting.

21  Q.  Following that meeting, did you go with others to the White

22  House to advocate for the U.S. Government to file a -- an

23  amicus brief in the *Fisher* case?

24  A.  Yes, I was communicating with the Bush administration that

25  there are race-neutral alternatives available to -- to using

1  race that could be successful.

2  Q.  And let me -- I may have led you astray.  I said the *Fisher*

3  matter.  I meant to refer to the *Grutter* matter.

4      Was it an amicus brief in the *Grutter* matter in 2003?

5  A.  Yes, yes, that's correct.

6  Q.  I asked you a bad question.  You agreed with me.  So my

7  bad.  Thank you.

8      And you've testified as an expert witness, obviously, on

9  behalf of SFFA in the *Harvard* case, correct?

10 A.  That's correct.

11 Q.  And, in fact, you attended a press conference with Mr. Blum

12 in 2014 where you participated in announcing that lawsuit

13 against Harvard, correct?

14 A.  I was in the audience.

15 Q.  Did you speak to reporters at that press conference?

16 A.  I think there were some questions that were directed to me,

17 but I wasn't standing up to make any official statement.  I

18 think I did respond to some questions that were asked.

19 Q.  Were you quoted in -- on the news as saying that you

20 believe that the plaintiffs in that case had presented

21 considerable evidence suggesting that Harvard discriminated

22 against Asian American applicants?

23 A.  I think that's right.  I think -- and that's considerable

24 evidence as opposed to definitive evidence.

25 Q.  But that was before you had seen any evidence from Harvard

1  yet, correct?

2  A.  That was based on the complaint.

3  Q.  And we'll come back to that in a moment.

4      You mentioned this morning -- I believe you testified that

5  the trial judge in the *Harvard* matter had reviewed and accepted

6  similar simulations to what you are offering here today; is

7  that correct?

8  A.  Yes.  So maybe I should clarify what I mean.  The Court in

9  that case accepted the concept of simulations as a valid way of

10 examining this issue.

11 Q.  And just to be clear, in the opinion that Judge Burroughs

12 issued at the end of the case, did she cite both the analysis

13 performed by Professor Card on behalf of Harvard and your

14 analysis is, quote, all convincingly establishing that no

15 workable race-neutral alternatives existed?

16 A.  So I want to make sure I understand the question:  That she

17 concluded that no race-neutral alternatives were available.

18 That's correct.

19 Q.  And she cited your testimony as part of the basis for

20 convincingly establishing that race-neutral alternatives would

21 not work in that case, correct?

22 A.  So she cited my -- my -- my research, yes.

23 Q.  So just to be clear, so you said that the judge accepted

24 your testimony.  You mean it was allowed into evidence?

25 A.  Yes, that's all I meant.

1  Q.  Thank you.

2      And at the same press conference at which the lawsuit

3  against Harvard was announced in 2014, the lawsuit in this case

4  was also announced, correct?

5  A.  I think that's right.

6  Q.  And you were involved in working on the case before the

7  complaint was filed, correct?

8  A.  That's correct.

9  Q.  And, in fact, you were heavily involved in reviewing and

10 editing the complaint in this case, correct?

11 A.  Yes, reviewing -- so I wasn't drafting the complaint.  I

12 was asked to comment on it and to provide edits.  That's

13 correct.

14 Q.  And you saw multiple drafts that you edited, correct?

15 A.  I think there were a number of different drafts.  I think

16 that's right.

17 Q.  And it's fair to say that you agreed at the deposition that

18 you were heavily involved in the editing of the complaint?

19 A.  That sounds right.  I mean, I don't want to overstate my

20 role.  There -- you know, my area of focus obviously is

21 race-neutral alternatives, so it's not as if I was

22 participating broadly in the complaint.  I really focused on

23 input on those issues.

24 Q.  And if we can go to the deposition testimony, DX315 at

25 line -- page 18, line 3 -- oh, 19.  I'm sorry.

1    Do you agree with me that you testified at the deposition
2  that you would say that you were heavily involved in the
3  editing of the complaint?
4  A.  Yes.
5  Q.  And that was true in the *Harvard* case as well --
6  A.  Yes.
7  Q.  -- that you were heavily involved in the editing of that
8  complaint?
9    And would you agree with me that it is possible that you
10  gave advice to SFFA on which schools to sue?  Correct?
11  A.  It's possible, yes.
12  Q.  And did you state that in your deposition as well; that you
13  could not recall, but it was possible you gave advice on which
14  schools to sue?
15  A.  The deposition was a couple years ago, but I'll take your
16  word.
17  Q.  Now, we can agree that you're not offering any opinion in
18  this case on whether or not the school group review process was
19  used to manipulate the racial composition of the admitted
20  class, correct?
21  A.  That's correct.
22  Q.  And similarly, we can agree that you're not offering any
23  opinion in this case on whether or not the waitlist process was
24  used to manipulate the racial composition of the admitted
25  class, correct?

1  A.  That's correct.

2  Q.  And we've talked about this before.  I'll just touch upon

3  this briefly just to be clear.

4     You do not have a degree in economics, mathematics or

5  statistics, correct?

6  A.  That's correct.

7  Q.  And you've never worked in an admissions office, correct?

8  A.  That's correct.

9  Q.  And you've never worked in a university financial aid

10 office, correct?

11 A.  Correct.

12 Q.  You've never worked in a university recruiting function,

13 correct?

14 A.  That's correct.

15 Q.  And you have never managed a university endowment, correct?

16 A.  That's correct.

17 Q.  You have never served on the board of a higher education

18 institution, correct?

19 A.  That's correct.

20 Q.  And I think we can agree that you did not personally design

21 or run the simulations you're sponsoring, correct?

22 A.  Yes.  We had a clear division of duties where I would draw

23 on my experience, you know, with race-neutral alternatives that

24 have been used elsewhere and then instruct

25 Professor Arcidiacono with kind of high-level ideas.  He knew

1 the data.  I don't claim to know that, and so that was -- that

2 was the division.

3 Q.  And it is fair to say that when you were asked at your

4 deposition about the underlying computer program for the

5 simulation you seek to sponsor, which was called Kahlenberg

6 race-neutral model dot DO, you were not familiar with that

7 program, correct?

8 A.  That's correct.  Just to reiterate, I know my lane, and I

9 wasn't going to question Professor Arcidiacono's analysis of

10 work papers and that sort of thing.

11 Q.  And you agree with me that you had not even looked at the

12 underlying program -- you said the program.  You hadn't looked

13 at the underlying work papers for that program, correct?

14 A.  That's correct.

15 Q.  And, in fact, when you were asked about the work papers,

16 you weren't sure who had created them, other than you knew that

17 you had not, correct?

18 A.  That sounds right.

19 Q.  And in terms of checking to see whether or not any of the

20 models or results that came from the models were the product of

21 overfit models, that was not something in your lane, correct?

22 A.  That's correct.

23 Q.  And prior to your deposition in this case, you had never

24 testified before to the significance of a logit number,

25 correct?

1  A.  Well, in the *Harvard* case that issue came up.

2  Q.  And so that's why I asked you prior to your deposition in

3  this case had you testified --

4  A.  That's right.  The deposition was before the *Harvard* case.

5  Correct.

6  Q.  And you did rely upon -- in your first report in January of

7  2018, you put in your report an array of coefficients derived

8  from Model 7 -- Professor Arcidiacono's Model 7.  Do you recall

9  that?

10  A.  Yes.  The actual simulations use Model 4, but -- Model 4

11  and Model 2, but, yes, in the report I include a table from --

12  from 7.

13  Q.  To indicate what the size of various coefficients were,

14  correct?

15  A.  That's right.

16  Q.  Do you know that Model 7 is overfit?

17  A.  So the Model 7 is illustrative of the -- the logit --

18  relationship.  Model 4 shows something very similar in terms of

19  the significance of various preferences.  But, yes, Model 7 I

20  understand is overfit.

21  Q.  Did you know it was overfit at the time that you included

22  the table derived from Model 7 in your report?

23  A.  I did not, and I -- I mean, this is -- again, with the

24  division of duties, that's one that -- that I relied on

25  Professor Arcidiacono.

1  Q.  And at the time of your deposition, you were not aware that

2  Professor Arcidiacono was using any measures in his models that

3  were not themselves being used by the university, correct?

4  A.  I'm sorry.  Can you repeat that again?

5  Q.  Sure.  You did not -- you had no understanding -- strike

6  that.

7      You were not aware of anything that Professor Arcidiacono

8  was using in his models that was not being used by the

9  university in its admissions process as of the time of the

10  deposition, correct?

11  A.  I don't remember.

12  Q.  Let me show you your deposition, DX315, at page 77,

13  line 11.  There we go.

14      If we can look here at the first question:  "Are you aware

15  of whether or not Arcidiacono's academic index comes from UNC's

16  calculations or is it something he created on his own, if you

17  know?"

18      And your answer was:  "So the academic index is something

19  that's used at other universities as well."

20  A.  I see.  So, yeah, he --

21  Q.  Go ahead, sir.

22  A.  Yes.  No, I see your point.

23  Q.  I was going to move ahead to the next page, but I didn't

24  want to cut you off.

25      If we can go to the next page to line 1, you give an

1  answer, I believe:  "Well, Carolina has a system of looking at

2  the strength of the program that a student is taking, as well

3  as SAT scores and grades.  So what I asked

4  Professor Arcidiacono to do was look at UNC's system, as

5  opposed to something UNC is not using."

6  A.  Yes.

7  Q.  Do you see that?

8  A.  So --

9  Q.  I'm going to continue -- I'll stop.  Go ahead, sir.

10  A.  So I think -- I think what's going on here -- my

11  instructions to Professor Arcidiacono were to replicate as

12  closely as possible the -- the -- UNC's current system of

13  admissions, which is why I've been talking today about the

14  holistic ratings and all the rest; and there is one simulation

15  where those ratings are not available and where

16  Professor Arcidiacono uses SATs and grades.  But that -- it's a

17  minor piece of the whole puzzle.

18  Q.  And I am just going to show you one more section, the next

19  question and answer, and that's what I was referring to.  The

20  question was:  "So, to your understanding, do you know if

21  Professor Arcidiacono was using any measures that were not

22  themselves being used by Carolina?"

23      Your answer was:  "I'm not aware of any."

24      Do you recall that?

25  A.  So in fairness, UNC uses SAT scores; they use grades.  They

1  don't call it the academic index, but those are indicators that
2  UNC relies upon.
3  Q.   And as you sit here now, you know that UNC does not
4  calculate an academic index, correct?
5  A.   Correct.
6  Q.   They don't use one; they don't have one, correct?
7  A.   That's correct.
8  Q.   Thank you.
9       Let me now turn to the simulations we talked about, and
10 I'll try to keep us all straight on which simulation we're
11 referring to.  So we'll start talking about the simulations
12 regarding percentage plans, and we'll talk about Simulation 5
13 first so we can keep track.
14      In your January report, you sponsored a simulation that
15 Professor Arcidiacono ran that was called Simulation 5,
16 correct?
17 A.   That's correct.
18 Q.   And to run this simulation, you asked Professor Arcidiacono
19 to rank UNC's current applicants using his model, removing any
20 preference that he believes was for race and certain other
21 preferences and then admit the top 4.5 percent, correct?
22 A.   So Simulation 5, you know, had some errors in it, so I'm
23 not -- it's not top of mind, but that sounds generally correct.
24 Q.   I want to walk through the process of how you got from
25 Simulation 5 to Simulation 8.

1  A.  Okay.

2  Q.  So if that sounds generally correct -- and you then

3  represented in the report that running Simulation 5 in that way

4  showed it was possible to achieve the educational benefits of

5  diversity without compromising the academic excellence of the

6  class.  Do you remember saying that?

7  A.  That sounds right.

8  Q.  And this simulation used the actual data from the UNC

9  applicant pool, correct?

10 A.  I believe that's right.

11 Q.  And you wrote in your report in January that, quote,

12 Simulation 5 is superior to the status quo in virtually every

13 respect, correct?

14 A.  Again, it's been a while since I looked at Simulation 5

15 since we discarded it, but --

16 Q.  If we can just look at --

17 A.  -- that sounds -- I'm not going to argue with that.

18 Q.  We'll look at Plaintiff's -- PX118.1, which is, I believe,

19 your January report, at page 81.

20     And is that your statement that "Simulation 5 is superior

21 to the status quo in virtually every respect"?

22 A.  Yes.

23 Q.  "African American representation increases by 51 percent;

24 Hispanic shares increase by more than 16 percent, and

25 disadvantaged shares also increase.  Geographic diversity is

1   enhanced as top students in all high schools can attend UNC.

2   Meanwhile, traditional academic criteria are honored; indeed,

3   academic qualifications improve under this model, as both mean

4   SAT scores and high school GPA rise."

5        Did you say that, sir?

6   A.   Yes.

7   Q.   And then did you continue on the next page, at page 82, and

8   say -- the following page said:  "...a careful investigation of

9   UNC's admissions data and practices confirms that UNC has at

10  its disposal viable race-neutral alternatives that would

11  provide a net increase in racial and socioeconomic diversity

12  without requiring the use of race," correct?

13  A.   That's correct.

14  Q.   Now, after you offered this simulation as proving that a

15  race-neutral alternative would work, Professor Hoxby pointed

16  out errors in the simulation, correct?

17  A.   That's correct.

18  Q.   And specifically, she pointed out that in Simulation 5, the

19  model that -- the simulation that was run with

20  Professor Arcidiacono, ended up admitting too few students,

21  correct?

22  A.   That's correct.

23  Q.   And so the number of students admitted by the simulation

24  was 3,741 rather than 4,427, which was the size of the actual

25  2019 class, correct?

1  A.  That's correct.

2  Q.  And so the number of students that the simulation was short

3  was about 686.  Does that sound right?

4  A.  Yeah.  I mean, that's why in subsequent simulations we get

5  the class, you know, to the right size.

6  Q.  And we'll walk through that.

7     But it was about 15 percent too small, correct?

8  A.  Right.

9  Q.  Now -- and you agree that Professor Hoxby was dead right on

10 that, correct?

11 A.  She was.

12 Q.  And to fix this error, you asked Professor Arcidiacono to

13 fill the missing seats with top students using what was akin to

14 an academic index focused in particular on grades and test

15 scores, correct?

16 A.  Yes.  So that was inartful language, akin to the academic

17 index.  So it's -- you know, what we're trying to do is fill

18 the seats with a combination of factors, including grades and

19 test scores.  I was -- I -- I recall asking

20 Professor Arcidiacono for a quick-and-dirty way to describe

21 what he was doing, and he used that language.

22 Q.  And that language was inartful, correct?

23 A.  I think it was.

24 Q.  And then in addition to this issue with the size of the

25 class that would be admitted under Simulation 5, there was a

1  coding error regarding the school codes in Simulation 5 that

2  Professor Hoxby identified as well, correct?

3  A.  That's correct.

4  Q.  And after Professor Arcidiacono fixed the school code error

5  that Professor Hoxby found, the number of seats that you and

6  Professor Arcidiacono were short was even bigger, correct?

7  A.  That's correct.

8  Q.  And, in fact, the number of vacancies or missing seats rose

9  from 15 percent to 30 percent, correct?

10 A.  Right.  As I described in the subsequent simulation, that's

11 the 30 percent that we fill with other means, right.

12 Q.  And when you read Professor Hoxby's report and she

13 indicated that the school code errors had caused these

14 problems, did you know yourself whether or not she was right

15 when you read the report by yourself?

16 A.  That's -- no, that's Professor Arcidiacono's territory.

17 You know, when we discussed it, he made clear this is one of

18 those areas where she's right, and so I indicated, well,

19 obviously -- we both agreed to fix that problem.

20 Q.  And then prior to the school code error that

21 Professor Hoxby had identified, she had done an analysis in her

22 report that you read indicating that the average SAT score of

23 your Simulation 5 had been calculated wrong and that the SAT

24 points were 75 points too high.  Do you recall that?

25 A.  Yes, there was an error in the reporting of the SAT scores

1 as well.

2 Q.  And then once you fixed the errors in Simulation 5 and you

3 added the top students, that simulation became Simulation 8,

4 correct?

5 A.  I believe that's right, yes.

6 Q.  And just so we're clear, the method used in Simulation 8

7 was to take the top students from the existing pool in UNC and

8 admit the top 4.5 percent of the students based upon the

9 Arcidiacono admissions index; is that right?

10 A.  That's right.

11 Q.  And then --

12 A.  From the various high schools.

13 Q.  Yes.

14 A.  Yes.

15 Q.  Now, let me talk to you about -- in this model, when you

16 make calculations as to what the results are, you have to make

17 assumptions about what is going to happen in terms of

18 applicants' abilities -- of willingness to apply, correct?

19 A.  Yeah, models will -- there are different ways to predict --

20 not to predict, but to handle that uncertainty about who's

21 going to apply; and so in some of the cases, we -- we take a

22 current class that's applied, assume no one else is going to

23 apply, and then in others we use, following Professor Hoxby,

24 the NCERDC approach.

25 Q.  We'll talk through those assumptions for the Court.  Let me

1  just talk generally, stepping away from Simulation 8 for the

2  moment.

3      If you have a regime where you tell the world, "We're fully

4  committed to race-conscious admissions, holistic admissions,"

5  and then you tell the world, "We're no longer engaging in

6  race-conscious admissions, but now we're going to engage in

7  admissions that -- be more focused on socioeconomic diversity,"

8  you will agree with me that applicants, whether minority or

9  not, socioeconomically diverse or not, may think differently

10  about applying to UNC?  Correct?

11  A.  Yeah, I think the keyword there is "may."  I don't think we

12  can be confident about precisely what is going to happen, but

13  the incentives are different, so it may be that more

14  working-class African Americans and Latinos apply, where in the

15  past more upper middle class applied.  I think that's right.

16  Q.  With Simulation 8, when generating the results, that

17  modeling, that chart we saw assumed that every single

18  underrepresented minority who had applied before in this new

19  world in which race-conscious admissions are gone would still

20  apply, correct?

21  A.  So -- so it makes -- yeah, we -- there's a continuum.

22  There is the -- there are the simulations that say we're going

23  to use the existing data and therefore just assume the exact

24  same people are going to apply.  At the other end of the

25  continuum is the assumption that, you know, incentives will

1    change, and we're just going to open up to everyone in the

2    NCERDC, and nonapplicants may apply.  I think the truth is

3    going to be somewhere in the middle.

4        But you're right, using one approach is -- I mean -- let me

5    step back and say that's why I think it's important to model

6    both approaches, to give you that continuum.

7    Q.  And just now to focus on Simulation 8 in particular,

8    Simulation 8 would be replacing the current UNC holistic system

9    with a system that favors socioeconomic preference, correct?

10   A.  Yeah.

11   Q.  And for calculating the results of who's actually going to

12   be an applicant and how this is all going to work out,

13   Simulation 8 assumes that no underrepresented minorities leave

14   the applicant pool, correct?

15   A.  Right.  That's what I'm saying.  We've got the -- you know,

16   lots of different models to cover the fact that on the one

17   extreme it's probably unlikely you'll get the same exact

18   applicants; on the other extreme, it's probably unlikely that

19   100 percent of the people will apply, and you want to model

20   those so that you can get a sense of the total picture.  You

21   have to model something.

22   Q.  And to my point, just on Simulation 8 -- I just want to

23   focus on that simulation because you report results from a

24   mathematical exercise.

25       Those results are premised on the assumption that not a

 1  single underrepresented minority applicant leaves the applicant
 2  pool, correct?
 3  A.  Right.  I guess what I'm trying to explain is that if
 4  Simulation 8 were out there by itself, that was the only
 5  simulation done, that could be -- that could be -- one could
 6  raise questions about whether the same exact people are going
 7  to apply, and that's why we model it both ways, to give that
 8  range.
 9  Q.  We'll talk about the other models or other simulations
10  separately.  I'll go through them one by one, and we'll focus
11  on this question each time.
12      My question is:  For Simulation 8, you're assuming when the
13  calculations are run that not a single underrepresented
14  minority applicant leaves the applicant pool, correct?
15  A.  Right.  We're assuming no new working-class African
16  Americans and Latinos are applying either.
17  Q.  And in addition, when you -- when you adopt a plan, a
18  simulation that says we're going to prefer socioeconomic
19  diversity, the calculation of the results in Simulation 8
20  assumes that not a single additional person with socioeconomic
21  diversity applies, correct?
22  A.  That's correct.
23          **MR. FITZGERALD:**  Your Honor, this may be a good place
24  to break for lunch.
25          **THE COURT:**  All right.  Yes.

1      Sir, you may step down.

2           **THE WITNESS:**  Okay.  Thank you.

3           **THE COURT:**  All right.  Let us recess until 1:30.

4      (A noon recess was taken from 12:30 p.m. until 1:30 p.m.;

5  all parties present.)

6           **THE COURT:**  Yes, sir.  You may proceed.

7           **MR. FITZGERALD:**  Thank you, Your Honor.

8  Q.  (By Mr. Fitzgerald)  Good afternoon, Mr. Kahlenberg.

9  A.  Good afternoon.

10  Q.  I'll try to keep us straight when we're talking about

11  simulations, so I'm now going to talk to you about another

12  simulation called Simulation 9.

13      And that is what you referred to as the 4 percent plan?

14  A.  Yes.

15  Q.  And will you agree with me that this simulation uses the

16  applicant pool generated from the NCERDC data?

17  A.  That's correct.

18  Q.  And Simulation 9 -- when we talked about Simulation 8, we

19  had talked about the background of Simulation 5, some

20  corrections that were made, and then eventually that became

21  Simulation 8, correct?

22  A.  That's correct.

23  Q.  And similarly, Simulation 9 came out of Simulation 5 with

24  those corrections made, correct?

25  A.  The basic concept of the percentage plans is similar.

1   Q.  And here 75 percent of the class is admitted if they have

2   the top 4 percent class rank, right?

3   A.  "Class rank" meaning the credentials in Model 2 that are

4   desired by UNC.

5   Q.  So it's not based upon the high school class rank.  It's

6   based upon the rank on an index that Professor Arcidiacono

7   created in Model 2?

8   A.  Correct.

9   Q.  And we agree that's not the process UNC currently uses,

10  correct?

11  A.  That's correct.

12  Q.  And importantly, when you calculate how the results will

13  turn out when you do it differently under the 4 percent plan

14  versus the holistic admissions plan, the assumption is made

15  that 100 percent of the people who are qualified will apply to

16  UNC, correct?

17  A.  That's correct in this continuum.  It's the other end of

18  the continuum.

19  Q.  It's everyone -- it's no one is let in the pool and no one

20  let out of the pool; now everyone is in the pool, correct?

21  A.  That's correct.

22  Q.  Would you agree with me that it's an unrealistic

23  assumption?

24  A.  I think it's meant to provide parameters.  So on the one

25  end, only people who applied in the past will apply; at the

1  other end of the spectrum, 100 percent will apply.  I agree

2  with you it's unlikely that 100 percent would apply.

3  Q.  Would you consider it an audacious assumption?

4  A.  I believe I used that language.

5  Q.  And you used that when Professor Kretchmar made that

6  assumption in a model.  You criticized her for making that

7  assumption which you called audacious, correct?

8  A.  Well, I said there were advantages and disadvantages to the

9  two approaches and, you know, assuming 100 percent is one

10 extreme.  That's right.

11 Q.  My question is:  Did you call that assumption when

12 Professor Kretchmar made it audacious?

13 A.  Yes.

14 Q.  Now, just to be clear, that means that the model -- the

15 simulation, when it calculates the results, assumes that every

16 public high school valedictorian in the state will apply to

17 UNC?

18 A.  Everyone, yes.

19 Q.  Everyone.  Thank you.

20     And even with those assumptions, Simulation 9 resulted in a

21 decrease in diversity for Hispanics of about 10 percent, from

22 5.9 percent to 5.3 percent, meaning 10 percent (indiscernible).

23     (Court reporter requests clarification.)

24       **MR. FITZGERALD:**  I'm sorry.  I'll say that again.

25 Q.  (By Mr. Fitzgerald)  Meaning -- when I say a 10 percent

1  drop -- if there were 5.9 percent of Hispanics in the admit

2  pool under the current system, under that simulation with those

3  assumptions, the Hispanic admits would drop to 5.3 percent,

4  meaning a drop of .6 percent, correct?

5  A.  So for the purpose of this, I'm going to assume what you

6  are saying the data -- because I don't have it all in my head

7  exactly, the percentages.

8  Q.  No one should.  If you did, I would be worried.  Let me

9  pull this up.  I think it was on the slide -- if we can pull up

10  the slide for -- Kahlenberg Slide 29 might be easier because --

11  we'll stay on the slides we did this morning.

12  A.  Thank you.

13  Q.  21.  I'm sorry.  Slide 21.

14     I don't know if yours is a little blurry, but do you see

15  that Hispanic admits go from 5.9 percent to 5.3 percent?

16  A.  They do.

17  Q.  And that would be -- .6 percent would be a roughly

18  10 percent drop, would you agree?

19  A.  Yes.

20  Q.  Would you also agree that Asian American applicants would

21  drop from 11.6 percent to 10.3 percent?

22  A.  Yes.

23  Q.  And that would be roughly an 11 percent drop?

24  A.  Yes.  I mean, I think it's relevant for context that UNC,

25  because it -- you know, as you're saying, it doesn't engage in

1  racial balancing, year to year these numbers change a little

2  bit.

3  Q.  But this is the number generated by the assumption that it

4  applies, correct?

5  A.  Yes.

6  Q.  And then the Native American population drops from

7  1.9 percent to -- that's on a different chart.  Okay.  If it

8  dropped from 1.9 percent to 8 percent [sic], that would be a

9  substantial drop proportionally, would you agree?  I don't know

10  that it's reflected here.

11  A.  Well, it would be underrepresented, yeah.  Yes.

12  Q.  1.9 to .8 percent?

13  A.  That's right.

14  Q.  And all based upon the assumption that all people apply,

15  correct?

16  A.  That's correct.

17  Q.  Let me turn to Simulation 3 next, and 3 is a simulation

18  where the applicant pool is just the University of North

19  Carolina, correct?

20  A.  That's correct.

21  Q.  And that's based upon Professor Arcidiacono's Model 4,

22  correct?

23  A.  That's correct.

24  Q.  And that's where you provided what you call bumps -- SES

25  bumps to folks who meet any of three criteria:  They're either

1  first-generation college, they applied for a fee waiver or they

2  are eligible for free or reduced-price lunch, correct?

3  A.  That's one bump for being in one of those categories.  And

4  we had the data on free or reduced lunch for certain years, not

5  others, for Simulation 3.

6  Q.  But if you fit into any one of these three categories, you

7  received a bump, correct?

8  A.  That's correct.

9  Q.  Then if the person lived in a ZIP code in North Carolina

10 with a median income, in the bottom third nationally, you added

11 another bump, correct?

12 A.  That's correct.

13 Q.  And so an applicant could get up to two bumps, correct?

14 A.  That's correct.

15 Q.  And the bumps were significant, correct?

16 A.  Sizable out-of-state legacy.

17 Q.  And by your metric, it added -- each bump added 219 points

18 on the SAT score as one measure, correct?

19 A.  I don't remember the exact number, but that's possible.

20 Q.  And that was netting out the current -- whatever current

21 preference there was for socioeconomic diversity, correct?

22 A.  With such specific numbers, it's hard for me without my

23 report.  For purposes of our discussion, I'll assume you're

24 citing the report correctly.

25 Q.  And if the bump was doubled, it could be 400 some -- well

1  over 400 points on the SAT, correct?

2  A.  That's correct.

3  Q.  And this would provide a strong incentive for folks from a

4  socioeconomically disadvantaged background to apply, correct?

5  A.  That's correct.

6  Q.  It would take away the preferences given to

7  underrepresented minorities, correct?

8  A.  Underrepresented minorities -- there would be many

9  underrepresented minorities who would receive the new bump, of

10  course.

11  Q.  But an underrepresented minority who did not qualify for

12  the SES bump would be worse off with this system, correct?

13  A.  They would no longer receive the preferences, yes.

14  Q.  Again, your assumption says that under those circumstances,

15  no one joins the applicant pool from the SES group, correct?

16  A.  Yes.  So that's correct as we've been discussing the

17  parameters here -- the model parameters rather than every

18  particular possibility.  So those are the two end points of the

19  spectrum.

20  Q.  I just want to be clear.  You make two assumptions:  That

21  no socioeconomically disadvantaged people -- no additional

22  people apply, notwithstanding that they may be getting more

23  than 400 additional points -- SAT points credit when they

24  apply, correct?

25  A.  That's correct.

1  Q.  And similarly, when any race preference is removed, you

2  still have the same number of underrepresented minority

3  applicants, correct?

4  A.  That's correct.

5  Q.  And on that premise, you calculate the results, correct?

6  A.  That's correct.

7  Q.  Are you aware that Professor Hoxby ran the simulation

8  against student -- the student population in North Carolina,

9  allowing other SES candidates to apply?

10  A.  Yes, through the NCERDC, right.

11  Q.  And then when she scaled it down to the size of the class,

12  the SAT scores on average fell by 170 points; is that right?

13  A.  I don't recall the exact numbers.

14  Q.  Do you have any reason to doubt that the SAT scores fell to

15  1136?

16  A.  This is for -- let me make sure I understand the question.

17  Q.  When Professor Hoxby ran the simulation,

18  the (indiscernible).

19      (Court reporter requests clarification.)

20  Q.  When Professor Hoxby ran a simulation against this data but

21  allowed additional SES applicants, the SAT scores fell,

22  correct?

23  A.  Correct.

24  Q.  So these assumptions affect the results of the simulations,

25  correct?

1  A.   Yes.

2  Q.   Thank you.

3       And let me turn to Simulation 13.  In essence, this is the

4  same situation where, again, the applicant pool is locked both

5  ways.  No one gets in the pool, and no one gets out, correct?

6  A.   That's correct.

7  Q.   And that's the assumption upon which you calculated the

8  numbers that appear in the charts, correct?

9  A.   That's correct.

10  Q.   And we'll turn to Simulation 11.  And that's another

11  simulation involving an SES bump of 1.5, correct?

12  A.   That's correct.

13  Q.   And this one uses the NCERDC data, correct?

14  A.   That's correct.

15  Q.   That's based upon Professor Arcidiacono's Model 2, correct?

16  A.   That's correct.

17  Q.   And, again, this falls into the category where the

18  assumption is made at the time you calculate what the results

19  will be that every high school student in North Carolina will

20  apply, correct?

21  A.   That's correct.

22  Q.   And I'll turn now to the simulation that we'll call

23  Modified Hoxby 750/20.  You mentioned that you had a

24  disagreement with how Professor Hoxby completed the class.  Do

25  you recall that?

1  A.  That's correct.

2  Q.  And one of the concerns you had was that she used the

3  underlying admissions data to complete the class for the actual

4  admissions, and since that was under a race-conscious decision,

5  that introduced some element that lacked race neutrality,

6  correct?

7  A.  Yeah.  I mean, I would argue it's a significant element to

8  lack race neutrality in admitted students where race was used

9  in the process.  It didn't make any sense to me.

10  Q.  What I'm trying to figure out is how the numbers are

11  affected by different choices people make.

12      Will you agree with me, whether or not you agree with the

13  decision that Professor Hoxby made on how to project how the

14  class would be filled, the assumption she made was favoring the

15  outcome of her race-neutral alternative, correct?

16  A.  That's correct.

17  Q.  And, again, when you approached it differently, you once

18  again made the assumption that every top student in the state

19  would apply to UNC, correct?

20  A.  Yes.

21  Q.  And so based upon those results -- based upon that

22  assumption, you calculated the results that we went over this

23  morning, correct?

24  A.  That's correct.

25  Q.  Will you agree with me that between the analysis in your

 1  reports and the analysis in Professor Hoxby's reports and your

 2  depositions that the waterfront of race-neutral alternatives

 3  has been covered in this case?

 4  A.  I think that's a fair statement, yes.

 5  Q.  Now -- pardon me.  Excuse me just one second.

 6          **THE COURT:**  Yes.

 7      (Pause in the proceedings.)

 8  Q.  (By Mr. Fitzgerald)  Now, this morning I believe you

 9  testified that one of the schools that you believe are covered

10  after going to race-blind admissions were the California

11  schools, UCLA and Berkeley, correct?

12  A.  That's right.

13  Q.  Now, is it fair to say that UCLA and UC Berkeley went race

14  blind as a result of Proposition 209?

15  A.  That's correct.

16  Q.  And that occurred in 1996, correct?

17  A.  That's correct.

18  Q.  And after that went into effect, would you agree with me

19  that racial diversity dropped dramatically at both schools?

20  A.  So, yes, it took them a couple years to get their

21  race-neutral alternatives in place, so initially there was a

22  very sharp drop.

23  Q.  And then they -- after a couple of years, they did in good

24  faith pursue race-neutral alternatives, correct?

25  A.  So I would say yes and no.  I would say, yes, they adopted

1  a number of good programs that -- you know, a percentage plan,

2  bigger socioeconomic preferences, community -- enhanced

3  community college transfers.  They did a number of good things,

4  but I don't think they've done enough.

5  Q.  And you'll agree with me that as of 2014, you advised the

6  Supreme Court in your amicus brief that UCLA could not sustain

7  the prior levels of racial diversity using their race-neutral

8  alternatives, correct?

9  A.  That's right.  That's referencing a study I discussed

10  earlier where seven out of ten were able to get up to prior

11  levels of black and Latino representation and three at that

12  time did not, and UCLA was one of them.

13  Q.  And the three were the most -- the three most selective

14  schools of the ten, correct?  The three of the ten that not did

15  not achieve racial diversity following the elimination of

16  race-conscious admissions were the three most selective schools

17  out of those ten, correct?

18  A.  I think that's right, but I don't think the selectivity is

19  the key issue there.

20  Q.  But you would agree with me that there were -- three

21  schools that it didn't work in were UCLA, Berkeley, and

22  Michigan, correct?

23  A.  That's correct.

24  Q.  And they were the three most selective schools in that

25  study, correct?

1  A.   That is true, although there may be other relevant factors

2  here.

3  Q.   And will you agree with me that you've stated that the

4  three exceptions were universities that draw from a natural

5  applicant pool and face a hard time enrolling black and Latino

6  applicants who had competitors still applying racial

7  preferences?  Would you agree with that statement?

8  A.   I do.

9  Q.   And you will agree with me that when schools that attempt

10 to go race blind are drawing on a natural applicant pool, it is

11 harder, correct?

12 A.   That's right.  I mean, I would draw a distinction, I guess,

13 between a state-level initiative which prohibits a particular

14 set of universities from using race from any federal

15 intervention which could have national implications.  So a

16 university that was told by a federal court that they couldn't

17 use race would send a signal to lots of other universities that

18 they better be careful about pursuing race-neutral

19 alternatives.  And so they would be in a different position

20 than UC Berkeley, UCLA, and the University of Michigan where

21 the rest of -- all the competitors can still use race, but they

22 can't.  So it's an unlevel playing field.

23 Q.   And you'll agree with me that if UNC voluntarily, separate

24 and apart from this case, adopted a race-neutral alternative at

25 any point, they would face competition from schools that had

not done so, correct? Just like Berkeley and UCLA and Michigan, correct?
A. Except to the extent that, you know, a leading institution like UNC recognized that it could use race-neutral alternatives. I think that would send a signal as well to other universities that they ought to seriously explore these issues more vigorously than they have in the past.
Q. And you'll also agree with me that you stated in the past that percentage plans may not easily translate to public or private universities with natural pools of applicants? Is that fair?
A. I think -- you know, I don't remember when -- when I wrote that. I guess I feel now that there are -- there are ways to try to extend a percentage plan, but in states like North Carolina where 82 percent of the students are in state, then it's less of an issue anyway.
Q. But you'll agree that UNC does draw on a natural applicant pool, correct?
A. I do.
Q. And going back to the situation with California, putting aside -- you testified in the deposition in this case that UCLA and Berkeley were on the list of schools that had not achieved diversity, correct, racial diversity, following the change in applications? Correct?
A. Yes. This was as of -- the 2012 study found that UCLA, UC

1  Berkeley, and University of Michigan had not yet achieved the
2  levels of black and Latino representation that they had in the
3  past.
4  Q.  And in 2018, you testified that those two schools had not
5  yet achieved racial diversity, correct, in the deposition in
6  this case?
7  A.  So if you're saying so, I'm guessing there's a slide that
8  suggests I said that.  I mean, I -- Berkeley has -- Berkeley
9  and UCLA have just admitted their most diverse classes ever.
10 Berkeley is 17 percent white.  So if I said that in 2018, I may
11 have been incorrect.
12 Q.  And did you also say that in a report you filed in the
13 *Harvard* case in 2017?
14 A.  I'm sure I cited the 2012 study.
15 Q.  And putting aside --
16        **MR. FITZGERALD:**  And, Your Honor, I just make a note
17 we object to updating information beyond the discovery record.
18 Q.  (By Mr. Fitzgerald)  But putting aside whatever may have
19 happened in 2019 or '20, where we are, you'll agree with me
20 it's been more than two decades since California and Berkeley
21 ended their race-conscious admissions; and at least until a few
22 years ago, whatever happened in the last couple of years, they
23 went decades where their racial diversity failed to catch up,
24 correct?
25 A.  I think that's accurate.  As I say, I think they could have

1  done more, but that's accurate.

2  Q.  Thank you.

3      And let me ask you this question, Mr. Kahlenberg:  Would

4  you agree with me that -- and have you said this before, that

5  the pursuit of socioeconomic diversity could be expected to

6  lower the rankings of universities when the funds they use to

7  pay for such diversity are not available to be spent on other

8  things that lead to higher rankings?

9  A.  I -- yes, I think that's true if -- if we don't see a --

10  you know, a widespread adoption of -- of race-neutral

11  alternatives.  If an institution, in my view, kind of does the

12  right thing and tries to open its doors to more students of

13  humble backgrounds, that they could not do as well in the *U.S.*

14  *News & World Report* rankings, I think that's accurate.

15  Q.  And you'll agree with me that a change in *U.S. News & World*

16  *Report* rankings could affect the applicant pool, correct?

17  A.  It could.

18  Q.  People like to go to schools with better ranks, correct?

19  A.  Yes.  I mean, I think people also like diverse

20  environments, as we all know.  So I think that would be an

21  offsetting consideration as well.

22  Q.  Well, if the school became less diverse and its rank fell,

23  that would be a double negative, correct?

24  A.  I'm saying if they adopted socioeconomic preferences and

25  that meant it couldn't spend as much money on climbing walls

1 and other things that might be attractive to students, there

2 will be some students who might say, "This institution is open

3 to all.  I'd rather go there."

4 Q.  And if they spent less money on faculty or retaining

5 faculty, that would hurt the admissions, would it not?

6 A.  I mean, it could potentially reduce the rankings to the

7 extent that institutions are competing on prestige for *U.S.*

8 *News & World Report*.  And I think it's right to say that an

9 institution which -- which opens its doors to more students has

10 to make -- has to make choices, and if it's more important to

11 be higher on the *U.S. News & World Report* than it is to be open

12 to all students, that's a choice any university can make.

13 Q.  But you'll agree with me that the *U.S. News & World Report*

14 rankings can be affected?

15 A.  Can be -- I'm sorry?

16 Q.  Can be affected by a change in admissions policy if funds

17 are spent on socioeconomic diversity, correct?

18 A.  Yes.

19 Q.  Now, you talked earlier today about financial aid.  Are you

20 aware that the university is one of only two public

21 universities in the country that meets 100 percent of each

22 admitted student's need?

23 A.  So I know the Carolina Covenant program is well regarded.

24 I've written favorably about it.  I think it's a good program.

25 Q.  And are you aware that the Carolina Covenant program takes

1    care of 100 percent of the qualifying students' needs?

2    A.  Yes.

3    Q.  And you're aware that Carolina was the first public

4    university to engage in that kind of program?

5    A.  Well, I -- I remember when the UNC officials invited me to

6    speak at a panel in 2006.  I think this was around the time

7    when they were trying to get other universities involved, so it

8    wouldn't surprise me that they were one of the first.

9    Q.  And we could agree that you spoke very favorably about the

10   program, correct?

11   A.  I would say I was mixed.  So I spoke favorably about the

12   financial aid program.  I thought it was an important step.  I

13   was critical of UNC for not coupling the Carolina Covenant

14   financial aid with a meaningful boost in the admissions process

15   to low-income students.  You can have the best financial aid

16   program in the world, but if you're not letting people in the

17   door, then it doesn't do as much good as if you do both things.

18   That was my point at the time.

19   Q.  But you agree that you characterized it as a positive

20   effort to increase financial aid, correct?

21   A.  Yes.

22   Q.  And are you aware that the university has been ranked first

23   among public universities in *Kiplinger's Personal Finance*

24   magazine's ranking of best college values for 18 years?

25   A.  I didn't know that, no.

1  Q.  And are you aware that the university received the Jack

2  Cooke award in 2017, which is given to a selective college or

3  university with an excellent record of admitting, supporting,

4  and graduating outstanding low-income students?

5  A.  As I said, I think UNC does some good things.  Could do

6  more, though.

7  Q.  You mentioned that you thought that some of these options

8  were feasible.  I recognize where the burden of proof is, but

9  you mentioned it's feasible.

10     You'll agree with me that you have not done a quantitative

11  analysis of what the financial cost of increasing the

12  percentage of fee waiver, first-generation college, Carolina

13  Covenant admits would cost, correct?

14  A.  Right.  I was in the posture of hoping to have a chance to

15  examine the University of North Carolina's evidence on why it

16  couldn't afford more socioeconomic diversity, and so I would

17  have reacted to that.  But in the absence, I didn't do an

18  analysis, that's correct.

19  Q.  And you haven't done any detailed analysis of what parts of

20  the university's endowment are restricted, correct?

21  A.  I've examined some information about that, but I haven't --

22  I didn't write anything in my report about that.

23  Q.  Now, with regard to analysis, you'll agree with me that

24  you've not done a quantitative analysis particular to the state

25  of North Carolina about the overlap between those people who

1  are socioeconomically disadvantaged and those who are

2  underrepresented minorities, correct?

3  A.  So I would say -- I mean, certainly in conjunction with

4  Professor Arcidiacono, we looked at overlap between

5  socioeconomic status and race with respect to UNC's applicants

6  and student body.  There -- I believe we did some analysis of

7  the NCERDC data as well that's in the other reports.  I don't

8  recall all the particulars though.

9  Q.  And you did not do a quantitative analysis of how they

10 overlapped, correct?

11 A.  Well, I'm not sure what you mean by that.  I mean, I know

12 there's discussion in the report about the issue, broadly

13 speaking, in looking at NCERDC data and, you know, what

14 proportion of African Americans and Latinos are disadvantaged.

15 And, of course, the simulations are meant to get at that major

16 question, so I guess that's how I'd answer that question.

17 Q.  You're obviously aware of the C-STEP program that you

18 talked about this morning, correct?

19 A.  Yes.  I think it's a good program.

20 Q.  And with regard to community college transfers, you did not

21 do a simulation or other quantitative analysis testing how it

22 would work if the university tried to expand it to other

23 colleges, correct?

24 A.  Yes, that's correct.  Our simulations didn't assume

25 anything about -- about community college transfers.  We just

1  put that out there as another thing for -- another strategy

2  that UNC could consider, but we didn't do a quantitative

3  analysis.

4  Q.  And you testified this morning about legacy preference.  Do

5  you recall that testimony?

6  A.  Yes.

7  Q.  And you'll agree with me that limiting a legacy preference

8  is not a standalone race-neutral alternative, correct?

9  A.  I don't really see any of these efforts as completely

10 standalone.  So if you provide a socioeconomic preference and

11 then you don't provide financial aid, that's no good.  I mean,

12 you need to do both.  I think there are -- you know, addressing

13 legacy preferences would -- would have some impact on improving

14 racial diversity and certainly socioeconomic diversity, but by

15 itself -- I wouldn't advocate any of these things just by

16 themselves.

17 Q.  And are you aware that Professor Arcidiacono has testified

18 that the number of minorities admitted to the university is

19 minimally affected by legacy preference?

20 A.  I heard that testimony, yes.

21 Q.  And you brought up the topic of early admissions in your

22 testimony today.  Do you recall that?

23 A.  Yes.

24 Q.  And when you wrote your first report, do you recall

25 indicating your concern that early admissions has a bad

1  influence on the process because it required an applicant to

2  commit to a decision early in the process?  Do you recall that?

3  A.  So it's my understanding that UNC -- they have different

4  forms of early admissions.  I think I always use the term

5  "early admission" kind of generally.  There's early action and

6  there's early decision.  Early decision, you know, you need to

7  commit; and it's my understanding UNC doesn't have that

8  process.

9  Q.  That's my point.  Can we agree that it's an early action

10  program where a student can apply early and, if accepted, can

11  still choose to go somewhere else?  Correct?

12  A.  That's correct.  I mean, it still slants toward the wealthy

13  and well-connected and white students who -- who realize it's

14  an advantage to apply early, whereas other students who might

15  not have intensive counseling won't have that knowledge.  So I

16  would say early decision is worse than early action, but they

17  both imply inequities.

18  Q.  You indicated that some universities had abandoned early

19  admissions, correct?

20  A.  That's correct.

21  Q.  And in your early reports, you referenced Harvard as one of

22  the universities that had abandoned early admissions, correct?

23  A.  They experimented with that, yes.

24  Q.  Is it fair to say that Harvard, Princeton, and the

25  University of Virginia all abandoned early admissions in or

1  about 2006?

2  A.  Yes.

3  Q.  And then in about 2010, did Harvard, Princeton, and the

4  University of Virginia go back to early admissions because they

5  thought they were losing underrepresented minorities who

6  applied to other schools?

7  A.  Well, so I can't speak to UVA and Princeton, but I can

8  speak to Harvard because we had access to internal documents

9  through the *Harvard* case.  And it was clear they were primarily

10 concerned about losing, you know, highly sought-after students,

11 many of whom were not underrepresented minorities.  So -- so

12 with respect to Harvard, they may have said publicly that they

13 wanted to continue to attract underrepresented minorities, but

14 I don't think the evidence bears out that as being their

15 primary consideration.

16 Q.  But at a minimum, they were concerned that eliminating

17 early admissions decisions led them to get less highly

18 qualified applicants, correct?

19 A.  That's correct.

20 Q.  And then they abandoned that approach, correct?

21 A.  That's correct.  Although -- I mean, there are ways to do

22 this where you could -- you could continue an early program and

23 just not give preference to it.  What I talked about was

24 turning off the preference for early admissions.

25 Q.  And are you assuming, sir, that there is a preference for

1  early admissions when you give that testimony?

2  A.  Professor Arcidiacono, in his models, established that UNC

3  provides a preference for early admission.

4  Q.  And so your assumption is based upon what you saw in

5  Professor Arcidiacono's math, correct?

6  A.  That's correct.  That's what it's based on.

7          **MR. FITZGERALD:**  Nothing further, Your Honor.

8          **THE COURT:**  All right.  Yes, ma'am.

9          **MS. TORRES:**  Defendant Intervenors just have a few

10  quick questions for the witness.  If we may proceed.

11          **THE COURT:**  You may proceed, yes.

12                    **CROSS-EXAMINATION**

13  **BY MS. TORRES:**

14  Q.  Good afternoon, Mr. Kahlenberg.

15  A.  Good afternoon.

16  Q.  I'm going to ask if Aaron can bring up Slide 5 from your

17  direct testimony this morning.

18      And you recall testifying earlier today about how you

19  considered statewide demographics; is that right?

20  A.  In this, yes.

21  Q.  And specifically, you compared the demographics of students

22  who are first generation at UNC with statewide demographics of

23  adults who lacked a college degree; is that right?

24  A.  That's right.

25  Q.  Across the state of North Carolina, correct?

1  A.  That's correct.

2  Q.  And you agreed that there was a striking contrast between

3  these proportions, correct?

4  A.  I do.

5  Q.  And for you, the striking contrast was informative for

6  showing underrepresentation; is that right?

7  A.  That's correct.

8  Q.  I'm going to move to a different topic now briefly.  You

9  were retained in this case to examine how UNC could implement

10  workable alternatives to considering race to produce the

11  benefits of diversity; is that right?

12  A.  Educational benefits of diversity.  That's correct.

13  Q.  And you would agree that the benefits of diversity include

14  reducing isolation so that underrepresented minority students

15  do not feel like representatives for their race; is that right?

16  A.  I can agree with that.

17  Q.  And you reviewed various sources that you talked about to

18  formulate your conclusions, correct?

19  A.  That's correct.

20  Q.  And all the sources that you relied upon to formulate your

21  opinions are cited in the three reports that you wrote for this

22  case?

23  A.  So broadly speaking, yes.  I mean, because this is my area

24  of work, it's possible there is something stuck in the back of

25  my head, but anything I cited certainly would be part of what I

1  included.

2  Q.  And you took great care to make sure that your report was

3  accurate, correct?

4  A.  I tried to.

5  Q.  And as a researcher, you know that it's important to cite

6  your sources, correct?

7  A.  Yes.  No, I'm not being clear.  I thought you were asking

8  if -- if my -- kind of my -- the thinking in my report was

9  informed only by things that I've cited, and I'm saying, just

10 to be cautious, that it's possible that there are ideas in the,

11 you know -- that have assimilated into my mind over the last 25

12 years that -- where there wasn't -- you know, it would have

13 influenced my thinking.  But anything that had particular

14 evidence would, of course, be cited.

15 Q.  And just to clear things up, in arriving at your opinions

16 about workable alternatives, you never consulted with any UNC

17 students; is that right?

18 A.  That's -- that's correct.  I didn't think that was going to

19 be essential to my analysis.

20 Q.  And you did not review any written declarations by current

21 students at UNC, correct?

22 A.  So -- in preparing my reports, no.

23 Q.  And you didn't review any written declarations by alumni of

24 UNC discussing their educational experiences at UNC, correct?

25 A.  That's correct.

1  Q.  And you didn't consult any student surveys about the levels

2  of racial isolation felt by black and Latino or Native American

3  students and their comfort level in participating in class?

4  A.  No.  That's -- I remember there was a survey that I looked

5  at.

6  Q.  Did you directly review a student survey firsthand?

7  A.  I -- well, I don't know if it was a report on the survey or

8  the actual, you know, questions, but I definitely remember some

9  sort of a climate survey.

10 Q.  Did you cite it in the sources relied upon in your report?

11 A.  I don't know.

12        **MS. TORRES:**  No further questions.

13        **THE COURT:**  All right.  Thank you.

14     Any redirect?

15                    **REDIRECT EXAMINATION**

16 **BY MR. STRAWBRIDGE:**

17 Q.  Mr. Kahlenberg, do you remember Mr. Fitzgerald asking you

18 some questions about some errors that affected the calculations

19 in Simulation 5 placed in your report?

20 A.  I do.

21 Q.  Did you present any analysis based on Simulation 5 in your

22 testimony today?

23 A.  No.  It contained errors, so we -- I mean, I don't stand by

24 that one.  It had some errors.  When pointed out the errors, we

25 corrected them, and so I'm not relying on them.

1          MR. STRAWBRIDGE:  No further questions.

2          THE COURT:  All right.  You may step down, sir.  Thank

3   you.

4          THE WITNESS:  Thank you.

5          THE COURT:  Yes.

6      (The witness left the stand.)

7          THE COURT:  Further evidence for Plaintiffs?

8          MR. STRAWBRIDGE:  Your Honor, subject to the documents

9   I think the parties have already agreed to be admitted and any

10  need for us to recall or introduce rebuttal evidence, we rest

11  our case at this time.

12          THE COURT:  All right.  Are there any motions before

13  the Court?

14          MS. BRENNAN:  No, Your Honor.

15          THE COURT:  All right.

16          MS. BRENNAN:  Your Honor, if we may just have a moment

17  to resituate for a second.

18          THE COURT:  Yes.

19          MS. BRENNAN:  Thank you.

20      (Pause in the proceedings.)

21          THE COURT:  You may call your first witness.

22          MS. BRENNAN:  Thank you, Your Honor.  The UNC

23  Defendants call Stephen Farmer.

24          STEPHEN FARMER, DEFENDANT UNC WITNESS, SWORN

25                    DIRECT EXAMINATION

1  **BY MS. BRENNAN:**

2          **THE WITNESS:**  Your Honor, may I remove my mask?

3          **THE COURT:**  You may.

4          **THE WITNESS:**  Thank you.

5  Q.  Good afternoon, Mr. Farmer.

6  A.  Good afternoon.

7  Q.  Could you please introduce yourself to the Court and state

8  your current position at the university?

9  A.  I'm Stephen Farmer.  I'm the vice provost for enrollment

10 and undergraduate admissions.

11 Q.  I'd like to take you back a little bit and ask you about

12 your personal background.  Where did you grow up?

13 A.  I grew up near the village of Rustburg, Virginia, in the

14 country, about three miles outside of the village.

15 Q.  Could you describe your family background?

16 A.  My parents were one generation removed from the farm.  They

17 both grew up on family farms.  They both grew up in large

18 families.  My mother was one of 18 children.  My father was one

19 of seven.  They came off the farm, and they got jobs.  My dad

20 went to work as a machinist in a factory.  My mom went to work

21 as a clerk in the county office building.  And they raised my

22 sister and me in the little community where we were surrounded

23 by our relatives.

24 Q.  Where did you go to school for your precollege years?

25 A.  I went to the public schools of Campbell County, Virginia:

1  First Rustburg Elementary School, then J.J. Fray Elementary

2  School, then Rustburg Middle, and then Rustburg High.

3  Q.  Did you attend college?

4  A.  I did.

5  Q.  Where did you go to school?

6  A.  I went to Duke University.

7  Q.  Did you receive a degree?

8  A.  I did.  I received a bachelor's degree in English there.

9  Q.  Had other family members attended college?

10  A.  My sister, who is four years older than I, went to college

11  before me and is probably responsible for my going to college.

12  Q.  After you graduated from college, did you pursue any

13  graduate work?

14  A.  I did.  I went to graduate school at the University of

15  Virginia.

16  Q.  Did you receive a degree?

17  A.  I received a master's degree there in English also.

18  Q.  Do you recall what year that was?

19  A.  That was 1986.

20  Q.  And after you completed your master's degree, what -- did

21  you go to work?

22  A.  I worked on a Ph.D. for a while, and then I taught at Mary

23  Washington College, now Mary Washington -- or the University of

24  Mary Washington in Fredericksburg, Virginia.  Then I came back

25  to Virginia, and I taught for a little while, and then I went

1    to work in the office of admission there.

2    Q.   How many years did you teach before you started in

3    admissions at Virginia?

4    A.   Including teaching as a graduate student, I think maybe

5    seven, maybe eight years.

6    Q.   What year did you join the office of admissions -- of

7    undergraduate admissions at UVA?

8    A.   In 1994.

9    Q.   What was your position?

10   A.   I was the assistant dean of admission.

11   Q.   And what were your general responsibilities in that role?

12   A.   I recruited students.  I read applications.  I traveled to

13   recruit students across Virginia and across the country, and

14   for a while, I handled all the correspondence for the office.

15   After a while, I began to recruit honors students to the

16   university and began to do communications and operations

17   related work for the university.

18   Q.   How long did you hold that position?

19   A.   For six years.

20   Q.   What was your next position?

21   A.   I moved to Chapel Hill and became senior associate director

22   of undergraduate admission.

23   Q.   What brought you to Chapel Hill?

24   A.   The short answer is it was and is a wonderful university

25   and a public university.  The longer answer is that my wife and

1  I had two small children.  My wife was pastoring a church and

2  working 60 or 70 hours a week and wanted to take a break, and

3  the rule in my wife's line of work is that when the preacher

4  leaves the pulpit, the preacher leaves town.  And so, although

5  we loved Charlottesville, we had to leave, and we were just

6  lucky that we found the University of North Carolina.

7  Q.  Can you remind me what year it was that you came to UNC?

8  A.  That was in 2000.

9  Q.  What was your position?

10  A.  I was senior associate director of undergraduate admissions

11  for operations.

12  Q.  What were your responsibilities in that role?

13  A.  I handled all the administrative functions of the office,

14  all the back-office functions:  The processing of applications,

15  correspondence with students, information technology,

16  information systems, things like that.

17  Q.  At some point did your position in the admissions office at

18  the university change?

19  A.  It did.  Even while I held that job, my position began to

20  change, and I became more involved in the recruitment of

21  students and in the evaluation of candidates, and in the

22  general leadership of the office, and, by extension, in the

23  leadership of the university.

24  Q.  At some point did your title change?

25  A.  It did.  In 2004, I became assistant provost and director

1  of undergraduate admissions.

2  Q.  Did your responsibilities change when the title changed?

3  A.  Yes.  I became -- I became responsible for the whole of the

4  office, fundamentally responsible for our success, for our

5  strategy, for our relations with schools across North Carolina

6  and with others across the campus.

7  Q.  And has your title changed again since 2004?

8  A.  It has.

9  Q.  Can you describe that change?

10 A.  In 2011, I became vice provost for enrollment and

11 undergraduate admissions.  That's my current role.

12 Q.  And what are your primary responsibilities in that current

13 role?

14 A.  I continue to direct the Office of Undergraduate

15 Admissions, but I'm also responsible through the leaders of two

16 other offices for the success of the Office of Scholarships and

17 Student Aid and the Office of the University Registrar, and I'm

18 also involved as a member of the Chancellor's Cabinet and a

19 member of the Provost's Cabinet and broader questions of

20 leadership for the university.

21 Q.  How long will you continue to hold this position?

22 A.  Until December 31st of this year.

23 Q.  Have you accepted a new possession?

24 A.  I have.

25 Q.  What is that position?

1  A.  I'll be the first vice provost for enrollment at the

2  University of Virginia.

3  Q.  What led to that change?

4  A.  Well, it's hard to make this change because I love the

5  university and I love my colleagues and I love our students,

6  but Charlottesville is the place where my wife and I met and

7  were married.  It's the place where our children were born and

8  baptized.  Our children are grown now, and it seemed like a

9  good time to try something new.

10 Q.  I'd like to turn now and talk to you about your current

11 position at the university.

12         **MS BRENNAN:**  And, Aaron, if you could put up a

13 demonstrative, DX501.

14 Q.  (By Ms. Brennan)  Mr. Farmer, I'd like to ask you to look

15 at this.  Are you familiar with this document?

16 A.  I am.

17 Q.  What does it depict?

18 A.  This shows the -- in a high level the organization of

19 enrollment at the university, the people to whom I report, and

20 the people who report to me.

21 Q.  Can you please explain who you report up to?

22 A.  Yes, I report to Bob Blouin, the provost of the university.

23 Q.  And who does Blouin report to?

24 A.  Bob Blouin reports to Kevin Guskiewicz, who is the

25 chancellor of the university.

1    Q.   Who does the chancellor report to?

2    A.   The chancellor reports to the Board of Trustees of the

3    university.

4    Q.   And then could you talk about the boxes that are below you

5    on the chart, your -- the people who report up to you?

6    A.   From left to right, in the Office of Scholarships and

7    Student Aid, Rachel Feldman, who is associate provost for

8    scholarships and student aid, reports to me.  All the way to

9    the right, in the Office of the University Registrar, Lauren

10   DiGrazia, who is the university registrar, reports to me.  And

11   then in the Office of Undergraduate Admissions, there are a

12   number of associate directors who themselves have leadership

13   responsibilities through the office and across the university.

14   Q.   And then there's some functions listed in that box.  What

15   are those functions within the admissions office?

16   A.   We have a pretty broad mission in the Office of

17   Undergraduate Admissions.  So we're responsible for traditional

18   admissions functions, such as the evaluation of candidates, and

19   I think the box that's labeled "Readers" represents that

20   function.  We also recruit candidates.  We recruit applicants

21   to the university, and then we recruit students once they've

22   been admitted to the university, and that's in the recruiting

23   box.

24        But we also do other things.  So you see the C-STEP program

25   that's been mentioned here today represented here, and then you

1  see the Carolina College Advising Corps, which has also been

2  mentioned here today, represented in the box, and then you see

3  other functions, such as communications, relations with other

4  campus partners there.

5  Q.  I also want to ask you about the boxes that are to the top

6  right, and that reflects the Advisory Committee and Faculty

7  Council.

8      How does the admissions office relate to those entities?

9  A.  The university operates in a system of shared governance.

10 The administration of the university shares governance with the

11 faculty and with various faculty committees.  The Advisory

12 Committee on Undergraduate Admissions is a faculty committee

13 chartered under the code of faculty governance.  In effect,

14 it's a part of Faculty Council.  The members of that committee

15 are appointed by the chancellor.

16 Q.  We can put that exhibit aside.

17     In your capacity as the head of admissions, have you had

18 the opportunity to serve on committees at the university?

19 A.  I have.

20 Q.  Can you describe some of that committee service?

21 A.  I've served on committees that have had to do with the

22 success of students, the happiness, the well-being of students

23 at the university.  I've served on committees that have

24 involved fundraising for the university.  I've served, as I

25 mentioned, on the Chancellor's Cabinet and on the Provost's

1    Cabinet.  I serve currently on the Educational Benefits of

2    Diversity Working Group.  I am staffed to the Committee on

3    Race-Neutral Strategies and a number of other committees over

4    time.

5    Q.  To what extent does this committee service give you an

6    opportunity to interact with various people throughout the

7    university?

8    A.  Well, it gives me daily opportunities to interact with

9    people across the university:  Faculty members, fellow

10   administrators, deans of the university, others who are

11   involved in the financial affairs of the university and

12   fundraising for the university, and people who are involved in

13   the lives of students on behalf of the university.

14   Q.  In your role, do you also have the opportunity to interact

15   with students?

16   A.  I do.

17   Q.  Can you talk about that?

18   A.  Well, it's a blessing to be involved in the lives of

19   students, and I've done different things at different times at

20   the university.  I've taught a class at the university.  I have

21   regular conversations with representatives from student council

22   and other student organizations.  I stay in touch with a lot of

23   students we recruited to the university that keep me informed

24   about their lives.

25        Probably my main involvement, though, on a day-to-day

1  basis, especially in the pre-pandemic environment, was just in

2  the day-to-day workings of the Office of Undergraduate

3  Admissions.  We have a lot of students who volunteer their

4  time.  They give tours to prospective students.  They talk and

5  try to help prospective students and their families.  And we

6  have a lot of work-study students, students who are putting

7  themselves through school by working in the Office of

8  Undergraduate Admissions.  And, again, in a pre-pandemic

9  environment, I saw, I lived, and I worked with those students

10  every day.

11  Q.  Mr. Farmer, I'd like to turn now and ask you some questions

12  about the university and its mission.  We're going to take a

13  look at DX1.  You have a binder of exhibits if you need to

14  refer to them that way, but we are also going to be putting

15  them up on the screen if that would be easier.

16      Do you recognize this?

17  A.  I do.

18  Q.  What is it?

19  A.  This is the mission statement of the university.

20  Q.  And could you please read the highlighted portion of the

21  mission statement of the university?

22  A.  "Our mission is to serve as a center for research,

23  scholarship, and creativity and to teach a diverse community of

24  undergraduate, graduate, and professional students to become

25  the next generation of leaders."

1  Q.  I want to ask you some questions about this mission
2  statement, and I'm actually going to direct you to the language
3  that's above the highlighted portion where it talks about the
4  university being the nation's first public university.
5      What does it mean to the university's mission that it's the
6  first public university?
7  A.  I think it's hard for most people at the university to
8  think of the university without thinking of it as a public
9  institution that's responsible to the people and that's here to
10 serve the people of North Carolina.  Our being public is
11 integral to who we are.  It's how we think of ourselves, and we
12 make decisions based on our understanding of our
13 responsibilities as a public university.
14 Q.  And then the mission portion that you just read talked
15 about "to teach a diverse community of undergraduate, graduate,
16 and professional students to become the next generation of
17 leaders."
18     What is the importance to the university's mission of
19 teaching a diverse group of students?
20 A.  We believe strongly, based on our experience and based on
21 evidence, that if we're going to prepare the next generation of
22 leaders for our state and our country, we have to provide them
23 the experience of learning and living alongside people from
24 different backgrounds.
25 Q.  Has the university received any recognition for having top

1  academics?

2  A.  We have.

3  Q.  Can you describe that?

4  A.  Well, we've been perennially ranked among the top five

5  public universities by *U.S. News & World Report.*  We have

6  really high global rankings among all universities, public and

7  private, worldwide.

8  Q.  I want to ask you, then, about the competitiveness of

9  admissions at the university.  How selective is the university?

10  A.  It's hard to earn admission.  It's especially hard for

11  nonresident students, but it's also hard for North Carolinians.

12  In a typical year, we'll offer admission to 47 to 50 percent of

13  the North Carolinians who apply and maybe 12 to 14 percent of

14  the out-of-state students who apply.

15  Q.  Approximately how many applications do you receive?  And

16  I'd like to focus your answers on the time period of 2013 to

17  2017.

18  A.  I think in 2017, we received about 43,500 applications,

19  roughly.

20  Q.  And what is the size of the class?

21  A.  At the time it was about 4,200, I believe.

22  Q.  And you talked about a difference between in state and out

23  of state.  Can you describe how that works?

24  A.  Well, we have a limit on out-of-state enrollment, and the

25  limit is by policy of the Board of Governors of the university

1  system.  Enrollment in our first-year class is capped at

2  18 percent of the total.  So we have fewer spaces for

3  nonresident students with many more candidates from out of

4  state, though.  About two-thirds of our candidates in a typical

5  year come from beyond North Carolina and about a third from

6  within.

7  Q.  I'm going to ask you some questions about the university's

8  commitment to diversity.  That commitment has been described

9  here as a broad commitment to diversity.  Do you agree with

10  that?

11  A.  I do agree with that.

12  Q.  And can you describe what that means?

13  A.  We're interested in enrolling great students who will make

14  each other better, both because of the excellence of their

15  achievement and their potential and because of their

16  differences one from another.  We don't think of diversity as

17  limited by what we know.  We are willing to be surprised by the

18  differences that our students bring to us when they apply for

19  admission, and that's one of the reasons why it's important for

20  us to consider candidates one by one, as individual people,

21  each of them unique from everyone else.

22  Q.  What would you describe are the benefits of diversity and

23  having a broadly diverse class?

24  A.  Well, the university's enumerated certain benefits of

25  diversity.  We've codified them, if you will, and are assessing

1  ourselves against those specific benefits.

2     In general, the benefits are that students are able to

3  experience different perspectives that will challenge them to

4  think; that students will come up with more creative solutions

5  than they would have come up with otherwise; that students will

6  learn how to navigate in a complex and multicultural world so

7  that they'll know more and they'll be able to do more when they

8  leave us.

9  Q.  You mentioned that this has been memorialized.  I want to

10 look at some university documents, and we'll start with DX6.

11     Do you recognize this?

12 A.  I do.

13 Q.  What is it?

14 A.  This is the university's academic plan from 2003.

15 Q.  What is an academic plan?

16 A.  It's a statement of the university's goals and aspirations

17 where academics are concerned.

18 Q.  I'd like to look at page 17 of the PDF.  Do you see where

19 this says "Six overriding academic priorities will guide

20 Carolina over the next five years"?

21 A.  I do.

22 Q.  Can you please read what Priority D states?

23 A.  D says:  "Increase diversity among faculty, students, and

24 staff."

25 Q.  And then if we could look at page 28 of the document, do

1  you see -- is this a further explanation of that particular

2  priority?

3  A.  It is.

4  Q.  And if you could read what this states in the first

5  sentence.

6  A.  "Diversity is critical to the University's effectiveness in

7  fully preparing students for the world."

8  Q.  Do you agree that as of 2003, this was a priority for the

9  university?  Is that consistent with your experience?

10 A.  I do agree, and that's completely consistent with my

11 experience.

12 Q.  We can set that one aside, and I want to look at another

13 exhibit, DX7.

14     What is this document?

15 A.  This is the academic plan from 2011.

16 Q.  And if we can look at page 3 of the document briefly.  This

17 has "Academic Plan Steering Committee," and it looks like

18 you're listed.  Were you a member of this group?

19 A.  I was.

20 Q.  Let's look at page 46.  Did equity and inclusion remain a

21 theme in this document?

22 A.  It did.

23 Q.  Can you please read the highlighted portion?

24 A.  "Our approach to equity and inclusion on campus must

25 proceed from a moral conviction, a social commitment, and an

1  institutional educational priority that recognize how much

2  Carolina's learning environment is enhanced by students,

3  faculty, and staff from multiple backgrounds and ethnicities

4  interacting together."

5  Q.  And based on your own experience, was that a value and

6  commitment of the university in 2011?

7  A.  It was.

8  Q.  I'd like to now show you DX2 and see if you recognize this

9  document.

10  A.  I do.

11  Q.  And this states at the top:  "Resolution 2016-12.  On

12  Commitment to Diversity and Inclusion."  What is this?

13  A.  This is a resolution that Faculty Council unanimously

14  approved in 2016.

15  Q.  Were you at a meeting where this occurred?

16  A.  I was at this meeting.

17  Q.  Okay.  And this was in 2016?

18  A.  Yes, I believe it was.

19  Q.  How much support did this statement have among the faculty?

20  A.  Well, it passed unanimously.

21  Q.  And I want to take a quick look at the resolution.  If you

22  could look at -- is that paragraph 2?  Yep -- the highlighted

23  portion and read that into the record, please.

24  A.  "Therefore, the Faculty Council reaffirms its commitment to

25  the values of diversity and inclusion.  We recognize that

 1  student body diversity is a vital and necessary component of

 2  academic excellence, and we believe that we can achieve our

 3  educational, research, and service missions only by creating

 4  and sustaining a diverse and inclusive environment."

 5  Q.  Thank you.  Could you read the first three sentences of the

 6  second paragraph, please?

 7  A.  "We are committed to promoting the many educational

 8  benefits, generation of new ideas, and the innovations that

 9  flow from a diverse student body.  These benefits are a real

10  and meaningful part of our pedagogy.  It is our goal for our

11  students to experience these benefits inside and outside the

12  classroom as part of their educational experience by fostering

13  the best conditions possible to maximize these results."

14  Q.  And is this statement consistent with what you personally

15  observed in terms of the faculty's commitment to diversity?

16  A.  It is.

17  Q.  We can set that one aside, and I want to now turn to PX3.

18      Do you recognize this document?

19  A.  I do recognize it.

20  Q.  I'm sorry.  DX -- it's DX3, for the record.

21      What is this?

22  A.  This is a report that Provost Jim Dean submitted to

23  Chancellor Folt in 2017 about the educational benefits of

24  diversity and inclusion at the university.

25  Q.  Did you have any involvement in the preparation of this

1  document?

2  A.  I did.

3  Q.  Can you describe your involvement?

4  A.  I helped edit the final draft of it.

5  Q.  And what was the purpose of this document?

6  A.  This document was intended to draw together the work that

7  had been done over the years on the part of faculty and

8  administrators at the university and to incorporate in one

9  place the university's view of the educational benefits of

10  diversity that we're committed to providing to our students.

11  Q.  And let's go to page 5 of the PDF, please.  This section is

12  entitled "The Benefits of Diversity and Inclusion."  And if we

13  can scroll out from this, it looks like in this section there

14  is an attempt to put into categories some of the educational

15  benefits that the university is striving to achieve.

16      Is that your understanding?

17  A.  Yes, that's right.

18  Q.  Could you please go through those headings and describe

19  what those areas are?

20  A.  The first is "Promoting the robust exchange of ideas."

21  Q.  And then the second?

22  A.  The second is "Broadening and refining understanding."  The

23  third is "Fostering innovation and problem-solving."  The

24  fourth is "Preparing engaged and productive citizens and

25  leaders."  And the fifth is "Enhancing appreciation, respect,

1  and empathy."

2  Q.  So this document was 2016.  Are those benefits that the

3  university first realized in 2016?

4  A.  No.  Those are benefits that we had been talking about for

5  years.  This document was an attempt to incorporate and refine

6  the things that we've been discussing over a period of many

7  years in one place.

8  Q.  Have you had an opportunity to personally observe some of

9  these benefits?

10  A.  Yes, absolutely.

11  Q.  Can you provide an example?

12  A.  Just one?

13  Q.  Well, let's start with one.

14  A.  "Preparing engaged and productive citizens and leaders."

15  I -- for a variety of reasons, I have some close secondhand

16  experience with the ROTC battalions at the university, and I

17  know how committed the leadership of those battalions -- both

18  the officer and the NCO leadership of those battalions are to

19  fostering diversity within their battalions, and I also know

20  that they try very hard to ensure that their cadets are

21  interacting with one another in a way that will help those

22  cadets prepare for their lives as leaders of diverse platoons

23  or companies or battalions themselves eventually.

24  Q.  When we talk about the educational benefits of diversity,

25  has the university recognized that there are specific benefits

 1  for racial and ethnic diversity?

 2  A.  Yes.

 3  Q.  Can you talk about that?

 4  A.  The world that our students will join is a multiracial

 5  world, and multiracial understanding is really a part of all of

 6  the benefits that are enumerated here.  It's important that our

 7  students have the experience of learning and living alongside

 8  other students of other races and ethnicities because that's

 9  the world they will join, and it's also important that they

10  have that experience at the university because the

11  conversations they have will be richer and the discoveries that

12  they make will be better and the decisions that they make will

13  be better informed as a result of their experience with

14  students of other races and ethnicities.

15  Q.  I'd like to now change topics and ask you some questions

16  about the admissions process, and, again, I want to focus on

17  that 2013 to 2017 time frame to describe this.

18      We've heard a lot in this case so far about data and

19  statistics.  Is that how you think about applications to the

20  university?

21  A.  I think about candidates to the university.  I think about

22  students who are applying to the university.  You know, I --

23  and we think about people who are entrusting us to try to make

24  sense of them, to appreciate the best in them, to consider them

25  as fairly and as fully as we can, and then to make good

1  decisions about them.  And, yes, there are times when we use

2  data.  There are times when we pay attention to the whole, but

3  our daily work is work meeting students, trying to understand

4  them, and trying to treat them well and care for them one by

5  one by one.  So, yes, we think of data, but we think primarily

6  of people and primarily of young people.

7  Q.  What are you trying to achieve with the admitted class?

8  A.  Well, we want to enroll students who can contribute to the

9  excellence of the university, and we want to enroll students

10 who together will be better than any of them could be alone.

11 And the way that I put it to people often is that we're looking

12 for great students who will make each other better, and we're

13 looking for students who will form a community where people can

14 thrive and people can learn and people can trust that others

15 will see the best in them and want to work with them to help

16 them do together, again, what they can't do by themselves.

17 Q.  What is holistic review?

18 A.  Holistic review means that we try to make sense of whole

19 people.  We try to make sense of candidates as human beings.

20 We try to understand them as fully as we can given the limits

21 that we face.  You know, we're -- we're considering students

22 through the applications that they submit.  We don't get to

23 live with them.  You know, we don't get to teach them or coach

24 them or mentor them.  But within those limits, we try to

25 consider students carefully one by one, and, you know, we try

1  to care for students really one by one.

2      I mean, holistic admission really means that we focus on

3  the best in young people, that we try to see the best in them,

4  that we try make sense of them, where they come from, what they

5  care about, what they're good at, what they've struggled at,

6  what they can get better at, what difference they'll make in

7  the lives of the people around them and in the lives of other

8  people who are going to depend on them forever.

9      So holistic admission, I know that sounds probably pretty

10 expansive, but it really involves our considering students

11 comprehensively, rigorously, sympathetically, individually, one

12 by one by one on the basis of everything that we know about

13 them, not one or two facts that we know about them, but

14 everything that we know about them.

15 Q.  Can you describe the role of the admissions office in

16 furthering the university's mission as it relates to the

17 educational benefits of diversity?

18 A.  I think it starts with caring for young people and

19 encouraging them.  You know, the -- the university -- we have

20 students who come to us from all walks of life; and if we don't

21 treat them well, if we don't respect them, if we don't thank

22 them for applying, if we don't honor their trust in us when

23 they take a chance and apply for admission, if we don't do

24 those things, if we don't care for people in the moment, they

25 won't join us; and they shouldn't.

1    So we start by trying to care for young people as soon as
2  we meet them and encourage them to think about the university.
3  We encounter many students who have never thought about coming
4  to Chapel Hill.  We talk with many students who have never
5  thought about going to college.  And, again, our job is to try
6  to see the best in them and try to care for them and encourage
7  them and to demonstrate to them the university might be worth
8  their time.

9    So we advance the educational benefits of diversity, first
10 of all, by caring for people and in the act of caring to try to
11 encourage people to think about joining us, the broadest pool
12 of candidates we can find.  If students don't apply, we can't
13 admit them, and so we have to care for them and encourage them
14 to think about coming and joining us.

15   Once they apply, we try to consider them, as I said, one by
16 one, and we try to imagine the difference that they'll make in
17 the lives of others and in the life of the university, and we
18 try to imagine the capacity to which they would benefit from
19 being a part of our community.  And it's putting together that
20 jigsaw puzzle of students who come from different places, who
21 have different ideas, who have different backgrounds, who
22 travel different paths.  It's putting together that complex
23 human community that helps the university advance and achieve
24 the educational benefits that we're trying to provide to our
25 students.

1  Q.  Have you received any guidance from the faculty advisory

2  committee on how to approach the admissions process?

3  A.  We have.

4  Q.  And I would like to look at DX9.  What is this document?

5  A.  This is the faculty advisory committee's statement on the

6  evaluation of candidates for admission.

7  Q.  And if we could look at the first paragraph of that, could

8  you please read that into the record?

9  A.  "In evaluating candidates for undergraduate admission, the

10  University of North Carolina at Chapel Hill seeks to shape the

11  entering class so that its collective strengths will foster

12  excellence within the University community; enhance the

13  education of everyone within it; provide for the leadership of

14  the educational, governmental, scientific, business,

15  humanistic, artistic, and professional institutions of the

16  state, nation, and world; and enrich the lives of all the

17  people of North Carolina."

18  Q.  Does the admissions office follow that guidance?

19  A.  We do.

20  Q.  And I want to look at paragraph 3, please.  That's actually

21  the middle paragraph here.  Could you please read that

22  highlighted portion?

23  A.  "The qualities we seek in each class are those that foster

24  such a community, including intellect, talent, curiosity, and

25  creativity; leadership, kindness, and courage; honesty,

1  perseverance, perspective, and diversity.  Although we expect

2  each successful candidate to demonstrate strength in many of

3  these areas, we do not expect every candidate to be equally

4  strong in all of them.  Just as there is no formula for

5  admission, there is no list of qualities or characteristics

6  that every applicant must present."

7  Q.  Is that how it works in practice?

8  A.  That is how it works in practice.

9  Q.  And I wanted to look at the first sentence of the following

10 paragraph where it says "In shaping the class...."  It uses

11 some language that sounds very similar to what you've said,

12 which is that "...we evaluate individual candidates rigorously,

13 holistically, and sympathetically."

14      Can you describe what you mean when you say you look at

15 people sympathetically?

16 A.  You know, students do a lot of work when they apply to

17 Chapel Hill, and they do a lot of work just to get to the point

18 of applying.  They have other responsibilities.  They have

19 other cares.  They have other things to do.  They have people

20 who depend on them.

21      We don't take for granted when someone takes the time and

22 goes to the trouble to apply for admission at UNC, and we think

23 that when a student does that, the student deserves to be

24 treated with care and the student deserves to be treated

25 sympathetically.  I guess here by sympathetically we mean we

1  want to understand people, we want to see the best in them, we

2  want to give them the benefit of the doubt.

3  Q.  Now I want to point to the last sentence there, and it

4  talks about that "...we understand the context within which

5  achievements have been realized and potential forged."

6      What do you mean by that?

7  A.  You know, no student lives in the air.  No student lives in

8  the abstract.  Students are real people.  They come from real

9  families.  They live in real neighborhoods.  They go to real

10  schools that are in real communities.  We don't feel as though

11  we can understand any student fully unless we try to understand

12  as fully as we can the context within which the student has

13  lived and done his or her work because, again, students

14  aren't -- they're not interchangeable parts.  They're not

15  numbers to us.  They're people, and people have lives.

16  Q.  Would you be able to do what's being described in DX9 if

17  the only thing you knew about a candidate was their GPA and

18  their SAT score?

19  A.  No.

20  Q.  Okay.  I want to now turn away from that document and talk

21  about the stages of review at a high level, and I'm just going

22  to state that we will be hearing later from one of your

23  associate directors who is going to go through the evaluation

24  process in more detail.  So I'm just asking really to orient

25  the Court, and I think we've prepared a demonstrative for this,

1 DX503, about the stages of review in the application process.

2     Are you familiar with this?

3 A.  I am.

4 Q.  And could you just at a high level walk the Court through

5 these stages of review?

6 A.  Before we get to these stages of review, there are a lot of

7 people who work really hard to put all the credentials

8 together, and I just have to say that because we have a lot of

9 people in the admissions office who are demonstrating care for

10 students just by making sure that their credentials don't go

11 astray.  So all that happens before we get to the person who is

12 labeled Tier 1.

13     Once files are complete, they are distributed randomly to

14 readers.  In a typical year, we have about 40 people reading

15 applications, and most of those students -- most of those

16 readers are assigned to do first reads on files.  When the

17 first reader reads a file, the first reader makes some notes.

18 The first reader applies some ratings, as other people have

19 discussed here today.  The first reader writes a comment that

20 tries to summarize what the reader has said, and the first

21 reader recommends a decision, and then the first reader passes

22 the folder along.

23     That can happen in a couple of different ways.  If the

24 candidate is an out-of-state candidate who the first reader is

25 recommending for admission, the candidate -- the folder goes to

1    a second read -- the file goes to a second reader.  If there's

2    a candidate about whom the first reader is not sure, the file

3    can go for a second read.  If the reader in question is a new

4    reader who is just learning how to do her job or his job, the

5    filed goes for a second read.  But in other cases, the file

6    could go straight through as a provisional decision, straight

7    through to the school group review section that you see on the

8    screen.

9    Q.  Can you talk about if it were to go to the second read,

10   what happens at that level?

11   A.  The second reader's job is to read what the first reader

12   wrote and to see whether the decision makes sense given the

13   whole of the file, to do a comprehensive evaluation of the

14   file, and then either agree or disagree with the first reader's

15   conclusion.

16   Q.  And then at some point do these files all end up at the

17   school group review?

18   A.  They do.

19   Q.  What happens at that stage?

20   A.  At the end of each cycle -- and we have two deadlines for

21   candidates.  We have an early-action deadline in October, and

22   we have a regular decision deadline in January.  At the end of

23   each of those two cycles, all of these provisional decisions

24   that have been made over a period of several months by 40

25   different readers, they get collected and they get arranged in

1  schools.

2      And so the school group review process involves a senior

3  member of the team, a second reader, a Tier 2 reader, going

4  through and looking at all of the decisions that have been made

5  within each school that sent us candidates.

6  Q.  Do the readers at school group review review files in any

7  different way than they're reviewed at the earlier stages?

8  A.  Their charge is to provide the same comprehensive and

9  holistic, rigorous, sympathetic, individualized review to any

10 file that they evaluate that they would have if they had been a

11 first or a second reader.  School group review is an extension

12 of comprehensive and holistic review.

13 Q.  What are the purposes of school group review?

14 A.  There are a couple.  We have a lot of different people

15 reading applications over a long period of time.  They're

16 working really hard.  They're doing the best they can, but

17 they're learning as they go along.  They're entering

18 information in the file.

19     And so one purpose of school group review is quality

20 control.  It's to make sure someone hasn't entered a rank in

21 class incorrectly or a GPA incorrectly.  Because the decisions

22 are arranged within the roster of a school, the second

23 reader -- excuse me, a school group reviewer can see if there

24 are anomalous decisions or decisions that look anomalous within

25 the school group.

1    So, for example, if we have 20 candidates from a school --
2    from a North Carolina school and we've offered admission to
3    candidates who are Nos. 2 through 12 and we haven't offered
4    admission to the candidate No. 1, it's important for us to take
5    a look at candidate No. 1.  There might be a really good reason
6    why we're not offering admission to candidate No. 1, but we
7    want to make sure.  We want to make sure that before the
8    decisions go out the door that we can defend them to counselors
9    in schools.  We want to make sure that we could defend them to
10   families when they call.  We want to make sure that we got
11   things right.  So making sure that we got things right is one
12   purpose of school group review.
13       The other purpose of school group review is to make sure
14   that we don't overadmit our class.  Because what happens over
15   the course of three or four months of reading, as people are
16   making provisional decisions, we inevitably end up with more
17   people we want than we have spaces, and so school group
18   reviewers have to go through and they have to make difficult
19   decisions within schools about candidates to move in one
20   direction or the other.  Sometimes candidates are admitted
21   from -- or moved from a provisional admit offer to a waitlist
22   offer or a denial offer.  Sometimes students are moved from a
23   provisional deny offer to a waitlist offer or admit offer.  So
24   there are files going in every direction as we're trying to get
25   to the right number of admissions for the cycle.

1  Q.  And you said that you were trained to get to the right

2  number of admissions as it relates to in state and out of

3  state.

4  A.  That's correct, yes.

5  Q.  Do you use any other numerical targets for any other

6  categories as part of that process in the school group review?

7  A.  No, we do not.

8  Q.  And is that true at all stages of the process?

9  A.  That is true at all stages of the process.

10 Q.  And then it looks like the next step after school group

11 review is that decisions are released.  What are the potential

12 options there?

13 A.  A student could be offered admission, a student could be

14 offered a place on the waiting list, or a student could be

15 declined.

16 Q.  And I see an option coming from the waitlist or from denial

17 that there is an appeal.  What is the appeal process?

18 A.  Students may appeal a negative admissions decision, and

19 that's anything less than an admission.  They may appeal a

20 negative admissions decision first to me, and then if I decline

21 the appeal, they may appeal to the provost of the university.

22 Q.  Let me talk to you now -- we can put this exhibit aside --

23 about the evaluation of candidates as it occurs during this

24 process.  I want to ask is there guidance that's provided to

25 readers about evaluation of candidates?

1  A.  Yes.

2  Q.  And let's look at DX10.  Do you recognize this?

3  A.  I do.  This is the reading document that we use to help

4  train readers.

5  Q.  And I think we've seen a prior version of this document.

6  Can you describe the difference between the document that was

7  used, I believe, with Dr. Kretchmar and this document?

8  A.  We've had a version of this document I think since about

9  2006 or 2007, and it's been updated, revised periodically ever

10 since.

11 Q.  And for the one that we have up on the screen now, DX10,

12 what year does this reflect?

13 A.  2016-2017.

14 Q.  And if we can look at page 5 of this document where it

15 talks about the evaluation process, could you please look at

16 the first paragraph and read the first two sentences?

17 A.  "In keeping with principles established by the Advisory

18 Committee, the Office of Undergraduate Admissions assigns no

19 fixed weights or points to any specific parts of the

20 application for admission, and it uses no formula to assess the

21 students who have applied.  With the exception of the

22 18 percent limit on out-of-state enrollment in the first-year

23 class, there are no quotas of any kind."

24 Q.  Is that an accurate statement?

25 A.  That's an accurate statement.

1  Q.  And then I want to look at page 6 of the document, please.

2  And if you could read what it states here with the highlighted

3  language in the middle of the paragraph.

4  A.  "In keeping with policies and procedures established by the

5  Advisory Committee, they," meaning readers, "are also

6  explicitly and repeatedly encouraged to base their

7  recommendations on everything they know about candidates rather

8  than on one or two criteria."

9  Q.  Is that what readers are asked to do in practice?

10  A.  That is.

11  Q.  Then I want to look at -- a little further down the page

12  there's a heading that says "Criteria for Admission."  Could

13  you please read the first paragraph?

14  A.  "The goal of each evaluation is to understand the candidate

15  individually, comprehensively, and holistically.  Accordingly,

16  the relative weight or credit assigned to any individual

17  criterion may vary from candidate to candidate.  Candidates for

18  admissions are evaluated on everything the admissions process

19  reveals about them and not on the basis of formulas or preset

20  scoring requirements.  Because individual students differ

21  widely from one another, it is difficult, if not impossible, to

22  list every criterion that might be used over the course of an

23  admissions season in which more than 35,000 candidates are

24  evaluated."

25  Q.  Is that also how it works in practice?

1  A.   That is.

2  Q.   Then I want to look at the next sentence below there that

3  starts with "typically."  What does that sentence state?

4  A.   "Typically, however, more than forty criteria, grouped

5  roughly into eight categories, are used at every stage in the

6  admissions process."

7  Q.   What does it mean that more than 40 criteria are used at

8  every stage?

9  A.   It means that readers should consider everything they know

10  about candidates at every stage in the admissions process,

11  including everything that they know about students across these

12  40 rough criteria.

13  Q.   And then if you look below that, it groups those 40

14  criteria into several headings.  It looks like there are eight

15  of them.

16     Could you just list the eight categories of criteria that

17  are considered?

18  A.   Academic program criteria, academic performance criteria,

19  standardized testing criteria, extracurricular activity

20  criteria, special talent criteria, essay criteria, background

21  criteria, and personal criteria.

22  Q.   I want to ask you now about the consideration of race in

23  the admissions process.

24        **MS. BRENNAN:**  Your Honor, this section is going to go

25  a little bit longer than probably about five or ten minutes, so

1    I would defer to you if you want us to go ahead and get started

2    or you would like to go ahead and take the afternoon break.

3            **THE COURT:**  Why don't we take a 15-minute recess, and

4    we will resume at 3:20.

5            **MS. BRENNAN:**  Thank you.

6        (An afternoon recess was taken from 3:05 p.m. until

7    3:20 p.m.; all parties present.)

8            **THE COURT:**  You may proceed.

9            **MS. BRENNAN:**  Thank you, Your Honor.

10   Q.   (By Ms. Brennan)  Mr. Farmer, when we broke, I was about to

11   ask you some questions about the consideration of race in the

12   admissions process.

13       Is there any guidance in the reading document for readers

14   about how race is considered?

15   A.   There is.

16   Q.   I'd like to look at DX10 that we were looking at

17   previously, at page 7, and this is a section of the reading

18   document entitled "Race, Ethnicity, and National Origin."

19       Could you please read the first paragraph?

20   A.   "While race, ethnicity, or national origin may be used at

21   any stage in the admissions process, it is never used as

22   anything other than one part of the comprehensive, holistic,

23   and individualized review afforded to each candidate.  At no

24   point in the process are candidates of different racial or

25   ethnic backgrounds reviewed in separate groups.  Nor does the

1  University have explicit or implicit quotas for any particular

2  racial group or ethnic group, or for underrepresented students

3  as a whole, or for students of color as a whole."

4  Q.  Is that all accurate in terms of the way that it works in

5  practice?

6  A.  Yes, that's accurate.

7  Q.  And I want to ask you about specifically when it talks

8  about "may be used at any stage."  What does that mean?

9  A.  We want to treat students as whole people at every point

10  along the way when we're evaluating them; and so everything

11  that we know about them, including if they choose to disclose

12  their race or ethnicity, may be used at every point along the

13  way in the decisions that we make about individual people.

14  Q.  Is it fair to say that that's not something unique about

15  race in terms of it being able to be considered at every stage?

16  A.  It's true about everything that we consider about

17  candidates or everything that we know about them.

18  Q.  Now I want to look at the first sentence of the next

19  paragraph.  Could you please read that into the record?

20  A.  "Within this flexible and non-numbers-based consideration

21  of race, and in support of the cultivation of diversity broadly

22  construed, the University also aims to enroll critical masses

23  of students who identify themselves as members of groups the

24  University deems underrepresented."

25  Q.  Is that an accurate statement?

1   A.   That is an accurate statement.

2   Q.   What does it mean that the university aims to enroll

3   critical masses of students who identify themselves as

4   underrepresented?

5   A.   Critical mass is a complicated idea, a complex idea.  It's

6   really about the experience of students in our community, and

7   it's about their ability to contribute fully to the experience

8   of others and also benefit fully from the experience that we

9   offer.

10  Q.   How does that relate to the university's desire to provide

11  educational benefits?

12  A.   It's integrally connected to our desire to provide crucial

13  educational benefits of diversity to our students.  Our

14  students have to feel free to be themselves.  They -- they have

15  to feel as though they can be the unique individuals they are.

16  To the extent that people think of them as spokespeople for

17  their race or to the extent that people stereotype them on the

18  basis of their race, it limits their ability to contribute

19  fully to the experience of others, and it also limits their

20  ability to benefit from the education that we're trying to

21  provide.

22  Q.   That sentence also refers to groups the university deems

23  underrepresented, and then the paragraph goes on to define what

24  that is.

25       Which groups are considered unrepresented --

1  underrepresented?

2  A.  American Indian students; Hispanic, Latino, Latina

3  students; black or African American students.

4       **MS BRENNAN:**  And could we just show the next portion

5  of that paragraph?

6  Q.  (By Ms. Brennan)  And does this portion of the reading

7  document set forth how that definition came into place?

8  A.  It does.

9  Q.  I want to now look at page 8 in the third paragraph and

10 have you read this paragraph into the record, please.

11 A.  "Consistent with the Supreme Court's decision in *Grutter*,

12 the race or ethnicity of any student may -- or may not --

13 receive a 'plus' in the evaluation process depending on the

14 individual circumstances revealed in the student's application.

15 And, while a 'plus' that is awarded may be significant in an

16 individual case and tip the balance towards the admission of

17 the student, it is not automatically awarded, and not

18 considered in terms of numeric points or as the defining

19 feature of an application.  Even if awarded, a 'plus' does not

20 automatically result in an offer of admission.  In alignment

21 with the direction provided by the Supreme Court, including

22 most recently in its decisions in *Fisher I* and *Fisher II*, the

23 race and ethnicity of any applicant is always viewed in the

24 context of everything else that the admissions committee knows

25 about a candidate and in light of the range of contributions

1  the candidate might make to the University community."

2  Q.  Are the statements in that paragraph related to how the

3  admissions process works accurate in practice?

4  A.  They are accurate.

5  Q.  And to what extent has the university attempted to ensure

6  that its admissions program is compliant with legal standards?

7  A.  Well, we seek the advice of counsel all the time, and we

8  have for many, many years.  We have actively sought to align

9  our practices precisely with the guidance that we've received

10 as the law has been revealed to us in these decisions.

11 Q.  I want to ask you about what information evaluators have

12 when they're reviewing applications about race.  How do

13 evaluators know a student's race, typically?

14 A.  They know a student's race if the student reveals the

15 student's race to us, and they don't know the student's race if

16 the student does not reveal the student's race to us.  And the

17 student reveals if he chooses to or she chooses to -- the

18 student reveals race through The Common Application that the

19 student submits to us.

20 Q.  Just to be clear, does the university require information

21 about race and ethnicity?

22 A.  No, we don't.

23 Q.  Do evaluators have information during their review of

24 applications about how many students have been provisionally

25 admitted based on race or ethnicity?

1  A.  No, they do not.

2  Q.  They do not now, but I want to ask during that -- that time

3  frame that we're talking about, was that information available

4  to anyone?

5  A.  There was a period of time before 2015 when aggregate

6  information was available to some people in the office.

7  Q.  Has that changed?

8  A.  It has changed.  In 2015, we eliminated any reference to

9  the number of students admitted with numbers disaggregated by

10 race from the reports that we've produced.

11 Q.  After 2015, what information do readers of applications

12 have available to them about the numbers of provisionally

13 admitted students about race or ethnicity?

14 A.  They have information about the number of students who have

15 applied.  They don't have any information about the number of

16 students who have been admitted.  They don't have any

17 information about the number of admitted students who have said

18 that they intend to enroll.

19 Q.  Are there times when someone in the admissions office needs

20 to look at the numbers of provisional admits for any reason?

21 A.  Yes, there are.

22 Q.  And what happens when that occurs?

23 A.  If a reader or someone who is involved in the reading

24 process has a reason to learn how many students have been

25 admitted with the numbers disaggregated by race, then that

 1  person has to recuse himself or herself from reading from that
 2  point forward.
 3  Q.   And why was that implemented?
 4  A.   It was implemented because -- although readers had never
 5  made decisions in light of information that they knew about the
 6  aggregate numbers of students who had been admitted
 7  disaggregated by race, to be on the safe side, we implemented
 8  that recusal to make sure that there could be no confusion and
 9  there could be no misinterpretation of our practices.
10  Q.   And even during the time when some may have had access to
11  that type of information, did they ever use it to adjust
12  individual decisions based on what they knew about the
13  provisional numbers?
14  A.   No.
15  Q.   How can you say that with confidence?
16  A.   Because we talked about the importance of paying attention
17  to individual students, first of all, and extending the same
18  individualized and comprehensive review that we extend to
19  students at the beginning through to the very end of the
20  process.  We train people well.  We check behind them to make
21  sure that they were following our guidelines.  And also,
22  honestly, I've never heard that mentioned in the admissions
23  office.  I've never heard anyone give an instruction; I've
24  never heard conversation about that.  That simply wasn't what
25  we did.

1  Q.  I'm going to ask some follow-up questions about the

2  consideration of race.

3      Are there applicants of all races who are rejected?

4  A.  There are.

5  Q.  Are there applicants who get in no matter what their race

6  or ethnicity is?

7  A.  Yes, of course.

8  Q.  Are there candidates of different racial or ethnic

9  backgrounds who are ever assigned automatic points based on

10  that racial or ethnic background?

11  A.  No.

12  Q.  Do you ever negatively evaluate applicants on the basis of

13  their self-disclosed race or ethnicity?

14  A.  No, we do not.

15  Q.  Do you ever negatively evaluate applicants because they

16  choose not to share information about their race or ethnicity?

17  A.  No, we do not.

18  Q.  Are there ever any particular different standards or

19  thresholds based on race in the admissions process?

20  A.  No, there are not.

21  Q.  When the document talks about race being a potential plus,

22  is that something that can apply to students other than

23  underrepresented minority students?

24  A.  Yes, it can.

25  Q.  Can you give an example of how that might happen?

1    A.   I can give a complicated example.  So -- this is an actual

2    example.  A student from Vietnam, who identified herself as

3    Montagnard -- Asian and Montagnard, applied for admission.  The

4    student and her family had moved across the world, had settled

5    in a part of North Carolina I'm sure they'd never heard of

6    before, and the student thrived in her environment despite the

7    difficult circumstances, and the whole of her background was

8    appealing to us when we evaluated her applications -- her

9    application.

10        I think that story reveals sometimes how hard it is to

11   separate race out from other things that we know about a

12   student.  That was integral to that student's story.  It was

13   part of our understanding of her, and it played a role in our

14   deciding to admit her.

15   Q.   Does the attempt to understand individual circumstances

16   apply equally to applicants of all races?

17   A.   It does.

18   Q.   Overall -- to what extent do you take into account the

19   overall contribution that each individual would make to the

20   student body?

21   A.   We strive to give every student an equal chance to

22   demonstrate their capacity to make other people better, you

23   know, better not just through what they've already achieved,

24   but better because of the distance they've traveled or the

25   distance that they will travel.  And we try hard to extend that

1 same level of care and that same level of consideration to
2 every candidate who applies, no matter what the student's
3 numbers are, no matter what the student's immediate credentials
4 are.
5 Q.   There's been a claim in this case of an implicit formula as
6 it relates to race.  What is your response to that?
7 A.   That there is no formula.  We don't think formulaically
8 about complicated people, and every person who comes to us is
9 complicated.  We don't think that students are a little bit of
10 this and a little bit of that.  We don't disaggregate them into
11 parts and assign coefficients to them and then try to put them
12 back together, because at the end of it we have to talk to the
13 people we admit.  We have to talk to the people we disappoint.
14 We feel that we owe them -- that we have a duty to them to
15 consider them as whole, complicated people, and not just
16 subject them to some formula, implicit or explicit, that
17 doesn't do justice to their achievements and their potential
18 and to their uniqueness.
19      So that's a long way of saying I don't know what this
20 formula is.  We've never talked of formulas.  I don't think our
21 readers -- I don't think 40 people have an implicit formula.  I
22 suppose there's a way of discovering a formula for anything
23 that a group does, but we don't consider students formulaically
24 because we know they're people.
25 Q.   There's also been a claim in the case that the university's

 1  admissions office has been overrating race.  What is your

 2  response to that?

 3  A.  You know, I -- that's not true.  You know, I heard the

 4  comments about some mythical automatic bump that some students

 5  get by virtue of their race.  That's not the way it works.

 6  There's no automatic advantage for anybody based on their race.

 7  Q.  I want to turn now and ask you some questions about a

 8  slightly different topic.  That's socioeconomic diversity.

 9      Are there instructions in the reading document related to

10  that?

11  A.  There are.

12  Q.  Let's look at DX10, page 8, and this talks about

13  socioeconomic status.  Could you had read this paragraph into

14  the record, please?

15  A.  "The University works strongly to attract and retain

16  disadvantaged students regardless of race.  This is a critical

17  component of the institution's obligation to the state of

18  North Carolina and indeed to the nation.  As part of its broad

19  effort to foster diversity within the scholarly community on

20  campus, the University's admissions process takes into account

21  the socioeconomic status of each candidate, with an eye towards

22  increasing the number of disadvantaged students who are

23  admitted and eventually enroll.  As with other criteria

24  considered by the admissions committee, relative disadvantage

25  is assessed in ways that are both flexible and

1  individualized -- a continuum of consideration rather than a

2  simple on-off switch.  Assessment of disadvantage must also in

3  turn inform the University's interpretation of the candidate's

4  scores on standardized tests and other academic indicators."

5  Q.  Is this an accurate statement about the university's

6  consideration of socioeconomic status?

7  A.  It is.

8  Q.  How do readers take socioeconomic status into account?

9  A.  Well, as this paragraph suggests, they take it into account

10 flexibly and in light of everything else that they know about

11 the candidate because not every student who is

12 socioeconomically disadvantaged is the same student, and we

13 feel that we owe students individualized consideration one by

14 one by one.

15       Having said that, the university is trying to and has been

16 trying to increase its enrollment of low-income students,

17 especially low-income North Carolinians, and increase its

18 enrollment of first-generation college students, especially

19 first-generation college North Carolinians.  We've had some

20 success in those areas through recruitment, both of applicants

21 and of admitted students, and we've also had some success by

22 including statements like these in our reading documents and

23 training readers in how to consider socioeconomic status

24 appropriately and flexibly in the process.

25 Q.  What information in the application speaks to socioeconomic

1   status?

2   A.  Well, there are a few things that are -- pretty clearly

3   speak to it:  You know, whether a student qualified for a

4   waiver of the application fee; whether a student indicated --

5   and the student may indicate this -- whether the student

6   indicated that the student qualified for free or reduced-price

7   lunch; whether the parents are employed; if they're employed,

8   how they're employed; how much education the parents have;

9   where the students live; what high schools they attend; what

10  students say about themselves; often what they're involved in

11  outside the classroom, for example, working a job to put food

12  on the table for younger siblings.  So we have a variety of

13  information.  It differs from one candidate to another.

14  Q.  Is the university considered need blind?

15  A.  We are.

16  Q.  What does that mean?

17  A.  Need blind means that we will never hold against a student

18  the student's inability to pay the full cost of her

19  education/his education at Chapel Hill.  That's what need blind

20  means.  Need blind does not mean that we're blind to the

21  circumstances of students, that we're blind to the obstacles

22  that they've overcome or the disadvantages that they've

23  experienced.

24  Q.  Do readers have access to all of the information that the

25  financial aid office might get about an applicant?

1  A.  No, readers don't.

2  Q.  Why not?

3  A.  Well, there are a couple of reasons.  One is that we've

4  been concerned over time that candidates for admission, and

5  especially low-income candidates for admission, might be

6  worried that if the admissions office had access to the

7  financial information, they might -- despite our telling them

8  over and over again that we will never hold against them their

9  inability to pay, they might worry that we were really looking

10 for students who could afford to pay.  There's been a lot of

11 conversation over the years in higher education through the

12 College Board, through other resources of, you know, students

13 being worried that colleges and universities might actually

14 penalize them for being poor.  And so we intend the separation

15 between admissions and financial aid to reassure students that

16 they don't have to worry about that with us.

17 Q.  I believe you heard Mr. Kahlenberg's testimony.

18 A.  I did.

19 Q.  Did you hear his suggestion that the university should ask

20 for wealth data from students on applications?

21 A.  I did.

22 Q.  What was your response to that?

23 A.  I think what he said was an oversimplification of a very,

24 very complicated set of circumstances.  You know, we're

25 concerned already that students are doing so much to apply for

1  admission.  We're concerned that the burden of applying falls

2  disproportionately on low-income students.  We don't want to

3  ask students to do more in order to apply.

4      There's a lot of talk at the federal level about

5  simplifying the FAFSA to provide actually less information to

6  colleges and universities as a way of simplifying the process

7  of applying for aid for low-income students.

8      We ourselves at UNC-Chapel Hill, although we required the

9  CSS Profile, a more complicated form for new students, we don't

10  require it anymore for students when they're renewing financial

11  aid because we realize that the profile can be a burden and a

12  barrier for low-income students, and we don't want to impose

13  another barrier for students who might already be struggling to

14  get to us.

15  Q.  Does the reading document also address how other aspects of

16  diversity should be considered?

17  A.  It does.

18  Q.  And if we can just pull that up.  I think it's DX10,

19  page 8.  It talks about other aspects of diversity.  You don't

20  necessarily need to read this into the record.

21      Could you just state how other aspects of diversity are

22  considered?

23  A.  Our readers are happy to be surprised.  They are happy to

24  be surprised by things they've never seen, by perspectives

25  they've never encountered, by experiences they've never read

1  about.  Our readers know that there's more to the world than

2  what we see year by year in the admissions process, and so we

3  encourage people to try to stay open really to difference of

4  any kind, something that we haven't experienced yet or that we

5  think people won't see often on our campus as a difference, and

6  that difference can make a difference in the admissions

7  process.

8  Q.  We can set that document aside, and I have a few more

9  questions about the evaluation process and the admissions

10 process generally.

11      How is legacy considered during the admissions process?

12 A.  It's considered as one factor among many for nonresident

13 candidates only.

14 Q.  We heard some mention of children of faculty and staff.  Is

15 there a preference for children of faculty and staff?

16 A.  There is no preference for children of faculty and staff.

17 Q.  Do children of faculty and staff go through the same

18 process as all other applicants?

19 A.  They do.

20 Q.  I want to ask you about early action.  Is there a

21 preference for early action?

22 A.  There is no preference for early action.

23 Q.  And how does early action work at the university?

24 A.  As I mentioned earlier, we have two deadlines.  The first,

25 the early-action deadline, is on October 15th; and the second,

1  the regular decision deadline, is on January 15th.  We offer

2  two deadlines primarily because it's a way for us to space our

3  reading of 40-some-thousand applications out over six months

4  instead of over a smaller window of time.

5      We offer early in particular because we know there are

6  many, many candidates around North Carolina, every corner of

7  North Carolina, who have been waiting to apply to Chapel Hill.

8  About two-thirds of our candidates apply early.  The early pool

9  is, in a typical year, more North Carolinian than nonresident.

10  About a third of the candidates apply regular decision.  In a

11  typical year, that pool is more nonresident than resident.

12      I should say, too, our aim -- and we talk about this with

13  staff continuously.  Our aim is to make early and regular as

14  close to the same as we can.  We want them to be as hard and as

15  easy, one as the other; and that's because we don't want

16  students to have to worry that if they apply to one deadline or

17  the other they're somehow compromising their chances or they're

18  playing some game that they don't know the rules of, and if

19  they play it wrong, it might hurt them.  So we try to make the

20  two exactly the same if we can and as close to the same if we

21  can.

22  Q.  Is early action binding for students?

23  A.  Students make no commitment when they apply early action.

24  They don't have to enroll if they're admitted.

25  Q.  I'm going to ask you about quality control within the

1   admissions process.  As an initial matter, how much time and

2   effort goes into the review in the evaluation process?

3   A.   I'm sorry.  Could you restate the question?

4   Q.   Sure.  The question is:  How much time and effort goes into

5   the evaluation process?

6   A.   Well, about six months of effort just in the execution of

7   it and another six months in the planning of it.

8   Q.   And what are some of the ways that the admissions office

9   ensures quality in the decisions it's making?

10  A.   You know, I think it starts actually with hiring smart,

11  caring people who are willing to see the best in students.  So

12  hiring is a form of quality control.

13      We train readers intently, new readers especially intently,

14  over a period of really many weeks.  We re-train all readers

15  every year at the beginning of the season.  As soon as we start

16  reading applications, new readers are read behind.  In other

17  words, there are veteran readers who are reviewing every

18  decision that new readers make, giving them feedback about

19  things they might have missed, praising them when they do

20  things well.

21      We have the second reads in the process, spot checks.  We

22  have files that go to committee and are reviewed by larger

23  groups of people.  And then, of course, at the end of it, as

24  we've already discussed, we have the school group process and

25  the decision review process, which is the last step in quality

1  control before we release our decisions to students.

2  Q.  Overall, how confident are you in the evaluation process?

3  A.  I'm extremely confident in the process.

4  Q.  Why is that?

5  A.  Well, because I know how much work goes into training

6  people, because I know how much work goes into supervising

7  them, because I see in my own reading.  When I read behind

8  people who did first reads, I see the care and attention they

9  bring to the smallest detail in a file; and then in the end, I

10  hear about the results through the school group process.  And

11  then, as I said before, we do have an appeals process, and so I

12  get some feedback about the quality of our evaluations through

13  the number of appeals we receive and what I see when I consider

14  appeals.

15  Q.  I want to ask you some questions about the results of the

16  evaluation process.  Do you recall specific examples of

17  admitted students who you believe would contribute to the

18  educational benefits of diversity?

19  A.  I do.

20  Q.  Can you share a few of those examples?

21  A.  I can.  I'm going to share them without their names.

22      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX



1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2  XXXXXXXXXXXXXXXXXXXXXXXX

3     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16 XXXXXXX

17     Leaving aside for a minute the difference that all these

18 students made in my life -- and that's not the point -- you

19 know, these are the kinds of students we want at the

20 university.  They're the kinds of students who make other

21 people around them better every day, and they really

22 demonstrate the benefits to all students of our having students

23 like them in our classes and in our community.

24 Q.  Let's talk about the ways that you evaluate your success in

25 achieving the educational benefits of diversity.

1    Do you share information about the admitted class?

2  A.  I do.

3  Q.  Who do you share that information with?

4  A.  Well, eventually, once it becomes public, we share it

5  broadly.  We share it broadly with our community.  We report to

6  Faculty Council.  We have an elaborate detailed report to

7  Faculty Council that tries to describe our students using --

8  using numbers, and that's tricky because our students are more

9  than numbers.  But at the end of it all, once we've made

10  decision on 4,200 people and invited them into the community,

11  one way that we have to describe them is in terms of their

12  aggregate strengths, and so we produce these statistical

13  profiles, and we share them with the faculty, and they include

14  a lot of information.

15    We also do things that are designed to acquaint other

16  people in the university community with who our students are.

17  So we will produce infographics, and we'll put them on video

18  boards around the university:  In the academic buildings, in

19  the student union, in the residence halls.  And it's a way of

20  reminding everyone in our community, including our students, of

21  the richness that's all around them.

22    You know, beyond those public reports, I talk almost

23  yearly, sometimes more than once a year, with the Board of

24  Trustees.  I report to the chancellor and the provost.  I

25  report to the Educational Benefits of Diversity Working Group

1   the shape of our class on a lot of different dimensions.  I

2   share information with the Advisory Committee on Undergraduate

3   Admissions.  I talk with the alumni association, give

4   presentations to their board.  I talk with various fundraising

5   committees.  I talk with the alumni committee on racial and

6   ethnic diversity.  I've talked with the Tribes of

7   North Carolina when they visited campus.  So I try to share

8   information and we try to share information about our students

9   broadly.

10      The last thing I'll say about this, though, is that we

11  really try hard to tell the stories of students, not just the

12  numbers that describe students in the aggregate, but the

13  stories that describe them as the individual people they are,

14  because at the end of it our students aren't numbers.  They're

15  people.  And where we can, we try to celebrate them and lift

16  them up and let their stories inspire other people in our

17  community and other people who want to join us.

18  Q.  Let's look at an example of information that you share out

19  about an admitted class.  If we can pull up DX22, and I'll just

20  ask you to identify what the document is.

21  A.  This is the annual report of the Advisory Committee on

22  Undergraduate Admissions, the committee we talked about

23  earlier, to Faculty Council.  Once a year the advisory

24  committee reports to Faculty Council about its work and the

25  work of the Office of Undergraduate Admissions.

1    **MS BRENNAN:**  Can we go to page 3 of that document,

2    please?  Actually, it may be the next page.  Yep.  If you can

3    rotate that, please.

4    Q.  (By Ms. Brennan)  Mr. Farmer, can you describe what this

5    is?

6    A.  This is a high-level statistical summary of the 4,076

7    students who did us the favor of joining us for the fall 2015

8    first-year class.

9    Q.  These were enrolled students?

10   A.  These were students who enrolled, yes.

11   Q.  Can you describe some of the dimensions that you're

12   presenting information about?

13   A.  Resident and nonresident, sex or gender, citizenship,

14   whether a student requested and received a waiver of the

15   application fee, whether the student was the first in the

16   family or will be the first in the family to graduate from

17   college, resident children of alumni, nonresident students who

18   receive need-based aid, students who qualified for the Carolina

19   Covenant, students who are affiliated with the military, other

20   students -- or a subset of military-affiliated students who are

21   receiving benefits.  Those are typically either active-duty

22   servicemen or women or close dependents of them -- students who

23   were identified as having talent in athletics or music or

24   dramatic art, and then there's a little bit of academic

25   information on this section too.

 1    **MS BRENNAN:**  Can you scroll down a little bit further?

 2  Q.  (By Ms. Brennan)  Here we see some information about race

 3  and ethnicity in a couple of different ways.  Can you describe

 4  what we're seeing?

 5  A.  The first way is the way that we're required to report on

 6  race and ethnicity by the Department of Education -- the U.S.

 7  Department of Education.  These are the federal reporting

 8  guidelines.  And so if you go out to the U.S. Department of

 9  Education's statistical repository, you can retrieve this

10  information about schools around the country because schools

11  are all reporting on the same dimension.

12      But we found over time that it's important for us to report

13  on race and ethnicity in other ways because race and ethnicity,

14  like everything else about our students, is complicated, and

15  there are students who identify themselves in multiple ways.

16  So we have students in the class who are both American Indian

17  or Native American and black or African American.  We have

18  students in the class who are both Asian and Asian American;

19  Hispanic, Latino and Latina.  We feel that it's important to

20  report to our community all the ways that students have

21  identified themselves in terms of their race, not just the way

22  that the federal government requires that we report their

23  identities.

24          **MS BRENNAN:**  Can we scroll down again?  I think it

25  might be the next page.

1   Q.   (By Ms. Brennan)   Okay.   We can put that document aside.

2       I want to ask, when you present this type of information

3   and tell stories of students, as you've described it, do you

4   get feedback from anyone?

5   A.   We get plenty of feedback.

6   Q.   Can you describe the type of feedback you receive?

7   A.   Well, you know, I think generally people in our community

8   appreciate our students, and so some of the feedback we get is

9   really positive.   You know, people are glad that we have

10  another class.   They're glad that the class is diverse along

11  many dimensions.   They're glad that the class demonstrates

12  excellence and potential.   So we get positive feedback about

13  the class.

14      But we get other feedback too; and there are times when

15  students, faculty members, alumni, and others will express

16  concerns about some of the things that they see in the profile

17  that you just presented.

18  Q.   In Mr. Kahlenberg's presentation, you may have heard a

19  critique for not measuring critical mass specifically.   Do you

20  recall that?

21  A.   I do.

22  Q.   What is your response to that?

23  A.   I think that critical mass, as I said earlier, is

24  complicated, and I think that critical mass has to be assessed

25  not exclusively in terms of numbers but really in the lived

1  experience of our students:  What they're learning, how they're

2  thriving, what they're contributing to the learning and the

3  thriving of others.

4      You know, meaningful representation is important in

5  critical mass for the reasons that I've just described.  It's

6  important that students not feel isolated.  It's important that

7  students feel free to be all they are instead of feeling

8  trapped into being one-dimensional, and it's important that

9  students feel free from stereotype.  All those things are

10  important, and meaningful representation is important for those

11  reasons.  It's also important, though, that we pay attention to

12  the experience of students once they have enrolled.

13  Q.  Do you pay attention to the numbers?

14  A.  We do pay attention to the numbers.

15  Q.  Do you also pay attention to what's happening beyond the

16  numbers, as you've described?

17  A.  Yes, of course.  Again, both are important.  You know,

18  meaningful representation is important, but so is the

19  experience of our students, and the reason why the two are

20  important is that they're interrelated.

21  Q.  I want to ask you first some information about how you

22  assessed how well you've done based on that feedback you've

23  received and your own review.

24      What have you learned about students' desire for diversity?

25  A.  Well, I've learned, I think, a lot in a lot of different

1  ways.  One of the things that I've learned just from the

2  conversations on campus, from stories in the student newspaper,

3  *The Daily Tar Heel,* from things that I've heard from faculty

4  members that faculty members have shared, from surveys that the

5  university has conducted of the experience of students on our

6  campus -- one of the things that I've learned is that students

7  wish there were more diversity, including more racial and

8  ethnic diversity, on our campus, and the feeling is

9  particularly pronounced among underrepresented students.

10 Q.  How well has the university done with achieving racial and

11 ethnic diversity in the student body?

12 A.  You know, I think we've made progress.  We've worked

13 extremely hard.  And when I say "we," I don't mean just the

14 admissions office.  I mean the university has worked hard, and

15 I mean our students have worked hard.  You know, our students

16 help us recruit students to the university, and our students

17 are the best recruiters to the university.  So we've worked

18 really hard, and we have made some progress.

19     But I think we -- we have work to do and we -- we're not

20 where we want to be.  I've honestly never heard a person say at

21 the university that we're where we need to be.  So I think

22 people appreciate the experience that they have, but I think

23 people recognize that their experience could be better, and

24 it's our job to try to provide the best possible experience

25 that we can.

1  Q.  Are there any URM groups in particular that the university

2  has had particular challenges enrolling?

3  A.  Well, first of all, the underrepresented students who are

4  applying and enrolling at the university are incredible

5  students.  They are incredible students, and we, or any

6  university, would be lucky to have them.  And we have to

7  compete for these students.  These students have other choices.

8  They don't have to come to UNC.  So, yes, we've had to work

9  hard to recruit American Indian, Hispanic, Latino, Latina,

10  Latinx students, black or African American students.  We've had

11  to work hard.  In some years, we've done better; we've had more

12  success than in others.

13  Q.  Do you have any examples of a particularly challenging year

14  with respect to any of those groups?

15  A.  Yes.  I think it was 2013 and -- you know, I think for the

16  first time in a long time the enrollment of African American

17  men in the first-year class had fallen below a hundred.  And

18  when the university published the results of the profile of the

19  class, the shape of the class, I -- I think the low enrollment

20  of African American men caused a lot of harm.  It caused a lot

21  of hurt.  There was a story about it in *The Daily Tar Heel.*

22      As I recall, three wonderful young men came and sat on the

23  front steps of Jackson Hall where the admission office is

24  located, which is named for the university's first black

25  tenured faculty member, and they made a video that they

1  released publicly.  And it was heartbreaking to watch, but it

2  was terrific because they were speaking of their experience.

3  And it wasn't long after that that a group of American Indian

4  students on campus produced a similar video.

5       And, you know, I remember that fall in particular being a

6  really tough one for our students and leading students to feel

7  that they needed more than we had been able to give them.

8  Q.  Have you received other feedback from minority students on

9  campus about their experiences?

10 A.  Yes.

11 Q.  Generally, what does that feedback tell you?

12 A.  Well, again -- and I just want to say this again.  We have

13 incredible students.  The underrepresented students on our

14 campus are fantastic, and, you know, generally, I think -- they

15 chose the university.  They love the university, but life at

16 the university sometimes is hard for them.  You know, I think

17 they feel isolated.  Actually, I don't feel that.  I know that.

18 I -- I know that underrepresented students sometimes are in the

19 excruciating position of being expected to be the spokesperson

20 for their group.  I know sometimes that they feel lonely, and I

21 think it's hard for students to thrive under those

22 circumstances.  That our students have thrived under those

23 circumstances is a tribute to them, to their academic

24 preparation, and to their resilience.  But, again, I think the

25 experience has not always been what we want it to be or what

1 students deserve it to be.

2 Q. Has the university made any efforts to formalize its

3 assessment of how well it's doing --

4 A. Yes.

5 Q. -- in terms of these issues? Can you talk about that?

6 A. Well, I should say that the university has been assessing

7 the health of our campus, the success of our students, and the

8 success of our diversity efforts for a long time, before I came

9 to Carolina certainly.

10 But recently the provost formed the Educational Benefits of

11 Diversity Working Group, and the purpose of that group is to

12 develop an assessment plan, implement an assessment plan that

13 will help the university keep tabs on the extent to which it's

14 providing the educational benefits of diversity that we are

15 committed to providing and also to consider how we can get

16 better.

17 Q. You said recently. Do you recall what year that group was

18 formed?

19 A. Several years ago. I'm sorry. 2017, 2018.

20 Q. Okay. Are you a member of the group?

21 A. I am.

22 Q. What is your assessment of the group's efforts thus far?

23 A. Well, first of all --

24 Q. Or as of the close of the discovery period.

25 A. Yes. It's a terrific group, and the group is taking its

1   work seriously.  The group developed, I think, a really

2   elaborate assessment plan that it's been executing.  You know,

3   the goal of the group really is to start assessing students

4   before they arrive at the university, and so we begin with a

5   survey of enrolling students and admitted students that the

6   office of admissions distributes.  And the survey simply asks

7   students the extent to which they are seeking the educational

8   benefits of diversity that the university is committed to

9   providing.  So we begin with the baseline of what our students

10  want and need, what they're expecting of us.

11      You know, while I'm on the subject, the -- all the students

12  want the benefits of diversity that we've said we're going to

13  provide.  All 92 -- 95 percent say that they want these

14  benefits.

15      And so we're trying to take a life cycle approach to pay

16  attention to students at every point along their path.  We want

17  to disaggregate results meaningfully across different

18  dimensions so that we can understand how different groups of

19  students are doing, and we want to do this is a rigorous way,

20  in a way that's methodologically sound.  We're lucky that we

21  have good methods people on the committee, and they have access

22  to other good methods people around the university.  And I

23  think in time -- actually, I think the group has already done

24  great work, and I think in time it will make a huge difference

25  at the institution.

1  Q.  I want to turn to a new topic now and ask you some

2  questions about race-neutral strategies and in particular about

3  some things that may already be happening at the university.

4      Has the university found any alternatives to completely

5  replace consideration of race as a factor in the admissions

6  process?

7  A.  We have not.

8  Q.  Has the university nonetheless tried to adopt some

9  race-neutral strategies to increase its enrollment of

10 underrepresented minority students in conjunction with holistic

11 review?

12 A.  We have.

13 Q.  I want to talk to you about some of those efforts, and I

14 would like to start with recruiting.  Has the university done

15 any diversity-specific recruiting efforts?

16 A.  Yes.

17 Q.  And could you talk about the university's general approach

18 to recruiting underrepresented groups?

19 A.  We want to reach out in every way that we know how and to

20 the extent that we can to make sure that any student who would

21 benefit from the experience of joining us at the university or

22 any student who might contribute to the experience of others is

23 at least thinking about UNC.  So we start engaging with

24 students really early in their high school careers.

25     We offer a lot of hospitality to students.  In other words,

1 we welcome them to campus, and when we do that, we try to do it

2 in an appropriate way for students. And we host special

3 sessions, for example, Spanish language sessions, on campus.

4 We have a team of students who are reaching out to prospective

5 students all the time by telephone.

6    We travel to students in their communities. For example,

7 in a nonpandemic year, admissions offices visit every high

8 school that's served by a member of the Carolina College

9 Advising Corps. We go to all hundred counties in

10 North Carolina.

11    We partner with the Office of Diversity and Inclusion to

12 operate Project Uplift, which is a big pipeline program that

13 happens in the summer, and it is available to rural,

14 low-income, underrepresented first-generation college and other

15 students.

16    And then we recruit students after they're admitted. So we

17 have special events for them on campus. We partner with the

18 Black Student Movement. We have partnered with Hispanic

19 students and with American Indian students to sponsor special

20 events for those groups, and we have special events on campus

21 for first-generation college students as well.

22 Q.  I want to ask you about some of the signature programs the

23 university has to enhance recruitment and enrollment of diverse

24 students. You mentioned Project Uplift.

25    I want to ask about another program, Carolina College

1  Advising Corps.  What is that program?

2  A.  The Carolina College Advising Corps is our effort to serve

3  as many students in North Carolina as we possibly can.  So we

4  hire recent graduates of UNC-Chapel Hill.  We train them as

5  college and scholarship and financial aid advisors, and then we

6  place them in underserved schools across the state of

7  North Carolina where they work with any student who seeks their

8  help and where they try to help principals, counselors, and

9  teachers create a college-going culture.

10 Q.  And you heard Mr. Kahlenberg talk about the lack of

11 information that some students may have about things like early

12 action.  How does that program address those types of issues?

13 A.  The advisors that we place in schools are very well

14 trained.  In effect, they go to a four- or five-week boot camp

15 in Chapel Hill in the summer before they enter the field.  They

16 are trained by admissions officers at the university, financial

17 aid officers at the university; and each of them has a contact

18 in the admissions office, so they can always reach out with

19 questions.

20     So in all 79 of our partner high schools, there is a young,

21 well-informed, energetic college advisor who can help

22 low-income students, first-generation college students,

23 underrepresented students, any student in the school make sense

24 of the things that Mr. Kahlenberg was talking about.

25 Q.  Do you recall what year the program began?

1  A.  We began in 2007.  We earned the grant that launched the

2  program, I believe, in 2006.  I think that's right.  It's been

3  a long time.

4  Q.  Since the inception of the program, has the program grown

5  to its current levels?

6  A.  Yes.  We received the grant for this program in March.  We

7  hired our first advisors pretty much immediately, and we had

8  four advisors serving eight schools in August of 2007.  We

9  planned to expand to another ten, but what happened is that

10  communities around the state learned about the program, and

11  they wanted advisors, and so we started raising money so we

12  could expand the program.  And it's expanded steadily ever

13  since then.

14      You know, as I mentioned, we have 79 partner schools now.

15  We have close to 60 advisors.  The program costs about

16  $3 million a year.  We -- we raised the money for it.  We do

17  this as a service to schools and students across

18  North Carolina, and the program really is huge, and it has a

19  big impact.  You know, the corps serves about 20 percent of all

20  black or African American students in public high schools in

21  North Carolina.  It serves about 50 percent of all American --

22  American Indian students in North Carolina.  It serves a large

23  share of Hispanic, Latino, Latinx students and a lot of

24  low-income students.  So we've been really pleased that it's

25  been able to expand in the way that it has.

1    Q.  Has the university been in the process of expanding it as

2    rapidly as it reasonably can?

3    A.  Yes.  There have been times when we've -- it's been a

4    stretch to expand as fast as we have, but we wanted to do it.

5    So as we have been able to raise the funds to do it, we've

6    expanded it.

7    Q.  I want to ask about the American Talent Initiative.  What

8    is that?

9    A.  The American Talent Initiative, or ATI, is an effort by the

10   Aspen Institute in conjunction with Bloomberg Philanthropies to

11   encourage the colleges and universities in the country with the

12   highest graduation rates to recruit more low-income students.

13   Q.  When was that program started?

14   A.  I believe that program was started in 2015 or 2016.

15   Q.  And the university was a founding member of that?

16   A.  We were a founding member.  I think we were one of 30 or 40

17   initial members of ATI.

18   Q.  I'm going to ask you about C-STEP.  You've heard a little

19   bit about C-STEP, but can you describe in your words what

20   C-STEP is?

21   A.  C-STEP is our effort to work in partnership with community

22   colleges so that faculty and staff there can identify

23   extraordinarily promising low- to moderate-income students who

24   would be great at Carolina, but who aren't thinking about even

25   trying to join us or for that matter even thinking about going

1  to a four-year college or university.  The program identifies

2  students very carefully one by one.  There's no formula for

3  identifying C-STEP students.  The admissions office at UNC

4  considers students carefully and individually in concert with

5  faculty and staff at the community college partners who know

6  the students well.

7      But when students enroll in the program, we promise them

8  admission to Carolina if they participate fully in the program

9  and if they graduate with an appropriate associate's degree

10 from their community college.

11 Q.  What is the eligibility for the program?

12 A.  Typically -- and it varies a little bit, but we aim for

13 students who are at or below 300 percent of the federal poverty

14 guidelines indexed by family size.  So that's students who --

15 if it's a household of four, the household is roughly 70,

16 $75,000.  Most C-STEP students, though, are Carolina Covenant

17 scholars.  Most are low income.

18 Q.  Does the university provide support for participants?

19 A.  We do.  We provide support for participants as soon as they

20 join the program.  So we send academic advisors from

21 UNC-Chapel Hill to the community colleges to meet with students

22 and encourage them and help them make sure that they're taking

23 the appropriate prerequisite courses.  We bring C-STEP students

24 to campus before they're ever enrolled in UNC.

25      The theory behind C-STEP is that -- the real barrier for

1  community college transfer students isn't intellectual.  It's
2  emotional and social.  So what we wanted to do was to get
3  students comfortable on the campus before they ever enrolled,
4  so that instead of their having to make a great leap from their
5  community college to Carolina, they could just take a step and
6  get to Carolina.
7  Q.  Is this also a program that the university is interested in
8  growing?
9  A.  It is, yes.
10  Q.  Can you talk about that?
11  A.  Yes.  And we have grown.  So we launched C-STEP in 2006
12  with 3 partner colleges and 8 students, and today we have 14
13  partner colleges and 400 students.  It costs money to run the
14  program.  We have three staff members in the Office of
15  Undergraduate Admissions whom the admissions office funds, but
16  we also provide support to the community colleges.  The reason
17  why we do that is that we know community colleges have too much
18  to do, and we know that they are constrained in their
19  resources, and so we want to make it as easy as possible for
20  our community college partners to serve their students well and
21  to work with us to identify great people who will come and make
22  the university better.
23  Q.  In your view, could more rapid or aggressive expansion of
24  this program wholly replace the consideration of race as a
25  factor in admissions?

1  A.  No, I don't think so.

2  Q.  Why not?

3  A.  You know, I should say, too, that C-STEP students aren't

4  the only community college students we enroll.  We enroll other

5  students from the community colleges of North Carolina.

6  Community college enrollment at UNC-Chapel Hill has grown

7  substantially.  Five years ago about 30 percent, maybe 28

8  percent of our transfer class was from North Carolina community

9  colleges.  Last year it was 45 percent.  This year it will be

10  higher than that.  So we've grown community college enrollment

11  generally.

12     The number of C-STEP students is fairly small.  If we

13  doubled the number of partners in the scheme of a 19,000

14  student -- undergraduate student body, the numbers of students

15  would still be fairly small.  The students are terrific, and

16  they make us better, and we're glad to have them, but we don't

17  consider that or the expansion of that program to be a viable

18  way to replace the consideration of race or ethnicity in

19  comprehensive review.

20  Q.  I'm going to now turn and ask you some questions about the

21  university's financial aid.

22     What kind of a commitment has the university made to

23  financial aid?

24  A.  We promise to meet the full demonstrated need of every

25  undergraduate student who's eligible for federal aid.

1  Q.  How common is that among public universities?

2  A.  There are only two of us.

3  Q.  Which universities commit to that?

4  A.  UNC and the University of Virginia.

5  Q.  What kind of dollars does the university put into this

6  commitment?

7  A.  I think in 2016-2017, we spent around $260 million on

8  student aid.  I think close to 160 million of that went to

9  undergraduate students.  I think 27, 28 million of that went to

10  first-year students.  Of the aid that we awarded to

11  undergraduate students, $86 million of it was institutional

12  funding.  That is funding that the university itself committed.

13  Q.  Do you recall what percentage of the first-year entering

14  class received scholarship or grant money or typically does?

15  A.  In that year 41 percent, and the percentage continues to

16  rise.

17  Q.  How much of the university's available scholarship and

18  grant funds are need based?

19  A.  About 93 percent.

20  Q.  And I believe you heard Mr. Kahlenberg's testimony about

21  the numbers of low- and moderate-income students at UNC.  What

22  is your response to that?

23  A.  I have two responses.  The first is when you look at

24  UNC-Chapel Hill in the context of the leading research

25  universities in this country -- and we typically consider

 1  ourselves alongside -- for broad benchmarking, alongside other

 2  public universities in the Association of American

 3  Universities.   There are 36 public research universities in the

 4  group.

 5       When you look at the enrollment of low-income students

 6  across that group of schools, as measured by students'

 7  eligibility for federal Pell grants, which is one way of

 8  identifying low-income students, we're in the middle.  When you

 9  look at change over time, though, when you look at the increase

10  in low-income students at UNC-Chapel Hill between 2007 and '8

11  and 2017 and 2018, we're near the top.  So we're in the middle,

12  but we're getting stronger.

13  Q.  Can you talk about the Carolina Covenant?

14  A.  Yes.

15  Q.  What is that program?

16  A.  The Carolina Covenant is our promise to students --

17  low-income students, students who are at or below 200 percent

18  of the federal poverty guidelines, again indexed by family

19  size.  It's about $52,000 a year for a family of four.  It's

20  our promise to those students that if they come to Carolina and

21  they're willing to work 10 or 12 hours a week in a work-study

22  job, like that young man I was talking about earlier -- if

23  they're willing to work 10 or 12 hours a week in a work-study

24  job, they can graduate from UNC debt free.

25  Q.  What has been the impact of the program?

1  A.  It's had a profound impact on the university because it's

2  brought great students to the university who have made other

3  students better.  Its impact on the lives of individual

4  students I think also has been profound.

5      There's so many testimonials of Covenant students.  The

6  young woman I mentioned -- I was talking about earlier who came

7  to the first-generation college event with her meemaw, she was

8  a Carolina Covenant scholar.  Some of the other students that

9  I've talked about are Carolina Covenant scholars.

10     Their ability to focus on their studies, their ability to

11 work in an office like the one where I work where people are

12 looking out for them, it's really improved the success of

13 students on our campus, and I think it's also improved their

14 happiness.

15 Q.  What percentage of incoming first-year students are

16 eligible for the Covenant scholar program?

17 A.  In a typical year, maybe 13 to 15 percent.

18 Q.  Has that grown over time?

19 A.  It has grown some, and it's bounced up and down some.  It's

20 a little higher now than it has been and probably not as high

21 as it will be following COVID.

22 Q.  Does the university at this point set a cap on the number

23 of students who can participate in the program?

24 A.  No.

25 Q.  What kind of an institutional commitment does this require?

A.   It's a huge commitment.  The university has been proud to

make that commitment, but it's a struggle to keep it because

it's expensive to support students.  A nonresident -- an

out-of-state Covenant scholar, for example, gets $40,000 a year

in institutional grant funding from the university.  A resident

Covenant scholar gets about 12 1/2, $13,000 a year in

institutional grant funding from the university.  The

difference, of course, is because it costs less to attend if

you're a resident student.

     The university spends probably in a given year, as I

mentioned, 80 to $90 million on student aid that it could spend

on something else, but that it chooses to spend on student aid

because we think it's the right thing to do and we think that

it strengthens our student body.

Q.   Are there limits on the university's ability to expand that

commitment in the way that Mr. Kahlenberg suggests?

A.   The university faces really serious financial challenges,

and those financial challenges make it hard for us to expand

financial aid at will.

Q.   Can you talk about the sources of funding for financial aid

at the university?

A.   Some of the funding for student aid for need-based aid

comes from the tuition that students pay.  In effect, we return

a share of the tuition that students pay back to students in

the form of need-based aid.  We don't use tuition revenue for

1  merit aid, but we do use it for need-based aid.

2      We have some private money that people have donated over

3  time to endow need-based scholarships for students.  We have

4  other money that the university has to work very hard to find

5  every year -- and sometimes it's touch and go -- to make sure

6  that we can continue to meet our commitment to students, but

7  we've always found a way.

8  Q.  And there was a suggestion to just tap into the endowment.

9  What's your response to that?

10  A.  I don't think that's how endowments work.  The university

11  does have a substantial endowment.  My understanding is that

12  90 percent or more of it is restricted; in other words, people

13  gave the money to the university for a particular purpose.  In

14  effect, there's a contract for the money to be used for that

15  purpose.

16      I think the university has -- well, the other thing I

17  should say is that the university doesn't spend the endowment.

18  The university spends the income on the endowment.  So the

19  endowment is a fund of money that's kept aside to generate

20  revenue in perpetuity, forever; and the university takes

21  whatever revenue the endowment generates and distributes it for

22  the restricted purposes that the endowment has in place.

23      There's some money every year that's generated by the

24  endowment that's not restricted.  I believe that's about 6 or

25  6 1/2 million dollars a year.  There are many demands for that

1  money, and much of it is already going to need-based student

2  aid.

3      So there's a limit on what the endowment can do.  I

4  appreciate how it seems when someone hears the word "billion"

5  attached to a resource that the university has, but the

6  endowment doesn't work in quite the way that I heard described

7  here today.

8  Q.  I'm going to ask you whether the university has been

9  recognized for affordability or financial aid efforts.

10 A.  We have been.

11 Q.  Can you talk about some of those recognitions?

12 A.  Sure.  We -- every year, every other year *Kiplinger's*

13 *Personal Finance* magazine rates universities, public and

14 private, in the country on the basis of their value.  And

15 Kiplinger's definition of value includes the quality of the

16 student body; it includes the success of students in the

17 student body, the rates at which they graduate; it includes the

18 amount of financial aid that the university provides to

19 students; and it includes the university's tuition and fees,

20 with lower being better than higher.  So for 18 consecutive

21 years -- in fact, every time Kiplinger's has done this ranking

22 of colleges and universities in the United States,

23 UNC-Chapel Hill has been the best value among public

24 universities.

25 Q.  Has the university received other recognition in this area?

1  A.  We have.

2  Q.  Can you describe that?

3  A.  In 2017, we received the Jack Kent Cooke prize for

4  excellence in educational equity.  We were the first public

5  university to receive this prize, which recognizes the college

6  or the university in the United States that's doing the best

7  job for outstanding low-income students.

8  Q.  Having overseen both the recruiting and the financial aid

9  aspects, are these areas that have been priorities for the

10  university already?

11  A.  Yes.  I mean, I would just say if they weren't priorities

12  for the university, we wouldn't be able to do what we do.  You

13  know, if these weren't priorities for the university, we

14  wouldn't be meeting the full demonstrated need of students.  If

15  these weren't priorities for the university, we wouldn't have

16  the Carolina Covenant.  If these weren't priorities for the

17  university, the university wouldn't let its admissions office,

18  much less encourage its admissions office, to run the Carolina

19  College Advising Corps.  It wouldn't allow us to compete for

20  grants for the C-STEP program.  Yes, these things have been

21  priorities for the university for a very long time.

22  Q.  I want to turn to another topic now and ask you about the

23  university's consideration of race-neutral alternatives.

24      What is your understanding of whether the university has an

25  obligation to consider race-neutral alternatives?

1  A.  We do.

2  Q.  I'd like to walk through some of the efforts that the

3  university has made over the years.

4     In the early years of arrival at the university, what was

5  your focus in terms of race-neutral alternatives?

6  A.  You know, I've actually been paying attention to

7  race-neutral alternatives personally since 1996 with the

8  passage of Proposition 209 in California; and through contacts

9  at other universities and through my attendance at professional

10  meetings, I heard that things weren't going well, especially

11  for UCLA and Berkeley.  I continued to pay attention to what

12  was going on at UCLA and Berkeley once I got to Carolina.

13     And what I heard from people there and again in

14  professional meetings is that, at least from UCLA's point of

15  the view and Berkeley's point of view, they had thrown

16  everything they knew at the challenge that they faced once they

17  had been prohibited from any use of race or ethnicity at all in

18  admissions.  What I learned is that enrollments of

19  underrepresented students at those schools plummeted, and what

20  I also heard is that applications declined substantially.

21     So we were paying attention to this natural experiment that

22  was going on in California with Berkeley and with UCLA, and we

23  were paying careful attention to their results.

24     After I became admissions director in September of 2004, I

25  started attending meetings of Access & Diversity Collaborative

1  of the College Board.  In fact, the first meeting that I

2  attended of the collaborative was the month after I became

3  admissions director.

4      And the Access & Diversity Collaborative is an effort by

5  the College Board to bring policymakers, legal experts together

6  with enrollment and admissions practitioners so that we could

7  talk about how we could do a better job, so that we could talk

8  about the legal landscape, and so we could hear what other

9  schools were doing and how well their tactics were working.

10     And from that point forward -- from 2004 forward, somebody

11 in our office, often I, but sometimes others, would attend

12 meetings of the Access & Diversity Collaborative and pay

13 attention to their documents about race-neutral alternatives

14 and other practices that other schools were putting into place.

15 So those were the early years.

16 Q.  At some point did the university conduct a race-neutral

17 alternative analysis?

18 A.  We did.

19 Q.  Can you describe the first analysis that was conducted?

20 A.  The first one was in 2007, and what we tried to do -- or I

21 should say what I tried to do because I did this working

22 solo -- what I tried to do was to take the candidates who had

23 applied for admission and to apply a rote, formulaic, automatic

24 bonus to students based on socioeconomic disadvantage, and I

25 tried this in a couple of different ways.

1  Q.  Let's look at some of the documentation.

2        **MS BRENNAN:**  If you can pull up DX34, please.

3  Q.  (By Ms. Brennan)  Do you recognize this?

4  A.  I do.

5  Q.  Is this part of the work that you did in that analysis?

6  A.  This is part of the summary spreadsheet or one of the

7  summary spreadsheets that I produced.

8  Q.  Okay.  And if we could look at DX35.  Do you recognize

9  that?

10  A.  I do.

11  Q.  What is that?

12  A.  This is another of the summary spreadsheets that I

13  produced.

14  Q.  Okay.  And then if we can look at DX36.  What is that?

15  A.  This is a third that I produced.

16  Q.  Which spreadsheet is the best one to look at to try to get

17  an understanding of what you did?

18  A.  I would look at this one because this one weights

19  socioeconomic disadvantage the most heavily.

20  Q.  Can you explain what we see with DX36?

21  A.  Yes.  At the time when I did this simulation, we were

22  calculating for candidates a predicted first-year GPA based on

23  any number of factors.  We weren't using predicted GPA to make

24  admissions decisions, but after we had made admissions

25  decisions, we would calculate a predicted GPA.  And we did this

1  so that we could do studies later on of factors that predicted
2  success at the university, and that's what's referred to by AI
3  in Row 1.

4     What this simulation does is it takes a student's AI, and
5  for each of four disadvantaged criteria that the student meets,
6  it adds a third of a point.  So if a student was
7  first-generation college, the student got an extra third of a
8  point added to the student's predicted GPA or AI.  If the
9  student was also a fee-waiver student, the student got another
10 third of a point.  If the student was from a single-person
11 household, the student would get another third of a point; and
12 if the student was first-generation college, the student would
13 get another third of a point.  So in effect, if you had a
14 student with a 2.7 predicted first-year GPA, if the student met
15 all four of those criteria, the student would end up with a 4.0
16 GPA.

17    So then all I did was apply those weights, those bonuses,
18 if you want to think about it that way, to all the candidates
19 who had applied, and then tried to predict using our yield
20 model, which you see below here, what the shape of the class
21 would have been like on only a couple of dimensions.  And you
22 can see the results over in the little box that says "Total."

23        **MR. STRAWBRIDGE:**  Your Honor, I object, and I need to
24 raise something.  I don't know if Your Honor wants me to do it
25 with the witness on the stand or outside the presence of the

1    witness.

2           **THE COURT:**  Well, I don't know what you're going to

3    raise.

4           **MR. STRAWBRIDGE:**  We have concerns about the

5    divergence of the trial testimony from the record that was made

6    at his deposition.

7           **THE COURT:**  That you can't address on cross?

8           **MR. STRAWBRIDGE:**  Well, I mean, I think that there

9    ought to be some concerns about the ability to inquire into

10   discovery of a 30(b)(6) witness's testimony at the deposition.

11   This is -- again, I don't necessarily want to say too much.  I

12   can address it on cross, but I actually think the entire line

13   of questioning has crossed a line into improper inquiry.

14          **THE COURT:**  All right.  Well, sir, why don't you step

15   down and step outside so that I can hear this argument, please.

16       (The witness left the stand and the courtroom.)

17          **THE COURT:**  Yes, sir.

18          **MR. STRAWBRIDGE:**  Thank you, Your Honor.

19      We took Mr. Farmer's deposition in June of 2017, and we

20   specifically asked him about his efforts regarding these

21   spreadsheets.  He testified at the time that he could not

22   remember how he went about calculating this information.  He

23   could not remember how -- what his standard was for whether it

24   would be successful.  He was basically unable to provide any

25   substantive information about how he did this.  He also said --

1  I mean, I should note, at the time that we took his deposition,
2  he had been identified by UNC as a 30(b)(6) witness on its
3  consideration of race-neutral alternatives.

4      So I am troubled by the fact that now he's got these
5  spreadsheets up and he's testifying in great detail about how
6  he went about reconstructing this analysis when he was unable
7  to say so at his deposition.

8          MS. BRENNAN:  Your Honor, we didn't intend to go into
9  it much further than what I've already asked him, just
10  basically that he did an analysis, which they were aware from
11  the deposition.  They have the spreadsheets, so they had the
12  opportunity to see what was depicted in terms of the analysis.
13  You know, he's not really deviated from just explaining what is
14  shown on those Excel spreadsheets.  So I think this is proper
15  potentially for cross-examination, but I don't think it
16  precludes him from talking about what he actually did on some
17  spreadsheets that they have had as well.

18         THE COURT:  All right.  I am going to overrule your
19  objection, and you can address this on cross-examination.

20         MR. STRAWBRIDGE:  Thank you, Your Honor.

21         THE COURT:  All right.  Let's call him back in.

22     How much longer?  Let me ask you.

23         MS BRENNAN:  Your Honor, I don't think I will quite
24  finish with him today.  I'll have a little bit of direct
25  remaining in the morning.  So I'm happy to stop, you know,

1  whatever time makes sense.

2       **THE COURT:**  Well, we can use these 15 minutes.  So why

3  don't we bring him back in.

4       **MS BRENNAN:**  Okay.  Certainly.

5     (The witness returned to the courtroom and the witness

6  stand.)

7       **THE COURT:**  You may proceed.

8  Q.  (By Ms. Brennan)  Mr. Farmer, did the work that you did

9  here as part of this analysis suggest to you a race-neutral

10 alternative that you believed could be adopted at the

11 university?

12 A.  It did not.

13 Q.  All right.  I'd like to ask you what the next step was for

14 the university's consideration of race-neutral alternatives.

15 A.  In 2009, I asked Dr. Jennifer Kretchmar in the admissions

16 office to conduct a thorough review of the literature on

17 race-neutral alternatives.

18 Q.  Why did you task that to Dr. Kretchmar?

19 A.  Well, Dr. Kretchmar has a Ph.D. in educational psychology.

20 I had hired her years before.  I had worked closely with her

21 over the years.  I knew her to be among the smartest, most

22 intellectually curious people I had met at the university; and

23 I thought this would be a perfect assignment for her.  I knew

24 she would do it well, and I knew she'd produce great work.

25 Q.  Did she produce a report as a result of this assignment?

1  A.   She did.

2  Q.   Let's look at DX37, please.  What is this document?

3  A.   This is Dr. Kretchmar's literature review.

4  Q.   And if we could just take a look -- scrolling through the

5  document, is this -- how many pages was the document,

6  approximately?

7  A.   Thirteen.

8  Q.   And that includes a couple of pages of references at the

9  end?

10 A.   It includes the bibliography, yes.

11 Q.   Did you review this when you received it?

12 A.   I did.

13 Q.   What did you think?

14 A.   First of all, I thought it was very well done, as I

15 expected it would be, and I thought that the literature review

16 strongly demonstrated that schools like the university had not

17 found race-neutral alternatives that worked well.

18 Q.   I want to ask you now about what the next step was for the

19 university in terms of considering race-neutral alternatives.

20 A.   The next step was in 2012 when Dr. Kretchmar and I worked

21 together to try to model the impact of a top 10 percent plan on

22 the share of the first-year class that was composed of North

23 Carolinians.

24 Q.   Okay.

25        **MS BRENNAN:**  Can we take a look at DX38, please.

1  Q.  (By Ms. Brennan)  What is this document?

2  A.  This is the summary document of that study.

3  Q.  And can you walk us through this?

4  A.  As the first paragraph says, this top 10 percent policy

5  that we simulated would have yielded a first-year class -- and

6  just to be clear, that's not the entire first-year class;

7  that's the share of the first-year class composed of resident

8  students -- a first-year class with a higher percentage of

9  underrepresented students, 16 percent versus 15 percent.

10     Then it also says that under the same policy, every

11  academic indicator, other than the share in the class ranking

12  in the top 10 percent, would have declined.  And as you can see

13  here, we found that the average SAT, critical reading and math

14  combined, would have been 1262 as opposed to 1317.

15     And there was other information underneath this summary

16  that was also concerning to us.

17  Q.  What was that information?

18  A.  What we found was that when we compared the students who

19  would have been -- who were admitted to the university through

20  comprehensive review but would not have been admitted through

21  the top 10 percent plan, and you compared those students to the

22  students who were not admitted through comprehensive review but

23  would have been admitted through the top 10 percent plan, there

24  was a difference in the average SAT score of about 130 points.

25  Q.  And why is a drop in SAT score across a population

1  something that you consider with respect to race-neutral

2  alternatives?

3  A.  Well, I should make one thing clear.  I mean, test scores

4  aren't the only things that we care about, and it's true that

5  we don't set out to maximize the average SAT in the first-year

6  class.  That's not our goal.

7      It's also true that when you compare two people one to

8  another, a difference of 60 points on the SAT probably isn't a

9  material difference, especially if you're able to assess each

10  of those two candidates on many dimensions, not just on the

11  mechanical dimension of the SAT.  So it's just important to

12  remember all of that.

13      The real impact of testing is across big populations, and

14  so although a difference of 60 points between two people might

15  not be a significant difference, a difference of 60 points

16  across a population of 30-some hundred is actually a very

17  significant difference.  It's not a small difference.  It's a

18  big one.  And the reason why it's big for the big group and not

19  for the two people is that the bigger the group, the more

20  significant the difference.

21  Q.  Did the university determine as a result of this analysis

22  that there was a race-neutral alternative it could adopt?

23  A.  We did not determine -- we determined that this

24  race-neutral alternative was one that we could not adopt.

25  Q.  Was this study reported outside of the admissions office?

1  A.   It was.

2  Q.   Can you describe that?

3  A.   Well, it appeared in the university's amicus brief, and it

4  also was discussed at the Advisory Committee on Undergraduate

5  Admissions.

6  Q.   You mentioned the -- an amicus brief.  Was this analysis

7  specifically prepared for the purpose of the amicus brief?

8  A.   It was prepared in conversation with faculty members at the

9  law school who were preparing the university's amicus brief.  I

10  don't know that I would go so far as to say it was prepared

11  explicitly for it, but I had talked with the faculty members

12  who were working on the amicus brief because they were asking

13  about how admissions worked at the university.  So I talked

14  with them and described the process.  And because the case at

15  hand was *Fisher,* I decided that it would be helpful to model a

16  top 10 percent plan like the one that was being used at the

17  University of Texas and like the one that was at the heart of

18  the *Fisher* case.

19  Q.   And did you consider this part of your consideration for

20  the purposes of admissions work --

21  A.   I did.

22  Q.   -- of race-neutral alternatives?

23  A.   Yes, I did.

24       **MS. BRENNAN:**  Your Honor, that would be a good

25  stopping point, if that's acceptable.

1   **THE COURT:**  Yes, that would be fine.

2       Sir, if you will step down.

3       **THE WITNESS:**  Thank you, Your Honor.

4       (The witness left the stand.)

5       **THE COURT:**  Are there matters that we need to discuss

6   before we leave today?

7       **MR. STRAWBRIDGE:**  None, Your Honor.  I think that the

8   parties are going to confer, in light of the discussion, over

9   the weekend both in terms of how we can go about limiting

10  people in the courtroom as well as potential schedule

11  adjustments we can make.  I don't know if we're prepared to

12  talk about those now or if you want to further discuss those.

13      **MR. FITZGERALD:**  I think it would be good for the

14  parties to further discuss them, but maybe just give Your Honor

15  a status update.  My understanding is that Mr. Farmer obviously

16  will return tomorrow for cross, and I believe we are prepared

17  and have exchanged materials about two other witnesses,

18  Mr. Rosenberg and Mr. Davis.  And if we were to finish those

19  tomorrow, I think we would be a witness ahead of schedule from

20  what we submitted before, if I have it right.  We don't have

21  witnesses beyond Mr. Farmer, Mr. Rosenberg, and Mr. Davis

22  tomorrow because we've exchanged -- we thought that Mr. Davis

23  would be Monday.  He's been moved up.

24      And then if we get to Monday, there's a witness who will

25  take some time, Ms. Panter, and she will be our last fact

1 witness, as I understand it. And then, because the expert is
2 scheduled to testify remotely Tuesday morning, we've been
3 talking to Intervenors about whether or not they can move some
4 witnesses to Monday afternoon. We're working to try to take
5 advantage of the time, recognizing that because we've gone
6 faster than we thought on witnesses there may be some bumps.
7 But everyone has been working together, and we'll see what we
8 can do. I just want to let Your Honor know what the plan is.
9         **MR. HINOJOSA:** Yeah. And we are prepared, Your Honor,
10 to -- we are prepared, Your Honor, to present two witnesses on
11 Monday afternoon, and we'll be sure to provide those names to
12 the other parties as well. One of those witnesses will be
13 testifying remotely, and so we'll just be sure to coordinate
14 with Ms. Blay and the technology to make sure we understand
15 exactly how that's going to work.
16         **THE COURT:** All right. That sounds fine. It doesn't
17 seem like you would need to move on Monday, but I am concerned
18 about where you are sitting on that day that you are going to
19 examine all of those witnesses. And so I am going to recommend
20 that when we get to that point that maybe we switch places to
21 allow him to face the witnesses. We will make sure that this
22 area is cleaned up, and I would encourage you to do the same
23 before you sit there so we don't have those issues. All right.
24         **MR. FITZGERALD:** Thank you, Judge.
25         **THE CLERK:** Judge, also they had discussed with Efren

1  earlier about putting a podium in front of the table here if --
2  unless you -- if you prefer them moving, we'll just do that,
3  but they had suggested putting the podium there.
4         **THE COURT:**  I'm not sure it would be that difficult
5  for there to be a move.
6         **MR. FITZGERALD:**  That's fine with us.
7         **THE COURT:**  And that will give you direct sight to
8  your witnesses, and I would rather not clutter up the well any
9  more than we've got it cluttered up.
10        **MR HINOJOSA:**  Absolutely.
11        **THE COURT:**  So if you -- you just talk about it and
12 work that out.  It doesn't sound like you would need that
13 assistance on Monday afternoon because one is on video and --
14 one is on video and the other -- but on the day you've got that
15 list of witnesses --
16        **MR HINOJOSA:**  Right now we anticipate calling two
17 Monday afternoon.  Then possibly Wednesday afternoon we were
18 maybe going to call three, depending on the time available, and
19 then we would call the remaining three on Thursday.  So we're
20 working with Defendants --
21        **THE COURT:**  I see.
22        **MR HINOJOSA:**  -- to fill some gaps in the testimony,
23 and then we'll sadly possibly finish early, ahead of schedule.
24        **THE COURT:**  Well, I won't be sad about that.
25     But I will say, as I've said earlier, you have worked so

1  well together, so I did want you to know I had a concern about

2  his ability to see his witnesses.  So you work out the best way

3  for that to occur and when that should occur.

4       **MR. STRAWBRIDGE:**  We'll be happy to do it.  Our

5  numbers will be down since it will be next week anyway.  That

6  should not be a problem at all.

7       **THE COURT:**  All right.  That sounds good.

8     Let us adjourn court until 9:30 a.m. in the morning.

9     (Proceedings recessed at 4:56 p.m.)

10                   **C E R T I F I C A T E**

11     I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
12 CERTIFY:
      That the foregoing is a true and correct transcript of the
13 proceedings had in the within-entitled action; that I reported
   the same in stenotype to the best of my ability and thereafter
14 reduced same to typewriting through the use of Computer-Aided

16  *Lori Russell*

17 Lori Russell, RMR, CRR        Date:  12/11/2020
   Official Court Reporter

18                 **REDACTION CERTIFICATION**

19
      I, Lori Russell, certify that the foregoing is a true and
20 correct copy of the transcript originally filed with the clerk
   of court on 12/21/2020, and incorporating redactions authorized
21 by the Court requested by Defendants' counsel, in accordance
   with Judicial Conference policy.  Redacted characters appear as
22 an "X" in the transcript.

23

24  *Lori Russell*

25 Lori Russell, RMR, CRR        Date:  1/15/2021
   Official Court Reporter