# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

**STUDENTS FOR FAIR**
**ADMISSIONS, INC.,**

                **Plaintiff,**

**v.**                                       **CASE NO. 1:14-CV-954**

**THE UNIVERSITY OF NORTH**
**CAROLINA et al.,**

                **Defendants.**

## UNC DEFENDANTS' PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ........................................................................ vii

INTRODUCTION .......................................................................................... 1

PROPOSED FINDINGS OF FACT.............................................................. 6

I.      THE PARTIES ................................................................................... 6

II.     THE UNIVERSITY HAS A COMPELLING INTEREST IN ATTAINING
        THE EDUCATIONAL BENEFITS OF DIVERSITY ......................................... 8

        A.      Diversity Is a Critical Component of the University's Mission ................... 8

        B.      The University's Commitment to Diversity Is Authentic, Long-
                Standing, and Well-Documented .............................................................. 10

        C.      Experts, Faculty, Students, and Alumni Confirm that the Educational
                Benefits of Diversity Are Real, Not Theoretical ...................................... 11

        D.      The University Has Made Deliberate and Sustained Efforts To
                Pursue the Educational Benefits of Diversity............................................ 14

        E.      The University Regularly Assesses Its Achievement of the
                Educational Benefits of Diversity ............................................................. 15

        F.      The Educational Benefits of Diversity and Inclusion Working Group
                Enhances the University's Assessment Efforts ......................................... 17

        G.      The University's Efforts To Achieve the Educational Benefits of
                Diversity Are Significant and Ongoing, but Unfinished............................ 18

III.    THE UNIVERSITY'S USE OF RACE IN ADMISSIONS IS
        NARROWLY TAILORED TO ACHIEVE THE EDUCATIONAL
        BENEFITS OF DIVERSITY ............................................................................. 20

        A.      Background on the University's Admissions Office and Admissions
                Process....................................................................................................... 20

                i.      The University's Admissions Office is guided by the
                        Admissions Policy and overseen by an advisory committee........... 20

ii

ii. The University's admissions process is highly selective ................ 22

B. The University Strives To Enroll a Diverse First-Year Class Through Holistic Review ......................................................................... 22

i. The University's application process and requirements ................. 23

ii. The University's application readers .............................................. 25

iii. Application readers participate in thorough and continuous training ........................................................................................... 26

iv. Readers review each application for admission holistically, considering race and ethnicity as only one factor among many ...... 28

v. Second reads are part of the holistic review process ..................... 33

vi. School Group Review assures that admissions decisions are reasonable and comply with University policy .............................. 34

vii. Readers do not receive demographic information for the admitted or enrolling class until after admissions decisions become final ................................................................................... 37

IV. EXPERT TESTIMONY REINFORCES THAT RACE AND ETHNICITY IS NOT THE DOMINANT FACTOR IN THE UNIVERSITY'S ADMISSIONS PROCESS ................................................................... 38

A. Empirical Analysis Confirms that the University's Admissions Decisions Are Holistic ................................................................... 38

B. Race and Ethnicity Is Not the Dominant Factor in the University's Admissions Process ...................................................................... 42

i. The proper econometric technique for assessing the role of a specific factor in the admissions decision demonstrates that race and ethnicity explains a very small share regardless of which regression model is used for the analysis ............................ 42

ii. The testimony and evidence offered by Professor Arcidiacono do not credibly challenge Professor Hoxby's conclusion that race and ethnicity are not the dominant factor in the University's admissions process ................................................... 44

iii

(a) Professor Arcidiacono's choice to create a model to convert ACT scores to SAT scores was inappropriate and imposed a penalty on underrepresented minority applicants ............................................................................. 45

(b) Professor Arcidiacono's "transformation" examples are hypothetical and unrealistic ........................................... 47

(c) Professor Arcidiacono presented his conclusions in misleading ways that make his testimony less credible ....... 48

(d) The purported "accuracy" of Professor Arcidiacono's preferred model confirms that an applicant's race and ethnicity is not the dominant factor in admissions decisions .............................................................................. 49

(e) Decile analysis based on Arcidiacono's self-devised academic index is not based on the University's admissions process, over-weights test scores and grades, and ignores the impact of unobservable factors ....... 50

V. THERE IS NO WORKABLE RACE-NEUTRAL ALTERNATIVE TO THE UNIVERSITY'S CURRENT RACE-CONSCIOUS PRACTICES ............. 52

A. The University Already Employs Many Robust Race-Neutral Strategies that Complement Race-Conscious, Holistic Review ................. 52

i. The University engages in continuous recruitment, including special outreach to students from diverse backgrounds ................. 52

(a) The University recruits diverse applicants to apply ............. 52

(b) The University undertakes significant efforts to encourage a diverse group of students to enroll ................... 54

ii. The University extends outreach to underserved, low-income, first generation college student, and minority populations through special programs and financial aid ................................... 55

iii. The University's generous financial aid program is a race-neutral way that it attracts and enrolls a diverse undergraduate student body, regardless of ability to pay ....................... 57

iv

B.    The University Has Rigorously Assessed Potential Race-Neutral Alternatives that Might Replace Its Current Admissions Process ............ 59

    i.    The Admissions Office made early efforts to follow the "natural experiments" of other universities .................................... 59

    ii.    The Admissions Office analyzed a socioeconomic status race-neutral alternative .......................................................................... 60

    iii.    The Admissions Office kept apprised of research concerning race-neutral alternatives ................................................ 60

    iv.    The Admissions Office analyzed a class rank percentage plan ....... 61

    v.    The U.S. Department of Education's Office for Civil Rights found that the University had seriously and in good faith considered race-neutral alternatives as of November 2012............. 61

    vi.    The University convened the Working Group on Race-Neutral Alternatives ..................................................................... 62

    vii.    The University convened the Committee on Race-Neutral Strategies ...................................................................................... 64

C.    Comprehensive Expert Analysis Confirms that No Workable Race-Neutral Alternative Would Allow the University To Maintain Its Current Levels of Academic Preparedness and Racial Diversity............... 68

    i.    No socioeconomic status-based race-neutral alternative achieves the University's current levels of racial and ethnic diversity and academic preparedness. ............................................ 72

        (a)    No realistic percentage plan attains the University's current levels of both racial and ethnic diversity and academic preparedness ...................................................... 75

        (b)    No geography-based race-neutral alternative achieves the University's current levels of racial and ethnic diversity and academic preparedness ................................. 76

        (c)    No other potential race-neutral strategy suggested by Mr. Kahlenberg achieves the University's current levels of racial and ethnic diversity and academic preparedness ...................................................................... 78

      *ii.*    SFFA presented no credible expert evidence to contradict Professor Hoxby's conclusions ........................................................ 79

           (a)    Mr. Kahlenberg overstated the success of other institutions in implementing race-neutral alternatives ......... 82

           (b)    The "success" of Mr. Kahlenberg's simulations depends upon numerous unrealistic assumptions ................ 85

                 (1)    Mr. Kahlenberg's simulations fail to account for reasonably foreseeable changes in applicant behavior ................................................................. 85

                 (2)    Mr. Kahlenberg originally failed to properly account for the size of the admitted class and then improperly filled the remaining seats in the class based on an equal weighting of test score and GPA ................................................................. 86

                 (3)    Mr. Kahlenberg provides unrealistic "boosts" for socioeconomic disadvantage .............................. 88

**PROPOSED CONCLUSIONS OF LAW** ........................................................ 90

I.     CONTROLLING SUPREME COURT PRECEDENT PERMITS THE CONSIDERATION OF RACE IN ADMISSIONS ............................................ 90

II.    THE UNIVERSITY'S ADMISSIONS PROGRAM IS CONSTITUTIONAL ........................................................................................ 93

     A.    The University Demonstrated Its Compelling Interest in Diversity ........... 93

     B.    The University Demonstrated that Its Use of Race in Admissions Is Narrowly Tailored ...................................................................... 96

         *i.*    The University conducts a holistic, individualized review of each applicant, considering race flexibly as only one factor among many ................................................................. 96

         *ii.*    No workable race-neutral alternative would allow the University to achieve its compelling interest about as well as race-conscious admissions ........................................................ 101

**CONCLUSION** ......................................................................................... 106

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Fisher v. University of Texas at Austin,*
    136 S. Ct. 2198 (2016)........................................................................ passim

*Fisher v. University of Texas at Austin,*
    570 U.S. 297 (2013)........................................................................... passim

*Gratz v. Bollinger,*
    539 U.S. 244 (2003)................................................................................. 92

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)........................................................................... passim

*Regents of the University of California v. Bakke,*
    438 U.S. 265 (1978)....................................................................90, 91, 92

*Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989)................................................................................. 91

Case 1:14-cv-00954-LCB-JLW   Document 245   Filed 02/05/21   Page 7 of 115

# INTRODUCTION

The evidence presented at trial demonstrated that The University of North Carolina at Chapel Hill (the "University") employs a holistic, individualized, race-conscious admissions program for the right reason (to further a compelling interest in the educational benefits of diversity) and in the right way (constitutionally). Although the Complaint in this action called into question the University's sincerity and lodged serious accusations of cheating against the University and its officials, most of these allegations were abandoned by plaintiff Students for Fair Admissions ("SFFA") at trial and none were substantiated by the evidence. To the contrary, the UNC Defendants[1] carried their burden to satisfy strict scrutiny, demonstrating through credible witness testimony and ample record evidence that the University has a genuine and compelling interest in the educational benefits of diversity and that its admissions program is narrowly tailored to achieve that interest.

First, the University's compelling interest in the educational benefits that flow from a diverse student body was overwhelmingly established and uncontested. University witnesses credibly testified at trial and in multiple submitted declarations that a diverse campus community is critically important to the University's mission and that racial diversity, in particular, imparts distinct educational benefits that the University strives to

---

[1] The "UNC Defendants" include the University and certain of its employees, the University of North Carolina Board of Governors and its individual members, and the University of North Carolina System and its president. (*See infra*, Proposed Findings of Fact ¶¶2-4, 6-8.)

attain. The Supreme Court has recognized as a compelling interest many of the same benefits of racial diversity that University witnesses described and experienced, including breaking down stereotypes, promoting learning outcomes, and preparing students for an increasingly diverse workforce and society. *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210 (2016) ("*Fisher II*"). SFFA did not challenge the existence of these benefits and its expert witness acknowledged they are real.

Moreover, voluminous record evidence, including witness testimony, declarations, and uncontradicted expert reports, demonstrated that the University's commitment to attaining these benefits is deliberate, long-standing, and sincere. The University systematically engages diversity throughout its academic and extracurricular programming, housing initiatives, and affinity groups so that its students can experience the educational benefits of diversity. The University also routinely assesses whether students are experiencing these benefits. But the evidence demonstrated that the University has not yet fully realized its diversity goals. Minority students remain underrepresented on campus and in certain fields of study, compromising the University's ability to deliver the educational benefits of diversity, and warranting the University's sustained efforts to improve.

At trial, SFFA did not challenge this evidence or otherwise contest the University's good faith in its pursuit of the educational benefits of diversity. In these circumstances, the University's good faith is both presumed and conclusively proven. *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). In short, the University has established its

2

compelling interest in the educational benefits of diversity and its academic judgment to pursue this interest is entitled to judicial deference. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310-11 (2013) ("*Fisher I*").

Second, the UNC Defendants demonstrated that, consistent with Supreme Court guidance, the University engages in an individualized, holistic review of each application for admission, considering race flexibly, as only one factor among all the many qualities an applicant may possess. SFFA's experts readily agreed that the University's admissions process is holistic. And nothing in the record suggests that the University engages in prohibited practices. Quite the opposite: the record uniformly supports that the University does <u>not</u> assign automatic points for race, employ quotas, review minority applicants in separate categories or according to different standards, engage in racial balancing, or intentionally discriminate against any applicants. SFFA abandoned all contrary allegations at trial by failing to present any evidence on these issues whatsoever.

Despite overwhelming evidence that the University has scrupulously complied with Supreme Court guidance, SFFA sought to use expert statistical analysis to contend that race, nevertheless, plays an outsized role in the University's admissions process. But the expert evidence presented at trial did not support SFFA's argument. The University's expert, Professor Caroline Hoxby, empirically demonstrated, through careful econometric analysis, that race and ethnicity explains only a small share of the admission decision under either party's preferred model. Tellingly, SFFA's expert, Professor Peter Arcidiacono, agreed that race is <u>not</u> a dominant factor across the University's entire

3

admissions process. And Professor Arcidiacono's opinion that race is dominant for a subset of applicants—even if credible (which it was not)—does not mean that the University uses race in an unconstitutional way. To the contrary, the Supreme Court has expressly condoned the use of race when it plays a role in only a small portion of admissions decisions, declaring it a "hallmark of narrow tailoring, not evidence of unconstitutionality." *Fisher II*, 136 S. Ct. at 2212.

Third and finally, the UNC Defendants demonstrated that the University has seriously and in good faith considered race-neutral alternatives to its race-conscious admissions practices, but found none that would allow it to achieve its compelling interest about as well and at tolerable administrative expense. The record shows that the University has regularly studied race-neutral alternatives since at least 2004, including reviewing race-neutral admissions programs implemented by other colleges, researching social science and legal literature, conducting admissions simulations, and convening two separate committees to rigorously explore race-neutral alternatives.

University witnesses credibly testified at trial that these efforts have yet to reveal a race-neutral alternative that could be substituted for race-conscious review. Expert testimony supported this conclusion. Professor Hoxby conducted exhaustive simulations of race-neutral alternatives, making generous assumptions designed to favor their viability, but found none that could allow the University to maintain diversity and academic excellence. Although SFFA's race-neutral alternative expert, Richard Kahlenberg, posited that the University could implement a race-neutral alternative, his

opinions were biased, overly optimistic, and, in certain respects, divorced from reality. Likewise, Mr. Kahlenberg's suggestion that the University could satisfy its compelling interest merely by enhancing certain race-neutral strategies to which the University already devotes substantial resources—including partnering with disadvantaged high schools, facilitating community college transfers, and awarding generous financial aid—lacks credibility, especially in light of his concession that these strategies could not fully replace race-conscious admissions.

Simply put, the evidence presented at trial overwhelmingly supports the conclusion that the University's admissions process is constitutional under controlling Supreme Court precedent because the University engages in individualized, holistic admissions decisions, considering race as only one factor among many, and no workable, race-neutral alternative exists that could achieve the University's goals about as well and at tolerable administrative expense. Although SFFA has not disguised its desire to eventually challenge the controlling precedent, all parties agree that this Court is bound to apply the prevailing law. (*See* ECF 209 (UNC Defs.' Unopposed Mot. for Partial J.); ECF 210 (granting judgment in favor of UNC Defendants on Count III).) And under those standards, the record is clear: the UNC Defendants have carried their burden in this case. The Court should grant judgment in favor of the UNC Defendants on Counts I and II of the Complaint, and deny SFFA's bid to disable the University from pursuing its compelling interest in diversity by considering race in admissions.

## PROPOSED FINDINGS OF FACT

These proposed findings of fact reflect evidence presented during the trial conducted from November 9 through November 19, 2020, and the parties' Joint Statement of Undisputed Facts (ECF No. 225 ("JSF").)

## I.    THE PARTIES

1.    Plaintiff Students for Fair Admissions, Inc. is an Internal Revenue Code Section 501(c)(3) organization. Its stated mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." (JSF ¶1.) SFFA is a voluntary membership association comprised of more than 20,000 members, including, among others, applicants who have applied for and were denied admission to the University. (*Id.*)

2.    Defendant The University of North Carolina at Chapel Hill was founded in 1789 as the nation's first public university. (JSF ¶2.) The University is a constituent institution of defendant University of North Carolina System (the "UNC System"). (JSF ¶4.)

3.    Defendant University of North Carolina Board of Governors is the governing body of the UNC System. (JSF ¶5.) The Board of Governors has responsibility for the planning, development, and overall governance of the UNC System pursuant to Chapter 116 of the North Carolina General Statutes. (JSF ¶6.)

4.    Defendant Peter Hans is President of the UNC System and its chief administrative and executive officer. He has authority to manage the affairs and execute the policies of the UNC System, subject to the direction of the Board of Governors. (JSF ¶7.)

5.    The University's Board of Trustees serves as an advisor to the Board of Governors on matters pertaining to the University. (JSF ¶8.) The Board of Trustees also serves as an advisor to the Chancellor concerning the management and development of the University. (JSF ¶12.) The Board of Trustees is composed of thirteen persons: eight are elected by the Board of Governors, four are appointed by the North Carolina General Assembly, and the remaining member is the student body president, ex officio. (JSF ¶9.) The Board of Trustees and its individual members were initially named as defendants to this action, but they were dismissed in 2015. (JSF ¶10.)

6.    The University's Chancellor is responsible for carrying out the policies of the Board of Governors and the Board of Trustees and is vested with executive authority over the University, subject to the direction of the President of the UNC System. The Chancellor of the University is Defendant Kevin Guskiewicz, who succeeded Carol Folt in 2019. (JSF ¶11.)

7.    Defendant Robert Blouin is the Executive Vice Chancellor and Provost of the University; Dr. Blouin succeeded James Dean in 2017. (JSF ¶17.)

7

8. Defendant Stephen Farmer was the University's Vice Provost for Enrollment and Undergraduate Admissions from 2011 through 2020. (Tr. 512:10-22 (Farmer).)

## II. THE UNIVERSITY HAS A COMPELLING INTEREST IN ATTAINING THE EDUCATIONAL BENEFITS OF DIVERSITY

### A. Diversity Is a Critical Component of the University's Mission

9. The University is a public institution that is responsible to the people of North Carolina. (Tr. 518:5-13 (Farmer).) As set forth in its mission statement, the University exists to serve as a center for research, scholarship, and creativity, and to teach a diverse community of undergraduate, graduate, and professional students to become the next generation of leaders. (JSF ¶3; DX001 at 1; Tr. 780:3-10 (Panter).)

10. The University has determined, in its academic judgment, based on experience and evidence, that in order to prepare the next generation of leaders for North Carolina and the country, the University must provide students with the experience of learning and living alongside people from different backgrounds. (Tr. 518:18-24 (Farmer).) The University has long recognized that it must admit and enroll a diverse student body to realize this goal. (DX120 ¶20; DX003 at 3; DX135 ¶¶56-57; DX006 at 28; DX002 at 1.)

11. The University defines diversity to include "all of the ways in which people differ." (DX088 at 6.) Accordingly, the University strives to foster a campus community that varies in multifaceted ways, including social backgrounds, economic circumstances,

8

philosophical outlooks, life experiences, perspectives, beliefs, expectations, and aspirations. (Deposition of Carol Folt ("Folt Dep.") at 29:14-22.)[2]

12.    Diversity includes racial and ethnic differences, which combine with multiple other individual characteristics to create an "exciting environment for learning." (Folt Dep. at 32:7-14.) Racial and ethnic diversity, in particular, provides unique educational benefits and is essential to the achievement of the University's goals. (Tr. 526:24-527:14 (Farmer); Tr. 782:1-3, 861:9-862:4 (Panter); DX003.) The University's former Chancellor testified that it is "critical" to expose students to a "broad range of diversity" in college that mirrors what they will face as the next generation of leaders. (Folt Dep. at 31:5-20.)

13.    The University expressly established as an institutional goal the admission of underrepresented populations to enhance the educational process. (DX088 at 6; DX003 at 7.) The University defines "underrepresented" to mean "those groups whose percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina," a framework established in the 1981 consent decree between the UNC System and the United States Department of Health, Education, and Welfare. (DX010 at 7.) Under this definition, the University

---

[2]    Citations to deposition transcripts refer to deposition testimony designated by the parties and jointly submitted to the Court on November 5, 2020.

considers as underrepresented those students identifying themselves as African American or black; American Indian or Alaska Native; or Hispanic, Latino, or Latina. (*Id.*)

## B. The University's Commitment to Diversity Is Authentic, Long-Standing, and Well-Documented

14. As early as 1998, the University's Faculty Council expressly made clear that the University has an obligation to "create and sustain an environment of educational excellence" and "foster mutually beneficial interactions among students, faculty, staff, and administrators who possess diverse backgrounds and wide varieties of perspectives and life experiences." (DX003 at 2.) The University's 2003 and 2011 Academic Plans—strategic plans for achieving the University's academic goals—reflect a commitment to these principles. (Tr. 521:9-523:4 (Farmer); DX006 at 5-6; DX007.)

15. In 2016, the Faculty Council reaffirmed the University's commitment to the values of diversity and inclusion by unanimously passing Resolution 2016-12: On Commitment to Diversity and Inclusion. (DX002; Tr. 523:8-524:13 (Farmer).) In the resolution, the Faculty Council recognized that student body diversity is a vital and necessary component of academic excellence, and reaffirmed its belief that the University can achieve its educational, research, and service missions only by creating and sustaining a diverse and inclusive environment. (DX002; *see also* Tr. 524:7-16 (Farmer).)

16. The educational benefits of diversity the University seeks to achieve are also reflected in the 2017 Provost's Report on the Educational Benefits of Diversity. (Tr. 780:11-23 (Panter); DX003.) These benefits include promoting the robust exchange of ideas; broadening and refining understanding; fostering innovation and problem-solving;

10

preparing engaged and productive citizens and leaders; and enhancing appreciation, respect, and empathy. (DX003.)

## C. Experts, Faculty, Students, and Alumni Confirm that the Educational Benefits of Diversity Are Real, Not Theoretical

17.     The educational benefits of diversity are well-documented in academic research. (DX108A at 9-12, 14-21; IX001 at 4-6.)

18.     The educational benefits of diversity also are routinely experienced and observed by University faculty, staff, students, and alumni across disciplines and professions. (*See* Tr. 780:24-781:11 (Panter); DX131 ¶16; DX116 ¶8; DX118 ¶¶20, 29; DX140 ¶9; DX144 ¶10; DX146 ¶¶14, 17; DX124 ¶12; DX136 ¶¶15-16; DX139 ¶15.)

19.     Mr. Farmer credibly testified that some of these benefits include that "students are able to experience different perspectives that will challenge them to think; that students will come up with more creative solutions than they would have otherwise; [and] that students will learn how to navigate in a complex multicultural world so that they'll know more and they'll be able to do more when they [graduate]." (Tr. 521:2-8 (Farmer).) Other record evidence likewise reflects that a diverse student body improves students' capacity to work effectively with others: exposure to diversity breaks down stereotypes, creates common understandings, and encourages empathy. (DX118 ¶¶20, 30; DX131 ¶19; DX135 ¶12; DX123 ¶19; DX128 ¶13; DX132 ¶33; DX124 ¶24; DX130 ¶28; DX133 ¶¶19, 22; DX126 ¶16; Tr. 911:6-10 (Ward).)

20.     Dr. Abigail Panter, the Senior Associate Dean for Undergraduate Education, testified that she personally observed the educational benefits of diversity in

11

her classroom. (Tr. 780:24-781:11 (Panter).) So too have other University professors. For example, Dr. Joseph DeSimone, the Chancellor's Eminent Professor of Chemistry, submitted a declaration averring that diversity—as opposed to homogenous "groupthink"—provides a "fertile ground for innovation" in his research lab. (DX127 ¶¶20-22, 29-30.) Other University professors likewise testified that diversity promotes discovery and innovation and expands fields of inquiry. (DX145 ¶¶11-12; DX140 ¶9; DX118 ¶35; DX127 ¶¶18, 24, 27-29.) Professors also averred that diverse classrooms expand discussions and offer opportunities for learning. (*See, e.g.*, DX121 ¶9 (testifying that racial diversity results in more robust and fully inclusive conversations in class about the history of the South); DX118 ¶30 (testifying that students in political science class discussing police behavior toward minorities learned from diverse classmates who had been involved with traffic stops, providing "a powerful and impactful learning moment").)

21.     Students, too, want to engage with a broad range of perspectives to improve their leadership skills and deepen their appreciation for others. (DX005 at 5.) Thus, racial and ethnic diversity is an important consideration for students when deciding whether to matriculate at the University. (*See* Tr. 1260:16-20 (Brennen).)

22.     Students have observed and experienced the importance of learning from classmates of different backgrounds and recognize that exposure to these differences is critical to their future success. (Tr. 680:13-16 (Rosenberg); Tr. 1298:8-1299:2 (Wingate-Bey); DX148 ¶17; DX133 ¶24; *see also* DX123 ¶¶4, 13, 20-21; DX150 ¶4.) For example,

12

Mary Cooper, a white alumna who served as student body president in 2011, averred that learning in a diverse student body prepared her to work with, coach, and teach others who do not look like her or who have not had the same experiences. (DX123 ¶21.) Likewise, Peter Henry, a black male alumnus from a wealthy Chicago suburb, observed that when he became study partners with a white male from rural North Carolina he learned a "real lesson" about the "implicit assumptions" he made about people. (DX131 ¶19.)

23. Student-intervenors testified convincingly about the importance of racial and ethnic diversity to their University educations. (Tr. 1297:12-1298:7 (Wingate-Bey) (testifying that racial and ethnic diversity enriched her educational experience); Tr. 885:25-886:3 (Polanco) ("[T]he ethnic and racial diversity I experienced at UNC helped me have more of an understanding of people from different backgrounds that are different from my own, which makes me better . . . .").)

24. Successful University alumni also confirm that exposure to diversity in college is necessary to prepare future leaders for their careers. (Tr. 911:23-912:3 (Ward), Tr. 1269:14-1270:1 (Brennen); Tr. 1305:12-25 (Wingate-Bey); DX131 ¶¶11-12; DX116 ¶18; DX129 ¶17; DX117 ¶¶16-18; DX141 ¶¶12-14; DX147 ¶¶12-13; DX149 ¶17.) For example, student-intervenor Rimel Mwamba, a 2018 graduate of the University, testified that her experiences as a student will enable her to treat and care for a diverse patient population in her career as a doctor. (Tr. 1371:24-1372:11 (Mwamba).)

13

**D.    The University Has Made Deliberate and Sustained Efforts To Pursue the Educational Benefits of Diversity**

25.    The University strives to foster a campus environment where the educational benefits associated with a diverse student body can be realized. (Folt Dep. at 31:5-35:19, 75:11-18, 173:9-22; DX120 ¶42; DX125 ¶12; Deposition of Christopher Faison ("Faison Dep.") at 26:6-29:5, 291:6-292:3; DX002 at 1.)

26.    In the classroom, the University intentionally creates opportunities for students to learn from their peers and actively encourages participation from all students. (DX118 ¶¶20-28; DX121 ¶¶6-17; DX133 ¶¶16-22; DX146 ¶19; DX122 ¶26; DX145 ¶¶8-10; DX132 ¶¶18-22, 26, 28-29; DX124 ¶¶15-26.) In the College of Arts & Sciences, all classes that are part of the general education curriculum require student collaboration as part of the course. (Tr. 792:1-6 (Panter).)

27.    Outside the classroom, the University likewise takes deliberate steps to encourage students to interact and engage with other students from a wide variety of backgrounds. For example, the Carolina Union hosts events featuring internationally regarded scholars and leaders, providing opportunities for students from all backgrounds and experiences to come together on campus to build community and lasting connections. (DX135 ¶¶25-31.) The Carolina Union also sponsors Carolina United, a leadership program designed to foster dialogue about issues of diversity. (DX135 ¶21.) Participants talk about issues regarding race, sexuality, gender and religion and report that the experience makes them more accepting and empathetic and better members of the community. (Tr. 1296:13-23 (Wingate-Bey).)

14

28.     Additionally, the University's Student Affairs Division supports 180 student organizations with missions related to advocacy or diversity. (DX125 ¶33.)

29.     Other University programs and organizations also promote the advancement and connectivity of diverse students. (DX122 ¶¶27-33; DX124 ¶¶37-30; DX129 ¶8.) For example, student-intervenor, Star Wingate-Bey, a black student, credibly testified that the Misconception dance team provided opportunities for her to meet and interact with those of Asian heritage and learn about their culture. (Tr. 1295:21-1296:10 (Wingate-Bey).)

30.     The University's expert, Professor Mitchell Chang of the University of California, Los Angeles, assessed the University's programming, including affinity groups, student housing initiatives, campus discussion forums, academic preparedness and mentoring programs, discipline-specific initiatives, course offerings, and classroom assignments. (DX108A at 29-32, 34-41.) Professor Chang determined that the University has implemented a variety of programs and policies that demonstrate that it systematically and effectively "engages diversity" to intentionally create the conditions necessary for the achievement of educational benefits. (DX108A at 5-6, 26, 33-34; *see also* IX001 at 38, 44, 47.)

## E.     The University Regularly Assesses Its Achievement of the Educational Benefits of Diversity

31.     The University has long assessed the health of its campus, the success of its students, and the success of its diversity efforts. (Tr. 572:6-9 (Farmer); Tr. 782:7-10 (Panter).) Since at least the late 1990s, the University has continuously conducted

15

numerous, ongoing assessments related to student learning and experiences, including the collection of survey data at different stages of the student experience. (DX108A at 41-43, 49, 53, 58; Tr. 782:13-21, 783:19-784:2 (Panter).) The University also seeks information about the student experience informally through Office of Diversity and Inclusion programs and the Faculty Council. (Tr. 788:4-15 (Panter).) Additionally, the University conducts targeted climate surveys addressing diversity issues, most recently in 2016. (Tr. 787:3-15 (Panter).)

32.     The University specifically assesses its progress toward achieving the educational benefits of diversity by, for example: (a) collecting and analyzing quantitative data tracking the diversity of the campus population (DX120 ¶47); (b) collecting feedback on diversity issues from students and faculty (DX120 ¶48; DX125 ¶61; DX003 at 17); (c) completing department-specific self-assessments and course evaluations that provide information related to diversity topics (DX125 ¶¶62-76; DX119 ¶¶79-95; DX135 ¶¶45-54; Tr. 782:22-783:3, 783:12-18, 788:16-790:8 (Panter)); and (d) participating in third-party studies and surveys including information about how diversity impacts the student experience (DX135 ¶¶47-48; DX119 ¶¶87-88, 90-94 & Exs. 3-8). (DX108A at 26-31.)

33.     Measuring the University's success at achieving the educational benefits of diversity is both quantitative and qualitative. (Tr. 867:22-24 (Panter).) Although numbers are necessary, they are not sufficient to the University's understanding of dynamic diversity. A key metric is qualitative: determining that students "are being supported and

16

are having positive, meaningful interactions across race." (Tr. 867:22-869:7 (Panter); *see also* Tr. 567:18-568:20 (Farmer); Tr. 108:11-23, 109:23-110:10 (Kretchmar).)

## F. The Educational Benefits of Diversity and Inclusion Working Group Enhances the University's Assessment Efforts

34.     In December 2017, Provost Robert Blouin established the Educational Benefits of Diversity and Inclusion Working Group ("EBD Working Group"). (DX120 ¶49.) The EBD Working Group reports to the Chancellor and the Diversity and Inclusion Executive Council. (Tr. 809:14-21 (Panter); DX005 at 7.)

35.     The EBD Working Group is charged with coordinating and enhancing the assessment of the University's ongoing efforts to realize the educational benefits of diversity. (DX120 ¶49; DX003 at 7; Tr. 572:10-16 (Farmer); Tr. 795:12-796:4 (Panter).) The EBD Working Group is committed to being a national leader in providing, constantly assessing, and improving the delivery of the educational benefits of diversity. (Tr. 808:8-16 (Panter).)

36.     Members of the EBD Working Group bring to bear different types of expertise relevant to the group's charge, including in the areas of educational research and assessment; the impact and implementation of organizational diversity, equity, and inclusion; admissions and enrollment management; student advising and support; strategy; and project management. (Tr. 796:5-797:7 (Panter); DX005 at 3.)

37.     During its first year of existence, the EBD Working Group reviewed significant data regarding the University's delivery of the educational benefits of diversity and developed a plan for assessing the University's efforts going forward.

17

(DX120 ¶¶51, 53-54; Tr. 573:1-2 (Farmer); Tr. 797:8-802:12 (Panter); DX061.) Specifically, the EBD Working Group adopted a framework to measure the University's efforts, which begins before matriculation and continues through the full range of the student experience on campus and post-graduation. (DX005 at 5, 82-83.) This will help the EBD Working Group better assess the educational benefits of diversity over time. (Tr. 800:20-801:13 (Panter); DX005 at 3.)

38.     The EBD Working Group also formed a subcommittee that assembled a comprehensive list of existing surveys and took steps to ensure that it is regularly apprised of all relevant assessments performed on campus. (Tr. 807:4-14 (Panter).) The EBD Working Group provides regular reporting of its activities to the Chancellor and to the University Diversity and Inclusion Executive Council. (Tr. 809:14-21 (Panter); DX005 at 7.)

**G.     The University's Efforts To Achieve the Educational Benefits of Diversity Are Significant and Ongoing, but Unfinished**

39.     Dr. Panter testified that the evidence reviewed by the EBD Working Group to date suggests that University students are receiving educational benefits from diversity; however, the University still has significant work to do in many different spaces in order to fully realize its goals. (Tr. 805:18-806:7 (Panter).)

40.     The University continues to face challenges admitting and enrolling underrepresented minorities, particularly African American males, Hispanics, and Native Americans. (Tr. 570:8-11 (Farmer).) For example, in 2013, the enrollment of African

18

American men in the first-year class fell below 100 students out of 4,200. (Tr. 519:20-21, 570:15-17 (Farmer).)

41.     Student-intervenors credibly testified that there were far fewer students of color on campus than they expected and that they experienced low minority representation. (Tr. 879:2-7 (Polanco); Tr. 1285:19-25 (Ornelas); Tr. 1299:3-17 (Wingate-Bey); Tr. 1366:4-6 (Mwamba).) This underrepresentation causes minority students to experience loneliness and tokenism. (Tr. 879:17-880:14 (Polanco); Tr. 1300:13-18 (Wingate-Bey).) Underrepresented minority students also report feelings of isolation and unfair pressure to represent their race or ethnicity—effects that do not create the experience the University wants or the students deserve. (Tr. 571:15-572:1 (Farmer); Tr. 1262:10-1263:5 (Brennen); DX128 ¶¶9-11; DX138 ¶9; DX142 ¶9; DX143 ¶¶14-23; DX144 ¶¶3-6; IX001 at 65.)

42.     University professors likewise observe a lack of minorities in certain classes, fields, or areas of campus; this underrepresentation limits opportunities for exposure and learning. (DX126 ¶¶18-21; DX145 ¶15.)

43.     The foregoing challenges hinder both the University's efforts to provide students with the educational benefits of diversity and the University's ability to fully realize those benefits. (DX108A at 70-73; *see also* Tr. 1286:1-6 (Ornelas) ("Q: And when you encountered that lack of representation, how did it affect you? A: I think in some of those instances I retreated to some old strategies . . . of how I coped being in those

19

spaces, found myself maybe participating less and not sharing as much of my opinion or experiences in those environments."); Tr. 1364:15-1366:3 (Mwamba).)

III.   **THE UNIVERSITY'S USE OF RACE IN ADMISSIONS IS NARROWLY TAILORED TO ACHIEVE THE EDUCATIONAL BENEFITS OF DIVERSITY**

A.   **Background on the University's Admissions Office and Admissions Process**

   *i.*   **The University's Admissions Office is guided by the Admissions Policy and overseen by an advisory committee**

44.   The Board of Trustees sets the University's admissions policy, documented as The University of North Carolina at Chapel Hill: Admissions Policy (DX008) (the "Admissions Policy"). (JSF ¶13.) The Admissions Policy states that undergraduate admissions are the responsibility of the Office of Undergraduate Admissions (the "Admissions Office"), which makes the University's admissions decisions. (JSF ¶14.)

45.   The Admissions Policy also states that the Advisory Committee on Undergraduate Admissions (the "Advisory Committee") approves policies and procedures applied by the Admissions Office. (JSF ¶18; Tr. 816:8-13 (Panter); DX011.) The Advisory Committee is a faculty committee chartered under the code of faculty governance. (Tr. 515:11-14 (Farmer).) Members of the Advisory Committee include faculty across the college and deans of the professional schools that enroll undergraduate students. (Tr. 814:12-15 (Panter); *see also* JSF ¶19; DX011.) Ex officio members of the Advisory Committee include the University Registrar, the Vice Provost for Enrollment and Undergraduate Admissions, the Associate Dean for Academic Advising, and a leader

20

from Student Affairs. (Tr. 814:17-23 (Panter).) The Advisory Committee reports annually to the Faculty Council. (Tr. 817:3-17 (Panter); DX022.)

46. The Advisory Committee is charged with serving in an advisory capacity to the director of undergraduate admissions, including addressing the design and application of admissions policy, recommending guidelines for special talent and exceptional admissions, and monitoring and responding to the national college admissions environment. (DX011 at 2.) The Advisory Committee also conducts a variety of activities related to advising the Admissions Office, including discussing recruiting, receiving updates from the working group studying race-neutral alternative admissions processes, and reviewing de-identified applications for admission. (DX022; Tr. 818:13-820:18 (Panter).) The Advisory Committee has discussed the importance of—and supports—the consideration of race as a factor in the University's admissions process. (Tr. 816:21-817:1 (Panter).)

47. During his tenure as the University's Vice Provost for Enrollment and Undergraduate Admissions, Stephen Farmer was responsible for all aspects of the University's Admissions Office, including overseeing a staff of approximately 120 full-time and part-time employees. (JSF ¶¶15, 16.) Mr. Farmer reported to Provost Blouin. (JSF ¶17.) From 2011 through 2020, in addition to directing the Admissions Office, Mr. Farmer oversaw the Office of Scholarships and Student Aid and the Office of the University Registrar and served as a member of the Chancellor's Cabinet and the Provost's Cabinet. (Tr. 512:10-20, 514:6-10 (Farmer).)

21

### ii. The University's admissions process is highly selective

48.     The University has received recognition for having top academics and is perennially ranked among the top five public universities by *U.S. News & World Report*. (Tr. 518:25-519:7 (Farmer).)

49.     The University annually enrolls a first-year class of only approximately 4,200 students. (Tr. 519:20-21 (Farmer).) The admissions process is highly selective: for the class of 2022, the University received approximately 43,500 applications. (Tr. 519:8-21 (Farmer).)

50.     Pursuant to Board of Governors' Policy 700.1.3, the enrollment of non-North Carolina residents in each incoming freshman class cannot exceed 18%. (JSF ¶38; Tr. 519:24-520:2 (Farmer); *see also* JSF ¶39 (explaining penalties for exceeding this cap).) The University receives applications from approximately twice as many out-of-state applicants as in-state applicants each year. (JSF ¶40.)

## B.     The University Strives To Enroll a Diverse First-Year Class Through Holistic Review

51.     The University seeks to enroll "great students who will make each other better, both because of the excellence of their achievement and their potential and because of their differences one from another." (Tr. 520:13-16 (Farmer); *see also* Tr. 679:17-24 (Rosenberg) (testifying that the goal of the application review process is to admit a smart, caring diverse group of students who will enhance both the academic and social environment on campus).) "[I]n support of the cultivation of diversity broadly construed, the University also aims to enroll critical masses of students who identify

22

themselves as members of groups the University deems underrepresented." (DX010 at 7; Tr. 543:20-24 (Farmer).)

52.     Dr. Jennifer Kretchmar and Mr. Jared Rosenberg, both long-time members of the Admissions Office, credibly testified that the Admissions Office staff members understand the University's goal of achieving the educational benefits of diversity and aim to build a class of students who contribute diverse backgrounds and perspectives, including racial and ethnic diversity. (Tr. 108:11-23, 109:25-110:10 (Kretchmar); Tr. 679:20-680:20, 683:17-684:2 (Rosenberg).) Although admissions officers do not frequently use the term "critical mass," they think of critical mass in terms of the outcomes of the educational benefits of diversity. (Tr. 109:18-110:10 (Kretchmar); Deposition of Damon Toone ("Toone Dep.") 70:6-71:24, 74:8-17.)

53.     To admit a class that fulfills its goals, the University engages in a whole-person, holistic review, which involves considering applicants comprehensively, rigorously, sympathetically, individually, one-by-one, on the basis of everything known about them. (Tr. 528:7-529:14 (Farmer).)

*i.*     **The University's application process and requirements**

54.     Applicants for admission to the University's first-year class must apply by one of two deadlines. (JSF ¶21.) October 15th is the deadline for non-binding Early Action, and January 15th is the deadline for non-binding Regular Decision. (JSF ¶¶22, 23.) There is no admission preference for students who apply early; the University's goal

23

is to make the Early Action and Regular Decision admissions processes as similar as possible. (Tr. 557:20-22, 558:12-21 (Farmer).)

55.     During the relevant time period, i.e., the 2013-2014 through 2016-2017 admissions cycles, applicants for admission were required to submit the Common Application, which is an undergraduate college admission application that students may use to apply to any of more than 800 member colleges. (JSF ¶¶24-25.) All applicants also were required to submit the Common Application essay; short essays in response to prompts posed by the University; standardized test scores from either the SAT or the ACT; a letter of recommendation from at least one teacher who taught the applicant in a core academic area; a high school transcript; and, for those applicants claiming North Carolina residency, verification of residency. (JSF ¶¶26-30, 32.) Applicants may also submit additional materials, including resumes, artwork, music samples, disability-related documentation, and additional letters of recommendation. (JSF ¶35.)

56.     Additionally, as part of the application process, a school counselor must submit a secondary school statement providing information about the applicant's high school and the available curriculum. (JSF ¶31.)

57.     Applicants are also required to submit an application fee. (JSF ¶33.) However, the University will waive the application fee for applicants who demonstrate they meet the fee waiver guidelines of the National Association for College Admission Counseling, ACT, or the College Board, or who serve on active duty in the U.S. Armed Forces. (JSF ¶34.)

24

58.     The Common Application contains a "Demographics" section that requests, but does not require, the applicant's citizenship status, birthplace, and race, and a "Family" section that requests, but does not require, the applicant's parents' country of birth. (JSF ¶36.) Applicants who identify themselves by race or ethnicity are not limited to one race or ethnicity, but may choose all with which they identify. (JSF ¶37.)

59.     The University does not require applicants to submit information about their race and ethnicity. (Tr. 546:20-22 (Farmer); Sealed Tr. 11:2-6 (Rosenberg).) Mr. Farmer credibly testified that the University, including Admissions Office application readers, becomes aware of a student's race only if the student chooses to disclose their race during the application process. (Tr. 546:12-19 (Farmer).)

60.     Regardless, all applicants go through the same evaluation process; candidates of different racial backgrounds are not reviewed separately or differently (Tr. 696:4-6 (Rosenberg)), and applicants are not penalized for their decision not to disclose their race. (Tr. 549:12-17 (Farmer).)

### ii.     The University's application readers

61.     Every application for admission is reviewed by at least one of 30 to 40 application readers, who collectively form the admissions committee. (JSF ¶41.) Application readers consist of both full-time staff and seasonal Admissions Office employees. (JSF ¶42.) They are responsible for evaluating applications and making recommended admissions decisions. (JSF ¶43.)

25

62.     Jared Rosenberg has served as Associate Director of Admissions since 2015. In this role, he is responsible for the day-to-day management of application review and the overall philosophical direction of the review, including the training of readers and the supervision of seasonal application readers. (Tr. 678:7-679:15, 685:2-3 (Rosenberg).)

63.     Application readers have a diversity of background and experience. The majority of full-time admissions staff have graduate degrees, all readers have undergraduate degrees, and many joined the Admissions Office with previous experience working in post-secondary schools or high schools. (Tr. 681:21-24, 682:5-20 (Rosenberg).)

64.     Mr. Rosenberg credibly testified that the Admissions Office seeks readers who understand and believe in the mission of the University and who will approach application reading empathetically, sympathetically, and with an eye towards understanding the entire student. (Tr. 683:17-684:2 (Rosenberg).)

### *iii.*   **Application readers participate in thorough and continuous training**

65.     Readers receive extensive, annual training over a period of several weeks at the beginning of each reading season and continuous training thereafter. (Tr. 559:13-15 (Farmer); Tr. 688:19-22 (Rosenberg).)

66.     The goals of reader training are to introduce readers to the University's individual, comprehensive, and holistic review philosophy and teach them that "when they read an applicant, they're reading the entire applicant, not just the test score, not just the GPA, not just an essay." (Tr. 690:13-18 (Rosenberg).) Mr. Rosenberg credibly

26

testified that the Admissions Office trains readers to "meet our applicants where they are" and that the context of an applicant's background is "extremely important to consider" when making an admissions decision. (Tr. 690:22-25 (Rosenberg).)

67.     Annual reader training is broken into three phases. (Tr. 685:9-10 (Rosenberg).) First, new readers are introduced to the basics of reading, including going through an application and learning how to use the reading technology and software. (Tr. 685:11-15 (Rosenberg).) During new reader training, new readers are also shown how to rate applications. (Tr. 686:3-9 (Rosenberg).)

68.     Next, all readers—new and experienced—spend several days together as a group for training and discussion, known as "all-reader training." (Tr. 685:16-19 (Rosenberg).) During all-reader training, readers discuss applications as a larger group and also meet in smaller groups to review individual applications together. (Tr. 687:8-17 (Rosenberg).)

69.     Finally, before the reading season commences, new readers reconvene for additional training during which they read applications under the guidance of more experienced readers and present their views on applications for group discussion. (Tr. 685:20-25, 687:18-24 (Rosenberg).)

70.     The Admissions Office introduces readers to the applicant pool during training by showing them statistics concerning the previous year's applicant pool, admitted pool, and enrolling pool. (Tr. 686:10-17 (Rosenberg).) This provides the readers with context that enables them to understand the many considerations that go into reading

27

an application for admission. (Tr. 686:19-24 (Rosenberg).) Mr. Rosenberg credibly testified: "Our job is not just as simple as to say yes or no, but it's really to make sure that we understand everything about the pool that we have because we read each application individually, and the only real thing we think about when we read each application individually is how it may compare to our pool overall." (Tr. 687:2-7 (Rosenberg).)

71.    Reader training continues throughout the reading season. During at least the first two weeks of reading season, a more experienced reader re-reads every application read by a new reader. (Tr. 689:10-19, 707:16-19 (Rosenberg).) In addition, the Admissions Office holds weekly all-staff meetings to evaluate applications in a group setting and give readers the opportunity to ask questions. (Tr. 688:25-689:6 (Rosenberg).)

72.    Readers also email questions to Mr. Rosenberg; during a typical admissions cycle Mr. Rosenberg receives hundreds of emails from readers with questions about applications or the reading process. (Tr. 690:7-10 (Rosenberg).)

73.    The Admissions Office specifically trains readers on the consideration of race and ethnicity in the admissions process. Mr. Rosenberg credibly testified that readers are taught to consider race and ethnicity as one of many diversity factors, within the context of the entire application. (Tr. 688:7-18 (Rosenberg).)

### *iv.*    **Readers review each application for admission holistically, considering race and ethnicity as only one factor among many**

74.    The Reading Document (DX010) provides application readers guidance for the review of applications for admission. (JSF ¶45.) It is provided to all application

readers at the outset of the reading season. (Tr. 63:18-64:1 (Kretchmar); Tr. 539:2-13 (Farmer).)

75.    The Reading Document provides that readers should seek to understand each candidate individually and holistically, based on everything their application reveals about them. (DX010 at 6.) Mr. Farmer and Mr. Rosenberg credibly testified that this is the guiding principle of application evaluation. (Tr. 540:14-24 (Farmer);Tr. 691:21-23 (Rosenberg).)

76.    At least one reader reviews every application for admission in its entirety and assesses the applicant using more than 40 criteria, grouped into the areas of academic performance, academic program, standardized testing, extracurricular activity, special talent, essay, background, and personal qualities. (DX010; Tr. 541:4-21 (Farmer); JSF ¶46.)

77.    Readers assign ratings for five criteria categories: academic program, academic performance, extracurricular activity, essay, and personal qualities. (JSF ¶47.) The ratings are used by readers to help distinguish particular characteristics of an application, providing readers with a shorthand way to understand the relative strengths and weaknesses of an application. (Tr. 686:4-5, 697:11-14 (Rosenberg).)

78.    Students are not admitted or denied on the basis of these ratings. (Tr. 75:16-17 (Kretchmar); Tr. 697:9 (Rosenberg).) Readers do not sum up, tally, or total the ratings in any way to yield an automatic admission decision. (JSF ¶51; Tr. 697:18-19 (Rosenberg).)

29

79.     The academic program rating reflects an assessment of the rigor of an applicant's course of study, and is objectively assigned based on the number of college-level or advanced courses that an applicant has taken during high school. (Tr. 72:16-23; Tr. 73:3-14 (Kretchmar); Sealed Tr. 23:19-24:9 (Rosenberg).) When considering an applicant's academic program rating, readers may also take into account the number and types of college-level courses offered by the student's school, as well as any limitations on the student's ability to enroll in such courses. (Sealed Tr. 23:16-18, 24:13-23, 24:24-25:3 (Rosenberg).)

80.     The academic performance rating reflects an assessment of the academic performance of an applicant through the evaluation of grades on the student's high school transcript. (Tr. 73:15-17 (Kretchmar); Sealed Tr. 25:13-26:4 (Rosenberg).)

81.     The extracurricular activity rating reflects an assessment of an applicant's activities outside the classroom, including clubs, work, family responsibilities, and school activities. (Tr. 74:3-17 (Kretchmar).) Readers do not weigh the substance of the applicant's chosen activities; rather, readers focus on the student's passion and level of commitment. (Sealed Tr. 15:4-10 (Rosenberg).)

82.     The essay rating reflects an assessment of the applicant's writing ability, including grammar, spelling, punctuation, complex sentence structure, and organization and complexity of thought, as demonstrated in the submitted essays. (Sealed Tr. 17:14-18:7 (Rosenberg).)

30

83.     The personal quality rating reflects an assessment of the student's character and incorporates some of the intangible factors readers might observe in an application. (Sealed Tr. 28:15-18 (Rosenberg).) When assigning the personal quality rating, readers may consider, for example, the applicant's ability to overcome adversity, intellectual curiosity or accomplishment, or talent in a particular activity. (Sealed Tr. 28:18-21 (Rosenberg).) The personal quality rating may also include contributions to diversity. (Sealed Tr. 28:21-22 (Rosenberg).)

84.     Standardized test scores, such as the SAT and ACT, are considered within the context of the entire application. (Tr. 693:21-694:2 (Rosenberg).) During 2013-2017, students could submit either an SAT score, an ACT score, or both. If the student submitted an ACT score, the reader would concord the ACT score to its SAT equivalent using a table provided by the College Board. (Tr. 694:18-695:11 (Rosenberg).)

85.     Dr. Kretchmar, Mr. Rosenberg, and Mr. Farmer all credibly testified that at any stage of the review process, readers may consider an applicant's race, ethnicity, or national origin, if disclosed, but only in the context of everything else known about the applicant. (Tr. 68:2-7 (Kretchmar); Tr. 543:7-13, 545:11-546:4 (Farmer); Tr. 695:12-25, Tr. 697:20-698:4 (Rosenberg); *see also* DX010.) The Admissions Office does not assign automatic points for race in the reading process. (Tr. 696:1-3 (Rosenberg).)

86.     In assessing an applicant's contributions to diversity, readers may also consider the socioeconomic status of each candidate for admission. (Tr. 552:15-23 (Farmer).) The University's consideration of socioeconomic status is flexible and informs

31

the University's interpretation of the candidate's standardized test scores and other academic indicators. (Tr. 552:23-553:7 (Farmer).)

87.    Readers may become aware of an applicant's socioeconomic status if the student qualifies for a waiver of the application fee or for free or reduced-price lunch; through the parents' employment status or level of education; or by what the student writes about him- or herself. (Tr. 553:25-554:13 (Farmer).) The University does not consider an applicant's ability to pay all or part of the cost of their education when making admissions decisions. (JSF ¶76; *see also infra* ¶153.)

88.    After reviewing the application in its entirety and assigning the five ratings, the reader makes a tentative admissions decision. (JSF ¶48; Tr. 696:9-13 (Rosenberg).) The reader makes this determination by considering the ratings in the five categories and all other information contained in the application, including the applicant's strengths and weaknesses in the context of the University's applicant pool. (JSF ¶49.)

89.    There are no minimum rating thresholds or formulas for admission. (JSF ¶50; Tr. 697:15-17 (Rosenberg).) Mr. Farmer credibly testified that the Admissions Office never discusses formulas and does not consider students formulaically. (Tr. 551:7-24 (Farmer).)

90.    From 2013 to 2017, for the Early Action deadline, a reader could choose to admit, defer, or deny an applicant. For the Regular Decision deadline, a reader could choose to admit, waitlist, or deny an applicant. (Tr. 697:3-6 (Rosenberg).)

32

91.    If an application does not receive a second read, the admissions decision becomes provisionally final after the first read. (JSF ¶52.)

*v.*    **Second reads are part of the holistic review process**

92.    From 2013 to 2017, approximately 40% of applications were read twice. (Tr. 700:5-8 (Rosenberg).) Second reads are conducted by more experienced, senior members of the Admissions Office (sometimes referred to as Tier 2 readers). (JSF ¶53; Tr. 699:5-9 (Rosenberg).)

93.    Second reads may occur under several different circumstances. When a first reader decides to admit or defer an out-of-state candidate, the application will be read by a Tier 2 reader. (Tr. 698:20-22 (Rosenberg).) Tier 2 readers also give second reads to all applications read by new readers, who are still learning the reading process. (Tr. 534:23-535:8 (Farmer); Tr. 689:10-19 (Rosenberg).) Finally, first readers may request that an application receive a second read. (Tr. 699:2-4 (Rosenberg).)

94.    Tier 2 readers read each application that advances to a second read in its entirety, and make independent assessments of candidates using the same criteria as first readers. (JSF ¶¶54-55; Tr. 699:12-24 (Rosenberg).) After reading the entire application, the Tier 2 reader inputs his or her own admissions decision for the candidate. (JSF ¶56; Tr. 699:22-24 (Rosenberg).)

95.    Recommended admissions decisions made by Tier 2 readers become the provisionally final decisions.(JSF ¶57; Tr. 699:25-700:4 (Rosenberg).)

33

### vi. School Group Review assures that admissions decisions are reasonable and comply with University policy

96.     At the end of the reading period for each application deadline, every provisional admissions decision goes through a process known as Decision Review or School Group Review ("SGR"). (JSF ¶59; Tr. 535:20-536:5 (Farmer).) SGR takes place over the three-week period prior to the release of admissions decisions to applicants and is conducted by a committee comprised of experienced members of the Admissions Office. (JSF ¶¶60-61.)

97.     SGR facilitates a review of readers' provisional admissions decisions to assure conformity with the University's standards and to assure that decisions are justified in context. (JSF ¶64; DX012 at 1; Tr. 536:14-537:12 (Farmer).)

98.     The SGR policy applicable from October 1, 2015, through the 2016-2017 application cycle (the "SGR Policy") (DX012) provides that every provisional admission decision is reviewed within the context of the applicant's high school during SGR. (JSF ¶¶62-63.) Pursuant to this policy, reports are generated for each high school from which an applicant applied for admission to the University. The reports display the application deadline, provisional admission decision, class rank, GPA, test scores, subjective admissions ratings, residency status, legacy status, recruited student athlete status, and applicable recruiting category of each applicant from that particular high school. (JSF ¶67; *see also* DX012 at 1; Tr. 536:2-5 (Farmer).)

99.     Each SGR committee member is assigned a group of high schools to review. (JSF ¶66.) Committee members may revisit an application if it appears that a

34

provisional decision could be wrong; for example, if the top-ranked applicant from a high school was denied admission while lower-ranked applicants were admitted, the committee member may review the denial to ensure it was justified. (*See* Tr. 537:1-12 (Farmer).) Because SGR is an extension of comprehensive and holistic review, committee members who revisit an application during SGR reread it in its entirety, holistically. (Tr. 536:8-12 (Farmer).)

100.    Pursuant to the SGR policy, decisions during SGR are informed, in part, upon the predicted number of spaces in the entering class that students who have been provisionally selected for admission are likely to fill. (JSF ¶68.) The Admissions Office runs a yield assessment projection to predict the number of students who will accept the University's offers of admission. (JSF ¶69; Tr. 84:14-16 (Kretchmar).) SGR allows the Admissions Office to consider this expected enrollment, and, if necessary, make adjustments to avoid over- or under-enrollment. (JSF ¶65, Tr. 537:13-538:4 (Farmer).)

101.    Mr. Farmer credibly testified that the Admissions Office does not use the SGR process to shape class composition toward a particular goal, other than admitting the correct proportion of North Carolina versus out-of-state residents. (Tr. 538:5-9 (Farmer); *see also* Tr. 109:25-110:10 (Kretchmar) (credibly testifying that the Admissions Office does not aim to enroll a specific number or quota of underrepresented minority students).)

102.    Likewise, analysis of the racial composition of the class of students selected for admission before and after SGR showed no significant changes in the percentage of the class belonging to any racial or ethnic group, demonstrating that race and ethnicity

35

does not play any role in the SGR process. (Tr. 978:5-980:15 (Hoxby).) To illustrate, in the 2013-2014 admissions cycle—the year immediately after fewer than 100 African American males enrolled in the first-year class (*see supra* ¶40)—10.1% of students admitted before SGR were African American and 10.1% of students admitted after SGR were African American; the SGR process resulted in <u>no</u> change to the percentage of African American students admitted. (Tr. 978:23-979:3 (Hoxby).)

103.    Upon completion of the SGR process, the yield assessment projections are updated; it may be necessary to adjust the number of applicants who will receive an offer of admission to avoid over- or under-enrollment. (JSF ¶70.)

104.    The Admissions Office never uses racial or ethnic data to make adjustments to the admitted class. (Tr. 548:10-25 (Farmer).)

105.    Quality control measures, including second reads and SGR, provide assurance that readers adhere to holistic review practices. Mr. Rosenberg personally reads behind every reader multiple times throughout the application cycle. (Tr. 703:14-20 (Rosenberg).) Likewise, during SGR, Mr. Rosenberg opens hundreds of applications, reviews reader comments, and understands the thought process behind the admissions decisions. (Tr. 703:21-23 (Rosenberg).) Mr. Rosenberg credibly testified that readers comply with University policies and training, including properly considering race and ethnicity while reading applications. (Tr. 703:11-704:3 (Rosenberg); *see also* Tr. 560:2-14 (Farmer) (expressing confidence in evaluation process based on reading behind first readers and school group review).)

36

106.     Shortly after the conclusion of SGR, admissions decisions are released to each applicant. (JSF ¶71.) The University allows admissions decisions to be appealed to an admissions officer and, ultimately, to the Provost. (Tr. 538:18-21 (Farmer).) Candidates admitted to the University have until May 1 to accept their place in the incoming class and to submit their enrollment deposit or their request for a waiver of their deposit. (JSF ¶72.)

107.     A small subset of applicants who do not receive offers of admission may be offered a place on the Waiting List. (JSF ¶73.) A candidate offered a place on the Waiting List must affirmatively accept that offer in order to receive consideration for any spaces that may become available in the entering class. (JSF ¶74.) Final admissions decisions for all candidates who accept a spot on the Waiting List are made by June 30th. (JSF ¶75.)

   *vii.*   **Readers do not receive demographic information for the admitted or enrolling class until after admissions decisions become final**

108.     Readers may learn of the racial and ethnic makeup of the first-year class during the summer, after reading is completed, the Waiting List is disbanded, and the class is fully enrolled. (Tr. 702:23-703:1 (Rosenberg).) If a reader becomes aware of the racial or ethnic composition of the provisionally admitted class prior to that time, the reader must recuse him- or herself from reading from that point forward during the admissions cycle. (Tr. 547:23-548:9 (Farmer).)

109.     Mr. Farmer credibly testified that since 2015, readers do not receive any information regarding the racial or ethnic composition of the class that has been provisionally identified for admission. (Tr. 546:23-547:10 (Farmer).) Similarly, Mr.

37

Rosenberg credibly testified that readers are not provided with reports showing the breakdown of demographics of the provisionally admitted class to ensure fairness and consistency in the review process. (Tr. 702:6-22 (Rosenberg).)

110.    To the extent demographic information regarding applicants was circulated from 2013 to 2017, only senior Admissions Office leadership had access to it. (DX065; Tr. 700:15-17 (Rosenberg).) Seasonal readers and Admissions Office staff did not have access to any reports showing the racial and ethnic breakdown of the provisionally admitted class. (Tr. 700:25-702:8 (Rosenberg).)

## IV.    EXPERT TESTIMONY REINFORCES THAT RACE AND ETHNICITY IS NOT THE DOMINANT FACTOR IN THE UNIVERSITY'S ADMISSIONS PROCESS

### A.    Empirical Analysis Confirms that the University's Admissions Decisions Are Holistic

111.    The University presented expert testimony about its admissions process, including in response to SFFA's allegation that race and ethnicity were dominant factors in that process, from Professor Caroline Hoxby. (Tr. 936:7-14 (Hoxby).) Professor Hoxby is the Scott and Donya Bommer Professor in Economics at Stanford University, has a master's degree in economics from the University of Oxford, holds a Ph.D. in economics from the Massachusetts Institute of Technology, has published extensively on the economics of education, and has won numerous awards and prizes for her economics research. Professor Hoxby is the head of the Economics of Education Program of the National Bureau of Economic Research and a presidential appointee to the National

38

Board for Education Sciences. (Tr. 929:3-936:4 (Hoxby).) Professor Hoxby testified credibly.

112.    Through careful empirical analysis, Professor Hoxby established that the University's admissions decisions are consistent with a holistic admissions process and could not be explained by a formula based on verifiable variables. (Tr. 937:3-7 (Hoxby).) Thus, Professor Hoxby concluded the University's admissions process does not appear formulaic. (Tr. 937:11-12 (Hoxby).) Professor Arcidiacono, agreed that the University's admissions process is holistic. (Tr. 318:1-5 (Arcidiacono); *see also* Tr. 421:8-10 (Kahlenberg).)

113.    Professor Hoxby conducted her analysis of the University's admissions process using regression analysis—a standard econometric technique used to understand actual human decision-making. She built a series of regression models incorporating the quantitative variables reflected within the application process and progressively added more variables into the models to test to what extent these variables could explain the admissions outcome: was the applicant admitted or rejected. (Tr. 938:22-942:3 (Hoxby).)

114.    In the first instance, Professor Hoxby included only objective, verifiable ("endogenous") variables within her multiple regression models. (Tr. 942:8-12, 943:16-944:3 (Hoxby).) Professor Hoxby's preferred and most comprehensive regression model (model 9) included standardized test scores and sub-scores, race and ethnicity factors, class rank, high school GPA, within high school GPA rank, gender, North Carolina residency status, whether the applicant satisfied the University's minimum coursework

39

requirements, whether the applicant was a child of a faculty or staff member, legacy status, whether the applicant applied through Early Action or Regular Decision, parental education level, foreign citizenship status, and whether the applicant received a fee waiver. (Tr. 939:9-940:23, 946:22-24 (Hoxby).) Hoxby's preferred model 9 is not "overfit." (Tr. 975:17-24 (Hoxby).)[3]

115.    Using her preferred model 9, Professor Hoxby calculated a "pseudo R-squared" of 0.428 (a value out of a maximum of 1.0), meaning in approximate terms that the model can predict the decision to accept or reject an applicant less than half of the time.[4] (Tr. 946:22-947:22 (Hoxby).)

116.    Professor Hoxby emphasized that the portion of the admissions decisions that is <u>not</u> correctly predicted by the model is important:

> [T]he reason I say it's important is that it is not that the admissions decision is somehow absent in that part. It isn't absent. This isn't something that isn't happening. It's something that's happening, but we, as statisticians, econometricians, do not know what is happening in that part. It's that the admissions officer is looking at the whole application, looking over that -- all of the material that's there -- the essays, the letters, the personal statement, the context for the student -- and that is what is going into that 57.2 percent.

---

[3]    A model is "overfit" (and therefore cannot be used to predict an outcome accurately) if it does not predict as well on an out-of-sample dataset as it predicts on an in-sample dataset. (Tr. 971:21-972:6 (Hoxby).) Certain of Professor Arcidiacono's models are overfit, including his preferred model. (Tr. 975:25-976:3 (Hoxby); Tr. 316:1-3 (Arcidiacono) (conceding that his model 7 is overfit).)

[4]    Professor Arcidiacono agreed that pseudo R-squared is a measure of fit for the model: a higher number means the model fits the data better. He testified, however, that pseudo R-squared could not be interpreted with the precision of its counterpart for linear models ("R-squared"). (Tr. 191:14-21 (Arcidiacono).)

40

> So it may be not observable by the statistician, but that doesn't mean it wasn't observed or considered carefully by the admissions officer.

(Tr. 947:15-948:10 (Hoxby).)

117.     Professor Arcidiacono's preferred model has a higher pseudo R-squared than Professor Hoxby's, meaning that the model can predict a greater number of the admissions decisions correctly. But Professor Arcidiacono admitted that a model that predicts an outcome better does not indicate that such a model is accurately measuring the contribution (or coefficient) of a particular relevant factor such as race and ethnicity on the outcome of the admissions decision. (Tr. 314:22-315:1 (Arcidiacono); *see also* Tr. 956:2-23 (Hoxby).) Thus, calculating a higher pseudo R-squared does not indicate that a particular model is better explaining the role of a specific factor in the admissions decision. Indeed, Professor Arcidiacono admitted that a model could be "very accurate" in predicting the likelihood of an applicant being admitted, but "wouldn't measure the coefficient of . . . race . . . very well." (Tr. 315:2-23 (Arcidiacono).) Instead, as Professor Hoxby explained, the proper way to assess the impact of a particular factor in the admissions process is to use an econometric technique known as a Shapley decomposition. (*Infra* ¶119.)

**B. Race and Ethnicity Is Not the Dominant Factor in the University's Admissions Process**

*i. The proper econometric technique for assessing the role of a specific factor in the admissions decision demonstrates that race and ethnicity explains a very small share regardless of which regression model is used for the analysis*

118. Professor Hoxby explained that, if race and ethnicity was the dominant factor in the University's admissions process, then statistical analysis would reveal that a large share of a model's predictive power (i.e., the model's ability to correctly predict whether an applicant is admitted or rejected) is attributable to race and ethnicity. (Tr. 939:4-8 (Hoxby).) But empirical evidence demonstrates the opposite: when admissions decisions across the entire applicant pool are considered, <u>both</u> Professor Hoxby <u>and</u> Professor Arcidiacono agree that race is <u>not</u> the dominant factor. (Tr. 980:16-24 (Hoxby); Tr. 331:20-23 (Arcidiacono) ("Q: So you will agree with me that across the whole process of admissions, considering all races, race is not the dominant factor? A: Yes.").)

119. The Shapley decomposition is the proper econometric method to answer the relevant question of what role a specific factor, or variable, plays in the outcome of whether an applicant is admitted or rejected across the University's admissions process. (Tr. 948:16-21, 949:2-23 (Hoxby).) The Shapley decomposition is designed to hold all other variables constant and then introduce and remove a specific factor to calculate the "share" that factor contributes to the model's ability to predict the admissions decision. (Tr. 950:1-16 (Hoxby).) The Shapley decomposition is also designed to show the marginal effect of any factor reliably; thus, even if the factor was important for only a

42

subset of applicants rather than all applicants, the Shapley decomposition would show that effect. (Tr. 949:15-23, 950:17-19 (Hoxby).)

120. Professor Hoxby employed the Shapley decomposition and, using her preferred model 9, concluded that race and ethnicity explains only a very small share of the total admissions decision—a mere 1.2%. (Tr. 951:1-17 (Hoxby).)

121. Standardized test scores (e.g., ACT and SAT scores) explain approximately 10% of the admissions decision using Professor Hoxby's preferred model 9. Thus, in comparison to race and ethnicity, test scores are a more important factor but still do not explain most of the admissions decision. (Tr. 952:1-9 (Hoxby).)

122. The conclusion that race and ethnicity is not the dominant factor in the University's admissions process holds true even when analyzing the in-state and out-of-state applicant pools separately. For in-state applicants, the Shapley decomposition shows that race and ethnicity explains only approximately 1.2% of the admissions decision, while test scores explain approximately 15%. For out-of-state applicants, the Shapley decomposition shows that race and ethnicity explains only approximately 5.1% of the admissions decision, whereas test scores explain approximately 19%. (Tr. 953:3-18 (Hoxby).)

123. Likewise, race and ethnicity is not the dominant factor in the University's admissions process even when the Admissions Office ratings variables (*supra* ¶77) are incorporated into the separate in-state and out-of-state models. Including all ratings variables, race and ethnicity explains only 1.6% of the admissions decision for in-state

43

applicants, and 6.2% of the admissions decision for out-of-state applicants. (Tr. 953:19-954:8 (Hoxby).)

124.     Performing the Shapley decomposition on Professor Arcidiacono's preferred model confirms that race and ethnicity is not the dominant factor in admissions decisions: race and ethnicity explains 2.7% of the admissions decision for in-state applicants, and 6.7% for out-of-state applicants. (Tr. 955:4-19 (Hoxby).) Thus, no matter which preferred model is used—Hoxby's or Arcidiacono's—race and ethnicity is not the dominant factor in whether an applicant is admitted or rejected across the University's admissions process. (Tr. 957:1-22, 980:16-24 (Hoxby); *see also* Tr. 323:21-24 (Arcidiacono) (admitting that other factors dominate the admissions process aside from race and ethnicity).)

125.     Professor Hoxby testified credibly that, if race and ethnicity was the dominant factor in the University's admissions process, her empirical review of the admissions data would have revealed that fact. (Tr. 1181:12-1182:1 (Hoxby).)

**ii.     The testimony and evidence offered by Professor Arcidiacono do not credibly challenge Professor Hoxby's conclusion that race and ethnicity are not the dominant factor in the University's admissions process**

126.     Professor Arcidiacono performed numerous econometric and statistical analyses in response to the assignment he was given: to determine whether race is a predominant factor in the University's admissions process. (Tr. 328:3-8 (Arcidiacono).) These analyses did not credibly support his conclusion that race and ethnicity is dominant in the admissions process.

44

127. Professor Arcidiacono's testimony and conclusion that race and ethnicity is a dominant factor was not persuasive because he admittedly considered the role of race from the wrong perspective, actively ignoring its role across the entire admissions process. (Tr. 251:8-10 (Arcidiacono) ("[Hoxby's] thinking about how race affects the entire admissions process, and I don't think that's the right way of looking at it.").) Professor Arcidiacono also conceded that race is not a dominant factor for white applicants. (Tr. 331:6-7 (Arcidiacono).)

128. Professor Arcidiacono, unlike Professor Hoxby, failed to consider whether SAT scores and grades were a more important factor in the University's admissions process than race. (Tr. 325:3-6 (Arcidiacono).) Professor Arcidiacono's testimony that "[t]here's not an actual way to measure" whether high SAT scores have greater correlation with the admissions outcome than race or ethnicity was not credible. (Tr. 324:7-325:2 (Arcidiacono).)

### (a) Professor Arcidiacono's choice to create a model to convert ACT scores to SAT scores was inappropriate and imposed a penalty on underrepresented minority applicants

129. Professor Arcidiacono attempted to develop a model that approximates the process University admissions officers follow, including capturing the data inputs that admissions officers see in the applicant file. (Tr. 339:10-19, 340:17-19 (Arcidiacono).)

130. For those applicants who submitted only ACT scores, the Admissions Office uses the College Board's concordance table to translate the score into a corresponding SAT score. (Tr. 342:2-18 (Arcidiacono); Tr. 694:18-695:11 (Rosenberg).)

45

Thus, for applicants who took the ACT and received the same score, the University would credit the same converted SAT score to each applicant, regardless of the applicant's race. (Tr. 343:7-344:4 (Arcidiacono); *see also* Tr. 694:18-695:6 (Rosenberg).)

131. Rather than follow the University's practice, however, Professor Arcidiacono chose to convert an applicant's ACT score to an SAT score in a different way. (Tr. 342:18-20. (Arcidiacono).) Under Professor Arcidiacono's preferred model, underrepresented minority applicants and women received a lower converted SAT score than white or Asian applicants or men who received the exact same ACT score. (Tr. 357:23-360:5, 363:16-23; *see also* Tr. 359:1-7 (Arcidiacono) ("Q. Now, obviously—to put the two together and figure out the net change, will you agree with me that if you take from the first chart of the deduction for SAT verbal where blacks received a penalty of minus 8.1 and then if we look to the bottom slide where the SAT math penalty is minus 13.5, that totals about 22 points, correct? A. Correct").) Because this conversion choice is part of Professor Arcidiacono's preferred model, it is also incorporated into his subsequent analyses that rely upon his preferred model. (Tr. 364:21-24 (Arcidiacono); *see also infra* ¶¶133-136.)

132. Professor Arcidiacono steadfastly maintained that using a lower converted SAT score for underrepresented minorities and women who received the <u>exact same</u> ACT score as a white, Asian, or male applicant was "not a penalty"—even though his approach resulted in a black woman receiving 45 fewer points than a white male. (Tr. 360:22-361:3 (Arcidiacono).) This testimony is not credible.

46

### (b) Professor Arcidiacono's "transformation" examples are hypothetical and unrealistic

133. To assess the role of race and ethnicity within the admissions process, Professor Arcidiacono "turns off" an applicant's race within his preferred model, but assumes that everything else about the applicant remains unchanged. (Tr. 364:1-8, 365:12-15 (Arcidiacono).) These so-called "transformation" examples are entirely hypothetical. (Tr. 364:9-17 (Arcidiacono).)

134. Professor Arcidiacono's analysis and interpretation of the average marginal effect of racial preferences based on his transformation examples is not credible because he unrealistically assumes that an applicant's race and ethnicity can be turned on or off without any other factors in the applicant's file (or life) changing. (*See* Tr. 965:2-24 (Hoxby).) Professor Hoxby persuasively testified that this is "not just a sensible statistical thing to do." (Tr. 965:17-24 (Hoxby).)

135. Even in the world of statistical analysis, average marginal effect cannot be interpreted to show the impact of an applicant's race or ethnicity on his or her chance of admission to the University because it is not possible to hold all other factors constant. (Tr. 964:8-16 (Hoxby); *see also* Tr. 964:8-15 (Hoxby) ("When we look at UNC admissions data, it is not a randomized control trial. The data are not generated by . . . a true experiment or any type of experiment. They're generated by real behavior of real people and many students to UNC."); Tr. 1198:2-5 (Long) ("You know, we unfortunately, or fortunately, don't have the circumstance if we were in a laboratory—a

47

science laboratory where we could change one thing and hold everything else constant.").)

136.    Although Professor Arcidiacono characterized his work as bringing "nuance to the affirmative action debate" (Tr. 119:20-23 (Arcidiacono)), his transformation examples are mathematical exercises divorced from reality that render any related analyses as to the role of race and ethnicity within the University's admissions process unpersuasive.

> **(c)    Professor Arcidiacono presented his conclusions in misleading ways that make his testimony less credible**

137.    Professor Arcidiacono presented evidence purporting to show that the "share" of an admission decision due to an out-of-state applicant being African American applicant was 91.1%. (Tr. 1178:14-16 (Hoxby).) But Professor Arcidiacono's "share" or marginal effect analysis is not statistically valid because his "shares" do not add up to one hundred percent. (Tr. 966:1-967:21 (Hoxby) (explaining that Professor Arcidiacono's "shares" of an admissions outcome add up to 543.4% for out-of-state African American applicants and 557.4% for Hispanic applicants).)

138.    Professor Hoxby credibly testified that Professor's Arcidiacono's methodology was improper. (Tr. 1176:23-1177:1 (Hoxby) ("That's why we don't do things this way. It ends up with improper statistics, like saying that these shares could add up to 432 percent of the total explanation. That's why we use things like a Shapley decomposition."); Tr. 1179:13-17 (Hoxby) ("Given the novel and unusual definition of share here, I would say the numbers you are reading from the table are correct, but that

48

these so-called shares do not represent average marginal effects, which is why they add up to more than a hundred percent."); *see also* Tr. 967:8-12 (Hoxby) (testifying that the Shapley decomposition is the proper way to show the "share" or marginal effect of any type of factor or group of factors).)

139. Additionally, Professor Arcidiacono's use of average marginal effect to interpret his transformation examples generates misleading results. (Tr. 968:1-7 (Hoxby).) Specifically, Professor Arcidiacono's average marginal effect of race is 12.7% for in-state African American applicants, but the median marginal effect of race for in-state African American applicants is only 1.2%; this demonstrates that the average must be highly influenced by outliers. (Tr. 968:1-969:13 (Hoxby).) So too for Hispanic applicants. (Tr. 969:4-22 (Hoxby).) Professor Hoxby convincingly explained that by choosing to rely on the average marginal effect in this way, Professor Arcidiacono inappropriately ignored that his model explains only a portion of the admissions decision and does not capture all factors that are considered during the University's actual holistic review process. (Tr. 969:23-970:25 (Hoxby).)

(d) **The purported "accuracy" of Professor Arcidiacono's preferred model confirms that an applicant's race and ethnicity is not the dominant factor in admissions decisions**

140. Professor Hoxby testified that Professor Arcidiacono uses a novel and nonstandard measure of "accuracy" in support of the impact of the alleged "racial preferences" he finds. (Tr. 976:23-977:9, 1143:25-1144:3, 1170:10-1171:4 (Hoxby).) However, accepting this definition of "accuracy," removing race and ethnicity variables

49

from Professor Arcidiacono's preferred model, and recalculating the alleged accuracy reveals a reduction in accuracy of only 1% for in-state applicants and less than 2% for out-of-state applicants. (Tr. 977:3-17 (Hoxby).) Thus, other variables besides race and ethnicity generate the purported accuracy of Professor Arcidiacono's preferred model. (Tr. 977:18-978:3 (Hoxby).)

> **(e)** **Decile analysis based on Arcidiacono's self-devised academic index is not based on the University's admissions process, over-weights test scores and grades, and ignores the impact of unobservable factors**

141. Professor Arcidiacono admitted that his decile analysis by itself is insufficient to show that the difference of admission rate is the result of any purported racial preference. (Tr. 317:8-11 (Arcidiacono).)

142. Professor's Arcidiacono's decile analysis is based upon an academic index that he devised ("the Arcidiacono Index"), which is a weighted average of only test scores and grades. (Tr. 316:4-10 (Arcidiacono); Tr. 958:20-21 (Hoxby).)

143. The University does not calculate or use an academic index in its admissions process. (Tr. 958:11-19 (Hoxby); Tr. 316:22-24 (Arcidiacono).) Professor Arcidiacono admitted that he imported this concept from his work in SFFA's litigation against Harvard, which actually calculates an academic index. (Tr. 316:11-19 (Arcidiacono).)

144. Most of the University's admitted students fall into the top Arcidiacono Index deciles, but Professor Arcidiacono's decile analysis—and the transformation examples based on this decile analysis—focus on the portion of the admissions pool that

50

is on the bubble between admissions and rejections where even small differences in an applicant's qualifications or characteristics can make a difference. (Tr. 1150:25-1151:14 (Hoxby); *see also* Tr. 1151:14-1152:1 (Hoxby) ("[T]o focus on it unduly is to overemphasize the importance of those marginal decisions and the marginal characteristics that might make a difference. If one was using race and ethnicity, say, minimally overall in the admissions process, then you are most likely to find that it would affect a student's admission decision for a student who was right on the bubble. It's not wrong . . . to look at those students, but one should not describe them as representative of the admissions process because they actually play a fairly minor role in the admissions process.").)

145.    Professor Arcidiacono's exclusive reliance on test scores and grades (in both the Arcidiacono Index and his decile analysis) means that he "tends to not consider that there are many factors that may be observable to the admissions officers but are not observable to . . . the statisticians." (Tr. 961:8-10 (Hoxby).) Consequently, Professor Arcidiacono's decile analysis "essentially push[es] those unobservable factors to the side and pretend[s] that they don't exist," even though they do. (Tr. 961:21-25 (Hoxby).)

146.    Simply because race and ethnicity might tip the scale for some students who are "on the bubble" of being admitted or rejected does not mean that race and ethnicity plays a dominant role in the admissions decision and across the entire pool of applicants. (Tr. 960:20-961:2 (Hoxby).) To the contrary, a student who is admitted with lower test scores and grades—including applicants who are white and Asian—must have

51

strong unobservable factors that make them attractive to an admissions officer. (Tr.

962:2-23 (Hoxby).)

## V. THERE IS NO WORKABLE RACE-NEUTRAL ALTERNATIVE TO THE UNIVERSITY'S CURRENT RACE-CONSCIOUS PRACTICES

### A. The University Already Employs Many Robust Race-Neutral Strategies that Complement Race-Conscious, Holistic Review

147.    The factual record incontrovertibly demonstrates that the University has

adopted race-neutral strategies to increase its enrollment of underrepresented minority

students in conjunction with holistic review. (Tr. 574:8-12 (Farmer).)

### i.    The University engages in continuous recruitment, including special outreach to students from diverse backgrounds

#### (a)    The University recruits diverse applicants to apply

148.    The University engages in extensive recruitment efforts to encourage

talented and diverse students, including underrepresented minority students, low-income

students, first generation college students, and geographically diverse students, to apply

for admission. (Tr. 574:14-16 (Farmer).)

149.    Each year, University staff, students, and alumni send recruiting

communications to 80,000 to 100,000 high school students throughout the state,

nationally, and internationally who have either expressed interest in the University or

achieved grades and standardized test scores above certain levels, encouraging them to

apply. (Tr. 732:5-8, 728:24-729:2, 730:1-7, 731:1-9, 732:11-20 (Davis).)

150.    To further encourage applicants, Admissions Office representatives visit

every county in North Carolina at least once annually, to engage with prospective

students in their own communities. (Tr. 735:9-12 (Davis); Tr. 575:6-10 (Farmer).) The University also participates in college fairs, high school visits, and information sessions across the state and country. (Tr. 734:22-735:8 (Davis); Toone Dep. 83:21-84:4.) Additionally, each year, the Admissions Office hosts an on-campus daily visit program for 60,000 to 70,000 students and their families, which includes campus tours led by current students and information sessions led by admissions officers. (Tr. 735:13-22 (Davis).)

151.    The Admissions Office considers students who identify as either first-generation college, low income, African American, Native American, or Hispanic/Latinx, or students outside of the U.S. to be priority groups for recruitment and employs special recruitment strategies targeted toward students in these groups. (Tr. 731:12-16 (Davis).) For example, the Admissions Office hosts a series of information sessions designed for first-generation college students. (Tr. 735:23-25, 736:2-6 (Davis).)

152.    The Admissions Office also collaborates with the Office of Diversity and Inclusion to sponsor "Project Uplift," a pipeline program offered in the summer to rural, low-income, first-generation college, and underrepresented minority students. (Tr. 575:11-15 (Farmer); 736:13-737:4 (Davis).) Additionally, the Admissions Office partners with the American Indian Center to host "Carolina Horizons," an event that invites Native American students to campus, introduces them to the University's Native American community, and encourages college attendance. (Tr. 737:8-15 (Davis).)

53

153.    The University also has a need-blind admissions policy. (Tr. 554:14-23 (Farmer).) This policy encourages applications from low-income students by assuring them that their ability to pay for their college education will not be held against them in the admissions process. (Tr. 555:3-16 (Farmer).)

### (b)    The University undertakes significant efforts to encourage a diverse group of students to enroll

154.    Once students are admitted, the University continues its recruiting outreach. The University extensively communicates with admitted students through print mailings, e-mails, social media, and phone campaigns. (Tr. 740:17-25 (Davis).)

155.    Each year, the University also invites every admitted student to campus for the Admitted Students Day program. (Tr. 742:1-5 (Davis).) During Admitted Students Day, students can take a campus tour, interact with student groups, meet individually with representatives from the Admissions Office or the Office of Scholarships and Student Aid, and attend programs based on their interests—academic or otherwise. (Tr. 742:7-22 (Davis).)

156.    To ensure cost is not a barrier for admitted students to visit campus, the Admissions Office offers a travel grant to any student who applied with a fee waiver or is eligible for a Pell Grant. (Tr. 743:7-11 (Davis).) The travel grant covers the cost of a student and one parent to come to campus and experience the University. (Tr. 743:1-15 (Davis).)

157.    The University also encourages enrollment through other means. For example, in addition to scholarships that are awarded on the basis of financial need, each

54

year the University awards 400 to 450 scholarships to incoming students who will contribute to the University community in meaningful ways. (Tr. 738:25-739:14, 739:21-25, 740:1-7 (Davis).) The University similarly encourages admitted students to enroll by offering unique opportunities, such as participation in Honors Carolina, a summer study abroad fellowship, or Excel @ Carolina, a research mentoring program. (Tr. 738:19-24, 740:9-14 (Davis).)

158.    The University also intentionally targets outreach toward underrepresented students. For example, the Admissions Office partners with the Carolina Black Caucus and the American Indian Center to run telephone campaigns specifically aimed toward students who may share an identity with these groups. (Tr. 741:14-23 (Davis).) The Admissions Office also engages with diverse students in their home communities by hosting admitted student dinners for priority recruitment groups across the state. (Tr. 743:16-21, 744:9-11 (Davis).)

   *ii.*    **The University extends outreach to underserved, low-income, first generation college student, and minority populations through special programs and financial aid**

159.    The University's commitment to increasing college access for low-income, first-generation college, and underrepresented minority students from North Carolina is demonstrated, in part, through its support of the Carolina College Advising Corps ("CCAC"). (Tr. 576:2-9 (Farmer); JSF ¶92.) The CCAC places recent University graduates, who receive training from the University's admissions and financial aid officers, as college advisors in selected public high schools throughout the state to assist

55

with the college admissions and financial aid processes. (JSF ¶¶93-95; Tr. 576:13-17 (Farmer).)

160. The CCAC has grown from four advisors serving eight schools in 2007, to 57 advisors serving 77 North Carolina high schools in 2017-2018. (JSF ¶96; Tr. 577:7-13 (Farmer).) The CCAC serves about 20% of all black or African American students in public high schools in North Carolina, 50% of all American Indian students in North Carolina, and a large share of Hispanic, Latino, and Latinx students. (Tr. 577:19-23 (Farmer).)

161. Although the University has expanded the CCAC as quickly as possible, there are financial limits. (Tr. 578:1-6 (Farmer).) The CCAC program is not state funded and relies on its own fundraising efforts for 60-70% of its funding. (JSF ¶¶97-98.)

162. The University also seeks to increase its enrollment of diverse students through the Carolina Student Transfer Excellence Program ("C-STEP"). Established in 2006, C-STEP offers guaranteed University admission to students who attend one of eleven partner community colleges in the state of North Carolina, complete required coursework, and earn an associate degree. (JSF ¶¶88, 90.) Students whose household incomes fall at or below 300% of federal poverty guidelines are eligible for C-STEP, and the University meets 100% of their financial need. (JSF ¶¶89, 91.)

163. The University provides support to participating community colleges, funds staff members to support C-STEP, and provides academic support for C-STEP participants as soon as they join the program. (Tr. 579:19-23, 580:14-16 (Farmer).)

56

164.    C-STEP has grown from three partner colleges and eight students in 2006 to 14 partner colleges and 400 students today. (Tr. 580:11-13 (Farmer).) Mr. Farmer credibly testified that although the University has grown C-STEP, more rapid expansion is not a viable replacement for the consideration of race or ethnicity during holistic review. (Tr. 581:3-19 (Farmer).)

### iii. The University's generous financial aid program is a race-neutral way that it attracts and enrolls a diverse undergraduate student body, regardless of ability to pay

165.    The University's admissions approach is need-blind; it evaluates applicants based on their merits, not their financial means. The University does not penalize a student for their inability to pay the full cost of their education. (Tr. 554:17-23 (Farmer).)

166.    The University awards 93% of its available scholarship and grant funds based solely on financial need. (JSF ¶¶77-80; Tr. 582:17-19 (Farmer).) Moreover, the University is one of only two public universities in the country that meets 100% of students' demonstrated financial need. (Tr. 581:24-582:4 (Farmer); JSF ¶81.)

167.    For the 2016-2017 school year, the University provided approximately $159 million in scholarships and grants to undergraduate students. (JSF ¶82.) Approximately 41 percent of the first-year entering class for the 2016-2017 school year received a scholarship or grant money from the University. (JSF ¶83.)

168.    The University recruits and supports low-income students through its Carolina Covenant program. The Carolina Covenant offers admitted students whose family income is at or below 200% of the federal poverty guidelines a financial aid

package that <u>meets 100% of their cost of attendance</u> and allows them to graduate debt free. (JSF ¶¶84-85 (emphasis added).)

169.    The Carolina Covenant represents a huge financial commitment from the University—an out-of-state Covenant scholar receives $40,000 per year in institutional grant funding from the University, while a North Carolina resident Covenant Scholar receives about $13,000 per year.[5] (Tr. 585:3-7 (Farmer).) Carolina Covenant Scholars account for approximately 12-14% of each incoming first-year class, and the University does not set a cap on the number of students who can participate. (JSF ¶86; Tr. 584:22-24 (Farmer).)

170.    The University has received recognition for its affordability and financial aid efforts. (Tr. 587:8-10 (Farmer).) For example, for 18 consecutive years the University has been ranked as the best value among public universities by *Kiplinger's Personal Finance* magazine. (Tr. 587:12-24 (Farmer).) In 2017, the University was the first public school to receive the Cooke Prize for Equity in Educational Excellence, an award given to a college or university "doing the best job for outstanding low-income students." (Tr. 588:3-7 (Farmer).)

171.    The University faces serious financial challenges that make it difficult to expand financial aid at will. (Tr. 585:17-19 (Farmer).) As a state-supported entity, the

---

[5]    It costs less to attend the University for students who are North Carolina residents. (Tr. 585:8-9 (Farmer).)

University receives some monies from direct state appropriations that are designated by the General Assembly for purposes other than student aid. N.C. Gen. Stat. 116-11(9). (DX120 ¶37.) Moreover, since 2014, the Board of Governors has capped the amount of tuition revenue that the University can use to fund financial aid. (JSF ¶87.)

172.    The evidence demonstrates that the University cannot spend more of its endowment funds to expand financial aid. The University's endowment funds are subject to restrictions that donors typically place on such funds, which cannot be removed without express consent. (DX120 ¶¶38-39.) Ninety percent of the University's endowment is restricted. (Tr. 586:10-22 (Farmer).) The University may access about $6 million per year in unrestricted endowment funds, much of which already supports need-based student aid. (Tr. 586:23-587:2 (Farmer).)

## B.    The University Has Rigorously Assessed Potential Race-Neutral Alternatives that Might Replace Its Current Admissions Process

### i.    The Admissions Office made early efforts to follow the "natural experiments" of other universities

173.    In 2004, Mr. Farmer and other Admissions Office leaders began regularly attending meetings of the College Board's Access & Diversity Collaborative. (Tr. 589:24-590:15 (Farmer).) Mr. Farmer testified credibly that he and others in the Admissions Office also paid close attention to the natural experiments that were occurring at universities in states that had banned the consideration of race in admissions. (Tr. 589:6-23, 590:10-15 (Farmer).)

59

### ii. The Admissions Office analyzed a socioeconomic status race-neutral alternative

174. In 2007, the Admissions Office evaluated whether it could use indicators of socioeconomic disadvantage in the admissions process to yield a class with academic credentials and racial diversity levels similar to those of the actual admitted class. (Tr. 590:20-25 (Farmer); DX034; DX035; DX036.) This study demonstrated that giving increased weight to socioeconomic status would not permit the University to achieve levels of diversity and academic excellence comparable to those attained through the current practice of holistic review. (Tr. 591:21-592:22, 595:8-12, 663:10-15 (Farmer); DX036.)

### iii. The Admissions Office kept apprised of research concerning race-neutral alternatives

175. In 2009, Mr. Farmer asked Dr. Kretchmar to conduct a thorough review of the literature on race-neutral alternatives. (Tr. 92:9-12, 93:9-13 (Kretchmar); Tr. 595:15-17 (Farmer).) Dr. Kretchmar produced a report of her findings. (Tr. 595:25-596:3 (Farmer); DX037.) Dr. Kretchmar concluded in the report that available race-neutral alternatives were not as effective as holistic admissions practices at producing comparable levels of diversity and academic quality. (DX037 at 9-10; Tr. 93:22-94:3 (Kretchmar).)

176. Mr. Farmer testified that the 2009 Literature Review demonstrated to him that schools like the University had not found race-neutral alternatives that worked well. (Tr. 596:15-17 (Farmer).)

Case 1:14-cv-00954-LCB-JLW   Document 245   Filed 02/05/21   Page 67 of 115

### iv. The Admissions Office analyzed a class rank percentage plan

177. In 2012, Mr. Farmer and Dr. Kretchmar used historical applicant data to model a top 10% plan on the share of the first-year class composed of North Carolina residents, i.e., guaranteeing admission to every in-state applicant who graduated in the top 10% of his or her high school class. (Tr. 596:20-23 (Farmer); DX038.)

178. This simulation yielded a first-year class with a slightly higher percentage of underrepresented students (16% versus 15%), but every academic indicator—other than the share of the class ranking in the top 10% of their high schools—declined. (Tr. 597:4-14 (Farmer); *see also* Tr. 597:13-24 (Farmer) (testifying that the average SAT score of the simulated class declined by 130 points).) As a result of this analysis, the University determined that it could not adopt a top 10% plan in lieu of holistic admissions. (Tr. 598:21-24 (Farmer).)

179. The results of this study were reported to the Advisory Committee on Undergraduate Admissions. (Tr. 598:25-599:5 (Farmer).)

### v. The U.S. Department of Education's Office for Civil Rights found that the University had seriously and in good faith considered race-neutral alternatives as of November 2012

180. On November 27, 2012, the Office for Civil Rights ("OCR") sent the University a letter closing a complaint made about the University's consideration of race and national origin in admissions. (Tr. 606:22-15, 607:21-608:2 (Farmer); DX039.) In closing the complaint, the OCR concluded that "the University has seriously and in good faith considered race-neutral alternatives" and noted that the University was "using some

61

race-neutral diversity factors [in admissions], including socioeconomic status and first-generation college status." (Tr. 607:16-608:22 (Farmer).)

181.    At the time, the University committed to periodically review its use of race in undergraduate admissions and informed OCR that it planned to next do so within 90 days following the Supreme Court's issuance of its decision in *Fisher v. University of Texas at Austin*. (Tr. 609:5-10, 613:25-615:5 (Farmer); PX008.)

182.    On September 6, 2013, the Advisory Committee held a special meeting to discuss the recently decided *Fisher* case, review the University's current admissions policy, and address three questions: (1) Does the University's current admissions practice result in the needed diversity to enhance the student experience?, (2) What is critical mass and has the University attained it?, and (3) Are there race-neutral alternatives that could potentially provide similar results to the current policy? (Tr. 617:2-618:13 (Farmer); PX009.)

*vi.*    **The University convened the Working Group on Race-Neutral Alternatives**

183.    In September 2013, Mr. Farmer convened a working group chaired by Barbara Polk, the then-Deputy Director of Admissions, to explore race-neutral alternatives to the University's current admissions practices. (Tr. 618:17-619:17 (Farmer).) That working group consisted of members of faculty and staff from across the University. (Tr. 96:17-22 (Kretchmar); Tr. 620:23-621:11 (Farmer).)

184.    From December 2013 through October 2014, the Working Group held regular meetings during which it identified possible race-neutral alternatives, reviewed

relevant literature and commentary, and sought to understand other institutions' experiences with implementing race-neutral alternatives. (DX040; DX041; DX042; DX043; Tr. 96:23-24 (Kretchmar); *see also* PX036 (reflecting one meeting in 2015).)

185.    The Working Group modeled the impact of five race-neutral alternatives on the in-state portion of the University's entering class: (1) an approach that used strength of a student's high school curriculum and a standardized testing threshold as criteria for admission; (2) a top 10% plan; (3) a top 4.5% plan; (4) a percentage plan that guaranteed admission to top-ranked students while also admitting more students from low-income high schools; and (5) an approach that would guarantee admission to students with standardized test scores above a certain threshold. (DX045 at 17-19; Tr. 630:7-15 (Farmer).) Each alternative analyzed resulted in either a decline in racial diversity, a decline in academic quality, or both. (DX045 at 17-20; Tr. 631:1-8 (Farmer).)

186.    The Working Group concluded that no race-neutral alternative would allow the University to achieve a level of academic excellence and diversity comparable to that achieved by the current admissions practices. (DX045 at 17; Tr. 631:1-4 (Farmer).) The Working Group summarized its findings in a November 2014 report (the "White Paper"). (Tr. 105:7 (Kretchmar); DX045.)

187.    In February 2016, the Working Group presented the White Paper to the Advisory Committee for Undergraduate Admissions. (PX038; DX048; Tr. 104:24-105:25 (Kretchmar); DX047.) The Advisory Committee approved the Working Group's White Paper. (*Id.*)

63

### *vii.* **The University convened the Committee on Race-Neutral Strategies**

188.     In February 2016, the Advisory Committee convened the Committee on Race-Neutral Strategies ("CRNS") to build upon the work of the Working Group. (PX 38; Tr. 106:1-6 (Kretchmar); Tr. 631:15-18 (Farmer).) The CRNS is comprised of faculty and administrators who have expertise in various fields relevant to exploring race-neutral alternatives, including diversity and inclusion, data integration and analysis, machine learning, modeling, causal inference, student affairs, and undergraduate admissions. (Tr. 823:22-825:7 (Panter).)

189.     The charge of the CRNS is to: (1) consider whether there are workable race-neutral strategies and practices that the Admissions Office could employ in evaluating applications for undergraduate admission; (2) advise the Admissions Office about these strategies and practices; and (3) report to the Advisory Committee on the CRNS's consideration of specific race-neutral strategies approximately every two years. (Tr. 822:9-23 (Panter); DX054 at 2.)

190.     In evaluating race-neutral alternatives, the CRNS considered the effect of race-neutral practices on the University's diversity objectives and academic goals, as well as the potential administrative expense associated with implementing such practices. (Tr. 828:6-11 (Panter).) As a starting point, the CRNS sought to identify a race-neutral alternative that would work about as well as holistic review, meaning that the incoming class would have approximately the same levels of academic preparedness and diversity

64

as classes the University had enrolled through holistic review. (Tr. 858:23-859:7 (Panter); *see also* Tr. 635:16-636:4 (Farmer).)

191.    The CRNS convened 15 times between Spring 2016 and April 9, 2018. (Tr. 826:25-827:1 (Panter).) The CRNS began its work by discussing the University's mission and diversity goals and reviewing the Provost's Report on the Educational Benefits of Diversity. (Tr. 826:25-827:1, 831:2-11 (Panter).) The CRNS also met with representatives from the Admissions Office to learn about the University's admissions practices. (Tr. 831:20-23 (Panter); DX054 at 3.) Additionally, the CRNS reviewed the White Paper prepared by the Working Group on Race-Neutral Alternatives and met with members of that working group to learn more about their work. (Tr. 832:6-24 (Panter); DX054 at 4.)

192.    The CRNS formed three subcommittees, each charged with completing different tasks and reporting back to the larger committee: the Literature Review Subcommittee, the Data Analytics Subcommittee, and the Impact of Diversity on the Student Experience Subcommittee. (Tr. 833:13-21 (Panter); DX054 at 4-5.)

193.    The Literature Review Subcommittee reviewed current social science and legal literature on race-neutral alternative admissions practices, focusing on published studies, race-neutral admissions strategies adopted by other schools, public policy reports, and court documents. (Tr. 834:24-835:22 (Panter); DX54 at 4, 5.) The Literature Review Subcommittee identified five major categories of race-neutral strategies and presented them to the CRNS. (Tr. 839:6-12 (Panter); DX54 at 5.)

65

194.    The CRNS discussed these five categories and determined that three warranted further review: percentage plans, socioeconomic affirmative action programs, and race-neutral diversity essays. (Tr. 839:18-840:1 (Panter); DX54 at 5.) The Literature Review Subcommittee found that research generally suggests that percentage plans and socioeconomic affirmative action programs are unlikely to be effective and efficient substitutes for admission strategies that overtly consider race. (Tr. 839:18-21, 840:7-20 (Panter); DX054 at 5.) The subcommittee also found research on race-neutral diversity essays to be lacking. (Tr. 839:24-841:2; DX054 at 5.)

195.    Even though the literature review cast doubt on the utility of race-neutral strategies as a complete substitute for the consideration of race in admissions, the Literature Review Subcommittee nevertheless recommended that the CRNS update and expand simulations of percentage plans, run simulations of socioeconomic affirmative action programs, and consider having further discussions about the advantages and disadvantages of race-neutral diversity essays. (Tr. 842:15-843:4 (Panter); DX54 at 5-6.) Dr. Panter credibly testified that the CRNS considered and pursued these recommendations. (Tr. 843:5-11 (Panter).)

196.    The Data Analytics Subcommittee empirically examined the role of various undergraduate applicant attributes, including race and ethnicity, that were considered as part of the holistic admissions process during the 2016-2017 application cycle. (Tr. 843:15-20 (Panter); DX054 at 6-7.) After completing its analysis, the subcommittee examined its findings across five application cycles (from 2012 through 2017) and

66

concluded that applicants' race or ethnic status does not dominate the admissions decision. (Tr. 843:23-844:1, 844:16-845:2 (Panter); DX055.)

197.    The Data Analytics Subcommittee also developed infrastructure for statistical and data analyses that can be used to evaluate potential race-neutral alternatives. (Tr. 843:20-23 (Panter).) This process was an important threshold step to enable the subcommittee to simulate race-neutral alternatives. (DX054 at 46.) Dr. Panter credibly testified that although admissions simulations are not the sole way to evaluate race-neutral alternatives, the CRNS would run simulations of race-neutral alternatives in the future, as needed. (Tr. 857:5-858:13 (Panter).)

198.    The Impact of Diversity on the Student Experience Subcommittee analyzed existing University student surveys and social science literature to understand student experiences and how diversity has contributed to those experiences, a critical aspect of determining whether the University is realizing the educational benefits of diversity. (Tr. 836:22-838:2, 851:5-852:9 (Panter), DX054 at 7, 110.)

199.    In May 2018, the CRNS issued an interim report to the Chancellor and the Provost. (DX054.) At the time of that report, in addition to the work of the CRNS and its subcommittees, the CRNS Chair had also reviewed the expert reports in this case with the intent to learn from the experts' analyses. (Tr. 849:16-850:9 (Panter).) As of the time the interim report was issued, the CRNS planned to conduct a deeper dive into the parties' expert reports. (Tr. 850:13-15 (Panter).)

67

200. The CRNS's work is extensive and ongoing. (Tr. 854:15-855:10, 856:10-857:4 (Panter).) Dr. Panter credibly testified that the CRNS is committed to continuing to meet its charge. (Tr. 856:10-21 (Panter).)

201. Mr. Farmer and Dr. Panter both credibly testified that, over the past 16 years, the University has considered many different race-neutral alternatives to its holistic, race-conscious admissions program, but has not found an alternative that has come close to achieving its goals. Mr. Farmer also credibly testified that the University has considered the workability of race-neutral alternatives, both in terms of the "ability to translate a theory into a practice" and the expense involved. (Tr. 634:20-635:11 (Farmer).) Additionally, both convincingly testified that the University is committed to considering in good faith any alternative that appears to be reasonably capable of replacing race-conscious admissions practices. (Tr. 635:19-636:3 (Farmer); Tr. 858:17-20 (Panter).)

C. **Comprehensive Expert Analysis Confirms that No Workable Race-Neutral Alternative Would Allow the University To Maintain Its Current Levels of Academic Preparedness and Racial Diversity**

202. The University presented expert testimony from Professor Hoxby concerning the availability and feasibility of race-neutral alternatives to its current admissions process. Professor Hoxby conducted exhaustive econometric simulations of race-neutral alternatives, attempting to assess all potentially plausible race-neutral alternatives, including, but not limited to, those suggested in the Complaint or by SFFA's expert on race-neutral alternatives, Richard Kahlenberg. (Tr. 937:21-938:4, 981:3-25,

68

992:18-994:5, 1043:19-23 (Hoxby).) Mr. Kahlenberg agreed that the expert analysis performed covered the "waterfront of race-neutral alternatives." (Tr. 489:25-490:4 (Kahlenberg).)

203.    Professor Hoxby ran more than 100 simulations of various admissions plans and analyzed the resulting racial composition and academic preparedness of a hypothetical enrolling class. The alternatives she assessed include: (1) socioeconomic status-based plans in which greater emphasis is given to applicants from disadvantaged backgrounds; (2) percentage plans in which a certain percentage of students—typically those at the top of their high school class—are automatically admitted; and (3) geography-based plans in which greater emphasis is given to applicants from particular geographic areas. (Tr. 993:1-5 (Hoxby).)

204.    Professor Hoxby also ran a matriculation model predicting who would enroll under every race-neutral alternative that she simulated. (Tr. 983:17-984:1 (Hoxby).) She testified that this step was important to understand the results of the simulation because admitted students who do not enroll at the University do not affect the composition of the class. (Tr. 982:3-983:16 (Hoxby).) By contrast, Mr. Kahlenberg did not account for who might enroll, but considered only the admitted class. (Tr. 1054:5-7 (Hoxby).)

205.    In performing her simulations, Professor Hoxby made very generous assumptions favorable to the race-neutral alternatives in order to test the ceiling of what is reasonably possible. (Tr. 938:5-11, 986:24-987:12, 1073:8-11, 1106:2-17, 1113:7-14

69

(Hoxby); *see also* Tr. 988:1-991:16, 991:20-992:16 (Hoxby) (explaining assumptions made).) Mr. Kahlenberg agreed that Professor Hoxby's methodology of filling any remaining admissions seats (i.e., "completing the class") in her race-neutral simulations favored the success of the race-neutral alternative. (Tr. 489:12-16 (Kahlenberg).)

206.    In assessing the outcome of each race-neutral alternative simulation, Professor Hoxby reported whether the alternative would allow the University to attain both its actual levels of racial diversity and academic preparedness. (Tr. 984:2-13, 1049:3-9 (Hoxby).) Whether a race-neutral alternative can achieve the same amount of racial diversity as a race-conscious approach depends on how strongly the proxy or variable used as an alternative to race—e.g., socioeconomic status or attending a particular high school—correlates with underrepresented minority status within the applicant pool. (Tr. 1193:9-1194:4, 1205:13-1206:2 (Long); Tr. 1044:23-1045:10 (Hoxby).)

207.    Professor Hoxby measured academic preparedness by using average composite SAT score. (Tr. 984:16-25 (Hoxby).) Although Professor Hoxby acknowledged that average SAT score is an imperfect academic indicator, it is the best available because it is standardized, unlike high school GPA. (Tr. 985:1-19 (Hoxby).)

208.    Professor Hoxby also considered whether the race-neutral alternatives she assessed could be feasibly implemented by the University. (Tr. 986:11-21 (Hoxby).)

209.    Professor Hoxby concluded that none of the race-neutral alternatives she simulated would allow the University to attain its current levels of racial and ethnic diversity, as well as academic preparedness. (Tr. 938:5-11, 1032:16-1033:7 (Hoxby).)

70

Professor Hoxby testified credibly that if there was a realistic and feasible race-neutral alternative capable of attaining the University's actual levels of racial and ethnic diversity and academic preparedness, her empirical analysis would have revealed it, particularly due to the favorable assumptions she made and the wide range of possibilities she considered. (Tr. 1182:3-14 (Hoxby).)

210. The University also presented evidence on race-neutral alternatives from Dr. Bridget Terry Long, Dean of the Harvard Graduate School of Education. Dean Long has a Master's and Ph.D. in economics from Harvard University and has taught at the Harvard Graduate School of Education since 2000. Dean Long was appointed by President Obama and confirmed by the United States Senate to serve on the national Board of Education Sciences, which oversees and advises on the research functions of the Department of Education. Dean Long's research in economics focuses upon college access and success, and she also teaches graduate level courses focused on the economics of higher education. Dean Long has also served on the admissions committee of the Harvard Graduate School of Education, has taught students who have worked in admissions, has taught in professional education, and has consulted with colleges and universities seeking to improve their admissions processes. (Tr. 1184:9-1188:13 (Long).) Dean Long has testified four times in front of United States congressional committees, most recently to the Senate Health Commission, which focuses on education, relating to the FAFSA federal financial aid form. (Tr. 1188:18-25 (Long).)

71

211.    Dean Long testified credibly on three topics: (1) race-neutral alternatives implemented by universities, hypothesized in academic literature, or mentioned in the Complaint; (2) whether certain potential race-neutral alternatives should be considered by the University; and (3) certain of the opinions and assertions offered by Mr. Kahlenberg. (Tr. 1189:3-15 (Long).)

      ***i.***     **No socioeconomic status-based race-neutral alternative achieves the University's current levels of racial and ethnic diversity and academic preparedness.**

212.    Professor Hoxby tested socioeconomic status ("SES")-based race-neutral alternatives using different SES-indices: (1) a student's likelihood to attend a two-year or four-year college, (2) a student's likelihood to attend a four-year college, (3) a student's ability to overcome disadvantage, and (4) a composite proxy designed to maximize the power of socioeconomic variables to predict race and ethnicity. (Tr. 1006:4-1008:22 (Hoxby).)

213.    For each of these four SES-indices, Professor Hoxby ran 20 different simulations (80 overall), using both a variety of thresholds for what would be considered "low" SES and varied emphasis, i.e., how many low-SES students the University would hypothetically admit. (Tr. 998:18-1000:6, 1075:10-25 (Hoxby).) For each simulation, she filled the remaining admissions seats (i.e., "completed the class") by randomly drawing students from the University's current admitted applicant pool to incorporate the University's current holistic approach. (Tr. 1001:15-1002:10 (Hoxby).)

72

214.    In each socioeconomic status-based race-neutral alternative simulation, as part of predicting who would be admitted under the hypothetical admissions regime, Professor Hoxby sought to make the simulation come as close as possible to achieving the University's actual levels of racial diversity and academic preparedness through generous assumptions. (Tr. 1001:5-13, 1096:22-1097:7 (Hoxby).) Similarly, when predicting who would enroll under the hypothetical admission regime, Professor Hoxby designed her model to mimic the University's current admissions process, thereby favoring the odds that the race-neutral alternative would attain the University's actual levels of racial diversity and academic preparedness. (Tr. 1001:14-1002:16, 1003:10-13 (Hoxby).)

215.    Professor Hoxby made other "optimistic" assumptions that maximized the SES-based simulations' chances for success. She assumed the University could identify all socioeconomic-disadvantaged students even though no admissions office in the United States currently obtains the sophisticated data and undertakes the considerable analytic effort that would be required to adopt such a plan in reality. (Tr. 1003:18-1004:7, 995:1-6 (Hoxby).) She also assumed that the University would be able to get socioeconomically disadvantaged students to apply at the same rate as current well-qualified applicants. (Tr. 1004:8-23 (Hoxby).) Finally, she assumed that applicants admitted under the current race-conscious admissions system would continue to enroll exactly as they do now— even though the experience of universities who have ceased race-conscious admissions

73

(e.g., Texas and California) suggests that applicant behavior will change. (Tr. 1005:13-22, 1069:25-1071:4 (Hoxby); Tr. 1201:1-16 (Long).)

216. Professor Hoxby found no SES-based simulation that met the actual levels of racial diversity or academic preparedness the University achieves through race-conscious admissions. She reached this conclusion despite her attempts "to test the absolute ceiling of what could be achieved by a socioeconomic index in a race-neutral alternative." (Tr. 1013:1-3, 1013:8-20, 1102:2-7 (Hoxby).)

217. Professor Hoxby's empirical analysis and conclusion that no reasonable SES-based race-neutral alternative would achieve the University's current levels of racial diversity is credible and consistent with Dean Long's testimony that even though many low-income students are African American or Hispanic, the majority of low-income students are white. Thus, an admissions policy that gives preferences according to socioeconomic status will end up admitting more white students than underrepresented minorities. (Tr. 1206:3-17 (Long).) Indeed, empirical analysis using data from the University's applicant pool and NCERDC data[6] demonstrates that, in the state of North Carolina, socioeconomic status is not highly correlated with race and ethnicity.[7] (Tr. 995:21-996:20, 1013:11-16, 1065:21-1066:6 (Hoxby); *see also* Tr. 997:9-998:14,

---

[6] The North Carolina Educational Research Data Center ("NCERDC") contains data for all North Carolina public school students. (Tr. 421:15-16 (Kahlenberg); Tr. 989:22-23 (Hoxby); Tr. 996:4-5 (Hoxby).)

[7] Unlike Professor Hoxby, Mr. Kahlenberg did not directly quantitatively analyze the relationship between socioeconomic status variables and underrepresented minority status.

74

1013:17-20 (Hoxby).) Notably, no undergraduate university has implemented a socioeconomic status-based plan that has replaced a holistic, race-conscious admissions approach (Tr. 1206:21-1207:3 (Long)), a fact that further supports Professor Hoxby's conclusions.

<blockquote>
(a) **No realistic percentage plan attains the University's current levels of both racial and ethnic diversity and academic preparedness**
</blockquote>

218. A "percentage" or "top X percent" plan automatically admits students who are in a defined top X percent—most often, high school class rank. (Tr. 1016:19-1017:5 (Hoxby).) The specific percentage, or "X," depends on the specific institution's characteristics, including the number of students who are eligible for admission and the number of seats that are available at the university. (Tr. 1017:6-14 (Hoxby).)

219. A high school class rank percentage plan could produce racial diversity only if there is underlying racial segregation; in other words, applicants must attend racially segregated high schools—both now and in the future. (Tr. 1019:4-8, 1019:24-1020:6 (Hoxby); Tr. 1196:11-17 (Long).)

220. Professor Hoxby analyzed a top 7.95% plan, which replicates the size of a typical admitted class under the University's current admissions process. (Tr. 1017:20-25 (Hoxby).) Under this plan, the average SAT score of admitted students dropped by 77 points, with this decrease especially pronounced among underrepresented minority students. (Tr. 1018:1-10 (Hoxby) (testifying that, on average, SAT scores were 129 and 99 points lower for African American and Hispanic students, respectively).) Although the

75

overall percentage of underrepresented minority students did not change, more white students were accepted and fewer Asian-American applicants were accepted. (Tr. 1018:15-25 (Hoxby).)

221. Professor Hoxby likewise concluded that a percentage plan produced an enrolled class with lower academic preparation compared to the University's current enrolled class: the average test scores for enrolled students fell by 76 points, with scores for enrolled African American and Hispanic students falling by 122 and 96 points, respectively. (Tr. 1020:18-24 (Hoxby).)

      **(b)**    **No geography-based race-neutral alternative achieves the University's current levels of racial and ethnic diversity and academic preparedness**

222. A geography-based admissions plan is entirely theoretical; no university has implemented such an alternative, and there is no precedent for how such a plan would work or the results it would produce in practice. (Tr. 1024:21-25 (Hoxby); *see also* Tr. 1202:3-11 (Long).) Although difficult to design and test, Professor Hoxby relied on articles cited in the Complaint and her own expertise to design and simulate the most successful geography-based plans possible. (Tr. 1025:1-9, 1028:6-1029:1 (Hoxby).) Mr. Kahlenberg did not simulate any geography-based race-neutral alternative.

223. Specifically, Professor Hoxby used North Carolina census tracts as the geographic replacement for high schools and prioritized applicants from census tracts that were historically the most "disadvantaged" in terms of the admissions rate for its well-qualified potential applicants to the University. (Tr. 1027:4-23 (Hoxby).) To admit

76

students within each census tract, Professor Hoxby ranked students within each tract using an equally weighted combination of test scores and grades—a choice designed to favor the geography-based race-neutral alternative's ability to attain the University's current level of average test score and academic preparedness. (Tr. 1025:10-1026:21 (Hoxby).)

224.    Even after making favorable assumptions, Professor Hoxby found that a geography-based plan using census tracts resulted in a significant decrease in the racial diversity of the University's admitted and enrolled student populations. (Tr. 1028:1-3 (Hoxby).)

225.    Professor Hoxby also created an index designed to test the ceiling of a what geography-based race-neutral alternative could achieve. Using this geography-based index (designed akin to her socioeconomic status indicator index), she concluded that the University would experience a significant decrease in racial diversity in both its admitted class and enrolled class if it employed a geography-based race-neutral alternative. (Tr. 1029:2-7 (Hoxby).)

226.    As with place-based percentage plans based on high school class rank, the more desegregated North Carolina is, the more a geography-based race-neutral alternative would automatically fail to attain racial and ethnic diversity. (Tr. 1029:8-1030:5 (Hoxby); *see also* Tr. 1202:12-16 (Long) ("[S]imilar to the percentage plan, in order for [a geography-based plan] to be successful, there would have to be a high level

77

of segregation across ZIP codes in order for that – that kind of preference to produce a racially and ethnically diverse student body.").)

> (c) **No other potential race-neutral strategy suggested by Mr. Kahlenberg achieves the University's current levels of racial and ethnic diversity and academic preparedness**

227.   Without any detailed analysis or evidence, SFFA's expert Mr. Kahlenberg asserts that the University could do "more" to recruit minority students, partner with disadvantaged high schools, and increase transfers from community colleges. He admits that none of these strategies could, on their own, replace the University's current admissions approach; however, he insists that increased efforts would enable the University to move away from the consideration of race as part of a holistic review. (Tr. 500:9-16 (Kahlenberg).)

228.   Professor Hoxby empirically evaluated each of these additional strategies that Mr. Kahlenberg suggested in his expert reports. (Tr. 1030:10-14 (Hoxby).) In response to Mr. Kahlenberg's suggestion that the University could better partner with disadvantaged high schools, Professor Hoxby ran 16 different simulations focusing on high schools with high proportions of more socioeconomically disadvantaged students. (Tr. 1030:17-1031:6 (Hoxby).) Based on these simulations, Professor Hoxby concluded that such an approach would result in substantially lower test scores in the University's admitted and enrolled classes. (Tr. 1031:7-9 (Hoxby).)

229.   Although Mr. Kahlenberg did not perform any simulations or quantitative analysis relating to community college transfers (Tr. 499:20-500:3 (Kahlenberg)),

78

Professor Hoxby empirically tested Mr. Kahlenberg's suggestion that the University could significantly increase the number of transfer students admitted from community colleges to implement a race-neutral alternative. (Tr. 1031:10-14 (Hoxby).)

230.    Professor Hoxby assumed that the University would be able to identify all students within the NCERDC data who expressed an intention to attend a community college and convince the students with the highest test scores to transfer to the University, thereby ensuring the simulation would result in the highest possible average test score. (Tr. 1031:14-23 (Hoxby).) Even with these generous and optimistic assumptions, Professor Hoxby's empirical analysis of a community college transfer plan yielded substantially lower average test scores. (Tr. 1031:14-1032:1 (Hoxby).)

231.    Professor Hoxby ran this same simulation but substituted transfer students from North Carolina State University rather than using all the NCERDC data. This simulation resulted in both substantially lower average test scores and less racial diversity. (Tr. 1032:2-15 (Hoxby).)

### ii.    SFFA presented no credible expert evidence to contradict Professor Hoxby's conclusions

232.    The evidence demonstrated that SFFA's sole proffered expert on race-neutral alternatives, Mr. Kahlenberg, is not objective. He has known the president of SFFA since 2003, was heavily involved in editing the Complaint in this action, appeared at the press conference announcing the commencement of this litigation, and may have even given advice to SFFA on which universities to sue. (Tr. 461:10-13, 462:11-18, 464:2-23, 465:1-16 (Kahlenberg).)

79

233. Mr. Kahlenberg is also a self-professed advocate for increasing socioeconomic diversity. (Tr. 460:23-463:2 (Kahlenberg).) Although socioeconomic diversity is unquestionably an important goal, including for the University (*see supra* ¶¶10-11, 153, 159), the relevant inquiry is whether a race-neutral alternative would allow the University to maintain racial diversity. (Tr. 1015:17-1016:6 (Hoxby); *see also* Tr. 1016:1-6 (Hoxby).) Mr. Kahlenberg does not dispute, and in fact agreed, that there are distinct benefits to racial diversity. (Tr. 399:2-15, 414:25-415:2, 504:13-16 (Kahlenberg).)

234. Mr. Kahlenberg is not qualified—and does not claim to be qualified—to perform econometric analysis and modeling to simulate race-neutral alternatives. (Tr. 466:20-467:22 (Kahlenberg).) Instead, Professor Arcidiacono executed race-neutral simulations based on Mr. Kahlenberg's instructions; most of these simulations were based off models that Professor Arcidiacono created. (Tr. 296:9-17 (Arcidiacono).) As of his deposition, Mr. Kahlenberg had never even seen the work papers submitted in support of the simulations contained in his expert reports. (Tr. 466:20-467:22 (Kahlenberg).) When he formulated opinions about these simulations of race-neutral alternatives, Mr. Kahlenberg did not know and had no way to test whether Professor Arcidiacono was using overfit models or conducting analyses, such as creating the Arcidiacono Index, that were not based on the actual University admissions process. (Tr. 468:6-471:8 (Kahlenberg).)

80

235.    Additionally, certain of Mr. Kahlenberg's broad assertions about race-neutral alternatives are contradicted by other record evidence. Mr. Kahlenberg asserted that a SES-based race-neutral alternative would be more likely to succeed if the University would broaden its definition of socioeconomic disadvantage to account for an applicant's "wealth" rather than income. (Tr. 1215:8-11 (Long).) But implementing such a policy, particularly if it meant that a university would no longer be "need-blind" as to an applicant's financial aid needs, would be a "fundamental change to how admissions committees do their work or how they strive to do their work to not disadvantage low-income students." (Tr. 1215:2-7 (Long); *see also* 555:17-556:14 (Farmer).)

236.    Perhaps more fundamentally, universities do not possess applicant wealth information. (Tr. 1210:24-1211:3, 1215:22-25 (Long).) Mr. Kahlenberg's assertion that universities could use the FAFSA form to acquire information about applicant wealth is contradicted by Dean Long's credible testimony concerning the FAFSA. (Tr. 452:2-19 (Kahlenberg); Tr. 1216:1-1218:24 (Long).) Dean Long testified that requiring additional forms, including additional financial status forms, can discourage low-income students from applying because "every form is a barrier." (Tr. 1231:3-13 (Long); *see also* Tr. 556:4-14 (Farmer).)

237.    Other of Mr. Kahlenberg's broad assertions are similarly unsupported—if not contradicted by the record evidence or even the testimony of Professor Arcidiacono. For example, Mr. Kahlenberg posited that UNC should eliminate any preference for legacy applicants. (Tr. 415:20-416:12 (Kahlenberg).) But Mr. Kahlenberg ignored that

81

Professor Arcidiacono admitted that any purported legacy preference has a "minimal effect" on the admissions process. (Tr. 317:20-24 (Arcidiacono).) Likewise, Mr. Kahlenberg asserts that the University can afford any socioeconomic status-based admissions regime because of the size of the University's endowment. (Tr. 458:15-459:12 (Kahlenberg).) But Mr. Kahlenberg did no analysis as to the financial cost to the University of increasing certain measures designed to support socioeconomic diversity or whether the University's endowment might be restricted. (Tr. 496:13-498:22 (Kahlenberg).)

### (a) Mr. Kahlenberg overstated the success of other institutions in implementing race-neutral alternatives

238.    Dean Long credibly testified that Mr. Kahlenberg overstates how effective race-neutral alternatives have been or would be because he failed to pay sufficient attention to the details of the studies and context of the institutions that implemented them. (Tr. 1210:11-23 (Long).)

239.    Mr. Kahlenberg admitted that when the University of California at Berkeley and UCLA stopped considering race in the admissions process due to a change in state law in 1996, they experienced a sharp drop in racial diversity. (Tr. 490:13-22 (Kahlenberg).) Indeed, when Mr. Kahlenberg submitted a personal amicus brief to the Supreme Court in 2014, UCLA still had not reached its prior levels of racial diversity using race-neutral alternatives. (Tr. 491:5-12 (Kahlenberg).) Likewise, at his 2018 deposition in this case and in his 2017 expert report in the Harvard litigation, Mr. Kahlenberg cited the same 2012 study showing that both UCLA and Berkeley had been

unable to achieve their prior levels of racial diversity in the 15 years since they discontinued race-conscious admissions. (Tr. 493:20-494:17 (Kahlenberg).)

240.    Mr. Kahlenberg emphasized that, in the last year, the University of California at Berkeley and UCLA achieved their highest levels of racial diversity ever. (Tr. 494:4-11 (Kahlenberg).) But as even Mr. Kahlenberg admitted and as Dean Long testified, the race-neutral policies put in place at those institutions failed for 20 years to achieve the level of racial diversity achieved using race-conscious admissions. (Tr. 1199:5-19 (Long); Tr. 494:18-25 (Kahlenberg).) Thus, it is not credible to attribute the racial diversity finally achieved in a recent admissions cycle year to the 1996 policy change enacted by the California legislature and to claim that such an approach means that the University would be able to maintain its level of racial diversity. (Tr. 1199:9-1200:6 (Long).)

241.    Likewise, universities—most notably the University of Texas at Austin—that have implemented percentage plans have struggled to maintain racial and ethnicity diversity. (Tr. 1197:2-17 (Long).) Dean Long testified that academic literature that has studied the experience of Texas questions the success of its percentage plan at maintaining racial diversity because the underlying demographics of the Texas population were also changing at the time to become more diverse. (Tr. 1198:9-16 (Long).)

242.    Mr. Kahlenberg's testimony that race-neutral alternatives have been successfully implemented also ignores the indirect effects of the change in admissions

83

policy, including that applicant behavior might change. As Dean Long testified, researchers have documented that parents have moved school districts as a result of the changed incentives for their child to attend a different high school where his or her chances of admissions to a university may change. (Tr. 1201:1-21 (Long).)

243.    Additionally, all of the academic literature relating to socioeconomic status-based plans are hypothetical simulations because no university has implemented such a plan. Thus, these thought experiments provide limited insights as to what might actually be feasible for colleges and universities to implement—not the conclusive evidence that Mr. Kahlenberg claims. (Tr. 1207:4-10 (Long).) Similarly, many of the hypothesized plans and approaches put forth by researchers require data that an admissions committee would not have, or use assumptions that are not reasonable for the real world; these simulations rely on models that do not look like what real admissions offices look like and how they do their work. (Tr. 1207:15-18 (Long).)

244.    Finally, Mr. Kahlenberg's testimony that other universities have "abandoned" early admissions to increase "fairness" and provide more racial and ethnic diversity selectively ignores the actual experience of other universities.[8] As Mr. Kahlenberg admitted on cross examination, Harvard—a university that abandoned early

---

[8]    Mr. Kahlenberg's characterization of the University's process also borders on inaccurate. Contrary to Mr. Kahlenberg's characterization, the University does not require a binding commitment to attend if an applicant applies early (so-called "Early Decision") but allows an applicant to apply early and apply to other schools (so-called "Early Action"). (Tr. 558:22-24 (Farmer).)

admissions in 2006—reinstituted the approach because it was concerned that it was receiving less qualified applicants. (Tr. 500:24-502:21 (Kahlenberg).)

   **(b)**  **The "success" of Mr. Kahlenberg's simulations depends upon numerous unrealistic assumptions**

     **(1)**  **Mr. Kahlenberg's simulations fail to account for reasonably foreseeable changes in applicant behavior**

  245.  Mr. Kahlenberg's simulations—both his percentage plans and SES-based plans—frequently failed to consider that the applicant pool would change if the admissions process changed. (Tr. 1014:1-6 (Hoxby).) This assumption that the applicant pool would hold constant "creates an unrealistic environment in which none of the newly eligible students who would be guaranteed admission or would have had their admissions probability go up by a great deal decide to apply." (Tr. 1014:8-12 (Hoxby).) Mr. Kahlenberg's assumption means the University would "never add[] newly eligible students to the pool who might be less qualified," or change "the racial and ethnic composition of the applicant pool." (Tr. 1014:11-14 (Hoxby).) As Professor Hoxby credibly explained, Mr. Kahlenberg's decision to keep the applicant pool constant is "terribly unrealistic" and at odds with the experience of other public universities like Texas and California. (Tr. 1014:15-18 (Hoxby).)

  246.  Mr. Kahlenberg's primary percentage plan is not based on high school class rank. Instead, he used Arcidiacono's model that incorporates the Admissions Office ratings to rank students and then admits the top 4.5% of students from each high school based on their ranking within Professor Arcidiacono's model. (Tr. 1021:15-1022:15

(Hoxby).) Using this approach means that the percentage plan did not consider any students who did not already apply to the University. This assumption runs contrary to the evidence of other institutions that have implemented race-neutral alternative admissions and observed a change in applicant behavior. This assumption also means that the Kahlenberg percentage plan will unreasonably favor the alternative's ability to match the University's current level of racial diversity because it assumes all students who already apply will to continue to apply—an assumption Mr. Kahlenberg previously asserted was "audacious."[9] (Tr. 480:10-482:13 (Kahlenberg).)

247.    Mr. Kahlenberg's claim that his choice to use Arcidiacono's model of the University's admissions process as the basis for his percentage plan was an attempt to mimic holistic admissions reflects the limitations of his ability to design econometric analysis. No university has implemented a percentage plan that is not based on high school class rank. (Tr. 1022:16-18 (Hoxby).)

>    **(2)    Mr. Kahlenberg originally failed to properly account for the size of the admitted class and then improperly filled the remaining seats in the class based on an equal weighting of test score and GPA**

248.    Mr. Kahlenberg's testimony concerning percentage plans is less credible than Professor Hoxby's because of numerous errors that he made.

---

[9]    Mr. Kahlenberg criticized Dr. Kretchmar's use of the same assumption as "audacious" when she used it in modeling certain race-neutral alternatives. (Tr. 482:11-13 (Kahlenberg).)

86

249.     Mr. Kahlenberg selected the percentage of students to be admitted in his simulations. (Tr. 297:2-3 (Arcidiacono).) In his original percentage plan simulation (Simulation 5), Mr. Kahlenberg made two errors and, as a result, simulated admitting a class that was 30% smaller than the University's average class size. (Tr. 472:2-473:13, 473:23-474:8, 473:18-22, 474:24-475:11 (Kahlenberg).)

250.     Before Professor Hoxby identified these errors and another error that resulted in the average SAT score in Simulation 5 being 75 points too high, Mr. Kahlenberg opined that Simulation 5 was "superior to the status quo in virtually every respect" and represented a "viable race-neutral alternative." (Tr. 472:18-22, 473:7-13 (Kahlenberg).)

251.     When he attempted to fix these errors, Mr. Kahlenberg instructed Professor Arcidiacono to fill the remaining class seats with top students using what was akin to an academic index focused on grades and test scores. (Tr. 474:12-16 (Kahlenberg).) This approach (Simulation 8) also assumes that every student in North Carolina with top test scores and grades applies to the University and would always be admitted—an assumption that is not realistic. (Tr. 1024:3-18 (Hoxby).) Thus, Mr. Kahlenberg's choice to admit the students with the highest test scores and GPA also means that the average test score and GPA under this simulation will be artificially inflated.

252.     Mr. Kahlenberg's approach also fails to account for changes in applicant behavior by assuming that every single underrepresented minority applicant who

previously applied to the University would still continue to apply even if race-conscious admissions were discontinued. (Tr. 478:22-479:3 (Kahlenberg).)

253.    Mr. Kahlenberg also simulated a 4% plan (Simulation 9) that filled 75% of the available seats with the students in the NCERDC data with the highest probability of admission under Professor Arcidiacono's model 2. (Tr. 480:18-481:8 (Kahlenberg).) Simulation 9 unrealistically assumes that every public high school student in North Carolina, including every valedictorian, will apply to the University. (Tr. 482:14-19 (Kahlenberg).) Yet, even with this assumption, racial diversity for Hispanic, Asian, and Native American applicants would decrease by at least 10%. (Tr. 482:20-484:16 (Kahlenberg).)

### (3)    Mr. Kahlenberg provides unrealistic "boosts" for socioeconomic disadvantage

254.    Mr. Kahlenberg does not provide credible evidence showing that an SES-based plan would allow the University to maintain similar levels of racial and ethnic diversity and academic preparedness. (Tr. 1016:9-15 (Hoxby).)

255.    Mr. Kahlenberg based his original SES simulation (Simulation 3) on the current University applicant pool using Professor Arcidiacono's preferred model. (Tr. 484:17-23 (Kahlenberg).) Mr. Kahlenberg provided applicants with a "bump" in their admission chances if they met one of several SES-based criteria: (1) first-generation college status, (2) applied for a fee waiver or were eligible for free or reduced price lunch, and/or (3) lived in a North Carolina zip code with a median income in the bottom third nationally. (Tr. 484:24-485:12 (Kahlenberg).) An applicant could receive multiple

88

bumps. (Tr. 485:13-14 (Kahlenberg).) Mr. Kahlenberg selected the size of the bumps used to give an SES preference. (Tr. 297:4-19 (Arcidiacono).)

256.    Mr. Kahlenberg's SES-plan simulations appear successful because he provides an "unrealistically large" SES bump. As Professor Hoxby testified, and Mr. Kahlenberg admitted, the boost is so large that a student could have hundreds of SAT points added to his SAT score. (Tr. 1015:4-16 (Hoxby); Tr. 485:25-486:2 (Kahlenberg) ("Q: And if the bump was doubled, it could be 400 some – well over 400 points on the SAT, correct? A: That's correct.").)

257.    Even though such a significant bump would create a strong incentive for any applicant who would receive one or more bumps to apply, Mr. Kahlenberg's simulation assumed the applicant pool would not change. (Tr. 486:20-487:6 (Kahlenberg).) It is not credible to assume that a student with an 1100 SAT score who had not applied to the University before but who would now be treated as if he had scored a 1500 on the SAT would not behave differently.

258.    Mr. Kahlenberg admitted that his assumption that the applicant pool would not change affected the results of the simulations, and acknowledged that when Professor Hoxby ran the simulation using the broader applicant pool reflected in the NCERDC data, the average SAT score fell. (Tr. 487:7-488:1 (Kahlenberg).)

89

## PROPOSED CONCLUSIONS OF LAW

## I. CONTROLLING SUPREME COURT PRECEDENT PERMITS THE CONSIDERATION OF RACE IN ADMISSIONS

Time and time again, the U.S. Supreme Court has approved the use of race-conscious admissions policies in higher education as a means to enhance student-body diversity. *See Grutter v. Bollinger*, 539 U.S. 306 (2003); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013) ("*Fisher I*"); *Fisher v Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) ("*Fisher II*"). To decide whether any such policy complies with the Equal Protection Clause of the Fourteenth Amendment, courts apply strict scrutiny. *Fisher I*, 570 U.S. at 308, 309-10; *Fisher II*, 136 S. Ct. at 2208. Under this standard, a university must demonstrate that its race-conscious admissions program is narrowly tailored to further a compelling interest. *Fisher II*, 136 S. Ct. at 2208.

The Supreme Court has recognized that that a university's pursuit of "the educational benefits that flow from student body diversity" is a compelling interest that may justify the consideration of race in admissions. *Id.* at 2210; *Grutter*, 539 U.S. at 328. Diversity that furthers a compelling interest encompasses a broad "'array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher I*, 570 U.S. at 308 (quoting *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 315 (1978).) Racial diversity, in particular, imparts distinct benefits to a university's educational program; a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Fisher II*, 136 S. Ct. at 2210 (quoting *Grutter*, 539

90

U.S. at 330). "Equally important, 'student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.'" *Id.* (quoting *Grutter*, 539 U.S. at 330).

The decision to pursue the educational benefits of diversity "is, in substantial measure, an academic judgment." *Fisher II*, 136 S. Ct. at 2208; *see also Grutter*, 539 U.S. at 329 (recognizing that a university's autonomy to select a student body is an academic freedom rooted in the First Amendment); *Bakke*, 438 U.S. at 312 (same). Thus, a university's "reasoned, principled explanation for its decision" to pursue the educational benefits of diversity deserves considerable judicial deference. *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted); *see also id.* at 2214 ("Considerable deference is owed to a university in defining those intangible characteristics, like student body diversity, that are central to its identity and educational mission."). Indeed, "absent 'a showing to the contrary,'" courts may "presume[]" a university's "'good faith'" in choosing to pursue the educational benefits of diversity. *Grutter*, 539 U.S. at 329 (quoting *Bakke*, 438 U.S. at 318-19).

A race-conscious admissions approach is narrowly tailored when there is a close "fit" between the university's consideration of race and its "compelling goal" of diversity, so that there is "little or no possibility [for] illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 334 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.)). Thus, universities cannot use a quota system or separate admissions tracks, engage in racial balancing, or automatically assign numerical values to

91

race. *Id.*; *Fisher I*, 570 U.S. at 311; *Gratz v. Bollinger*, 539 U.S. 244, 273-74 (2003). Instead, the Supreme Court has found race-conscious admissions programs to be narrowly tailored when universities consider race flexibly as part of an "individualized, holistic review" of each applicant, "giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 309, 337; *see also Gratz*, 539 U.S. at 271. Such individualized consideration assures that all applicants "'have been weighed fairly and competitively,'"—and not prejudiced due to their race or ethnicity. *Grutter*, 539 U.S. at 341 (quoting *Bakke*, 438 U.S. at 318).

In addition, to satisfy narrow tailoring, a university must show that "'race-neutral alternatives' that are both 'available' and 'workable' 'do not suffice.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312) . That is, the university must have considered race-neutral alternatives and concluded that they do not promote the university's goals "about as well [as race-conscious practices] and at tolerable administrative expense." *Id.* (quoting *Fisher I*, 570 U.S. at 312). However, "exhaustion of every conceivable race-neutral alternative" is not required. *Id.* (quoting *Grutter*, 539 U.S. at 339). Nor must a university "choose between a diverse student body and a reputation for academic excellence." *Id.* at 2213. Accordingly, a race-neutral alternative need not be implemented if it would compromise a university's "reputation for excellence," or if it would undermine the university's commitment to "all . . . aspects of diversity"— including, but not limited to, diversity based on race. *Id.*

92

In short, controlling Supreme Court precedent makes clear that a race-conscious admission program is constitutionally permissible where two conditions are met: (1) the university engages in a holistic, individualized review of each applicant, considering race flexibly as only one factor among many, and (2) available race-neutral alternative approaches would not allow the university to achieve its compelling interest in diversity without sacrificing academic quality or incurring unreasonable expense.

## II. THE UNIVERSITY'S ADMISSIONS PROGRAM IS CONSTITUTIONAL

### A. The University Demonstrated Its Compelling Interest in Diversity

The uncontested evidence in this case demonstrates that the University has a compelling interest in attaining the educational benefits of diversity—including racial diversity. As a public institution that strives to prepare the next generation of leaders, the University has determined, in its academic judgment, that it must provide students with a diverse learning environment. (*Supra*, Proposed Findings of Fact ("FOF") ¶¶9-10.) This decision is consistent with the Supreme Court's recognition that, "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332.

For more than two decades, the University has emphasized—in academic plans, official reporting, and a unanimously approved Faculty Council resolution—that student-body diversity is a deeply held value, central to the University's identity and mission. (FOF ¶¶14-16.) The record demonstrates that racial diversity is a critical component of

93

student body diversity, necessary to achieve the educational benefits the University seeks to provide its students. Faculty, students, and alumni testified at trial and through declarations that racial diversity provides unique benefits to the lived student experience. (FOF ¶¶18-24.) To name just a few, these benefits include breaking down stereotypes, encouraging empathy, promoting innovation, and providing a depth and breadth of learning experiences. (FOF ¶¶19-20, 23.) The University intentionally pursues these benefits, both in and out of the classroom, through its programming, events, initiatives, and policies, thoughtfully creating a campus environment where the educational benefits of diversity can be realized. (FOF ¶¶25-30.)

Additionally, the record demonstrates that the University regularly assesses its effectiveness in delivering these benefits to students. (FOF ¶31.) This ongoing process of self-evaluation includes the collection and analysis of quantitative and qualitative data over many years. (FOF ¶¶32-33.) More recently, the University convened a committee specially charged with enhancing the University's efforts to assess its progress toward achieving, and improve its delivery of, the educational benefits of diversity. (FOF ¶¶34-38.) These deliberate and sustained efforts demonstrate that the University has endeavored, in good faith, to continually assess and fulfill its commitment to attaining the educational benefits of diversity.

Although faculty and students testified to experiencing the educational benefits of diversity at the University (FOF ¶¶18-24), the record also demonstrates that the University has not yet fully achieved its goals. In particular, Mr. Farmer, the University's

94

Vice Provost for Enrollment and Undergraduate Admissions, Dr. Panter, the Senior Associate Dean for Undergraduate Education, and the student-intervenors explained how minority students remain underrepresented on the University's campus, including in certain classes and fields of study. (FOF ¶¶39-43.) These witnesses testified that the continuing lack of racial diversity risks undermining both the University's ability to fulfill its mission and students' ability to learn, grow, and thrive on campus. (FOF ¶¶40-41.)

At trial, SFFA did not contest the legitimacy of the educational benefits of diversity. Indeed, SFFA's expert acknowledged these benefits, including the distinct benefits associated with racial diversity. (FOF ¶233.) Nor did SFFA dispute at trial that the University's pursuit of this compelling interest was genuine. Thus, although SFFA's Complaint suggested that the University's pursuit of the educational benefits of diversity is inauthentic and pretextual, SFFA effectively abandoned any such claim at trial. In short, the University's compelling interest in pursuing the educational benefits of diversity is established and uncontested. The University has more than adequately provided a "reasoned, principled explanation for its decision" to pursue these benefits and, in these circumstances, the University's considered judgment is entitled to "judicial deference." *Fisher II*, 136 S.Ct. at 2208 (quoting *Grutter*, 539 U.S. at 339).

95

**B.** **The University Demonstrated that Its Use of Race in Admissions Is Narrowly Tailored**

**i.** **The University conducts a holistic, individualized review of each applicant, considering race flexibly as only one factor among many**

Consistent with Supreme Court precedent, the University engages in a "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 337; *see Fisher II*, 136 S. Ct. at 2205-06. The record demonstrates that readers evaluate each application for admission in its entirety and attempt to understand each student on an individual basis, assessing all the ways he or she might contribute to the student body. (FOF ¶¶53, 66, 75-76, 88; *cf.* FOF ¶105 (application readers comply with admissions policies and training).)

It is undisputed that applicants to the University are not required to disclose their race or ethnicity and are not penalized in any way for declining to do so. (FOF ¶¶58-60.) The parties stipulated and the evidence shows that readers evaluate applicants taking into account dozens of criteria across broad categories. (FOF ¶76; *see also* FOF ¶¶77-86 (describing certain criteria and considerations).) If voluntarily disclosed, race is only one factor among many that application readers may consider when individually assessing applicants in a multi-dimensional, holistic manner. (FOF ¶¶73, 85.) Mr. Rosenberg, an Associate Director of Admissions who is responsible for day-to-day management of the application-review process and reader training, described the extensive and continuous training that readers receive, including on holistic review and the proper consideration of

96

race in admissions. (FOF ¶¶65-73.) Mr. Rosenberg also testified to his first-hand observation that, when evaluating applications, readers properly consider race and ethnicity as only one factor among many. (FOF ¶105; *see also* FOF ¶75 (readers properly employ holistic review).)

Although readers assign ratings for certain admissions categories, it is undisputed that there are no minimum rating thresholds or formulas for admission. (FOF ¶78.) The record demonstrates that the University does not assign any points for race. (FOF ¶85.) Nor does the University employ quotas or separate admissions processes for applicants of different races. (FOF ¶¶60, 101.) Additionally, although SFFA's Complaint alleged that the University manipulated the admissions process and engaged in racial balancing, the facts developed at trial proved any such allegation false. There is no evidence that the University manipulates the admissions process or engages in racial balancing, including during School Group Review or in connection with the Waiting List. (*See* FOF ¶¶101-102, 104.) Indeed, SFFA abandoned this allegation when it did not even attempt to present contrary evidence at trial. Likewise, no evidence was presented at trial suggesting the University intentionally discriminates against applicants on the basis of race.

Expert evidence reinforces that the University's admissions process is holistic. Through careful empirical analysis, Professor Hoxby established that the University's admissions decisions are fully consistent with a holistic, non-formulaic admissions process. (FOF ¶112.) Likewise, SFFA's experts conceded that the University's admissions process is individualized and holistic. (FOF ¶112.)

97

Thus, the evidence presented at trial clearly establishes that the University's practices closely align with applicable Supreme Court guidance concerning the consideration of race in admissions. That is, the University permissibly considers race "flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Grutter*, 539 U.S. at 334.

The only evidence SFFA offered to support its claim that the University impermissibly uses race in an outsized way is the expert testimony of Peter Arcidiacono. Even if Professor Arcidiacono's testimony were credible,[10] he fails to answer the relevant question properly framed through the lens of Supreme Court precedent. Professor's Arcidiacono's assertion that race dominates the University's admissions process rests entirely on his claim that race and ethnicity is determinative for—at most—a subset of applicants. But the Supreme Court has already rejected this position. As the Court noted in *Grutter* when finding the University of Michigan Law School's race-conscious admissions program constitutional, the petitioner's expert, Dr. Larntz, had concluded that applicants in certain minority groups "'are given an extremely large allowance for

---

[10] As discussed in detail in the Findings of Fact, Professor Arcidiacono's testimony was not credible. In numerous instances, Professor Arcidiacono made unnecessary and non-standard choices that did not correspond to the University's actual admissions process, including: his inappropriate decision to calculate and apply disparate converted SAT scores for applicants of different racial groups and gender; his use of an academic index relying only on test scores and grades even though the University uses no such index; his "shares" that add up to more than 400 percent; and his mathematical transformation exercises that sought to hypothetically and unrealistically "transform" an applicant from one race and ethnicity to another. (FOF ¶¶129-139, 142-143.)

admission'" relative to other applicants. *Grutter*, 539 U.S. at 320. The Court went on to explain that this conclusion was not controlling, because Dr. Larntz had also conceded "that race is not the predominant factor in the Law School's admissions calculus." *Id.* Professor Arcidiacono made the same concession here:

> Q: So you will agree with me that across the whole process of admissions, considering all races, race is not the dominant factor?
>
> A: Yes.

(FOF ¶118.) Professor Arcidiacono further admitted that race is "not a dominant factor for white applicants." (FOF ¶127; *see also* FOF ¶124 (admitting that other factors aside from race and ethnicity are dominant for many applicants).) The inquiry ends here. Under Supreme Court precedent, the germane question is not whether an applicant's race might have an effect on the outcome for some applicants. It is whether <u>the entire admissions program</u> is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337; *see also Fisher I*, 570 U.S. at 309.

In the context of a selective school such as the University with a highly competitive applicant pool, any factor (race or any other) may be enough in an <u>individual</u> case to properly tip the scales toward admission. But that modest consideration of race does not violate the Constitution. To the contrary, the Supreme Court has characterized such a sparing and individualized use of race as a "hallmark of narrow tailoring." *Fisher II*, 136 S. Ct. at 2212; *Grutter*, 539 U.S. at 339. Thus, under Supreme Court precedent, this case is not about whether race could have tipped the scales toward an individual

99

applicant's (or even a subgroup of applicants') admission. It is about whether race predominates across the entire admissions process.

In contrast, Professor Hoxby properly analyzed the role of race and ethnicity in admissions decisions across the University's entire applicant pool. (FOF ¶¶118-125.) Professor Hoxby concluded that race explains, at most, a very small share of applicants' admissions outcomes. (FOF ¶¶120, 122-124.) She reached the same conclusion after applying the proper econometric methodology to a variety of models, including both the models she constructed and Professor Arcidiacono's preferred model. (FOF ¶¶122-124.) Moreover, in multiple instances, Professor Hoxby found that race and ethnicity plays a smaller role than standardized test scores—an analysis that Professor Arcidiacono made no effort to conduct.[11] (FOF ¶¶121-122, 128.) Professor Hoxby also explained that if a factor such as race and ethnicity was important for only a subset of applicants rather than all applicants, her analysis would have demonstrated that effect. (FOF ¶119.) Thus, taken as a whole, the record evidence establishes that race and ethnicity is not the dominant factor in the University's admissions process.

---

[11] Professor Arcidiacono's testimony that he was "not sure exactly how to" measure the impact of SAT scores on admissions decisions strains credulity. (FOF ¶128.)

### ii. No workable race-neutral alternative would allow the University to achieve its compelling interest about as well as race-conscious admissions

The University established at trial that it has devoted substantial resources to considering whether race-neutral alternatives could allow it to meet its educational goals, but, to date, has not found a workable substitute for holistic, race-conscious review. *See Grutter*, 539 U.S. at 339. Since 2004, the University has studied race-neutral alternatives, including by monitoring the "natural experiments" of other universities, reviewing available literature, and simulating race-neutral admissions approaches. (FOF ¶¶173-178, 183-186, 188, 191-201.) In late 2012, the U.S. Department of Education's Office for Civil Rights separately reviewed the University's admissions process and concluded that the University had given serious, good-faith consideration to race-neutral alternatives. (FOF ¶180.) Since that time, the University convened two separate committees to rigorously study-race neutral alternatives, and that work remains on-going. (FOF ¶¶183-186, 188-200.) University witnesses explained that this work has thus far failed to reveal any race-neutral alternative that would allow the University to achieve racial diversity about as well, without sacrificing academic quality. (FOF ¶201.) *See Fisher II*, 136 S. Ct. at 2208 (establishing that standard).

Credible expert evidence further bolsters the conclusion that no available race-neutral alternative would allow the University to achieve its compelling interest. Professor Hoxby independently performed exhaustive econometric analysis on this point, running more than 100 race-neutral admissions simulations, including socioeconomic

101

status plans, place-based plans, and other suggestions posited by Mr. Kahlenberg. (FOF ¶¶202-203.) As Professor Hoxby testified repeatedly and convincingly, in each instance, she made very generous assumptions that would *favor* the race-neutral alternative, attempting to maximize the chances that it would be able to attain the University's current level of racial diversity and academic preparedness. (FOF ¶¶205, 209, 214-216, 224-225.) Despite these assumptions, none of Professor Hoxby's simulations resulted in an admitted—much less matriculating—class with the same level of racial diversity and academic preparedness that the University currently achieves through holistic review.[12] (FOF ¶209.)

SFFA, through the testimony of Mr. Kahlenberg, failed to establish at trial any workable race-neutral alternative. To begin, Mr. Kahlenberg's self-professed advocacy for increased socioeconomic diversity is admirable and a worthy goal—one shared by the University. (FOF ¶233 (citing FOF ¶¶10-11, 153, 159).) But racial diversity and socioeconomic diversity are not one and the same. Thus, any suggestion that a race-neutral alternative must be employed if it results in greater <u>socioeconomic</u> diversity—even at the expense of racial diversity—is misplaced in this litigation. *See Fisher II*, 136 S. Ct. at 2210 (recognizing distinct benefits of racial diversity); *Grutter*, 539 U.S. at 330 (same). Student body diversity—including racial diversity—is a compelling interest that

---

[12]  This is perhaps unsurprising considering that, to date, no court in the country has found an available, workable race-neutral alternative for a highly selective school such as the University.

the University may pursue through race-conscious admissions practices, so long as no workable race-neutral alternative exists. *See Fisher II*, 136 S. Ct. at 2208; *Fisher I*, 570 U.S. at 312.

With respect to whether there are any race-neutral alternatives that could achieve <u>racial</u> diversity while maintaining academic preparedness, Professor Hoxby's vast experience with econometrics, which she used to design her approach to simulating hypothetical race-neutral alternatives, makes her testimony more credible than that of Mr. Kahlenberg. (FOF ¶¶ 111, 234.) In numerous instances, for example, Mr. Kahlenberg's simulations reflected basic mathematical and modeling mistakes (some of which were caught only by Professor Hoxby and not Mr. Kahlenberg or Professor Arcidiacono), such as failing to account for the actual size of the University's admitted class. (FOF ¶¶248-251.) More fundamentally, Mr. Kahlenberg relied on unreasonable, unrealistic assumptions when conducting his percentage plan and socioeconomic status-based simulations—particularly with respect to the applicant pool he used. (FOF ¶¶245-246, 251-258.) As both Professor Hoxby and Dean Long testified, there is strong, real-world evidence from other universities that moving away from race-conscious admissions alters applicant behavior, i.e., whether they will apply or not. (FOF ¶¶215, 242, 245.) Thus, Mr. Kahlenberg's decision to hold the applicant pool constant in his simulations erroneously failed to account for the actual and foreseeable effects on the applicant pool that go along with the race-neutral alternatives in question. (FOF ¶¶245-246, 252-253.) It is simply not credible to assume that students whose likelihood of admission would change

103

substantially under a new admissions regime—including, in some of Mr. Kahlenberg's proposals, effectively adding hundreds of points to their SAT scores—would not alter their behavior. Because Mr. Kahlenberg's simulations require such nonsensical assumptions to reach results that appear facially successful, those simulations are simply unreliable.

Moreover, SFFA failed to advance any credible evidence that other universities have successfully implemented race-neutral alternatives that the University has not considered. Dean Long credibly testified that Mr. Kahlenberg overstates the effectiveness of race-neutral alternatives implemented by other universities or considered in academic studies and literature. (FOF ¶¶237-238.) Similarly, the claim by Mr. Kahlenberg that an alternative based on socioeconomic status would be workable if the University would make just a little more effort is not persuasive. First, Dean Long testified that need-blind universities like the University do not have access to the sort of wealth information that Mr. Kahlenberg asserts would make socioeconomic status-based plans successful. (FOF ¶236.) Second, even if the University decided to abandon need-blind admissions, both Dean Long and Mr. Farmer persuasively testified that socioeconomic-focused efforts are not likely to succeed—and could, in fact, be counterproductive; any additional steps and forms can be an incremental barrier to low-income students applying, and the current FAFSA form does not provide the type of wealth information that Mr. Kahlenberg asserts it contains. (FOF ¶236.) Mr. Kahlenberg's testimony also ignores the feasibility of and

expense associated with implementing this sort of novel admissions approach. (FOF ¶237.)

Finally, Mr. Kahlenberg's claim that implementing or enhancing additional race-neutral strategies would allow the University to no longer consider race is contradicted by strong record evidence that the University already engages in substantial race-neutral strategies to complement its race-conscious admissions practices. The record reflects that the University engages in robust recruiting, partners with disadvantaged high schools, attempts to increase community college transfers through programmatic efforts, and offers generous financial aid. (FOF ¶¶148-159, 162, 165-168.) Mr. Kahlenberg asserts that the University could do "more" to recruit minority students through these methods; however, he admitted that none of these strategies could, on their own, replace the University's current admissions approach. (FOF ¶227.)

Moreover, Mr. Kahlenberg's assertions are not only unsupported by any analysis but also contradicted by credible record evidence. Mr. Kahlenberg claims that any increased cost is no issue for the University even though he undertook no analysis to support his assertions (FOF ¶237) and University employees testified that current efforts are extensive and not capable of being quickly or affordably expanded. (FOF ¶¶159-172.) Just as important, Professor Hoxby's empirical analysis demonstrates that expanding certain of these efforts would not be successful. In each instance where Mr. Kahlenberg suggested that the University could simply "do more" with race-neutral strategies, such as increasing the number of community college transfers or partnering with

105

disadvantaged high schools, Professor Hoxby empirically tested Mr. Kahlenberg's amorphous suggestion (even though Mr. Kahlenberg himself provided no specificity and performed no empirical analysis) and found that none of these concepts would allow the University to maintain racial and ethnic diversity or its current levels of academic preparedness. (FOF ¶¶228-231.)

Based on the evidence presented at trial, the University has met its burden to show that it has engaged in the serious, good-faith consideration of race-neutral alternatives and that none would work about as well to further the University's compelling interest.

## <u>CONCLUSION</u>

The UNC Defendants have carried their burden to establish that the University's sparing use of race in admissions is narrowly tailored to achieve its compelling interest in the educational benefits of diversity. For the foregoing reasons, and on the bases reflected in the UNC Defendants' proposed findings of fact and the trial record, the UNC Defendants respectfully request that the Court adopt the UNC Defendants' proposed findings of fact and conclusions of law, find that the University's admissions practices are constitutional, and enter judgment in favor of the UNC Defendants on Counts I and II of the Complaint.

106

Respectfully submitted this 5th day of February, 2021.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

/s/ Patrick Fitzgerald
Patrick Fitzgerald
Amy L. Van Gelder
Marianne Combs
Skadden, Arps, Slate, Meagher
   & Flom, LLP
155 North Wacker Drive
Chicago, IL 60606-1720
(312) 407-0700
E: patrick.fitzgerald@skadden.com
E: amy.vangelder@skadden.com
E: marianne.combs@skadden.com

/s/ Lara Flath
Lara Flath
Skadden, Arps, Slate, Meagher
   & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-3000
E: lara.flath@skadden.com

JOSHUA H. STEIN
ATTORNEY GENERAL

/s/ Stephanie Brennan
Stephanie Brennan
Special Deputy Attorney General
NC State Bar No. 35955
E: sbrennan@ncdoj.gov

/s/ Tamika Henderson
Tamika Henderson
Special Deputy Attorney General
NC State Bar No. 42398
E: tlhenderson@ncdoj.gov

*Attorneys for UNC Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing UNC Defendants'
Proposed Findings of Fact and Conclusions of Law via the Court's electronic filing
systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have
entered an appearance by ECF in this matter.

This 5th day of February, 2021.

/s/ Patrick Fitzgerald
Patrick Fitzgerald