**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, | |
| Plaintiff, | CASE NO. 1:14-CV-954 |
| v. | |
| THE UNIVERSITY OF NORTH CAROLINA et al., | |
| Defendants. | |

**DEFENDANT-INTERVENORS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... v

**INTRODUCTION** ...................................................................................................... 1

**PROPOSED FINDINGS OF FACT** ........................................................................ 4

    **A. Student-Intervenors** ............................................................................... 4

        i.   Student-Intervenor Witnesses ....................................................... 4

        ii.  Student-Intervenor Declarants ...................................................... 8

        iii. Student-Intervenors' Expert Testimony ....................................... 11

    **B. UNC's Limited Consideration of Race is Necessary to Appropriately Evaluate and Admit Exceptional Candidates from Diverse Backgrounds** ......................... 12

        i.   Race-Conscious Admissions Allows Racially Diverse Students, Including Student-Intervenors, to Fully Disclose Their Identities and Reveal Their Potential for Academic Success ........................................ 12

        ii.  Race-Conscious Admissions Allows UNC to Account for Inequalities and Better Assess a Student's Potential .................... 17

        iii. Race is Not the Dominant or Defining Feature in UNC's Admissions Process .... 19

    **C. UNC's Efforts to Cultivate Racial Diversity Are Producing Educational Benefits** ......................... 21

        i.   Exposure To, and Engagement With, Racial Diversity is Producing Benefits for UNC Students ............................................. 23

        ii.  UNC's Cultivation of Diversity Within Each Racial Group is Producing Educational Benefits for Students, Including the Deconstruction of Stereotypes. 26

        iii. UNC's Cultivation of Diversity Is Lessening Racial Isolation and Tokenism ...... 27

        iv. A Diverse Student Body Enables the UNC Administration to Better Serve Its Students and Develop a Scholarly Community .................... 29

        v.  A Diverse Student Body Enables UNC to Better Serve the State of North Carolina ................................................................. 31

    **D. More Progress is Needed for UNC to Fully Harness the Benefits of Diversity** .... 34

E. **Race-Conscious Admissions Remain Necessary for Cultivating the Fullest Depth and Breadth of Diversity Which Benefits All Students** ..........................................39

    i. SFFA's Expert Richard Kahlenberg Failed to Properly Assess Race-Neutral Alternatives, Which Requires Considering Both Numbers and UNC's Particularized Context..........................................................................................39

    ii. UNC's Particularized Context Impedes its Ability to Achieve the Full Benefits of Diversity Using Race-Neutral Alternatives. .........................................................41

        a) UNC's Particularized Sociohistorical Context ...............................................41

        b) UNC's Race-Conscious Admissions Policy Incentivizes Students of Color to Apply and Enroll at UNC ...............................................................................44

    iii. There Are No Feasible Alternatives Available to Considering Race as One Factor Among Many ......................................................................................................46

        a) Both Parties' Race-Neutral Simulations Show a High Likelihood of Declines in Diversity .......................................................................................................46

        b) The Declines in Diversity Would Be Even Greater Than Projected by the Simulations and Substantially Harm the Educational Environment ..............48

        c) Mr. Kahlenberg's Proposed Alternatives Ignore the Distinct Benefits of Racial Diversity and the Many Other "Intangible Characteristics" that UNC Seeks in a Student Body ...............................................................................................51

**PROPOSED CONCLUSIONS OF LAW** ................................................................53

A. **Legal Framework**................................................................................................54

B. **UNC's Compelling Interest in the Educational Benefits that Flow from a Diverse Student Body Satisfies Constitutional Principles**...................................................55

C. **UNC's Consideration of Race is Legally Permissible and is Not Used as More Than a "Plus Factor" in Admissions, as Alleged by SFFA (Count I)** .................57

D. **UNC Has Considered Seriously and in Good Faith Race-Neutral Alternatives But None are Adequate, Workable and Sufficient, as Alleged by SFFA (Count II)** ......................................................................................................................60

    i. UNC Has Considered Seriously and in Good Faith Race-Neutral Alternatives....61

ii.  SFFA's Proposed Race-Neutral Alternatives are Not Adequate, Workable, and Sufficient and Do Not Properly Consider the Greater Context of UNC's Compelling Interest in Student Body Diversity....................................................61

**CONCLUSION** ..........................................................................................................66

iv

# TABLE OF AUTHORITIES

Cases                                                                                                    Pages

*Adams v. Richardson*, 356 F. Supp. 92 (D.D.C. 1973) ...................................................... 64

    *Modified and aff'd*, 480 F.2d 1159 (D.C. Cir. 1973) ............................................ 64

*Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) (*Fisher II*) ...................... *passim*

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) (*Fisher I*) ...................... 55, 57, 61

*Frasier v. Bd. of Trustees of Univ. of N.C.*, 134 F. Supp. 589 (M.D.N.C. 1955) .............. 64

    *Aff'd mem.* 350 U.S. 979 (1956) ................................................................ 64

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) .................................................... 55

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................ *passim*

*McKissick v. Carmichael,* 187 F.2d 949 (4th Cir. 1951) .................................... 64

*N. Carolina State Conference of the NAACP v. McCrory*,
    182 F. Supp. 3d 320 (M.D.N.C. 2016) .................................................... 64

    *Rev'd and remanded on other grounds*, 831 F.3d 204 (4th Cir. 2016) ................. 64

*North Carolina v. N. Carolina State Conference of the NAACP*
    137 S. Ct. 1399 (2017) .................................................................. 64

*Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978) .................. 54, 55, 57, 58, 59, 62

*Sweatt v. Painter*, 339 U.S. 629 (1950) ...................................................... 62, 65

Case 1:14-cv-00954-LCB-JLW   Document 246   Filed 02/05/21   Page 5 of 73

# I. INTRODUCTION

Defendant-Intervenors (or "Student-Intervenors") are a racially diverse group of underrepresented students of color[1] who applied to the University of North Carolina at Chapel Hill ("UNC"), attended UNC, and/or recently graduated from UNC.[2] As this Court recognized, Student-Intervenors have a substantial stake in the outcome of this case, which "will have a direct and significant impact on North Carolinians' access to UNC-Chapel Hill," and which will profoundly impact the educational benefits students will obtain once on campus. *See* ECF No. 79 at 13-14. This Court granted Student-Intervenors permissive intervention to present evidence on two issues: (i) the effect of UNC's existing, and SFFA's proposed, admissions processes on the critical mass of diverse students at UNC; and (ii) the history of segregation and discrimination at UNC-Chapel Hill and in North Carolina. *Id.*

At trial, Student-Intervenors presented testimony and evidence that reaffirms UNC's conclusion that its limited consideration of race in admissions remains necessary to cultivate the full benefits of diversity—often termed achieving a "critical mass" or obtaining "dynamic diversity"—for several reasons, including UNC's particularized

---

[1] For purposes of this brief, "students of color" refers to those students who identify with historically underrepresented and marginalized racial and ethnic groups, including Black, Hispanic, and Native American students. Student-Intervenors use the following terms interchangeably: "Black" and "African American"; "Native American" and "Indigenous"; and "Hispanic" and "Latinx," which is the gender-neutral term for "Latino" or "Latina." Student-Intervenors use the term "white" to mean white/Non-Hispanic.

[2] *See* Jan. 13, 2017, Mem. Op. and Order at 4 (ECF No. 79); *see also* ECF No. 82 (adding Andrew Brennen as a Student-Intervenor).

1

sociohistorical context. Student-Intervenors submit these proposed findings and conclusions, focusing primarily on the evidence presented by Student-Intervenors, to highlight four aspects of the evidentiary record that demonstrate UNC's race-conscious policy is both lawful and indispensable.

First, absent UNC's consideration of race, UNC would miss out on extraordinary students like Student-Intervenors, whose racial and ethnic identities were central to their applications and who might otherwise be undervalued, overlooked, or misunderstood. The limited, yet meaningful, consideration of an applicant's race helps UNC appreciate the full applicant—illuminating their experiences, contextualizing their achievements, and offering a window into their perspective and potential contributions to campus aligned with UNC's mission.

Second, UNC's promotion of diversity through race-conscious admissions (and numerous complimentary activities and services) is producing critical benefits for students of all backgrounds. Student-Intervenors' uncontradicted testimony vividly illustrates such benefits, including: (i) promoting robust dialogue, broadening understanding, and fostering problem-solving; (ii) exposing diversity within each racial group, thereby dismantling stereotypes; (iii) lessening racial isolation and tokenism; (iv) increasing UNC's capacity to create an inclusive scholarly community; and (v) better preparing the next generation of leaders in North Carolina and the world.

Third, while the educational benefits flowing from racial diversity at UNC are tangible and expanding, more progress is needed. Unrebutted evidence demonstrates that while UNC has made strides in harnessing the benefits of diversity, Black, Latinx, and

2

Native American students continue to experience tokenism, false stereotypes, racial isolation, and overt racial hostility on UNC's campus. These dynamics require UNC's ongoing attention to both numeric representation and contextual factors that shape the campus climate.

Fourth, ending all consideration of race would substantially harm UNC's educational environment by reducing both the breadth and depth of diversity on UNC's campus. In so doing, it would greatly diminish the benefits flowing to students and stunt UNC's relatively recent progress towards a more inclusive campus that departs from its racially segregative past. In addition to the shortcomings of SFFA's proposed race-neutral alternatives articulated by UNC in its proposed findings, Student-Intervenors' witnesses and experts provided convincing evidence that a so-called "race-blind" (or "race-neutral")[3] admissions process would produce a range of harms. Such harms would include: triggering an all-but-certain drop in overall diversity as fewer students of color apply to UNC, obtain admission, and accept those offers; lessening the diversity within each racial group, thereby entrenching racial stereotypes; exacerbating racial isolation among students who are already among the most marginalized on UNC's campus; and undermining their leadership and collective efforts to counter the lingering effects of racial discrimination on campus.

Student-Intervenors' testimony, admissions files, sworn declarations, and expert reports—combined with the substantial evidence offered by UNC's fact and expert witnesses—overwhelmingly demonstrate that UNC's consideration of race is both lawful

---

[3] This brief uses the terms "nonracial", "race-blind," and "race-neutral" interchangeably to refer to policies that do not *explicitly* consider race.

3

and crucial for fully harnessing diversity's benefits at an institution that is making notable strides, but still reckons with racial inequities.

## II. PROPOSED FINDINGS OF FACT

1.     Student-Intervenors adopt and incorporate each of Defendants' Proposed Findings of Fact at Sections I-V. *See* Defs.' Proposed Findings of Fact and Conclusions of Law ("UNC FOF/COL"), ECF No. 245.

### A. Student-Intervenors

2.     Student-Intervenors are a diverse group of underrepresented students of color who attended UNC or intended to apply to UNC during the pendency of this litigation. ECF No. 79 at 4; *see also* ECF No. 82. Virtually all of the Student-Intervenors were North Carolina residents when they applied to UNC. *See* ECF No. 79 at 4.

### *i. Student-Intervenor Witnesses*

3.     At trial, Student-Intervenors presented eight witnesses who, collectively, attended UNC between the years of 1980-2020. *See infra* ¶¶ 4-11. All of the Student-Intervenor witnesses credibly testified that UNC's race-conscious policy allowed them to fully contextualize the breadth of their experiences and perspectives, *infra* Section II.B.; that racial diversity on UNC's campus is producing some transformative benefits (*infra* Section II.C.) but that there is a need for even greater representation of underrepresented students of color on UNC's campus where students of color still frequently experience tokenism and racial isolation, *infra* Section II.D.; and that a decline in diversity across racial groups, or within a racial group, would substantially harm UNC's educational

Case 1:14-cv-00954-LCB-JLW   Document 246   Filed 02/05/21   Page 9 of 73

environment and make other students of color less likely to apply to UNC, *infra* Section II.E.

4. Luis Acosta—who identifies as Mexican American—graduated from UNC in 2017, with a degree in Chemistry. Tr. 1336:11-16 (Acosta). Mr. Acosta grew up in Hendersonville, North Carolina, with his parents who immigrated from Mexico and his three younger brothers. Tr. 1336:22-1337:8 (Acosta). As a student at UNC, Mr. Acosta actively participated in a mentoring program for at-risk Latinx middle school students. Tr. 1351:24-1352:11 (Acosta). Now in medical school at UNC, Mr. Acosta has served as co-president for the Latino Medical Student Association and Vice President for Diversity and Campus Affairs. Tr.1353:5-11 (Acosta). Mr. Acosta hopes to become a doctor who can improve the lives of low-income communities. Tr. 1353:16-1354:8 (Acosta).

5. Andrew Brennen—who identifies as African American, queer, and a member of the LGBTQ community—graduated in 2019 with a degree in Political Science. Tr. 1255:15-20 (Brennen). Mr. Brennen attended high school in Lexington, Kentucky, where he cofounded the Prichard Committee Student Voice Initiative, which successfully centers youth voices and leadership in Kentucky's formation of education policy. Sealed Tr. at 46:10-18 (Brennen); *see also* IX027[4] at 5-6 (Brennen application file). At UNC, Mr. Brennen participated in student government and chaired the Governance Committee for UNC's independent student newspaper, *The Daily Tar Heel*. Tr. 1254:16-23 (Brennen).

---

[4] Student-Intervenors' exhibits appear as both IX### (Trial Exhibit List) and DI### (labels for exhibits). This brief uses IX###.

Mr. Brennen currently works at the intersection of education policy and communication as an Education Fellow at National Geographic. Tr. 1255:15-20 (Brennen).

6. Rimel Mwamba—who identifies as Black or African American—graduated from UNC in 2018 with a degree in Global Studies, and minors in Chemistry and Human Development. Tr. 1356:10-22 (Mwamba). Born in the Democratic Republic of the Congo, Ms. Mwamba immigrated to the United States when she was six years old. Tr. 1356:24-1357:2 (Mwamba). Ms. Mwamba attended a rigorous math and science magnet high school in Columbia, South Carolina, where she was one of only two Black students in the academic program. Tr. 1357:16-23 (Mwamba). At UNC, Ms. Mwamba earned several honors, including becoming: a Robertson Scholar, a Ron Brown Scholar, and an Honors Laureate graduating with distinction. Tr. 1356:15-18 (Mwamba). Ms. Mwamba currently works as a Research Fellow at the Duke Global Health Institute and plans to become a doctor who addresses healthcare disparities and provides holistic care to her patients by attending to their physical, psychological, and emotional needs. Tr. 1370:8-13; 1371:16-1372:11 (Mwamba).

7. Laura Ornelas—who identifies as Hispanic and Latina—graduated from UNC in 2017 with a double major in Hispanic Linguistics and Latin American Studies, and a minor in Linguistics. Tr. 1274:11-14; 1275:15-18 (Ornelas). Ms. Ornelas attended high school in Chapel Hill, North Carolina, where she pursued honors courses while also working part-time to financially support herself and her family. Tr. 1275:19-1276:4 (Ornelas). As a student at UNC, Ms. Ornelas held a leadership position in North Carolina's Scholars' Latino Initiative (SLI), which provides mentorship and college advising to

6

Hispanic high school students. Tr. 1284:3-1285:3 (Ornelas). After graduation, Ms. Ornelas served in the Carolina Advising Corps where she provided college advising to students attending a predominantly low-income, minority high school in Charlotte, North Carolina. Tr. 1289:6-18 (Ornelas). Ms. Ornelas is committed to pursuing a profession where she can support other low-income, students of color navigate the higher education system and achieve greater educational opportunities. Tr. 1289:25-1290:9 (Ornelas).

8.     Kenneth Ward—who identifies as African American—attended UNC from 1980-84 and graduated with a degree in Radio, Television, and Motion Pictures. Tr. 889:2-10 (Ward). Growing up in Enfield, North Carolina, Mr. Ward was one of the first Black students to attend the formerly all-white local public school as part of statewide integration efforts. Tr. 889:12-13; 893:14-894:8 (Ward). After graduating as the high school valedictorian, Mr. Ward actively participated in UNC's academic and extracurricular offerings. Tr. 898:12-15; 902:8-903:2; 905:21-908:22 (Ward). He served as UNC's first Black "mic man" during football games where he fostered "conversations about inclusion, about race and…healing" before being forced to resign because of his outspokenness on race and social justice issues. Tr. 903:16-904:22 (Ward). Mr. Ward currently serves as the Executive Director of College Bound, a mentoring program that supports a diverse group of marginalized students through the college application process and helps them excel once admitted. Tr. 888:6-17; 915:10-21 (Ward).

9.     Hanna Watson—who identifies as Black or African American—graduated from UNC in 2020 with a degree in African, African American, and Diaspora Studies, and a minor in Creative Writing. Tr. 1312:1-10 (Watson). Ms. Watson grew up in Wichita,

7

Kansas, where her family experienced exclusion and racially-motivated vandalism as one of the only Black families in the neighborhood. Tr. 1313:7-25 (Watson). As a student at UNC, Ms. Watson received the Robert B. House Memorial Prize in poetry and became an initiated member of the Phi Beta Kappa Honors Society. Tr. 1312:11-15 (Watson). Ms. Watson is currently pursuing a Masters in Divinity at Princeton Theological Seminary. Tr. 1333:15-18 (Watson).

10.     Star Wingate-Bey—who identifies as Black or African American--graduated from UNC in 2016 with a degree in Communications and a minor in History. Tr. 1292:6-15; 1305:9-10 (Wingate-Bey). Ms. Wingate-Bey grew up in a "culturally [B]lack household" in Durham, North Carolina, which instilled in her a strong work ethic and keen awareness of North Carolina's struggles with integration. Tr. 1292:19-1293:3 (Wingate-Bey). As a student at UNC, Ms. Wingate-Bey excelled academically and participated in efforts to rename campus buildings that commemorated Ku Klux Klan ("KKK") members. Tr. 1294:17-25, 1304:22-1305:3 (Wingate-Bey). Ms. Wingate-Bey currently works at a New York advertising agency where she seeks to lift up diverse perspectives. Tr. 1305:11-25 (Wingate-Bey).

11.     The five named Student-Intervenors—Cecilia Polanco, Andrew Brennen, Laura Ornelas, Star Wingate-Bey, and Luis Acosta—submitted their application files into the record. IX027-IX031.

### *ii. Student-Intervenor Declarants*

8

12.     In addition to the eight witnesses at trial, Student-Intervenors submitted into evidence the declarations of thirteen Black and Latinx students and alumni who discussed their experiences attending UNC between the years of 1979 and 2017. IX011-IX023.

13.     Five of the Student-Intervenor declarants attended UNC during the pendency of this litigation. Jessica Mencia—who identifies as Latina Honduran American—is a member of UNC's 2020 class who studied Public Policy and Latino/Latina Studies. IX014 ¶¶ 2-3 (Mencia). Diandra Anna Kay Dwyer—who identifies as Black and Jamaican—is a member of UNC's 2020 class who studied Journalism and Mass Communication and Japanese. IX019 ¶¶ 2-3 (Dwyer). D'Angelo Gatewood—who identifies as African American—is a member of UNC's 2019 class who studied Public Relations and Education. IX012 ¶¶ 2-3 (Gatewood). Maria Gomez Flores—who identifies as Latina—is a member of UNC's 2018 class who studied Political Science and History. IX021 ¶¶ 2-3 (Gomez Flores). Siena Scarbrough—who identifies as African American—graduated from UNC in 2017 with a degree in Media and Journalism, with a focus in Public Relations. IX011 ¶¶ 2-3 (Scarbrough).

14.     These Student-Intervenor declarants described how racial diversity at UNC enriched their education by allowing for "deeper, fuller discussions," IX019 ¶ 6 (Dwyer); breaking down stereotypes, IX021 ¶ 6 (Gomez Flores); and providing a "cultural awakening" to the diversity within particular racial groups, IX012 ¶ 5 (Gatewood). They also expressed how they "experienced negative and uncomfortable situations…as a direct result of [] race," IX011 ¶ 7 (Scarbrough), including tokenism and being the "sole spokesperson" for their community. IX021 ¶ 7 (Gomez Flores).

9

15.     Eight of the Student-Intervenor declarants were alumni of UNC when this litigation was filed. Shatifa Searles—who identifies as African American—graduated from UNC in 2003, with a degree in Anthropology. IX022 ¶¶ 2-3 (Searles). Valerie Newsome Hayes—who identifies as African-American—graduated from UNC in 1985 with a degree in Chemistry. IX017 ¶¶ 2-3 (Hayes). Pamela Phifer White—who identifies as African American—graduated from UNC in 1985 with a degree in Radio, Television, and Motion Pictures. IX023 ¶¶ 2-3 (Phifer White). Alan C. Frazier—who identifies as African American or Black—graduated from UNC in 1984, with a degree in Business Administration and a concentration in Accounting. IX020 ¶¶ 2-3 (Frazier). Adrian C. Douglass—who identifies as African-American—graduated from UNC in 1983 with a degree in Radio, Television and Motion Pictures. IX018 ¶¶ 2-3 (Douglass). Lisa-Anne Staton Dyer—who identifies as African American—graduated from UNC in 1983 with a degree in English and a minor in Communications. IX013 ¶¶ 2-3 (Dyer). Gwenevere Charlene Parker—who identifies as Black—graduated from UNC in 1983 with a degree in Biology. IX016 ¶¶ 2-3 (Parker). Patsy B. Zeigler—who identifies as African American—graduated from UNC in 1983 with a degree in Industrial Relations and a concentration in Sociology. IX015 ¶¶ 2-3 (Zeigler).

16.     These Student-Intervenor alumni declarants described how they frequently faced negative stereotypes, racism, and racial bias on UNC's predominantly white campus, including incidents of racial slurs that still haunt them today. IX023 ¶¶ 8-10 (Phifer White); *see also* IX017 ¶ 7 (Hayes). Student-Intervenor declarants were nevertheless committed to improving UNC's campus culture by: participating in efforts to recruit more diverse staff

10

to campus, IX023 ¶ 11 (Phifer White); serving as counselors for incoming students of color, IX015 ¶¶ 6-7 (Zeigler); and seizing opportunities to address racial ignorance and develop mutual, cross-racial respect. IX016 ¶¶ 9, 13 (Parker).

### *iii. Student-Intervenors' Expert Testimony*

17.     Student-Intervenors also submitted into evidence the expert reports of Dr. Uma Jayakumar and Dr. David Cecelksi, and underlying public reports and documents. IX001; IX002; IX024-IX055.

18.     Dr. Jayakumar provided expert testimony on UNC's progress towards attaining the full benefits of diversity—sometimes termed achieving a "critical mass" or "dynamic diversity." IX001 at 1, 6-7.[5] Dr. Jayakumar is an Associate Professor of Higher Education Administration and Policy who has published extensively on issues involving race, affirmative action, and diversity in higher education. IX001 at 1. Her scholarly research and expertise focus on how institutional practices shape college access, outcomes, and the educational benefits of diversity. IX001 at 1.

19.     Dr. Cecelksi provided expert testimony on the history of discrimination and segregation at UNC and North Carolina's public (K-12) education system. IX002 at 2-3.[6] Dr. Cecelski is a historian and scholar of North Carolina history and culture. IX002 at 1. He earned his M.A. and Ed.D. degrees from the Harvard Graduate School of Education. IX002 at 1. He has published several scholarly books and hundreds of articles on the history

---

[5] Citations to Dr. Jayakumar's report, IX001, refer to the internal page numbers appearing in her report.
[6] Citations to Dr. Cecelski's report, IX002, refer to the internal page numbers appearing in his report.

of North Carolina, including on the topics of racial discrimination in public education and the struggle against state-sponsored racial segregation in education. IX002 at 1-2.

20.     Student-Intervenors and UNC were the only parties to offer testimony from students and alumni, and the only parties to offer expert testimony analyzing UNC's progress towards harnessing the benefits of diversity. *See, e.g.,* IX001 (Report of Dr. Jayakumar), IX003-023 (declarations of UNC students and alumni); Tr. 871-923, 1254-1306, 1311-1372 (testimony of Polanco, Ward, Brennen, Ornelas, Wingate-Bey, Watson, Acosta, Mwamba); PX119.2 (Report of UNC's expert Professor Mitchell Chang); *see, e.g.,* DX116-117, DX123, DX128-131, DX133-134, DX138-139, DX141-144, DX147-150 (declarations of students and alumni submitted by UNC).

21.     By contrast, SFFA offered no student or alumni testimony to support its claims, nor did SFFA introduce any application file evidencing how race dominates UNC's admissions process.

## B.  UNC's Limited Consideration of Race Is Necessary to Appropriately Evaluate and Admit Exceptional Candidates From Diverse Backgrounds

### *i. Race-Conscious Admissions Allows Racially Diverse Students, Including Student-Intervenors, to Fully Disclose Their Identities and Reveal their Potential for Academic Success*

22.     UNC employs a "whole person" admissions process that considers all available information about an applicant in an effort to admit exceptional students whose "collective strengths" will "enrich each other's education, strengthen the campus community, contribute to the betterment of society, and help the University achieve its broader mission." DX009; Tr. 528:17-529:14; 531:9-19 (Farmer). UNC seeks a wide range

12

of qualities in its incoming class, including "intellect, talent, curiosity, and creativity; leadership, kindness, and courage; honesty, perseverance, perspective, and diversity." DX010; Tr. 531:23-532:8 (Farmer). UNC defines diversity broadly to include "all of the ways in which people differ," including but not limited to differences in: experience, belief, socioeconomic status, physical ability, sexual orientation, and racial or ethnic identity. DX003 at 3; DX088 at 6; *see also* UNC FOF Section III.B.

23.    UNC has concluded, through its academic judgment, that identifying candidates with these valued characteristics requires evaluating applicants in the full context of their life circumstances. Tr. 528:18-529:14; 532:9-533:15 (Farmer). If voluntarily self-disclosed, race and ethnicity may be considered as one factor among numerous others. DX010 at 7-8; Tr. 543:9-13 (Farmer). Race is always viewed in the context of everything else known about the candidate and in light of the candidate's full range of potential contributions. DX010 at 8-9; Tr. 545:11-546:4 (Farmer). UNC never awards automatic points or insulates candidates from review based on race; nor does applying a "tip" based on race automatically result in an offer of admission. *Id.;* Tr. 542:20-543:6 (Farmer); *see also* Section III.B.iv.

24.    Many applicants of color must express their racialized experiences in order to convey the full breadth of their achievements, contributions to the college community, and future potential as leaders. For example, Ms. Polanco wrote her personal essay to UNC about being a "first-generation Salvadorean American" who faced prejudice from an early age as educators routinely stereotyped her as lacking English proficiency. IX031 at 7-8; Sealed Tr. at 32:13-33:22 (Polanco). Ms. Polanco shared with UNC that she "excelled [in

13

advanced placement courses] despite being the only Latina in a predominantly white environment." IX031 at 7. Ultimately, these encounters with prejudice gave her a "tough skin" that made her "strong[er] and prepared for life after high school." IX031 at 8. It also instilled in her an "impenetrable pride in [her] Salvadorean culture" that she would carry to UNC's campus, if admitted. IX031 at 8. For Ms. Polanco, it was important to share her Salvadoran heritage with UNC because it was "formative" to her perspective, values, and "how I walk through the world." Sealed Tr. 33:25-34:1, 34:17-20 (Polanco). It allowed UNC to "hear [her] voice" and "see [her] and get to know [her] a bit better." Sealed Tr. 35:12-15 (Polanco).

25.     Mr. Brennen similarly wrote his application essay about the stereotypes that he often faced as a Black man, as classmates questioned his Blackness because of his academic ambition and wide-ranging interests beyond "rap music" and "the hood." IX027 at 11-12; Sealed Tr. 44:12-45:18 (Brennen). In response to UNC's question about personal motivation, Mr. Brennen succinctly expressed: "I do what I do because people do not expect it from me, [and] because others who look like me are not able to do it…I am Black and I am proud." IX027 at 12; Tr. 45:14-18 (Brennen). At trial, Mr. Brennen explained that he discussed his racialized experiences in his essay because it was "the only option that would fully capture my perspective"; "every experience that I had prior to college was informed by the color of my skin, and so my perspective going into college was similarly so." Sealed Tr. 45:21-24 (Brennen); Tr. 1257:6-8 (Brennen).

26.     For many applicants of color, memories of racial discrimination and the development of cultural pride are at the root of what motivates them to pursue college and

14

advocate for change. Ms. Watson, for example, wrote her college essays about how racism in her community fueled her interest in "public policy…to bring more racial justice to the United States." Tr. 1317:19-1318:20 (Watson). Ms. Watson's own racial identity provided important context for her "passions" because it showed UNC the deep-seated strength of her "empathy to care about the experiences of other minoritized races" in light of her own lived experience. Tr. 1318:8-20 (Watson). Mr. Acosta's college essay similarly discussed how the racial slurs that he faced as a Mexican American deepened his commitment "to not judge another by their color or any difference." IX030 at 13-14; Sealed Tr. 58:14-59:24 (Acosta). He practiced this principle by "promot[ing] cross-racial friendships at the Boys & Girls Club" where he volunteered. IX030 at 13. For Mr. Acosta, disclosing his racial identity to UNC "gave some context to…everything [he's] been through. . . ." and allowed him to show his commitment to "change…the next generations" by increasing racial inclusivity. Sealed Tr. 54:24-55:7; 59:25-60:9 (Acosta).

27. Ms. Polanco, Mr. Brennen, Ms. Watson, and Mr. Acosta are not outliers— all of the Student-Intervenor witnesses testified that their racial identities shaped their ability to contribute to UNC's campus through their unique viewpoints, interests, and future ambitions. *See, e.g.,* Sealed Tr. 1360:18-25; 1358:7-25; 1359:11-18; 1360:25-1361:7 (Mwamba) (noting how her racial identity was a formative part of her experience before college and influenced the perspective and skills that she offered as a college applicant); Tr. 890:2-892:4 (Ward) (describing how growing up in a segregated rural town and witnessing a KKK cross-burning shaped his perspective); Tr. 1281:1-5, Sealed Tr. 50:7-13 (Ornelas) (affirming importance of considering her ethnicity); Tr. 1295: 4-14

15

(Wingate-Bey) ("[I]t was important for UNC to know I was black. I think it colors all of my experiences…").

28.    Based on decades of experience, UNC officials have also observed that race and ethnicity can be "integral" for understanding a student's whole story and potential to contribute to UNC's community. *See, e.g.,* Tr. 550:10-14 (Farmer).

29.    Ending race-conscious admissions could deprive UNC of exceptional students of color who would be less likely to be admitted without a comprehensive understanding of their background. *Supra* ¶¶ 24-27; *infra* ¶ 30.

30.    As Mr. Brennen forthrightly stated: he would not have been able to share his perspective without any reference to his race. Tr. 45:25-46:2; 48:2-4 (Brennen). Numerous Student-Intervenors agreed that ignoring their racial identity would make it impossible to fully convey what they could add to UNC's campus. Tr. 34:25-35:7 (Polanco) (explaining she could not have shared about her aspirations and academic successes without any reference to ethnicity); Tr. 61:14-20 (Acosta) (eliminating race and ethnicity from admissions "would have taken out a majority of what I would have talked about…it would have disrupted a lot."); Sealed Tr. 50:14-51:3 (Ornelas) (explaining that if she was unable to reference her ethnicity then "I don't think I would have been able to portray a complete picture of the person I was and am to the admissions committee."); Tr. 1361:1-7 (Mwamba) ("[I]t's really important, at least for my application, that UNC see what -- who I am, you know, holistically and how the color of my skin and the texture of my hair impacted my upbringing.").

### ii. Race-Conscious Admissions Allows UNC to Account for Inequalities and Better Assess a Student's Potential

31. Race-conscious admissions allows UNC to fully evaluate individual applicants in the context of the inequality that may have shaped their educational opportunities. For example, Mr. Acosta and Ms. Ornelas both described that having immigrant parents who did not attend college and had limited resources restricted their familiarity with, and access to, test preparation resources, thereby suppressing their scores on the SATs. Tr. 1345:9-1346:10 (Acosta); 1277:10-1278:13 (Ornelas). Based on his years of experience in providing academic mentorship to students, Mr. Ward similarly observed that—in spite of equal talent and potential—students attending predominantly white, affluent schools perform better on standardized tests, as compared to their peers attending predominantly minority schools, because of their access to test preparation courses that could boost scores by 200 or 300 points. Tr. 897:12-898:1; 918:1-918:11.

32. Many students of color also have less access to a wider range of rigorous coursework because some educators harbor biased views that Black and Latinx students are less academically gifted, irrespective of their qualifications. Ms. Polanco shared how a school counselor discouraged her from enrolling in advanced coursework because "they were not used to advising a Latina student with my drive and energy." Sealed Tr. 33:12-17 (Polanco); *see also* Tr. 1341:17-20, 1343:1-25 (Acosta) (describing challenges in enrolling in advanced coursework because counselor doubted his academic capabilities for reasons seemingly tied to his ethnicity). Mr. Ward also described instances where educators undervalued his scholarly contributions and extolled disproportionate punishment for

17

reasons that could only be explained by his being Black. Tr. 894:24-895:4; 906:4-14 (Ward).

33.     In addition to being racially skewed, numeric metrics such as test scores, class rank, and grades are—when viewed on their own—poor predictors of an individual student's ability to thrive at UNC. Mr. Acosta described how despite earning lower SAT scores than his white peers, his strong work ethic allowed him to excel in UNC's pre-med program while some of his higher-scoring white peers dropped out. Sealed Tr. 64:20-65:9 (Acosta). Mr. Ward similarly affirmed that the diverse students that he mentors through "College Bound" graduate at the same rate as their white peers because of the rich knowledge they have developed in their neighborhoods and lived experiences, not their standardized test scores, which merely reflect access to test preparation courses. Tr. 918:1-918:25 (Ward).

34.     Moreover, these numerical metrics cannot capture the less quantifiable, but equally important, qualities that UNC seeks in its applicants, including but not limited to: perseverance and a strong work ethic; kindness and the ability to enhance UNC's academic and social environment; leadership and a commitment to enriching the lives of North Carolinians, among other attributes. *Supra* ¶ 22; *see also* Tr. 679:17-24 (Rosenberg). UNC administrators have attested that they cannot comprehensively evaluate these desired qualities based solely on an applicant's GPA and SAT score. Tr. 533:16-19 (Farmer); DX009. Rather, readers are "explicitly and repeatedly encouraged to base their recommendations on everything they know about candidates rather than on one or two criteria." DX010 at 6; Tr. 540:4-10 (Farmer); *see also* Tr. 532:4-6 (Farmer) ("Just as there

18

is no formula for admission, there is no list of qualities or characteristics that every applicant must present.").

35.    Student-Intervenors' application files exemplify how non-quantifiable aspects are highly indicative of which applicants can best fulfill UNC's mission. For example, Ms. Polanco expressed her desire that UNC see her "as more than just grades and numbers." Sealed Tr. 34:18-19 (Polanco). Her recommendation letters noted her unique ability to bridge cultural divides, how she "has been a student leader in our school and community," and how she is a "go-getter in every way." IX031 at 9, 14. Numbers alone do not reflect these intangible qualities.

### *iii. Race is Not the Dominant or Defining Feature in UNC's Admissions Process*

34.    SFFA's expert Dr. Arcidiacono is the lone witness who asserted at trial that race predominates in UNC's application process. In addition to all of the reasons proffered by UNC in dispelling the credibility and reliability of Dr. Arcidiacono's testimony, (UNC FOF Section IV.B.ii.), Student-Intervenors highlight three ways the record rebuts Dr. Arcidiacono's contention and demonstrates how UNC's admissions process comports with the type of holistic review endorsed by the Supreme Court.

35.    First, Student-Intervenors' application files illustrate that UNC's admissions process is highly individualized, only considers race alongside other contextual factors, values many other diversity attributes, and does not apply an automatic or outsized boost for race. *See* IX027 (application file of Andrew Brennen) (redacted, under seal); IX028 (application file of Star Wingate-Bey) (redacted, under seal); IX029 (application file of

19

Laura Ornelas) (redacted, under seal); IX030 (application file of Luis Acosta) (redacted, under seal); IX031 (application file of Cecilia Polanco) (redacted, under seal).

36.    For example, Mr. Acosta's file shows that the admissions officer commented on his socioeconomic status (noting his fee waiver states, or "FW"); his being a first generation college student ("FGC"); his supportive recommendations; his varied extracurriculars, with more than 300 volunteer hours and notable leadership positions; and his test scores that, while on the lower end, were nevertheless contextualized by his bilingual abilities, lower-income status of his family, and many other indicators of scholarly strength. IX030 at 41. Alongside all of these comments is a note that Mr. Acosta would "add diversity" to UNC, *id.,* which is likely informed by Mr. Acosta's own essays about his racial heritage and commitment to cross-cultural friendships.

37.    Second, Dr. Arcidiacono's flawed analysis relies, in part, on his creation of an "academic index"—a calculation based entirely on SAT scores and grades, which UNC has never used—and then rank-orders students by decile and demographic group. Tr. 141:11-21; 144:7-21 (Arcidiacono). He suggests that race predominates in the admissions process because UNC seemingly admits a larger share of underrepresented minority students in lower deciles. Tr. 150:9-151:5; 162:10-18 (Arcidiacono). But this manufactured decile analysis wrongly equates merit with high academic scores. *See* UNC FOF Section IV.B.ii.e. As explained (*supra* ¶¶ 31-35), test scores and grades are poor indicators of an individual's ability to contribute to UNC and thrive once admitted. In addition, such scores tend to underpredict the potential of many talented underrepresented minority students who face race-based barriers to test preparation and supportive educators. *Supra* ¶¶ 31-35.

20

Further compounding these concerns, Dr. Arcidiacono's statistical approach imposes a penalty on women and underrepresented minority students who only took the ACT. His model attributes markedly lower converted SAT scores to Black, Hispanic, Native American, and female applicants as compared to white, Asian, and male applicants who earned the exact same ACT scores. Tr. 357:23-360:5; 363:16-23 (Arcidiacono); *see also* UNC FOF Section IV.B.ii.a.

38.     Third, Dr. Arcidiacono ignores the fact that—consistent with a non-mechanical, highly individualized process that flexibly considers race—UNC admits many white students with relatively low test scores and rejects many underrepresented minority students with relatively high test scores. Tr. 370:4-371:18; 371:23–372:3 (Arcidiacono). Putting aside his flawed decile grouping, Dr. Arcidiacono confirmed that his data showed that UNC admitted over 2,000 white students from the lowest five deciles in his decile analysis and rejected many Black and Latinx students from the highest five deciles. *Id*. The admission of "lower-performing" white students over "higher-performing" underrepresented students of color further demonstrates the individualized nature of UNC's admissions process.

## C. UNC's Efforts to Cultivate Racial Diversity Are Producing Educational Benefits

39.     UNC has long recognized that it must admit and enroll a diverse student body to realize its mission to "serve as a center for research, scholarship, and creativity and to reach a diverse community of undergraduate, graduate, and professional students to become the next generation of leaders." DX001; Tr. 517:22-25 (Farmer). Racial and ethnic

21

diversity are among the forms of diversity that UNC regards as crucial to "create and sustain an environment of educational excellence." DX003 at 2-3; Tr. 527:4-14 (Farmer); *see also* UNC FOF Sections II.A, II.B.

40.     Synthesizing decades of work and observations, UNC has enumerated five categories of educational benefits that it seeks: (i) promoting the robust exchange of ideas; (ii) broadening and refining understanding; (iii) fostering innovation and problem-solving; (iv) preparing engaged and productive citizens and leaders; and (v) enhancing appreciation, respect, and empathy. DX003 at 5-7; Tr. 525:5-526:7 (Farmer).

41.     The benefits of diversity articulated by UNC are well-documented and widely-recognized by academic research. IX001 at 7-9; PX119.2 14-24. Student-Intervenors' expert Dr. Jayakumar synthesized research studies showing how meaningful, cross-racial interactions contribute to: reducing prejudice; reducing social distance between racial groups; promoting a sense of belonging; cultivating intergroup dialogue skills and pluralistic orientation; encouraging comfort with people from other races; improving racial/cultural understanding and engagement; furthering overall student well-being and retention; increased civic development and social agency; improved academic skills and cognitive outcomes; enhanced personal growth and development; and developed capacity for teamwork and leadership. IX001 at 7-9. These benefits have been shown to last beyond the college years and into adulthood. IX001 at 7-9; *see also* PX119.2 at 4 (SFFA's expert Professor Mitchell Chang opining the research consensus shows diversity in higher education produces substantial benefits that flow to all students (minority and non-minority) ("individual benefits"), to the institutions in which they are educated

22

("institutional benefits"), to the economy and private sector ("economic and private sector benefits"), and for the society as a whole ("societal benefits").

42. And as discussed more thoroughly in UNC's Proposed Findings (*see* UNC FOF Section II.E.), UNC's goals are sufficiently measurable and can be assessed through a combination of both qualitative and quantitative measures. *See* IX001 at 35-36; *see also* DX061 (Inventory of Assessments Related to Delivery of the Educational Benefits of Diversity and Inclusion); Tr. 782:4-790:8 (Panter).

### *i. Exposure To, and Engagement With, Racial Diversity is Producing Benefits for UNC Students*

43. The record overwhelmingly reflects that UNC students have experienced firsthand the educational benefits of diversity through more nuanced and rewarding discussions that occur both inside and outside of classrooms. *See* Tr. 884:22-885:17 (Polanco); Tr. 1269:11-1270:1 (Brennen); Tr. 1290:1-21 (Ornelas); Tr 1305:14-1305:5 (Wingate-Bey); Tr. 1321:9-1323:8 (Watson); Tr. 1349:6-1354:24 (Acosta); Tr. 1364:9-1366:3 (Mwamba).

44. For example, Ms. Wingate-Bey explained how racial diversity is contributing to UNC's articulated goal of "promoting the robust exchange of ideas," testifying that classrooms with greater racial and ethnic diversity "made my education a lot richer" because it created a "safer space" where students could "talk and really discuss and dive deep into…the text we were reading, to relate it back to our experiences, [our] shared experiences, our different experiences." Tr. 1297:18-1298:7 (Wingate-Bey). Other student and alumni expressed similar sentiments. IX019 ¶ 6 (Dwyer) (describing how he found the

23

ethnic diversity at UNC enriching to the classroom environment); Tr. 1319:23-1320:17 (Watson) (describing how the ethnic diversity at UNC led to her forming a lifelong friendship with a white South African student where they had cross-cultural conversations about race, justice and apartheid in South Africa).

45.     Student-Intervenors uniformly shared about how racial and ethnic diversity is advancing UNC's goal to "broaden and refine understanding." *See* IX012 ¶ 6 (Gatewood) (describing how he befriended several Native American students while at UNC and as a result became more aware about their culture and issues); IX005 ¶ 15 (Brennen) (describing how he became aware of islamophobia on UNC's campus after attending a campus vigil for the murder of three Muslim students); Tr. 1282:8-19 (Ornelas) (Ms. Ornelas, who grew up in a family with documented legal status, explaining that her interactions with Latinx students who were undocumented allowed her to "learn[] so much from their perspective and now can consider things that before had never even crossed my mind.").

46.     Student-Intervenors also testified about how racial and ethnic diversity is furthering UNC's goal of "fostering innovation and problem-solving." Mr. Acosta, for example, testified how exposure to racial disparities in health outcomes during classroom discussions has made him more attuned to the needs of communities he seeks to serve as a medical doctor. Tr. 1353:12-1354:8 (Acosta); *see also* Tr. 1321:11-1322:1 (Watson) (describing how her poetry writing improved due to the racial diversity present in her writing class).

24

47.     Substantial witness testimony confirmed that racial diversity is contributing to UNC's goal of "enhancing appreciation, respect, and empathy." *See* Tr. 1296:11-1297:17 (Wingate-Bey) (describing how UNC's leadership program with racially diverse peers made her "a more empathetic person, a more accepting person…and you just become a better member of the community"); Sealed Tr. 40:1-9 (Polanco) (discussing how, as a Latina woman, her interactions with members of UNC's Black Student Movement caused her to "empathize and be conscious and aware" of "other people's experiences" involving police brutality); *see also* IX004 ¶ 7 (Acosta) (describing how during his time at UNC he was able to learn from and find commonalities with Indian and Asian students, and unlearn many stereotypes that he held about their culture); Tr. 1323:9-20 (Watson) (describing how her friendship with an Asian American woman generated conversations about how the Black and Asian experiences interacted, allowing them to grow "in compassion and in the ability to interact" with those from different backgrounds).

48.     These benefits are flowing to students and alumni of all racial and ethnic groups. PX119.2 at 17-19 (Report of UNC's expert Dr. Chang) (stating "white students who attended colleges with 25 percent or more minority enrollment were more likely to have diverse friendships after leaving college and to live in diverse neighborhoods . . . ."); *see also* PX119.2 at 67 (Asian American male alumnus explaining how he actively sought opportunities to interact with racially and ethnically diverse students at UNC); PX119.2 at 68 (African American male alumnus discussing how he was exposed to diverse religions and ethnicities at UNC and how it allowed him to develop an expanded worldview);

25

PX119.2 at 66 (white male alumnus explaining how interacting with diverse students was one of the most rewarding experiences of attending UNC).

49.     Climate surveys further confirm that racial diversity at UNC is producing some benefits across the student body. IX001 at 55-58; PX119.2 at 46-68. For example, UNC's 2016 Climate Survey shows that a majority of UNC students reported that they either "very often" or "often" reconsidered the way they thought about an issue after hearing the perspectives of UNC students with a different race or ethnicity (60.3%) and have learned from perspectives offered by UNC students of a different race or ethnicity (70%). PX119.2 at 49.

### ii. UNC's Cultivation of Diversity Within Each Racial Group is Producing Educational Benefits for Students, Including the Deconstruction of Stereotypes

50.     Several nonracial approaches suggested by SFFA's expert Mr. Kahlenberg ignore the value of diversity within racial groups (sometimes termed "intra-racial" diversity or "diversity within diversity"). However, the record clearly demonstrates that having intra-racial diversity plays an important role in imparting the educational benefits sought by UNC. As Student-Intervenors' expert Dr. Jayakumar explained, exposure to differences within a given racial group helps to break down stereotypes and prejudice by "encourag[ing] students to avoid crude and inaccurate inferences based on isolated, observable attributes." IX001 at 18-19. Student testimony corroborated these benefits. Ms. Polanco testified that diversity within the Latinx community at UNC dismantled stereotypes that she held that educated Latino males did not exist. The exposure to a range of Latino students of differing backgrounds "helped show me another story, a different

26

narrative" about her own community. Tr. 877:11-25 (Polanco); *see also* Tr. 914:7-15 (Ward) (explaining how diversity within the Black community taught him the Black community is "not a monolith"); Tr. 1324-25 (Watson) (diversity within the Black community showed her "important differences between black individuals" and deconstructed stereotypes she had previously held); Tr. 1282:8-19 (Ornelas) (explaining that diversity within the Hispanic community created "eye-opening discussions" that broadened her perspective on issues facing the Latinx community).

51. Dr. Jayakumar explains that "diversity within diversity" also "promotes cultural flexibility by highlighting social similarities and differences across other significant identity markers such as culture and socioeconomic status." IX001 at 19. Mr. Acosta, a first-generation college student who qualified for free lunch in his K-12 school, testified how UNC allowed him to socialize with other Latino students who were at the higher-end of the socioeconomic spectrum. Tr. 1337:5-16; 1351:16-1352:22 (Acosta). These interactions allowed him to "break down barriers and biases" that he previously held about higher income students, and made him more comfortable in spaces with people of all socioeconomic backgrounds whether low-income, middle-income, or high-income. Tr. 1351:18-1354:8 (Acosta).

### *iii. UNC's Cultivation of Diversity is Lessening Racial Isolation and Tokenism*

52. A racially diverse student body is also necessary to cultivate a learning environment in which students from underrepresented minority groups do not feel isolated or "tokenized" in the classroom. IX001 at 27.

27

53. Conditions that foster a sense of racial isolation, tokenism,[7] and stereotype threat[8] among students of color suppress their participation by making them feel invisible, othered, unwelcome, and/or unsafe. IX001 at 13. This withdrawal of students of color, in turn, suppresses opportunities for cross-racial interactions and associated educational benefits. IX001 at 9, 11-17.

54. However, research also shows a greater number of same-race peers increases the likelihood that underrepresented minority students will continue to participate rather than choose silence, distance, or disengagement. IX001 at 22. For example, the availability of Black student groups in predominately white contexts enables students to gain validation, resist stereotypes, and develop culturally affirming identities. IX001 at 23.

55. Student-Intervenor testimony and declarations confirm that many students of color continue to experience tokenism and racial isolation on UNC's campus. *See infra* ¶ 69.

56. Consistent with the research, Student-Intervenors testified that having spaces with a greater number of students of color relieves their sense of isolation and promotes their participation. Ms. Polanco, for example, explained that finding spaces with students "from a similar racial or ethnic background" allowed her to feel safer and "seen and appreciated for who [she] was" at UNC. Tr. 880:21-881:11 (Polanco). By giving her a

---

[7] Tokenism refers to the sense of scrutiny and pressure felt by students of color to represent their group when faced with underrepresentation. IX001 at 9.

[8] Stereotype threat or "social identity threat" represents "a threat that occurs when people recognize they may be devalued in a setting because of one of their social identities." PX119.2 at 21.

28

sense of community, spaces with higher numbers of students of color gave Ms. Polanco "the resilience to go back out into [her] classes and…show up better," increasing her participation and cross-racial interactions. Tr. 880:15-881:11 (Polanco). Many other Student-Intervenors similarly provided examples of how being in spaces with higher proportions of underrepresented students of color eased their sense of tokenism and made them more comfortable fully engaging in UNC's learning environment. Tr. 1282:20-1283:7 (Ornelas) (explaining how in diverse classrooms she felt more comfortable to share her experiences and her opinions); Tr. 1301:22-1302:17 (Wingate-Bey) (noting how meeting other Black dancers on UNC's dance team helped her to find community and ease her sense of isolation on campus); Tr. 1329:17-1330:9 (Watson) (discussing how she found a sense of community and support in UNC's diverse campus ministry); Tr. 1367:3-22 (Mwamba) (explaining how she felt seen and understood at UNC when she was able to write for "The Bridge" which was staffed by women of color).

### *iv. A Diverse Student Body Enables the UNC Administration to Better Serve Its Students and Develop a Scholarly Community*

57.     Faculty and administrators recognize how diversity improves pedagogy and bolsters the institutional profile of UNC. "[I]t is clear from…evidence that diversity in classrooms has a powerful and positive impact on the learning environment. PX119.2 at 35-36; *see also,* DX124 ¶ 31 (Crimmons) ("Diversity has also been a major contributor to innovation in teaching methods for the scientists, which has improved learning and understanding for all students"); DX136 ¶ 11 (Kohn) ("Having students from diverse backgrounds deepens and broadens their education, expanding their perspectives and

29

understanding"); DX132 ¶ 21 (Hogan) ("Diversity jolts us into cognitive action in ways that homogeneity simply does not."); *see also* UNC FOF Section II.C.

58.     Greater diversity and multicultural groups "are associated with higher retention rates and more positive racial experiences for both white students and students of color." IX001 at 32; Tr. 1303:16-25 (Wingate-Bey) (opining that based on her experiences, the already low "[r]etention rates for [B]lack students would be affected if there was less diversity" and "you need to see people that look like you to feel like you can belong somewhere"). UNC has actively designed programs that are explicitly centered on diversity and seek to improve retention and graduation rates for underrepresented students. *See* PX119.2 at 29-32.

59.     Students of color also play a key role in recruiting other underrepresented students to the university. Programs like Project Uplift and the Carolina College Advising Corps rely on UNC students and alumni to reach out to Black, Latinx, Native American, and Asian American students, introduce them to UNC and provide peer mentorship. IX001 at 37-39; *see also* Tr. 878:4-879:16 (Polanco) (explaining her participation in Project Uplift, Dia de Bienvenida, and Tar Heel Target, to reach out to underrepresented youth in North Carolina and show them that there is diverse racial representation at UNC). Typically, students of color lead these programs, creating critical and more credible pipelines that attract other diverse students allowing underrepresented high school candidates "to see representation so that they can…see themselves [at UNC]." Tr. 878:20-22 (Polanco); *see also supra* ¶ 108.

60.     Underrepresented student groups also significantly contribute to the social and intellectual life of the University. For example, Black students have taken a leading role in addressing issues such as criminal justice, racial justice, and "without a strong [B]lack community…newsworthy protests" like those against police brutality would not have occurred. IX007 ¶ 5 (Watson); *see also* IX006 ¶ 11 (Polanco) (describing how "many minority students and the Black Student Movement [were] trying to generate awareness and support [for] the 'Black Lives Matter' movement"); Tr. 882:3-5 (Polanco) (highlighting that it is "mostly [B]lack and [B]rown students…doing advocacy and organizing work to improve conditions at the university for themselves and their peers" including efforts to remove the Silent Sam Confederate statue); IX014 ¶ 7 (Mencia) (outlining how the Latinx community created the "Estamos Aqui UNC movement…to advocate for itself and for the creation of [a Latinx center].")

### *v. A Diverse Student Body Enables UNC to Better Serve the State of North Carolina*

61.     UNC graduates of color are instrumental in providing mentorship and college advising to underrepresented students, helping to build a more skilled workforce for North Carolina. *See* Tr. 1289:6-18 (Ornelas) (sharing her post-graduation experience as part of the Carolina College Advising Corps, which places UNC graduates in majority underrepresented population high schools for two years with the goal of "advis[ing] the entire student population about the college application process, regardless of what school they wish to attend.").

31

62. Diversity on UNC's campus also enables graduates to thrive in the state's job market, where they will encounter individuals from different cultures and backgrounds. Ms. Polanco, for example, explained UNC's diversity better equipped her to serve as the Executive Director of SEEDS, a Durham-based youth development organization. By enhancing Ms. Polanco's "understanding" and "empathy" for the diverse student population that she serves, she is more capable of "clos[ing] some of the opportunity gaps or achievement gaps" facing Durham's public schoolchildren. Tr. 885:20-886:18 (Polanco); *see also* PX119.2 at 64 (declarant Jonathan Reckford indicating that professionals "cannot succeed…if you can not work cross-culturally…with people from different cultures, [and] races"); PX119.2 at 64 (declarant Jennifer Ho sharing that "students need to have racial and social literacy" to be successful after graduation, and this literacy is developed by "interact[ing] with people from different racial and ethnic groups").

63. Diversity also "creates capacity for leadership" by creating cross-cultural experiences, which "are the prerequisites to developing respect and appreciation for diverse opinions and experiences." DX117 ¶ 17 (Barnes). Mr. Brennen, for example, explained how UNC's racial diversity better prepared him for his job at National Geographic working with youth advocates around the world because it strengthened his "ability to connect with anyone, to make friends with anyone, to understand how different cultures and different races…intersect and interact with one another." Tr. 1269:14-1270:1 (Brennen). Such cross-cultural competencies have made Mr. Brennen "more comfortable and confident" providing skill training to these diverse youth leaders. *Id.*; *see also* DX117 ¶ 19 (Barnes)

32

(indicating that "if we want UNC-CH graduates to be successful…leaders, UNC-CH must continue to expose its students to classmates from different backgrounds who have different experiences than their own").

64.     The leadership skills facilitated by diverse classroom and campus spaces are evident in UNC alumni leadership around the state. *See, e.g.* DX117 ¶ 18 (Barnes) (highlighting that her "cross-cultural experiences" at UNC have been "essential to [her] professional success); PX119.2 at 60 (declarant Jonathan Rich asserting that his "experiences in the military affirm the importance of an educational environment where students are exposed to great diversity"); DX123 ¶ 21 (Cooper) (indicating that her experiences "with diversity at UNC-CH…made [her] confident in [her] ability to work with, coach, and teach others who do not look like [her] or who have not had the same experiences"); DX129 ¶ 17 (Gonzalez) (concluding that his experiences "with people from different backgrounds has helped [him] with [his] current position doing business all over the world").

65.     The University's alumni acknowledge how cross-racial interactions during college helped to make them more effective professionals in their careers. *See, e.g.* DX117 ¶ 18 (Barnes) (highlighting that her "cross-cultural experiences" at UNC have been "essential to [her] professional success"); PX119.2 at 60 (declarant Jonathan Rich asserting that his "experiences in the military affirm the importance of an educational environment where students are exposed to great diversity"); DX123 ¶ 21 (Cooper) (indicating that her experiences "with diversity at UNC-CH…made [her] confident in [her] ability to work with, coach, and teach others who do not look like [her] or who have not had the same

33

experiences"); DX129 ¶ 17 (Gonzalez) (concluding that his experiences "with people from different backgrounds has helped [him] with [his] current position doing business all over the world").

**D. More Progress is Needed for UNC to Fully Harness the Benefits of Diversity**

66.     While UNC's recent diversity efforts have moved the University towards attaining many of the benefits of diversity, *see* Section II.C., much more progress is needed to fully attain diversity's benefits. IX001 at 6-7.

67.     UNC recognizes that the benefits of diversity cannot fully be realized in the absence of inclusion and belonging. DX003 at 2-3. Inclusion occurs when students of all backgrounds feel "welcome, supported, and prepared for academic success," and are able to fully participate and thrive in the university's educational setting. DX003 at 2. UNC understands the critical importance of having enough underrepresented students on campus to ensure students in the UNC community have the "ability to contribute fully to the experience of others and also benefit fully from the experience that we offer." Tr. 544:2-9 (Farmer).

68.     The benefits of diversity are suppressed when there are campus conditions that discourage students from sharing their unique combinations of experiences and backgrounds. IX001 at 8-14; DX003 at 2-4. As Stephen Farmer explained: the University cannot achieve the full benefits of diversity—or a "critical mass"—when students continue to face pressures of being "spokespeople for their race" and encounter learning environments where "people stereotype them on the basis of their race." Tr. 544:2-21 (Farmer).

34

69.     Students and alumni of color have testified that racial isolation and tokenism remain a common experience for UNC's underrepresented minority students, and this experience reduces their full and open participation in classes. Star Wingate-Bey, for example, often found herself to be the only person of color in the classroom, making her feel like "the token or sole representative for my race." Tr. at 1299:12-17, 1300:13-18 (Wingate-Bey). Being the sole Black student felt "isolating," "draining," and "burden[some]." Tr. at 1299:12-1301:21 (Wingate-Bey). It caused her to enter classes with her "guard up….[which is] not conducive to learning." Tr. 1300:22-1301:13 (Wingate-Bey). Mr. Brennen similarly shared about often "being the only African American in the class" and how such isolation prevented him from speaking up about racially-salient issues because he did not want to "represent the perspective of all African Americans on campus." Tr. at 1262:12-1263:5 (Brennen). Cecilia Polanco also shared that the representation of students of color on UNC's campus "still feels low" and it was "really challenging being in spaces that were predominantly white." Tr. 879:2-22 (Polanco). As "the only Latina" in many spaces, Ms. Polanco often felt "alone" and "invisible," which made it "hard to speak up" because it "felt like tokenization" and she did not want to have to speak for the entire Latinx or immigrant community. Tr. 879:23-880:6 (Polanco). Virtually all of the Student-Intervenor witnesses shared stories about being tokenized on UNC's campus. Tr. 906:4-5 (Ward) (testifying "I remember being in classrooms where I felt like I was the token [B]lack or the spokesperson for all [B]lack folk."); Tr. 1285:22-1286:6 (Ornelas) (explaining that she often felt like the "sole representative of [her] ethnic group" due to lack of representation, thereby leading to less participation and engagement in the

35

classroom); Tr. 1365:12-21 (Mwamba) (discussing instances when she was the only person of color or Black person in class and "felt that [she] had to speak up in defense of everything [B]lack," which sometimes caused her to be emotionally drained and tired); Tr. 1327:14-1328: 25 (Watson) (reflecting on her experience feeling like she was seen as "the token [B]lack girl" in UNC's a cappella group and the immense pressure she felt to "be the representative for the [Black] race" due to underrepresentation in the classroom).

70.     Students of color also continue to face racial hostility and overt racism on UNC's campus. Rimel Mwamba testified how one classmate derogatorily called her a "slave," and another excluded her from a party by telling her "my president [Trump] says it's okay to kick out the N words." Tr. 1366:7-20 (Mwamba). Mr. Brennen was also called racial slurs on UNC's campus on more than one occasion. Tr. 1265:17-1266:10 (Brennen). These experiences are painful, and increase the need for having more same-race peers who can provide support. Tr. 1366:7-1367:2 (Mwamba); Tr. 1268:16-1269:4 (Brennen).

71.     Climate surveys and quantitative institutional data also show underrepresented students of color are experiencing racial isolation, tokenism, and racial hostility at frequent and disproportionate rates compared to their peers. Students of color expressed markedly higher agreement with the statement that "I feel pressured in class discussions to represent the views of all people from my racial or ethnic background." IX001 at 60 (citing DX106, "Classroom Experiences" sheet, Question 44c). Just over 50% and 30% of Black and Latinx students, respectively, agreed (compared to an average agreement rate of 14%). *Id.* Students of color were also more likely to report discomfort from being singled out in class, overwhelmingly because of their race or national origin.

36

For example, nearly 50% of Black students expressed such discomfort, and 76.5% of such students felt singled out due to race or color. IX001 at 60-61 (citing DX106, "Classroom Experiences" sheet, Question 42d).

72.     Such surveys similarly show students of color are disproportionately suppressing aspects of their cultural identities, which hinders the benefits of diversity by reducing the exchange of diverse perspectives. The 2016 Climate Survey indicated 40% of Black students and 29% of Latinx students agreed or strongly agreed with the statement: "I feel that I need to minimize aspects of my racial or ethnic culture to fit in here" (compared to an average agreement rate of 15%). IX001 at 65 (citing DX106, "Isolation" sheet, Question 44e).

73.     The 2016 Climate Survey also reflects the continued prevalence of racial hostility and bias on campus. Over 91% of students reported hearing insensitive or disparaging remarks made by other students, with 25% hearing such remarks often or very often. IX001 at 59 (citing DX106, "Experienced Bias, Observations" sheet, Question 46c). Disaggregating these findings demonstrates that underrepresented students of color hear insensitive and disparaging remarks related to racial and ethnic minorities far more often (49.1% of Black students and 29.4% of Latinx students heard such remarks often or very often). *Id.* Furthermore, the majority of students of color has personally experienced bias at UNC, and overwhelmingly reports being subject to racial bias in particular (100% of American Indian students, 95% of Black students, and 70% of Latinx students). *Id.* at 61 (citing DX106, "Experienced Bias, Observations" sheet, Question 45).

37

74. While UNC has recently expanded its efforts to recruit and enroll underrepresented minority students, (*see* UNC FOF Section V.A.), all of the Student-Intervenors testified that the number of students of color remains too low, and more representation is needed to fully achieve UNC's diversity and inclusion goals. Tr. 879:2-16 (Polanco) (remarking that upon arrival on campus, she noticed that "there were much, much less students of color than [she] thought" and that UNC "needed to better recruit students…to make Carolina a better place for ourselves and our peers"); Tr. 919:13-23 (Ward) (describing social exclusion on campus as evidence that "increasing [diversity] numbers is incredibly important for the university" to create a sense of belonging for underrepresented students); Tr. 1264:25-1265:3 (Brennen) (lamenting that the number of Black students on campus is too "low and could be improved"); Tr. 1285:22-1286:6 (Ornelas) (explaining that there is inadequate representation of students of color, which led to less participating and sharing in classroom environments among those students); Tr. 1299:3-6 (Wingate-Bey) (indicating that she "did not feel like there was enough diversity at UNC"); Tr. 1326:20-23 (Watson) (recalling that she "never thought that there was adequate representation" of students of color on campus and "UNC's [B]lack population was not reflective of North Carolina's [B]lack population"); Tr. 1366:6 (Mwamba) (confirming her belief that UNC does not have adequate racial representation "at all"). UNC professors have likewise observed students of color are lacking in particular classes and fields. DX126 ¶¶ 18-21 (Cuadros); DX145 ¶ 15 (Sathy); *see also* UNC FOF Section II.G.

Case 1:14-cv-00954-LCB-JLW   Document 246   Filed 02/05/21   Page 43 of 73

### E. Race-Conscious Admissions Remain Necessary for Cultivating the Fullest Depth and Breadth of Diversity Which Benefits All Students

#### *i. SFFA's Expert Richard Kahlenberg Failed to Properly Assess Race-Neutral Alternatives, Which Requires Considering Both Numbers and UNC's Particularized Context*

75.     Any analysis of whether a race-neutral alternative can achieve educational benefits "about as well" as UNC's holistic, race-conscious policy should consider both demographic representation and contextual factors since both influence the level of educational benefits flowing to students on campus. IX001 at 6-7, 20-21.

76.     Student-Intervenors' expert Dr. Jayakumar explained that harnessing diversity's benefits depends not only on the overall demographic composition of the admitted class, but also on a number of contextual factors that enhance or impede the educational environment. IX001 at 6-7, 20-21. These contextual factors include: the institution's sociohistorical context, the institution's commitment to diversity, and the incoming student body's characteristics such as whether each racial group reflects a full range of diverse backgrounds (diversity within diversity). IX001 at 8-34.

77.     Numbers and contextual factors are both important because they both influence the levels of participation and cross-racial interaction that give rise to the educational benefits of diversity. IX001 at 6.

78.     UNC's administrators and experts agree that contextual considerations matter when analyzing race-neutral alternatives and the anticipated benefits of diversity. UNC's expert Bridget Terry Long opined that when assessing race-neutral alternatives it is "very important" to account for "the context and the institutional characteristics" of both

39

UNC and the universities described in the research. Tr. 1192:10-22 (Long). Abigail Panter, who heads UNC's Committee on Race-Neutral Strategies, similarly explained that when evaluating UNC's ongoing need to consider race "numbers are a part of it. But…[another] critical piece is the context of the institution and the interactions that are ongoing" among students on campus. Tr. 868:9-869:7 (Panter).

79. UNC has developed a comprehensive framework for analyzing race-neutral alternatives that considers both predicted demographic representation and contextual factors that affect UNC's ability to cultivate such benefits. UNC has taken various measures to evaluate the availability of race-neutral alternatives including: drafting an extensive literature review on how banning racial considerations impacted flagship institutions in other states; conducting a variety of simulations; and creating subcommittees to analyze conditions that can affect the viability of race-neutral alternatives, including a subcommittee on "the student experience." *See* DX054; *see also* UNC FOF Section V.B. To date, UNC has not identified any workable race-neutral alternative to race-conscious, holistic review that will achieve the educational benefits of diversity without sacrificing UNC's educational goals. DX054; *see also* UNC FOF Section V.

80. In contrast to UNC's comprehensive approach, SFFA's expert on race-neutral alternatives Richard Kahlenberg failed to critically examine whether the benefits of diversity are accruing at UNC and whether any of his proposed models would adequately address the contextual factors of diversity beyond numbers. In forming his opinions, Mr. Kahlenberg did not consult with any UNC students because he viewed it as non-essential; did not review any written declarations by UNC current students or alumni discussing their

40

educational experiences; and does not recall whether he cited any student climate surveys when forming his conclusions. Tr. 505:15-506:11 (Kahlenberg).

81.     Mr. Kahlenberg also lacks the direct experience and expertise to provide an informed opinion on whether students are experiencing the benefits of diversity. Mr. Kahlenberg has never worked in an admissions office, never worked in a university financial aid office, never worked in a recruiting function, never managed a university endowment, and never served on the board of a higher education institution. Tr. 466:4-19 (Kahlenberg).

82.     Accordingly, the Court finds Mr. Kahlenberg's findings and opinions inconclusive and unpersuasive.

### ii. UNC's Particularized Context Impedes its Ability to Achieve the Full Benefits of Diversity Using Race-Neutral Alternatives

83.     As Dr. Jayakumar observed, there are several contextual factors that impede UNC's ability to achieve the full benefits of diversity. IX001 at 37. Contextual factors that affect the viability of ending UNC's race-conscious admissions policy include: UNC's particularized sociohistorical context and its perceived commitment to diversity. *See* IX001 at 33, 44, 48-52.

### a)  UNC's Particularized Sociohistorical Context

84.     North Carolina has a sordid history of state sponsored racial discrimination, which includes excluding African-American and other students of color from UNC-Chapel Hill. IX002 at 19-25. Even after UNC was forced by court order to admit students of color, the State continued to fight integration; for decades, UNC's leadership turned a blind eye

41

to the discrimination experienced by those same students once admitted. IX002 at 8-13. When Mr. Ward attended UNC as a Black student in the early 1980s, he repeatedly faced racial epithets, received hate mail, and encountered KKK rallies on campus. Tr. 901:13-18, 903:3-13 (Ward). When he drew attention to UNC's challenges around race as the University's first Black mic man, the Dean promptly forced him to resign from the role. Tr. 903:14-23 (Ward). Other Black alumni attending UNC in the 1980s similarly recall the prevalence of classmates displaying confederate flags, IX013 ¶ 9 (Staton Dyer); having white classmates and professors treat them as "maids" and "domestics" rather than students, IX015 ¶ 10 (Zeigler); and casually using racially derogatory language, IX016 ¶ 10 (Parker); IX017 at ¶ 7 (Hayes).

85.    Although UNC recently has now rejected its prior legacy of exclusion, UNC's very recent history of racial subjugation currently affects student life on campus and exacerbates barriers to achieving meaningful educational benefits of diversity at UNC. IX002 at 8-9, 26; IX001 at 49-54. As of January 2018, more than half a dozen buildings on campus bore the names of leaders of the KKK and white supremacy campaigns. IX002 at 12. For students, these physical relics of UNC's confederate past are a "constant reminder of the [University's] history and legacy" of racial exclusion. Tr. 881:15-882:20 (Polanco); *see also* Tr. 1266:12-1267:10 (Brennen) (sharing that "many students of color…were hyperaware that we were sleeping and attending class in buildings named after people who bragged about their racism.")

86.    Campus artifacts commemorating the confederacy are "a cause of discomfort" for students of color because they do "not make students of color…feel safe

42

and supported by the university." Tr. 881:15-882:20 (Polanco). Star Wingate-Bey explained that having to walk past UNC's "racist wallpaper…every day adds to that feeling of not being valued on campus." Tr. 1304:16-1305:8 (Wingate-Bey). Rimel Mwamba similarly reflected that the presence of monuments commemorating "such a violent history towards black people" made her ask herself: "as a black person,…does this school actually value my being here[?]" Tr. 1369:7-1370:3 (Mwamba).

87.     These confederate relics also make Black students such as Andrew Brennen more guarded in terms of his interactions with others on campus. Tr. 1266:25-1267:10 (Brennen) (explaining he was more "careful" in light of this historical context); *see also* Tr. 1330:13-1331:13 (Watson) (recalling how controversies regarding the "racist legacy" surrounding confederate relics like the Silent Sam statue "pervaded [her] UNC experience").

88.     In addition, UNC's confederate monuments have heightened the psychological and physical threats for students of color by attracting current-day white supremacists to UNC's campus to defend the confederate statue against removal. Rimel Mwamba described instances where the Sons of the Confederacy came to campus to rally around the Silent Sam statue and how such experiences were "emotionally and physically violent" for her and her Black classmates. Tr. 1369:18-1370:3 (Mwamba); *see also* Tr. 1330:13-1331:13; 1332:12-1333:6 (Watson) (describing how "white supremacists came to the campus wielding guns to defend the statue" and "terrorize" Black students).

89.     While UNC publicly rejects its prior legacy of racial discrimination and has made some progress in removing and renaming confederate relics, (IX001 at 49, 51-52),

43

Student-Intervenors' testimony and experts' analyses demonstrate that UNC's historical context has present-day manifestations that make students of color feel unwelcome on UNC's campus. *Supra* ¶¶ 85-88. As Dr. Jayakumar opined: UNC is moving in the right direction, but "[i]t will take time and continued effort to increase the University's capacity for ensuring a healthy climate for dynamic diversity that enables the type of educational benefits all UNC students will need to excel." IX001 at 68.

### b) UNC's Race-Conscious Admissions Policy Incentivizes Students of Color to Apply and Enroll at UNC

90.     Admissions policies that express a commitment to racial diversity can encourage applications and enrollment from students of color, whereas policies that fail to express a commitment to diversity can signal to students of color that they are not welcome. IX001 at 33.

91.     For example, bans on affirmative action have had a "discouragement effect" that leads students of color to not apply to an institution. IX001 at 33. Dr. Caroline Hoxby explained that after California and Texas ended their race-conscious policies, students who previously benefitted from the prior policy—*i.e.* Black and Hispanic students—applied at lower rates. Tr. 988:6-20, 1002:25-1003:4 (Hoxby) (discussing drop in application rates and providing example of a high-achieving African American student who would be less incentivized to apply); *see also* DX054 at 33 (Committee on Race-Neutral Strategies discussing how "studies have generally suggested that schools which eliminate the use of race or ethnicity have tended to experience declines in applications from underrepresented students."); UNC FOF Section V.C.ii.b.

44

92. Consistent with this trend, selective institutions in other states that have banned race-conscious admissions have experienced a marked decline in underrepresented minority students. According to the study conducted by SFFA's own expert Mr. Kahlenberg, the most selective state flagships that stopped considering race—UCLA, UC Berkeley, and Michigan University—were not able to achieve their prior levels of diversity even after implementing race-neutral alternatives. Tr. 491:9-23 (Kahlenberg); *see also* UNC FOF Section V.C.ii.a.

93. In contrast, Dr. Jayakumar explained that visible efforts to promote racial diversity—such as race-conscious admissions policies—can signal an inclusive and welcoming environment to prospective students of color, making them more interested in applying. IX001 at 33.

94. Student-Intervenors testified that UNC's race-conscious policy impacted their perception of UNC as welcoming to underrepresented minority students. Ms. Watson explained that UNC's consideration of race in admissions indicated to her that the University "care[d] about [applicants] as whole people." Tr. 1315:14-23 (Watson). If UNC had not considered race, she would have found it "off-putting" and it "would have made me [feel] unwelcome at the university." *Id.* at 1315:14-1316:3. Ms. Wingate-Bey similarly expressed that if UNC stopped considering race in admissions it would send a message that people of color "aren't valued for the specific cultural experiences that we could bring to UNC." Tr. 1304:4-13 (Wingate-Bey).

### *iii. There Are No Feasible Alternatives Available to Considering Race as One Factor Among Many*

95.     UNC's race-conscious admissions policy has a limited but meaningful impact on the racial diversity of its class. *See* Tr. 955:1-3 (Hoxby).

96.     UNC's current admissions policy does not result in under-qualified students being admitted in the name of racial diversity—rather, the contextual weight of race in admissions impacts only those applicants who are highly-qualified and highly competitive based on their many talents, irrespective of race. Tr. 570:3-6, 667:14-18 (Farmer); Tr. 1044:15-22 (Hoxby); *see, e.g.,* IX027-IX031 (Student-Intervenors' application files reflecting remarkable, wide-ranging talents).

97.     UNC's internal evaluations and the expert analyses have all revealed that elimination of race-conscious practices would result in a decline in racial diversity of certain underrepresented minority groups, academic preparedness, or both. DX047; DX054; Tr. 1032:25-1033:7 (Hoxby); *see also* UNC FOF Sections V.B., V.C.

98.     Student-Intervenors' testimony confirms UNC's findings that race-neutral alternatives would not achieve comparable benefits, would unduly sacrifice other desirable class characteristics, or both. *Infra* ¶¶ 104, 107-109, 111-113.

### a) Both Parties' Race-Neutral Simulations Show a High Likelihood of Declines in Diversity

99.     It is undisputed that many of the proposed race-neutral alternatives would result in a marked decline in the number of underrepresented students, either collectively or with regard to a particular underrepresented group. *See, e.g.,* Tr. 1011:16-21 (Hoxby); Tr. 482:20-483:24 (Kahlenberg).

100. Professor Hoxby explored the "ceiling" of what was possible with regard to race-neutral admissions policies. Tr. 987:1-11 (Hoxby). She ran more than a hundred simulations of various admissions plans and made "very favorable" assumptions meant to maximize each race-neutral plan's chances of achieving UNC's current levels of underrepresented minority students and academic preparedness. Tr. 1000:8-1001:13; 1032:25-1033:7 (Hoxby). Even with these generous assumptions, Dr. Hoxby found that the majority of the socioeconomic-based simulations resulted in "fewer URM [underrepresented minority] students admitted." Tr. 1011:16-21 (Hoxby).

101. SFFA's expert Mr. Kahlenberg also offered several race-neutral simulations to support his contention that UNC could stop considering race and achieve comparable benefits. *See* Tr. 423:23-448:9 (Kahlenberg). As a preliminary matter, Mr. Kahlenberg's simulations are unreliable for the numerous reasons set forth in UNC's Findings of Fact and Conclusions of Law, including that they are based on Dr. Arcidiacono's models that themselves suffer from methodological flaws. UNC FOF Section V.C.ii. (describing flaws in Mr. Kahlenberg's approach); *see also* Section IV.B.ii. (describing flaws in Dr. Arcidiacono's modeling approach).

102. But even setting these flaws aside, some of Mr. Kahlenberg's proposed models result in a decline in underrepresented minority groups. For example, in Simulation 9, Hispanic students drop from 5.9% to 5.3%, roughly a 10% drop in their numbers; Native Americans students drop from 1.9% to 0.8%, representing a 50% decline in numbers. Tr. 482:20-484:24 (Kahlenberg). As explained below, these simulations—though problematic on their own—almost certainly underpredict the actual declines that UNC would

47

experience, (*infra* ¶¶ 103-108) , and thereby provide further evidence that there are not race-neutral alternatives that will produce comparable levels of diversity as UNC's race-conscious admissions and its associated benefits.

### b) The Declines in Diversity Would Be Even Greater Than Projected By The Simulations and Substantially Harm the Educational Environment

103. The declines in diversity would likely be greater than anticipated by both parties' simulations for at least three reasons.

104. First, Student-Intervenors' testimony and other states' experiences confirm that ending race-conscious admission will reduce applications from underrepresented minority students and produce a marked decline in diversity. *See supra* ¶¶ 90-94. As Laura Ornelas candidly expressed: if UNC stopped considering race, "I would have reconsidered if I were to apply to UNC at all" because it would convey to her "the university isn't interested in how I identify." Sealed Tr. 50:25-51:3 (Ornelas).

105. Both parties' simulations do not account for this likely decline in underrepresented students' application and matriculation to UNC. To maximize the success of the race-neutral policy, Dr. Hoxby presumed that no underrepresented minority student would leave the applicant pool. Tr. 988:6-20, 1002:25-1003:4 (Hoxby). She openly recognized that this approach inflated the race-neutral policy's projected number of admitted minority students because, in reality, high-achieving students of color would be less likely to apply to UNC once the University stopped considering race. *Id.* She emphasized that her findings must be interpreted with the understanding that she made extremely optimistic assumptions. Tr. 988:1-989:19 (Hoxby).

48

106.     Mr. Kahlenberg's models also presume that no underrepresented student of color will leave the applicant pool when UNC stops considering race. His simulations were based on two different, equally unreliable assumptions. Half of his proposed race-neutral models presume there is no change in UNC's applicant pool after changing the admissions policy. Tr. 478:13-479:3; 484:17-486:16; 488:3-6 (Kahlenberg) (describing simulations 8, 3, and 13, which presume no one joins the applicant pool, or leaves the applicant pool). The other half of his simulations presume 100 percent of North Carolina's eligible high schoolers would apply to UNC. Tr. 480:23-482:18; 478:10-21; 478:22-479:20 (Kahlenberg). Mr. Kahlenberg conceded that both assumptions were highly unlikely. Tr. 478:3-11; 481:19-482:2 (Kahlenberg). Perhaps more importantly, both presumptions substantially inflate the simulation's projection of the share of Black, Latinx, and Native American students admitted under each race-neutral alternative, since—in reality—such students would be less likely to apply.

107.     Second, the simulations fail to capture the decline in the diversity *within* each racial group that would likely result if UNC switched from an entirely holistic process to a process that mechanically applies socioeconomic "boosts" or automatically admits students based on particular metrics, like test scores or grade point average. Student-Intervenors, Dr. Jayakumar, and UNC all affirmed that having diversity within each racial group is crucial for enriching the educational environment and breaking down preconceived stereotypes. *Supra* ¶¶ 50-51; *see also* DX003 at 2 ("difference within difference[] is a crucial component" of UNC's ability to extend the educational benefits of diversity). By failing to provide similarly high levels of intra-racial diversity, the simulated

49

race-neutral alternatives would likely reduce the educational benefits flowing to students and prohibit UNC from meeting its educational objectives.

108.    Third, any decline in diversity would likely trigger a downward spiral in representation since students of color play a crucial role in convincing other underrepresented minority students to attend UNC. *Supra* ¶ 59. To begin, recruitment efforts would be less effective because there would be fewer Black, Latinx, and Indigenous students who are among the best recruiters for persuading same-race high-schoolers to come to UNC. Tr. 878:20-22 (Polanco); Tr. 569:15-17; 575:16-21 (Farmer). In addition, it would be much harder for UNC to compete for talented Black, Latinx, and Indigenous students. Based on his decades of experience working with youth pursuing college, Mr. Ward observed that students of color would be even less inclined to attend UNC if the number of underrepresented minority students decreased on UNC's campus. Tr. 919:10-23 (Ward). Instead, they will choose other options where they can encounter more diversity. *Id.; see also* Tr. 1354:13-24 (Acosta) (decided against applying to schools because of low numbers of Latinos on campus); Tr. at 1261:2-11 (Brennen) (ultimately decided to attend UNC because he saw women of color organizing for a safer, more inclusive campus); Tr. at 913:13-25 (Ward) (describing how after meeting other Black students "I knew then that Carolina was where I wanted to go because they looked like me"); Sealed Tr. 38:8-18 (Polanco) (seeing other Latinx students was "important" in convincing her to attend UNC).

109.    The likely decline in the number of Black, Latinx, and Indigenous students on UNC's campus would also significantly lessen the educational benefits flowing to

students, and further exacerbate the levels of racial isolation, tokenism, and stereotype threat already felt by UNC's underrepresented minority students. *See* Tr. 883:6-23 (Polanco) (explaining that a reduction in Black and Latinx students would be "harmful for the student body" because there are such "limited numbers [of students of color] already"); Tr. 1303:13-1304:3 (Wingate-Bey) (noting that a decline would harm "all…aspects" of campus life from the social interactions, to the educational setting, to the learning environment); Tr. 1265:11-16 (Brennen) (having fewer Black students on campus would make it less likely that Black students would share their perspective in discussions, and thereby reduce the likelihood that racially-offensive viewpoints would be pushed back on or confronted); *see also supra* ¶¶ 43-49, 62-65 (indicating how fewer students of color would reduce the educational benefits flowing to students and make them less prepared for leadership in today's multiethnic society); *supra* ¶¶ 59-60 (reflecting how a decline would negatively impact the campus climate because students of color are leading the efforts to move UNC towards a more inclusive campus).

### c) Mr. Kahlenberg's Proposed Alternatives Ignore the Distinct Benefits of Racial Diversity and the Many Other "Intangible Characteristics" that UNC Seeks in a Student Body

110.     Mr. Kahlenberg suggests that gains in socioeconomic diversity could counteract any losses due to racial diversity. Tr. 415:1-9, 429:10-13 (Kahlenberg); *see also* UNC FOF Section V.C.ii. However, socioeconomic diversity is "not interchangeable with racial diversity when it comes to contributing to a diversity in opinions regarding certain educationally relevant topics." PX119.3 at 6. Pedagogically, racial diversity produces distinct benefits.

51

111.     Moreover, the real-life experiences of UNC students and applicants cannot be accurately captured by focusing solely on socioeconomic status in lieu of race in admissions. For example, Mr. Acosta explained his race is more visibly salient and has often been the source of discrimination, but his low socioeconomic class has not resulted in the same experiences. Tr. 1342:9-17 (Acosta). Without considering those aspects of his identity, UNC would be unable to understand his talents and full life experience. Sealed Tr. 60:10-16 (Acosta).

112.     Indeed, Student-Intervenors uniformly testified that their socioeconomic status is not a reliable substitute for their racial identity. Tr. 884:25-885:2 (Polanco) (describing how there are benefits to both socioeconomic and racial diversity, and how both "can be a marginalized identity, so it's important to consider…both"); Tr. 920:4-921: 4 (Ward) (recalling instances of racism when he was called the n-word both on UNC's campus and abroad, and how "socioeconomics had nothing to do with that" but instead "skin color and race…perceptions and how people see you" regardless of socioeconomic status have powerful effects in social settings); Tr. 1258:6-10 (Brennen) (opining that he does not see much of a link between socioeconomic status and racial identity, sharing that "people don't see me as someone that is relatively affluent; they see me as a black man"); Tr. 1287:211288:2 (Ornelas) (explaining that her socioeconomic status, first-generation college status, and racial identity are all "important parts to getting a full picture" of who she is, and "the way they uniquely intersect…is important"); Tr. 1362:9-1263:8 (Mwamba) (describing her success becoming more socioeconomically mobile, but qualifying that mobility by remarking that "although someone who may be in the same socioeconomic

class…might have had somewhat similar experiences…my racial identity has given me unique perspective and unique life experiences that would not be the same").

113.     Even Mr. Kahlenberg agrees that colleges "seeking to identify talent should consider not only the credentials that a student offers . . . but also what obstacles they've had to overcome" to achieve their record. Tr. 414:1-5 (Kahlenberg). Student-Intervenors all affirmed that they faced distinct obstacles prior to college due to their racial identity, which also allowed them to form particular strengths that they could contribute to UNC's community. *See supra* ¶¶ 24-27.

114.     Additionally, Mr. Kahlenberg's contention that his proposed, mechanical alternatives would achieve "comparable" benefits ignores the many intangible characteristics that UNC seeks in its class—such as perseverance, kindness, and leadership—that are best evaluated through holistic, individualized review. *See supra* ¶¶ 22, 35; *see generally* UNC FOF Section III.B.

115.     Of note, Mr. Kahlenberg agrees that colleges should be able to consider race if there are no viable nonracial alternatives available. Tr. 417:21-23 (Kahlenberg). The record demonstrates UNC does not have workable race-neutral alternatives available. *See supra* ¶¶ 75-114*; see also* UNC FOF Section V.

## III.     PROPOSED CONCLUSIONS OF LAW

116.     Student-Intervenors adopt and incorporate by reference each of Defendants' proposed Conclusions of Law at Sections I-II. ("UNC COL"). Student-Intervenors offer the following Conclusions of Law to complement UNC's submission and underscore

conclusions that are directly supported, in part, by Student-Intervenors' witnesses, evidence, and counsel's cross-examination.

117.    The Court concludes that UNC has satisfied its burden of demonstrating that its admissions process complies with the principles articulated by the Supreme Court in preceding cases and that judgment must issue for UNC on each of the claims. *See, e.g., Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2207-08 (2016) (*Fisher II*) (setting forth controlling principles assessing college admissions affirmative action programs); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (holding that racial classifications must survive strict scrutiny). More specifically, the Court finds that UNC satisfies its burden under the Supreme Court's burden-shifting framework in cases challenging the consideration of race by universities for admissions and denies SFFA any relief on: Count I where SFFA alleged that UNC unlawfully considered race as more than a "plus factor" in admissions; and Count II where SFFA alleged that UNC unlawfully failed to consider race-neutral alternatives that were available, workable, and sufficient.

## A.  Legal Framework

119.    For over forty years, the Supreme Court has recognized the lawfulness of a university's consideration of race and ethnicity as a "plus" factor to further the goal of acquiring the educational benefits of diversity that flow from a diverse student body. *See, e.g., Fisher II*, 136 S. Ct. at 2210 (citation and internal quotation marks omitted) ("a university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity'"); *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 314-15 (1978) (J. Powell, plurality opinion) ("As the interest of

54

diversity is compelling in the context of a university's admissions program," the remaining question is "whether the program's racial classification is necessary to promote this interest.").

120. To be constitutionally permissible under the Equal Protection Clause, racial classifications must pass strict scrutiny; that is, they must be narrowly tailored to achieve a compelling state interest. *Fisher II*, 136 S. Ct. at 2208; *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (*Fisher I*); *Grutter*, 539 U.S. at 326; *Bakke*, 438 U.S. at 299.

121. Importantly, "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause." *Grutter*, 539 U.S. at 327 (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 343-44 (1960)).

## B. UNC's Compelling Interest in the Educational Benefits that Flow from a Diverse Student Body Satisfies Constitutional Principles

122. Universities have a compelling interest in attaining the "substantial, . . . important and laudable" benefits that stem from a diverse educational environment. *Grutter*, 539 U.S. at 330. To pursue racial diversity, a university must offer a "reasoned, principled explanation" for its pursuit of the educational benefits of diversity, and that decision is entitled to deference. *Fisher II*, 136 S. Ct. at 2208 (citation omitted).

123. This interest stems from diversity's numerous benefits within the academic environment and, more broadly, for national progress and welfare. As recently as 2016, the Supreme Court reaffirmed that a diverse student body "'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Id*. at 2210 (quoting *Grutter*, 539 U.S. at 330)

55

(internal quotation marks and alteration omitted). It also facilitates "enhanced classroom dialogue and the lessening of racial isolation. . . ." *Fisher I*, 570 U.S. at 308. These benefits extend beyond the college campus by contributing to the broader goal and "overriding importance of preparing students for work and citizenship" in our extraordinarily diverse society. *Grutter*, 539 U.S. at 331. As Justice Powell reflected over forty years ago in *Bakke*, nothing less than "the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." 438 U.S. at 313 (internal quotation marks and citation omitted).

124. The Supreme Court has further recognized that "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." and that "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332.

125. As noted above, (*supra* ¶¶ 39-42), and as more fully discussed in UNC's Proposed Findings of Fact and Conclusions (UNC FOF Section II), UNC has established convincingly its "reasoned, principled explanation" for its pursuit of the educational benefits of diversity, with the degree and specificity required by the Supreme Court. UNC has further demonstrated that its goals in student body diversity are "sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211 (approving the University of Texas at Austin's goals of "the destruction of stereotypes, the promotion of cross-racial understanding, the preparation of a student

56

body for an increasingly diverse workforce and society, and the cultivation of a set of leaders with legitimacy in the eyes of the citizenry."); UNC FOF Sections II; *see also, supra* ¶¶ 39-42 (such educational benefits are widely recognized by research and can be measured through qualitative and quantitative means).

126.     The overwhelming, uncontradicted evidence also demonstrates that while more work needs to be done, UNC is harnessing the educational benefits that flow from student body diversity, including racial and ethnic diversity. *See supra* ¶¶ 43-65; *see also* UNC FOF Section II.C. These educational benefits are consistent with UNC's goals and the benefits recognized by the Supreme Court, including: enhanced classroom dialogue, the lessening of racial isolation, and the cultivation of leadership. *Id.*

## C.  UNC's Consideration of Race is Legally Permissible and is Not Used as More Than a "Plus Factor" in Admissions, as Alleged by SFFA (Count I)

127.     Narrow tailoring requires the university to show it engages in individualized review, meaning it "ensure[s] that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Fisher I*, 570 U.S. at 309. "To be narrowly tailored, a race conscious admissions program . . . may consider race or ethnicity only as a 'plus in a particular applicant's file,' without 'insulat[ing] the individual from comparison with all other candidates for the available seats.'" *Grutter,* 539 U.S. at 334 (third alteration in original) (quoting *Bakke*, 438 U.S. at 317). The process should employ a "highly individualized, holistic review" which flexibly considers "all pertinent elements of diversity . . . although not necessarily according them the same weight." *Id.* at 309 (citation omitted).

57

128.    As emphasized by the Supreme Court, "[t]he importance of this individualized consideration in the context of a race-conscious admissions program is paramount." *Id.* at 337. "So long as the university proceeds on an individualized, case-by-case basis, there is no warrant for judicial interference in the academic process." *Bakke*, 438 U.S. at 319 n.53 (opinion of Powell, J.).

129.    Race may, however, "make a difference to whether an application is accepted or rejected." *Fisher II*, 136 S. Ct. at 2207.

130.    Courts have recognized that race has been, and continues to be, a unique and integral part of a student's experience. "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters." *Grutter*, 539 U.S. at 333.

131.    The overwhelming evidence demonstrates that UNC considers race in the admissions process in the manner permitted by the Supreme Court. UNC considers each applicant as a whole person, scrutinizing each application through an intensive individualized review that accounts for the full breadth and depth of what the applicant has accomplished, overcome, and would bring to campus. UNC FOF Section III.B.; *see also supra* ¶¶ 22-38. UNC's admissions program is "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Grutter*, 539 U.S. at 334 (quoting *Bakke*, 438 U.S. at 317). Undeniably, race is an important consideration in deciding to admit many talented, highly qualified African

58

American, Native American and Latinx applicants. However, the evidence demonstrates the consideration of race remains an "individualized consideration in the context of [UNC's] race-conscious admissions program" and does not operate as "the defining feature" of applications. *Grutter*, 539 U.S. at 337 (citing *Bakke*, 438 U.S. at 318 n.52).

132.     In addition, evidence submitted by SFFA's expert, Dr. Arcidiacono, shows that—in spite of the flawed analysis described in greater detail in UNC's Proposed Findings of Fact (UNC FOF Section IV.B.ii.)—UNC admitted students from all races and ethnic groups in the "lower" academic tiers, including white students. *See supra* ¶ 38. This further demonstrates to the Court that UNC properly conducts an individualized review of each applicant and considers a panoply of outstanding, competitive qualifications and attributes for each applicant admitted.

133.     Moreover, the record reflects that it is vital for many students of color to discuss their racial identities in their applications to convey, and contextualize, the full breadth of their achievements and future contributions to UNC's campus. *See supra* ¶¶ 24-30. As the Court has seen and heard, race can profoundly influence an applicant's experiences prior to college and formatively impact an applicant's outward perspective. *Id.*

134.     Aside from its flawed and unreliable expert analyses from Dr. Arcidiacono, SFFA presented no evidence—and certainly no convincing evidence—rebutting the substantial evidence from UNC and Student-Intervenors showing that UNC's admissions program does not "insulate [any] individual from comparison with all other candidates for the available seats." *Grutter*, 539 U.S. at 334 (citation and some internal quotation marks omitted). UNC's admissions, instead, reflects an appropriately flexible approach that

59

"consider[s] all pertinent elements of diversity in light of the particular qualifications of each applicant, and [] place[s] them on the same footing for consideration, although not necessarily according them the same weight." *Id.*

### D. UNC Has Considered Seriously and in Good Faith Race-Neutral Alternatives But None are Adequate, Workable, and Sufficient, as Alleged by SFFA (Count II)

135.    A university that seeks to consider race in admissions in pursuit of its compelling interest in student body diversity must also show that "a 'nonracial approach' would not promote its interest in the educational benefits of diversity about as well and at tolerable administrative expense." *Fisher II*, 136 S. Ct. at 2208.

136.    The university need not, however, "exhaust[] … every conceivable race-neutral alternative" to a race-conscious admissions process. *Id.* (internal quotation marks omitted). Its burden is to show "that race-neutral alternatives that are both *available* and *workable* do not suffice." *Id.* (emphases added; internal quotation marks omitted; citation omitted).

137.    Nor must a university "choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups." *Id.* (bracket in original) (quoting *Grutter*, 539 U.S. at 339). A university may deem a race-neutral approach unavailable or unworkable if it would compromise the university's "reputation for academic excellence," or if it would compromise the university's commitment to pursuing "all … aspects of diversity," including aspects other than racial and ethnic diversity. *Fisher II*, 136 S. Ct. at 2213.

#### *i. UNC has Considered Seriously and in Good Faith Race-Neutral Alternatives*

60

138. As reflected above in the Findings of Fact (*supra* ¶ 79) and more specifically in UNC's Proposed Findings of Fact and Conclusions of Law (UNC FOF Section V.), UNC has engaged in "serious, good faith consideration of workable race-neutral alternatives," *Fisher I*, 570 U.S. at 312 (internal quotation marks and citation omitted). UNC's approach to analyzing nonracial alternatives appropriately considers both predicted demographic representation and contextual factors that affect UNC's ability to cultivate such benefits. *See supra* ¶¶ 77-79.

139. Based on its comprehensive and ongoing consideration, UNC has properly determined that other race-neutral alternatives examined would lead to declines in the educational benefits that flow from student diversity, compromise the university's commitment to pursuing all aspects of diversity, and/or place at risk UNC's reputation for academic excellence. UNC FOF Section V.

### ii. SFFA's Proposed Race-Neutral Alternatives are Not Adequate, Workable, and Sufficient and Do Not Properly Consider the Greater Context of UNC's Compelling Interest in Student Body Diversity

140. Eliminating UNC's ability to consider race as proposed by SFFA's race-neutral alternatives would impede UNC's capacity to admit a student body that is diverse across and within racial and ethnic groups, undermining the educational benefits of cross-racial and intra-racial diversity (benefits that SFFA does not dispute).

141. As discussed more fully in UNC's Proposed Findings of Fact and Conclusions of Law (UNC FOF Section V.C.ii.) and above (¶¶ *supra* 80-82, 101-115), Mr. Kahlenberg's examination of potential race-neutral alternatives is both flawed in terms of

61

methodology and the data set relied upon. The Court, therefore, finds Mr. Kahlenberg's testimony and analysis invalid and unreliable.

142. As far back as *Bakke*, the Supreme Court has recognized the important aspects of an admissions process that creates multi-dimensional diversity. 438 U.S. at 314 (recognizing ethnic diversity as "one element in a range of factors a university properly may consider in attaining the goal of a heterogenous student body"). In *Fisher II,* the Supreme Court highlighted the importance of various "intangible" characteristics within a student body which "are incapable of objective measurement but which make for greatness" in a university setting. 136 S. Ct. at 2214 (quoting *Sweatt v. Painter*, 339 U.S. 629, 634 (1950)). The Court concludes that the race-neutral alternatives proposed by SFFA (i.e., percentage plans and socioeconomic-based plans) ignore the Supreme Court's rulings in *Bakke* and elsewhere finding that focusing admissions on single instruments such as class rank "is in deep tension with the goal of educational diversity. . . ." *Fisher II*, 136 S. Ct. at 2213-14 (citing *Grutter*, 539 U.S. at 340) (explaining that percentage plans "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university") (other citation omitted). Mr. Kahlenberg's proposals ignore the tremendous value of diversity within diversity that aligns well with Supreme Court precedent and UNC's educational objectives. *Supra* ¶ 107. Such alternatives would impede UNC's efforts in identifying highly qualified, highly competitive students, including students of color, across a broad range of factors. Forcing UNC to adopt a percentage plan or other race-neutral plan preferred by SFFA that "privileg[es] one characteristic above all

62

others" or shifts greater weight to a certain characteristic (i.e., socioeconomic status) does not adequately capture the essence of a diverse student body envisioned by the Supreme Court. *Fisher II*, 136 S. Ct. at 2213.

143. Mr. Kahlenberg's testimony and analysis were further compromised by his failure to examine how his proposed race-neutral alternatives would impact other contextual factors that are essential to obtaining the benefits of student body diversity. *See, e.g., supra* ¶¶ 75-94. In *Fisher II*, the Supreme Court held that while increasing minority enrollment is "instrumental" to acquiring the educational benefits that flow from student body diversity, a goal cannot and should not "be reduced to pure numbers." 136 S. Ct. at 2210. The Court proceeded with examining the University of Texas at Austin's internal examination of statistical *and* anecdotal data and information related to the educational benefits of diversity. *Id.* at 2211-12. Here, UNC has similarly engaged in several quantitative and qualitative analyses of its own race-conscious program and the impact of other race-neutral alternatives. *See supra* ¶ 79; *see also* UNC FOF Sections V.B., V.C. The record convincingly demonstrates that UNC has satisfied its burden of "proving a 'nonracial approach' would not promote its interest in the educational benefits of diversity 'about as well and at tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208. SFFA, however, failed to present any evidence—beyond proposed, flawed enrollment numbers—measuring or predicting the impact of its proposed race-neutral alternatives on the educational benefits of diversity at UNC.

144. The Court further concludes that the race-neutral alternatives proposed by SFFA do not adequately address the present-day effects of UNC's racially segregative

63

history, which suppress the benefits of diversity by influencing UNC's ability and capacity to recruit, retain, and lessen the racial isolation of Black and other underrepresented students of color. These present-day effects impact student life on campus and exacerbate barriers to achieving meaningful educational benefits of diversity at UNC. *Supra* ¶¶ 85-89.

145.    As noted above, this past history is well-documented in North Carolina's "sordid," "shameful," and "disgraceful" history of state sponsored racial discrimination. *Supra* ¶ 84; *see also* 18 *N. Carolina State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 425, 428, 432 (M.D.N.C. 2016), *rev'd and remanded on other grounds*, 831 F.3d 204 (4th Cir. 2016), *cert. denied sub nom. North Carolina v. N. Carolina State Conference of the NAACP*, 137 S. Ct. 1399 (2017). This history includes the exclusion of African-American and other students of color from UNC. *See* IX002 at 8-19*; see also Adams v. Richardson*, 356 F. Supp. 92, 94 (D.D.C. 1973), *modified and aff'd*, 480 F.2d 1159 (D.C. Cir. 1973); *McKissick v. Carmichael,* 187 F.2d 949, 950-51 (4th Cir. 1951); *Frasier v. Bd. of Trustees of Univ. of N.C.*, 134 F. Supp. 589 (M.D.N.C. 1955), *aff'd mem*. 350 U.S. 979 (1956).

146.    UNC's past history does not stand in isolation. The record is abundantly clear that to this day, issues of race, white supremacy, and the historic legacy of slavery and Jim Crow discrimination continue to pervade UNC's campus environment, impacting the University's ability to harness the educational benefits that flow from student body diversity. *Supra* ¶¶ 85-89; *see also supra* ¶¶ 66-74. Student-Intervenors, for example, testified about the relentless efforts that students of color have engaged in for decades to rename buildings and remove statues that serve as daily reminders to Black and other

64

students of color of racial exclusion, creating a less welcoming environment and exacerbating racial isolation and tokenism. *Id.* SFFA presented no contradictory evidence of how its proposed race-neutral alternatives would address those present-day effects on recruitment and on the educational benefits of diversity at UNC.

147. The Supreme Court has further held that "because universities and in particular, law schools, represent the training ground for a large number of the Nation's leaders. . . the path to leadership must be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 308 (citing, in part, *Sweatt*, 339 U.S. at 634). Although the Supreme Court was reflecting more specifically on the role of law schools, the same principle applies in equal force for large, influential selective state flagships like UNC at both the state and national levels. Eliminating the consideration of race at UNC without a valid, workable, and sufficient nonracial approach would make underrepresented students of color less likely to apply and matriculate to UNC, likely leading to further declines in student of color on UNC's campus and in successive leadership roles in the state of North Carolina and beyond. *Supra* ¶¶ 104, 107-109; *see also supra* ¶¶ 61-65.

148. The Court has scrutinized UNC's examination and consideration of race-neutral alternatives and concludes that the lawful consideration of race and ethnicity as currently practiced by UNC remains necessary and that none of the race-neutral alternatives are available or workable and do not suffice to achieve UNC's educational objectives. *Fisher II*, 136 S. Ct. at 2208.

65

## IV.  CONCLUSION

For the aforementioned reasons and arguments, Student-Intervenors respectfully urge the Court to consider and incorporate the above proposed findings of fact and conclusions of law, declare UNC's admissions practices lawful and constitutional, enter judgment in favor of UNC on Counts I and II, and deny Plaintiff all relief.

Dated: February 5, 2021

Respectfully submitted,

/s/ Jon M. Greenbaum
Jon M. Greenbaum*
David Hinojosa*
Genevieve B. Torres*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Avenue NW, Suite 400
Washington, DC 20005
jgreenbaum@lawyerscommittee.org
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org
Tel: (202) 662-8600

/s/ Jack Holtzman
Jack Holtzman, N.C. Bar No. 13548
Emily P. Turner, N.C. Bar No. 49578
NORTH CAROLINA JUSTICE CENTER
224 South Dawson Street
Raleigh, NC 27601
jack@ncjustice.org
emilyt@ncjustice.org
Tel: (919) 856-2165

/s/ Reed Colfax
Reed N. Colfax*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
rcolfax@relmanlaw.com
larandes@relmanlaw.com

66

Tel: (202) 728-1888

ATTORNEYS FOR DEFENDANT-
INTERVENORS

* *Special Appearance*

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing document via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 5th day of February, 2021.

/s/ Genevieve Bonadies Torres

Genevieve Bonadies Torres
