# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR ADMISSIONS, INC,

Plaintiff,

v.

THE UNIVERSITY OF NORTH CAROLINA et al.,

Defendants.

CASE NO. 1:14-CV-954

**DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 4

I.  SFFA's Argument That Race-Neutral Alternatives Exist Ignores Key
    Components of UNC's Ability to Obtain the Educational Benefits of Diversity ... 4

    A. SFFA Fails to Account for Contextual Factors That Influence the Benefits of
       Diversity ........................................................................................................ 4

    B. SFFA Fails to Account for the Likely Declines in Black, Latinx, and Native
       American Students, the Reduction in Intra-Racial Diversity, and the Associated
       Educational Harms of Such Diminished Diversity ............................................ 8

II. SFFA's Analyses of UNC's Admissions Process Overemphasize Academic
    Credentials Above All Other Qualifications and Misconstrue the Limited Role
    Race Plays in UNC's Admissions Process ............................................................ 12

    A. Dr. Arcidiacono's Descriptive Analysis Incorrectly Overemphasizes Academic
       Qualifications ................................................................................................ 12

    B. Dr. Arcidiacono's Regression Analyses Mischaracterize the Role of Race in
       UNC's Admissions Process and Do Not Support the Conclusion That Race
       Dominates UNC's Admissions Process ........................................................... 16

    C. SFFA's Heavy, and Virtually Exclusive, Reliance on Statistical Analyses and
       Emphasis on Academic Metrics Overlooks and Undervalues Many Characteristics
       That UNC Rightly Values ............................................................................... 19

    D. SFFA's Blanket Assertion That UNC Admits Applicants of Color Who Are Not
       Equipped to Succeed Academically is Irrelevant, Entirely Unsupported by the
       Record, and Discriminatory In and Of Itself .................................................. 21

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                   Pages

*Carlson v. Bos. Sci. Corp.*, 856 F.3d 320 (4th Cir. 2017) ................................................. 23

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988) ...........................22-23

*Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) (*Fisher II*) .....................*passim*

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ...................................................................... 4

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .................................................................*passim*

*Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978) ................................................ 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126 (D. Mass 2019) ................................................. 13, 14

    *Aff'd*, 980 F. 3d 157 (1st Cir. 2020) ................................................................ 13, 14

*Sweatt v. Painter*, 339 U.S. 629 (1950) ............................................................................ 19

Case 1:14-cv-00954-LCB-JLW   Document 250   Filed 03/03/21   Page 3 of 30

# INTRODUCTION

In its seventy-five page Proposed Findings of Fact and Conclusions of Law, Plaintiff Students for Fair Admissions ("SFFA") never once challenges—or even acknowledges—the testimony offered by Defendant-Intervenors' (or "Student-Intervenors") witnesses, experts, and declarants. That testimony described in vivid detail how racial diversity at the University of North Carolina at Chapel Hill ("UNC" or "the University") imparts critical benefits in the classroom and on campus, how more progress is needed to lessen racial isolation and fully realize such benefits, and how UNC's race-conscious policy allowed Student-Intervenors to fully contextualize the breadth of their talents.[1] Their testimony remains unrebutted in the record.

SFFA's complete silence on the actual experiences of students and alumni exposes a fatal flaw underlying their entire case: SFFA ignores the real-world implications of UNC's race-conscious policy and the real people who would be affected if this Court enjoined the policy. Instead, SFFA has built its case around the testimony of two experts—Dr. Arcidiacono and Mr. Kahlenberg—whose opinions are based on flawed statistical models. Student-Intervenors submit this Response to highlight how Student-Intervenors' testimony and evidence, in addition to the ample evidence proffered by UNC, reveal that SFFA's analyses and arguments are based on faulty assumptions that produce distorted

---

[1] For purposes of this brief, "students of color" refers to those students who identify with historically underrepresented and marginalized racial and ethnic groups, including Black, Hispanic, and Native American students. Student-Intervenors use the following terms interchangeably: "Black" and "African American"; "Native American" and "Indigenous"; and "Hispanic" and "Latinx," which is the gender-neutral term for "Latino" or "Latina." Student-Intervenors use the term "white" to mean white/Non-Hispanic.

results, which cannot support the two remaining counts in this case under existing law.

*Section I* discusses how Student-Intervenors' testimony and evidence reveal three fundamental ways that SFFA falls far short of rebutting UNC's conclusion that there are no "race-neutral"[2] alternatives that can achieve the University's educational objectives (Count II). First, SFFA fails to account for the contextual factors that influence diversity's benefits, including UNC's segregative history that has present-day effects on campus. Second, SFFA ignores the likely decline in Black, Latinx, and Native American students applying to and attending UNC if the University stopped considering race as a factor in admissions. Finally, SFFA neglects the value and the foreseeable loss of diversity within each racial group. By comparison, Student-Intervenors' testimony and evidence bolster UNC's conclusion—reached after a comprehensive analysis that appropriately accounts for the student experience, anticipated changes in student behavior, and the real-world experiences of other flagship institutions—that there are no workable nonracial alternatives that would achieve comparable benefits.

*Section II* demonstrates how Student-Intervenors' testimony and evidence illuminate defects in SFFA's claim that race dominates UNC's admissions process in violation of Supreme Court precedent (Count I). Dr. Arcidiacono's analysis overemphasizes academic metrics and undervalues the many "intangible characteristics"— such as motivation, community impact, and overcoming setbacks—that UNC rightly values to cultivate an engaging learning community and train the next generation of

---

[2] This brief uses the term "race-neutral" and "nonracial" interchangeably to refer to policies that do not explicitly consider race.

leaders. Furthermore, the Student-Intervenors and their application files are living proof that UNC's process comports with the hallmarks of individualized review and allows UNC to admit exceptional candidates of all racial backgrounds whose talents might otherwise be overlooked. Finally, SFFA's blanket assertion that UNC admits minority students who are not equipped to succeed at UNC is not only legally irrelevant as this Court held previously in this case—it is also wholly unsupported by the record.

Student-Intervenors' testimony, admissions files, sworn declarations, and expert reports—combined with the substantial evidence offered by UNC's fact and expert witnesses—overwhelmingly demonstrate that SFFA cannot prevail on its claims under established law.[3] This Court should reject SFFA's efforts to upend settled precedent, which recognizes that universities may consider race "to achieve that diversity which has the potential to enrich everyone's education" and ensure "institutions are open and available to all segments of American society, including people of all races and ethnicities." *Grutter v. Bollinger*, 539 U.S. 306, 315, 331-32 (2003) (citation omitted). Such lawful, race-conscious policies are particularly vital for institutions such as UNC, which is making notable strides away from its recent history of racial exclusion and moving towards a more racially inclusive campus whose graduates can bridge divides across North Carolina and the country.

---

[3] *See generally* Defendant-Intervenors' Proposed Findings of Fact and Conclusions of Law ("D-I Br."), ECF No. 246; Defs.' Proposed Findings of Fact and Conclusions of Law ("UNC Br."), ECF No. 245.

# ARGUMENT

## I. SFFA's Argument That Race-Neutral Alternatives Exist Ignores Key Components of UNC's Ability to Obtain the Educational Benefits of Diversity

### A. SFFA Fails to Account for Contextual Factors That Influence the Benefits of Diversity

SFFA's argument that UNC has numerous available, "workable race-neutral alternatives" hinges on its contention that Mr. Kahlenberg has "identified 6 different simulations that would work 'about as well'" as UNC's holistic, race-conscious policy. Plaintiff's Proposed Findings of Fact and Conclusions of Law ("SFFA Br.") ¶¶ 320, 322, ECF No. 247. None of Mr. Kahlenberg's six simulations rebuts UNC's conclusion that there are no nonracial alternatives available. In addition to the multifarious defects described by UNC (UNC Br. ¶¶ 232-258), Student-Intervenors demonstrate a glaring flaw in Mr. Kahlenberg's conclusory analysis: he completely fails to account for contextual factors that impact the real-world benefits flowing to students. *See* IX001[4] at 6-7, 20-21; D-I Br. ¶¶ 80, 106-108.

The Supreme Court has emphasized that "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause." *Grutter*, 539 U.S. at 308, 327 (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 343-44 (1960)). Qualitative and quantitative considerations guide the viability of admissions plans to achieve a university's educational objectives. While increasing numerical representation is "instrumental" to acquiring the benefits that flow from student body diversity, a goal cannot and should not

---

[4] Student-Intervenors' exhibits appear as both IX### (Trial Exhibit List) and DI### (labels for exhibits). This brief uses IX###.

4

"be reduced to pure numbers." *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210 (2016) (*Fisher II*). Indeed, *Fisher II* upheld the University of Texas at Austin's race-conscious program after examining both "demographic data" and "anecdotal evidence" showing African American and Hispanic students "experienced feelings of loneliness and isolation." *Id.* at 2211-12; *see also Grutter,* 539 U.S. at 318, 343-44 (affirming a university's interest in cultivating a level of representation "that encourages underrepresented minority students to participate in the classroom and not feel isolated.").

UNC recognizes that when evaluating its ongoing need to consider race in the admissions process, "numbers are a part of it. But … [another] critical piece is the context of the institution and the interactions that are ongoing" among students on campus. Tr. 868:9-869:7 (Panter). UNC, therefore, has appropriately adopted a comprehensive framework that considers both predicted demographic representation and contextual factors that affect its ability to cultivate the benefits of diversity it desires. *See* DX054; UNC Br. Section V.B. (outlining the range of measures used to evaluate the availability of race-neutral alternatives, including considering outcomes at similar institutions employing such alternatives, conducting simulations, and creating subcommittees to analyze important conditions, including "the student experience").

In contrast, SFFA ignores the importance of contextual factors and instead advances

Case 1:14-cv-00954-LCB-JLW   Document 250   Filed 03/03/21   Page 8 of 30

purely numerical arguments based on Mr. Kahlenberg's flawed simulations.[5] Of significance, SFFA omits any discussion of key evidence presented by Student-Intervenors at trial, including the particular sociohistorical context of the University and how it impacts UNC's ability to harness the educational benefits of diversity. *See, e.g.,* SFFA Br. ¶¶ 240-66, 317-328.

It is uncontested that North Carolina has a pernicious history of state-sponsored racial discrimination, which includes excluding African-American and other students of color from UNC. IX002 at 8-25; D-I Br. ¶ 84. Even after UNC was forced to admit students of color, its leadership turned a blind eye to the discrimination experienced by those same students once admitted. D-I Br. ¶ 84 (citing IX002 at 8-13; Tr. 901:13-18, 903:3-23 (Ward) (describing experiences with racism on campus in the early 1980s); IX013 ¶ 9 (Dyer) (recalling the prevalence of confederate flags on campus in the 1980s); IX015 ¶ 10 (Zeigler) (recounting being treated as a "maid" and "domestic" by white classmates); IX016 ¶ 10 (Parker) (describing casual use of racially derogatory language); IX017 at ¶ 7 (Hayes) (same)).

SFFA fails to address the unrebutted evidence that UNC's shameful history does

---

[5] The numerical results of Mr. Kahlenberg's simulations form the core of SFFA's arguments that viable race-neutral alternatives exist. SFFA Br. ¶¶ 240-266, 322-328. SFFA does make two passing references to how "academic research" highlights additional steps UNC could take to increase diversity. SFFA Br. ¶¶ 238, 325 n. 10. But UNC's expert Professor Hoxby empirically evaluated these additional strategies and found that none would achieve the same levels of diversity or academic preparedness. *See* UNC Br. ¶¶ 228-231. SFFA offered no countervailing empirical analysis. SFFA's minimal discussion of prevailing research further demonstrates how SFFA has built its case around numbers and manipulated statistics.

6

not stand in isolation. Though UNC has recently publicly rejected its prior legacy of racial discrimination and has made some progress in removing and renaming confederate relics (IX001 at 49, 51-52), Student-Intervenors' testimony and experts' analyses demonstrate that UNC's historical context has present-day manifestations that make students of color feel unwelcome on UNC's campus and that hinder UNC's ability to harness the educational benefits of diversity. *See* D-I Br. ¶¶ 85-88; Tr. 1304:16-1305:8 (Wingate-Bey) (explaining that having to walk past UNC's "racist wallpaper…every day adds to that feeling of not being valued on campus"); Tr. 1330:13-1331:13, 1332:12-1333:6 (Watson) (describing how "white supremacists came to the campus wielding guns to defend the [confederate] statue" and "terrorize" Black students); Tr. 881:15-882:20 (Polanco) (explaining that the physical relics of UNC's confederate past are a "constant reminder of the [University's] history and legacy" of racial exclusion). As Student-Intervenors' diversity expert Dr. Uma Jayakumar opined: UNC is moving in the right direction, but "[i]t will take time and continued effort to increase the University's capacity for ensuring a healthy climate for dynamic diversity that enables the type of educational benefits all UNC students will need to excel." IX001 at 68.

Student-Intervenors testified that UNC's race-conscious policy helps to counteract the lingering effects of UNC's legacy of exclusion by impacting their perception of UNC as welcoming to underrepresented minority students. D-I Br. ¶ 94. Ms. Hanna Watson explained that UNC's consideration of race in admission indicated to her that the University "care[d] about [applicants] as whole people." Tr. 1315:14-23 (Watson). If UNC had not considered race, she would have found it "off-putting" and it "would have made

[her feel] unwelcome at the university." Tr. 1315:14-1316:3 (Watson). Ms. Star Wingate-Bey similarly expressed that if UNC stopped considering race in admissions it would send a message that people of color "aren't valued for the specific cultural experiences that [they] bring to UNC." Tr. 1304:4-13 (Wingate-Bey).

SFFA provides no argument as to how UNC could adequately address the impact of adopting a race-neutral admissions policy given its specific sociohistorical context; nor does SFFA acknowledge the importance of visible efforts to promote racial diversity—such as race-conscious admissions policies—that can signal an inclusive environment to prospective students of color at an institution that has historically excluded and alienated such students. *Cf. Grutter*, 539 U.S. at 332. (observing that "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.").

### B. SFFA Fails to Account for the Likely Declines in Black, Latinx, and Native American Students, the Reduction in Intra-Racial Diversity, and the Associated Educational Harms of Such Diminished Diversity

By ignoring contextual factors, SFFA's heavy reliance on mathematical simulations (which are fraught with methodological errors, *see* UNC Br. Section IV.B.ii.) critically underestimates the likely declines in the number of Black, Latinx, and Native American students applying to and attending UNC, and the reduced diversity within each ethnic group.

As a preliminary matter, some of SFFA's simulations show a decline in underrepresented minority students. *See, e.g.*, Tr. 482:20-483:24, 482:20-484:24 (Kahlenberg) (observing a 10% drop in Hispanic students and a 50% drop in Native

8

American students under simulation 9). But even those simulations that, on their face, reflect no decline in underrepresented minority students are neither "workable" nor credible for at least three reasons.

First, Mr. Kahlenberg's mathematical simulations overestimate the number of underrepresented minority students who would apply to UNC. As discussed above, Student-Intervenors presented uncontested evidence that UNC's race-conscious admissions policy encourages enrollment among students of color. *Supra* Section I.A. Unrebutted evidence likewise reflects that bans on affirmative action admissions policies at other comparable state universities have had a "discouragement effect" that reduces applications from students of color. IX001 at 33. Dr. Caroline Hoxby explained that after California and Texas ended their race-conscious policies, students who were previously favored by the prior policy—Black and Hispanic students—applied at lower rates. Tr. 988:6-20, 1002:25-1003:4 (Hoxby); *see also* DX054 at 33 ("studies have generally suggested that schools which eliminate the use of race or ethnicity have tended to experience declines in applications from underrepresented students."); D-I Br. ¶¶ 90-94 (testimony confirming the elimination of race-conscious admissions will reduce applications from underrepresented minority students); Sealed Tr. 50:25-51:3 (Ornelas) ("I would have reconsidered if I were to apply to UNC at all" because a ban on considering race would indicate "the university isn't interested in how I identify.").

SFFA wrongly assumes no underrepresented student of color will leave the applicant pool if UNC stops considering race. *See, e.g.*, Tr. 478:13-479:3, 484:17-486:16, 488:3-6 (Kahlenberg) (describing simulations 8, 3, and 13, which presume no one joins the

9

applicant pool, or leaves the applicant pool); Tr. 480:23-482:18, 478:10-21, 478:22-479:20 (Kahlenberg) (presuming 100 percent of eligible high schoolers would apply); Tr. 478:3-11, 481:19-482:2 (Kahlenberg) (conceding both assumptions highly unlikely).[6] The mathematical simulations on which SFFA relies, therefore, substantially inflate the projected share of Black, Latinx, and Native American students admitted under each race-neutral alternative. Consequently, SFFA's proffered exemplar "alternatives" fail to account for the real-world impacts of such policies on diversity at UNC.

Second, SFFA fails to address the cumulative negative impact that a decline would have on UNC's ability to compete for and retain talented Black, Latinx, and Native American students. SFFA does not rebut evidence showing a drop in diversity would likely trigger a downward spiral in representation since students of color play a crucial role in UNC's ability to recruit and retain other underrepresented minority students. D-I Br. ¶ 59, 108; *see also* Tr. 919:10-23 (Ward) (observing, based on decades of experience working with college-bound youth, that students of color would be less inclined to attend UNC if the number of underrepresented minority students decreased on UNC's campus); Sealed

---

[6] UNC's expert Professor Hoxby also offered simulations where she presumed no underrepresented minority student would leave the applicant pool in order to maximize the success of the race-blind alternative. Tr. 988:6-20, 1002:25-1003:4 (Hoxby). Unlike Mr. Kahlenberg, however, Professor Hoxby recognized this approach inflates the race-neutral simulation's projected number of admitted minority students. Tr. 988:1-989:19 (Hoxby). She emphasized that her findings should be interpreted as applying very favorable presumptions. Tr. 988:1-989:19 (Hoxby). Moreover, UNC's comprehensive analysis relies not only on Dr. Hoxby's analysis but also on the opinions offered by Dr. Long and UNC's committees evaluating race-neutral alternatives, who have collectively considered both quantitative and qualitative data and research. *See* UNC Br. Sections V.A., V.B., ¶¶ 210, 217, 219, 235-36, 238, 240-43.

Tr. 38:8-18 (Polanco) (seeing other Latinx students was "important" in convincing her to attend UNC).

Third, the simulations fail to account for the foreseeable loss of diversity within each racial group (or "intra-racial diversity"), and the associated reduction of the benefits of diversity. It is all but certain that UNC would experience diminished intra-racial diversity if the University switched from an entirely holistic process to a process that mechanically applies socioeconomic "boosts" or automatically admits students solely based on particular numerical metrics such as test scores, grade point average, or formulaic application of UNC's ratings. Student-Intervenors, Dr. Jayakumar, and UNC all affirmed that having diversity within each racial group is crucial for enriching the educational environment and breaking down preconceived stereotypes. D-I Br. ¶¶ 50-51; *see also* DX003 at 3 ("difference within difference[] is a crucial component" of UNC's ability to extend the educational benefits of diversity). By failing to provide similarly high levels of intra-racial diversity, SFFA's proffered race-neutral alternatives would likely further reduce the educational benefits flowing to students and inhibit UNC from meeting its educational objectives.

Altogether, SFFA is wrong to suggest Mr. Kahlenberg's simulations definitively prove the existence of workable nonracial alternatives. *See* SFFA Br. ¶ 322. Rather, the likely decline in the number of Black, Latinx, and Native American students on UNC's campus—and the reduced diversity within each group—under such alternatives would significantly lessen the educational benefits flowing to students, and further exacerbate the levels of racial isolation, tokenism, and stereotyping already felt by UNC's

underrepresented minority students.[7] *See* Tr. 883:6-23 (Polanco) (explaining that a reduction in Black and Latinx students would be "harmful for the student body" because there are such "limited numbers [of students of color] already"); Tr. 1303:13-1304:3 (Wingate-Bey) (noting that a decline would harm "all…aspects" of campus life from the social interactions, to the educational setting, to the learning environment); *see also* D-I Br. ¶¶ 43-49, 59-60, 62-65.

## II. SFFA's Analyses of UNC's Admissions Process Overemphasize Academic Credentials Above All Other Qualifications and Misconstrue the Limited Role Race Plays in UNC's Admissions Process

### A. Dr. Arcidiacono's Descriptive Analysis Incorrectly Overemphasizes Academic Qualifications

SFFA relies nearly entirely on the statistical analyses of Dr. Arcidiacono to support its claim that race unlawfully dominates UNC's admissions process. Dr. Arcidiacono offers both a descriptive analysis and a regression analysis (SFFA Br. ¶¶ 99, 109-173), neither of which is persuasive. In addition to the shortcomings articulated by UNC (UNC Br. ¶¶ 126-146), SFFA's statistical case is pervasively marred by incorrect presumptions, which result in distorted statistical outcomes and unsupported conclusions.

First, SFFA leans heavily on Dr. Arcidiacono's descriptive analysis that wrongly presumes academic metrics determine who is worthy of admission. SFFA makes the

---

[7] To the extent SFFA argues that socioeconomic diversity could counteract losses due to racial diversity, (*see, e.g.*, Tr. 415:1-9, 429:10-13; SFFA Br. ¶¶ 327-28), SFFA fails to address the unrebutted evidence put forth by Student Intervenors' witnesses, who uniformly testified that their socioeconomic status is not a reliable substitute for their racial identity. D-I Br. ¶¶ 111-112 (citing Tr. 1342:9-17 (Acosta); Sealed Tr. 60:10-16 (Acosta); Tr. 884:25-885:2 (Polanco); Tr. 920:4-921:4 (Ward); Tr. 1258:6-10 (Brennen); Tr. 1287:211288:2 (Ornelas); Tr. 1362:9-1263:8 (Mwamba)).

blanket assertion that white and Asian American applicants have "substantially stronger qualifications" because they, on average, have "higher GPAs, class ranks, and standardized test scores" than their Black, Hispanic, and Native American peers. SFFA Br. ¶ 113. SFFA continues to myopically focus on academic metrics by relying on Dr. Arcidiacono's "academic decile" analysis—a calculation based entirely on SAT scores and grades, which UNC has never used (*see* D-I Br. ¶ 37)—whereby he rank-orders students by decile, demographic group, and admission rates. Based on this decile analysis, SFFA assumes that "cross-racial differences" in admitted students' SAT scores and grades imply that white and Asian American students are more deserving of admission. SFFA. Br. ¶¶ 123-135.

But the courts have already rejected similar efforts to reduce an applicant's qualifications to narrow, numerical metrics such as grades, class rank, and test scores. In *Fisher II*, the Supreme Court observed: "Class rank is a single metric, and like any single metric, it will capture certain types of people and miss others." 136 S. Ct. at 2213. More recently, the District Court of Massachusetts upheld Harvard's race-conscious admissions policy by observing that Dr. Arcidiacono's academic decile analysis "likely over emphasizes grades and test scores and undervalues other less quantifiable qualities and characteristics that are valued by Harvard and important to the admissions process." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 165 (D. Mass. 2019), *aff'd*, 980 F.3d 157 (1st Cir. 2020). The district court further noted that every admitted student is "academically prepared" and has a "similar level of academic potential," even though the record showed significant differences in demographic groups' average SAT scores and high school grades. *Id.* at 199.

13

The same conclusion should be reached here.

The evidence in this case further bears this out. While standardized test scores and grades bear some importance to UNC's admissions process, UNC rightly contextualizes such scores based on the applicant's background, which shapes educational opportunities and a student's ability to obtain high scores. Student-Intervenors' witnesses explained how race-based barriers to test preparation and supportive educators can suppress the scores of equally talented students of color who are capable of thriving on UNC's campus. D-I Br. ¶¶ 31-35. For example, Mr. Kenneth Ward, who has worked extensively providing academic mentorship to high school students applying to college (D-I Br. ¶ 8), testified that students attending predominantly white, affluent schools perform better on standardized tests—as compared to their equally talented peers attending predominantly minority schools—because of their greater access to test preparation courses that boost scores by 200 or 300 points. D-I Br. ¶ 31 (citing Tr. 897:12-898:1, 918:1-918:11). Mr. Luis Acosta similarly described how despite earning lower SAT scores (due, in part, to growing up in immigrant family with limited resources and knowledge about the test), his strong work ethic allowed him to excel in UNC's pre-med program while some of his higher-scoring white peers dropped out. D-I Br. ¶¶ 31, 33 (citing Tr. 1345:9-1346:10; Sealed Tr. 64:20-65:9 (Acosta)).

Even SFFA's own expert Mr. Kahlenberg testified that the strength of a student's "essays, their grades, their SATs, [and] their extracurriculars" should be viewed in light of "what obstacles they've had to overcome in life to achieve that record." Tr. 414:1-6 (Kahlenberg). Mr. Kahlenberg reflected that lower SAT scores can be even more

14

"remarkable" when students have "had to overcome more obstacles." Tr. 429:22-430:3 (Kahlenberg).[8]

If anything, Dr. Arcidiacono's academic decile analysis shows UNC's admissions process comports with the hallmarks of individualized review. In *Grutter,* the Supreme Court observed that evidence that Michigan Law School "accepts nonminority applicants with grades and test scores lower than underrepresented minority applicants (and other nonminority applicants) who are rejected" provided probative proof that the Law School engages in the type of holistic, race-conscious review permitted by the Constitution. 539 U.S. at 309. Here, too, Dr. Arcidiacono's decile analysis shows UNC admits many white students with relatively low grades and test scores, and rejects many underrepresented minority students with relatively high grades and test scores. D-I Br. ¶¶ 38, 132 (citing Tr. 370:4-371:18; 371:23–372:3(Arcidiacono)). As in *Grutter,* this pattern of admission corroborates the individualized nature of UNC's admissions process, not undue preferences as SFFA suggests.

---

[8] Indeed, SFFA's heavy-handed emphasis on SAT scores as a benchmark for "stronger qualifications" while discussing race as a "plus" factor (*e.g.* SFFA Br. ¶ 113), notably contradicts Dr. Kahlenberg's own arguments that certain race-neutral alternatives are "workable" despite declines in average SAT scores. *See, e.g.,* Tr. 448:2-3 (Kahlenberg). While Mr. Kahlenberg's analyses are flawed for the reasons discussed in UNC's and Student-Intervenors' Proposed Findings of Fact and Conclusions of Law (UNC Br. ¶¶ 232-258; D-I Br. ¶¶ 80-81, 106-109, 110-115), this inherent contradiction further undermines the credibility of SFFA's claim that minority students with lower SAT scores are less qualified for admission.

### B. Dr. Arcidiacono's Regression Analyses Mischaracterize the Role of Race in UNC's Admissions Process and Do Not Support the Conclusion That Race Dominates UNC's Admissions Process

SFFA concedes that its descriptive analysis is insufficient proof on its own and offers Dr. Arcidiacono's regression analyses to "reveal the effect of race on UNC's admissions decisions." SFFA Br. ¶ 136; Tr. 162:16-19 (Arcidiacono). But Dr. Arcidiacono's regression analyses fare no better for the numerous reasons outlined in UNC's Findings of Fact and Conclusions of Law. UNC Br. ¶¶ 126-140. Student-Intervenors provide illustrative examples of two of the defects identified by UNC.

First, Dr. Arcidiacono's "transformational analyses" (SFFA Br. ¶¶ 142-150) are not credible because, as UNC points out (UNC Br. ¶ 134), it is unrealistic to assume that an applicant's race and ethnicity can be turned "on" or "off" without any other factors in the applicant's file changing. Student-Intervenors directly illustrate this point, testifying how their racial identity impacted their access to academic resources, (D-I Br. ¶¶ 31-33); the perspectives they shared in their essays, (D-I Br. ¶¶ 24-25); and the skill sets and passions they developed and carried to college (D-I Br. ¶¶ 26-27). As Mr. Andrew Brennen testified, "every experience that [he] had prior to college was informed by the color of [his] skin, and so [his] perspective going into college was similarly so," motivating him to write his college essay about his Black skin and the stereotypes he overcame. D-I Br. ¶ 25 (citing Sealed Tr. 45:21-24; Tr. 1257:6-8). Ms. Laura Ornelas similarly expressed that her racial identity could not be disaggregated and separated from her other identities, as Dr. Arcidiacono's transformation analysis purports to do. Tr. 1288:10-16 (Ornelas). In her words: "[a]ll my identities uniquely intersect in the way that I've grown up and the way

16

that I've experienced the world." *Id.*

Second, SFFA wrongly collapses the meaningful distinction between race playing a *determinative* role—which is permitted under current case law—versus it playing a "defining" or "dominant" role, which is prohibited. Even if Dr. Arcidiacono's regression analyses are taken at face value (in spite of a myriad of statistical flaws, *see* UNC Br. ¶¶ 126-140), his four self-touted statistical methods merely show that race makes a difference in admitting Black and Hispanic applicants. There is nothing suspect about such an outcome; in fact, to be "necessary," a race-conscious program *must* meaningfully tip the scales for underrepresented minority applicants. In *Regents of Univ. of Calif. v. Bakke*, Justice Powell approvingly discussed Harvard's race-conscious admissions policy knowing that when the admissions committee reviews competing applicants "deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor." 438 U.S. 265, 323 (1978).

Similarly, in *Grutter* the Supreme Court upheld Michigan Law School's race-conscious program after noting that ending race-conscious admissions would reduce the number of admitted minority students by roughly 70%. 539 U.S. at 320 (explaining minority students in the admitted class would drop from 14.5% to 4%, a nearly 70% drop); *see also id.* at 339 (rejecting argument that a race-conscious policy is unlawful simply because "race is likely outcome determinative for many members of minority groups"). Likewise, in *Fisher II*, the Supreme Court upheld the University of Texas at Austin's race-conscious program, in part, because it meaningfully increased the proportion of admitted Hispanic and African American students by 54% and 94% respectively. 136 S. Ct. at 2212.

17

This is not to suggest that Dr. Arcidiacono's overblown marginal effects should be accepted at face value. Indeed, Dr. Hoxby's analysis shows that race does not play an outsized role: other characteristics such as standardized test scores explain more about the variation in admissions outcomes than race does. UNC Br. ¶¶ 120-21. But as these cases reflect, SFFA is flatly wrong to suggest (SFFA Br. ¶ 310) that alleged large marginal effects are functionally equivalent to automatic bonuses, which are unconstitutional. Rather, such marginal effects, even if true (which they are not), merely indicate how any relevant trait—whether race, or geography, or socioeconomic status, or artistic ability—can make the ultimate difference in a highly competitive, holistic process such as UNC's admissions.

Student-Intervenors provide concrete examples of how a student's race might be outcome "determinative," without being the "defining" or dominant feature of an application. As discussed in Student-Intervenors' Findings of Facts (D-I Br. ¶ 26), Mr. Acosta discussed in his application essay how the racial slurs that he faced as a Mexican American deepened his commitment "to not judge another by their color or any difference" and motivated him to "promot[e] cross-racial friendships at the Boys & Girls Club" where he volunteered. *Id*. His application file shows that the admissions officer commented on the broad spectrum of Mr. Acosta's strengths, consistent with a review process that employs a "highly individualized, holistic review" which flexibly considers "all pertinent elements of diversity . . . although not necessarily according them the same weight." *Grutter,* 539 U.S. at 309 (citation omitted); *compare* D-I Br. ¶ 36 (citing IX030 at 41). There are comments about Mr. Acosta's supportive recommendations, leadership, relatively lower test scores, and lower-income status, among other factors. Alongside these

18

varied considerations, the admissions officer notes that Mr. Acosta would "add diversity" to UNC, an observation likely drawn from Mr. Acosta's own essays discussing his racial identity and commitment to cross-cultural friendships. D-I Br. ¶ 36 (citing IX030 at 41). Mr. Acosta's file, along with the additional files submitted by Student-Intervenors and UNC, illuminate the stark disconnect between Dr. Arcidiacono's models and how UNC's highly individualized process works in practice.

### C. SFFA's Heavy, and Virtually Exclusive, Reliance on Statistical Analyses and Emphasis on Academic Metrics Overlooks and Undervalues Many Characteristics That UNC Rightly Values

SFFA's statistical case suffers from the fact that it routinely ignores—and, at times, outright disparages—the many characteristics that are highly valued in UNC's admitted class. For example, SFFA's discussion of Dr. Arcidiacono's descriptive statistics summarily dismisses the fact that, on average, Black, Hispanic, and Native American students receive high ratings on character attributes that reflect "motivation," "impact on community," "overcoming obstacles," and "talent for building bridges across divisions…[and] different backgrounds." SFFA Br. ¶¶ 20, 115, 119. But SFFA is wrong to downplay the importance of such characteristics. As the Supreme Court has recognized, "intangible" attributes—such as leadership and cross-cultural diversity—may be less capable of "objective measurement…but make for greatness" in cultivating engaging campus communities and training the next generation of leaders. *See Fisher II*, 136 S. Ct. at 2214 (quoting *Sweatt v. Painter*, 339 U.S. 629, 634 (1950)).

SFFA's statistical analyses likewise fail to account for many background factors that are "unobservable" to a statistician but observable to admissions officers. Dr. Hoxby's

19

robust statistical analysis showed such "unobservable" attributes play an important role in UNC's process whereby an admissions officer "is looking at the whole application, looking over…the essays, the letters, the personal statement, the context for the student." UNC Br. ¶ 116. As Dr. Hoxby opined, UNC's comprehensive, holistic assessment cannot be fully captured by statistical modeling; her own preferred model predicts outcomes less than half the time. *Id.*

Student-Intervenors illustrate how "unobservable" attributes can provide UNC with critical information about who can best advance the University's mission of "serv[ing] as a center for research, scholarship, and creativity" and training the "next generation of leaders" who reflect North Carolina's diversity. *See* D-I Br. ¶ 39. For example, Ms. Ornelas testified that her high school rank, grades, and test scores alone did not adequately reflect what she offered as an applicant and community member. Tr. 1280:17-23 (Ornelas). Ms. Ornelas's recommenders—whose comments are unobservable in Dr. Arcidiacono's model—spoke about Ms. Ornelas's "great patience and incredible work ethic," her ability to successfully navigate multicultural environments, and how Ms. Ornelas "adds so much to our school [community] in and out of the classroom." IX029 at 13, 33.

Holistic review of "unobservable" background factors can also better contextualize quantifiable factors. While Ms. Ornelas fell outside the top 10% of her class, her 4.6 GPA becomes far more impressive when viewed beside her part-time employment throughout high school to help financially support herself and independently navigate UNC's application process as a first-generation college student. IX029 at 44; Tr. 1277:14-1280:4 (Ornelas). Indeed, UNC's judgment that Ms. Ornelas would advance its mission bore out.

20

Once admitted, Ms. Ornelas thrived and actively contributed to the surrounding community as a Co-Director for UNC's Scholars' Latino Initiative, providing support to other first-generation Latinx families. Tr. 1284:3-1285:18 (Ornelas). As a graduate, Ms. Ornelas strengthened UNC's pipeline programs by serving in the Carolina Advising Corps where she provided college advising to students attending a predominantly low-income, minority high school in Charlotte, North Carolina. Tr. 1289:6-18 (Ornelas). Today, Ms. Ornelas remains professionally committed to supporting other low-income students of color navigate the higher education system and achieve greater educational opportunities. Tr. 1289:25-1290:9 (Ornelas). Ms. Ornelas exemplifies the type of exceptional student who is at risk of being severely undervalued by Dr. Arcidiacono's statistical models that only consider the narrow slice of "observable" characteristics and overemphasize academic metrics.

### D. SFFA's Blanket Assertion That UNC Admits Applicants of Color Who Are Not Equipped to Succeed Academically is Irrelevant, Entirely Unsupported by the Record, and Discriminatory In and Of Itself

In a last-ditch effort to suggest race predominates UNC's admissions process, SFFA's post-trial brief baldly asserts UNC's race-conscious policy admits underrepresented minority applicants who are not "equipped to succeed" at UNC. *See* SFFA Br. ¶¶ 88-93, 282-83. SFFA's "mismatch" assertion has no place in this case: the argument is legally irrelevant, unsupported by the record, and premised on SFFA's faulty theory that underrepresented students of color—no matter their outstanding talents—are not worthy of accessing North Carolina's flagship institution.

To begin, SFFA's argument that UNC admits minority students who are unprepared

21

to succeed at UNC has no legal relevance to the claims at issue, as already determined in these proceedings. Magistrate Judge Webster already reached this relevancy determination when denying SFFA's motion to compel discovery on "student preparedness and performance data for the 2011-17 admissions cycles." Order Granting Plaintiff's Motion to Compel Production of Applicant Data and Denying Plaintiff's Motion to Compel Documents and Data Regarding Student Preparedness and Performance, ECF No. 101 at 2 (citing ECF No. 87 at 1). SFFA argued such data was relevant to "'to explore . . . whether UNC's use of race in the admissions process results in the admission of underrepresented minority ("URM") students who struggle academically because they are unprepared or underprepared for the academic rigors of UNC.'" *Id.* at 9 (quoting ECF No. 87 at 2). Judge Webster rejected this argument for three reasons. First, he observed that such evidence "is not relevant" for SFFA's claims, which turn on whether applicants were treated unequally in admission "at the time of the decision—not enrolled student performance." *Id.* at 10. Second, Judge Webster observed that the governing cases involving race-conscious admissions do not "reference, cite, or even acknowledge student performance, retention rates, or graduation rates" in the majority opinions. *Id.* (citing *Fisher II,* 136 S. Ct. at 2212). Third, Judge Webster reasoned that analyzing post-admissions data falls outside the scope of the admissions office's core responsibilities, which is tasked with evaluating an applicant's "scholastic promise" at the time of admission, not college outcomes. *Id.* at 10. SFFA did not appeal Judge Webster's ruling that evidence related to "mismatch" was irrelevant. Thus, the law of the case controls here. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("when a court decides upon a rule of law, that

22

decision should continue to govern the same issues in subsequent stages in the same case.")
(citation omitted); *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (same)
(citation omitted). Even if this Court determines the law of the case doctrine is inapplicable,
it should reach the same conclusion: post-admission performance does not bear on the
legality of UNC's admissions process.

Setting serious relevancy concerns aside, SFFA provides no concrete support for its
assertion that UNC's consideration of race results in the admission of underprepared
minority students. SFFA's cited evidence merely reflects (outdated) statistics showing
demographic differences in average GPA and graduation rates. *See* SFFA Br. ¶ 88 (citing
PX112 at 18-19; PX104 at 36-37). But SFFA never links such differentials to UNC's
consideration of race in admission.[9] In fact, SFFA's cited evidence reaffirms that the
University is investing resources into closing opportunity gaps and fostering an
environment where all admitted students can thrive. SFFA Br. ¶¶ 88, 91 (citing PX112 at
18-19 (diversity plan discussing efforts to support and retain minority students); PX104 at
36-37 (retention study evaluating approaches to foster student success); and PX105 at 10
(report examining methods to support underrepresented minority male students)). The cited
evidence also reaffirms the importance of cultivating greater levels of diversity on UNC's
campus, not eliminating a policy that enhances same-race support networks. UNC
ultimately recommends that to improve graduation rates, UNC should "[e]xpand cultural

---

[9] Indeed, SFFA recognized as much at trial when its counsel attested SFFA would not
introduce any opinion testimony about mismatch. Tr. 121:11-19 (McCarthy) ("we don't
intend to have Professor Arcidiacono draw any conclusions about this [mismatch] at
all . . . . No conclusions.").

and co-curricular programs that promote smaller communities, cultural identity, and a sense of belonging in the greater Carolina community." PX104 at 8. Similarly, UNC's Minority Male Report (also cited by SFFA Br. ¶ 91) concludes that UNC can better support underrepresented minority ("URM") male students by "strengthen[ing]…efforts to attract and recruit URM male students" because "[i]ncreasing URM male presence and other forms of diversity on our campus enhances the academic and co-curricular experiences of all students." PX105 at 12. Dr. Jayakumar's synthesis of social science research further shows how racial diversity is associated with higher levels of retention and improved academic skills. IX001 at 4-5.

Student-Intervenors further expose the hollowness of SFFA's blanket assertion that UNC's race-conscious policy results in the admission of underrepresented minority students who allegedly "struggle academically." SFFA Br. ¶ 282. All of the Student-Intervenor witnesses testified it was important for UNC to consider their race when evaluating their applications and the distinct perspectives they would bring to campus. D-I Br. ¶¶ 24-27. Once admitted, these same individuals thrived academically and became proud graduates of UNC contributing to North Carolina and beyond. Among the many examples: Ms. Mwamba graduated as an Honors Laureate with distinction and works as a Research Fellow at the Duke Global Health Institute, Tr. 1356:15-18 (Mwamba); Ms. Watson received the Robert B. House Memorial Prize in poetry, Tr. 1312:11-15 (Watson); Mr. Acosta relied on his strong "work ethic" to achieve success in UNC's pre-med program and earn admission in UNC's medical school, Tr. 1336:18, 1346:10-22 (Acosta); Mr. Brennen had professors thank him for the comments he raised in class, and now serves as

24

an Education Fellow at National Geographic, Tr. 1255:1-3, 1264:11-14 (Brennen); Ms. Wingate-Bey felt "very prepared" for the rigors of UNC and earned all As in her freshman year, Tr. 1294:15-25 (Wingate-Bey); Ms. Ornelas became a more confident and outspoken student at UNC, and has risen within the field of student services and advising, Tr. 1282:24-1283:23, 1289:1-3, 1290:1-9 (Ornelas); Mr. Ward eagerly embraced UNC's academic rigor and currently serves as the Executive Director of College Bound, Tr. 888:7, 907:4-15 (Ward); and Ms. Polanco became a member of the Order of the Golden Fleece, UNC's highest honorary society, Tr. 872:16-17 (Polanco). *See also* D-I Br. ¶¶ 4-10, 62-63 (describing honors at UNC and post-graduation careers and leadership).

Student-Intervenors' evidence corroborates the testimony of Stephen Farmer, UNC's Vice Provost for Enrollment and Undergraduate Admissions, that the students of color enrolling at UNC "are incredible students" who are equipped to flourish at the University. Tr. 570:2-6, 667:14-24 (Farmer). Moreover, SFFA has provided *no* counterexamples or logical connection between the students admitted based, in part, on racial considerations and differences in on-campus success. Instead, SFFA's post-trial accusation reveals the racially discriminatory assumptions underlying SFFA's lawsuit which ultimately question whether exceptional underrepresented minority students are worthy of accessing North Carolina's flagship institution. There is no serious dispute that such students are not only deserving of admission, but they are also playing a critical role to enrich UNC's campus and improve our broader, increasingly diverse society.

## CONCLUSION

For the reasons set forth above and in Student-Intervenors' and UNC's Findings of

25

Fact and Conclusions of Law, Student-Intervenors respectfully urge the Court to enter judgment in UNC's favor on all remaining counts.

Dated: March 3, 2021                    Respectfully submitted,

/s/ Jon M. Greenbaum
Jon M. Greenbaum*
David Hinojosa*
Genevieve B. Torres*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Avenue NW, Suite 400
Washington, DC 20005
jgreenbaum@lawyerscommittee.org
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org
Tel: (202) 662-8600

/s/ Jack Holtzman
Jack Holtzman, N.C. Bar No. 13548
Emily P. Turner, N.C. Bar No. 49578
NORTH CAROLINA JUSTICE CENTER
224 South Dawson Street
Raleigh, NC 27601
jack@ncjustice.org
emilyt@ncjustice.org
Tel: (919) 856-2165

/s/ Reed Colfax
Reed N. Colfax*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
rcolfax@relmanlaw.com
larandes@relmanlaw.com
Tel: (202) 728-1888

ATTORNEYS FOR DEFENDANT-INTERVENORS

* Special Appearance

26

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing document via the Court's electronic filing systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 3rd day of March, 2021.

/s/ Genevieve Bonadies Torres

Genevieve Bonadies Torres

Case 1:14-cv-00954-LCB-JLW   Document 250   Filed 03/03/21   Page 30 of 30