# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDENTS FOR FAIR
ADMISSIONS, INC.,

                            Plaintiff,

v.                                  **CASE NO. 1:14-CV-954**

THE UNIVERSITY OF NORTH
CAROLINA et al.,

                            Defendants.

## UNC DEFENDANTS' RESPONSE TO PLAINTIFF'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................iv

INTRODUCTION ....................................................................................................1

ARGUMENT ............................................................................................................5

I.     SFFA Does Not Challenge the University's Compelling Interest in the
Educational Benefits of Diversity ......................................................................5

     A.    The University's Interest in the Educational Benefits of Diversity Is
Genuine ...................................................................................................5

     B.    The Educational Benefits of Diversity the University Seeks Are Well-
Defined ...................................................................................................9

II.    The University's Use of Race in Admissions Is Narrowly Tailored To Achieve Its
Compelling Interest .........................................................................................12

     A.    SFFA's Proposed Findings of Fact Concerning the University's
Admissions Process Are Not Supported by the Trial Record ..............14

          1.    The University does not unduly focus on race in the admissions
process .................................................................................14

          2.    The University does not discriminate against any applicants ..................16

          3.    The University does not engage in racial balancing ................19

     B.    The University Does Not Use Race in a Mechanical or Formulaic Way ............22

     C.    Race Is Not the Predominant Factor in Admissions Decisions ............28

          1.    Professor Arcidiacono's "academic index" and corresponding
decile analysis are not probative of the role of race in admissions ..........29

          2.    Professor Arcidiacono's "transformation examples" are
hypothetical and impossible ....................................................31

          3.    Professor Arcidiacono made additional choices that render his
testimony noncredible .............................................................34

III.   There Is No Workable Race-Neutral Alternative to the University's Race-
Conscious Admissions Program .......................................................................36

A.      The University Has Considered Race-Neutral Alternatives Seriously and in Good Faith ........................................................................................... 36

B.      The University Already Employs the Majority of the Race-Neutral Strategies that SFFA Asserts Would Allow the University To Pursue the Educational Benefits of Diversity ...................................................................... 38

      1.      The University engages in extensive recruiting designed to increase diversity within its applicant pool ............................................... 39

      2.      The University offers generous financial aid ........................................... 39

      3.      The University partners with disadvantaged high schools ...................... 40

      4.      The University encourages community college transfers ......................... 41

C.      Other Race-Neutral Strategies Are Not Likely To Increase Racial Diversity ............................................................................................................. 42

D.      No Workable Race-Neutral Alternative to the University's Current Admissions Process Is Available ........................................................................ 44

      1.      Professor Hoxby's analysis demonstrated that no alternatives are workable ................................................................................................. 44

      2.      SFFA's simulations are flawed and unpersuasive .................................. 47

CONCLUSION ................................................................................................................. 53

Case 1:14-cv-00954-LCB-JLW   Document 251   Filed 03/03/21   Page 3 of 59

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Canoe Association v. Murphy Farms, Inc.*,
    326 F.3d 505 (4th Cir. 2003)...................................................................................... 10

*Fisher v. University of Texas at Austin*,
    570 U.S. 297 (2013)............................................................................................. passim

*Fisher v. University of Texas at Austin*,
    136 S. Ct. 2198 (2016)......................................................................................... passim

*Gratz v. Bollinger*,
    539 U.S. 244 (2003)........................................................................................11, 21, 22

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)............................................................................................. passim

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978)...................................................................................................... 19

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard College*,
    980 F.3d 157 (1st Cir. 2020) ...................................................................................... 18

*United States v. Duke Energy Corp.*,
    No. 1:00-cv-1262, 2014 WL 4659479 (M.D.N.C. Sept. 17, 2014) ........................... 10

iv

## INTRODUCTION

The record evidence establishes that the UNC Defendants carried their burden to prove that the University's holistic, race-conscious admissions process complies with constitutional standards because the University's use of race in admissions is narrowly tailored to achieve its compelling interest in the educational benefits of diversity.[1] As amply set forth in the UNC Defendants' proposed findings of fact and conclusions of law, the factual evidence presented during the eight-day trial in the case was virtually uncontradicted.

University witnesses testified to the University's genuine interest in educational benefits of diversity, described the concrete benefits that the University strives to attain, and offered reasoned, principled explanations for the University's decision to pursue these benefits, in its academic judgment. Witnesses also testified to the University's highly individualized application evaluation process, in which race may be considered flexibly as only one factor among many that might contribute to student body diversity. The evidence demonstrated that the University does <u>not</u> engage in any prohibited practices, such as the use of quotas, automatic points for race, or racial balancing. Additionally, witnesses described the University's on-going—but thus far unsuccessful—

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the UNC Defendants' Proposed Findings of Fact and Conclusions of Law (ECF No. 245).

serious and good faith attempts to identify a race-neutral alternative to the University's current race-conscious admissions practices.

Under controlling United States Supreme Court precedent this record should lead to only one conclusion: the University's admissions process is constitutional. But against the weight of the evidence, SFFA asks this Court to find otherwise. SFFA's request is based on a skewed version of the record that all but pretends the trial did not occur. Instead, SFFA resurrects nearly verbatim many of the arguments it made at summary judgment, disregarding when this Court's intervening rulings reject them, when the evidence presented at trial fails to support them, or even when SFFA's counsel expressly disclaimed them.

To support these contentions, SFFA ignores or mischaracterizes the parts of the record that do not fit its preconceived version of the facts. Relying on selective or incomplete citations, SFFA repeatedly suggests findings of fact concerning the University's admissions process that are unsupported or directly contradicted by the testimony it cites. SFFA takes similar liberties with the documentary evidence, misleadingly interpreting exhibits it did not present at trial and conveniently ignoring testimony and other evidence that puts exhibits in their proper context. Perhaps

recognizing the gaps in the evidence it presented at trial, SFFA also cites to deposition testimony and documents that are not part of the record.[2]

Because the factual record cannot support the allegations that it made in the Complaint, SFFA relies nearly exclusively on its expert evidence. But this evidence, too, is wholly insufficient to undermine the University's proof that its admissions process is lawful. Much like SFFA's factual presentation, its expert evidence is deeply flawed and noncredible. In particular, Professor Arcidiacono answered the wrong question, in the wrong way. His analysis focuses on only a subset of applicants, leading to the false conclusion that race plays an outsized role in University admissions. But when the question is properly framed and examined—as it was by Professor Hoxby—even Professor Arcidiacono admitted that race is not the dominant factor in the University's admissions process. This is fatal to SFFA's contrary claim.

Mr. Kahlenberg's opinions on race-neutral alternatives fare no better. His conclusion that the University purportedly failed to consider and implement viable race-neutral alternatives is wrong, ignoring that the University already employs many of the strategies he suggests and that other proposed strategies have proven ineffectual. For the few alternatives he simulates, Mr. Kahlenberg relies on unreasonable, implausible

---

[2] *See, e.g.*, SFFA Proposed Findings of Fact and Conclusions of Law (ECF No. 247) ("SFFA") ¶34 (citing PX301 and PX302, which were designated as impeachment exhibits and never admitted); *id.* ¶40 (citing the deposition of Jennifer Kretchmar, which was neither designated nor admitted); *id.* ¶74 (citing PX076, which was withdrawn before trial).

3

assumptions that render his opinions noncredible and irrelevant. By contrast, Professor Hoxby conducted a comprehensive set of reliable simulations of race-neutral alternatives, making generous assumptions designed to favor each alternative's success. Even so, she found no race-neutral alternative that could achieve the University's current levels of diversity and academic preparedness. In other words, no workable race-neutral alternative exists.

In sum, the record demonstrates that Stephen Farmer, the University's Vice Provost for Enrollment and Undergraduate Admissions, was correct to have confidence in the propriety of the University's admissions process. (*See* Tr. 657:16-17 (Farmer).) All credible evidence shows that the University closely adheres to constitutional requirements. Unfortunately, given SFFA's apparent willingness to mischaracterize the record, Mr. Farmer was also correct to be "less confident in how others"—namely, SFFA—"would interpret" the University's actions. (*Id.*) As set forth below, the Court should reject SFFA's proposed findings of fact and conclusions of law in their entirety because they are based on a misleading and incomplete picture of the evidence presented at trial, and a misapplication of the controlling law.

4

## ARGUMENT[3]

### I.    SFFA Does Not Challenge the University's Compelling Interest in the Educational Benefits of Diversity

SFFA does not contest that student body diversity—including racial and ethnic diversity—yields educational benefits. Nor does SFFA challenge that the University has a compelling interest in attaining the educational benefits of diversity. Instead, while recognizing that courts ordinarily must defer to universities' academic judgment to pursue these benefits (SFFA ¶281), SFFA argues that the Court should afford no deference here because the University supposedly "focuses on diversity at the most superficial level" (*Id.* ¶283) and lacks a "'measurable' definition of critical mass." (*Id.* ¶287). SFFA claims that for these reasons alone, the University fails to satisfy strict scrutiny. (*Id.* ¶292.) SFFA is wrong. The record, controlling precedent, and this Court's prior rulings all require a finding that the University's (conceded) compelling interest in the educational benefits of diversity is both genuine and well-defined.

#### A.    The University's Interest in the Educational Benefits of Diversity Is Genuine

Overwhelming record evidence demonstrates that the University's commitment to diversity is longstanding and authentic. Documentary evidence dating back more than

---

[3] To the extent any of the UNC Defendants' statements regarding the record are not already made in the UNC Defendants' proposed findings of fact, the UNC Defendants request that the Court consider the statement as a supplemental proposed finding of fact.

*(cont'd)*

5

twenty years continually reiterates the importance of student body diversity to the University's mission and delineates the educational benefits that the University strives to attain. (UNC FOF ¶¶14-16.)[4] Likewise, multiple University employees credibly testified at trial that diversity is a deeply held institutional value essential to creating a robust learning environment. (*Id.* ¶¶17-20, 25.) And the evidence, including unrebutted expert evidence, demonstrates that the University intentionally and systematically implements numerous programs and policies designed to achieve the educational benefits of diversity on its campus. (*Id.* ¶¶25-30.)

SFFA did not elicit any testimony at trial to rebut this evidence. Instead, it relies on isolated snippets of data from University reporting to contend that the University's interest in enrolling a diverse class is disingenuous. Specifically, SFFA asserts that differences in cumulative GPAs and four-year graduation rates among students of different racial backgrounds demonstrate that the University fails to admit underrepresented minority applicants "who are equipped to succeed" and "has shown no interest in creating an environment where [underrepresented minorities] will thrive." (SFFA ¶¶282-283.) These false and insidious accusations are not supported by any record evidence and should be rejected out of hand.

---

[4] Citations to "UNC FOF" refer to the proposed findings of fact set forth in the UNC Defendants' Proposed Findings of Fact and Conclusions of Law (ECF No. 245). Citations to "UNC COL" refer to the proposed conclusions of law in that submission.

As an initial matter, this argument appears to be an attempt to introduce a "mismatch" theory that SFFA expressly disclaimed at trial. (*Compare* SFFA ¶283 (suggesting the University admits unqualified underrepresented minority applicants) *with* Tr. 121:6-122:3 ("THE COURT: So are you offering any evidence on [the mismatch] theory? MR. MCCARTHY: No.").) Moreover, the Court already found that evidence of post-admission academic performance, including retention and graduation rates, "is not relevant" to the issues at hand in this case. (ECF No. 222 at 2; ECF No. 101 at 9.) Regardless, although SFFA implies that the consideration of race results in the admission of supposedly underqualified underrepresented minorities, SFFA offers no evidence to prove this false theory.

The record is uncontradicted that every applicant admitted to the University is academically qualified. (Tr. 667:11-24 (Farmer); Tr. 691:12-14 (Rosenberg); Dean Dep. 177:11-178:24.) Moreover, SFFA does not and cannot link differences in GPAs or graduation rates to particular applicants' academic qualifications, much less to the consideration of race in their admission. Instead, the most plausible conclusion is that achievement gaps are attributable to other struggles students face, such as financial challenges, service gaps, or underrepresentation itself. (*See, e.g.*, PX105 at 4, 9-13; PX103 at 1 (characterizing low admission and retention rate for male students of color as a "crisis" and encouraging faculty to refer them to resources such as "counseling & wellness and advising"); Clayton Dep. 208:21-209:24 (testifying that a number of

minority males who departed the University prior to graduating were academically eligible and went to other schools); UNC FOF ¶¶39-43.)[5]

In any event, the cited reports directly contradict SFFA's argument that the University focuses on diversity only "superficial[ly]." (SFFA ¶283.) Each demonstrates on its face that the University is deeply committed to diversity and the success of all of its students, including underrepresented minorities. (*See, e.g.*, PX112 at 9, 10, 11, 13 (reiterating the importance of diversity); *id.* at 26-40 (discussing strategies to advance the University's diversity goals); PX104 at 50-51 (making recommendations to further increase student retention and graduation rates); PX105 at 4, 11-14 (recognizing the unique needs of minority male students and making programmatic recommendations to support their academic success).) SFFA ignores both the content and spirit of these reports. Moreover, SFFA chose not to question trial witnesses about them or present any expert testimony on the data it now contends evidences disingenuousness on the University's part, deciding instead to rely on speculation and innuendo. SFFA's trial tactic failed. The record is clear that the University has a genuine, compelling interest in the educational benefits of diversity.

---

[5] SFFA incorrectly cites PX103 for the proposition that University "officials repeatedly have lamented [an] achievement gap and described it as a 'crisis' with respect to [underrepresented minority] males." (SFFA ¶89.) Setting aside that a single email hardly suggests a repeated lament, the cited evidence does not refer to an achievement gap, but rather the University's efforts to enroll and retain underrepresented minority male students. (*See also* UNC FOF ¶40.)

**B.** **The Educational Benefits of Diversity the University Seeks Are Well-Defined**

The United States Supreme Court has "made clear" that "the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students." *Fisher II*, 136 S. Ct. at 2210. Rather, a university may implement race-conscious admissions practices to achieve the educational benefits of diversity, so long as it articulates with precision the goals it seeks to achieve. *Id.* at 2210-11 (explaining that "an interest in the educational benefits of diversity writ large is insufficient"). Here, the University has repeatedly articulated "concrete and precise goals" of the same sort that the Supreme Court recently approved in *Fisher II*. *Id.* at 2211. For example, the University's 2017 Provost Report on the Educational Benefits of Diversity reiterates five distinct benefits of diversity that the University seeks: promoting the robust exchange of ideas, broadening and refining understanding, fostering innovation and problem solving, preparing engaged and productive citizens and leaders, and enhancing appreciation, respect, and empathy. (UNC FOF ¶16; *see also id.* ¶¶9-15, 17-20.) *Cf. Fisher II*, 136 S. Ct. at 2211 (approving similar goals, including the "promotion of cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivation of a set of leaders with legitimacy in the eyes of the citizenry" (internal quotations and brackets omitted)).

SFFA ignores this evidence and precedent, contending instead that the University "may use race <u>only</u> to enroll a 'critical mass of underrepresented minority students'" and

9

that the University has not articulated a sufficiently precise definition of "critical mass." (SFFA ¶¶278, 285 (emphasis added).) In support of this theory, SFFA resurrects, practically verbatim, the argument it made at summary judgment. (*Compare id.* ¶¶36-43, 280-292 *with* ECF No. 159 at 4-5, 28-29, 30-31.) But the Court already rejected this argument, finding that the University "is <u>not</u> required to articulate a definition of 'critical mass' in order for its admissions policy to survive strict scrutiny." (ECF No. 190 at 14 (emphasis added) (internal citation and quotations omitted); *see also id.* at 13-14 (noting that the term "critical mass" was not used by the Supreme Court, but by the university-litigants).) This conclusion is perfectly aligned with controlling Supreme Court precedent. *See Fisher II*, 136 S. Ct. at 2210-11 (rejecting argument that university must articulate "the level of minority enrollment that would constitute a 'critical mass'"); *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (endorsing concept of critical mass as "defined by reference to the educational benefits that diversity is designed to produce"). Because there has been no change in the law or development of new evidence since

summary judgment, the Court's ruling need not—and should not—be revisited.[6] *See, e.g.*, *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (explaining that the law of the case doctrine guides courts' discretion to revisit interlocutory orders); *United States v. Duke Energy Corp.*, No. 1:00-cv-1262, 2014 WL 4659479, at *3 (M.D.N.C. Sept. 17, 2014) (explaining that a court's decisions generally should continue to govern the same issues in subsequent stages of the same case).

In short, all record evidence demonstrates that the University has a genuine interest in well-defined educational benefits that flow from student body diversity. SFFA concedes that this interest is real and compelling, and the University has provided ample reasons for exercising its sound academic judgment to pursue these benefits. The Court should find that the University has shown a compelling interest in the educational benefits of diversity that satisfies strict scrutiny.

---

[6]  Indeed, the evidence presented at trial undermines SFFA's argument that University officials do not understand or ever discuss the concept of critical mass. (UNC FOF ¶52.) And the testimony SFFA cites for a contrary conclusion is incomplete and overstated. (*Compare* SFFA ¶¶37, 43 *with* Dean Dep. 142:22-145:13 (testifying to his understanding of critical mass and linking it to the achievement of educational benefits); Tr. 109:18-112:4 (Kretchmar) (explaining that critical mass is defined "in terms of the ends that [the University is] trying to achieve" and reflecting a refreshed recollection that she had been involved in discussions concerning critical mass although she could not remember the specifics); Tr. 544:2-21, 659:1-3 (Farmer) (explaining that critical mass is a complex idea "integrally connected" to the University's ability to provide the educational benefits of diversity); Polk Dep. 255:13-25 (testifying to discussing critical mass in relation to the benefits experienced by students); Folt Dep. 118:2-119:10 (testifying that she understands critical mass to be a "qualitative concept" linked to educational benefits).)

## II.    The University's Use of Race in Admissions Is Narrowly Tailored To Achieve Its Compelling Interest

To determine whether the use of race is narrowly tailored, the crucial inquiry is whether the admissions process is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337; *see also Gratz v. Bollinger*, 539 U.S. 244, 271 (2003). Contrary to SFFA's implication, the Supreme Court has <u>not</u> restricted the permissible consideration of race to only the "last few seats in the class" (SFFA ¶23.) *See Grutter*, 539 U.S. at 334 (finding admissions process constitutional where it allowed for the consideration of any applicant's race); *Fisher II*, 136 S. Ct. at 2214 (finding admissions process constitutional where it allowed for the consideration of race for the last 25% of the class). Likewise, no precedent limits the consideration of race to only those applications that indicate "race affected the student's life" (SFFA ¶24.) Instead, the Supreme Court has emphasized that a race-conscious admissions program must consider each individual applicant in a way that "ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race." *Grutter*, 539 U.S. at 337.

As demonstrated at trial, the University's admissions program closely adheres to this guidance. Race is one factor among many in a comprehensive, holistic review process during which the University carefully evaluates the potential contributions of each and every applicant, one-by-one, as individuals. (UNC FOF ¶¶53, 75-76, 99, 105.)

12

Unrebutted testimony of University admissions officers confirms that the University undertakes this highly individualized review of each application across a number of factors, which may include race, if voluntarily disclosed. (*Id.* ¶¶59, 77-88.) Although application readers assign ratings for certain admissions criteria, there is no formula for admission, ratings do not determine an admissions decision, and no points are awarded for race. (*Id.* ¶¶77-78, 85, 89.) Tellingly, even SFFA's experts readily acknowledged the holistic nature of the University's admissions system and that the University does <u>not</u> follow an explicit formula. (*Id.* ¶112.)

Facing an uncontradicted record that the University is reviewing applications in the right way, SFFA casts scattershot aspersions against the University's admissions process, relying, once again, on speculation, innuendo, and mischaracterization instead of actual evidence. In its proposed findings of fact, SFFA insinuates that the University inappropriately focuses on race, discriminates against certain applicants by holding them to higher standards, and engages in racial balancing. Of course, the record does not support any of these accusations. That is why SFFA does not propose any conclusion of law that rests on these purported facts. (*See* SFFA ¶¶293-316.) Instead, SFFA relies on a mechanized review allegation first introduced at trial, implying that efficiency and consistency in the process of evaluating more than 40,000 applications annually is somehow evidence of unconstitutionality. (*Id.* ¶311.) SFFA is grasping at straws. Simply put, there is absolutely <u>no</u> evidence that the University does anything but scrupulously comply with constitutional standards. Thus, SFFA takes the same tack that it took at trial:

13

showcasing Professor Arcidiacono's flawed and noncredible expert analysis as a substitute for actual facts. The Court should not accept SFFA's invitation to disregard the established facts and rely solely on misleading statistics.

## A. SFFA's Proposed Findings of Fact Concerning the University's Admissions Process Are Not Supported by the Trial Record

As an initial matter, SFFA's description of the University's admissions process reflects numerous evidentiary mischaracterizations and hinges on isolated documents or testimony excerpts that do not accurately reflect the process or are otherwise taken out of context. The Court should reject these proposed findings of fact in their entirety.

### 1. The University does not unduly focus on race in the admissions process

First, SFFA attempts to undermine the holistic nature of University admissions decisions by falsely claiming that readers disproportionately focus on race. For example, SFFA wrongly contends that "race can affect every one of the ratings UNC assigns." (SFFA ¶24.) This is unsupported by any evidence, including the testimony SFFA cites. (*See* Tr. 76:4-7 (Kretchmar) (testifying that race is one factor among many that the first reader may consider); Tr. 543:7-13 (Farmer) (testifying that race, like all applicant characteristics, may be considered at any stage of the evaluation process).) The Reading Document and trial testimony make clear the criteria that are assessed in each rated category; race and ethnicity are <u>not</u> factors in the academic program, academic performance, extracurricular, and essay ratings. (DX010 at 6-7; UNC FOF ¶¶74, 76-86.) Readers may consider contributions to diversity as part of the personal quality rating.

14

(UNC FOF ¶83.) Race, ethnicity, or national origin may be considered as one factor among many in the admissions decision at any stage of the evaluation process (first read, second read, or School Group Review), but only in the context of everything else known about the applicant. (*Id.* ¶¶85, 94, 99.)

SFFA also incorrectly contends that the University "gives preferences" to underrepresented minorities in the evaluation process, implying that they are reviewed separately or differently than other applicants. (SFFA ¶29.) Again, the evidence at trial shows that this is not true. Although the University targets certain "priority populations for recruitment" (Tr. 731:12-14 (Davis) (emphasis added)), all applicants are reviewed according to the same admissions standards. (UNC FOF ¶60.)

Additionally, SFFA holds out a few isolated documents as "evidence" that application readers are unduly focused on race. (SFFA ¶74.) The documents SFFA cites consist of three emails in which the writer merely notes an applicant's race within the context of asking legitimate admissions questions (PX071; PX074; PX075), two emails from athletic staff about recruited athletes (which are irrelevant here because they do not reflect the standard admissions process) (PX080; PX081), and a single instant message

15

conversation[7] between three application readers noting the race of certain applicants under consideration for scholarship nomination (PX084).[8]

These isolated examples hardly reflect any disproportionate consideration of race. If anything, they demonstrate the opposite. Mr. Rosenberg testified that during a typical admissions cycle he receives hundreds of emails from readers with questions about applications or the reading process. (UNC FOF ¶72.) Yet among a voluminous discovery record that included thousands of communications between readers, including emails and instant messages, and comments to all application files received from 2013 to 2017, SFFA could muster only six communications that even mention race. This utter lack of evidence completely undermines SFFA's argument that readers unduly focus on race and is certainly insufficient to rebut the strong evidence presented at trial that the University properly considers race in admissions as only one factor among many. (*See id.* ¶¶73, 85.)

## 2. The University does not discriminate against any applicants

Second, SFFA implies that the University discriminates against Asian-American applicants by allegedly holding them to different admissions standards. (SFFA ¶28.) In

---

[7] As the University stated at summary judgment, some of the language in this exchange is inappropriate. (ECF No. 175 at 8.) But the comments, when read in their entirety, in no way suggest that the University's application readers impermissibly deviate from a highly individualized admissions process that considers race as only one of many factors. Moreover, the conversation is an outlier among a voluminous record that is not representative of the University's entire admissions program. (*See* Coleman Dep. 29:18-23 (testifying that the language in PX084 was not common in the Admissions Office).)

[8] SFFA also cites PX076 (SFFA ¶74); however, this exhibit was withdrawn before trial.

16

particular, SFFA argues that the University requires Asian-Americans to "perform better on standardized tests" in order to be admitted. (*Id.* ¶47.) This is false. To make this argument, SFFA attempts to blur the line between distinct recruiting and evaluation processes, relying on out-of-date and irrelevant evidence concerning the University's past purchase of College Board-provided test score data in connection with the <u>pre-application recruitment</u> of potential students. (*Id.* ¶47; *see also id.* ¶¶44-46 (discussing pre-application recruiting).)

As established at trial, the University recruits a broad variety of diverse talent—including first-generation college students and low-income students of all races and ethnicities—using, among other methods, the purchase of College Board data. (UNC FOF ¶149 (citing Mr. Davis' testimony discussing the purchase of College Board data); *see also id.* ¶¶148, 151-153.) However, as SFFA readily admits, the University has not restricted its purchase of College Board data by race for years. (SFFA ¶50.) So even if the purchase of student information for recruiting purposes were relevant to a case about the University's admissions process—which it is not—the past purchase of this data is beside the point, especially in a case seeking only prospective injunctive relief.

At any rate, no evidence supports the notion that the University holds Asian-Americans to higher testing standards. To make this claim, SFFA blatantly mischaracterizes the evidence. (*See id.* ¶¶28, 49, 71-72.) Mr. Davis did not, as SFFA claims, testify that "racial cutoffs" were imposed at all, much less in the purchase of test score bands. (*Id.* ¶49.) Instead, he testified that the University purchased expanded data

17

for certain priority recruiting categories, and that the University did not purchase any data of students who it did not believe were potentially admissible, such as students with a "C average in high school." (Tr. 748:9-13, 749:6-14 (Davis).)

Likewise, Mr. Parrish's deposition testimony does not support SFFA's claim that Asian-Americans are held to a "higher academic standard." (SFFA ¶28; *see also id.* ¶¶71-72.) He and others unequivocally testified that applicants are <u>not</u> treated differently in the admissions process on the basis of race. (Parrish Dep. at 208:13-20 ("Q: Is it fair to say that UNC treats [underrepresented minorities] with low test--scores differently than non-[underrepresented minorities] at the same testing levels? A: No. Because I wouldn't say ethnicity's the only thing we're looking at to interpret their scores."); *see also* Tr. 693:18-694:17 (Rosenberg) (explaining how test scores are considered during the admissions process).) Likewise, the unrebutted trial testimony confirms that, no matter their racial or ethnic background, all applicants are held to the same admissions standards. (Tr. 551:25-552:6 (Farmer) (testifying that there are no different standards or thresholds based on

18

race in the admissions process); Tr. 696:1-6 (Rosenberg) (explaining that "[e]veryone goes through the same evaluation process").)[9]

### 3. The University does not engage in racial balancing

Third, SFFA insinuates that the University engages in racial balancing by allegedly "monitoring" the racial make-up of the class and using the School Group Review process to "shape[] and fine-tune[] the class . . . from a racial/ethnic standpoint." (SFFA ¶¶77-79, 86; *see also id.* ¶¶30, 32.) No evidence supports either of these accusations, and SFFA expressly disclaimed the second one at trial.

The record demonstrates that, at certain times from 2013 to 2015, the Admissions Office generated weekly or bi-weekly (not daily) reports on the composition of the admitted and enrolling class, including, among other demographics, by race and ethnicity. (Tr. 88:4-89:16, 91:24-92:2 (Kretchmar); PX003 at 4-5 (Interrogatory 10); *see also* PX058; PX067.) These reports were kept on a secure site that only a few senior admissions officers could access. (Tr. 86:2-8, 91:13-19 (Kretchmar); Tr. 700:25-702:22

---

[9]  SFFA's failure to plead a separate claim for intentional discrimination against Asian Americans or to offer any expert testimony on the topic of intentional discrimination speaks volumes. SFFA expressly made this claim in its case against Harvard and Professor Arcidiacono offered extensive opinions on the subject. *See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, No. 1:14-cv-14176-DJC, ECF No. 1 ¶¶428-442 (pleading as Count I "Intentional Discrimination Against Asian Americans"); *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 980 F.3d 157, 180-81 (1st Cir. 2020) (describing the "extensive" statistical evidence presented on the issue of "whether Harvard intentionally discriminated against Asian American applicants"). SFFA did not allege a claim on this basis or offer any such evidence here.

19

(Rosenberg).) By contrast, seasonal readers and Admissions Office staff did not have access to any reports showing the racial and ethnic breakdown of the provisionally admitted class. (UNC FOF ¶110; *see also id.* ¶¶108-109.) Regardless, the mere fact that these reports existed is not evidence of any impropriety. *See Grutter*, 539 U.S. at 336 ("'Some attention to numbers,' without more" is not unconstitutional. (quoting *Bakke*, 438 U.S. at 323 (brackets omitted))). And SFFA points to none. That is because absolutely no such evidence exists.

As to School Group Review or "SGR," after alleging in the Complaint that the University engages in racial balancing, including during the SGR process (Compl. ¶¶49, 52, 219), <u>both</u> of SFFA's experts claimed not to have to analyzed SGR decisions and neither offered <u>any</u> opinions on this topic at trial. Additionally, SFFA's counsel expressly represented to the Court that it had abandoned allegations that the University cheats during SGR. (Tr. 1378:18-25 (SFFA Closing) (arguing that SGR claims were "not developed for trial").) Still, SFFA continues to insinuate that the University improperly considers race during SGR. (SFFA ¶¶83-86 (alleging that race is a prominent component of SGR, and that the University shapes the class from a racial standpoint during SGR).) This is simply untrue.

The evidence at trial firmly established that SGR is an extension of the University's holistic review process, meaning that to the extent race and ethnicity is considered at this stage, it is considered as one factor among many in the context of everything else known about the applicant. (UNC FOF ¶¶85, 99, 105.) And the evidence

20

is unrebutted that, other than assuring the correct proportion of in-state versus out-of-state students, the Admissions Office does not use the SGR process to shape the class toward any demographic goal—including racial or ethnic composition. (*Id.* ¶101; *see also id.* ¶104.) Indeed, the University's expert, Professor Hoxby, analyzed the SGR process and affirmatively demonstrated that race and ethnicity do not play any role. (*Id.* ¶102.) This evidence was uncontradicted.

In a bid to keep its SGR claims alive, SFFA relies on paltry, cherry-picked evidence taken out context, including selectively quoted SGR reader comments that appear—at least as characterized in SFFA's brief—to justify an admissions decision change based on race alone. (SFFA ¶86 (quoting PX087 and PX088).) But, consistent with the University's holistic review process, these very exhibits note other attributes, including ratings and test scores, that contributed to the changed decision. (PX087 at 2 ("Defer to admit. [Underrepresented]. <u>Strong across the board. 10, 10, 7, 7, 7. 34 ACT. 1510 SAT.</u>" (emphasis added)); PX088 at 2 ("Defer to admit. [Underrepresented]. <u>Testing is 30 ACT. SAT 1360 with +60 writing. All other areas are strong.</u>" (emphasis added)).) If anything, this evidence confirms that the University properly considers race as only one factor among many when making admissions decisions based on a holistic

21

review of an applicant. In short, SFFA's resurrected assertion that the SGR process is used to "shape" the class on the basis of race is factually unsupported and wrong.[10]

## B. The University Does Not Use Race in a Mechanical or Formulaic Way

Because the evidence of malfeasance SFFA hoped for when it drafted the Complaint never materialized, SFFA instead attacks the holistic nature of the University's evaluation process through innuendo and noncredible expert evidence. Specifically, SFFA contends that the University's admissions process is mechanized, non-individualized, and formulaic, including with respect to the use of race. (SFFA ¶¶308-316.) SFFA renews verbatim its summary judgment argument that "UNC's use of race is functionally no different" than giving every minority applicant an automatic 20-point bonus. (SFFA ¶310 (citing *Gratz*, 539 U.S. at 270, 272); ECF No. 159 at 33

---

[10] SFFA also points to PX070, a 2013 reading plan proposal attached to an email from Mr. Rosenberg—an exhibit SFFA did not bother to confront Mr. Rosenberg with at trial—insinuating that a stale, unimplemented proposal in this document to include race on SGR reports is somehow probative. (SFFA ¶84.) It is not. (*See* UNC FOF ¶¶ 98 (demonstrating race is not included on SGR reports).) Indeed, SFFA continually relies on this unused exhibit to argue its case. (*See* SFFA ¶¶13, 64, 68, 70, 84.) But, as with many of SFFA's proposed findings, the conclusions SFFA draws from this document are overstated. (*Compare, e.g.*, SFFA ¶70 (citing PX070 at 3 (UNC0179479) for the proposition that "readers know they are being calibrated and seek confirmation that they are hewing to  UNC admissions priorities") *with* PX070 at 3 (stating that "[m]ost readers have suggested we include the chance for an application to be flagged for another 'read' or 'quick look'"); *and* SFFA ¶86 (citing PX070 at 5 (UNC0179481) for the proposition that SGR "'shapes and fine-tunes' the class . . .  from a racial/ethnic standpoint") *with* PX070 at 5 (stating that "[m]any readers have asked to become more involved in [the SGR] process since decision review really shapes and fine-tunes our class").)

*(cont'd)*

22

(same).) But SFFA's claim is nothing more than hyperbolic overstatement refuted by the evidence presented at trial.

As an initial matter, SFFA's comparison of this case to *Gratz* falls flat. In *Gratz*, the Supreme Court found the University of Michigan's use of racial preferences in undergraduate admissions to be unconstitutional where the university admitted applicants based on a scoring system that automatically awarded 20 points to every applicant based on membership in an underrepresented minority group. *Gratz* 539 U.S. at 254-55, 270. This system resulted in the admission of virtually every qualified underrepresented minority applicant without any individualized review. *Id.* at 254, 270-72. That is not at all similar to the University's admissions process here.[11]

As stated above, the evidence at trial uniformly established that the University employs a highly individualized, holistic admissions process in which race may be considered as only one factor among many. (UNC FOF ¶¶73, 88.) No points are awarded for race, and there is no score or minimum rating threshold that results in admission. (*Id.* ¶¶78, 85.) Because there is no credible evidence to undermine this proof, SFFA can only insidiously suggest that the "swiftness" of the review process implies a formulaic review.

---

[11] Instead, this case is far more analogous to *Grutter*, where the Supreme Court upheld as constitutional an admissions program that considered race flexibly as part of the individualized review of each candidate—over the introduction of expert testimony contending that race was an "extremely strong" but "not the predominant factor in the . . . admissions calculus." *Grutter*, 539 U.S. at 320, 334-39. (*See also, e.g.*, UNC COL at 98-99 (discussing similarities in expert analysis).)

23

(SFFA ¶311.) SFFA also attempts to spin other benign facts as nefarious, suggesting that training readers to assure that every applicant is reviewed according to the same standards is somehow evidence of malintent. (*Id.* ¶¶13, 68, 70.) Here, again, this is nothing more than unsupported conjecture.

Every year, the University receives more than 40,000 applications for admission, which it must review during a reading season that spans six months. (UNC FOF ¶49; Tr. 557:23-558:11 (Farmer) (testifying that two application deadlines are offered as a way for the Admissions Office to space reading numerous applications over six months).) The application readers work as a team to timely complete the review of applications. (Tr. 718:22-719:13 (Rosenberg) (testifying that if one reader falls behind, applications could be reassigned to another reader).) While the evidence shows that experienced readers can typically review an average of five to six applications per hour (Tr. 720:11-721:21 (Rosenberg)), nothing suggests that readers are artificially limited in the time they can spend on any one application, much less that readers fail to give due consideration to every aspect of an applicant's file. To the contrary, University witnesses testified credibly and consistently to the great care and attention to detail that goes into evaluating applications. (UNC FOF ¶¶53, 75-76, 105.) And reader training and quality control measures assure that readers comply with University admissions policy, including as to the consideration of race in admissions. (*Id.* ¶¶65-73, 96-97, 105.)

In short, the evidence shows that the University strives to efficiently review a voluminous number of applications and assure that each and every applicant is

24

holistically evaluated according to the same standards, no matter which reader receives the file. This is a gold standard, not evidence of unconstitutionality. Indeed, Professor Hoxby demonstrated that the University's admissions decisions are fully consistent with a holistic process and that the admissions process is not formulaic. (UNC FOF ¶¶112-117.) And even SFFA's experts conceded that the University's process is holistic and not explicitly formulaic. (*Id.* ¶112.)

Despite its own experts' concessions, SFFA points to the work of the University's Committee on Race-Neutral Strategies Data Analytics Subcommittee to seemingly suggest that the University itself found that an applicant's race predicts the admissions decision. (SFFA ¶94 ("UNC produced documents showing that its Data Analytics Subcommittee conducted a regression analysis showing that URM status is 'uniquely predictive of admission.'").) But SFFA selectively quotes the findings set forth in the subcommittee's draft report, which states in full:

> Key findings reflect that, although under-represented minority status was uniquely predictive of admission, this was just one of a large number of unique predictors (indeed, every measured variable reflected a unique prediction of admission status). Importantly, the classification accuracy in the prediction of admission status was virtually unchanged when comparing a comprehensive model that did and did not include information about applicant racial status. This reflects that under-represented minority status does not meaningfully drive the prediction accuracy of the final multivariate model.

25

(PX068 at 1 (emphasis added).)[12] SFFA also ignores the complete testimony of Professor Michael Kosorok, a member of the subcommittee, who explained that although the coefficient for underrepresented minority status is statistically significant, "[s]tatistical significance does not relate to the actual size of the impact." (Kosorok Dep. at 118:1-123:22.) Indeed, as SFFA ultimately admits, the subcommittee found that residency—not race—"is the variable with the largest impact on admission when the entire applicant pool is taken as a whole." (SFFA ¶115 n.3; *see also* PX050 at 3, 7.)

Thus, SFFA is left with the sole argument that the admissions process must be formulaic because of the purported accuracy of Professor Arcidiacono's models in predicting who is admitted. This is a red herring. As Professor Arcidiacono admitted, a model can be very accurate in predicting the admissions outcome, but such a model may not reliably explain the contribution of a specific factor to that outcome. (UNC FOF ¶117; *see also id.* ¶140 (demonstrating that even accepting Professor Arcidiacono's measure of accuracy does not show that race and ethnicity generate the alleged accuracy of the model).) In other words, just because the University's admissions outcomes are not random does not mean that the admissions process is formulaic.

_____

[12]  SFFA twice highlights that these materials were produced "after the close of fact discovery." (SFFA ¶¶94, 115 n.3.) The University periodically supplemented its productions with materials relating to its continuing efforts to consider race-neutral alternatives, including PX068. Judge Webster ordered a limited reopening of discovery relating to these materials and permitted SFFA to take additional depositions concerning the work of the Committee on Race-Neutral Strategies. (ECF No. 144.)

This is true even before considering the extensive flaws in Professor Arcidiacono's approach and models. (*Id.* ¶¶126-146.) Although Professor Arcidiacono's models may appear on the surface to embody the University's admissions process, as demonstrated at trial, they do not. (*See, e.g.*, *id.* ¶145.) Professor Hoxby testified that the proper test of a model's accuracy is whether the model predicts as well <u>out of sample</u> as it does <u>in sample</u>, and certain of Professor Arcidiacono's models (including his preferred model) were overfit, meaning that they could not satisfy this basic axiom. (*Id.* ¶114, n.3.) Indeed, Professor Arcidiacono conceded that his model 7 is overfit. (*Id.*)

Perhaps because its foundation on this front is so shaky, SFFA presented a lengthy discussion of why Professor Hoxby's measure of overfit is improper, focusing on the presentation of mean squared error. (SFFA ¶¶192-213.) Professor Hoxby credibly rebutted such challenges in both her direct and cross examinations explaining that, no matter the methodology or nomenclature used, her preferred model is not overfit whereas Professor Arcidiacono's models are. (Tr. 974:17-976:5, 1158:6-1165:3 (Hoxby).) But even if Professor Hoxby had not disproved the criticisms of her measure of overfit, another completely uncontested fact renders SFFA's arguments in this regard meaningless. Professor Hoxby ran an entirely separate test for overfit, which she testified is the <u>best</u> measure of overfitting for a non-linear model. (Tr. 971:4-20 (Hoxby).) Professor Arcidiacono not only failed to perform this test (or to respond to Professor Hoxby's presentation of these results), but SFFA also did not even bother to cross examine Professor Hoxby on this point.

Thus, any notion that the University's admissions process is formulaic or so mechanical that it effectively results in the automatic awarding of points for race is simply false and without any support in the record. To the contrary, the University has more than satisfied its burden to prove that it conducts a holistic, individualized review of each applicant, properly considering race flexibly as only one factor among many. (UNC COL at 96-100.)

### C. Race Is Not the Predominant Factor in Admissions Decisions

Because no factual evidence supports SFFA's claims, SFFA attempts to reduce this case to a "battle of the experts."[13] SFFA would have the Court disregard the entire factual record, including the testimony of the University officials whose academic judgment is at issue, the University employees who testified to their individualized and careful consideration of each applicant, and the students whose experience goes to the heart of this litigation, in favor of a single statistician's model. Even if SFFA's framing were correct, however, when faced with a choice between dueling experts, the University wins the battle. As Professor Hoxby credibly demonstrated at trial, race is not the predominant factor in the University's admissions process and, at most, explains a very

---

[13] Purportedly for the "convenience of the Court," SFFA filed as exhibits to its post-trial brief copies of the expert witness demonstratives that were provided to the Court during trial, but not admitted into evidence. (SFFA ¶111 n.2.) Although these demonstratives are not part of the record and University reserves all objections in that respect, the University attaches its expert demonstratives as Exhibit A and B to this response so that, to the extent the Court elects to consider demonstratives, they may be equally considered.

small share of admissions outcomes. (UNC FOF ¶¶118-125.) This is true under both

Professor Hoxby's models and Professor Arcidiacono's preferred model. (*Id.* ¶¶122-124.)

And Professor Arcidiacono <u>conceded</u> that race is not the dominant factor across the

whole admissions process. (*Id.* ¶118; *see also id.* ¶¶124, 127).)

      Nonetheless, SFFA contends that the University employs "massive" racial

preferences (SFFA ¶295), relying on Professor Arcidiacono's flawed analysis. But

Professor Arcidiacono's testimony should not be credited because he answers the wrong

question, in the wrong way, rendering his opinions irrelevant and noncredible.

      **1.    Professor Arcidiacono's "academic index" and corresponding decile analysis are not probative of the role of race in admissions**

      SFFA maintains that the University must be using race improperly because

Professor Arcidiacono's contrived "academic index," which is a weighted average of an

applicant's SAT score and high school GPA, purportedly demonstrates large cross-racial

differences in academic qualifications. (SFFA ¶¶120-122.) According to SFFA, Professor

Arcidiacono's "analysis demonstrates that, <u>if admission to UNC were based only on the</u>

29

academic index, the admitted classes would shift to a substantially larger population of non-[underrepresented minority] students." (*Id.* ¶135 (emphasis added).)[14]

But, critically, it is undisputed that admission to the University is not based exclusively on standardized test scores and high school GPA. (UNC FOF ¶143.) When making its admissions decisions, the University considers—and values—a vast array of applicant qualities that go far beyond these metrics. (*Id.* ¶¶75-76, 85-86, 88-89.) Thus, SFFA's conclusions based on Professor Arcidiacono's hypothetical academic index are irrelevant because they do not even attempt to reflect the University's actual admissions process.

Moreover, as Professor Arcidiacono admitted, his corresponding decile analysis that compared subgroups of students by GPA and test scores is not probative of the role of race in admissions. (*Id.* ¶141.) Professor Hoxby also disputed the other conclusions drawn from Professor Arcidiacono's manufactured index and subsequent analysis, which are based upon his artificial approach of dividing applicants up into deciles within this hypothetical academic index—another methodology the University does not employ. (*Id.*

---

[14] Bafflingly, SFFA devotes five pages and 20 paragraphs to a "descriptive analysis merely identif[ying] basic patterns in the data," while admitting that this description reveals nothing about the "effect of race on UNC's admissions decisions." (SFFA ¶136; *see also id.* ¶¶109-135.) It is unclear whether this is included as an attempt to clarify Professor Arcidiacono's testimony by referencing non-admitted trial demonstratives or merely to insinuate more inflammatory allegations against the University. Regardless, as with many of SFFA's proposed findings of fact, this "descriptive analysis" can and should be disregarded in its entirety as irrelevant and unnecessary to any proposed conclusion of law.

30

¶¶142-146) Indeed, Professor Hoxby testified that Professor Arcidiacono's conclusions are misleading and do not show that race is a dominant factor within the admissions process. (*Id.* ¶¶144-146.)

## 2. Professor Arcidiacono's "transformation examples" are hypothetical and impossible

SFFA's assertion that the University affords substantial racial preferences, particularly for out-of-state applicants, based on Professor Arcidiacono's "transformation examples" fares no better. SFFA doubles down on Professor Arcidiacono's analysis calculating the change in purported admissions probability if he treats <u>hypothetical</u> individual applicants as though they were another race. (SFFA ¶¶145-150.) According to Professor Arcidiacono, hypothetical white and Asian applicants who are highly likely to be rejected would be transformed into highly likely admits if they were African American or Hispanic, "keeping all other characteristics the same." (*Id.* ¶146; *see also id.* ¶¶145-150, 298, 303.) Based on these "transformation examples," SFFA claims that racial preferences "dominate admissions for [underrepresented minority] applicants." (*Id.* ¶304.)

Professor Arcidiacono's analysis simply was not credible. (UNC FOF ¶¶133-136.) As Professor Hoxby explained, these hypothetical examples are not representative of the entire applicant pool and were purposefully selected to focus on the portion of the admissions pool where even small differences in qualifications or characteristics can tip the scales between admission and rejection. (*Id.* ¶¶144-146.) But the Supreme Court

31

recognizes that, legally, race <u>may</u> be "likely outcome determinative" for a portion of admissions decisions. *See Grutter* 539 U.S. at 339; *see also Fisher II*, 136 S. Ct. at 2212 ("The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality.").

To determine whether race plays an outsized role, therefore, the Court should look to <u>all</u> admissions decisions—not just the few where any factor, including race, might tip the scale. To hold otherwise would effectively mean that race could never be considered in admissions without becoming the "dominant" factor. For example, there are likely some students for whom playing the piano or being a debate champion would tip the admissions decision from deny to admit, but this does not mean that those qualities are dominant factors in admissions. Tellingly, SFFA admits—based on Professor Arcidiacono's own testimony—that Professor Hoxby's analysis (the Shapley decomposition) determines the effect of race across all admissions decisions in the entire applicant pool. (SFFA ¶187.) Because it cannot credibly challenge the merits of this

analysis,[15] SFFA complains that this analysis "spreads the effect of UNC's racial preferences across the approximately 40,000 admissions decisions made each cycle for the entire applicant pool." (*Id.* ¶189.) But the role of race and ethnicity across the University's admissions process is the question at hand, and Professor Hoxby's approach is consistent with the governing law. (*See* UNC COL at 98-100.) It is not "conceptually flawed" (SFFA ¶186) to address the question as framed by the Supreme Court, and the undisputed evidence presented at trial—including Professor Arcidiacono's testimony—proved that when the entire applicant pool is properly considered, race is not the predominant factor.

Nor can Professor Arcidiacono's calculation of a "marginal effect of race" or purported accounting of a percentage of admissions decisions "due to racial preferences"

---

[15] To attempt to undermine Professor Hoxby's opinions, SFFA again takes liberties with the record by citing two economic textbooks that are not in evidence, purportedly because they were "quoted and discussed" during Professor Hoxby's cross-examination. (SFFA ¶183.) But the only "discussion" that occurred was counsel's repeated question of whether Professor Hoxby "heard [him] okay" and Professor Hoxby's answer in the affirmative. (Tr. 1132:12-1134:5 (Hoxby).) Not only is SFFA's characterization wrong, but it also ignores the Court's guidance during closing arguments that attempting to use these non-admitted textbooks to support Professor Arcidiacono's opinion—exactly as SFFA attempts to do now—is improper. (Tr. 1397:24-1399:10 (SFFA Closing).) At any rate, Professor Hoxby credibly rebutted any challenge to her approach, explaining why her choices are appropriate, that the Shapley decomposition is the proper econometric method to employ to answer the relevant question, and that its use on either expert's preferred model reveals that race is not the dominant factor in admissions. (UNC FOF ¶¶118-125.)

*(cont'd)*

relating to subgroups of applicants change this conclusion.[16] (*Id.* ¶¶297, 299, 302.) SFFA asserts that Professor Arcidiacono demonstrated that racial preferences "account for" a high percentage of Hispanic and African American admissions. (*Id.*) But Professor Arcidiacono cannot escape that when his percentage values are totaled up, they do not equal 100% as one would reasonably expect, and instead misleadingly add up to far more than 100%. (Tr. 966:15-967:21 (Hoxby); UNC FOF ¶¶137-138.) Moreover, other factors, including test scores, are demonstrably more important in the University's admissions process than race. (UNC FOF ¶120.) Under governing Supreme Court law, the inquiry ends here: even if race does tip the scales in some admissions decisions (as the law allows), there is no statistical evidence that race is the predominant factor in the University's admissions process.

### 3. Professor Arcidiacono made additional choices that render his testimony noncredible

As discussed in the University's post-trial brief, even if Professor Arcidiacono had examined the proper question, his testimony regarding the University's admission process was not credible. (UNC COL at 98 n.10 (citing UNC FOF ¶¶129-139, 142-143).) Consider, for example, Professor Arcidiacono's decision to calculate and apply disparate converted SAT scores for applicants of different racial groups and gender who actually

---

[16] Professor Hoxby also demonstrated that Professor Arcidiacono's large putative "average marginal effect[s] of race" are inapplicable to the circumstances of an admission process and driven by small numbers of students—much like his individual, hypothetical transformation examples discussed above. (Tr. 967:23-970:25 (Hoxby).)

34

earned the same score on the ACT. Professor Arcidiacono's choice in this respect was entirely divorced from the University's actual process. As even he acknowledged, the University uses a concordance table created by the College Board to translate test scores. (UNC FOF ¶130.) Not only was Professor Arcidiacono's choice unnecessary, it also penalized underrepresented minority and female applicants by assigning them lower scores than white, Asian, and male applicants who took the same test and received the same score. (*Id.* ¶131-132 (Professor Arcidiacono's approach resulted in a black woman receiving 45 fewer points than a white male).) Nonetheless, Professor Arcidiacono steadfastly maintained this was "not a penalty." (*Id.* ¶132.)

Rather than address this point, which was made at trial, SFFA instead discusses an entirely separate criticism Professor Hoxby made in her expert reports regarding <u>other</u> ways in which Professor Arcidiacono chose to treat African American and Hispanic applicants differently than white and Asian applicants.[17] (*See* SFFA ¶¶214-225.) But SFFA's refusal to confront the record evidence cannot hide that Professor Arcidiacono repeatedly made unnecessary and non-standard choices that did not correspond to the University's actual admission process, rendering his opinions noncredible.

---

[17] Tellingly, SFFA does not cite the trial transcript when arguing against the relevance and persuasiveness of Professor Hoxby's criticism of Professor Arcidiacono's method of imputing missing performance ratings. (SFFA ¶214.) This is because Professor Hoxby did not discuss this criticism at trial.

35

Accordingly, despite SFFA's claims to the contrary, for these and all the reasons articulated in the University's post-trial brief, the overwhelming conclusion based upon the totality and credibility of the evidence presented at trial is that race does not dominate the University's entire holistic admissions process. (UNC COL at 96-100.) The Court should find that the University considers race in admissions in a narrowly tailored, constitutionally permissible manner.

III.    **There Is No Workable Race-Neutral Alternative to the University's Race-Conscious Admissions Program**

A.    **The University Has Considered Race-Neutral Alternatives Seriously and in Good Faith**

In addition to proving that its consideration of race in admissions is narrowly tailored to pursue its compelling interest in the educational benefits of diversity, the University also demonstrated at trial that, over many years, it has given serious, good-faith consideration to race-neutral alternatives to its race-conscious program, but has yet to find one that could work "about as well and at tolerable administrative expense." *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312.) In particular, as recommended by the Supreme Court, the University periodically assessed various available alternatives, including those implemented by other institutions or studied in academic literature. (UNC FOF ¶¶173-195.) *Cf. Grutter* 539 U.S. at 342 (advising universities to pay attention to race-neutral approaches developed by schools in states where state law prohibits the consideration of race). It also established two separate committees comprising experienced, dedicated stakeholders who drafted reports,

36

conducted simulations, and invested significant time and resources to careful, conscientious deliberation of admissions strategies that might work within the specific context of the University. (UNC FOF ¶¶183-200.) Although SFFA tries to diminish the University's efforts—implying they are too few in number and characterizing them as "ad hoc," "draft," and unfinished (SFFA ¶¶231-232)—the trial record does not support SFFA's criticisms.

SFFA suggests that the University's efforts are inadequate because the University did not "fully" test or adopt certain approaches that SFFA's expert, Mr. Kahlenberg, proposes. (SFFA ¶¶238, 321.) But running simulations or implementing policies that an academic <u>thinks</u> might work or should be studied is not what the law requires.[18] *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013) ("*Fisher I*") ("Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." (quoting *Grutter*, 539 U.S. at 339-40)). And Mr. Kahlenberg's assertions regarding possible race-neutral alternatives that are divorced from the realities of the University (*see, e.g.*, UNC FOF ¶¶235-244) are insufficient to support a finding that the University has failed in its obligation to engage in a good-faith consideration of race-neutral alternatives. Here, the record shows that the University repeatedly considered race-neutral alternatives in good faith and rejected those alternatives that, in the University's "experience and expertise,"

---

[18]  And, as discussed below, Professor Hoxby ran simulations to cover as many of these suggestions as possible, but was unable to find a successful race-neutral alternative. *See infra* §III.D.1.

are unworkable for its unique circumstances. *See Fisher I*, 570 U.S. at 311 (stating that a court can take into account "a university's experience and expertise in adopting or rejecting certain admissions processes").

Moreover, any argument that the University's efforts are insufficient because they remain ongoing rings hollow. Consistent with its "continuing obligation" to assess the necessity of considering race, *Fisher II*, 136 S. Ct. at 2209-10, the work of the University's Committee on Race-Neutral Strategies persists, including evaluating the expert evidence developed during this case and, when appropriate, running independent simulations of race-neutral alternatives. (UNC FOF ¶¶199-201.) This is what the law requires. The Court should find that the University has made a serious and good faith attempt to consider race-neutral alternatives.

> **B.** **The University Already Employs the Majority of the Race-Neutral Strategies that SFFA Asserts Would Allow the University To Pursue the Educational Benefits of Diversity**

SFFA overstates the record when it asserts that Mr. Kahlenberg found that the University "failed to fully . . . implement numerous workable race-neutral alternatives." (SFFA ¶238.) As Mr. Kahlenberg conceded, none of the "alternatives" SFFA proposes are standalone replacements for the University's current admissions program (UNC FOF ¶227). Perhaps more fundamentally, the University <u>already</u> employs numerous of the race-neutral strategies Mr. Kahlenberg touts—including recruiting diverse students, offering financial aid, partnering with disadvantaged high schools, and encouraging community college transfers—all with the aim of increasing diversity within its applicant

pool. (*Id.* ¶¶147-172.) And the few strategies that the University has not implemented—eliminating legacy preferences and Early Action—were shown at trial to be ineffectual.

### 1. The University engages in extensive recruiting designed to increase diversity within its applicant pool

As part of its efforts to increase diversity on its campus, the University engages in extensive recruiting efforts, including recruitment specifically targeted toward underrepresented minorities. (UNC FOF ¶¶148-158.) Indeed, Mr. Kahlenberg conceded that the University has "a number of good programs for recruitment" and is doing "some good work in this area." (Tr. 453:13 (Kahlenberg).) Tellingly, the <u>only</u> support that Mr. Kahlenberg provided for his opinion that the University could somehow enhance its good work in recruiting was to cite the statistic that 22% of applicants are first generation college students in a state where 72% of adults over 25 years-of-age lack a college degree. (Tr. 453:14-22 (Kahlenberg).) But Mr. Kahlenberg's superficial observation ignores that most socioeconomically disadvantaged applicants in North Carolina are white—as Professor Hoxby empirically established and neither Mr. Kahlenberg nor Professor Arcidiacono disputed. (UNC FOF ¶217; *see also* Tr. 1206:3-14 (Long).) Thus, the evidence establishes both that the University already engages in robust recruiting <u>and</u> that doing "more" would not allow the University to abandon the consideration of race and still achieve racial and ethnic diversity.

### 2. The University offers generous financial aid

The record shows the University's ongoing and demonstrated commitment to increasing access to higher education for low income students—both by seeking to

understand their achievements in the context of socioeconomic challenges they face and by making it financially possible to attend the University through generous and award-winning financial aid initiatives, including meeting 100% of demonstrated financial need. (UNC FOF ¶¶165-170.) Nevertheless, SFFA posits that further increasing financial aid is a viable race-neutral alternative. (SFFA ¶238.) But Mr. Kahlenberg did not provide any evidence supporting this proposition, and he admitted he did not analyze the funding sources for, or feasibility of, increased financial aid; he merely considered the issue at a "high level." (UNC FOF ¶237.) And, even if there were a concrete basis to suggest that increasing financial aid would increase racial diversity, implementing this strategy clearly would impose more than tolerable administrative expense. *Cf. Fisher II*, 136 S. Ct. at 2208 (workable alternatives must promote the universities goals "about as well and at tolerable administrative expense"). Thus, even assuming this "alternative" were available—which is it not—the law does not require its implementation.

### 3. The University partners with disadvantaged high schools

Through the Carolina College Advising Corps program, the University works to extend its outreach to underserved, low-income, and first-generation college students and minority populations in partner high schools across North Carolina. (UNC FOF ¶¶159-160.) SFFA ignores this evidence, claiming that Mr. Kahlenberg found that the University has failed to develop partnerships with disadvantaged high schools and could do so as a race-neutral alternative. (SFFA ¶238 (citing Tr. 430:22-435:9 (Kahlenberg)).)

40

This purported assertion by Mr. Kahlenberg is not only non-existent within his trial testimony, but also squarely contradicted by the actual record evidence.

In the portion of the trial record on which SFFA relies, Mr. Kahlenberg testified to a specific socioeconomic status-based simulation that provided a preference for students who attend a disadvantaged high school, but he said nothing about the University's purported failure to develop partnerships with such schools. (Tr. 430:22-435:9 (Kahlenberg).) Although Mr. Kahlenberg previously made this assertion in his expert reports—and Professor Hoxby rebutted this theory in her reports through empirical analysis—his opinion on this front simply is not part of the record.[19]

Even setting aside the lack of evidence to support this assertion, Professor Hoxby rebutted it at trial, finding that even if the University was able to draw an unusually large number of applicants from socioeconomically disadvantaged high schools (clearly the intended goal of partnerships with such high schools), the admitted and matriculating class would have substantially lower test scores. (UNC FOF ¶228.) Mr. Kahlenberg never addressed this analysis, and it stands unchallenged.

### 4. The University encourages community college transfers

Finally, the record demonstrates the University makes substantial efforts to recruit community college transfer students through its Carolina Student Transfer Excellence

---

[19] By the agreement of the parties, the reports of the parties' experts who testified at trial were not proffered or admitted into evidence.

Program ("C-STEP"). (UNC FOF ¶¶162-164.) SFFA asserts that admitting more community college transfer students is another workable race-neutral alternative underutilized by the University (SFFA ¶238), but no evidence supports this. Once again, Mr. Kahlenberg admitted that the University "has some good programs in this area" while baselessly asserting that there is "room for improvement." (Tr. 454:11-455:1 (Kahlenberg).) But Mr. Kahlenberg never attempted to quantify the impact such "improvement" might have, and he admitted that he made no effort to model this strategy. (UNC FOF ¶229.)

Although the University bears the burden of assessing race-neutral alternatives, it cannot be the case that SFFA—or an expert it retains—can do no more than theorize hypothetical alternatives and consequently force the University to engage in extensive analysis to <u>disprove</u> the theory, no matter how vague or amorphous. *See Fisher I*, 570 U.S. at 312. Nevertheless, Professor Hoxby did the work: she empirically tested the possible results of an increase in transfer students from community colleges and concluded based on two separate analyses that the University would likely suffer a decrease in both racial and ethnic diversity and academic preparedness. (UNC FOF ¶¶229-231.)

## C.    Other Race-Neutral Strategies Are Not Likely To Increase Racial Diversity

In addition to suggesting race-neutral strategies that the University already uses, SFFA also suggests strategies that the evidence shows would have no impact on the

42

University's ability to achieve racial diversity without considering race, including eliminating legacy preferences and Early Action admissions decisions. (SFFA ¶238.) The Court should not credit these unsupported suggestions.

Relying on Mr. Kahlenberg, SFFA claims that the University could eliminate legacy preferences to produce the educational benefits of diversity. (*Id.* ¶238.) But Professor Arcidiacono admitted that legacy preferences have a <u>minimal</u> effect on the number of underrepresented minority students admitted to the University. (UNC FOF ¶237; *see also* Tr. 500:17-20 (Kahlenberg) (testifying that he witnessed Professor Arcidiacono's admission).) Thus, Mr. Kahlenberg's conjecture is once again disproven by the data itself. Simply put, no evidence exists that this strategy, even when combined with others, would have a meaningful impact on the University's ability to achieve a diverse and academically prepared class.

Likewise, SFFA claims the University's elimination of its Early Action application process is a race-neutral alternative based on Mr. Kahlenberg's say-so.[20] (SFFA ¶238.) On this front, the experience of other universities belies Mr. Kahlenberg's speculation that the University is actively ignoring a successful race-neutral strategy. Mr. Kahlenberg did not dispute that, after abandoning early admissions in 2006, the

---

[20] Mr. Kahlenberg premised his claim that the University employs a "preference" for early admissions based on some unidentified finding of Professor Arcidiacono's models. (Tr. 502:25-503:3 (Kahlenberg).) But Professor Arcidiacono offered no such testimony at trial, and Mr. Kahlenberg conceded that he is not an expert in economics, much less econometrics. (UNC FOF ¶234.)

University of Virginia and Princeton re-instituted those policies, and he admitted that Harvard did the same because of a concern that eliminating early admissions had led to fewer highly qualified students applying. (UNC FOF ¶244.)

## D. No Workable Race-Neutral Alternative to the University's Current Admissions Process Is Available

The only remaining issue is whether any of the race-neutral alternative simulations run either at Mr. Kahlenberg's direction or by Professor Hoxby prove that an alternative to the University's current race-conscious admissions practices is available and "workable." The record establishes that the University has met its burden to prove that no such alternative could achieve the University's goals about as well, and SFFA's evidence fails to demonstrate otherwise.

### 1. Professor Hoxby's analysis demonstrated that no alternatives are workable

The Supreme Court has made clear that a university bears the burden to prove that "available, workable race-neutral alternatives" are insufficient. *Fisher I*, 570 U.S. at 312; *Fisher II*, 136 S. Ct. at 2208. To be a "workable" alternative, the race-neutral approach must promote the university's "interest in the educational benefits of diversity 'about as well and at tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 313). An alternative that would force the university to choose between diversity and academic excellence is—by definition—unworkable, and need not be implemented. *Id.* Likewise, universities are not required to adopt an admissions approach that would "sacrifice all other aspects of diversity in pursuit of enrolling a

44

higher number of minority students." *Id.* at 2213. To date, no court has found an available, workable race-neutral alternative for a highly selective school like the University. Tellingly, SFFA's post-trial brief does not contend otherwise.

Instead, SFFA claims that the University has not presented any evidence to meet its burden because Professor Hoxby testified that she did not offer a specific opinion concerning whether any particular race-neutral alternative is "workable." (SFFA ¶¶267-270.) This argument elevates form over substance. Professor Hoxby assessed the question of whether a race-neutral approach could achieve the University's current levels of racial diversity without sacrificing academic excellence. She comprehensively analyzed all reasonable race-neutral alternatives, including the levels of racial diversity and academic preparedness that might be achieved using favorable assumptions to effectively create the best-case scenarios. (*See, e.g.*, UNC FOF ¶¶202-209.) She objectively compared these levels to the outcomes currently achieved under the University's holistic, individualized, race-conscious approach and found that <u>none</u> of the race-neutral alternatives she simulated would result in the levels of racial diversity or academic preparedness currently achieved by the University. (*Id.*)

As Professor Hoxby explained, she made "really generous assumptions" that would ensure the most positive conditions possible for the race-neutral alternatives and yet still was unable to find a single realistic and feasible alternative that would be able to attain the University's actual levels of racial diversity and academic preparedness. (Tr. 938:5-11; 1182:3-10 (Hoxby).) And while the University is committed to considering any

45

alternative that could come close to meeting its goals (UNC FOF ¶201), the evidence reflects that the University continues to work toward achieving the educational benefits of diversity (*Id.* ¶¶39-43). Alternatives that do not compare to holistic, race-conscious review under even the most optimistic circumstances are inherently unworkable. Moreover, because the Supreme Court does not require the University to sacrifice either racial diversity or academic excellence, the evidence presented by Professor Hoxby necessarily demonstrates that race-neutral alternatives are not workable, regardless of what terminology is employed. The inquiry properly ended there.

Indeed, Professor Hoxby's reluctance to overstep her mandate is consistent with the governing law, which requires that any viable alternative must not only promote the University's educational goals, but also impose only "tolerable administrative expense" in order to be "workable." *Fisher I*, 570 U.S. at 312 (citation omitted). Neither Professor Hoxby nor Mr. Kahlenberg can reliably consider the question of "tolerable administrative expense." This makes sense because whether a new admissions process should be adopted or rejected based on administrative expense should be informed by the "experience and expertise" of the University—not expert witnesses. *Cf. Fisher I*, 570 U.S. at 311. And, regardless of what either expert opines, it is this Court that must ultimately be satisfied based on the presentation of the evidence "that no workable race-neutral alternatives would produce the educational benefits of diversity." *Id*. at 312.

46

## 2. SFFA's simulations are flawed and unpersuasive

Setting aside SFFA's incorrect assertion that Mr. Kahlenberg presented "unrebutted" expert opinion (SFFA ¶330), the evidence presented at trial proved that Mr. Kahlenberg's simulations are noncredible and unrealistic, and fail to prove the existence of any workable race-neutral alternative. (UNC FOF ¶¶245-257.)

As a threshold point, all of Mr. Kahlenberg's simulations—including those highlighted in SFFA's post-trial brief—are premised on unreasonable and unreliable assumptions about the applicants who might apply under a new admissions program. As set forth below, Mr. Kahlenberg adopted an all-or-nothing approach that effectively locked the applicant pool, assuming either that the University's applicant pool remained unchanged despite the implementation of a new admissions program, or that all eligible applicants in the state would apply:

| Kahlenberg Simulation | Applicant Pool | Unrealistic, Foundational Assumption |
|---|---|---|
| 8 (percentage) 3 (SES) 13 (SES) | University's current applicant pool | All high achieving underrepresented minority applicants continue to apply, i.e., "no one leaves the pool"; and no potential applicants favored by the plan apply, i.e., "no one is let into the pool" |
| 9 (percentage) 11 (SES) | NCERDC[21] applicant pool | 100% of all eligible applicants, including the highest achieving applicants (measured by test scores and grades) apply, i.e., "everyone is in the pool" |

Mr. Kahlenberg conceded that these assumptions were unrealistic and that it was "unlikely that 100 percent of the people will apply." (Tr. 478:18-19 (Kahlenberg); *see also* UNC FOF ¶¶245, 258.) And both Professor Hoxby and Dean Long provided undisputed testimony that when an admission process changes, so too does applicant behavior. (UNC FOF ¶¶215, 242, 245.)

Mr. Kahlenberg's Simulation 3—a socioeconomic status-based race-neutral alternative that SFFA touts in its post-trial brief as a workable alternative yielding roughly comparable racial diversity and academic characteristics (SFFA ¶¶242-244)— provides a clear illustration of the serious flaws in Mr. Kahlenberg's approach. Despite providing a very large boost to applicants who are socioeconomically disadvantaged, Mr. Kahlenberg assumes that the University applicant pool <u>will not change</u>. Because he draws from the exact same applicant pool, it is no surprise that racial diversity and academic performance measures remain about the same as the current levels. But when Professor

---

[21] The North Carolina Educational Research Data Center ("NCERDC") contains data for all North Carolina public school students. (UNC FOF ¶217 n.6.)

48

Hoxby ran Simulation 3 using the NCERDC applicant pool that would be strongly incentivized to apply under this new admissions approach, the average SAT score dropped by approximately 170 points. (UNC FOF ¶¶257-258.) The fundamentally flawed assumptions that underpin each of Mr. Kahlenberg's simulations make those simulations incapable of proving that there is a workable race-neutral alternative that would allow the University to achieve racial and ethnic diversity and academic preparedness about as well as holistic, individualized race-conscious admissions. For this reason alone, they should be discarded.

Mr. Kahlenberg's simulations fail to prove the existence of a race-neutral alternative for other reasons as well. First, SFFA concedes by lack of argument that there is no geography-based race-neutral alternative, based either upon zip code or Census tract, that is available to the University. Mr. Kahlenberg offered no such simulations and Professor Hoxby persuasively testified that, despite her best efforts to operationalize an entirely theoretical concept that has only been posited in academic papers, there is no geography-based race-neutral alternative that would achieve racial diversity or academic preparedness. (*Id.* ¶¶222-227.) This ends consideration of this issue.

Second, the two percentage plans that SFFA proffers as workable (Simulations 8 and 9) are inherently flawed and noncredible. Both Simulations 8 and 9 are versions of a percentage plan based upon Professor Arcidiacono's flawed model of the University's admissions process and a hypothetical "ranking" of the applicants based upon that model. No university has ever implemented such a percentage plan. (*Id.* ¶¶246-247.) Moreover,

Simulation 8 exists only because Professor Hoxby noticed that Mr. Kahlenberg's original percentage plan (Simulation 5)—which he claimed was "superior in every respect"—was missing 30% of the incoming admitted class (in addition to reflecting other basic errors).[22] Consequently, Mr. Kahlenberg was forced to have Professor Arcidiacono re-do the simulation. (*Id.* ¶¶248-250.) And even though Simulation 9 uses the University's current applicant pool to fill 75% of the admitted class and assumes that every public high school valedictorian in North Carolina will apply to the University to fill the remaining 25% of seats, Mr. Kahlenberg admitted that Simulation 9 resulted in an approximately 10% decrease in Hispanic and Asian American applicants. (UNC FOF ¶253; *see also* Tr. 481:1-483:24 (Kahlenberg).) This is hardly "roughly comparable" diversity as SFFA claims. (SFFA ¶258 ("Hispanic shares also are roughly comparable").)

Third, Mr. Kahlenberg's testimony did not prove that a workable socioeconomic status-based race-neutral alternative exists. Simulations 3, 11, and 13 are the socioeconomic status-based plans reflected in Mr. Kahlenberg's original report modified by two rounds of revisions in response to Professor Hoxby's analysis and criticism. But

---

[22] At times, SFFA mischaracterizes Mr. Kahlenberg's testimony on his simulations. For example, in describing Simulation 8, SFFA states that "[b]ecause this would not fill the entire incoming admitted class, Mr. Kahlenberg rounded out Simulation [8] by taking the top remaining applicants as scored on UNC's ratings." (SFFA ¶253.) But SFFA misstates how Mr. Kahlenberg attempted to correct for the errors that Professor Hoxby identified: he had Professor Arcidiacono fill the missing 30% of the admitted class (hardly a "rounding out") with the top students based not on the University's ratings, but on the Arcidiacono admissions index—which uses only high school grades and test scores. (UNC FOF ¶251; *see also* Tr. 476:6-14, 474:12-475:11 (Kahlenberg).)

50

Mr. Kahlenberg gave such a large socioeconomic preference that it rendered the simulations entirely unrealistic. Simulation 3—the underlying basis for Simulations 11 and 13—allows an applicant to get up to two "bumps" for being socioeconomically disadvantaged, with each bump effectively being the equivalent of over 200 SAT score points. (UNC FOF ¶¶255-256.) Requiring the University to focus on socioeconomic status to the exclusion of all other applicant characteristics cannot be a proper application of strict scrutiny. *See Fisher II*, 136 S. Ct. at 2213 (explaining that a race-neutral alternative need not be implemented if it would undermine the university's commitment to "all . . . aspects of diversity").

Moreover, as discussed above, and as Mr. Kahlenberg admitted, the purported "success" of Simulation 3 is premised upon the flawed assumption that, despite this very large socioeconomic boost, the University applicant pool will not change. When a realistic applicant pool is used, the average SAT score dropped by approximately 170 points. (UNC FOF ¶¶257-258.) Similarly, the other two SES-based simulations (Simulations 11 and 13, which decrease the magnitude of the bumps) are premised upon the assumption that the applicant pool is locked in a way that favors the simulation results. (*Id.*; *see also* Tr. 488:3-21 (Kahlenberg).) Nevertheless, despite these unrealistic assumptions, Simulation 11, which SFFA repeatedly emphasizes, increases the percentage of white admitted students from 68.4% to 72.7% and decreases the percentage of Asian-American admitted students from 11.6% to 9.4%. (*See* ECF No. 247-2 at 18.) And despite assuming that every high school applicant in North Carolina with the highest

51

standardized test scores will apply, average SAT scores still drop. (*Id.*) Simulations premised upon such unrealistic assumptions do not prove that a workable race-neutral alternative is available to the University.

Mr. Kahlenberg also misinterprets the results of Professor Hoxby's socioeconomic status-based plan, claiming that her "750/20% plan" is a workable race-neutral alternative if modified. To begin, SFFA incorrectly asserts that Professor Hoxby failed to complete the class after admitting 750 students based upon their socioeconomic status. (SFFA ¶262.) Professor Hoxby testified that she completed the class—not just once, but "a hundred times in a row in order to try to figure out . . . what the rest of the class would probably look like in a realistic kind of way." (Tr. 1001:14-1002:10 (Hoxby) (emphasis added) (cited at UNC FOF ¶214).) Moreover, Professor Hoxby intentionally designed this final step of completing the class to favor the race-neutral alternative's ability to achieve both racial and ethnic diversity and higher test scores.[23] (UNC FOF ¶214.) Despite this, and the other very generous assumptions she made to favor the socioeconomic status-based alternatives' chance of success, Professor Hoxby testified that, after completing the class, none of the 82 SES-based simulations she tested achieved the University's actual levels of racial and ethnic diversity and academic preparedness. (*Id.* ¶¶212-217.)

---

[23] Like all of her simulations of potential race-neutral alternatives, Professor Hoxby's 750/20% SES-based simulation relied upon very generous assumptions designed to maximize the alternative's chance of success. (UNC FOF ¶¶200-209, 212-217.)

52

Additionally, not only does SFFA misapprehend Professor Hoxby's testimony, but the "modification" that Mr. Kahlenberg instructed Professor Arcidiacono to perform to complete the class is unrealistic. After admitting 750 students based on socioeconomic status, Mr. Kahlenberg fills the rest of the class—approximately 80%—by selecting the "most academically qualified students remaining, using GPA and SAT (equally weighted) for in-North Carolina public high school students." (SFFA ¶262.) Despite this incredible assumption, test scores and grades <u>still</u> declined. (*Id.* ¶266.) An admissions system that admits 100% of students based on three factors—socioeconomic status, test scores, and grades—but still causes test scores to drop is hardly a workable alternative to holistic, individualized review. *See Fisher II*, 136 S. Ct. at 2213 (explaining that a university is not required to sacrifice a commitment to all aspects of diversity). Thus, under the circumstances and based on the evidence presented at trial, the Court should find that there presently is no workable race-neutral alternative to the University's holistic, race-conscious admissions program.

<u>**CONCLUSION**</u>

For the foregoing reasons, and for the reasons stated in the UNC Defendants' Proposed Findings of Fact and Conclusions of Law (ECF No. 245), the UNC Defendants respectfully request that the Court reject SFFA's proposed findings of fact and conclusions of law, adopt the UNC Defendants' proposed findings of fact and conclusions of law, find that the University's admissions practices are constitutional, and enter judgment in favor of the UNC Defendants on Counts I and II of the Complaint.

53

Respectfully submitted this 3rd day of March, 2021

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

/s/ Patrick Fitzgerald
Patrick Fitzgerald
Amy L. Van Gelder
Marianne Combs
Skadden, Arps, Slate, Meagher
   & Flom, LLP
155 North Wacker Drive
Chicago, IL 60606-1720
(312) 407-0700
E: patrick.fitzgerald@skadden.com
E: amy.vangelder@skadden.com
E: marianne.combs@skadden.com

/s/ Lara Flath
Lara Flath
Skadden, Arps, Slate, Meagher
   & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-3000
E: lara.flath@skadden.com

JOSHUA H. STEIN
ATTORNEY GENERAL

/s/ Stephanie Brennan
Stephanie Brennan
Special Deputy Attorney General
NC State Bar No. 35955
E: sbrennan@ncdoj.gov

/s/ Tamika Henderson
Tamika Henderson
Special Deputy Attorney General
NC State Bar No. 42398
E: tlhenderson@ncdoj.gov

*Attorneys for UNC Defendants*

54

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing UNC Defendants'

Proposed Findings of Fact and Conclusions of Law via the Court's electronic filing

systems, pursuant to the Electronic Filing Procedures, on all attorneys of record who have

entered an appearance by ECF in this matter.

This 3rd day of March, 2021.

/s/ Patrick Fitzgerald
Patrick Fitzgerald