# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-954-LCB-JLW |
| UNIVERSITY OF NORTH CAROLINA, et al., | |
| Defendants. | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Alan M. Ruley
N.C. State Bar No. 16407
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston Salem, NC 27120-1029
(336) 714-4147
aruley@belldavispitt.com

Thomas R. McCarthy
William S. Consovoy
J. Michael Connolly
Bryan Weir
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
tom@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

March 3, 2021

# TABLE OF CONTENTS

RESPONSE TO UNC'S PROPOSED FINDINGS OF FACT ............................................... 1

I.   UNC's Admissions Process is Formulaic and Focuses Heavily on Race. ..................... 1

   A.   UNC's Pre-Application Recruiting Practices Reveal Its Racial Admissions
   Preferences. ................................................................................................................ 1

   B.   UNC's Reader Training Carefully "Calibrates" Readers to Ensure that They All
   Reach the Same Conclusions About Similar Applicants. ..................................... 2

   C.   Readers Heavily Emphasize Race When Evaluating Applications. ............................. 3

   D.   UNC Actively Monitored the Racial Makeup of Incoming Classes Until Discovery
   Commenced in this Case. ...................................................................................... 6

   E.   UNC Has Failed to Define, Understand, or Pursue Critical Mass. ............................ 6

II.   UNC Cannot Overcome the Statistical Evidence Demonstrating that Race Plays a
Dominant Role in the Admission of URM Applicants and that UNC's Admissions
Process is Highly Formulaic. ........................................................................................ 9

   A.   Dr. Hoxby's Testimony Does Nothing to Undermine Professor Arcidiacono's
   Conclusion that UNC's Admissions Process is Highly Formulaic. ................... 10

   B.   Dr. Hoxby's Testimony Does Nothing to Undermine Professor Arcidiacono's
   Conclusion that UNC Gives Significant Racial Preferences to URM Applicants. .......... 13

   C.   Dr. Hoxby's Remaining Criticisms Miss the Mark. ..................................................... 24

III.   UNC Failed to Consider or Pursue Available Race-Neutral Alternatives. ............... 26

   A.   UNC Failed to Fully Consider Numerous Available Race-Neutral Alternatives that
   Could Achieve the Educational Benefits of Diversity. ....................................... 26

   B.   UNC failed to pursue clearly available, established programs that would have
   increased the racial and ethnic diversity of its student body without considering race in
   admissions. ............................................................................................................ 31

i

C.   Dr. Hoxby's Race-Neutral Alternatives Analysis Fails to Undermine Mr. Kahlenberg's Testimony and Simulations, which Demonstrate that UNC Has Workable Race-Neutral Alternatives. ................................................................................................... 32

RESPONSE TO UNC'S PROPOSED CONCLUSIONS OF LAW ..................................... 42

I.   UNC'S Use of Race Violates Strict Scrutiny. .................................................. 42

A.   UNC Does Not Use Race Merely as an Individualized "Plus" Factor to Achieve the "Educational Benefits of Diversity." ............................................................. 43

B.   It is Unnecessary for UNC to Use Race to Achieve Student Body Diversity. ........ 47

CONCLUSION ........................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ................................................................ 48

*Fisher v. University of Texas at Austin,* 136 S. Ct. 2198 (2016) ........................................................ 9

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ............................................................................46, 47

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................................................. passim

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294 (4th Cir. 2004) ........................................................ 49

*Students for Fair Admissions, Inc. v. Harvard College*, 397 F. Supp. 3d 126 (D. Mass. 2019) ..16, 33, 36

**Other Authorities**

Greene, W., Econometric Analysis (7th Ed. 2012) ...................................................................... 11

Train, K., Discrete Choice Methods with Simulation (2nd ed. 2009) ....................................... 11

**RESPONSE TO UNC'S PROPOSED FINDINGS OF FACT**

**I.**     **UNC's Admissions Process is Formulaic and Focuses Heavily on Race.**

   **A. UNC's Pre-Application Recruiting Practices Reveal Its Racial Admissions Preferences.**

1.     UNC's racial preferences begin before admissions officers ever read an application. UNC engages in "extensive recruitment efforts" to attract "talented and diverse students" of all types to the University. UNC Findings of Fact and Conclusions of Law ("UNC-FF" or "UNC Br.") ¶148. It does so by (1) purchasing the contact information of more than 75,000 high school students who have taken standardized tests; (2) identifying "admissible" prospects from "targeted populations"; and (3) encouraging them to apply. SFFA Findings of Fact and Conclusions of Law ("SFFA-FF") ¶¶44-45. UNC officers testified that they only purchase contact information for students whose test scores make them competitive for admission. SFFA-FF ¶49. Tellingly, the admissions office sets different minimum thresholds for "admissibility" based on students' race. In 2014, for example, URMs in North Carolina could score as low as a 26 on the ACT and be recruited, whereas white and Asian-American students needed at least a 29. SFFA-FF ¶47. In short, UNC considers URM applicants who score a 26 on the ACT to be competitive for admission but views white and Asian-American applicants with identical scores as "not … admissible." SFFA-FF ¶49. UNC ceased this practice after this case was filed, SFFA-FF ¶49, but that post-hoc adjustment (like others undertaken by UNC to mask its discriminatory process) cannot paper over the racial preferences revealed by its previous policy.

1

**B. UNC's Reader Training Carefully "Calibrates" Readers to Ensure that They All Reach the Same Conclusions About Similar Applicants.**

2.      UNC conducts "extensive" reader training each year before readers begin reviewing applications, UNC-FF ¶65, to ensure that every reader is "on the same page." SFFA-FF ¶68. UNC also assigns a second reader to review new readers' decisions to ensure that they are "calibrated" to the University's admissions priorities. SFFA-FF ¶68. After readers finish their training, UNC continues to evaluate the ratings they assign, "to see how calibrated" they are. SFFA-FF ¶69. The admissions office even conducted a "reliability test" of readers' decisions, giving each reader the same application to review, to ensure that every reader was scoring applicants the same way. SFFA-FF ¶69.

3.      UNC insists that the "goals of reader training are to introduce readers to the University's individual, comprehensive, and holistic review philosophy and teach them that 'when they read an applicant, they're reading the entire applicant, not just the test score, not just the GPA, not just an essay.'" UNC-FF ¶66. UNC also maintains that reader training is designed to teach readers "that the context of an applicant's background is 'extremely important to consider.'" UNC-FF ¶66. But that is in direct conflict with the fact that readers reach the same conclusions 99% of the time. *See* SFFA-FF ¶70. It is implausible that dozens of readers independently and carefully consider dozens of criteria, account for each applicant's personal history, and then all reach the same conclusion—unless there are, in fact, only a few factors that bear disproportionate weight in the process.

4.      The structure of UNC's review process itself confirms that UNC does not assesses "the entire student" the way it claims. *See* UNC-FF ¶64. UNC sets weekly quotas to ensure that its readers review applications quickly enough to complete the review of 40,000

2

applications within six months. SFFA-FF ¶64. And Jared Rosenberg testified that one of his responsibilities in the admissions office was to "keep the trains running on time" and ensure that readers processed applications quickly enough to meet their weekly quotas. SFFA-FF ¶64. Meeting those quotas necessarily requires fast reviews, even though there is "a lot of information" to "digest" in each application. SFFA-FF ¶64. Although the reading document lists more than 40 criteria grouped into various assessment areas, readers evaluate those criteria and assign ratings within ten minutes of opening an application. SFFA-FF ¶64. And because readers typically spend 2-4 minutes on the student's essay alone and anywhere between thirty seconds to four minutes reading his or her letters of recommendation, they may spend as little as 4 minutes reviewing and scoring the remainder of the application. SFFA-FF ¶66. Though UNC describes its admissions process as "holistic" at least 45 times in its proposed findings of fact and conclusions of law, in truth, UNC's application reviews "are necessarily mechanical, swift, and impersonal." SFFA-FF ¶64.

### C. Readers Heavily Emphasize Race When Evaluating Applications.

5.     UNC admits that it considers applicants' race at every stage of the admissions process, UNC-FF ¶85, but misleadingly claims that race is merely a single data point among many that is considered "in the context of everything else known about the applicant." UNC-FF¶85. That assertion is implausible in light of the evidence at trial. Race is not just a "plus" factor in UNC's admissions criteria, UNC Br. at 98, and UNC does not simply use it to fill the last few seats in the class, PX004, Admission 5.

6.     In fact, UNC is hyper-focused on race throughout admissions decisions. *See* SFFA-FF ¶74 (citing PX071, UNC0209034 ("She is an AA [African- American] female, with

solid everything that adds up to an admit for me."); PX075, UNC0230512 ("I'm going through this trouble because this is a bi-racial (black/white) male."); PX084, UNC0224139 ("I just opened a brown girl who's an 810 [SAT]."); *id.* (noting she was just "think[ing] of a wonderful brown girl a bit ago"); id., UNC0224140 ("If its brown and above a 1300 [SAT] put them in for [the] merit/Excel [scholarship]."); *id.*, UNC0224141 (even with a 26 ACT, the applicant is "[s]till yes, give these brown babies a shot at these merit $$"); *id.*, UNC0224142-43 (expressing disappointment that an applicant with perfect test scores was Asian and not "Brown"); PX 074, UNC0209194 ("Stellar academics for a Native Amer/African Amer kid[.]"); PX076, UNC0231016; PX081, UNC0194840; PX080, UNC0194845.).

7.    For example, UNC listed applicants' race on School Group Reports (SGR) before this litigation began. And even after it removed race fand ethnicity from the face of the reports, that information was still accessible to SGR reviewers if they clicked on the applicant's name on the report. SFFA-FF ¶84. Information about an applicant's race, in other words, was never more than "a click away." SFFA-FF ¶84; *see also* Tr. 77:14-78:5 (Kretchmar) (SGR reviewers "can easily access all the information in the applicant's file," including "information about the race or ethnic identity of the applicant"); Perkins Dep. 97:7-13 ("The moment you click into a file, it's available to you."). Like first and second readers, SGR reviewers take race into account when deciding whether to admit an applicant. SFFA-FF ¶86. Indeed, racial preferences dominate UNC's admissions decisions so thoroughly that SGR reviewers add handwritten notes about a student's race to application

summaries when race is not originally included in the document itself. PX098, UNC0379534 (handwritten notations on SGR report highlighting URM status).

8.      UNC's internal quality-control policies reveal there is no foundation to UNC's claimed confidence that it is not overemphasizing race. Farmer instructed the admissions office to review whether readers were giving undue weight to a wide variety of factors, including gender, legacy, and admissions cycle (early action vs. regular admission). Yet, he never asked them to assess the impact of race on admissions decisions, even though UNC had a model that would permit it to do so—and which it had used to assess the impact of other factors in its process. SFFA-FF ¶93. UNC's confidence in its process, then, is based on little more than speculation that its readers are considering race properly.

9.      Nor can UNC hide from its lackluster efforts to increase socioeconomic diversity. UNC tracks the composition of admitted classes by gender, residency, citizenship, legacy status, and (at least until this case was filed) race. SFFA-FF ¶32. But it does not track the socioeconomic makeup of admitted classes. SFFA-FF ¶32. UNC's decision to impose quality-control measures on its use of every personal characteristic but race reflects its true admissions priorities. Indeed, Farmer himself previously dismissed the idea that UNC emphasizes applicants' socioeconomic status to the same degree that it emphasizes race. In an interview shortly before this case was filed, Farmer admitted that UNC is "not as good as [he] wished it to be with respect to admitting and enrolling disadvantaged students." SFFA-FF ¶31 (citing Tr. 644:2-23 (Farmer)).

Case 1:14-cv-00954-LCB-JLW   Document 252   Filed 03/03/21   Page 9 of 53

### D. UNC Actively Monitored the Racial Makeup of Incoming Classes Until Discovery Commenced in this Case.

10. Until 2015, UNC circulated core reports that identified the racial/ethnic composition of the admitted class as of that date, with comparisons to the prior year. SFFA-FF ¶77. Admissions officers received updates on rolling enrollment rates by race and the projected "yield" of various racial or ethnicity groups throughout the admissions cycle. SFFA-FF ¶77; PX067, UNC0108650 ("Down 17.5% for [African American students] – Ugh."). UNC tries to minimize the fact that its senior officials in charge of admissions policy monitored the racial composition of enrolled students on a daily basis, *see* PX003, Interrogatory No. 9, by emphasizing the new core-report policies it adopted in 2015, UNC-FF ¶¶109-10. But the University cannot have it both ways—it cannot insist that its pre-2015 practices were above board while simultaneously touting its 2015 policy changes as evidence that it now complies with the law. The dissonance of UNC's position is underscored by Farmer's testimony that he changed UNC's core report procedures after discovery commenced because he "didn't want anyone to get the wrong idea." SFFA-FF ¶80.

### E. UNC Has Failed to Define, Understand, or Pursue Critical Mass.

11. UNC claims that it uses race in admissions to enroll a "critical mass" of URMs that can provide the "educational benefits of diversity." SFFA-FF ¶36. Yet the University is unable to define the term "critical mass," cannot pinpoint how or when it may be achieved, and many of its officials *had not even heard of it* before this lawsuit. SFFA-FF ¶¶37, 38, 42. UNC's inability to express its understanding of "critical mass" is predictable, given officials' testimony that they never discuss the concept. Then-Provost Jim Dean admitted that, "[i]n all my conversations with Steve Farmer, that phrase [critical mass] has never come up. ...

6

[N]o one has directed anybody to achieve a critical mass, and I'm not even sure we would know what it is." SFFA-FF ¶37. Contrary to UNC's claims that its race-based admissions policy is designed to achieve a "critical mass" of URMs, Dean testified that critical mass does not "driv[e] the conversation about when race is used and why it is used." SFFA-FF ¶37.

12.     Other testimony confirms what Dean made explicit. Jennifer Kretchmar admitted that she never "had a discussion about" critical mass despite working in the UNC admissions office for more than a decade. SFFA-FF ¶37. Likewise, Michael Davis testified that he never "had any discussions with anyone in the admissions office about what critical mass means," despite his position as Associate Director of Recruitment at UNC. A fourth admissions official testified that critical mass was not "a term that was used in the admissions office" and that she "never got any guidance" about it. SFFA-FF ¶37. A fifth described critical mass as an "amorphous" term that could not be fully measured. SFFA-FF ¶42. A sixth said that there is "no concrete definition" of critical mass and there is "nothing that says when you get to X you will have reached critical mass." SFFA-FF ¶43.

13.     The University's apathy towards critical mass manifests itself in every area of its admissions policy. The Committee on Race-Neutral Alternatives, tasked with analyzing UNC's compliance with its constitutional obligations under *Grutter*, issued a report that never defined or even mentioned "critical mass"—even though this was identified by senior officials as a key question the Committee "needed to address." PX006, UNC0324038. Its successor, the University's Working Group on Race-Neutral Strategies, did not address the term either. Unsurprisingly, then, UNC has never bothered to determine whether it has achieved critical mass. SFFA-FF ¶38.

14.	At trial, UNC tried to rehabilitate its officials' prior admissions by claiming that, although it doesn't formally use the term, it understands critical mass to be assessed based on its campus atmosphere. Farmer claimed that UNC measures critical mass through student climate surveys but conceded under cross examination that he did not review a single climate survey from 2006-2017. Tr. 659:24-660:1 (Farmer). Thus, even under Farmer's post-hoc and self-serving characterizations of UNCs understanding of critical mass—which are contradicted by the record—UNC did not assess its progress towards achieving critical mass for *eleven years*. Yet even at trial, UNC officials could not articulate a coherent or consistent understanding of critical mass. Kretchmar testified that UNC "think[s] of critical mass in terms of its outcomes," and that "one of the ways that [it tries] to determine" it has achieved critical mass is by asking students whether the University has "created the environment for them that they say they want." SFFA-FF ¶41. For her part, Panter stated that the measurement of critical mass is "part quantitative or numbers" and part qualitative, SFFA-FF ¶40, but she was unable to say whether UNC would achieve a critical mass of URMs if "all of the major racial groups were at equilibrium and had the same share of the campus population," SFFA-FF ¶41.

15.	Fittingly, UNC's Proposed Findings of Fact and Conclusions of Law mentions "critical mass" just three times. *See* UNC-FF ¶¶51-52, 182. Worse, UNC's only substantive mention of the term was a generic assertion that even though UNC "admissions officers do not frequently use the term 'critical mass,' they think of critical mass in terms of the outcomes of the educational benefits of diversity." UNC-FF ¶¶52.

8

16.     In sum, nearly eighteen years after *Gruttinger* and nearly seven years after this litigation began, UNC still cannot define critical mass. This directly violates the Supreme Court's command that a "university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher v. University of Texas at Austin,* 136 S. Ct. 2198, 2211 (2016).

## II.    UNC Cannot Overcome the Statistical Evidence Demonstrating that Race Plays a Dominant Role in the Admission of URM Applicants and that UNC's Admissions Process is Highly Formulaic.

17.     As UNC acknowledges, SFFA's expert—Professor Peter Arcidiacono—employed standard, well-accepted econometric techniques to analyze UNC's admissions process. SFFA-FF ¶¶100, 137; UNC-FF ¶113.

18.     In particular, Professor Arcidiacono estimated a series of admissions models to estimate the magnitude of UNC's racial preferences, SFFA-FF ¶¶142-144, and to assess whether UNC's admissions process is formulaic and mechanical, SFFA-FF ¶¶170-73.

19.     Professor Arcidiacono testified credibly that powerful statistical evidence demonstrates both that (1) race plays a dominant role in the admission of URM applicants and (2) UNC's admissions process is highly formulaic. SFFA-FF ¶¶142-73.

20.     UNC retained Dr. Caroline Hoxby to offer expert testimony on these issues. SFFA-FF ¶108; UNC-FF ¶111. Her analytical work is novel and unsupported by academic work in the field and does nothing to undermine Professor Arcidiacono's conclusions. SFFA-FF ¶¶174-229; *see infra* ¶¶21-30, 31-78. Indeed, Dr. Hoxby's work actually supports Professor Arcidiacono's conclusions in multiple respects. *See infra* ¶¶56-78.

## A. Dr. Hoxby's Testimony Does Nothing to Undermine Professor Arcidiacono's Conclusion that UNC's Admissions Process is Highly Formulaic.

21. Professor Arcidiacono's models predict UNC's actual admissions decisions with an "incredibly high" degree of accuracy. SFFA-FF ¶171. For both UNC's in-state and out-of-state pools, Professor Arcidiacono's preferred model accurately predicts UNC's admissions decisions more than 92% of the time. SFFA-FF ¶170. Moreover, his preferred model has an easy time sorting applicants into those very likely to be admitted and very likely to be rejected. SFFA-FF ¶172. Professor Arcidiacono testified credibly that this extraordinarily high degree of accuracy means that UNC's admissions process is "highly formulaic." SFFA-FF ¶173.

22. For its part, UNC concedes that Professor Arcidiacono's preferred model has greater predictive accuracy than Dr. Hoxby's preferred model. UNC-FF ¶117. To be sure, Dr. Hoxby's preferred model is accurate, Tr. 269:16-271:1 (Arcidiacono): its Pseudo-R Square is .428, Tr. 1142:4-6 (Hoxby), which is well above the range which econometrics scholars consider an "excellent fit," Tr. 191:22-25 (Arcidiacono); and it accurately predicts UNC's admissions decisions more than 80% of the time, Tr. 1142:14-18 (Hoxby). Professor Arcidiacono's preferred model is simply better on both metrics (Pseudo-R Squared of .727, Tr. 250:17-20 (Arcidiacono) (in-state), and approximately .6, Tr. 196:9-15 (Arcidiacono) (out-of-state), and predictive accuracy over 92%, SFFA-FF ¶170). This underscores both its "incredibly high" accuracy and Professor Arcidiacono's conclusion that UNC's admissions process is highly formulaic.

23.     Dr. Hoxby contests this conclusion, but in doing so relies on her highly flawed interpretation of the Pseudo-R Squared metric that badly confuses the Pseudo-R Squared with a distinct metric known as the R Squared. SFFA-FF ¶¶178-85.

24.     As noted above, Dr. Hoxby's preferred model has a Pseudo-R Squared of .428. She contends that the Pseudo-R Squared of .428 means that her preferred model explains 42.8% of the variation in the data—that is, she contends that her preferred model "explain[s] 42.8 percent of the admissions rejection decision." Tr. 951:3-6 (Hoxby). From there, she claims that a model with a Pseudo-R Squared of .428 means that "57.2 percent of the admissions decision" is "not explained by the model," Tr. 947:19-22 (Hoxby), and then claims that "57.2 percent … of the process must be holistic," Tr. 948:9-10 (Hoxby), and thus "cannot be formulaic," Tr. 947:8-14 (Hoxby).

25.     Dr. Hoxby failed to cite a single econometrics textbook or academic work supporting this novel interpretation of the Pseudo-R Squared. This is, of course, because econometrics literature makes clear that the Pseudo-R Squared, "even in the discrete choice context for which it was proposed, has no connection to the fit of the model to the data." Greene, W., Econometric Analysis 533 (7th Ed. 2012) (passage quoted and discussed at Tr. 1132:12-1133:5 (Hoxby)); *see also* Train, K., Discrete Choice Methods with Simulation 68 (2nd ed. 2009) ("The likelihood ratio has no intuitively interpretable meaning for values between the extremes of zero and one.") (passage quoted and discussed at Tr. 1133:8-1134:3 (Hoxby)). Indeed, the Pseudo-R Squared has "no natural interpretation." In other words, it does not translate into any percentage and "does not represent the percentage of variation in the data explained by the model." Tr. 250:8-24 (Arcidiacono).

11

26.     Dr. Hoxby agreed on cross-examination that it "doesn't quite make sense" to interpret the pseudo-R squared the same way as the R Squared metric. Tr. 1139:18-22 (Hoxby). Instead of claiming that the Pseudo-R Squared translates directly to the percentage of the admission decision explained by the model (as she had in her direct testimony), Dr. Hoxby retreated. She was willing to state only that, "roughly speaking," this is "a way to interpret [the Pseudo-R Squared]." Tr. 1130:20-24 (Hoxby). Her backtracking testimony further confirms what econometrics textbooks show: Dr. Hoxby's testimony regarding the Pseudo-R Squared is not credible.

27.     Cognizant that Dr. Hoxby's testimony doesn't square with econometrics literature, UNC itself goes to a fallback position. UNC states in its brief that Dr. Hoxby's Pseudo-R Squared of .428 "mean[s] in approximate terms that the model can predict the decision to accept or reject an applicant less than half of the time." UNC-FF ¶115. But even this watered-down claim is still demonstrably wrong.[1]

28.     Given that a Pseudo-R Squared of .2 to .4 represents an excellent fit, a model with a Pseudo-R Squared of .428 would yield much greater predictive accuracy. Professor Greene's textbook, which Dr. Hoxby cited in her own reports, Tr. 1131:2-6 (Hoxby), makes this clear. Professor Greene uses the example of a probit model—which Dr. Hoxby concedes is the same type of model she used—that had a Pseudo-R Squared of 0.083 yet

---

[1] Moreover, UNC's and Dr. Hoxby's interpretation of the Pseudo-R Squared defies common sense. If economists were to produce a binary choice model that predicted less than half of outcomes correctly, then doing the opposite of what the model predicts—since there are only two outcomes—would result in correct predictions more than half the time. To the same point, flipping a coin would produce a better model. Dr. Hoxby's interpretation of the Pseudo-R Squared is thus nonsensical.

12

accurately predicted 71.2% of the observations correctly. *See* Greene, W., Econometric Analysis 703 (7th Ed. 2012) (passage quoted and discussed at Tr. 1140:18-1141:23 (Hoxby)). Indeed, both Dr. Hoxby and Professor Arcidiacono's models illustrate the same point. *See supra* ¶22.

29.     Because Dr. Hoxby's testimony that UNC's admissions process "cannot be formulaic," Tr. 947:8-14 (Hoxby), hinges on a discredited interpretation of the Pseudo-R Squared metric, it is not credible.

30.     UNC recognizes the weakness of Dr. Hoxby's testimony on this point. So it responds by claiming that SFFA's experts "conceded" that UNC's admissions process is "individualized" and thus "non-formulaic." UNC Br. 97. But that is not true. Nowhere in their testimony does either of SFFA's experts say so. To repeat, Professor Arcidiacono testified that UNC's admissions process is "highly formulaic." SFFA-FF ¶173.[2]

### B. Dr. Hoxby's Testimony Does Nothing to Undermine Professor Arcidiacono's Conclusion that UNC Gives Significant Racial Preferences to URM Applicants.

31.     Professor Arcidiacono employed four statistical methods of quantifying the effect of UNC's racial preferences. His analysis shows that, for both in-state and out-of-state

---

[2] Though SFFA's experts at times described UNC's admissions process as "holistic," that is a generic term often used to describe any admissions system that purports to consider numerous subjective criteria. *See, e.g.,* Tr. 117:7-16 (Arcidiacono). Indeed, this is how UNC's counsel regularly used the term in discussing holistic admissions generally. *See, e.g.,* Tr. 301:8-22 (three times using the phrase "holistic admissions" to refer to colleges generally). Lest there be any doubt, Professor Arcidiacono testified that his experience analyzing UNC's applicant data and admissions process has made him skeptical that holistic admissions is genuinely holistic. Tr. 301:8-24 (Arcidiacono). For UNC to claim a supposed concession from the use of the everyday term "holistic" thus is telling. UNC has no effective counter to Professor Arcidiacono's credible testimony that UNC's admissions process is highly formulaic.

applicants, race is determinative for many URM applicants and thus a dominant factor in the admission of URM applicants. SFFA-FF ¶¶144-68.

32.     Dr. Hoxby's testimony on these four analyses ranges from not credible to non-existent. It does nothing to undermine Professor Arcidiacono's conclusion that UNC affords very large racial preferences to URM applicants.

33.     Dr. Hoxby's own analysis of the effect of UNC's racial preferences likewise does nothing to undermine Professor Arcidiacono's conclusions. Her Shapley Decomposition analysis is fundamentally flawed, unpersuasive, and not credible. And she inadvertently confirms that UNC employs very large racial preferences. Her remaining objections miss the mark entirely.

1.  **Dr. Hoxby fails to rebut Professor Arcidiacono's extensive analysis demonstrating that UNC gives very large racial preferences to African-American and Hispanic applicants.**

34.     ***Transformational Analysis.*** Professor Arcidiacono's transformational analysis takes a hypothetical applicant whose characteristics line up with a particular probability of admission and then "transforms" one characteristic of that applicant to recompute his or her probability of admission. SFFA-FF ¶145. Here, Professor Arcidiacono changes the race of his hypothetical applicant from non-URM to URM status to simulate the effect of UNC's racial preferences on non-preferred applicants. Tr. 210:12-21 (Arcidiacono); SFFA-FF ¶147.

35.     This analysis demonstrated that UNC employs "very large" racial preferences. Tr. 223:15-16 (Arcidiacono). For example, if a male, non-FGC white applicant with a 25% chance of admission were an out-of-state applicant, his probability of admission would

14

increase to more than 87% had he been treated like a Hispanic applicant and more than 99% had he been treated like an African-American applicant. SFFA-FF ¶150.

36.     Dr. Hoxby does not quibble with the mathematics underlying this analysis. Her only objection is that the examples are "hypothetical" and that it is impossible to change an applicant's race without changing their life experiences. UNC-FF ¶¶133-36. This is a meritless objection that ignores the point of the analysis: to divine what would happen to a non-URM applicant's likelihood of admission if he or she were afforded racial preferences that UNC gives to URM applicants.

37.     Dr. Hoxby thus does nothing to undermine Professor Arcidiacono's testimony that this analysis proves that UNC has "very large" racial preferences in favor of URMs.

38.     ***Average Marginal Effect Analysis.*** Professor Arcidiacono's average marginal effect analysis involves computing the marginal effect of race for an applicant. It does so by finding the difference in an applicant's probability of admission with and without racial preferences and then averaging the marginal effects for all applicants of the same race. SFFA-FF ¶151. Doing this for a particular racial group (for example, African-American applicants) shows how admissions probabilities change because of racial preferences— averaged across all African-American applicants. Tr. 230:15-25 (Arcidiacono).

39.     Professor Arcidiacono's findings are stark. They show that in-state African-American applicants are admitted at a rate of 30.5% with racial preferences, but removing those preferences would drop their admissions rate to only 17.8%. SFFA-FF ¶154. Similarly,

they show that out-of-state admission rates for African-American applicants are 17.1% but would plummet to 1.5% without racial preferences. SFFA-FF ¶156.

40. These are massive drops relative to the baseline admissions rate; as Professor Arcidiacono testified, racial preferences account for nearly 42% of in-state admissions and more than 90% of out-of-state admissions for African-American applicants. SFFA-FF ¶¶154, 156.

41. Dr. Hoxby responds that median marginal effect—not average marginal effect—is the proper method of evaluating the magnitude and effect of racial preferences. UNC ¶139. She contends that average marginal effect "is not a sensible statistical thing to do," UNC-FF ¶134, suggesting that it "grossly exaggerates the role of outliers," Tr. 968:6-7 (Hoxby).

42. As elsewhere, Dr. Hoxby's position runs contrary to the academic literature. Average marginal effect is a standard technique that is well-accepted in the field for evaluating the magnitude and impact of racial preferences, SFFA-FF ¶152, was used by *both sides'* experts in the Harvard litigation, and was accepted by the Court in that litigation as a proper econometric technique for quantifying the effect of race on admission, *Students for Fair Admissions, Inc. v. Harvard College*, 397 F. Supp. 3d 126, 165-68 (D. Mass. 2019); *see also id.* at 176.

43. Dr. Hoxby's median marginal effect, on the other hand, finds no support in academic literature—at least she offered none. Tr. 1147:16-18 (Hoxby) ("Q. You don't cite any academic papers that use a median marginal effect, correct? A. I don't think I need to."). Unlike average marginal effect, which considers the marginal effect across the entire group,

16

median marginal effect focuses on only one applicant—the one with the median marginal effect. And at UNC (and in any system of competitive admissions), the median applicant is a reject; taking the medial marginal effect is thus predestined to yield a small effect. This is undoubtedly why Dr. Hoxby was unable to offer any support for it as a legitimate technique in econometrics. Dr. Hoxby's testimony on this point is not credible.

44. ***Admitted URMs Analysis.*** Professor Arcidiacono's admitted URMs analysis involved taking the entire set of URM applicants who were actually admitted to UNC and then recomputing their probabilities of admission after "turning off" UNC's racial preferences using Bayes' Rule. Tr. 237:25-239:14 (Arcidiacono); SFFA-FF ¶¶158-63.

45. Professor Arcidiacono testified credibly that this technique is "another way of illustrating … just how large [UNC's] racial preferences are." Tr. 242:13-14 (Arcidiacono).

46. Dr. Hoxby offered no expert testimony on Professor Arcidiacono's admitted URM analysis. As a result, it is unsurprising that UNC does not mention it in their proposed findings of fact and conclusions of law.

47. ***Capacity Constraints Analysis.*** Professor Arcidiacono's capacity constraints analysis involves removing the effect of UNC's racial preferences from his preferred model while holding fixed the number of admits UNC actually had each year for the six-year period from 2012 through 2017. SFFA-FF ¶¶164-69.

48. His analysis reveals that removing racial preferences would increase non-URM admits by approximately 3600 over the six-year period and reduce the number of URM admits by a corresponding number. On average, then, this means that *UNC denies admission to approximately 600 non-URM applicants each year on account of race*. SFFA-FF ¶167.

49.    Dr. Hoxby's only response to this analysis is that Professor Arcidiacono fails to account for UNC's limited capacity to admit students. Tr. 1023:10-15. But this makes no sense given that Professor Arcidiacono is the only expert in this action who actually conducted a capacity constraints analysis. And that analysis demonstrated UNC's "[r]acial preferences are quite large, especially for out-of-state applicants," and "removing would have a substantial effect on the racial distribution of the class." Tr. 248:4-7 (Arcidiacono).

50.    As with his admitted URMs analysis, then, Professor Arcidiacono's capacity constraints analysis thus stands unrebutted. That is why UNC's proposed findings of fact and conclusions of law also never mention Professor Arcidiacono's capacity constraints analysis.

### 2. Dr. Hoxby's Shapley Decomposition analysis is flawed, unpersuasive, and not credible.

51.    Dr. Hoxby's methodology for quantifying the effect of UNC's racial preferences is to take the Pseudo-R Squared metric and to perform a Shapley decomposition of the Pseudo-R Squared to determine how much of UNC's admissions decisions are attributable to race. Tr. 948:16-949:23 (Hoxby); Tr. 248:8-16 (Arcidiacono).

52.    Dr. Hoxby's analysis is flawed from the start, as it grows out of her improper use of the Pseudo-R Squared metric. *See supra* ¶¶23-28; SFFA-FF ¶¶178-85.

53.    But even her Shapley Decomposition analysis suffers from a more fundamental error on top of that: it purports to determine the effect of race across all admissions decisions "across the entire applicant pool." UNC-FF ¶¶118, 119 ("across the

18

University's admissions process"), 146 ("across the entire pool of applicants"); Tr. 948:16-21, 949:2-23 (Hoxby); Tr. 251:3-14 (Arcidiacono).

54.     As Professor Arcidiacono credibly testified, spreading the effect of UNC's racial preferences across the approximately 40,000 admissions decisions made each cycle understates the effect of UNC's racial preferences on the applicants who receive those preferences. SFFA-FF ¶¶188-89; Tr. 252:9-12 (Arcidiacono).

55.     This is undoubtedly why Dr. Hoxby could not identify a single "academic paper in which an economist performed a Shapley decomposition of a pseudo-R squared to determine the effect of race in admissions decisions," Tr. 1124:18-23 (Hoxby), much less a single working paper in the NBER Economics of Education program she directs that uses the Shapley decomposition, Tr. 1124:24-1125:4 (Hoxby).

### 3. Dr. Hoxby inadvertently confirms that UNC employs very large racial preferences.

56.     Dr. Hoxby conducts two analyses that inadvertently confirm UNC's large racial preferences: first, her "share due to" analysis; and second, analyzing the effect of removing racial preferences on model predictive accuracy.

57.     ***Dr. Hoxby's "share due to" analysis.*** As explained, Professor Arcidiacono testified that the admit rate for in-state African-American applicants would drop from 30.5% with racial preferences to only 17.8% without racial preferences. SFFA-FF ¶154. He similarly testified that the admit rate for out-of-state African-American applicants would drop from 17.1% with racial preferences to 1.5% without racial preferences. SFFA-FF ¶156. Professor Arcidiacono highlights these massive drops relative to the baseline admissions rate; as he

Case 1:14-cv-00954-LCB-JLW   Document 252   Filed 03/03/21   Page 23 of 53

testified, racial preferences account for nearly 42% of in-state admissions and more than 90% of out-of-state admissions for African-American applicants. SFFA-FF ¶¶154, 156.

58.     In response, as noted above, Dr. Hoxby claims that average marginal effect is an inappropriate technique here. She attempts to demonstrate this by purporting to conduct an average marginal effect analysis with other variables that UNC considers in making admissions decisions. She then claims that the average marginal effect technique is to blame when she finds that the "shares" of the admission decision explained by each variable add up to more than 100%. Tr. 966:7-967:7 (Hoxby) (discussing Hoxby Demonstrative 16).

59.     The manner in which Dr. Hoxby conducted this analysis was fundamentally flawed. To illustrate, take SAT scores. Dr. Hoxby claims that, using average marginal effect analysis, what she calls the "share due to SAT preferences" is 100%. Tr. 966:22-23 (Hoxby).

60.     But the problem is that Dr. Hoxby didn't explain on direct examination what she meant by "SAT preferences" or how she actually calculated the 100% share figure she cited; the footnotes in her reply report, however, contain the explanation.  Tr. 1171:25-1172:8 (Hoxby) (referencing Exhibit 1 of Dr. Hoxby's reply report).

61.     Those footnotes explain that in computing her "share due to SAT preferences," she reset all SAT scores to the minimum score observed in the data—or a score 200 each on both the SAT math and verbal for a total SAT score of 400. Tr. 1172:9-21 (Hoxby).

62.     On cross examination, Dr. Hoxby agreed that resetting SAT scores to the minimum score of 400 would overstate the effect of SAT scores on admissions decisions by turning every affected applicant into an automatic reject. Tr. 1172:22-24 (Hoxby). Indeed,

20

she agreed that this would have a "massive effect" on her analysis. Tr. 1172:25-1173:7 (Hoxby).

63.     Dr. Hoxby expressed confusion on cross-examination, suggesting that perhaps she did not actually reset SAT scores to the minimum score of 400 in her analysis. Tr. 1173:3-5 (Hoxby). After being afforded an opportunity to contest this fact during a break, however, Dr. Hoxby declined to do so. Tr. 1173:8-9 (Hoxby).

64.     In other words, Dr. Hoxby's own testimony confirms that her analysis was skewed, that she reset SAT scores in a way that had a "massive effect" on the claimed results of her "share due to" analysis. Tr. Tr. 1172:25-1173:7 (Hoxby).

65.     Notably, it wasn't just Dr. Hoxby's so-called "SAT preference" that was skewed in this manner.[3]

66.     For her "share due to GPA preferences," Dr. Hoxby reset GPAs to the minimum GPA of 1.0—that is, "straight Ds on a four-point scale." Tr. 1174:10-23 (Hoxby).

67.     Again, Dr. Hoxby questioned on cross-examination whether she actually reset GPAs to the minimum GPA of 1.0. Tr. 1173:15-17 (Hoxby). And again, after being afforded an opportunity to contest this fact during a break, Dr. Hoxby declined to do so. Tr. 1173:18-20 (Hoxby).

---

[3] Relatedly, UNC criticized Professor Arcidiacono for not analyzing whether SAT scores and grades were a more important factor in the University's admissions process than UNC's racial preferences. UNC-FF ¶128. But as Professor Arcidiacono testified, because SAT scores represent a continuous variable, there is no way to measure how much high SAT scores matter without setting an arbitrary thresholds for comparing a "high" score against a "low" score. Tr. 324:7-325:2 (Arcidiacono). Dr. Hoxby's extreme example of resetting all SAT scores to the minimum 400 proves the point.

68.     Dr. Hoxby did the same for class rank and for all of UNC's ratings; for each variable, she reset the score to the minimum. Tr. 1173:24-1174:13 (Hoxby) (resetting UNC's ratings all to "1").

69.     In other words, Dr. Hoxby's "share due to" analysis was fundamentally flawed from top to bottom; by resetting all variables to the minimum score, she skewed her analysis and overstated her results.

70.     But more importantly, the results of this flawed analysis confirm Professor Arcidiacono's conclusions. Even accepting Dr. Hoxby's overstated results, UNC's racial preferences have a greater effect on admissions decisions than GPA, class rank, and UNC's program, performance, and extracurricular activity ratings—for both African-American and Hispanic applicants. Tr. 1176:3-1179:17 (Hoxby) (discussing Exhibit 1 to Dr. Hoxby's reply report, which is reprinted in relevant part in Hoxby Demonstrative 16). Dr. Hoxby's "share due to" analysis thus supports Professor Arcidiacono's conclusion that UNC gives URM applicants very large racial preferences.

71.     ***Dr. Hoxby's predictive-accuracy analysis.*** As noted previously, Professor Arcidiacono's preferred model predicts UNC's actual admissions decisions with an "incredibly high" degree of accuracy. SFFA-FF ¶171. For both UNC's in-state and out-of-state pools, Professor Arcidiacono's preferred model accurately predicts UNC's admissions decisions more than 92% of the time. SFFA-FF ¶170.

72.     Dr. Hoxby undertook an exercise in which she turned off UNC's racial preferences and then determined the predictive accuracy of Professor Arcidiacono's

preferred model in order to determine the difference in accuracy with and without racial preferences. Tr. 977:2-9 (Hoxby).

73.    At trial, Dr. Hoxby testified that removing racial preferences from Professor Arcidiacono's preferred model "reveals a reduction in accuracy of only 1% for in-state applicants and less than 2% for out-of-state applicants." UNC ¶140. She concludes that this relatively small reduction in accuracy means that "racial preferences "are contributing almost nothing" to the accuracy of Professor Arcidiacono's models. Tr. 977:23-978:3 (Hoxby).

74.    Similar to her flawed Shapley decomposition analysis, the problem with Dr. Hoxby's accuracy analysis is that it dilutes the effect of UNC's racial preferences by spreading them across the entire applicant pool. Indeed, Dr. Hoxby conceded that turning off preferences for Native American applicants would not have more than a tiny effect on the overall accuracy of the model. Tr. 1166:16-1167:1 (Hoxby).

75.    Dr. Hoxby's own analysis proves the point with respect to URM applicants. On cross examination, Dr. Hoxby was shown an exhibit from her July 2018 deposition that highlighted the accuracy of the model for URM applicants. Tr. 1167:20-1168:8 (Hoxby). This exhibit displayed the accuracy of the model for both URM admits and rejects, in state and out of state, Tr. 1168:14-1169:17 (Hoxby), all based on figures drawn from Dr. Hoxby's analysis.

76.    Those figures showed that the accuracy for in-state African-American admits dropped from 86.2% when the model included UNC's racial preferences to only 65.6% without racial preferences. Tr. 1168:14-24 (Hoxby).

77.    Dr. Hoxby's analysis showed even more striking results with respect to out-of-state African-American admits. The accuracy of the model with respect to these admits bottomed out, dropping from 74.6% with racial preferences to 17.9% without racial preferences. Tr. 1169:6-17 (Hoxby).

78.    In attempting to show that UNC's racial preferences have only a small effect on admissions decisions, Dr. Hoxby thus inadvertently confirmed that UNC's racial preferences are actually very large.

### C. Dr. Hoxby's Remaining Criticisms Miss the Mark.

79.    ***Academic index deciles.*** UNC states that Professor Arcidiacono's academic index decile analysis does not show that any of the large racial disparities in admit rates among similarly qualified applicants "is the result of" UNC's racial preferences. UNC-FF ¶141. But of course, Professor Arcidiacono's academic index decile analysis was merely descriptive. It only revealed the massive racial disparities without attempting to explain whether they resulted from UNC's racial preferences. SFFA-FF ¶¶120-35.

80.    ***"Bubble" deciles.*** Dr. Hoxby criticizes Professor Arcidiacono's academic decile analysis, claiming that it focuses on the wrong deciles. According to Dr. Hoxby, the proper focus should be on the top deciles, because most admitted students fall in the top three deciles, rather than the "bubble" deciles (deciles 4 through 6) where small differences in an applicant's qualifications or characteristics can make a difference. UNC-FF ¶144.

81.    But Dr. Hoxby's analysis equalizing admission rates as between URM and non-URM applicants within the same deciles revealed why the "bubble" deciles are important. Tr. 1156:5-9 (Hoxby). Dr. Hoxby's work paper underlying her decile analysis

24

showed that the number of URM admits is highest in deciles 4 through 6. Tr. 1157:13-18 (Hoxby).

82.     ***Overfit.*** SFFA has already explained why Dr. Hoxby's overfit methodology is flawed. SFFA-FF ¶¶192-213. And her shifting metrics for measuring overfit underscore that her testimony on overfit is not credible. SFFA-FF ¶¶ 204-05.

83.     Dr. Hoxby's latest shift again on overfit is that a model "is 'overfit' (and therefore cannot be used to predict an outcome accurately) if it does not predict as well on an out-of-sample dataset as it predicts on an in-sample dataset." Tr. 971:21-972:6 (Hoxby). But this definition of overfit is demonstrably incorrect. Models always predict better in-sample than they do out-of-sample, Tr. 254:4-5 (Arcidiacono); under Dr. Hoxby's newest definition, every model would be overfit.

84.     Dr. Hoxby's shifting rationales on this issue further undermine her credibility. No accepted method for determining overfit would indicate that Professor Arcidiacono's preferred model is overfit.

85.     Dr. Hoxby next claims that her "preferred model 9 is not 'overfit.'" Tr. 975:17-24 (Hoxby). But again, her overfit methodology is severely flawed and thus her testimony on this point is not credible. Moreover, even Professor Arcidiacono's model 7 (which is overfit), Tr. 316:2-3 (Arcidiacono), has better predictive accuracy than Dr. Hoxby's preferred model, Tr. 269:9-271:1 (Arcidiacono).

86.     ***Converting ACT scores to SAT scores.*** UNC's claim that Professor Arcidiacono's method of converting ACT scores to SAT scores "penalized" certain applicants is both wrong and irrelevant.

87.     Professor Arcidiacono's model had separate variables for SAT math and verbal score. Because concordance tables do not translate ACT scores into separate SAT math and verbal scores, Professor Arcidiacono's model predicted those scores according to all the variables in the model.

88.     As Professor Arcidiacono testified, Dr. Hoxby's method of translating ACT scores into SAT scores would sometimes yield a lower SAT score than Professor Arcidiacono and sometimes vice versa, with their two methods producing similar average scores overall. Tr. 378:6-8, 14-17, 377:19-23 (Arcidiacono). In other words, by UNC's own logic, Dr. Hoxby "penalized" certain applicants in converting their ACT scores to SAT scores. Moreover, Professor Arcidiacono also estimated his preferred models using Dr. Hoxby's method of translating ACT to SAT scores and showed that it had no effect on his analytical results or conclusions. Tr. 378:18-21, 379:7-381:3 (Arcidiacono).

## III.    UNC Failed to Meet Its Obligation to Consider Available Race-Neutral Alternatives.

### A. UNC Failed to Fully Consider Numerous Available Race-Neutral Alternatives that Could Achieve the Educational Benefits of Diversity.

89.     The Supreme Court requires universities to engage in "serious, good faith consideration of workable race-neutral alternatives" before employing racial preferences. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). UNC has never treated this obligation seriously. By 2014—eleven years after *Grutter*—UNC's only efforts to assess race-neutral alternatives were (1) a 2007 excel "spreadsheet" in which Farmer calculated UNC's class if the admissions process operated "mechanically" based on certain factors; (2) a 2010 "literature review," in which Jennifer Kretchmar reviewed academic papers on race-neutral alternatives

26

but performed no analysis whatsoever as to whether such alternatives would work at UNC; (3) a 2012 top-ten-percent analysis Kretchmar conducted to support UNC's advocacy in an amicus brief in *Fisher I*; (4) an ad hoc "working group" on race-neutral alternatives that met for the first time in December 2013 (and met only four additional times between then and February 2016, when it was disbanded), and which produced only a rough "draft" of a report from Kretchmar that contained "preliminary results" of the findings of the working group; and (5) a years-long and still ongoing effort by a post-litigation committee that—after four years—has yet to issue anything other than "preliminary" assessments. SFFA-FF ¶231. Upon closer examination, these efforts are even more underwhelming than they appear at first glance.

90. ***First,*** Farmer testified that he conducted an "analysis" of a race-neutral alternative based on "socioeconomic disadvantage" in 2007 and found it lacking. UNC-FF ¶174; Tr. 590:20-595:12 (Farmer). Under cross examination, however, Farmer admitted that he simply engaged in a "mechanical" exercise that assessed changes to a spreadsheet of UNC's admissions outcomes. Tr. 662:20-25 (Farmer); *see also* Tr. 591:20-592:22 (Farmer) (describing excel process). Farmer also acknowledged: (1) that he could not recall the "standard" he used to determine whether the outcome of a race-neutral alternative "was sufficient for UNC's needs," Tr. 663:5-16 (Farmer); (2) that he could not replicate the steps of his "analysis" today, Tr. 663:17-19 (Farmer); (3) that he did not recall ever discussing the assessment with "anybody in the admissions office" or the faculty Advisory Committee on Undergraduate Admissions, Tr. 663:20-664:1 (Farmer); and (4) that he did not recall "preparing a written report or documentation" of the study, Tr. 664:2-3 (Farmer).

27

91.    **Second,** UNC claims that Kretchmar "conduct[ed] a thorough review of the literature on race-neutral alternatives" in 2009-10. UNC-FF ¶175. In reality, that exercise was limited in scope and legally irrelevant. Nearly half of the studies that Kretchmar reviewed pre-dated *Grutter*, DX037, UNC0079529-31; *see also* PX026, UNC104748 (2014 UNC email describing the studies cited in Kretchmar's literary review as "dated"), and none of them analyzed UNC's admissions program, PX026, UNC0104753-55. In other words, Kretchmar summarized *third-party analyses of other, unrelated universities*—many of which were conducted in 2002 or 2003—instead of analyzing the effect of potential changes that could be made to *UNC's* current admissions policy.

92.    **Third,** UNC attempts to recast its summary analysis of a class rank percentage plan from its 2012 amicus brief in *Fisher I* as a comprehensive and good-faith assessment of race-neutral alternatives. UNC-FF ¶¶177-79. That summary analysis, however, was created for advocacy purposes; UNC's brief explicitly and vehemently opposed enforcement of any strict standard for the valuation of race-neutral alternatives. *See* PX116 at 25-33. In short, it was not an independent study of race-neutral alternatives available to UNC; and it was not conducted to investigate new admissions policies. In any event, UNC's cursory analysis concluded that the plan would increase racial and ethnic diversity while maintaining high academic standards. PX116, at 32-34; DX038, UNC0079622.

93.    **Fourth,** as part of the conclusion of the Department of Justice Office of Civil Rights investigation into UNC's use of race, the University committed to "conduct [a] … review" of its "consideration of race in admissions within 90 days" of the Supreme Court's decision in *Fisher*. PX008, UNC0325551-53. Fulfilling that commitment required UNC to

complete a review of race-neutral alternatives by September 2013. But the University did not even *begin* the process until that month, when the Advisory Committee on Undergraduate Admissions decided to convene the Working Group on Race-Neutral Alternatives (the "Working Group"). PX013, UNC0079651. And even after deciding to form the Working Group, UNC waited until late November 2013 to invite faculty and staff members to participate. PX014, UNC0096472. The Working Group did not convene its initial meeting until December 2013—nearly 180 days after *Fisher*. PX015, UNC0079624.

94.     The Working Group met a total of five times between December 2013 and January 2016, SFFA-FF ¶231, and limited its analysis to existing (and outdated) literature, PX030, UNC0325570. In October 2014, Kretchmar finished a "draft" report summarizing the "preliminary results" of the Working Group's activities. PX029.1, UNC0099539, UNC0099556. Kretchmar thought very little of her own draft, writing:

> I know most of this won't likely make the cut for the final draft, but I felt like I needed at least to make an attempt. So, I hope it's a start, at least.

PX029.1, UNC0099539. Former OCR staffer and then-UNC employee Howie Kallem agreed. He reviewed the draft report in November 2014 and informed UNC officials that it relied on outdated data. PX030, UNC0325570 (noting that "[t]he latest article cited is from 2010, with many of them being much earlier"). In fact, Kallem suggested that UNC include research by SFFA's expert, Mr. Kahlenberg. PX030, UNC0325570. UNC ignored Kretchmar's criticisms of her work and Kallem's expertise, taking no steps to update Kretchmar's analysis before the Advisory Committee on Undergraduate Admissions accepted the draft report as final in February 2016—nearly three years after *Fisher* and two and a half years after UNC told OCR its review would be complete. PX038, UNC0283495.

95.     **Finally,** UNC created the Committee on Race-Neutral Strategies in February 2016, shortly after accepting the November 2014 report from the Working Group on Race Neutral Alternatives. SFFA-FF ¶231. Despite its formation in the throes of this litigation, the committee showed even less urgency than its predecessor. Despite meeting 10 times over 13 months, the Committee on Race-Neutral Strategies did not issue any findings, evaluate any expert reports or proposed race-neutral alternatives in this case, or come to any conclusions by June 30, 2017 (the close of fact discovery). SFFA-FF ¶¶231-32.

96.     A year after the close of fact discovery, UNC produced an interim report from the committee; in that report, the committee noted that some academic literature "cast[s] doubt on the utility of race-neutral strategies as complete substitutes for overt considerations of race" but recommended that it should conduct its own simulations of race-neutral strategies because "the outcomes of race-neutral admission strategies vary depending on the circumstances surrounding the particular universit[y]." SFFA-FF ¶232. As of November 2018, however, the committee never actually conducted any simulations of race-neutral alternatives. SFFA-FF ¶232.

97.     The committee's failure to conduct any simulations of race-neutral alternatives is consistent with its apathetic approach to the entire inquiry. It likewise has made no effort to define "critical mass," SFFA-FF ¶39, specify what constitutes "an intolerable administrative expense" or "a dramatic sacrifice of diversity," Tr. 864:22-25, 866:6-9 (Panter), or even determine the meaning of the term "diversity," Tr. 866:10-867:16 (Panter). The committee claimed to use the cost of UNC's current admissions approach as a baseline for evaluating the costs of proposed race-neutral alternatives, yet it could not specify any

"cost" of its current approach. Tr. 865:1-24 (Panter). Perhaps unsurprisingly, then, the chair of the committee was unable to identify when "the University should make the decision or even a recommendation to stop using race in admissions." Tr. 867:17-21 (Panter).

**B. UNC failed to pursue clearly available, established programs that would have increased the racial and ethnic diversity of its student body without considering race in admissions.**

98. Several pre-existing race-neutral programs were available to UNC. Farmer testified that UNC's Carolina Covenant program is a "real and meaningful" race-neutral strategy that provides financial aid to low-income students. Tr. 638:1-7 (Farmer). Yet despite UNC's claim that it prioritizes applicants from low-income backgrounds "with an eye towards increasing the number of disadvantaged students who are admitted and enroll," PX108, UNC0000016; *see also* UNC-FF ¶¶168-69, the University's percentage of Carolina Covenant scholars in its incoming classes has been trending downward, Tr. 645:23-646:19 (Farmer).

99. UNC's Carolina College Advising Corps is likewise designed to increase "college access for low-income, first-generation, and [URM] students from North Carolina" and has achieved some success in that endeavor. UNC-FF ¶ 159. The percentage of first-generation college students in UNC's incoming classes increased from 18.6% in 2015 to 20% in 2017. Tr. 646:20-648:1 (Farmer). But that progress has been slowed by a lack of financial commitment from UNC; as of June 2017, UNC dedicated only "2.1 or 2.2" million dollars a year to the program. Tr. 649:4-11 (Farmer). Finally, UNC's Carolina Student Transfer Excellence Program ("C-STEP") "seeks to increase its enrollment of diverse students" by guaranteeing admission to students who complete required coursework and obtain an

31

associate degree from certain community colleges. JSF ¶¶88, 90. But as of June 2017, UNC only offered C-STEP through 10 of North Carolina's 58 community colleges, even though the program costs only "about $15,000 per year per participating community college." Tr. 648:7-25 (Farmer).

100. UNC blames its failure to expand these programs on restrictions that limit its ability to spend money generated by its $3 billion endowment. Tr. 586:8-25 (Farmer); *see* also Tr. 459:8-9 (Kahlenberg) (testifying that UNC's endowment is $3 billion). Under cross examination, however, Farmer admitted that he had no personal knowledge of UNC's management of its endowment or restrictions on its use, and he could not identify any record evidence of such restrictions. Tr. 649:12-650:15 (Farmer). But even crediting Farmer's assertion that "90% or more of [the endowment] is restricted, that would leave approximately $300 million in unrestricted funds, a fraction of which could be used to actually increase these programs that UNC admissions officials claim to value as race-neutral strategies. Tr. 586:8-12 (Farmer). Given that UNC bears the burden of satisfying the narrow-tailoring question, its unsupported claim about the lack of funding is insufficient to demonstrate that has given "serious, good faith" consideration to race-neutral alternatives as *Grutter* requires.

### C. Dr. Hoxby's Race-Neutral Alternatives Analysis Does Not Undermine Mr. Kahlenberg's Testimony and Simulations, which Demonstrate that UNC Has Workable Race-Neutral Alternatives.

#### 1. Mr. Kahlenberg's featured simulations demonstrate that UNC has workable race-neutral alternatives.

101. Mr. Kahlenberg—with Professor Arcidiacono's modeling assistance—created simulations of several race-neutral alternatives. SFFA-FF ¶¶240-41. Notably, the five of

these simulations he featured in his trial testimony involved varying race-neutral strategies and different assumptions about the applicant pool.[4]

102.    Three were SES-preference models. Two of those models assumed UNC's current applicant pool (Simulation 3 and Simulation 13), and one that expanded the applicant pool (using the same NCERDC data as Dr. Hoxby did) to include in-state high school students who did not apply to UNC (Simulation 11). SFFA-FF ¶¶242-43, 245, 249. These simulations employed SES preferences of varying magnitude. Simulations 3 and 13 employed boosts equivalent to the size of the preference UNC affords to out-of-state legacy applicants, SFFA-FF ¶¶242-43, 245, and Simulation 11 employs smaller SES boosts, each about one-third the magnitude of UNC's out-of-state legacy boost, SFFA-FF ¶¶249.

103.    The other two simulations offered by Mr. Kahlenberg were percentage plans (Simulation 8 and Simulation 9). SFFA-FF ¶¶253, 257. One assumed UNC's current applicant pool (Simulation 8), and one expanded the pool to include in-state students from the NCERDC data who did not apply to UNC (Simulation 9). SFFA-FF ¶¶253, 257. Simulation 8 takes the top 4.5% of applicants (based on UNC's ratings) from each North Carolina high school, and then fills the remainder of the incoming class with the top remaining applicants as scored on UNC's ratings. Tr. 438:14-439:18 (Kahlenberg).

---

[4] The court shouldn't credit UNC's suggestion that Mr. Kahlenberg is not objective. The same tactic failed in the Harvard case. There, the Court recognized that Mr. Kahlenberg "has published works on numerous socioeconomic subjects, including the use of race-neutral alternatives in college admissions," and permitted him to testify as an expert on race-neutral alternatives. *Students for Fair Admissions, Inc. v. Harvard Coll.*, 397 F. Supp. 3d 126, 177 n.50 (D. Mass. 2018). That UNC seeks to use his very same experience and expertise as an advocate of SES diversity (UNC-FF ¶233) as a reason to discredit his testimony is nonsensical.

Simulation 9 does not employ UNC's ratings; it instead takes the top 4% of students from each high school based on academic criteria UNC considers in its applicant files (e.g., grades and test scores) and then fills the remainder of the incoming class with the top remaining applicants using those same criteria. Tr. 441:7-442:1 (Kahlenberg).[5]

104. Mr. Kahlenberg testified credibly that all five of his featured simulations (Simulations 3, 8, 9, 11, and 13) are workable race-neutral alternatives available to UNC. SFFA-FF ¶¶242-60; Tr. 448:4-20 (Kahlenberg). Each yields racial and academic metrics similar to the status quo, while increasing socioeconomic diversity.[6]

105. For example, Simulation 3 increases socioeconomic diversity and does about as well on racial diversity and academic qualifications; Simulation 13 does about as well on racial diversity and academic qualifications, while increasing socioeconomic diversity; Simulation 8 increases both racial and socioeconomic diversity, with only a slight decrease in academic qualifications; and Simulation 9 does about as well on racial diversity, increases socioeconomic diversity and yields similar or better academic qualifications. SFFA-FF ¶¶244, 246-247, 254-255, 259-260.

106. Simulation 11 performs even better than UNC's current system with racial preferences; it produces an admitted class with academic qualifications that are equal to or better than the status quo at UNC, with better racial and socioeconomic diversity. SFFA-FF ¶¶250-52.

---

[5] UNC confuses Simulations 8 and 9 by suggesting that Simulation 8 is based on something akin to an academic index based on grades and test scores. UNC-FF ¶251.

[6] UNC, in the course of criticizing the mechanics of some of the simulations, concedes that the results themselves are "successful." UNC-FF ¶¶ 238-39.

107.    Critically, UNC presented *no* expert testimony to counter Mr. Kahlenberg's conclusions that all of his featured simulations are "workable" race-neutral alternatives. SFFA-FF ¶¶267-69. Dr. Hoxby's "assignment" was more limited; her job was to "evaluate each alternative relative to what UNC attains actually now under its current plan" to determine whether any particular race neutral alternative could achieve UNC's "actuals" in terms of URM representation and standardized test scores. Tr. 1040:6-12, 1042:4-6 (Hoxby). UNC thus offered no expert testimony on the workability of *any* particular race-neutral alternative.[7]

108.    Having declined to counter Mr. Kahlenberg's expert testimony on this point, Dr. Hoxby resorted to nitpicking certain aspects of particular simulations. For example, Dr. Hoxby criticized Mr. Kahlenberg for running Simulations 3, 13, and 8 assuming UNC's actual applicant pool. UNC-FF ¶¶245-46, 252, 257. But this is the same approach both experts took in the Harvard litigation, and the trial court found no issue with it. Tr. 398:19-22 (Kahlenberg). *Harvard Coll.*, 397 F. Supp. 3d at 181-83.

109.    In any event, Mr. Kahlenberg conducted his other featured simulations in the same manner as Dr. Hoxby—assuming an expanded applicant pool that includes North Carolina students in the NCERDC dataset (Simulations 11 and 9). *See supra* ¶¶102, 103. Naturally, UNC criticizes that assumption as well. UNC-FF ¶253.

---

[7] UNC attempts to cover this fatal deficiency by using the claiming in its brief's headers that "Comprehensive Expert Analysis Confirms that No Workable Race-Neutral Alternative Would Allow the University To Maintain Its Current Levels of Academic Preparedness and Racial Diversity." UNC-FF at 68. Yet that point is noticeably absent from UNC's actual discussion of its own experts' testimony. Again, this is because UNC offered no expert testimony on the workability of *any* particular race-neutral alternative.

110. That simulations based on both types of assumed applicant pools yielded racial and academic metrics similar to UNC's status quo (while also increasing socioeconomic diversity) shows that the assumed applicant pool makes no difference to Mr. Kahlenberg's results.[8]

111. Dr. Hoxby criticized Mr. Kahlenberg's percentage plans for being based not on class rank, noting that "[n]o university has implemented a percentage plan that is not based on high school class rank." UNC-FF ¶¶246-47. Yet the fact that Mr. Kahlenberg's percentage plans were based on UNC's ratings (Simulation 8) or other criteria UNC considers in evaluating students (Simulation 9) shows that UNC has the ability to employ the same or similar percentage plans.

112. Dr. Hoxby criticized Simulation 3 as relying on unrealistically large SES boosts. UNC-FF ¶¶254-58. It is undisputed, however, that the SES boosts in Simulation 3 were equivalent to the magnitude of the preferences UNC gives to out-of-state legacies and *smaller than the preferences UNC affords to out-of-state African American applicants*. Tr. 427:23-428:2 (Kahlenberg). Moreover, Mr. Kahlenberg reduced the size of the SES-boosts in Simulation 11 to one-third the magnitude of UNC's out-of-state legacy boost and thus and *even smaller fraction of the preferences UNC gives to out-of-state African-American applicants*. SFFA-FF ¶249.

---

[8] UNC misstates Mr. Kahlenberg's trial testimony by claiming that he described a simulation assuming UNC's applicant pool as making an "audacious" assumption. The trial record makes clear that Mr. Kahlenberg was expressing the opinion that it is "unlikely" that 100% of the high school students in the NCERDC data would apply to UNC and thus audacious to assume (similar to Dr. Hoxby) that all of those students would apply to UNC. Tr. 481:12-482:10 (Kahlenberg). Dr. Hoxby herself acknowledged that she did no modeling to determine how the applicant pool would change and instead simply made a "generous assumption." Tr. 1072:12-16 (Hoxby).

36

113.     In a final criticism of the SES preferences, UNC repeatedly cites expert Bridget Terry Long's bizarre contention that no university has employed SES preferences as a race-neutral alternative. UNC-FF ¶217. In fact, virtually every leading university that is subject to a ban on racial preferences has employed SES preferences, including the University of California at Berkeley, the University of Texas at Austin, and the University of Florida.

### 2. Dr. Hoxby Conceded at Trial that Her Race-Neutral Alternatives Analysis Stopped Far Short of Fully Implementing Possible Race-Neutral Alternatives.

114.     UNC makes much of the fact that Dr. Hoxby considered 100 simulations of different race-neutral alternatives and found none that met UNC's "actuals" in terms of both racial demographics and standardized test scores.

115.     Setting aside the fact that meeting UNC's "actuals" is not the relevant standard, Dr. Hoxby's failure to analyze and report GPA scores for her simulations is fatal because UNC obviously considers GPA in making admissions decisions, Tr. 1058:2-8 (Hoxby); SFFA-FF ¶18 (identifying GPA as the primary criteria identified as part of UNC's academic performance rating), and in fact values GPA more than standardized test scores, Tr. 422:21-423:2 (Kahlenberg); PX055, UNC 0384120-21 (UNC internal assessment concluding that GPA is more closely correlated to admissions probabilities than test scores); *see also* PX037, UNC0100558. Indeed, Dr. Hoxby recognized the importance UNC places on GPA by including it in her admissions models. Tr. 1058:9-14 (Hoxby).

116.     But the more fundamental problem with Dr. Hoxby's race-neutral alternatives analysis is that she stopped short of fully implementing possible race-neutral alternatives.

117.     On cross-examination, Dr. Hoxby acknowledged that there were obvious trend lines illustrating how adjustments to her race-neutral alternatives would improve their

37

performance on both of her preferred metrics (URM admits and SAT scores). Tr. 1078:4-1082:25 (Hoxby). In particular, she acknowledged both that "increasing the number of seats reserved for disadvantaged students increases the number of URM students in the simulation" and that adjusting the SES index "steadily increases the average SAT score of those URM students." Tr. 1082:5-19.

118. Dr. Hoxby also conceded that if she had pursued these trend lines further to a 2,000-seat/50% model of her SES simulation, "we might be able to attain [UNC's] actuals." Tr. 1083:6-11. Her sole objection to doing so was that it would begin to approximate admission based on standardized test scores for the "disadvantaged stage" of her SES-based simulations, which is not how UNC does it. Tr. 1083:13-15 (Hoxby) ("UNC does not actually admit students in rank order in terms of their test score."). Of course, the point of a proper race-neutral alternatives analysis is to examine methods the university "does not actually" use to determine whether they work about as well as racial preferences. Perhaps more importantly, Dr. Hoxby conceded that a hybrid plan like the 2,000-seat/50% model of her SES simulation (which she never considered) is a "feasible plan." Tr. 1100:18-20 (Hoxby). This concession renders her testimony that there are no race-neutral alternatives that would meet UNC's "actuals" not credible.

119. Dr. Hoxby further undermined her testimony. Recognizing that such a feasible plan would almost certainly meet UNC's "actuals," Dr. Hoxby proposed to shift UNC's "actuals" to something other than the actual status quo. Tr. 1085:9-10 (Hoxby) ("And so we would need to change what the counter – what the actuals were."); 1087:21-25 (agreeing that she "would be picking some other baseline that's not the status quo"). Dr.

38

Hoxby's proposal to "move the goalposts" is nonstandard to say the least and further renders her testimony not credible.[9]

### 3. Mr. Kahlenberg's modification of Dr. Hoxby's 750/20% SES-preference simulation further demonstrates that Dr. Hoxby did not fully pursue race-neutral alternatives.

120. Under Dr. Hoxby's 750/20% Simulation, "she sets aside 750 seats in the class for disadvantaged admits and defines disadvantaged as the lowest 20 percent using a complex formula that includes family, neighborhood, and school SES." Tr. 444:1-4 (Kahlenberg).

121. Mr. Kahlenberg took this simulation and explored what would happen if he filled the remainder of the incoming class (something Dr. Hoxby never attempted). SFFA-FF ¶262. Specifically, Mr. Kahlenberg completed the class with the most academically qualified students remaining, using GPA and SAT (equally weighted) for in-North Carolina public high school students (in the NCERDC database). SFFA-FF ¶262. Under this modified version of Dr. Hoxby's 750/20% Simulation, racial diversity held steady, SES diversity increased, and academic metrics decreased only slightly. SFFA-FF ¶¶264-66. Mr. Kahlenberg thus concluded that his modified version of Dr. Hoxby's 750/20% Simulation was a workable race-neutral alternative.

---

[9] It is worth noting that Dr. Hoxby wished to change the "actuals" to a new "status quo" with higher SAT scores but "substantially lower" URM representation. Tr. 1091:15-1092:3 (Hoxby). Of course, adjusting the SES index in her simulations would yield such outcomes, *see supra* ¶117-18, which means that race-neutral alternatives could do "about as well" even despite Dr. Hoxby's moving goalposts.

39

### 4. Dr. Hoxby's failure to consider SES diversity further undermines her opinions regarding race-neutral alternatives.

122. Dr. Hoxby never considered—much less reported—how any race-neutral alternative might affect SES diversity. Tr. 1063:13-1064:10 (Hoxby). As she put it, considering SES diversity (or any type of diversity beyond racial diversity) was "not in my assignment." Tr. 1063:18-20 (Hoxby). Indeed, even after she became aware of UNC's stated interest in SES, Dr. Hoxby "did not have a change in [her] assignment." Tr. 1065:5-17 (Hoxby).

123. The failure to consider SES diversity is noteworthy given that "student body diversity" is broader than just racial diversity and that "socioeconomic diversity is sorely lacking" at UNC. Tr. 415:5-7 (Kahlenberg); 400:13-403:9 (Kahlenberg).

124. UNC tries to compensate for Dr. Hoxby's failure to consider SES diversity by mischaracterizing Mr. Kahlenberg's own consideration of SES diversity. UNC suggests that Mr. Kahlenberg views SES diversity as a replacement for racial diversity, UNC Br. at 102 ("But racial diversity and socioeconomic diversity are not one and the same."). Mr. Kahlenberg, however, made clear that he seeks both racial and SES diversity, Tr. 415:1-3 (Kahlenberg) ("I believe strongly that racial diversity brings educational benefits, but socioeconomic diversity does as well."), and indeed considered and measured both in his simulations, SFFA-FF ¶¶242-66. It is thus disingenuous to suggest that Mr. Kahlenberg's position is that "a race-neutral alternative must be employed if it results in greater socioeconomic diversity—even at the expense of racial diversity." UNC Br. at 102.

125. Sadly, UNC goes even further, implying that student body diversity encompasses racial diversity but not SES diversity. UNC Br. at 102-03. This litigation

40

position is an unfortunate turn away from UNC's emphasis on SES diversity in its Reading Document. DX10, UNC0323606 (defining diversity to include "economic circumstances"), 323609 (considering "relative advantage or disadvantage, as indicated by family income level), UNC0323610 ("As part of its broad effort to foster diversity within the scholarly community on campus, the University's admissions process takes into account the socioeconomic status of each candidate.")

### 5. UNC's remaining arguments are meritless.

126. Finally, UNC resorts to a series of arguments so lacking in merit they bespeak the weakness of UNC's position on race-neutral alternatives.

127. For example, UNC notes that Dr. Hoxby has more experience in econometrics than Mr. Kahlenberg, UNC Br. at 103; but Mr. Kahlenberg has substantially more experience with simulating race-neutral alternatives Tr. 398:11-399:1, 419:16-420:3 (Kahlenberg), and Professor Arcidiacono—who has substantially more experience with econometric modeling than Dr. Hoxby, Tr. 116:21-22, 118:21-24 (Arcidiacono)—conducted the modeling underlying Mr. Kahlenberg's simulations.

128. UNC criticizes Mr. Kahlenberg for not conducting the underlying modeling himself, UNC ¶234, but UNC withdrew this very argument at trial, Tr. 755:3-12. And it is as meritless now as it was then. (Doc. 226.)

129. UNC attacks a simulation in Mr. Kahlenberg's opening report (Simulation 5) that he subsequently adjusted. UNC-FF ¶¶248-50. That UNC feels compelled to attack a simulation that Mr. Kahlenberg did not feature in his trial testimony serves only to

underscore the lack of substance in UNC's and Dr. Hoxby's responses to the numerous simulations Mr. Kahlenberg featured in his trial testimony.[10]

### 6. Dr. Hoxby's Testimony is at War with Itself.

130. Dr. Hoxby concludes that UNC's racial preferences have a very small effect on admissions at UNC. UNC-FF ¶120. At the same time, she concludes that it's impossible to satisfactorily replace those racial preferences with any race-neutral alternative. UNC-FF ¶209.

131. These two conclusions are in serious tension if not outright incompatible. Yet, Dr. Hoxby doubles down, claiming that even "if race were affecting only .1 percent of admissions decisions at UNC," it would still "be hard to find a race-neutral alternative." Tr. 1046:19-24 (Hoxby). This position is untenable. If racial preferences were doing so little work in terms of their effect on admissions decisions, they would be having almost no effect on the admissions process and thus would be easy to replace. Dr. Hoxby's testimony on this point is not credible, and it undermines her entire analysis.

## RESPONSE TO UNC'S PROPOSED CONCLUSIONS OF LAW

### I. UNC'S Use of Race Violates Strict Scrutiny.

132. As SFFA explained in its opening brief, UNC cannot survive strict scrutiny for two reasons. First, UNC does not use race merely as an individualized "plus" factor to achieve the educational benefits of diversity. Second, it is unnecessary for UNC to use race to enroll a diverse student body.

---

[10] Oddly, UNC suggests that Mr. Kahlenberg was unsure whether UNC's early admissions process is Early Decision or Early Action. The record is clear; Mr. Kahlenberg testified that Early Decision requires the applicant to "commit" and that "UNC doesn't have that process." Tr. 501:6-8 (Kahlenberg).

42

## A. UNC Does Not Use Race Merely as an Individualized "Plus" Factor to Achieve the "Educational Benefits of Diversity."

133.     UNC must show "that its plan is narrowly tailored to achieve the only interest [the Supreme] Court has approved in this context: the benefits of a student body diversity that 'encompasses a ... broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher I*, 570 U.S. at 314-15. Accordingly, UNC may use race only to enroll a "critical mass of underrepresented minority students ... so as to realize the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 318. But even then, race may only be used as a "plus" factor in a system "that consider[s] the overall individual contribution of each candidate." *Fisher I*, 570 U.S. at 305. UNC is violating both preconditions.

### 1.     UNC Has Failed to Articulate Any Legitimate Conception of "Critical Mass."

134.     As SFFA explained in its opening brief, UNC has no "measurable" definition of critical mass. SFFA-FF ¶287. Indeed, it has no definition at all because it has never investigated the issue. As then-Provost James Dean explained: "In all my conversations with Steve Farmer, [critical mass] has never come up. No one has directed anybody to achieve a critical mass, and I'm not even sure we would know what it is." Dean Dep. 144:22-145:5. SFFA-FF ¶287. Not surprisingly, then, UNC officials cannot agree on what critical mass means. SFFA-FF ¶¶288-89.

135.     UNC has identified no way of measuring when it will achieve its self-described "amorphous" goal of reaching critical mass. SFFA-FF ¶290. Though UNC is aware that it must define critical mass to survive *Grutter*—members of the Working Group on Race-

43

Neutral Alternatives candidly acknowledged that it "need[ed] to address" the issue, PX006, UNC0324038—the Working Group report never even mentioned the term, PX029, UNC0099540-68. In fact, the evidence shows that UNC officials purposefully *avoided* discussing "critical mass" in detail, because they didn't want to "raise too many questions about just what we would consider to be critical mass and whether the current holistic approach is effective." PX030, UNC0325570.

136.    Because UNC's conception of critical mass is at best elusory and amorphous, UNC thus fails strict scrutiny at the outset.

### 2.    UNC Mechanically Uses Race as Far More Than a "Plus" Factor.

137.    For race to be only a "plus" factor in admissions decisions, it may not be a "predominant factor" in the decision to admit URMs. *Grutter*, 539 U.S. at 320. Put differently, UNC must use race in a manner that is "flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 337.

138.    Despite UNC and Student-Intervenors' claims to the contrary, the evidence shows that UNC violates this narrow-tailoring requirement in both respects. UNC's racial preferences are massive. And it uses race in a non-individualized, highly formulaic manner.

139.    As SFFA has explained, race plays a dominant role in the admission of URM applicants. UNC's racial preferences account for "a fourth of admissions for in-state Hispanic applicants" and "nearly 42% of African-American in-state admissions." SFFA-FF ¶297. UNC's racial preferences are even greater when it comes to out-of-state applicants.

UNC's racial preferences account for 70% of out-of-state Hispanic admissions and 91% of out-of-state African-American admissions. SFFA-FF ¶298.

140. To illustrate the magnitude of UNC's racial preferences another way, a male, in-state, and non-FGC white applicant with a 25% chance of admission would see his chances increase to nearly 71% if treated as a Hispanic applicant. SFFA-FF ¶298. If he were instead treated as an African-American applicant, his admission chances would increase to more than 92%. SFFA-FF ¶298. The out of state numbers are even more striking. A male, out-of-state, and non-FGC white applicant with a 25% chance of admission would see his "probability of admission ... increase to more than 87% had he been treated like an out-of-state Hispanic applicant and more than 99%—granting him "virtual[ly] certain" admission— had he been treated like an out-of-state African-American applicant. Tr. 220:15-22 (Arcidiacono). This reality alone shows that race is a "predominant factor" in admissions decisions under any definition of the term.

141. Professor Arcidiacono's admitted URM analysis further illustrates the magnitude of UNC's racial preferences. For in-state applicants, if racial preferences were removed, then the average probability of admission would drop to 75.8% for Hispanic admits and 57.8% for African-American admits. SFFA-FF ¶299. (Because the baseline is a URM *admit*, the initial probability of admission is 100%.) And for out-of-state applicants, the average probability of admission for Hispanic admits would drop to 29.2% and the average probability of admission for African-American admits would drop to 8.7%—a 91.3 percentage point decrease. SFFA-FF ¶304. In other words, without racial preferences, out-

45

of-state URMs who were actually admitted to UNC would more than likely have been denied admission.

142. All told, UNC's racial preferences account for more than 1,100 additional seats for in-state URMs (nearly 200 per year) and more than 2,500 additional seats for out-of-state URMs (more than 400 per year) over the full six-year period. SFFA-FF ¶¶300, 305. That is the definition of an admissions system that makes race the predominant consideration for URM applicants. UNC's use of race is not a "plus" factor that has a marginal effect on admission probabilities for a small number of applicants on the margins.

143. The data conclusively show that race plays a "tremendous role in the admissions process," especially for out-of-state applicants. SFFA-FF ¶306. The Supreme Court has held that a racial preference accounting for "one-fifth of the points needed to guarantee admission," was not narrowly tailored because it effectively made race "decisive for virtually every minimally qualified underrepresented minority applicant." *Gratz v. Bollinger*, 539 U.S. 244, 270, 272 (2003) (citation omitted). The racial preferences UNC grants to URM applicants are even larger. *See supra* ¶¶34-50; SFFA-FF ¶¶142-69.

144. But UNC doesn't just use race as a dominant and often decisive factor in admissions decisions—it also does so in a mechanical and inflexible way. UNC readers process applications and issue admissions decisions with the efficiency of a factory assembly line. *Supra* ¶4, SFFA-FF ¶¶64-70. The University purportedly bases admissions decisions on holistic assessments of applicants, but UNC officials admitted that they spend only ten to twelve minutes reviewing, evaluating, scoring, and commenting on each 30-plus page application. SFFA-FF ¶¶64-65. An admissions regime that requires each officer to admit or

46

reject six applicants every hour is irreconcilable with a truly holistic process. Try as it might, UNC cannot hide that its admissions process operates as an implicit formula that does not give individualized attention to race. Professor Arcidiacono's model predicts over 90% of both in-state and out-of-state admission decisions. SFFA-FF ¶312 (more than 92% for in-state admissions and more than 93% for out-of-state admissions).

145. UNC, in short, is not "considering each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education." *Gratz*, 539 U.S. at 271. Rather, it assumes that all the URM applicants will "automatically" make "a specific and identifiable contribution to … diversity" simply because of their race. *Id.* That is flagrantly unconstitutional.

**B. It is Unnecessary for UNC to Use Race to Achieve Student Body Diversity.**

146. The Fourteenth Amendment "forbids the use even of narrowly drawn racial classifications except as a last resort." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519 (1989) (Kennedy, J., concurring in part and concurring in the judgment). Thus, "strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S at 312. Universities are not required to adopt alternatives that "would require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both." *Grutter*, 539 U.S. at 340. But "[i]f a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Fisher I*, 570 U.S. at 312 (quotations omitted).

47

147.    UNC has failed to give more than pro-forma consideration to the various race-neutral alternatives available to it. *Supra* ¶¶89-100; SFFA-FF ¶¶27-39. Yet more importantly, SFFA's expert Richard Kahlenberg's simulations of race-neutral strategies demonstrated that UNC could adopt at least six race-neutral strategies that would do at least "about as well" as race in promoting student body diversity. *See* SFFA-FF ¶¶322-28.

148.    Kahlenberg's simulations demonstrate that UNC's use of race is unnecessary and, therefore, unlawful. Indeed, some of alternatives Kahlenberg analyzed actually do a *better job than race in promoting UNC's diversity interests, while maintaining academic quality.*[11] *See* SFFA-FF ¶¶324-25. Tellingly, UNC's experts do not challenge this conclusion. As explained above, UNC's experts admitted at deposition and reaffirmed during trial that they *offer no opinions on the workability of any particular race-neutral alternative. Supra* ¶107; SFFA-FF ¶¶267-69. Kahlenberg's expert opinion stands unrebutted; that alone warrants judgment for SFFA on Count II. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 308-9 n.17 (4th Cir. 2004).

## CONCLUSION

149.    For the foregoing reasons, SFFA respectfully requests that the Court adopt SFFA's proposed findings of fact and conclusions of law, find that the University's racial preferences in admissions are unconstitutional, and enter judgment in favor of SFFA on Counts I and II of the Complaint.

---

[11] Additional steps would increase both racial and socioeconomic diversity even more. Among other things, UNC could make better use of socioeconomic data, increase financial aid, use geographic data to admit out-of-state applicants, admit more community college transfers, and/or develop partnerships with disadvantaged North Carolina high schools. *See supra* 237-38.

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion via the Court's electronic filing system, pursuant to the Electronic Filing Procedures, on all attorneys of record who have entered an appearance by ECF in this matter.

This 3rd day of March, 2021.

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy