# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br>     Plaintiff, <br>     v. <br> UNIVERSITY OF NORTH CAROLINA, et al., <br>     Defendants. | Civil Action No. 1:14-cv-954-LCB-JLW |

## JOINT MOTION FOR ENTRY OF JUDGMENT

Plaintiff Students for Fair Admissions, Inc. ("SFFA") and Defendants University of North Carolina, et al., ("UNC Defendants") respectfully request that the Court enter the attached proposed final judgment in this action. In support thereof, the parties state as follows:

1. SFFA filed this action on November 17, 2014.

2. On November 4, 2021, this Court entered a judgment in this proceeding in favor of Defendants, which Plaintiff appealed to the United States Supreme Court.

3. On June 29, 2023, the Supreme Court of the United States reversed the judgment of this Court.

4. On July 31, 2023, the Supreme Court of the United States transmitted a certified copy of its judgment to the Court of Appeals for the Fourth Circuit. Dkt. 269.

5. The Fourth Circuit issued its mandate on August 1, 2023. Dkt. 271.

6. After the Supreme Court decision, Defendant University of North Carolina issued *System Directives Regarding Implementation of Students for Fair Admissions Decision* (see Ex. A).

7. Since the Supreme Court decision, Defendant University of North Carolina at Chapel Hill ("UNC-Chapel Hill") has taken the following actions with respect to its undergraduate admissions practices:

    a. UNC-Chapel Hill has announced policies to comply with the United States Supreme Court decision;

    b. UNC-Chapel Hill has updated its training materials to reflect that it does not consider race as a factor in making undergraduate admissions decisions;

    c. UNC-Chapel Hill does not use the term "underrepresented minority" ("URM") in connection with undergraduate admissions decisions; and

    d. UNC-Chapel Hill has updated its Reading Document to reflect the Supreme Court's decision (see Ex. B [*Updated Undergraduate Admissions Reading Document*]).

8. The parties respectfully request the Court enter the attached proposed final judgment for SFFA (Ex. C). Plaintiff does not seek any injunctive relief or other relief in this Court's judgment.

9. SFFA and UNC Defendants have conferred with Intervenors about this motion and proposed judgment. Intervenors do not oppose this motion.

| | |
|---|---|
| JOSHUA H. STEIN<br>Attorney General<br><br>*/s/ Stephanie A. Brennan*<br>Stephanie Brennan<br>Tamika Henderson<br>Special Deputy Attorneys General<br><br>NORTH CAROLINA DEPARTMENT OF JUSTICE<br>Post Office Box 629<br>Raleigh, NC 27602<br>(919) 716-6400<br>rpark@ncdoj.gov<br><br>Amy L. Van Gelder<br>SKADDEN ARPS, SLATE, MEAGHER & FLOM LLP<br>155 North Wacker Drive<br>Chicago, IL 60606<br><br>Lara A. Flath<br>SKADDEN ARPS, SLATE, MEAGHER & FLOM LLP<br>One Manhattan West<br>New York, NY 10001<br><br>*Counsel for Defendant University of North Carolina* | */s/ Thomas R. McCarthy*<br>Thomas R. McCarthy<br>J. Michael Connolly<br>Cameron T. Norris<br>Bryan Weir<br>James F. Hasson<br>CONSOVOY MCCARTHY PLLC<br>1600 Wilson Blvd., Ste. 700<br>Arlington, VA 22209<br>(703) 243-9423<br>tom@consovoymccarthy.com<br><br>Patrick Strawbridge<br>CONSOVOY MCCARTHY PLLC<br>Ten Post Office Square<br>8th Floor South PMB #706<br>Boston, MA 02109<br><br>*Counsel for Plaintiff Students for Fair Admissions, Inc.* |

**CERTIFICATE OF SERVICE**

On November 21, I electronically filed the foregoing motion, which will notify all counsel of record.

                                                          */s/ Thomas R. McCarthy*

# EXHIBIT A



DIRECTIVES REGARDING IMPLEMENTATION OF *STUDENTS FOR FAIR ADMISSIONS* DECISION

*Division of Legal Affairs*

*August 2023*

The June 29th decision of the United States Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* held that the challenged race-conscious admissions practices violate the Equal Protection Clause of the 14th Amendment and therefore must end.[1]

The higher education industry of the United States lived with *Bakke* and its progeny for approximately fifty years.[2] The *Students for Fair Admissions* decision requires a new mindset among higher education because—at least for admissions decisions and targets—diversity cannot mean anyone's ideal mix of racial identities on campus. Given the litigation environment where admissions decisions and unwritten practices can prompt exhaustive discovery into what was said, unsaid, done, or left undone, a reset on how an ideal admissions process should look is likely appropriate at every level of each campus from undergraduate admissions to the more focused admissions systems for graduate programs and professional schools. As discussed below, these initiatives should be documented.

American college admissions practices must abide by a new rule: the United States Constitution prohibits the use of race as a tool in judging individual applications, in setting an ideal demographic composition for an admitted class, or as a basis for achieving broad goals which are not sufficiently coherent or measurable.[3] Race can be neither a means nor an end in college admissions. This applies to admissions practices both written and unwritten, and there is no wiggle room—no institution may try to achieve indirectly what the Court prohibited directly.[4]

If there are theoretical exceptions to this rule, in practice, the newly-cast application of strict scrutiny—the most exacting inquiry in constitutional law—creates a needle's eye too narrow to thread, and the litigation risk of even trying should be cost-prohibitive, especially for public universities.

While this decision applies to and binds *all* public colleges and universities throughout the country, and those private colleges and universities receiving federal funds like Harvard University, the decision's practical effect will be felt most directly by colleges and universities with highly selective admissions policies or practices that included race as a factor prior to the decision. In contrasts, institutions in the UNC System that have not used race as a factor in admissions decisions may not need to modify their admissions practices.

The directives below emphasize areas on which UNC System institutions should continue to focus to implement the Court's wide-reaching decision to the extent those institutions have used race as a factor in admissions decisions. Additionally, these directives should inform any institution that might consider future changes to its admissions practices.

---

[1] *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, No. 20-1199 (U.S. 2023); *Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 21-707 (U.S. 2023). *See also Students for Fair Admissions*, No. 21-1199, slip op. at 58 (Thomas, J., concurring) (reinforcing the Court's opinion that "*Grutter* is, for all intents and purposes, overruled.").
[2] *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 316 (1978).
[3] *Students for Fair Admissions*, No. 21-1199, slip op. at 23–26, 32.
[4] *Id*. at 39. (holding "universities may not simply establish through application essays or other means the regime [the Court] hold[s] unlawful today.").

1. <u>INTERSECTION WITH CAMPUS POLICY</u>. In light of the Supreme Court's decision, these directives are intended to promote consistency across constituent institutions regarding application of the University's Nondiscrimination Policy in Section 103 of *The Code* and UNC Policy Manual.[5] To effect that purpose, constituent institutions should rely on these directives to resolve any conflict posed by any policy or resolution of the institution or its board of trustees.

2. <u>ELIMINATE WRITTEN POLICIES AND UNWRITTEN PRACTICES ON CONSIDERATION OF RACE</u>. Every constituent institution of the University of North Carolina should act immediately to remove race *and ethnicity* from the consideration of any application for admission.[6] Race must not be a consideration at any point in the admissions process; this includes, but is not limited to, initial screenings, interview selections, admissions decisions, and waitlist decisions. Moreover, the use of race in a holistic admissions model fails to meet the demanding inquiry of strict scrutiny.[7] Therefore, any express policy *or practice* factoring in an applicant's race must be eliminated immediately in letter and spirit. Any unwritten policy or practice of doing the same is prohibited. There can be no winks or nods. Not only should all campuses implement these actions immediately, they should also document these actions promptly.

3. <u>MOVE AGGRESSIVELY TOWARDS RACE-BLIND APPLICATIONS</u>. The practice of inclusion of race on an application, i.e., the box to be checked, will need to change significantly if not end entirely. In the short run, this means campuses should firewall knowledge of an applicant's race from those who are reviewing and evaluating the applications. We understand that the Common App offers this feature.[8] In the longer run beyond the immediate admissions cycle, campuses should remove the race box from the application process entirely unless the campus can identify a clear, discrete legal need to continue to include the race box. Asking applicants to indicate their race on their applications likely will force campuses to prove that their express knowledge of an applicant's race *did not* factor into the decision to admit or deny the student. Proving a negative is always difficult, even more so when the question turns on reading the mind of an admissions officer who could know the race of the applicant.[9] Accordingly, if a campus *does* identify what it believes to be a clear, discrete legal need for continued use of a race box on its application in the longer run, campus officials should discuss the perceived need with the leadership of both the campus and the UNC System.

4. <u>PROHIBIT PURSUIT OF AGGREGATE TARGETS OF RACIAL COMPOSITION</u>. The Court rejected the use of race for race's sake in all contexts.[10] Its rule does not only prohibit a reviewer from considering an applicant's race (race as a means)—the rule has an even more sweeping effect. American colleges and universities must abandon pursuit of aggregated race-based targets in choosing to

---

[5] *See The Code* Section 103, *Equality of Opportunity in the University*, UNC POLICY MANUAL, https://www.northcarolina.edu/apps/policy/doc.php?type=pdf&id=54 (last visited Aug. 16, 2023).
[6] *Students for Fair Admissions*, No. 21-1199, slip op. at 25 (discussing Harvard's "*racial* composition categories" that include *Hispanic*) (emphasis added). *Compare with* Surveys & Programs, *2020 Census Frequently Asked Questions About Race and Ethnicity*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/release/faqs-race-ethnicity.html (last updated Aug. 12, 2021) (the United States Census Bureau characterizes *Hispanic* as ethnicity, not race.) (emphasis added). *See also* discussion *infra*.
[7] *Students for Fair Admissions*, No. 21-1199, slip op. at 22–23; *Id.* at 3 (Thomas, J., concurring) (reasoning "it was the view of the Court in *Brown*, which rejected 'any authority to use race as a factor in affording educational opportunities'…. And, it is the view adopted in the Court's opinion today[.]").
[8] *See* Anemona Hartocollis, *Colleges Will Be Able to Hide a Student's Race on Admissions Applications*, THE NEW YORK TIMES, May 26, 2023, https://www.nytimes.com/2023/05/26/us/college-admissions-race-common-app.html.
[9] *Students for Fair Admissions,* No. 21-1199, slip op. at 24–26; *Id.* at 5–8 (Gorsuch, J., concurring).
[10] *Id.* at 22–23.

whom to offer admission (race as an end).[11] Race-consciousness cannot drive where an admissions officer or the institution as a whole seeks to end up as to the demographic composition of the admitted class. For example, a university with a race-blind admissions process likely still runs afoul of *Students for Fair Admissions* if the university's end target is a class with a prescribed racial composition. A university might further risk running afoul of the Court's decision, or at a minimum tempt litigation, if the racial composition of an admitted class is compared against institutional aggregate racial targets or goals.[12]

5. PROVIDE TRAINING ON IMPLEMENTING RACE-BLIND ADMISSIONS PRACTICES. Admissions officers, readers, recruiters, and any other person who participates in application intake or evaluation, or whose opinion is sought on the qualifications of an applicant, must receive meaningful training to understand that an applicant's race cannot factor into whether that application is screened, or further, favored. Nor that such reviewers and decisionmakers can review with an unspoken target of racial composition for the admitted class. These efforts should include training for both written portions of any application process, as well as in-person or virtual interviews of students

---

[11] *Id*. at 23–26.

[12] In producing these directives, the Office of Legal Affairs reviewed the August 14, 2023 Dear Colleague Letter and related Questions and Answers jointly produced by the United States Departments of Education and Justice, both linked internally here and here, respectively (together the "Agency Guidance"). The Agency Guidance tracks these directives in many ways with one key difference. The self-described non-binding Agency Guidance seems to indicate that the Departments do not view the decision as barring a college or university from articulating "missions and goals tied to student body diversity" which can be reasonably construed as advising institutions they may continue to seek an ideal racial composition of their admitted classes. *See* Letter from Kristen Clarke, Assistant Att'y Gen., Civil Rights Division, U.S. Dep't of Justice, and Catherine E. Lhamon, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* at 3 (Aug. 14, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-questionsandanswers-tvi-20230814.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term= (providing that "[i]n particular, nothing in the SFFA decision prohibits institutions from continuing to seek the admission and graduation of diverse student bodies, including along the lines of *race* and *ethnicity*, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." (emphasis added)). The Agency Guidance then further elaborates on Question 3 by providing examples of what is described as "existing practices that can be lawfully used" in furtherance of the goal of achieving diverse student bodies. It is the opinion of this office that such a conclusion reads the *Students for Fair Admissions* decision too narrowly and cannot be reconciled with the express language of the Court's opinion. *See, e.g., Students for Fair Admissions*, No. 21-1199, slip op. at 25 (noting all of the imprecision, overbreadth, and under breadth of racial categories utilized in the case) and slip op. at 39–40 (requiring that any benefit to an applicant "who overcame racial discrimination…must be tied to *that student's* courage and determination" and summarizing that a "student must be treated based on his or her experiences as an individual—not on the basis of race."); *see also supra* note 4 (citing the Court's admonition against obtaining indirectly what cannot be obtained directly). To the extent the non-binding Agency Guidance implies that a college or university may continue to animate its admissions decisions with a stated or unstated aggregate goal of racial diversity, such a course would seem to look past the applying individual and instead treat him or her as merely a statistic sorted based on the color of his or her skin. Such a path seems forbidden by the plain language of the high court both in *Students for Fair Admissions* and a portion of an earlier case it leaves undisturbed in part. *See Students for Fair Admissions*, No. 21-1199, slip op. at 18 (noting that Justice Powell's opinion in *Regents of University of California v. Bakke* while accepting diversity as a constitutionally permissible goal, rejected the use of express quotas or a prescribed number of seats for preferred ethnic groups in an admitted class). It is further the opinion of this office that the strategies offered in the Agency Guidance as recruiting and outreach practices that may be used to achieve diverse student bodies must be considered in light of the Court's opinion and must *not* be structured in such a way as to target students for recruitment based on race. Whether the non-binding Agency Guidance gets it right or wrong, the answer ultimately rests with the courts. UNC institutions reading the opinion so narrowly face the costly and time-consuming enterprise risk of being test cases on the national stage.

applying for admission.[13] Each campus should document these safeguards and training actions promptly.

6. DO NOT TREAT THE COURT'S ESSAY QUESTION SCENARIO AS AN EXCEPTION. Public response to the decision includes discussion of a hypothetical essay response that might reveal the applicant's hardship suffered because of, or inspired by, race.[14] Given the ready source of plaintiffs and the high cost of litigation[15], and the concurrences' failure to criticize the discussion as a poison pill in the Court's logic[16], the essay discussion likely is not an exception that swallows the rule.

   Instead, the Court's language—coupled with the broader cautionary language the Chief Justice follows it with[17]—might be better read only as an intellectually honest acknowledgment that an applicant's personal experience because of the applicant's race may shape or forge other race-blind attributes that bear directly on whether the applicant is best suited for admission. Things like grit, determination, humor, and drive are all traits—among countless others—that are the product of the experience unique to each of us, and the high court's dicta seems only to reinforce the need for individualized determinations that do not treat people or groups differently because of the color of their skin. Even if a campus does not read the essay question discussion so narrowly, admissions essay questions with leading questions, signaling favor to a particular viewpoint might implicate, and run afoul of, the Compelled Speech Policy codified at UNC Policy Manual Section 300.5.1(II)(A)(5) or State law.[18]

7. ENSURE NEW APPROACHES TO ADMISSIONS ARE NOT PROXIES FOR RACE. The Court's decision itself acknowledges that diversity of types other than race can be constitutionally-sound goals chosen by policy makers. But acceptable types of diversity must be race blind, and they cannot be proxies or pretexts to achieve racial targets prohibited by the *Students for Fair Admissions* decision's interpretation of the United States Constitution's equal protection principles. Diversity of geography; diversity of socioeconomic status; diversity in majors—the list of myriad qualities and attributes that admitting officers can consider is innumerable. In a vacuum, all may be laudable. Indeed, a fresh pursuit of geographic diversity from the whole State may

---

[13] *Students for Fair Admissions,* No. 21-1199, slip op. at 5–8 (Gorsuch, J., concurring) (warning of the racial classifications that rest on incoherent and unlawful stereotypes, stating that "[p]aid advisors, in turn, tell high school students of Asian descent to downplay their heritage to maximize their odds of admission….'If you're given an option, don't attach a photograph to your application[.]' ") (quoting Brief for Asian American Coalition for Education et al. as Amici Curiae 12–14, 18–19).

[14] *Id.* at 39.

[15] *See* Allie Reed, *Harvard's Affirmative Actions Row With Insurer Faces Skepticism*, BLOOMBERG LAW, June 7, 2023, https://news.bloomberglaw.com/insurance/harvards-affirmative-action-row-with-insurer-faces-skepticism ("Harvard must pay its lawyers more than $27 million for defending the university in a 2014 lawsuit from Students for Fair Admissions that [went] before the US Supreme Court."); *See Also* Adam Liptak, *Blunder in Affirmative Action Case May Cost Harvard $15 Million*, THE NEW YORK TIMES, Oct. 23, 2022, https://www.nytimes.com/2022/10/23/us/harvard-affirmative-action-litigation-cost.html.

[16] *Students for Fair Admissions*, No. 21-1199, slip op. at 1–58 (Thomas, J., concurring); *Students for Fair Admissions*, No. 21-1199, slip op. at 1–25 (Gorsuch, J., concurring); *Students for Fair Admissions*, No. 21-1199, slip op. at 1–8 (Kavanaugh, J., concurring).

[17] *Students for Fair Admissions*, No. 21-1199, slip op. at 39 (reasoning nothing in the opinion should be construed as prohibiting universities "from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise….But,….universities may not simply establish through application essays or other means the regime [the Court] holds unlawful today.").

[18] *See* Policy 300.5.1(II)(A)(5), *Political Activities of Employees*, UNC POLICY MANUAL, https://www.northcarolina.edu/apps/policy/doc.php?type=pdf&id=125 (section last amended Feb. 23, 2023). *See also* S.L. 2023-62 § 126-14.5 (prohibiting state government from compelling certain forms of employee speech).

honor—in a race-blind manner—the core mission of the University to serve all of North Carolina. However, any doubt as to whether the stated goal is a novel approach undertaken in good faith or is instead the proxy forecasted by the Chief Justice likely will subject a campus at least to threats of litigation and potentially years of both expensive discovery and attorneys' fees. Any campus seeking to foster race-blind forms of diversity should take care to deliberate thoughtfully about, and document well, the decision-making process and its implementation to remain well clear of fact-intensive allegations that the campus is doing indirectly what has been prohibited directly. Such inquiries will be costly and will only distract from the good work of the University.

8. CONSTRUE OPINION & DIRECTIVES REGARDING RACE TO INCLUDE ETHNICITY. Common parlance may use the terms race and ethnicity interchangeably more so than federal agencies or academics.[19] Indeed, there is commentary on why the two terms might not be synonymous.[20] However, distinguishing between the meaning of the two terms is beyond the scope of these directives. For purposes of implementing the Court's decision in *Students for Fair Admissions*, UNC campuses should presume the Court's logic prohibiting the use of race applies equally to the consideration of ethnicity. Both instances likely entail judging an applicant's individual suitability for admission based on stereotypical class-based assumptions about the actual or perceived genetic ancestry of the applicant. Both, therefore, likely must survive the exacting crucible established by *Students for Fair Admissions*.

9. CONSIDER THE DECISION'S EFFECT ON OTHER PRACTICES. It is likely that *Students for Fair Admissions*' holding and rationale will be extended to other instances where university actors use race in allocating university resources. Because the rationale of the decision could affect the award of scholarships and financial aid, campuses should begin to evaluate and assess any scholarship or aid programs that consider race in the award of the benefit, and the extent to which campus officials play a role in the award decision. Institutions should broadly consider how various University-sponsored programs are constituted and organized. Programs that offer opportunities for students based on race to the exclusion of others, who are not of the same race, may also be implicated by the Court's ruling. So, too, campuses should start evaluating whether they believe certain scholarships, aid, and campus programs are still permissible.

These directives will be updated as necessary.

---

[19] *See supra* n. 6.
[20] Harmeet Kaur, *The Differences Between Race and Ethnicity and Why They're So Hard to Define*, CNN, May 30, 2023, https://www.cnn.com/2023/05/30/us/race-ethnicity-difference-explainer-cec/index.html.

# EXHIBIT B

**The Mission of the University**

The admissions policies and practices of the University of North Carolina at Chapel Hill derive from and are aligned with the mission of the University. The University's mission statement confirms that the University "embrace[s] an unwavering commitment to excellence as one of the world's great research universities." The statement also observes "through the efforts of our exceptional faculty and staff, and with generous support from North Carolina's citizens, we invest our knowledge and resources to enhance access to learning and to foster the success and prosperity of each rising generation." Additionally, the mission statement provides that we "extend knowledge-based services and other resources of the University to the citizens of North Carolina and their institutions to enhance the quality of life for all people in the State."

**UNC System Office Policies on Undergraduate Admissions**

The University of North Carolina at Chapel Hill, a constituent institution of the UNC System, is subject to the provisions of the UNC System's Policy Manual. The Policy Manual provides in section 103 that:

> Admission to, employment by, and promotion in the University of North Carolina and all of its constituent institutions shall be on the basis of merit, and there shall be no unlawful discrimination against any person on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, age, disability, genetic information, or veteran status.

Additionally, in section 700.1.1.1[R], the Policy Manual sets forth minimum eligibility requirement for undergraduate admissions to UNC System schools, including UNC-Chapel Hill. These requirements address prerequisite courses, minimum grade point averages and test scores, and relevant exemptions.

**Trustee Policy on Undergraduate Admissions**

The Board of Trustees' policy on admissions establishes a framework of competitive admissions and mandates that candidates be selected largely on the basis of the University's "special responsibility to residents of North Carolina" and its "judgment of the applicant's relative qualifications for satisfactory performance" in the program to which the applicant seeks admission. At the same time, this policy explicitly states that these two broad selection criteria:

> ... shall not prevent the admission of selected applicants (a) who give evidence of possessing special talents for University programs requiring such special talents, (b) whose admission is designed to help achieve variety within the total number of students admitted and enrolled, or (c) who seek educational programs not readily available at other institutions.

The policy goes on to frame this interest in variety as an affirmation of the University's "commitment to achieve excellence, to provide for the leadership of the educational, governmental, scientific, business, humanistic, artistic, and professional institutions of the state and nation, and to enrich the lives of all the people of North Carolina."

1

For admission to the first-year or freshman class, the policy specifies several criteria including" satisfactory evidence of scholastic promise" gleaned from the applicant's academic record, recommendations, test scores, and application. For admission to the transfer class, criteria include "a satisfactory academic record on work undertaken in all other institutions attended, satisfactory recommendations from institutions previously attended, and eligibility to return to all previously attended institutions of higher education."

**Guidance of the Advisory Committee on Undergraduate Admissions**

The Advisory Committee on Undergraduate Admissions serves in an advisory capacity to the director of undergraduate admissions. The committee is charged with addressing the design and application of admissions policy, recommending guidelines for the review of candidates who possess special talent, and monitoring the national college admissions environment. The committee includes deans and faculty from across the University.

Pursuant to its charge, the committee has defined procedures designed to help the University achieve its mission by affording each candidate a series of individualized evaluations. These individualized evaluations aim to draw together students who will enrich each other's education and strengthen the campus community. In so doing, they help the University achieve its broader mission.

**The Evaluation Process**

In keeping with principles established by the Advisory Committee, the Office of Undergraduate Admissions assigns no fixed weights or points to any specific parts of the application for admission, reviews each applicant in the context of their school, community, and experiences, and it uses no formula to assess the students who have applied. With the exception of the 18-percent limit on out-of-state enrollment in the first-year class, there are no quotas of any kind. Applications are read over a period of roughly six months by approximately sixty evaluators who collectively form the admissions committee.

We will review each applicant individually, considering each applicant's unique ability to contribute to the University based on the individual's lived experience. This includes not just academic and extracurricular achievements and potential, but also the context within which achievements have been realized and potential forged. Through these reviews, we aim to admit a smart and caring group of students whose collective strengths and varied experiences will foster excellence within the University community, enhance the education of everyone within it, and help the University achieve its mission.

Each application is assigned to one of these committee members. The committee member reads the application, assesses the applicant across specified attributes, formulates an opinion about whether the student should be admitted based on the totality of information in the applicant's record, and adds a comment defending his or her recommended decision. If the committee member determines that a second thorough review of the application is warranted, the application will receive a second review by a senior member of the committee. When opinions differ on the recommended decision, the decision of the more experienced, second reviewer will be entered as

2

the preliminary decision. Prior to the release of decisions, each decision receives a final review. Committee members are instructed to approach each application with an open mind, seek first to understand the individual student, and take into account the many qualities that we seek in each entering class.

Once all candidates have been reviewed and preliminary decisions entered, the admissions committee uses a statistical model to predict the number of spaces in the entering class that are likely to be filled by the students who have been earmarked provisionally for admission. After comparing this predicted enrollment to the total number of spaces available for the entering class, the committee may need to fine-tune the number of admitted students and then reevaluate applications. If applications need to be reevaluated, that reevaluation is conducted by one or more senior members of the admissions committee.

Throughout these many evaluations, members of the admissions committee are expected to exercise their judgment as educators and to make cases for the admission of individual candidates who they believe will contribute substantially to the scholarly community at Carolina and to the achievement of the University's mission. As the Trustee policy stipulates, committee members are charged with assessing each candidate's "relative qualifications for satisfactory [academic] performance." In keeping with policies and procedures established by the Advisory Committee, admissions committee members are also explicitly and repeatedly encouraged to base their recommendations on everything they know about candidates rather than on one or two criteria. They are also strongly encouraged to seek out students who would bring an interesting or unusual talent, perspective, or set of life experiences that might enhance the experience of their fellow students and faculty.

**Academic Indicator, Personal Qualities, and other Factors for Evaluation**

In order to build a class that supports the mission of the University and honors the direction set by University leadership, the Board of Governors, the Board of Trustees, and the Advisory Committee on Undergraduate Admissions, the Admissions Committee and evaluators review applications for several factors beyond academic indicators.

Specifically, in reviewing the academic preparedness and strength of candidates, evaluators are asked to consider many factors, including:

- **Academic performance criteria:** individual grades, grade-point average, rank in class, trends in grades, and patterns in grades, all viewed within the contexts of the entire applicant pool and the student's high school and any previously attended post-secondary institutions.
- **Academic program criteria:** rigor, breadth, and pattern of courses taken, all viewed within the context of the entire applicant pool, and the student's high school and any previously attended post-secondary institutions.
- **Character Traits:** Applicants are also reviewed and evaluated on several personal qualities including:
  - Character: Integrity and kindness
  - Courage: overcoming obstacles or setbacks, building bridges across divisions, advocating for others
  - Creativity: Intellectually adventurous and or brilliant, original thought
  - Curiosity

3

- Exceptional achievement
- Impact: on school, others or broader community
- Initiative, drive, self-motivation and determination
- Leadership
- Openness to new cultures and new or opposing ideas

- While these are qualities we seek in all applicants, not every candidate is expected to excel in every quality, and applicants with various strengths will enhance the overall student body

- **Essay criteria:** evidence of self-knowledge and reflection; idea, organization, voice, vocabulary, sentence structure and grammar; insightfulness; unique or unusual perspectives.
- **Extracurricular activity criteria:** demonstrated capacity for leadership; engagement outside the classroom; impact or contributions to family, school, and community; persistence of commitment; work history; unique or unusual interests.
- **Letter of Recommendation:** outside perspective from a teacher or other who knows the applicant well and can supply additional context which the student may not have supplied or which the applicant struggles to highlight, specific examples of contributions to the classroom and community, and academic strengths and passions.
- **Standardized testing criteria:** results from the SAT or ACT when available, Advanced Placement, and International Baccalaureate exams, as well as occasional results from state-mandated end-of-course exams, all viewed in light of the documented strengths and limitations of these tests, for all first-year and sophomore transfer candidates.
  **Special talent criteria:** in music, drama, and athletics.

**Consideration of Individual Context**

In consideration of all these factors – including academic performance and potential, extracurricular activities, and demonstrated personal qualities – evaluators will strive to understand the applicant's background and the context of their school and community. Evaluators take into account their understanding of the opportunities and obligations each applicant experienced in the ratings and consideration of each individual. Admissions evaluators may use knowledge of a high school or community, information from College Board's Landscape tool, information from NC Department of Public instruction, or similar information to strengthen their understanding of context. Context and opportunity may also be gleaned from essays, the application, or letters of recommendation.

**Socioeconomic Status and Geographic Variety**

Following the belief that talent and ability are found across North Carolina and beyond, regardless of an applicant's financial background or means, the University works to attract and retain students from across the socioeconomic spectrum. This is a critical component of the institution's obligation to the State of North Carolina and indeed to the nation. Similarly, the University seeks to enroll students from across North Carolina, while exposing North Carolina students to classmates from

4

around the nation and world.  As with other criteria considered by the admissions committee, relative disadvantage is assessed in ways that are both flexible and individualized, and considered as part of the overall circumstances in which each student's achievements and potential are evaluated.

**No Consideration of Race**

Consistent with the U.S. Supreme Court's decision in Students *for Fair Admissions, Inc. v. The University of North Carolina,* the University does not consider race as a factor when making admissions decisions This means that the admissions committee does not award any form of a "tip," "plus" or any other benefit or advantage to any applicant based upon the applicant's race at any stage of the admissions process. The admissions committee also does not use the admissions process to perform racial balancing or to pursue racially defined goals, including, for example, mirroring the racial demographics of the State of North Carolina. While the admissions application may request that students volunteer their racial identity, this information is blinded to anyone involved in the admissions process and is used only for federal reporting purposes and to learn about the demographics of the admitted class once the admissions cycle is complete. To the extent a student's essays or recommendation letters highlight an applicant's racial identity as part of a discussion of the applicant's lived experience, the admissions committee may consider that information only to the extent that such experience is connected to a race-neutral achievement, character trait, or other evaluation criteria that the admissions committee credits for any applicant – regardless of race – and that does not operate as a proxy for race.

The Admissions Committee's race-neutral approach to considering candidates for undergraduate admission is further guided by the Board of Trustees of the University of North Carolina at Chapel Hill Resolution Concerning Civil Rights and the UNC System Directives Regarding Implementation of the Students for Fair Admissions Decision. The Board of Trustees Resolution provides that:

> The University shall not unlawfully discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin, religion, sexual orientation, gender identity, age, disability, genetic information, or veteran status in its admissions, hiring and contracting; and
>
> . . . .
>
> The University shall not "establish through application essays or other means" any regime of or encourage heuristics and/or proxies premised upon race-based preferences in hiring or admissions. If the University considers the personal experience of applicants for admission, each applicant "must be treated based on his or her experiences as an individual – not on the basis of race."

The UNC System Directives instruct that constituent institutions must, among other requirements:

- Eliminate written policies and unwritten practices on consideration of race;
- Move aggressively toward race-blind applications;
- Prohibit pursuit of aggregate targets of racial composition;
- Not treat essays as an exception to the prohibition on consideration of race;
- Ensure new approaches to admission are not proxies for race; and
- Consider the U.S. Supreme Court decision and directives regarding race to include ethnicity.

5

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNIVERSITY OF NORTH CAROLINA, et al.,<br><br>    Defendants. | Civil Action No. 1:14-cv-954-LCB-JLW |

## **[PROPOSED JUDGMENT]**

IT IS ORDERED, ADJUDGED, AND DECREED that judgment is hereby entered in favor of Plaintiff Students for Fair Admissions, as follows:

UNC-Chapel Hill's consideration of race as a factor in undergraduate admissions shall be governed by the majority decision of the United States Supreme Court in this case.

Dated: November __, 2023

                                                                        _____
                                                                         The Honorable Loretta C. Biggs
                                                                          United States District Judge